UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| In re FLUENCE ENERGY, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 1:25-cv-00444-PTG-IDD<br><br>__CLASS ACTION__ |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) ) ) ) | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br>__DEMAND FOR JURY TRIAL__ |

4932-2928-2126.v2

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF THE ACTION ...................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................7

III.    PARTIES .................................................................................................................8

IV.     BACKGROUND ...................................................................................................11

V.      FLUENCE'S BATTERY STORAGE SYSTEMS WERE NOT READY FOR THE MARKET THROUGHOUT THE CLASS PERIOD ................................................13

        A.      Former Fluence Employees Explain that Fluence's Gen 6 Systems Were Not Ready for the Market During the Class Period ................................................13

        B.      Fluence's Project Installations Reveal that Fluence's Gen 6 System Was Not Ready for the Market During the Class Period ................................................16

        C.      Diablo Energy Storage ....................................................................................16

        D.      High Desert .....................................................................................................19

        E.      Siemens Energy, Inc. .......................................................................................20

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING  STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD .....................................23

VII.    FLUENCE'S CLASS PERIOD MD&A'S FAILED TO DISCLOSE KNOWN TRENDS AND UNCERTAINTIES THAT WERE LIKELY TO ADVERSELY AFFECT ITS FINANCIAL CONDITION, RENDERING DEFENDANTS' STATEMENTS MISLEADING HALF-TRUTHS .........................................................55

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ......................................................59

        A.      The Fraud Involved Fluence's Core Operations ....................................................60

        B.      Defendants Were Aware that the Gen 6 Systems Were Not Fully Tested Before Their Release to Market ..................................................................................64

        C.      The Individual Defendants' Public Statements Support a Strong Inference of Scienter ..........................................................................................................65

        D.      Fluence Experienced Suspiciously High Executive Turnover at Suspicious Times During the Class Period ....................................................................................66

        E.      AES' Financial Benefit from the Fraud Supports a Strong Inference of Scienter ..........................................................................................................67

IX.     NO SAFE HARBOR ............................................................................................67

- i -

4932-2928-2126.v2

**Page**

X.     APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE
       MARKET ...........................................................................................................68

XI.    LOSS CAUSATION/ECONOMIC LOSS ..........................................................69

       A.     February 9, 2022 Disclosure ..................................................................70

       B.     December 20, 2023 Disclosure ...............................................................71

       C.     February 22, 2024 Disclosure ................................................................73

       D.     November 25, 2024 Disclosure...............................................................74

       E.     February 10, 2025 Disclosure ................................................................75

XII.   CLASS ACTION ALLEGATIONS ...................................................................77

COUNT 1...........................................................................................................................78

COUNT II..........................................................................................................................79

XIII.  PRAYER FOR RELIEF .....................................................................................80

XIV.   JURY DEMAND .................................................................................................81

- ii -

Lead Plaintiff Erste Asset Management GmbH ("Erste AM" or "Plaintiff"), by and through Plaintiff's undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls, and United States Securities and Exchange Commission ("SEC") filings, press releases published by Fluence Energy, Inc. ("Fluence" or the "Company"), analysts' reports about the Company, court filings, interviews with former employees, and information readily obtainable on the internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   This is a securities fraud class action brought on behalf of all purchasers of Fluence Class A common stock ("Fluence stock") between October 28, 2021 and February 10, 2025, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Fluence and certain of the Company's senior executives and directors and its controlling shareholder.

2.   Fluence, a company that specializes in energy storage, was launched as a joint venture between AES Corporation and AES Grid Stability, LLC (collectively, "AES") and Siemens Industry, Inc. ("Siemens Industry") in January 2018 "to address gaps in the utility-scale energy storage market."  The Company's former President and Chief Executive Officer, Stephen Coughlin ("Coughlin"), stated that Fluence was formed to fill a gap in the market as the founders "'saw customers struggling to find a trusted technology partner with deep knowledge of the power sector

- 1 -

4932-2928-2126.v2

and the ability to deliver an industrial grade solution they could count on to be there in the future.'"[1] Moreover, Coughlin bragged that "'[w]ith a team drawn from both Siemens and AES, we are fluent in the power sector and bring the capabilities, global reach and experience to make sure our customers achieve the full value of storage.'"[2]  In the Fall of 2021, based on this promise of trust, industry knowledge, and reliability, Fluence took the Company public via an initial public offering ("IPO") and pursuant to an amended registration statement filed with the SEC on October 19, 2021 ("IPO Registration Statement").  Defendants sold investors on the story of the Company's ability to deliver scalable, configurable, and cost-effective energy storage systems to fit standard and customer-specific uses through its latest, sixth-generation iteration of its battery storage system products (collectively, "Gen 6").  Fluence claimed that the Gen 6 "Tech Stack" "is the foundation of our energy storage products."  When Fluence began installing its first Gen 6 systems in early 2022, defendants reported on ten purportedly "successful" installations and identified two of its major "mega site installations" in California by name.  And although defendants reported on what Fluence vaguely described as "cost overruns" associated with its initial Gen 6 system installations, they blamed the issues predominantly on COVID-19, and assured investors that Fluence had resolved the issues going forward.

3.      Yet, unbeknownst to investors, its Gen 6 systems, the "foundation of [Fluence's] energy storage products," were not ready to be released to the market.  Although Fluence claimed that its Gen 6 systems were "buil[t] upon 13 years of development . . . reflecting ***ongoing*** . . . ***design improvements***," the truth is that the Gen 6 systems were not fully designed and tested to meet customer specifications.  Despite this, Fluence delivered and installed these systems anyway in order

---

[1]      Sonal Patel, POWER, AES and Siemens, Two Power Giants Join Forces on Energy Storage, Jan. 11, 2018, https://www.powermag.com/aes-and-siemens-two-power-giants-join-forces-on-energy-storage/.

[2]      *Id.*

4932-2928-2126.v2

to recognize revenue and avoid penalties for failing to meet contractual obligations.  In addition, Fluence installed systems with modifications that were not approved by customers, including modifications as major as installing entirely different systems than what customers had contracted to buy.  As a result, Fluence installed systems that failed to deliver under their contracts with customers.  For example, Fluence's contracts generally required its products to produce approximately 97% of the contracted megawatt-hour ("MWh") capacity (*i.e.*, availability rate), but availability at many sites was closer to 80%.[3]  These and other issues resulted in Fluence accruing liquidated damages from the moment the Gen 6 sites went live.  Further, despite Fluence's description of cost overruns as "temporary," Fluence incurred significant costs (sometimes in the tens of millions of dollars) to get availability back to contracted levels, and to remedy other installation and design issues to get the systems to perform as contracted.  These efforts took as long as a year or more, and even then, the systems did not always deliver to contracted specifications.

4.    Despite being repeatedly notified by customers of its defective installations, including at its "mega" sites, Fluence failed to adequately address product defects and installation errors or to honor outstanding warranty obligations, all while highlighting for investors its skill and success with project execution.  Additionally, defendants concealed that Fluence's battery energy storage systems' ("BESS") installation and commissioning issues – and Fluence's unwillingness or inability to resolve these issues – seriously damaged Fluence's relationships with customers.  Indeed, before the Class Period, Fluence was engaged in an undisclosed dispute with Siemens Energy, Inc. ("Siemens Energy"), an affiliate of Fluence's corporate parent, over Fluence's installation of a BESS

---

[3]    In this context, a megawatt ("MW") refers to the power capacity that an electrical system can produce at any given moment, and MWh refers to how much electricity an electrical system delivers over an hour.

4932-2928-2126.v2

that failed to meet contractual specifications.[4]  As a result of these issues, it was much less likely that Fluence's customers would sign long-term service agreements, contract with Fluence for expansions of existing projects, or enter into contracts for new projects.  Instead, unhappy customers were seeking to hold the Company responsible for its breaches of contract.

5.      Because defendants concealed this information from investors, Fluence's stock prices were artificially inflated throughout the Class Period.  Defendants capitalized on the inflated price of Fluence stock in 2021 and again in 2023.  On or about October 28, 2021, Fluence sold 31 million shares of its stock in the IPO at $28 per share for proceeds of $868 million.  As discussed more *infra*, by this point, Fluence knew, but concealed from investors, that (i) Fluence was already months behind substantial completion deadlines for one of its first Gen 6 mega-installations for Diablo Energy Storage, LLC ("Diablo") (the "Diablo Project");[5] and (ii) Siemens Energy, an affiliate of Fluence's own corporate parent, had already demanded that Fluence pay Siemens Energy over five million dollars in costs on another Gen 6 installation.  On December 8, 2023, Fluence again tapped the markets, conducting a registered secondary public offering ("SPO") that enabled the Company's largest shareholders, including defendant AES and Siemens Industry, to collectively sell 18 million shares of Fluence stock at approximately $22 per share for proceeds of nearly $400 million at artificially inflated prices.

6.      Then, ***less than two weeks after the Company conducted its SPO***, the truth about Fluence's inability to deliver a BESS in compliance with contractual specifications (*i.e.*, a working BESS delivered on time that did not require months of additional work and significant additional

---

[4]      Siemens Energy, Inc. is a trademark licensed by Siemens AG, the same company of which Siemens Industry, Inc., is an indirect subsidiary.

[5]      The Diablo Project is a BESS system located near Pittsburg, CA, which was commissioned in approximately January or February 2022.

costs) – and the risk that these issues would negatively impact Fluence's reputation and cause Fluence to lose business – began to be revealed through a series of partial corrective disclosures.

7.      First, on December 20, 2023, *Energy Storage News* published an article focusing investors' attention on litigation between Diablo and Fluence (the "Diablo Litigation"). The article reported that Fluence's work on the Diablo Project had suffered from a "litany of 'defects, deficiencies, and failures.'" The article detailed several alleged defects and chronic failures that plagued the Diablo Project, including, *inter alia*, that: (i) Fluence's project control system responded slowly or inaccurately, causing California's system operator to temporarily remove the project from the service markets; (ii) Fluence's proprietary systems failed to function properly, requiring project owners to resort to alternative technologies not designed for that purpose, resulting in costly inefficiencies; (iii) Fluence's inverters failed 27 times within a short one-month period, just two months after project delivery; and (iv) the occurrence of two arc flashes (electrical explosions caused by an electrical fault) created the risk of serious harm and injury. Beyond these significant defects, the article revealed that Fluence had delivered the Diablo Project approximately eight months after it was contractually due and repeatedly failed to timely address and resolve related warranty claims. On this news, the price of Fluence stock fell precipitously, from $27.22 per share on December 19, 2023 to $23.01 per share on December 20, 2023, a decline of approximately 15%.

8.      Fluence promptly denied the information revealed by the *Energy Storage News* article, and concealed from investors that the same issues present at the Diablo Project affected several other sites, including another "mega site" at High Desert located in San Bernardino County in California (the "High Desert Project") as well as the BESS project in Antioch, California for Siemens Energy (the "Siemens Energy Project"). On December 20, 2023, Fluence issued a press release stating that it "[stood] by its [w]ork on the Diablo Plant, and [would] [v]igorously [p]ursue the [p]ayments it [was] [o]wed." And during a February 8, 2024 conference call, defendant Julian

- 5 -

Nebreda represented that the Diablo Project was "performing very well and has delivered availability or uptime above its contractual requirement during 2023." Fluence's statements denying the information in the *Energy Storage News* article prevented the full truth of Fluence's installation issues from being revealed to the market, maintaining an artificially high stock price.

9.    On February 22, 2024, analysts at Blue Orca Capital published a report (the "Blue Orca Report") revealing that the Diablo Project was not a one-off situation, but in fact Siemens Energy had also filed a counterclaim against Fluence for breach of contract, fraud in the inducement, and fraudulent omission in connection with the Siemens Energy Project (the "Siemens Litigation"). Siemens Energy's counterclaim revealed that Fluence had unilaterally altered the design of the project originally proposed without consulting Siemens Energy. On this news, the price of Fluence stock declined from $17.01 per share on February 21, 2024 to $14.73 per share on February 22, 2024, a decline of more than 13%.

10.    Fluence denied the information in the Blue Orca Report, describing the Siemens Litigation as "immaterial" in both amount and significance, and noted that "Siemens AG and its German retirement fund are investors in Fluence." Fluence's statements denying the information in the Blue Orca Report prevented the full truth of Fluence's execution issues from being revealed to the market, maintaining the Company's artificially high stock price.

11.    The truth about Fluence's performance failures further manifested itself in a sharp decline in the Company's revenue prospects. On November 26, 2024, Fluence hosted an earnings call to report on its financial results for its fourth fiscal quarter and full year 2024 (the "4Q24 Earnings Call"). During the call, defendant Ahmed Pasha revealed that Fluence's fiscal 2025 revenue would be severely "back-end loaded," with the Company recognizing an extraordinary 80% of all revenues during the second half of fiscal 2025. On this news, the price of Fluence stock fell

- 6 -

4932-2928-2126.v2

from $23.50 per share on November 25, 2024 to $18.37 per share on November 27, 2024, a decline of approximately 22%.

12. The truth about the Company's performance failures was finally and fully revealed on February 10, 2025, when Fluence issued a press release to report its financial results for the Company's first quarter in fiscal 2025 (the "1Q25 Release"). Fluence stunned investors by announcing that it was reducing its fiscal 2025 revenue guidance by approximately $600 million due in part to "'customer-driven delays'" in executing outstanding contracts. In response, the price of Fluence stock fell more than 52% over a three-day trading period.

13. As a result of defendants' misconduct alleged herein, Plaintiff and members of the Class purchased Fluence stock at artificially inflated prices and/or artificially maintained prices and suffered significant damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

15. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

16. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Fluence is headquartered in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

17. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

- 7 -

4932-2928-2126.v2

### III.    PARTIES

18.    Plaintiff Erste AM is an Austrian asset management company with billions of Euros of assets under management.  Erste AM purchased Fluence's publicly traded Fluence stock during the Class Period and has been damaged thereby, as set forth in its certification filed on May 12, 2025.  *See* ECF 35-1.

19.    Defendant Fluence is a global provider of energy storage products and services and digital applications for renewable energy and storage.  Fluence is a holding company and conducts all of its business through Fluence Energy, LLC.  The Company is headquartered in Arlington, Virginia.  Fluence stock is listed on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "FLNC."   When the Class Period started on October 28, 2021, the Company had approximately 450 employees.

