**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **In re Fluence Energy, Inc. Securities Litigation** | **No. 1:25-cv-00444-PTG-IDD**<br><br>**CLASS ACTION** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S CONSOLIDATED COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................3

     A.     Fluence Launches Its Gen 6 Product Line Amidst Onset of Global Pandemic ........................................................................................................................3

     B.     Fluence Discloses Gen 6 Operational Issues, Cost Overruns, and Disputes ..........4

     C.     Two Customers File Cross-Complaints Stemming from Business Disputes ..........6

     D.     Demand for Fluence's Gen 6 Products Grows Throughout the Class Period..........8

     E.     Plaintiff Files This Lawsuit Alleging Fraud ........................................................8

LEGAL STANDARD....................................................................................................................9

ARGUMENT ................................................................................................................................9

I.     PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER .................10

     A.     Plaintiff Fails to Allege Severe Recklessness ........................................................11

     B.     Plaintiff Alleges No Reason Why Defendants Would Commit Fraud .................16

     C.     Competing Inferences Are Far More Compelling .................................................17

II.     PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ...................................................17

III.     PLAINTIFF FAILS TO PLEAD FALSITY....................................................................20

     A.     Plaintiff Fails to Plead an Actionable Omission ...................................................21

     C.     The Safe Harbor Protects the Challenged Forward-Looking Statements..............28

     D.     Plaintiff Fails to Plead an Actionable Opinion Statement .....................................29

IV.     PLAINTIFF'S SECTION 20(A) CLAIM ALSO FAILS .................................................30

CONCLUSION............................................................................................................................30

# Table of Authorities

## CASES

*Amorosa v. Gen. Elec. Co.*,
  2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) ...................................................... 16

*Arnlund v. Deloitte & Touche LLP*,
  199 F. Supp. 2d 461 (E.D. Va. 2002) .................................................................. 14

*Ash v. PowerSecure Int'l, Inc.*,
  2015 WL 5444741 (E.D.N.C. Sept. 15, 2015).......................................... 13, 25, 29

*Attia v. Google LLC*,
  2018 WL 2971049 (N.D. Cal. June 13, 2018) ..................................................... 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................................ 21

*Boykin v. K12, Inc.*,
  54 F.4th 175 (4th Cir. 2022) ........................................................... 16, 27, 28, 30

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ......................................................................... 9, 10

*Defeo v. IonQ, Inc.*,
  134 F.4th 153 (4th Cir. 2025) .......................................................... 17, 18, 19

*Dunn v. Robotics Corp.*,
  2003 WL 23697826 (E.D. Va. 2003).................................................................... 21

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................................ 17

*Emps. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v.*
  *MacroGenics*,
  61 F.4th 369 (4th Cir. 2023) ................................................................. 25, 29, 30

*Greenhouse v. MCG Cap. Corp.*,
  392 F.3d 650 (4th Cir. 2004) .............................................................................. 21

*Hawes v. Argo Blockchain*,
  2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024)......................................................... 10

*In re Apollo Grp., Inc. Sec. Litig.*,
  2011 WL 5101787 (D. Ariz. Oct. 27, 2011)......................................................... 15

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) .............................................................................. 19

*In re Connetics Corp. Secs. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................. 15

*In re Conventry Healthcare, Inc. Sec. Litig.*,
2011 WL 1230998 (D. Md. Mar. 30, 2011)........................................... 13

*In re Dexcom Inc. Class Action Sec. Litig.*,
2025 WL 1399196 (S.D. Cal. May 14, 2024)........................................ 10

*In re DXC Tech. Co. Secs.*,
2025 WL 950398 (E.D. Va. 2025)......................................................... 27

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
763 F. Supp. 3d 1027 (C.D. Cal. 2025) ................................................ 20

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)................................................................. 14

*In re Lululemon Sec. Litig.*,
14 F.Supp.3d 553 (S.D.N.Y. 2014)...................................................... 30

*In re Marriot Int'l, Inc.*,
31 F.4th 898 (4th Cir. 2022) .................................................. 21, 23, 25

*In re Triangle Capital Corp. Sec. Litig.*,
988 F.3d 743 (4th Cir. 2021) .......................................................... 11, 16

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
432 F. Supp. 2d 571 (E.D. Va. 2006) .............................................. 11, 12

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2018).............................................................................. 21

*Katyle v. Penn Nat. Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) .......................................................... 3, 9, 20

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ....................................................... 11, 15, 17

*Knurr v. Orbital ATK Inc.*,
272 F. Supp. 3d 784 (E.D. Va. 2017) .................................................. 13

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
601 U.S. 257 (2024).............................................................................. 26

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ............................................................... 17

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ............................................................................................ 21

*Ottmann v. Hanger Orthopedic Grp., Inc.,*
  353 F.3d 338 (4th Cir. 2003) ............................................................................ 16

*Philips v. Triad Guar. Inc.,*
  2015 WL 1457980 (M.D.N.C. Mar. 30, 2015) ................................................. 21

*Phillips v. LCI Int'l, Inc.,*
  190 F.3d 609 (4th Cir. 1999) ..................................................................... 25, 26

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.,*
  966 F. Supp. 2d 525 (M.D.N.C. 2013) ............................................................. 29

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.,*
  2021 WL 1439680 (E.D. Va. Mar. 24, 2021) .............................................. 27, 28

*Raab v. Gen. Physics Corp.,*
  4 F.3d 286 (4th Cir. 1993) ......................................................................... 28, 29

*Ret. Ass'n of Colo. v. Deloitte & Touche,*
  551 F.3d 305 (4th Cir. 2009) ............................................................................ 17

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.,*
  75 F.4th 232 (4th Cir. 2023) ......................................................... 9, 16, 22, 25

*Taylor v. First Union Corp. of South Carolina,*
  857 F.2d 240 (4th Cir. 1988) ............................................................................ 24

*Tchrs. Ret. Sys. Of Louisiana v. Hunter,*
  477 F.3d 162 (4th Cir. 2007) ............................................................................ 11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ............................................................................. 9, 10, 11

*Touchstone Strategic Tr. v. Gen. Elec. Co.,*
  2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022) ........................................... 15, 16

*United States ex rel. Taylor v. Boyko,*
  39 F.4th 177 (4th Cir. 2022) .............................................................................. 9

*Veal v. LendingClub Corp.,*
  423 F. Supp. 3d 785 (N.D. Cal. 2019) .............................................................. 22

*Weston Family P'ship LLLP v. Twitter, Inc.,*
  29 F.4th 611 (9th Cir. 2022) ............................................................................. 22

*Yates v. Mun. Mortg. & Equity, LLC*,
 744 F.3d 874 (4th Cir. 2014) ................................................................................. 12, 17, 30

## STATUTES

15 U.S.C. § 78u-4(b).................................................................................................... 2, 10, 9, 20

15 U.S.C. § 78u-4(e) ............................................................................................................... 20

15 U.S.C. § 78u-5 ............................................................................................................... 28, 29

## RULES

Fed. R. Civ. P. 11(b)(3)................................................................................................................15

Fed. R. Civ. P. 12(b)(6)............................................................................................................3, 9

Fed. R. Civ. P. 9(b) .........................................................................................................3, 9, 11, 12

Rule 10(b) (5)...................................................................................................... 8, 9, 21, 26, 28, 30

Rule 20(a)................................................................................................................................ 8, 30

Note on Citation Format:  Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.  All paragraph citations are to the Consolidated Complaint, while references to Ex.__ correspond to the exhibits attached to the Declaration of Matthew J. Peters submitted in support of this Motion.

.

**INTRODUCTION**

Plaintiff's theory is that Fluence Energy, Inc. ("Fluence") and certain of its current and former officers intentionally engaged in self-sabotage by delivering, installing, and operationalizing sixth-generation clean energy storage systems ("Gen 6") knowing that they were not ready and would fail, while publicly expressing optimism about Fluence's performance and improved project execution. This theory, in turn, is based on untested allegations—sourced from cross-complaints filed by just two customers in response to Fluence-initiated litigation, vague statements attributed to two anonymous former Fluence employees, and a self-professed "biased" anonymous short-seller report—about business disputes concerning a few Gen 6 clean energy storage projects. Plaintiff's 81-page, 204-paragraph Consolidated Complaint ("Complaint") distills to the following: because Fluence had business disputes with a few large customers, it must also have had systematic and widespread operational issues with its Gen 6 products which it hid to defraud investors. That premise is debunked by Fluence's robust public disclosures of the operational challenges it did face, is irreconcilable with the reality that demand for Fluence's products grew throughout the Class Period, and fails to plead securities fraud.