20.    Defendant Manuel Pérez Dubuc ("Pérez") served as Fluence's Chief Executive Officer ("CEO") from May 2020, and as a member of the Company's Board of Directors ("Board") from October 2021, until his departure from the Company in August 2022.  Prior to his role on the Board and as CEO, defendant Pérez served as Senior Vice President of Global Renewables at AES, and as President of AES's subsidiaries in South America, Mexico, Central America, the Caribbean, China, and North Asia.

21.    Defendant Dennis Fehr ("Fehr") served as Fluence's Chief Financial Officer ("CFO") from at least September 2021 until his departure from the Company in September 2022.  Prior to serving as CFO of Fluence, defendant Fehr served as CFO of Fluence Energy, LLC since January 2018.

22.    Defendant Julian Nebreda ("Nebreda") has served as Fluence's President and CEO from September 2022, and as a member of the Company's Board since September 2021.  Prior to his

4932-2928-2126.v2

role as President and CEO, defendant Nebreda held various executive and senior positions within AES, and also served as chairman of the board of AES's subsidiaries in Chile and Brazil.

23.    Defendant Manavendra Sial ("Sial") served as Fluence's Senior Vice President and CFO from September 2022 until his departure from the Company in December 2023.

24.    Defendant Ahmed Pasha ("Pasha") has served as Fluence's Senior Vice President and CFO since January 1, 2024.  Prior to his role as CFO, defendant Pasha worked for AES for nearly 30 years, holding various executive and senior positions, including CFO of AES's United States Utilities and Conventional Generation business.

25.    Defendant Rebecca Boll ("Boll") served as Fluence's Senior Vice President and Chief Product Officer from June 2020 until her departure from the Company in January 2025.

26.    Defendants referenced above in ¶¶20-25 are referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "Defendants."

27.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, client relations, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

28.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's

- 9 -

4932-2928-2126.v2

operations, business, services, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of Fluence stock would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     Because of their positions of control and authority as officers and/or directors of the Company, the Individual Defendants were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

30.     Defendant AES Corporation ("AES Corp.") is a global energy company that operates utilities and power generation facilities. Defendant AES Corp. is headquartered in Arlington, Virginia.

31.     Defendant AES Grid Stability, LLC ("AES Grid Stability") is an indirect subsidiary of defendant AES Corp.

32.     Prior to and leading up to the Class Period, AES owned 100% of Fluence's outstanding Class B-1 common stock, providing it with approximately 71.8% of the combined voting power of all Fluence stock. Accordingly, Fluence was considered a "controlled company" under NASDAQ rules. In addition, AES entered into a stockholders' agreement with the Company, pursuant to which AES had the right to appoint three directors to the Board and provided AES with

- 10 -

certain rights and privileges not available to outside shareholders.  AES oversaw the Company and exerted influence over its management as a controlling shareholder.  For example, AES caused Fluence to hire Nebreda as CEO (who was previously an executive at AES) and Sial and Pasha as CFO.  Numerous directors of Fluence were also affiliated with AES during the Class Period, including Ricardo Falu (Senior Vice President and Chief Strategy and Commercial Officer at AES); Tish Mendoza (Senior Vice President and Chief Human Resources Officer at AES); and John Christopher Shelton (Senior Vice President and Chief Product Officer of AES).

## IV.    BACKGROUND

33.    Fluence is a global provider of battery-based energy storage products, services, and artificial intelligence-enabled digital applications for renewable energy storage.  Fluence is a holding company and conducts all of its business through Fluence Energy, LLC.  Fluence Energy, LLC was established in 2018 as a joint venture between AES and Siemens Industry, an indirect subsidiary of Siemens AG.  Fluence's customers include utilities, developers, independent power producers, and commercial and industrial customers.  In October 2021, AES and Siemens took Fluence public in the IPO.

34.    Fluence's energy storage products are based upon the Company's technology stack that it claims is comprised of factory-built hardware, a proprietary edge-based control platform, and digital applications that optimize electrical market bidding for storage assets.  The hardware component of Fluence's sixth-generation technology stack consists of a modular 8'x8'x8' building block called the "Cube" that houses batteries and other components.

35.    During the Class Period, Fluence offered energy storage products that it claimed were specifically designed to address common customer use cases.  The products each varied in scale and application.  The Company's "Gridstack" solution, for example, was Fluence's industrial-strength energy storage product intended to meet large grid-scale demands.  By contrast, Fluence's

"Edgestack" product was intended for smaller commercial applications.  These energy storage products included varying numbers of Cubes, as well as inverters, control systems, and other components necessary for the entire system to function.

36.    Fluence generates the vast majority of its revenues from the provision of energy storage solutions, primarily to a highly concentrated customer base.  For example, Fluence's five largest customers represented approximately 76% and 77%, respectively, of its revenues during its 2021 and 2022 fiscal years.[6]  In fiscal year 2023, Fluence generated approximately $2.2 billion in revenues from the sale of energy storage products, while the Company's other businesses (*i.e.*, services and digital applications) collectively generated only $20 million.  As part of its provision of energy storage products, Fluence also provides design, engineering, installation, and commissioning services, and purports to allow its customers to select from the full range of project design to complete installation.

37.    Since its inception, Fluence has relied significantly on AES and Siemens Industry for financial and operational assistance.  Through various agreements between Fluence and its corporate parents, Fluence has historically obtained access to, *inter alia*, critically needed support services, including intellectual property licenses, established sales organizations and customer relationships, equipment supplies, and credit support.  Notably, both AES and Siemens Industry entered into purchase agreements with Fluence, requiring them to purchase energy storage equipment (and related services) from Fluence under preferred purchasing conditions.  In fiscal year 2022, approximately 54% of Fluence's nearly $1.2 billion in reported revenue was derived from related parties, primarily AES.  During fiscal years 2023 and 2024, Fluence's two largest customers represented approximately 49% and 50%, respectively, of its revenues.

---

[6]    Fluence's fiscal year ends on September 30 of the calendar year.  For example, Fluence's fiscal 2023 ended on September 30, 2023.

- 12 -

V.    **FLUENCE'S BATTERY STORAGE SYSTEMS WERE NOT READY FOR THE MARKET THROUGHOUT THE CLASS PERIOD**

A.    **Former Fluence Employees Explain that Fluence's Gen 6 Systems Were Not Ready for the Market During the Class Period**

38.    CW-1[7] worked for Fluence in a variety of roles from approximately September 2021 to August 2024.  CW-1 began his employment at Fluence as a regional field service engineer, and later became a regional senior service engineer, and then worked as a network and controls engineer through the rest of his tenure.  CW-1 reported to Fluence's Director of Services and Director of Network Software Development.  CW-1 worked remotely, but would often visit project sites he worked on, including Diablo, High Desert, and Copperhead.  CW-1's responsibilities included running product issues to ground for these and other project sites.  CW-1 stated that he worked as an engineer on the first Gen 6 system to come to market in the United States ("U.S.").

39.    CW-1 worked on both the Diablo Project and an early Gen 6 installation called the High Desert Solar Project ("High Desert Project").  CW-1 stated that the Diablo Project was commissioned in approximately January or February 2022.[8]  But, when it was commissioned, it was not ready to perform per Diablo's specifications.

40.    CW-1 also stated that the High Desert Project was commissioned in approximately December 2021, and that it was not ready to meet High Desert's specifications from the time it was released.  CW-1 also stated that when the High Desert Project was released, it was only at 82% availability, when the contract specified 97% availability, as was the case in most Fluence battery storage system contracts.  Additionally, Fluence engineers worked on the project for approximately a year to remedy these and other issues, but the system still did not perform as specified in the

---

[7]    References to "CW" are to confidential witnesses alleged herein.  The pronouns "he" or "him" are used for anonymity purposes.

[8]    The term "commissioned" refers to the step in the BESS project when construction and installation is finished, and the customer takes control of the system and it is released to the market.

4932-2928-2126.v2

contract. CW-1 stated that even after this approximate year of work, the system was still only able to produce 50 megawatts for three to three and a half hours, not the four hours for which it was designed.

41. CW-1 was also familiar with customers' reactions to the failures and challenges Fluence experienced with its energy storage customers. Specifically, CW-1 stated that High Desert was upset with Fluence and felt that it did not get what it paid for. CW-1 also stated that he worked on a project called the Copperhead Solar & Storage Project ("Copperhead Project") in Falls County, Texas. The Copperhead Project was supposed to use a version of the Gen 6 product updated from the initial rollout. Fluence's customer for the Copperhead Project was National Grid Renewables, LLC ("National Grid"). CW-1 stated that National Grid had also partnered with Fluence for a Gen 6 project called Azure Sky, which was commissioned shortly after the High Desert Project and Diablo Project. According to CW-1, the Azure Sky project experienced similar issues to those described below at the Diablo Project and the High Desert Project, and National Grid was so dissatisfied with Fluence's performance on Azure Sky that it decided not to expand on the Copperhead Project with Fluence, even though the Copperhead Project was supposed to use an updated version of Fluence's Gen 6 system.

42. CW-2 worked within the product organization at Fluence between 2020 through 2022. CW-2 was personally involved in product discussions and business reviews with executive management, directing cost reduction initiatives, and delivering to customers their desired specifications for each product. CW-2's responsibilities involved speaking directly with members of the executive management team including but not limited to defendant Boll, the Company's CFO, the Company's head of sales, and the Company's head of North American Sales about issues with Fluence's Gen-6 product.

- 14 -

43.     According to CW-2, Fluence delivered its Gen 6 products to its customers before the entire systems were fully tested.  CW-2 stated that the individual components of the systems had been tested, but the systems as a whole had never been tested before the initial Gen 6 products were released to customers.  This meant that Fluence's customers who received the initial Gen 6 systems received systems that had never been fully tested for customer use.  According to CW-2, Fluence was motivated to deliver these Gen 6 systems to customers even though the systems were not fully tested because Fluence had signed contracts with customers to deliver systems by certain dates, and to Fluence, the contractual penalties for missing these deadlines outweighed the need to fully test the Gen 6 products.

44.     CW-2's responsibilities also involved communicating with and working with Dax Kepshire ("Kepshire"), Fluence's Vice President of Engineering and Project Management, Americas, during the Class Period.  According to CW-2, by sometime within 2022, after the initial rollout of Gen 6 energy storage systems, Kepshire drafted and sent a memorandum to the executive management team describing issues with the initial rollout of the Gen 6 product.  CW-2 stated that they knew this memo was sent to the executive team because while CW-2 was not included on the email sending this memo to the executive team, someone forwarded the memo to CW-2 after it was sent to the executive team.

45.     Additionally, according to CW-2, sometime by 2022 after the initial rollout of Fluence's Gen 6 products, defendant Boll organized the commissioning of a new test facility outside of Pittsburgh, Pennsylvania.  The purpose of the test facility was to conduct "system-level" tests of Fluence's Gen 6 products so that the Gen 6 products would actually be tested as full systems before being released to customers.  According to CW-2, defendant Boll wanted this test lab because she knew that Fluence had never tested the Gen 6 products at a system-wide level before their initial rollout and wanted to make the product ready for customer use.

- 15 -

**B.      Fluence's Project Installations Reveal that Fluence's Gen 6 System Was Not Ready for the Market During the Class Period**

46.      When the Company went public in September 2021, the newest models of its battery storage systems, the Gen 6 products, were not ready to meet Fluence's customers' specifications. But Fluence delivered and installed these systems anyway to recognize much-needed revenue and avoid contractual penalties.  Similarly, Fluence installed systems with unapproved modifications with the Company sometimes even providing systems entirely different than what the customer contracted for.  As a result, the systems that were installed were either incapable of providing, or not ready to provide, the services that Fluence's customers had contracted for.  Fluence, the customer, or both, engaged in lengthy and costly efforts to remedy these situations and salvage the projects.  Such efforts took as long as a year or more, and undermined the Company's relationships with its customers, sometimes resulting in litigation.

47.      Below are examples of Fluence's failures to deliver and install battery storage systems that met its customers' specifications both before and during the Class Period.  These examples demonstrate that the battery storage system failures and defects were widespread.

**C.      Diablo Energy Storage**

48.      The first installations of Fluence's Gen 6 products demonstrated that the products were not ready for the market.  One of the first Gen 6 systems that Fluence released to the market in the U.S. was for Diablo.  The Diablo Project was commissioned in approximately January or February 2022, a few months after Fluence's IPO.  According to the Diablo Litigation, the Diablo Project was designed to have a storage capacity of 955 MW and a discharge capacity of 200 MW in a single continuous discharge for a duration of four hours.  But the Diablo Project was not ready to perform to Diablo's specifications when Fluence commissioned the project.  It did not function as designed, and as a result, it required significant oversight and maintenance, and additional costs.

Yet, as discussed herein, Fluence falsely highlighted the Diablo Project as one of its "successful" "mega site installations" during the Class Period.

49.    According to the Diablo Litigation, Diablo and Fluence entered an engineering, procurement, and construction agreement (the "Diablo EPC") on August 4, 2020.  Pursuant to the Diablo EPC, Fluence would design, engineer, and install a BESS according to certain completion deadlines.  In return, Fluence would be paid a contract price of $237,976,007 under the Diablo EPC and $821,964 under an accompanying services agreement.  This contract was crucial to Fluence because the value of the contract represented the equivalent of approximately 75% of the Company's U.S. revenues for its 2020 fiscal year.

50.    Diablo alleged that Fluence missed the substantial completion deadlines in the EPC – which were set out in different "phases" – by almost a full year.  For example, according to Diablo, the substantial completion date for phase one of the Diablo Project was June 1, 2021, but Fluence did not submit a certificate of completion for this phase until April 15, 2022, 318 days after the contracted deadline.  On April 17, 2022, Fluence filed a certificate of completion for phase two of the Diablo Project, which had a substantial completion date of July 15, 2021, 286 days after the contracted deadline.  Fluence filed a certificate of completion for the substantial completion of the project on April 27, 2022, but the substantial completion date in the Diablo EPC was 255 days earlier, on August 15, 2021.

51.    Despite Fluence's certificates, Diablo alleged, *inter alia*, that the system Fluence installed was "woefully deficient" and did not perform as specified in the Diablo EPC:

> In addition, Diablo duly provided Fluence notice of chronic failures in August and September 2022 with respect to the Project's control system and inverters, and in November 2023 with regarding to the inverter heat sinks. . . .  The chronic failures of the control system, inverters, and inverter heat sinks have not been addressed and resolved by Fluence.
>
> In sum, Fluence's performance under the EPC Agreement has been woefully deficient.  Fluence delivered Substantial Completion Certificates and turned over

- 17 -

control of the Project hundreds of days behind schedule. Fluence delivered a Project that does not function as designed and requires constant oversight and maintenance. Fluence has failed to properly address and resolve warranty items and chronic failures of essential systems. And Fluence still has not achieved Final Completion.