Headquartered in Arlington, Virginia, Fluence is a leading global provider of clean energy storage products and services whose mission is to transform the way we power our world for a more sustainable future. *See* ¶¶ 19, 33; Ex. 1 at 1. Amid the COVID-19 pandemic in 2020, Fluence introduced its cutting-edge Gen 6 systems, which provide large-scale clean energy storage solutions to utilities, renewable energy developers, and industries. Ex. 1 at 2. Fluence experienced operational challenges and delays that led some projects to be more costly than anticipated. Documents incorporated by reference in the Complaint could not be clearer on how the Company responded. Fluence was forthcoming with the public—it repeatedly disclosed the challenges and the resulting financial impacts (including liquidated damages paid to customers), implemented and

disclosed remedial efforts and processes, and cautioned that the challenges may continue. When Fluence sued two of its customers for amounts due under their contracts, the customers counter-sued, as is typical with most commercial disputes. But pleading the existence of business disputes is insufficient to plead securities fraud.

As an initial matter, the Complaint is a textbook puzzle pleading. Plaintiff fails to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" as required by the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u-4(b)(1). The PSLRA was intended, among other things, to avoid the enormous costs imposed on Defendants and this Court in piecing together Plaintiff's jigsaw puzzle of scattershot allegations to figure out what, exactly, Plaintiff claims was fraudulent, by whom. The Complaint should be dismissed for this reason alone. To the extent Plaintiff identifies any discernable claim for securities fraud, Plaintiff fails to plead three critical elements of that claim.

*First*, Plaintiff fails to plead facts creating the requisite "strong inference" of scienter. While Plaintiff has allegations from two low-level former employees, disgruntled customers seeking to avoid contractual obligations, executive turnover, and the rhetorical allegation that the purported fraud involved Fluence's "core operations," none is a well-pled fact establishing that any Defendant had any information contradicting their public statements. To the extent Plaintiff relies on unverified allegations in other lawsuits, the Court should disregard those allegations under Rule 11. Plaintiff also does not plead a fraudulent motive (e.g., insider stock sales) for any Defendant.

*Second*, Plaintiff fails to plead loss causation—that the alleged misstatements or omissions Plaintiff cites "caused the loss which it seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). None of Plaintiff's allegations—a biased anonymous short-seller report, a news article reporting on

public litigation, and disappointing financial results—"revealed 'new facts' suggesting [Fluence] had perpetrated a fraud on the market," which is fatal to Plaintiff's ability to plead loss causation. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011).

*Third*, Plaintiff has not pled any actionable misrepresentation. Plaintiff's allegations fail to demonstrate, as required by the heightened pleading standards applicable to these claims, how any of the challenged statements were false or misleading. In addition, many of the statements that Plaintiff seemingly challenges are exactly the type of statements that courts within this Circuit have routinely dismissed as legally non-actionable expressions of corporate optimism, protected by the PSLRA's safe harbor, and/or protected opinions.

The Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

### A.    Fluence Launches Its Gen 6 Product Line Amidst Onset of Global Pandemic

Fluence was formed in 2018 as a joint venture between Siemens Industry, Inc. and AES Grid Stability to address perceived gaps in the nascent utility-scale energy storage market. *See* ¶¶ 2, 34; Ex. 13. Fluence offers a range of cutting-edge clean energy storage products, services, and digital solutions and, in particular, pioneered new use cases for clean energy storage products in electrical power grids. Ex. 1 at 1, 3. Fluence's clean energy storage products share a cube-shaped design and contain proprietary hardware and software. *See* ¶ 34. These products can be customized and combined to meet specific customer needs, ¶ 35; Ex. 1 at 3-4, 102, supporting uses such as frequency regulation, generation enhancement, and renewable integration. Ex. 20 at 5. Even before it went public, Fluence won numerous awards for its innovative clean-energy products and was recognized as the leading and largest global energy storage systems integrator. Ex. 1 at 2. In 2020, coinciding with the onset of the COVID-19 pandemic, Fluence launched its Gen 6 systems.

**B.      Fluence Discloses Gen 6 Operational Issues, Cost Overruns, and Disputes**

Fluence went public on October 28, 2021. ¶ 5. In its Registration Statement, Fluence disclosed that it had been experiencing operational challenges in connection with installing and commissioning its Gen 6 systems. Ex. 1 at 11. The Company publicly highlighted negative impacts from shipping delays, customer site closures, and other pandemic-related issues, as well as "cost overruns and delays . . . in some projects currently under construction." Ex. 1 at 11; *see, e.g.*, Ex. 4 at 10-12; App. B at 15, 17. Fluence specifically disclosed "some of those costs overruns and delays are occurring in the first Generation 6 product deliveries." Ex. 1 at 11; *see, e.g.*, Ex. 2 at 11; App. B at 8. Fluence also disclosed that product modifications during production and installation have caused customer disputes and may continue to do so, potentially leading to future work loss and reduced profits, Ex. 1 at 26-27; *see, e.g.*, Ex. 13 at 19; App. B at 21-22,[1] as well as that it had experienced quality-control problems and defects in product design, components, and in workmanship, Ex. 1 at 11, 13, 25-26, 28-29, 31; *see, e.g.*, Ex. 13 at 23; App. B at 23-24. Fluence explained the risk that these may continue, may negatively affect its financial performance, reputation, and customer satisfaction and market acceptance, and may result in liquidated damages claims. Ex. 1 at 28-29, 36; *see, e.g.*, Ex. 20 at 17; App. B at 28.

Fluence reported that these challenges negatively affected its financial performance, Ex. 1 at 11 (expectation that gross profit would turn into a loss); Ex. 2 at 11 (predicting net losses), and its expectation that financial results "will be negatively impacted by . . . cost overruns and delays we are experiencing in some projects currently under construction," Ex. 1 at 11; *see* Ex. 2 at 11.

Throughout the Class Period, Fluence continued to regularly update investors about cost overruns, delays, and other challenges related to Gen 6 projects. Ex. 5 at 2 ("We are still seeing

---

[1] A chart cataloging Fluence's risk disclosures is attached as Appendix B ("App. B").

some headwinds associated with supply chain disruptions from COVID-19 as well as project cost overruns from our first Gen 6 product installations and commissioning"); Ex. 6 at 16 ("$31.3 million of project charges and other costs which are compounding effects of the COVID-19 pandemic"); Ex. 8 at 4 ("Seeing progress on Gen 6 roll out . . .; still working on commissioning and installation cost improvements"); *id.* at 8 (identifying as "Trends vs Q1" for which "corrective actions [are] ongoing," "[c]ontinued unanticipated new product start-up costs associated with Gen 6 projects," and "[f]aulty or sub-standard supplier components driving overruns"); *id.* at 27 (regarding project cost overruns, "corrective actions [are] ongoing," and noting that "[r]ectified issues with customers" have been "implemented" and "[c]ontinuous improvement of on-site processes" as ongoing); Ex. 9 at 4 ("encountering headwinds in battery production that have resulted in force majeure in some customer contracts").

Fluence also disclosed the financial impacts of these challenges. *See, e.g.*, Ex. 7 at 8 ("gross profit was negative $53 million . . . driven by . . . nonrecurring expenses" including "project charges and other costs attributable to the compounding effects of COVID-19 pandemic"); *see also* Ex. 3 at 8-9 (disclosing negative financial results pertaining to COVID-19-related delays); Ex. 9 at 9 ("we have had to reset our expectations for financial performance" due to "many unexpected challenges over the past 6 months ranging from the macro environment to a homegrown issue" and that "are focused on . . . improving our product delivery operations"); Ex. 13 at 53 (disclosing fiscal year 2021 gross loss was negatively impacted by "cost overruns and delays we are experiencing in some projects currently under construction. Some of those costs overruns and delays are occurring in the first Generation 6 product deliveries").