52.    Diablo further alleged that when it assumed control of the Diablo Project on April 29, 2022, the Diablo Project immediately began experiencing a series of failures, including chronic control system failures and defects. The control system that Fluence put into place at the Diablo Project was not the one that Diablo contracted for in the Diablo EPC – which was an unmanned system capable of following dispatch signals from the California Independent System Operator ("CAISO") system on a consistent basis. The control system that Fluence installed responded slowly and inaccurately to CAISO signals which, among other problems, caused CAISO to remove the Diablo facility from the ancillary market for several weeks. Diablo alleged that between May 15, 2022 and August 22, 2022, the control system failed 81 times. The auxiliary control system also experienced frequent failures that caused overheating and the signals and alarms meant to provide notice of such failures did not function properly. Diablo began notifying Fluence of the control system defects in July 2022. The control system provided by Fluence remained riddled with significant problems as recently as February 2024, almost two years later.

53.    The Diablo Project also experienced a high rate of inverter modules failures and defects, which required constant maintenance and replacement. Fluence's control system's defects and failures exacerbated these issues, causing additional failures. Between June 13, 2022 and July 14, 2022, the Diablo Project experienced 27 inverter failures.

54.    Diablo further alleged that Fluence's proprietary human-machine interface monitor also did not function properly at the Diablo Project. As a result, Diablo was forced to operate the system using a data acquisition system that was inefficient and not intended for that purpose.

55.    In total, Diablo alleged that it submitted more than 100 warranty claims to Fluence based on the above issues. As of November 2023, Diablo claimed that dozens of warranty claims

- 18 -

4932-2928-2126.v2

remained outstanding, including many that had been unresolved for more than a year. Fluence attempted to provide a "Final Completion Certificate," which unilaterally modified a section that purported to relieve Fluence of the obligation to complete warranty work. Diablo described the Final Completion Certificate as "null and void" because Fluence had not fulfilled its obligation to complete warranty work.

56.    As a result of the systemic failures and defects at the Diablo Project, and the Company's inability or unwillingness to remedy these issues, Fluence and Diablo's relationship deteriorated to the point where Fluence sued Diablo for breach of contract on October 6, 2023. Diablo filed a cross-complaint on November 13, 2023, bringing its own breach of contract claims, and seeking $229,106,742 in damages. The Diablo Litigation is ongoing.

**D.    High Desert**

57.    Fluence's failure at the Diablo Project was not a one-off event. According to CW-1, the High Desert Project faced problems similar to the Diablo Project. Another one of Fluence's self-described "mega site installations," the High Desert Project, is a BESS system in or near Adelanto, California, in San Bernardino County which was designed for capacity of 50 MW and 200 MWh. According to CW-1, it was released to the market in approximately December 2021.

58.    According to CW-1, like the Diablo Project, the High Desert Project failed to meet its customer's specifications from the time it was released to the market. As in most of Fluence's Gen 6 systems, the applicable contract specified 97% availability. But when the High Desert Project was released to the market, it was only at 82% availability. Fluence engineers worked on the project for approximately a year to remedy these and other issues, but the system still did not perform as specified in the contract. The system was only able to produce 50 megawatts for three to three and a half hours, not the four hours for which it was designed.

4932-2928-2126.v2

59.    According to CW-1, the customers behind the High Desert Project ultimately bought a system that did not perform as agreed.  This upset the customers, and Fluence accrued liquidated damages while the High Desert Project did not perform to its specifications.

### E.    Siemens Energy, Inc.

60.    The Company's inability to meet its customers' needs with the Gen 6 systems also negatively impacted Fluence's relationship with Siemens Energy, an affiliate of Fluence's corporate parent.  According to Siemens Energy, leading up to June 2018, Siemens Energy sought proposals for a BESS with certain specifications to add black start capability to a power generating station in Antioch, California.  Fluence's BESS was expected to function as a "black start addition" that would allow the generating station, in the event a blackout, to independently restart its gas turbines without any externally provided electricity.  Siemens Energy was serving as the engineering, procurement, and construction contractor for this station.

61.    In the Siemens Litigation, Siemens Energy alleges that on June 22, 2018, it accepted Fluence's proposal to provide a BESS according to Siemens Energy's specifications, in which all system components were contained in four containers to be mounted on a 20 foot by 40-foot concrete pad and connected to the station by overhead electrical connections.  Siemens Energy claimed that Fluence's proposal was for a "SieStorage" BESS, in which all system elements were included.  Fluence also promoted the SieStorage's scalability to Siemens Energy, which would permit additional storage capacity without the need for costly underground construction.

62.    According to the Siemens Litigation, Siemens Energy and the Siemens Energy Project station's owner continued to negotiate throughout 2020.  While negotiations were ongoing, on November 11, 2019, Siemens Energy requested that Fluence commence engineering and design activities for a SieStorage BESS pursuant to Fluence's June 22, 2018 proposal.    Fluence

- 20 -

4932-2928-2126.v2

conditionally accepted this request via letter dated February 19, 2020, acknowledging that the proposal was for the black start addition at the Siemens Energy Project.

63.     However, unknown to Siemens Energy at the time, Fluence had allegedly abandoned the SieStorage BESS for the Gen 6 Gridstack BESS.  Siemens Energy alleged that the Gridstack BESS differed from the agreed-upon SieStorage BESS design, most notably in that the system: (1) did not have fully containerized components; (2) required underground electrical connections; and (3) required significant re-engineering.  Fluence's February 19, 2020 acceptance letter did not state that Fluence planned to use the Gridstack BESS instead of the SieStorage BESS.

64.     On June 15, 2020, the station's owner issued a full notice to proceed on the black start addition.  Siemens alleged that on July 15, 2020, Fluence submitted an updated BESS proposal including, for the first time, the Gen 6 Gridstack BESS design instead of the agreed-upon SieStorage proposal.  This July 15, 2020 updated proposal also included terms and conditions at odds with those included in Siemens Energy's contract with the station's owner.

65.     According to Siemens Energy's allegations, Fluence's July 15, 2020 proposal delayed the Siemens Energy Project because: (1) the project could not proceed until Fluence and Siemens Energy agreed on new terms and conditions; (2) the new design required work to be abandoned, and required added design and engineering to accommodate the new design; and (3) Fluence failed to provide engineering drawings of the new design.  On September 15, 2020, Fluence submitted a revised proposal agreeing to terms and conditions matching Siemens Energy's agreement with the station owner.

66.     According to the Siemens Litigation, on September 22, 2020 and September 28, 2020, Siemens Energy issued purchase orders to Fluence to proceed with the revised proposal because, by that time, it was no longer feasible to solicit alternative proposals or contract with anyone else and still meet the station owner's completion schedule.  Fluence and Siemens Energy

- 21 -

amended the purchase orders in February 2021 and agreed to a "Guaranteed Substantial Completion Date" of May 31, 2021.

67.     However, as was the case for the Diablo Project and the High Desert Project, Fluence's system was not ready to perform to Siemens Energy's specifications.  Siemens Energy alleged that it became aware soon after executing the purchase orders in September 2020 that Fluence's design for the BESS was still in flux.  Fluence provided Siemens Energy with conflicting information regarding the configuration and interconnectedness of the site.  Additionally, a major change in Fluence's BESS design forced Siemens Energy to change the electrical connections between the BESS and the station from planned above-ground connections to unplanned below-ground connections.  Siemens Energy incurred nearly $5.5 million in additional costs to complete the work necessary to install the BESS.  Siemens Energy then notified Fluence by letter on September 17, 2021, one month before the IPO, that Fluence was responsible for these additional costs.  Fluence denied any responsibility.

68.     Additionally, Siemens Energy alleged that during testing, the BESS immediately tripped offline, which cut off power to the station.  This failure forced Siemens Energy to modify the black start addition, involving more unplanned work and costs for Siemens Energy.

69.     Siemens Energy also alleged that on May 14, 2022, the Siemens Energy BESS failed to deliver sufficient energy to restart the Station during performance testing.  While investigating this failure, Siemens Energy discovered multiple defects in the BESS, including a design error involving the inverter's ability to handle in-rush current.  To meet its contractual obligations to the station owner, Siemens Energy had to develop stop-gap solutions to make up for the BESS's design failures.

70.     The issues in the Siemens Energy Project led to litigation.  Fluence sued Siemens Energy for breach of contract on September 8, 2023.  On November 28, 2023, Siemens Energy filed

- 22 -

4932-2928-2126.v2

its answer and counterclaim, bringing causes of action including fraud in the inducement, fraudulent omission, and breach of warranty.  Siemens Energy alleged that in negotiating and contracting to provide a BESS that would meet Siemens Energy's performance requirements, "Fluence knew that [its] representations [to Siemens Energy] were false" and, in particular, that "Fluence knew, prior to [Siemens Energy] entering into the EPC contract with the Station's owner, that [Fluence] planned to furnish a Gridstack BESS . . . that . . . would not fit on a single 40 foot by 20 foot concrete pad and would instead require substantial additional design, engineering, and construction work not anticipated by [Siemens Energy][.]"  Siemens also alleged that "[t]he BESS that Fluence delivered was poorly designed," suffered from "multiple defects," "failed to deliver sufficient energy and power to restart the Station," and was "unable to meet the performance test set forth in its . . . contract."  As a result, Siemens Energy alleged it had incurred approximately $7.5 million in additional, unanticipated costs and project delays.

71.    During Fluence's May 9, 2024 second fiscal quarter earnings call ("2Q24 Earnings Call"), defendant Pasha told investors that the Company had settled litigation with Siemens Energy, but did not disclose the amount.  On June 11, 2024, the suit was dismissed without prejudice.

72.    In sum, throughout the Class Period, Fluence's undisclosed problems with its customers and execution of contracts were not isolated occurrences, but were systematic and widespread, including at "mega site installations."

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

73.    On October 19, 2021, Fluence filed its IPO Registration Statement.  The Class Period begins the day after the SEC declared Fluence's IPO Registration Statement effective, on October 28, 2021.  On October 29, 2021, Fluence filed a prospectus on Form 424B4 for the IPO (the "IPO Prospectus") with the SEC, which incorporated and formed a part of the IPO Registration Statement.

- 23 -

4932-2928-2126.v2

74.     The IPO Registration Statement promoted Fluence's "highly configurable energy storage products," including the "Gridstack," which Fluence claimed was part of its ability to "build[] products and technology based on customer needs and economic feasibility":

> We sell **highly configurable** energy storage products with integrated hardware, software, and digital intelligence.  Unlike other energy storage providers, **we take a customer- and market-centric approach, building products and technology based on customer needs and economic feasibility**.  We offer three energy storage products built on our sixth-generation Tech Stack foundation, **which are optimized for common customer use cases but can be configured for specific use cases**:
>
> - Gridstack™: grid-scale, industrial-strength energy storage product designed for demanding market applications with **industry-leading reliability, scalabilit**y, and safety.  Its design is built for applications including flexible peaking capacity, frequency regulation, renewable integration, transmission, and distribution enhancement and more.
>
> - Sunstack™: designed to optimize solar capture and delivery.  Its product architecture unites batteries and PV on the same side of the DC bus to take advantage of higher PV-to-inverter ratios, maximize solar yield, and simplify the interconnection process.
>
> - Edgestack™: commercial energy storage product that discharges when needed to flatten a facility's energy load profile, resulting in significantly reduced demand charges.  The fully integrated product is available in smaller-size building blocks that can be easily configured to meet the needs of individual facilities and aggregated across fleets or locations without time-consuming redesigns.

75.     The IPO Registration Statement further represented that Fluence's "Sixth-Generation Technology Stack" delivered "scalable" and "cost-effective" products:

> Sales Contracts with Related Parties
>
> Our energy storage products are built on our Tech Stack, which is comprised of our Fluence Cube, Fluence OS, and Fluence IQ.  The Tech Stack builds upon 13 years of development in prior generations (introduced in 2008, 2009, 2010, 2014, 2017), **reflecting ongoing . . . design improvements**.
>
> Fluence Cube is a modular, factory-built, approximately 8'x8'x8' building block that **delivers . . . scalable, cost-effective products**.  Our battery and supplier-agnostic product architecture allows us to deliver optimized solutions for our customers on a global scale while incorporating the latest technology components.

- 24 -

76.     Under a heading titled "Rapid Delivery and Augmentation," the IPO Registration Statement highlighted the "form factor" of Fluence's products, which it claimed drove "efficiencies" and supported "rapid on-site installation and commissioning":

- *Rapid Delivery and Augmentation*: **repeatable form factor drives efficiencies in project design and Balance of Plant interfaces**.  The Fluence Cube ships with all battery, cooling, and controls equipment pre-installed to support **rapid on-site installation and commissioning**.  Our building block approach is designed to help customers meet current requirements and enable optimal augmentation of products over time, taking advantage of falling battery prices and best-in-class technologies.

77.     The IPO Registration Statement also highlighted Fluence's related-party transactions, including a discussion of its "Sales Contracts with Related Parties."  In that discussion, Fluence stressed the importance of its relationship with Siemens Industry, explaining that it signs product and related service contracts with Siemens Industry in connection with the execution of contracts with external customers and direct contracts with Siemens Industry itself, noting that it included revenue from these contracts in revenue from related parties:

Sales Contracts with Related Parties

**Fluence signs back-to-back battery-based energy storage product and related service contracts with** AES, **Siemens and their subsidiaries (collectively referred to as affiliates) in relation to execution of the affiliates' contracts with external customers and also direct contracts signed with affiliates of the Members**.  The contract price is similar to the price charged to third-party customers.  **Revenue from contracts with affiliates is included in revenue from related parties on the Company's consolidated statements of operations and comprehensive loss**.

78.     Defendants' misstatements and omissions in the IPO Registration Statement about Fluence's Siemens contracts and their statements describing the Gen 6 products as "cost-effective," "configurable," being "based on customer needs and economic feasibility," and ready for "rapid on-site installation and commissioning," as set forth in ¶¶74-77 above, were materially false and/or misleading and omitted material facts for the following reasons:

- 25 -

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)    For example, by September 2021, the "mega site installation[]" Diablo Project was months behind the substantial completion deadlines in the Diablo EPC.