In particular, Fluence disclosed that it had reduced certain transaction prices due to contractual clauses giving customers the right to liquidated damages if specified project milestones

are not met on time or if equipment does not meet contract specifications. Ex. 4 at 79 (disclosing reduction in transaction prices to reflect variable consideration); Ex. 16 at 12 (disclosing $14.4 million in incremental charges and excess costs incurred while introducing Gen 6 products due to disruptions in quality assurance processes and $10.5 million in incremental project charges principally related to liquidated damages under customer contracts); Ex. 13 at 90 (reduction in transaction prices "to reflect variable consideration of $75.5 million and $52.8 million . . . . Variable consideration primarily relates to our customers' rights to liquidated damages in the event a specified milestone has not been met or equipment is not delivered to contract specifications."); Ex. 20 at 94 (similar); Ex. 24 at 18 (similar); Ex. 27 at 95 (similar).

Beyond acknowledging challenges, Fluence disclosed remedial steps. The Company "documented lessons learned" and "conducted more training." Ex. 9 at 6. Recognizing delays, "particularly at large installations," were caused by "[f]aulty or substandard components from . . . our battery and inverter suppliers," Fluence assembled a new supplier quality control team to "work[] with our suppliers," *id.*; *see also* Ex. 14 at 9 ("New contracting committee formed to ensure contracts underwritten meet necessary hurdle requirements; implementing stronger contractual compliance for our suppliers"). Fluence also expanded its global testing network by opening a test lab in Pittsburgh. Ex. 10 at 12 ("[A] big part of the reason for that lab is to be able to do exactly that: test our products, test their components and test their designs, both before they're launched and then when they're out in the field so we can recreate issues and solve them quickly"); *see also* Ex. 12 at 8 (similar).

## C.    Two Customers File Cross-Complaints Stemming from Business Disputes

Fluence initiated lawsuits against two customers in connection with Gen 6 projects—a project in Antioch, California ("Antioch Project") that involved Siemens Energy, Inc. ("SEI") and another involving Diablo Energy ("Diablo Project"). In September 2020, SEI issued purchase

orders to Fluence for a Gen 6 product in connection with the Antioch Project. ¶¶ 63, 66. Siemens AG, an investor in Fluence, has a minority interest in SEI. Ex. 26 at 1. Fluence later filed a complaint against SEI that sought approximately $2 million in unpaid amounts due. *Id*. In November 2023, SEI filed a counterclaim of approximately $9 million. *Id.* On February 22, 2022, Blue Orca—a "biased" short seller who "st[ood] to realize significant gains in the event the price of [Fluence's] securities declined"—published a "report" repeating several allegations from SEI's counterclaim (the "Short Report"). Ex. 25 at 1; *see also* ¶¶ 9, 10, 120, 128-130, 159-160, 180-183. Fluence publicly disclosed its belief that the Short Report contains numerous inaccuracies, including about the SEI litigation. Ex. 26 at 1. On February 22, 2022, Fluence's stock price declined from $17.01 per share to $14.73. ¶ 182.

As for the Diablo Project, Diablo and Fluence entered into an agreement for an energy storage system and separately a services agreement, both in August 2020. Ex. 21 at ¶ 5. Diablo paid Fluence approximately $229,106,742 out of $237,976,007 contemplated in the agreement, or about 96%. *Id.* at ¶ 5, 24. Diablo also paid Fluence approximately $821,964 pursuant to a services agreement. *Id.* at ¶ 6, 28. In October 2023, Fluence filed a complaint against Diablo and others seeking approximately $37.0 million in damages arising from the supply and construction of the energy storage facility. Ex 20 at 54. Diablo filed a cross-complaint, seeking $25 million of alleged damages. *Id.* Diablo also sought approximately $230 million in disgorgement based on an alleged failure by Fluence to maintain a valid license at all times under California's Business & Professions Code. Ex. 21 at ¶¶ 21-28. Fluence disclosed the Diablo litigation in a Form 10-K on November 19, 2023. Ex 20 at 54. Weeks later, on December 20, 2023, *Energy Storage News* published an article parroting Diablo's allegations (the "*Energy Storage* Article"). Ex. 22; ¶¶ 176-177. On December 20, 2023, Fluence's stock price declined from $27.22 per share to $23.01. ¶ 177.

### D.    Demand for Fluence's Gen 6 Products Grows Throughout the Class Period

Despite these publicly-disclosed challenges, demand for Fluence's Gen 6 products grew steadily. During the Class Period, the amount of Gigawatts of energy storage products Fluence had deployed and its contracted backlog increased by approximately 544% and 188%, respectively. *Compare* Ex. 13 at 57 *with* Ex. 29 at 45.

Fluence's fiscal performance reflected the growing demand for its clean-energy storage products. Although the Company was not profitable early in the Class Period and missed Wall Street's consensus expectations, ¶ 172; *see also* Ex. 4 at 48 ("We have incurred net operating losses each year since our inception"), Fluence achieved its first profitable quarter in the fourth quarter 2023, Ex. 19 at 6, and first profitable fiscal year in 2024, Ex. 27 at 67, tracking the consistent increased demand of Fluence's clean-energy storage products between 2021 and 2024. Fluence's customer base likewise grew. *See, e.g.*, Ex. 26 (noting Fluence's "robust pipeline of sales to other customers continues to grow"). On February 10, 2025, Fluence issued results for its first fiscal quarter 2025 that revealed it was reducing its fiscal 2025 financial guidance, due to delays in signing contracts for projects in Australia and competitive pressures. Ex. 28 at 1-2. Between February 10-13, 2025, Fluence's stock declined from $13.07 per share to $6.18. ¶ 189.

### E.    Plaintiff Files This Lawsuit Alleging Fraud

The Complaint alleges a putative class period spanning from October 28, 2021, to February 10, 2025, inclusive, and asserts claims under Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 against Fluence, Manuel Pérez Dubuc, Dennis Fehr, Julian Nebreda, Manavendra Sial, Ahmed Pasha, and Rebecca Boll (collectively, "Individual Defendants" and with Fluence, "Defendants"); and under Exchange Act Section 20(a) against the Individual Defendants and AES. ¶¶ 1, 196-204.

## LEGAL STANDARD

To state a Section 10(b) claim, Plaintiff must plead that each Defendant (1) made a material misrepresentation or omission; (2) with scienter; as well as (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *San Antonio Fire & Police Pension Fund v. Syneos Health Inc*., 75 F.4th 232, 240 n.7 (4th Cir. 2023). Plaintiff must also satisfy Rule 9(b)'s and the PSLRA's "exacting" heightened pleading requirements. *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623-24, 629 (4th Cir. 2008). "A lack of compliance with [these heightened] pleading requirements is treated as failure to state a claim under Rule 12(b)(6)." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022). And this Court may accept as true only "well-pleaded factual allegations;" it "owe[s] no allegiance to 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Katyle*, 637 F.3d at 466. With the Complaint, the Court should consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 322 (2007).

## ARGUMENT

In addition to failing as impermissible puzzle pleading, the Complaint should be dismissed because it does not allege particularized facts pleading (1) a strong inference of scienter for each Defendant, (2) loss causation, or (3) an actionable misstatement of material fact or omission.

The Complaint is textbook puzzle pleading. Instead of identifying each allegedly misleading statement with particularity, 15 U.S.C. § 78u-4(b)(1), the Complaint reproduces large text blocks from SEC filings, investor presentations, and other sources, while separately characterizing responses during earnings calls. Sometimes the Complaint emphasizes portions of quotations, *e.g.*, ¶ 74; sometimes it does not, *e.g.*, ¶ 88. Beyond such haphazard pleading, the Complaint nonsensically asserts that challenged statements "were materially false *and/or*

misleading *and* omitted material facts for the following reasons." *E.g.*, ¶ 78. Which is it? The Complaint never says. Frequently, paragraphs describing the challenged statements ignore the earlier emphasized portions of quotations. For example, paragraph 78's description of "Defendants' misstatements and omissions" does not mention the emphasized language from paragraph 74, "optimized for common customer use cases but can be configured for specific use cases." ¶¶ 74, 78. Paragraph 108 declares that "Defendants' misstatements and omissions in the . . . 3Q23 Form 10-Q . . . as set forth in ¶¶ 106-107" were "false and/or misleading," but paragraphs 106-107 *do not even reference* the 3Q23 Form 10-Q.