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

(i)    Specifically, by the time of the filing of the IPO Registration Statement, Siemens Energy had sent its September 17, 2021 letter informing Fluence that the Company was responsible for nearly $5.5 million in costs that Siemens Energy had incurred resulting from Fluence's attempt to utilize its Gen 6 system.

79.    On December 14, 2021, Fluence filed with the SEC its annual report on Form 10-K for the fiscal year ended September 30, 2021, which was signed by defendants Pérez and Fehr who also filed certifications pursuant to the Sarbanes-Oxley Act attesting to the document's accuracy and completeness ("4Q21 Form 10-K").  The 4Q21 Form 10-K represented that Fluence's "Sixth-Generation Technology Stack" delivered "scalable" and "cost-effective" products:

- 26 -

4932-2928-2126.v2

The Tech Stack, which is comprised of our Fluence Cube, Fluence OS, and Fluence IQ, builds upon 13 years of development in prior generations, *reflecting ongoing . . . design improvements*. The Fluence Cube is a modular, factory-built, approximately 8'x8'x8' building block that *delivers . . . scalable, cost-effective products*. Our battery and supplier-agnostic system architecture allows us to deliver *optimized solutions for our customers* on a global scale while incorporating the latest technology components.

80.    Defendants' misstatements and omissions in the Company's 4Q21 Form 10-K, as set forth in ¶79 above, were materially false and/or misleading because they emphasized that Fluence's "design improvements" made its Gen 6 systems' "scalable, cost-effective products" and therefore able to "deliver optimized solutions for our customers," but omitted that:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)    For example, when released into the market in approximately December 2021, the High Desert Project was only at approximately 82% availability compared to the contracted 97%; and

(ii)    by December 2021, the Diablo Project was approximately eight months behind the substantial completion deadlines in the Diablo EPC.

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen

- 27 -

4932-2928-2126.v2

6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

81.    On February 10, 2022, Fluence hosted an earnings call with analysts to discuss the Company's results for its first fiscal quarter of 2022 ("1Q22 Earnings Call").  During his prepared remarks, defendant Pérez downplayed initial struggles installing Fluence's Gen 6 systems, representing that Fluence had quickly "implement[ed] corrective actions" to address "cost overruns" related to the rollout of its "first Generation 6 product installations and commissioning:"

> Turning to Slide 6.  I would like to update you on the headwinds that we discussed on our last earnings call and the steps we are taking to mitigate their impact.  This mostly stemmed from supply chain disruption as a result of COVID-19 ***as well as some cost overruns in the rollout of our first Generation 6 product installations and commissioning.  Our team has acted swiftly to implement corrective actions that provide us the confidence to further execute on our plan***.

> Some of these mitigation efforts include securing shipping capacity for our high-volume routes on a 2- to 4-month forward-looking basis, giving us better visibility to deliver our product to our customers on time.  Furthermore, we have increased the size of our supply chain and manufacturing teams by 57% to provide us with the resources necessary to meet the robust demand we see.  And finally, ***we are documenting lessons learned from our teams around the world and providing additional training so they can deliver our Gen 6 product installation and commissioning more effectively***.

82.    A presentation referenced by defendant Pérez during the conference call further represented that the "corrective actions" Fluence had implemented to address product installation issues had "[r]ectified issues with customers," as depicted in the following slide:

- 28 -

4932-2928-2126.v2

83.    During the call, defendant Boll further represented that Fluence's installation cost overruns were "temporary" and assured investors that the Company had already "addressed" and "identified the issues" and "implemented the fixes":

> And on the cost overruns, ***they are temporary*** and they are associated with installation and commissioning.  So the way that ***we have addressed*** that is we have done root cause analysis of either operational issues or technical issues that we could optimize to ensure that those cost overruns get to 0 closer to the end of this quarter.  We've implemented those fixes either in our field installation manuals or in our factory, and those are in play right now.  So ***we've identified the issues and we've implemented the fixes***.  We've also hired a significant number of more people to be able to handle the installation and commissioning.  So that was one of the lessons learned is that we needed more people, and we have trained those people in the installation procedures and updated our installation manuals.

84.    Defendants' misstatements and omissions in the 1Q22 Earnings Call about identifying and resolving "temporary" issues such as "some cost overruns," as set forth in ¶¶81-83 above, were materially false and/or misleading and omitted material facts for the following reasons:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the

- 29 -

solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)     Specifically, Fluence had not resolved these issues on several projects, including the High Desert Project and Diablo Project;

(ii)    projects were not delivering the promised levels of availability once installed.  Specifically, the High Desert Project was only at approximately 82% availability in late 2021, as compared to the contracted 97%;

(iii)   the Diablo Project was approximately six months behind the substantial completion deadlines in the Diablo EPC;

(iv)    delays and failures to resolve warranty claims at sites like the Diablo Project exposed Fluence to potential liability for liquidated damages and other costs; and

(v)     costs continued to rise at the Siemens Energy Project as Siemens Energy tried to salvage a project where Fluence had cornered Siemens Energy into using a Gen 6 system.

(b)     Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)     Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

85.     On May 12, 2022, Fluence hosted an earnings call with analysts to discuss the Company's results for its second fiscal quarter of 2022.  During his prepared remarks, defendant Pérez focused investors on Fluence's skill in executing on its projects and installing Fluence's new

- 30 -

4932-2928-2126.v2

Gen 6 products.  In particular, Pérez highlighted that Fluence had "successfully installed 10 Gen 6 systems since the beginning of this year," including "several mega site installations such as Diablo and High Desert" in California:

> As you can see on Slide 9, I'm pleased to report that ***we are now fully caught up on our Gen 6 installation schedule***.  We have ***successfully installed*** 10 Gen 6 systems since the beginning of this year with a combined power of about 420 megawatts.  This includes several ***mega site installations such as Diablo and High Desert***, both in California.



86.    Defendants' misstatements and omissions in the 2Q22 earnings call, as set forth in ¶85 above, were materially false and/or misleading and omitted material facts because while Fluence claimed that it had "successfully installed 10 Gen 6 systems," including "mega site installations such as Diablo and High Desert," the Company omitted that:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the

- 31 -

solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)      Specifically, when released to the market in approximately December 2021, the High Desert Project was only at approximately 82% availability compared to the contracted 97%;

(ii)      the Diablo Project was purportedly "successfully installed" ten months behind the substantial completion deadlines in the Diablo EPC;

(iii)      when Diablo assumed control of the Diablo Project on April 29, 2022, the Diablo Project immediately began experiencing a series of failures, including chronic control system failures and defects;

(iv)      Fluence did not provide the control system that Diablo had asked for, and the installed control system responded slowly and inaccurately to CAISO signals, causing CAISO to remove the Diablo facility from the ancillary market for several weeks; and

(v)      by May 2022, Fluence had not remedied the issues at either the Diablo Project or the High Desert Project.

(b)      Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)      Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

87.      On August 16, 2022, Fluence hosted an earnings call with analysts to discuss the Company's results for its third fiscal quarter of 2022 ("3Q22 Earnings Call"). During his prepared

- 32 -

4932-2928-2126.v2

remarks, defendant Pérez briefly addressed "project cost overruns," which he attributed to "a few specific projects":

> Finally, turning to project cost overruns.  This is a continued agenda item for the team.  While we'll continue to roll out additional projects during the quarter, ***we experienced unanticipated costs associated with installations and commissioning, including balance of plant and transformer challenges on a few specific projects***.

88.    During the question-and-answer portion of the call, an analyst from Wolfe Research, LLC noted that Fluence's "order intake" was "down versus what you guys did in the previous quarter," and asked "what drove the softness this quarter, particularly on the storage product side?" In defendant Fehr's response, he assured the analyst that the decrease in battery storage was due to "market and macroeconomics," and that "we are not really seeing a signal from our customers that they're not wanting to sign service agreements."

89.    After another analyst asked about competition, defendant Pérez emphasized the strength of Fluence's client relationships, stating "those customers that we selected are very loyal. They want to keep working with us.  They want to keep developing their portfolios with us."

90.    After another analyst asked "how else do you improve your operations in the back half of the year and ensure full year '22 execution[?]", defendant Boll responded by emphasizing "a systems test lab that we're putting in Pennsylvania right outside of Pittsburgh."

91.    Defendants' misstatements and omissions in the 3Q22 release and 3Q22 Earnings Call minimizing "cost overruns" as being related to "a few specific projects," assuring investors about customer loyalty and continued business, and emphasizing its new "systems test lab" as set forth in ¶¶87-90 above, were materially false and/or misleading and omitted that:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the

- 33 -

solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)    Specifically, two of these "specific projects" were "mega site installations" Diablo and High Desert;

(ii)    between May 2022 and August 2022, the Diablo Project control system that Fluence installed had failed 81 times;

(iii)    Diablo started notifying Fluence of the control system defects in July 2022;

(iv)    between June 13, 2022 and July 14, 2022, the Diablo Project experienced 27 inverter failures; and

(v)    by August 2022, High Desert was still not performing per the customer's specifications.

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence:

(i)    Specifically, by September 2021, Siemens Energy had sent a letter to Fluence claiming Fluence was responsible for additional costs Siemens Energy had incurred at the Siemens Energy Project; and

(ii)    High Desert was growing upset that its system was not working per its specifications.

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable; and

- 34 -

4932-2928-2126.v2

(d)    Defendant Boll omitted when emphasizing "a systems test lab that we're putting in Pennsylvania right outside of Pittsburgh[]" that Fluence was putting in this test lab because Fluence had never tested its Gen 6 products on a system level before the initial rollout.

92.    On November 15, 2022, Fluence issued a press release titled "Fluence Expands Network of Global Product Testing Facilities with Systems Test Lab in Pennsylvania," emphasizing the Company's new facility as the "primary location for system-level testing:"

> Fluence Energy, Inc. . . . today announced that the company has expanded its network of product testing facilities by opening a new product testing lab in Pennsylvania. Now with three product testing labs located across the globe, Fluence is uniquely equipped to accelerate product development and support energy storage customers with increased speed, expertise, and flexible support throughout the product lifecycle.
>
> *The new facility will serve as the primary location for system-level testing of various configurations of the company's energy storage products*. System-level testing supports quality assurance and is crucial for the rapid iteration, testing, and launching of new Fluence energy storage technology and products.
>
> "*Fluence's new systems test lab expands our global lab presence and is our second lab within the United States, with a third lab located in Germany. We believe this facility will be critical to fully testing our products leading up to product launch, as well as supporting product commissioning and field teams in providing world-class support to customers*," said Fluence SVP & Chief Product Officer Rebecca Boll. "We look forward to using this lab to best serve our customers."

93.    Defendants' misstatements and omissions in the November 15, 2022 press release about the Pennsylvania test lab, as set forth in ¶92 above, were materially false and/or misleading because they omitted:

(a)    Fluence released the Gen 6 systems before the systems were fully tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions

- 35 -

took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim;

(b)    that Fluence commissioned the Pennsylvania test lab because the Company had not fully tested its Gen 6 products on a system level before their initial rollout; and

(c)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence.

94.    On December 13, 2022, Fluence hosted an earnings call with analysts to discuss the Company's results for its fourth fiscal quarter and full year 2022 ("4Q22 Earnings Call").  During his prepared remarks, defendant Nebreda told investors that Fluence outpaced the competition "establishing [Fluence] as a leader among the mega project side":

> *As a comprehensive solutions provider, we continue to outpace our competition due to our scale, industry-leading experience and our ability to solve highly [complex problems], but quickly establishing ourselves as a leader among the mega project side*.

95.    During defendant Sial's prepared remarks, he claimed that Fluence "believe[d] that issues confronted are well understood and now largely behind us":

> And while 2022 was a challenging year, we ended the fourth quarter with positive gross profit and *believe that issues confronted are well understood and now largely behind us*.

96.    During the question-and-answer portion of the call, an analyst inquired why a particular customer selected Fluence as its energy storage supplier.  In response, Nebreda represented that customers were selecting Fluence because of its ability to deliver on complex projects and "to manage complexity, both in terms of project or product":

> Thank you, Ben.  No kind of maybe the rule of thumb is a part of it.  Okay. As you go up with the complexity scale, competition gets less – gets softer.  So if you go to a simpler solution where you see a lot of these stars, there's a lot of competition as you go up the scale either *because the projects are very big or they need specific characteristics or features that we can only deliver then the*

- 36 -

*competition kind of windows a little bit* and (inaudible) you always need to find. And I think that why do people pay cost, which is a little bit – why do they select us.

I guess the reasons that we have – *we talk to our customers as our ability to manage complexity, both in terms of project or product*. Our safety features. We have a product which is very – it has proven to be very, very safe. We have gone through burn tests, we have done all the testing on the safety that people are really present.

*    *    *

*So I would say those are the 3 things: complexity, both on product and project*; safety; and they are – they see us as a partner that will offer them – will compete with them and that's the driver.

97.    Also during the call, defendant Sial attributed Fluence's "record" revenues to its "strong project execution."

98.    Defendants' misstatements and omissions in the 4Q22 Earnings Call about Fluence being a "leader among the mega project side," its "ability to manage complexity," and that gross margin issues were "well understood and now largely behind us," as set forth in ¶¶94-97 above, were materially false and/or misleading because they omitted:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)    Specifically, Fluence installed the Diablo Project ten months behind schedule;

(ii)    between May 2022 and August 2022, the Diablo Project control system that Fluence installed had failed 81 times;

- 37 -

(iii)    Diablo started notifying Fluence of the control system defects in July 2022;

(iv)    between June 13, 2022 and July 14, 2022, the Diablo Project experienced 27 inverter failures; and

(v)    High Desert was still not performing per the customer's specifications after approximately a year of work.

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

99.    On February 9, 2023, Fluence hosted an earnings call with analysts to discuss the Company's results for its first fiscal quarter of 2023 ("1Q23 Earnings Call").  During his prepared remarks, defendant Nebreda represented that Fluence had succeeded in "improving our project execution."  Nebreda also referenced a presentation slide deck that highlighted Fluence's "[s]trong [c]ustomer [r]elationships" and claimed that the purported "[p]erformance" of the Company's products were drivers of its business generation, as depicted in the following slide:

- 38 -

4932-2928-2126.v2



100.    Defendant Nebreda similarly claimed that Fluence's products performed at a "high level," and represented that these qualities competitively differentiated Fluence, stating in pertinent part as follows:

> On Slide 7, *we have highlighted some of the reasons why our customers choose us to provide their energy storage solution*.  They are looking for someone who can provide them with a safe product.  We are proud to be one of the market leaders in safety and have surpassed the industry standards.  Time after time, our customers tell us that safety is their top priority when selecting an energy source.  We will continue to make safety our highest priority when developing additional solutions.