The result is an utterly indecipherable morass of obfuscation that is only made worse by paragraphs merely listing "omissions"—without explaining how a particular omission contradicted a particular statement (and which), or identifying which Defendant supposedly knew of the omission at the time. *E.g.*, ¶ 78. It is not the task of Defendants or the Court to solve a jigsaw puzzle to determine Plaintiff's allegations as to how each Defendant supposedly committed securities fraud. This alone warrants dismissal of the Complaint. *See, e.g.*, *In re Dexcom Inc. Class Action Sec. Litig.*, 2025 WL 1399196, at *3-6 (S.D. Cal. May 14, 2024).[2]

## I.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Dismissal is also warranted because Plaintiff has not alleged "with particularity facts giving rise to a strong inference" of scienter—*i.e.*, that each Defendant "acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319; 15 U.S.C. § 78u4(b)(2)(A). The scienter requirement has "teeth." *Cozzarelli*, 549 F.3d at 624. To qualify as

---

[2] Defendants attempted to discern which statements Plaintiff is challenging. Attached as Appendix A ("App. A") is a chart cataloging those statements. *See Hawes v. Argo Blockchain plc*, 2024 WL 4451967, at *1 (S.D.N.Y. Oct. 9, 2024) (approving such appendices). Plaintiff could have created its own appendix to avoid puzzle pleading, but apparently chose not to do so.

"strong," an inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Scienter includes "severe recklessness," defined as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743, 751 (4th Cir. 2021). Ultimately, this Court must conduct a holistic "comparative inquiry," aided by "context and common sense," to decide if "the more compelling inference is that the Defendants merely acted negligently or non-fraudulently." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607-08 (4th Cir. 2021). Here, Plaintiff's allegations yield only a non-fraudulent conclusion.

### A.    Plaintiff Fails to Allege Severe Recklessness

To begin, the majority of Plaintiff's scienter allegations are deficient because they do not support an inference as to any *particular* Defendant's state of mind. To survive dismissal, Plaintiff "must allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement." *Tchrs. Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007). But the Complaint groups all Defendants together and alleges knowledge or actions as to the group. *See, e.g.*, ¶¶ 147, 154-160. Such "group pleading is insufficient to plead with the particularity required by Rule 9(b)." *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594 (E.D. Va. 2006). Application of that long-held principle is particularly important here, where no Individual Defendant worked at Fluence for the entire Class Period, and dispenses with all scienter allegations that do not name a specific Defendant.

Most of Plaintiff's remaining scienter allegations boil down to a generic contention that because the Individual Defendants' roles as Fluence's "most senior executives" required "direct[]

11

involve[ment] in the management and day-to-day operations of the Company at the highest levels" and permitted access "to confidential proprietary information concerning Fluence and its business, operations, services, client relations, and present and future business prospects," Defendants *must* have known about purported "execution issues." *E.g.*, ¶¶ 147, 154. But "[a]llegations that a defendant must have known that a statement was false and misleading because of his or her position in the company are precisely the types of inferences which courts . . . have determined to be inadequate to withstand Rule 9(b) scrutiny." *Iron Workers*, 432 F. Supp. 2d at 594, 592; *see Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014) (allegation that defendants were hands-on managers reflects "diligence rather than evidence of a nefarious purpose"). For the same reason, Plaintiff's allegation that Fluence executives "regularly visited" (unspecified) "clients and project sites" is too vague and generic to support an inference of scienter. ¶ 157.

Notably, the Complaint "fails to allege that any Defendant received" specific internal reports that contradicted public statements. *Iron Workers*, 432 F. Supp. 2d at 593 (no scienter where plaintiff did "not allege that the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made"). Plaintiff's allegation that Defendants "were aware that the Gen 6 systems were not ready to be released to the market and of the pervasiveness of the Gen 6 execution issues" because a "Senior Vice President informed them of as much" in a "memorandum to Fluence's executive management team describing issues with the initial rollout" similarly fails. ¶ 155. That allegation relies completely on CW-2, but the Complaint contains insufficient allegations as to CW-2's identity, job title, or detailed duties to be particularized. It also contains no well-pled facts about the purported memorandum's contents (leaving unknown the purported "issues" and whether they were even of any significance), or to whom it was sent or when, alleging only that the memorandum was sent to the "executive

12

management team" in "2022" and discussed "issues with the initial rollout." *Id.*; *see* ¶ 44 (alleging that CW-2 "was not included on the email sending memo to the executive team," but "someone" forwarded it). No Defendant is alleged to have seen or read the memorandum. *See Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 799 (E.D. Va. 2017) (complaint must contain "detailed allegations establishing the defendants' *actual exposure* to" the alleged problem).[3]

Plaintiff's other efforts to conjure scienter from allegations attributed to CW-2 and CW-1 are likewise too vague and speculative and do not, in any event, provide any facts contradicting the Challenged Statements. Anonymous witnesses lacking "direct contact with" defendants logically cannot know "what the Defendants knew or recklessly disregarded." *In re Coventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011). The Complaint does not allege that CW-1 had any contact with an Individual Defendant. ¶¶ 38-41. Statements attributed to CW-1 therefore cannot possibly demonstrate "what th[e] defendants actually knew." *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *13 (E.D.N.C. Sept. 15, 2015). While the Complaint alleges that CW-2 "sp[oke] directly with . . . defendant Boll," ¶ 42, it never alleges when CW-2 talked with Boll (whether within the Class Period or not), what they discussed, or that CW-2 had sufficiently substantive discussions such that CW-2 could opine on Boll's state of mind. *See Conventry Healthcare*, 2011 WL 1230998, at *5 (allegation "that 'CW2 periodically attended meetings, at which Defendant[s] . . . were [occasionally] present'" not sufficient to support scienter). While CW-2 purportedly believed that Fluence commissioned an additional test facility because it had not tested Gen 6 products at a system-wide level, it is implausible that Defendants would hide that they were not testing products so to deceive investors, but then publicly reverse

---

[3] The Complaint contains no allegations suggesting that Kepshire's knowledge could be imputed to Fluence *when the memorandum was supposedly sent*. *See* ¶ 155 n.12.

course by announcing a new testing regime. The more compelling inference is that Defendants were improving and augmenting the established testing program. *See supra* 6.

Plaintiff's remaining allegations likewise fail. Plaintiff claims that "temporal proximity" between Challenged Statements and "the revelation of the truth [] strengthens the scienter inference," ¶ 159. But there is no such proximity, and "pleading temporal proximity alone has not been viewed as adequately establishing scienter." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 482 (E.D. Va. 2002). Plaintiff alleges that "[t]he high level of executive departures" supports an inference that "Fluence and its executives were aware of the pervasiveness of the issues arising out of the Gen 6 products," and their impact on customer relationships. *Id.* ¶ 161. But Plaintiff does not plead why any executive left, or facts linking any resignation to the alleged fraud (or even disputes relating to Diablo or SEI). *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 119 (3d Cir. 2018) ("Corporate resignations do not strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud."). Instead, the Complaint paints the departures as "suspicious" because they occurred around the time of customer litigation or "struggles" with Gen 6 products. ¶ 162. But it never explains why the departures were suspicious and thus relies on "temporal proximity alone," which is not enough. *Arnlund,* 199 F. Supp. 2d at 482. And the record discounts Plaintiff's allegations. *See* Ex. 19 at 4 (noting Sial was recruited by another company).