> Second, *performance.  Our customers demand* not only *a* safe *product* but **one** *that performs at high level*.  To that point, we are pleased to have deployed the world's fastest responding battery and storage facility.  Our team has achieved the demand response times below 150 milliseconds (inaudible).

101.    Defendants' misstatements and omissions in the 1Q23 Earnings Call, as set forth in ¶¶99-100 above, were materially false and/or misleading for emphasizing Fluence's "performance" and "project execution" track record, and the resulting positive impact on customer relationships, but omitting that:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers

- 39 -

incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim;

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

102.    On May 10, 2023, Fluence issued a release providing the Company's results for its second fiscal quarter ended March 31, 2023 ("2Q23 Release"). The 2Q23 Release quoted defendant Nebreda, who credited Fluence's "'record quarter'" to its success in "'***accelerating project execution***.'" The 2Q23 Release also quoted defendant Sial who likewise praised Fluence's improved project execution, representing that the Company was making "'***notable progress in [its] execution***'" and "'***improving cycle times on select projects***.'"

103.    On May 11, 2023, Fluence hosted a conference call with analysts to discuss the Company's results for its second fiscal quarter of 2023 ("2Q23 Earnings Call"). During the call, defendant Sial represented that Fluence was "seeing faster progress" on certain projects because of "improved execution":

> While we expect that most of our projects will be executed within the 15- to 18-month time frame that we have previously discussed, ***we are seeing faster progress on certain projects compared to prior expectations*** and thus expect this trend to continue in the future, benefiting both the second half of this year as well as fiscal year 2024.

- 40 -

> *This improvement is attributable to* better supply chain visibility and *improved execution* as we leverage lessons learned from prior projects. We are also coming into the third quarter with 100% of our second half 2023 expected revenue in our backlog.

104.    During the call, an analyst inquired as to what customers were focused on during business negotiations. In response, defendant Nebreda represented that Fluence's customers were focused on selecting products they were "sure . . . were going to be delivered," "going to perform as we tell them that they're going to perform," and Fluence's ability to have its product "running for them when they need it":

> We look for customers that value what we offer, that value, clearly, products that are – that we – that *they are sure that they were going to be delivered*, that they're *going to perform as we tell them that they're going to perform*, that will provide services that will keep this solutions up to date, and that will have them *running for them when they need it*, that they can ensure it very well and that they can finance it.

105.    Defendants' misstatements and omissions in the 2Q23 Release and 2Q23 Earnings Call about Fluence's "improved execution" and ability to deliver to customers products that were going to perform, as set forth in ¶¶102-104 above, were materially false and/or misleading and omitted:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)    Specifically, Fluence's Gen 6 systems were closer to 80% available when released to the market, instead of the 97% commonly promised in its contracts;

- 41 -

(ii)    Fluence's installations were often delayed, including the almost year-long delay at the Diablo Project; and

(iii)    After Fluence installed Gen 6 systems at the Diablo Project and Siemens Energy Project, the systems experienced failures during testing that caused Fluence's customers to incur significant additional expenses to get the projects running at sufficiently reliable levels.

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

106.    On August 10, 2023, Fluence hosted a conference call with analysts to discuss the Company's results for its third fiscal quarter of 2023 ("3Q23 Earnings Call").  During his prepared remarks, defendant Sial represented that Fluence "continue[d] to execute well" on its legacy backlog.

107.    Also during the call, defendant Nebreda claimed that product "performance" was among the "type of guarantees" that Fluence provided to ensure customer satisfaction, stating in pertinent part as follows:

> I'm going to say far away but far from the point where the industry consolidates in a way that we are a limited number of players that I don't say we're there, too.  So for us, competitiveness is a driver internally to ensure that we did everybody on price, but not only on price, prices, are drivers not the main driver on ensuring our customers have a product that meets their needs.  Price being one, ***our performance, what we do,*** how they can bank or finance our investments, ***the type of guarantees we provide them to ensure that they feel comfortable on in our assets going forward***.

- 42 -

4932-2928-2126.v2

108.     Defendants' misstatements and omissions in the 3Q23 Earnings Call, and 3Q23 Form 10-Q emphasizing Fluence's "performance" and "guarantees" as factors that made customers "comfortable," as set forth in ¶¶106-107 above, were materially false and/or misleading and omitted:

(a)     Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)     Specifically, Fluence promised 97% availability for its Gen 6 systems, but they were closer to 80% available when released to the market, as was the case for High Desert;

(ii)     Fluence failed to resolve customer issues, including in the Diablo Project, in which Diablo had submitted more than 100 warranty claims, dozens of which remained outstanding by the end of 2023, and many of which had been outstanding for more than a year; and

(iii)     Fluence attempted to provide a "Final Completion Certificate" to Diablo, which purported to relieve Fluence of the obligation to complete warranty work, but Diablo described the Final Completion Certificate as "null and void" because Fluence had not fulfilled its obligation to complete warranty work.

(b)     Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)     Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen

- 43 -

4932-2928-2126.v2

6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

109.    On November 28, 2023, Fluence issued a press release providing the Company's results for its fourth fiscal quarter and full year ended September 30, 2023 ("4Q23 Release"). The 4Q23 Release quoted defendant Nebreda, who emphasized Fluence's "strong execution" and "ability to navigate challenges, drive towards success, and deliver solutions to our customers" when discussing its transformative profitability milestone:

> "I'm pleased to report that we reached a transformative milestone in the fourth quarter, achieving profitability for the first time.  This momentous achievement is a testament to our unwavering commitment to operational excellence, and to our team's relentless dedication.
>
> Our ***strong execution reaffirms*** our position as a leader in the energy storage industry. ***It demonstrates our ability to navigate challenges, drive towards success, and deliver solutions to our customer***s.  As we look ahead, our market outlook is more robust than ever.  We see a world hungry for sustainable energy solutions, and we believe that Fluence is at the forefront, ready to meet that demand head-on as evidenced by our recently launched Gridstack Pro product."

(Footnote omitted.)

110.    On November 29, 2023, Fluence hosted a conference call with analysts to discuss the Company's results for its fourth fiscal quarter and full year 2023.  During his prepared remarks, defendant Nebreda credited Fluence's "improved execution" for its annual revenue performance:

> I'd like to highlight some of our accomplishments of the past fiscal year.  As you may recall, a year ago, we embarked on the transformation of our business.  I'm pleased to report that we delivered on our commitments to the market.  We grew our annual revenue by 85% and achieved our first profitable quarter. ***Importantly, we exceeded our regional [sic] annual revenue guidance by more than $600 million, thanks to improved execution***, easing supply chains and project time line acceleration.

111.    Defendants' misstatements and omissions in the 4Q23 Release and 4Q23 Earnings Call, as set forth in ¶¶109-110 above, were materially false and/or misleading because Fluence emphasized "improved execution" and "strong execution," but omitted that:

- 44 -

4932-2928-2126.v2

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim;

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

112.    Also on November 29, 2023, Fluence filed with the SEC its annual report on Form 10-K for the fiscal year ended September 30, 2023, which was signed by defendants Nebreda and Sial who also filed certifications attesting to the document's accuracy and completeness ("4Q23 Form 10-K").  The 4Q23 Form 10-K represented that Fluence's "Sixth-Generation Technology [Stack]" allowed customers to deploy storage "faster" and more "cost effectively":

> Fluence's sixth generation energy storage products are built on more than 14 years of development in prior generations, and reflecting, among other things, ***ongoing safety and design improvements***.  Fluence's energy storage products make it simpler for customers to deploy storage ***faster and more cost effectively without sacrificing quality and configurability***.

113.    The 4Q23 Form 10-K also stated that, in October 2023, Fluence had filed a complaint against Diablo and others seeking monetary damages arising from the supply and construction of an energy storage facility, and that Diablo had filed a cross-complaint against Fluence seeking damages

- 45 -

and other monetary relief in November 2023. The 4Q23 Form 10-K emphasized that Fluence denied the allegations and intended to "vigorously defend against them":

> In October 2023, Fluence filed a complaint in the Superior Court of California, Contra Costa County, against Diablo Energy Storage, LLC, Empire Business Park, LLC, the Bank of New York Mellon and others, seeking approximately $37.0 million in damages arising from the supply and construction of an energy storage facility for the defendants. On or about November 10, 2023, Defendant Diablo Energy Storage, LLC filed a cross-complaint against Fluence, seeking a minimum of $25.0 million of alleged damages and disgorgement of all compensation received by Fluence for the project, in the amount of approximately $230.0 million. ***Fluence denies the allegations in the cross-complaint and intends to vigorously defend against them and to enforce our claims against the defendants***. We are currently not able to estimate the impact, if any, that this litigation may have on our reputation or financial results, or on market adoption of our products.

114.     Defendants' misstatements and omissions in the 4Q23 Release, earnings call, and 4Q23 Form 10-K about "ongoing . . . design improvements," and denying allegations in the Diablo Litigation, as set forth in ¶¶112-113 above, were materially false and/or misleading and omitted material facts for the following reasons:

(a)     Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim;

(b)     Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence;

(c)     Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen

- 46 -

4932-2928-2126.v2

6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable; and

(d)     Fluence disclosed the existence of the Diablo Litigation, but omitted or failed to disclose that: (i) this was not a one-off situation, as Fluence had also sued Siemens Energy in September 2023, and the issues at the Diablo Project were also present at other projects like High Desert; and (ii) the issues that culminated in the Diablo Litigation had been present since early 2022.

115.    On December 20, 2023, less than two weeks after the Company conducted its secondary public offering ("SPO") through which insiders sold nearly $400 million worth of stock, *Energy Storage News* published a news article revealing that Fluence's work on the Diablo Project suffered from a "litany of 'defects, deficiencies and failures.'"  The article detailed the numerous alleged defects and failures that plagued Fluence's work, including that: (i) Fluence's project control system responded slowly or inaccurately to the CAISO – the non-profit entity responsible for managing the flow of electricity and operator of the State's wholesale energy market – prompting CAISO to remove the project from the service market for several weeks; (ii) Fluence's proprietary human-machine interface had failed to function properly, which required Diablo to use an alternative technology not designed for that purpose, resulting in operational inefficiencies; (iii) Fluence's Auxiliary Control System frequently failed; (iv) Fluence's inverters failed repeatedly – including 27 inverter failures within a one-month period just two months after delivery; and (v) the occurrence of two arc flashes posed a risk of serious harm and injury.  The *Energy News Storage* article further revealed that Fluence had completed the Diablo Project approximately eight months after the contracted delivery date and that Fluence had failed to address and resolve related warranty claims on the defective work.

116.    On this news, the price of Fluence stock fell from $27.22 per share on December 19, 2023 to $23.01 per share on December 20, 2023, or approximately 15%, on above-average trading

- 47 -

volume of more than 10 million shares traded as financial analysts directly attributed the price decline to the disclosures in the *Energy Storage News* article.

117.   In response to the *Energy Storage News* article, on December 20, 2023, Fluence denied the information in a press release, stating that it "[stood] by its [w]ork on the Diablo Plant, and [would] [v]igorously [p]ursue the [p]ayments it [was] [o]wed." Fluence made similar statements in its Form 10-Q for its first fiscal quarter ended December 31, 2023, which was signed by defendant Nebreda, who also filed certifications pursuant to the Sarbanes-Oxley Act attesting to the document's accuracy and completeness ("1Q24 Form 10-Q"). Additionally, on February 8, 2024, defendant Nebreda denied the allegations revealed in the *Energy Storage News* article during an earnings call discussing the Company's results for its first fiscal quarter of 2024, claiming that the Diablo Project was "performing very well and has delivered availability or uptime above its contractual requirement during 2023."

118.   The statements referenced in ¶117 above, were materially false and/or misleading when made because they omitted that:

(a)   Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim:

(i)   Specifically, the issues that culminated in the Diablo Litigation had been present since early 2022; and

(ii)   The Diablo Project was not a one-off situation. Fluence had also sued Siemens Energy in September 2023, and Siemens Energy had asserted counterclaims in November

- 48 -

2023.  Additionally, the issues at the Diablo Project were also present at other projects like High Desert;

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence; and

(c)    Fluence was engaged in a dispute with Siemens Energy, an affiliate of Fluence's corporate parent, because Fluence had cornered Siemens Energy into using Fluence's Gen 6 system, which had failed to meet Siemens Energy's specifications, causing Siemens Energy to experience delays and incur additional costs to make the system operable.

119.    Fluence's false and/or misleading statements assured investors about the Diablo Litigation's impact.  For example, on December 21, 2023, J.P. Morgan published a report stating that "[w]e believe the selloff is overdone.  We believe the complaint is likely a one-off."  Similarly, on December 20, 2023, Guggenheim published a report describing the article's impact on Fluence's stock price as "overdone" after noting "we've spoken to FLNC."

120.    Then, on February 22, 2024, the Blue Orca Report revealed that the installation and operational issues at the Diablo Project were not, as Defendants knew, a "one-off" exception.  In particular, the Blue Orca Report revealed that Siemens Energy had filed a counterclaim against Fluence accusing the Company of breach of contract and fraud in the inducement due to a "laundry list" of engineering and design failures related to the Siemens Energy Project.

121.    On this news, the price of Fluence stock fell from $17.01 per share on February 21, 2024 to $14.73 per share on February 22, 2024, more than 13%, on above-average trading volume as analysts expressed surprise about the claims in the Siemens Litigation.

122.    Because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Fluence stock

- 49 -

continued to be artificially inflated. For example, Fluence published a press release on February 22, 2024, in which the Company tried to undermine the importance of the Siemens Litigation, telling investors that this was only "a single project" and focusing on the amount of damages claimed:

> The short-seller's report references pending litigation between Fluence and Siemens Energy, attempting to characterize it as a "critical and dramatic development." While any dispute with a customer is unfortunate, *this is a small, ordinary course commercial dispute arising from a single project. Fluence brought the action to collect approximately $2 million in unpaid amounts due, and Siemens Energy responded with counterclaims of approximately $9 million.* Fluence strongly denies Siemens Energy's counterclaims and the case is progressing in the ordinary course.