Next, trying to invoke the "core operations" doctrine, Plaintiff alleges that because Fluence had a few, large customers, this Court can "presume[]" scienter because it would be "implausible" and "absurd" to think otherwise. *See* ¶¶ 148-54. But "bare allegations that [Defendants] have knowledge of key facts . . . because such knowledge relates to the business's core operations are

14

not enough, standing alone, to support a strong inference of scienter." *DXC*, 19 F.4th at 612. This is particularly true here, where the Complaint pleads no facts showing that the Diablo and Antioch projects constituted Fluence's "core operations." Plaintiff alleges "the value of the Diablo Project to Fluence at the time it entered into the agreement represented the equivalent of approximately 75% of the Company's U.S. revenues for its 2020 fiscal year" and therefore the project "would have been particularly important and visible to the Individual Defendants." ¶¶ 149-50. But the relative size of project in 2020 is meaningless; Plaintiff alleges that problems at the Diablo site began in 2022, ¶ 51-2, and contains no allegation about project size in relation to others in 2022.

Finally, Plaintiff relies heavily on allegations from the cross-complaints filed by Diablo and SEI in response to claims brought against them by Fluence. *E.g.*, ¶¶ 48-56, 60-70. While it is unclear how Plaintiff believes those allegations support scienter (or, for that matter, falsity), courts generally "do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not conducted independent investigation." *Touchstone Strategic Tr. v. Gen. Elec. Co*., 2022 WL 4536800, at *2 (S.D.N.Y. Sept. 28, 2022); *see also In re Apollo Grp., Inc. Sec. Litig*., 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011) ("[B]ecause allegations from other complaints are unproven and contested, they do not amount to 'facts' sufficient to establish a strong inference of scienter."). That is because Rule 11 requires that Plaintiff's attorneys undertake "an inquiry reasonable under the circumstances" and attest that their "factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3); *see In re Connetics Corp. Secs. Litig.,* 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (Rule 11 imposes "a nondelegable responsibility to personally validate the truth and legal reasonableness of the papers filed"). Here, Plaintiff's attorneys state that they "review[ed] . . . court filings" in preparing the Complaint. Compl. at 1. Plaintiff does *not* attest to any independent

15

investigation of the facts alleged in those cross-complaints upon which it now relies. *Touchstone*, 2022 WL 4536800 at *2. Thus, all allegations relying on the cross-complaints—e.g., ¶¶ 48-56, 60-70—"should be disregarded." *Attia v. Google LLC*, 2018 WL 2971049, at *15 (N.D. Cal. June 13, 2018); *see also Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *2-4 (S.D.N.Y. Aug. 19, 2022) ("disregarding" allegations copied from other suit because plaintiff's investigation was "limited to reviewing" papers from other actions and therefore had "verified none of what he copied").

### B.    Plaintiff Alleges No Reason Why Defendants Would Commit Fraud

Plaintiff's failure to identify any Defendant's motive to defraud investors eradicates any scienter inference. Here, where Plaintiff did "not put forward any plausible motive for why Defendants sought to defraud investors," the "circumstantial evidence of fraud must be correspondingly greater" to prove scienter. *Syneos*, 75 F.4th at 242; *Triangle*, 988 F.3d at 752 (noting absence of motion allegations *"often weighs heavily in a scienter analysis"*). The Complaint contains *no allegation* that any Defendant secured "concrete benefit" by "one or more of the [alleged] false statements." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003); *see* ¶¶ 146-163. "While [D]efendants could have unloaded [Fluence] shares at prices that [Plaintiff] contend[s] were fraudulently elevated," the Complaint does not allege any purportedly "suspicious' insider selling or other kinds of self-dealing" by any Defendant. *Boykin v. K12, Inc.*, 54 F.4th 175, 186 (4th Cir. 2022). The Complaint references the December 2023 SPO, *e.g.,* ¶ 5, but Fluence and Individual Defendants did not even participate. Ex. 24 at 9-10. To the extent that SPO relates to the supposed motive of AES, Plaintiff does not assert a 10(b) claim against AES. *See* ¶ 163. Plaintiff's failure to give any reason why any (let alone each) Defendant would, at significant personal and professional cost, engineer an allegedly fraudulent, multi-year scheme (spanning their various tenures) that had no beneficial end "is enough to doom" Plaintiff's

16

scienter theory. *DXC*, 19 F.4th at 607.[4]

### C. Competing Inferences Are Far More Compelling

The scienter inquiry requires this Court to "compare the malicious and innocent inferences cognizable from the facts pled," *Yates*, 744 F.3d at 885, and here, the "inference that [D]efendants acted innocently" is far "more compelling than [any] inference that they acted with the requisite scienter." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche*, 551 F.3d 305, 313 (4th Cir. 2009). The more compelling inference is that throughout the Class Period, Fluence executives were optimistic about Fluence's Gen 6 products despite (transparently disclosed) operational challenges driven largely by a global pandemic and isolated disputes with a couple of customers, vigorously disputed the allegations from those customers and others who parroted them in an effort to make a profit, and adjusted Fluence's financial guidance as they learned new information.

## II. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Loss causation is the causal connection between the alleged misconduct and the economic harm allegedly suffered by Plaintiff. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To plead loss causation, Plaintiff must "plausibly and with sufficient specificity" allege "(1) the exposure of the defendant's misrepresentation or omission, i.e., the revelation of *new* facts suggesting the defendant perpetrated a fraud on the market, and (2) [] such exposure resulted in the decline of the defendant's share price." *Defeo v. IonQ, Inc.*, 134 F.4th 153, 161-62 (4th Cir. 2025). Loss causation can be pled through an "amalgam" of the "corrective disclosure" theory (the defendant makes a disclosure that "corrects" a prior fraud) and a "materialization of known risk" theory (the fraud is exposed by a third party), in which "the truth of a company's fraud can leak

---

[4] Plaintiff's failure to plead a strong inference of scienter for any Individual Defendant (or anyone else) also dooms its ability to plead corporate scienter for Fluence. *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 189 (4th Cir. 2009).

out slowly from a variety of different sources." *Defeo*, 134 F.3d at 162. Under each, Plaintiff must "plausibly and with sufficient specificity allege that any new truth was exposed to the market." *Id.*

Plaintiff alleges the market learned of the purported fraud through an amalgam of exposures: (1) Fluence's February 9, 2022 announcement of disappointing financial results for Q1 2022; (2) the December 20, 2023 *Energy Storage* Article discussing the public Diablo cross-complaint; (3) the February 22, 2024 Short Report discussing the public SEI counterclaim; (4) Fluence's November 25-26, 2024 announcement of Q4 2024 and fiscal 2024 financial results and that it anticipated 80% of its revenues would be realized during the second half of fiscal 2025; and (5) Fluence's February 10, 2025 announcement of disappointing financial results for Q1 2025 and reduction of its fiscal 2025 financial guidance. Consistent with the pervasive "puzzle pleading," Plaintiff does not explain which Challenged Statements were revealed to be false or misleading by which new facts on which exposure date. None of these allegations suffices to plead loss causation.

## A.    Plaintiff Cannot Allege Loss Causation Based on an Unreliable Short Report

Plaintiff contends that the Short Report exposed previously unknown facts by revealing that SEI had filed a counterclaim against Fluence containing allegations of engineering and design failures at the Antioch Project. ¶ 180. "[I]t is appropriately a 'high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers' when attempting to plead loss causation," *Defeo*, 134 F.4th at 163, and Plaintiff fails to clear it. "[W]hen authors of a report are 'anonymous and self-interested short-sellers who disavowed any accuracy,' their reports are 'rendered inadequate' for purposes of pleading loss causation." *Id.* The Short Report fits this description.

The Short Report was authored by anonymous authors who admit that they are self-interested and biased. Ex. 25 at 1. The Short Report's lengthy "Disclaimer" section states: "We are short sellers," "We are biased," and "we will make money if the price of Fluence stock declines." *Id.* at 44; *see also id.* (disclosing the Short Report's authors "stand[] to realize significant

gains if the price of such instrument [Fluence's stock] declines"). Compounding this problem, the Short Report relies on anonymous sources for its nonpublic information. *Id.* at 2 (describing sources as "former [Fluence/Vistra] employee"). Ultimately, the Short Report "disclaims its accuracy" to investors. *Defeo*, 134 F.4th at 163; *see* Ex. 25 at 44 (stating that "*all statements* contained herein are solely the opinion of BOC Texas, LLC, . . . and are not statements of fact"); *id.* (declaring that "BOC Texas, LLC makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information"). Because "a reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt[,]" it is "not plausible that the market reasonably perceived these posts as revealing the falsity of [Fluence's] prior misstatements, thereby causing the drops in [Fluence's] stock price on the days the posts appeared." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020) (plaintiffs failed to plead loss causation based on allegedly corrective anonymous blog posts from short sellers).