123. The statements referenced in ¶122 above, were materially false and/or misleading when made because they omitted that:

(a) Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim;

(b) Specifically, the kinds of issues underlying the Diablo and Siemens Energy litigations were present in other Gen 6 projects, including High Desert; and

(c) Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence:

(i) Specifically, the impact of the issues that caused the Siemens Litigation were larger than the total amount of damages claimed, as Fluence was exposed to material undisclosed risks of reputational and financial harm, including through loss of business from current and/or prospective clients.

- 50 -

4932-2928-2126.v2

124.    On May 9, 2024, Fluence hosted a conference call for investors to discuss the Company's results for its second fiscal quarter. During the 2Q24 Earnings Call, Defendants continued to make false and/or misleading statements and omissions regarding the Siemens Litigation that maintained the artificial inflation in the price of Fluence stock.

125.    For example, defendant Pasha, in his prepared remarks, announced that Fluence had settled the Siemens Litigation for "a modest expense" and assured investors about the future, noting "[o]ur continued execution further demonstrates that our legacy backlog issues are behind us":

> *These results also include a modest expense from settling our pending litigation with Siemens Energy. Our continued execution further demonstrates that our legacy backlog issues are behind us, and we are benefitting from our higher margin backlog.*

126.    Defendant Nebreda similarly assured investors by stating that the Siemens Litigation was "immaterial" and that Siemens Energy was "not a . . . significant customer":

> [W]e settled the Siemens Energy litigation. And just to remind everybody who may be listening, Siemens Energy is not Siemens AG or shareholders. Siemens Energy is a customer related to our shareholder, but not our shareholder. We settled that litigation, *as we have told you in the past, that was an immaterial litigation, normal course of business litigation, immaterial*.
>
> *We settle[d] it in terms that it's even more immaterial than the litigation and it's a fraction of the claims that the customer had. And as I have said in the past, Siemens Energy is not a customer – a significant customer*. So what we have done very, very little with them.

127.    The statements referenced in ¶¶125-126 above about the Siemens Litigation were materially false and/or misleading when made because they omitted that:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications. As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications. Even when those efforts succeeded – which was not always the case – the

- 51 -

4932-2928-2126.v2

solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim; and

(b)    Fluence's premature release of the Gen 6 system created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence:

(i)    specifically, the kinds of issues underlying the Diablo and Siemens Energy litigation were present in other Gen 6 projects, including High Desert; and

(ii)    the impact of the issues that caused the Siemens Litigation were qualitatively larger than the settlement amount, as Fluence was exposed to material undisclosed risks of reputational and financial harm, including through loss of business from current and/or prospective clients.

128.    On August 8, 2024, Fluence hosted a conference call for investors to discuss the Company's results for its third fiscal quarter ("3Q24 Earnings Call").  During defendant Pasha's prepared remarks, he continued to conceal the issues facing the Gen 6 rollout when he announced that Fluence's Audit Committee had investigated findings from the Blue Orca Report, and "concluded that the allegations contained in the short report are without merit."  Pasha also disclosed that the SEC was "investigating certain matters pertaining to the company," likely including "revenue recognition policies and our previously disclosed material weakness."

> In response to the allegations made in the short report, our Board's Audit Committee conducted an investigation with the assistance of an outside counsel and forensic accountants.  I am pleased to share that this investigation concluded that ***the allegations contained in the short report are without merit***.

> Recently, however, the SEC notified us that they are investigating certain matters pertaining to the company.  Based on the information the SEC has requested, we believe we are examining some of the topics raised in the short seller report, such as revenue recognition policies and our previously disclosed material weakness.

129.    During the question and answer portion of the call, defendant Nebreda similarly responded to a question about the board investigation, stating that the Blue Orca Report had "*zero merit*."

130.    The statements referenced in ¶¶128-129 above, were materially false and/or misleading when made because they dismissed the allegations in the Blue Orca Report as being "without merit," or having "*zero merit*," but omitted that:

(a)    Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications.  As a result, Fluence or its Gen 6 customers incurred significant, un-budgeted costs in efforts to conform the Gen 6 systems to the customers' contracted specifications.  Even when those efforts succeeded – which was not always the case – the solutions took as long as a year or more, and often did not fully meet the customers' specifications, and Fluence incurred liquidated damages in the interim; and

(b)    Fluence's release of the Gen 6 systems when they were not ready for customer use created a material risk that its current and prospective customers would either cancel planned expansions or refuse future business with Fluence.

131.    On November 25, 2024, Fluence issued a press release providing the Company's results for its fourth fiscal quarter and full year 2024 ("4Q24 Release").  The 4Q24 Release issued annual revenue guidance for fiscal 2025 of approximately $3.6 billion to $4.4 billion, representing year-over-year growth of approximately 48% at the midpoint of the range.  During the corresponding conference call held the following day, defendant Pasha further revealed that Fluence's fiscal 2025 revenue would be "back-end loaded," with the Company recognizing approximately 80% of all revenues during the second half of fiscal 2025, while only 20% of its annual revenue would be recognized in the first half of fiscal 2025.

- 53 -

132.    Analysts were surprised by the revelation that 80% of the Company's projected revenue was pushed to the second half of the year (as compared to only 63% coming in the second half of FY2024).  For example, on November 26, 2024, RBC directly attributed the declines in Fluence's stock price to the "heavily 2H-weighted FY25 revenue guidance."  BMO wrote on November 26, 2024 that it was "concerned about heavier weighting of revenue to the second half of the year."  And Evercore wrote on November 26, 2024 that the revenue guidance by the Company "[l]eaves [m]ore [q]uestions than [a]nswers" and that the second half weighting "provides trepidation."

133.    On this news, the price of Fluence stock fell from $23.50 per share on November 25, 2024 to $19.00 a share on November 26, 2024, a decline of 19.1%, and to $18.37 per share on November 27, 2024, a decline of approximately 22% over a two-day trading period, on above-average trading volume.

134.    On February 10, 2025, after the market closed, Fluence issued a press release providing the Company's results for its first fiscal quarter of 2025 ("1Q25 Release").  The 1Q25 Release revealed that Fluence was reducing its fiscal 2025 revenue guidance from a range of $3.6 billion to $4.4 billion to a range of $3.1 billion to $3.7 billion, representing a reduction of approximately $600 million at the midpoint.  The 1Q25 Release further revealed that the guidance revision was the result of "'customer-driven delays'" in executing outstanding contracts and "'competitive pressures.'"  The 1Q25 Release further revealed that quarterly revenue of $187 million significantly missed consensus estimates of $363 million by nearly 48%, representing a significant departure from the already muted expectations set by the Company's "back-end loaded" revenue cadence disclosed during the prior quarter.

135.    On February 11, 2025, defendants Nebreda and Pasha convened an investor call to discuss Fluence's 1Q25 results.  During the call, defendant Nebreda attributed the $600 million

- 54 -

revenue miss "mostly to delays in the expected signing of contracts for three projects in Australia" and the adjustments in fiscal year 2025 revenue guidance "primarily to reflect delays in signing specific contracts; and secondly, due to come competitive pressures."

136.    As a result of these disclosures, the price of Fluence stock fell from $13.07 per share on February 10, 2025 to $6.18 per share on February 13, 2025, a more than 52% decline over a three-day trading period, on above-average trading volume.  As discussed *infra*, analysts were again surprised by the February 11, 2025 disclosures, and promptly downgraded the Company's stock.

## VII.    FLUENCE'S CLASS PERIOD MD&A'S FAILED TO DISCLOSE KNOWN TRENDS AND UNCERTAINTIES THAT WERE LIKELY TO ADVERSELY AFFECT ITS FINANCIAL CONDITION, RENDERING DEFENDANTS' STATEMENTS MISLEADING HALF-TRUTHS

137.    Section 13(a) of the 1934 Act requires issuers such as Fluence to file periodic reports on Form 10-K and Form 10-Q and requires registrants to comply with Regulation S-K Item 303.

138.    Item 303(a)(3)(ii) of Regulation S-K requires that annual reports filed on Forms 10-K describe, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  In addition, this Item requires that annual reports describe "any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."

139.    Instruction 3 to Item 303(a) of Regulation S-K requires that the "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  Similarly, Item 303(b) of Regulation S-K requires discussion of material changes in such known trends or uncertainties in quarterly reports on Form 10-Q.[9]

---

[9]    The MD&A *Objective* was amended starting for public companies starting with fiscal years ending on after August 9, 2021, and states in part:

- 55 -

140.     Defendants made numerous statements about the nature, installation, and costs of the Company's Gen 6 systems (*see, e.g.*, ¶¶74-76, 79, 81-83, 85, 87-90, 94-97, 99-100, 102-104, 106-107, 109-110, 112-113, 117, and 122) without disclosing that Fluence experienced material events and uncertainties that were required to be disclosed to make these statements not misleading.  As alleged herein, Fluence released its Gen 6 systems well before they were fully designed and tested to meet customer specifications in order to recognize revenue and avoid penalties for failing to meet contractual obligations.  Fluence installed systems with modifications that were not approved by customers, including modifications as major as installing entirely different systems than what was requested, and consequently failed to deliver under their contracts with customers, causing serious delays in completing the installation and sale to customers which, in turn, caused material delays in sales and increased expenses from cost overruns.  This had a material negative impact on Fluence's future profits and revenue as Fluence experienced reputational damage with customers who either did not want to do additional business with Fluence or delayed purchasing from Fluence due to Gen 6 problems.  Fluence thus failed to disclose the financial impact of delayed revenues and cost overruns caused by its Gen 6 problems and installation problems.  Accordingly, material financial information was omitted from Fluence's quarterly and annual reports filed with the SEC that was

---

(a) *Objective*.  The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources.  The discussion and analysis ***must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition***.  This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.  The discussion and analysis must be of the financial statements and other statistical data that the registrant believes will enhance a reader's understanding of the registrant's financial condition, cash flows and other changes in financial condition and results of operations.

- 56 -

reasonably likely to have a material favorable or unfavorable impact on Fluence's revenues or income from continuing operations. The information omitted from Fluence's MD&A was necessary for an understanding of Fluence's results of operations and its statements about the nature, installation, and costs of its Gen 6 systems. *See* §VI.[10]

141.    Fluence's management was well aware throughout the Class Period that the Gen 6 problems were reasonably likely to have a material unfavorable impact on the Company's revenues and results of operations, as alleged in ¶¶147-160. In addition, Fluence's annual revenue dispersion underwent a material change that was recognized by senior management, including the Individual Defendants. As alleged, sales were delayed so significantly that it had a material adverse effect on both the timing and existence of reported revenues. *See* ¶¶184-189. Between fiscal 2021 and fiscal 2024, Fluence's revenue split averaged 40% during the first half of the fiscal year and 60% in the second half of the fiscal year. In November 2024, however, Fluence announced that the revenue split was expected to be 20% and 80% in the first and second half of fiscal 2025, respectively. By the end of the Class Period, Defendants announced that the revenue delay was worse than previously announced and adjusted Fluence's revenue split to 15% and 85% for the first and second halves of 2025, respectfully. This was the most back-end-loaded revenue split in the Company's history and

---

[10]    The MD&A rule for *Results of operations* was also amended for public companies with fiscal years ending on or after August 9, 2021, and states in part:

> *Results of operations.* (i) **Describe** any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations. (ii) Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

4932-2928-2126.v2

was a focus of Fluence's management.[11]  Defendants were therefore aware of the issues driving the change in the timing of Fluence's annual revenue.

142.    The Gen 6 problems had another material unfavorable impact on Fluence's financial results.  Notably, the Company's gross margin also decreased from 17.18% in 3Q24 to 11.35% in 1Q25 and dropped to 9.87% in 2Q25.

143.    Since, as Fluence admits, the Company "depend[s] significantly on our reputation for safety and reliability and high-quality products and services, exceptional customer service, and our brand name to attract new customers and maintain our current customers, and grow our business," the release of Fluence's Gen 6 systems before they were fully tested to meet customer specifications and the resulting execution issues and reputational harm, were material events and uncertainties known to management that were reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

144.    Fluence was required to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K, which states, in pertinent part, as follows:

- A disclosure duty exists where a trend, **demand, commitment, event** or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

Moreover, SEC Release 33-8350, from 2003, states as follows:

---

[11]    During Fluence's Q4 2024 earnings call, Nebreda confirmed his knowledge by addressing the purported reasons for the revised 20/80 revenue split, blaming it on "internal incentives to our sales teams and implementation teams" and further noting that "we're putting correction to address this."

One of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties. Disclosure decisions concerning trends, demands, commitments, events, and uncertainties generally should involve the:

consideration of financial, operational and other information known to the company;

identification, based on this information, of known trends and uncertainties; and

assessment of whether these trends and uncertainties will have, or are reasonably likely to have, a material impact on the company's liquidity, capital resources or results of operations.

- As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

* * *

- One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance. Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A.

145. Fluence's Forms 10-Q and 10-K from fiscal year 2021 to 1Q25 failed to disclose "a trend, demand, commitment, event or uncertainty [that was] both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation."

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

146. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were

- 59 -

4932-2928-2126.v2

materially false and misleading.  The Individual Defendants participated in the drafting, preparation, and/or approval of the Company's public statements and were provided with, or had access to, the information alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  In their respective roles as CEO (Pérez and Nebreda), CFO (Fehr, Sial, and Pasha), and Chief Product Officer (Boll), the Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to Fluence during the Class Period.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

### A.    The Fraud Involved Fluence's Core Operations

147.    As Fluence's most senior executives, the Individual Defendants were: (i) responsible for, and remained well informed of, issues critical to Fluence's success; and (ii) directly involved in the management and day-to-day operations of the Company at the highest levels and thus privy to confidential proprietary information concerning Fluence and its business, operations, services, client relations, and present and future business prospects.  Defendants' misrepresentations concern Fluence's execution of the provision of energy storage solutions at several of its most important projects, including those known as "mega site installations," including the Diablo Project and High Desert Project.  The execution issues alleged herein were not isolated, but widespread and involved the Company's major contracts.  Given the pervasive nature of these execution issues, it would be absurd to suggest that the Individual Defendants were without knowledge of them.  And given that the alleged misstatements and omissions addressed core issues of Fluence's business, a strong

- 60 -

inference arises that the Individual Defendants knowingly or recklessly withheld information that was material to investors.