**B.     Plaintiff Fails to Allege That the *Energy Storage* Article Revealed New Facts**

As with the Short Report, Plaintiff does not even attempt to tie anything in the *Energy Storage* Article (or the public Diablo cross-complaint on which it relies) to a specific Challenged Statement purportedly left uncorrected by December 20, 2023. In any event, Plaintiff does not and cannot plead how the *Energy Storage* Article disclosed "facts" that are "new, that is, publicly revealed for the first time." *Defeo*, 134 F.3d at 162. For one thing, the article simply repeats allegations, which are not facts. For another, the Diablo cross-complaint from which such allegations are regurgitated was already in the public domain. *See* Ex. 22 at 2 ("In the court document;" "The cross-complaint by Diablo is actually in response to a complaint initially filed by Fluence against Diablo in October 2023" and "Specifics of Diablo's Complaint"). The *Energy News* Article even acknowledges that, almost a month prior, Fluence had "address[ed] the litigation in a 10-K filing." *Id.* Plaintiff's attempt to plead loss causation "based entirely on publicly

available information that was easily accessible and required no special analysis" fails. *In re Genius Brands Int'l, Inc. Sec. Litig.*, 763 F. Supp. 3d 1027, 1042 (C.D. Cal. 2025).

### C.    The Remaining Disclosures Are Insufficient to Plead Loss Causation

Plaintiff's attempt to plead loss causation based on Fluence's announcement of financial results and accompanying news on February 9, 2022, November 25-26, 2024, and February 10, 2025 likewise misses the mark. Plaintiff's allegations essentially amount to observing that Fluence announced financial results and/or other disappointing news on these dates, and its stock price subsequently declined. A "decline in [share] price" alone is insufficient to establish loss causation. *Katyle*, 637 F.3d at 472. Rather, Plaintiff must allege with sufficient specificity facts showing that "information correcting the misstatement or omission that is the basis for the action [wa]s disseminated to the market" *and* caused Fluence's stock price to decline. 15 U.S.C. § 78u-4(e)(1). Plaintiff does not plead what in Fluence's February 2022, November 2024, or February 2025 releases of historical financial information and projections about future revenue (which are themselves not "facts") revealed the truth about any Challenged Statement that was left uncorrected as of each alleged corrective disclosure date. *Katyle*, 637 F.3d at 473 (to plead loss causation, complaint must detail how the disclosure of new information "*relate[d] back to the [alleged] misrepresentation[s]* and not to some other negative information about the company.").[5]

## III.    PLAINTIFF FAILS TO PLEAD FALSITY

The Complaint should be dismissed for the independent reason that Plaintiff has not adequately alleged that any Challenged Statement was false or misleading. 15 U.S.C. § 78u–

---

[5] For example, the February 10, 2025 disclosure attributed Fluence's adjustments to fiscal year 2025 financial guidance "primarily to reflect delays in signing specific contracts; and secondly, due to some competitive pressure." Ex. 31 at 8; ¶ 188. Plaintiff does not explain: (1) how delays in signing unspecified contracts or competitive pressure contradicted any Challenged Statement; (2) which Challenged Statements even remained uncorrected as of February 10, 2025; or (3) that any information disclosed on February 10, 2025 could have been disclosed by Fluence any sooner.

4(b)(1); *Dunn v. Robotics Corp.*, 2003 WL 23697826, at *4 (E.D. Va. 2003) (falsity allegations evaluated on a statement-by-statement basis). Plaintiff launches a see-what-sticks strategy against approximately thirty-seven statements made between October 2021 and August 2024 (the "Challenged Statements"), often without identifying who made or had authority over the statement. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2018). Rather than allege that the Challenged Statements were literally false, Plaintiff primarily proceeds on a garbled omissions theory that flops. *See* ¶¶ 73-130.[6] While this alone scuttles Plaintiff's claims, many Challenged Statements are also inactionable puffery, forward-looking and protected by the PSLRA's safe harbor, and/or inactionable opinions.

### A.    Plaintiff Fails to Plead an Actionable Omission

"Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). "[A]n omission is actionable only if—absent the fact omitted—'a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision.'" *In re Marriot Int'l, Inc.*, 31 F.4th 898, 902 (4th Cir. 2022); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (similar). Moreover, "a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 656 (4th Cir. 2004).

The Complaint mechanically asserts that most or all Challenged Statements wrongfully omitted three amorphous things: (1) that "Fluence released the Gen 6 systems before the systems were fully designed and tested to meet their customers' specifications," ¶¶ 78, 80, 84, 86, 91, 93,

---

[6] To the extent Plaintiff challenges SOX certifications, ¶¶ 79, 117, "[t]his argument fails because Plaintiff has not alleged that the material facts" therein "were false." *Philips v. Triad Guar. Inc.*, 2015 WL 1457980, at *11 (M.D.N.C. Mar. 30, 2015).

98, 101, 105, 108, 111, 114, 118, 123, 127, 130 ("Testing Omission"); (2) that the "premature release of the Gen 6 system created a material risk" that customers would cancel planned expansions or refuse future business with Fluence, *id.* ("Risk Omission"); and (3) that Fluence was engaged in a dispute with SEI, ¶¶ 78, 80, 84, 86, 91, 98, 101, 105, 108, 111, 114, 118 ("Dispute Omission"). As demonstrated below, the purportedly omitted "facts" have no connection to, and are often temporally divorced from, the Challenged Statements. *E.g.*, ¶ 78; *e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019) (proffered reasons why statements were false or misleading "bear no connection to the substance of the statements").

<u>*Testing Omission*</u>. The Complaint contains no well-pled factual allegation showing that Fluence released the Gen 6 system before it was fully designed. SEI's allegations that sometime after September 2020 they believed Fluence's design for that project "was still in flux," ¶ 67; Ex. 23 at ¶ 30, should be disregarded (*see supra* 15-16), but in any event at most speaks to that specific project as opposed to the Gen 6 system's technology more generally. And Fluence had no obligation to disclose minutia about projects or Gen 6's development. *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) ("[no] obligation to offer an instantaneous update of every internal development, especially when it involves the oft-tortuous path of product development"). Regardless, Fluence disclosed that production and installation has and can entail project modifications, *e.g.*, Ex. 1 at 26-27, 31; App. B at 2-6, that Gen 6 reflected "*ongoing . . . design improvements*," *e.g.*, ¶¶ 3, 75, and that Fluence was "continuing to evolve the features and functionality of our products and technology platform through updates and enhancements," *e.g.*, Ex. 1 at 31; App. B at 5; *Syneos*, 75 F.4th at 245-246 (omission "not material because Defendants included 'specific warnings,' 'tailored to address' Plaintiffs' exact complaints").

Allegations that the Gen 6 system was not "tested" fare no better. The Complaint

acknowledges that Gen 6 system components were tested before being released to customers. ¶ 43. If Plaintiff's gripe is, based on deficient allegations attributed to CW-2, that "Gen 6 systems as a whole had never been tested before the initial Gen 6 products were released," ¶¶ 43, 45, the Complaint neither alleges that this type of testing was required (contractually or otherwise), nor that it would have obviated any alleged issue with a specific project. Indeed, the alleged issues largely pertain to components, *e.g.*, ¶¶ 51-55—which the Complaint concedes were all tested along with other aspects of Gen 6 products, ¶ 43; *see* ¶¶ 90, 92. And the Complaint nowhere alleges that SEI or Diablo asserts in litigation against Fluence that Gen 6 was not "tested." *See* ¶¶ 48-56, 60-72. Plaintiff insinuates that disclosures about *expanding* Fluence's testing capabilities suggests otherwise, but that takes Fluence's disclosure out of context. ¶¶ 45, 90, 92-93; *See Marriot*, 31 F.4th at 904 (instructing courts evaluating falsity to "strip[ ] . . . allegations of mischaracterizations and exaggeration, [and] focus on whether the exact statement in its true context constitutes a material representation"). Indeed, the record shows that before the Pennsylvania test lab, Fluence tested new products' components. *See* Ex. 11.