148. Throughout the Class Period, Fluence repeatedly informed investors in its Forms 10-K that its "revenue is primarily derived from sales of our energy storage products and solutions" and the Company's "revenue growth is directly tied to the continued adoption of energy storage [solutions] by our customers." Fluence's revenue also depended upon a highly concentrated customer base. In that regard, according to the Company's Forms 10-K for its fiscal years 2021 and 2022, Fluence's five largest customers represented approximately 76% and 77%, respectively, of its revenues during those fiscal years. During fiscal years 2023 and 2024, Fluence's two largest customers represented approximately 49% and 50%, respectively, of its revenues.

149. In fiscal year 2020, Fluence recognized total revenue of approximately $561.4 million, which included $318.9 million in revenue from U.S. operations. During that fiscal year, Fluence and Diablo entered into the Diablo EPC for the Diablo Energy Storage system dated and effective as of August 4, 2020. Pursuant to the Diablo EPC, Fluence agreed to perform the engineering, procurement, and construction of the Diablo Project for a contract price of $237,976,007. In other words, the value of the Diablo Project to Fluence at the time it entered into the agreement represented the equivalent of approximately 75% of the Company's U.S. revenues for its 2020 fiscal year. In connection with the Diablo EPC, Fluence and Diablo also entered into a services agreement, pursuant to which the Company agreed to perform repairs, maintenance, and other services on the Diablo Project in exchange for fees.

150. Diablo paid Fluence approximately $229,106,742 under the Diablo EPC and $821,964 under the services agreement. Accordingly, the Diablo Project would have been particularly important and visible to the Individual Defendants. It would be absurd to suggest that the Individual Defendants were unaware of the intricacies that were connected to such a major

- 61 -

contract.  In fact, the Individual Defendants emphasized the significance of the Diablo Project to the Company throughout the Class Period, referring to it as a "mega site installation[]."  ¶85.

151.    The issues with the Diablo Project were so pervasive that they would not have escaped executive management, including the Individual Defendants.  Between May 15, 2022 and August 22, 2022, the Diablo control system failed 81 times and remained riddled with significant problems until February 2024.  Similarly, between June 13, 2022 and July 14, 2022, the Diablo Project experienced 27 inverter failures.  Diablo informed the Company of these failures.  In total, Diablo submitted more than 100 warranty claims based on the above issues.

152.    Defendants' public statements confirm they were focused on the Company's most important projects: Throughout the Class Period, the Individual Defendants provided prepared statements on, and were asked and answered detailed questions about, the Company's project execution, further demonstrating the significance of these issues to investors.  Defendants made clear that project execution was crucial to the Company's revenues and financial guidance and that they were focused on the issue:

(a)    During the 1Q22 earnings call on February 2022, when asked about cost overruns associated with the Gen 6 product installations, defendant Boll said that Fluence conducted a "root cause analysis of either operational issues or technical issues that we could optimize to ensure that those cost overruns get to zero [or] closer to the end of this quarter" assuring investors that Fluence "identified the issues" and "implemented the fixes."

(b)    On May 12, 2022, during the 2Q22 earnings call, regarding "delays and additional costs associated with the rollout of our Gen 6 product," defendant Pérez said, "we have documented lessons learned and conducted more training for our crews."  On the same call, defendant Fehr spoke about "expected positive gross profit margins . . . being eroded during the delivery and installation" of Fluence's Gen 6 systems and attributed this erosion to, *inter alia*,

- 62 -

"installation cost overruns."  Defendant Fehr explained that reducing installation costs is "really the key item which we need to tackle now for the second half of the year and to further reduce here."

(c)    During the 4Q22 Earnings Call on December 2022, defendant Sial said that Fluence "believe[s] that issues confronted are well understood and now largely behind us" and "[w]e've also improved execution on product rollout, including leveraging our lab to test and debug solutions before we launch them not being."

(d)    During the 4Q22 Earnings Call on December 13, 2022, defendant Sial stated: "We're confident in our 2023 adjusted gross profit guidance of $60 million to $100 million, driven by improved contract underwriting and execution."

(e)    The Company's February 9, 2023 earnings presentation attributed "78% YOY revenue growth" to "improved execution / supply chain" and defendant Nebreda told investors that "improving [our] execution" was one of the "main areas" for the Company's "transformation."

(f)    During the May 16, 2023 Credit Suisse 2023 Renewables & Utilities Conference Presentation, Fluence stated that "[s]trong demand and execution lead to increased 2023 revenue guidance"; and

(g)    During the Company's August 10, 2023 3Q23 Earnings Call, defendant Nebreda attributed the Company's ability to raise guidance "to better project execution."

153.    Given the significance of Fluence's "mega site installations," including the Diablo Project, to the Company's financial results and guidance, the Individual Defendants, as Fluence's most senior executives, can be presumed to have knowledge of adverse facts impacting Fluence's execution of those projects, including those at Diablo and other "mega site installations."  Indeed, scienter is readily presumed when, as here, the fraudulent acts and statements relate to a significant part of a company's financial picture that cannot be expected to evade executive knowledge altogether.  This presumption is reinforced by Defendants' obligation under Regulation S-K, Item

- 63 -

303, to disclose known trends and uncertainties that were reasonably likely to have material effects on Fluence's financial condition or results of operation. *See* §VII.

154.   As the most senior executive officers at Fluence, the Individual Defendants were privy to confidential and proprietary information concerning Fluence and issues with the installation of its Gen 6 systems, including any breaches of contract or potential litigation stemming therefrom. The inference of scienter is even stronger where, as here, the corporate defendant is a small company in which corporate executives are likely to be familiar with day-to-day operations. It is implausible that the Individual Defendants would have been unaware of the pervasive operational issues described herein given Fluence's small size throughout the Class Period.

**B.   Defendants Were Aware that the Gen 6 Systems Were Not Fully Tested Before Their Release to Market**

155.   Defendants also were aware that the Gen 6 systems were not ready to be released to the market and of the pervasiveness of the Gen 6 execution issues. A Senior Vice President informed them of as much in 2022. For most of the Class Period, Kepshire was Fluence's Vice President of Engineering and Project Management, Americas, before he became Chief Operating Officer in December 2023, before departing the Company in April 2024.[12] According to CW-2, in 2022, after the initial rollout of Fluence's Gen 6 energy storage systems, Kepshire drafted and sent a memorandum to Fluence's executive management team describing issues with the initial rollout.

156.   Defendants also demonstrated that they knew the Gen 6 systems had not been properly tested because, according to CW-2, at defendant Boll's direction, Fluence commissioned a new test facility outside of Pittsburgh, Pennsylvania, in order to conduct "system-level" tests of Fluence's Gen 6 products. According to CW-2, Fluence wanted this test facility because Fluence had not tested the Gen 6 products at a system-wide level before their initial rollout.

---

[12]   Kepshire's promotion to Chief Operating Office imputes his knowledge to Fluence.

157.    The Individual Defendants were also aware of the pervasive operational issues alleged herein because Fluence's CEOs regularly visited the Company's clients and project sites. For example, during both a December 9, 2021 and February 10, 2022 earnings call, an Evercore analyst referenced defendant Pérez "going to see customers," stating "I mean, every time we speak, you're on an airplane or heading to an airplane or going somewhere to see a customer."  The fact that defendant Pérez was communicating directly with customers and visiting project sites, makes it even more likely that he was aware of the operational issues at the project sites.

### C.    The Individual Defendants' Public Statements Support a Strong Inference of Scienter

158.    The patent inconsistences between Defendants' public pronouncements and what was known internally within Fluence provides further circumstantial evidence of scienter.  By way of example, while Defendants emphasized Fluence's "***improved execution***" and "***strong execution***" throughout the Class Period, failed execution had resulted not only in the Diablo Litigation but had prompted Siemens Energy to file a counterclaim against Fluence for, *inter alia*, fraud in the inducement, fraudulent omission, and breach of warranty.  Moreover, notwithstanding Defendants' representations, Fluence had not resolved longstanding issues at the Diablo Project, the High Desert Project, or the Siemens Energy Project.  The large gap between Defendants' representations and the truth regarding Fluence's product development and execution suggests that Defendants knew their statements were false or ignored obvious signs of problems with product performance and execution.  In the face of the prevalent problems outlined herein, it would be highly implausible for Defendants to have remained in the dark about such widespread issues.

159.    The temporal proximity between Defendants' false and misleading statements and the revelation of the truth also strengthens the scienter inference.  Here, as late as November 28, 2023, defendant Nebreda emphasized Fluence's "strong execution" and "ability to navigate challenges, drive towards success, and deliver solutions to our customers."  ¶109.  But less than one month later,

- 65 -

*Energy Storage News* published a news article revealing that Fluence's work on the Diablo Project suffered from a "litany of 'defects, deficiencies, and failures.'" The article also detailed the numerous alleged defects and failures that plagued Fluence's work. ¶176. Similarly, Defendants made statements minimizing the import of the Diablo Litigation (¶117) in December 2023, two months before the Blue Orca Report revealed the existence of the Siemens Litigation, and disclosed to the market that the Diablo Litigation was not a "one-off."

160. Defendants' vehement (and false) denials of the operational concerns articulated in, *inter alia*, the *Energy Storage News* article and the Blue Orca Report (¶¶117, 122, 128-129) are probative of Defendants' scienter. Either Defendants' denials were knowingly false, or Defendants recklessly made the denials without any regard as to whether they would mislead public investors – in either scenario, Defendants acted with scienter.

### D.    Fluence Experienced Suspiciously High Executive Turnover at Suspicious Times During the Class Period

161. The high level of executive departures during the Class Period supports an inference that Fluence and its executives were aware of the pervasiveness of the issues arising out of the Gen 6 products, and the impact these issues were having on Fluence's relationships with its customers. Key examples of this revolving door of executive departures include:

(a)    On August 8, 2022, Fluence announced that defendant Pérez would be departing as CEO, effective September 1, 2022;

(b)    On August 31, 2022, Fluence announced that defendant Fehr would be departing in September 2022;

(c)    On November 16, 2023, Fluence announced that defendant Sial would be succeeded as CFO, effective January 1, 2024, after he had been in the role for just over a year; and

(d)    On January 8, 2025, Fluence announced that defendant Boll was departing, effective January 31, 2025.

- 66 -

4932-2928-2126.v2

162.    These departures were suspicious in timing and magnitude.  For example, defendants Pérez and Fehr departed Fluence after the Company's struggles installing its initial rollout of Gen 6 products.  Further, defendant Sial's departure occurred shortly after the revelation of the Diablo Litigation, and shortly before the revelation of the Siemens Energy litigation.  Lastly, Fluence announced defendant Boll's departure just over a month after the November 25, 2024 corrective disclosure, and approximately a month before the February 10, 2025 disclosure.

**E.    AES' Financial Benefit from the Fraud Supports a Strong Inference of Scienter**

163.    Defendant AES also had the motive and opportunity to carry out the fraud alleged herein.  Within one week of Fluence's announcement that it had achieved its "milestone" of generating positive net income, AES caused Fluence to conduct a registered SPO that enabled AES to dump more than $156 million in Fluence stock at artificially inflated prices.  The timing of the sale was also highly suspicious as it occurred approximately one week after Siemens Energy had initiated its lawsuit against Fluence and less than two weeks before the truth regarding the misrepresentations detailed herein was partially revealed to investors.

**IX.    NO SAFE HARBOR**

164.    Fluence's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

165.    Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of Fluence who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to

- 67 -

any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

166.    At all relevant times, the market for Fluence stock was an efficient market for the following reasons, among others:

(a)    Fluence stock met the requirements for listing, and was listed and actively traded May 16 on the NASDAQ, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for the fiscal year ended September 30, 2024, Fluence had over 129 million shares of Class A common stock outstanding as of November 20, 2024;

(c)    as a regulated issuer, Fluence filed periodic public reports with the SEC;

(d)    Fluence regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

(e)    material news about Fluence was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

167.    As a result of the foregoing, the market for Fluence stock promptly digested current information regarding Fluence from publicly available sources and reflected such information in the price of Fluence stock.  Under these circumstances, all purchasers of Fluence stock during the Class Period suffered similar injury through their purchases of Fluence stock at artificially inflated prices, and a presumption of reliance applies.

- 68 -

4932-2928-2126.v2

168.    A presumption of reliance is also appropriate in this action under the Supreme Court's

holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's

claims are based, in significant part, on Defendants' material omissions.  Because this action

involves Defendants' failure to disclose material adverse information regarding Fluence's business,

operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of Defendants'

material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    LOSS CAUSATION/ECONOMIC LOSS

169.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

Plaintiff's and Class members' economic loss.  The market for Fluence's stock was open, well-

developed, and efficient during the Class Period.  Throughout the Class Period, Fluence's stock

traded at artificially inflated prices as a direct result of the Defendants' false and misleading

statements and omissions, which were widely disseminated to the securities market, investment

analysts, and the investing public.  Plaintiff and other members of the Class purchased or otherwise

acquired the Company's stock relying upon the integrity of the market price for Fluence's stock, and

have been damaged thereby.

170.    The Class Period inflation in Fluence's stock price was removed when information

concealed by the Defendants' false or misleading statements and omissions were revealed to the

market through a series of partial disclosures, as more particularly described below.  The truth was

not revealed to the market all at once, but, rather, the truth began to emerge, and the risk caused by

Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of

Defendants' Class Period statements.  The relevant stock price declines were due to firm specific,

- 69 -

4932-2928-2126.v2

fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraudulent factors.

171.    Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, as a result of their purchases of Fluence stock during the Class Period.  The economic loss suffered by Plaintiff and the other Class members was a direct result of the nature and extent of the Defendants' false and misleading statements and omissions being revealed to investors and the market.

**A.      February 9, 2022 Disclosure**

172.    After the market closed on February 9, 2022, Fluence issued a press release providing the Company's results for its first fiscal quarter 2022 ("1Q22 Release").  The 1Q22 Release reported that the Company had an EBITDA loss of $43 million on revenue of $175 million, which was below the Wall Street consensus expectation of an Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") of $33 million loss on revenue of $204 million.  The Company also reported adjusted gross margins of -4.8%, far below the Wall Street consensus estimate of 1.4%.  On February 10, 2022 the Company convened a conference call with investors, during which defendant Pérez revealed that:

> I would like to update you on the headwinds that we discussed on our last earnings call and the steps we are taking to mitigate their impact.  This mostly stemmed from supply chain disruption as a result of COVID-19 *as well as some cost overruns in the rollout of our first Generation 6 product installations and commissioning*.  Our team has acted swiftly to implement corrective actions that provide us the confidence to further execute on our plan.

173.    On this news, Fluence stock declined from a closing price of $16.67 per share on February 9, 2022 to $15.21 per share on February 10, 2022 and to $13.34 per share on February 11, 2022, a 19.97% decline on very heavy trading volume.