Plaintiff's scattershot allegations about delays, warranty claims, and other issues that are derivative of the Testing Omission also do not render any Challenged Statement materially misleading. ¶¶ 78, 80, 84, 86, 91, 98, 105, 108, 118. First, these allegations lack the requisite particularity. *See, e.g.*, ¶ 118 ("[T]he issues that culminated in the Diablo Litigation had been present since early 2022"). They also have nothing to do with the challenged affirmative statements, much less contradict any Challenged Statement. *See, e.g.*, ¶ 110; *Marriot*, 31 F.4th at 902 ("basic problem with the complaint . . . is that the facts it alleges do not contradict [Fluence's] public disclosures"). For example, the Complaint seemingly alleges that each Challenged Statement within the October 2021 Registration Statement was false or misleading because Diablo

alleged in its cross complaint that by September 2021 the Diablo Project was behind the substantial completion deadline. ¶ 78. Yet none of those Challenged Statements assert that the Diablo Project was proceeding as scheduled. *See, e.g.*, *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 244 (4th Cir. 1988). In any event, Fluence disclosed (in the Registration Statement and elsewhere throughout the Class Period) "cost overruns and delays" including "in the first Generation 6 product deliveries," Ex. 1 at 11—which allegedly included the Diablo Project, ¶ 48.

Many allegations also suffer from timing problems. Plaintiff, for example, seemingly argues Defendant Pérez's May 12, 2022 statement, that Fluence had "'successfully installed 10 Gen 6 systems,'" was misleading because "the Diablo Project" had been "experiencing a series of failures" with the control system by May 2022. ¶ 86. But, even relying on Diablo's allegations, the Complaint does not specifically allege that any control system "failures" occurred before May 12. *See* ¶ 52 (citing Diablo allegations about control system issues between May 15, 2022 and August 22, 2022).[7] The Complaint's allegations also belie any theory of falsity regarding the May 12, 2022 statement. Plaintiff alleges that Diablo was commissioned in "January or February 2022," ¶ 39, meaning that "construction and *installation* is finished, and the customer [has] take[n] control of the system and it is released to the market," ¶ 39 n.8—and there are no well-pled allegations that the "issues" at Diablo, occurring once it had "take[n] control of the system," were related to installation. The statement Plaintiff challenges from August 16, 2022, that Fluence "experienced unanticipated costs associated with installations and commissioning . . . on a few specific projects," ¶ 87, puts a finer point on Plaintiff's pleading failure. Plaintiff speculates that the "specific projects" referenced in that statement included "Diablo and High Desert[8]," ¶ 91(a)(i), but

---

[7] The Complaint alleges that Diablo did not inform "Fluence" about issues regarding the control system until August 2022. ¶ 51.

[8] High Desert was commissioned in December 2021, ¶ 40.

no allegation in the Complaint supports Plaintiff's guess. And, perhaps more importantly, it shows that Fluence "disclosed and discussed" the "very issue[s]"—that is, "unanticipated costs associated with installations," ¶ 87; *see* ¶ 82—that Plaintiff alleges "later contributed to the negative financial results of which [P]laintiff[] now complain[s]." *Ash*, 2015 WL 5444741, at *8.

*Risk Omission*. Plaintiff's speculation that the purported "premature release of the Gen 6 system" created a material undisclosed risk concerning current and prospective customers cannot support its claims. *See, e.g.*, *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) ("factual allegations must be true to provide the basis for a cause of action" and "speculation cannot give rise to a claim of securities fraud"). The record belies the speculation; demand for Gen 6 products grew steadily throughout the Class Period, as did Fluence's customer base. *See supra* 8. Regardless, even if such a risk existed, Fluence's risk disclosures were sufficient. *See supra* 4-6; *e.g.*, Ex. 4 at 11; App. B at 16-17; *Syneos*, 75 F.4th at 245-246.

*Dispute Omission.* Plaintiff's allegation that approximately a dozen Challenged Statements were false or misleading because Fluence "was engaged in a dispute" with SEI fails for many reasons. *E.g.*, ¶ 78, 80, 84, 86, 91, 98, 101, 105, 108, 111, 114, 118. Again, a fundamental problem is the Complaint alleges no particularized fact concerning any dispute with SEI, or the existence of the dispute itself, that contradicts a Challenged Statement. *See Marriot*, 31 F.4th at 902. How, for example, do allegations from counterclaims filed in 2023 render false or misleading generic descriptions of sales contracts or how the Company recognizes revenue from those contracts? *See* ¶¶ 77-78; App. A at 2. They obviously don't. *See Emps. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v. MacroGenics*, 61 F.4th 369, 389 (4th Cir. 2023).

As noted above, to the extent Plaintiff sourced its assertions about SEI from an Answer

and Counterclaim, those allegations should be disregarded.[9] *See supra* 15-16. In any event, SEI's allegations that the customized design for the specific system was in "flux" because of purportedly conflicting information about interconnections with the specific power station at that project, *see* ¶¶ 67-70; Ex. 23 at ¶ 30, that a purported design error with an inverter was identified during testing in May 2022, ¶ 69, or that in September 2021 SEI sent "Fluence" a letter indicating a belief that Fluence was responsible for approximately $5.5 million in costs, which Fluence denied, ¶¶ 67, 78(c)(i), 91(b)(i), Ex. 23 at ¶ 34, do not come close to establishing that, absent their disclosure, "a reasonable investor, exercising due care, would gather a false impression from [any challenged] statement, which would influence an investment decision." *Phillips*, 190 F.3d, at 613.

Plaintiff resorts to declaring that statements describing the SEI litigation and settlement as immaterial, *see* ¶¶ 122, 125-126, were misleading because "the impact of the issues in the [SEI] Litigation were qualitatively larger than the settlement amount" due to potential "reputational harm, including through the loss of business . . . ." ¶ 127(b)(ii); *see* ¶ 123(b). Such speculation fails under the applicable heightened-pleading standards. *See Phillips*, 190 F.3d 609, at 615. And, in any event, Fluence once again disclosed that exact risk. *See, e.g.*, Ex. 20 at 22; *supra* 4.[10]

<u>*Item 303 Omission*</u>. Plaintiff alleges that Defendants are separately liable for failure to disclose information pursuant to Item 303 of Regulation S-K. ¶¶ 140-145. "[T]he failure to disclose information required by Item 303 can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024). Plaintiff's allegations mostly do not allege that purported Item 303 omissions rendered affirmative statements misleading. *See* ¶¶ 141-145. Where the Complaint

---

[9] For example, Defendants' understanding is that the allegation that in September 2021 SEI sent a letter to "Fluence," e.g., ¶ 67, can only be derived from the Counterclaim. *See* Ex. 23.

[10] Plaintiff ignores that SEI's claims were *dismissed* well prior to any settlement. *See* Ex. 31.

alleges that statements were rendered misleading, it fails to identify them with particularity. *E.g.*, ¶ 140. Even if it had, the Item 303 claim still fails because Fluence disclosed risks related to "delays," "increased expenses from cost overruns," "reputational damage," and the "financial impact of delayed revenues," *Id.*; *see supra* 4-6, and for the reasons discussed in Section III.