174.    Analysts were surprised by these revelations regarding Fluence's cost overruns and Gen 6 issues.  For example, Morgan Stanley wrote in a February 11, 2022 report that Fluence's gross margin miss was caused by "cost overruns and delays experienced in some Gen 6 cube product

- 70 -

installations and commissioning." JP Morgan wrote in a February 10, 2022 report that "gross margin was a 4.8% loss, reflecting project delays and some cost overruns on Gen 6 installs." Credit Suisse published a report on February 15, 2022 stating that "[w]e reduce our TP by $2 to $37 due to near-term cost over runs and lower volumes."

175.    However, because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Fluence stock continued to be artificially inflated.

## B.    December 20, 2023 Disclosure

176.    On December 20, 2023, *Energy Storage News* published a news article revealing that the owner of the Diablo Project had filed a cross-complaint against Fluence seeking $230 million and alleging Fluence's work on the Diablo Project suffered from a "litany of 'defects, deficiencies, and failures.'" The article detailed the numerous alleged defects and failures that plagued Fluence's work, including that: (i) Fluence's project control system responded slowly or inaccurately to the CAISO – the non-profit entity responsible for managing the flow of electricity and operator of the State's wholesale energy market – prompting CAISO to remove the project from the service market for several weeks; (ii) Fluence's proprietary human-machine interface had failed to function properly, which required Diablo to use an alternative technology not designed for that purpose, resulting in operational inefficiencies; (iii) Fluence's Auxiliary Control System frequently failed; (iv) Fluence's inverters failed repeatedly – including 27 inverter failures within a one-month period just two months after delivery; and (v) the occurrence of two arc flashes which posed a risk of serious harm and injury. The *Energy News Storage* article further revealed that Fluence had completed the Diablo Project approximately eight months past the contracted delivery date and that Fluence had failed to address and resolve related warranty claims on the defective work.

4932-2928-2126.v2

177.    As a result of the disclosures on December 20, 2023, the price of Fluence stock fell from $27.22 per share on December 19, 2023 to $23.01 per share on December 20, 2023, more than 15%, on above-average trading volume of more than ten million shares traded.  Financial analysts directly attributed the price decline to the disclosures in the *Energy Storage News* article and promptly issued reports expressing their disappointment.  For instance:

- On December 20, 2023 Roth published an article that stated: "Energy Storage News published an article indicating LS Power is seeking a $230mn refund for its Diablo Energy Storage EPC contract with FLNC.  The counterclaim follows a $37mn breach of contract complaint filed by FLNC.  The dispute was previously disclosed in FLNC's FY'23 10K; however, shares closed down 15% as it appears it was not widely understood" and that "FLNC's complaint against Diablo Energy Storage LLC and the subsequent cross-complaint *introduces financial and reputational risks for FLNC*" and that "the Energy Storage News article *focused attention on the issue*."  The analyst also stated that "[t]he negative implications of this legal dispute include the potential loss of a customer and damage to FLNC's reputation as LS Power is a large U.S. IPP having developed >13GW of generating capacity."

- On December 21, 2023, J.P. Morgan issued a report which stated "a media report detailed a lawsuit filed against FLNC by a customer for EPC work performed on the Diablo Energy Storage project in California.  The stock subsequently declined ~15%, compared to the SP500 down 1.5%."

- RBC issued a report on December 20, 2023 entitled "***Diablo BESS project lawsuit pressuring stock price***."

178.    However, because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Fluence stock continued to be artificially inflated.  For example, in response to the *Energy Storage News* article, Fluence denied the information it disclosed, including during a February 2024 conference call, where defendant Nebreda represented that the Diablo Project was "performing very well and has delivered availability or uptime above its contractual requirement during 2023."

179.    Similarly, on December 20, 2023, Fluence denied the information in a press release stating that it "[stood] by its [w]ork on the Diablo Plant, and [would] [v]igorously [p]ursue the

4932-2928-2126.v2

[p]ayments it [was] [o]wed." Fluence made similar statements in its 1Q24 Form 10-Q, which was signed by defendant Nebreda who also filed certifications pursuant to the Sarbanes-Oxley Act attesting to the document's accuracy and completeness.

### C.    February 22, 2024 Disclosure

180.    On February 22, 2024, analysts at Blue Orca Capital published a research report revealing new facts previously unknown to the market regarding Fluence's operational failures. Specifically, the research report revealed that Siemens Energy – an affiliate of Fluence's major shareholder Siemens Industry, Inc. – had filed a counterclaim in the Siemens Litigation against Fluence accusing the Company of fraud, misrepresentations, and a "laundry list" of engineering and design failures related to a Company project in Antioch, California, and that Fluence's work for Siemens Energy had been late and defective. Siemens Energy claimed that the Company had unilaterally altered the design of its original proposal, which resulted in significant operational failures requiring other portions of the project to be redesigned and reengineered to fit Fluence's undisclosed alterations. Despite the follow-on work, Fluence's completed system failed performance tests administered in May 2022.

181.    Fluence had not previously disclosed the existence of the Siemens Litigation to investors, and the Blue Orca analysts stated that because it was filed in state court in Arlington County, Virginia, they had to send someone in person to the courthouse to obtain a copy of the court filing.

182.    On this news, the price of Fluence stock fell from $17.01 per share on February 21, 2024 to $14.73 per share on February 22, 2024, more than 13%, on above-average trading volume. Analysts were shocked by the revelation of the existence of the claims in the Siemens Litigation. For example:

- On February 22, 2024, BNP Paribas published a report stating "[t]he Siemens countersuit highlighted in the Blue Orca report *is indeed a surprising*

- 73 -

4932-2928-2126.v2

*development* . . . the growing number of lawsuits (Diablo, Dashiell, Siemens) is cautious for a company which requires >$1bn order growth per quarter to meet revenue targets. ***Allegations of poor product quality and EPC work could deter future customers, especially given increasingly competitive ESS environment. We see greater risk of future reputational damage or demand hit from ramping lawsuits than financial or cash flow implications related to potential specific damages***."

- On February 26, 2024, Guggenheim published a report stating "Having carefully read the [Blue Orca] report as well as the related legal documents, we believe that . . . there is one element of the report that did merit further investigation in our view, specifically the assertion that FLNC has been engaged in litigation with Siemens Energy (SMNEY, $14.84, NC) regarding an energy storage project. We note that the litigation was not disclosed in any of FLNC's public filings, which also merited attention in our view."

183. However, because Defendants failed to disclose the full truth and continued to make materially false and misleading statements and omissions, as detailed herein, the price of Fluence stock continued to be artificially inflated.

**D.    November 25, 2024 Disclosure**

184. On November 25, 2024, Fluence issued a press release providing the Company's results for its fourth fiscal quarter and full year 2024. The 4Q24 Release issued annual revenue guidance for fiscal 2025 of approximately $3.6 billion to $4.4 billion, representing year-over-year growth of approximately 48% at the midpoint of the range. During the corresponding conference call held the following day, defendant Pasha further revealed that Fluence's fiscal 2025 revenue would be "back-end loaded," with the Company recognizing approximately 80% of all revenues during the second half of fiscal 2025, while only 20% of its annual revenue would be recognized in the first half of fiscal 2025.

185. Analysts were surprised by the revelation that 80% of the Company's projected revenue was now supposed to come in the second half of the year (as compared to only 63% coming in the second half of FY24). For example, on November 26, 2024, RBC directly attributed the declines in Fluence's stock price to the "heavily 2H-weighted FY25 revenue guidance," while BMO

- 74 -

wrote on November 26, 2024 that it was "concerned about heavier weighting of revenue to the second half of the year" and Evercore wrote on November 26, 2024 that the revenue guidance by the Company "leaves more questions than answers" and that the second half weighting "provides trepidation."

186.    On this news, the price of Fluence stock fell from $23.50 per share on November 25, 2024 to $19.00 per share on November 26, 2024, a decline of 19.1%, and to $18.37 per share on November 27, 2024, a decline of approximately 22% over a two-day trading period, on above-average trading volume.  However, because Defendants failed to disclose the full truth, the price of Fluence stock remained artificially inflated.

### E.    February 10, 2025 Disclosure

187.    On February 10, 2025, after the market closed, Fluence issued a press release providing the Company's results for its first fiscal quarter of 2025.  The 1Q25 Release revealed that Fluence was reducing its fiscal 2025 revenue guidance from a range of $3.6 billion to $4.4 billion to a range of $3.1 billion to $3.7 billion, representing a reduction of approximately $600 million at the midpoint.  The 1Q25 Release further revealed that the guidance revision was the result of "'customer-driven delays'" in executing outstanding contracts and "'competitive pressures.'"  The 1Q25 Release further revealed that quarterly revenue of $187 million significantly missed consensus estimates of $363 million by nearly 48%, representing a significant departure from the already muted expectations set by the Company's "back-end loaded" revenue cadence disclosed during the prior quarter.

188.    On February 11, 2025, defendants Nebreda and Pasha convened an investor call to discuss Fluence's 1Q25 results.  During the call, Nebreda attributed the $600 million revenue miss "mostly to delays in the expected signing of contracts for three projects in Australia" and the

adjustments in fiscal year 2025 revenue guidance "primarily to reflect delays in signing a specific contracts; and secondly, due to some competitive pressures."

189.    As a result of these disclosures, the price of Fluence stock fell from $13.07 per share on February 10, 2025 to $6.18 per share on February 13, 2025, a more than 52% decline over a three-day trading period, on above-average trading volume.  Analysts were shocked by the February 11, 2025 disclosures, and promptly downgraded the Company and issued reports expressing their surprise and frustration, and directly called Fluence's explanations into question.  For instance:

- On February 13, 2025, BofA Global Research issued a report entitled "Downgrade on *execution missteps* and intensifying competition."  The report stated says "confidence has eroded in the execution" and that "[m]oving from growth to more uncertainty . . . Post 1Q earnings, we downgrade Fluence Energy to Neutral based on three key factors: 1) Execution Risks: A 15% cut to FY25 revenue guidance and heavier second-half deliveries raise the risk of negative revisions and potential earnings misses, echoing FY24 challenges."

- BofA also stated that:

    We see significant uncertainty in the near-to-mid-term for the company as *execution has been challenged in an environment where competition is heating up. We came away from the 1FQ25 call with less confidence in the company's ability to assess project timing and execute on revenue targets*.  Despite the lower guidance bar ($3.1-3.7B in FY25 revenue versus $3.6-4.4B prior) and higher backlog coverage toward the mid-point of the guidance (85% versus ~2/3rds prior), we lack confidence in the company's ability to handicap FY25 for potential pushouts.  Hence, we are modelling $3.2B at the low end of guidance and well below our prior $3.9B estimate on lower volumes.

    The decrease in FY25 revenue guidance and increase in backlog coverage to 85% implies only a ~$223M improvement in FY25 visibility during the quarter despite a stated ~$1.5B of near-term opportunities indicated on the 4FQ24 call.  We note that the 1H/2H split also shifted to 15%/85% from the 20%/80% expected in November, which implies a roughly even cut in revenue from both 1H and 2H. *While the cut was attributable to $600M of revenue from three Australian projects that were expected to be signed in January, we believe there are likely incremental project pushes that were not addressed on the call given a January contract signing likely would've represented more revenue recognized in 2H based on the company's rule of thumb for 70% of project revenue recognized in 3-12 months*.  We believe the larger back-end weighting sets up a similar dynamic as FY24 of negative revisions throughout the year and a potential miss.

4932-2928-2126.v2

- On February 12, 2025, Morgan Stanley issued a report stating that "[n]et-net, the execution mis-steps calls into question the visibility into medium-term demand and therefore challenges consensus estimates."

- On February 12, 2025, UBS issued a report entitled "Execution risk, D/G to Neutral," which stated "[t]he key driver to the [revenue] cut is declining expected gross margins on recently signed contracts and FY 2025 project delays."

- On February 11, 2025, Barclays issued a report questioning Fluence's explanation about Australia, stating "[w]e find it hard to believe this was the sole reason for the topline guide-down, so did projects in the backlog also slip?"  The report also asked "is the company seeing margin pressure generally across all regions or is there a difference between US and ROW?  Aren't margins supposed to be locked in at time of booking, so what changed?"

## XII.    CLASS ACTION ALLEGATIONS

190.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Fluence stock during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company and AES, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

191.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fluence stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Fluence or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

4932-2928-2126.v2

192.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

193.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

194.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business and operations of Fluence and/or omitted material information; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

195.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT 1

**For Violation of §10(b) of the Exchange Act and
Rule 10b-5 Against All Defendants Except AES**

196.     Plaintiff incorporates ¶¶1-195 by reference.

197.     During the Class Period, Defendants named herein disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

198.    Defendants named herein violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Fluence stock during the Class Period.

199.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fluence stock.  Plaintiff and the Class would not have purchased Fluence stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### COUNT II

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants and AES**

200.    Plaintiff incorporates ¶¶1-199 by reference.

201.    The Individual Defendants and AES acted as controlling persons of Fluence within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants and AES had the power and authority to cause Fluence to engage in the wrongful conduct complained of herein.

202.    As set forth elsewhere herein, by virtue of their high-level positions and their participation in and awareness of Fluence's operations and public statements, the Individual

4932-2928-2126.v2

Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the information that Plaintiff and the Class contend contained materially false and misleading statements and on which Plaintiff and the Class relied.

203.    Defendant AES controlled Fluence and the Individual Defendants for the reasons detailed herein, including through its ownership of a majority of Fluence voting stock, influence over Fluence's management, historical relationship with the Company, and the various agreements that these Defendants had caused the Company to execute.

204.    By reason of such conduct, the Individual Defendants and AES are liable pursuant to §20(a) of the Exchange Act.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

4932-2928-2126.v2

## XIV.   JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  June 20, 2025                    */s/ Craig C. Reilly*

CRAIG C. REILLY
VSB #20942
THE OFFICE OF CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA  22314
Telephone:  703/549-5354
703/549-5355 (fax)
craig.reilly@ccreillylaw.com

Liaison Counsel

DOUGLAS R. BRITTON
LUCAS F. OLTS
JOSEPH J. TULL
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
lolts@rgrdlaw.com
jtull@rgrdlaw.com

GREGG S. LEVIN
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
CAMERAN GILLIAM
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com
cgilliam@motleyrice.com

Lead Counsel for Lead Plaintiff

- 81 -

4932-2928-2126.v2