### B.    Many Challenged Statements Are Textbook Puffery

The bulk of the Challenged Statements are also inactionable "puffing"—general statements of corporate optimism and enthusiasm that a reasonable investor would not rely upon. *See* App. A at 1-3, 5, 7, 9, 15, 18-19, 21-22, 24, 26, 28, 32; *Boykin*, 54 F.4th at 183 ("[T]the law recognizes that not all self-promotion is actionable . . . ."). Plaintiff challenges general positive statements about Fluence's products, such as describing them as "highly configurable," ¶ 74, "optimized," ¶¶ 74, 79, "scalable" and "cost-effective," ¶¶ 75, 79, "driv[ing] efficiencies," ¶ 76, and "reflecting ongoing . . . design improvements," ¶¶ 75, 79, 112. These are indefinite and vague corporate affirmations that exemplify non-actionable puffery. *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *27 (E.D. Va. Mar. 24, 2021) (statement that company provided "a cost-effective infrastructure that integrate[d] clinical and administrative functions under one roof, and allow[ed] [ ] [its] provider partners to leverage the benefits" was puffery). So too are generalized positive statements that Fluence takes a "customer- and market-centric approach, building products and technology based on customer needs and economic feasibility," ¶ 74, delivers "optimized solutions," ¶ 79, and is "quickly establishing [itself] as a leader among the mega project side," ¶ 94, "strong project execution," ¶ 97, "improving our project execution," ¶ 99, as well as "making notable progress in our execution" and "improving cycle times on select projects," ¶ 102; *see* ¶ 103, "continue to execute well," ¶ 106; *see* ¶ 117, and "strong execution reaffirms" and "demonstrates our ability to navigate challenges, drive towards success, and deliver solutions," ¶ 109. *E.g.*, *In re DXC Tech. Co. Secs.*, 2025 WL 950398, at *11 (E.D. Va. 2025)

27

(puffery includes statements that company has "delivered a better culture, stronger customer relationships, a better sales model" and "made improvements in both leadership and our operating model"). Plaintiff challenges the statement that ten Gen 6 systems were "successfully installed," ¶ 85, but does not contend that ten had not been installed, and "successfully" is a "subjective description[] that [is] vague, so lacking in specificity" that no investor would rely upon it, *Evolent Health*, 2021 WL 1439680, at *25 (product "successfully launched" was puffery)—particularly where installation is part of a broader process and followed by commissioning (a distinction Plaintiff tacitly acknowledges but glosses over). *E.g.*, ¶¶ 36, 39 & n.8, 76, 87.

## C.    The Safe Harbor Protects the Challenged Forward-Looking Statements

Many Challenged Statements are also forward-looking statements protected by the PSLRA's safe harbor. *See* App. A at 6, 7, 8, 13, 14, 29, 30, 31. With limited exceptions not applicable here, the safe harbor insulates from liability statements about "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u5(i)(l)(B)-(C). It likewise covers "any statement of the assumptions underlying or relating to any [forward-looking] statement," *id.* § 78u-5(i)(1)(D), even though those necessarily reflect implicit assertions about present events. *See Boykin*, 54 F.4th at 184 (phrase "positions us well" was forward-looking despite implicit reference to current circumstances). Future performance projections not phrased "as guarantees are generally not actionable" under Section 10(b). *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993).

Challenged Statements regarding Fluence's "confidence to further execute on our plan," ¶ 81, and others like it are plans and objectives for future operations and forward-looking. 15 U.S.C. § 78u-5(i)(l)(B); *see* ¶ 81 ("deliver our Gen 6 product installation and commissioning more effectively"), ¶ 82 ("continuous improvement of onsite processes"), ¶ 90 (answering "how" to "improve" operations "in the back half of the year"), ¶ 92 (test lab "will be critical" and "serve as

the primary location"), ¶¶ 113 & 117 ("intends to vigorously defend" and "to enforce our claims"), ¶ 117 ("Fluence . . . will [v]igorously [p]ursue the [p]ayments"). As is Boll's description of the nature of certain overruns as "temporary," which conveys an expectation that something currently exists but is expected to change. ¶ 83. This is reinforced by the phrase's "full context," *see id; MacroGenics*, 61 F.4th at 389, which includes Fehr acknowledging that "we expect to see some trailing cost overruns in Q2." Ex. 7 at 8. These future performance statements were not "worded as guarantees," *Raab*, 4 F.3d at 290, and are inactionable. Moreover, the PSLRA protects forward-looking statements unless Plaintiff can show *both* (1) a lack of "meaningful cautionary" language, *and* (2) the speaker's "actual knowledge" of falsity when the statement was made. *See MacroGenics*, 61 F.4th at 389; 15 U.S.C. § 78u5(c)(1). The Complaint does neither.

Meaningful cautionary language accompanied each forward-looking statement. *See* 15 U.S.C. § 78u-5(e); Exs. 6 at 2, 7 at 4, 10 at 4, 11 at 1-2, 20 at 2, 24 at 3, 32 at 1; App. B. at 45-56. Risk disclosures put investors "sufficiently on notice of the danger of the investment [in Fluence] to make an intelligent decision about it[.]" *Ash*, 2015 WL 5444741, at *8. That triggers protection. Separately, Plaintiff has not pled that any Defendant had actual knowledge any forward-looking statement was false when made. *See supra* Sect. I; *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 549 (M.D.N.C. 2013) ("[E]ven [absent cautionary language], liability only attaches if the speaker had actual knowledge that it was false when made.").

### D.    Plaintiff Fails to Plead an Actionable Opinion Statement

Other Challenged Statements are also non-actionable opinions. App. A at 11-14, 16, 17, 19, 20, 23, 25, 32, 34, 35, 36, 37. Because opinions are "inherently subjective and uncertain," to plead an actionable opinion statement, Plaintiff must allege the opinion was both "not honestly believed and lack[ed] a reasonable basis" when made. *MacroGenics*, 61 F.4th at 387. While opinions "may often be recognized by their wording," *e.g.*, ¶¶ 92 ("We believe this facility will be

29

critical . . ."), 95 ("[we] believe that issues confronted are well understood . . ."), there are no magic words. *Boykin*, 54 F.4th at 183. Rather, a statement is opinion due to the nature of the information conveyed, *i.e.*, a person's views. *See id.* Opinions include "belief[s] as to what third parties think about the company and its products." *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 578 (S.D.N.Y. 2014); *see* ¶ 104 (opinion about what Fluence customers "care about"); Ex. 17 at 9; ¶¶ 99 & 100.

Plaintiff challenges opinions such as, for example, Nebreda's answer to the question "how do you think about labor and environment." ¶ 96; Ex. 12 at 17 ("I guess the reasons that we have – we talk to our customers we talk to our customers as our ability to manage complexity, both in terms of project or product . . . ."); *see* ¶ 88; Ex. 10 at 14 ("So in general, we are not really seeing a signal from our customers that they're not wanting to sign service agreements. And we see it really just as a timing issue and, therefore, expect that to catch up . . . ."); ¶ 89; Ex 10 at 17 ("And the fact that we haven't had any cancellation of projects, and we have been able to reprice some . . . it tells us that those customers that we selected are very loyal."); ¶ 104; ¶ 107; Ex. 18 at 14 (Nebreda responding with opinion to question on "market dynamics" including, "Tesla talking about having pricing power in the market for their storage business . . . . if you guys are seeing that and what's causing that?"); ¶ 117 (Diablo Project "performing very well"); ¶¶ 125 & 126 (SEI litigation "immaterial" and settlement "modest expense"); ¶¶ 128 & 129 (Short Report "zero merit"). But Plaintiff offers nothing to show each opinion's speaker did not honestly believe the opinion and lacked a reasonable basis when expressing it. *MacroGenics*, 61 F.4th at 387.

## IV.    PLAINTIFF'S SECTION 20(A) CLAIM ALSO FAILS

Because Plaintiff has not pled a primary Section 10(b) violation, the derivative Section 20(a) claim for control-person liability fails too. *Yates*, 744 F.3d at 894 n.8.

## <u>CONCLUSION</u>

Defendants respectfully request that the Complaint be dismissed with prejudice.

Dated: July 11, 2025

Respectfully submitted,

/s/ *Laura E. Bladow*
Laura E. Bladow VA Bar 93395
Sarah Tomkowiak (*pro hac vice*)
Matthew J. Peters (*pro hac vice*)
Henry Zaytoun (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004
Tel: (202)-637-2200
Fax: (202)-637-2201
laura.bladow@lw.com
matthew.peters@lw.com
henry.zaytoun@lw.com

Colleen C. Smith (*pro hac vice*)
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
Tel.: (858) 523-5400
Fax: (858) 523-5450
colleen.smith@lw.com

*Attorneys for Defendants Fluence Energy, Inc., Manuel Pérez Dubuc, Dennis Fehr, Julian Nebreda, Manavendra Sial, Ahmed Pasha, and Rebecca Boll*