# Exhibit 1

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 1 of 1007
PageID# 980

As filed with the Securities and Exchange Commission on October 19, 2021.

Registration No. 333-259839

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### Amendment No. 1
### to
### FORM S-1
### REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Fluence Energy, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **3690** | **87-1304612** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**4601 Fairfax Drive, Suite 600**
**Arlington, Virginia 22203**
**Telephone: (833) 358-3623**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Manuel Perez Dubuc**
**Chief Executive Officer**
**4601 Fairfax Drive, Suite 600**
**Arlington, Virginia 22203**
**Telephone: (833) 358-3623**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | | |
|---|---|---|
| **Senet S. Bischoff** | **Dennis Fehr** | **Alexander D. Lynch** |
| **Alison A. Haggerty** | **Chief Financial Officer** | **Michael B. Hickey** |
| **Latham & Watkins LLP** | **Francis A. Fuselier** | **Weil, Gotshal & Manges LLP** |
| **1271 Avenue of the Americas** | **General Counsel** | **767 Fifth Avenue** |
| **New York, New York 10020** | **4601 Fairfax Drive, Suite 600** | **New York, New York 10153** |
| **Telephone: (212) 906-1200** | **Arlington, Virginia 22203** | **Telephone: (212) 310-8000** |
| **Fax: (212) 751-4864** | **Telephone: (833) 358-3623** | **Fax: (212) 310-8007** |

**APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE TO THE PUBLIC: AS SOON AS PRACTICABLE AFTER THIS REGISTRATION STATEMENT IS DECLARED EFFECTIVE.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered[1] | Proposed Maximum Offering Price Per Share[2] | Proposed Maximum Aggregate Offering Price[2] | Amount of Registration Fee[3] |
|---|---|---|---|---|
| Class A common stock, $0.00001 par value per share | 35,650,000 | $24.00 | $855,600,000 | $79,314.12 |

(1)  Includes 4,560,000 additional shares of Class A common stock that may be sold if the option to purchase additional shares of Class A common stock granted by the Registrant to the underwriters is exercised.
(2)  Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended.
(3)  Of this amount, $10,910 has previously been paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

*The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.*

**Subject to completion, dated October 19, 2021.**

**31,000,000 SHARES**



**Fluence Energy, Inc.**

**CLASS A COMMON STOCK**

This is an initial public offering of shares of Class A common stock of Fluence Energy, Inc. We are selling 31,000,000 shares of Class A common stock.

Prior to this offering, there has been no public market for the Class A common stock. It is currently estimated that the initial public offering price per share of Class A common stock will be between $21.00 and $24.00. We have applied to list our Class A common stock on the Nasdaq Global Market under the symbol "FLNC."

We will have three classes of common stock after this offering: Class A common stock, Class B-1 common stock and Class B-2 common stock. Each share of our Class A common stock entitles its holder to one vote per share, each share of our Class B-1 common stock entitles its holder to five votes per share and each share of our Class B-2 common stock entitles its holder to one vote per share on all matters presented to our stockholders generally. Immediately following the consummation of this offering, all of the outstanding shares of our Class B-1 common stock will be held by the Founders (as defined below), which will represent in the aggregate approximately 92.2% of the voting power of our outstanding common stock after this offering (or approximately 91.5% if the underwriters exercise in full their option to purchase additional shares).

This offering is being conducted through what is commonly referred to as an "Up-C" structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C approach provides the existing owners with the tax treatment of continuing to own interests in a pass-through structure and provides potential future tax benefits for both the public company and the existing owners when they ultimately redeem their pass-through interests for shares of Class A common stock or cash from the sale of newly issued shares of Class A common stock. We will be a holding company, and upon consummation of this offering and the application of the proceeds therefrom, our principal asset will consist of LLC Interests (as defined below) we purchase directly from Fluence Energy, LLC with the net proceeds from this offering and acquire indirectly from the Blocker Shareholder (as defined below), collectively representing an aggregate 29.7% economic interest in Fluence Energy, LLC. Of the remaining 70.3% economic interest in Fluence Energy, LLC, 70.3% will be owned by the Founders through their ownership of LLC Interests. Fluence Energy, LLC intends to use the net proceeds from the sale of LLC Interests to Fluence Energy, Inc. to repay all outstanding borrowings under our existing Line of Credit and the Promissory Notes (as defined below), and the remainder for working capital and other general corporate purposes.

Fluence Energy, Inc. will be the sole managing member of Fluence Energy, LLC. We will operate and control all the business and affairs of Fluence Energy, LLC and its direct and indirect subsidiaries and, through Fluence Energy, LLC and its direct and indirect subsidiaries, conduct our business.

Following this offering, we will be a "controlled company" within the meaning of the Nasdaq rules. See "Our Organizational Structure" and "Management—Controlled Company Exception."

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended, or the Securities Act, and will be subject to reduced disclosure and public reporting requirements. This prospectus complies with the requirements that apply to an issuer that is an emerging growth company.

**See "Risk Factors" beginning on page 25 to read about factors you should consider before buying shares of our Class A common stock.**

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

| | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount[1] | $ | $ |
| Proceeds, before expenses, to Fluence Energy, Inc. | $ | $ |

[1] We have agreed to reimburse the underwriters for certain expenses in connection with this offering. See "Underwriting."

At our request, the underwriters have reserved for sale at the initial public offering price per share up to 5% of the shares of Class A common stock offered by this prospectus for sale at the initial public offering price through a directed share program to certain individuals identified by management. See the section titled "Underwriting—Directed Share Program."

BNP Paribas Energy Transition Fund ("BNPP ET") has indicated an interest in purchasing an aggregate of up to a maximum of $70 million in shares of Class A common stock in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or a commitment to purchase, BNPP ET could determine to purchase more, fewer or no shares of Class A common stock in this offering, or the underwriters could determine to sell more, fewer or no shares to BNPP ET. The underwriters will receive the same discount on any of the shares of Class A common stock purchased by BNPP ET as they will on any other shares of Class A common stock sold to the public in this offering.

The underwriters have the option to purchase up to an additional 4,650,000 shares of Class A common stock from us at the initial price to public less the underwriting discount within 30 days of the date of this prospectus.

The underwriters expect to deliver the shares of Class A common stock against payment in New York, New York on                 , 2021.

*(Lead bookrunners listed in alphabetical order by row)*

| | |
|---|---|
| **J.P. Morgan** | **Morgan Stanley** |
| **Barclays** | **BofA Securities** |

| | | |
|---|---|---|
| **Citigroup** | **Credit Suisse** | **UBS Investment Bank** |
| **Evercore ISI** | **HSBC** | **RBC Capital Markets** |

*Co-Managers*

| | | |
|---|---|---|
| **Nomura** | **Baird** | **Raymond James** |
| **Seaport Global Securities** | **Penserra Securities LLC** | **Siebert Williams Shank** |

**Prospectus dated              , 2021.**



**TABLE OF CONTENTS**

| | Page |
|---|---|
| Basis of Presentation | ii |
| Trademarks | iii |
| Market and Industry Data | iv |
| Prospectus Summary | 1 |
| Risk Factors | 25 |
| Cautionary Note Regarding Forward-Looking Statements | 66 |
| Our Organizational Structure | 68 |
| Use of Proceeds | 72 |
| Capitalization | 73 |
| Dividend Policy | 74 |
| Dilution | 75 |
| Unaudited Pro Forma Consolidated Financial Information | 77 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 85 |
| Business | 112 |
| Management | 129 |
| Executive Compensation | 138 |
| Certain Relationships and Related Party Transactions | 151 |
| Principal Stockholders | 166 |
| Description of Capital Stock | 168 |
| Shares Eligible for Future Sale | 174 |
| Material U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class A Common Stock | 177 |
| Underwriting | 181 |
| Legal Matters | 190 |
| Experts | 190 |
| Where You Can Find More Information | 190 |
| Index to Consolidated Financial Statements | F-1 |

**Through and including                    , 2021 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.**

You should rely only on the information contained in this prospectus and any free writing prospectus prepared by or on behalf of us or to which we have referred you. No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this prospectus or in any free writing prospectus that we file with the Securities and Exchange Commission. We and the underwriters have not authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any related free writing prospectuses. We and the underwriters take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. You must not rely on any unauthorized information or representations. This prospectus is an offer to sell only the shares offered by this prospectus, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date regardless of the time of delivery of this prospectus or of any sale of our Class A common stock. Our business, financial condition, results of operations, and prospects may have changed since that date.

For investors outside the United States: We have not, and the underwriters have not, done anything that would permit this offering or the possession or distribution of this prospectus or any free writing prospectus we may provide to you in connection with this offering in any jurisdiction where action for purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the shares of Class A common stock and the distribution of this prospectus outside the United States. See "Underwriting."

i

<div align="center">**BASIS OF PRESENTATION**</div>

**Organizational Structure**

In connection with the closing of this offering, we will undertake certain organizational transactions to reorganize our corporate structure. Unless otherwise stated or the context otherwise requires, all information in this prospectus reflects the consummation of the organizational transactions described in the section titled "Our Organizational Structure" and this offering, and the application of the proceeds therefrom, which we refer to collectively as the "Transactions."

See "Our Organizational Structure" for a diagram depicting our organizational structure after giving effect to the Transactions, including this offering.

**Certain Definitions**

As used in this prospectus, unless the context otherwise requires, references to:

• "*AES*" refers to The AES Corporation, a Delaware corporation, and its subsidiaries and affiliates.

• "*AES Grid Stability*" refers to AES Grid Stability, LLC, a Delaware limited liability company and indirect subsidiary of AES.

• "*Blocker Company*" refers to QFH, which is an owner of LLC Interests in Fluence Energy, LLC prior to the Transactions and is taxable as a corporation for U.S. federal income tax purposes.

• "*Blocker Mergers*" refers to one or more mergers in connection with the consummation of the Transactions, whereby the Blocker Shareholder will exchange their interests in the Blocker Company for shares of our Class A common stock.

• "*Blocker Shareholder*" refers to Qatar Holding LLC, which is the owner of the Blocker Company prior to the Transactions and will exchange their interests in the Blocker Company for shares of our Class A common stock pursuant to one or more mergers in connection with the consummation of the Transactions.

• "*Continuing Equity Owners*" refers collectively to AES Grid Stability, Siemens Industry, and the Blocker Shareholder and their respective subsidiaries, who will after this offering collectively own all of our Class B-1 common stock and 18,493,275 shares of our Class A common stock, representing a substantial majority of the voting power of our outstanding common stock.

• "*Contracted Backlog*" means signed purchase orders or contractual minimum purchase commitments with take-or pay provisions. For our energy storage product contracts, contracted backlog includes signed customer orders or contracts under execution prior to when substantial completion is achieved. For service contracts, contracted backlog includes signed service agreement associated with our storage product projects that have not been completed.

• "*Founders*" refers collectively to holders of LLC Interests (other than us) and our Class B-1 common stock immediately following consummation of the Transactions, including AES Grid Stability, Siemens Industry, and their respective subsidiaries, who may, following the consummation of this offering, at each of their respective options, in whole or in part from time to time, require Fluence Energy, LLC to redeem their LLC Interests (along with an equal number of shares of Class B-1 common stock or Class B-2 common stock, as the case may be (and such shares shall be immediately cancelled)) for, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), cash or newly-issued shares of our Class A common stock as described in "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement."

• "*Fluence Energy LLC Agreement*" refers to Fluence Energy, LLC's third amended and restated limited liability company agreement, which will become effective prior to the consummation of this offering.

• "*LLC Interests*" refers to the common units of Fluence Energy, LLC, including those that we purchase with the net proceeds from this offering.

<div align="center">ii</div>

- *"Original LLC Owners"* refers to the owners of LLC Interests in Fluence Energy, LLC prior to the consummation of the Transactions, collectively, which include AES Grid Stability, Siemens Industry, and QFH.

- "*Promissory Notes*" refers to the two promissory notes entered into by Fluence Energy, LLC on August 11, 2021 with each of Siemens Industry and AES Grid Stability, under which Fluence Energy, LLC received a bridge financing of an aggregate of $50.0 million.

- "*QFH*" refers to QIA Florence Holdings LLC, an affiliate of QIA.

- "*QIA*" refers to Qatar Investment Authority, the sovereign wealth fund of Qatar, and its subsidiaries and affiliates.

- "*Siemens*" refers to Siemens AG, a company incorporated under the laws of Germany, and its subsidiaries and affiliates.

- "*Siemens Industry*" refers to Siemens Industry, Inc., a Delaware corporation and indirect subsidiary of Siemens.

- "*Transactions"* refers to the organizational transactions and this offering, and the application of the net proceeds therefrom.

Fluence Energy, Inc. will be a holding company and the sole managing member of Fluence Energy, LLC, and upon consummation of the Transactions, its principal asset will consist of LLC Interests.

**Presentation of Financial Information**

Fluence Energy, LLC is the accounting predecessor of Fluence Energy, Inc. for financial reporting purposes. Fluence Energy, Inc. will be the audited financial reporting entity following this offering. Accordingly, this prospectus contains the following historical financial statements:

- *Fluence Energy, Inc.*   Other than the inception balance sheet, dated as of June 30, 2021, the historical financial information of Fluence Energy, Inc. has not been included in this prospectus as it is a newly incorporated entity, has no business transactions or activities to date and had no assets or liabilities during the periods presented in this prospectus.

- *Fluence Energy, LLC.*   Because Fluence Energy, Inc. will have no interest in any operations other than those of Fluence Energy, LLC and its subsidiaries, the historical consolidated financial information included in this prospectus is that of Fluence Energy, LLC and its subsidiaries.

Certain monetary amounts, percentages and other figures included in this prospectus have been subject to rounding adjustments. Percentage amounts included in this prospectus have not in all cases been calculated on the basis of such rounded figures, but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this prospectus may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements included elsewhere in this prospectus. Certain other amounts that appear in this prospectus may not sum due to rounding.

<div align="center">

**TRADEMARKS**

</div>

This prospectus includes our trademarks and trade names which are protected under applicable intellectual property laws and are our property. This prospectus also contains trademarks, trade names, and service marks of other companies, which are the property of their respective owners. Solely for convenience, trademarks, trade names, and service marks referred to in this prospectus may appear without the ®, TM or SM symbols, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent permitted under applicable law, our rights or the right of the applicable licensor to these trademarks, trade names, and service marks. We do not intend our use or display of other parties' trademarks, trade names, or service marks to imply, and such use or display should not be construed to imply, a relationship with, or endorsement or sponsorship of us by, these other parties.

<div align="center">

iii

</div>

**MARKET AND INDUSTRY DATA**

Unless otherwise indicated, information contained in this prospectus concerning our industry, competitive position, and the markets in which we operate is based on information from independent industry and research organizations, other third-party sources, and management estimates. Management estimates are derived from publicly available information released by independent industry analysts and other third-party sources, as well as data from our internal research, and are based on assumptions made by us upon reviewing such data, and our experience in, and knowledge of, such industry and markets, which we believe to be reasonable. In addition, projections, assumptions, and estimates of the future performance of the industry in which we operate and our future performance are necessarily subject to uncertainty and risk due to a variety of factors, including those described in "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements." These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

### PROSPECTUS SUMMARY

*This summary highlights selected information contained elsewhere in this prospectus. It does not contain all of the information that may be important to you and your investment decision. Before investing in our Class A common stock, you should carefully read this entire prospectus, including the matters set forth under the sections of this prospectus captioned "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus. In addition, certain statements in this prospectus include forward-looking information that is subject to risks and uncertainties. See "Cautionary Note Regarding Forward-Looking Statements."*

*Unless otherwise indicated or the context otherwise requires, all references in this prospectus to the "Company," "we," "us," "our," "Fluence" and similar terms refer, following the consummation of the Transactions (including this offering), to Fluence Energy, Inc., and all of its direct and indirect subsidiaries, including Fluence Energy, LLC, and prior to the consummation of the Transactions (including this offering), Fluence Energy, LLC and all of its direct and indirect subsidiaries, and, in each case, unless otherwise stated or the context otherwise requires, to our predecessor companies. See "—Creation of Our Company" below for additional information.*

*Our fiscal year ends on September 30. All references to fiscal 2019 and 2020 refer to the year ended September 30, 2019 and 2020, respectively.*

**Our Mission**

Our mission is to transform the way we power our world for a more sustainable future.

**Overview**

We are enabling the global clean energy transition with market-leading energy storage products and services and digital applications for renewables and storage. We believe battery energy storage technology ("energy storage") is at the center of this transition and is becoming even more important as more renewables are added to the grid and the transportation sector moves towards electrification. We are driving change by delivering configurable energy storage product, service, and digital application packages, as well as our AI-enabled Fluence IQ Platform to optimize renewable and third-party storage assets. Our offerings help major utilities, developers, and commercial and industrial ("C&I") customers around the world deliver a more sustainable, reliable, and resilient electric grid in a repeatable, scalable way.

Energy storage is a key solution to the challenges facing electricity markets and transmission grids, including: electricity load variability and quality issues from increased participation of renewable energy generation; growing consumer and industrial demand for smart grid services; and localized capacity constraints on transmission networks, particularly around periods of peak demand. Energy storage is a uniquely flexible, asset that can provide multiple critical grid services, including energy shifting, peaking capacity, ancillary services, and transmission and distribution infrastructure functions. Our team has helped the industry move from a few deployments of single-function systems under 10 megawatts ("MW"), to multiple deployments of systems over 100 MW with broad functionality optimized by advanced software and digital intelligence.

Fluence is a leading pure-play provider of energy storage technology globally, and our AI-enabled Fluence IQ helps customers maximize the value and performance of single assets or entire portfolios of clean energy assets. Although we were established in January 2018 as a joint venture between Siemens and AES, members of our board of directors and leadership team were part of the founding team at AES Energy Storage that conceived and tested the world's first lithium-ion energy storage system on an electric grid starting in 2007. Fluence has built on AES' industry-defining work in clean energy and storage operations and Siemens' energy technology leadership and global sales presence. The result is an agile company with a global presence solely focused on enabling the clean energy transition.

We believe our customer- and market-centric approach differentiates us from our peers and best positions us to deploy our high-value and high-margin services and digital recurring revenue offerings across a large, global installed base, building upon our 13 years of deep energy storage experience and data-driven insights. Furthermore, our advanced digital applications delivered to non-Fluence customers can

1

enable cross-sales of Fluence energy storage products. Last year, we unveiled our sixth-generation technology stack ("Tech Stack"), which is the foundation of our energy storage products. The Tech Stack is comprised of our modular, factory-built hardware ("Fluence Cube"), proprietary operating system ("Fluence OS"), and AI-enabled digital platform ("Fluence IQ"). In addition to energy storage products, our offerings include delivery services and recurring operational services, as well as financing structuring services, such as energy-storage-as-a-service ("ESaaS"). Our Fluence IQ Digital Platform includes the Fluence Bidding Application, which delivers AI-powered market bidding optimization for solar, wind, and energy storage assets, including non-Fluence energy storage systems.

Guidehouse Consulting has ranked us as the leading energy storage provider since our inception, based on factors including vision, go-to-market strategy, product performance, technology, and execution. We were also ranked the leading global energy storage systems integrator by Navigant in 2018 and the largest global energy storage system integrator in a 2021 report by Clean Horizon. We won Best Commercial Technology of the Year at the 2020 S&P Global Platts Global Energy Awards for our sixth-generation Tech Stack and were named to Fast Company's Most Innovative Companies, Energy list in 2019 and 2021. Previous generations of our technology have won the Edison Electric Institute's annual Edison Awards (2016, 2019, and 2021).

As of September 30, 2021, we had 1.0 gigawatts ("GW") of energy storage assets deployed and 2.7 GW of contracted backlog across 29 markets with a gross global pipeline of 14.2 GW. As of September 30, 2021, our global operational and maintenance ("O&M") services team was providing services for 0.8 GW of energy storage assets, with a further 1.9 GW of contracted backlog, which have provided Fluence with over 290 terabytes of data on energy storage operation and performance as of June 30, 2021. As of June 30, 2021, we had $885 million of contracted backlog related to energy storage products, representing a 14% increase related to the same date last year and as of September 30, 2021 we estimated that we had between approximately $1,344 million and $1,393 million of contracted backlog related to energy storage products.

In 2020, we entered into an agreement with QFH for a $125 million investment to accelerate our growth and the global deployment of our offerings, which has included the acquisition of the software and digital intelligence platform of Advanced Microgrid Solutions ("AMS"), a leading artificial intelligence-enabled optimized bidding software for utility-scale storage and renewable generation assets, which became the Fluence Bidding Application. As of September 30, 2021, we had an aggregate of 3.1 GW of renewable energy assets using the Fluence Bidding Application and 1.6 GW of contracted backlog related to renewable and energy storage assets. We expect our services and Fluence IQ digital applications, including the Fluence Bidding Application, to expand meaningfully over the next five years and contribute increasingly to our bottom-line growth.

**Our Industry and Market Opportunity**

Climate change is an existential threat. Severe weather events and broader awareness of the financial implications of climate change are driving a systemic global transition away from fossil fuels towards sustainable energy systems. However, renewable generation, unlike fossil fuel generation, has no inherent storage capacity and can only be used in favorable wind and solar conditions. Energy storage is therefore a critical enabler of large-scale adoption of 24/7 renewable energy. Furthermore, accelerating electrification of industries such as transportation is driving demand for more generation. Energy storage can help both serve and smooth additional peak demand, improving grid reliability and managing energy requirements.

As the first truly digital asset on the electric grid, energy storage is also a uniquely flexible tool for grid planners, operators, and power providers. We believe energy storage sits at the epicenter of the global clean energy transition and represents the backbone of a massive change in our energy market infrastructure driven by three key trends: Grid modernization, decarbonization, and digitalization. The energy transformation will require $100 trillion of investment through 2050 based on the midpoint of Bloomberg New Energy Finance's ("BloombergNEF") NEO 2020 clean electricity and green hydrogen pathway.

The energy storage market is comprised of three components:

- **Energy storage products—**the components (including batteries), professional services, and labor required to manufacture, assemble, and install products. According to BloombergNEF, global annual

2

energy storage capacity installations, excluding the residential market, grew from 0.6 GW a year in 2015 to 3.8 GW a year in 2020, and are expected to grow to 34.2 GW a year by 2030. We believe most forecasts for the energy storage sector, including BloombergNEF, understate the size and market opportunity as forecasts generally only account for spend associated with the physical energy storage asset and do not account for the associated service and digital spend.

- **Services—**recurring operational and maintenance services that energy storage products require, management services that are provided by third parties when asset owners outsource the operations of their systems, and the provision of ESaaS. According to BloombergNEF, global installed energy storage capacity, excluding the residential market, grew 57% per annum between 2015 and 2020, and the installed base is expected to grow at a 31% annual growth rate through 2030. BloombergNEF forecasts that global installed energy storage capacity will reach 193.7 GW by 2030, excluding the residential market.

- **Digital applications and solutions—**operating systems, applications, such as trading platforms that allow system owners to manage their grid participation, and dynamic capacity services, such as virtual power plants. We believe there is an opportunity to not only deploy digital applications and solutions on individual assets but also across entire energy storage fleets and portfolios of generation assets to improve their collective performance and economic output, and to reduce the overall carbon footprint of the electric grid by optimizing the interactions between different asset types.

We believe there are multiple factors driving continued growth in the energy storage sector, including:

- The accelerating transition from fossil to renewable generation is expected to require significant increases in energy storage capacity to both offset potential grid instability caused by intermittent renewable resources and enable the use of power from renewable generation assets at times when the natural resource is unavailable.

- Growing capacity constraints on existing power grids that were not designed to support distributed and renewable generation infrastructure or technologies such as electric vehicles are positioning energy storage assets as a key solution.

- A forecasted reduction in the battery cost, estimated by BloombergNEF to be approximately 8% annually from 2020 to 2030, is expected to improve the economics of energy storage and support the development of larger energy storage systems.

- The levelized cost of storage (LCOS) of battery storage has decreased from an estimated $324/MWh in 2018 to an estimated $192/MWh in 2020, according to the Lazard Levelized Cost of Storage Analysis. This reduction in cost makes battery storage economically competitive with the gas peakers which are estimated in 2020 to have a levelized cost of energy (LCOE) range of $151/MWh to $198/MWh, according to the Lazard Levelized Cost of Energy Analysis.

- Environmental responsibility has become a priority for major companies and investors, with over 300 major companies having pledged to source 100% of their energy from renewables as part of the RE100, a global corporate renewable energy initiative.

- Governments across the globe have announced policies to support the transition from fossil fuels to low-carbon forms of energy.

**Our Products and Services**

Our offerings include energy storage products and delivery services, recurring operational services, and digital solutions and applications for energy storage and other power assets. We have repeatedly pioneered new use cases for grid-scale energy storage. Some of the uses we have supported include frequency regulation, generation enhancement, capacity peak power, energy cost control, microgrids/islands, renewable integration, virtual dams, T&D enhancement, and critical power.

*Energy Storage Products*

We sell highly configurable energy storage products with integrated hardware, software, and digital intelligence. Unlike other energy storage providers, we take a customer- and market-centric approach,

3

building products and technology based on customer needs and economic feasibility. We offer three energy storage products built on our sixth-generation Tech Stack foundation, which are optimized for common customer use cases but can be configured for specific use cases: *Gridstack*™, a grid-scale, industrial-strength energy storage product designed for demanding market applications with industry-leading reliability, scalability, and safety; *Sunstack*™: designed to optimize solar capture and delivery; and *Edgestack*™: commercial energy storage product that discharges when needed to flatten a facility's energy load profile, resulting in significantly reduced demand charges. The fully integrated product is available in smaller-size building blocks that can be easily configured to meet the needs of individual facilities and aggregated across fleets or locations without time-consuming redesigns. We also offer comprehensive engineering and delivery services to support the deployment of our storage products. Customers can select from a range of delivery service, from project design to full-wrap turnkey installation.

*Sixth-Generation Technology Stack*

The Tech Stack, which is comprised of our Fluence Cube, Fluence OS, and Fluence IQ, builds upon 13 years of development in prior generations, reflecting ongoing safety and design improvements. The Fluence Cube is a modular, factory-built, approximately 8'x8'x8' building block that delivers safe, scalable, cost-effective products. Our battery and supplier-agnostic system architecture allows us to deliver optimized solutions for our customers on a global scale while incorporating the latest technology components. Fluence OS is a fully integrated edge controls platform with comprehensive control, asset management and system visibility across single sites or entire fleets. The Fluence IQ Digital Platform supports applications to improve revenue generation, system decision-making, asset performance, and operations.

**Services**

*Operational & Maintenance Services*

In addition to energy storage products, our offerings include delivery services and recurring operational services. Our recurring O&M services are designed around customer business needs, in-house capabilities, performance requirements, and risk profiles. We offer four operational services packages: Guided Services, Shared Services, Complete Services, and Asset Management. These packages provide varying levels of training, maintenance, guarantees, warranties, and support to address our customers' desired level of active system management. These service levels range from providing comprehensive training for customers to performing full asset operation and management on behalf of the customer.

*Energy Storage-as-a-Service*

Fluence, working with third-party financial partners, including Siemens Financial Services, offers financing structuring services to customers. For instance, ESaaS enables customers to access the benefits of energy storage without upfront investment or technical expertise.

**Digital Applications and Solutions**

Our team is continuously expanding the digital applications we offer to customers. Those applications may include internally developed applications as well as third-party applications offered through the Fluence IQ digital applications platform.

Our proprietary operations platform, Fluence OS, enables asset owners to manage storage product operations according to pre-set modes and access real-time information through cloud-based data. It is an integral part of all our energy storage product sales. Fluence OS controls software enables Fluence energy storage products to deliver critical grid services such as primary frequency regulation, secondary frequency response, fast frequency response, peak shaving, voltage regulation, power factor regulation, non-spinning reserves, capacity peak power, solar energy time-shifting, firm solar export, energy arbitrage, and more. Fluence also delivers stacking of grid services, allowing storage assets to perform multiple services simultaneously and increase revenue-generating opportunities. In addition to Fluence OS, we offer the Fluence IQ Digital Platform with specialized digital applications that encompasses proprietary artificial intelligence and data science technologies, such as the Fluence Bidding Application.

4

The Bidding Application is a leading artificial intelligence-enabled bidding software for utility-scale storage and renewable and conventional generation assets, enabling customers to optimize asset trading in wholesale electricity markets. That leadership is demonstrated by the fact that it has been selected by one customer for deployment in the California market to optimize a product acquired from a Fluence competitor. In addition, it is currently used to optimize approximately 20% of all the utility-scale wind and solar assets bidding into Australia's National Electricity Market, including one of the largest solar farms in the country. One of the goals of the AMS acquisition is to combine Fluence's insights from deep experience operating energy storage products globally with the Bidding Application's optimized market participation capabilities.

Our Bidding Application is technology-agnostic (it can be applied to wind and solar assets as well as energy storage assets) and vendor-agnostic (it is available to optimize non-Fluence storage products), and it is delivered using cloud-based software-as-a-service, avoiding requirements for onsite hardware or software installations. Our pricing strategy is based on a volume-based subscription fee with the ability to start with a smaller scale and increase the number of assets covered by the software as customers build out their fleets, along with the potential for performance-based revenue-sharing structures.

**Our Competitive Strengths**

We believe the following key strengths have enabled us to become a leading provider of energy storage products, services, and digital applications, positioning us to continue to capture future market opportunities:

- *Incumbent position with global track record of success.* We are one of the largest providers of energy storage products globally, with 1.0 GW of energy storage assets deployed and 2.7 GW of contracted backlog as of September 30, 2021, and a track record of 13 years of experience from our predecessor companies. Additionally, as of September 30, 2021, we had an aggregate of 3.1 GW of renewable energy assets using the Fluence Bidding Application and 1.6 GW of contracted backlog related to renewables and energy storage assets. Moreover, through Fluence OS, we have access to hundreds of thousands of hours of cumulative energy storage product operating history, with over 290 terabytes of data on operation and performance as of June 30, 2021. This data enables us to optimize our asset base, dispatching them to maximize economics, reduce operational costs, extend useful lives, and deliver critical grid services when needed.

- *Disruptive digital and software products.* We use multi-layered design of edge and cloud applications, including Fluence OS and Fluence IQ, to transform hardware into digital assets that provide extensive market and grid services, such as the Fluence Bidding Application. Our dedicated Fluence Digital team is focused on developing and commercializing additional cloud-based applications using optimization, AI-driven predictive analytics, and software to address the challenges customers face when participating in complex energy markets.

- *Large installed base enables cross-selling and incremental revenue streams.* Our installed base is a captive market for repeat customers and high-margin follow-on service and digital opportunities, as we are best positioned to provide tailored, value-maximizing solutions for our own products. The majority of our customers adopt energy storage as a new asset class and return for subsequent products purchases. We believe our substantial base of customers and data enables cross-selling of our service and digital offerings. Conversely, digital applications sold to non-Fluence energy storage product customers can enable energy storage product cross-sales. By deploying learnings from our digital application customers to develop offerings that meet their business needs, we believe we can create opportunities to convert them into product owners.

- *Global supply chain and technology partnerships.* We have developed a global supply chain with an evolving regionally focused operational model with the objective of assembling products in proximity to major markets and partnering with innovative suppliers. For example, we recently signed a technology co-development and supply agreement with Northvolt that expands our battery supply chain into Europe and allows us to develop, manufacture, and commercialize an optimized battery subsystem that is significantly more energy dense than today's standard solutions. The agreement also enables us to deploy a battery management system that we can integrate with other vendors to extend our value chain, develop battery competencies, and lower total cost of ownership.

5

- *Battery technology-agnostic.* Our energy storage products are designed to work with many types of batteries, and we have established partnerships with the leading battery manufacturers around the world, with approximately 20 GWh of contracted battery supply through 2024. As a result, we do not believe we are exposed to significant risk from changes in battery technology or shifts in market share between different manufacturers.

- *Experienced management team with extensive energy storage experience.* We believe we have assembled one of the most experienced management teams in the energy storage sector, with over 200 years of aggregate industry experience and a proven track-record of managing high-growth, international operations for global industrial and technology companies. Members of our management and Board were on the team that conceived and tested the first ever grid-connected lithium-ion energy storage system and sold the world's first commercial system.

**Our Growth Strategy**

We intend to leverage our global scale, technology leadership and market share position to help transform the way we power our world for a more sustainable future. Some key elements of our growth strategy include:

- *Develop energy products, services, and digital applications packaged into solutions that solve customers' energy challenges.* Our close relationships with customers and our market intimacy informs our hardware and software product development and service offerings and enables us to continually expand use cases for energy storage on the grid—pushing the edge of innovation for grid modernization and decarbonization as our customers' business models evolve.

- *Expand competitive advantage of productization and manufacturing.* We aim to create an optimized production organization, develop mass manufacturing facilities globally, and continue to secure partnerships with key battery suppliers. We believe that enhancing our product-focused model and supply chain leverage will support our global growth objectives and result in superior unit economics.

- *Optimize sales channels and market segmentation with a regionalized model.* We are focused on expanding standardized offerings that are optimized for each of our sales channels, allowing us to streamline product procurement for our customers, improve our sales cycle, enhance our ability to scale and support our margin expansion. We are also moving to a more localized, regional organizational structure to better support customers and sales channels, improve logistics, and enhance market focus.

- *Leverage our sponsor relationships to accelerate global growth.* Our partnerships with AES and Siemens provide built-in and growing customer bases and an international sales channel. In addition, in 2021, QIA became a strategic sponsor with its investment through QFH that may help position us to form relationships with additional technology partners, customers, and suppliers.

- *Expand our services with additional value-add offerings.* Our delivery and operational service offerings address the diverse needs of our customers in different markets around the world. We intend to build and expand our portfolio of service offerings, including product upgrades, analysis, performance assurance, risk management products, and software support, using data-driven insights generated from our large installed base of energy storage products.

- *Accelerate the deployment of the Fluence Bidding Application and develop new Fluence IQ digital applications.* Our digital offerings enable renewable and energy storage asset owners to solve the complexities of power system dispatch on a grid that remains dependent on out-of-date infrastructure and inefficient tools. We are focused on making the Fluence Bidding Application available in more markets while expanding our breadth of Fluence IQ digital application offerings, including integrated solutions for specific customer segments and new asset classes.

- *Incubate innovative business models.* We continue to explore disruptive digitally-driven business models, including ESaaS, wide-ranging dynamic capacity, virtual storage, asset- and revenue-sharing models, and other offerings that will reinforce our position as a leading provider of comprehensive solutions to support the clean energy transition.

6

- *Ability to acquire and successfully integrate companies.*  We have a demonstrated track record of successfully acquiring and integrating companies, and believe we have the operational structure in place to achieve synergies and capture cross-selling opportunities. For example, within eight months of acquiring AMS, we had fully integrated the team and technology into Fluence and grown adoption of the Fluence Bidding Application software by 1.7 GW.

**Environmental, Social, and Governance**

We are a purpose-built, purpose-driven company on a mission to transform the way we power our world for a more sustainable future. We support the clean energy transition by enabling greater adoption of renewable energy and decarbonized technologies such as electric vehicles and reduced use of thermal generation resources. Our offerings enable more sustainable, reliable, and resilient electric grids in a repeatable, scalable way. On an annualized basis, based on MW deployed as of May 2021, we estimate that Fluence energy storage products have eliminated 145,000 metric tons of carbon per year that would have otherwise been produced—the equivalent of taking more than 30,000 cars off the road each year.

We endeavor to go beyond the inherent environmental aspects of our technology and implement sustainable and ethical processes throughout our organization. Our supplier code of conduct is at the core of our compliance expectations, and addresses environmental protection, child labor, conflict minerals, and anti-corruption, among other areas. In addition, we only purchase raw materials and minerals from trusted suppliers. In sourcing cobalt for example, we request that suppliers provide an official cobalt statement disclosing its origin, and we only buy cobalt battery chemistry from suppliers who are part of a sustainable cobalt sourcing initiative. In 2021, our supply chain sustainability coordinator engaged the Carbon Disclosure Project to conduct an audit of our supply chain's carbon footprint.

We are committed to implementing responsible environmental and ethical practices in our corporate offices as well as our supply chain. Our offices are internationally certified to ISO 14001, which requires an organization to implement and demonstrate compliance with an effective environmental management system to identify and control the environmental impact of its activities, products, and services; continually improve environmental performance; and implement a systematic approach to setting environmental objectives and targets.

We plan to report how we oversee and manage environmental, social, and governance ("ESG") factors material to our business under the sector-specific ESG standards recommended by the Sustainability Accounting Standards Board (the "SASB"), including an annual sustainability report. As part of our plan to provide ESG disclosures pursuant to SASB standards, we will evaluate aligning our internal sustainability goals with certain United Nations Sustainable Development Goals.

**Creation of Our Company**

We were created from the union of AES' Energy Storage division and Siemens' battery-based energy storage solutions group. The founding team at AES Energy Storage—several of whom are on Fluence's leadership team and Board—tested the first ever lithium-ion battery energy storage system on the grid in 2007, sold the world's first commercial grid-scale energy storage system in Chile in 2009, and subsequently amassed deep expertise in utility-scale storage solutions for flexible peaking capacity, ancillary services such as frequency regulation, transmission and distribution reliability, and renewable integration applications. Siemens' battery-based energy storage solutions group was established in 2011, building on the company's knowledge of customer power needs as a leading global original equipment manufacturer and developing experience in microgrid and islanding applications, renewable hybrid technology, and consumer peak shaving.

**Summary of the Transactions**

Fluence Energy, Inc., a Delaware corporation, was formed on June 21, 2021 and is the issuer of the Class A common stock offered by this prospectus. Prior to this offering, all of our business operations have been conducted through Fluence Energy, LLC and its direct and indirect subsidiaries. Prior to the Transactions, we expect there will initially be one holder of common stock of Fluence Energy, Inc. We will consummate the following organizational transactions in connection with this offering:

7

- we will amend and restate the existing limited liability company agreement of Fluence Energy, LLC, which will become effective prior to the consummation of this offering, to, among other things, (1) recapitalize all existing ownership interests in Fluence Energy, LLC into 135,666,665 LLC Interests and (2) appoint Fluence Energy, Inc. as the sole managing member of Fluence Energy, LLC upon its acquisition of LLC Interests in connection with this offering;

- we will amend and restate Fluence Energy, Inc.'s certificate of incorporation to, among other things, provide (1) for Class A common stock, with each share of our Class A common stock entitling its holder to one vote per share on all matters presented to our stockholders generally, and (2) for Class B-1 common stock, with each share of our Class B-1 common stock entitling its holder to five votes per share on all matters presented to our stockholders generally, and that shares of our Class B-1 common stock may only be held by the Founders and their respective permitted transferees as described in "Description of Capital Stock—Common Stock—Class B-1 and Class B-2 Common Stock;"

- we will acquire, by means of one or more mergers, the Blocker Company and will issue to the Blocker Shareholder 18,493,275 shares of our Class A common stock as consideration in the Blocker Mergers;

- we will issue 117,173,390 shares of our Class B-1 common stock to the Founders, which is equal to the number of LLC Interests held by such Founders, for nominal consideration;

- we will issue 31,000,000 shares of our Class A common stock to the purchasers in this offering (or 35,650,000 shares if the underwriters exercise in full their option to purchase additional shares of Class A common stock) in exchange for net proceeds of approximately $650.9 million (or approximately $750.0 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock) based upon an assumed initial public offering price of $22.50 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), less the underwriting discount and estimated offering expenses payable by us;

- we will use the net proceeds from this offering to purchase 31,000,000 newly issued LLC Interests (or 35,650,000 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from Fluence Energy, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us;

- Fluence Energy, LLC intends to use the net proceeds from the sale of LLC Interests to Fluence Energy, Inc. to repay all outstanding borrowings under our existing Line of Credit and the Promissory Notes, and the remainder for working capital and other general corporate purposes, as described under "Use of Proceeds;" and

- Fluence Energy, Inc. and the Continuing Equity Owners will enter into (1) the Stockholders Agreement and the (2) the Registration Rights Agreement, and Fluence Energy, Inc., Fluence Energy, LLC, and the Founders will enter into the Tax Receivable Agreement. For a description of the terms of the Stockholders Agreement, the Registration Rights Agreement and the Tax Receivable Agreement, see "Certain Relationships and Related Party Transactions."

Immediately following the consummation of the Transactions (including this offering):

- Fluence Energy, Inc. will be a holding company and its principal asset will consist of LLC Interests it purchases directly from Fluence Energy, LLC and acquires indirectly from the Blocker Shareholder;

- Fluence Energy, Inc. will be the sole managing member of Fluence Energy, LLC and will control the business and affairs of Fluence Energy, LLC and its direct and indirect subsidiaries;

- Fluence Energy, Inc. will own, directly or indirectly, 49,493,275 LLC Interests of Fluence Energy, LLC, representing approximately 29.7% of the economic interest in Fluence Energy, LLC (or 54,143,275 LLC Interests, representing approximately 31.6% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the Founders will own (1) 117,173,390 LLC Interests of Fluence Energy, LLC, representing approximately 70.3% of the economic interest in Fluence Energy, LLC (or 117,173,390 LLC Interests,

8

representing approximately 68.4% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (2) 117,173,390 shares of Class B-1 common stock of Fluence Energy, Inc., representing approximately 92.2% of the combined voting power of all of Fluence Energy, Inc.'s common stock (or 117,173,390 shares of Class B-1 common stock of Fluence Energy, Inc., representing approximately 91.5% if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the Blocker Shareholder will own (1) 18,493,275 shares of Class A common stock of Fluence Energy, Inc. (or 18,493,275 shares of Class A common stock of Fluence Energy, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 2.9% of the combined voting power of all of Fluence Energy, Inc.'s common stock and approximately 37.4% of the economic interest in Fluence Energy, Inc. (or approximately 2.9% of the combined voting power and approximately 34.2% of the economic interest if the underwriters exercise in full their option to purchase additional shares of Class A common stock), (2) directly and indirectly through Fluence Energy, Inc.'s ownership of LLC Interests, approximately 11.1% of the economic interest in Fluence Energy, LLC (or approximately 10.8% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the purchasers in this offering will own (1) 31,000,000 shares of Class A common stock of Fluence Energy, Inc. (or 35,650,000 shares of Class A common stock of Fluence Energy, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 4.9% of the combined voting power of all of Fluence Energy, Inc.'s common stock and approximately 62.6% of the economic interest in Fluence Energy, Inc. (or approximately 5.6% of the combined voting power and approximately 65.8% of the economic interest if the underwriters exercise in full their option to purchase additional shares of Class A common stock), and (2) through Fluence Energy, Inc.'s ownership of LLC Interests, indirectly will hold approximately 18.6% of the economic interest in Fluence Energy, LLC (or approximately 20.8% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock); and

- we will have 23,988,372 shares of Class A common stock reserved for issuance pursuant to awards under our incentive compensation plans. See "Executive Compensation—Equity Compensation."

As the sole managing member of Fluence Energy, LLC, we will operate and control all the business and affairs of Fluence Energy, LLC and, through Fluence Energy, LLC and its direct and indirect subsidiaries, conduct our business. Following the Transactions, including this offering, Fluence Energy, Inc. will control the management of Fluence Energy, LLC as its sole managing member. As a result, Fluence Energy, Inc. will consolidate Fluence Energy, LLC and record a significant non-controlling interest in a consolidated entity in Fluence Energy, Inc.'s consolidated financial statements for the economic interest in Fluence Energy, LLC held by the Founders.

Unless otherwise indicated, this prospectus assumes the shares of Class A common stock are offered at $22.50 per share (the midpoint of the estimated price range set forth on the cover page of this prospectus). For more information regarding the impact of the initial offering price on the share information included throughout this prospectus, see "—The Offering."

For more information regarding the Transactions and our structure, see "Our Organizational Structure."

**Revolving Credit Facility**

In connection with this offering, we plan to enter into a $200.0 million secured revolving credit facility (the "Revolver") dated on or about the date of the consummation of this offering, by and among Fluence Energy, LLC, as the borrower, Fluence Energy, Inc., as a parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Revolving Credit Facility." The effectiveness of the Revolver is conditioned upon the consummation of this offering; however, this offering is not contingent upon the effectiveness of the Revolver.

9

**Ownership Structure**

The diagram below depicts our organizational structure after giving effect to the Transactions, including this offering, assuming no exercise by the underwriters of their option to purchase additional shares of Class A common stock.



This chart does not include the 23,988,372 shares of Class A common stock issuable pursuant to our equity compensation plans.

After giving effect to the Transactions, including this offering, Fluence Energy, Inc. will be a holding company whose principal asset will consist of 29.7% of the outstanding LLC Interests of Fluence Energy, LLC (or 31.6% if the underwriters exercise in full their option to purchase additional shares of our Class A common stock). This offering is being conducted through what is commonly referred to as an "Up-C" structure, which is often used by partnerships and limited liability companies undertaking an initial public offering. The Up-C approach provides the existing owners with the tax treatment of continuing to own interests in a pass-through structure and provides potential future tax benefits for both the public company and the existing owners when they ultimately redeem their pass-through interests for shares of Class A common stock or cash from the sale of newly issued shares of Class A common stock.

*Recent Developments—Preliminary Fourth Quarter Results*

While we have not yet completed our closing procedures as of and for the three months and fiscal year ended September 30, 2021, set forth below are selected, unaudited, preliminary estimated results for that period.

Based on our preliminary internal estimates, we estimate new energy storage product contracts executed during the fiscal year ended September 30, 2021 will represent total contracted power of approximately 1,311 MW, compared to 844 MW of total contracted power during the fiscal year ended September 30, 2020, and new energy storage products executed during the three months ended September 30, 2021 will represent total contracted power of approximately 821 MW, compared to 279 MW of total contracted power during the three months ended September 30, 2020.

10

Additionally, we estimate that for the fiscal year ended September 30, 2021, we had approximately 1,959 MW of contracted service contracts, compared to 232 MW for the fiscal year ended September 30, 2020, and for the three months ended September 30, 2021, we had approximately 749 MW of contracted service contracts, compared to 205 MW for the three months ended September 30, 2020.

For the fiscal year ended September 30, 2021, we estimate that we had approximately 2,744 MW of contracted digital contracts, compared to 0 MW for the fiscal year ended September 30, 2020, and for the three months ended September 30, 2021, we estimate that we had approximately 1,010 MW of contracted digital contracts, compared to 0 MW for the three months ended September 30, 2020.

We also estimate that our total revenue for the fiscal year ending September 30, 2021 will be between approximately $650 million and $699 million, compared to $561.3 million of total revenue for the fiscal year ended September 30, 2020, and our total revenue for the three months ending September 30, 2021 will be between approximately $158 million and $207 million, compared to $239.5 million of total revenue for the three months ended September 30, 2020, which is being driven primarily by sales of our energy storage products. Revenue for the three months and fiscal year ending September 30, 2021 has been negatively affected by impacts related to the COVID-19 global pandemic, such as delays in shipping out energy storage products and temporary closures of customer construction sites. Such delays may continue in fiscal year 2022. Please see "Risk Factors—Risks Related to our Business—We have experienced and may continue to experience delays, disruptions, or quality control problems in our manufacturing operations in part due to our third-party supplier and manufacturer concentration." and "—We face risks related to actual or threatened health epidemics, such as the COVID-19 pandemic, and other outbreaks, which could significantly disrupt our suppliers' manufacturing and our operations."

As discussed elsewhere in this prospectus, we experience seasonality and typically see increased order intake in the third and fourth fiscal quarters (April to September), and we have seen that trend continue in our fiscal fourth quarter ended September 30, 2021. Please see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Factors and Trends—Seasonality" and "Risk Factors—Risks Related to Our Financial Condition and Liquidity—Our order intake and cash flows have been highly seasonal, which could make our future performance difficult to predict and could cause our results of operations for a particular period to fluctuate from quarter to quarter or fall below expectations, resulting in a decline in the price of our Class A common stock" for further discussion of our seasonality.

For the three months and fiscal year ended September 30, 2021, we expect that our financial results, specifically our gross profit and gross profit as a percentage of revenue, will be negatively impacted by (a) capacity constraints within the shipping industry and increased shipping costs, both of which we believe are caused primarily as a result of the COVID-19 pandemic, and (b) cost overruns and delays we are experiencing in some projects currently under construction. Some of those costs overruns and delays are occurring in the first Generation 6 product deliveries. As a result, we expect to recognize gross loss of approximately $64 million to $75 million for the fiscal year ended September 30, 2021 compared to a gross profit of $7.9 million for the fiscal year ended September 30, 2020, and a gross loss of approximately $54 million to $65 million for the three months ended September 30, 2021 compared to a gross profit of $12 million for the three months ended September 30, 2020. We also expect to report a lower gross profit as a percentage of revenue for the three months and fiscal year ended September 30, 2021 compared to the corresponding periods of fiscal 2020. See "Risk Factors—Risks Related to Our Business—Significant changes in the cost of raw materials or to logistic cost(s) could adversely affect our financial performance" and "Risk Factors - We have experienced and may continue to experience delays, disruptions, or quality control problems in our manufacturing operations in part due to our third-party supplier and manufacturer concentration."

We expect that the negative impacts of the items discussed below will result in a net loss of approximately $158 million to $169 million for the fiscal year ended September 30, 2021, compared to a net loss of $46.7 million for the fiscal year ended September 30, 2020, and a net loss of approximately $84 million to $95 million for the three months ended September 30, 2021, compared to a net loss of $1.1 million for the three months ended September 30, 2020.

The increased investment into our business growth, the transition to a mass manufacturing business model, the delays from shipping, and temporary customer site closures is causing negative cash flow. We

estimate that our cash flow from operations for the fiscal year ending September 30, 2021 will be between approximately $(254) million and $(264) million, compared to $(14) million of cash flow from operations for the fiscal year ended September 30, 2020, and our cash flow from operations for the three months ending September 30, 2021 will be between approximately $(115) million and $(125) million, compared to $61.8 million of cash flow from operations for the three months ended September 30, 2020.

As of September 30, 2021, we had $100 million of indebtedness outstanding under our existing Line of Credit and the Promissory Notes.

Our preliminary estimated results for the three months and fiscal year ending September 30, 2021 are based solely on information available to us as of the date of this prospectus and are inherently uncertain and subject to change due to a variety of business, economic and competitive risks and uncertainties, many of which are not within our control, and we undertake no obligation to update this information. Our estimates contained in this prospectus are forward looking statements. These estimates should not be viewed as a substitute for our full interim or annual financial statements prepared in accordance with GAAP. Accordingly, you should not place undue reliance on this preliminary data. Our actual results may differ materially from these estimates due to financial results for the remainder of the fiscal year, the completion of our year-end closing procedures, final adjustments and developments that may arise between now and the time our financial results for the three months and fiscal year ended September 30, 2021 are finalized. Our actual consolidated financial statements and related notes for the year ended September 30, 2021 are not expected to be filed with the SEC until after this offering is completed. During the course of the preparation of these actual consolidated financial statements and related notes, additional items that may require material adjustments to the preliminary estimated financial results presented above could be identified.

The preliminary financial data included in this prospectus have been prepared by and are the responsibility of our management. Ernst & Young LLP has not compiled, reviewed, examined, performed any other assurance procedures, or expressed any form of assurance with respect to the preliminary financial data included in this Registration Statement. The report of Ernst & Young LLP included in this Registration Statement relates to the Company's historical audited financial statements and does not extend to the unaudited preliminary financial data and should not be read to do so.

**Additional Updates**

As discussed in our condensed consolidated financial statements for the nine months ended June 30, 2021 contained within this prospectus, we were notified on April 28, 2021 of an emergency aboard a vessel carrying Fluence inventory. This incident resulted in damage to a portion of our cargo aboard the vessel. We recorded a gross inventory loss of $19.8 million during the nine months ended June 30, 2021 based on our best preliminary estimate of the net realizable value of the cargo. Subsequent to the issuance of our condensed consolidated financial statements for the nine months ended June 30, 2021, we have revised our estimate of gross inventory losses to $11.4 million based on further inspection and assessment of the damaged inventory. In addition to the inventory losses, we have incurred and expect to incur incremental expenses related to the incident, primarily consisting of inspection costs, project cost overruns due to logistical changes, legal fees and fees to dispose of the damaged cargo. The amount of these incremental expenses incurred during the fiscal year ended September 30, 2021 were approximately $9.4 million (subject to adjustment based on finalization of our financial results for fiscal year 2021), and we expect to incur at least an additional $2.9 million during the fiscal year ended September 30, 2022. We still expect insurance receivables of at least $10.0 million related to non-disputed claims that we believe are probable of collection.

On September 4, 2021, a 300 MW energy storage facility owned by one of our customers experienced an overheating event. Fluence served as the energy storage technology provider and installed the facility, which was completed earlier in fiscal year 2021. No injuries were reported from the incident. The facility has been taken offline as teams from Fluence, our customer, and the battery manufacturer investigate the incident. We are currently not able to estimate the impact, if any, that this incident may have on our reputation or financial results, or on market adoption of our products.

**Summary Risk Factors**

Participating in this offering involves substantial risk. Our ability to execute our strategy is also subject to certain risks. The risks described under the heading "Risk Factors" included elsewhere in this prospectus

12

may cause us not to realize the full benefits of our strengths or may cause us to be unable to successfully execute all or part of our strategy. Some of the most significant challenges and risks we face include the following:

- our limited operating and revenue history as an independent entity and our nascent industry make evaluating our business and future prospects difficult;

- if we are unable to attract new customers and retain existing customers, our revenue growth will be adversely affected;

- we have experienced and may continue to experience delays, disruptions, or quality control problems in our manufacturing operations in part due to our third-party supplier and manufacturer concentration;

- we have experienced and may continue to experience exposure to risks associated with construction, utility interconnection, cost overruns, and delays, including those related to obtaining government permits and other contingencies that may arise in the course of completing installations;

- the interruption of the flow of components and materials from international vendors could disrupt our supply chain, including as a result of the imposition of additional duties, tariffs, and other charges on imports and exports;

- significant changes in the cost of raw materials or to logistic cost could adversely affect our financial performance;

- if any energy storage products provided to our customers contain manufacturing defects, our business and financial results could be adversely affected;

- a loss of one or more of our significant customers, their inability to perform under their contracts, or their default in payment could harm our business and negatively impact revenue, results of operations, and cash flow;

- if we fail to manage our recent and future growth effectively, we may be unable to execute our business plan, maintain high levels of customer service, or adequately address competitive challenges;

- we depend on our senior management team and other key employees, and the loss of one or more of these employees or an inability to attract and retain other highly skilled employees could harm our business;

- if renewable energy technologies are not suitable for widespread adoption or sufficient demand for our hardware and software-enabled services does not develop or takes longer to develop than we anticipate, our sales may decline and we may be unable to achieve or sustain profitability;

- if we are unable to obtain, maintain, and enforce intellectual property protection for our technology or if the scope of our intellectual property protection is not sufficiently broad, others may be able to develop and commercialize technology substantially similar to ours, and our ability to successfully commercialize our technology may be adversely affected;

- we have made and expect to continue to make acquisitions, and if we fail to successfully select, execute, or integrate our acquisitions, then our business and operating results could be harmed and our stock price could decline;

- we are controlled by the Continuing Equity Owners, whose interests may differ from those of our public stockholders;

- the Tax Receivable Agreement we will enter into with the Founders requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and we expect that such payments will be substantial; and

- the services that we receive from the Founders may not be sufficient for us to operate our business, and we would likely incur significant incremental costs if we lost access to our Founders' services.

Before you invest in our Class A common stock, you should carefully consider all the information in this prospectus, including as set forth in the section titled "Risk Factors."

13

**Our Corporate Information**

Fluence Energy, Inc., the issuer of the Class A common stock in this offering, was incorporated as a Delaware corporation on June 21, 2021. Our corporate headquarters are located at 4601 Fairfax Drive, Suite 600, Arlington, Virginia 22203. Our telephone number is (833) 358-3623.

Our principal website address is *https://fluenceenergy.com*. The information on, or that can be accessed through, our website is deemed not to be incorporated in this prospectus or to be part of this prospectus. You should not consider information contained on our website to be part of this prospectus in deciding whether to purchase shares of our Class A common stock.

**Implications of Being an Emerging Growth Company**

We qualify as an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). An emerging growth company may take advantage of certain reduced reporting and other requirements that are otherwise generally applicable to public companies. As a result:

• we are required to have only two years of audited financial statements and only two years of related selected financial data and management's discussion and analysis of financial condition and results of operations disclosure;

• we are not required to engage an auditor to report on our internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act");

• we are not required to comply with the requirement of the Public Company Accounting Oversight Board regarding the communication of critical audit matters in the auditor's report on the financial statements;

• we are not required to submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay," "say-on-frequency," and "say-on-golden parachutes;" and

• we are not required to comply with certain disclosure requirements related to executive compensation, such as the requirement to present a comparison of our Chief Executive Officer's compensation to our median employee compensation.

We have elected to take advantage of certain of these reduced disclosure obligations in the registration statement of which this prospectus forms a part. We may take advantage of these reduced reporting and other requirements until such time that we are no longer an emerging growth company. We will remain an emerging growth company until the earliest of: (1) the last day of the fiscal year following the fifth anniversary of the consummation of this offering; (2) the last day of the fiscal year in which we have total annual gross revenue of at least $1.07 billion; (3) the last day of the fiscal year in which we are deemed to be a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which would occur if the market value of our common stock held by non-affiliates exceeded $700.0 million as of the last business day of the second fiscal quarter of such year; or (4) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

In addition, the JOBS Act permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We have elected to take advantage of this extended transition period. As a result, the information that we provide to stockholders may be different than the information you may receive from other public companies in which you hold equity.

14

**The Offering**

| | |
|---|---|
| Issuer | Fluence Energy, Inc. |
| Shares of Class A common stock offered by us | 31,000,000 shares (or 35,650,000 shares if the underwriters exercise in full their option to purchase additional shares). |
| Underwriters' option to purchase additional shares of Class A common stock from us | 4,650,000 shares. |
| Shares of Class A common stock to be outstanding immediately after this offering | 49,493,275 shares, representing approximately 7.8% of the combined voting power of all of Fluence Energy, Inc.'s common stock (or 54,143,275 shares, representing approximately 8.5% of the combined voting power of all of Fluence Energy, Inc.'s common stock if the underwriters exercise in full their option to purchase additional shares of Class A common stock), 100.0% of the economic interest in Fluence Energy, Inc. and 29.7% of the indirect economic interest in Fluence Energy, LLC. |
| Shares of Class B-1 common stock to be outstanding immediately after this offering | 117,173,390 shares, representing approximately 92.2% of the combined voting power of all of Fluence Energy, Inc.'s common stock (or 117,173,390 shares, representing approximately 91.5% of the combined voting power of all of Fluence Energy, Inc.'s common stock if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and no economic interest in Fluence Energy, Inc. |
| Shares of Class B-2 common stock to be outstanding immediately after this offering | No shares of Class B-2 common stock will be outstanding immediately after this offering. Each share of Class B-1 common stock will automatically convert into one share of Class B-2 common stock upon the occurrence of certain circumstances described in our amended and restated certificate of incorporation. See "Description of Capital Stock—Common Stock—Class B-1 and Class B-2 Common Stock." |
| LLC Interests to be held by us immediately after this offering | 49,493,275 LLC Interests, representing approximately 29.7% of the economic interest in Fluence Energy, LLC (or 54,143,275 LLC Interests, representing approximately 31.6% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock). |
| LLC Interests to be held directly by the Founders immediately after this offering | 117,173,390 LLC Interests, representing approximately 70.3% of the economic interest in Fluence Energy, LLC (or 117,173,390 LLC Interests, representing approximately 68.4% of the economic interest in Fluence Energy, LLC if the |

15

|  |  |
|---|---|
|  | underwriters exercise in full their option to purchase additional shares of Class A common stock). |
| Ratio of shares of Class A common stock to LLC Interests | Our amended and restated certificate of incorporation and the Fluence Energy LLC Agreement will require that we and Fluence Energy, LLC at all times maintain a one-to-one ratio between the number of shares of Class A common stock issued by us and the number of LLC Interests owned by us, except as otherwise determined by us. |
| Ratio of shares of Class B-1 and Class B-2 common stock to LLC Interests | Our amended and restated certificate of incorporation and the Fluence Energy LLC Agreement will require that we and Fluence Energy, LLC at all times maintain a one-to-one ratio between the aggregate number of shares of Class B-1 and Class B-2 common stock owned by the Founders and their respective permitted transferees and the number of LLC Interests owned by such Founders and their respective permitted transferees, except as otherwise determined by us. Immediately after the Transactions, the Founders will together own 100% of the outstanding shares of our Class B-1 common stock. |
| Permitted holders of shares of Class B-1 and Class B-2 common stock | Only the Founders and the permitted transferees of Class B-1 and Class B-2 common stock as described in this prospectus will be permitted to hold shares of our Class B-1 and Class B-2 common stock. Shares of Class B-1 and Class B-2 common stock may not be transferred, except together with an equal number of LLC Interests. See "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement." |
| Voting rights | Holders of shares of our Class A common stock and our Class B-1 and Class B-2 common stock will vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by law or our amended and restated certificate of incorporation. Each share of our Class A common stock entitles its holders to one vote per share, each share of our Class B-1 common stock entitles its holders to five votes per share and each share of our Class B-2 common stock entitles its holders to one vote per share on all matters presented to our stockholders generally. Each outstanding share of Class B-1 common stock will automatically convert into one share of Class B-2 common stock upon the earliest of (1) any transfer by a Founder of such shares of Class B-1 common stock other than to an affiliate of such Founder, (2) with respect to each Founder and its affiliates, 5:00 p.m. (New York City time) on a date fixed by our board of directors that is not less than 60 days nor more than 180 days following the date that such Founder, together with its affiliates, ceases to hold an aggregate number of shares of all classes of our common stock representing at least 20% of the aggregate number of all outstanding shares of all classes of our common stock, and (3) 5:00 p.m. (New York City |

16

time) on the date that is seven years following the closing of the offering. See "Description of Capital Stock."

| | |
|---|---|
| Redemption rights of holders of LLC Interests | The Founders may, subject to certain exceptions, from time to time at each of their options require Fluence Energy, LLC to redeem all or a portion of their LLC Interests in exchange for, at our election (determined solely by our independent directors (within the meaning of the rules of Nasdaq) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or a cash payment from the sale of newly issued shares of Class A common stock equal to a volume weighted average market price of one share of our Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the Fluence Energy LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), we may effect a direct exchange by Fluence Energy, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. In the event of cash settlement, Fluence Energy, Inc. would issue new shares of Class A common stock and use the proceeds from the sale of these newly-issued shares of Class A common stock to fully fund the cash settlement, which, in effect, limits the amount of the cash payment to the redeeming member. Such Founders may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement." Simultaneously with the payment of cash or shares of Class A common stock, as applicable, in connection with a redemption or exchange of LLC Interests pursuant to the terms of the Fluence Energy LLC Agreement, a number of shares of our Class B-1 common stock or Class B-2 common stock, as the case may be, registered in the name of the redeeming or exchanging Founder will automatically be transferred to the Company and will be cancelled for no consideration on a one-for-one basis with the number of LLC Interests so redeemed or exchanged. |
| Use of proceeds | We estimate, based upon an assumed initial public offering price of $22.50 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), that we will receive net proceeds from this offering of approximately $650.9 million (or $750.0 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock), after deducting the underwriting discount and estimated offering expenses payable by us. We intend to use the net proceeds from this offering to purchase 31,000,000 newly issued LLC Interests (or 35,650,000 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from Fluence Energy, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us. Fluence Energy, |

17

|  |  |
|---|---|
|  | LLC intends to use the net proceeds from the sale of LLC Interests to Fluence Energy, Inc. to repay all outstanding borrowings under our existing Line of Credit and the Promissory Notes, and the remainder for working capital and other general corporate purposes. Fluence Energy, LLC will bear or reimburse Fluence Energy, Inc. for all of the expenses of this offering. See "Use of Proceeds." |
| Dividend policy | We currently intend to retain all available funds and any future earnings to fund the development and growth of our business, and therefore, we do not anticipate declaring or paying any cash dividends on our Class A common stock in the foreseeable future. Holders of our Class B-1 and Class B-2 common stock are not entitled to participate in any dividends declared by our board of directors. Because we are a holding company, our ability to pay cash dividends on our Class A common stock depends on our receipt of cash distributions from Fluence Energy, LLC and, through Fluence Energy, LLC, cash distributions and dividends from our other direct and indirect subsidiaries. Assuming Fluence Energy, LLC makes distributions out of earnings and profits (other than tax distributions and other distributions to pay expenses) to its members in any given year, we currently expect, subject to the determination of our board of directors, to pay dividends on our Class A common stock out of the portion of such distributions remaining after our payment of taxes, Tax Receivable Agreement payments and expenses, and subject to Delaware law. Our ability to pay dividends may be restricted by the terms of any future credit agreement or any future debt or preferred equity securities of us or our subsidiaries. Any future determination as to the declaration and payment of dividends, if any, will be at the discretion of our board of directors, subject to compliance with contractual restrictions and covenants in the agreements governing our future indebtedness. Any such determination will also depend upon our business prospects, results of operations, financial condition, cash requirements and availability, industry trends, and other factors that our board of directors may deem relevant. See "Dividend Policy." |
| Controlled company exception | After the consummation of the Transactions, we will be considered a "controlled company" within the meaning of the listing rules of the Nasdaq Global Market, or the Nasdaq rules, as the Continuing Equity Owners will have more than 50% of the voting power for the election of directors. See "Principal Stockholders." As a "controlled company," we will not be subject to certain corporate governance requirements, including that: (1) a majority of our board of directors consists of "independent directors," as defined under the Nasdaq rules; (2) our board of directors have a compensation committee that is comprised entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and (3) our director nominations be made, or recommended to our full board of directors, by our independent directors or by a nominations committee that is |

18

| | |
|---|---|
| | comprised entirely of independent directors and that we adopt a written charter or board resolution addressing the nominations process. As a result, we may not have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or perform annual performance evaluations of the nominating and corporate governance and compensation committees unless and until such time as we are required to do so. |
| Directed Share Program | At our request, the underwriters have reserved up to 5.0% of the shares of Class A common stock offered by this prospectus for sale at the initial public offering price through a directed share program to certain individuals identified by management. Any shares sold under the directed share program will not be subject to the terms of any lock-up agreement, except in the case of shares purchased by our officers or directors. The number of shares of Class A common stock available for sale to the general public will be reduced by the number of reserved shares sold to these individuals. Any reserved shares not purchased by these individuals will be offered by the underwriters to the general public on the same basis as the other shares of Class A common stock offered under this prospectus. See the section titled "Underwriting—Directed Share Program." |
| Tax Receivable Agreement | We will enter into a Tax Receivable Agreement with Fluence Energy, LLC and the Founders that will provide for the payment by Fluence Energy, Inc. to such Founders of 85% of the amount of tax benefits, if any, that Fluence Energy, Inc. actually realizes (or in some circumstances is deemed to realize) as a result of (1) increases in our proportionate share of the tax basis of the assets of Fluence Energy, LLC and its subsidiaries resulting from future redemptions or exchanges (or deemed exchanges in certain circumstances) of LLC Interests by the Founders for Class A common stock or cash from the sale of newly issued shares of Class A common stock as described above under "—Redemption rights of holders of LLC Interests" and certain distributions (or deemed distributions) by Fluence Energy, LLC; and (2) certain additional tax benefits arising from payments made under the Tax Receivable Agreement. Following this offering, we expect to use distributions from Fluence Energy, LLC to fund any payments that we will be required to make under the Tax Receivable Agreement. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under any future debt agreements. Our obligations under the Tax Receivable Agreement could have a substantial negative effect on our liquidity. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement" for a discussion of the Tax Receivable Agreement. |
| Registration rights agreement | Pursuant to the Registration Rights Agreement, we will, subject to the terms and conditions thereof, agree to register the resale of the shares of our Class A common stock that are |

19

| | |
|---|---|
| | held by, issued or issuable to the Continuing Equity Owners. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement" for a discussion of the Registration Rights Agreement. |
| Indication of Interest | BNPP ET has indicated an interest in purchasing an aggregate of up to a maximum of $70 million in shares of Class A common stock in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or a commitment to purchase, BNPP ET could determine to purchase more, fewer or no shares of Class A common stock in this offering, or the underwriters could determine to sell more, fewer or no shares to BNPP ET. The underwriters will receive the same discount on any of the shares of Class A common stock purchased by BNPP ET as they will on any other shares of Class A common stock sold to the public in this offering. |
| Risk factors | See "Risk Factors" beginning on page 25 and other information included in this prospectus for a discussion of factors you should carefully consider before deciding to invest in shares of our Class A common stock. |
| Trading symbol | We have applied to list our Class A common stock on The Nasdaq Global Market under the symbol "FLNC." |

Unless we indicate otherwise or the context otherwise requires, all information in this prospectus:

- gives effect to the amendment and restatement of the Fluence Energy LLC Agreement that converts all existing ownership interests in Fluence Energy, LLC into 117,173,390 LLC Interests, as well as the filing of our amended and restated certificate of incorporation;

- gives effect to the other Transactions, including the consummation of this offering;

- excludes 23,988,371 shares of Class A common stock reserved for issuance under options issued pursuant to the Existing Equity Plan (as defined below) which will convert upon effectiveness of this offering into options to acquire shares of Class A common stock, or shares of Class A common stock reserved for issuance under our 2021 Equity Plan, or the 2021 Plan or shares of Class A common stock that may be issued in respect of awards under the Existing Phantom Equity Plan (as defined below);

- assumes an initial public offering price of $22.50 per share of Class A common stock, which is the midpoint of the estimated price range set forth on the cover page of this prospectus; and

- assumes no exercise by the underwriters of their option to purchase 4,650,000 additional shares of Class A common stock from us.

20

**Summary Historical and Pro Forma Condensed Consolidated Financial and Other Data**

The following tables present the summary historical consolidated financial and other data for Fluence Energy, LLC and its subsidiaries and the summary pro forma consolidated financial and other data for Fluence Energy, LLC. Fluence Energy, LLC is the predecessor of Fluence Energy, Inc. for financial reporting purposes. Fluence Energy, Inc. was formed as a Delaware corporation on June 21, 2021 and does not have historical financial results. Fluence Energy, Inc. currently has no assets or liabilities and has conducted no operations, and has not, to date, conducted any activities other than those incident to its formation, those in preparation for the Transactions and the preparation of this prospectus and the registration statement of which this prospectus forms a part. The summary consolidated statements of operations data and statements of cash flows data for the years ended September 30, 2020 and 2019, and the summary consolidated balance sheet data as of September 30, 2020 and 2019 are derived from the audited consolidated financial statements of Fluence Energy, LLC included elsewhere in this prospectus. We have derived the summary consolidated statements of operations and cash flows data for the nine months ended June 30, 2021 and June 30, 2020 from our unaudited condensed consolidated financial statements included elsewhere in this prospectus. Our summary consolidated balance sheet data as of June 30, 2021 has been derived from our unaudited condensed consolidated financial statements for such period included elsewhere in this prospectus. The unaudited consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements and, in the opinion of management, include all adjustments, consisting only of normal and recurring adjustments, necessary for a fair statement of the information set forth herein. Interim financial results are not necessarily indicative of results for the full year or any future reporting period. The results of operations for the periods presented below are not necessarily indicative of the results to be expected for any future period. The information set forth below should be read together with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and the accompanying notes included elsewhere in this prospectus.

The unaudited pro forma consolidated balance sheet as of June 30, 2021 presents the consolidated financial position of Fluence Energy, LLC after giving pro forma effect to the Transactions, excluding this offering, and Fluence Energy, Inc. adjusted for this offering and the contemplated use of the net proceeds from this offering as described under "Our Organizational Structure" and "Use of Proceeds" as if such transactions had occurred as of the balance sheet date. The unaudited pro forma consolidated statements of operations for the year ended September 30, 2020 and the nine-months ended June 30, 2021 present the consolidated results of operations of Fluence Energy, LLC after giving pro forma effect to the Transactions, excluding this offering, and Fluence Energy, Inc. adjusted for this offering and the contemplated use of the net proceeds from this offering as described under "Our Organizational Structure" and "Use of Proceeds" as if such transactions had occurred on October 1, 2019. The pro forma adjustments are based on available information and upon assumptions that our management believes are reasonable in order to reflect, on a pro forma basis, the impact of the Transactions, excluding this offering, and as further adjusted for this offering, on the historical financial information of Fluence Energy, LLC. The unaudited pro forma consolidated financial information is subject to change based on the actual initial public offering price, the number of common shares sold in this offering, and other terms of this offering determined at pricing. The unaudited pro forma consolidated financial information is included for informational purposes only and does not purport to reflect the results of operations or financial position of Fluence Energy, Inc. that would have occurred had it operated according to the organizational structure set forth herein to be in place post-offering as a standalone public company during the periods presented.

The summary of our consolidated financial data set forth below and the pro forma financial data should be read together with our consolidated financial statements and our condensed consolidated interim financial statements and the related notes, as well as the sections captioned "Unaudited Pro Forma Consolidated Financial Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing elsewhere in this prospectus.

21

| (in thousands, except unit and per unit amounts) | Pro Forma As Adjusted[1] Nine Months Ended June 30, 2021 | Actual Nine Months Ended June 30, | |
| --- | --- | --- | --- |
| | | 2021 | 2020 |
| **Consolidated Statements of Operations Data:** | | | |
| Total revenue | $ 492,561 | $ 492,561 | $ 321,859 |
| Cost of goods and services | 503,665 | 502,644 | 325,944 |
| Gross loss | (11,104) | (10,083) | (4,085) |
| Operating expenses: | | | |
| Research and development | 18,531 | 17,251 | 8,546 |
| Sales and marketing | 18,313 | 16,882 | 12,262 |
| General and administrative | 27,051 | 23,159 | 12,691 |
| Depreciation and amortization | 3,494 | 3,494 | 2,249 |
| Other expense, net | (1,427) | (1,061) | (93) |
| Loss before income taxes | (79,920) | (71,930) | (39,926) |
| Income tax expense | 2,874 | 2,874 | 5,678 |
| Net loss | $ (82,794) | $ (74,804) | $ (45,604) |
| Net loss attributable to non-controlling interest | $ (58,208) | | |
| Net loss attributable to Fluence Energy, Inc. | $ (24,586) | | |
| **Per Share Data:** | | | |
| Pro forma net loss per share data (unaudited): | | | |
| Basic | $ (0.50) | | |
| Diluted | $ (0.50) | | |
| Pro forma weighted-average shares used to compute net loss per share: | | | |
| Basic | 49,493,275 | | |
| Diluted | 49,493,275 | | |

| (in thousands, except unit and per unit amounts) | Pro Forma As Adjusted[1] Fiscal Year Ended September 30, 2020 | Actual Fiscal Year Ended September 30, | |
| --- | --- | --- | --- |
| | | 2020 | 2019 |
| **Consolidated Statements of Operations Data:** | | | |
| Total revenue | $ 561,323 | $ 561,323 | $ 92,151 |
| Cost of goods and services | 558,412 | 553,400 | 100,068 |
| Gross profit (loss) | 2,911 | 7,923 | (7,917) |
| Operating expenses: | | | |
| Research and development | 16,229 | 11,535 | 9,871 |
| Sales and marketing | 21,918 | 16,239 | 14,963 |
| General and administrative | 36,421 | 17,940 | 13,950 |
| Depreciation and amortization | 3,018 | 3,018 | 2,891 |
| Other income, net | 33 | 520 | 1,833 |
| Loss before income taxes | (74,642) | (40,289) | (47,759) |
| Income expense (benefit) | 6,421 | 6,421 | (778) |
| Net loss | $ (81,063) | $ (46,710) | $ (46,981) |
| Net loss attributable to non-controlling interest | $ (56,990) | | |
| Net loss attributable to Fluence Energy, Inc. | $ (24,072) | | |

22

| (in thousands, except unit and per unit amounts) | Pro Forma As Adjusted[1] Fiscal Year Ended September 30, 2020 | Actual Fiscal Year Ended September 30, 2020 | Actual Fiscal Year Ended September 30, 2019 |
|---|---|---|---|
| **Per Share Data:** | | | |
| Pro forma net loss per share data (unaudited): | | | |
| Basic | $ (0.49) | | |
| Diluted | $ (0.49) | | |
| Pro forma weighted-average shares used to compute net loss per share: | | | |
| Basic | 49,493,275 | | |
| Diluted | 49,493,275 | | |

| (in thousands) | Actual As of September 30, 2020 | Actual As of September 30, 2019 | Actual As of June 30, 2021 | Pro Forma As Adjusted as of June 30, 2021 |
|---|---|---|---|---|
| | | | | (unaudited) |
| **Consolidated Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ 93,815 | $ 84,113 | $ 58,497 | $ 702,602 |
| Total assets | 364,025 | 188,804 | 692,976 | 1,335,609 |
| Total liabilities | 381,250 | 163,299 | 662,163 | 673,323 |
| Total members' (deficit) equity | (17,225) | 25,505 | (86,459) | 662,286 |

| (in thousands) | Actual Fiscal Year Ended September 30, 2020 | Actual Fiscal Year Ended September 30, 2019 | Actual Nine Months Ended June 30, 2021 | Actual Nine Months Ended June 30, 2020 |
|---|---|---|---|---|
| | | | (unaudited) | |
| **Statement of Cash Flows Data:** | | | | |
| Net cash (used in) provided by operating activities | $(14,016) | $ 27,682 | $(139,277) | $(75,865) |
| Net cash provided by (used in) investing activities | 18,220 | (22,736) | (20,999) | 18,293 |
| Net cash provided by financing activities | 2,500 | 10,000 | 125,729 | 10,500 |

| ($ in thousands) | Actual Fiscal Year Ended September 30, 2020 | Actual Fiscal Year Ended September 30, 2019 | Actual Nine Months Ended June 30, 2021 | Actual Nine Months Ended June 30, 2020 |
|---|---|---|---|---|
| **Non-GAAP Financial Measures (unaudited)[2]:** | | | | |
| Adjusted EBITDA | $(35,883) | $(41,614) | $ (49,385) | $(37,139) |
| Adjusted Gross Profit (Loss) | $ 8,901 | $ (3,437) | $ 6,554 | $ (3,091) |
| Adjusted Gross Profit Margin | 1.6% | (3.7)% | 1.3% | (1.0)% |
| Adjusted Net Loss | $(42,459) | $(40,022) | $ (54,017) | $(42,750) |
| Free Cash Flow | $(15,796) | $ 24,946 | $(142,276) | $(76,878) |

(1) On a pro forma basis to give effect to the Transactions, excluding this offering. See "Unaudited Pro Forma Consolidated Financial Information." On a pro forma as adjusted basis to reflect the sale and issuance by us of shares of our Class A common stock in this offering, assuming an initial public offering

23

price of $22.50 per share, which is the midpoint of the estimated price range set forth on the cover of this prospectus, and the application of net proceeds from this offering as described under "Use of Proceeds," as if this offering and the application of the net proceeds of this offering had occurred on October 1, 2019, in the case of Consolidated Statement of Operations Data, and June 30, 2021, in the case of Consolidated Balance Sheet Data; the Transactions; and the payment by us of estimated offering expenses of $10.0 million. See "Unaudited Pro Forma Consolidated Financial Information."

(2)  These measures are not prepared in accordance with generally accepted accounting principles in the United States ("GAAP") and should not be considered in isolation from or substitutions for performance measures calculated in accordance with GAAP. For additional information about these non-GAAP financial measures and reconciliations of the non-GAAP financial measures to the most directly comparable financial measures stated in accordance with GAAP, see the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non-GAAP Financial Measures."

Adjusted EBITDA is calculated from the consolidated statements of operations using net income (loss) adjusted for (i) interest income (expense), net, (ii) income taxes, (iii) depreciation and amortization, (iv) equity-based compensation, and (v) other non-recurring income or expenses. Adjusted EBITDA may in the future also be adjusted for amounts impacting net income related to the Tax Receivable Agreement liability.

Adjusted Gross Profit (Loss) is calculated using gross profit (loss), adjusted to exclude certain non-recurring income or expenses.

Adjusted Gross Profit Margin is calculated using Adjusted Gross Profit (Loss) divided by revenue.

Adjusted Net Loss is calculated using net Loss, adjusted to exclude (i) amortization of intangibles, (ii) equity-based compensation, (iii) other non-recurring income or expenses, and (iv) tax impact of these adjustments.

Free Cash Flow is calculated from the consolidated statements of cash flows and is defined as net cash provided by operating activities, less purchase of property and equipment made in the period. We expect our Free Cash Flow to fluctuate in future periods as we invest in our business to support our plans for growth. Limitations on the use of Free Cash Flow include (i) it should not be inferred that the entire Free Cash Flow amount is available for discretionary expenditures. For example, cash is still required to satisfy other working capital needs, including short-term investment policy, restricted cash, and intangible assets; (ii) Free Cash Flow has limitations as an analytical tool, and it should not be considered in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities; and (iii) this metric does not reflect our future contractual commitments.

**RISK FACTORS**

*Investing in our Class A common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, including our consolidated financial statements and the related notes, before deciding to invest in our Class A common stock. The occurrence of any of the events described below could harm our business, operating results, and financial condition. In such an event, the market price of our Class A common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business. See "Cautionary Note Regarding Forward-Looking Statements."*

**Risks Related to Our Business**

***Our limited operating and revenue history as an independent entity and our nascent industry make evaluating our business and future prospects difficult.***

We were established in January 2018 as a joint venture between Siemens and AES. Since then, we have continued to evolve, including through acquisitions. While both AES and Siemens had approximately ten years of experience in battery-based energy storage before combining those businesses to create Fluence, and we benefit from the industry experience and substantial support AES and Siemens provide, we have a limited history operating our business and generating revenue as an independent entity, and therefore a limited history upon which you can base an investment decision.

Our future growth is dependent on rising demand for clean electric power solutions that can provide electric power with lower carbon emissions and replacement of conventional generation sources and the adoption speed of digital software applications to modernize the efficiency of power assets and the electric grid. Among other renewable energy market trends, we expect our business results to be driven by declines in the cost of generation of renewable power, decreases in the cost of manufacturing battery pack products, customer needs for services and digital applications, commercial, legal and political pressure for the reduced use of fossil fuels and electric power generation that relies on fossil or other non-renewable fuels, and a rapidly growing energy storage market driven by increasing demand from C&I customers, utilities, and grid operators. However, predicting our future revenue and appropriately budgeting for our expenses is difficult, and we have limited insight into trends that may emerge and affect our business.

***If we are unable to attract new customers and retain existing customers, our revenue growth will be adversely affected.***

To increase our revenue, our business strategy depends on our ability to attract new customers and retain existing customers. We face competition from other energy storage and digital application providers in the recruitment of potential customers. If we are unable to convince potential customers of the benefits of our services or if potential or existing customers prefer the product and service offerings of one of our competitors, we may not be able to effectively implement our growth strategy. Additionally, a significant portion of our annual sales were direct sales to AES or a result of our Siemens sales relationship. See Note 13 to our unaudited consolidated financial statements for the nine months ended June 30, 2021, "Related Party Transactions." If we fail to maintain those relationships, or if AES or Siemens decide to reduce their energy storage activities in the future, it could impact our sales and our growth would be even more reliant on our ability to recruit new customers. Our inability to recruit new customers and retain existing customers would harm our ability to execute our growth strategy and may have a material adverse effect on our business operations and financial position.

***We have experienced and may continue to experience delays, disruptions, or quality control problems in our manufacturing operations in part due to our third-party supplier and manufacturer concentration.***

Our product development, manufacturing and testing protocols are complex and require significant technological and production process expertise, and we currently depend on a limited number of third-party manufacturers, including for batteries and other key components of our products. In addition to concentration in our supply chain for batteries and other components, as of today, we have one major

25

contract manufacturer for the Fluence Cube and are planning to expand our set of partners in the near term. As we introduce new products, we plan to expand our supply chain and regional manufacturing capabilities to further support customers in APAC, EMEA, and the Americas. While the risks of relying on a single Cube vendor and a limited number of suppliers for batteries and other components will diminish with regional and footprint optimization, expansion may be delayed by the process of vetting and qualifying new suppliers and manufacturing partners. Further, any vendor delay or disruption could cause a delay or disruption in our ability to meet customer requirements which may result in a loss of customers. Such processes involve a number of precise steps from design to production.

Any change in our processes could cause one or more production errors, requiring a temporary suspension or delay in our production line until the errors can be researched, identified, and properly addressed and rectified. This may occur particularly as we introduce new products, modify our engineering and production techniques, and/or expand our capacity. In addition, our failure to maintain appropriate quality assurance processes could result in increased product failures, loss of customers, increased warranty reserve, or increased production and logistics costs, and delays. Any of these developments could have a material adverse effect on our business, financial condition, and results of operations.

***We have experienced and may continue to experience exposure to risks associated with construction, utility interconnection, cost overruns, and delays, including those related to obtaining government permits and other contingencies that may arise in the course of completing installations.***

Although we generally are not regulated as a utility, federal, state, and local government statutes and regulations concerning electricity heavily influence the market for our product and services. These statutes and regulations often relate to electricity pricing, net metering, incentives, taxation, and the rules surrounding the interconnection of customer-owned electricity generation for specific technologies. In the U.S., governments frequently modify these statutes and regulations. Governments, often acting through state utility or public service commissions, change and adopt different requirements for utilities and rates for commercial customers on a regular basis. Changes, or in some cases a lack of change, in any of the laws, regulations, ordinances, or other rules that apply to customer installations and new technology could make it more costly for our customers to install and operate our energy storage products on particular sites, and in turn could negatively affect our ability to deliver cost savings to customers for the purchase of electricity.

The installation and operation of our energy storage products at a particular site are also generally subject to oversight and regulation in accordance with national, state, and local laws and ordinances relating to building codes, safety, environmental protection, and related matters, and typically require obtaining and keeping in good standing various local and other governmental approvals and permits, including environmental approvals and permits, that vary by jurisdiction. In some cases, these approvals and permits require periodic renewal. It is difficult and costly to track the requirements of every individual authority having jurisdiction over energy storage product installations, to design our energy storage products to comply with these varying standards, and for our customers to obtain all applicable approvals and permits. We cannot predict whether or when all permits required for a given customer's project will be granted or whether the conditions associated with the permits will be achievable. The denial of a permit or utility connection essential to a project or the imposition of impractical conditions would impair our customer's ability to develop the project. In addition, we cannot predict whether the permitting process will be lengthened due to complexities and appeals. Delay in the review and permitting process for a project can impair or delay our customers' abilities to develop that project or increase the cost so substantially that the project is no longer attractive to our customers. Furthermore, unforeseen delays in the review and permitting process could delay the timing of the installation of our energy storage products and could therefore adversely affect the timing of the recognition of revenue related to hardware acceptance by our customer, which could adversely affect our operating results in a particular period.

The production and installation of our energy storage products also involves the incurrence of various project costs and can entail project modifications. We have policies and procedures regarding the approval of project costs and modifications. In connection with our limited operating history and our significant growth, we have in the past experienced and may in the future experience incurrence of project costs without proper documentation or adhering to our policies and procedures. We have implemented additional training on our policies and procedures in this regard. In addition, disagreements with our customers and

26

suppliers have arisen and may in the future arise with respect to project schedules, work and modifications, which can result in the need to find different suppliers, loss of future business, additional costs to us and not realizing the anticipated profit from the project.

In addition, the successful installation of our energy storage products is dependent upon the availability of and timely connection to the local electric grid. Our customers may be unable to obtain the required consent and authorization of local utilities to ensure successful interconnection to energy grids to enable the successful discharge of renewable energy. Any delays in our customers' ability to connect with utilities, delays in the performance of installation-related services, or poor performance of installation-related services will have an adverse effect on our results and could cause operating results to vary materially from period to period.

***The interruption of the flow of components and materials from international vendors could disrupt our supply chain, including as a result of the imposition of additional duties, tariffs, and other charges on imports and exports.***

We purchase some of our components and materials outside of the United States through arrangements with various vendors, and have experienced delays in obtaining these components and materials as a result of the recent coronavirus pandemic ("COVID-19 pandemic"). Political, social, or economic instability in these regions, or in other regions where our products are made, could cause future disruptions in trade. Actions in various countries have created uncertainty with respect to tariff impacts on the costs of some of our components and materials. The degree of our exposure is dependent on (among other things) the type of materials, rates imposed, and timing of the tariffs. Other events that could also cause disruptions to our supply chain include:

- the imposition of additional trade law provisions or regulations;

- the imposition of additional duties, tariffs and other charges on imports and exports, including as a result of the escalating trade war between China and the United States;

- quotas imposed by bilateral trade agreements;

- foreign currency fluctuations;

- logistics and shipping constraints;

- natural disasters;

- public health issues and epidemic diseases, their effects (including any disruptions they may cause) or the perception of their effects;

- theft;

- restrictions on the transfer of funds;

- the financial instability or bankruptcy of vendors; and

- significant labor disputes, such as dock strikes.

We cannot predict whether the countries in which our components and materials are sourced, or may be sourced in the future, will be subject to new or additional trade restrictions imposed by the United States or other foreign governments, including the likelihood, type, or effect of any such restrictions. Trade restrictions, including new or increased tariffs or quotas, border taxes, embargoes, safeguards, and customs restrictions against certain components and materials, as well as labor strikes and work stoppages or boycotts, could increase the cost or reduce or delay the supply of components and materials available to us and adversely affect our business, financial condition or results of operations.

***Significant changes in the cost of raw materials or to logistic cost could adversely affect our financial performance.***

We are subject to risk from fluctuating market prices of certain commodity raw materials, including steel and aluminum, that are used in our products. Prices of these raw materials may be affected by supply restrictions or other logistic costs market factors from time to time, and we do not enter into hedging

27

arrangements to mitigate commodity risk. Significant price changes for these raw materials could reduce our operating margins if we are unable to recover such increases from our customers, and could harm our business, financial condition, and results of operations.

***Failure by our vendors or our component or raw material suppliers to use ethical business practices and comply with applicable laws and regulations may adversely affect our business.***

We do not control our vendors or suppliers or their business practices. Accordingly, we cannot guarantee that they follow ethical business practices, such as fair wage practices and compliance with environmental, safety, and other local laws. A lack of demonstrated compliance could lead us to seek alternative manufacturers or suppliers, which could increase our costs and result in delayed delivery of our products, product shortages, or other disruptions of our operations. Violation of labor or other laws by our manufacturers or suppliers or the divergence of a supplier's labor or other practices from those generally accepted as ethical in the U.S. or other markets in which we do business could also attract negative publicity for us and harm our business.

***We face supply chain competition and, in some instances, have entered into long-term supply agreements that could result in insufficient inventory and negatively affect our results of operations.***

We have entered into long-term supply agreements with certain suppliers and contract manufacturers of batteries, inverters, and other components of our energy storage products. Some of these supply agreements provide for fixed or inflation-adjusted pricing, substantial prepayment obligations, and commitments to continue purchasing certain levels of components in future periods regardless of the level of demand we receive from customers. If our suppliers provide insufficient inventory at the level of quality required to meet customer demand, or if our suppliers are unable or unwilling to provide us with the contracted quantities, as we have limited alternatives for supply in the short term, our results of operations could be materially and negatively impacted. If our customers do not provide sufficient demand to purchase the levels of inventory we have committed to purchasing in future periods, our ability to generate revenue or cash flows may be limited.

Further, we face significant specific counterparty risk under long-term supply agreements when dealing with certain suppliers without a long, stable production and financial history. Given the uniqueness of our product, many of our suppliers do not have a long operating history and may not have substantial capital resources. In the event any such supplier experiences financial difficulties, it may be difficult or may require substantial time and expense to replace such supplier. We do not know whether we will be able to maintain long-term supply relationships with our critical suppliers, or secure new long-term supply agreements. Additionally, many of the battery storage products and components of our energy storage products are procured from foreign suppliers, which exposes us to risks including unforeseen increases in costs or interruptions in supply arising from changes in applicable international trade regulations, such as taxes, tariffs, or quotas. Any of the foregoing could materially adversely affect our business, financial condition, and results of operations.

Certain of our suppliers also supply products and components to other businesses, including businesses engaged in the production of electric vehicles, consumer electronics and other industries unrelated to energy storage products. As a relatively low-volume purchaser of certain of these parts and materials, we may be unable to procure a sufficient supply of the items on favorable terms or at all, in the event that our suppliers fail to produce sufficient quantities to satisfy the demands of all of their customers, which could materially adversely affect our business, financial condition, and results of operations.

***If any energy storage products provided to our customers contain manufacturing defects, our business and financial results could be adversely affected.***

The energy storage products we develop are complex energy solutions. We rely on our component OEM suppliers and contract manufacturers to control the quality of certain components that make up the energy storage products sold to our customers. We do not manufacture the batteries or other components of the energy storage products. As a result, our ability to seek recourse for liabilities and recover costs from our component OEM suppliers and contract manufacturers depends on our contractual rights as well as the financial condition and integrity of such component OEM suppliers and contract manufacturers that

28

supply us with the batteries and other components of our energy storage products. Such products may contain undetected or latent errors or defects. We provide installation, construction and commissioning services for our customers that purchase our products. In the past, we have from time to time discovered latent defects in energy storage products, and have experienced defects in workmanship. In connection with such defects in the future, we could incur significant expenses or disruptions of our operations. Any manufacturing defects or other failures of our energy storage products to perform as expected could cause us to incur significant re-engineering costs, divert the attention of our personnel from operating and maintenance efforts, expose us to adverse regulatory action, and significantly and adversely affect customer satisfaction, market acceptance, and our business reputation. Furthermore, our component OEM suppliers and contract manufacturers may be unable to correct manufacturing defects or other failures of any energy storage products in a manner satisfactory to our customers, which could adversely affect customer satisfaction, market acceptance, and our business reputation.

On rare occasions, lithium-ion batteries can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion batteries. This faulty result could subject us to lawsuits, product recalls, or redesign efforts, all of which would be time consuming and expensive. For example, in April 2019, the McMicken energy storage facility in Arizona experienced a thermal event and subsequent explosion, injuring several first responders and making the facility inoperable. The facility was built by AES prior to the creation of Fluence, and was under a maintenance contract with Fluence. The response and investigation required significant expense and the devotion of significant management time. Also, negative public perceptions regarding the suitability of lithium-ion batteries for energy applications or any future incident involving lithium-ion batteries, such as a plant, vehicle or other fire, even if such incident does not involve hardware provided by us, could adversely affect our business and reputation.

***A loss of one or more of our significant customers, including but not limited to AES and Siemens, their inability to perform under their contracts, or their default in payment could harm our business and negatively impact revenue, results of operations, and cash flow.***

We are dependent on a relatively small number of customers for our sales, and a small number of customers have historically accounted for a material portion of our revenue. The loss of any one of the Company's significant customers, their inability to perform under their contracts, or their default in payment could have a materially adverse effect on the revenues and profits of the Company. For the near future, we may continue to derive a significant portion of our net sales from a small number of customers. For the year ended September 30, 2020, our top five customers, in the aggregate, accounted for approximately 90% of our revenue. Accordingly, loss of a significant customer or a significant reduction in pricing or order volume from a significant customer could materially reduce net sales and operating results in any reporting period.

***If we fail to manage our recent and future growth effectively, we may be unable to execute our business plan, maintain high levels of customer service, or adequately address competitive challenges.***

We have experienced significant growth in recent periods. We intend to continue to expand our business significantly within existing and new market segments. This growth has placed, and any future growth may place, a significant strain on our management, operational, and financial infrastructure. In particular, we will be required to expand, train, and manage our growing employee base and scale and otherwise improve our IT infrastructure in tandem with that headcount growth. Our management will also be required to maintain and expand our relationships with customers, suppliers, channel partners, and other third parties and attract new customers and suppliers, as well as manage multiple geographic locations. Our current and planned operations, personnel, IT, and other systems and procedures might be inadequate to support our future growth and may require us to make additional unanticipated investment in our infrastructure. Our success and ability to further scale our business will depend, in part, on our ability to manage these changes in a cost-effective and efficient manner. If we cannot manage our growth, we may be unable to take advantage of market opportunities, execute our business strategies, or respond to competitive pressures. This could also result in declines in quality or customer satisfaction, increased costs, difficulties in introducing new offerings, or other operational difficulties. Any failure to effectively manage growth could adversely impact our business and reputation.

29

***If we are not able to maintain and enhance our reputation and brand recognition, our business and results of operations will be harmed.***

We believe that maintaining and enhancing our reputation and brand recognition is critical to our relationships with customers. The promotion of our brand may require us to make substantial investments, and we anticipate that, as our market becomes increasingly competitive, these marketing initiatives may become increasingly difficult and expensive. Our marketing activities may not be successful or yield increased revenue, and to the extent that these activities yield increased revenue, the increased revenue may not offset the expenses we incur, and our results of operations could be harmed. In addition, any factor that diminishes our reputation or that of our management, including failing to meet the expectations of or provide quality products and services to our customers, or any adverse publicity or litigation involving or surrounding us, one of our centers, or our management, could make it substantially more difficult for us to attract new customers. If we do not successfully maintain and enhance our reputation and brand recognition, our business may not grow, and we could lose our relationships with customers, which would harm our business, results of operations, and financial condition.

***Our growth depends in part on the success of our relationships with third parties.***

We rely on third-party general contractors to install energy storage products at our customers' sites. We currently work with a limited number of general contractors, which has impacted and may continue to impact our ability to facilitate customer installations as planned. Our work with contractors or their subcontractors may have the effect of our being required to comply with additional rules (including rules unique to our customers), working conditions, site remediation, and other union requirements, which can add costs and complexity to an installation project. The timeliness, thoroughness, and quality of the installation-related services performed by our general contractors and their subcontractors in the past have not always met our expectations or standards and in the future may not meet our expectations and standards, and it may be difficult to find and train third-party general contractors that meet our standards at a competitive cost.

In addition, a key component of our growth strategy is to develop or expand our relationships with third parties. For example, we are investing resources in establishing strategic relationships with market players across a variety of industries, including large renewable project developers, to generate new customers. These programs may not roll out as quickly as planned or produce the results we anticipated. A significant portion of our business depends on attracting new counterparties and retaining existing counterparties. Negotiating relationships with our counterparties, investing in due diligence efforts with potential counterparties, training such third parties and contractors, and monitoring them for compliance with our standards requires significant time and resources and may present greater risks and challenges than expanding a direct sales or installation team. If we are unsuccessful in establishing or maintaining our relationships with these third parties, our ability to grow our business and address our market opportunity could be impaired. Even if we are able to establish and maintain these relationships, we may not be able to execute on our goal of leveraging these relationships to meaningfully expand our business, brand recognition and customer base. Such circumstance would limit our growth potential and our opportunities to generate significant additional revenue or cash flows.

***We depend on our senior management team and other key employees, and the loss of one or more of these employees or an inability to attract and retain other highly skilled employees could harm our business.***

Our success depends largely upon the continued services of our senior management team and other key employees. We rely on our leadership team in the areas of sales and operations, information technology and security, marketing, and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. Our executive officers and other key personnel are not subject to any restrictions that would require them to continue to work for us for any specified period and, therefore, they could terminate their employment with us at any time. The loss of one or more of the members of our senior management team, or other key employees, could harm our business. Changes in our executive management team may also cause disruptions in, and harm to, our business. See "—We must attract and retain highly qualified personnel in order to execute our growth plan."

30

***We must attract and retain highly qualified personnel in order to execute our growth plan.***

Competition for highly qualified personnel is intense. We have, from time to time, experienced, and we expect to continue to experience, difficulty in hiring and retaining employees with appropriate qualifications. Many of the companies with which we compete for experienced personnel have greater resources than we have. If we hire employees from competitors or other companies, their former employers may attempt to assert that these employees or we have breached certain legal obligations, resulting in a diversion of our time and resources. If we fail to attract new personnel or fail to retain and motivate our current personnel, our business and future growth prospects could be harmed.

***Our products and technology could have undetected defects, errors, or bugs in hardware or software which could reduce market adoption, damage our reputation with current or prospective customers and/or expose us to product liability and other claims that could materially and adversely affect our business.***

We may be subject to claims that our hardware and software-enabled services have malfunctioned and persons were injured or purported to be injured. Any insurance that we carry may not be sufficient or it may not apply to all situations. Similarly, to the extent that such malfunctions are related to components obtained from third-party vendors, such vendors may not assume responsibility for such malfunctions. In addition, our customers could be subjected to claims as a result of such incidents and may bring legal claims against us to attempt to hold us liable. Any of these events could adversely affect our brand, relationships with customers, operating results, or financial condition. For example, on September 4, 2021, a 300 MW energy storage facility owned by one of our customers experienced an overheating event. Fluence served as the energy storage technology provider and installed the facility, which was completed earlier in fiscal year 2021. No injuries were reported from the incident. The facility has been taken offline as teams from Fluence, our customer, and the battery manufacturer investigate the incident. We are currently not able to estimate the impact, if any, that this incident may have on our reputation or financial results, or on market adoption of our products.

Furthermore, our products and technology platform are complex and developed by many employees with various components of hardware and software sourced from third-parties. Our products and software have contained design and manufacturing-related defects and errors and may in the future contain undetected defects or errors. Our installation and construction work have contained and in the future may contain workmanship errors. We are continuing to evolve the features and functionality of our products and technology platform through updates and enhancements, and as we do, we may introduce additional defects or errors that may not be detected until after deployment to customers through our hardware. In addition, if our hardware and software-enabled services, including any updates or patches, are not implemented or used correctly or as intended, inadequate performance, data breaches, and disruptions in service may result.

In particular, the Fluence Bidding Application delivers artificial intelligence-enabled bidding software for utility-scale storage and renewable generation assets, enabling customers to optimize asset trading in wholesale electricity markets. While we generally are not regulated as a utility or a broker-dealer, customers of the Fluence Bidding Application are regulated utilities. We could experience scrutiny from regulators for providing the Fluence Bidding Application to our customers.

Any defects or errors in product or services offerings, or the perception of such defects or errors, or other performance problems could result in any of the following, each of which could adversely affect our business, financial condition, and results of operations:

- expenditure of significant financial and product development resources, including recalls, in efforts to analyze, correct, eliminate, or work around errors or defects;
- loss of existing or potential customers or partners;
- interruptions or delays in sales;
- delayed or lost revenue;
- delay or failure to attain market acceptance;
- delay in the development or release of new functionality or improvements;

31

- negative publicity and reputational harm;

- sales credits or refunds;

- security vulnerabilities, data breaches, and exposure of confidential or proprietary information;

- diversion of development and customer service resources;

- breach of warranty claims;

- legal claims under applicable laws, rules, and regulations; and

- the expense and risk of litigation.

Although we have contractual protections, such as warranty disclaimers and limitation of liability provisions, in many of our agreements with customers, resellers, and other business partners, such protections may not be uniformly implemented in all contracts and, where implemented, may not fully or effectively protect from claims by customers, resellers, business partners or other third parties. Any insurance coverage or indemnification obligations of suppliers may not adequately cover all such claims, or cover only a portion of such claims. A successful product liability, warranty, or other similar claim could have an adverse effect on our business, financial condition, and operating results. In addition, even claims that ultimately are unsuccessful could result in expenditure of funds in litigation, divert management's time and other resources, and cause reputational harm.

***Compromises, interruptions, or shutdowns of our systems, including those managed by third parties, whether intentional or inadvertent, could lead to delays in our business operations and, if significant or extreme, affect our results of operations.***

From time to time, our systems require modifications and updates, including by adding new hardware, software, and applications; maintaining, updating, or replacing legacy programs; and integrating new service providers and adding enhanced or new functionality. Although we are actively selecting systems and vendors and implementing procedures to enable us to maintain the integrity of our systems when we modify them, there are inherent risks associated with modifying or replacing systems, and with new or changed relationships, including accurately capturing and maintaining data, realizing the expected benefit of the change, and managing the potential disruption of the operation of the systems as the changes are implemented. Potential issues associated with implementation of these technology initiatives could reduce the efficiency of our operations in the short term. The efficient operation and successful growth of our business depends upon our information technology systems. The failure of our information technology systems and the third-party systems we rely on to perform as designed, or our failure to implement and operate them effectively, could disrupt our business or subject us to liability and thereby have a material adverse effect on our business, financial condition, results of operations, and prospects.

***Our current and planned foreign operations could subject us to additional business, financial, regulatory, and competitive risks.***

We sell our products in a number of different countries, including the United States, the United Kingdom, multiple EU countries, Australia, and the Philippines. We have in the past, and may in the future, evaluate opportunities to expand into new geographic markets and introduce new product offerings and services that are a natural extension of our existing business. We also may from time to time engage in acquisitions of businesses or product lines with the potential to strengthen our market position, enable us to enter attractive markets, expand our technological capabilities, or provide synergy opportunities.

Our success operating in these new geographic or product markets, or in operating any acquired business, will depend on a number of factors, including our ability to develop solutions to address the requirements of the battery energy storage industry, our timely qualification and certification of new products, our ability to manage increased manufacturing capacity and production, and our ability to identify and integrate any acquired businesses.

Further, any additional markets that we may enter could have different characteristics from the markets in which we currently sell products, and our success will depend on our ability to adapt properly to these

32

differences. These differences may include regulatory requirements, including tax laws, trade laws, labor regulations, tariffs, export quotas, customs duties, or other trade restrictions, limited or unfavorable intellectual property protection, international, political, or economic conditions, restrictions on the repatriation of earnings, longer sales cycles, warranty expectations, product return policies, and cost, performance, and compatibility requirements. In addition, expanding into new geographic markets will increase our exposure to presently existing and new risks, such as fluctuations in the value of foreign currencies and difficulties and increased expenses in complying with United States and foreign laws, regulations, and trade standards, including the Foreign Corrupt Practices Act of 1977, as amended.

Tax laws and regulations in various jurisdictions where we currently operate or may operate in the future also could result in additional tax liabilities for us or otherwise adversely affect us. See the discussion under "—Changes in tax laws or regulations that are applied adversely to us or our customers could materially adversely affect our business, financial condition, results of operations and prospects." below.

Failure to develop and introduce new products successfully into the market, to successfully integrate acquired businesses or to otherwise manage the risks and challenges associated with our potential expansion into new product and geographic markets, could adversely affect our revenues and our ability to sustain profitability.

***Amounts included in our pipeline and contracted backlog may not result in actual revenue or translate into profits.***

As of September 30, 2021, our pipeline, which represents potential contracts where we either have been selected by the customer or have provided the customer a quote or bid, but for which the contracts have not been signed, was 14.2 GW compared to 11.3 GW as of September 30, 2020. As of September 30, 2021, we estimated that we had between approximately $1,344 million and $1,393 million of contracted backlog related to energy storage products. We define "contracted backlog" as signed purchase orders or contractual minimum purchase commitments with take-or pay provisions. For our energy storage product contracts, contracted backlog includes signed customer orders or contracts under execution prior to when substantial completion is achieved. For service contracts, contracted backlog includes signed service agreement associated with our storage product projects that have not been completed. For digital applications contracts, contracted backlog includes signed agreements where the associated subscription has not started.

Our pipeline and contracted backlog are based on numerous assumptions and limitations, are calculated using our internal data that have not been independently verified by third parties and may not provide an accurate indication of our future or expected results. Pipeline and contracted backlog are internal management metrics that we construct from market information reported by our global sales force. We monitor and track our pipeline and contracted backlog, but they are not maintained or audited in accordance with U.S. GAAP. Although the amount of contracted backlog includes signed purchase orders or other contractual commitments and the amount of pipeline includes potential future orders, we cannot guarantee that our pipeline or contracted backlog will result in actual revenue in the originally anticipated period or at all. Our customers operate in a relatively new industry and have based their commitments to us on assumptions about future energy prices, demand levels, regulatory obligations and incentives, among other factors. Further, certain of those customers may need to obtain financing to fulfill their commitments to us. If the market does not grow as expected, the regulatory environment changes, or customers fail to obtain necessary financial backing, customers may fail to satisfy their minimum purchase commitments to us and we would fail to realize our contracted backlog. In that event, our revenue and profitability could be adversely affected. Our pipeline or contracted backlog may not generate margins equal to our historical operating results. We have only recently begun to track our pipeline and contracted backlog on a consistent basis, and as a result, we do not have significant experience in determining the level of realization that we will achieve on these contracts. Our customers may experience project delays or cancel orders as a result of external market factors and economic or other factors beyond our control. If our pipeline or backlog fails to result in revenue at all or in a timely manner, we could experience a reduction in revenue, profitability, and liquidity. See the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Operating Metrics—Pipeline" for additional information regarding our pipeline and "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Factors And Trends" for additional information regarding our pipeline and contracted backlog.

33

***Our hardware and software-enabled services involve a lengthy sales and installation cycle, and if we fail to close sales on a regular and timely basis it could adversely affect our business, financial condition, and results of operations.***

Our sales cycle is typically three (3) to twelve (12) months for our hardware and software-enabled services but can vary considerably. In order to make a sale, we must typically provide a significant level of education to prospective customers regarding the use and benefits of our hardware and software-enabled services.

The period between initial discussions with a potential customer and the sale of even a single energy storage product typically depends on a number of factors, including the potential customer's budget and decision as to the type of financing it chooses to use, as well as the arrangement of such financing. Prospective customers often undertake a significant evaluation process, which may further extend the sales cycle. This lengthy sales and installation cycle is subject to a number of significant risks over which we have little or no control. Because of both the long sales and installation cycles, we may expend significant resources without having certainty of generating a sale.

These lengthy sales and installation cycles increase the risk that our customers may fail to satisfy their payment obligations, cancel orders before the completion of the transaction, or delay the planned date for installation. Cancellation rates may be impacted by factors outside of our control including an inability to install an energy storage product at the customer's chosen location because of permitting or other regulatory issues, unanticipated changes in the cost or availability of alternative sources of electricity available to the customer, or other reasons unique to each customer. Our operating expenses are based on anticipated sales levels, and many of our expenses are fixed. If we are unsuccessful in closing sales after expending significant resources or if we experience delays or cancellations, our business, financial condition, and results of operations could be adversely affected.

Additionally, we have long-term, multi-year service contracts with some of our customers. If those contracts are terminated or if we are unable to continue to fulfill the obligations under such contracts, our business, financial condition, and results of operations could be adversely affected.

***Any failure to offer high-quality technical support services may adversely affect our relationships with our customers and adversely affect our financial results.***

Our customers depend on our support organization to resolve any technical issues relating to our hardware and software-enabled services. In addition, we have, in some instances, provided performance guarantees for our products and services to our customers. Any failure meet such guarantees or to maintain high-quality and highly-responsive technical support, or a market perception that we do not maintain high-quality and highly-responsive support, could adversely affect our reputation, our ability to sell our products to existing and prospective customers, and our business, financial condition, and results of operations.

We offer technical support services with our hardware and software-enabled services and may be unable to respond quickly enough to accommodate short-term increases in demand for support services, particularly as we increase the size of our customer base. We also may be unable to modify the format of our support services to compete with changes in support services provided by competitors. It is difficult to predict demand for technical support services and if demand increases significantly, we may be unable to provide satisfactory support services to our customers. Additionally, increased demand for these services, without corresponding revenue, could increase costs and adversely affect our business, financial condition, and results of operations.

***We may experience difficulties in establishing mass manufacturing capacity and estimating potential cost savings and efficiencies from anticipated improvements to our manufacturing capabilities.***

While our manufacturing output achieved to date is already at commercial scale, it is a fraction of what we expect will be necessary to fully meet the demand we see in the market for our products. The manufacturing process for our expected full commercial scale is still being refined and improved. There are risks associated with scaling up manufacturing to larger commercial volumes including, among others, technical or other

34

problems with process scale-up, process reproducibility, stability issues, quality consistency, timely availability of raw materials, cost overruns, and adequate definitions or qualifications for safety, reliability, and quality. In addition, in connection with our limited operating history and our significant growth, we have in the past experienced and may in the future experience incurrence of project costs without proper documentation or adhering to our policies and procedures. There is no assurance that our manufacturers will be successful in establishing a larger-scale commercial manufacturing process that achieves our objectives for manufacturing capacity and cost per battery, in a timely manner or at all. If we are unable to produce sufficient quantities of product on a timely basis and in a cost-effective manner, the Company's commercialization efforts would be impaired which could materially affect our business, financial condition, results of operations, and growth prospects.

***If our estimates of useful life for our energy storage products and related hardware and software-enabled services are inaccurate or if our component OEM suppliers do not meet service and performance warranties and guarantees, our business and financial results could be adversely affected.***

We sell hardware and software-enabled services to our customers. Our software-enabled services are essential to the operation of these hardware products. Our pricing of services contracts is based upon the value we expect to deliver to our customers, including considerations such as the useful life of the energy storage product and prevailing electricity prices. We also provide warranties and guarantees covering the efficiency and performance of certain of our products and digital applications, in some cases up to 25 years in length. We do not have a long history with a large number of field deployments, and our estimates may prove to be incorrect. Failure to meet these performance warranties and guarantee levels may require us to refund our service contract payments to the customer or require us to make cash payments to the customer based on actual performance, as compared to expected performance.

***As part of growing our business, we have made and expect to continue to make acquisitions. If we fail to successfully select, execute, or integrate our acquisitions, then our business and operating results could be harmed and our stock price could decline.***

We will continuously evaluate potential acquisitions to add new product lines and technologies, gain new sales channels, or enter into new sales territories. For example, in 2020, we acquired AMS' software and digital intelligence platform, which became the Fluence Bidding Application. Acquisitions involve numerous risks and challenges, including but not limited to the following:

- integrating the companies, assets, systems, products, sales channels, and personnel that we acquire;
- higher than anticipated acquisition and integration costs and expenses;
- reliance on third parties to provide transition services for a period of time after closing to ensure an orderly transition of the business;
- growing or maintaining revenues to justify the purchase price and the increased expenses associated with acquisitions;
- entering into territories or markets with which we have limited or no prior experience;
- establishing or maintaining business relationships with customers, vendors, and suppliers who may be new to us;
- overcoming the employee, customer, vendor, and supplier turnover that may occur as a result of the acquisition;
- disruption of, and demands on, our ongoing business as a result of integration activities including diversion of management's time and attention from running the day to day operations of our business;
- inability to implement uniform standards, disclosure controls and procedures, internal controls over financial reporting, and other procedures and policies in a timely manner;
- inability to realize the anticipated benefits of or successfully integrate with our existing business the businesses, products, technologies or personnel that we acquire; and
- potential post-closing disputes.

35

As part of undertaking an acquisition, we may also significantly revise our capital structure or operational budget, such as issuing common stock that would dilute the ownership percentage of our stockholders, assuming liabilities or debt, utilizing a substantial portion of our cash resources to pay for the acquisition, or significantly increasing operating expenses. In addition, our effective tax rate in any particular quarter may also be impacted by acquisitions. Following the closing of an acquisition, we may also have disputes with the seller regarding contractual requirements and covenants, purchase price adjustments, contingent payments, or for indemnifiable losses. Any such disputes may be time consuming and distract management from other aspects of our business. In addition, if we increase the pace or size of acquisitions, we will have to expend significant management time and effort into the transactions and integrations, and we may not have the proper human resources bandwidth to ensure successful integrations and accordingly, our business could be harmed or the benefits of our acquisitions may not be realized.

As part of the terms of an acquisition, we may commit to pay additional contingent consideration if certain revenue or other performance milestones are met. We are required to evaluate the fair value of such commitments at each reporting date and adjust the amount recorded if there are changes to the fair value.

We cannot ensure that we will be successful in identifying, selecting, executing, and integrating acquisitions. Failure to manage and successfully integrate acquisitions could materially harm our business and operating results. In addition, if stock market analysts or our stockholders do not support or believe in the value of the acquisitions that we choose to undertake, our stock price may decline.

***Our customer relationships, business, financial results and reputation may be adversely impacted due to events and incidents relating to storage, delivery, installation, operation, maintenance and shutdowns of our energy storage products.***

Our customer relationships, business, financial results and reputation may be adversely impacted due to events and incidents relating to storage, delivery, installation, operation and shutdowns of our energy storage products, including events and incidents outside of our control. We are subject to various risks as a result of the size, weight, nature and sophisticated nature of our energy storage products, including exposure to production, delivery, supply chain, inventory, installation and maintenance issues. Such issues may, and from time to time have, result in financial losses, including losses resulting from our failure to deliver or install our energy storage products on a contractually agreed timeframe, or losses resulting from agreed warranty or indemnity terms. Furthermore, issues and incidents involving our customers or their facilities at which our energy storage products are located, whether or not attributable to our energy storage products, may have an adverse effect on our reputation and customer relationships. Any of these developments could have a material adverse effect on our business, financial condition, and results of operations. For example, on September 4, 2021, a 300 MW energy storage facility owned by one of our customers experienced an overheating event. Fluence served as the energy storage technology provider and installed the facility, which was completed earlier in fiscal year 2021. No injuries were reported from the incident. The facility has been taken offline as teams from Fluence, our customer, and the battery manufacturer investigate the incident. We are currently not able to estimate the financial impact, if any, that this incident may have on our financial results.

***We may acquire companies for both strategic and financial reasons but may not realize a return on our investments.***

We have acquired, and plan to continue to seek to acquire, other companies to further our strategic objectives and support our key business initiatives. These investments may include acquiring equity or debt instruments of public or private companies which may be non-marketable at the time of our initial investment. We do not restrict the types of companies which we might seek to acquire. These companies may range from early-stage companies that are often still defining their strategic direction to more mature companies with established revenue streams and business models. We must also analyze tax, accounting, and legal issues when making these acquisitions. If we do not structure these acquisitions properly, we may be subject to certain unfavorable accounting or tax impact.

***We face risks related to actual or threatened health epidemics, such as the COVID-19 pandemic, and other outbreaks, which could significantly disrupt our suppliers' manufacturing and our operations.***

Our business could be adversely impacted by the effects of a widespread outbreak of contagious disease, including the recent outbreak of respiratory illness caused by the COVID-19 pandemic. Any

36

widespread outbreak of contagious diseases, and other adverse public health developments, could cause disruption to, among other things, our ground operations at project sites, our manufacturing facilities and our suppliers and vendors located in the United States, Asia and elsewhere and have a material and adverse effect on our business operations. Our ground operations at project sites, our manufacturing facilities and our suppliers and vendors could be disrupted by worker absenteeism, quarantines, shortage of the COVID-19 pandemic test kits and personal protection equipment for employees, office and factory closures, disruptions to ports and other shipping infrastructure, or other travel or health-related restrictions. If our ground operations at project sites, our manufacturing facilities and our suppliers or vendors are so affected, our supply chain, manufacturing and product shipments will be delayed, which could adversely affect our business, operations and customer relationships. For example, our suppliers and vendors in Asia have been affected by business closures and disruptions to ports and other shipping infrastructure. In addition, the macroeconomic effects of the COVID-19 pandemic in the United States and other markets has resulted in a widespread health crisis that has adversely affected the economies and financial markets of many countries, resulting in an economic downturn that could affect demand for our products and impact our operating results.

Given the ongoing and dynamic nature of the circumstances, it is difficult to predict the full impact of the COVID-19 pandemic on our business. The extent of such impact will depend on future developments, which are highly uncertain, including when the COVID-19 pandemic can be controlled and abated. Further, while jurisdictions in which we operate have gradually allowed the reopening of businesses and other organizations and removed the sheltering restrictions, it is premature to assess whether doing so will result in a meaningful increase in economic activity and the impact of such actions on further the COVID-19 pandemic cases.

We are monitoring the recent global health emergency driven by the potential impact of the COVID-19 pandemic, along with global supply and demand dynamics. The extent to which these events may impact our business will depend on future developments, which are highly uncertain and cannot be predicted at this time.

We have encountered and could encounter in the future project delays and resulting liquidated damages claims from customers due to impacts on suppliers, customers, or others. The duration and intensity of these impacts and resulting disruption to our operations is uncertain and continues to evolve as of the date of this filing. Accordingly, management will continue to monitor the impact of the global situation on its financial condition, liquidity, operations, suppliers, industry, and workforce.

To the extent the COVID-19 pandemic adversely affects our financial condition, operating results and cash flows, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section, such as those relating to our high level of indebtedness, our need to generate sufficient cash flows to service our indebtedness and our ability to comply with the covenants contained in the agreements that govern our indebtedness.

**Risks Related to Our Industry**

***If renewable energy technologies are not suitable for widespread adoption or sufficient demand for our hardware and software-enabled services does not develop or takes longer to develop than we anticipate, our sales may decline, and we may be unable to achieve or sustain profitability.***

The market for renewable, distributed energy generation is emerging and rapidly evolving, and its future success is uncertain. If renewable energy generation proves unsuitable for widespread commercial deployment or if demand for our renewable energy hardware and software-enabled services fails to develop sufficiently, we would be unable to achieve sales and market share.

Many factors may influence the widespread adoption of renewable energy generation and demand for our hardware and software-enabled services, including, but not limited to, the cost-effectiveness of renewable energy technologies as compared with conventional and competitive technologies, the performance and reliability of renewable energy products as compared with conventional and non-renewable products, fluctuations in economic and market conditions that impact the viability of conventional and competitive alternative energy sources, increases or decreases in the prices of oil, coal and natural gas, continued

37

deregulation of the electric power industry and broader energy industry, and the availability or effectiveness of government subsidies and incentives. You should consider our prospects in light of the risks and uncertainties emerging companies encounter when introducing new products and services into a nascent industry.

The growth and profitability of our business is dependent upon the continued decline in the cost of battery storage. Over the last decade the cost of battery storage products, particularly lithium-ion based battery storage products, have declined significantly. This lower cost has been driven by advances in battery technology, maturation of the battery supply chain, the scale of battery production by the leading manufacturers and other factors. The growth of our hardware sales and related software-enabled services is dependent upon the continued decrease in the price and efficiency of battery storage products of our component OEM suppliers. If for any reason our component OEM suppliers are unable to continue to reduce the price of their battery storage products, our business and financial condition will be negatively impacted.

***If the estimates and assumptions we use to determine the size of our total addressable market are inaccurate, our future growth rate may be affected, and the potential growth of our business may be limited.***

Market estimates and growth forecasts are subject to significant uncertainty and are based on assumptions and estimates that may prove to be inaccurate. Even if the market in which we compete meets our size estimates and forecasted growth, our business could fail to grow at similar rates, if at all. The assumptions relating to our market opportunity include, but are not limited to, the following: (i) according to BloombergNEF, global energy storage capacity grew 63% per annum between 2015 and 2020 and is expected to grow at a further 41% annual growth rate through 2025; (ii) declines in lithium-ion battery costs and in the cost of renewable generation; (iii) growing demand for renewable energy; and (iv) increased complexity of the electrical grid. Our market opportunity is also based on the assumption that our existing and future offerings will be more attractive to our customers and potential customers than competing products and services. If these assumptions prove inaccurate, our business, financial condition, and results of operations could be adversely affected. For more information regarding our estimates of market opportunity and the forecasts of market growth included herein, see the section entitled "Business."

***The economic benefit of our energy storage products to our customers depends on the cost of electricity available from alternative sources, including local electric utility companies, which cost structure is subject to change.***

The economic benefit of our energy storage products to our customers includes, among other things, the benefit of reducing such customer's payments to the local electric utility company. The rates at which electricity is available from a customer's local electric utility company is subject to change and any changes in such rates may affect the relative benefits of our energy storage products. Further, the local electric utility may impose "departing load," "standby" or other charges on our customers in connection with their acquisition of our energy storage products, the amounts of which are outside of our control and which may have a material impact on the economic benefit of our energy storage products to our customers. Changes in the rates offered by local electric utilities and/or in the applicability or amounts of charges and other fees imposed by such utilities on customers acquiring our energy storage products could adversely affect the demand for our energy storage products.

***Existing electric utility industry policies and regulations, and any subsequent changes, may present technical, regulatory, and economic barriers to the purchase and use of energy storage products that may significantly reduce demand for our products or harm our ability to compete.***

Federal, state, local, and foreign government regulations and policies concerning the broader electric utility industry, as well as internal policies and regulations promulgated by electric utilities and organized electric markets with respect to fees, practices, and rate design, heavily influence the market for electricity generation products and services. These regulations and policies often affect electricity pricing and the interconnection of generation facilities, and can be subject to frequent modifications by governments, regulatory bodies, utilities, and market operators. For example, changes in fee structures, electricity pricing structures, and system permitting, interconnection, and operating requirements can deter purchases of

38

renewable energy products by reducing anticipated revenues or increasing costs or regulatory burdens for would-be system purchasers. The resulting reductions in demand for energy products could harm our business, prospects, financial condition, and results of operations.

A significant recent development in renewable-energy pricing policies in the U.S. occurred on July 16, 2020, when the Federal Energy Regulatory Commission ("FERC") issued a final rule amending regulations that implement the Public Utility Regulatory Policies Act ("PURPA"). Among other requirements, PURPA mandates that electric utilities buy the output of certain renewable generators below established capacity thresholds. PURPA also requires that such sales occur at a utility's "avoided cost" rate. FERC's PURPA reforms include modifications (1) to how regulators and electric utilities may establish avoided cost rates for new contracts; (2) that reduce from 20 MW to 5 MW the capacity threshold above which a renewable-energy qualifying facility is rebuttably presumed to have nondiscriminatory market access, thereby removing the requirement for utilities to purchase its output; (3) that require regulators to establish criteria for determining when an electric utility incurs a legally enforceable obligation to purchase from a PURPA facility; and (4) that reduce barriers for third parties to challenge PURPA eligibility. The net effect of these changes is uncertain, as FERC's final rules do not become effective until 120 days after publication in the Federal Register, and some changes will not become fully effective until states and other jurisdictions implement the new authorities provided by FERC. In general, however, FERC's PURPA reforms have the potential to reduce prices for the output from certain new renewable generation projects while also narrowing the scope of PURPA eligibility for new projects. These effects could reduce demand for PURPA-eligible battery energy storage products and could harm our business, prospects, financial condition, and results of operations.

Changes in other current laws or regulations applicable to us or the imposition of new laws, regulations, or policies in the U.S., Europe, or other jurisdictions in which we do business could have a material adverse effect on our business, financial condition, and results of operations. Any changes to government, utility, or electric market regulations or policies that favor electric utilities or other market participants could reduce the competitiveness of battery energy storage products and cause a significant reduction in demand for our products and services and adversely impact our growth. In addition, changes in our products or changes in export and import laws and implementing regulations may create delays in the introduction of new products in international markets, prevent our customers from deploying our products internationally or, in some cases, prevent the export or import of our products to certain countries altogether. Any such event could have a material adverse effect on our business, financial condition, and results of operations.

***An increase in interest rates or a reduction in the availability of tax equity or project debt capital in the global financial markets could make it difficult for end customers to finance the cost of a renewable energy system and could reduce the demand for our products.***

Many end users depend on financing to fund the initial capital expenditure required to purchase our products and services. As a result, an increase in interest rates or a reduction in the supply of project debt or tax equity financing could reduce the number of customer projects that receive financing or otherwise make it difficult for our customers or their customers to secure the financing necessary to construct a renewable energy system on favorable terms, or at all, and thus lower demand for our products, which could limit our growth or reduce our net sales. In addition, we believe that a significant percentage of end-users construct renewable energy systems as an investment, funding a significant portion of the initial capital expenditure with financing from third parties. An increase in interest rates could lower an investor's return on investment, increase equity requirements, or make alternative investments more attractive relative to our products and services and, in each case, could cause these end users to seek alternative investments.

***Changes in tax laws or regulations that are applied adversely to us or our customers could materially adversely affect our business, financial condition, results of operations, and prospects.***

Changes in corporate tax rates, tax incentives for renewable energy projects, the realization of net deferred tax assets relating to our U.S. operations, the taxation of foreign earnings, and the deductibility of expenses under future tax reform legislation could have a material impact on the value of our deferred tax assets, could result in significant one-time charges in the current or future taxable years, and could increase our future U.S. tax expense, which could have a material adverse effect on our business, financial condition, results of operations, and prospects.

39

Governmental agencies in the jurisdictions in which we and our affiliates do business, as well as the Organization for Economic Cooperation and Development (the "OECD"), have recently focused on issues related to the taxation of multinational business, including issues relating to "base erosion and profit shifting," where profits are reported as earned for tax purposes in relatively low-tax jurisdictions or payments are made between affiliates in jurisdictions with different tax rates. The OECD has released several components of its comprehensive plan to create an agreed set of international rules for addressing base erosion and profit shifting, and governmental authorities from various jurisdictions (including the United States) continue to discuss potential legislation and other reforms, including proposals for global minimum tax rates.

As we operate in numerous jurisdictions, the application of tax laws can be subject to diverging and sometimes conflicting interpretations by tax authorities of these jurisdictions. It is not uncommon for taxing authorities in different countries to have conflicting views, for instance with respect to whether a permanent establishment exists in a particular jurisdiction, the manner in which an arm's length standard is applied for transfer pricing purposes, or with respect to the valuations of intellectual property. For example, if a taxing authority in one country where we operate were to reallocate income from another country where we operate, and if the taxing authority in the second country did not agree with the reallocation asserted by the first country, then we could be subject to tax on the same income in both countries, resulting in double taxation. If taxing authorities were to allocate income to a higher tax jurisdiction, subject our income to double taxation or assess interest and penalties, our tax liabilities could increase, which could adversely affect our business, financial condition, and results of operations.

Due to the potential for changes to tax laws and regulations or changes to the interpretation thereof (including regulations and interpretations pertaining to recent and proposed potential tax reforms in the United States), the ambiguity of tax laws and regulations, the subjectivity of factual interpretations, the complexity of our intercompany arrangements, uncertainties regarding the geographic mix of earnings in any particular period, and other factors, our estimates of effective tax rate and income tax assets and liabilities may be incorrect and our financial statements could be adversely affected, and the resulting impacts may vary substantially from period to period.

In particular, in the United States, there have been multiple significant changes recently proposed (including by the Biden administration and by members of Congress) to the taxation of business entities, including, among other things, an increase in the U.S. federal corporate income tax rate, a transition to graduated rates, an increase in the tax rate applicable to global intangible low-taxed income and elimination of certain exemptions, and various other changes to the U.S. international tax regime. These and other proposals are currently being discussed, but the likelihood of these changes being enacted or implemented is not yet clear. We are currently unable to predict whether such changes will occur and, if so, when they would be effective or the ultimate impact on us or our business. To the extent that such changes have a negative impact on us or our business, these changes may materially and adversely impact our business, financial condition, and results of operations.

In addition, the amounts of taxes we pay are subject to current or future audits by taxing authorities in the United States and all other jurisdictions in which we operate. If audits result in additional payments or assessments different from our reserves, our future results may include unfavorable adjustments to our tax liabilities, and our financial statements could be adversely affected.

***We may incur obligations, liabilities, or costs under environmental, health, and safety laws, which could have an adverse impact on our business, financial condition, and results of operations.***

We are required to comply with national, state, local, and foreign laws and regulations regarding the protection of the environment, health, and safety. We may incur expenses, or be subject to liability, related to the transportation, storage, or disposal of lithium-ion batteries. Adoption of more stringent laws and regulations in the future could require us to incur substantial costs to come into compliance with these laws and regulations. In addition, violations of, or liabilities under, these laws and regulations may result in restrictions being imposed on our operating activities or in our being subject to adverse publicity, substantial fines, penalties, criminal proceedings, third-party property damage or personal injury claims, cleanup costs, or other costs. Liability under these laws and regulations can be imposed on a joint and several basis and without regard to fault or the legality of the activities giving rise to the claim. In addition, future developments such as more aggressive enforcement policies or the discovery of presently unknown

40

environmental conditions may require expenditures that could have an adverse effect on our business, financial condition, and results of operations.

***The reduction, elimination, or expiration of government incentives for, or regulations mandating the use of, renewable energy could reduce demand for energy storage products and harm our business.***

Federal, state, local, and foreign government bodies provide incentives to owners, end users, distributors, system integrators and manufacturers of renewable energy products to promote renewable electricity in the form of rebates, tax credits and other financial incentives.

The range and duration of these incentives varies widely by jurisdiction. Our customers typically use our products for grid-connected applications wherein power is sold under a power purchase agreement or into an organized electric market. The reduction, elimination, or expiration of government incentives for grid-connected electricity may negatively affect the competitiveness of our offerings relative to conventional renewable sources of electricity and could harm or halt the growth of our industry and our business. These subsidies and incentives may expire on a particular date, end when the allocated funding is exhausted or be reduced or terminated as renewable energy adoption rates increase or as a result of legal challenges, the adoption of new statutes or regulations, or the passage of time. These reductions or terminations may occur without warning.

***Revenue from any projects we support may be adversely affected if there is a decline in public acceptance or support of renewable energy, or regulatory agencies, local communities, or other third parties delay, prevent, or increase the cost of constructing and operating customer projects.***

Certain persons, associations and groups could oppose renewable energy projects in general or our customers' projects specifically, citing, for example, misuse of water resources, landscape degradation, land use, food scarcity or price increase, and harm to the environment. Moreover, regulation may restrict the development of renewable energy plants in certain areas. In order to develop a renewable energy project, our customers are typically required to obtain, among other things, environmental impact permits or other authorizations and building permits, which in turn require environmental impact studies to be undertaken and public hearings and comment periods to be held during which any person, association, or group may oppose a project. Any such opposition may be taken into account by government officials responsible for granting the relevant permits, which could result in the permits being delayed or not being granted or being granted solely on the condition that our customers carry out certain corrective measures to the proposed project.

***Severe weather events, including the effects of climate change, are inherently unpredictable and may have a material adverse effect on our financial results and financial condition.***

Our business, including our customers and suppliers, may be exposed to severe weather events and natural disasters, such as tornadoes, tsunamis, tropical storms (including hurricanes), earthquakes, windstorms, hailstorms, severe thunderstorms, wildfires, and other fires, which could cause operating results to vary significantly from one period to the next. We may incur losses in our business in excess of: (1) those experienced in prior years, (2) the average expected level used in pricing, or (3) current insurance coverage limits. The incidence and severity of severe weather conditions and other natural disasters are inherently unpredictable. Climate change may affect the occurrence of certain natural events, such as an increase in the frequency or severity of wind and thunderstorm events, and tornado or hailstorm events due to increased convection in the atmosphere; more frequent wildfires and subsequent landslides in certain geographies; higher incidence of deluge flooding; and the potential for an increase in severity of the hurricane events due to higher sea surface temperatures. Additionally, climate change may adversely impact the demand, price, and availability of insurance. Due to significant variability associated with future changing climate conditions, we are unable to predict the impact climate change will have on our business.

**Risks Related to Our Financial Condition and Liquidity**

***Our order intake and cash flows have been highly seasonal, which could make our future performance difficult to predict and could cause our results of operations for a particular period to fluctuate from quarter to quarter or fall below expectations, resulting in a decline in the price of our Class A common stock.***

Our quarterly results of operations are difficult to predict and may fluctuate significantly in the future. We experience seasonality and typically see increased order intake in our third and fourth fiscal quarters,

41

driven by demand in the Northern Hemisphere to install energy storage products before the summer of the following year. Our services and digital application offerings do not experience the same seasonality given their recurring nature. Combined third and fourth fiscal quarter order intake for energy storage products in fiscal year 2020 and fiscal year 2019 accounted for 80% or more of our total intake each year. As a result, revenue recognition is significantly stronger in our third and fourth fiscal quarters. Cash flows historically have been negative in our first and second fiscal quarters, neutral to positive in our third fiscal quarter, and positive in our fourth fiscal quarter. See "Recent Developments — Preliminary Fourth Quarter Results."

***We have a history of net losses, we anticipate increasing expenses in the future, and we may not be able to achieve or maintain profitability.***

We have incurred net losses on an annual basis since our inception. We incurred net losses of $46.7 million and $47.0 million for the years ended September 30, 2020 and 2019, respectively, and net losses of $74.6 million and $42.7 million for the nine months ended June 30, 2021 and 2020, respectively. We expect our aggregate costs will increase substantially in the foreseeable future and our losses will continue as we expect to invest heavily in increasing our customer base, expanding our operations, hiring additional employees, and operating as a public company. These efforts may prove more expensive than we currently anticipate, and we may not succeed in increasing our revenue sufficiently to offset these higher expenses. To date, we have financed our operations with equity contributions from AES Grid Stability, Siemens Industry, and QFH, cash and cash equivalents, negative working capital, and short-term borrowings. Our net cash flow from operations was negative for the year ended September 30, 2020 and the nine months ended June 30, 2021. We may not generate positive cash flow from operations or profitability in any given period, and our limited operating history may make it difficult for you to evaluate our current business and our future prospects.

We have encountered and will continue to encounter risks and difficulties frequently experienced by growing companies in rapidly changing industries, including increasing expenses as we continue to grow our business. We expect our operating expenses to increase significantly over the next several years as we continue to hire additional personnel, expand our operations and infrastructure, and continue to expand to reach more customers. In addition to the expected costs to grow our business, we also expect to incur additional legal, accounting, and other expenses as a newly public company. These investments may be more costly than we expect, and if we do not achieve the benefits anticipated from these investments, or if the realization of these benefits is delayed, they may not result in increased revenue or growth in our business. If our growth rate were to decline significantly or become negative, it could adversely affect our financial condition and results of operations. If we are not able to achieve or maintain positive cash flow in the long term, we may require additional financing, which may not be available on favorable terms or at all and/or which would be dilutive to our stockholders. If we are unable to successfully address these risks and challenges as we encounter them, our business, results of operations and financial condition would be adversely affected. Our failure to achieve or maintain profitability could negatively impact the value of our common stock.

***The Revolver we will enter into in connection with this offering imposes certain restrictions that may affect our ability to operate our business and make payments on our indebtedness.***

In connection with this offering, we plan to enter into the Revolver, which will contain covenants that, among other things, will restrict our ability to incur additional indebtedness; incur liens; sell, transfer, or dispose of property and assets; invest; make dividends or distributions or other restricted payments and engage in affiliate transactions. In addition, we will be required to maintain (i) minimum liquidity and gross revenue requirements, in each case, until consolidated EBITDA reaches a certain specified threshold and we make an election, and (ii) thereafter, a maximum total leverage ratio and a minimum interest coverage ratio. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Revolving Credit Facility." The Revolver will limit our ability to make certain payments, including dividends or distributions on Fluence Energy, LLC's equity and other restricted payments, provided, however, that payments in respect of certain tax distributions under the Fluence Energy LLC Agreement and certain payments under the TRA will be permitted. These restrictions may restrict our current and future operations, particularly our ability to respond to certain changes in our business or

42

industry, or take future actions. In connection with the Revolver, we will grant the lenders party thereto a security interest in substantially all of our assets.

Our ability to meet these restrictive covenants can be impacted by events beyond our control and we may be unable to do so. Our Revolver and related security agreements will provide that our breach or failure to satisfy certain covenants constitutes an event of default. Upon the occurrence of an event of default, our lenders could elect to declare all amounts outstanding under its debt agreements to be immediately due and payable. In addition, our lenders would have the right to proceed against the assets we provided as collateral pursuant to the Revolver and related security agreement. If the debt under our Revolver was to be accelerated, we may not have sufficient cash on hand or be able to sell sufficient collateral to repay it, which would have an immediate adverse effect on our business and operating results. This could potentially cause us to cease operations and result in a complete loss of your investment in our Class A common stock.

Moreover, the new Revolver will require us to dedicate a portion of our cash flow from operations to interest payments, thereby reducing the availability of cash flow to fund working capital, capital expenditures and other general corporate purposes; increasing our vulnerability to adverse general economic, industry, or competitive developments or conditions; and limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate or in pursuing our strategic objectives.

***Our future capital needs are uncertain and we may need to raise additional funds in the future, and such funds may not be available on acceptable terms or at all.***

We believe that our current cash and cash equivalents, including the net proceeds from this offering together with our expected cash from operations, will be sufficient to meet our projected operating requirements for the foreseeable future. However, continued expansion of our business will be expensive, and we may seek additional funds from public and private stock offerings, borrowings under our existing or new credit facilities or other sources which we may not be able to maintain or obtain on acceptable or commercially reasonable terms, if at all. Our capital requirements will depend on many factors, including:

- market acceptance of our offerings;
- the revenue generated by sales of our offerings;
- the costs associated with expanding our sales and marketing efforts;
- the expenses we incur in manufacturing and selling our products;
- the costs of developing and commercializing new products or technologies;
- the cost of filing and prosecuting patent applications and defending and enforcing our patent and other intellectual property rights;
- the cost of defending, in litigation or otherwise, any claims that we infringe third-party patent or other intellectual property rights;
- the cost of enforcing or defending against non-competition claims;
- the number and timing of acquisitions and other strategic transactions;
- the costs associated with our planned international expansion; and
- unanticipated general and administrative expenses.

As a result of these factors, we may seek to raise additional capital to, among others:

- maintain appropriate product inventory levels;
- continue our research and development and protect our intellectual property rights;
- defend claims, in litigation or otherwise;
- expand our geographic reach;
- commercialize our new products; and
- acquire companies and license products or intellectual property.

43

Such capital may not be available on favorable terms, or at all. Furthermore, if we issue equity or debt securities to raise additional capital, our existing stockholders may experience dilution, and the new equity or debt securities may have rights, preferences, and privileges senior to those of our existing stockholders. In addition, if we raise additional capital through collaboration, licensing, or other similar arrangements, it may be necessary to relinquish valuable rights to our products, potential products, or proprietary technologies, or grant licenses on terms that are not favorable to us. Historically, we have relied on parent corporate guarantees from our affiliates to support project sales. If we are unable to rely on our standalone credit quality or utilize such parent corporate guarantees going forward, it may impact our ability to sell products or establish supplier relationships going forward. If we cannot raise capital on acceptable terms, we may not be able to develop or enhance our products, execute our business plan, take advantage of future opportunities, or respond to competitive pressures, changes in our supplier relationships, or unanticipated customer requirements. Any of these events could adversely affect our ability to achieve our development and commercialization goals, which could have a material adverse effect on our business, results of operations, and financial condition.

**Risks Related to Our Intellectual Property and Technology**

***If we are unable to obtain, maintain and enforce intellectual property protection for our technology or if the scope of our intellectual property protection is not sufficiently broad, others may be able to develop and commercialize technology substantially similar to ours, and our ability to successfully commercialize our technology may be adversely affected.***

Our business depends on internally developed technology, including hardware, software, databases, confidential information and know-how, the protection of which is crucial to the success of our business. We rely on a combination of trademark, trade-secret, and copyright laws and confidentiality procedures and contractual provisions to protect our intellectual property rights in our internally developed technology. We may, over time, increase our investment in protecting our intellectual property through additional trademark, patent, and other intellectual property filings that could be expensive and time-consuming. Effective trademark, trade-secret, and copyright protection is expensive to develop and maintain, both in terms of initial and ongoing registration requirements and the costs of defending our rights. These measures, however, may not be sufficient to offer us meaningful protection. If we are unable to protect our intellectual property and other rights, our competitive position and our business could be harmed, as third parties may be able to commercialize and use technologies and software products that are substantially the same as ours without incurring the development and licensing costs that we have incurred. Any of our owned or licensed intellectual property rights could be challenged, invalidated, circumvented, infringed, or misappropriated, our trade secrets and other confidential information could be disclosed in an unauthorized manner to third parties, or our intellectual property rights may not be sufficient to permit us to take advantage of current market trends or otherwise to provide us with competitive advantages, which could result in costly redesign efforts, discontinuance of certain offerings, or other competitive harm.

Monitoring unauthorized use of our intellectual property is difficult and costly. From time to time, we seek to analyze our competitors' services, and may in the future seek to enforce our rights against potential infringement. However, the steps we have taken to protect our intellectual property rights may not be adequate to prevent infringement or misappropriation of our intellectual property. We may not be able to detect unauthorized use of, or take appropriate steps to enforce, our intellectual property rights. Any inability to meaningfully protect our intellectual property rights could result in harm to our ability to compete and reduce demand for our technology. Moreover, our failure to develop and properly manage new intellectual property could adversely affect our market positions and business opportunities. Also, some of our services rely on technologies and software developed by or licensed from third parties, and we may not be able to maintain our relationships with such third parties or enter into similar relationships in the future on reasonable terms or at all.

Uncertainty may result from changes to intellectual property legislation and from interpretations of intellectual property laws by applicable courts and agencies. Accordingly, despite our efforts, we may be unable to obtain and maintain the intellectual property rights necessary to provide us with a competitive advantage. Our failure to obtain, maintain and enforce our intellectual property rights could therefore have a material adverse effect on our business, financial condition, and results of operations.

44

***We may be sued by third parties for infringement, misappropriation, dilution, or other violation of their intellectual property or proprietary rights.***

Internet, advertising, and e-commerce companies frequently are subject to litigation based on allegations of infringement, misappropriation, dilution, or other violations of intellectual property rights. Some internet, advertising, and e-commerce companies, including some of our competitors, as well as non-practicing entities, own large numbers of patents, copyrights, trademarks, and trade secrets, which they may use to assert claims against us.

Third parties may in the future assert, that we have infringed, misappropriated, diluted, or otherwise violated their intellectual property rights. For instance, the use of our technology to provide our offerings could be challenged by claims that such use infringes, dilutes, misappropriates, or otherwise violates the intellectual property rights of a third party. In addition, we may in the future be exposed to claims that content published or made available through our apps or websites violates third-party intellectual property rights.

As we face increasing competition and as a public company, the possibility of intellectual property rights claims against us grows. Such claims and litigation may involve patent holding companies or other adverse intellectual property rights holders who have no relevant product revenue, and therefore our own pending patents and other intellectual property rights may provide little or no deterrence to these rights holders in bringing intellectual property rights claims against us. There may be intellectual property rights held by others, including issued or pending patents and trademarks, that cover significant aspects of our technologies, content, branding, or business methods, and we cannot assure that we are not infringing or violating, and have not violated or infringed, any third-party intellectual property rights or that we will not be held to have done so or be accused of doing so in the future. We expect that we may receive in the future notices that claim we or our partners, or clients using our solutions and services, have misappropriated, or misused other parties' intellectual property rights, particularly as the number of competitors in our market grows and the functionality of applications amongst competitors overlaps.

Any claim that we have violated intellectual property or other proprietary rights of third parties, with or without merit, and whether or not it results in litigation, is settled out of court or is determined in our favor, could be time-consuming and costly to address and resolve, and could divert the time and attention of management and technical personnel from our business. Furthermore, an adverse outcome of a dispute may result in an injunction and could require us to pay substantial monetary damages, including treble damages and attorneys' fees, if we are found to have willfully infringed a party's intellectual property rights. Any settlement or adverse judgment resulting from such a claim could require us to enter into a licensing agreement to continue using the technology, content, or other intellectual property that is the subject of the claim; restrict or prohibit our use of such technology, content, or other intellectual property; require us to expend significant resources to redesign our technology or solutions; and require us to indemnify third parties. Royalty or licensing agreements, if required or desirable, may be unavailable on terms acceptable to us, or at all, and may require significant royalty payments and other expenditures. We may also be required to develop alternative non-infringing technology, which could require significant time and expense. There also can be no assurance that we would be able to develop or license suitable alternative technology, content, or other intellectual property to permit us to continue offering the affected technology, content, or services to our partners or clients. If we cannot develop or license technology for any allegedly infringing aspect of our business, we would be forced to limit our product or service offerings and may be unable to compete effectively. Any of these events could materially harm our business, financial condition, and results of operations.

***If our trademarks and trade names are not adequately protected or protectable, we may not be able to build name recognition in our markets of interest, and our competitive position may be harmed.***

The registered or unregistered trademarks or trade names that we own may be challenged, infringed, circumvented, declared generic, lapsed, or determined to be infringing on or dilutive of other marks. We may not be able to protect our rights in these trademarks and trade names, which we need in order to build name recognition with potential members, partners, and clients. In addition, third parties may file for registration of trademarks similar or identical to our trademarks, thereby impeding our ability to build brand identity and possibly leading to market confusion. If they succeed in registering or developing common-law rights in such trademarks, and if we are not successful in challenging such third-party rights, we may

45

not be able to use these trademarks to develop brand recognition of our technologies, products, or services. In addition, there could be potential trade name or trademark infringement claims brought by owners of other registered or unregistered trademarks or trademarks that incorporate variations of our registered or unregistered trademarks or trade names. If we are unable to establish name recognition based on our trademarks and trade names, we may not be able to compete effectively, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

### *We may not be able to enforce our intellectual property rights throughout the world.*

We may also be required to protect our proprietary technology and content in an increasing number of jurisdictions, a process that is expensive and may not be successful, or which we may not pursue in every location. Filing, prosecuting, maintaining, defending, and enforcing intellectual property rights on our products, services, and technologies in all countries throughout the world could be prohibitively expensive, and our intellectual property rights in some countries outside the United States can be less extensive than those in the United States. We do not own and have not registered or applied for intellectual property registrations in all countries outside the United States. Competitors may use our technologies in jurisdictions where we have not obtained protection to develop their own products and services and, further, may export otherwise violating products and services to territories where we have protection but enforcement is not as strong as that in the United States. These products and services may compete with our solutions and services, and our intellectual property rights may not be effective or sufficient to prevent them from competing. In addition, the laws of some foreign countries do not protect certain proprietary rights to the same extent as the laws of the United States, and many companies have encountered significant challenges in establishing and enforcing certain of their proprietary rights outside of the United States. These challenges can be caused by the absence or inconsistency of the application of rules and methods for the establishment and enforcement of intellectual property rights outside of the United States. For instance, there is no uniform worldwide policy regarding patentable subject matter or the scope of claims allowable for business methods. As such, we do not know the degree of future protection that we will have on our technologies, products, and services.

In addition, the legal systems of some countries, particularly developing countries, do not favor the enforcement of certain intellectual property protection. This could make it difficult for us to stop the misappropriation or other violation of certain of our other intellectual property rights. Accordingly, we may choose not to seek protection in certain countries, and we will not have the benefit of protection in such countries. Proceedings to enforce our intellectual property rights in foreign jurisdictions could result in substantial costs and divert our efforts and attention from other aspects of our business. Accordingly, our efforts to protect our intellectual property rights in such countries may be inadequate. In addition, changes in the law and legal decisions by courts in the United States and foreign countries may affect our ability to obtain adequate protection for our products, services, and other technologies and the enforcement of intellectual property. Any of the foregoing could harm our competitive position, business, financial condition, results of operations, and prospects.

### *We may be subject to claims that our employees, consultants, or advisors have wrongfully used or disclosed alleged trade secrets of their current or former employers or claims asserting ownership of what we regard as our own intellectual property.*

Many of our employees, consultants, and advisors are currently or were previously employed at other companies in our field, including our competitors or potential competitors. Although we try to ensure that our employees, consultants, and advisors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or these individuals have used or disclosed intellectual property, including trade secrets or other proprietary information, of any such individual's current or former employer. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management.

In addition, while it is our policy to require our employees and contractors who may be involved in the conception or development of intellectual property to execute agreements assigning such intellectual property

46

to us, we may be unsuccessful in executing such an agreement with each party who, in fact, conceives or develops intellectual property that we regard as our own. The assignment of intellectual property rights may not be self-executing, or the assignment agreements may be breached, and we may be forced to bring claims against third parties, or defend claims that they may bring against us, to determine the ownership of what we regard as our intellectual property. Any of the foregoing could harm our competitive position, business, financial condition, results of operations, and prospects.

***Our business depends on our ability to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems.***

Our business is highly dependent on maintaining effective information systems as well as the integrity and of the data we use to serve our customers and operate our business. Because of the large amount of data that we collect and manage, it is possible that hardware failures or errors in our systems could result in data loss or corruption or cause the information that we collect to be incomplete or contain inaccuracies that our partners regard as significant. If our data were found to be inaccurate or unreliable due to fraud or other error, or if we, or any of the third-party service providers we engage, were to fail to maintain information systems and data integrity effectively, we could experience operational disruptions that may impact our operations and hinder our ability to provide services, establish appropriate pricing for services, establish reserves, report financial results timely and accurately and maintain regulatory compliance, among other things. If any such failure of our data integrity were to result in the theft, corruption or other harm to the data of our customers, our ability to retain and attract partners or customers may be harmed.

We must continue to invest in long-term solutions that will enable us to anticipate customer needs and expectations, enhance the customer experience, act as a differentiator in the market, and protect against cybersecurity risks and threats. Despite our implementation of reasonable security measures, our IT systems, like those of other companies, are vulnerable to damages from computer viruses, natural disasters, fire, power loss, telecommunications failures, personnel misconduct, human error, unauthorized access, physical or electronic security breaches, cyber-attacks (including malicious and destructive code, phishing attacks, ransomware, and denial of service attacks), and other similar disruptions. Such attacks or security breaches may be perpetrated by bad actors internally or externally (including computer hackers, persons involved with organized crime, or foreign state or foreign state-supported actors). Cybersecurity threat actors employ a wide variety of methods and techniques that are constantly evolving, increasingly sophisticated, and difficult to detect and successfully defend against. We have experienced such incidents in the past, and any future incidents could expose us to claims, litigation, regulatory or other governmental investigations, administrative fines, and potential liability. Any system failure, accident, or security breach could result in disruptions to our operations. A material network breach in the security of our IT systems could include the theft of our trade secrets, customer information, human resources information, or other confidential data, including but not limited to personally identifiable information.

Although past incidents have not had a material effect on our business operations or financial performance, to the extent that any disruption or security breach results in a loss or damage to our data, or an inappropriate disclosure of confidential, proprietary or customer information, it could cause significant damage to our reputation, affect our relationships with our customers and strategic partners, lead to claims against us from governments and private plaintiffs, and adversely affect our business. We cannot guarantee that future cyberattacks, if successful, will not have a material effect on our business or financial results.

Many governments have enacted laws requiring companies to provide notice of cyber incidents involving certain types of data, including personal data. These laws may be subject to alterations and revisions, and if we fail to comply with our obligations under such laws in the jurisdictions in which we operate, we could be subject to regulatory action and lawsuits. If an actual or perceived cybersecurity breach of security measures, unauthorized access to our system or the systems of the third-party vendors that we rely upon, or any other cybersecurity threat occurs, we may incur liability, costs, or damages, contract termination, our reputation may be compromised, our ability to attract new customers could be negatively affected, and our business, financial condition, and results of operations could be materially and adversely affected. Any compromise of our security could also result in a violation of applicable domestic and foreign security, privacy or data protection, consumer protection, and other laws, regulatory or other governmental investigations, enforcement actions, and legal and financial exposure, including potential

47

contractual liability. In addition, we may be required to incur significant costs to protect against and remediate damage caused by these disruptions or security breaches in the future.

***We utilize open-source software, which may pose particular risks to our proprietary software and solutions.***

We use open-source software in our solutions and will use open-source software in the future. Companies that incorporate open-source software into their solutions have, from time to time, faced claims challenging the use of open-source software and compliance with open-source license terms. Some licenses governing the use of open-source software contain requirements that we make available source code for modifications or derivative works we create based upon the open-source software, and that we license such modifications or derivative works under the terms of a particular open-source license or other license granting third parties certain rights of further use. By the terms of certain open-source licenses, we could be required to release the source code of our proprietary software, and to make our proprietary software available under open-source licenses to third parties at no cost, if we combine our proprietary software with open-source software in certain manners. Although we monitor our use of open-source software, we cannot assure you that all open-source software is reviewed prior to use in our solutions, that our developers have not incorporated open-source software into our solutions, or that they will not do so in the future. Additionally, the terms of many open-source licenses to which we are subject have not been interpreted by U.S. or foreign courts. There is a risk that open-source software licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to market or provide our solutions as currently marketed or provided. Companies that incorporate open-source software into their products have, in the past, faced claims seeking enforcement of open-source license provisions and claims asserting ownership of open-source software incorporated into their product. If an author or other third party that distributes such open-source software were to allege that we had not complied with the conditions of an open-source license, we could incur significant legal costs defending ourselves against such allegations. In the event such claims were successful, we could be subject to significant damages or be enjoined from the distribution of our software. In addition, the terms of open-source software licenses may require us to provide source code that we develop using such open-source software to others on unfavorable license terms. As a result of our current or future use of open-source software, we may face claims or litigation, be required to release our proprietary source code, pay damages for breach of contract, re-engineer our solutions, discontinue making our solutions available in the event re-engineering cannot be accomplished on a timely basis, or take other remedial action. Any such re-engineering or other remedial efforts could require significant additional research and development resources, and we may not be able to successfully complete any such re-engineering or other remedial efforts. Further, in addition to risks related to license requirements, use of certain open-source software can lead to greater risks than use of third-party commercial software, as open-source licensors generally do not provide warranties or controls on the origin of software. Any of these risks could be difficult to eliminate or manage, and, if not addressed, could have a negative effect on our business, financial condition, and results of operations.

***If we fail to comply with our obligations under license or technology agreements with third parties, we may be required to pay damages, and we could lose license rights that are critical to our business. If we fail to comply with our obligations under license and technology agreements with AES and Siemens, we could lose license rights, including to patents and patent applications, which may prove to be material to our business.***

We license certain intellectual property, including patents, technologies and software from third parties, including AES and Siemens, that is important to our business, and in the future, we may enter into additional agreements that provide us with licenses to valuable intellectual property or technology. If we fail to comply with any of the obligations under our license agreements, we may be required to pay damages and the licensor may have the right to terminate the license. Termination by the licensor would cause us to lose valuable rights, and could prevent us from selling our products and services, or adversely impact our ability to commercialize future solutions and services. Our business would suffer if any current or future licenses terminate, if the licensors fail to abide by the terms of the license, if the licensors fail to enforce licensed patents against infringing third parties, if the licensed intellectual property is found to be invalid or unenforceable, if the licensed intellectual property expires or if we are unable to enter into necessary licenses on acceptable terms. In addition, our rights to certain intellectual property, technologies, and software, are licensed to us on a non-exclusive basis. The owners of these non-exclusively licensed technologies are therefore free to license them to third parties, including our competitors, on terms that may be superior

48

to those offered to us, which could place us at a competitive disadvantage. Moreover, our licensors may own or control intellectual property that has not been licensed to us and, as a result, we may be subject to claims, regardless of their merit, that we are infringing or otherwise violating the licensor's rights. In addition, the agreements under which we license intellectual property or technology from third parties are generally complex, and certain provisions in such agreements may be susceptible to multiple interpretations. The resolution of any contract interpretation disagreement that may arise could narrow what we believe to be the scope of our rights to the relevant intellectual property or technology, or increase what we believe to be our financial or other obligations under the relevant agreement. Any of the foregoing could harm our competitive position, business, financial condition, results of operations, and prospects.

*If we cannot license rights to use technologies on reasonable terms, we may not be able to commercialize new solutions or services in the future.*

In the future, we may identify additional third-party intellectual property we may need to license in order to engage in our business, including to develop or commercialize new products or services. However, such licenses may not be available on acceptable terms or at all. The licensing or acquisition of third-party intellectual property rights is a competitive area, and several more established companies may pursue strategies to license or acquire third-party intellectual property rights that we may consider attractive or necessary. These established companies may have a competitive advantage over us due to their size, capital resources, and greater development or commercialization capabilities. In addition, companies that perceive us to be a competitor may be unwilling to assign or license rights to us. Even if such licenses are available, we may be required to pay the licensor substantial royalties based on sales of our products and services. Such royalties are a component of the cost of our products or services and may affect the margins on our products and services. In addition, such licenses may be non-exclusive, which could give our competitors access to the same intellectual property licensed to us. If we are unable to enter into the necessary licenses on acceptable terms or at all, if any necessary licenses are subsequently terminated, if our licensors fail to abide by the terms of the licenses, if our licensors fail to prevent infringement by third parties, or if the licensed intellectual property rights are found to be invalid or unenforceable, or if the licensed intellectual property rights expire, our business, financial condition, results of operations, and prospects could be affected. If licenses to third-party intellectual property rights are or become required for us to engage in our business, the rights may be non-exclusive, which could give our competitors access to the same technology or intellectual property rights licensed to us. Moreover, we could encounter delays and other obstacles in our attempt to develop alternatives. Defense of any lawsuit or failure to obtain any of these licenses on favorable terms could prevent us from commercializing solutions and services, which could harm our competitive position, business, financial condition, results of operations, and prospects.

**Risks related to the Offering and Ownership of our Class A Common Stock**

*Certain provisions of Delaware law and antitakeover provisions in our organizational documents could delay or prevent a change of control.*

Certain provisions of Delaware law, our amended and restated certificate of incorporation, amended and restated bylaws, and our Stockholders Agreement may have an antitakeover effect and may delay, defer, or prevent a merger, acquisition, tender offer, takeover attempt, or other change of control transaction that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares held by our stockholders. These provisions provide for, among other things:

- the ability of our board of directors to issue one or more series of preferred stock;

- advance notice for nominations of directors by stockholders and for stockholders to include matters to be considered at our annual meetings;

- certain limitations on convening special stockholder meetings;

- prohibit cumulative voting in the election of directors;

- that certain provisions of amended and restated certificate of incorporation may be amended only by the affirmative vote of at least $66\,^2/_3\%$ of the voting power represented by our then-outstanding common stock;

49

- the right of each of AES Grid Stability, Siemens Industry, and the Blocker Shareholder to nominate certain of our directors;

- the shares of our Class B-1 common stock that will be held by our Founders entitle them to five votes per share on all matters presented to our stockholders generally; and

- the consent rights of the Continuing Equity Owners in the Stockholders Agreement as described in "Certain Relationships and Related Party Transactions — Stockholders Agreement."

These antitakeover provisions could make it more difficult for a third party to acquire us, even if the third party's offer may be considered beneficial by many of our stockholders. As a result, our stockholders may be limited in their ability to obtain a premium for their shares.

In addition, we have opted out of Section 203 of the General Corporation Law of the State of Delaware, which we refer to as the DGCL, but our amended and restated certificate of incorporation will provide that engaging in any of a broad range of business combinations with any "interested" stockholder (any stockholder with 15% or more of our voting stock) for a period of three years following the date on which the stockholder became an "interested" stockholder is prohibited, subject to certain exceptions. See "Description of Capital Stock."

***The JOBS Act will allow us to postpone the date by which we must comply with certain laws and regulations intended to protect investors and to reduce the amount of information we provide in our reports filed with the SEC. We cannot be certain if this reduced disclosure will make our Class A common stock less attractive to investors.***

The JOBS Act is intended to reduce the regulatory burden on "emerging growth companies." As defined in the JOBS Act, a public company whose initial public offering of common equity securities occurs after December 8, 2011, and whose annual net revenues are less than $1.07 billion will, in general, qualify as an "emerging growth company" until the earliest of:

- the last day of its fiscal year following the fifth anniversary of the date of its initial public offering of common equity securities;

- the last day of its fiscal year in which it has annual gross revenue of $1.07 billion or more;

- the date on which it has, during the previous three-year period, issued more than $1.07 billion in nonconvertible debt; and

- the date on which it is deemed to be a "large accelerated filer," which will occur at such time as the company (1) has an aggregate worldwide market value of common equity securities held by non-affiliates of $700 million or more as of the last business day of its most recently completed second fiscal quarter, (2) has been required to file annual and quarterly reports under the Securities Exchange Act of 1934, as amended, or the Exchange Act, for a period of at least 12 months, and (3) has filed at least one annual report pursuant to the Exchange Act.

Under this definition, we will be an "emerging growth company" upon completion of this offering and could remain an "emerging growth company" until as late as the fifth anniversary of the completion of this offering. For so long as we are an "emerging growth company," we will, among other things:

- not be required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act;

- not be required to hold a nonbinding advisory stockholder vote on executive compensation pursuant to Section 14A(a) of the Exchange Act;

- not be required to seek stockholder approval of any golden parachute payments not previously approved pursuant to Section 14A(b) of the Exchange Act;

- be exempt from the requirement of the Public Company Accounting Oversight Board, or PCAOB, regarding the communication of critical audit matters in the auditor's report on the financial statements; and

50

- be subject to reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements.

In addition, Section 107 of the JOBS Act provides that an emerging growth company can use the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. This permits an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to use this extended transition period and, as a result, our consolidated financial statements may not be comparable to the financial statements of issuers who are required to comply with the effective dates for new or revised accounting standards that are applicable to public companies.

We cannot predict if investors will find our Class A common stock less attractive as a result of our decision to take advantage of some or all of the reduced disclosure requirements above. If some investors find our Class A common stock less attractive as a result, there may be a less active trading market for our Class A common stock and our stock price may be more volatile.

***Because we have no current plans to pay regular cash dividends on our Class A common stock following this offering, you may not receive any return on investment unless you sell your Class A common stock for a price greater than that which you paid for it.***

We do not anticipate paying any regular cash dividends on our Class A common stock following this offering. Any decision to declare and pay dividends in the future will be made at the discretion of our board of directors and will depend on, among other things, general and economic conditions, our results of operations and financial condition, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions, and such other factors that our board of directors may deem relevant. In addition, our ability to pay dividends is, and may be, limited by covenants of any future outstanding indebtedness we or our subsidiaries incur. Therefore, any return on investment in our Class A common stock is solely dependent upon the appreciation of the price of our Class A common stock on the open market, which may not occur. See "Dividend Policy" for more detail.

***We cannot predict the effect our multiple class structure may have on the market price of our Class A common stock.***

We cannot predict whether our multiple class structure will result in a lower or more volatile market price of our Class A common stock, in adverse publicity, or other adverse consequences. For example, certain index providers have announced restrictions on including companies with multiple-class share structures in certain of their indices. In July 2017, FTSE Russell announced that it plans to require new constituents of its indices to have greater than 5% of the company's voting rights in the hands of public stockholders, and S&P Dow Jones announced that it will no longer admit companies with multiple-class share structures to certain of its indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400, and S&P SmallCap 600, which together make up the S&P Composite 1500. Also in 2017, MSCI, a leading stock index provider, opened public consultations on their treatment of no-vote and multi-class structures and temporarily barred new multi-class listings from certain of its indices and in October 2018, MSCI announced its decision to include equity securities "with unequal voting structures" in its indices and to launch a new index that specifically includes voting rights in its eligibility criteria. Under such announced policies, the multiple class structure of our stock would make us ineligible for inclusion in certain indices and, as a result, mutual funds, exchange-traded funds, and other investment vehicles that attempt to track those indices would not invest in our Class A common stock. These policies are relatively new, and it is unclear what effect, if any, they will have on the valuations of publicly traded companies excluded from such indices, but it is possible they may depress valuations, compared to similar companies that are included. Given the sustained flow of investment funds into passive strategies that seek to track certain indices, exclusion from certain stock indices would likely preclude investment by many of these funds and could make our Class A common stock less attractive to other investors. As a result, the market price of our Class A common stock could be adversely affected.

***We are a "controlled company" within the meaning of the Nasdaq rules and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You may not have the same protections afforded to stockholders of companies that are subject to such corporate governance requirements.***

After the consummation of the Transactions, our Continuing Equity Owners will have more than 50% of the voting power for the election of directors, and, as a result, we will be considered a "controlled

51

company" for the purposes of the Nasdaq rules. As such, we will qualify for, and intend to rely on, exemptions from certain corporate governance requirements, including the requirements to have a majority of independent directors on our board of directors, an entirely independent compensation committee or to have director nominations be made, or recommended to the full board of directors, by its independent directors or by a nominations committee that is composed entirely of independent directors.

The corporate governance requirements and, specifically, the independence standards are intended to ensure directors who are considered independent are free of any conflicting interest that could influence their actions as directors. Following this offering, we intend to utilize certain exemptions afforded to a "controlled company." As a result, we will not be subject to certain corporate governance requirements, including that a majority of our board of directors consists of "independent directors," as defined under the rules of the Nasdaq. In addition, we are not required to have director nominations be made, or recommended to the full board of directors, by its independent directors or by a nominations committee that is composed entirely of independent directors.

Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the Nasdaq rules. Our status as a controlled company could make our Class A common stock less attractive to some investors or otherwise harm our stock price.

***No market currently exists for our Class A common stock, and an active, liquid trading market for our Class A common stock may not develop, which may cause our Class A common stock to trade at a discount from the initial offering price and make it difficult for you to sell the Class A common stock you purchase.***

Prior to this offering, there has not been a public market for our Class A common stock. We cannot predict the extent to which investor interest in us will lead to the development of a trading market or how active and liquid that market may become. If an active and liquid trading market does not develop or continue, you may have difficulty selling any of our Class A common stock that you purchase at a price above the price you purchase it or at all. The initial public offering price for the shares was determined by negotiations between us and the underwriters and may not be indicative of prices that will prevail in the open market following this offering. The failure of an active and liquid trading market to develop and continue would likely have a material adverse effect on the value of our Class A common stock. The market price of our Class A common stock may decline below the initial offering price, and you may not be able to sell your shares of our Class A common stock at or above the price you paid in this offering, or at all. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies by using our shares as consideration.

***Our amended and restated certificate of incorporation will provide that the Court of Chancery of the State of Delaware will be the sole and exclusive forum for certain stockholder litigation matters, and the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.***

Our amended and restated certificate of incorporation will provide (A) (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws (as either may be amended or restated) or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware or (iv) any action asserting a claim governed by the internal affairs doctrine of the law of the State of Delaware shall, to the fullest extent permitted by law, be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, the federal district court of the State of Delaware; and (B) the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. Notwithstanding the foregoing, the exclusive forum provision shall not apply to claims seeking to enforce any liability or duty created by the Exchange Act. The choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for

52

disputes with us or our directors, officers, or other employees, which may discourage such lawsuits against us and our directors, officers, and other employees. Alternatively, if a court were to find the choice of forum provision contained in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, results of operations, and financial condition. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and consented to the forum provisions in our amended and restated certificate of incorporation.

***Our amended and restated certificate of incorporation provides that the doctrine of "corporate opportunity" will not apply with respect to any director or stockholder who is not employed by us or our subsidiaries.***

The doctrine of corporate opportunity generally provides that a corporate fiduciary may not develop an opportunity using corporate resources, acquire an interest adverse to that of the corporation or acquire property that is reasonably incident to the present or prospective business of the corporation or in which the corporation has a present or expectancy interest, unless that opportunity is first presented to the corporation and the corporation chooses not to pursue that opportunity. The doctrine of corporate opportunity is intended to preclude officers or directors or other fiduciaries from personally benefiting from opportunities that belong to the corporation. Our amended and restated certificate of incorporation, which will be in effect upon the consummation of the Transactions, will provide that the doctrine of "corporate opportunity" will not apply with respect to any director or stockholder who is not employed by us or our subsidiaries. Any director or stockholder who is not employed by us or our subsidiaries will, therefore, have no duty to communicate or present corporate opportunities to us, and will have the right to either hold any corporate opportunity for their (and their affiliates') own account and benefit or to recommend, assign or otherwise transfer such corporate opportunity to persons other than us, including to any director or stockholder who is not employed by us or our subsidiaries.

As a result, certain of our stockholders, directors, and their respective affiliates, including AES Grid Stability, Siemens Industry, the Blocker Shareholder, and any of our directors nominated by them that is not employed by us or our subsidiaries, will not be prohibited from operating or investing in competing businesses. We, therefore, may find ourselves in competition with certain of our stockholders, directors, or their respective affiliates, and we may not have knowledge of, or be able to pursue, transactions that could potentially be beneficial to us. Accordingly, we may lose a corporate opportunity or suffer competitive harm, which could negatively impact our business, operating results, and financial condition.

***If securities analysts do not publish research or reports about our business or if they downgrade our stock or our sector, or if there is any fluctuation in our credit rating, our stock price and trading volume could decline.***

The trading market for our Class A common stock will rely in part on the research and reports that industry or financial analysts publish about us or our business. We do not control these analysts. Securities and industry analysts do not currently, and may never, publish research on our company. If no securities or industry analysts commence coverage of us, the trading price of our shares would likely be negatively impacted. Furthermore, if one or more of the analysts who do cover us downgrade our stock or our industry, or the stock of any of our competitors, or publish inaccurate or unfavorable research about our business, the price of our stock could decline. If one or more of these analysts stops covering us or fails to publish reports on us regularly, we could lose visibility in the market, which, in turn, could cause our stock price or trading volume to decline.

Additionally, any fluctuation in the credit rating of us or our subsidiaries may impact our ability to access debt markets in the future or increase our cost of future debt, which could have a material adverse effect on our operations and financial condition, which in return may adversely affect the trading price of shares of our Class A common stock.

***Future sales, or the perception of future sales, by us or our existing stockholders in the public market following this offering could cause the market price for our Class A common stock to decline.***

After this offering, the sale of shares of our Class A common stock in the public market, or the perception that such sales could occur, could harm the prevailing market price of shares of our Class A

common stock. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate.

Upon consummation of the Transactions, we will have outstanding a total of 49,493,275 shares of Class A common stock. Of the outstanding shares, the 31,000,000 shares sold in this offering (or 35,650,000 shares if the underwriters exercise in full their option to purchase additional shares) will be freely tradable without restriction or further registration under the Securities Act, other than any shares held by our affiliates. In addition, the shares of Class A common stock issued to the Blocker Shareholder in the Transactions will be eligible for resale pursuant to Rule 144 without restriction or further registration under the Securities Act, other than affiliate restrictions under Rule 144. Any shares of Class A common stock held by our affiliates will be eligible for resale pursuant to Rule 144 under the Securities Act, subject to the volume, manner of sale, holding period and other limitations of Rule 144.

Our directors and executive officers, and substantially all of our stockholders have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, subject to certain exceptions, for a period of 180 days after the date of this prospectus, may not, without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the underwriters, (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Class A common stock or any securities convertible into or exercisable or exchangeable for Class A common stock; or (2) file any registration statement with the Securities and Exchange Commission relating to the offering of any Class A common stock or any securities convertible into or exercisable or exchangeable for Class A common stock; or (3) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Class A common stock, whether any such transaction described in clauses (1), (2), or (3) is to be settled by delivery of Class A common stock or such other securities, in cash or otherwise. See "Underwriting."

In addition, we have reserved 12,267,403 shares of Class A common stock for issuance pursuant to equity incentives issued pursuant to the Existing Equity Plan which will convert upon effectiveness of this offering into options and other rights to acquire shares of Class A common stock. Further, we have reserved 2,220,968 shares of Class A common stock for issuance pursuant to phantom units issued pursuant to the Existing Phantom Equity Plan, which will convert into a right to receive cash or equity based upon the value of shares of Class A common stock. Finally, we have reserved 9,500,000 shares of Class A common stock for issuance under the 2021 Plan. Any Class A common stock that we issue under the 2021 Plan or other equity incentive plans that we may adopt in the future would dilute the percentage ownership held by the investors who purchase Class A common stock in this offering.

As restrictions on resale end or if these stockholders exercise their registration rights, the market price of our shares of Class A common stock could drop significantly if the holders of these shares sell them or are perceived by the market as intending to sell them. These factors could also make it more difficult for us to raise additional funds through future offerings of our shares of Class A common stock or other securities.

In the future, we may also issue securities in connection with investments, acquisitions or capital raising activities. In particular, the number of shares of our Class A common stock issued in connection with an investment or acquisition, or to raise additional equity capital, could constitute a material portion of our then-outstanding shares of our Class A common stock. Any such issuance of additional securities in the future may result in additional dilution to you, or may adversely impact the price of our Class A common stock.

***Our stock price may change significantly following the offering, and you may not be able to resell shares of our Class A common stock at or above the price you paid or at all, and you could lose all or part of your investment as a result.***

The initial public offering price for the shares was determined by negotiations between us and the underwriters. You may not be able to resell your shares at or above the initial public offering price due to a number of factors included herein, including the following:

- results of operations that vary from the expectations of securities analysts and investors;

54

- results of operations that vary from those of our competitors;

- changes in expectations as to our future financial performance, including financial estimates and investment recommendations by securities analysts and investors;

- technology changes, changes in consumer behavior in our industry;

- security breaches related to our systems or those of our affiliates or strategic partners;

- changes in economic conditions for companies in our industry;

- changes in market valuations of, or earnings and other announcements by, companies in our industry;

- declines in the market prices of stocks generally, particularly those of energy storage providers;

- strategic actions by us or our competitors;

- announcements by us, our competitors or our strategic partners of significant contracts, new products, acquisitions, joint marketing relationships, joint ventures, other strategic relationships, or capital commitments;

- changes in general economic or market conditions or trends in our industry or the economy as a whole and, in particular, in the energy storage environment;

- changes in business or regulatory conditions;

- future sales of our Class A common stock or other securities;

- investor perceptions of the investment opportunity associated with our Class A common stock relative to other investment alternatives;

- the public's response to press releases or other public announcements by us or third parties, including our filings with the SEC;

- announcements relating to litigation or governmental investigations;

- guidance, if any, that we provide to the public, any changes in this guidance, or our failure to meet this guidance;

- the development and sustainability of an active trading market for our stock;

- changes in accounting principles; and

- other events or factors, including those resulting from system failures and disruptions, natural disasters, war, acts of terrorism, an outbreak of highly infectious or contagious diseases, such as the COVID-19 pandemic, or responses to these events.

Furthermore, the stock market may experience extreme volatility that, in some cases, may be unrelated or disproportionate to the operating performance of particular companies. These broad market and industry fluctuations may adversely affect the market price of our Class A common stock, regardless of our actual operating performance. In addition, price volatility may be greater if the public float and trading volume of our Class A common stock is low.

In the past, following periods of market volatility, stockholders have instituted securities class action litigation. If we were involved in securities litigation, it could have a substantial cost and divert resources and the attention of management from our business regardless of the outcome of such litigation.

***If you purchase shares of Class A common stock in this offering, you will suffer immediate and substantial dilution of your investment.***

The initial public offering price of our Class A common stock is substantially higher than the net tangible book value per share of our Class A common stock. Therefore, if you purchase shares of our Class A common stock in this offering, you will pay a price per share that substantially exceeds our net tangible book value per share after this offering. You will experience immediate dilution of $18.92 per share, representing the difference between our net tangible book value per share after giving effect to this offering

55

and the initial public offering price. In addition, investors who purchase Class A common stock from us in this offering will have contributed 75.7% of the aggregate price paid by all purchasers of our outstanding equity but will own only approximately 18.6% of our outstanding equity after this offering. See "Dilution" for more detail, including the calculation of the net tangible book value per share of our Class A common stock.

**Risks Related to Our Existing Shareholders**

***Our articles of incorporation limit our Continuing Equity Owners' and their directors' and officers' liability to us or you for breach of fiduciary duty and could also prevent us from benefiting from corporate opportunities that might otherwise have been available to us.***

Our articles of incorporation will provide that, subject to any contractual provision to the contrary, our Continuing Equity Owners will have no obligation to refrain from:

- engaging in the same or similar business activities or lines of business as we do;

- doing business with any of our clients, customers, vendors or lessors;

- employing or otherwise engaging any of our officers or employees; or

- making investments in any property in which we may make investments.

Under our articles of incorporation, neither Continuing Equity Owners nor any officer or director of Continuing Equity Owners, except as provided in our articles of incorporation, will be liable to us or to our stockholders for breach of any fiduciary duty by reason of any of these activities.

Any interests or expectancy in corporate opportunities which become known to (i) any of our directors or officers who are also directors, officers, employees or other affiliates of Continuing Equity Owners or their affiliates (except that we and our subsidiaries shall not be deemed affiliates of Continuing Equity Owners or its affiliates for the purposes of the provision), or dual persons, or (ii) our Continuing Equity Owners themselves, and which relate to the business of Fluence or may constitute a corporate opportunity for both our Continuing Equity Owners and us. Generally, neither our Continuing Equity Owners nor our directors or officers who are also dual persons will be liable to us or our stockholders for breach of any fiduciary duty by reason of the fact that any such person pursues or acquires any corporate opportunity for the account of our Continuing Equity Owners or their affiliates, directs, recommends, sells, assigns or otherwise transfers such corporate opportunity to Our Continuing Equity Owners or its affiliates, or does not communicate information regarding such corporate opportunity to us. The corporate opportunity provision may exacerbate conflicts of interest between our Continuing Equity Owners and us because the provision effectively permits one of our directors or officers who also serves as a director, officer, employee or other affiliate of Our Continuing Equity Owners to choose to direct a corporate opportunity to our Continuing Equity Owners instead of us.

Our Continuing Equity Owners will not be restricted from competing with us in the energy storage business, including as a result of acquiring a company that operates an energy storage business. Due to the significant resources of our Continuing Equity Owners, including their intellectual property (all of which our Continuing Equity Owners will retain and certain of which they will license to us under the IP License Agreements), financial resources, name recognition and know-how resulting from the previous management of our business, our Continuing Equity Owners could have a significant competitive advantage over us should it decide to utilize these resources to engage in the type of business we conduct, which may cause our operating results and financial condition to be materially adversely affected.

***We are controlled by the Continuing Equity Owners, whose interests may differ from those of our public stockholders.***

Immediately following this offering and the application of net proceeds from this offering, the Continuing Equity Owners will control approximately 92.2% of the combined voting power of our common stock through their ownership of both Class A common stock and Class B-1 common stock. The Continuing Equity Owners will, for the foreseeable future, have the ability to substantially influence us through their ownership position over corporate management and affairs. The Continuing Equity Owners

56

are able to, subject to applicable law, and the voting arrangements described in "Certain Relationships and Related Party Transactions," elect a majority of the members of our board of directors and control actions to be taken by us and our board of directors, including amendments to our certificate of incorporation and bylaws and approval of significant corporate transactions, including mergers and sales of substantially all of our assets. The directors so elected will have the authority, subject to the terms of our indebtedness and applicable rules and regulations, to issue additional stock, implement stock repurchase programs, declare dividends and make other decisions. It is possible that the interests of the Continuing Equity Owners may in some circumstances conflict with our interests and the interests of our other stockholders, including you. For example, the Continuing Equity Owners may have different tax positions from us, especially in light of the Tax Receivable Agreement, that could influence our decisions regarding whether and when to dispose of assets, whether and when to incur new or refinance existing indebtedness, and whether and when we should terminate the Tax Receivable Agreement and accelerate its obligations thereunder. In addition, the determination of future tax reporting positions and the structuring of future transactions may take into consideration the Continuing Equity Owners' tax or other considerations, which may differ from the considerations of us or our other stockholders. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement."

***Certain of our officers and directors may have actual or potential conflicts of interest because of their positions with our Continuing Equity Owners.***

Following this offering, Julian Nebreda, Lisa Krueger, Barbara Humpton, Emma Falck, Axel Meier, Chris Shelton and Simon Smith will serve on our board of directors and will retain their positions with AES, Siemens, or QIA, as applicable. These individuals' holdings in and compensation from the Continuing Equity Owners may be significant for some of these persons. Their positions at AES, Siemens, or QIA, their compensation from AES, Siemens or QIA and the ownership of any equity or equity awards in AES, Siemens, or QIA, as applicable, may create the appearance of conflicts of interest when these individuals are faced with decisions that could have different implications for our Continuing Equity Owners than the decisions have for us.

***We rely on our access to our Founders' brands and reputation, some of our Founders' relationships, and the brands and reputations of unaffiliated third parties.***

We believe the association with our Founders has contributed to our building relationships with our customers due to their recognized brands and products, as well as resources such as their intellectual property and access to third parties' intellectual property. Any perceived loss of our Founders' scale, capital base and financial strength as a result of this offering, or any actual loss in the future, may prompt business partners to reprice, modify or terminate their relationships with us. In addition, our Founders' reduction of their ownership of our company may cause some of our existing agreements and licenses to be terminated. We cannot predict with certainty the effect that this offering will have on our business.

***Third parties may seek to hold us responsible for liabilities of our Founders, which could result in a decrease in our income.***

Third parties may seek to hold us responsible for our Founders' liabilities. If those liabilities are significant and we are ultimately held liable for them, we cannot assure that we will be able to recover the full amount of our losses from our Founders.

***We may be required to pay additional taxes as a result of partnership tax audit rules.***

We may be required to pay additional taxes as a result of partnership audit rules under U.S. federal and other applicable income tax law. The Bipartisan Budget Act of 2015 changed the rules applicable to U.S. federal income tax audits of partnerships, including entities such as Fluence Energy, LLC. Under these rules (which generally are effective for taxable years beginning after December 31, 2017), subject to certain exceptions, audit adjustments to items of income, gain, loss, deduction, or credit of an entity (and any holder's share thereof) are determined, and taxes, interest, and penalties attributable thereto, are assessed and collected, at the partnership level. Although there is uncertainty about how these rules will continue to be implemented, it is possible that they could result in Fluence Energy, LLC (or any of its subsidiaries that are

or have been treated as partnerships for U.S. federal income tax purposes) being required to pay additional taxes, interest, and penalties as a result of an audit adjustment, and we, as an owner of Fluence Energy, LLC (or as an indirect owner of such other entities), could be required to indirectly bear the economic burden of those taxes, interest, and penalties even if they relate to periods prior to this offering and even though we may not otherwise have been required to pay additional corporate-level taxes as a result of the related audit adjustment.

***We may incur certain tax liabilities attributable to the Blocker Company as a result of the transactions contemplated to occur in connection with this offering.***

In connection with the Transactions and pursuant to the Blocker Mergers, the Blocker Company will merge with and into us. See "Our Organizational Structure." As the successor to the Blocker Company, we will generally succeed to and be responsible for any outstanding or historical liabilities, including tax liabilities, of the Blocker Company, including any liabilities that might be incurred as a result of the Blocker Mergers. Any such liabilities for which we are responsible could have an adverse effect on our liquidity and financial condition.

***We may not achieve some or all of the anticipated benefits of being a standalone public company.***

We may not be able to achieve all of the anticipated strategic and financial benefits expected as a result of being a standalone public company, or such benefits may be delayed or not occur at all. These anticipated benefits include the following:

- allowing investors to evaluate the distinct merits, performance and future prospects of our business, independent of our Founders' other businesses;

- improving our strategic and operational flexibility and increasing management focus as we continue to implement our strategic plan and allowing us to respond more effectively to the competitive environment for our business;

- allowing us to adopt a capital structure better suited to our financial profile and business needs, without competing for capital with our Founders' other businesses;

- creating an independent equity structure that will facilitate our ability to effect future acquisitions utilizing our capital stock; and

- facilitating incentive compensation arrangements for employees more directly tied to the performance of our business, and enhancing employee hiring and retention by, among other things, improving the alignment of management and employee incentives with performance and growth objectives of our business.

We may not achieve the anticipated benefits of being a standalone public company for a variety of reasons, and it could adversely affect our operating results and financial condition.

***The services that we receive from our Founders may not be sufficient for us to operate our business, and we would likely incur significant incremental costs if we lost access to our Founders' services.***

Because we have not operated as an independent company, we have obtained, and will need to continue to obtain, services from our Founders relating to many important corporate functions including the support we receive from AES relating to clean energy project development and the access Siemens provides to its global sales channels, among various others. We will pay our Founders mutually agreed-upon fees for these services, which will be based on their costs of providing the services.

If we lost access to the services provided to us by certain of our Founders, we would need to replicate or replace certain functions, systems, and infrastructure. We may also need to make investments or hire additional employees to operate without the same access to our Founders' existing operational infrastructure and wide-ranging support. These initiatives may be costly to implement. Due to the scope and complexity of the underlying projects relative to these efforts, the amount of total costs could be materially higher than our estimate, and the timing of the incurrence of these costs could be subject to change.

58

We may not be able to replace these services or enter into appropriate third-party agreements on terms and conditions, including cost, comparable to those that we have received in the past and will continue to receive from our Founders. Additionally, if the agreements pursuant to which such services are provided are terminated, we may be unable to sustain the services at the same levels or obtain the same benefits as when we were receiving such services and benefits from our Founders. If we have to operate these functions separately, if we do not have our own adequate systems and business functions in place or if we are unable to obtain them from other providers, we may not be able to operate our business effectively or at comparable costs, and our profitability may decline. In addition, we have historically received informal support from certain of our Founders. The level of this informal support could diminish or be eliminated following this offering.

While we are controlled by our Continuing Equity Owners, we may not have the leverage to negotiate amendments to our agreements with our Founders, if required, on terms as favorable to us as those we would negotiate with an unaffiliated third party.

***Our historical financial results are not necessarily representative of the results we have or may achieve as a standalone company and may not be a reliable indicator of our future results.***

Our historical financial results included in this prospectus do not reflect the financial condition, results of operations or cash flows we would have achieved as a standalone company during the periods presented or those we will achieve in the future. This is primarily the result of the following factors:

- our historical financial results reflect charges for the use of certain proprietary and third-party intellectual property licensed or sublicensed from certain of our Founders under a prior intercompany intellectual property license agreement;

- our cost of potential future debt and our capital structure will be different from that reflected in our historical financial statements;

- we will incur additional ongoing costs as a result of this offering, including costs related to public company reporting, investor relations, and compliance with the Sarbanes-Oxley Act; and

- this offering may have a material effect on our relationship with our players and our other business relationships, including supplier relationships.

Our financial condition and future results of operations could be materially different from amounts reflected in our historical financial statements included elsewhere in this prospectus, so it may be difficult for investors to compare our future results to historical results or to evaluate our relative performance or trends in our business.

Similarly, the pro forma financial information included in this prospectus includes adjustments based upon available information we believe to be reasonable. However, the assumptions may change and actual results may differ. In addition, we have not made pro forma adjustments to reflect changes that will occur in our cost structure, funding, and operations as a result of our transition to becoming a public company, including any changes that may occur in our employee base, potential increased costs associated with reduced economies of scale and increased costs associated with being a publicly traded, standalone company.

**Risks Related to Our Organizational Structure**

***Our principal asset after the completion of this offering will be our interest in Fluence Energy, LLC, and, as a result, we will depend on distributions from Fluence Energy, LLC to pay our taxes and expenses, including payments under the Tax Receivable Agreement. Fluence Energy, LLC's ability to make such distributions may be subject to various limitations and restrictions.***

Upon the consummation of this offering and the Transactions, we will be a holding company and will have no material assets other than our ownership of LLC Interests. As such, we will have no independent means of generating revenue or cash flow, and our ability to pay our taxes and operating expenses or declare and pay dividends in the future, if any, will be dependent upon the financial results and cash flows of Fluence Energy, LLC and its subsidiaries and distributions we receive from Fluence Energy, LLC. There can be no assurance that Fluence Energy, LLC and its subsidiaries will generate sufficient cash flow to

59

distribute funds to us or that applicable state law and contractual restrictions, including negative covenants in our debt instruments, will permit such distributions. Although Fluence Energy, LLC is not currently subject to any debt instruments or other agreements that would restrict its ability to make distributions to us, our future debt agreements, including our Revolver, may restrict the ability of our subsidiaries to pay dividends to Fluence Energy, LLC.

Fluence Energy, LLC will continue to be treated as a partnership for U.S. federal income tax purposes and, as such, generally will not be subject to any entity-level U.S. federal income tax. Instead, any taxable income of Fluence Energy, LLC will be allocated to holders of LLC Interests, including us. Accordingly, we will incur income taxes on our allocable share of any net taxable income of Fluence Energy, LLC. Following this offering, we expect to use distributions from Fluence Energy, LLC to fund any payments that we will be required to make under the Tax Receivable Agreement. Under the terms of the Fluence Energy LLC Agreement, Fluence Energy, LLC will be obligated, subject to various limitations and restrictions, including with respect to our debt agreements, to make tax distributions to holders of LLC Interests, including us, although tax distributions may not be paid in whole or in part in certain circumstances, including if Fluence Energy, LLC does not have available cash to make such distributions. In addition to tax expenses, we will also incur expenses related to our operations, including payments under the Tax Receivable Agreement, which we expect could be significant. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." We intend, as its managing member, to cause Fluence Energy, LLC to make cash distributions to the holders of LLC Interests in an amount sufficient to (1) fund all or part of their tax obligations in respect of taxable income allocated to them and (2) cover our operating expenses, including payments under the Tax Receivable Agreement. However, Fluence Energy, LLC's ability to make such distributions may be subject to various limitations and restrictions, such as restrictions on distributions that would either violate any contract or agreement to which Fluence Energy, LLC is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering Fluence Energy, LLC insolvent. If we do not have sufficient funds to pay tax or other liabilities, or to fund our operations (including, if applicable, as a result of an acceleration of our obligations under the Tax Receivable Agreement), we may have to borrow funds, which could materially and adversely affect our liquidity and financial condition, and subject us to various restrictions imposed by any lenders of such funds. To the extent we are unable to make timely payments under the Tax Receivable Agreement for any reason, such payments generally will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement resulting in the acceleration of payments due under the Tax Receivable Agreement. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement" and "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement." In addition, if Fluence Energy, LLC does not have sufficient funds to make distributions, our ability to declare and pay cash dividends will also be restricted or impaired. See "—Risks related to the offering and ownership of our Class A common stock" and "Dividend Policy."

As a result of (1) potential differences in the amount of net taxable income allocable to us and to Fluence Energy, LLC's other equityholders, (2) the lower tax rate applicable to corporations as opposed to individuals, and (3) certain tax benefits that we anticipate from (a) future redemptions or exchanges of LLC Interests from the Founders, (b) payments under the Tax Receivable Agreement and (c) certain other transactions, tax distributions to us may be in amounts that exceed our tax liabilities. Our board of directors will determine the appropriate uses for any excess cash so accumulated, which may include, among other uses, the payment of obligations under the Tax Receivable Agreement. We will have no obligation to distribute such cash (or other available cash) to our stockholders. No adjustments to the redemption or exchange ratio or price for LLC Interests and corresponding shares of Class B-1 or Class B-2 common stock will be made as a result of any cash distribution by us or any retention of cash by us. To the extent we do not distribute such excess cash as dividends on our Class A common stock, we may take other actions with respect to such excess cash, for example, holding such excess cash, or lending it (or a portion thereof) to Fluence Energy, LLC or its subsidiaries, which may result in shares of our Class A common stock increasing in value relative to the value of LLC Interests. The holders of LLC Interests may benefit from any value attributable to such cash balances or loan receivables if they acquire shares of Class A common stock in exchange for their LLC Interests or otherwise exercise their rights to redeem or exchange their LLC Interests, notwithstanding that such holders may have participated previously as holders of LLC Interests in distributions by Fluence Energy, LLC that resulted in the excess cash balances.

60

***The Tax Receivable Agreement with the Founders requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and we expect that such payments will be substantial.***

In connection with the consummation of this offering, we will enter into a Tax Receivable Agreement with Fluence Energy, LLC and the Founders. Under the Tax Receivable Agreement, we will be required to make cash payments to such Founders equal to 85% of the tax benefits, if any, that we actually realize, or in certain circumstances are deemed to realize, as a result of (1) the increases in our share of the tax basis of assets of Fluence Energy, LLC and its subsidiaries resulting from any future redemptions or exchanges of LLC Interests from the Founders as described under "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement" and certain distributions (or deemed distributions) by Fluence Energy, LLC; and (2) certain other tax benefits arising from payments under the Tax Receivable Agreement. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under any future debt agreements. We expect that the amount of the cash payments we will be required to make under the Tax Receivable Agreement will be substantial. Based on certain assumptions described in "Unaudited Pro Forma Consolidated Financial Information", we estimate our Founders will be entitled to receive payments under the Tax Receivable Agreement (assuming all Founders exchange their LLC Interests for shares of Class A common stock on the date of this offering) totaling approximately $487.2 million. Any payments made by us to the Founders under the Tax Receivable Agreement will not be available for reinvestment in our business and will generally reduce the amount of overall cash flow that might have otherwise been available to us and have a substantial negative impact on our liquidity. To the extent that we are unable to make timely payments under the Tax Receivable Agreement for any reason, the unpaid amounts generally will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement resulting in the acceleration of payments due under the Tax Receivable Agreement. The payments under the Tax Receivable Agreement are not conditioned upon continued ownership of us by the redeeming or exchanging Founders. Furthermore, our future obligation to make payments under the Tax Receivable Agreement could make us a less attractive target for an acquisition, particularly in the case of an acquirer that cannot use some or all of the tax benefits that are the subject of the Tax Receivable Agreement. For more information, see "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." The actual increase in tax basis, and the actual utilization of any resulting tax benefits, as well as the amount and timing of any payments under the Tax Receivable Agreement, will vary depending upon a number of factors: including the timing of redemptions of exchanges by the Founders; the price of shares of our Class A common stock at the time of the exchange; the extent to which such redemptions or exchanges are taxable; the amount of gain recognized by such Founders; the amount and timing of the taxable income allocated to us or otherwise generated by us in the future; the portion of our payments under the Tax Receivable Agreement constituting imputed interest; and the federal and state tax rates then applicable.

***Our organizational structure, including the Tax Receivable Agreement, confers certain benefits upon the Founders that will not benefit holders of our Class A common stock to the same extent that it will benefit the Founders.***

Our organizational structure, including the Tax Receivable Agreement, confers certain benefits upon the Founders that will not benefit the holders of our Class A common stock to the same extent that it will benefit such Founders. We will enter into the Tax Receivable Agreement with Fluence Energy, LLC and certain Founders in connection with the completion of this offering and the Transactions, which will provide for the payment by us to such Founders of 85% of the amount of tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize, as a result of (1) the increases in our share of the tax basis of assets of Fluence Energy, LLC and its subsidiaries resulting from any future redemptions or exchanges of LLC Interests from the Founders as described under "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement" and certain distributions (or deemed distributions) by Fluence Energy, LLC and (2) certain other tax benefits arising from payments under the Tax Receivable Agreement. See "Certain Relationships and Related Party Transactions—Tax Receivable Agreement." Although we will retain 15% of the amount of such tax benefits, this and other aspects of our organizational structure may adversely impact the future trading market for the Class A common stock.

61

***In certain cases, payments under the Tax Receivable Agreement may be accelerated or significantly exceed any actual benefits we realize in respect of the tax attributes subject to the Tax Receivable Agreement.***

The Tax Receivable Agreement will provide that if (1) we materially breach any of our material obligations under the Tax Receivable Agreement and the Continuing Equity Owners elect an early termination of the Tax Receivable Agreement, (2) certain mergers, asset sales, other forms of business combinations or other changes of control were to occur after the consummation of this offering and the Continuing Equity Owners elect an early termination of the Tax Receivable Agreement, or (3) we elect, at any time, an early termination of the Tax Receivable Agreement, then our obligations, or our successor's obligations, under the Tax Receivable Agreement to make payments would be based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement.

As a result of the foregoing, we would be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, based on certain assumptions, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. We could also be required to make cash payments to the Founders that are greater than the specified percentage of any actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring, or preventing certain mergers, asset sales, other forms of business combinations or other changes of control. There can be no assurance that we will be able to fund or finance our obligations under the Tax Receivable Agreement. To the extent we are unable to make timely payments under the Tax Receivable Agreement for any reason, such payments generally will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement resulting in the acceleration of payments due under the Tax Receivable Agreement. We may need to incur debt to finance payments under the Tax Receivable Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

***We will not be reimbursed for any payments made under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, and the U.S. Internal Revenue Service, or the IRS, or another tax authority, may challenge all or part of the tax basis increases or other tax benefits we claim, as well as other related tax positions we take, and a court could sustain such challenge. If the outcome of any audit of us or our subsidiaries is reasonably expected to adversely affect the rights and obligations of the Continuing Equity Owners under the Tax Receivable Agreement in a material respect, then we will notify the Continuing Equity Owners of such audit, keep them reasonably informed with respect thereto, provide them with a reasonable opportunity to provide information and other input concerning the audit or the relevant portion thereof and consider such information and other input in good faith. The interests of such Founders in any such challenge may differ from or conflict with our interests and your interests, and the Founders may exercise their rights relating to any such challenge in a manner adverse to our interests and your interests. We will not be reimbursed for any cash payments previously made under the Tax Receivable Agreement in the event that any tax benefits initially claimed by us and for which payment has been made are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us will be netted against any future cash payments we might otherwise be required to make to the applicable Founder under the terms of the Tax Receivable Agreement. However, we might not determine that we have effectively made an excess cash payment to a Founder for a number of years following the initial time of such payment and, if any of our tax reporting positions are challenged by a taxing authority, we will not be permitted to reduce any future cash payments under the Tax Receivable Agreement until any such challenge is finally settled or determined. Moreover, the excess cash payments we made previously under the Tax Receivable Agreement could be greater than the amount of future cash payments against which we would otherwise be permitted to net such excess. The applicable U.S. federal income tax rules for determining applicable tax benefits we may claim are complex and factual in nature, and there can be no assurance that the IRS or a court will not disagree with our tax reporting positions. As a result, payments could be made

62

under the Tax Receivable Agreement significantly in excess of any actual cash tax savings that we realize in respect of the tax attributes that are the subject of the Tax Receivable Agreement.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our results of operations and financial condition.***

We are subject to taxes by the U.S. federal, state, local, and foreign tax authorities. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- allocation of expenses to and among different jurisdictions;

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, tax treaties, regulations or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other taxes by U.S. federal, state, and local, and foreign taxing authorities. Outcomes from these audits could have an adverse effect on our operating results and financial condition.

***If we were deemed to be an investment company under the Investment Company Act of 1940, as amended, or the 1940 Act, including as a result of our ownership of Fluence Energy, LLC, applicable restrictions could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.***

Under Sections 3(a)(1)(A) and (C) of the 1940 Act, a company generally will be deemed to be an "investment company" for purposes of the 1940 Act if (1) it is, or holds itself out as being, engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting or trading in securities, or (2) it engages, or proposes to engage, in the business of investing, reinvesting, owning, holding or trading in securities and it owns or proposes to acquire investment securities having a value exceeding 40% of the value of its total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. We do not believe that we are an "investment company," as such term is defined in either of those sections of the 1940 Act.

We and Fluence Energy, LLC intend to conduct our operations so that we will not be deemed an investment company. As the sole managing member of Fluence Energy, LLC, we will control and operate Fluence Energy, LLC. On that basis, we believe that our interest in Fluence Energy, LLC is not an "investment security" as that term is used in the 1940 Act. However, if we were to cease participation in the management of Fluence Energy, LLC, or if Fluence Energy, LLC itself becomes an investment company, our interest in Fluence Energy, LLC could be deemed an "investment security" for purposes of the 1940 Act.

We and Fluence Energy, LLC intend to conduct our operations so that we will not be deemed an investment company. If it were established that we were an unregistered investment company, there would be a risk that we would be subject to monetary penalties and injunctive relief in an action brought by the SEC, that we would be unable to enforce contracts with third parties and that third parties could seek to obtain rescission of transactions undertaken during the period it was established that we were an unregistered investment company. If we were required to register as an investment company, restrictions imposed by the 1940 Act, including limitations on our capital structure and our ability to transact with affiliates, could make it impractical for us to continue our business as contemplated and could have a material adverse effect on our business.

63

**General Risk Factors**

***We will incur significant costs as a result of operating as a public company.***

Prior to this offering, we operated on a private basis. After this offering, we will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Act, the listing requirements of the exchange on which our securities are listed and other applicable securities laws and regulations. The expenses incurred by public companies generally for reporting and corporate governance purposes have been increasing. We expect these rules and regulations to increase our legal and financial compliance costs and to make some activities more difficult, time-consuming, and costly, although we are currently unable to estimate these costs with any degree of certainty. We also expect that being a public company and being subject to new rules and regulations will make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These laws and regulations could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, our board committees or as our executive officers. Furthermore, if we are unable to satisfy our obligations as a public company, we could be subject to delisting of our Class A common stock, fines, sanctions, and other regulatory action and potentially civil litigation. These factors may, therefore, strain our resources, divert management's attention, and affect our ability to attract and retain qualified board members.

***As a result of becoming a public company following our IPO, we will be obligated to develop and maintain proper and effective internal control over financial reporting in order to comply with Section 404 of the Sarbanes-Oxley Act. We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective, which may adversely affect investor confidence in us and, as a result, the value of our common stock. In addition, because of our status as an emerging growth company, you will not be able to depend on any attestation from our independent registered public accountants as to our internal control over financial reporting for the foreseeable future.***

We will become a public company following our IPO, and we will be required by Section 404 of the Sarbanes-Oxley Act to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting as of the year ending September 30, 2022. The process of designing and implementing internal control over financial reporting required to comply with this requirement will be time-consuming, costly, and complicated. If during the evaluation and testing process we identify one or more other material weaknesses in our internal control over financial reporting or determine that existing material weaknesses have not been remediated, our management will be unable to assert that our internal control over financial reporting is effective. In addition, if we fail to achieve and maintain the adequacy of our internal controls, as such standards are modified, supplemented, or amended from time to time, we may not be able to ensure that we can conclude on an ongoing basis that we have effective internal controls over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act.

Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may issue a report that is qualified if it is not satisfied with our controls or the level at which our controls are documented, designed, operated, or reviewed. However, our independent registered public accounting firm will not be required to attest formally to the effectiveness of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act until the later of the filing of our second annual report following the completion of our IPO or the date we are no longer an "emerging growth company," as defined in the JOBS Act. Accordingly, you will not be able to depend on any attestation concerning our internal control over financial reporting from our independent registered public accountants for the foreseeable future.

During the fiscal year ended September 30, 2020, a material weakness in the internal control over revenue recognition process has been identified. The design and implementation of controls has not been sufficient to adequately interpret ASC 606 in the design of the accounting policy related to in-transit and delivered, but uninstalled equipment. We are in the process of developing a remediation plan which includes, without limitation, i) hiring additional experienced accounting, financial reporting and internal control personnel as we transition to being a public company and are required to comply with Section 404 of the Sarbanes-Oxley Act, ii) implementing controls to enhance our review of significant accounting transactions

64

and other new technical accounting and financial reporting issues and preparing and reviewing accounting memoranda addressing these issues, and iii) implementing controls to enable an effective and timely review of account analyses and account reconciliations. We have recently hired additional resources, and we are engaging with a third-party consulting firm to assist us with our formal internal control plan and provide staff augmentation of our internal audit function.

The material weaknesses will not be considered remediated until management designs and implements effective controls that operate for a sufficient period of time and management has concluded, through testing, that these controls are effective.

We and our independent registered public accounting firm were not required to, and did not, perform an evaluation of our internal control over financial reporting as of September 30, 2020, in accordance with Section 404(b) of the Sarbanes-Oxley Act. Accordingly, we cannot assure you that we have identified all, or that we will not in the future have additional, material weaknesses. Material weaknesses may still exist when we report on the effectiveness of our internal control over financial reporting as required under Section 404 of the Sarbanes-Oxley Act.

We cannot be certain as to the timing of completion of our evaluation, testing, and any remediation actions or the impact of the same on our operations. If we are not able to implement the requirements of Section 404 of the Sarbanes-Oxley Act in a timely manner or with adequate compliance, our independent registered public accounting firm may issue an adverse opinion due to ineffective internal controls over financial reporting, and we may be subject to sanctions or investigation by regulatory authorities, such as the SEC. As a result, there could be a negative reaction in the financial markets due to a loss of confidence in the reliability of our financial statements. In addition, we may be required to incur costs in improving our internal control system and the hiring of additional personnel. Any such action could negatively affect our results of operations and cash flows.

***Our management team has limited experience managing a public company.***

Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage us as a public company that is subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, results of operations and financial condition. See "—We will incur significant costs as a result of operating as a public company."

***Future litigation or administrative proceedings could have a material adverse effect on our business, financial condition, and results of operations.***

We have been and continue to be involved in legal proceedings, administrative proceedings, claims, and other litigation. In addition, since our energy storage product is a new type of product in a nascent market, we have in the past needed and may in the future need to seek the amendment of existing regulations or, in some cases, the creation of new regulations, in order to operate our business in some jurisdictions. Such regulatory processes may require public hearings concerning our business, which could expose us to subsequent litigation. Unfavorable outcomes or developments relating to proceedings to which we are a party or transactions involving our products and services, such as judgments for monetary damages, injunctions, or denial or revocation of permits, could have a material adverse effect on our business, financial condition, and results of operations. In addition, settlement of claims could adversely affect our financial condition and results of operations.

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements. All statements other than statements of historical facts contained in this prospectus may be forward-looking statements. Statements regarding our future results of operations and financial position, business strategy and plans, and objectives of management for future operations, including, among others, statements regarding the Transactions, including the consummation of this offering, expected growth, future capital expenditures and debt service obligations, are forward-looking statements. In some cases, you can identify forward-looking statements by terms, such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "targets," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. Accordingly, we caution you that any such forward-looking statements are not guarantees of future performance and are subject to risks, assumptions, and uncertainties that are difficult to predict. Although we believe that the expectations reflected in these forward-looking statements are reasonable as of the date made, actual results may prove to be materially different from the results expressed or implied by the forward-looking statements.

There are or will be important factors that could cause our actual results to differ materially from those indicated in these forward-looking statements. Forward-looking statements contained in this prospectus include, but are not limited to, the following:

- our future financial performance, including our ability to achieve or maintain profitability;

- our ability to successfully execute our business and growth strategy;

- the sufficiency of our cash and cash equivalents to meet our liquidity needs;

- our ability to attract and retain customers;

- our ability to develop new offerings and services, including digital applications;

- our ability to optimize sales channels and market segmentation;

- our ability to compete with existing and new competitors in existing and new markets and offerings;

- the impact of the COVID-19 pandemic on our ground operations at project sites, our manufacturing facilities and our suppliers and vendors;

- our ability to maintain customer contracts due to events and incidents relating to storage, delivery, installation, operation and shutdowns of our energy storage products, including events and incidents outside of our control;

- our ability to prevent defects, errors, or bugs in hardware or software of our products and technology as well as any product liability or other claims;

- our expectations regarding the effects of existing and developing laws and regulations;

- our expectations regarding our global growth;

- our expectations regarding the size and growth of our existing and future markets in which we compete;

- our expectations concerning our relationships with third parties;

- our ability to maintain, protect, and enhance our intellectual property;

- the increased expenses associated with being a public company;

- our use of proceeds from this offering; and

- the significant influence the Continuing Equity Owners will have over us after the Transactions, including control over decisions that require the approval of stockholders.

The outcome of the events described in these forward-looking statements is subject to risks, uncertainties, and other factors described in the section titled "Risk Factors" and elsewhere in this prospectus. If one or more events related to such risks or uncertainties materialize, or if our underlying assumptions prove to be incorrect, actual results may differ materially from what we anticipate. Many of the important

66

factors that will determine these results are beyond our ability to control or predict. Accordingly, you should not place undue reliance on any such forward-looking statements. In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and you are cautioned not to unduly rely upon these statements. Any forward-looking statement speaks only as of the date on which it is made, and, except as otherwise required by law, we do not undertake any obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise. New factors emerge from time to time, and it is not possible for us to predict which will arise. In addition, we cannot assess the impact of each factor on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements.

## OUR ORGANIZATIONAL STRUCTURE

Fluence Energy, Inc., a Delaware corporation, was formed on June 21, 2021 and is the issuer of the Class A common stock offered by this prospectus. Prior to this offering and the Transactions (as defined below), all of our business operations have been conducted through Fluence Energy, LLC and its direct and indirect subsidiaries and the Original LLC Owners are the only owners of Fluence Energy, LLC. We will consummate the Transactions, excluding this offering, prior to the consummation of this offering.

### Existing Organization

Fluence Energy, LLC is treated as a partnership for U.S. federal income tax purposes and, as such is generally not subject to any U.S. federal entity-level income taxes. Taxable income or loss of Fluence Energy, LLC is included in the U.S. federal income tax returns of Fluence Energy, LLC's members. Prior to the consummation of this offering, the Original LLC Owners were the only members of Fluence Energy, LLC.

### Transactions

Prior to the Transactions, we expect there will initially be one holder of common stock of Fluence Energy, Inc. We will consummate the following organizational transactions in connection with this offering:

- we will amend and restate the existing limited liability company agreement of Fluence Energy, LLC, which will become effective prior to the consummation of this offering, to, among other things, (1) recapitalize all existing ownership interests in Fluence Energy, LLC into 135,666,665 LLC Interests and (2) appoint Fluence Energy, Inc. as the sole managing member of Fluence Energy, LLC upon its acquisition of LLC Interests in connection with this offering;

- we will amend and restate Fluence Energy, Inc.'s certificate of incorporation to, among other things, provide (1) for Class A common stock, with each share of our Class A common stock entitling its holder to one vote per share on all matters presented to our stockholders generally, (2) for Class B-1 common stock, with each share of our Class B-1 common stock entitling its holder to five votes per share on all matters presented to our stockholders generally, (3) for Class B-2 common stock, with each share of our Class B-2 common stock entitling its holder to one vote per share on all matters presented to our stockholders generally, and that shares of our Class B-1 and Class B-2 common stock may only be held by the Founders and their respective permitted transferees as described in "Description of Capital Stock—Common Stock—Class B-1 and Class B-2 Common Stock;"

- we will acquire, by means of one or more mergers, the Blocker Company and will issue to the Blocker Shareholder 18,493,275 shares of our Class A common stock as consideration in the Blocker Mergers;

- we will issue 117,173,390 shares of our Class B-1 common stock to the Founders, which is equal to the number of LLC Interests held by such Founders, for nominal consideration;

- we will issue 31,000,000 shares of our Class A common stock to the purchasers in this offering (or 35,650,000 shares if the underwriters exercise in full their option to purchase additional shares of Class A common stock) in exchange for net proceeds of approximately $650.9 million (or approximately $750.0 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock) based upon an assumed initial public offering price of $22.50 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), less the underwriting discount and estimated offering expenses payable by us;

- Fluence Energy, LLC intends to use the net proceeds from the sale of LLC Interests to Fluence Energy, Inc. to repay all outstanding borrowings under our existing Line of Credit and the Promissory Notes, and the remainder for working capital and other general corporate purposes, as described under "Use of Proceeds;" and

- Fluence Energy, Inc. and the Continuing Equity Owners will enter into (1) the Stockholders Agreement and (2) the Registration Rights Agreement, and Fluence Energy, Inc., Fluence Energy, LLC and the Founders will enter into the Tax Receivable Agreement. For a description of the terms of the Stockholders Agreement, the Registration Rights Agreement and the Tax Receivable Agreement, see "Certain Relationships and Related Party Transactions."

68

**Organizational Structure Following the Transactions**

Immediately following the consummation of the Transactions (including this offering):

- Fluence Energy, Inc. will be a holding company and its principal asset will consist of LLC Interests it purchases directly from Fluence Energy, LLC and acquires indirectly from the Blocker Shareholder;

- Fluence Energy, Inc. will be the sole managing member of Fluence Energy, LLC and will control the business and affairs of Fluence Energy, LLC and its direct and indirect subsidiaries;

- Fluence Energy, Inc. will own, directly or indirectly, 49,493,275 LLC Interests of Fluence Energy, LLC, representing approximately 29.7% of the economic interest in Fluence Energy, LLC (or 54,143,275 LLC Interests, representing approximately 31.6% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the Founders will own (1) 117,173,390 LLC Interests of Fluence Energy, LLC, representing approximately 70.3% of the economic interest in Fluence Energy, LLC (or 117,173,390 LLC Interests, representing approximately 68.4% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (2) 117,173,390 shares of Class B-1 common stock of Fluence Energy, Inc., representing approximately 92.2% of the combined voting power of all of Fluence Energy, Inc.'s common stock (or 117,173,390 shares of Class B-1 common stock of Fluence Energy, Inc., representing approximately 91.5% if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- The Blocker Shareholder will own (1) 18,493,275 shares of Class A common stock of Fluence Energy, Inc. (or 18,493,275 shares of Class A common stock of Fluence Energy, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 2.9% of the combined voting power of all of Fluence Energy, Inc.'s common stock and approximately 37.4% of the economic interest in Fluence Energy, Inc. (or approximately 2.9% of the combined voting power and approximately 34.2% of the economic interest if the underwriters exercise in full their option to purchase additional shares of Class A common stock) and (2) directly and indirectly through Fluence Energy, Inc.'s ownership of LLC Interests, approximately 11.1% of the economic interest in Fluence Energy, LLC (or approximately 10.8% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock);

- the purchasers in this offering will own (1) 31,000,000 shares of Class A common stock of Fluence Energy, Inc. (or 35,650,000 shares of Class A common stock of Fluence Energy, Inc. if the underwriters exercise in full their option to purchase additional shares of Class A common stock), representing approximately 4.9% of the combined voting power of all of Fluence Energy, Inc.'s common stock and approximately 62.6% of the economic interest in Fluence Energy, Inc. (or approximately 5.6% of the combined voting power and approximately 65.8% of the economic interest if the underwriters exercise in full their option to purchase additional shares of Class A common stock), and (2) through Fluence Energy, Inc.'s ownership of LLC Interests, indirectly will hold approximately 18.6% of the economic interest in Fluence Energy, LLC (or approximately 20.8% of the economic interest in Fluence Energy, LLC if the underwriters exercise in full their option to purchase additional shares of Class A common stock); and

- we will have 23,988,372 shares of Class A common stock reserved for issuance pursuant to awards under our incentive compensation plans. See "Executive Compensation — Equity Compensation".

Our post-offering organizational structure, as described above, is commonly referred to as an umbrella partnership-C-corporation (or Up-C) structure. This organizational structure will allow our Founders to retain their equity ownership in Fluence Energy, LLC, an entity that is classified as a partnership for U.S. federal income tax purposes, in the form of LLC Interests. Investors in this offering and the Blocker Shareholder will, by contrast, hold their equity ownership in Fluence Energy, Inc., a Delaware corporation that is a domestic corporation for U.S. federal income tax purposes, in the form of shares of Class A common

69

stock. This approach provides the Founders with the tax treatment of continuing to own interests in a pass-through structure and provides potential future tax benefits for both Fluence Energy, Inc. and the Founders when the Founders ultimately redeem their LLC Interests for shares of Class A common stock or cash from the sale of newly issued shares of Class A common stock. One of the tax benefits to the Founders associated with this structure is that the portion of Fluence Energy, LLC's future taxable income that is allocated to the Founders will be taxed for U.S. federal income tax purposes on a flow-through basis and therefore will not be subject to corporate income taxes for such purposes at the Fluence Energy, LLC level. Additionally, because the Founders will be entitled to have their LLC Interests redeemed for newly issued shares of our Class A common stock on a one-for-one basis or, at our option, for cash from the sale of newly issued shares of Class A common stock, the Up-C structure also provides the Founders with potential liquidity that holders of non-publicly traded limited liability companies are not typically afforded.

Fluence Energy, Inc. also expects to benefit from the Up-C structure, in general, in the form of cash tax savings in amounts equal to 15% of certain tax benefits that Fluence Energy, Inc. actually realizes (or in some circumstances is deemed to have realized) arising from Basis Adjustments (as defined below) and certain other tax benefits related to our entering into the Tax Receivable Agreement, including tax benefits attributable to payments under the Tax Receivable Agreement. Such cash tax benefits and cash tax savings generally would not be available to Fluence Energy, Inc. without the Up-C structure. The Tax Receivable Agreement is discussed in "Certain Relationships and Related Party Transactions—Tax Receivable Agreement," and the estimated payments with respect thereto are set forth in "—The Offering—Tax receivable agreement." See "Risk Factors—Risks Related to Our Company and Our Organizational Structure."

The diagram below depicts our organizational structure after giving effect to the Transactions, including this offering, assuming no exercise by the underwriters of their option to purchase additional shares of Class A common stock.



This diagram excludes shares of Class A common stock reserved for issuance under options issued pursuant to the Existing Equity Plan which will convert upon effectiveness of this offering into options to acquire shares of Class A common stock, phantom units issued pursuant to the Existing Phantom Equity Plan, which will convert into a right to receive cash or equity based upon the value of shares of Class A common stock, or shares of Class A common stock reserved for issuance under our 2021 Equity Plan.

As the sole managing member of Fluence Energy, LLC, we will operate and control all the business and affairs of Fluence Energy, LLC and, through Fluence Energy, LLC and its direct and indirect

subsidiaries, conduct our business. Following the Transactions, including this offering, Fluence Energy, Inc. will control the management of Fluence Energy, LLC as its sole managing member. As a result, Fluence Energy, Inc. will consolidate Fluence Energy, LLC and record a significant non-controlling interest in a consolidated entity in Fluence Energy, Inc.'s consolidated financial statements for the economic interest in Fluence Energy, LLC held by the Founders.

**Incorporation of Fluence Energy, Inc.**

Fluence Energy, Inc., the issuer of the Class A common stock offered by this prospectus, was incorporated as a Delaware corporation on June 21, 2021. Fluence Energy, Inc. has not engaged in any business transactions or activities to date and had no assets or liabilities during the periods presented in this prospectus, and will not engage in any activities prior to consummation of this offering except in connection with its formation and the Transactions. The amended and restated certificate of incorporation of Fluence Energy, Inc. that will become effective immediately prior to the consummation of this offering will, among other things, authorize three classes of common stock, Class A common stock, Class B-1 common stock and Class B-2 common stock, each having the terms described in "Description of Capital Stock."

**Reclassification and Amendment and Restatement of the Fluence Energy LLC Agreement**

Prior to the consummation of this offering, the existing limited liability company agreement of Fluence Energy, LLC will be amended and restated to, among other things, recapitalize its capital structure by creating a single new class of units that we refer to as "common units" and provide for a right of redemption of common units in exchange for, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq), who are disinterested), shares of our Class A common stock or cash from the sale of newly issued shares of Class A common stock. See "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement."

**Tax Receivable Agreement**

Prior to the completion of this offering, we will enter into a Tax Receivable Agreement with our Founders that provides for the payment by Fluence Energy, Inc. to such Founders of 85% of the benefits, if any, that Fluence Energy, Inc. actually realizes, or is deemed to realize (calculated using certain assumptions), as a result of (i) increases in Fluence Energy, Inc.'s allocable share of the tax basis of the assets of Fluence Energy, LLC and its subsidiaries resulting from future redemptions or exchanges of LLC Interests by the Founders and (ii) certain other tax benefits related to our entering into the Tax Receivable Agreement, including tax benefits attributable to payments under the Tax Receivable Agreement. Future redemptions or exchanges of LLC Interests are expected to result in increases in the tax basis of the assets of Fluence Energy, LLC and certain of its subsidiaries. The increases in existing tax basis and the tax basis adjustments generated over time may increase (for tax purposes) the depreciation and amortization deductions available to Fluence Energy, Inc. and, therefore, may reduce the amount of U.S. federal, state and local tax that Fluence Energy, Inc. would otherwise be required to pay in the future. Actual tax benefits realized by Fluence Energy, Inc. may differ from tax benefits calculated under the Tax Receivable Agreement as a result of the use of certain assumptions in the Tax Receivable Agreement, including the use of an assumed state and local income tax rate to calculate tax benefits. This payment obligation is an obligation of Fluence Energy, Inc. and not of Fluence Energy, LLC, and is expected to be significant. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under any future debt agreements. We expect that the amount of the cash payments we will be required to make under the Tax Receivable Agreement will be substantial. We estimate our Founders will be entitled to receive payments under the Tax Receivable Agreement (assuming all Founders exchange their LLC Interests for shares of Class A common stock on the date of this offering) totaling approximately $487.2 million. Any payments made by us to the Founders under the Tax Receivable Agreement will not be available for reinvestment in our business and will generally reduce the amount of overall cash flow that might have otherwise been available to us and have a substantial negative impact on our liquidity. To the extent that we are unable to make timely payments under the Tax Receivable Agreement for any reason, the unpaid amounts generally will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement resulting in the acceleration of payments due under the Tax Receivable Agreement. See "Certain Relationships and Related Person Transactions—Tax Receivable Agreement."

## USE OF PROCEEDS

We estimate, based upon an assumed initial public offering price of $22.50 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), that we will receive net proceeds from this offering of approximately $650.9 million (or $750.0 million if the underwriters exercise in full their option to purchase additional shares of Class A common stock), after deducting the underwriting discount and estimated offering expenses payable by us.

We intend to use the net proceeds from this offering to purchase 31,000,000 newly issued LLC Interests (or 35,650,000 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from Fluence Energy, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us.

Fluence Energy, LLC intends to use the net proceeds from the sale of LLC Interests to Fluence Energy, Inc. to repay all outstanding amounts under our existing Line of Credit and the Promissory Notes (as defined below), and the remainder for working capital and other general corporate purposes.

On August 11, 2021, Fluence Energy, LLC entered into a promissory note with each of Siemens Industry (the "Siemens Promissory Note") and AES Grid Stability, (the "AES Promissory Note" and together with the Siemens Promissory Note, the "Promissory Notes"), under which Fluence Energy, LLC received a bridge financing of an aggregate of $50.0 million. In connection with the bridge financing, Fluence Energy, LLC issued a $25.0 million promissory note to each of Siemens Industry and AES Grid Stability. The Promissory Notes are unsecured, the AES Promissory Note has a maturity date of August 11, 2022 and the Siemens Promissory Note has a maturity date of December 31, 2021. If we complete a private placement or public offering of certain equity securities prior to the maturity date, the Promissory Notes and all accrued interest thereunder will automatically and without notice be due and payable within five business days. The Promissory Notes bear interest at 2.86% per annum through and until the earliest of the maturity date thereunder and or a mandatory prepayment event (including consummation of this offering), at which time the interest rate will increase by an additional 2%. The proceeds from the Promissory Notes are being used by Fluence Energy, LLC to provide additional liquidity and to fund ongoing working capital needs.

Assuming no exercise of the underwriters' option to purchase additional shares of Class A common stock, each $1.00 increase (decrease) in the assumed initial public offering price of $22.50 per share (which is the midpoint of the estimated price range set forth on the cover page of this prospectus) would increase (decrease) the net proceeds to us from this offering by approximately $29.4 million and, in turn, the net proceeds received by Fluence Energy, LLC from the sale of LLC Interests to Fluence Energy, Inc. by $29.4 million, assuming the number of shares offered, as set forth on the cover page of this prospectus, remains the same, and after deducting the underwriting discount and estimated offering expenses payable by us.

Each 1,000,000 share increase (decrease) in the number of shares offered by us in this offering would increase (decrease) the net proceeds to us from this offering by approximately $21.3 million and, in turn, the net proceeds received by Fluence Energy, LLC from the sale of LLC Interests to Fluence Energy, Inc. by $21.3 million, assuming that the price per share for the offering remains at $22.50 (which is the midpoint of the estimated price range set forth on the cover page of this prospectus), and after deducting the underwriting discount and estimated offering expenses payable by us.

Fluence Energy, LLC will bear or reimburse Fluence Energy, Inc. for all of the expenses incurred in connection with the Transactions, including this offering.

72

## CAPITALIZATION

The following table sets forth our cash and cash equivalents, and capitalization as of June 30, 2021, as follows:

- on a historical basis for Fluence Energy, LLC and its subsidiaries; and

- a pro forma basis for Fluence Energy Inc., giving effect to the Transactions described under "Unaudited Consolidated Pro Forma Financial Information," including the Reorganization Transactions, and application of the proceeds from this offering as described in "Use of Proceeds," after deducting estimated underwriting discounts and commissions and estimated offering expenses and other related transaction costs payable by us.

For more information, please see "Our Organizational Structure," "Use of Proceeds" and "Unaudited Pro Forma Consolidated Financial Information" included elsewhere in this prospectus. You should read this information together with our consolidated financial statements and the related notes included elsewhere in this prospectus and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and other financial information contained in this prospectus.

| | As of June 30, 2021 (unaudited) | |
| --- | --- | --- |
| (in thousands, except share and per share amounts) | Fluence Energy, LLC Actual | Fluence Energy, Inc. Pro Forma As Adjusted |
| Cash and cash equivalents | $ 58,497 | $702,602 |
| Long-term debt | — | — |
| Mezzanine equity | 117,272 | — |
| **Members' equity:** | | |
| Total members' (deficit) equity | (86,459) | — |
| **Stockholders' equity:** | | |
| Class A common stock – $0.00001 par value per share, 1,200,000,000 shares authorized on a pro forma basis, 49,493,275 shares issued and outstanding on a pro forma basis | — | — |
| Class B-1 common stock – $0.00001 par value per share, 300,000,000 shares authorized on a pro forma basis, 117,173,390 shares issued and outstanding on a pro forma basis | — | 1 |
| Class B-2 common stock – $0.00001 par value per share, 300,000,000 shares authorized on a pro forma basis, no shares issued and outstanding on a pro forma basis | | |
| Additional paid in capital | — | 209,247 |
| Accumulated deficit | — | (12,577) |
| Total members'/stockholders' (deficit) equity attributable to Fluence Energy, LLC/Fluence Energy, Inc. | (86,459) | 196,672 |
| Non-controlling interest | — | 465,614 |
| **Total capitalization** | **$ 30,813** | **$662,286** |

73

**DIVIDEND POLICY**

We currently intend to retain all available funds and any future earnings to fund the development and growth of our business, and therefore we do not anticipate declaring or paying any cash dividends on our Class A common stock in the foreseeable future. Holders of our Class B-1 and Class B-2 common stock are not entitled to participate in any dividends declared by our board of directors. Furthermore, because we are a holding company, our ability to pay cash dividends on our Class A common stock depends on our receipt of cash distributions from Fluence Energy, LLC and, through Fluence Energy, LLC, cash distributions and dividends from our other direct and indirect subsidiaries. Assuming Fluence Energy, LLC makes distributions out of earnings and profits (other than tax distributions and other distributions to pay expenses) to its members in any given year, we currently expect, subject to the determination of our board of directors, to pay dividends on our Class A common stock out of the portion of such distributions remaining after our payment of taxes, Tax Receivable Agreement payments and expenses, and subject to Delaware law. Our ability to pay dividends may be restricted by the terms of any future credit agreement or any future debt or preferred equity securities of us or our subsidiaries. See "Description of Capital Stock" and "Management's Discussion and Analysis of Financial Condition and Results of Operation—Liquidity and Capital Resources." Any future determination as to the declaration and payment of dividends, if any, will be at the discretion of our board of directors and subject to compliance with contractual restrictions and covenants in the agreements governing our future indebtedness. Any such determination will also depend upon our business prospects, results of operations, financial condition, cash requirements and availability and other factors that our board of directors may deem relevant.

Accordingly, you may need to sell your shares of our Class A common stock to realize a return on your investment, and you may not be able to sell your shares at or above the price you paid for them. See "Risk Factors—Risks related to the offering and ownership of our Class A common stock—Because we have no current plans to pay regular cash dividends on our Class A common stock following this offering, you may not receive any return on investment unless you sell your Class A common stock for a price greater than that which you paid for it."

Immediately following this offering, we will be a holding company, and our principal asset will be the LLC Interests we purchase from Fluence Energy, LLC and acquire indirectly from the Blocker Shareholder. If we decide to pay a dividend in the future, we may need to cause Fluence Energy, LLC to make distributions to us in an amount sufficient to cover such dividend. If Fluence Energy, LLC makes such distributions to us, the other holders of LLC Interests will be entitled to receive pro rata distributions, although tax distributions that Fluence Energy, LLC makes may not be pro rata. See "Risk Factors—Risks related to our organizational structure—Our principal asset after the completion of this offering will be our interest in Fluence Energy, LLC, and, as a result, we will depend on distributions from Fluence Energy, LLC to pay our taxes and expenses, including payments under the Tax Receivable Agreement. Fluence Energy, LLC's ability to make such distributions may be subject to various limitations and restrictions."

74

**DILUTION**

The Founders will own LLC Interests after the Transactions, and the Blocker Shareholder will receive shares of Class A common stock in the Transactions. We have presented dilution in pro forma net tangible book value per share both before and after this offering assuming that all of the holders of LLC Interests (other than Fluence Energy, Inc.) had their LLC Interests redeemed or exchanged for newly issued shares of Class A common stock on a one-for-one basis (rather than for cash) and the automatic transfer to the Company and cancellation for no consideration of all of their shares of Class B-1 and Class B-2 common stock (which are not entitled to receive distributions or dividends, whether cash or stock from Fluence Energy, Inc.) in order to more meaningfully present the dilutive impact on the investors in this offering. We refer to the assumed redemption or exchange of all LLC Interests for shares of Class A common stock as described in the previous sentence as the Assumed Redemption.

Dilution is the amount by which the offering price paid by the purchasers of the Class A common stock in this offering exceeds the pro forma net tangible book value per share of Class A common stock after the offering. Fluence Energy, LLC's pro forma net tangible book value as of June 30, 2021 prior to this offering and after giving effect to the other Transactions and the Assumed Redemption was a deficit of $15.3 million. Pro forma net tangible book value per share prior to this offering is determined by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of Class A common stock deemed to be outstanding after giving effect to the Assumed Redemption.

If you invest in our Class A common stock in this offering, your ownership interest will be immediately diluted to the extent of the difference between the initial public offering price per share and the pro forma net tangible book value per share of our Class A common stock after this offering.

Pro forma net tangible book value per share after this offering is determined by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of Class A common stock deemed to be outstanding, after giving effect to the Transactions, including this offering and the application of the net proceeds from this offering as described in "Use of Proceeds," and the Assumed Redemption. Our pro forma net tangible book value as of June 30, 2021, after giving effect to this offering would have been approximately $616.1 million, or $3.69 per share of Class A common stock. This amount represents an immediate increase in pro forma net tangible book value of $3.58 per share to our existing stockholders and an immediate dilution in pro forma net tangible book value of approximately $18.92 per share to new investors purchasing shares of Class A common stock in this offering. We determine dilution by subtracting the pro forma net tangible book value per share after this offering from the amount of cash that a new investor paid for a share of Class A common stock. The following table illustrates this dilution:

The following table illustrates this dilution on a per share basis to new investors.

| | | |
|---|---:|---:|
| Assumed initial public offering price per share of common stock | | $22.50 |
| Pro forma net tangible book value per share as of June 30, 2021 | $(0.11) | |
| Increase per share attributable to new investors purchasing shares of common stock in this offering | 3.69 | |
| Pro forma as adjusted net tangible book value per share immediately after this offering | | 3.58 |
| Dilution in pro forma as adjusted net tangible book value per share to new common stock investors in this offering | | $18.92 |

The following table summarizes, as of June 30, 2021, after giving effect to the Transactions (including this offering) and the Assumed Redemption, the number of shares of Class A common stock purchased from us, the total consideration paid, or to be paid, to us and the average price per share paid, or to be paid, by existing owners and by the new investors. The calculation below is based on an assumed initial public offering price of $22.50 per share, which is the midpoint of the estimated price range set forth on the cover page of this prospectus, before deducting the underwriting discounts and commissions and estimated offering expenses payable by us.

75

| | Shares Purchased | | Total Consideration | | Average price per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing stockholders | 135,666,665 | 81.4% | $223,424,000 | 24.3% | $  1.65 |
| New investors | 31,000,000 | 18.6 | 697,500,000 | 75.7 | $ 22.50 |
| Total | 166,666,665 | 100% | $920,924,000 | 100% | |

Each $1.00 increase (decrease) in the assumed initial public offering price of $22.50 per share would increase (decrease) the total consideration paid by new investors and the total consideration paid by all stockholders by $29.4, assuming the number of shares offered by us and the selling stockholder, as set forth on the cover page of this prospectus, remains the same and after deducting the underwriting discounts and commissions but before estimated offering expenses.

The number of shares of our Class A common stock outstanding after this offering as shown in the tables above is based on the number of shares outstanding as of September 30, 2021, after giving effect to the Transactions and the Assumed Redemption. The discussion and tables above exclude shares of Class B-1 and Class B-2 common stock, because holders of the Class B-1 and Class B-2 common stock are not entitled to distributions or dividends, whether cash or stock, from Fluence Energy, Inc. To the extent that options are issued under our compensatory stock plans or we issue additional shares of common stock in the future, there will be further dilution to investors participating in this offering.

Except as otherwise indicated, the discussion and the tables above assume no exercise of the underwriters' option to purchase additional shares of Class A common stock. If the underwriters exercise in full their option to purchase additional shares of Class A common stock, the percentage of shares of Class A common stock held by the Continuing Equity Owners will decrease to approximately 34.2% of the total number of shares of our Class A common stock outstanding after this offering; and the number of shares held by new investors will increase to 35,650,000, or approximately 65.8% of the total number of shares of our Class A common stock outstanding after this offering.

**UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL INFORMATION**

Fluence Energy, Inc. was formed on June 21, 2021 and does not have historical financial results. Fluence Energy, Inc. currently has no assets or liabilities and has conducted no operations. The following unaudited pro forma consolidated financial information reflects the impact of this offering, after giving effect to the Transactions discussed in "Our Organizational Structure." Following the completion of the Transactions, Fluence Energy, Inc. will be a holding company whose principal asset will consist of 29.7% of the outstanding LLC Interests that it acquires directly from Fluence Energy, LLC and indirectly from the Blocker Shareholder in connection with this offering. The remaining LLC Interests will be held by the Founders. Fluence Energy, Inc. will act as the sole managing member of Fluence Energy, LLC. Fluence Energy, Inc. will operate and control the business and affairs of Fluence Energy, LLC and its direct and indirect subsidiaries, and, through Fluence Energy, LLC and its direct and indirect subsidiaries, conduct its business.

The following unaudited pro forma consolidated statements of operations for the year ended September 30, 2020 and the nine months ended June 30, 2021 give effect to the Transactions, including this offering, as if the same had occurred on October 1, 2019. The unaudited pro forma consolidated balance sheet as of June 30, 2021 presents our unaudited pro forma balance sheet giving effect to the Transactions, including this offering, as if they had occurred as of June 30, 2021.

We have derived the unaudited pro forma consolidated statement of operations and unaudited pro forma consolidated balance sheet from the consolidated financial statements of Fluence Energy, LLC and its subsidiaries included elsewhere in this prospectus. The unaudited consolidated pro forma financial information has been prepared on the basis that we will be taxed as a corporation for U.S. federal and state income tax purposes and, accordingly, will become a taxpaying entity subject to U.S. federal, state and foreign income taxes. The presentation of the unaudited consolidated pro forma financial information is prepared in conformity with Article 11 of Regulation S-X, as amended by the final rule, Release 33-10786 "Amendments to Financial Disclosures about Acquired and Disposed Businesses." The unaudited consolidated pro forma financial information has been adjusted to include Transaction Accounting Adjustments, which reflect the application of the accounting required by generally accepted accounting principles in the United States ("GAAP"), linking the effects of the transactions listed above to the Company's historical consolidated financial statements and is based on currently available information and certain estimates and assumptions. See the accompanying notes to the unaudited consolidated pro forma financial information for a discussion of assumptions made.

We refer to the adjustments related to the Transactions, including the impact of the Transactions described in "Our Organizational Structure," but excluding the adjustments related to the Offering, as the Pro Forma Transaction Adjustments.

The adjustments related to this offering, which we refer to as the Pro Forma Offering Adjustments, are described in the notes to the unaudited pro forma consolidated financial information and principally include the following:

- the amendment and restatement of the limited liability company agreement of Fluence Energy, LLC to, among other things, appoint Fluence Energy, Inc. as the sole managing member of Fluence Energy, LLC and provide certain redemption rights to the Founders;

- the issuance of 18,493,275 shares of our Class A common stock to the Blocker Shareholder in one or more mergers, pursuant to which we acquire their LLC Interests;

- the execution of the Tax Receivable Agreement and recognition of the related payable under such agreement;

- the issuance of 31,000,000 shares of our Class A common stock to the investors in this offering in exchange for net proceeds of approximately $660.9 million (based on an assumed initial public offering price of $22.50 per share, the midpoint of the estimated price range set forth on the cover page of this prospectus), after deducting the underwriting discounts and commissions but before estimated offering expenses payable by us; and

77

- the payment of fees and expenses related to this offering and the application of the net proceeds from the sale of Class A common stock in this offering to purchase LLC Interests from Fluence Energy LLC and certain Continuing Equity Owners at a purchase price per unit equal to the initial public offering price per share of Class A common stock less the underwriting discounts and commissions, with such LLC Interests representing 29.7% of the outstanding LLC Interests.

Except as otherwise indicated, the unaudited pro forma consolidated financial information presented assumes no exercise by the underwriters of their option to purchase additional shares of Class A common stock in the offering.

As a public company, we will be implementing additional procedures and processes for the purpose of addressing the standards and requirements applicable to public companies. We expect to incur additional annual expenses related to these additional procedures and processes and, among other things, additional directors' and officers' liability insurance, director fees, additional expenses associated with complying with the reporting requirements of the SEC, transfer agent fees, costs relating to additional accounting, legal and administrative personnel, increased auditing, tax and legal fees, stock exchange listing fees and other public company expenses. We have not included any pro forma adjustments relating to these costs in the information below.

The unaudited pro forma consolidated financial information is included for informational purposes only. The unaudited pro forma consolidated financial information should not be relied upon as being indicative of our results of operations or financial condition had the Transactions, including this offering, occurred on the dates assumed. The unaudited pro forma consolidated financial information also does not project our results of operations or financial position for any future period or date. The unaudited pro forma consolidated statement of operations and balance sheet should be read in conjunction with the "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

We expect to obtain an increase in the tax basis of our share of the assets of Fluence Energy, LLC and certain of its subsidiaries when common units are redeemed or exchanged by the Founders if the value of the common units redeemed or exchanged exceeds the existing tax basis of the corresponding share of the assets of Fluence Energy, LLC at the time of the redemption or exchange, and in other qualifying transactions. This increase in tax basis may have the effect of reducing the amounts that we would otherwise pay in the future to various tax authorities. The increase in tax basis may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets. In connection with the consummation of this offering, we will enter into a Tax Receivable Agreement with AES Grid Stability and Siemens Industry that will provide for the payment by us to AES Grid Stability and Siemens Industry of 85% of the amount of tax benefits, if any, that we actually realize or in some cases are deemed to realize as a result of certain increases in the tax basis of assets of Fluence Energy, LLC and its subsidiaries resulting from, redemptions or exchanges (or deemed exchanges) of LLC Interests or certain distributions (or deemed distributions) by Fluence Energy, LLC and (ii) certain additional tax benefits related to our entering into the Tax Receivable Agreement, including tax benefits attributable to payments that we make under the Tax Receivable Agreement. See "Related Party Transactions—Tax Receivable Agreement."

If all of the Founders were to exchange or redeem their LLC Interests for Class A common stock pursuant to the terms of the Fluence Energy LLC Agreement, we would recognize a deferred tax asset of approximately $811.0 million and a related liability for payments under the Tax Receivable Agreement of approximately $487.2 million, assuming, among other factors, (i) all exchanges occurred on the same day; (ii) a price of $22.50 per share of Class A common stock (the midpoint of the estimated price range set forth on the cover of this prospectus); (iii) a constant corporate tax rate of 27%; (iv) we will have sufficient taxable income to fully utilize the tax benefits; (v) Fluence Energy, LLC is able to fully depreciate or amortize its assets; and (vi) no material changes in applicable tax law. These amounts are estimates and have been prepared for informational purposes only. The actual amount of deferred tax assets and related liabilities that we will recognize will differ based on, among other things, the timing of the redemptions or exchanges, the price of our shares of Class A common stock at the time of the redemptions or exchanges and the tax rates then in effect.

78

*Fluence Energy, Inc. and subsidiaries*

*Unaudited pro forma consolidated balance sheet as of June 30, 2021*

| | Fluence Energy, LLC, Historical[1] | Pro Forma Transaction Adjustments | Pro Forma Fluence Energy, Inc. |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 58,497 | $ 644,105[4][9] | $ 702,602 |
| Trade receivables | 61,456 | — | 61,456 |
| Unbilled receivables | 122,994 | — | 122,994 |
| Receivables from related parties | 24,574 | — | 24,574 |
| Advances to suppliers | 14,135 | — | 14,135 |
| Inventory, net | 333,417 | — | 333,417 |
| Other current assets | 23,792 | (3,421)[6] | 20,371 |
| Total current assets | 638,865 | 640,683 | 1,279,548 |
| Non-current assets: | | | |
| Property and equipment, net | 7,602 | — | 7,602 |
| Intangible assets, net | 36,953 | — | 36,953 |
| Goodwill | 9,201 | — | 9,201 |
| Other non-current assets | 355 | 1,950[9] | 2,305 |
| Total non-current assets | 54,111 | 1,950 | 56,061 |
| Total assets | $ 692,976 | $ 642,633 | $1,335,609 |
| **Liabilities and members' equity (deficit)** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 68,204 | $ — | $ 68,204 |
| Deferred revenue | 140,386 | — | 140,386 |
| Personnel related liabilities | 8,304 | — | 8,304 |
| Accruals and provisions | 266,823 | — | 266,823 |
| Payables and deferred revenue with related parties | 166,502 | — | 166,502 |
| Taxes payable | 5,997 | — | 5,997 |
| Other current liabilities | 1,825 | — | 1,825 |
| Total current liabilities | 658,041 | — | 658,041 |
| Non-current liabilities: | | | |
| Personnel related liabilities | 3,150 | 11,160[5] | 14,310 |
| Accruals and provisions | 257 | — | 257 |
| Deferred income tax liability | 163 | — | 163 |
| Other non-current liabilities | 552 | — | 552 |
| Total non-current liabilities | 4,122 | 11,160 | 15,282 |
| Total liabilities | 662,163 | 11,160 | 673,323 |
| Mezzanine equity (1,250,000 Class B units issued and outstanding as of June 30, 2021) | 117,272 | (117,272)[2] | — |
| Total mezzanine equity | 117,272 | (117,272) | — |
| **Members' equity:** | | | |
| Capital contributions | 106,152 | (106,152)[3] | — |
| Accumulated other comprehensive income (loss) | (509) | 509[3] | — |
| Deficit | (192,102) | 192,102[3] | — |

| | Fluence Energy, LLC, Historical[1] | Pro Forma Transaction Adjustments | Pro Forma Fluence Energy, Inc. |
|---|---|---|---|
| Total members' deficit | (86,459) | 86,459 | — |
| Class A common stock—$0.00001 par value per share, 1,200,000,000 shares authorized on a pro forma basis, 49,493,275 shares issued and outstanding on a pro forma basis | — | 0[2][4] | 0 |
| Class B-1 common stock—$0.00001 par value per share, 300,000,000 shares authorized on a pro forma basis, 117,173,390 shares issued and outstanding on a pro forma basis | — | 1[3] | 1 |
| Class B-2 common stock – $0.00001 par value per share, 300,000,000 shares authorized on a pro forma basis, no shares issued and outstanding on a pro forma basis | — | — | — |
| Additional paid in capital | | 209,247[7] | 209,247 |
| Accumulated deficit | — | (12,577)[5] | (12,577) |
| Total members'/stockholders' equity attributable to Fluence Energy, LLC/Fluence Energy, Inc.[a] | (86,459) | 283,131 | 196,672 |
| Non-controlling interest | — | 465,614[8] | 465,614 |
| Total members'/stockholders' deficit | (86,459) | 748,745 | 662,286 |
| Total liabilities, members' equity, and mezzanine equity | $ 692,976 | $ 642,633 | $1,335,609 |

(a)  For historical amounts, represents total members' deficit attributable to Fluence Energy, LLC. For Pro Forma amounts, represents total members'/stockholders' equity attributable to Fluence Energy, Inc.

*Fluence Energy, Inc. and subsidiaries*

*Notes to unaudited pro forma consolidated balance sheet*

(1)  Fluence Energy, Inc. was formed on June 21, 2021 and will have no material assets or results of operations until the consummation of the Transactions, and therefore its historical financial position is not shown in a separate column in this unaudited pro forma balance sheet.

(2)  In connection with this offering the Class B membership units will be recapitalized and converted into Class A common stock of Fluence Energy, Inc. As a result, no Class B membership units will be outstanding following the offering.

(3)  As a result of the Transactions, we will hold a significant equity interest in Fluence Energy, LLC. and will be the managing member of Fluence Energy, LLC. Accordingly, we will operate and control all of the business and affairs of Fluence Energy, LLC and, through Fluence Energy, LLC. and its operating subsidiaries, conduct Fluence Energy, Inc.'s business. As a result, we will consolidate the financial results of Fluence Energy, LLC and will report a non-controlling interest related to the LLC Units held by the Continuing Equity Owners on our consolidated balance sheet.

The computation of the non-controlling interest following the consummation of this offering, based on the assumed initial public offering price, is as follows:

| | Units | Percentage |
|---|---|---|
| Interest in Fluence Energy, LLC held by Fluence Energy, Inc. | 49,493,275 | 29.7% |
| Non-controlling interest in Fluence Energy, LLC held by Continuing Equity Owners | 117,173,390 | 70.3% |

80

In connection with this offering, we will issue 117,173,390 shares of Class B-1 common stock to the Continuing Equity Owners, on a one to-one basis with the number of common units of Fluence Energy, LLC they own for nominal consideration.

The following table includes a reconciliation of the impact of this adjustment to non-controlling interest:

| | |
|---|---|
| Members' deficit | $(86,459) |
| Issuance of Class B-1 common stock at par value | (1) |
| Total Members' deficit | (86,460) |
| Percentage of non-controlling interest | 70.3% |
| Adjustment to non-controlling interest | $(60,785) |

(4)  Reflects the net effect on cash of the receipt of offering proceeds to us of $650.9, based on the assumed sale of shares of Class A common stock at an assumed initial public offering of $22.50 per share, the midpoint of the estimated price range set forth on the cover page of this prospectus, after deducting the underwriting discounts and commissions and estimated offering expenses payable by us. These amounts, as described in "Use of Proceeds," will be used by Fluence Energy, LLC to repay any future outstanding borrowings under our existing Line of Credit and the Promissory Notes, and the remainder for working capital and other general corporate purposes.

(5)  This adjustment relates to: (a) the cumulative catch-up for the services provided under both the Options and Phantoms of $15.1 million, (b)  a modification of historical grants to the former CEO, (c) a modification of historical grants to executives of the Company, and (d) a Day 1 liability related to the liability classified awards of $11.2 million, all of which we expect to incur following the completion of this offering. Below is a further breakdown of the four components, respectively:

(a)   Options and Phantom awards which meet their performance condition upon the IPO and are adjusted based on their original grant date fair value representing a cumulative adjustment of the service to-date on outstanding awards since grant; and

(b)   Immediately prior to this offering, the existing Options and Phantoms will be modified, qualifying as an improbable to improbable modification under ASC 718, to remove their required service condition and change their performance condition settlement to be paid in cash at the time of IPO. The $4.8 million charge represents the value of the Options and Phantoms as of the new measurement date;

(c)   Immediately prior to this offering, the existing Phantom awards for executive members of the Company will be modified, qualifying as an improbable to improbable modification under ASC 718, to extend their required service condition after the performance condition has been met. The $13.3 million charge represents the value of the Phantoms as of the new measurement date which is based on the assumed initial public offering price of $22.50 per share, the midpoint of the estimated price range set forth on the cover page of this prospectus; and

(d)   Options and Phantom awards which are liability classified and will be cash settled at an assumed initial public offering of $22.50 per share, the midpoint of the estimated price range set forth on the cover page of this prospectus, after deducting the underwriting discounts and commissions but before estimated offering expenses payable by us.

(6)  We are deferring certain costs associated with this offering, including certain legal, accounting, and other related expenses, which have been recorded in other assets on our consolidated balance sheet. Upon completion of this offering, these deferred costs will be charged against the proceeds from this offering with a corresponding reduction to additional paid-in capital.

(7)  The following table is a reconciliation of the Offering Adjustments impacting additional paid-in-capital

| (in thousands) | As of June 30, 2021 | Note |
|---|---|---|
| Reclassification of Mezzanine equity | $ 34,825 | (2) |
| Reclassification of Members' deficit | (25,675) | (3) |

81

| (in thousands) | As of June 30, 2021 | Note |
|---|---|---|
| Net proceeds from offering of Class A Common Stock | 193,284 | (4) |
| Day 1 Compensation Charge | 3,893 | (5) |
| Deferred costs incurred in this offering | (1,016) | (6) |
| Net additional paid-in capital pro forma adjustment | $205,311 | |

(8) In addition to the adjustments to additional paid-in capital above in Note (7), other accounts within stockholders' equity, including accumulated deficit, are adjusted to reflect the approximately 70.3% ownership interest held by the noncontrolling interests. The following table is a reconciliation of the Offering Adjustments impacting noncontrolling interests:

| (in thousands) | As of June 30, 2021 | Note |
|---|---|---|
| Reclassification of Mezzanine equity | $ 82,447 | (2) |
| Reclassification of Members' deficit | (60,785) | (3) |
| Impact of net proceeds from offering | 457,597 | (4) |
| Reclassification of liability classified awards | (11,239) | (5) |
| Reclassification of write-off of deferred costs incurred | (2,405) | (6) |
| Net noncontrolling interests pro forma adjustment | $465,614 | |

(9) In connection with the consummation of this offering, we expect to enter into the Revolver, pursuant to which we will be able to borrow up to $200.0 million. We expect the Revolver to be undrawn at the time of closing and will pay a 0.6% upfront fees to our lenders plus associated legal expenses. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Revolving Credit Facility."

### Fluence Energy, Inc. and subsidiaries

*Unaudited pro forma consolidated statement of operations for the nine month period ended June 30, 2021*

| (In thousands except per share amounts) | Fluence Energy, LLC Historical[1] | Pro Forma Transaction Adjustments | Pro Forma Fluence Energy, Inc. |
|---|---|---|---|
| Revenue | $ 430,397 | $ — | $ 430,397 |
| Revenue from related parties | 62,164 | — | 62,164 |
| Total revenue | 492,561 | — | 492,561 |
| Cost of goods and services | 502,644 | 1,021[2] | 503,665 |
| Gross (loss) | (10,083) | (1,021) | (11,104) |
| Operating expenses: | | | |
| Research and development expenses | 17,251 | 1,280[2] | 18,531 |
| Sales and marketing expenses | 16,882 | 1,431[2] | 18,313 |
| General and administrative expenses | 23,159 | 3,892[2] | 27,051 |
| Depreciation and amortization | 3,494 | — | 3,494 |
| Other expense, net | (1,061) | (366)[5] | (1,427) |
| Loss before income taxes | (71,930) | (7,990) | (79,920) |
| Income tax expense | 2,874 | —[3] | 2,874 |
| Net loss | (74,804) | (7,990) | (82,794) |
| Net loss attributable to non-controlling interest | — | (58,208)[4] | (58,208) |
| Net loss attributable to Fluence Energy, Inc. | $ (74,804) | $ 50,218 | $ (24,586) |
| **Pro Forma Net loss per share data:[5]** | | | |
| Net income available to Class A common stock per share: | | | |

82

| (In thousands except per share amounts) | Fluence Energy, LLC Historical[1] | Pro Forma Transaction Adjustments | Pro Forma Fluence Energy, Inc. |
|---|---|---|---|
| Basic | | [6] | $ (0.50) |
| Diluted | | [6] | $ (0.50) |
| Weighted-average shares of Class A common stock outstanding: | | | |
| Basic | | [6] | 49,493,275 |
| Diluted | | [6] | 49,493,275 |

*Unaudited pro forma consolidated statement of operations for the fiscal year ended September 30, 2020*

| (In thousands except per share amounts) | Fluence Energy, LLC Historical[1] | Pro Forma Transaction Adjustments | Pro Forma Fluence Energy, Inc. |
|---|---|---|---|
| Revenue | $401,676 | $ — | $ 401,676 |
| Revenue from related parties | 159,647 | — | 159,647 |
| Total revenue | 561,323 | — | 561,323 |
| Cost of goods and services | 553,400 | 5,012[2] | 558,412 |
| Gross profit (loss) | 7,923 | (5,012) | 2,911 |
| Operating expenses: | | | |
| Research and development expenses | 11,535 | 4,694[2] | 16,229 |
| Sales and marketing expenses | 16,239 | 5,679[2] | 21,918 |
| General and administrative expenses | 17,940 | 18,481[2] | 36,421 |
| Depreciation and amortization | 3,018 | — | 3,018 |
| Other income (expense), net | 520 | (488)[5] | 33 |
| Loss before income taxes | (40,289) | (34,353) | (74,642) |
| Income tax expense | 6,421 | —[3] | 6,421 |
| Net loss | (46,710) | (34,353) | (81,063) |
| Net loss attributable to non-controlling interest | — | (56,990)[4] | (56,990) |
| Net loss attributable to Fluence Energy, Inc. | $ (46,710) | $ 22,638 | $ (24,072) |
| **Pro Forma Net loss per share data:[5]** | | | |
| Net income available to Class A common stock per share: | | | |
| Basic | | [6] | $ (0.49) |
| Diluted | | [6] | $ (0.49) |
| Weighted-average shares of Class A common stock outstanding: | | | |
| Basic | | [6] | 49,493,275 |
| Diluted | | [6] | 49,493,275 |

*Notes to unaudited pro forma consolidated statement of operations*

(1) Fluence Energy, Inc. was formed on June 21, 2021 and will have no material assets or results of operations until the consummation of the Transactions, and therefore its historical financial position is not shown in a separate column in this unaudited pro forma statement of operations.

(2) This adjustment relates to the compensation expense we expect to incur following the completion of

83

this offering which relates to stock compensation expense related to the 827,590 option awards and 145,330 phantom units granted in April 2021 and outstanding as of June 30, 2021.These awards were subject to performance conditions, including a liquidity event such as an IPO. Accordingly, in connection with the IPO, the Company expects to record an accelerated charge of $13.1 million as explained in Note 5 (refer to Balance Sheet) related to the cumulative catch-up for the service provided and the modification of awards granted to the former CEO that will be settled in cash. The Company has calculated $33.9 million for the fiscal year 2020 annual period and $7.6 million for the nine months ended June 30, 2021 interim period using a graded vesting approach, which front loads the compensation expense over the service vesting term, causing a majority of the expense to be recognized in fiscal year 2020 assuming the awards had been granted on October 1, 2019.

(3) Following the Transactions, we will be subject to United States federal income taxes, in addition to applicable state and local taxes, with respect to our allocable share of any net taxable income of Fluence Energy, LLC. Fluence Energy, LLC has been, and will continue to be, treated as a partnership for U.S. federal and state income tax purposes. As such, income generated by Fluence Energy, LLC will flow through to its partners, including us, and is generally not subject to tax at the Fluence Energy, LLC level. Given the historical losses of Fluence Energy, LLC, the deferred tax assets carry a full valuation allowance, and as such, the effective tax rate following the consummation of this offering is expected to be 3.5%. We will continue to assess the realizability of the deferred tax assets each reporting period.

(4) Upon completion of the Transactions, we will become the sole managing member of Fluence Energy, LLC. We will have the sole voting interest in, and control of the management of, Fluence Energy, LLC. As a result, we will consolidate the financial results of Fluence Energy, LLC and will report a non-controlling interest related to the interests in Fluence Energy, LLC held by the Founders on our consolidated balance sheet. Immediately following the Transactions, the economic interests held by the non-controlling interest will be approximately 70.3%. If the underwriters exercise their option to purchase additional shares of our Class A common stock in full, the economic interests held by the non-controlling interest will be approximately 68.4%. The impact of all adjustments to the Statement of Operations has been allocated between Fluence Energy, Inc. and non-controlling interests.

(5) This adjustment relates to amortization of the customary upfront fees paid in connection with the Revolver plus associated legal expenses. The upfront fees and associated legal expenses of $2.0 million are amortized over the four year term of the Revolver. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Revolving Credit Facility."

(6) Pro forma basic earnings per share is computed by dividing the net income available to Class A common stockholders by the weighted- average number of shares of Class A common stock outstanding during the period. Pro forma diluted earnings per share is computed by adjusting the net income available to Class A common stockholders and the weighted-average shares of Class A common stock outstanding to give effect to potentially dilutive securities. Shares of our Class B-1 and Class B-2 common stock are not entitled to receive any distributions or dividends and have no rights to convert into Class A common stock. When a common unit is exchanged for, at the holder's election, cash or Class A common stock by a Founder who holds shares of our Class B-1 or Class B-2 common stock, such Founder will be required to surrender a share of Class B-1 common stock or Class B-2 common stock, as the case may be, which we will cancel for no consideration. Therefore, we did not include shares of our Class B-1 or Class B-2 common stock in the computation of pro forma basic earnings per share. As we have incurred losses for all periods presented, pro forma diluted loss per share is equal to pro forma basic loss per share because the effect of potentially dilutive securities would be antidilutive.

84

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with our audited consolidated financial statements and related notes as of and for the fiscal years ended September 30, 2020 and 2019, as well as our unaudited condensed consolidated financial statements and the related notes as of and for the nine months ended June 30, 2021 and 2020 appearing elsewhere in this prospectus. This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" or in other parts of this prospectus.

Historically, our business has been operated through Fluence Energy, LLC, together with its subsidiaries. Fluence Energy, Inc. was formed for the purpose of this offering and has engaged to date only in activities in contemplation of this offering. Upon the completion of this offering, all of our business will continue to be conducted through Fluence Energy, LLC, together with its subsidiaries, and the financial results of Fluence Energy, LLC will be consolidated in our financial statements. Fluence Energy, Inc. will be a holding company whose sole material asset will be the LLC Interests in Fluence Energy LLC. Fluence Energy LLC is, and will continue to be, taxed as a partnership for federal income tax purposes and, as a result, its members, including Fluence Energy, Inc. will pay income taxes with respect to their allocable shares of its net taxable income. For more information regarding the organizational transactions and holding company structure, see "Our Organizational Structure." As of June 30, 2021, Fluence Energy, LLC had three subsidiaries: Fluence Energy GmbH in Germany, Fluence Energy Pty Ltd. in Australia, and Fluence Energy Inc. in the Philippines.

Our fiscal year begins on October 1 and ends on September 30.

### Overview

We are enabling the global clean energy transition with market-leading energy storage products and services and digital applications for renewables and storage. We believe energy storage is at the center of this transition and is becoming even more important as more renewables are added to the grid and the transportation sector moves towards electrification. We are driving change by delivering configurable energy storage product, service, and digital application packages, as well as our AI-enabled Fluence IQ Platform to optimize renewable and third-party storage assets. Our offerings help major utilities, developers, and C&I customers around the world to deliver a more sustainable, reliable, and resilient electric grid in a repeatable, scalable way.

Fluence Energy, LLC was established in January 2018 as a joint venture between AES Grid Stability and Siemens Industry. On December 27, 2020, we entered into a subscription agreement with QFH for the issuance of 1,250,000 Class B units for a total value of $125.0 million. Following the completion of the transaction on June 9, 2021, and as of June 30, 2021, AES Grid Stability holds 3,960,000 Class A units, or 43.2% of our limited liability interest, Siemens Industry holds 3,960,000 Class A units, or 43.2% of our limited liability interest and QFH holds 1,250,000 Class B units, or 13.6% of our limited liability interests.

Since our inception in January 2018, we have focused on international growth and to further develop our energy storage product and delivery services, the operational services, and digital applications. We have incurred net operating losses each year since our inception. We have financed our operations with equity contributions from AES Grid Stability, Siemens Industry, and QFH, cash and cash equivalents, negative working capital, and short-term borrowings.

As of June 30, 2021, we deployed cumulative 942 MW of energy storage products, compared to 460 MW as of September 30, 2020. We recognized revenue of $492.6 million, representing an increase of $170.7 million, or 53.0%, for the nine months ended June 30, 2021 compared to the nine months ended June 30, 2020 as we expanded our sales in terms of the number of energy storage products sold as well as geographic footprint in 2021. Revenue generated from operations in the United States increased from $230.6 million in the nine months ended June 30, 2020 to $357.1 million in the nine months ended June 30, 2021, representing a 54.9% increase. Revenue generated from international operations increased from $91.3 million

85

in the nine months ended June 30, 2020 to $135.5 million in the nine months ended June 30, 2021, representing a 48.4% increase, which was driven by growth in existing international markets and expansion into new markets.

Revenue and costs of goods and services both increased significantly due to increased sales volumes, while relatively greater weighted average cost of material and supplies, resulted in a decreased gross profit margin for the nine months ended June 30, 2021 compared to the nine months ended June 30, 2020.

Research and development, sales and marketing, and general and administrative expenses all increased for the nine months ended June 30, 2021, compared to the nine months ended June 30, 2020 as we have been investing heavily in our human capital, technology, products and services to support significant increases in our operations and related revenues. We expect these expenses to increase for the foreseeable future as we experience continuing substantial growth and mature as a public company.

We believe the anticipated proceeds of this offering along with cash flows from operations, short-term borrowing, and our June 2021 investment from QIA will be sufficient to meet our expense and capital requirements for the foreseeable future.

**Key Factors and Trends**

We believe that our performance and future success depend on several factors that present significant opportunities for us but also pose risks and challenges, including those discussed below and in the section of this prospectus titled "Risk Factors."

*Expected Decrease In Lithium-ion Battery Cost*

Our revenue growth is directly tied to the continued adoption of energy storage products by our customers. The cost of lithium-ion energy storage hardware has declined significantly in the last decade and has resulted in a large addressable market today. According to BloombergNEF, the component costs for lithium-ion battery packs are expected to fall from $161 per kilowatt hour ("kWh") in 2020 to $73/kWh in 2030, an 8% annual reduction over this period. The market for energy storage is rapidly evolving, and while we believe costs will continue to decline, there is no guarantee that they will decline or decline at the rates we expect. If costs do not continue to decline, this could adversely affect our ability to increase our revenue or grow our business.

*Increasing Deployment Of Renewable Energy*

Deployment of renewable energy resources has accelerated over the last decade, and solar and wind have become a low-cost energy source. BloombergNEF estimates that renewable energy is expected to represent 70% of all new global capacity installations over the next 10 years. Energy storage is critical to reducing the intermittency and volatility of solar and wind generation.

*Competition*

We are a global energy storage leader. We intend to leverage our competitive strengths, technology, leadership, and market share position to help transform the way we power our world for a more sustainable future. The market for our products is competitive, and we may face increased competition as new and existing competitors introduce energy storage solutions and components. Furthermore, as we expand our services and digital applications in the future, we may face other competitors including software providers and some hardware manufacturers that offer software solutions. If our market share declines due to increased competition, our revenue and ability to generate profits in the future may be adversely affected.

*Seasonality*

We experience seasonality and typically see increased order intake in our third and fourth fiscal quarters (April – September), driven by demand in the Northern Hemisphere to install energy storage products before the summer of the following year. Combined third and fourth fiscal quarter order intake generally accounted for 80% or more of our total intake each year. As a result, revenue generation is typically significantly stronger in our third and fourth fiscal quarters as we provide the majority of our products to

86

customers during these periods. Cash flows historically have been negative in our first and second fiscal quarters, neutral to positive in our third fiscal quarter, and positive in our fourth fiscal quarter. See "Recent Developments — Preliminary Fourth Quarter Results." Our services and digital applications and solutions offerings do not experience the same seasonality given their recurring nature.

**Impact of the COVID-19 Pandemic**

On March 11, 2020, the World Health Organization declared the outbreak of a strain of novel coronavirus disease, the COVID-19 pandemic, a global pandemic. Governments in affected areas and countries in which we operate have imposed a number of measures designed to contain the outbreak, including business closures, travel restrictions, quarantines, and cancellations of gatherings and events. We have implemented operational and protective measures to ensure the safety, health, and welfare of our employees and stakeholders. This includes implementing work from home policies for all office employees. We have also ensured that all employees and visitors that visit our facilities have access to personal protective equipment, and we strictly enforce social distancing. Many of the sites where our products and services are delivered have been declared critical infrastructure and remained open following the respective safety protocols. However, many of our customers' project sites have experienced shutdowns and delays related to COVID-19. We will maintain these precautions and procedures until the COVID-19 pandemic is under adequate control. As of June 30, 2021, the COVID-19 pandemic has not had a material impact on our operations or financial condition.

The full impact of the COVID-19 pandemic on our financial condition and results of operations will depend on future developments, such as the ultimate duration and scope of the pandemic, its impact on our employees, customers, and vendors, in addition to how quickly normal economic conditions and operations resume and whether the pandemic impacts other risks disclosed in "Risk Factors" within this prospectus. Even after the pandemic has subsided, we may continue to experience adverse impacts to our business from any economic recession or depression that may occur as a result of the pandemic. Therefore, we cannot reasonably estimate the impact at this time. We continue to actively monitor the pandemic and may decide to take further actions that alter our business operations as may be required by federal, state, or local authorities or that we determine to be in the best interests of our employees, customers, vendors, and shareholders.

**Key Components of Our Results of Operations**

The following discussion describes certain line items in our Consolidated Statements of Operations.

*Total Revenue*

We generate revenue from the sale of energy storage products, service agreements with customers to provide operational services related to battery-based energy storage products, and from digital application contracts after the acquisition of AMS in 2021. Fluence enters into contracts with utility companies, developers, and commercial and industrial customers. We derive the majority of our revenues from selling product solutions. When we sell a battery-based energy storage product, we enter into a contract with our customers covering the price, specifications, delivery dates and warranty for the products being purchased, among other things.

Our revenue is affected by changes in the price, volume and mix of products and services purchased by our customers, which is driven by the demand for our products, geographic mix of our customers, strength of competitors' product offerings, and availability of government incentives to the end-users of our products.

Our revenue growth is dependent on continued growth in the amount of battery-based energy storage products projects constructed each year and our ability to increase our share of demand in the geographies where we currently compete and plan to compete in the future as well as our ability to continue to develop and commercialize new and innovative products that address the changing technology and performance requirements of our customers.

*Cost of Goods and Services*

Cost of goods and services consists primarily of product costs, including purchased materials and supplies, as well as costs related to shipping, customer support, product warranty and personnel. Personnel

costs in cost of goods and services includes both direct labor costs as well as costs attributable to any individuals whose activities relate to the transformation of raw materials or component parts into finished goods or the transportation of materials to the customer.

Our product costs are affected by the underlying cost of raw materials, including steel and aluminum supply costs, including inverters, casings, fuses, and cable; technological innovation; economies of scale resulting in lower supply costs; and improvements in production processes and automation. We do not currently hedge against changes in the price of raw materials. We generally expect our average cost of materials and supplies to decrease as sales volumes increase, however, some of these costs, primarily personnel related costs, are not directly affected by sales volume.

### Gross Profit (Loss) and Gross Profit Margin

Gross profit (loss) and gross profit margin may vary from quarter to quarter and is primarily affected by our sales volume, product prices, product costs, product mix, customer mix, geographical mix, shipping method, warranty costs, and seasonality.

### Operating Expenses

Operating expenses consist of research and development, sales and marketing and general and administrative expenses as well as depreciation and amortization. Personnel-related expenses are the most significant component of our operating expenses and include salaries, benefits, sales commissions, and payroll taxes. We expect to invest in additional resources to support our growth which will increase our operating expenses in the near future.

### Research and Development Expenses

Research and development expenses consist primarily of personnel-related expenses, including salaries, benefits, and payroll taxes, for engineers engaged in the design and development of products and technologies, as well as products, materials, and third-party services used in our research and development process. We expect research and development expenses to increase in future periods to support our growth and as we continue to invest in research and development activities that are necessary to achieve our technology and product roadmap goals. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments.

### Sales and Marketing Expenses

Sales and marketing expenses consist primarily of personnel-related expenses, including salaries, benefits, amortization of sales commissions, and payroll taxes, for our sales and marketing organization, consultants and other third-party vendors. We expect to increase our sales and marketing personnel as we expand into new geographic markets. We intend to expand our sales presence and marketing efforts to additional countries in the future.

### General and Administrative Expenses

General and administrative expenses consist primarily of personnel-related expenses, including salaries, benefits, and payroll taxes, for our executives, sales, finance, human resources, information technology, engineering and legal organizations that do not relate directly to the sales or research and development functions, as well as travel expenses, facilities costs, bad debt expense and fees for professional services. Professional services consist of audit, legal, tax, insurance, information technology and other costs. We expect general and administrative expenses to increase in the future as we scale our headcount with the growth of our business. We also expect that after the completion of this offering, we will incur additional audit, tax, accounting, legal and other costs related to compliance with applicable securities and other regulations, as well as additional insurance, investor relations and other costs associated with being a public company.

### Depreciation and Amortization

Depreciation consists of costs associated with property, plant and equipment ("PP&E") and amortization of intangibles consisting of patents, licenses, and developed technology over their expected

period of use. We expect that as we increase both our revenues and the number of our general and administrative personnel, we will invest in additional PP&E to support our growth resulting in additional depreciation and amortization.

*Tax Expense*

As the Company is currently treated as a partnership, we are generally not subject to U.S. federal or state income tax. As such, we do not pay U.S. federal or state income tax, as taxable income or loss will be included in the U.S. tax returns of our members. We are subject to income taxes, including withholding taxes, outside the U.S. and our income tax expense (benefit) on the consolidated statements of operations primarily relates to income taxes from foreign operations, withholding taxes on intercompany royalties and changes in valuation allowances related to deferred tax assets of certain foreign subsidiaries. After consummation of this offering, we will become subject to U.S. federal and state income taxes with respect to our allocable share of any taxable income or loss of Fluence Energy, LLC, and we will be taxed at the prevailing corporate tax rates. We will continue to be subject to foreign income taxes with respect to our foreign subsidiaries and our expectations are valuation allowances will be needed in certain tax jurisdictions. In addition to tax expenses, we also will incur expenses related to our operations, as well as payments under the Tax Receivable Agreement, which we expect could be significant over time. Following this offering, we will receive a portion of any distributions made by Fluence Energy, LLC. Any cash received from such distributions from our subsidiaries will be first used by us to satisfy any tax liability and then to make payments required under the Tax Receivable Agreement.

*Other Income, Net*

Other income, net consists of income (expense) from foreign currency exchange adjustments for monetary assets and liabilities.

**Key Operating Metrics**

| (amounts in MW) | As of June 30, 2021 | As of September 30, 2020 | As of September 30, 2019 | Change (June 30, 2021 vs September 30, 2020) | % Change | Change (September 30, 2020 vs September 30, 2019) | % Change |
|---|---|---|---|---|---|---|---|
| **Energy Storage Products** | | | | | | | |
| Deployed | 942 | 460 | 418 | 482 | 104.8% | 42 | 10.0% |
| Contracted Backlog | 1,896 | 1,879 | 1,077 | 17 | 0.9% | 802 | 74.5% |
| Pipeline | 13,311 | 11,320 | 7,040 | 1,991 | 17.6% | 4,280 | 60.8% |
| **Service Contracts** | | | | | | | |
| Asset under Management | 743 | 276 | 264 | 467 | 169.2% | 13 | 4.7% |
| Contracted Backlog | 1,198 | 455 | 236 | 743 | 163.3% | 219 | 92.8% |
| Pipeline | 10,223 | 7,889 | 3,006 | 2,334 | 29.6% | 4,883 | 162.4% |
| **Digital Contracts** | | | | | | | |
| Asset under Management | 2,458 | — | — | 2,458 | 100% | — | — |
| Contracted Backlog | 1,269 | — | — | 1,269 | 100% | — | — |
| Pipeline | 3,314 | — | — | 3,314 | 100% | — | — |

| (amounts in MW) | For the Nine Months ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | Change | % Change |
| **Energy Storage Products** | | | | |
| Contracted | 490 | 565 | (75) | (13.3)% |
| **Service Contracts** | | | | |
| Contracted | 1,210 | 27 | 1,183 | 4,381.5% |
| **Digital Contracts** | | | | |
| Contracted | 1,734 | — | 1,734 | 100.0% |

| (amounts in MW) | For the Fiscal Years Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | Change | % Change |
| **Energy Storage Products** | | | | |
| Contracted | 844 | 832 | 12 | 1.4% |
| **Service Contracts** | | | | |
| Contracted | 232 | 106 | 126 | 118.9% |

*Deployed or Asset Under Management*

Deployed represents cumulative energy storage products that have achieved substantial completion and are not decommissioned.

Asset under management for service contracts represents our long-term service contracts with customers associated with our completed energy storage system products. We start providing maintenance, monitoring, or other operational services after the storage product projects are completed.

Asset under management for digital software contracts represents the amount of MWs under signed digital application contracts, including Fluence Trading Platform after the acquisition of AMS in 2021.

*Contracted Backlog and Contracted*

For our energy storage products contracts, contracted backlog includes signed customer orders or contracts under execution prior to when substantial completion is achieved. For service contracts, contracted backlog includes signed service agreements associated with our storage product projects that have not been completed and the associated service has not started. For digital applications contracts, contracted backlog includes signed agreements where the associated subscription has not started.

Contracted represents new energy storage product contracts, new service contracts and new digital contracts signed during each fiscal year presented.

*Pipeline*

Pipeline represents our uncontracted, potential revenue from energy storage products, service, and digital software contracts currently in process, which have a reasonable likelihood of contract execution within 24 months. Pipeline is monitored by management to understand the growth of our Company and our estimated future revenue related to customer contracts for our battery-based energy storage products and services.

We cannot guarantee that our contracted backlog or pipeline will result in actual revenue in the originally anticipated period or at all. Contracted backlog and pipeline may not generate margins equal to our historical operating results. We have only recently begun to track our contracted backlog and pipelines on a consistent basis as performance measures, and as a result, we do not have significant experience in determining the level of realization that we will achieve on these contracts. Our customers may experience project delays or cancel orders as a result of external market factors and economic or other factors beyond our control. If our contracted backlog and pipeline fail to result in revenue at all or in a timely manner, we

could experience a reduction in revenue, profitability, and liquidity. Pipeline is an internal management metric that we construct from market information reported by our global sales force. We monitor and track our pipeline but it is not maintained or audited in accordance with U.S. GAAP.

**Non-GAAP Financial Measures**

This section contains references to certain non-GAAP financial measures, including Adjusted EBITDA, Adjusted Gross Profit (Loss), Adjusted Gross Profit Margin, Adjusted Net Loss, and Free Cash Flow.

Adjusted EBITDA is calculated from the consolidated statements of operations using net income (loss) adjusted for (i) interest income (expense), net, (ii) income taxes, (iii) depreciation and amortization, (iv) equity-based compensation, and (v) other non-recurring income or expenses. Adjusted EBITDA may in the future also be adjusted for amounts impacting net income related to the Tax Receivable Agreement liability.

Adjusted Gross Profit (Loss) is calculated using gross profit (loss), adjusted to exclude certain non-recurring income or expenses. Adjusted Gross Profit Margin is calculated using Adjusted Gross Profit (Loss) divided by total revenue.

Adjusted Net Loss is calculated using net loss, adjusted to exclude (i) amortization of intangibles, (ii) equity-based compensation, (iii) other non-recurring income or expenses, and (iv) tax impact of these adjustments.

Free Cash Flow is calculated from the consolidated statements of cash flows and is defined as net cash provided by operating activities, less purchase of property and equipment made in the period. We expect our Free Cash Flow to fluctuate in future periods as we invest in our business to support our plans for growth. Limitations on the use of Free Cash Flow include (i) it should not be inferred that the entire Free Cash Flow amount is available for discretionary expenditures. For example, cash is still required to satisfy other working capital needs, including short-term investment policy, restricted cash, and intangible assets; (ii) Free Cash Flow has limitations as an analytical tool, and it should not be considered in isolation or as a substitute for analysis of other GAAP financial measures, such as net cash provided by operating activities; and (iii) this metric does not reflect our future contractual commitments.

These non-GAAP measures are intended as supplemental measures of performance and/or liquidity that are neither required by, nor presented in accordance with, GAAP. We present these non-GAAP measures because we believe they assist investors and analysts in comparing our performance across reporting periods on a consistent basis by excluding items that we do not believe are indicative of our core operating performance. In addition, we use certain of these non-GAAP measures (i) as factors in evaluating management's performance when determining incentive compensation and (ii) to evaluate the effectiveness of our business strategies.

These non-GAAP measures should not be considered in isolation or as substitutes for performance measures calculated in accordance with GAAP and may not be comparable to similar measures presented by other entities. Readers are cautioned that these non-GAAP measures should not be construed as alternatives to other measures of financial performance calculated in accordance with GAAP. These non-GAAP measures and their reconciliation to GAAP financial measures are shown below.

The following tables present our non-GAAP measures for the periods indicated.

| ($ in thousands) | Nine Months Ended June 30, | | YTD 2021 vs. YTD 2020 | |
| | 2021 | 2020 | $ Change | % Change |
| --- | --- | --- | --- | --- |
| Net loss | $(74,804) | $(45,604) | $(29,200) | (64.0)% |
| Add (deduct): | | | | |
| Interest expense (income), net | 901 | (456) | 1,357 | 297.6 |
| Income tax expense | 2,874 | 5,678 | (2,804) | (49.4) |
| Depreciation and amortization | 3,494 | 2,249 | 1,245 | 55.4 |
| Non-recurring (income) expenses[a] | 18,150 | 994 | 17,156 | 1,726.0 |
| **Adjusted EBITDA** | $(49,385) | $(37,139) | $(12,246) | (33.0)% |

91

(a) Amount in the nine months ended June 30, 2021 included $9.8 million related to a cargo loss incident, $6.8 million related to non-recurring excess shipping costs primarily attributable to the COVID-19 pandemic, and $1.5 million of non-recurring IPO-related expenses which did not qualify for capitalization. Amount in the nine months ended June 30, 2020 included $1.0 million expense associated with a safety incident in FY 2019.

| ($ in thousands) | Fiscal Year Ended September 30, | | FY 2020 vs. FY 2019 | |
| | 2020 | 2019 | Change | Change % |
| --- | --- | --- | --- | --- |
| Net loss | $(46,710) | $(46,981) | $   271 | 0.6% |
| Add (deduct): | | | | |
| Interest expense (income), net | (379) | (1,226) | 847 | 69.1 |
| Income tax expense (benefit) | 6,421 | (778) | 7,199 | 925.3 |
| Depreciation and amortization | 3,018 | 2,891 | 127 | 4.4 |
| Non-recurring (income) expenses[a] | 1,767 | 4,480 | (2,713) | 60.6 |
| **Adjusted EBITDA** | $(35,883) | $(41,614) | $ 5,731 | 13.8% |

(a) Amount in FY 2020 included $0.8 million of costs associated with the AMS acquisition and a $1.0 million expense associated with a safety incident in FY 2019. Amounts in FY 2019 included a $4.5 million expense caused by the same safety incident.

| ($ in thousands) | Nine Months Ended June 30, | | YTD 2021 vs. YTD 2020 | |
| | 2021 | 2020 | $ Change | % Change |
| --- | --- | --- | --- | --- |
| Total Revenue | $492,561 | $321,859 | $170,702 | 53.0% |
| Cost of goods and services | 502,644 | 325,944 | 176,700 | 54.2 |
| Gross (loss) profit | (10,083) | (4,085) | (5,998) | (146.8) |
| Add (deduct): | | | | |
| Non-recurring (income) expenses[a] | 16,637 | 994 | 15,643 | 1,573.7 |
| Adjusted Gross (Loss) Profit | $   6,554 | $  (3,091) | $   9,645 | 312.0% |
| **Adjusted Gross Profit Margin %** | 1.3% | (1.0)% | | |

(a) Amount in the nine months ended June 30, 2021 included $9.8 million related to a cargo loss incident and $6.8 million related to non-recurring excess shipping costs primarily attributable to the COVID-19 pandemic. Amount in the nine months ended June 30, 2020 included $1.0 million expense associated with a safety incident in FY 2019.

| ($ in thousands) | Nine Months Ended June 30, | | YTD 2021 vs. YTD 2020 | |
| | 2021 | 2020 | $ Change | % Change |
| --- | --- | --- | --- | --- |
| Net loss | $(74,804) | $(45,604) | $(29,200) | (64.0)% |
| Add (deduct): | | | | |
| Amortization of intangible | 2,637 | 1,860 | 777 | 41.8 |
| Non-recurring (income) expenses[a] | 18,150 | 994 | 17,156 | 1,726.0 |
| **Adjusted Net Loss[b]** | $(54,017) | $(42,750) | $(11,267) | (26.4)% |

(a) Amount in the nine months ended June 30, 2021 included $9.8 million related to a cargo loss incident, $6.8 million related to non-recurring excess shipping costs primarily attributable to the COVID-19 pandemic, and $1.5 million of non-recurring IPO-related expenses which did not qualify for

92

capitalization. Amount in the nine months ended June 30, 2020 included $1.0 million expense associated with a safety incident in FY 2019.

(b)  All non-recurring (income) expense items included as an add-back in the table above were related to the LLC entity, which for U.S. federal income tax purposes is treated as a partnership and therefore the tax impact is zero.

| ($ in thousands) | Fiscal Year Ended September 30, | | FY 2020 vs. FY 2019 | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | Change | Change % |
| Total Revenue | $561,323 | $ 92,151 | 469,172 | 509.1% |
| Cost of goods and services | 553,400 | 100,068 | 453,332 | 453.0 |
| Gross profit (loss) | 7,923 | (7,917) | 15,840 | 200.1 |
| Add (deduct): | | | | |
| Non-recurring (income) expenses[a] | 978 | 4,480 | (3,502) | (78.2) |
| Adjusted Gross Profit (Loss) | $  8,901 | $ (3,437) | $ 12,338 | 359.0% |
| **Adjusted Gross Profit Margin %** | 1.6% | (3.7)% | | |

(a)  Amount in FY 2020 included a $1.0 million expense associated with a safety incident in FY 2019. Amounts in FY 2019 included a $4.5 million expense caused by the same safety incident.

| ($ in thousands) | Fiscal Year Ended September 30, | | FY 2020 vs. FY 2019 | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | Change | Change % |
| Net loss | $(46,710) | $(46,981) | $   271 | 0.6% |
| Add (deduct): | | | | |
| Amortization of intangible | $   2,484 | $   2,479 | 5 | 0.2 |
| Non-recurring (income) expenses[a] | 1,767 | 4,480 | (2,713) | (60.6) |
| **Adjusted Net Loss** | $(42,459) | $(40,022) | $(2,437) | (6.1)% |

(a)  Amount in FY 2020 included $0.8 million costs associated with the AMS acquisition and $1.0 million of expenses related to a safety incident which occurred in FY 2019. Amount in FY 2019 included $4.5 million expenses caused by the same safety incident.

| ($ in thousands) | Nine Months Ended June 30, | | YTD 2021 vs. YTD 2020 | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | Change | % Change |
| Net cash (used in) provided by operating activities . | $(139,277) | $(75,865) | $(63,412) | (83.6)% |
| Less: Purchase of property and equipment | (2,999) | (1,013) | (1,986) | (196.1) |
| **Free Cash Flow** | $(142,276) | $(76,878) | $(65,398) | (85.1)% |

| ($ in thousands) | Fiscal Year Ended September 30, | | FY 2020 vs. FY 2019 | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | Change | Change % |
| Net cash (used in) provided by operating activities | $(14,016) | $27,682 | $(41,698) | (150.6)% |
| Less: Purchase of property and equipment | (1,780) | (2,736) | 956 | (34.9) |
| **Free Cash Flow** | $(15,796) | $24,946 | $(40,742) | (163.3)% |

93

**Results of Operations**

*Comparison of the Nine Months Ended June 30, 2021 to the Nine Months Ended June 30, 2020*

The following table sets forth our operating results for the periods indicated.

| ($ in thousands) | Nine Months Ended June 30, 2021 | Nine Months Ended June 30, 2020 | YTD 2021 vs. YTD 2020 $ Change | YTD 2021 vs. YTD 2020 % Change |
|---|---|---|---|---|
| Total revenue | $492,561 | $321,859 | $170,702 | 53.0% |
| Costs of goods and services | 502,644 | 325,944 | 176,700 | 54.2 |
| Gross (loss) profit | (10,083) | (4,085) | (5,998) | (146.8) |
| Gross profit % | (2.0)% | (1.3)% | | |
| Operating expenses | | | | |
| Research and development | 17,251 | 8,546 | 8,705 | 101.9 |
| Sales and marketing | 16,882 | 12,262 | 4,620 | 37.7 |
| General and administrative | 23,159 | 12,691 | 10,468 | 82.5 |
| Depreciation and amortization | 3,494 | 2,249 | 1,245 | 55.4 |
| Other expense, net | (1,061) | (93) | (968) | (1,040.9) |
| Loss before income taxes | (71,930) | (39,926) | (32,004) | (80.2) |
| Income tax expense | 2,874 | 5,678 | (2,804) | (49.4) |
| **Net loss** | $ (74,804) | $ (45,604) | $ (29,200) | (64.0)% |

*Total Revenue*

Total revenue increased from $321.9 million for the nine months ended June 30, 2020 to $492.6 million for the nine months ended June 30, 2021. The increase of $170.7 million, or 53.0%, was mainly from the sales of our battery energy storage products, which increased by $168.8 million, as we expanded our business in the United States and international markets. Sales to customers in the United States and the Philippines increased $126.5 million and $47.5 million, respectively.

*Costs of Goods and Services*

Cost of goods and services increased from $325.9 million for the nine months ended June 30, 2020 to $502.6 million for the nine months ended June 30, 2021. The $176.7 million or 54.2% increase was primarily from materials and supplies, and shipping costs associated with the sale of our battery energy storage products due to the increased sales volume and higher weighted average cost of the material and supplies. Included within cost of goods and services for the nine months ended June 30, 2021 were $9.8 million in costs related to a cargo loss incident in the period. Refer to Note 12—*Commitments and Contingencies.*

*Gross Profit (Loss) and Gross Profit Margin*

Gross loss was $4.1 million and negative gross profit margin was 1.3% for the nine months ended June 30, 2020, compared to gross loss of $10.1 million and negative gross profit margin of 2.0% for the nine months ended June 30, 2021. The decrease was driven by relatively greater weighted average cost of material and supplies, increased shipping cost and the cargo loss incident in the nine-month period ended June 30, 2021 as compared to the nine-month period ended June 30, 2020.

*Research and Development Expenses*

Research and development expenses increased from $8.5 million for the nine months ended June 30, 2020 to $17.2 million for the nine months ended June 30, 2021. The $8.7 million or 101.9% increase was mainly related to increased salaries and personnel-related costs as we continued to expand our research and development efforts.

94

*Sales and Marketing Expenses*

Sales and marketing expenses increased from $12.3 million for the nine months ended June 30, 2020 to $16.9 million for the nine months ended June 30, 2021. The increase of $4.6 million, or 37.7%, is related to increased personnel-related expenses for our sales and marketing organization, consultants and other third-party vendors, including the increase in sales and marketing expense in global markets.

*General and Administrative Expenses*

General and administrative expenses increased from $12.7 million for the nine months ended June 30, 2020 to $23.2 million for the nine months ended June 30, 2021. The $10.5 million or 82.5% increase was mainly related to increases in personnel-related expenses including corporate, executive, finance, and other administrative functions, as well as expenses for outside professional services as we have been expanding our personnel headcount rapidly to support our growth.

*Depreciation and Amortization*

Depreciation and amortization increased from $2.2 million for the nine months ended June 30, 2020 to $3.5 million for the nine months ended June 30, 2021. This increase was from $0.9 million amortization related to intangible assets from the AMS acquisition and $0.4 million depreciation from increased fixed assets.

*Other Expense, Net*

Other expense, net, increased from $0.1 million for the nine months ended June 30, 2020 to $1.1 million for the nine months ended June 30, 2021. The $1.0 million or 1,040.9% increase was mainly from foreign currency exchange adjustments for monetary assets and liabilities.

*Income Tax Expense*

Income tax expense decreased from $5.7 million in the nine months ended June 30, 2020 to $2.9 million in the nine months ended June 30, 2021. The effective income tax rate was (14.2)% and (4.0)% for the nine months ended June 30, 2020 and 2021, respectively. The $2.8 million decrease in income tax expense and change in effective tax rate were primarily due to an increase in global pre-tax loss for the nine months ended June 30, 2021. Furthermore, the income tax expense for the nine months ended June 30, 2020 included an increase in the valuation allowance recorded on deferred tax assets.

*Net Loss*

Net loss increased from $45.6 million in the nine months ended June 30, 2020 to $74.8 million in the nine months ended June 30, 2021. The increase in net loss was mainly due to an increase in gross loss related to our operations which included expenses of $9.8 million related to the cargo loss incident as well as increased expenses in general and administrative expenses, sales and marketing expenses and research and development expenses due to the expansion of our business and the build out of our corporate functions.

*Comparison of the Fiscal Year Ended September 30, 2020 to the Fiscal Year Ended September 30, 2019*

The following table sets forth our operating results for the periods indicated.

| ($ in thousands) | Fiscal Year Ended September 30, | | FY 2020 vs FY 2019 | |
| | 2020 | 2019 | Change | Change % |
| --- | --- | --- | --- | --- |
| Total revenue | $561,323 | $ 92,151 | $469,172 | 509.1% |
| Costs of goods and services | 553,400 | 100,068 | 453,332 | 453.0 |
| Gross profit (loss) | 7,923 | (7,917) | 15,840 | 200.1 |
| Gross Profit % . . . . . . . . . . . . . . . . . . . . . . . . . | 1.4% | (8.6)% | | |
| Operating expenses | | | | |
| Research and development | 11,535 | 9,871 | 1,664 | 16.9 |
| Sales and marketing | 16,239 | 14,963 | 1,276 | 8.5 |
| General and administrative | 17,940 | 13,950 | 3,990 | 28.6 |
| Depreciation and amortization | 3,018 | 2,891 | 127 | 4.4 |
| Other income, net | 520 | 1,833 | (1,313) | (71.6) |
| Loss before income taxes | (40,289) | (47,759) | 7,470 | 15.6 |
| Income tax expense (benefit) | 6,421 | (778) | 7,199 | 925.3 |
| **Net loss** | $ (46,710) | $ (46,981) | $ 271 | 0.6% |

*Total Revenue*

Total revenue increased from $92.2 million in FY 2019 to $561.3 million in FY 2020. The $469.1 million or 509.1% increase was mainly from the sales of our battery energy storage products as we expanded our business in United State and international markets.

*Costs of Goods and Services*

Cost of goods and services increased from $100.1 million in FY 2019 to $553.4 million in FY 2020. The $453.3 million or 453.0% increase was primarily from materials and supplies associated with the sale of our battery energy storage products due to the increased sales volume net of lower weighted average cost of the material and supplies.

*Gross Profit (Loss) and Gross Profit Margin*

Gross profit was $7.9 million, and gross profit margin was 1.4%, in FY 2020, compared to a gross loss of $7.9 million, and a negative gross profit margin of 8.6%, in FY 2019. The increase was driven by higher sales of energy storage products, net of lower per unit cost of material and supplies in FY 2020.

*Research and Development Expenses*

Research and development expenses increased from $9.9 million in FY 2019 to $11.5 million in FY 2020. The $1.6 million or 16.9% increase in FY 2020 compared to FY 2019 was mainly related to increased salaries and personnel-related costs.

*Sales and Marketing Expenses*

Sales and marketing expenses increased from $15.0 million in FY 2019 to $16.3 million in FY 2020. The increase of $1.3 million, or 8.5%, is related to increased marketing cost to support our revenue growth.

*General and Administrative Expenses*

General and administrative expenses increased from $13.9 million in FY 2019 to $17.9 million in FY 2020. The $4.0 million or 28.6% increase in FY 2020 as compared with FY 2019 related mainly to

96

increases in personnel-related expenses including corporate, executive, finance, and other administrative functions, as well as expenses for outside professional services as we have been expanding our personnel headcount rapidly to support our growth.

### *Depreciation and Amortization*

Depreciation and amortization remained flat from $2.9 million in FY 2019 to $3.0 million in FY 2020.

### *Other Income, Net*

Other income, net decreased from $1.8 million in FY 2019 to $0.5 million in FY 2020. The $1.3 million or 71.6% decrease was mainly from foreign currency exchange adjustments for monetary assets and liabilities.

### *Income Tax Expense (Benefit)*

Income tax expense increased from a $(0.8) million benefit in FY 2019 to a $6.4 million expense in FY 2020. The $7.2 million increase in income tax expense was mainly due to $3.4 million of tax withholdings on intracompany royalties and increase in valuation allowance of our deferred tax asset for foreign subsidiaries.

The effective income tax rate was (15.9) % and 1.6% for FY 2020 and FY 2019, respectively, with the change due to an increase in our international operations.

### *Net Loss*

Net loss decreased from $47.0 million in FY 2019 to $46.7 million in FY 2020. The slight decrease in net loss was mainly due to an increase in gross profit, offset by increased expenses in general and administrative, sales and marketing, and research and development related to supporting expanding operations of the business, and also due to increase in income tax expense.

### Liquidity and Capital Resources

Since inception and through June 30, 2021, our principal sources of liquidity were our cash and cash equivalents, short-term borrowing, capital from AES Grid Stability and Siemens Industry, and proceeds from the QFH investment.

We received a $6.3 million capital contribution from Siemens Industry and a $2.5 million capital contribution from AES Grid Stability during the nine months ended June 30, 2021 and 2020, respectively.

Additionally, we procured liquidity from short-term borrowing from banks. We have an Uncommitted Line of Credit Agreement ("Line of Credit') with Citibank, N.A. ("Citibank") originally signed on January 29, 2019, which allows us to borrow an amount in aggregate not to exceed $2.0 million, from time to time, until January 29, 2021 ("Expiration Date"). The Line of Credit was further amended to increase the aggregate borrowing amount to $10.0 million, $30.0 million, and $50.0 million on May 13, 2020, August 7, 2020, and December 23, 2020, respectively. The Expiration Date for the Line of Credit was extended to March 31, 2023, on June 2, 2021. We did not have any outstanding short-term borrowings from the Line of Credit as of June 30, 2021, September 30, 2020 and 2019. Subsequent to June 30, 2021, we borrowed an aggregate of $50.0 million under the line of credit, all of which is outstanding as of September 3, 2021.

On December 27, 2020, we entered into a subscription agreement with QFH for the issuance of 1,250,000 Class B units for a total value of $125.0 million. The transaction completed on June 9, 2021 with the proceeds used to accelerate our growth.

On April 28, 2021 and June 3, 2021, we borrowed $25.0 million and $25.0 million, respectively, from AES in the form of one-year promissory notes, each bearing an annual interest at 2.86%. On May 3, 2021, we borrowed $25.0 million from Siemens Industry, in the form of a one-year promissory note with an annual interest rate of 2.86%. The proceeds were used for general working capital needs. As of June 22, 2021, these total $75.0 million in borrowings from AES and Siemens Industry were paid off in full.

On August 11, 2021, Fluence Energy, LLC entered into a promissory note with each of Siemens Industry and AES Grid Stability, under which Fluence Energy, LLC received a bridge financing of an aggregate of $50.0 million. In connection with the bridge financing, Fluence Energy, LLC issued a $25.0 million promissory note to each of Siemens Industry and AES Grid Stability (together, the "Promissory Notes"). The Promissory Notes are unsecured and the note with AES Grid Stability matures on August 11, 2022 and the note with Siemens Industry matures on December 31, 2021. If we complete a private placement or public offering of certain equity securities prior to the maturity date, the Promissory Notes and all accrued interest thereunder will automatically and without notice be due and payable within five business days. The Promissory Notes bear interest at 2.86% per annum through and until the earliest of the maturity date thereunder and a mandatory prepayment event, at which time the interest rate will increase by an additional 2%. The proceeds from the Promissory Notes are being used by Fluence Energy, LLC to provide additional liquidity and to fund ongoing working capital needs.

We believe that our current cash and cash equivalents, cash flows from operations, short-term borrowing, and recent investments from QIA through QFH, combined with the anticipated proceeds of this offering, will be sufficient to meet our capital expenditure and working capital requirements for the foreseeable future.

After completion of this offering, Fluence Energy, Inc. will be a holding company and will have no material assets other than its ownership of LLC Interests. Fluence Energy, Inc. has no independent means of generating revenue and is dependent upon the financial results and cash flows of Fluence Energy, LLC and its subsidiaries and distributions we receive from Fluence Energy, LLC. Fluence Energy, Inc. intends to cause Fluence Energy, LLC to make distributions and payments to its holders of LLC Interests, including Fluence Energy, Inc. and our Founders, in an amount sufficient to cover all applicable taxes at assumed tax rates, expenses, payments under the Tax Receivable Agreement and dividends, if any, declared by it. Deterioration in the financial condition, earnings or cash flow of Fluence Energy, LLC and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Additionally, the terms of our financing arrangements, including the Revolving Credit Facility (as defined below), contain covenants that may restrict Fluence Energy, LLC and its subsidiaries from paying such distributions, subject to certain exceptions. Further, Fluence Energy, LLC is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of Fluence Energy, LLC (with certain exceptions) exceed the fair value of its assets. Subsidiaries of Fluence Energy, LLC are generally subject to similar legal limitations on their ability to make distributions to Fluence Energy, LLC. See "Dividend Policy" and "Risk Factors—Risks Related to Our Organizational Structure—Our principal asset after the completion of this offering will be our interest in Fluence Energy, LLC, and, as a result, we will depend on distributions from Fluence Energy, LLC to pay our taxes and expenses, including payments under the Tax Receivable Agreement. Fluence Energy, LLC's ability to make such distributions may be subject to various limitations and restrictions."

### *Revolving Credit Facility*

In connection with this offering, we plan to enter into the Revolver, dated on or about the date of the consummation of this offering, by and among Fluence Energy, LLC, as the borrower, Fluence Energy Inc., as a parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent. The Revolver will be secured by a (i) first priority pledge of the equity securities of Fluence Energy, LLC and its subsidiaries and (ii) first priority security interests in, and mortgages on, substantially all tangible and intangible personal property and material fee-owned real property of Fluence Energy, LLC, the parent guarantor and each subsidiary guarantor party thereto, in each case, subject to customary exceptions and limitations. The effectiveness of the Revolver is conditioned upon the consummation of this offering, however this offering is not contingent upon the effectiveness of the Revolver.

The interest rate will be either (i) the Adjusted LIBOR or Adjusted EURIBO Rate (each as defined in the Revolver) plus 3.0% or (ii) the Alternate Base Rate (as defined in the Revolver) plus 2.0% (subject to customary LIBOR replacement provisions and alternative benchmark rates including customary spread adjustments with respect to borrowings in foreign currency), at the option of Fluence Energy, LLC. Fluence Energy, LLC is required to pay to the lenders a commitment fee of 0.55% per annum on the average daily unused portion of the revolving commitments through maturity, which will be the four-year anniversary of

98

the closing date of the Revolver. The Revolver will also provide for up to $200.0 million in letter of credit issuances, which will require customary issuance and administration fees, as well as a fronting fee payable to each issuer thereof and a letter of credit participation fee of 2.75% per annum payable to the lenders.

The Revolver will contain covenants that, among other things, will restrict our ability to incur additional indebtedness; incur liens; sell, transfer, or dispose of property and assets; make investments or acquisitions; make dividends, distributions or other restricted payments; and engage in affiliate transactions. The Revolver will limit our ability to make certain payments, including dividends and distributions on Fluence Energy, LLC's equity, Fluence Energy, Inc.'s equity and other restricted payments. In addition, we will be required to maintain (i) minimum liquidity and gross revenue requirements, in each case, until consolidated EBITDA reaches a certain specified threshold and we make an election, and (ii) thereafter, a maximum total leverage ratio and a minimum interest coverage ratio. Such covenants will be tested on a quarterly basis.

### Tax Receivable Agreement

In connection with the Offering Transactions, we will enter into the tax receivable agreement (the "Tax Receivable Agreement") with Fluence Energy, LLC and the Founders that will provide for the payment by Fluence Energy, Inc. to the Founders of 85% of the amount of certain tax benefits, if any, that Fluence Energy, Inc. actually realizes, or in some circumstances is deemed to realize, arising from the Basis Adjustments (as defined below) and certain other tax benefits arising from payments made under the Tax Receivable Agreement. Fluence Energy, LLC will have in effect an election under Section 754 of the Code effective for each taxable year in which a redemption or exchange (including deemed exchange) of LLC Interests for Class A common stock or cash occurs or when Fluence Energy, LLC makes (or is deemed to make) certain distributions. These Tax Receivable Agreement payments are not conditioned upon one or more of the Founders maintaining a continued ownership interest in Fluence Energy, LLC. If a Founder transfers LLC Interests but does not assign to the transferee of such units its rights under the Tax Receivable Agreement, such Founder generally will continue to be entitled to receive payments under the Tax Receivable Agreement arising in respect of a subsequent exchange of such LLC Interests. In general, the Founders' rights under the Tax Receivable Agreement may not be assigned, sold, pledged or otherwise alienated or transferred to any person, other than certain permitted transferees, without our prior written consent (not to be unreasonably withheld) and such person's becoming a party to the Tax Receivable Agreement and agreeing to succeed to the applicable Founder's interest therein.

Subsequent redemptions or exchanges of LLC Interests are expected to result in increases in the tax basis of the assets of Fluence Energy, LLC and certain of its subsidiaries. Increases in tax basis and tax basis adjustments generated over time may increase (for tax purposes) the depreciation and amortization deductions available to Fluence Energy, Inc. and, therefore, may reduce the amount of U.S. federal, state and local tax that Fluence Energy, Inc. would otherwise be required to pay in the future, although the IRS may challenge all or part of the validity of that tax basis, and a court could sustain such a challenge. Fluence Energy, Inc.'s allocable share of tax basis and the anticipated tax basis adjustments upon redemptions or exchanges of LLC Interests may also decrease gains (or increase losses) on future dispositions of certain assets to the extent tax basis is allocated to those assets. Actual tax benefits realized by Fluence Energy, Inc. may differ from tax benefits calculated under the Tax Receivable Agreement as a result of the use of certain assumptions in the Tax Receivable Agreement, including the use of an assumed state and local income tax rate to calculate tax benefits. The payment obligation under the Tax Receivable Agreement is an obligation of Fluence Energy, Inc. and not of Fluence Energy, LLC. Following this offering, we expect to use distributions from Fluence Energy, LLC to fund any payments that we will be required to make under the Tax Receivable Agreement. To the extent we are unable to make timely payments under the Tax Receivable Agreement for any reason, such payments generally will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement resulting in the acceleration of payments due under the Tax Receivable Agreement. Fluence Energy, Inc. expects to benefit from the remaining 15% of cash tax benefits, if any, it realizes from such tax benefits. For purposes of the Tax Receivable Agreement, the cash tax benefits will be computed by comparing the actual income tax liability of Fluence Energy, Inc. to the amount of such taxes that Fluence Energy, Inc. would have been required to pay had there been no such tax basis adjustments of the assets of Fluence Energy, LLC or its subsidiaries as a result of redemptions or exchanges and had Fluence Energy, Inc. not entered into the Tax Receivable Agreement. The actual and

99

hypothetical tax liabilities determined in the Tax Receivable Agreement will be calculated using the actual U.S. federal income tax rate in effect for the applicable period and an assumed state and local income tax rate (along with the use of certain other assumptions). The term of the Tax Receivable Agreement will continue until all such tax benefits have been utilized or expired, unless Fluence Energy, Inc. exercises its right to terminate the Tax Receivable Agreement early, certain changes of control occur or Fluence Energy, Inc. breaches any of its material obligations under the Tax Receivable Agreement, in which case, all obligations generally (and in the case of such a change of control or such breach, only if the Founders elect) will be accelerated and due as if Fluence Energy, Inc. had exercised its right to terminate the Tax Receivable Agreement. The payment to be made upon an early termination of the Tax Receivable Agreement will generally equal the present value of payments to be made under the Tax Receivable Agreement using certain assumptions. Estimating the amount of payments that may be made under the Tax Receivable Agreement is by its nature imprecise, insofar as the calculation of amounts payable depends on a variety of factors. The tax basis adjustments upon the redemption or exchange of LLC Interests, as well as the amount and timing of any payments under the Tax Receivable Agreement, will vary depending upon a number of factors, including the timing of purchases or exchanges, the price of shares of our Class A common stock at the time of the purchase or exchange, the extent to which such purchases or exchanges do not result in a basis adjustment, the amount of tax attributes, changes in tax rates and the amount and timing of our income.

We expect that as a result of the anticipated tax basis adjustment of the assets of Fluence Energy, LLC and its subsidiaries upon the redemption or exchange of LLC Interests and our possible utilization of certain tax attributes, the payments that we may make under the Tax Receivable Agreement will be substantial. If all of the Founders were to exchange or redeem their LLC Interests for Class A common stock pursuant to the terms of the Fluence Energy LLC Agreement, we estimate our Founders will be entitled to receive payments under the Tax Receivable Agreement totaling approximately $487.2 million; assuming, among other factors, (i) all exchanges occurred on the same day; (ii) a price of $22.50 per share of Class A common stock (the midpoint of the estimated price range set forth on the cover of this prospectus); (iii) a constant corporate tax rate of 27%; (iv) we will have sufficient taxable income to fully utilize the tax benefits; (v) Fluence Energy, LLC is able to fully depreciate or amortize its assets; and (vi) no material changes in applicable tax law. The payments under the Tax Receivable Agreement are not conditioned upon continued ownership of us by the Founders. Although the timing and extent of future payments could vary significantly under the Tax Receivable Agreement for the factors discussed above, we anticipate funding payments from the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under any future debt agreements, and such payments are not anticipated to be dependent upon the availability of proceeds of this offering. See "Certain Relationships and Related Person Transactions—Tax Receivable Agreement."

### *Historical Cash Flows – Nine months ended June 30*

The following table summarizes our cash flows from operating, investing, and financing activities for the periods presented.

| ($ in thousands) | Nine Months Ended June 30, | | YTD 2021 vs. YTD 2020 | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | $ Change | % Change |
| Net cash (used in) operating activities | $(139,277) | $(75,865) | (63,412) | (83.6)% |
| Net cash (used in) provided by investing activities | $ (20,999) | $ 18,293 | (39,292) | (214.8)% |
| Net cash provided by financing activities | $ 125,729 | $ 10,500 | 115,229 | 1,097.4% |

Net cash flows used in operating activities were $139.3 million in the nine months ended June 30, 2021 compared to $75.9 million in the nine months ended June 30, 2020. The decrease in net operating cash flows was mainly due to increased purchases of inventory due to the significant expansion of our business activities, partially offset by increases in accounts payable and accruals.

Net cash flows used in investing activities in the nine months ended June 30, 2021 included $18.0 million cash paid for acquisitions and $3.0 million cash outflows used in purchases of property and equipment. Net cash flows provided by investing activities in the nine months ended June 30, 2020 included $19.0 million cash inflows from the release of bank deposits that were collateralized for outstanding bank guarantees, net of $1.0 million cash outflows used in purchases of property and equipment.

100

Cash flows provided by financing activities of $125.7 million for the nine months ended June 30, 2021 included $117.3 million net proceeds from issuance of Class B membership units and $6.3 million capital contribution from Siemens Industry. Cash flows provided by financing activities of $10.5 million for the nine months ended June 30, 2020 included $ 8.0 million borrowing from lines of credit and $2.5 million capital contribution from AES Grid Stability.

*Historical Cash Flows – Annual periods ended September 30*

The following table summarizes our cash flows from operating, investing, and financing activities for the periods presented.

| ($ in thousands) | Fiscal Year Ended September 30, | | FY 2020 vs. FY 2019 | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | Change | Change % |
| Net cash (used in) provided by operating activities | $(14,016) | $ 27,682 | (41,698) | (150.6)% |
| Net cash provided by (used in) investing activities | $ 18,220 | $(22,736) | 40,956 | 180.1% |
| Net cash provided by financing activities | $  2,500 | $ 10,000 | (7,500) | (75.0)% |

Net cash flows used in operating activities were $14.0 million in FY 2020 compared to net cash flows provided by operating activities of $27.7 million in FY 2019. The decrease in net operating cash flows was mainly due to increased trade receivables and unbilled receivable balances from increased sales of energy storage products, partially offset by increased accounts payable and accruals.

Net cash flows from investing activities in FY 2020 included $20.0 million of cash inflows from the release of bank deposits that were collateralized for outstanding bank guarantees, net of $1.8 million of cash out flows used in purchases of property and equipment. Net cash flows used in investing activities in FY 2019 included $20.0 million of bank deposits invested and placed as collateral in FY 2019 and $2.7 million of cash out flows used in purchases of property and equipment.

Cash flows provided by financing activities of $2.5 million and $10.0 million were from capital contributions from AES Grid Stability in FY 2020 and FY 2019, respectively.

*Credit Support and Reimbursement Agreement*

We are party to an Amended and Restated Credit Support and Reimbursement Agreement with AES and Siemens Industry whereby they may, from time to time, agree to furnish credit support to us in the form of direct issuances of credit support to our lenders or other beneficiaries or through their lenders' provision of letters of credit to backstop our own facilities or obligations. Pursuant to the Credit Support and Reimbursement Agreement, if AES or Siemens Industry agree to provide a particular credit support (which they are permitted to grant or deny in their sole discretion), they are entitled to receipt of a credit support fee and reimbursement for all amounts paid to our lenders or other counterparties, payable upon demand. The Credit Support and Reimbursement Agreement will not provide any credit support from September 30, 2026, provided that either AES or Siemens Industry will be permitted to terminate the agreement upon six months prior notice.

**Critical Accounting Policies and Use of Estimates**

Our financial statements have been prepared in accordance with GAAP. In the preparation of these financial statements, we consider an accounting judgment, estimate or assumption to be critical when (1) the estimate or assumption is complex in nature or requires a high degree of judgment and (2) the use of different judgments, estimates, and assumptions could have a material impact on the consolidated financial statements. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates. Refer to Note 2—*Summary of Significant Accounting Policies and Estimates* for further discussion of our critical accounting policies and estimates.

*Revenue Recognition*

We determine our revenue recognition through the following steps: (i) identification of the contract or contracts with a customer, (ii) identification of the performance obligations within the contract, (iii) determination of the transaction price, (iv) allocation of the transaction price to the performance obligations within the contract, and (v) recognition of revenue as the performance obligation has been satisfied.

As of June 30, 2021, our revenue was generated primarily from sale and battery-based energy storage products, providing operational services related to storage products, and digital application and solutions.

*Sale of Energy Storage Products*

Fluence enters into contracts with utility companies, developers, and C&I customers to design and build battery-based energy storage products. Each storage product is customized depending on the customer's energy needs. Customer payments are due upon meeting certain milestones that are consistent with contract-specific phases of a project. We determine the transaction price based on the consideration expected to be received which includes estimates for project execution risks and other variable considerations, including liquidated damages. The transaction price identified is allocated to each distinct performance obligation to deliver a good or service based on the relative standalone selling prices. Generally, our contracts to design and build battery-based storage solutions are determined to have one performance obligation. We believe that the prices negotiated with each individual customer are representative of the stand-alone selling price of the energy storage products.

We recognize revenue over time as a result of the continuous transfer of control of our energy storage products to the customer. This continuous transfer of control to the customer is supported by clauses in the contracts that provide enforceable rights to payment of the transaction price associated with work performed to date, and is for products that do not have an alternative use to us and/or the project is built on the customer's land that is under the customer's control.

Revenue from the contracts is recognized using the percentage of completion method based on cost incurred as a percentage of total estimated contract costs. Contract costs include all direct material and labor costs related to contract performance. Pre-contract costs with no future benefit are expensed in the period in which they are incurred. Since the revenue recognition of these contracts depends on estimates, which are assessed continually during the term of the contract, recognized revenues and profit are subject to revisions as the contract progresses to completion. The cumulative effects of revisions of estimated total contract costs and revenues, together with any contract reserves which may be deemed appropriate, are recorded in the period in which the facts and changes in circumstance become known. Due to the uncertainties inherent in the estimation process, it is reasonably possible that these estimates will be revised in a different period. When a loss is forecasted for a contract, the full amount of the anticipated loss is recognized in the period in which it is determined that a loss will occur.

*Services*

Fluence also enters into long-term service agreements with customers to provide operational services related to purchased battery-based energy storage products. The services include maintenance, monitoring, and other minor services. We account for the services as a single performance obligation as the services are substantially the same and have the same pattern of transfer to the customers. Straight-line revenue recognition method is applied for these types of services. We believe using a time-based method to measure progress is appropriate as the performance obligations are satisfied evenly over time based on the fact that customers receive the services evenly and cost pattern does not change significantly over the service period. Revenue is recognized by dividing the total contact revenue over the service period.

Some of the agreements also provide capacity guarantees which stand for a commitment to perform certain augmentation activities to maintain the level of battery capacity specified in the agreement. Augmentation activities would typically be represented by installation of additional batteries, and other components as needed, to compensate for partially lost capacity due to degradation of batteries over time. These services are treated as service-type warranties and are accounted for as separate performance obligations

102

from other services discussed above. Performance obligations of the services are satisfied over time. Percentage of completion revenue recognition method is applied for service type warranties as the cost pattern changes significantly with little to no operating costs incurred in the earlier years and larger costs incurred in later years when augmentation is required to restore the required capacity, for example, adding more batteries or changing some existing modules with declined capacity.

For both products and service contracts where there are multiple performance obligations in a single contract, we allocate the consideration to the various obligations in the contract based on the relative standalone selling price method. Standalone selling prices are estimated based on estimated costs plus margin or using market data for comparable products when estimated costs are not imputable.

### *Digital Applications and Solutions*

In October 2020, Fluence acquired the Advanced Microgrid Solutions ("AMS") software and digital intelligence platform, which became the Fluence Trading Platform. Contracts involving the Fluence Trading Platform are generally entered into with commercial entities that control utility-scale storage and renewable generation assets. Fluence Trading Platform arrangements consist of a promise to provide access to proprietary cloud-based Software-as-a-Service ("SaaS") to promote enhanced financial returns on the utility-scale storage and renewable generation assets. The Fluence Trading Platform is a hosted service that delivers automated, market-compliant bids to local electricity market operators. Customers do not receive legal title or ownership of the software as a result of these arrangements. The term for Fluence's contracts with Trading Platform customers is generally 5 years, which may include certain renewal options to extend the initial contract term or certain termination options to reduce the initial contract term.

The Fluence Trading Platform is technology- and vendor-agnostic (i.e. it can be utilized for wind and solar assets as well as non-Fluence systems). The Fluence Trading Platform is separately identifiable from other promises that Fluence offers to its customers (i.e. it is not highly interrelated or integrated with other solutions). As such, Fluence determined that the Fluence Trading Platform should be accounted for as a separate performance obligation. Revenue from the Fluence Trading Platform includes an integration fee and a monthly subscription fee. We consider the access to the Fluence Trading Platform and related support services in a customer contract to be a series of distinct services which comprise a single performance obligation because they are substantially the same and have the same pattern of transfer. We record amounts that have been invoiced in accounts receivable and in deferred revenue or revenues, depending on whether the revenue recognition criteria have been met.

### Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis.

During the fiscal year ended September 30, 2020, a material weakness in the internal control over our revenue recognition process was identified. The design and implementation of controls has not been sufficient to adequately interpret ASC 606 in the design of the accounting policy related to in-transit and delivered, but uninstalled equipment. We are in the process of developing a remediation plan which includes, without limitation, (i) hiring additional experienced accounting, financial reporting and internal control personnel as we transition to being a public company and are required to comply with Section 404 of the Sarbanes-Oxley Act, (ii) implementing controls to enhance our review of significant accounting transactions and other new technical accounting and financial reporting issues and preparing and reviewing accounting memoranda addressing these issues, and (iii) implementing controls to enable an effective and timely review of account analyses and account reconciliations. We have recently hired additional resources, and we are engaging with a third-party consulting firm to assist us with our formal internal control plan and provide staff augmentation of our internal audit function.

The material weaknesses will not be considered remediated until management designs and implements effective controls that operate for a sufficient period of time and management has concluded, through testing, that these controls are effective.

We and our independent registered public accounting firm were not required to, and did not, perform an evaluation of our internal control over financial reporting as of June 30, 2021, or September 30, 2020, in accordance with Section 404(b) of the Sarbanes-Oxley Act. Accordingly, we cannot assure you that we have identified all, or that we will not in the future have additional, material weaknesses. Material weaknesses may still exist when we report on the effectiveness of our internal control over financial reporting as required under Section 404 of the Sarbanes-Oxley Act.

**Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the potential loss that may result from market changes associated with our business or with an existing or forecasted financial transactions. We are exposed to various market risks in the ordinary course of our business which are discussed below.

*Credit Risk*

Credit risk refers to the risk that a counterparty may default on its contractual obligations resulting in a loss to us. Our counterparties for sale of our energy storage products and delivery service are customers including conglomerates, utilities / load-serving entities, independent power producers, developers, and C&I customers in the United States and other countries. A loss of one or more of our significant customers, their inability to perform under their contracts, or their default in payment could harm our business and negatively impact revenue, results of operations, and cash flows. Credit policies have been approved and implemented to govern our portfolio of counterparties with the objective of mitigating credit losses. These policies establish guidelines, controls, and limits to manage credit risk within approved tolerances by mandating an appropriate evaluation of the financial condition of existing and potential counterparties, monitoring agency credit ratings, and by implementing credit practices that limit exposure according to the risk profiles of the counterparties. In addition, customers are required to make milestone payments based on their project's progress. We may also, at times, require letters of credit, parent guarantees or cash collateral when deemed necessary.

Our overall exposure may be affected positively or negatively by macroeconomic or regulatory changes that impact our counterparties to one extent or another. As of June 30, 2021, the COVID-19 pandemic has not had a material impact on our credit risk exposure to our counterparties. Currently, management does not anticipate a material adverse effect in our financial position or results of operations as a consequence of counterparty non-performance. We continuously monitor the creditworthiness of all our counterparties.

*Foreign Currency Risk*

Our reporting currency is the U.S. dollar, while certain of our current subsidiaries have other functional currencies, reflecting their principal operating markets. Fluctuations in currency exchange rates between the U.S. dollar and the Euro, the British pound, the Australian dollar, and the Swiss Franc in our current foreign markets could create significant fluctuations in earnings and cash flows. To date, we have not had material exposure to foreign currency fluctuations and have not had material hedging instruments to hedge the foreign currency risks.

*Commodity Price Risk*

We are subject to risk from fluctuating market prices of certain commodity raw materials that are used in our products. Prices of these raw materials may be affected by supply restrictions, logistics and shipping, and tariffs or other market factors from time to time, and we do not enter into hedging arrangements to mitigate commodity risk. Significant price changes for these raw materials could reduce our operating margins if we are unable to recover such increases from our customers and could harm our business, financial condition, and results of operations.

104

*Customer Concentration and Emerging Market Exposure Risk*

We deliver products and services in developed economies, including the United States, the United Kingdom, Chile, Ireland, Switzerland, Australia, and Germany. We also deliver products and services in the Philippines, which represent 20.9% and 34.1% of revenue the nine months ended June 30, 2021 and FY 2020, respectively. Macroeconomic conditions in developing economies are usually more volatile than in developed economies and entail certain risks and uncertainties. Changes in the United States trade environment, including the imposition of import tariffs, could adversely affect the amount or timing of our revenues, results of operations or cash flows. The interruption of the flow of components and materials from international vendors could disrupt our supply chain, including as a result of the imposition of additional duties, tariffs and other charges on imports and exports.

**Emerging Growth Company Status**

We are an emerging growth company, as defined under the JOBS Act. The JOBS Act permits an emerging growth company like us to take advantage of an extended transition period to comply with new or revised accounting standards applicable to public companies. We have elected to take advantage of this extended transition period. As a result, the information that we provide to stockholders may be different than the information you may receive from other public companies in which you hold equity.

105

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 114 of 1007 PageID# 1093









Fluence is driving the clean energy transition with energy storage technology and digital applications for utilities, developers and C&I customers globally.

Case 1:25-cv-00444-PTG-IDD     Document 69-4     Filed 07/11/25     Page 118 of 1007
PageID# 1097



A letter from
**Manuel Perez Dubuc**

CEO, FLUENCE

Fluence is a purpose-built and purpose-driven company. We were created as a pure-play energy storage technology joint venture between AES Energy Storage and Siemens' energy storage group to help organizations navigate their transition to renewable energy. Our work is driven by a larger mission – to transform the way we power our world for a more sustainable future.

Our public offering is the culmination of a journey that began 14 years ago, when members of our team deployed the world's first lithium-ion energy storage project on a power grid in Indianapolis, Indiana. This project, which demonstrated that grid scale battery-based energy storage was a technologically and commercially viable solution with real world applications, kicked off the industry as we know it today.

Since that foundational moment, the Fluence team has played a leading role in shaping the stationary battery energy storage industry, opening new markets and continually developing new ways to use energy storage on the grid. Through the Fluence IQ Digital Platform, we've expanded into digital optimization of renewables and non-Fluence energy storage assets to help accelerate the energy transition more broadly and in new ways. By anticipating our customers' future needs and providing solutions for entire portfolios of assets, we are well-positioned with complementary products and cross-selling opportunities that will help us to continue winning in a robust and accelerating market.

We do not rest on our laurels. Led by a highly experienced and knowledgeable team, we will continue to innovate new technology, products, services, digital applications, and business models that bring value to our customers and support the global transition to a clean energy future. I am incredibly proud and honored to be part of the team that is reshaping the power industry with more sustainable, flexible, and resilient grids around the world.

Fluence employees are passionate about our work and the knowledge that we are playing a role in the efforts to preserve the planet for future generations. We are also energized by the vast opportunity for transformation ahead of us, and I hope you are, too.

Manuel Perez Dubuc



**BUSINESS**

**Our Mission**

Our mission is to transform the way we power our world for a more sustainable future.

**Overview**

We are enabling the global clean energy transition with market-leading energy storage products and services and digital applications for renewables and storage. We believe battery energy storage technology ("energy storage") is at the center of this transition and is becoming even more important as more renewables are added to the grid and the transportation sector moves towards electrification. We are driving change by delivering configurable energy storage product, service, and digital application packages, as well as our AI-enabled Fluence IQ Platform to optimize renewable and third-party storage assets. Our offerings help major utilities, developers, and commercial and industrial ("C&I") customers around the world deliver a more sustainable, reliable, and resilient electric grid in a repeatable, scalable way.

Energy storage is a key solution to the challenges facing electricity markets and transmission grids, including: electricity load variability and quality issues from increased participation of renewable energy generation; growing consumer and industrial demand for smart grid services; and localized capacity constraints on transmission networks, particularly around periods of peak demand. Energy storage is a uniquely flexible, asset that can provide multiple critical grid services, including energy shifting, peaking capacity, ancillary services, and transmission and distribution infrastructure functions. Our team has helped the industry move from a few deployments of single-function systems under 10 megawatts ("MW"), to multiple deployments of systems over 100 MW with broad functionality optimized by advanced software and digital intelligence.

Fluence is a leading pure-play provider of energy storage technology globally, and our AI-enabled Fluence IQ helps customers maximize the value and performance of single assets or entire portfolios of clean energy assets. Although we were established in January 2018 as a joint venture between Siemens and AES, members of our board of directors and leadership team were part of the founding team at AES Energy Storage that conceived and tested the world's first lithium-ion energy storage system on an electric grid starting in 2007. Fluence has built on AES' industry-defining work in clean energy and storage operations and Siemens' energy technology leadership and global sales presence. The result is an agile company with a global presence solely focused on enabling the clean energy transition.

We believe our customer- and market-centric approach differentiates us from our peers and best positions us to deploy our high-value and high-margin services and digital recurring revenue offerings across a large, global installed base, building upon our 13 years of deep energy storage experience and data-driven insights. Furthermore, our advanced digital applications delivered to non-Fluence customers can enable cross-sales of Fluence energy storage products. Last year, we unveiled our sixth-generation technology stack ("Tech Stack"), which is the foundation of our energy storage products. The Tech Stack is comprised of our modular, factory-built hardware ("Fluence Cube"), proprietary operating system ("Fluence OS"), and AI-enabled digital platform ("Fluence IQ"). In addition to energy storage products, our offerings include delivery services and recurring operational services, as well as financing structuring services, such as energy-storage-as-a-service ("ESaaS"). Our Fluence IQ Digital Platform includes the Fluence Bidding Application, which delivers AI-powered market bidding optimization for solar, wind, and energy storage assets, including non-Fluence energy storage systems.

Guidehouse Consulting has ranked us as the leading energy storage provider since our inception, based on factors including vision, go-to-market strategy, product performance, technology, and execution. We were also ranked the leading global energy storage systems integrator by Navigant in 2018 and the largest global energy storage system integrator in a 2021 report by Clean Horizon. We won Best Commercial Technology of the Year at the 2020 S&P Global Platts Global Energy Awards for our sixth-generation Tech Stack and were named to Fast Company's Most Innovative Companies, Energy list in 2019 and 2021. Previous generations of our technology have won the Edison Electric Institute's annual Edison Awards (2016, 2019, and 2021).

As of September 30, 2021, we had 1.0 gigawatts ("GW") of energy storage assets deployed and 2.7 GW of contracted backlog across 29 markets with a gross global pipeline of 14.2 GW. As of September 30,

112

2021, our global operational and maintenance ("O&M") services team was providing services for 0.8 GW of energy storage assets, with a further 1.9 GW of contracted backlog, which have provided Fluence with over 290 terabytes of data on energy storage operation and performance as of June 30, 2021. As of June 30, 2021, we had $885 million of contracted backlog related to energy storage products, representing a 14% increase related to the same date last year and as of September 30, 2021 we estimated that we had between approximately $1,344 million and $1,393 million of contracted backlog related to energy storage products.

In 2020, we entered into an agreement with QFH for a $125 million investment to accelerate our growth and the global deployment of our offerings, which has included the acquisition of the software and digital intelligence platform of Advanced Microgrid Solutions ("AMS"), a leading artificial intelligence-enabled optimized bidding software for utility-scale storage and renewable generation assets, which became the Fluence Bidding Application. As of September 30, 2021, we had an aggregate of 3.1 GW of renewable energy assets using the Fluence Bidding Application and 1.6 GW of contracted backlog related to renewable and energy storage assets. We expect our services and Fluence IQ digital applications, including the Fluence Bidding Application, to expand meaningfully over the next five years and contribute increasingly to our bottom-line growth.

**Our Industry and Market Opportunity**

Climate change is an existential threat. Severe weather events and broader awareness of the financial implications of climate change are driving a systemic global transition away from fossil fuels towards sustainable energy systems. However, renewable generation, unlike fossil fuel generation, has no inherent storage capacity and can only be used in favorable wind and solar conditions. Energy storage is therefore a critical enabler of large-scale adoption of 24/7 renewable energy. Furthermore, accelerating electrification of industries such as transportation is driving demand for more generation. Energy storage can help both serve and smooth additional peak demand, improving grid reliability and managing energy requirements.

As the first truly digital asset on the electric grid, energy storage is also a uniquely flexible tool for grid planners, operators, and power providers. We believe energy storage sits at the epicenter of the global clean energy transition and represents the backbone of a massive change in our energy market infrastructure driven by three key trends: Grid modernization, decarbonization, and digitalization. The energy transformation will require $100 trillion of investment through 2050 based on the midpoint of Bloomberg New Energy Finance's ("BloombergNEF") NEO 2020 clean electricity and green hydrogen pathway.

113



Source: BloombergNEF; Note: Coal excluded from conventional generation for purposes of estimating Digital Applications and Solutions TAM

*Energy Storage Market Opportunity*

The energy storage market is comprised of three components: energy storage products; services; and digital applications and solutions. Energy storage products encompass the components (including batteries), professional services, and labor required to manufacture, assemble, and install products. Services include the recurring operational and maintenance services that energy storage products require, management services that are provided by third parties when asset owners outsource the operations of their systems, and the provision of ESaaS. Digital applications and solutions include operating systems, applications, such as trading platforms that allow system owners to manage their grid participation, and dynamic capacity services, such as virtual power plants ("VPPs"). These trading platforms and VPPs can be deployed on both energy storage assets and renewable and conventional generation assets.

The energy storage products market is driven by the deployment of new energy storage products globally, and its addressable market is comprised of the annual spend associated with the manufacturing, delivery, and installation of new energy storage products. According to BloombergNEF, global annual energy storage capacity installations, excluding the residential market, grew from 0.6 GW a year in 2015 to 3.8 GW a year in 2020, and are expected to grow to 34.2 GW a year by 2030. We believe most forecasts for the energy storage sector, including BloombergNEF's, understate the size and market opportunity as forecasts generally only account for spend associated with the physical energy storage asset and do not account for the associated service and digital spend.

The services market is driven by the growth in installed energy storage products globally, and its addressable market is comprised of the recurring annual service spend across the entire fleet of energy storage products, which is continuing to grow through new product installations. According to

114

BloombergNEF, global installed energy storage capacity, excluding the residential market, grew 57% per annum between 2015 and 2020, and the installed base is expected to grow at a 31% annual growth rate through 2030. BloombergNEF forecasts that global installed energy storage capacity will reach 193.7 GW by 2030, excluding the residential market.

The digital applications and solutions sector is driven by the growth in installed energy storage products and renewable and conventional generation assets, and its addressable market is comprised of the total global installed fleet of energy storage products and renewable and conventional generation assets. The digital applications and solutions economic model is primarily structured as (i) $/kilowatt ("kW") recurring fixed fees, and in some cases (ii) $/kW performance-based incentive fees both calculated based on the GWs of storage and generation assets on which digital applications and solutions service offerings are deployed. We believe there is an opportunity to not only deploy digital applications and solutions on individual assets but also across entire energy storage fleets and portfolios of generation assets to improve their collective performance and economic output, and to reduce the overall carbon footprint of the electric grid by optimizing the interactions between different asset types.

### Key Drivers of Growing Energy Storage Market

We believe there are multiple factors driving continued growth in the energy storage sector including:

- *Heightened grid variability from the increasing prevalence of renewable energy and decarbonized technologies.* BloombergNEF forecasts that 1,298 GW of coal and natural gas power plants are expected to be retired globally over the next 10 years and that renewable energy is expected to represent approximately 75% of all new global capacity installations in the same period. Energy storage is a proven replacement for retiring natural gas plants, as evidenced by the AES Alamitos Battery Energy Storage System in Long Beach, California, which uses Fluence technology and was procured specifically to replace a retiring natural gas plant that provided critical peaking capacity for the LA Basin. The accelerating transition from fossil to renewable generation and from conventional to electric vehicles is expected to require significant increases in energy storage capacity to both offset potential grid instability caused by intermittent renewable resources and enable the use of power from renewable generation assets at times when the natural resource is unavailable.

- *Ability to compensate for infrastructure constraints.* The existing power grid was not designed to support distributed and renewable generation infrastructure. Growing capacity constraints on transmission lines are forcing grid operators to curtail, or dump, excess renewable energy, limiting the ability to decarbonize the grid. Energy storage assets placed at strategic nodes on transmission networks allow power to be transmitted during times of increased transmission capacity. This reduces congestion, increases use of existing transmission lines, and lowers system operating costs. Additionally, by being able to store renewable power, grid operators can use renewable energy to meet potential power shortfalls that would otherwise be met by traditional sources of energy such as natural gas peaker plants.

- *Expected decrease in battery costs.* According to BloombergNEF, the component costs for lithium-ion battery packs are expected to fall from $161/kWh in 2020 to $73/kWh in 2030, which represents an 8% annual reduction over this period. This forecasted reduction in the battery cost is expected to improve the economics of energy storage and support the development of larger energy storage systems. Moreover, the levelized cost of storage (LCOS) of battery storage has decreased from an estimated $324/MWh in 2018 to an estimated $192/MWh in 2020, according to the Lazard Levelized Cost of Storage Analysis. This reduction in cost makes battery storage economically competitive with the gas peakers which are estimated in 2020 to have a levelized cost of energy (LCOE) range of $151/MWh to $198/MWh, according to the Lazard Levelized Cost of Energy Analysis.

- *Corporate and investor support for decarbonization.* Over 300 major companies have pledged to source 100% of their energy from renewable energy as part of the RE100 initiative. This trend has driven over 13 GW of corporate power purchase agreements to be signed in the United States in 2020 compared to just 3 GW in 2017, according to BloombergNEF. Additionally, environmental responsibility has also become a priority for investors. In September 2020, Climate Action 100+, an

115

investor initiative representing 500 global investors collectively managing more than $47 trillion in assets, sent letters to multiple corporations to urge them to set clear goals to pursue net-zero emissions by 2050 or sooner.

- **Favorable government policy initiatives.**   Governments across the globe have announced policies to support the transition from fossil fuels to low-carbon forms of energy. For example, the United States recently rejoined the Paris Agreement and proposed a tax incentive for standalone energy storage projects as part of President Biden's American Jobs Plan. Internationally, the European Union has proposed legislation targeting achieving net-zero emissions by 2050, Australia announced a targeted two-thirds reduction in emissions per unit of gross domestic product by 2030, and India pledged to achieve a 33-35% reduction in emissions intensity by 2030.

### Our Products and Services

Our offerings include energy storage products and delivery services, recurring operational services and digital solutions and applications for energy storage and other power assets. We have repeatedly pioneered new use cases for grid-scale energy storage. Some of the uses we have supported include frequency regulation, generation enhancement, capacity peak power, energy cost control, microgrids/islands, renewable integration, virtual dams, T&D enhancement, and critical power.

#### *Energy Storage Products*

We sell highly configurable energy storage products with integrated hardware, software and digital intelligence. Unlike other energy storage providers, we take a customer- and market-centric approach, building products and technology based on customer needs and economic feasibility. We offer three energy storage products built on our sixth-generation Tech Stack foundation, which are optimized for common customer use cases but can be configured for specific use cases:

- *Gridstack™*:   grid-scale, industrial-strength energy storage product designed for demanding market applications with industry-leading reliability, scalability, and safety. Its design is built for applications including flexible peaking capacity, frequency regulation, renewable integration, transmission, and distribution enhancement and more.

- *Sunstack™*:   designed to optimize solar capture and delivery. Its product architecture unites batteries and PV on the same side of the DC bus to take advantage of higher PV-to-inverter ratios, maximize solar yield, and simplify the interconnection process.

- *Edgestack™*:   commercial energy storage product that discharges when needed to flatten a facility's energy load profile, resulting in significantly reduced demand charges. The fully integrated product is available in smaller-size building blocks that can be easily configured to meet the needs of individual facilities and aggregated across fleets or locations without time-consuming redesigns.

We also offer comprehensive engineering and delivery services to support the deployment of our storage products. Customers can select from a range of delivery service, from project design to full-wrap turnkey installation.

We have designed our energy storage products to allow for licensing to third-party partners, and plan to offer the ability to license Fluence products, services, and digital applications to partners targeting specific geographies and market use cases.

#### *Sixth-Generation Technology Stack*

Our energy storage products are built on our Tech Stack, which is comprised of our Fluence Cube, Fluence OS, and Fluence IQ. The Tech Stack builds upon 13 years of development in prior generations (introduced in 2008, 2009, 2010, 2014, 2017), reflecting ongoing safety and design improvements.

Fluence Cube is a modular, factory-built, approximately 8'x8'x8' building block that delivers safe, scalable, cost-effective products. Our battery and supplier-agnostic product architecture allows us to deliver optimized solutions for our customers on a global scale while incorporating the latest technology components.

116

- *Component Flexibility*:   incorporates various technologies to meet common requirements for power, duration, and battery technology, with no need for custom design. The technology-agnostic approach avoids vendor lock-in and reduces risk.

- *Embedded Safety*:   comprehensive safety features are built into each Fluence Cube, including HVAC, fast-stop, incipient gas detection, fire suppression, deflagration panels, and more, while factory assembly provides consistent quality control. Continuous safety upgrades are based on extensive research, industry-leading experience, and ongoing design improvements.

- *Rapid Delivery and Augmentation*:   repeatable form factor drives efficiencies in project design and Balance of Plant interfaces. The Fluence Cube ships with all battery, cooling, and controls equipment pre-installed to support rapid on-site installation and commissioning. Our building block approach is designed to help customers meet current requirements and enable optimal augmentation of products over time, taking advantage of falling battery prices and best-in-class technologies.

Fluence OS is a sixth-generation, fully integrated edge controls platform with comprehensive control, asset management, and system visibility across single sites or entire fleets. It enables asset owners to manage storage system operations according to pre-set modes and access real-time information through cloud-based data. The OS architecture uses three levels of supervisory controls and embedded logic to coordinate system charging and discharging based on operating parameters and constraints.

- *Comprehensive Controls*:   system operations can be set to a variety of modes, with ability to actively manage state of charge and control the timing and parameters of different storage applications. Integration is also enabled with external interfaces, independent system operators, and third-party software via common protocols.

- *Precise Dispatch*:    suite of dispatch algorithms for more than 40 controls applications built on historical data and market requirements for optimal accuracy and performance. Market-specific algorithms are updated based on rule changes and other developments.

- *System Visibility*:   access to real-time performance and operating metrics through multiple system views covering the full storage array down to individual Fluence Cubes. Customers can view time-stamped system alarms displayed in a hierarchy of warnings and alerts. Comprehensive data acquisition and cloud-based storage enable regular system monitoring.

- *Embedded Safety*:   Fluence OS provides additional layers of protection beyond hardware components and continuously monitors, detects, and alerts operators to potential anomalies for immediate attention, including to Fluence's 24/7 monitoring staff.

- *Data and Cybersecurity*:   Fluence follows the National Institute of Standards and Technology cybersecurity framework and supports North American Electric Reliability Corporation cybersecurity standards. Fluence software and systems employ enterprise-class network security with firewall software monitoring and controlling all local network traffic, including weekly vulnerability scanning and patching on local devices. High-grade, Advanced Encryption Standard 256-bit encryption protects all data in transit from local systems to our virtual private cloud ("VPC"), and external access utilizes multifactor authentication.

The Fluence IQ Digital Platform supports applications to improve revenue generation, system decision-making, asset performance, and operations.

- *Price Forecasting*:   AI predicts pricing in energy and ancillary service markets to produce probabilistic forecasts. Advanced machine learning analyzes thousands of variables to predict future market prices every five minutes.

- *Precise Dispatch*:   suite of dispatch algorithms for more than 40 controls applications built on historical data and true market requirements for optimal accuracy and performance. Market-specific algorithms are updated based on rule changes and other developments.

- *Machine Learning*:   data science-driven models leveraging hundreds of terabytes of historical data create new digital applications for ongoing system operations and management. Digital intelligence tools are used to predict capacity with battery degradation models, predict pricing in energy and

117

ancillary services markets, optimize storage system sizing based on lifetime usage profiles, and detect anomalous temperature activity.

- *Advanced Reporting*:   Cloud-based reporting provides interactive visualizations and pre-configured analyses on key system performance indicators, including system availability, state of health, discharge cycles, outages, and more.

### *Services*

### *Operational & Maintenance Services*

In addition to energy storage products, our offerings include delivery services and recurring operational services. Our recurring O&M services are designed around customer business needs, in-house capabilities, performance requirements, and risk profiles. We offer four operational services packages: Guided Services, Shared Services, Complete Services and Asset Management. These packages provide varying levels of training, maintenance, guarantees, warranties, and support to address our customers' desired level of active system management. The service levels range from providing comprehensive training for customers to performing full asset operation and management on behalf of the customer. Fluence services help secure products with back-to-back OEM equipment warranties and extensive claims support. We help safeguard customer asset revenue potential over project life with degradation, capacity, and availability guarantees. Preventive and reactive maintenance services maintain equipment and optimal operating conditions, backed by 24/7 support and what we believe to be the most experienced team in the industry.

### *Energy Storage-as-a-Service*

Fluence, working with third-party financial partners, including Siemens Financial Services, offers financing structuring services to customers. For instance, ESaaS enables customers to access the benefits of energy storage without upfront investment or technical expertise.

We are continuously innovating new service offerings for our customers, including providing support for Fluence products, services, and digital applications to channel partners such as Siemens.

### *Digital Applications and Solutions*

Our team is continuously expanding the digital applications we offer to customers. Those applications may include internally developed applications as well as third-party applications offered through the Fluence IQ Digital Platform.

Our proprietary operations platform, Fluence OS, enables asset owners to manage storage system operations according to pre-set modes and access real-time information through cloud-based data. It is an integral part of all our energy storage product sales. Fluence IQ encompasses proprietary artificial intelligence and data science technologies to enable the advanced capabilities of our digital applications. Fluence IQ leverages terabytes of data gathered from Fluence OS and external sources to inform price forecasting, anomaly detection, and system size optimization. Fluence OS controls software enables Fluence energy storage products to deliver critical grid services such as primary frequency regulation, secondary frequency response, fast frequency response, peak shaving, voltage regulation, power factor regulation, non-spinning reserves, capacity peak power, solar energy time-shifting, firm solar export, energy arbitrage, and more. Fluence also delivers stacking of grid services, allowing storage assets to perform multiple services simultaneously and increase revenue-generating opportunities. In addition to Fluence OS, we offer specialized digital applications, such as the Fluence Bidding Application.

The Fluence Bidding Application, which we acquired from AMS in 2020, is a leading artificial intelligence-enabled bidding software for utility-scale storage and renewable and conventional generation assets, enabling customers to optimize asset trading in wholesale electricity markets. That leadership is demonstrated by the fact that it has been selected by one customer for deployment in the California market to optimize a system acquired from a Fluence competitor. In addition, it is currently used to optimize approximately 20% of all the utility-scale wind and solar assets bidding into Australia's National Electricity Market ("NEM"), including one of the largest solar farms in the country. One of the goals of the AMS

118

acquisition is to combine Fluence's insights from deep experience operating energy storage products globally with the Fluence Bidding Application's optimized market participation capabilities.

The Fluence Bidding Application provides energy traders with a range of optimization solutions:

- *Advanced Price Prediction:* State-of-the-art machine learning techniques, producing an ensemble of price forecasts (P10 to P90) for each product across day-ahead and real-time markets;

- *Optimized Bidding:* Stochastic optimization that captures technical constraints and business objectives to produce bids across energy and ancillary services in day-ahead and real-time markets; and

- *Automated Trading*: System-generated complete bid files (with option for customer override) for seamless transmission to market operators and real-time review of market results.

Our Bidding Application is technology-agnostic (it can be applied to wind and solar assets as well as energy storage assets) and vendor-agnostic (it is available to optimize non-Fluence storage products), and is delivered using cloud-based software-as-a-service, avoiding requirements for onsite hardware or software installations. Our pricing strategy is based on a volume-based subscription fee with the ability to start with a smaller scale and increase the number of assets covered by the software as customers build out their fleets, along with the potential for performance-based revenue-sharing structures.

The Fluence Bidding Application analyzes thousands of variables to provide leading price forecasting and optimization using proprietary machine learning algorithms. The resulting market-compliant bids can increase revenue for wind and solar asset owners by up to 10%, and up to 25-30% for energy storage asset owners over a 12-month period compared to manual trading. The Percent of Perfect Foresight ("PoP") metric helps asset owners evaluate the performance of an algorithmic trading approach by comparing it with the maximum revenue an asset could have attained if it had perfect knowledge of actual market prices (i.e., "perfect foresight"). The Fluence Bidding Application has delivered up to 90% PoP to customers in Australia's NEM.

To protect the Fluence OS and Fluence IQ, we employ enterprise-class network security, with firewall software monitoring and controlling all local network traffic. Secure, role-based user access is done via a virtual private network ("VPN") with multi-factor authentication and 256-bit encryption. High-grade, Advanced Encryption Standard 256-bit encryption is used to protect all data in transit from local systems to the VPC. Data in transit takes place over secure, site-to-site VPN tunnels. A secure, logically isolated cloud environment uses restrictive firewall and security group rules to limit connectivity within the VPC. All external access to the cloud is done using VPN with multi-factor authentication.



119

To protect the Fluence Bidding Application, we employ similar network security measures, complete with firewall software monitoring, strict network environment partitioning, and encrypted traffic between all systems. Our authorization and authentication solution leverages the industry standard provider Auth0, requires multi-factor authentication and strong password requirements for all users, and contains monitoring, alerting, and limiting to ensure resiliency against concentrated attacks and immediate knowledge of inappropriate access. Data in transit takes place over secure site-to-site VPN tunnels and SSL/TLS. Services deployed in logically isolated cloud environments are separated using strict network partitioning and are not accessible to the internet except for specific bastion nodes. All external access to the cloud is done using either VPN with multi-factor authentication or secure public/private key Secure Shell Protocol.

**Our Competitive Strengths**

We believe the following key strengths have enabled us to become a leading provider of energy storage products, services, and digital applications, positioning us to continue to capture future market opportunities:

- *Incumbent position with global track record of success.* We are one of the largest providers of energy storage products globally, with 1.0 GW of energy storage assets deployed and 2.7 GW contracted backlog, and a track record of 13 years of experience from our predecessor companies. We have a presence across 29 markets and supplied the first battery-based energy storage products in 18 of those markets. Additionally, as of September 30, 2021, we had an aggregate of 3.1 GW of renewable energy assets using the Fluence Bidding Application and 1.6 GW of contracted backlog related to renewable and energy storage assets. Moreover, through Fluence OS, we have access to hundreds of thousands of hours of cumulative energy storage system operating history, with over 290 terabytes of data on operation and performance as of June 30, 2021. This data enables us to optimize our asset base, dispatching them to maximize economics, reduce operational costs, extend useful lives, and deliver critical grid services when needed.

- *Disruptive digital and software products.* Fluence uses multi-layered design of edge and cloud applications, including Fluence OS and Fluence IQ, to transform hardware into digital assets with extensive market and grid services, such as the Fluence Bidding Application. Our dedicated Fluence Digital team is focused on developing and commercializing additional cloud-based digital application using optimization, AI-driven predictive analytics, and software to address the challenges customers face when participating in complex energy markets. We have delivered our digital products using a software-as-a-service business model suitable to Fluence's growth plan. We are evolving to a platform-as-a-service to allow customers to implement their own propriety applications on Fluence's digital platform to flexibly serve their growing needs across global energy markets.

- *Large installed base enables cross-selling and incremental revenue streams.* Our installed base is a captive market for repeat customers and high-margin follow-on service and digital opportunities, as we are best positioned to provide tailored, value-maximizing solutions for our own products. The majority of our customers adopt energy storage as a new asset class and return for subsequent products purchases. We believe our substantial base of customers and data enables cross-selling of our service and digital offerings. Conversely, digital applications sold to non-Fluence energy storage product customers can enable energy storage product cross-sales. By deploying learnings from our digital application customers to develop offerings that meet their business needs, we believe we can create opportunities to convert them into system owners.

- *Global supply chain and technology partnerships.* We have developed a global supply chain with an evolving regionally focused operational model with the objective of assembling products near project sites and partnering with innovative suppliers. For example, we recently signed a technology co-development and supply agreement with Northvolt that expands our battery supply chain into Europe and allows us to develop, manufacture, and commercialize an optimized battery subsystem that is significantly more energy dense than today's standard solutions. The agreement also enables us to deploy a battery management system that we can integrate with other vendors to extend our value chain, develop battery competencies, and lower total cost of ownership.

- *Battery technology-agnostic.* Our energy storage products are designed to work with many types of batteries, and we have established partnerships with the leading battery manufacturers around the world, with approximately 20 GWh of contracted battery supply expected through 2024. As a result,

120

we do not believe we are exposed to significant risk from changes in battery technology or shifts in market share between different manufacturers. Our sixth-generation product line, as well as our earlier product lines, can take advantage of current and next-generation lithium-ion and lithium batteries (e.g. solid state).

- *Experienced management team with extensive energy storage experience.* We believe we have assembled one of the most experienced management teams in the energy storage sector, with over 200 years of aggregate industry experience and a proven track-record of managing high-growth, international operations for global industrial and technology companies. Members of our management and Board were on the team that conceived and tested the first ever grid-connected lithium-ion energy storage products and sold the world's first commercial system.

**Our Growth Strategy**

We intend to leverage our global scale, technology leadership, and market share position to help transform the way we power our world for a more sustainable future. Some key elements of our growth strategy include:

- *Develop energy products, services, and digital applications packaged into solutions that solve customers' energy challenges.* Our close relationships with customers and our market intimacy informs our hardware and software product development and service offerings and enables us to continually expand use cases for energy storage on the grid. Our technology addresses customers' existing energy challenges and we are committed to continuing to push the edge of innovation for grid modernization and decarbonization as our customers' business models evolve.

- *Expand competitive advantage of productization and manufacturing.* We aim to create an optimized production organization, develop mass manufacturing facilities globally, and continue to secure partnerships with key battery suppliers. We believe that enhancing our product-focused model and supply chain leverage will support our global growth objectives and result in superior unit economics.

- *Optimize sales channels and market segmentation with a regionalized model.* We are focused on expanding standardized offerings that are optimized for each of our sales channels. Having customizable packages for geographic and market segments streamlines product procurement for our customers, improves our sales cycle, enhances our ability to scale, and supports our margin expansion. We are also moving to a more localized, regional organizational structure to better support customers and sales channels, improve logistics, and enhance market focus.

- *Leverage our sponsor relationships to accelerate global growth.* Our partnerships with AES and Siemens provide built-in and growing customer bases and an international sales channel. AES is one of the world's leading power companies, with operations focused on generating and distributing electric power in 14 countries, while Siemens is a technology powerhouse with a sales and delivery presence in 200 countries. We have benefited from AES' clean energy project development expertise and position as an anchor customer, as well as Siemens' global sales channels and deep customer relationships. In addition, in 2021, QIA became a strategic sponsor with its investment through QFH that may help position us to form relationships with additional technology partners, customers, and suppliers.

- *Expand our services with additional value-add offerings.* Our delivery and operational service offerings address the diverse needs of our customers in different markets around the world. We intend to build and expand our portfolio of service offerings, including system upgrades, analysis, performance assurance, risk management products, and software support, using data-driven insights generated from our large installed base of energy storage products.

- *Accelerate the deployment of the Fluence Bidding Application and develop new Fluence IQ digital applications.* Our digital offerings enable renewable and energy storage asset owners to solve the complexities of power system dispatch on a grid that remains dependent on out-of-date infrastructure and inefficient tools. We are focused on making the Fluence Bidding Application available in more markets while expanding our breadth of digital application offerings, including integrated solutions for specific customer segments and new asset classes.

121

- ***Incubate innovative business models.*** As a market leader in energy storage and renewable bidding optimization, we are uniquely positioned to pioneer new use cases and customer offerings as the market evolves. We continue to explore disruptive digitally driven business models, including ESaaS, wide-ranging dynamic capacity, virtual storage, asset- and revenue-sharing models, and other offerings that will reinforce our position as a leading provider of comprehensive solutions to support the clean energy transition.

- ***Ability to acquire and successfully integrate companies.*** We have a demonstrated track record of successfully acquiring and integrating companies, and believe we have the operational structure in place to achieve synergies and capture cross-selling opportunities. For example, within eight months of acquiring AMS, we had fully integrated the team and technology into Fluence and grown adoption of the Fluence Bidding Application software by 1.7 GW.

**Industry Recognition**

Guidehouse Consulting has ranked us as the leading energy storage system provider since our inception, based on factors including vision, go-to-market strategy, product performance, technology, and execution. Our numerous awards also include being ranked the leading global utility-scale energy storage systems integrator by Navigant in 2018 and the largest energy storage system integrator in a 2021 report by Clean Horizon, and winning Best Commercial Technology of the Year at the 2020 *S&P Global Platts* Global Energy Awards.

Additional awards include:

- Fast Company's Most Innovative Companies Award, Energy Category (2019 and 2021)

- Frost & Sullivan, 2021 Global Grid Battery Energy Storage Product Leadership Award

- 2020 Green Power Leadership Awards, International Green Power Market Development

- DistribuTECH 2017 Project Awards, Grid Optimization Winner

- 2017 Energy Storage North America Innovation Award, SDG&E Expedited Energy Storage Project

- Edison Awards 2012, 2016 International category and 2021, US Category

- 2014 ESA Outstanding Industry Award

**Product Offering Roadmap and Philosophy**

Our products reflect the innovation and engineering capabilities of our people. Our product roadmap is rooted in delivering value to the customer through differentiated products and services designed to solve their energy challenges. Products and services are built on and enhanced by our digital capabilities.

Continuously creating new market applications (such as storage as a transmission asset and virtual dams) and business models that open new opportunities for energy storage are at the heart of our product development philosophy. Our product philosophy is also based on a strong belief in standardizing, mass manufacturing, and continuously optimizing core elements of our products while simultaneously aggregating different offerings into customized packages to provide a unique customer experience. Third-party services and digital applications from strategic partners can also be included in the packages. We have been consistently at the forefront of innovating customer applications by packaging our capabilities into new offerings that deliver valuable grid services not previously offered through energy storage.

In addition, we are developing improvements to our product offerings to reduce costs and promote a product-based sales approach in which the customer can choose products from a determined portfolio of feature, service, and digital application options.

We are also planning to introduce improvements and additional functionality to our digital applications, enabling customers to select an optimized set of features to fit their needs. Developing new digital capabilities and applications enables us to innovate new business models, like virtual power plants or structuring an ESaaS offering to support a faster and more efficient clean energy transition.

122

In addition to the existing Fluence Bidding Application, we plan to develop a suite of market-agnostic Fluence IQ digital applications that will increase our addressable market by accelerating our entry into U.S. regulated power markets, expanding our existing presence in U.S. wholesale power markets, and enabling our entry into wholesale power markets in Europe and Asia. This includes potentially incorporating carbon optimization into digital applications such as a bidding app, a dispatch app, a manage app and an invest app that can be modified by the customer for any organized market and any renewable asset type. As the clean energy transition continues to evolve, we believe we can provide Fluence solutions to support emerging customer needs and business models.

## Research and Development

We have an established R&D organization with centers in Arlington, VA, San Francisco, CA, and Erlangen, Germany. Our R&D teams, with deep expertise in batteries, data science, industrial controls, mechanical and electrical engineering, and software development, are focused on building innovative new products, technologies, and digital applications. Our R&D organization covers both core technology and product development (e.g., integrated storage products) as well as cutting-edge artificial intelligence and data science work to drive value-added digital and software applications. Fluence's new organizational function—Fluence Next—is focused exclusively on assessing longer-term emerging and next-generation technologies that can enable the clean energy sector.

Our development strategy is to identify products and features that bring value to our customers and differentiate us from our competitors. We evaluate and prioritize our R&D initiatives beginning with defining market requirements, which includes customer research, a program budget, financial payback, resource requirements and time required to launch the new product, system, or service into the market. We employ a stringent engineering stage gate review process that ensures all R&D programs are meeting their stated objectives from inception to deployment.

We have a strong R&D team consisting of 69 employees with significant experience not just in energy storage technology, but also in global energy markets and regulatory structures. As needed, we collaborate with academia, national laboratories, and consultants to further enhance our capabilities and confirm results independently.

## Sales, Marketing, and Partnerships

Our sales and marketing strategy is to educate key stakeholders involved in procuring, building, owning, and maintaining energy storage products on the merits of our products, services, and data applications, including the benefits of greater configurability, reliability, data-driven intelligence, safety, operational flexibility, and cost advantages compared with competing products. To make our innovative solutions the preferred offerings globally, we conduct comprehensive analysis of market requirements and dynamics and develop in-depth customer segmentation to ensure we are focused on meeting precise needs of customers and pursuing optimal sales and marketing strategies in our target markets.

We educate customers and stakeholders through a combination of multichannel and account-based marketing, thought leadership, educational whitepapers and webinars, independent third-party studies, training seminars, and participating in industry conferences and events. Fluence regularly engages in regulatory proceedings and helps drive policy and market reform to open new markets to energy storage participation.

As of May 31, 2021, the Fluence global sales team included 61 employees. We have dedicated regional sales teams to enable faster and more agile decision-making and a focus on region- and market-specific business objectives and customer needs. We also work with third-party sales channels, including Siemens. Our sales relationship is with Siemens Smart Infrastructure and its local sales organization in 200 countries. We have various sales models, including pass-through sales, consortium approaches, and sales support, and we provide channel support tools like sales collateral and in-depth training for our sales partners.

## Our Customers

We have deployed energy storage products in 29 markets on six continents. We sell our products to a wide range of customers around the world, including utilities / load-serving entities, independent power

producers, developers, conglomerates, and C&I customers. In fiscal 2020, our five largest customers represented approximately 90% of our revenues. As of June 30, 2021, we had a gross global pipeline of 13.3 GWs, and customers in the United States composed the largest portion of our gross global pipeline at 6.5 GWs or 49%, with the United Kingdom following at 1.7 GWs or 13%, and Australia at 0.7 GWs or 5%.

**Our Commitment to Responsible Environmental and Ethical Practices**

Our mission is to transform the way we power our world for a more sustainable future. We support the clean energy transition by enabling greater adoption of renewable energy and reduced use of thermal generation resources. Our offerings enable more sustainable, reliable, and resilient electric grids in a repeatable, scalable way.

The AES Alamitos Battery Energy Storage System, which uses Fluence technology, exemplifies our commitment to sustainability. Providing 100 MW / 400 MWh of renewable energy storage to reduce California's reliance on fossil fuels, it represents the first time in the U.S. that an energy storage product was procured as a peak capacity resource instead of natural gas. This system can provide enough energy to cleanly power 22,000 homes during peak conditions.

We plan to report how we oversee and manage environmental, social, and governance ("ESG") factors material to our business under the sector-specific ESG standards recommended by the Sustainability Accounting Standards Board (the "SASB"), including an annual sustainability report. As part of our plan to provide ESG disclosures pursuant to SASB standards, we will evaluate aligning our internal sustainability goals with certain United Nations Sustainable Development Goals. On an annualized basis, based on MW deployed as of May 2021, we estimate Fluence energy storage products have eliminated 145,000 metric tons of carbon per year that would have otherwise been produced—the equivalent of taking more than 30,000 cars off the road each year.

Our supplier code of conduct is at the core of our compliance expectations, and addresses environmental protection, child labor, conflict minerals, and anti-corruption, among other areas. In addition, we only purchase raw materials and minerals from trusted suppliers. In sourcing cobalt for example, we request that suppliers provide an official cobalt statement disclosing its origin, and we only buy cobalt battery chemistry from suppliers who are part of a sustainable cobalt sourcing initiative. In 2021, our supply chain sustainability coordinator engaged the Carbon Disclosure Project to conduct an audit of our supply chain's carbon footprint.

In addition, we are committed to implementing responsible environmental and ethical practices in our corporate offices as well as our supply chain. Our offices are internationally certified to ISO 14001, which requires an organization to implement and demonstrate compliance with an effective environmental management system to identify and control the environmental impact of its activities, products, and services; continually improve environmental performance; and implement a systematic approach to setting environmental objectives and targets.

**Human Capital Management**

We believe our workforce is critical to our success and we strive to create a positive, equitable, and safe work environment. A survey of employees during the pandemic revealed that most people prefer to work remotely rather than in the office, so Fluence has moved to a 75% remote work policy permanently and offers employees a stipend for home office equipment. To create a culture of transparency, we maintain a regular cadence of communications from the executive leadership team to employees, including emails, quarterly all hands meetings, Q&A sessions, and employee resource groups with executive sponsors.

As of May 31, 2021, we had 379 full-time employees. None of our employees in the United States is represented by a labor union. As of May 31, 2021, approximately 64 of our employees in Germany were represented by a works council. We have not experienced any employment-related work stoppages, and we consider relations with our employees to be good.

Our purpose-driven culture has fostered a work environment in which employees feel supported, empowered to develop in their careers, and fulfilled in their work. Initiatives driven by this culture include a partnership with Inova through which we provide free professional and wellness services to employees and

124

professional development courses made available to all employees. To assess and continually improve employee sentiment, we conduct regular employee surveys soliciting feedback on topics such as work/life balance, working remotely, career development, and mentorship.

Fluence is internationally certified to ISO 9001, a quality management standard that ensures a commitment to customer satisfaction, purpose-driven leadership, and equitable involvement for all employees. Fluence is also internationally certified to ISO 45001, an occupational health and safety standard which requires certain proactive measures to ensure employee safety and reduce workplace risks. Fluence's corporate headquarters is certified to SA8000, which demonstrates our commitment to the elimination of unethical and discriminatory labor practices, while affirming workers' rights, livable wages, and treating all people with dignity.

Fluence is committed to fostering a culture of diversity and inclusion that makes our employees feel safe and engaged. We have conducted trainings for hiring managers on how to avoid bias in the interview process, and formed a diversity and inclusion working group to identify and address areas for improvement. Our workforce includes citizens of 38 countries. Women represent 24% of our total workforce and 40% of our key corporate management roles.

**Manufacturing**

Our manufacturing strategy is designed to meet our key objectives: limit capital-intensive and low value-added activities that can be outsourced to other companies; maintain a capital light business model; minimize labor content where possible; minimize the amount of assembly our customers are required to do at the site; and minimize material movement both from vendors to us and within factories.

Mass manufacturing is a cornerstone of our product delivery approach and a key to driving down product cost and delivering at scale. We aim to create an optimized production organization, develop mass manufacturing capabilities globally through contract manufacturing, and continue to secure partnerships with key battery suppliers. We believe that enhancing our product-focused model and supply chain leverage will support our global growth objectives and result in superior unit economics.

We have entered outsourcing contracts for the assembly and production of our Fluence Cube, which ship directly from our contract manufacturers to job sites or designated warehouses. By using regional contract manufacturers, we can drop ship products directly to our customers' sites, which improves working capital turnover, quality, and inventory management. The Fluence Cube is currently manufactured in Asia, and we intend to expand manufacturing to sites in North America and Europe. As of July 31, 2021, Fluence has contracted approximately 1.2 GW of our sixth-generation products.

We have developed a global supply chain with an evolving regionally focused operational model with the objective of allowing us to assemble products in proximity to major markets to minimize material movement, working capital investment, and costs of goods sold. Additionally, we believe that the volume of key components we purchase, such as lithium-ion batteries, provides us preferential pricing, terms, and availability from our suppliers, creating a competitive advantage. We recently entered into a technology co-development and supply agreement with Northvolt that expands our battery supply chain into Europe. Pursuant to this agreement, we have a license to develop, manufacture and commercialize an optimized battery subsystem that is significantly more energy dense than today's standard solutions. The agreement also enables us to deploy as a battery management system that can be integrated with other vendors to extend our value chain, develop battery competencies, and lower total cost of ownership.

**Intellectual Property**

The success of our business depends, in part, on our ability to maintain and protect our proprietary technologies, information, processes and know-how. We rely primarily on patent, trademark, copyright and trade secret laws, confidentiality agreements and procedures, and other contractual arrangements to protect our technology. Fluence also has a perpetual license (terminable in the event of an uncured material breach) to certain patents and other intellectual property that belong to AES and Siemens, including methods for cooling inverters, overvoltage protections, and transfer of large amounts of data (methodology).

125

As of May 31, 2021, we had access to twenty-one patents and forty-eight patent applications filed by AES in the United States and multiple other countries, and five patents and eleven patent applications filed by Siemens in the United States and multiple other countries. In addition, as of May 31, 2021, we owned ninety-seven trademark registrations globally, one patent application pending for examination in the United States, and eleven domain name registrations. Many of our patents relate to product architecture, application algorithms, and renewable resource integration.

We rely on trade secret protection and confidentiality agreements to safeguard our interests with respect to proprietary know-how and software that is not patented and processes for which patents are difficult to enforce. We believe that many elements of our manufacturing processes involve proprietary know-how, technology or data that are not covered by patents or patent applications, including technical processes, test equipment designs, algorithms, and procedures.

We require our customers and business partners to enter into confidentiality agreements before we disclose any sensitive aspects of our technology or business plans.

**Seasonality**

We experience seasonality and typically see increased order intake in our third and fourth fiscal quarters, driven by demand in the Northern Hemisphere to install energy storage products before the summer of the following year. Combined third and fourth fiscal quarter order intake in fiscal 2019 and 2020 accounted for 80% or more of our total order intake each year. As a result, revenue recognition is typically stronger in our third and fourth fiscal quarters. Cash flows historically have been negative in our first and second fiscal quarters, neutral to positive in our third fiscal quarter, and positive in our fourth fiscal quarter. Our services and digital application offerings do not experience the same seasonality given their recurring nature. See "Recent Developments — Preliminary Fourth Quarter Results."

**Competition**

Our products, services, and digital applications are highly specialized and specific to the clean energy industry. The unique expertise required to design these offerings as well as customers' reluctance to try unproven products has confined the number of firms that produce such products to a relatively small number, particularly in the segments we are targeting. In addition, we are continuously engaging in developing new use cases and opening new market segments, which are often less contested.

Our principal competitors include Tesla and Wartsila, but competition varies by geography, grid service or customer segment. A key differentiator is our ability to identify customer needs and deliver customer-centric products, services, and use cases that can compete in the market either as packages or standalone offerings. We believe we compete favorably based on performance and value-creation, including low total cost of ownership, long-term reliability, varied service options, and convenient and efficient sales and delivery processes. We believe we are the current market leader in our space.

**Government Regulation and Compliance**

Governments across the globe have announced policies to support the transition from fossil fuels to low-carbon forms of energy. For example, the United States recently rejoined the Paris Agreement, an international climate change agreement among almost 200 nations that calls for countries to set their own greenhouse gas ("GHG") emissions targets and be transparent about the measures each country will use to achieve these targets, and proposed a tax incentive for standalone energy storage projects as part of President Biden's American Jobs Plan. Internationally, the European Union has proposed legislation targeting achieving net-zero emissions by 2050, Australia announced a targeted two thirds reduction in the emissions intensity of its economy by 2030, and India pledged to achieve a 33 – 35% reduction in emissions intensity by 2030.

Current and future legislation or regulations that may be adopted to address climate change could make lower GHG-emitting energy sources, such as solar and wind, more desirable than higher GHG-emitting energy sources, such as coal and natural gas. As a result, such climate change regulatory and legislative

126

initiatives with more stringent limitations on GHG emissions would potentially increase the demand for energy storage products.

There are varying policy frameworks across the United States and abroad designed to support and accelerate adoption of clean and/or reliable distributed generation technologies. These policy initiatives come in the form of tax incentives, cash grants, performance incentives, and/or electric tariffs.

Our energy storage products are currently installed or in delivery in Arizona, California, Colorado, Indiana, Maryland, Massachusetts, New York, New Jersey, North Carolina, Ohio, Pennsylvania, Texas, and West Virginia, each of which has its own enabling policy framework. Some states have utility procurement programs and/or renewable portfolio standards for which our technology is eligible. Many states, including California, Massachusetts, and New York, offer tax exemptions or other customer incentives. These policy provisions are subject to change.

Although we generally are not regulated as a utility, federal, state, and local government statutes and regulations concerning electricity heavily influence the market for our product and services. These statutes and regulations often relate to electricity pricing, net metering, incentives, taxation, competition with utilities and the interconnection of customer-owned electricity generation. In the United States, governments continuously modify these statutes and regulations. Governments, often acting through state utility or public service commissions, change and adopt different rates for commercial (and residential) customers on a regular basis. These changes can have a positive or negative impact on our ability to deliver cost savings to customers for the purchase of electricity.

Several states have an energy storage mandate or policies designed to encourage the adoption of storage. For example, Virginia has a mandate for 3.1 GW of energy storage by 2035, California offers a cash rebate for storage installations through the Self Generation Incentive Program, and Massachusetts and New York offer performance-based financial incentives for storage. Storage installations also are supported in certain states by state public utility commission policies that require utilities to consider alternatives such as storage before they can build new generation. In February 2018, the Federal Energy Regulatory Commission ("FERC") issued Order 841 directing regional transmission operators and independent system operators to remove barriers to the participation of storage in wholesale electricity markets and to establish rules to help ensure storage resources are compensated for the services they provide. An appeal of Order 841 filed by utility trade associations and other parties challenging the extent of FERC's jurisdiction over storage resources connected to distribution systems (among other issues) is currently pending before the U.S. Court of Appeals for the D.C. Circuit. In September 2020, the FERC issued Order 2222 opening U.S. wholesale energy markets to aggregations of distributed energy resources like rooftop solar, "behind the meter" batteries and electric vehicles.

Energy storage products require interconnection agreements from the applicable authorities having jurisdiction to operate. In almost all cases, interconnection agreements are standard form agreements that have been pre-approved by the local public utility commission or other regulatory body with jurisdiction over interconnection agreements. As such, no additional regulatory approvals are typically required once interconnection agreements are signed.

**Permits and Approvals**

Each of our installations or customer installations must be designed, constructed, and operated in compliance with applicable federal, state, and local regulations, codes, standards, guidelines, policies, and laws. To install and operate energy storage products on our platform, we, our customers, or our partners, as applicable, are required to obtain applicable permits and approvals from local authorities having jurisdiction to install energy storage products and to interconnect the products with the local electrical utility.

**Government Incentives**

The U.S. Congress is considering a variety of proposals for tax incentives that will benefit the energy storage industry, including in the form of tax credits. IRS private letter ruling 201809003 clarified that energy storage is eligible for federal tax credits if charged primarily by qualifying renewable resources. In

127

December 2020, the U.S. Congress passed a spending bill that includes $35 billion in energy research and development programs, a two-year extension of the Investment Tax Credit ("ITC") for solar power, a one-year extension of the Production Tax Credit for wind power projects, and an extension through 2025 for offshore wind tax credits. In June 2021, the White House announced that it will look into dramatically expanding U.S. production of lithium batteries, rare earth minerals, and semiconductors, and seek to stimulate demand for domestically manufactured batteries by expanding federal energy storage procurement, expanding the ITC to include stationary energy storage as a standalone resource, and instituting power transmission regulatory reform to support renewable power and stationary energy storage. Also in June, the Senate passed a $250 billion bipartisan technology and manufacturing bill whose provisions included: (i) provide $52 billion to support domestic semiconductor manufacturing; and (ii) authorize $16.9 billion for the Department of Energy from FY22 to FY26 for research and development and energy-related supply chains in key technology areas. Proposals being considered by Congress include: (i) the establishment of an ITC for standalone energy storage (i.e., products not paired with a renewable resource); (ii) extension of the federal solar energy ITC for ten (10) more years, keeping the credit at 30% through 2029; (iii) the consolidation of 44 federal energy tax incentives into three provisions to award credits for clean electricity, lower-emitting transportation fuels and energy efficient offices and homes; and (iv) the allowance of renewable electricity production and investment tax credits to be transferred on a limited basis to any entity involved in a renewable energy project, regardless of whether they have taxable income. There can be no assurance that all or any of the above proposals will be adopted by the U.S. Congress.

**Facilities**

Our corporate headquarters are in Arlington, Virginia, and consist of approximately 17,000 square feet of office space. We lease our corporate headquarters. We also have offices in Alpharetta, Georgia, San Francisco, California, Erlangen, Germany, Melbourne, Australia, and Taguig City, Philippines. Our Erlangen office includes an energy storage testing facility.

We believe that our existing properties are in good condition and are sufficient and suitable for the conduct of our business for the foreseeable future. To the extent our needs change as our business grows, we expect that additional space and facilities will be available.

We have gone through rigorous certification processes at several of our offices and are actively pursuing additional certification at others. The corporate office space and the testing facility in Erlangen are ISO 9001, ISO 14001, and ISO 45001 certified (quality, environmental and safety certifications, respectively). Our Melbourne office is ISO 9001 certified, and our U.S. Arlington office is SA8000 certified which is a standard of ethical and decent working conditions.

**Legal Proceedings**

From time to time, we may be involved in litigation relating to claims that arise out of our operations and businesses and that cover a wide range of matters, including, among others, intellectual property matters, contract disputes, insurance and property damage claims, employment claims, personal injury claims, product liability claims, environmental claims and warranty claims. Currently, there are no claims or proceedings against us that we believe will have a material adverse effect on our business, financial condition, results of operations or cash flows. However, the results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, we may incur significant costs and experience a diversion of management resources as a result of claims and litigation.

## MANAGEMENT

The following table provides information regarding our executive officers and members of our board of directors as of the date of this prospectus:

| Name | Age | Position(s) |
| --- | --- | --- |
| Manuel Perez Dubuc | 58 | Chief Executive Officer and Director |
| Dennis Fehr | 41 | Senior Vice President and Chief Financial Officer |
| Seyed Madaeni | 37 | Senior Vice President and Chief Digital Officer |
| Rebecca Boll | 49 | Senior Vice President and Chief Product Officer |
| Carol Couch | 58 | Senior Vice President and Chief Supply Chain and Manufacturing Officer |
| Julian Nebreda | 55 | Director |
| Lisa Krueger | 57 | Director |
| Barbara Humpton | 60 | Director |
| Emma Falck | 43 | Director |
| Axel Meier | 58 | Director |
| Chris Shelton | 50 | Director |
| Simon Smith | 47 | Director |
| Cynthia Arnold | 63 | Director Nominee |
| Herman Bulls | 65 | Director Nominee |
| Elizabeth Fessenden | 66 | Director Nominee |
| Harald von Heynitz | 61 | Director Nominee |

### Executive Officers

Manuel Perez Dubuc has served as chief executive officer of Fluence since May 2020 and served on our board of directors from October 2018 to May 2020. Mr. Dubuc previously served as SVP of Global Renewables at The AES Corporation from October 2018 to May 2020, president of AES South America from March 2018 to October 2018, and president of AES Mexico, Central America and the Caribbean from December 2012 to March 2018. He was also chairman & CEO of Meiya Power Corporation (MPC), based in Hong Kong, and president of AES China and North Asia, based in Beijing. Prior to that, he served as CFO and corporate treasurer for EDC in Venezuela and director for Eletropaulo, Brazil and Ron Santa Teresa, Venezuela. Mr. Dubuc holds an MBA in finance from IESA and a bachelor's degree in electrical engineering from Universidad Simón Bolívar. We believe Mr. Dubuc is qualified to service as our chief executive officer and on our board of directors due to his over 35 years of senior leadership experience in the energy sector and deep knowledge of energy storage technology and renewable energy optimization.

Dennis Fehr has served as Chief Financial Officer of Fluence Energy, LLC since January 2018. Prior to his current role, Mr. Fehr was the Vice President of Finance at Siemens from November 2014 to December 2017. Mr. Fehr's tenure at Siemens dated back to 2003, and he held various finance-related positions across the German, Indonesian and Chinese entities of Siemens from 2003 to 2014. In addition to his responsibilities at Fluence, Mr. Fehr has also served as a member of the Board of Directors of German International School Society Washington, D.C. from June 2019 to present. Mr. Fehr obtained his bachelor's degree in business administration from Cooperative State University Villingen-Schwenningen.

Dr. Seyed Madaeni has served as Chief Digital Officer and head of our Fluence Digital business unit since October 2020. From November 2019 until starting his current role, he was Chief Executive Officer and a member of the Board of Directors of Advanced Microgrid Solutions Inc. (AMS), a leading software-as-a-service startup that was acquired by Fluence in October 2020. Dr. Madaeni began his tenure at AMS in 2018, previously serving as Senior Vice President of Product Strategy and Chief Product Officer. Dr. Madaeni also had engineering roles at Tesla Inc. from February 2017 until January 2018 leading software and digital applications development for energy storage. He also served as Principal Engineer at SolarCity

129

from September 2015 until January 2017. Dr. Madaeni graduated with bachelor's and master's degrees in electrical engineering from the University of Tehran and earned his PhD in Industrial and Systems Engineering from The Ohio State University.

Rebecca Boll has served as Chief Product Officer for Fluence since June 2020. She is responsible for developing energy storage products and services that anticipate customer needs and ensure Fluence's leadership position within the energy storage industry. Prior to joining Fluence, Ms. Boll was Chief Technology Officer for the Digital Buildings business at Schneider Electric. She spent 13 years at General Electric serving as Chief Technology Officer for Licensing & Technology Ventures and previously in various leadership roles at GE Aviation, GE Global Research and GE Power. Ms. Boll's career began in the United States Air Force, where she served for six years as an Electronic Combat Officer on a surveillance plane called AWACS (Airborne Warning & Controls System). She received her bachelor's degree in applied mathematics from Boston University and master's in human relations from the University of Oklahoma.

Carol Couch has served as Chief Supply Chain and Manufacturing Officer of Fluence since May 2021. Prior to joining Fluence, Ms. Couch was the Vice President of Supply Chain Operations at Itron Inc. from November 2016 to April 2021. From March 2016 until joining Itron Inc., she was the Chief Operating Officer and a member of the Board of Directors of DataLogic. From 2014 to March 2016, she was the Vice President of Americas Operations at Hewlett Packard Enterprise. Before 2014, Ms. Couch also had extensive experience in manufacturing and supply chain optimization at several other companies. Ms. Couch obtained her bachelor of science degree and master's in business administration from the University of Colorado—Colorado Springs.

**Non-Employee Directors**

Julian Nebreda has served as a member of our board of directors since September 2021. He currently serves as President of the South America Strategic Business Unit of The AES Corporation since October 2018. Prior to assuming his current position, Mr. Nebreda served as the President of the AES Brazil Strategic Business Unit from April 2016 to October 2018, and the President of the Europe Strategic Business Unit from 2009 to April 2016. Prior to that, Mr. Nebreda held several senior positions, such as Vice President for Central America and Caribbean from 2007 to 2009, Chief Executive Officer of Electricidad de Caracas from 2005 to 2007, and President of AES Dominicana, in Santo Domingo, Dominican Republic from 2003 to 2005. Mr. Nebreda serves as Chairman of the Board of AES Andes and AES Brasil. Before joining AES, Mr. Nebreda has held positions in the public and private sectors, namely he served as Counsellor to the Executive Director from Panama and Venezuela at the Inter-American Development Bank from 1993 to 1999. Mr. Nebreda earned a law degree from Universidad Católica Andrés Bello in Caracas, Venezuela. He also earned a master of laws in common law with a fullbright fellowship and a master of laws in securities and financial regulations, both from Georgetown University. Mr. Nebreda's leadership experience with AES and in the energy storage industry, together with his extensive background in renewables and corporate finance, makes him qualified to govern Fluence as a member of the board of directors.

Lisa Krueger has served as a member of our board of directors since September 2021. Ms. Krueger currently serves as Executive Vice President and President of The AES Corporation in the U.S. since August 2018, where she unites AES utilities, clean energy solutions and generates business to accelerate a greener, smarter energy future for its U.S. customers. She also served as an Independent Consultant from July 2017 to August 2018, Chief Commercial Officer at Cogentrix Energy, LLC from January 2017 to June 2017, and President and Chief Executive Officer at Essential Power, LLC from 2014 to June 2017. Ms. Krueger earned a bachelor's degree in chemical engineering from the Missouri University of Science and Technology and a master's degree from the Jones Graduate School of Business at Rice University. We believe Ms. Krueger is qualified to serve on our board of directors due to her leadership experience at AES and Essential Power, and her deep knowledge of and commitment to clean energy technology and creating a sustainable climate future.

Barbara Humpton has served as a member of our board of directors since September 2021. She is President and Chief Executive Officer of Siemens Corporation, where, since June 2018, she guides the company's strategy and engagement in serving the company's largest market. Previously, Ms. Humpton spent 2015 to 2018 as President and Chief Executive Officer of Siemens Government Technologies, Inc., a leading integrator of Siemens' products and services for federal government agencies. Prior to joining Siemens

130

in 2011, she served as a Vice President at Booz Allen Hamilton where she was responsible for program performance and new business development for technology consulting in the U.S. Department of Justice and U.S. Department of Homeland Security. She has also served as Vice President at Lockheed Martin Corporation, where she was responsible for Biometrics Programs, Border and Transportation Security, and Critical Infrastructure Protection. Ms. Humpton holds a bachelor's degree in mathematics from Wake Forest University. We believe Ms. Humpton is qualified to serve on our board of directors due to her experience as President and Chief Executive Officer of Siemens USA, where she guides the company's strategy and execution in the company's largest market, and to her expertise in the energy industry, including innovative product, technologies and services programs.

Emma Falck has served as a member of our board of directors since September 2021. Ms. Falck currently serves as Head of Strategy of Smart Infrastructure at Siemens Schweiz AG since September 2020. She also served as Managing Director and Partner at the Boston Consulting Group from May 2017 to August 2020, Vice President, Greater China Area New Equipment, and China Frontline Product Strategy and Marketing for the KONE Corporation from 2015 to April 2017. At KONE, Ms. Falck also served as Director, Greater China Area New Equipment, and China Frontline Product Strategy and Marketing from 2014 to 2015 and Director of Strategy Development from 2012 to 2014. She holds a master's degree in engineering physics and a doctor of philosophy degree from Aalto University. Ms. Falck is qualified to serve on our board of directors from her extensive leadership experience for Siemens and KONE leading operations all over the world, and her expertise and dedication to smart infrastructure, the energy industry and product strategy.

Axel Meier is a member of our board of directors and had served as a member of the board of directors of Fluence Energy, LLC since January 2020. Since April 2019, Mr. Meier has served as Chief Financial Officer of Siemens Smart Infrastructure. From 2015 until starting his current role, Mr. Meier was the Chief Financial Officer of Siemens Building Technologies. He started his career at Siemens Germany in 1988 with increasing responsibilities in businesses pertaining to Communications, Industry and Infrastructure. Mr. Meier graduated from the University of Siegen in Germany with a financial degree in financial business management. We believe Mr. Meier is qualified to serve on our board of directors due to his financial acumen and extensive international experience creating value for businesses and shareholders.

John Christopher Shelton is a member of our board of directors and had served as a member of the board of directors of Fluence Energy, LLC since January 2018. Mr. Shelton currently serves as Senior Vice President and Chief Product Officer of AES and President of AES Next, the strategic venture arm of AES. He began his tenure at AES in 1994, previously serving as President of AES Energy Storage, Vice President of New Energy Solutions, and as Chief Technology Innovation Officer. Mr. Shelton currently serves on the board of directors of Uplight, a privately held software-as-service customer platform for utilities. Mr. Shelton served as Chairman of the Board of the Electricity Storage Association from 2011 to 2013. Mr. Shelton is listed as an inventor on 16 patents, 8 of which are grid energy storage related. Mr. Shelton holds a B.S. from Indiana University of Pennsylvania and executive certificates in Strategy and Innovation from The Sloan School of Management at MIT and Organizational Leadership from The McDonough School of Business at Georgetown University. We believe Mr. Shelton is qualified to serve on our board of directors due to his experience in inventing, commercializing, and scaling lithium-ion battery solutions for the electric grid and his broader experience in commercializing renewable energy and digital innovations.

Simon Smith is a member of our board of directors and had served as a member of the board of directors of Fluence Energy, LLC since June 2021. Mr. Smith has worked for Qatar Investment Authority, the Sovereign Wealth Fund of Qatar, since 2012. He is an Industrials Director covering a global portfolio of public and private investments. Prior to joining Qatar Investment Authority, Mr. Smith spent 10 years working in equity research, as the sector head of European Capital Goods at Credit Suisse, and at Citigroup covering the Capital Goods and Transportation sectors. He additionally worked for a number of investment firms in London at the beginning of his career. Mr. Smith graduated from the University of Bristol with a BSc in Mathematics and has a Masters in Finance with distinction from London Business School. We believe Mr. Smith is qualified to serve on our board of directors due to his experience investing in high growth companies across the spectrum of 'green' technology and his experience working with the management and boards of public and private companies.

131

Cynthia Arnold is expected to serve as our director upon the effectiveness of the registration statement of which this prospectus forms a part. Prior to retirement, Dr. Arnold, Ph.D. served as the Chief Technology Officer for Valspar from 2011 to July 2017. In this role, Dr. Arnold led Valspar's global technology activities and became an officer of the company. Dr. Arnold joined Valspar from Sun Chemical where she served as Chief Technology Officer from 2004 to 2011. Prior to Sun Chemical, she served as Vice President, Technology, Coatings Adhesives and Specialties, for Eastman Chemical from 2003 to 2004 and in R&D and business leadership positions with GE from 1994 to 2003. Dr. Arnold was a Sloan Executive Science and Engineering Fellow in the White House Office of Science and Technology Policy, and she currently serves on the boards of Cabot Corporation, Milliken, Avantium, Citrine, and on the External Advisor Board of the University of Minnesota Department of Chemical Engineering and Materials Science. Dr. Arnold holds a doctorate in materials science and engineering from Virginia Polytechnic Institute and State University, and master of business administration and bachelor's degrees from the University of California, Berkeley. We believe Dr. Arnold is qualified to serve on our board of directors due to her leadership experience, and her expertise and dedication to renewable energy and technology.

Herman Bulls is expected to serve as our director upon the effectiveness of the registration statement of which this prospectus forms a part. He has spent over thirty years at JLL, currently serving as Vice Chairman, Americas, and International Director and founder of JLL's Public Institutions business unit, which specializes in delivering comprehensive real estate solutions to nonprofit organizations, higher education institutions, and governments at the federal, state, and local levels. A thought leader and strategic advisor, Mr. Bulls guides the firm and senior executive clients on issues related to real estate occupancy, the environment, corporate governance, and social trends. Additionally, Mr. Bulls co-founded and served as President and Chief Executive Officer of Bulls Capital Partners, a multi-family financing company, and founded Bulls Advisory Group, LLC, a management and real estate advisory firm. Prior to joining JLL, Mr. Bulls completed nearly twelve years of active-duty service with the United States Army. He retired as a Colonel in the U.S. Army Reserves in 2008 and received the Legion of Merit award for his leadership and strategic thinking skills. Mr. Bulls currently serves on the board of directors for Host Hotels and Resorts since June 2021, USAA since 2010, American Campus Communities since January 2021, Comfort Systems USA since 2001, Collegis Education since September 2020, American Red Cross since September 2016, Military Bowl by Northrup Grumman since 2010, and the West Point Association of Graduates since 1996. He holds a master of business administration from Harvard Business School and a bachelor's degree in engineering from the United States Military Academy at West Point. We believe Mr. Bulls is qualified to serve on our board of directors due to his leadership experience, and his financial expertise and dedication to the environment.

Elizabeth Fessenden is expected to serve as our director upon the effectiveness of the registration statement of which this prospectus forms a part. Ms. Fessenden is a strategic leader with demonstrated success in profit and loss management from over twenty-five years as a senior executive with Fortune 100 global industrial manufacturing company, Alcoa Inc, and private equity firm American Capital. At American Capital, Ms. Fessenden served as Principal, Operations Team from 2005 to 2007. At Alcoa Inc, Ms. Fessenden most recently served as President, Flexible Packaging, from 2002 to 2005. Prior to that role, she served as President, Primary Metals Allied Businesses from 2000 to 2002, Director, Executive Staffing and Leadership Development from 1998 to 2000, and Smelting Plant Manager from 1994 to 1998. Ms. Fessenden has extensive experience as a board director and leader for public and private companies including experience as chair of Compensation, Governance, Audit, and CEO Search. She currently serves as an Independent Director on a number of boards of directors, including at Meritor since June 2021, Alpha Metallugical Resources since February 2021, Ampco-Pittsburgh Corporation since August 2017, Plan International USA since November 2017, and Quarles Petroleum since 2015. She holds a master of business administration, master's degree in systems engineering, and bachelor's degree in electrical engineering from Clarkson University. We believe Ms. Fessenden is qualified to serve on our board of directors due to her leadership experience, and her financial acumen and commitment to clean energy technology.

Harald von Heynitz is expected to serve as our director upon the effectiveness of the registration statement of which this prospectus forms a part. Mr. von Heynitz is a senior accountant and auditor certified in Germany and the United States with extensive experience in accounting, auditing, financial, and business advisory. He has been registered in own practice since January 2020, and started as a member of management of FAS Steuerberatungsgesellschaft mbH, Munich in March 2020. Mr. von Heynitz worked for

132

KPMG in Munich and New York for thirty-three years. He became a partner in 1999 and has served as Audit Lead Partner and/or Global client Lead Partner at large publicly listed companies including Siemens, Airbus Group, and Linde. During the last fifteen years, he held different leadership positions within KPMG, including serving as the Lead Audit Partner for Siemens from 2001 to 2004, Partner in charge of the Audit function for Southern Germany from 2004 to 2007 and member of the KPMG Europe LLP Board from 2007 until 2012. Mr. von Heynitz currently serves as Chairman of the Audit, Compliance and Related Party Transactions Committee and Member of the Appointments and Remunerations Committee for the Siemens Gamesa Renewable Energy SA board of directors. He graduated with a degree in business administration from the University of Munich and has been certified as a tax consultant and certified public accountant in Germany for twenty-five years. He is also a certified public accountant in the United States and has been a member of the AICPA for twenty-two years. We believe Mr. von Heynitz is qualified to serve on our board of directors due to his leadership experience and financial expertise.

**Family Relationships**

There are no family relationships among any of our executive officers or directors.

**Composition of our Board of Directors**

Our business and affairs are managed under the direction of our board of directors, which will consist of 12 members upon consummation of the Transactions. Our amended and restated certificate of incorporation will provide that, subject to the rights of the holders of preferred stock, the number of directors on our board of directors shall be fixed exclusively by resolution adopted by our board of directors (provided that such number shall not be less than the aggregate number of directors that the parties to the Stockholders Agreement are entitled to nominate from time to time). Our amended and restated certificate of incorporation and our amended and restated bylaws will provide that each member of our board of directors will serve for a one-year term, being elected each year by our stockholders.

When considering whether directors have the experience, qualifications, attributes or skills, taken as a whole, to enable our board of directors to satisfy its oversight responsibilities effectively in light of our business and structure, the board of directors focuses primarily on each person's background and experience as reflected in the information discussed in each of the directors' individual biographies set forth above. We believe that our directors provide an appropriate mix of experience and skills relevant to the size and nature of our business.

Prior to the consummation of the Transactions, we will enter into the Stockholders Agreement with our Continuing Equity Owners, pursuant to which each party thereto will agree to vote, or cause to be voted, all of their outstanding shares of our Class A common stock, Class B-1 common stock and Class B-2 common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of all of the directors that are nominated by the other Continuing Equity Owners. Immediately following the consummation of the Transactions, each of AES Grid Stability and Siemens Industry will directly or indirectly own 117,173,390 shares of Class B-1 common stock of Fluence Energy, Inc., which in each case represents approximately 92.2% of the combined voting power of all of Fluence Energy, Inc.'s common stock, and the Blocker Shareholder will directly or indirectly own 18,493,275 shares of Class A common stock of Fluence Energy, Inc., which represents approximately 2.9% of the combined voting power of all of Fluence Energy, Inc.'s common stock. For a description of the terms of the Stockholders Agreement, see "Certain Relationships and Related Party Transactions—Stockholders Agreement."

**Director Independence**

Prior to the consummation of the Transactions, our board of directors undertook a review of the independence of our directors and considered whether any director has a relationship with us that could compromise that director's ability to exercise independent judgment in carrying out that director's responsibilities. Our board of directors has affirmatively determined that Cynthia Arnold, Herman Bulls, Elizabeth Fessenden and Harald von Heynitz are each an "independent director," as defined under the Nasdaq rules. In making these determinations, our board of directors considered the current and prior relationships that each director has with the Company and all other facts and circumstances our board of directors

133

deemed relevant in determining his or her independence, including the beneficial ownership of our capital stock by each director, and the transactions involving them described in the section titled "Certain Relationships and Related Party Transactions."

**Controlled Company Exception**

After the consummation of the Transactions, AES Grid Stability and Siemens Industry, and the Continuing Equity Owners as a whole, will collectively have beneficial ownership of more than 50% of the combined voting power of our common stock. As a result, we will be a "controlled company" within the meaning of the corporate governance standards of the Nasdaq rules and intend to elect not to comply with certain corporate governance standards, including that: (1) a majority of our board of directors consists of "independent directors," as defined under the Nasdaq rules; (2) our board of directors have a compensation committee that is comprised entirely of independent directors with a written charter addressing the committee's purpose and responsibilities; and (3) our director nominations be made, or recommended to our full board of directors, by our independent directors or by a nominations committee that is comprised entirely of independent directors and that we adopt a written charter or board resolution addressing the nominations process. We intend to rely on the foregoing exemptions provided to controlled companies under the Nasdaq rules. Therefore, immediately following the consummation of the Transactions, we may not have a majority of independent directors on our board of directors, have our director nominations be made by our independent directors or by an entirely independent nominations committee or an entirely independent compensation committee unless and until such time as we are required to do so. Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of these corporate governance requirements. In the event that we cease to be a "controlled company" and our shares continue to be listed on the Nasdaq, we will be required to comply with these provisions within the applicable transition periods. See "Risk Factors—Risks related to the offering and ownership of our Class A common stock—We are a 'controlled company' within the meaning of the Nasdaq rules and, as a result, will qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You may not have the same protections afforded to stockholders of companies that are subject to such corporate governance requirements."

**Committees of Our Board of Directors**

Our board of directors directs the management of our business and affairs, as provided by Delaware law, and conducts its business through meetings of the board of directors and its standing committees. We will have a standing audit committee, nominating and corporate governance committee and compensation committee. In addition, from time to time, special committees may be established under the direction of the board of directors when necessary to address specific issues.

*Audit Committee*

Our audit committee will be responsible for, among other things:

- appointing, approving the fees of, retaining, and overseeing our independent registered public accounting firm;

- discussing with our independent registered public accounting firm their independence from management;

- discussing with our independent registered public accounting firm any audit problems or difficulties and management's response;

- approving all audit and permissible non-audit services to be performed by our independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing our policies on risk assessment and risk management;

- reviewing related person transactions; and

134

- establishing procedures for the confidential anonymous submission of complaints regarding questionable accounting, internal controls or auditing matters.

Upon the consummation of the Transactions, our audit committee will consist of Cynthia Arnold, Herman Bulls, Elizabeth Fessenden and Harald von Heynitz, with Ms. Fessenden serving as chair. Rule 10A-3 of the Exchange Act and the Nasdaq rules require that our audit committee have at least one independent member upon the listing of our Class A common stock, have a majority of independent members within 90 days of the date of this prospectus and be composed entirely of independent members within one year of the date of this prospectus. Our board of directors has affirmatively determined that Herman Bulls, Cynthia Arnold, Harald von Heynitz and Elizabeth Fessenden each meet the definition of "independent director" for purposes of serving on the audit committee under the Nasdaq rules and the independence standards under Rule 10A-3 of the Exchange Act and the Nasdaq rules. Each member of our audit committee meets the financial literacy requirements of the Nasdaq rules. In addition, our board of directors has determined that each of Elizabeth Fessenden and Harald von Heynitz will qualify as an "audit committee financial expert," as such term is defined in Item 407(d)(5) of Regulation S-K. Our board of directors will adopt a written charter for the audit committee, which will be available on our principal corporate website at *https:// fluenceenergy.com* substantially concurrently with the consummation of the Transactions. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

### *Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee will be responsible for, among other things:

- identifying individuals qualified to become members of our board of directors, consistent with criteria approved by our board of directors as set forth in our corporate governance guidelines and in accordance with the terms of the Stockholders Agreement;

- annually reviewing the committee structure of the board of directors and recommending to the board of the directors the directors to serve as members of each committee;

- developing and recommending to our board of directors a set of corporate governance guidelines, and from time to time, reviewing and reassessing the corporate governance guidelines and recommending any proposed changes to our board of directors for approval;

- overseeing the annual self-evaluations of our board of directors and its committees;

- making recommendations to our board of directors regarding governance matters, including, but not limited to, the certificate of incorporation, bylaws, and the charters;

- making regular reports to our board of directors regarding the activities of the committee;

- making periodic evaluations of the performance of the committee; and

- annually reviewing and reassessing the charter and submitting any recommended changes to our board of directors for its consideration.

Upon the consummation of the Transactions, our nominating and corporate governance committee will consist of Cynthia Arnold, Herman Bulls, Harald von Heynitz, Lisa Krueger and Axel Meier, with Mr. Bulls serving as chair. We intend to avail ourselves of the "controlled company" exception under the Nasdaq rules, which exempts us from the requirement that we have a nominating and corporate governance committee composed entirely of independent directors. Axel Meier and Lisa Krueger do not qualify as "independent directors" under the Nasdaq rules. Our board of directors will adopt a written charter for the nominating and corporate governance committee, which will be available on our principal corporate website at *https:// fluenceenergy.com* substantially concurrently with the consummation of the Transactions. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

135

*Compensation Committee*

Our compensation committee will be responsible for, among other things:

- reviewing and approving, or recommending that the board of directors approve, the compensation of our Chief Executive Officer and other executive officers;

- making recommendations to the board of directors regarding director compensation;

- reviewing and approving incentive compensation and equity-based plans and arrangements and making grants of cash-based and equity-based awards under such plans;

- reviewing and approving all employment agreements and severance arrangements for the executive officers;

- participating in the oversight of success plans for the chief executive officer and other executive officers or senior management, and advising on the recruitment, retention and operation of the senior executive team, as appropriate;

- preparing the annual compensation committee report required under the SEC rules;

- to the extent a Compensation Discussion Analysis ("CD&A") is required, in the annual report on Form 10-K or annual proxy statement, reviewing and discussing with management the CD&A and considering whether it will recommend to our board of directors that the CD&A be included in the appropriate filing;

- reporting regularly to our board of directors regarding the activities of the committee;

- periodically performing an evaluation of the performance of the committee; and

- annually reviewing and reassessing the charter and submitting any recommended changes to our board of directors for its consideration.

Upon the consummation of the Transactions, our compensation committee will consist of Cynthia Arnold, Elizabeth Fessenden, Harald von Heynitz, Barbara Humpton and Julian Nebreda, with Ms. Arnold serving as chair. We intend to avail ourselves of the "controlled company" exception under the Nasdaq rules, which exempts us from the requirement that we have a compensation committee composed entirely of independent directors. Barbara Humpton and Julian Nebreda do not qualify as "independent directors" under the Nasdaq rules. Our board of directors will adopt a written charter for the compensation committee, which will be available on our principal corporate website at *https://fluenceenergy.com* substantially concurrently with the consummation of the Transactions. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

**Risk Oversight**

Our board of directors is responsible for overseeing our risk management process. Our board of directors focuses on our general risk management policies and strategy, the most significant risks facing us, and oversee the implementation of risk mitigation strategies by management. Our board of directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions.

**Compensation Committee Interlocks and Insider Participation**

None of our executive officers serves as a member of the board of directors or compensation committee (or other committee performing equivalent functions) of any entity that has one or more executive officers serving on our board of directors or compensation committee.

**Code of Business Conduct and Ethics**

Fluence Energy, LLC has had a written code of business conduct and ethics since 2018. Prior to the completion of the Transactions, Fluence Energy, Inc. will adopt a written code of business conduct and ethics that applies to our directors, officers, and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A copy of the code will be posted on our website, *https://fluenceenergy.com*. In addition, we intend to post on our website all disclosures that are required by law or the Nasdaq rules concerning any amendments to, or

waivers from, any provision of the code. The information on any of our websites is deemed not to be incorporated in this prospectus or to be part of this prospectus.

**Director Compensation**

None of our directors for our fiscal year ended September 30, 2021 or any prior fiscal years have received any compensation for their services as a director. In connection with this offering, we have implemented a policy, effective as of this offering, pursuant to which each independent non-employee independent director will receive an annual director fee of $50,000 as well as an additional annual fee of $25,000 for service as our chairman and $10,000 for service as the chair of our audit committee, compensation committee, or nominating and corporate governance committee, each earned on a quarterly basis. Each non-employee independent director will also receive an annual equity award with a grant date value of $100,000 which will vest in full on the date of our annual shareholder meeting immediately following the date of grant, subject to the non-employee independent director continuing in service through such meeting date, as well as an equity award with a grant date value of $100,000 in connection with this offering. The award is further subject to accelerated vesting upon a change in control (to be defined in the 2021 Incentive Award Plan).

## EXECUTIVE COMPENSATION

This section discusses the material components of the executive compensation program for our executive officers who are named in the "2021 Summary Compensation Table" below. For the year ended September 30, 2021, our "named executive officers" and their positions were as follows:

- Manuel Perez Dubuc, Chief Executive Officer;

- Dennis Fehr, Chief Financial Officer; and

- Rebecca Boll, Chief Product Officer;

This discussion may contain forward-looking statements that are based on our current plans, considerations, expectations and determinations regarding future compensation programs. Actual compensation programs that we adopt following the completion of this offering may differ materially from the currently planned programs summarized in this discussion. As an "emerging growth company" as defined in the JOBS Act, we are not required to include a Compensation Discussion and Analysis section and have elected to comply with the scaled disclosure requirements applicable to emerging growth companies.

### 2021 Summary Compensation Table

The following table sets forth information concerning the compensation of our named executive officers for our fiscal year ended September 30, 2021.

| Name and Principal Position | Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Total[1] |
|---|---|---|---|---|---|
| Manuel Perez Dubuc<br>*Chief Executive Officer* | 2021 | 412,395 | 673,992[2] | 609,316 | 1,695,703 |
| Dennis Fehr<br>*Chief Financial Officer* | 2021 | 305,711 | 302,808 | 274,371 | 882,890 |
| Rebecca Boll<br>*Chief Product Officer* | 2021 | 306,557 | 270,248 | 243,192 | 819,997 |

(1) The Company and individual bonus factors required for our board of directors to determine the annual, performance-based bonuses for fiscal year 2021 are not final, and accordingly our board of directors has not yet determined the bonus amounts for our named executive officers. We anticipate that such determinations will be made in the first quarter of the fiscal year 2022, at which time the Company will disclose the amount of such bonuses.

(2) In fiscal year 2021, we granted 20,700 phantom units to Mr. Dubuc on April 2, 2021. However, in September 2021, the Company and Mr. Dubuc mutually agreed that Mr. Dubuc would relinquish his phantom units awarded on April 2, 2021, in connection with the compensation review in anticipation of this offering.

138

**Base Salaries**

The named executive officers receive a base salary to compensate them for services rendered to the Company. The base salary payable to each named executive officer is intended to provide a fixed component of compensation reflecting the executive's skill set, experience, role and responsibilities.

The actual salaries paid to each named executive officer for 2021 are set forth in the "Summary Compensation Table" above in the column entitled "Salary." Effective August 1, 2021, each named executive officer received a base salary increase. Mr. Dubuc's current base salary is $450,000, Mr. Fehr's current base salary is $350,000 and Ms. Boll's current base salary is $325,000.

**Bonus Compensation**

*Annual Cash Bonus*

Each of our named executive officers are eligible for an annual, performance-based bonus for fiscal year 2021. The performance-based bonus has both a Company bonus factor and an individual bonus factor. The Company bonus factor is determined as a percentage, up to 200%. The individual bonus factor is determined using a five-point rating score, of which the Company will ascribe as a percentage, up to 125%. The amount of the annual bonus for each named executive officer will be determined by our board of directors. Mr. Dubuc's target annual bonus opportunity for fiscal year 2021 was $337,500, which was 75% of his annual base salary for fiscal year 2021, which increased from 70% in August 2021. Mr. Fehr's target annual bonus opportunity for fiscal year 2021 was $175,000, which was 50% of his annual base salary for fiscal year 2021. Ms. Boll's target annual bonus opportunity for fiscal year 2021 was $146,250, which was 45% of her annual base salary for fiscal year 2021, which increased from 40% in August 2021. The Company and individual bonus factors required for our board of directors to determine the annual, performance-based bonuses for fiscal year 2021 are not final, and accordingly our board of directors has not yet determined the bonus amounts for our named executive officers. We anticipate that such determinations will be made in the first quarter of the fiscal year 2022, at which time the Company will disclose the amount of such bonuses.

*Cash Long Term Incentive Program*

In 2018, the Company approved the cash long term incentive program, pursuant to which participants were eligible to earn a cash bonus based on a three-year performance period dependent on the Company's achievement of certain target metrics of revenue, profit and/or operating cash flow. Mr. Fehr received awards under such program for the following performance periods: fiscal year 2018 through fiscal year 2020, fiscal year 2019 through fiscal year 2021 and fiscal year 2020 through fiscal year 2022. For the performance period ending in fiscal year 2021, Mr. Fehr's target bonus under the incentive program was $137,500. Ms. Boll only participated in such program for the fiscal year 2020 through fiscal year 2023 performance period and Mr. Dubuc did not participate in such program. The Company bonus factors required for our board of directors to determine Mr. Fehr's bonus under this long term incentive program for the performance period ending in fiscal year 2021 are not final, and accordingly our board of directors has not yet determined the bonus amount for him. We anticipate that such determination will be made in the first quarter of the fiscal year 2022, at which time the Company will disclose the amount of such bonuses.

**Equity Compensation**

*2020 Unit Option Plan of Fluence Energy, LLC*

We maintain the 2020 Unit Option Plan of Fluence Energy, LLC (the "Existing Equity Plan"). The Existing Equity Plan provides our employees (including the named executive officers), consultants, non-employee directors, and other service providers and those of our affiliates the opportunity to participate in the equity appreciation of our business through the receipt of options to purchase Class A-1 Units. We believe that such unit options encourage a sense of proprietorship and stimulate interest in our development and financial success. Following this offering, no further awards are expected to be made under the Existing Equity Plan.

139

In fiscal year 2021, we granted unit options to Messrs. Dubuc and Fehr and Ms. Boll on April 2, 2021, covering 68,400, 30,800, and 27,300 Class A-1 Units, respectively. Unit option awards are each scheduled to vest upon the satisfaction of a service-based requirement and a liquidity-event requirement. The service-based requirement will be satisfied over a three-year period, as to one-third of the unit option on each of the first, second and third anniversaries of the grant date, subject to the executive's continued employment with the Company through each applicable vesting date. The liquidity-event requirement will be satisfied upon the earlier to occur of a Liquidation Event, as defined in the Existing Equity Plan (which generally means a merger, consolidation or similar transaction where the Class A-1 Units do not continue to represent a majority of the voting power of the surviving entity (or a parent thereof) or a sale, lease, transfer, license or other disposition of substantially all of the Company's assets), or an initial public offering, which includes this offering, subject to continued service through such liquidity event.

It is anticipated that any unit options granted pursuant to the Existing Equity Plan will be converted into stock options in the Company and remain outstanding and continue to vest in accordance with their terms upon and following the effectiveness of this offering. Each Class A-1 Unit subject to an outstanding grant under the Existing Equity Plan will be converted into approximately 14.8 shares of the Company.

### *Fluence Energy, LLC Phantom Equity Incentive Plan*

We also maintain the Fluence Energy, LLC Phantom Equity Incentive Plan (the "Existing Phantom Equity Plan"). The Existing Phantom Equity Plan is designed to further align employees' interests with the interests of Fluence Energy, LLC, and its subsidiaries, and each phantom unit granted under the Existing Phantom Equity Plan represents a right to a potential one-time payment equal to the value of a Class A-1 Unit, less such phantom unit's strike price (if any). In general, awards of phantom equity vest and are paid upon the six-month anniversary of an initial public offering, which includes this offering, unless otherwise determined by a majority of each of the Class A and Class B Units, subject to continued employment through such date. However, in connection with this offering, the awards for Mr. Fehr and Ms. Boll and certain other executive team members will vest with respect to 1/3 of their respective phantom units on each of the sixth, eighteenth and thirtieth-month anniversaries of this offering.

In fiscal year 2021, we granted phantom units to Messrs. Dubuc and Fehr and Ms. Boll, on April 2, 2021, which following this offering will be in respect of 306,248, 137,589 and 122,795 shares of the Company, respectively. The strike price of such phantom units was $0.00. However, in September 2021, the Company and Mr. Dubuc mutually agreed that Mr. Dubuc would relinquish his phantom units awarded on April 2, 2021, in connection with the compensation review in anticipation of this offering.

### *2021 Incentive Award Plan*

We have adopted the 2021 Incentive Award Plan in connection with this offering in order to facilitate the grant of cash and equity incentives to directors, employees (including our named executive officers) and consultants of the Company and certain of its affiliates and to enable the Company and certain of its affiliates to obtain and retain services of these individuals, which we believe is essential to our long-term success. For additional information about the 2021 Incentive Award Plan, please see the section titled "New Incentive Plans" below.

### Other Elements of Compensation

### *Retirement Plans*

We maintain a 401(k) retirement savings plan for our employees, including our named executive officers, who satisfy certain eligibility requirements. The Internal Revenue Code allows eligible employees to defer a portion of their compensation, within prescribed limits, on a pre-tax basis through contributions to the 401(k) plan. Currently, we match employee contributions up to a maximum of 5% of the employee's compensation per pay period. We believe that providing a vehicle for tax-deferred retirement savings though our 401(k) plan, and making matching and non-elective contributions, adds to the overall desirability of our executive compensation package and further incentivizes our employees, including our named executive officers, in accordance with our compensation policies.

140

***Employee Benefits and Perquisites***

*Health/Welfare Plans*.   All of our full-time employees, including our named executive officers, are eligible to participate in our health and welfare plans, including:

- medical, dental and vision benefits;

- medical and dependent care flexible spending accounts;

- short-term and long-term disability insurance;

- life insurance;

- commuter benefits;

- health savings account and flexible spending account;

- dependent care program; and

- an employee assistance program.

We believe the benefits described above are necessary and appropriate to provide a competitive compensation package to our employees, including our named executive officers.

*Perquisites*.   We did not provide any perquisites to our named executives officers in fiscal year 2021.

***No Tax Gross-Ups***

We do not make gross-up payments to cover our named executive officers' personal income taxes that may pertain to any of the compensation or benefits paid or provided by the Company.

141

**Outstanding Equity Awards at Fiscal Year-End Table**

The following table summarizes the number of shares of common stock underlying outstanding equity incentive plan awards for each named executive officer as of September 30, 2021.

| Name | Grant Date | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($)[4] |
| Manuel Dubuc | 4/2/2021 | — | — | 1,011,952[1] | 2.45[2] | 4/2/2031 | — | — | — | — |
| Dennis Fehr | 4/2/2021 | — | — | 455,674[1] | 2.45[2] | 4/2/2031 | — | — | — | — |
| | 4/2/2021 | — | — | — | — | — | — | — | 137,589[3] | — |
| Rebecca Boll | 4/2/2021 | — | — | 403,893[1] | 2.45[2] | 4/2/2031 | — | — | — | — |
| | 4/2/2021 | — | — | — | — | — | — | — | 122,795[3] | — |

(1) The unit option awards vest upon the satisfaction of both a service-based requirement and a liquidity-event requirement. The service-based requirement will be satisfied over a three-year period, as to one-third of the unit option on each of the first, second and third anniversaries of April 2, 2021, subject to the executive's continued employment with the Company through each applicable vesting date. The liquidity-event requirement will be satisfied upon the earlier to occur of a Liquidation Event or an initial public offering, which includes this offering, subject to continued service through such liquidity event. The number of options set forth herein represents the number of shares of Class A common stock subject to such options.

(2) The exercise price set forth herein represents the per share Class A common stock exercise price of such options.

(3) One-third of the phantom units will vest on each of the six-month, eighteen-month and thirtieth-month anniversaries of this offering, in each case, subject to continued employment through such date.

(4) There is no public market for the phantom interests. For purposes of this disclosure, the Company has valued the phantom units using a third-party valuation on a per-unit basis as of September 30, 2021. The amount reported above under the heading "Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested" reflects the intrinsic value of the phantom units as of September 30, 2021, based upon the terms of each individual's phantom units.

**Executive Employment and Severance Arrangements**

Our named executive officers are currently not party to any employment agreements. Following this offering, we intend to enter into an executive severance plan, pursuant to which certain of our named executive officers will be eligible to receive severance upon certain qualifying terminations. The material terms of such plan have not yet been determined.

*Manuel Perez Dubuc*

Mr. Dubuc is not party to any offer letter or employment agreement but is subject to certain restrictive covenants and confidentiality and inventions assignment obligations pursuant to a separate confidential information and invention assignment agreement, including a perpetual nondisclosure of confidential information and trade secrets and an invention assignment covenant.

142

*Dennis Fehr*

Mr. Fehr is a party to an offer letter with the Company, dated as of October 27, 2017 (the "Fehr Offer Letter"), providing for his position as Chief Financial Officer of the Company. Mr. Fehr's employment with the Company is at-will and either party may terminate Mr. Fehr's employment at any time for any reason. The Fehr Offer Letter provides that Mr. Fehr is entitled to a base salary of $275,000 per year and a target annual cash bonus opportunity of 50% of his base salary. Mr. Fehr's base salary has been updated since entering into the Fehr Offer Letter and his 2021 base salary is set forth above.

Mr. Fehr is also subject to certain restrictive covenants and confidentiality and inventions assignment obligations pursuant to a separate confidential information and invention assignment agreement, including a perpetual nondisclosure of confidential information and trade secrets and an invention assignment covenant.

*Rebecca Boll*

Ms. Boll is a party to an offer letter with the Company, dated as of May 12, 2020 (the "Boll Offer Letter"), providing for her position as Chief Product Officer of the Company. Ms. Boll's employment with the Company is at-will and either party may terminate Ms. Boll's employment at any time for any reason. The Boll Offer Letter provides that Ms. Boll is entitled to a base salary of $300,000 per year and a target annual cash bonus opportunity of 40% of her base salary. Ms. Boll's base salary and annual cash bonus opportunity have been updated since entering into the Boll Offer Letter and her 2021 base salary and annual cash bonus opportunity are set forth above.

Ms. Boll is also subject to certain restrictive covenants and confidentiality and inventions assignment obligations pursuant to a separate confidential information and invention assignment agreement, including a perpetual nondisclosure of confidential information and trade secrets and an invention assignment covenant.

**New Incentive Plans**

As of October 18, 2021, options covering an aggregate of 829,180 Class A-1 Units were outstanding under the Existing Equity Plan and 150,120 phantom units were outstanding under the Existing Phantom Equity Plan. In connection with this offering, the Class A-1 Units reserved under the Existing Equity Plan with respect to outstanding options will be converted into 12,267,403 shares of the Company and Class A-1 Units in respect of outstanding grants under the Existing Equity Phantom Plan or Existing Phantom Equity Plan will be converted into 2,220,968 shares of the Company. Following the effectiveness of this offering, we do not intend to make any new grants of awards under the Existing Equity Plan or Existing Phantom Equity Plan, but rather intend to make grants under the 2021 Incentive Award Plan described below.

*2021 Incentive Award Plan*

We have adopted the 2021 Incentive Award Plan in connection with this offering in order to facilitate the grant of cash and equity incentives to directors, employees (including our named executive officers) and consultants of the Company and certain of its affiliates and to enable the Company and certain of its affiliates to obtain and retain services of these individuals, which we believe is essential to our long-term success. The material terms of such plan are summarized below.

*Eligibility and Administration*

The Company's employees, consultants and directors, and employees and consultants of any of the Company's subsidiaries, will be eligible to receive awards under the 2021 Plan. The basis for participation in the 2021 Plan by eligible persons is the selection of such persons for participation by the plan administrator in its discretion. The 2021 Plan will be generally administered by our board of directors, which may delegate its duties and responsibilities to committees of our board of directors and/or officers (referred to collectively as the plan administrator below), subject to certain limitations that may be imposed under the 2021 Plan, Section 16 of the Exchange Act and/or stock exchange rules, as applicable. The plan administrator will

143

have the authority to make all determinations and interpretations under, and adopt rules for the administration of, the 2021 Plan, subject to its express terms and conditions. The plan administrator will also set the terms and conditions of all awards under the 2021 Plan, including any vesting and vesting acceleration conditions. The plan administrator may also institute and determine the terms and conditions of an "exchange program," which could provide for the surrender or cancellation, transfer, or reduction or increase of exercise price, of outstanding awards, subject to the limitations provided for in the 2021 Plan. The plan administrator's determinations under the 2021 Plan are in its sole discretion and will be final and binding on all persons having or claiming any interest in the 2021 Plan or any award thereunder.

*Limitation on Awards and Shares Available*

The number of shares initially available for issuance under awards granted pursuant to the 2021 Plan will be 9,500,000. No more than 9,500,000 shares of common stock may be issued upon the exercise of incentive stock options under the 2021 Plan. Shares issued under the 2021 Plan may be authorized but unissued shares, shares purchased in the open market or treasury shares.

If an award under the 2021 Plan expires, lapses or is terminated, exchanged for cash, surrendered, repurchased, cancelled without having been fully exercised or forfeited, then any shares subject to such award will, as applicable, become or again be available for new grants under the 2021 Plan. Shares delivered to the Company by a participant to satisfy the applicable exercise price or purchase price of an award and/or satisfy any applicable tax withholding obligation (including shares retained by the Company from the award being exercised or purchased and/or creating the tax obligation), will not become or again be available for award grants under the 2021 Plan. The payment of dividend equivalents in cash in conjunction with any outstanding awards will not count against the number of shares available for issuance under the 2021 Plan. Awards granted under the 2021 Plan upon the assumption of, or in substitution or exchange for, awards authorized or outstanding under a qualifying equity plan maintained by an entity with which we enter into a merger, consolidation, acquisition or similar corporate transaction will not reduce the shares available for grant under the 2021 Plan. The plan administrator may, in its discretion, make adjustments to the maximum number and kind of shares which may be issued under the 2021 Plan upon the occurrence of a merger, reorganization, consolidation, combination, amalgamation, recapitalization, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the assets of the Company, or sale or exchange of common stock or other securities of the Company, change in control, issuance of warrants or other rights to purchase common stock or other securities of the Company or similar corporate transaction or event.

*Awards*

The 2021 Plan provides for the grant of stock options, including incentive stock options, or ISOs, and nonqualified stock options, or NSOs; restricted stock; dividend equivalents; restricted stock units, or RSUs; stock appreciation rights, or SARs; and other stock or cash-based awards. Certain awards under the 2021 Plan may constitute or provide for a deferral of compensation, subject to Section 409A of the Code, which may impose additional requirements on the terms and conditions of such awards. All awards under the 2021 Plan will be set forth in award agreements, which will detail the terms and conditions of the awards, including any applicable vesting and payment terms and post-termination exercise limitations. A brief description of each award type follows.

*Stock options*.   Stock options provide for the purchase of shares of common stock in the future at an exercise price set on the grant date. ISOs, by contrast to NSOs, may provide tax deferral beyond exercise and favorable capital gains tax treatment to their holders if certain holding period and other requirements of the Code are satisfied. Unless otherwise determined by the plan administrator and only with respect to certain substitute options granted in connection with a corporate transaction, the exercise price of a stock option will not be less than 100% of the fair market value of the underlying share on the date of grant (or 110% in the case of ISOs granted to certain significant shareholders). Unless otherwise determined by the plan administrator in accordance with applicable laws, the term of a stock option may not be longer than ten years (or five years in the case of ISOs granted to certain significant shareholders). Vesting conditions determined by the plan administrator may apply to stock options and may include continued service,

144

performance and/or other conditions as the plan administrator may determine. ISOs may be granted only to the Company's U.S. employees and employees of the Company's present or future parent or subsidiaries, if any.

*SARs.*   SARs entitle their holder, upon exercise, to receive from the Company an amount equal to the appreciation of the shares subject to the award between the grant date and the exercise date. The exercise price of a SAR will not be less than 100% of the fair market value of the underlying share on the date of grant (except with respect to certain substitute SARs granted in connection with a corporate transaction), and unless otherwise determined by the plan administrator in accordance with applicable laws, the term of a SAR may not be longer than ten years. Vesting conditions determined by the plan administrator may apply to SARs and may include continued service, performance and/or other conditions as the plan administrator may determine.

*Restricted stock and RSUs.*   Restricted stock is an award of nontransferable shares of common stock that remain forfeitable unless and until specified conditions are met, and which may be subject to a purchase price. RSUs are unfunded, unsecured rights to receive, on the applicable settlement date, common stock or an amount in cash or other consideration determined by the plan administrator to be of equal value as of such settlement date, subject to certain vesting conditions and other restrictions during the applicable restriction period or periods set forth in the award agreement. RSUs may be accompanied by the right to receive the equivalent value of dividends paid on shares of common stock prior to the delivery of the underlying shares, subject to the same restrictions on transferability and forfeitability as the RSUs with respect to which the dividend equivalents are granted. Delivery of the shares underlying RSUs may be deferred under the terms of the award or at the election of the participant, if the plan administrator permits such a deferral and in accordance with applicable law. Conditions applicable to restricted stock and RSUs may be based on continuing service, performance and/or such other conditions as the plan administrator may determine.

*Other stock or cash-based awards*.   Other stock or cash-based awards may be granted to participants, including awards entitling participants to receive common stock to be delivered in the future and including annual or other periodic or long-term cash bonus awards (whether based on specified performance criteria or otherwise). Such awards may be paid in common stock, cash or other property, as the administrator determines. Other stock or cash-based awards may be granted to participants and may also be available as a payment form in the settlement of other awards, as standalone payments and as payment in lieu of compensation payable to any individual who is eligible to receive awards. The plan administrator will determine the terms and conditions of other stock or cash-based awards, which may include vesting conditions based on continued service, performance and/or other conditions.

### Performance Awards

Performance awards include any of the foregoing awards that are granted subject to vesting and/or payment based on the attainment of specified performance goals or other criteria the plan administrator may determine, which may or may not be objectively determinable. Performance criteria upon which performance goals are established by the plan administrator may include: net earnings or losses (either before or after one or more of interest, taxes, depreciation, amortization and non-cash equity-based compensation expense); gross or net sales or revenue or sales or revenue growth; net income (either before or after taxes) or adjusted net income; profits (including, but not limited to, gross profits, net profits, profit growth, net operation profit or economic profit), profit return ratios or operating margin; budget or operating earnings (either before or after taxes or before or after allocation of corporate overhead and bonus); cash flow (including operating cash flow and free cash flow or cash flow return on capital); return on assets; return on capital or invested capital; cost of capital; return on shareholders' equity; total shareholder return; return on sales; costs, reductions in costs and cost control measures; expenses; working capital; earnings or loss per share; adjusted earnings or loss per share; price per share or dividends per share (or appreciation in or maintenance of such price or dividends); regulatory achievements or compliance; implementation, completion or attainment of objectives relating to research, development, regulatory, commercial or strategic milestones or developments; market share; economic value or economic value added models; division, group or corporate financial goals; customer satisfaction/growth; customer service; employee satisfaction; recruitment and maintenance of personnel; human resources management; supervision of litigation and other legal matters; strategic partnerships and transactions; financial ratios (including those measuring

145

liquidity, activity, profitability or leverage); debt levels or reductions; sales-related goals; financing and other capital raising transactions; cash on hand; acquisition activity; investment sourcing activity; marketing initiatives; and other measures of performance selected by the Company's board of directors or its applicable committee, any of which may be measured in absolute terms or as compared to any incremental increase or decrease. Such performance goals also may be based solely by reference to the Company's performance or the performance of its subsidiary, division, business segment or business unit, or based upon performance relative to performance of other companies or upon comparisons of any of the indicators of performance relative to performance of other companies. When determining performance goals, the plan administrator may provide for exclusion of the impact of an event or occurrence which the plan administrator determines should appropriately be excluded, including, without limitation, non-recurring charges or events, acquisitions or divestitures, changes in the corporate or capital structure, events not directly related to the business or outside of the reasonable control of management, foreign exchange gains or losses, and legal, regulatory, tax or accounting changes.

### Provisions of the 2021 Plan Relating to Director Compensation

The 2021 Plan provides that the plan administrator may establish compensation for non-employee independent directors from time to time subject to the 2021 Plan's limitations. The plan administrator may establish the terms, conditions and amounts of all such non-employee independent director compensation in its discretion and in the exercise of its business judgment, taking into account such factors, circumstances and considerations as it shall deem relevant from time to time, provided that the sum of any cash compensation or other compensation and the grant date fair value (as determined in accordance with ASC 718, or any successor thereto) of any equity awards granted as compensation for services as a non-employee independent director during any calendar year may not exceed $500,000, increased to $750,000 for a non-employee independent directors initial fiscal year of service as a non-employee independent director. The plan administrator may make exceptions to this limits for individual non-employee independent directors in extraordinary circumstances, as the plan administrator may determine in its discretion, provided that the non-employee independent director receiving such additional compensation may not participate in the decision to award such compensation or in other contemporaneous compensation decisions involving non-employee independent directors.

### Certain Transactions

In connection with certain transactions and events affecting common stock, including, without limitation, any dividend or other distribution, reorganization, merger, consolidation, recapitalization, or sale of all or substantially all of the assets of the Company, or sale or exchange of common stock or other securities of the Company, a change in control, or issuance of warrants or other rights to purchase common stock or other securities of the Company, or similar corporate transaction or event, or change in any applicable laws or accounting principles, the plan administrator has broad discretion to take action under the 2021 Plan to prevent the dilution or enlargement of intended benefits, facilitate such transaction or event, or give effect to such change in applicable laws or accounting principles. This includes canceling awards in exchange for either an amount in cash or other property with a value equal to the amount that would have been obtained upon exercise or settlement of the vested portion of such award or realization of the participant's rights under the vested portion of such award, accelerating the vesting of awards, providing for the assumption or substitution of awards by a successor entity, adjusting the number and type of shares available, replacing awards with other rights or property and/or terminating awards under the 2021 Plan.

For purposes of the 2021 Plan, a "change in control" means and includes each of the following:

- a transaction or series of transactions (other than certain public offerings of common stock) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than the Company or its subsidiaries or any employee benefit plan maintained by the Company or any of its subsidiaries or a "person" that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company, Siemens, AES or any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) of which AES or Siemens is a member so long as AES and/or Siemens (individually or in the aggregate) directly or directly has beneficial ownership of a

146

greater percentage of the combined voting power of the Company's securities outstanding immediately after such acquisition than any other member of such "group") directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of the Company's securities possessing more than 50% of the total combined voting power of the Company's securities outstanding immediately after such acquisition; or

- during any period of two consecutive years, individuals who, at the beginning of such period, constitute the Company board of directors together with any new directors (other than a director designated by a person who shall have entered into an agreement with the Company to effect a change in control transaction) whose election by the Company board of directors or nomination for election by the Company's shareholders was approved by a vote of at least seventy-five percent of the directors or was made by AES, Siemens or QIA pursuant to the terms of the Stockholders Agreements, cease for any reason to constitute a majority of the Company board of directors; or

- the consummation by the Company (whether directly or indirectly) of (x) a merger, consolidation, reorganization, or business combination or (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case other than a transaction:

  - which results in the Company's voting securities outstanding immediately before the transaction continuing to represent either by remaining outstanding or by being converted into voting securities of the company or the person that, as a result of the transaction, controls, directly or indirectly, the company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the Company's business, directly or indirectly, at least a majority of the combined voting power of the successor entity's outstanding voting securities immediately after the transaction, and

  - after which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the successor entity; provided, however, that no person or group shall be treated as beneficially owning 50% or more of the combined voting power of the successor entity solely as a result of the voting power held in the Company prior to the consummation of the transaction.

***Foreign Participants, Claw-back Provisions, Transferability and Participant Payments***

With respect to foreign participants, the plan administrator may modify award terms, establish subplans and/or adjust other terms and conditions of awards, subject to the share limits described above. All awards will be subject to the provisions of any claw-back policy implemented by the Company to the extent set forth in such claw-back policy or in the applicable award agreement. With limited exceptions for estate planning, domestic relations orders, certain beneficiary designations and the laws of descent and distribution, awards under the 2021 Plan are generally non-transferable prior to vesting and are exercisable only by the participant. With regard to tax withholding obligations arising in connection with awards under the 2021 Plan and exercise price obligations arising in connection with the exercise of stock options under the 2021 Plan, the plan administrator may, in its discretion and subject to any applicable blackout or lock-up periods, accept cash, wire transfer, or check, shares of common stock that meet specified conditions (a market sell order) or such other consideration as it deems suitable or any combination of the foregoing.

***Plan Amendment and Termination***

The Company's board of directors may amend, suspend or terminate the 2021 Plan at any time. However, no amendment, other than an increase in the number of shares available under the 2021 Plan, in excess of the initial pool and annual increase as described above, may materially and adversely affect any award outstanding at the time of such amendment without the affected participant's consent. The Company's board of directors will obtain stockholder approval for any plan amendment to the extent necessary to comply with applicable laws. The plan administrator will have the authority, without the approval of the Company's shareholders, to amend any outstanding award, including by substituting another award of the same or different type, changing the exercise or settlement date, or converting an ISO to an NSO. No award may be granted pursuant to the 2021 Plan after the expiration of the 2021 Plan. The 2021 Plan is scheduled to remain in effect until the earlier of (i) the tenth anniversary of the date on which the Company's

board of directors adopts the 2021 Plan and (ii) the earliest date as of which all awards granted under the 2021 Plan have been satisfied in full or terminated and no shares approved for issuance under the 2021 Plan remain available to be granted under new awards.

### Securities Laws

The 2021 Plan is intended to conform to all provisions of the Securities Act, the Exchange Act and any and all regulations and rules promulgated by the SEC thereunder, including, without limitation, Exchange Act Rule 16b-3. The 2021 Plan will be administered, and awards will be granted and may be exercised, only in such a manner as to conform to such laws, rules and regulations.

### Federal Income Tax Consequences

The material federal income tax consequences of the 2021 Plan under current federal income tax law are summarized in the following discussion, which deals with the general U.S. federal income tax principles applicable to the 2021 Plan. The following discussion is based upon laws, regulations, rulings and decisions now in effect, all of which are subject to change. Foreign, state and local tax laws, and employment, estate and gift tax considerations are not discussed due to the fact that they may vary depending on individual circumstances and from locality to locality.

*Stock options and SARs.* A 2021 Plan participant generally will not recognize taxable income and the Company generally will not be entitled to a tax deduction upon the grant of a stock option or SAR. The tax consequences of exercising a stock option and the subsequent disposition of the shares received upon exercise will depend upon whether the option qualifies as an ISO or an NSO. Upon exercising an NSO when the fair market value of common stock is higher than the exercise price of the option, an 2021 Plan participant generally will recognize taxable income at ordinary income tax rates equal to the excess of the fair market value of the stock on the date of exercise over the purchase price, and the Company (or its subsidiaries, if any) generally will be entitled to a corresponding tax deduction for compensation expense, in the amount equal to the amount by which the fair market value of the shares purchased exceeds the purchase price for the shares. Upon a subsequent sale or other disposition of the option shares, the participant will recognize a short-term or long-term capital gain or loss in the amount of the difference between the sales price of the shares and the participant's tax basis in the shares.

Upon exercising an ISO, 2021 Plan participant generally will not recognize taxable income, and the Company will not be entitled to a tax deduction for compensation expense. However, upon exercise, the amount by which the fair market value of the shares purchased exceeds the purchase price will be an item of adjustment for alternative minimum tax purposes. The participant will recognize taxable income upon a sale or other taxable disposition of the option shares. For federal income tax purposes, dispositions are divided into two categories: qualifying and disqualifying. A qualifying disposition generally occurs if the sale or other disposition is made more than two years after the date the option was granted and more than one year after the date the shares are transferred upon exercise. If the sale or disposition occurs before these two periods are satisfied, then a disqualifying disposition generally will result.

Upon a qualifying disposition of ISO shares, the participant will recognize long-term capital gain in an amount equal to the excess of the amount realized upon the sale or other disposition of the shares over their purchase price. If there is a disqualifying disposition of the shares, then the excess of the fair market value of the shares on the exercise date (or, if less, the price at which the shares are sold) over their purchase price will be taxable as ordinary income to the participant. If there is a disqualifying disposition in the same year of exercise, it eliminates the item of adjustment for alternative minimum tax purposes. Any additional gain or loss recognized upon the disposition will be recognized as a capital gain or loss by the participant.

The Company will not be entitled to any tax deduction if the participant makes a qualifying disposition of ISO shares. If the participant makes a disqualifying disposition of the shares, the Company should be entitled to a tax deduction for compensation expense in the amount of the ordinary income recognized by the participant.

Upon exercising or settling a SAR, 2021 Plan participant will recognize taxable income at ordinary income tax rates, and the Company should be entitled to a corresponding tax deduction for compensation

148

expense, in the amount paid or value of the shares issued upon exercise or settlement. Payments in shares will be valued at the fair market value of the shares at the time of the payment, and upon the subsequent disposition of the shares the participant will recognize a short-term or long-term capital gain or loss in the amount of the difference between the sales price of the shares and the participant's tax basis in the shares.

*Restricted stock and RSUs.*   2021 Plan participant generally will not recognize taxable income at ordinary income tax rates and the Company generally will not be entitled to a tax deduction upon the grant of restricted stock or RSUs. Upon the termination of restrictions on restricted stock or the payment of RSUs, the participant will recognize taxable income at ordinary income tax rates, and the Company should be entitled to a corresponding tax deduction for compensation expense, in the amount paid to the participant or the amount by which the then fair market value of the shares received by the participant exceeds the amount, if any, paid for them. Upon the subsequent disposition of any shares, the participant will recognize a short-term or long-term capital gain or loss in the amount of the difference between the sales price of the shares and the participant's tax basis in the shares.

However, 2021 Plan participant granted restricted stock that is subject to forfeiture or repurchase through a vesting schedule such that it is subject to a risk of forfeiture (as defined in Section 83 of the Code) may make an election under Section 83(b) of the Code to recognize taxable income at ordinary income tax rates, at the time of the grant, in an amount equal to the fair market value of the shares of common stock on the date of grant, less the amount paid, if any, for the shares. The Company will be entitled to a corresponding tax deduction for compensation, in the amount recognized as taxable income by the participant. If a timely Section 83(b) election is made, the participant will not recognize any additional ordinary income on the termination of restrictions on restricted stock, and the Company will not be entitled to any additional tax deduction.

*Other stock or cash-based awards.*   2021 Plan participant will not recognize taxable income and the Company will not be entitled to a tax deduction upon the grant of other stock or cash-based awards until cash or shares are paid or distributed to the participant. At that time, any cash payments or the fair market value of shares that the participant receives will be taxable to the participant at ordinary income tax rates and the Company should be entitled to a corresponding tax deduction for compensation expense. Payments in shares will be valued at the fair market value of the shares at the time of the payment. Upon the subsequent disposition of the shares, the participant will recognize a short-term or long-term capital gain or loss in the amount of the difference between the sales price of the shares and the participant's tax basis in the shares.

*Section 162(m) of the Code.*   Section 162(m) of the Code currently limits the deduction certain employers may take for otherwise deductible compensation payable to certain executive officers of the employer to the extent the compensation paid to such an officer for the year exceeds $1 million. Payment of awards under the 2021 Plan could result in an officer (or any other employee covered by Section 162(m) in the future) receiving compensation in excess of $1 million in a year and thus a loss of deductibility for the Company.

*Section 280G of the Code.*   Section 280G of the Code limits the deduction that the employer may take for otherwise deductible compensation payable to certain individuals if the compensation constitutes an "excess parachute payment." Excess parachute payments arise from payments made to disqualified individuals that are in the nature of compensation and are contingent on changes in ownership or control of the employer or certain affiliates. Accelerated vesting or payment of awards under the 2021 Plan upon a change in ownership or control of the employer or its affiliates could result in excess parachute payments. In addition to the deduction limitation applicable to the employer, a disqualified individual receiving an excess parachute payment is subject to a 20% excise tax on the amount thereof.

*Section 409A of the Code.*   Section 409A of the Code ("Section 409A") imposes an additional 20% tax and interest on an individual receiving non-qualified deferred compensation under a plan that fails to satisfy certain requirements. For purposes of Section 409A, "non-qualified deferred compensation" could include equity-based incentive programs, including certain stock options, stock appreciation rights and RSU programs. Generally speaking, Section 409A does not apply to incentive stock options, non-discounted non-qualified stock options and stock appreciation rights if no deferral is provided beyond exercise, or restricted stock.

149

The awards made pursuant to the 2021 Plan are expected to be designed in a manner intended to be exempt from, or comply with, the requirements of Section 409A of the Code. However, if the 2021 Plan or any award thereunder fails to be maintained and administered in compliance with Section 409A, a participant could be subject to the additional taxes and interest.

State, local and foreign tax consequences may in some cases differ from the United States federal income tax consequences described above. The foregoing summary of the United States federal income tax consequences in respect of the 2021 Plan is for general information only. Interested parties should consult their own advisors as to specific tax consequences of their awards.

The 2021 Plan is not subject to the Employee Retirement Income Security Act of 1974, as amended, and is not intended to be qualified under Section 401(a) of the Code.

150

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

The following are summaries of certain provisions of our related party agreements and are qualified in their entirety by reference to all of the provisions of such agreements. Because these descriptions are only summaries of the applicable agreements, they do not necessarily contain all of the information that you may find useful. We, therefore, urge you to review the agreements in their entirety. Copies of the forms of the agreements have been filed as exhibits to the registration statement of which this prospectus is a part, and are available electronically on the website of the SEC at *www.sec.gov*.

### Related Party Agreements in Effect Prior to the Transactions

Prior to the completion of this offering and the other Transactions, we were owned by AES Grid Stability and Siemens Industry and, beginning in June 2021, QFH (as a result of the completion of the transaction contemplated by our subscription agreement with QFH, dated as of December 27, 2020, for the issuance of 1,250,000 Class B units for a total value of $125.0 million). During that time, Fluence Energy, LLC entered into various agreements that governed its relationship with those shareholders, including:

- the Fluence Energy LLC Second Amended and Restated LLC Agreement, which will be superseded by the Fluence Energy LLC Agreement upon completion of this offering and the other Transactions,

- a master sales cooperation agreement with Siemens Industry and a commercial cooperation agreement with AES,

- an equipment and service purchase agreement defining general terms for the procurement of goods and services from Siemens Industry,

- storage core frame purchase agreements defining general terms for the sale of battery storage products to AES and Siemens Industry,

- licensing agreements for trademarks, patents, and other intellectual property from AES and Siemens,

- various agreements for support in connection with the launch of our business in 2018, such as assistance with finance and treasury administration, information technology, certain human resources functions, quality, supply chain, salesforce, and purchasing functions, and

- seconding a limited number of employees to service for Fluence.

We have entered into sales agency agreements with Siemens, in certain locations, to utilize its sales force. In addition, in the ordinary course of business, both AES and Siemens purchase our products and services for energy storage projects in multiple countries, and Siemens is a supplier to us of goods and services that we use when delivering and maintaining energy storage projects for customers. Occasionally, in the ordinary course of business Siemens and Fluence act as a consortium to deliver energy storage projects for customers.

We have entered into a patent assignment agreement with Siemens pursuant to which Siemens has assigned, sold and transferred to us the entire right, title and interest in the United States and all foreign countries, in and to any and all inventions and improvements disclosed in certain identified patent applications, pending patent applications and granted letter patents.

On September 9, 2021, we entered into an intellectual property assignment agreement with AES (the "Patent Transfer Agreement"), whereby AES assigned certain intellectual property to Fluence that we had previously utilized pursuant to a license from AES. In connection with the Patent Transfer Agreement, we entered into a License Agreement with AES (the "License-Back Agreement"), whereby we granted AES perpetual, non-exclusive, worldwide rights to do any acts within the current and future fields of business of AES, which are not activities which are exclusive to us and which would otherwise infringe any of the intellectual property just transferred to us, under fair, reasonable and non-discriminatory royalty terms, to be negotiated by the parties thereto. The Patent Transfer Agreement contains customary limitation of liability provisions.

Prior to the completion of this offering and the other Transactions, AES and Siemens provided support services to us in the ordinary course of business, pursuant to various support agreements, such as

151

engineering support, software development, HR, and payroll services, and seconding a limited number of employees to service for Fluence. Prior to the completion of this offering and the other Transactions, AES and Siemens Industry provided revolving credit support for our business pursuant to an Amended and Restated Credit Support and Reimbursement Agreement.

Prior to August 1, 2021, Manuel Perez Dubuc, our chief executive officer, was seconded from AES, which paid Mr. Dubuc's salary. We reimbursed AES for that expense. After August 2, 2021, Mr. Dubuc became our employee.

On April 28, 2021 and June 3, 2021, we borrowed $25.0 million and $25.0 million from AES and Siemens Industry, respectively, in the form of one-year promissory notes, each bearing annual interest at 2.86%. On May 3, 2021, we borrowed $25.0 million from Siemens Industry, in the form of a one-year promissory note with an annual interest rate of 2.86%. The proceeds were used for general working capital needs. As of June 22, 2021, the total $75.0 million in borrowings from AES and Siemens Industry were paid off in full.

Prior to the completion of this offering and the other Transactions, Fluence Energy, LLC entered into customary indemnification agreements with the individual members of the Fluence Energy, LLC Board of Directors, as it was constituted at that time.

For more information regarding transactions between us, AES and Siemens prior to consummation of this offering and the Transactions, see Note 13 of "Notes to Condensed Combined Financial Statements" for the two fiscal years ended September 30, 2020 and the nine-months ended June 30, 2021 and 2022 included in this prospectus.

**Promissory Notes**

On August 11, 2021, Fluence Energy, LLC entered into a promissory note with each of Siemens Industry and AES Grid Stability, under which Fluence Energy, LLC received a bridge financing of an aggregate of $50.0 million. In connection with the bridge financing, Fluence Energy, LLC issued a $25.0 million promissory note to each of Siemens Industry and AES Grid Stability. The Promissory Notes are unsecured and (i) the AES Promissory Note has a maturity date of August 11, 2022 and (ii) the Siemens Promissory Note has a maturity date of December 31, 2021. If we complete a private placement or public offering of certain equity securities prior to the maturity date, the Promissory Notes and all accrued interest thereunder will automatically and without notice be due and payable within five business days. The Promissory Notes bear interest at 2.86% per annum through and until the earliest of the maturity date thereunder and or a mandatory prepayment event, at which time the interest rate will increase by an additional 2%. The proceeds from the Promissory Notes are being used by Fluence Energy, LLC to provide additional liquidity and to fund ongoing working capital needs.

**Related Party Agreements after the Transactions**

In connection with this offering, we will amend certain of our existing affiliate agreements and enter into a number of new agreements with those shareholders and their affiliates in order to provide a framework for our relationship with those shareholders, including a Tax Receivable Agreement, the Fluence Energy LLC Agreement, the Stockholders Agreement, the Registration Rights Agreement, certain intellectual property and trademark license agreements, an amended and restated equipment and services purchase agreement, an amended and restated storage core frame purchase agreement, a credit support and reimbursement agreement with Siemens Industry and AES, an amended and restated cooperation agreement with AES, certain employment agreements, and indemnification agreements with each of our directors and executive officers, each as described below.

We do not currently expect to enter into additional agreements with our shareholders outside the ordinary course of business, or with any of our directors, officers or other affiliates, other than those specified below. However, after the closing of this offering, in the ordinary course of our business we do expect that both AES and Siemens will continue to purchase our products and services for energy storage projects in multiple countries, and Siemens will continue to be a supplier to us of goods and services that we

use when delivering and maintaining energy storage projects for customers. Occasionally, in the ordinary course of business, Siemens and Fluence will continue to act as a consortium to deliver energy storage projects for customers.

Although we do not currently have plans to procure new support services from our shareholders or their affiliates, it is possible that we might do so in the future. After the closing of this offering, any transactions with shareholders, directors, officers or other affiliates will be subject to requirements of the Sarbanes-Oxley Act and SEC rules and regulations.

### The Transactions

In connection with the Transactions, we will engage in certain transactions with certain entities which are or will become holders of 5% or more of our voting securities upon the consummation of the Transactions. These transactions are described in "Our Organizational Structure."

We intend to use the net proceeds from this offering (including any net proceeds from any exercise of the underwriters' option to purchase additional shares of Class A common stock) to purchase 31,000,000 LLC Interests (or 35,650,000 LLC Interests if the underwriters exercise in full their option to purchase additional shares of Class A common stock) directly from Fluence Energy, LLC at a price per unit equal to the initial public offering price per share of Class A common stock in this offering less the underwriting discount and estimated offering expenses payable by us.

### Tax Receivable Agreement

We may obtain an increase in our share of the tax basis of the assets of Fluence Energy, LLC and certain of its subsidiaries in the future, when (as described below under "—Fluence Energy LLC Agreement") a Founder receives Class A common stock or cash from us or from Fluence Energy, LLC in connection with an exercise of such Founder's right to have LLC Interests redeemed by Fluence Energy, LLC or, at our election, exchanged, or when Fluence Energy, LLC makes, or is deemed to make, certain distributions to the Founders or upon certain other transactions. We intend to treat such redemptions or exchanges as our direct purchase of LLC Interests from such Founder for U.S. federal income and other applicable tax purposes, regardless of whether such LLC Interests are surrendered by a Founder to Fluence Energy, LLC for redemption or sold to us upon the exercise of our election to acquire such LLC Interests directly (any resulting basis increases, together with the basis increases arising from certain distributions (or deemed distributions) from Fluence Energy, LLC, the "Basis Adjustments"). Any Basis Adjustment, may have the effect of reducing the amounts that we would otherwise pay in the future to various tax authorities. The Basis Adjustments may also decrease gains (or increase losses) on future dispositions of certain assets to the extent tax basis is allocated to those assets.

In connection with the transactions described above, we will enter into a Tax Receivable Agreement with Fluence Energy, LLC and the Founders that will provide for the payment by Fluence Energy, Inc. to such Founders of 85% of the amount of certain tax benefits, if any, that Fluence Energy, Inc. actually realizes, or in some circumstances is deemed to realize in its tax reporting, arising from the transactions described above, including, the Basis Adjustments and certain other tax benefits arising from payments made under the Tax Receivable Agreement. Fluence Energy, LLC will have in effect an election under Section 754 of the Code effective for each taxable year in which a redemption or exchange (including deemed exchange) of LLC Interests for Class A common stock or cash occurs or when Fluence Energy, LLC makes (or is deemed to make) certain distributions. These Tax Receivable Agreement payments are not conditioned upon one or more of the Founders maintaining a continued ownership interest in Fluence Energy, LLC. If a Founder transfers LLC Interests but does not assign to the transferee of such units its rights under the Tax Receivable Agreement, such Founder generally will continue to be entitled to receive payments under the Tax Receivable Agreement arising in respect of a subsequent redemption or exchange of such LLC Interests. In general, the Founders' rights under the Tax Receivable Agreement may not be assigned, sold, pledged or otherwise alienated or transferred to any person, other than certain permitted transferees, without our prior written consent (not to be unreasonably withheld) and such person's becoming a party to the Tax Receivable Agreement and agreeing to succeed to the applicable Founder's interest therein.

153

The actual Basis Adjustments, as well as any amounts paid to the Founders under the Tax Receivable Agreement will vary depending on a number of factors, including:

- *the timing of any future redemptions or exchanges*—for instance, the increase in any tax deductions will vary depending on the fair value, which may fluctuate over time, of the depreciable or amortizable assets of Fluence Energy, LLC at the time of each redemption, exchange or distribution (or deemed distribution) as well as the amount of remaining existing tax basis at the time of such redemption, exchange or distribution (or deemed distribution);

- *the price of shares of our Class A common stock at the time of the purchases from the Founders in connection with this offering and any applicable redemptions or exchanges*—the Basis Adjustments, as well as any related increase in any tax deductions, are directly related to the price of shares of our Class A common stock at the time of such purchases or future redemptions or exchanges;

- *the extent to which such redemptions or exchanges are taxable*—if a redemption or exchange is not taxable for any reason, increased tax deductions will not be available; and

- *the amount and timing of our income*—the Tax Receivable Agreement generally will require us to pay 85% of the tax benefits as and when those benefits are treated as realized under the terms of the Tax Receivable Agreement. If Fluence Energy, Inc. does not have sufficient taxable income to realize any of the applicable tax benefits, it generally will not be required (absent a material breach of a material obligation under the Tax Receivable Agreement, change of control or other circumstances requiring an early termination payment and treating any outstanding LLC Interests held by the Founders as having been exchanged for Class A common stock for purposes of determining such early termination payment) to make payments under the Tax Receivable Agreement for that taxable year because no tax benefits will have been actually realized. However, any tax benefits that do not result in realized tax benefits in a given taxable year may generate tax attributes that may be utilized to generate tax benefits in previous or future taxable years. The utilization of any such tax attributes will result in payments under the Tax Receivable Agreement.

For purposes of the Tax Receivable Agreement, cash savings in income tax will be computed by comparing our actual U.S. federal, state and local income tax liability to the amount of such taxes that we would have been required to pay, had there been no Basis Adjustments, had the Tax Receivable Agreement not been entered into and had there been no tax benefits to us as a result of any payments made under the Tax Receivable Agreement; provided that, for purposes of determining cash savings with respect to state and local income taxes, we will use an assumed tax rate. The Tax Receivable Agreement will generally apply to each of our taxable years, beginning with the first taxable year ending after the consummation of the Transactions. There is no maximum term for the Tax Receivable Agreement; however, the Tax Receivable Agreement may be terminated by us pursuant to an early termination procedure that requires us to pay the Founders an agreed-upon amount equal to the estimated present value of the remaining payments to be made under the agreement (calculated with certain assumptions, including regarding tax rates and utilization of the Basis Adjustments and other benefits).

The payment obligations under the Tax Receivable Agreement are obligations of Fluence Energy, Inc. and not of Fluence Energy, LLC. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under any future debt agreements.

Although the actual timing and amount of any payments that may be made under the Tax Receivable Agreement will vary, we expect that the payments that we may be required to make to the Founders could be substantial. Any payments made by us to the Founders under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us or to Fluence Energy, LLC and, to the extent that we are unable to make payments under the Tax Receivable Agreement for any reason, the unpaid amounts will be deferred and will accrue interest until paid by us; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement and, therefore, may accelerate payments due under the Tax Receivable Agreement. We anticipate funding ordinary course payments under the Tax Receivable Agreement from cash flow from operations of our subsidiaries, available cash or available borrowings under any future debt agreements. Decisions made by us in the course of running our business, such as with respect to mergers, asset

154

sales, other forms of business combinations or other changes in control, may influence the timing and amount of payments that are received by a redeeming Founder under the Tax Receivable Agreement. For example, the earlier disposition of assets following an exchange or acquisition transaction will generally accelerate payments under the Tax Receivable Agreement and increase the present value of such payments. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative effect on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combinations or other changes of control.

The Tax Receivable Agreement provides that if certain mergers, asset sales, other forms of business combination, or other changes of control were to occur or if we materially breach any of our material obligations under the Tax Receivable Agreement, and in either such case the Continuing Equity Owners elect an early termination of the Tax Receivable Agreement, or if, at any time, we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, under the Tax Receivable Agreement would accelerate and become due and payable, based on certain assumptions, Fluence Energy, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. In those circumstances, Founders would be deemed to exchange any remaining outstanding LLC Interests for Class A common stock and would generally be entitled to payments under the Tax Receivable Agreement resulting from such deemed exchanges.

We may elect to completely terminate the Tax Receivable Agreement early only with the written approval of each of a majority of Fluence Energy, Inc.'s "independent directors" (within the meaning of Rule 10A-3 promulgated under the Exchange Act and the Nasdaq rules).

As a result of the foregoing, we could be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. We also could be required to make cash payments to the Founders that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring, or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

Payments under the Tax Receivable Agreement will generally be based on the tax reporting positions that we determine. We will not be reimbursed for any cash payments previously made to the Founders pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and ultimately disallowed. Instead, any excess cash payments made by us to a Founder will be netted against any future cash payments we might otherwise be required to make under the terms of the Tax Receivable Agreement to such Founder, as applicable. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments we might otherwise be required to make under the terms of the Tax Receivable Agreement and, as a result, there might not be future cash payments from which to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the IRS or a court will not disagree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings.

If the outcome of any audit of us or our subsidiaries is reasonably expected to adversely affect the rights and obligations of the Continuing Equity Owners under the Tax Receivable Agreement in a material respect, then we will notify the Continuing Equity Owners of such audit, keep them reasonably informed with respect thereto, provide them with a reasonable opportunity to provide information and other input concerning the audit or the relevant portion thereof and consider such information and other input in good faith.

Under the Tax Receivable Agreement, we are required to provide the Founders with a schedule showing the calculation of payments that are due under the Tax Receivable Agreement with respect to each taxable year with respect to which a payment obligation arises within 120 days after filing our U.S. federal

155

income tax return for such taxable year. This calculation will be based upon the advice of our tax advisors. Payments under the Tax Receivable Agreement will generally be made to the Founders within five business days after this schedule becomes final pursuant to the procedures set forth in the Tax Receivable Agreement, although interest on such payments will begin to accrue at a rate of LIBOR (or similar rate) plus 1% on the date on which such calculation becomes final under the Tax Receivable Agreement. Any late payments that may be made under the Tax Receivable Agreement will continue to accrue interest at a rate equal to LIBOR (or similar rate) plus 5%, until such payments are made, generally including any late payments that we may subsequently make because we did not have enough available cash to satisfy our payment obligations at the time at which they originally arose.

**Fluence Energy LLC Agreement**

In connection with the consummation of the Transactions, we and the Founders will enter into Fluence Energy, LLC's Third Amended and Restated Limited Liability Company Agreement which we refer to as the Fluence Energy LLC Agreement.

*Appointment as Managing Member.*   Under the Fluence Energy LLC Agreement, we will become a member and the sole manager of Fluence Energy, LLC. As the sole manager, we will be able to control all the day-to-day business affairs and decision-making of Fluence Energy, LLC without the approval of any other member. As such, we, through our officers and directors, will be responsible for all operational and administrative decisions of Fluence Energy, LLC and daily management of Fluence Energy, LLC's business. Pursuant to the terms of the Fluence Energy LLC Agreement, we cannot be removed or replaced as the sole manager of Fluence Energy, LLC except by our resignation, which may be given at any time by written notice to the members.

*Compensation, Fees and Expenses.*   We will not be entitled to compensation for our services as the manager of Fluence Energy, LLC. We will be entitled to reimbursement by Fluence Energy, LLC for reasonable fees and expenses incurred on behalf of Fluence Energy, LLC, including all expenses associated with the Transactions, any subsequent offering of our Class A common stock, being a public company and maintaining our corporate existence.

*Distributions.*   The Fluence Energy LLC Agreement will require "tax distributions" to be made by Fluence Energy, LLC to its members, as that term is used in the agreement, except to the extent Fluence Energy, LLC does not have available cash for such distributions or such distributions are otherwise prohibited by law or any of our future debt agreements. Tax distributions will be made on a quarterly basis, to each member of Fluence Energy, LLC, including us, based on such member's allocable share of the taxable income of Fluence Energy, LLC and an assumed tax rate that will be determined by us, as described below. For this purpose, Fluence Energy, Inc.'s allocable share of Fluence Energy, LLC's taxable income shall be determined without regard to any Basis Adjustments (as described above under "—Tax Receivable Agreement"). Tax distributions will generally be treated as advances of other distributions made under the Fluence Energy LLC Agreement, but no adjustments on account of prior tax distributions will be made to the redemption or exchange ratio or price for Founders whose LLC Interests are redeemed or exchanged (and tax distributions paid prior to such a redemption or exchange will not be treated as advances or otherwise reduce the distributions subsequently payable to us in respect of the LLC Interests we acquire in connection with any such redemption or exchange). The assumed tax rate for purposes of determining tax distributions from Fluence Energy, LLC to its members will generally be the highest combined marginal tax rates that may apply to a corporation that is resident in New York, New York, regardless of the actual final tax liability of Fluence Energy, LLC's members. However, in certain circumstances, including if Fluence Energy, LLC does not have sufficient cash on hand to make the entire tax distributions to the Continuing Equity Owners that would otherwise be required, the tax distributions that Fluence Energy, LLC makes to us may be reduced, without corresponding reductions to the tax distributions that Fluence Energy, LLC makes to the Continuing Equity Owners. The Fluence Energy LLC Agreement will also allow for cash distributions to be made by Fluence Energy, LLC (subject to our sole discretion as the sole manager of Fluence Energy, LLC) to its members on a pro rata basis out of "distributable cash," as that term is defined in the agreement. We expect Fluence Energy, LLC may make distributions out of distributable cash periodically and as necessary to enable us to cover our operating expenses and other obligations, including our tax liabilities and obligations under the Tax Receivable Agreement, except to the extent Fluence Energy, LLC is insolvent or are otherwise prohibited by law or any of our future debt agreements.

156

*Transfer Restrictions.*   The Fluence Energy LLC Agreement generally does not permit transfers of LLC Interests by members, except for transfers whereby AES Grid Stability or Siemens Industry transfers all (but not less than all) of its respective LLC Interests to any party (other than certain restricted parties), transfers pursuant to the redemption right described below, transfers to affiliates and transfers approved in writing by us, as manager, and other limited exceptions. The Fluence Energy LLC Agreement may impose additional restrictions on transfers (including redemptions described below with respect to each common unit) that are necessary or advisable so that Fluence Energy, LLC is not treated as a "publicly traded partnership" for U.S. federal income tax purposes. In the event of a permitted transfer under the Fluence Energy LLC Agreement, such member will be required to simultaneously transfer shares of Class B-1 common stock or Class B-2 common stock, as the case may be, to such transferee equal to the number of LLC Interests that were transferred to such transferee in such permitted transfer.

The Fluence Energy LLC Agreement provides that, in the event that a tender offer, share exchange offer, issuer bid, take-over bid, recapitalization or similar transaction with respect to our Class A common stock, each of which we refer to as a "Pubco Offer," is approved by our board of directors or otherwise effected or to be effected with the consent or approval of our board of directors, each holder of LLC Interests shall be permitted, but not required, to participate in such Pubco Offer by delivering a redemption notice, which shall be effective immediately prior to, and contingent upon, the consummation of such Pubco Offer. If a Pubco Offer is proposed by Fluence Energy, Inc., then Fluence Energy, Inc. is required to use its reasonable best efforts expeditiously and in good faith to take all such actions and do all such things as are necessary or desirable to enable and permit the holders of such LLC Interests to participate in such Pubco Offer, if they so elect, to the same extent as or on an economically equivalent basis with the holders of shares of Class A common stock, provided that in no event shall any holder of LLC Interests be entitled to receive aggregate consideration for each common unit that is greater than the consideration payable in respect of each share of Class A common stock pursuant to the Pubco Offer.

Except for certain exceptions, any transferee of LLC Interests must assume, by operation of law or executing a joinder to the Fluence Energy LLC Agreement, all of the obligations of a transferring member with respect to the transferred units, and such transferee shall be bound by any limitations and obligations under the Fluence Energy LLC Agreement even if the transferee is not admitted as a member of Fluence Energy, LLC. A member shall remain as a member with all rights and obligations until the transferee is accepted as substitute member in accordance with the Fluence Energy LLC Agreement.

*Recapitalization.*   The Fluence Energy LLC Agreement will recapitalize the units currently held by the existing members of Fluence Energy, LLC into a new single class of LLC Interests. The Fluence Energy LLC Agreement will also reflect a split of LLC Interests such that one common unit can be acquired with the net proceeds received in the initial offering from the sale of one share of our Class A common stock, after the deduction of the underwriting discount and estimated offering expenses payable by us. Each common unit generally will entitle the holder to a pro rata share of the net profits and net losses and distributions of Fluence Energy, LLC, although for income tax purposes, items of taxable income, gain, loss or deduction may be allocated disproportionately under applicable law to account for built-in gains or built-in losses that existed at the time of this offering or certain other extraordinary transactions.

*Maintenance of One-to-one Ratio between Shares of Class A Common Stock and LLC Interests Owned by the Company, and One-to-one Ratio between Shares of Class B-1 and Class B-2 common stock and LLC Interests Owned by the Founders*.   Except as otherwise determined by us, the Fluence Energy LLC Agreement requires Fluence Energy, LLC to take all actions with respect to its LLC Interests, including issuances, reclassifications, distributions, divisions or recapitalizations, such that (1) we at all times maintain a ratio of one common unit owned by us, directly or indirectly, for each share of Class A common stock issued and outstanding, and (2) Fluence Energy, LLC at all times maintains (a) a one-to-one ratio between the number of shares of Class A common stock issued and outstanding and the number of LLC Interests owned by us and (b) a one-to-one ratio between the aggregate number of shares of Class B-1 and Class B-2 common stock issued and outstanding and the number of LLC Interests owned by the Founders and their permitted transferees, collectively. This ratio requirement disregards (1) shares of our Class A common stock under unvested options issued by us, (2) treasury stock, and (3) preferred stock or other debt or equity securities (including warrants, options or rights) issued by us that are convertible into or exercisable or exchangeable for shares of Class A common stock, except to the extent we have contributed the net proceeds from such

157

other securities, including any exercise or purchase price payable upon conversion, exercise or exchange thereof, to the equity capital of Fluence Energy, LLC. In addition, the Class A common stock ratio requirement disregards all LLC Interests at any time held by any other person, including the Founders and the holders of options over LLC Interests. If we issue, transfer or deliver from treasury stock or repurchase shares of Class A common stock in a transaction not contemplated by the Fluence Energy LLC Agreement, we as manager of Fluence Energy, LLC have the authority to take all actions such that, after giving effect to all such issuances, transfers, deliveries or repurchases, the number of outstanding LLC Interests we own equals, on a one-for-one basis, the number of outstanding shares of Class A common stock. If we issue, transfer or deliver from treasury stock or repurchase or redeem any of our preferred stock in a transaction not contemplated by the Fluence Energy LLC Agreement, we as manager have the authority to take all actions such that, after giving effect to all such issuances, transfers, deliveries repurchases or redemptions, we hold (in the case of any issuance, transfer or delivery) or cease to hold (in the case of any repurchase or redemption) equity interests in Fluence Energy, LLC which (in our good faith determination) are in the aggregate substantially equivalent to our preferred stock so issued, transferred, delivered, repurchased or redeemed. Fluence Energy, LLC is prohibited from undertaking any subdivision (by any split of units, distribution of units, reclassification, recapitalization or similar event) or combination (by reverse split of units, reclassification, recapitalization or similar event) of the LLC Interests that is not accompanied by an identical subdivision or combination of (1) our Class A common stock to maintain at all times a one-to-one ratio between the number of LLC Interests owned by us and the number of outstanding shares of our Class A common stock and (2) our Class B-1 and Class B-2 common stock to maintain at all times a one-to-one ratio between the number of LLC Interests owned by the Founders and the aggregate number of outstanding shares of our Class B-1 and Class B-2 common stock, as applicable, in each case, subject to exceptions.

*Issuance of LLC Interests upon Exercise of Options or Issuance of Other Equity Compensation.*  Upon the exercise of options issued by us (as opposed to options issued by Fluence Energy, LLC), or the issuance of other types of equity compensation by us (such as the issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock), we will have the right to acquire from Fluence Energy, LLC a number of LLC Interests equal to the number of our shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation. When we issue shares of Class A common stock in settlement of stock options granted to persons that are not officers or employees of Fluence Energy, LLC or its subsidiaries, we will make, or be deemed to make, a capital contribution in Fluence Energy, LLC equal to the aggregate value of such shares of Class A common stock and Fluence Energy, LLC will issue to us a number of LLC Interests equal to the number of shares we issued. When we issue shares of Class A common stock in settlement of stock options granted to persons that are officers or employees of Fluence Energy, LLC or its subsidiaries, then we will be deemed to have sold directly to the person exercising such award a portion of the value of each share of Class A common stock equal to the exercise price per share, and we will be deemed to have sold directly to Fluence Energy, LLC (or the applicable subsidiary of Fluence Energy, LLC) the difference between the exercise price and market price per share for each such share of Class A common stock. In cases where we grant other types of equity compensation to employees of Fluence Energy, LLC or its subsidiaries, on each applicable vesting date we will be deemed to have sold to Fluence Energy, LLC (or such subsidiary) the number of vested shares at a price equal to the market price per share, Fluence Energy, LLC (or such subsidiary) will deliver the shares to the applicable person, and we will be deemed to have made a capital contribution in Fluence Energy, LLC equal to the purchase price for such shares in exchange for an equal number of LLC Interests.

*Dissolution.*  The Fluence Energy LLC Agreement will provide that the consent of Fluence Energy, Inc. as the managing member of Fluence Energy, LLC and members holding a majority of the voting units will be required to voluntarily dissolve Fluence Energy, LLC. In addition to a voluntary dissolution, Fluence Energy, LLC will be dissolved upon the entry of a decree of judicial dissolution or other circumstances in accordance with Delaware law. Upon a dissolution event, the proceeds of a liquidation will be distributed in the following order: (1) first, to pay the expenses of winding up Fluence Energy, LLC; (2) second, to pay debts and liabilities owed to creditors of Fluence Energy, LLC, other than members; and (3) third, to the members pro-rata in accordance with their respective percentage ownership interests in Fluence Energy, LLC (as determined based on the number of LLC Interests held by a member relative to the aggregate number of all outstanding LLC Interests).

158

*Confidentiality.*   We, as manager, and each member agree to maintain the confidentiality of Fluence Energy, LLC's confidential information. This obligation excludes information independently obtained or developed by the members, information that is in the public domain or otherwise disclosed to a member, in either such case not in violation of a confidentiality obligation of the Fluence Energy LLC Agreement or approved for release by written authorization of the Chief Executive Officer, the Chief Financial Officer or the General Counsel of either Fluence Energy, Inc. or Fluence Energy, LLC.

*Indemnification.*   The Fluence Energy LLC Agreement will provide for indemnification of the manager, members and officers of Fluence Energy, LLC and their respective subsidiaries or affiliates.

*Common Unit Redemption Right.*   The Fluence Energy LLC Agreement will provide a redemption right to the Founders which will entitle them to have their LLC Interests redeemed for, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or a cash payment from the sale of newly issued shares of Class A common stock equal to a volume weighted average market price of one share of Class A common stock for each LLC interest so redeemed, in each case in accordance with the terms of the Fluence Energy LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), we may effect a direct exchange by Fluence Energy, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. Such Founders may exercise such redemption right, subject to certain exceptions, for as long as their LLC Interests remain outstanding. In connection with the exercise of the redemption or exchange of LLC Interests (1) such Founders will be required to surrender a number of shares of our Class B-1 common stock or Class B-2 common stock, as the case may be, registered in the name of such redeeming or exchanging Founder, which will automatically be transferred to the Company and will be canceled for no consideration on a one-for-one basis with the number of LLC Interests so redeemed or exchanged and (2) except in the case of a direct exchange as described above, the redeeming Founders will surrender LLC Interests to Fluence Energy, LLC for cancellation. In the event of cash settlement, Fluence Energy, Inc. would issue new shares of Class A common stock and use the proceeds from the sale of these newly-issued shares of Class A common stock to fully fund the cash settlement, which, in effect, limits the amount of the cash payment to the redeeming member.

Each Founder's redemption rights will be subject to certain customary limitations, including the absence of any liens or encumbrances on such LLC Interests redeemed. Additionally, in the case we elect a cash settlement, such Founder may rescind its redemption request within a specified period of time. Moreover, in the case of a settlement in Class A common stock, such Founder's redemption may be conditioned on the consummation of a purchase by another person (whether in a tender or exchange offer, an underwritten offering or otherwise) of the shares of Class A common stock that may be issued in connection with such proposed redemption. In the case of a settlement in Class A common stock, such Founder may also revoke or delay its redemption request if the following conditions exist: (1) any registration statement pursuant to which the resale of the Class A common stock to be registered for such Founder at or immediately following the consummation of the redemption shall have ceased to be effective pursuant to any action or inaction by the SEC or no such resale registration statement has yet become effective; (2) we failed to cause any related prospectus to be supplemented by any required prospectus supplement necessary to effect such redemption; (3) we exercised our right to defer, delay or suspend the filing or effectiveness of a registration statement and such deferral, delay or suspension shall affect the ability of such Founder to have its Class A common stock registered at or immediately following the consummation of the redemption; (4) such Founder is in possession of any material non-public information concerning us, the receipt of which results in such Founder being prohibited or restricted from selling Class A common stock at or immediately following the redemption without disclosure of such information (and we do not permit disclosure); (5) any stop order relating to the registration statement pursuant to which the Class A common stock was to be registered by such Founder at or immediately following the redemption shall have been issued by the SEC; (6) there shall have occurred a material disruption in the securities markets generally or in the market or markets in which the Class A common stock is then traded; (7) there shall be in effect an injunction, a restraining order or a decree of any nature of any governmental entity that restrains or prohibits the redemption; (8) we shall have failed to comply in all material respects with our obligations under the Registration Rights Agreement, and such failure shall have affected the ability of such Founder to consummate the resale of the

159

Class A common stock to be received upon such redemption pursuant to an effective registration statement; or (9) the redemption date would occur three business days or less prior to, or during, a black-out period.

The Fluence Energy LLC Agreement will require that in the case of a redemption by a Founder we contribute cash or shares of our Class A common stock, as applicable, to Fluence Energy, LLC in exchange for an amount of newly-issued LLC Interests that will be issued to us equal to the number of LLC Interests redeemed from the Founder. Fluence Energy, LLC will then distribute the cash or shares of our Class A common stock, as applicable, to such Founder to complete the redemption. Alternatively, we may, at our option, effect a direct exchange by Fluence Energy, Inc. of cash or our Class A common stock, as applicable, for such LLC Interests in lieu of such a redemption. Whether by redemption or exchange, we are obligated to ensure that at all times the number of LLC Interests that we own equals the number of our outstanding shares of Class A common stock (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities).

*Change of Control Redemption.*   In the event of certain types of change of control described in the Fluence Energy, LLC Agreement, Fluence Energy, Inc. will have the right, in its sole discretion, to require each member to effect a redemption of all or a portion of such member's and all other member's LLC Interests (including common units or any other type, class or series of interests in Fluence Energy, LLC) together with an equal number of shares of Class B common stock; provided, however, that neither AES Grid Stability nor Siemens Industry will be required to effect such a redemption if such member holds at least 15% of the aggregate LLC Interests issued and outstanding. In connection with such redemption, such LLC Interests and such shares of Class B common stock will be exchanged for shares of Class A common stock (or an economically equivalent amount of cash and securities of a successor entity that would be received by holders of shares of Class A common stock).

*Amendments.*   In addition to certain other requirements, our consent, as manager, and the consent of members holding a majority of the LLC Interests then outstanding and entitled to vote (excluding LLC Interests held directly or indirectly by us) will generally be required to amend or modify the Fluence Energy LLC Agreement.

**Stockholders Agreement**

Pursuant to the Stockholders Agreement we and the Continuing Equity Owners will enter into in connection with the consummation of the Transactions, (a) each of AES Grid Stability and Siemens Industry will initially have the right to nominate three of our directors, which shall be reduced to two directors for as long as they shall directly or indirectly, beneficially own, in the aggregate, less than 20% but 10% or more of our Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our Class A common stock on a one-for-one basis), and which shall further be reduced to one director for as long as they shall directly or indirectly, beneficially own, in the aggregate, less than 10% but 5% or more of our Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our Class A common stock on a one-for-one basis), no Directors if they shall directly or indirectly, beneficially own, in the aggregate, less than 5% of our Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our Class A common stock on a one-for-one basis), and (b) the Blocker Shareholder will have the right to nominate one of our Directors if they shall directly or indirectly, beneficially own, in the aggregate, at least 5% of our Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our Class A common stock on a one-for-one basis).

Each of AES Grid Stability, Siemens Industry, and the Blocker Shareholder will also agree to vote, or cause to vote, all of their outstanding shares of our Class A common stock, Class B-1 common stock and Class B-2 common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the Directors nominated by the other Continuing Equity Owners. Additionally, pursuant to the Stockholders Agreement, we shall take all commercially reasonable actions to cause (1) the board of directors to be comprised of at least nine directors or such other number of directors as our board of directors may determine; (2) the individuals nominated in accordance with the terms of the Stockholders Agreement to be included in the slate of nominees to be elected to the board of directors at the next annual

160

or special meeting of our stockholders at which directors are to be elected and at each annual meeting of our stockholders thereafter at which a director's term expires; and (3) the individuals nominated in accordance with the terms of the Stockholders Agreement to fill the applicable vacancies on the board of directors. The Stockholders Agreement allows for the board of directors to reject the nomination, appointment or election of a particular director if such nomination, appointment or election would constitute a breach of the board of directors' fiduciary duties to our stockholders or does not otherwise comply with any requirements of our amended and restated certificate of incorporation or our amended and restated bylaws or the charter for, or related guidelines of, the board of directors' nominating and corporate governance committee. The directors appointed by AES Grid Stability and Siemens Industry, each, shall review and have the right to approve the Company's annual business plan and annual capital expenditure and operating budget prior to the implementation of such annual business plan and annual capital expenditure and operating budget by the Company. In the event that the board of directors fails to approve a budget for any fiscal year prior to the first day of such fiscal year, (i) any items of the proposed budget that have been approved will become operative, and (ii) the approved budget for the immediately preceding fiscal year will continue in effect after giving effect to any dispositions or other material changes to the business, subject to a 15% year-over-year increase with respect to overhead and fixed costs. See "Management—Composition of our Board of Directors."

In addition, the Stockholders Agreement provides that the Company shall not take, and shall cause Fluence Energy, LLC (and its subsidiaries) not to take, any of the following actions (whether by merger, consolidation or otherwise) without the prior written approval of (i) the AES Grid Stability related parties as long as they beneficially own, directly or indirectly, in the aggregate 10% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our Class A common stock on a one-for-one basis) and (ii) the Siemens Industry related parties for as long as they beneficially own, directly or indirectly, in the aggregate 10% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis):

- any buyback, purchase, repurchase, redemption or other acquisition by the Company or Fluence Energy, LLC of any of the securities of the Company, Fluence Energy, LLC or any of their respective subsidiaries, other than repurchases made pursuant to any duly adopted incentive plan, or in connection with any redemption or exchange of common units as set forth in the Fluence Energy LLC Agreement; or

- the creation of a new class or series of capital stock or equity securities of the Company, Fluence Energy, LLC or any of their respective subsidiaries, provided that this provision will not prohibit Fluence Energy LLC from causing any of its direct or indirect wholly-owned subsidiaries from revising the capitalization of such direct or indirect wholly-owned subsidiaries in the ordinary course of business and that such new class or series of equity securities is held by Fluence Energy LLC or its wholly-owned subsidiaries; or

- any issuance of additional shares of Class A common stock, Class B-1 common stock, Class B-2 common stock, Preferred Stock or other equity securities of the Company, Fluence Energy, LLC or any of their respective subsidiaries, other than (1) any issuance of additional shares of Class A Common Stock or other equity securities of the Company or its subsidiaries (i) under any duly adopted stock option or other equity compensation plan of the Company or any of its subsidiaries or (ii) in connection with any redemption of common units as set forth in the Fluence Energy LLC Agreement; or (2) any issuance of equity securities by the direct or indirect wholly-owned subsidiaries of Fluence Energy LLC to Fluence Energy LLC or to other wholly-owned subsidiaries of Fluence Energy LLC.

In addition, the Stockholders Agreement provides that the Company shall not take, and shall cause Fluence Energy, LLC (and its subsidiaries) not to take, certain actions (whether by merger, consolidation or otherwise) without the prior written approval of (i) the AES Grid Stability related parties as long as they beneficially own, directly or indirectly, in the aggregate 5% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than

161

LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis), and (ii) the Siemens Industry related parties for as long as they beneficially own, directly or indirectly, in the aggregate of 5% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis):

- the appointment of the Company Representative under (and as defined in) the Fluence Energy LLC Agreement, the making of any tax election outside the ordinary course of business, or any change or revocation of any material tax election, or any election to classify Fluence LLC or any Subsidiary (as defined in the Stockholders Agreement) thereof as a corporation for federal income tax purposes; or

- the (i) resignation, replacement or removal of the Company as the sole manager of Fluence LLC or (ii) appointment of any additional Person (as defined in the Stockholders Agreement) as a manager of Fluence Energy, LLC.

In addition, the Stockholders Agreement provides that the Company shall not take, and shall cause Fluence Energy, LLC (and its subsidiaries) not to take, certain actions (whether by merger, consolidation or otherwise) without the prior written approval of (i) the AES Grid Stability related parties as long as they beneficially own, directly or indirectly, in the aggregate 5% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis), (ii) the Siemens Industry related parties for as long as they beneficially own, directly or indirectly, in the aggregate of 5% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis) and (iii) the Blocker Shareholder related parties for as long as they beneficially own, directly or indirectly, in the aggregate 5% or more of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis):

- any increase or decrease of the size of the Board;

- the reorganization, recapitalization, voluntary bankruptcy, liquidation, dissolution or winding-up of the Company, Fluence Energy LLC or any of their respective subsidiaries; or

- any amendment or modification of the Stockholders Agreement or the organizational documents of the Company, Fluence Energy LLC or any of its subsidiaries that would adversely modify the rights, preferences or privileges of any of AES Grid Stability, Siemens Industry or the Blocker Shareholder in a materially disproportionate manner to the non-affected stockholders among AES, Siemens or Blocker Shareholder.

In addition, the Stockholders Agreement provides the Blocker Shareholder with certain "tag along" rights to participate in certain sales of shares and LLC Interests by AES Grid Stability and Siemens Industry. The Stockholders Agreement provides that (x) if either AES Grid Stability or Siemens Industry individually sells 100% of their shares of Class A common Stock, Class B-2 common stock and/or LLC Interests to an unrelated third party (the "Sale Shares") and (y) the Sale Shares represent 20% or more of all the issued and outstanding shares of Class A common stock (assuming conversion of all outstanding underlying LLC Interests into shares of Class A common stock), then AES Grid Stability or Siemens Industry may sell the Sale Shares and if such party seeks to assign such party's rights under the Stockholders Agreement to the buyer, Blocker Shareholder shall have the right to participate in the sale of such Sale Shares and sell 100% of Blocker Shareholder's shares of Class A common stock in connection therewith. In the event (x) AES Grid Stability and Siemens Industry collectively sell Sale Shares and (y) such Sale Shares represent 30% or more of all the issued and outstanding shares of Class A common stock (assuming conversion of all outstanding underlying LLC Interests into shares of Class A common stock), then if (1) (i) AES Grid Stability and Siemens Industry sell 100% of their collective Sale Shares, then (ii) Blocker Shareholder shall have the right to sell to such third party 100% of its shares of Class A common stock or (2) (i) if AES Grid Stability and Siemens Industry sell less than 100% of their Sale Shares, then (ii) Blocker Shareholder shall have the right to sell to such third party a pro rata share of its shares of its Class A common stock.

162

In addition, the Stockholders Agreement provides that, notwithstanding the tag-along rights described above, in the event that AES Grid Stability and Siemens Industry collectively sell to a third party 100% of the Class A common Stock, Class B-2 common Stock and LLC Interests they each own (a "Drag-Along Transaction") and (A) as a result of such Drag-Along Transaction, such third party acquires at least 60% (in the aggregate) of the issued and outstanding shares of Class A common stock (assuming consummation of the underlying LLC Interests into shares of Class A common stock) and (B) the purchase price set forth in the bona fide offer from the third party purchaser is at least a 30% increase on 30-day average trading price for the shares of Class A common stock and LLC (a "Drag Offer"), then AES Grid Stability and Siemens Industry may, at their option, require the Blocker Shareholder to sell 100% of their shares of Class A common stock to the third party by giving written notice to the Blocker Shareholder not less than 30 days prior to the date stated in the Drag Offer for consummation of the sale contemplated by the Drag Offer.

The Stockholders Agreement will terminate upon the earliest to occur of (i) the Continuing Equity Owners ceasing to beneficially own, directly or indirectly, any shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our Class A common stock on a one-for-one basis), (ii) the Continuing Equity Owners ceasing to have any director designation rights under the Stockholders Agreement and (iii) as unanimously agreed between us and the Continuing Equity Owners. In addition, the Stockholders Agreement will terminate (i) as to each of AES Grid Stability and Siemens Industry upon the AES Grid Stability or Siemens Industry related parties, respectively, ceasing to beneficially own, directly or indirectly, any Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis) and (ii) solely as to the Blocker Shareholder, at its sole discretion, upon (A) (x) the Board no longer having a Blocker Shareholder director and (y) the Blocker Shareholder owning, directly or indirectly, less than 5% of all issued and outstanding shares of Class A common stock (assuming that all outstanding LLC Interests in Fluence Energy, LLC (other than LLC Interests held by us) are redeemed for newly issued shares of our class A common stock on a one-for-one basis) or (B) following a transfer by either AES Grid Stability or Siemens Industry of common stock or LLC Interests and the right to designate a director to an unaffiliated third party, in the event the Blocker Shareholder determines that it would not be able to vote for a director candidate nominated by such third party transferee.

The Stockholders Agreement may not be assigned without the express prior written consent of the other parties thereto; provided, however, that each of AES Grid Stability, Siemens Industry and Blocker Shareholder is permitted to assign to their respective permitted transferees under the Stockholders Agreement (so long as any such permitted transferee becomes a party to the Stockholders Agreement); and provided further, that each of AES Grid Stability, Siemens Industry and Blocker Shareholder is permitted, without the consent of any party, to assign its rights and obligations under the Stockholders Agreement to a transferee of all (but not less than all) of its respective Class A common stock, Class B-1 common stock, Class B-2 common stock and/or LLC Units (as applicable) in a transfer not prohibited by the LLC Agreement, so long as such transferee agrees to become party to, and be bound by all of the provisions of the Stockholders Agreement.

**Credit Support and Reimbursement Agreement**

We are party to an Amended and Restated Credit Support and Reimbursement Agreement with AES and Siemens Industry whereby they may, from time to time, agree to furnish credit support to us in the form of direct issuances of credit support to our lenders or other beneficiaries or through their lenders' provision of letters of credit to backstop our own facilities or obligations. Pursuant to the Credit Support and Reimbursement Agreement, if AES or Siemens Industry agree to provide a particular credit support (which they are permitted to grant or deny in their sole discretion), they are entitled to receipt of a credit support fee and reimbursement for all amounts paid to our lenders or other counterparties, payable upon demand. The Credit Support and Reimbursement Agreement will not provide any credit support from September 30, 2026, provided that either AES or Siemens Industry will be permitted to terminate the agreement upon six months prior notice.

**Registration Rights Agreement**

We intend to enter into a Registration Rights Agreement with the Continuing Equity Owners in connection with this offering. The Registration Rights Agreement will provide certain of the Continuing

163

Equity Owners with "demand" registration rights whereby they can require us to register under the Securities Act the offer and sale of shares of Class A common stock issuable to them, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), upon redemption or exchange of their LLC Interests. The Registration Rights Agreement will also provide for customary "piggyback" registration rights for all parties to the agreement.

**Intellectual Property License Agreements**

On June 9, 2021, we entered into amended and restated intellectual property license agreement with Siemens pursuant to which Siemens entities will grant worldwide, non-exclusive, non-transferable, perpetual, royalty-free license to conduct certain non-exclusive activities for certain permitted business purposes and to engage in permitted sublicensing thereunder, subject to various exceptions. Similarly, we granted Siemens perpetual, non-exclusive, worldwide rights to do any acts within the current and future fields of business of Siemens or Siemens Industry, which are not activities which are exclusive to us and which would otherwise infringe any of the contributed Siemens intellectual property under fair, reasonable and non-discriminatory royalty terms, to be negotiated by the parties thereto before the licenses are exercised. The license agreement contains customary indemnification and limitation of liability provisions. Neither party will be permitted to assign their rights or obligations without the consent of the other party thereto.

**Equipment and Services Purchase Agreement**

In connection with the consummation of this offering, we will enter into an amended and restated equipment and services purchase agreement with Siemens Industry pursuant to which Siemens Industry will supply electrical balance of plant equipment and related services to us under preferred purchasing conditions. The equipment and services purchase agreement will contain customary provisions regarding orders and payment, delivery, title and risk of loss, quality control, warranties, force majeure, intellectual property, indemnification, confidentiality and dispute resolution, among others.

**Storage Core Frame Purchase Agreements**

In connection with the consummation of this offering, we will enter into an amended and restated storage core frame purchase agreement with each of AES Grid Stability and Siemens Industry, pursuant to which AES Grid Stability and Siemens Industry, purchase energy storage equipment and related services from us under preferred purchasing conditions, including most-favored-nation pricing, either for use in their own electrical transmission and distribution projects or for resale to their own end-customers. The storage core frame purchase agreements will contain customary provisions regarding orders and payment, delivery, title and risk of loss, quality control, warranties, force majeure, intellectual property, indemnification, confidentiality and dispute resolution, among others. The term of these agreements shall commence on the effective date and shall continue until the earlier of the (x) seven year anniversary thereof and (y) the date on which AES Grid Stability or Siemens Industry, as applicable, hold less than 10% of the then outstanding voting power. If AES Grid Stability and Siemens Industry hold at least 20% of the then-outstanding voting power, they shall cause their business units to purchase certain of our product offerings exclusively from us. If AES Grid Stability and Siemens Industry hold at least 10% of the then-outstanding voting power, neither it or its affiliates will directly or indirectly engage in any of the defined exclusive activities set forth in the agreement, subject to us maintaining certain sales volume requirements. Upon transfer of title with respect to any equipment purchased thereunder, we will grant such affiliate a non-exclusive, transferable, fully paid-up with no further royalty obligations, worldwide license in all intellectual property owed or licensed by us which are necessary for their use and enjoyment of such equipment. Neither party will be permitted to assign their rights or obligations, other than to an affiliate, without the written consent of the other party thereto, which consent shall not be unreasonably withheld. If any dispute arises regarding payments, either party shall pay all undisputed amounts, and both parties shall attempt in good faith to resolve the dispute as promptly as practicable. If parties are unable to resolve a dispute within 30 days, then either party may submit the dispute to arbitration.

**Master Sales Cooperation Agreement**

Siemens Industry, Inc. and Fluence Energy, LLC previously entered into a master sales cooperation agreement on January 1, 2018 for the intent of cooperating to ensure meeting customer demands, timely

164

delivery of high-quality battery energy storage solutions and related service and effective order planning and processing. The parties agree that the initial master sales cooperation agreement is terminated effective as of the date of the signing of the new master sales cooperation agreement and that this agreement replaces the initial agreement. In order to accelerate the adoption of energy storage in the market and to leverage Siemens' extensive sales reach, Fluence is using Siemens sales organizations and customer relationships in some countries to bring Fluence's battery energy storage solutions to Siemens customers as well as working together to assist Siemens in offering battery energy storage solutions as part of a larger solution. Both parties intend to cooperate and deliver value to each of the parties' customers. Siemens intends to support Fluence in a potential usage of the Siemens sales organization worldwide. The support that Siemens can provide will be defined by a country specific agreement and/or project related agreements. The decision to pursue any specific project or transactions under any of the agreements shall be made independently and at the sole discretion of the parties. The cooperation activities are non-exclusive, neither party shall have grounds for any claim under any theory of law against the other party as it relates to this agreement, modifications shall only be valid if made in writing, and the agreement will continue in effect until December 31, 2022 and automatically extend by consecutive one-year intervals unless terminated by a party upon three months prior written notice to the other party.

**Director and Officer Indemnification and Insurance**

Prior to the consummation of this offering, we intend to enter into separate indemnification agreements with each of our directors and executive officers. We have also purchased directors' and officers' liability insurance. See "Description of Capital Stock—Limitations on Liability and Indemnification of Officers and Directors."

**Directed Share Program**

At our request, the underwriters have reserved for sale at the initial public offering price per share up to 5.0% of the shares of Class A common stock offered by this prospectus for sale at the initial public offering price through a directed share program to certain individuals identified by management. See the section titled "Underwriting—Directed Share Program."

**Our Policy Regarding Related Party Transactions**

Our board of directors will adopt a written related person transaction policy, to be effective upon the closing of this offering, setting forth the policies and procedures for the review and approval or ratification by our audit committee of related person transactions. This policy will cover, with certain exceptions set forth in Item 404 of Regulation S-K under the Securities Act, any transaction, arrangement or relationship, or any series of similar transactions, arrangements or relationships, in which we were or are to be a participant, where the amount involved exceeds $120,000 in any fiscal year and a related person had, has or will have a direct or indirect material interest, including without limitation, purchases of goods or services by or from the related person or entities in which the related person has a material interest, indebtedness, guarantees of indebtedness, and employment by us of a related person. In reviewing and approving any such transactions, our audit committee is tasked to consider all relevant facts and circumstances, including, but not limited to, whether the transaction is on terms comparable to those that could be obtained in an arm's length transaction and the extent of the related person's interest in the transaction. All of the transactions described in this section occurred prior to the adoption of this policy.

165

## PRINCIPAL STOCKHOLDERS

The following table sets forth information with respect to the beneficial ownership of our common stock (1) immediately following the consummation of the Transactions (excluding this offering), as described in "Our Organizational Structure" and (2) as adjusted to give effect to this offering, for:

- each person known by us to beneficially own more than 5% of our Class A common stock or our Class B-1 or Class B-2 common stock;

- each of our directors;

- each of our named executive officers; and

- all of our executive officers and directors as a group.

As described in "Our Organizational Structure" and "Certain Relationships and Related Party Transactions," each common unit (other than LLC Interests held by us) is redeemable from time to time at each holder's option for, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or a cash payment equal to a volume weighted average market price of one share of Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the Fluence Energy LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), we may effect a direct exchange by Fluence Energy, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Founders may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions —Fluence Energy LLC Agreement." In connection with this offering, we will issue to the Founders, for nominal consideration, one share of Class B-1 common stock for each common unit of Fluence Energy, LLC such Founder will own, respectively. As a result, the number of shares of Class B-1 common stock listed in the table below correlates to the number of LLC Interests the Founders will own immediately after the Transactions. Although the number of shares of Class A common stock being offered hereby to the public and the total number of LLC Interests outstanding after the offering will remain fixed regardless of the initial public offering price in this offering, the shares of Class B-1 common stock held by the beneficial owners set forth in the table below after the consummation of the Transactions will vary, depending on the initial public offering price in this offering. The table below assumes the shares of Class A common stock are offered at $22.50 per share (the midpoint of the estimated price range set forth on the cover page of this prospectus). See "Our Organizational Structure."

The number of shares beneficially owned by each stockholder as described in this prospectus is determined under rules issued by the SEC. Under these rules, beneficial ownership includes any shares as to which the individual or entity has sole or shared voting power or investment power. In computing the number of shares beneficially owned by an individual or entity and the percentage ownership of that person, shares of common stock subject to options, or other rights, including the redemption right described above with respect to each common unit, held by such person that are currently exercisable or will become exercisable within 60 days of September 30, 2021, are considered outstanding, although these shares are not considered outstanding for purposes of computing the percentage ownership of any other person. The percentage ownership of each individual or entity after giving effect to the Transactions and before this offering is computed on the basis of 18,493,275 shares of our Class A common stock outstanding and 117,173,390 shares of our Class B-1 common stock outstanding. The percentage ownership of each individual or entity after the offering is computed on the basis of 49,493,275 shares of our Class A common stock outstanding and 117,173,390 shares of our Class B-1 common stock outstanding. Percentage ownership of our common stock after this offering also assumes the sale by us and the selling stockholder of shares of our Class A common stock in this offering. No shares of Class B-2 common stock will be outstanding immediately after the Transactions and before or after the offering. The table below excludes any purchases that may be made through our directed share program or otherwise in this offering. See "Underwriting—Directed Share Program." Unless otherwise indicated, the address of all listed stockholders is c/o Fluence Energy, Inc., 4601 Fairfax Drive, Suite 600, Arlington, Virginia 22203.

Each of the stockholders listed has sole voting and investment power with respect to the shares beneficially owned by the stockholder unless noted otherwise, subject to community property laws where applicable.

166

| Name of beneficial owner | Class A Common Stock Beneficially Owned[1] | | | | | | Class B-1 Common Stock Beneficially Owned | | | | | | Combined Voting Power[2] | |
| | After Giving Effect to the Transactions and Before this Offering | | After Giving Effect to the Transactions and this Offering (No Exercise Option) | | After Giving Effect to the Transactions and this Offering (With Full Exercise Option) | | After Giving Effect to the Transactions and Before this Offering | | After Giving Effect to the Transactions and this Offering (No Exercise Option) | | After Giving Effect to the Transactions and this Offering (With Full Exercise Option) | | After Giving Effect to the Transactions and this Offering (No Exercise Option) | After Giving Effect to the Transactions and this Offering (With Full Exercise Option) |
| | Number | % | Number | % | Number | % | Number | % | Number | % | Number | % | % | % |
| *5% Stockholders* | | | | | | | | | | | | | | |
| AES Grid Stability | — | — | — | — | — | — | 58,586,696 | 43.2 | 58,586,695 | 35.2 | 58,586,695 | 34.2 | 46.1 | 45.8 |
| Siemens Industry | — | — | — | — | — | — | 58,586,696 | 43.2 | 58,586,695 | 35.2 | 58,586,695 | 34.2 | 46.1 | 45.8 |
| The Blocker Shareholder | 18,493,275 | 13.6 | 18,493,275 | 11.1 | 18,493,275 | 10.8 | — | — | — | — | — | — | 2.9 | 2.9 |
| *Named Executive Officers and Directors* | | | | | | | | | | | | | | |
| Manuel Perez Dubuc | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Dennis Fehr | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Rebecca Boll | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Julian Nebreda | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Lisa Krueger | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Barbara Humpton | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Emma Falck | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Axel Meier | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Chris Shelton | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Simon Smith | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Cynthia Arnold | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Herman Bulls | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Elizabeth Fessenden | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Harald von Heynitz | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| All directors and executive officers as a group (16 persons) | — | — | — | — | — | — | — | — | — | — | — | — | — | — |

\*    Represents beneficial ownership of less than 1%.

(1)    Each common unit is redeemable from time to time at each holder's option for, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or a cash payment equal to a volume weighted average market price of one share of Class A common stock for each LLC Interest so redeemed, in each case, in accordance with the terms of the Fluence Energy LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), we may effect a direct exchange by Fluence Energy, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. The Founders may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement." In these tables, beneficial ownership of LLC Interests has been reflected as beneficial ownership of shares of our Class A common stock for which such LLC Interests may be exchanged.

(2)    Represents the percentage of voting power of our Class A common stock and Class B-1 common stock voting as a single class. Each share of Class A common stock entitles the registered holder to one vote per share and each share of Class B-1 common stock entitles the registered holder thereof to five votes per share on all matters presented to stockholders for a vote generally, including the election of directors. The Class A common stock and Class B-1 common stock will vote as a single class on all matters except as required by law or our amended and restated certificate of incorporation.

167

## DESCRIPTION OF CAPITAL STOCK

**General**

Prior to the consummation of this offering, we will file an amended and restated certificate of incorporation and we will adopt our amended and restated bylaws. Our amended and restated certificate of incorporation will authorize capital stock consisting of:

- 1,200,000,000 shares of Class A common stock, par value $0.00001 per share;

- 300,000,000 shares of Class B-1 common stock, par value $0.00001 per share;

- 300,000,000 shares of Class B-2 common stock, par value $0.00001 per share; and

- 10,000,000 shares of preferred stock, par value $0.00001 per share.

We are selling 31,000,000 shares of Class A common stock in this offering (35,650,000 shares if the underwriters exercise in full their option to purchase additional shares of our Class A common stock). All shares of our Class A common stock outstanding upon consummation of this offering will be fully paid and non-assessable. We are issuing 18,493,275 shares of Class A common stock to the Blocker Shareholder in connection with the Transactions, and are issuing 117,173,390 shares of Class B-1 common stock to the Founders in connection with the Transactions for nominal consideration.

The following summary describes the material provisions of our capital stock. We urge you to read our amended and restated certificate of incorporation and our amended and restated bylaws, which are included as exhibits to the registration statement of which this prospectus forms a part.

Certain provisions of our amended and restated certificate of incorporation and our amended and restated bylaws summarized below may be deemed to have an anti-takeover effect and may delay or prevent a tender offer or takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of common stock.

**Common Stock**

*Class A Common Stock*

Holders of shares of our Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders.

Holders of shares of our Class A common stock are entitled to receive dividends when and if declared by our board of directors out of funds legally available therefor, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock.

Upon our dissolution or liquidation, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of our Class A common stock will be entitled to receive pro rata our remaining assets available for distribution.

Holders of shares of our Class A common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class A common stock.

*Class B-1 and Class B-2 Common Stock*

Each share of our Class B-1 common stock entitles its holders to five votes per share and each share of our Class B-2 common stock entitles its holders to one vote per share on all matters presented to our stockholders generally.

Shares of Class B-1 and Class B-2 common stock will be issued in the future only (a) to the extent necessary to maintain a one-to-one ratio between the number of LLC Interests held by the Founders and the aggregate number of shares of Class B-1 and Class B-2 common stock issued to the Founders, and (b) in

168

the case of Class B-2 common stock, upon conversion of Class B-1 common stock as described below. Shares of Class B-1 and Class B-2 common stock are transferable only together with an equal number of LLC Interests. Only permitted transferees of LLC Interests held by the Founders will be permitted transferees of Class B-1 and Class B-2 common stock. See "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement."

Holders of shares of our Class B-1 and Class B-2 common stock will vote together with holders of our Class A common stock as a single class on all matters presented to our stockholders for their vote or approval, except for certain amendments to our amended and restated certificate of incorporation described below or as otherwise required by applicable law or the amended and restated certificate of incorporation.

Holders of our Class B-1 and Class B-2 common stock do not have any right to receive dividends or to receive a distribution upon dissolution or liquidation. Additionally, holders of shares of our Class B-1 and Class B-2 common stock do not have preemptive, subscription, redemption or conversion rights. There will be no redemption or sinking fund provisions applicable to the Class B-1 or Class B-2 common stock. Any amendment of our amended and restated certificate of incorporation that gives holders of our Class B-1 or Class B-2 common stock (1) any rights to receive dividends or any other kind of distribution, (2) any right to convert into or be exchanged for Class A common stock or (3) any other economic rights will require, in addition to stockholder approval, the affirmative vote of holders of our Class A common stock voting separately as a class.

Each outstanding share of Class B-1 common stock will automatically convert into one share of Class B-2 common stock upon the earliest of (1) any transfer by a Founder of such shares of Class B-1 common stock other than to an affiliate of such Founder, (2) with respect to each Founder and its affiliates, 5:00 p.m. (New York City time) on a date fixed by our board of directors that is not less than 60 days nor more than 180 days following the date that such Founder, together with its affiliates, ceases to hold an aggregate number of shares of all classes of our common stock representing at least 20% of the aggregate number of all outstanding shares of all classes of our common stock, and (3) 5:00 p.m. (New York City time) on the date that is seven years following the closing of the offering.

Upon the consummation of the Transactions, the Founders will together own 100% of the outstanding shares of our Class B-1 common stock. Upon the consummation of the Transactions, no shares of our Class B-2 common stock will be outstanding.

**Preferred Stock**

Upon the consummation of the Transactions and the effectiveness of our amended and restated certificate of incorporation that will become effective immediately prior to the consummation of the Transactions, the total of our authorized shares of preferred stock will be 10,000,000 shares. Upon the consummation of the Transactions, we will have no shares of preferred stock outstanding.

Under the terms of our amended and restated certificate of incorporation that will become effective immediately prior to the consummation of the Transactions, our board of directors is authorized to direct us to issue shares of preferred stock in one or more series without stockholder approval. Our board of directors has the discretion to determine the rights, preferences, privileges, and restrictions, including voting rights, dividend rights, conversion rights, redemption privileges, and liquidation preferences, of each series of preferred stock.

The purpose of authorizing our board of directors to issue preferred stock and determine its rights and preferences is to eliminate delays associated with a stockholder vote on specific issuances. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions, future financings, and other corporate purposes, could have the effect of making it more difficult for a third party to acquire, or could discourage a third party from seeking to acquire, a majority of our outstanding voting stock. Additionally, the issuance of preferred stock may adversely affect the holders of our Class A common stock by restricting dividends on the Class A common stock, diluting the voting power of the Class A common stock or subordinating the liquidation rights of the Class A common stock. As a result of these or other factors, the issuance of preferred stock could have an adverse impact on the market price of our Class A common stock.

169

**Registration Rights**

We intend to enter into a Registration Rights Agreement with the Continuing Equity Owners in connection with this offering pursuant to which such parties will have specified rights to require us to register for resale all or a portion of their shares of Class A common stock under the Securities Act. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

**Forum Selection**

Our amended and restated certificate of incorporation will provide (A) (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim for or based on breach of a fiduciary duty owed by any current or former director, officer, other employee, agent or stockholder of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim against the Company or any current or former director, officer, employee, agent or stockholder of the Company arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws (as either may be amended or restated) or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware or (iv) any action asserting a claim related to or involving the Company that is governed by the internal affairs doctrine of the law of the State of Delaware shall, to the fullest extent permitted by law, be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, the federal district court of the State of Delaware; and (B) the federal district courts of the United States shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. Notwithstanding the foregoing, the exclusive forum provision shall not apply to claims seeking to enforce any liability or duty created by the Exchange Act.

**Dividends**

Declaration and payment of any dividend will be subject to the discretion of our board of directors. The time and amount of dividends will be dependent upon our business prospects, results of operations, financial condition, cash requirements and availability, debt repayment obligations, capital expenditure needs, contractual restrictions, covenants in the agreements governing our future indebtedness, industry trends, the provisions of Delaware law affecting the payment of distributions to stockholders, and any other factors our board of directors may consider relevant. We currently intend to retain all available funds and any future earnings to fund the development and growth of our business, and therefore, do not anticipate declaring or paying any cash dividends on our Class A common stock in the foreseeable future. See "Dividend Policy" and "Risk Factors—Risks related to the offering and ownership of our Class A common stock—Because we have no current plans to pay regular cash dividends on our Class A common stock following this offering, you may not receive any return on investment unless you sell your Class A common stock for a price greater than that which you paid for it."

**Anti-Takeover Provisions**

Our amended and restated certificate of incorporation and amended and restated bylaws, as they will be in effect immediately prior to the consummation of the Transactions, will contain provisions that may delay, defer or discourage another party from acquiring control of us. We expect that these provisions, which are summarized below, will discourage coercive takeover practices or inadequate takeover bids. These provisions are also designed to encourage persons seeking to acquire control of us to first negotiate with our board of directors, which we believe may result in an improvement of the terms of any such acquisition in favor of our stockholders. However, they also give our board of directors the power to discourage acquisitions that some stockholders may favor.

**Authorized but Unissued Shares**

The authorized but unissued shares of our common stock and our preferred stock are available for future issuance without stockholder approval, subject to any limitations imposed by the Nasdaq rules. These additional shares may be used for a variety of corporate finance transactions, acquisitions and employee benefit plans and, as described under "Certain Relationships and Related Party Transactions —Fluence Energy LLC Agreement," funding of redemptions of LLC Interests. The existence of authorized but

170

unissued and unreserved common stock and preferred stock could make more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

### Special Meetings of Stockholders

Our amended and restated bylaws will provide that from and after the date on which the aggregate number of outstanding shares of Class B-1 and Class B-2 common stock, voting together as a single class, cease to represent at least 50% of the total voting power of the outstanding shares of our capital stock, only the chairperson of our board of directors or a majority of our board of directors may call special meetings of our stockholders.

### Limitation on Action by Written Consent

Our amended and restated certificate of incorporation will provide that from and after the date on which the aggregate number of outstanding shares of Class B-1 and Class B-2 common stock, voting together as a single class, cease to represent at least 50% of the total voting power of the outstanding shares of our capital stock, holders of our common stock will not be able to act by written consent without a meeting.

### Advance Notice Requirements for Stockholder Proposals and Director Nominations

In addition, our amended and restated bylaws will establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of stockholders, including proposed nominations of candidates for election to our board of directors. In order for any matter to be "properly brought" before a meeting, a stockholder will have to comply with advance notice and duration of ownership requirements and provide us with certain information. Stockholders at an annual meeting may only consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of our board of directors or by a qualified stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has delivered timely written notice in proper form to our secretary of the stockholder's intention to bring such business before the meeting. These provisions could have the effect of delaying stockholder actions that are favored by the holders of a majority of our outstanding voting securities until the next stockholder meeting. Notwithstanding anything contained in our amended and restated bylaws to the contrary, such advance notice procedures shall not apply to a stockholder exercising its rights to designate persons for nomination for election to our board of directors in accordance with the provisions of the Stockholders Agreement for so long as it remains in effect.

### Amendment of Certificate of Incorporation or Bylaws

The Delaware General Corporation Law provides generally that the affirmative vote of a majority of the shares entitled to vote on any matter is required to amend a corporation's certificate of incorporation or bylaws, unless a corporation's certificate of incorporation or bylaws, as the case may be, requires a greater percentage. Our amended and restated certificate of incorporation and amended and restated bylaws will provide that the affirmative vote of holders of at least 66 2/3% of the voting power of all of the then-outstanding shares of capital stock, voting as a single class, will be required to amend certain provisions of our amended and restated certificate of incorporation, including provisions relating to amending our amended and restated bylaws, the size of our board, removal of directors, director liability, vacancies on our board, special meetings, stockholder notices, actions by written consent and exclusive forum.

### Section 203 of the DGCL

We will opt out of Section 203 of the DGCL. However, our amended and restated certificate of incorporation will contain provisions that are similar to Section 203. Specifically, our amended and restated certificate of incorporation will provide that, subject to certain exceptions, we will not be able to engage in a "business combination" with any "interested stockholder" for three years following the date that the person became an interested stockholder, unless the interested stockholder attained such status with the approval of our board of directors or unless the business combination is approved in a prescribed manner. A "business combination" includes, among other things, a merger or consolidation involving us and the "interested stockholder" and the sale of more than 10% of our assets. In general, an "interested stockholder" is any

171

entity or person beneficially owning 15% or more of our outstanding voting stock and any entity or person affiliated with or controlling or controlled by such entity or person, provided that the Founders and certain of their related parties and their respective direct and indirect transferees shall not be considered "interested stockholders."

### Limitations on Liability and Indemnification of Officers and Directors

Our amended and restated certificate of incorporation and amended and restated bylaws provide indemnification for our directors and officers to the fullest extent permitted by the Delaware General Corporation Law. Prior to the consummation of the Transactions, we intend to enter into indemnification agreements with each of our directors and executive officers that may, in some cases, be broader than the specific indemnification provisions contained under Delaware law. In addition, as permitted by Delaware law, our amended and restated certificate of incorporation includes provisions that eliminate the personal liability of our directors for monetary damages resulting from breaches of certain fiduciary duties as a director. The effect of this provision is to restrict our rights and the rights of our stockholders in derivative suits to recover monetary damages against a director for breach of fiduciary duties as a director.

These provisions may be held not to be enforceable for violations of the federal securities laws of the United States.

### Corporate Opportunity Doctrine

Delaware law permits corporations to adopt provisions renouncing any interest or expectancy in certain opportunities that are presented to the corporation or its officers, directors or stockholders. Our amended and restated certificate of incorporation will, to the maximum extent permitted from time to time by Delaware law, renounce any interest or expectancy that we have in, or right to be offered an opportunity to participate in, specified business opportunities that are from time to time presented to any director or stockholder who is not employed by us or our subsidiaries. Our amended and restated certificate of incorporation will provide that, to the fullest extent permitted by law, any director or stockholder who is not employed by us or our affiliates will not have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which we or our affiliates now engage or propose to engage or (2) otherwise competing with us or our affiliates. In addition, to the fullest extent permitted by law, if any director or stockholder who is not employed by us or our subsidiaries acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for itself or himself or its or his affiliates or for us or our affiliates, such person will have no duty to communicate or offer such transaction or business opportunity to us or any of our affiliates and they may take any such opportunity for themselves or offer it to another person or entity, unless such opportunity was expressly offered to them solely in their capacity as a director, executive officer or employee of us or our affiliates. To the fullest extent permitted by Delaware law, no potential transaction or business opportunity may be deemed to be a corporate opportunity of the corporation or its subsidiaries unless (1) we or our subsidiaries would be permitted to undertake such transaction or opportunity in accordance with the amended and restated certificate of incorporation, (2) we or our subsidiaries, at such time have sufficient financial resources to undertake such transaction or opportunity, (3) we have an interest or expectancy in such transaction or opportunity, and (4) such transaction or opportunity would be in the same or similar line of our or our subsidiaries' business in which we or our subsidiaries are engaged or a line of business that is reasonably related to, or a reasonable extension of, such line of business. Our amended and restated certificate of incorporation will not renounce our interest in any business opportunity that is expressly offered to an employee director or employee in his or her capacity as a director or employee of Fluence Energy, Inc.

### Dissenters' Rights of Appraisal and Payment

Under the DGCL, with certain exceptions, our stockholders will have appraisal rights in connection with a merger or consolidation of Fluence Energy, Inc. Pursuant to the DGCL, stockholders who properly request and perfect appraisal rights in connection with such merger or consolidation will have the right to receive payment of the fair value of their shares as determined by the Delaware Court of Chancery.

172

**Stockholders' Derivative Actions**

Under the DGCL, any of our stockholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the stockholder bringing the action is a holder of our shares at the time of the transaction to which the action relates or such stockholder's stock thereafter devolved by operation of law.

**Transfer Agent and Registrar**

The transfer agent and registrar for our Class A common stock is Computershare Trust Company, N.A.

**Trading Symbol and Market**

We have applied to list our Class A common stock on the Nasdaq Global Market under the symbol "FLNC."

**SHARES ELIGIBLE FOR FUTURE SALE**

Immediately prior to this offering, there was no public market for our Class A common stock. Future sales of substantial amounts of Class A common stock in the public market (including shares of Class A common stock issuable upon redemption or exchange of LLC Interests of certain of our Continuing Equity Owners), or the perception that such sales may occur, could adversely affect the market price of our Class A common stock. Although we have applied to have our Class A common stock listed on the Nasdaq, we cannot assure you that there will be an active public market for our Class A common stock.

Upon the closing of this offering, we will have outstanding an aggregate of 49,493,275 shares of Class A common stock, assuming the issuance of 31,000,000 shares of Class A common stock offered by us in this offering and the issuance of 18,493,275 shares of Class A common stock to the Blocker Shareholder in the Transactions, and assuming the underwriters do not exercise their option to purchase additional shares of our Class A common stock. Of these shares, all shares sold in this offering (including shares issued pursuant to the underwriters' option to purchase additional shares) will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by our "affiliates," as that term is defined in Rule 144 under the Securities Act, whose sales would be subject to the Rule 144 resale restrictions described below, other than the holding period requirement.

The remaining 18,493,275 shares of Class A common stock will be "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted securities are eligible for public sale only if they are registered under the Securities Act or if they qualify for an exemption from registration under the Securities Act, including Rules 144 or 701 under the Securities Act, which are summarized below.

In addition, each common unit held by certain of our Founders will be redeemable, at the election of such Founder, for, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or a cash payment equal to a volume weighted average market price of one share of Class A common stock for LLC Interest so redeemed, in each case, in accordance with the terms of the Fluence Energy LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the rules of the Nasdaq) who are disinterested), we may effect a direct exchange by Fluence Energy, Inc. of such Class A common stock or such cash, as applicable, for such LLC Interests. In the event of cash settlement, Fluence Energy, Inc. would issue new shares of Class A common stock and use the proceeds from the sale of these newly-issued shares of Class A common stock to fully fund the cash settlement, which, in effect, limits the amount of the cash payment to the redeeming member. The Founders may, subject to certain exceptions, exercise such redemption right for as long as their LLC Interests remain outstanding. See "Certain Relationships and Related Party Transactions—Fluence Energy LLC Agreement." Upon consummation of the Transactions, our Founders will hold 117,173,390 LLC Interests, all of which will be exchangeable for shares of our Class A common stock. The shares of Class A common stock we issue upon such exchanges would be "restricted securities" as defined in Rule 144 unless we register such issuances. However, we will enter into a Registration Rights Agreement with the Continuing Equity Owners that will require us, subject to customary conditions, to register under the Securities Act these shares of Class A common stock. See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

**Lock-Up Agreements**

We and our directors, officers, and the holders of substantially all of our outstanding shares and share options have agreed subject to certain exceptions, that without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not, and will not publicly disclose an intention to, during the period beginning on the date of the lock-up agreement and ending at the close of business 180 days after the date of the final prospectus relating to the public offering (such period, the "restricted period"):

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Class A common stock or any securities convertible into or exercisable or exchangeable for Class A common stock;

174

- file any registration statement with the Securities and Exchange Commission relating to the offering of any Class A common stock or any securities convertible into or exercisable or exchangeable for Class A common stock; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Class A common stock,

whether any such transaction described above is to be settled by delivery of Class A common stock or such other securities, in cash or otherwise. In addition, we and each such person agrees that, without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the underwriters, we or such other person will not, during the restricted period, make any demand for, or exercise any right with respect to, the registration of any Class A common stock or any security convertible into or exercisable or exchangeable for Class A common stock.

Upon the expiration of the lock-up period, substantially all of the shares subject to such lock-up restrictions will become eligible for sale, subject to the limitations discussed above.

**Rule 144**

In general, under Rule 144 under the Securities Act as currently in effect, a person (or persons whose shares are aggregated) who is not deemed to have been an affiliate of ours at any time during the three months preceding a sale, and who has beneficially owned restricted securities within the meaning of Rule 144 for at least six months (including any period of consecutive ownership of preceding non-affiliated holders) would be entitled to sell those shares, subject only to the availability of current public information about us. A non-affiliated person who has beneficially owned restricted securities within the meaning of Rule 144 for at least one year would be entitled to sell those shares without regard to the provisions of Rule 144.

A person (or persons whose shares are aggregated) who is deemed to be an affiliate of ours and who has beneficially owned restricted securities within the meaning of Rule 144 for at least six months would be entitled to sell within any three-month period a number of shares that does not exceed the greater of 1% of the then-outstanding shares of our Class A common stock or the average weekly trading volume of our Class A common stock reported through Nasdaq during the four calendar weeks preceding the filing of notice of the sale. Such sales are also subject to certain manner of sale provisions, notice requirements, and the availability of current public information about us.

**Rule 701**

In general, under Rule 701, any of our employees, directors, officers, consultants or advisors who purchases shares from us in connection with a compensatory stock or option plan or other written agreement before the effective date of the registration statement of which this prospectus forms a part is entitled to sell such shares 90 days after such effective date in reliance on Rule 144. Our affiliates can resell shares in reliance on Rule 144 without having to comply with the holding period requirement, and non-affiliates of the issuer can resell shares in reliance on Rule 144 without having to comply with the current public information and holding period requirements.

The SEC has indicated that Rule 701 will apply to typical stock options granted by an issuer before it becomes subject to the reporting requirements of the Exchange Act, along with the shares acquired upon exercise of such options, including exercises after an issuer becomes subject to the reporting requirements of the Exchange Act.

**Equity Plans**

We intend to file one or more registration statements on Form S-8 under the Securities Act to register the offer and sale of all shares of Class A common stock subject to outstanding stock options and phantom units (including options issued pursuant to the Existing Equity Plan which will convert upon effectiveness of this offering into options to acquire shares of Class A common stock) and Class A common stock issued or issuable under our 2021 Plan (or which may be issued in respect of awards under the Existing Phantom Equity Plan). As of the date of this prospectus, options and phantom units representing 979,300 LLC Interests

175

were outstanding, which will convert into options and phantom units representing an aggregate of 14,488,372 shares of Class A common stock. A total of approximately 9,500,000 shares of our Class A common stock will be available for issuance to certain of our directors, executive officers and consultants under our 2021 Plan following with this offering. The number of shares of our Class A common stock that may be issued in respect of awards under the Existing Phantom Equity Plan will depend on the value of our Class A common stock following this offering.

We expect to file the registration statement covering shares offered pursuant to the Existing Equity Plan and our 2021 Plan (and, if necessary, in respect of awards under the Existing Phantom Equity Plan) shortly after the date of this prospectus, permitting the resale of such shares by nonaffiliates in the public market without restriction under the Securities Act and the sale by affiliates in the public market subject to compliance with the resale provisions of Rule 144.

**Registration Rights**

See "Certain Relationships and Related Party Transactions—Registration Rights Agreement."

176

**MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES
TO NON-U.S. HOLDERS OF CLASS A COMMON STOCK**

The following discussion is a summary of the material U.S. federal income tax consequences to Non-U.S. Holders (as defined below) of the purchase, ownership, and disposition of our Class A common stock issued pursuant to this offering, but does not purport to be a complete analysis of all potential tax effects. The effects of other U.S. federal tax laws, such as estate and gift tax laws, and any applicable state, local or non-U.S. tax laws are not discussed. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service (the "IRS"), in each case in effect as of the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect a Non-U.S. Holder of our Class A common stock. We have not sought and will not seek any rulings from the IRS regarding the matters discussed below. There can be no assurance the IRS or a court will not take a contrary position to that discussed below regarding the tax consequences of the purchase, ownership, and disposition of our Class A common stock.

This discussion is limited to Non-U.S. Holders that hold our Class A common stock as a "capital asset" within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion does not address all U.S. federal income tax consequences relevant to a Non-U.S. Holder's particular circumstances, including the alternative minimum tax and the impact of the Medicare contribution tax on net investment income. In addition, it does not address consequences relevant to Non-U.S. Holders subject to special rules, including, without limitation:

- U.S. expatriates and former citizens or long-term residents of the United States;

- persons holding our Class A common stock as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment;

- banks, insurance companies, and other financial institutions;

- brokers, dealers or traders in securities;

- "controlled foreign corporations," "passive foreign investment companies," and corporations that accumulate earnings to avoid U.S. federal income tax;

- partnerships or other entities or arrangements treated as partnerships for U.S. federal income tax purposes (and investors therein);

- tax-exempt organizations or governmental organizations;

- persons deemed to sell our Class A common stock under the constructive sale provisions of the Code;

- persons who hold or receive our Class A common stock pursuant to the exercise of any employee stock option or otherwise as compensation;

- tax-qualified retirement plans;

- "qualified foreign pension funds" as defined in Section 897(l)(2) of the Code and entities all of the interests of which are held by qualified foreign pension funds; and

- persons subject to special tax accounting rules as a result of any item of gross income with respect to the stock being taken into account in an applicable financial statement.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds our Class A common stock, the tax treatment of an owner in such an entity will depend on the status of the owner, the activities of such entity, and certain determinations made at the owner level. Accordingly, entities or arrangements treated as partnerships for U.S. federal income tax purposes holding our Class A common stock and the owners in such entities should consult their tax advisors regarding the U.S. federal income tax consequences to them.

177

**THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP, AND DISPOSITION OF OUR CLASS A COMMON STOCK ARISING UNDER THE U.S. FEDERAL ESTATE OR GIFT TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE INCOME TAX TREATY.**

### Definition of a Non-U.S. Holder

For purposes of this discussion, a "Non-U.S. Holder" is any beneficial owner of our Class A common stock that is neither a "U.S. person" nor an entity or arrangement treated as a partnership for U.S. federal income tax purposes. A U.S. person is any person that, for U.S. federal income tax purposes, is or is treated as any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Code) or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

### Distributions

If we make distributions of cash or property on our Class A common stock, such distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Amounts not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and first be applied against and reduce a Non-U.S. Holder's adjusted tax basis in its Class A common stock, but not below zero. Any excess will be treated as capital gain and will be treated as described below under "—Sale or Other Taxable Disposition."

Subject to the discussion below on effectively connected income, dividends paid to a Non-U.S. Holder of our Class A common stock will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the dividends (or such lower rate specified by an applicable income tax treaty, provided the Non-U.S. Holder furnishes a valid IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) certifying qualification for the lower treaty rate). A Non-U.S. Holder that does not timely furnish the required documentation, but that qualifies for a reduced treaty rate, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

If dividends paid to a Non-U.S. Holder are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such dividends are attributable), the Non-U.S. Holder will be exempt from the U.S. federal withholding tax described above. To claim the exemption, the Non-U.S. Holder must furnish to the applicable withholding agent a valid IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States.

Any such effectively connected dividends will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected dividends, as adjusted for certain items. Non-U.S. Holders should consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

178

**Sale or Other Taxable Disposition**

Subject to the discussion below under "—Information Reporting and Backup Withholding" and "—Additional Withholding Tax on Payments Made to Foreign Accounts," a Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized upon the sale or other taxable disposition of our Class A common stock unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such gain is attributable);

- the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met; or

- our Class A common stock constitutes a U.S. real property interest ("USRPI") by reason of our status as a U.S. real property holding corporation ("USRPHC") for U.S. federal income tax purposes.

Gain described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular graduated rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

A holder described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on any gain realized upon the sale or other taxable disposition of our Class A common stock, which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

With respect to the third bullet point above, we believe we currently are not, and do not anticipate becoming, a USRPHC. Because the determination of whether we are a USRPHC depends, however, on the fair market value of our USRPIs relative to the fair market value of our non-U.S. real property interests and our other business assets, there can be no assurance we currently are not a USRPHC or will not become one in the future. Even if we are or were to become a USRPHC, gain arising from the sale or other taxable disposition by a Non-U.S. Holder of our Class A common stock will not be subject to U.S. federal income tax if our Class A common stock is "regularly traded," as defined by applicable Treasury Regulations, on an established securities market, and such Non-U.S. Holder owned, actually and constructively, 5% or less of our Class A common stock throughout the shorter of the five-year period ending on the date of the sale or other taxable disposition or the Non-U.S. Holder's holding period.

Non-U.S. Holders should consult their tax advisors regarding potentially applicable income tax treaties that may provide for different rules.

**Information Reporting and Backup Withholding**

Payments of dividends on our Class A common stock will not be subject to backup withholding, provided the applicable withholding agent does not have actual knowledge or reason to know the holder is a United States person and the holder either certifies its non-U.S. status, such as by furnishing a valid IRS Form W-8BEN, W-8BEN-E or W-8ECI, or otherwise establishes an exemption. However, information returns are required to be filed with the IRS in connection with any distributions on our Class A common stock paid to the Non-U.S. Holder, regardless of whether such distributions constitute dividends or whether any tax was actually withheld. In addition, proceeds of the sale or other taxable disposition of our Class A common stock within the United States or conducted through certain U.S.-related brokers generally will not be subject to backup withholding or information reporting, if the applicable withholding agent receives the certification described above and does not have actual knowledge or reason to know that such holder is a United States person, or the holder otherwise establishes an exemption. Proceeds of a disposition of our Class A common stock conducted through a non-U.S. office of a non-U.S. broker generally will not be subject to backup withholding or information reporting.

Copies of information returns that are filed with the IRS may also be made available under the provisions of an applicable treaty or agreement to the tax authorities of the country in which the Non-U.S. Holder resides or is established.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

**Additional Withholding Tax on Payments Made to Foreign Accounts**

Withholding taxes may be imposed under Sections 1471 to 1474 of the Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "FATCA") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends on, or (subject to the proposed Treasury Regulations discussed below) gross proceeds from the sale or other disposition of, our Class A common stock paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code), unless (1) the foreign financial institution undertakes certain diligence and reporting obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States owned foreign entities" (each as defined in the Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our Class A common stock. While withholding under FATCA would also have applied to payments of gross proceeds from the sale or other disposition of stock, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

Prospective investors should consult their tax advisors regarding the potential application of withholding under FATCA to their investment in our Class A common stock.

180

## UNDERWRITING

Under the terms and subject to the conditions in an underwriting agreement dated the date of this prospectus, the underwriters named below, for whom J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC are acting as representatives, have severally agreed to purchase, and we have agreed to sell to them, severally, the number of shares indicated below:

| Name | Number of Shares |
| --- | --- |
| J.P. Morgan Securities LLC | |
| Morgan Stanley & Co. LLC. | |
| Barclays Capital Inc. | |
| BofA Securities, Inc. | |
| Citigroup Global Markets Inc | |
| Credit Suisse Securities (USA) LLC | |
| UBS Securities LLC | |
| Evercore Group L.L.C. | |
| HSBC Securities (USA) Inc. | |
| RBC Capital Markets, LLC | |
| Nomura Securities International, Inc. | |
| Robert W. Baird & Co. Incorporated | |
| Raymond James & Associates, Inc. | |
| Seaport Global Securities LLC | |
| Penserra Securities LLC | |
| Siebert Williams Shank & Co., LLC | |
| Total | 31,000,000 |

The underwriters and the representatives are collectively referred to as the "underwriters" and the "representatives," respectively. The underwriters are offering the Class A common stock subject to their acceptance of the Class A common stock from us and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the Class A common stock offered by this prospectus are subject to the approval of certain legal matters by their counsel and to certain other conditions. The underwriters are obligated to take and pay for all of the Class A common stock offered by this prospectus if any such shares are taken. However, the underwriters are not required to take or pay for the shares covered by the underwriters' over-allotment option described below.

The underwriters initially propose to offer part of the Class A common stock directly to the public at the offering price listed on the cover page of this prospectus and part to certain dealers. After the initial offering of the Class A common stock, the offering price and other selling terms may from time to time be varied by the representatives.

The Company has granted to the underwriters an option, exercisable for 30 days from the date of this prospectus, to purchase up to 4,650,000 Class A common stock at the public offering price listed on the cover page of this prospectus, less underwriting discounts and commissions. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with the offering of the Class A common stock offered by this prospectus. To the extent the option is exercised, each underwriter will become obligated, subject to certain conditions, to purchase about the same percentage of the additional Class A common stock as the number listed next to the underwriter's name in the preceding table bears to the total number of Class A common stock listed next to the names of all underwriters in the preceding table.

The following table shows the per share and total public offering price, underwriting discounts and commissions, and proceeds before expenses to us. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase up to an additional 4,650,000 shares of Class A common stock.

181

|  | Per Share | Total | |
|---|---|---|---|
|  |  | No Exercise | Full Exercise |
| Public offering price | $ | $ | $ |
| Underwriting discounts and commissions | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |

The estimated offering expenses payable by us, exclusive of the underwriting discounts and commissions, are approximately $10.0 million. We have agreed to reimburse the underwriters for expenses relating to clearance of this offering with the Financial Industry Regulatory Authority up to $0.1 million. The Underwriters have agreed to reimburse us for certain expenses incurred in connection with this offering in an amount not to exceed $        (or $        if the underwriters exercise in full their option to purchase additional shares).

We have applied to list our Class A common stock on the Nasdaq Global Market under the trading symbol "FLNC."

The underwriters have informed us that they do not intend sales to discretionary accounts to exceed 5% of the total number of Class A common stock offered by them.

BNPP ET has indicated an interest in purchasing an aggregate of up to a maximum of $70 million in shares of Class A common stock in this offering at the initial public offering price. Because this indication of interest is not a binding agreement or a commitment to purchase, BNPP ET could determine to purchase more, fewer or no shares of Class A common stock in this offering, or the underwriters could determine to sell more, fewer or no shares to BNPP ET. The underwriters will receive the same discount on any of the shares of Class A common stock purchased by BNPP ET as they will on any other shares of Class A common stock sold to the public in this offering.

We and our directors, officers, and the holders of substantially all of our outstanding shares and share options have agreed that, without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not, and will not publicly disclose an intention to, during the period beginning on the date of the lock-up agreement and ending at the close of business 180 days after the date of the final prospectus relating to the public offering (such period, the "restricted period"):

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Class A common stock or any securities convertible into or exercisable or exchangeable for Class A common stock;

- file any registration statement with the Securities and Exchange Commission relating to the offering of any Class A common stock or any securities convertible into or exercisable or exchangeable for Class A common stock; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Class A common stock,

whether any such transaction described above is to be settled by delivery of Class A common stock or such other securities, in cash or otherwise. In addition, we and each such person agrees that, without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the underwriters, we or such other person will not, during the restricted period, make any demand for, or exercise any right with respect to, the registration of any Class A common stock or any security convertible into or exercisable or exchangeable for Class A common stock.

The restrictions described in the immediately preceding paragraphs do not apply to our directors, officers, and other securityholders with respect to:

(1) transactions relating to Class A common stock or other securities acquired in open market transactions after the completion of the offering of the shares, provided that no filing under

182

Section 16(a) of the Exchange Act is required or voluntarily made in connection with subsequent sales of the Class A common stock or other securities acquired in such open market transactions during the restricted period;

(2) transfers of Class A common stock or any security convertible into Class A common stock (i) as a bona fide gift, (ii) to an immediate family member or to any trust for the direct or indirect benefit of the lock-up party or an immediate family member of the lock-up party, (iii) to any entity controlled or managed, or under common control or management by, the lock-up party or (iv) for bona fide estate planning purposes; provided, such transfer does not involve a disposition for value;

(3) the transfer of Class A common stock or any security convertible into Class A common stock that occurs by operation of law pursuant to a qualified domestic order or in connection with a divorce settlement or other court order;

(4) (i) the issuance of Class A common stock by us to the lock-up party upon the vesting, exercise or settlement of options, restricted share units, share value awards or other equity awards granted under a share incentive plan or other equity award plan, which plan is described herein, or the exercise of warrants outstanding and which are described herein (ii) the transfer or other disposition of Class A common stock or any securities convertible into Class A common stock to us upon a vesting or settlement event of our securities or upon the "net" or "cashless" exercise of options, restricted share units, share value awards, warrants or other equity awards to the extent permitted by the instruments representing such securities (including any transfer to us necessary to generate such amount of cash needed for the payment of taxes, including estimated taxes, due as a result of such vesting or exercise whether by means of a "net settlement" or otherwise), so long as such "cashless" or "net" exercise is effected solely by the surrender of outstanding options, restricted share units, share value awards, warrants or other equity awards (or underlying Class A common stock) to us, and our cancellation of all or a portion thereof to pay the exercise price and/or withholding tax obligations;

(5) the reclassification and conversion of shares of our outstanding redeemable convertible preferred stock into Class A common stock prior to or in connection with the consummation of this offering, provided that, in each case, such shares remain subject to the terms of the lock-up agreement; provided that (i) such conversion or reclassification is disclosed herein and (ii) any such Class A common stock received upon such conversion or reclassification shall be subject to the terms of the lock-up agreement;

(6) if the lock-up party is a corporation, partnership, limited liability company, trust or other business entity, any transfer or distribution of Class A common stock or any security convertible into or exercisable or exchangeable for Class A common stock to limited partners, members, managers, stockholders or holders of similar equity interests in the lock-up party or to another corporation, partnership, limited liability company, trust or other business entity that is an affiliate (as defined in Rule 405 as promulgated under the Securities Act of 1933, as amended) of the lock-up party or to any investment fund or other entity controlled or managed by the lock-up party or affiliates of the lock-up party;

(7) transfers of Class A common stock pursuant to a bona fide third-party tender offer, merger, consolidation or other similar transaction after the completion of this offering that is approved by our board of directors and made to all holders of our share capital involving a change of control; provided that such plan does not provide for the transfer of Class A common stock during the restricted period; or

(8) establishing trading plans pursuant to Rule 10b5-1 under the Exchange Act for the transfer of Class A common stock; provided that such plan does not provide for the transfer of Class A common stock during the restricted period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of us or the lock-up party regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of Class A common stock may be made under such plan during the restricted period;

183

*provided* that:

in the case of any transfer or distribution pursuant to clauses (2), (4)(i) and (6) above, each donee, distributee or transferee shall sign and deliver a lock-up agreement,

in the case of any transfer or distribution pursuant to clauses (2) and (6) above, no filing under the Exchange Act reporting a reduction in beneficial ownership of Class A common stock would be required or be voluntarily made, and

in the case of any transfer or distribution pursuant to clauses (3), (5) and (7) through (9) above, any filing required by the Exchange Act shall clearly indicate in the footnotes thereto that the such transfer or distribution is being made pursuant to the circumstances described in the applicable clause.

In our case, such restrictions shall not apply to:

the sale of shares to the underwriters;

the issuance by the Company of Class A common stock upon the exercise of an option or a warrant or the conversion of a security outstanding on the date of this prospectus of which the underwriters have been advised in writing; or

facilitating the establishment of a trading plan on behalf of a stockholder, officer or director of the Company pursuant to Rule 10b5-1 under the Exchange Act for the transfer of Class A common stock, provided that (i) such plan does not provide for the transfer of Class A common stock during the restricted period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the Company regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of Class A common stock may be made under such plan during the restricted period.

J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, in their sole discretion, may release the Class A common stock and other securities subject to the lock-up agreements described above in whole or in part at any time.

In order to facilitate the offering of the Class A common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the Class A common stock. Specifically, the underwriters may sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of shares available for purchase by the underwriters under the over-allotment option. The underwriters can close out a covered short sale by exercising the over-allotment option or purchasing shares in the open market. In determining the source of shares to close out a covered short sale, the underwriters will consider, among other things, the open market price of shares compared to the price available under the over-allotment option. The underwriters may also sell shares in excess of the over-allotment option, creating a naked short position. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the Class A common stock in the open market after pricing that could adversely affect investors who purchase in this offering. As an additional means of facilitating this offering, the underwriters may bid for, and purchase, Class A common stock in the open market to stabilize the price of the Class A common stock. These activities may raise or maintain the market price of the Class A common stock above independent market levels or prevent or retard a decline in the market price of the Class A common stock. The underwriters are not required to engage in these activities and may end any of these activities at any time.

The underwriters may offer and sell the Class A common stock through certain of their affiliates or other registered broker-dealers or selling agents.

We and the underwriters have agreed to indemnify each other against certain liabilities, including liabilities under the Securities Act.

A prospectus in electronic format may be made available on websites maintained by one or more underwriters participating in this offering. The representatives may agree to allocate a number of Class A

184

common stock to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the representatives to underwriters that may make Internet distributions on the same basis as other allocations.

**Other Relationships**

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing, and brokerage activities. Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us, for which they received or will receive customary fees and expenses. In particular, Morgan Stanley & Co. LLC acted as financial advisor in connection with QFH's $125 million investment in us earlier this year, for which Morgan Stanley & Co. LLC received customary indemnity, fees and expenses. Certain affiliates of the underwriters are lenders under the Revolver, the terms of which contain a minimum liquidity covenant which will be partially satisfied by the proceeds of the offering: (a) an affiliate of J.P. Morgan Securities LLC is acting as administrative agent, joint lead arranger, joint bookrunner and issuing bank, (b) an affiliate of Morgan Stanley & Co. LLC is acting as joint lead arranger, joint bookrunner, syndication agent and issuing bank, (c) an affiliate of Barclays Capital Inc. is acting as joint lead arranger, joint bookrunner, documentation agent and issuing bank, (d) an affiliate of BofA Securities, Inc. is acting as joint lead arranger and joint bookrunner and (e) an affiliate of BofA Securities, Inc. is acting as documentation agent and issuing bank. Additionally, an affiliate of Citigroup Global Markets Inc. acted as the lender under a $60 million Global Paying Services Agreement which is included as an exhibit to the registration statement of which this prospectus forms a part.

In addition, in the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve our securities and instruments. The underwriters and their respective affiliates may also make investment recommendations or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long or short positions in such securities and instruments.

**Pricing of the Offering**

Prior to this offering, there has been no public market for our Class A common stock. The initial public offering price was determined by negotiations between us and the representatives. Among the factors considered in determining the initial public offering price were our future prospects and those of our industry in general, our sales, earnings and certain other financial and operating information in recent periods, and the price-earnings ratios, price-sales ratios, market prices of securities, and certain financial and operating information of companies engaged in activities similar to ours.

**Directed Share Program**

At our request, the underwriters have reserved up to 5.0% of the shares of Class A common stock to be offered by this prospectus for sale, at the initial public offering price, to directors, officers, employees, business associates and related persons of Fluence Energy, Inc. If purchased by these persons, these shares will not be subject to a lock-up restriction, except in the case of shares purchased by any of our directors or executive officers, which shares will be subject to a 180-day lock-up restriction (as described above). The number of shares of Class A common stock available for sale to the general public will be reduced to the extent these individuals purchase such reserved shares. Any reserved shares that are not so purchased will be offered by the underwriters to the general public on the same basis as the other shares of Class A common stock offered by this prospectus.

**Selling Restrictions**

***European Economic Area***

In relation to each Member State of the European Economic Area, or each, a Relevant State, no securities have been offered or will be offered pursuant to the offering to the public in that Relevant State

185

prior to the publication of a prospectus in relation to the securities which has been approved by the competent authority in that Relevant State or, where appropriate, approved in another Relevant State and notified to the competent authority in that Relevant State, all in accordance with the Prospectus Regulation, except that offers of securities may be made to the public in that Relevant State at any time under the following exemptions under the Prospectus Regulation:

(a)   to any legal entity which is a qualified investor as defined under the Prospectus Regulation;

(b)   to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent of the representatives; or

(c)   in any other circumstances falling within Article 1(4) of the Prospectus Regulation,

provided that no such offer of shares shall require us or any of our representatives to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation.

For the purposes of this provision, the expression an "offer to the public" in relation to any shares in any Relevant State means the communication in any form and by any means of sufficient information on the terms of the offer and any shares to be offered so as to enable an investor to decide to purchase any shares, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129 (as amended).

### *United Kingdom*

In relation to the United Kingdom, no shares have been offered or will be offered pursuant to this offering to the public in the United Kingdom prior to the publication of a prospectus in relation to the shares that either (i) has been approved by the Financial Conduct Authority, or (ii) is to be treated as if it had been approved by the Financial Conduct Authority in accordance with the transitional provision in Regulation 74 of the Prospectus (Amendment etc.) (EU Exit) Regulations 2019, except that offers of shares may be made to the public in the United Kingdom at any time under the following exemptions under the UK Prospectus Regulation:

(a)   to any legal entity which is a qualified investor as defined under Article 2 of the UK Prospectus Regulation;

(b)   to fewer than 150 natural or legal persons (other than qualified investors as defined under Article 2 of the UK Prospectus Regulation), subject to obtaining the prior consent of representatives for any such offer; or

(c)   in any other circumstances falling within Section 86 of the Financial Services and Markets Act 2000 (the "FSMA"),

provided that no such offer of the shares shall require the Issuer or any representative to publish a prospectus pursuant to Section 85 of the FSMA or supplement a prospectus pursuant to Article 23 of the UK Prospectus Regulation.

For the purposes of this provision, the expression an "offer to the public" in relation to the shares in the United Kingdom means the communication in any form and by any means of sufficient information on the terms of the offer and any shares to be offered so as to enable an investor to decide to purchase or subscribe for any shares and the expression "UK Prospectus Regulation" means Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018.

In addition, this prospectus is only being distributed to, and is only directed at, and any investment or investment activity to which this prospectus relates is available only to, and will be engaged in only with, persons who are outside the United Kingdom or persons in the United Kingdom (i) having professional experience in matters relating to investments who fall within the definition of "investment professionals" in Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Order"); or (ii) who are high net worth entities falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). Persons who are not relevant persons should not take any action on the basis of this prospectus and should not act or rely on it.

186

*Switzerland*

This prospectus is not intended to constitute an offer or solicitation to purchase or invest in the Class A common stock. The Class A common stock may not be publicly offered, directly or indirectly, in Switzerland within the meaning of the Swiss Financial Services Act ("FinSA"), and no application has or will be made to admit the Class A common stock to trading on any trading venue (exchange or multilateral trading facility) in Switzerland. Neither this prospectus nor any other offering or marketing material relating to the Class A common stock constitutes a prospectus pursuant to the FinSA, and neither this prospectus nor any other offering or marketing material relating to the Class A common stock may be publicly distributed or otherwise made publicly available in Switzerland.

*Canada*

The Class A common stock may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the Class A common stock must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

*Cayman Islands*

This prospectus does not constitute a public offer of the Class A common stock, whether by way of sale or subscription, in the Cayman Islands.

*Hong Kong*

Our Class A common stock may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap.32, Laws of Hong Kong), and no advertisement, invitation or document relating to our Class A common stock may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to our Class A common stock which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap.571, Laws of Hong Kong) and any rules made thereunder.

*Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of our Class A common stock may not be circulated or distributed, nor may the our Class A common stock be offered or sold, or be made the subject of an invitation for

187

subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA") (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where our Class A common stock are subscribed or purchased under Section 275 by a relevant person which is: (i) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (ii) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired our Class A common stock under Section 275 except: (i) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (ii) where no consideration is given for the transfer; (iii) where the transfer is by operation of law; (iv) as specified in Section 276(7) of the SFA; or (v) as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

Solely for the purposes of its obligations pursuant to Section 309B of the SFA, we have determined, and hereby notify all relevant persons (as defined in the Securities and Futures (Capital Markets Products) Regulations 2018 of Singapore (the "CMP Regulations 2018")), that the Class A common stock are "prescribed capital markets products" (as defined in the CMP Regulations 2018) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

### *Dubai International Financial Centre*

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority (the "DFSA"). This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The Class A common stock to which this prospectus relates may be illiquid or subject to restrictions on its resale. Prospective purchasers of the Class A common stock offered should conduct their own due diligence on the Class A common stock. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

### *Japan*

No registration pursuant to Article 4, paragraph 1 of the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) (the "FIEL") has been made or will be made with respect to the solicitation of the application for the acquisition of the Class A common stock.

Accordingly, the Class A common stock have not been, directly or indirectly, offered or sold and will not be, directly or indirectly, offered or sold in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan) or to others for re-offering or re-sale, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan except pursuant to an exemption from the registration requirements, and otherwise in compliance with, the FIEL and the other applicable laws and regulations of Japan.

### *For Qualified Institutional Investors ("QII")*

Please note that the solicitation for newly-issued or secondary securities (each as described in Paragraph 2, Article 4 of the FIEL) in relation to the Class A common stock constitutes either a "QII only private placement" or a "QII only secondary distribution" (each as described in Paragraph 1, Article 23-13 of the FIEL). Disclosure regarding any such solicitation, as is otherwise prescribed in Paragraph 1, Article 4

of the FIEL, has not been made in relation to the Class A common stock. The Class A common stock may only be transferred to QIIs.

*For Non-QII Investors*

Please note that the solicitation for newly-issued or secondary securities (each as described in Paragraph 2, Article 4 of the FIEL) in relation to the Class A common stock constitutes either a "small number private placement" or a "small number private secondary distribution" (each as is described in Paragraph 4, Article 23-13 of the FIEL). Disclosure regarding any such solicitation, as is otherwise prescribed in Paragraph 1, Article 4 of the FIEL, has not been made in relation to the Class A common stock. The Class A common stock may only be transferred en bloc without subdivision to a single investor.

### Australia

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission, in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (the "Corporations Act"), and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act.

Any offer in Australia of the Class A common stock may only be made to persons (the "Exempt Investors") who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the Class A common stock without disclosure to investors under Chapter 6D of the Corporations Act.

The Class A common stock applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring Class A common stock must observe such Australian on-sale restrictions.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives, and circumstances, and, if necessary, seek expert advice on those matters.

189

## LEGAL MATTERS

The validity of the shares of Class A common stock offered hereby will be passed upon for us by Latham & Watkins LLP, New York, New York. Weil, Gotshal & Manges LLP, has acted as counsel for the underwriters in connection with certain legal matters related to this offering.

## EXPERTS

The consolidated financial statements of Fluence Energy, LLC at September, 2020 and 2019, and for each of the two years in the period ended September, 2020, appearing in this Prospectus and Registration Statement have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the Securities and Exchange Commission a registration statement on Form S-1 under the Securities Act with respect to the shares of Class A common stock offered hereby. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules filed with the registration statement. For further information about us and the Class A common stock offered hereby, we refer you to the registration statement and the exhibits filed with the registration statement. Statements contained in this prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and each such statement is qualified in all respects by reference to the full text of such contract or other document filed as an exhibit to the registration statement.

Upon the closing of this offering, we will be required to file periodic reports, proxy statements, and other information with the SEC pursuant to the Exchange Act. The SEC also maintains an internet website that contains reports, proxy statements and other information about registrants, like us, that file electronically with the SEC. The address of that site is *www.sec.gov*. We also maintain a website at *https://fluenceenergy.com*, through which you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

190

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

**Fluence Energy, LLC and consolidated subsidiaries**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Financial Statements for the fiscal years ended September 30, 2020 and 2019 | |
| Consolidated balance sheets as of September 30, 2020 and 2019 | F-3 |
| Consolidated statements of operations and comprehensive loss | F-4 |
| Consolidated statements of changes in members' (deficit) equity | F-5 |
| Consolidated statements of cash flows | F-6 |
| Notes to consolidated financial statements | F-7 |
| Unaudited Condensed Consolidated Financial Statements as of and for the nine months ended June 30, 2021 and 2020 | |
| Condensed Consolidated balance sheets (unaudited) as of June 30, 2021 and September 30, 2020 | F-24 |
| Condensed Consolidated statements of operations and comprehensive loss (unaudited) | F-25 |
| Condensed Consolidated statements of changes in members' (deficit) equity (unaudited) | F-26 |
| Condensed Consolidated statements of cash flows (unaudited) | F-27 |
| Notes to consolidated financial statements (unaudited) | F-28 |

F-1

**Report of Independent Registered Public Accounting Firm**

To the Members and the Board of Directors of Fluence Energy, LLC

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Fluence Energy, LLC (the Company) as of September 30, 2020 and 2019, the related consolidated statements of operations and comprehensive loss, members' deficit and cash flows for each of the two years in the period ended September, 2020, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at September 30, 2020 and 2019, and the results of its operations and its cash flows for each of the two years in the period ended September 30, 2020, in conformity with U.S. generally accepted accounting principles.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2018.

Tysons, VA
June 24, 2021

F-2

**FLUENCE ENERGY, LLC**

**CONSOLIDATED BALANCE SHEETS**
**(U.S. Dollars in Thousands, except per unit amounts)**

| | As of September 30, | |
| --- | ---: | ---: |
| | **2020** | **2019** |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 93,815 | $ 84,113 |
| Trade receivables | 32,097 | 6,948 |
| Unbilled receivables | 100,037 | 9,704 |
| Receivables from related parties | 52,452 | 6,672 |
| Advances to suppliers | 2,876 | 4,036 |
| Inventory, net | 37,310 | 10,684 |
| Other current assets | 8,886 | 26,138 |
| Total current assets | 327,473 | 148,295 |
| Non-current assets: | | |
| Property and equipment, net | 5,170 | 3,953 |
| Intangible assets, net | 26,298 | 28,753 |
| Goodwill | 4,731 | 4,698 |
| Deferred income tax asset | — | 1,616 |
| Other non-current assets | 353 | 1,489 |
| Total non-current assets | 36,552 | 40,509 |
| Total assets | $ 364,025 | $188,804 |
| **Liabilities and members' (deficit) equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 78,132 | $ 15,045 |
| Deferred revenue | 123,841 | 52,980 |
| Personnel related liabilities | 8,534 | 4,966 |
| Accruals and provisions | 137,696 | 17,802 |
| Payables and deferred revenue with related parties | 22,464 | 63,612 |
| Taxes payable | 5,937 | 5,175 |
| Other current liabilities | 1,636 | 1,135 |
| Total current liabilities | 378,240 | 160,715 |
| Non-current liabilities: | | |
| Personnel related liabilities | 1,829 | 1,619 |
| Accruals and provisions | 257 | 85 |
| Deferred income tax liability | 163 | – |
| Other non-current liabilities | 761 | 880 |
| Total non-current liabilities | 3,010 | 2,584 |
| Total liabilities | 381,250 | 163,299 |
| Commitments and Contingencies (Note 12) | | |
| Members' (deficit) equity: | | |
| Capital contributions (7,920,000 units issued and outstanding as of September 30, 2020 and 2019) | 99,872 | 97,372 |
| Accumulated other comprehensive income (loss) | 201 | (1,279) |
| Deficit | (117,298) | (70,588) |
| Total members' (deficit) equity | (17,225) | 25,505 |
| Total liabilities and members' (deficit) equity | $ 364,025 | $188,804 |

The accompanying notes are an integral part of these statements

F-3

**FLUENCE ENERGY, LLC**

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(U.S. Dollars in Thousands, except unit and per unit data)**

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Revenue | $ 401,676 | $ 44,982 |
| Revenue from related parties | 159,647 | 47,169 |
| Total Revenue | 561,323 | 92,151 |
| Cost of goods and services | 553,400 | 100,068 |
| Gross profit (loss) | 7,923 | (7,917) |
| Operating expenses: | | |
| Research and development | 11,535 | 9,871 |
| Sales and marketing | 16,239 | 14,963 |
| General and administrative | 17,940 | 13,950 |
| Depreciation and amortization | 3,018 | 2,891 |
| Other income, net | 520 | 1,833 |
| Loss before income taxes | (40,289) | (47,759) |
| Income tax expense (benefit) | 6,421 | (778) |
| Net loss | $ (46,710) | $ (46,981) |
| Loss Per Unit | | |
| Basic and Diluted | $ (5.90) | $ (5.93) |
| Weighted Average Number of Units | | |
| Basic and Diluted | 7,920,000 | 7,920,000 |
| Foreign currency translation gain (loss), net of income tax expense of $0 in each period | 1,270 | (691) |
| Actuarial gains/(losses) on pension liabilities, net of income tax expense of $0 in each period | 210 | (263) |
| Total other comprehensive income (loss) | 1,480 | (954) |
| Total comprehensive loss | $ (45,230) | $ (47,935) |

The accompanying notes are an integral part of these statements

F-4

**FLUENCE ENERGY, LLC**

**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' (DEFICIT) EQUITY**
**(U.S. Dollars in Thousands except Member Units)**

| | Limited Members' Capital | | Accumulated Other Comprehensive Income (Loss) | Total Members' | |
| --- | --- | --- | --- | --- | --- |
| | Units | Amount | | (Deficit) | (Deficit) Equity |
| Balance October 1, 2018 | 7,920,000 | $87,372 | $ (325) | $ (23,607) | $ 63,440 |
| Capital contribution | — | 10,000 | — | — | 10,000 |
| Net loss | — | — | — | (46,981) | (46,981) |
| Other comprehensive loss, net of income tax benefit of $0 | — | — | (954) | — | (954) |
| Balance September 30, 2019 | 7,920,000 | 97,372 | (1,279) | (70,588) | 25,505 |
| Capital contribution | — | 2,500 | — | — | 2,500 |
| Net loss | — | — | — | (46,710) | (46,710) |
| Other comprehensive income, net of income tax benefit of $0 | — | — | 1,480 | — | 1,480 |
| Balance September 30, 2020 | 7,920,000 | $99,872 | $ 201 | $(117,298) | $(17,225) |

The accompanying notes are an integral part of these statements

F-5

**FLUENCE ENERGY, LLC**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(U.S. Dollars in Thousands)**

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | **2020** | **2019** |
| **Operating activities** | | |
| Net loss | $(46,710) | $(46,981) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 3,018 | 2,891 |
| Deferred income taxes | 1,900 | (843) |
| Changes in operating assets and liabilities: | | |
| Trade receivables | (25,149) | (3,450) |
| Unbilled receivables | (90,333) | (4,634) |
| Receivables from related parties | (45,781) | (2,940) |
| Advances to suppliers | 1,160 | 1,272 |
| Inventory, net | (26,626) | (9,839) |
| Other current assets | (4,420) | (2,102) |
| Other non-current assets | 2,468 | (1,484) |
| Accounts payable | 63,086 | 12,433 |
| Payables and deferred revenue with related parties | (41,147) | 24,543 |
| Deferred revenue | 70,861 | 40,909 |
| Current accruals and provisions | 119,894 | 10,295 |
| Taxes payable | 762 | 2,676 |
| Other current liabilities | 4,069 | 2,915 |
| Other non-current liabilities | (1,068) | 2,021 |
| Net cash (used in) provided by operating activities | (14,016) | 27,682 |
| **Investing activities** | | |
| Proceeds from (purchases of) short-term investments | 20,000 | (20,000) |
| Purchase of property and equipment | (1,780) | (2,736) |
| Net cash provided by (used in) investing activities | 18,220 | (22,736) |
| **Financing activities** | | |
| Capital contribution from Members | 2,500 | 10,000 |
| Borrowing from line of credit | 14,500 | — |
| Repayment to line of credit | (14,500) | — |
| Net cash provided by financing activities | 2,500 | 10,000 |
| Effect of exchange rate changes on cash and cash equivalents | 1,327 | (815) |
| Net increase in cash and cash equivalents | 8,031 | 14,131 |
| Cash, cash equivalents, and restricted cash as of the beginning of the period | 87,020 | 72,889 |
| Cash, cash equivalents, and restricted cash as of the end of the period | $ 95,051 | $ 87,020 |
| **Supplemental disclosure of cash flow information** | | |
| Cash paid for income taxes | $ 2,197 | $ 851 |

The accompanying notes are an integral part of these statements

F-6

**FLUENCE ENERGY, LLC**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2020 and 2019**

**1.    Organization and Operations**

Fluence Energy, LLC (''Fluence''), a Delaware limited liability company, was formed on June 30, 2017, and commenced operations on January 1, 2018 (the ''Effective Date''). Fluence, with its wholly owned subsidiaries including Fluence Energy GmbH in Germany, Fluence Energy Pty Ltd. in Australia, and Fluence Energy Inc. in the Philippines. is primarily engaged in the construction and sale of battery-based energy storage products and provides related operational services. As of September 30, 2020, AES Grid Stability LLC (''AES'') and Siemens Industry, Inc. (''Siemens'') (together, ''Members'') each holds 3,960,000 units, or 50% of the limited liability interest, of the Company. Except where the content clearly indicates otherwise, "Fluence," "we," "us," "our" or the "Company" refers to Fluence Energy, LLC and its wholly owned subsidiaries.

The Company's chief operating decision maker (''CODM'') is its Chief Executive Officer. The Company's CODM reviews financial information on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company has determined that it operates in one operating segment, which corresponds to one reportable segment.

The Company's fiscal year begins on October 1 and ends on September 30. Consequently, fiscal year 2019 (''FY 2019'') ended on September 30, 2019 and fiscal year 2020 (''FY 2020'') ended on September 30, 2020.

**2.    Summary of Significant Accounting Policies and Estimates**

**Principles of Accounting and Consolidation**

The accompanying consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles (''U.S. GAAP'') and under the rules of the Securities and Exchange Commission (the ''SEC''). The accompanying consolidated financial statements include the accounts of Fluence and its subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

**Emerging Growth Company Status**

The Company is an emerging growth company, as defined in the Jumpstart Our Business Startups Act of 2012 (the ''JOBS Act''), and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes Oxley Act of 2002, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. The JOBS Act also provides that emerging growth companies can elect to adopt new or revised accounting standards issued subsequent to the enactment of the JOBS Act under private company effective dates.

The Company has elected to use this extended transition period to adopt new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date that it is (i) no longer an emerging growth company or (ii) affirmatively and irrevocably opts out of the extended transition period provided in the JOBS Act. As a result, the consolidated financial statements may not be comparable to companies that comply with the new or revised accounting pronouncements as of public company effective dates.

**Use of Estimates**

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the accompanying

F-7

consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. Items subject to such estimates and assumptions include: the carrying amount and estimated useful lives of long-lived assets; impairment of goodwill and long-lived assets; valuation allowances for inventories; deferred tax assets; revenue recognized under the percentage-of-completion method; accrued bonuses; and various project related provisions including but not limited to estimated losses, warranty obligations, and liquidated damages.

**Cash, Cash Equivalents, and Restricted Cash**

Cash and cash equivalents include cash on-hand and highly liquid investments readily convertible to cash, with an original maturity of 90 days or less when purchased.

Cash restricted for use as a result of financing or other obligations is classified separately as restricted cash in other current assets.

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the Company's consolidated balance sheets and sums to the total of such amounts shown on the consolidated statements of cash flows (in thousands):

| | As of September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Cash and cash equivalents | $93,815 | $84,113 |
| Restricted cash included in other current assets | 1,236 | 2,907 |
| **Total cash, cash equivalents and restricted cash shown in the statements of cash flows** | $95,051 | $87,020 |

Restricted cash included in other current assets on the consolidated balance sheets as of September 30, 2020 consists of $915 thousand collateral for credit card program (2019: $904 thousand) and $321 thousand of collateral for outstanding bank guarantee (2019: $2,003 thousand).

**Trade Receivables**

Trade receivables represent actual billings that are generally due within 30 days from the invoice date, and do not bear interest. Receivables are carried at amortized cost. The Company periodically assesses collectability of accounts receivable and records an allowance for doubtful accounts for the estimated uncollectable amount when deemed appropriate. As of September 30, 2020 and 2019, no allowance for doubtful accounts was recognized.

**Advances to Suppliers**

Advances are given to suppliers based on the contract terms of respective agreements and are presented on a separate line on the consolidated balance sheets. These advances are recovered through the receipt of goods and services mainly used in the production of battery-based energy storage products.

**Foreign Currency Transactions**

An entity's functional currency is the currency of the primary economic environment in which the entity operates and is generally the currency in which the entity generates and expends cash. The reporting currency of the Company is the U.S. dollar. Monetary and non-monetary assets and liabilities denominated in foreign currencies are remeasured into U.S. dollars using the year-end exchange rates, while revenues and expenses denominated in foreign currencies are remeasured at weighted average exchange rates prevailing during the year. Resultant foreign currency exchange adjustments for monetary assets and liabilities are recorded in earnings on the accompanying consolidated statements of operations and comprehensive loss. Adjustments arising from the translation of the balance sheets of subsidiaries that have a functional currency other than the U.S. dollar are recorded as a component of members' (deficit) equity in accumulated other comprehensive income (loss).

**Revenue and Cost Recognition**

The Company commenced operations on January 1, 2018 and immediately adopted Accounting Standards Updated (''ASU'') 2014-09, *Revenue from Contracts with Customers* and all related amendments (collectively known as Accounting Standards Codification 606, or ''ASC 606''). The Company's revenue recognition policy included herein is based on the application of ASC 606. As of September 30, 2020, the Company's revenue was generated primarily from sale of battery-based energy storage products and providing operational service related to storage products.

*Revenue from Sale of Battery-Based Energy Storage Products:*   Fluence enters into contracts with utility companies, developers, and commercial and industrial customers to design and build battery-based energy storage products. Each storage product is customized depending on the customer's energy needs. Customer payments are due upon meeting certain milestones that are consistent with contract-specific phases of a project. The Company determines the transaction price based on the consideration expected to be received which includes estimates of liquidated damages or other variable consideration that are included in the transaction price in accordance with ASC 606. The transaction price identified is allocated to each distinct performance obligation to deliver a good or service based on the relative standalone selling prices. Generally, the Company's contracts to design and build battery-based storage products are determined to have one performance obligation. The Company believes that the prices negotiated with each individual customer are representative of the stand-alone selling price of the product.

The Company recognizes revenue over time as a result of the continuous transfer of control of our product to the customer. This continuous transfer of control to the customer is supported by clauses in the contracts that provide enforceable rights to payment of the transaction price associated with work performed to date for products that do not have an alternative use to the Company and/or the project is built on customer's land that is under the customer's control.

Revenue for these performance obligations is recognized using the percentage of completion method based on cost incurred as a percentage of total estimated contract costs. Contract costs include all direct material and labor costs related to contract performance. Pre-contract costs with no future benefit are expensed in the period in which they are incurred. Since the revenue recognition of these contracts depends on estimates, which are assessed continually during the term of the contract, recognized revenues and profit are subject to revisions as the contract progresses to completion. The cumulative effects of revisions of estimated total contract costs and revenues, together with any contract reserves which may be deemed appropriate, are recorded in the period in which the facts and changes in circumstance become known. Due to the uncertainties inherent in the estimation process, it is reasonably possible that these estimates will be revised in a different period. When a loss is forecasted for a contract, the full amount of the anticipated loss is recognized in the period in which it is determined that a loss will occur. Refer to *Loss Contracts* below for further discussion.

*Revenue from Services:*   Fluence also enters into long-term service agreements with customers to provide operational services related to battery-based energy storage products. The services include maintenance, monitoring, and other minor services. The Company accounts for the services as a single performance obligation as the services are substantially the same and have the same pattern of transfer to the customers. Straight-line revenue recognition method is applied for these types of services. The Company believes using a time-based method to measure progress is appropriate as the performance obligations are satisfied evenly over time based on the fact that customers receive the services evenly and cost pattern does not change significantly over the service period. Revenue is recognized by dividing the total contract revenue over the service period.

Some of the agreements also provide capacity guarantees which stand for a commitment to perform certain augmentation activities to maintain the level of battery capacity specified in the agreement. Augmentation activities would typically be represented by installation of additional batteries, and other components as needed, to compensate for partially lost capacity due to degradation of batteries over time. These services are treated as service-type warranties and are accounted for as separate performance obligations from other services discussed above. Performance obligations of the services are satisfied over time. The percentage of completion revenue recognition method is applied for service type warranties as the cost pattern is expected to change significantly with little to no operating costs incurred in the earlier years and larger

F-9

costs incurred in later years when augmentation is required to restore the required capacity, for example, adding more batteries or changing some existing modules with declined capacity.

For both products and service contracts where there are multiple performance obligations in a single contract, the Company allocates the consideration to the various obligations in the contract based on the relative standalone selling price method. Standalone selling prices are estimated based on estimated costs plus margin or using market data for comparable products when estimated costs are not imputable.

Revenue is recorded net of any taxes assessed on and collected from customers, which are remitted to the governmental authorities.

***Cost of Goods and Services:***  Cost of goods and services are recognized when services are performed, or control of goods are transferred to the customers, which is generally based upon International Commercial Terms (commonly referred to as ''incoterms'') stated in corresponding supply agreements or purchase orders.

***Unbilled Receivables:***  Unbilled receivables represent the excess of revenues recognized over billings to date on certain contracts.

***Deferred Revenue***:  Deferred revenue represents the excess billings to date over the amount of revenue recognized to date. Contract advances represent amounts received by the Company upon signing of the related contracts with customers. The advances are offset proportionately against progress billings. Any outstanding portion is included in deferred revenue on the accompanying consolidated balance sheets.

***Loss Contracts:***  A contact becomes a loss contract when its estimated total costs are expected to exceed its total revenue. The Company accrues the full loss expected in the period a loss contract is identified which is recorded in current liabilities—accruals and provisions and cost of goods and services on the Company's consolidated balance sheets and consolidated statements of operations and comprehensive loss, respectively.

***Warranty Costs:***  The Company provides a limited warranty related to the successful operation of battery-based energy storage solutions, apart from the service type warranties described above and are normally provided for a limited period of time from one to three years after the commercial operation date. The warranties are considered assurance-type warranties which provide a guarantee of quality of the products. The Company accrues for expected warranty costs based on historical activity and expectations of future costs at the time of commercial operation date. Periodically, the Company evaluates and adjusts warranty costs to the extent that actual warranty costs materially differ from the original estimates. Extended warranties that customers purchase separately from the related products and services are accounted for as separate performance obligations. Both warranty fees and associated costs are accounted for after the commercial operation date of the related battery product. Warranty costs accrued are included in current liabilities—accruals and provisions and cost of goods and services on the consolidated balance sheets consolidated statements of operations and comprehensive loss, respectively.

## Inventory, Net

Inventory consists of batteries and equipment, cases, inverters, and spare parts which are used in ongoing battery storage projects for sale. Inventory is stated at the lower of cost or net realizable value with cost being determined by the specific identification method. The Company periodically reviews its inventory for potential obsolescence and write down of its inventory, as appropriate, to net realizable value based on its assessment of market conditions.

## Impairment of Long-Lived Assets

The Company evaluates the recoverability of its property and equipment, and intangible assets whenever events or changes in circumstances indicate that their carrying amount may not be recoverable. The assets are considered impaired when their fair value is less than their carrying value. Impairment charges are calculated as the difference between the discounted expected future cash flows, or other accepted valuation techniques to determine fair value and the assets' carrying amount at the date of the triggering event.

F-10

**Intangible Assets**

Intangible assets are stated at their historical cost and amortized on a straight-line basis over their expected useful lives.

**Accruals and Provisions**

Expenses are recognized on an accrual basis. Provisions are recognized when it is probable that a liability has been incurred and the amount of liability could be reasonably estimated.

**Operating Expenses**

Operating expenses include research and development, sales and marketing, general and administrative expenses, and depreciation and amortization.

Research and development expenses represent personnel costs of the technology team, and costs of materials and services procured for research and development projects.

Sales and marketing expenses represent personnel costs of the sales team and all marketing expenses.

General and administrative expenses represent personnel costs, rent, IT expenses insurance, and external providers for payroll, accounting, consulting and others.

Depreciation and amortization are expenses associated with property and equipment and contributed intangible assets, consisting of intellectual property rights.

**Income Taxes**

The Company is treated as a partnership for U.S. federal income tax purposes. As such, the members are individually liable for their own distributable share of taxable income or loss. No provision has been made in the accompanying consolidated financial statements for U.S. federal, state or local income taxes.

Foreign subsidiaries of the Company account for income taxes and the related accounts in accordance with ASC 740, *Income Taxes*. Under ASC 740, deferred tax assets and liabilities are determined based on differences between the financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse.

The Company recognizes the tax benefits from uncertain tax positions if it is more likely than not that the position will be sustained on examination by the taxing authorities. The Company recognizes interest and penalties related to unrecognized tax benefits as a component of income tax expense. As of September 30, 2020 and 2019, the Company has not recognized tax benefits relating to uncertain tax positions.

The preparation of income tax returns requires the use of management's estimates and interpretations which may be subjected to review by the respective taxing authorities and may result in an assessment of additional taxes, penalties and interest. The period from January 1, 2018 until September 30, 2020 remains subject to examination by foreign, federal and state taxing authorities.

**Fair Value Measurements**

The fair value of the Company's financial assets and liabilities reflects management's estimate of amounts that the Company would have received in connection with the sale of the assets or paid in connection with the transfer of the liabilities in an orderly transaction between market participants at the measurement date. In connection with measuring the fair value of its assets and liabilities, the Company seeks to maximize the use of observable inputs and to minimize the use of unobservable inputs. The following fair value hierarchy, defined by ASC 820, *Fair Value Measurements*, is used to classify assets and liabilities based on the observable inputs and unobservable inputs used to value the assets and liabilities:

Level 1—Quoted prices are available in active markets for identical assets or liabilities as of the reporting date. Active markets are those in which transactions for the asset or liability occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2—Pricing inputs are other than quoted prices in active markets included in Level 1, which are either directly or indirectly observable as of the reporting date. Level 2 inputs include those financial instruments that are valued using models or other valuation methodologies. These models are primarily industry-standard models that consider various assumptions, including quoted prices, time value, volatility factors, and current market and contractual prices for the underlying instruments, as well as other relevant economic measures. Substantially all of these assumptions are observable in the marketplace throughout the full term of the instrument, can be derived from observable data or are supported by observable levels at which transactions are executed in the marketplace.

Level 3—Pricing inputs include significant inputs that are generally less observable from objective sources. These inputs may be used with internally developed methodologies that result in management's best estimate of fair value from the perspective of a market participant. The Company does not have any recurring Level 3 fair value measurements.

The Company's cash equivalents include term deposits with original maturity of less than three months and are recorded at amortized cost. Fair value of cash equivalents approximates the carrying amount using Level 2 inputs. The carrying amounts of trade receivables, accounts payable and short-term debt obligations approximate fair values due to their short maturities using Level 2 inputs.

**Earnings per Unit (EPU)**

The Company calculates basic earnings per common LLC member unit by dividing net loss, by the average number of common LLC member unit outstanding during the period. Diluted earnings per unit is calculated in a similar manner after consideration of the potential dilutive effect of common LLC member unit equivalents on the average number of common LLC member units outstanding during the period. Dilution is not considered when a net loss is reported. Common LLC member unit equivalents that have an antidilutive effect are excluded from the computation of diluted earnings per common LLC member unit. As of September 30, 2020 and 2019, the Company had no outstanding common LLC member unit equivalents.

**Unit Split**

In December 2020, the Company approved an amendment to their Limited Liability Company Agreement to effect a 1:1,320 unit split of the Company's common LLC member units, which was effected on December 29, 2020. The par value of the common unit was not adjusted as a result of the unit split. All common LLC member units and per unit data have been retrospectively revised to reflect the unit split.

**Recent Accounting Pronouncements**

In February 2016, the Financial Accounting Standards Board (the ''FASB'') issued ASU 2016-02, *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases in ASC 840, *Leases*. This standard requires all leases to be recognized on the consolidated balance sheet. ASU 2016-02 was effective for public companies for fiscal year beginning after December 15, 2018. As an emerging growth company, Fluence is permitted to defer adoption until the non-public company adoption date, i.e. annual periods starting after December 15, 2021. Early application is permitted for all entities. The FASB has issued several amendments to ASU 2016-02, including ASU 2018-11, Leases (Topic 842): Targeted Improvements that introduced an additional transition method permitting an entity to initially apply the new lease standard at the adoption date and recognize a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. ASU 2016-02 includes optional practical expedients intended to reduce the cost and complexity to implement the new lease standard, such as an option to maintain the current lease classification for all existing lease arrangements and the option to use hindsight in evaluating lessee options to extend or terminate a lease. The Company's existing lease population is mainly comprised of operating leases for office space. It plans to utilize the available practical expedients to record the impact of adoption prospectively, maintain the current lease classification for all existing leasing arrangements, and use hindsight in determining the lease term. The Company is currently evaluating the impact of adoption on its consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes. This guidance removes certain exceptions related to the approach for

F-12

intraperiod tax allocations, the methodology for calculating income taxes in an interim period, and the recognition of deferred tax liabilities for outside basis differences. The guidance also clarifies and simplifies other areas of ASC 740. ASU 2019-12 is effective for the Company on October 1, 2022. Certain amendments must be applied on a prospective basis, certain amendments must be applied on a retrospective basis, and certain amendments must be applied on a modified retrospective basis through a cumulative-effect adjustment to retained earnings/(deficit) in the period of adoption. The Company is evaluating the impact of this guidance as well as timing of adoption.

In February 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326)*. This standard updates the impairment model for financial assets measured at amortized cost, known as the Current Expected Credit Loss ("CECL") model. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a new forward-looking expected loss model that generally will result in the earlier recognition of allowance for losses. ASU 2016-13 was effective for public companies for annual periods starting after December 15, 2019. As an EGC, Fluence is permitted to defer adoption until the non-public company adoption date, i.e. annual periods starting after December 15, 2022. Early adoption is permitted. There are various transition methods available upon adoption. The Company is currently evaluating the impact of adoption on its consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement,* which amends ASC 820 to add, remove, and modify fair value measurement disclosure requirements. New disclosures required for public companies under ASU 2018-13 include Level 3 changes in unrealized gains or losses and Level 3 range and weighted average used to develop significant unobservable inputs. ASU 2018-13 is effective for the Company beginning October 1, 2020, it is not expected that the adoption of this standard will have material effect on the Company's consolidated financial statements.

In March 2020, the FASB issued ASU No. 2020-04, *Facilitation of the Effects of Reference Rate Reform on Financial Reporting (Topic 848).* The ASU provides optional expedients and exceptions for applying GAAP to transactions affected by reference rate (e.g., the London Inter-Bank Offer Rate) reform if certain criteria are met, for a limited period of time to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The ASU is effective as of March 12, 2020 through December 31, 2022. The Company will evaluate transactions or contract modifications occurring as a result of reference rate reform and determine whether to apply the optional guidance on an ongoing basis. The ASU is currently not expected to have a material impact on our consolidated financial statements.

**3.    Revenue from Contracts with Customers**

**Disaggregation of revenue**

The following table presents the Company's revenues disaggregated by contract type (in thousands):

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Revenue from sale of battery-based energy storage products | $556,681 | $88,830 |
| Revenue from services | 3,773 | 2,326 |
| Other | 869 | 995 |
| | $561,323 | $92,151 |

F-13

The following table presents the Company's revenue disaggregated by geographical region. Revenues are attributed to countries based on location of customers (in thousands):

|  | Fiscal Year Ended September 30, | |
| --- | ---: | ---: |
|  | 2020 | 2019 |
| United States of America | $318,920 | $41,739 |
| Philippines | 191,530 | 663 |
| United Kingdom | 4,489 | 26,897 |
| Chile | 12,103 | 237 |
| Ireland | 8,246 | 360 |
| Switzerland | 9,967 | 75 |
| Other | 16,068 | 22,180 |
|  | $561,323 | $92,151 |

.

**Deferred revenue**

Deferred revenue represents the excess billings over the amount of revenue recognized to date. Deferred revenue from related parties is included in payables and deferred revenue with related parties on the Company's consolidated balance sheets. The following table provides information about deferred revenue from contracts with customers (in thousands):

|  | As of September 30 | |
| --- | ---: | ---: |
|  | 2020 | 2019 |
| Deferred revenue beginning of period | $ 52,980 | $ 12,071 |
| Additions | 120,852 | 51,129 |
| Revenue recognized related to amounts that were included in beginning balance of deferred revenue | (49,991) | (10,220) |
| Deferred revenue end of period | $123,841 | $ 52,980 |

|  | As of September 30 | |
| --- | ---: | ---: |
|  | 2020 | 2019 |
| Deferred revenue from related parties beginning of period | $ 60,968 | $ 36,895 |
| Additions | 10,464 | 46,922 |
| Revenue recognized related to amounts that were included in beginning balance of deferred revenue | (60,007) | (22,849) |
| Deferred revenue from related parties end of period | $ 11,425 | $ 60,968 |

**Remaining performance obligations**

The Company's remaining performance obligations ("backlog") represent the unrecognized revenue value of its contract commitments, which include deferred revenue and amounts that will be billed and recognized as revenue in future periods. The Company's backlog may vary significantly each reporting period based on the timing of major new contract commitments and the backlog may fluctuate with currency movements. In addition, the Company's customers have the right, under some circumstances, to terminate contracts or defer the timing of its services and their payments to the Company. As of September 30, 2020, the Company had $992,090 thousand of remaining performance obligations related to its battery storage product contracts, the majority of which we expect to recognize in revenue in the next 12 months. The Company also had $156,481 thousand of remaining performance obligations related to operational service contracts including maintenance, monitoring, and other minor services, of which we expect to recognize 35%

F-14

within the next five years and the remainder after five years, and $60,160 thousand remaining performance obligations related to capacity guarantees, 35% of which is expected to be recognized within the next five years and the remainder after five years.

The Company applied the practical expedient for certain revenue streams to exclude the value of remaining performance obligations for (i) contracts with an original expected term of one year or less or (ii) contracts for which the Company recognizes revenue in proportion to the amount we have the right to invoice for services performed.

**Costs to obtain or fulfill a contract**

The Company recognizes the incremental costs incurred to obtain or fulfill a contract with a customer as an asset when these costs are recoverable. These costs consist primarily of sales commissions and bid/proposal costs.

As of September 30, 2020, we recorded costs to obtain or fulfill a contract of $2,083 thousand (2019: $768 thousand) within other current assets and $0 thousand (2019: $560 thousand) within other non-current assets on the Company's consolidated balance sheets.

Amortization related to costs to obtain or fulfill a contract was $768 thousand and $418 thousand for fiscal year ended September 30, 2020 and 2019, respectively, which was recorded within sales and marketing on the Company's consolidated statements of operations and comprehensive loss.

**4.    Inventory, Net**

Inventory consisted of the following (in thousands):

|  | Cost | Provision | Net |
|---|---|---|---|
| **September 30, 2020** | | | |
| Batteries and equipment | $36,112 | $ — | $36,112 |
| Cases, inverters and other major equipment | 1,102 | — | 1,102 |
| Spare parts | 126 | (30) | 96 |
| **Total** | $37,340 | $(30) | $37,310 |
| **September 30, 2019** | | | |
| Batteries and equipment | $ 9,504 | $ — | $ 9,504 |
| Cases, inverters and other major equipment | 1,081 | — | 1,081 |
| Spare parts | 99 | — | 99 |
| **Total** | $10,684 | $ — | $10,684 |

The provision for loss on inventories is associated with the inventory in Australia.

**5.    Other Current Assets**

Other current assets consisted of the following amounts (in thousands):

|  | As of September 30 | |
|---|---|---|
|  | 2020 | 2019 |
| Taxes recoverable | $2,167 | $ 1,468 |
| Prepaid expenses | 1,261 | 767 |
| Restricted cash | 1,236 | 2,907 |
| Land held for resale | 849 | — |
| Contract acquisition cost | 2,083 | 768 |
| Short-term investments | — | 20,000 |
| Other | 1,290 | 228 |
| **Total** | $8,886 | $26,138 |

F-15

As of September 30, 2019, short-term investments consisted of a $20,000 thousand bank deposit collateralized for outstanding bank guarantee (Note 12). In 2020, collaterals were released and deposits closed.

**6.    Property and Equipment, Net**

Property and equipment are stated at amortized cost and consisted of the following (in thousands):

| | As of September 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
| | Cost | | Accumulated Depreciation | | Net | |
| Machinery and Equipment | $1,865 | $1,672 | $ 510 | $291 | $1,355 | $1,381 |
| Construction in Progress | 2,689 | 1,446 | — | — | 2,689 | 1,446 |
| IT Equipment | 687 | 385 | 191 | 74 | 496 | 311 |
| Furniture and Fixtures | 254 | 230 | 89 | 41 | 165 | 189 |
| Leasehold Improvements | 730 | 730 | 286 | 129 | 444 | 601 |
| Other | 27 | 29 | 6 | 4 | 21 | 25 |
| **Total** | $6,252 | $4,492 | $1,082 | $539 | $5,170 | $3,953 |

Total depreciation expense was $544 thousand for the fiscal year ended September 30, 2020. (2019: $412 thousand).

Property and equipment are depreciated over the estimated useful lives of the respective assets on a straight-line basis. The range of estimated lives for the respective assets is as follows:

| | |
|---|---|
| Machinery and equipment | 10 years |
| IT equipment | 5 years |
| Furniture and fixtures | 5 years |
| Leasehold Improvements | 10 years, or lease term if shorter |
| Other | 5 years |

**7.    Intangible Assets, Net**

Intangible assets are stated at amortized cost and consist of the following (in thousands):

| | Weighted Average Estimated Useful Lives | As of September 30, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 |
| | | Cost | | Accumulated Amortization | | Net | |
| Patents and licenses | 14 years | $33,100 | $33,100 | $6,851 | $4,377 | $26,249 | $28,723 |
| Other | 3 years | 65 | 36 | 16 | 6 | 49 | 30 |
| **Total** | | $33,165 | $33,136 | $6,867 | $4,383 | $26,298 | $28,753 |

Intangible assets are amortized over the estimated useful lives of the respective assets on a straight-line basis. Total amortization expenses for the fiscal year ended September 30, 2020 was $2,484 thousand (2019: $2,479 thousand).

F-16

Total future amortization expense for finite-lived intangible assets was estimated as follows (in thousands):

| | |
|---|---|
| Year 1 | $ 2,495 |
| Year 2 | 2,491 |
| Year 3 | 2,482 |
| Year 4 | 2,474 |
| Year 5 | 2,474 |
| Thereafter | 13,882 |
| Total | $26,298 |

**8.    Goodwill**

On January 1, 2018, $4,727 thousand of goodwill was recognized upon the formation of the Company.

Goodwill is assessed for impairment annually each year during the Company's fourth quarter, or when impairment indicators exist. No impairment was recognized for the fiscal year ended September 30, 2020 or 2019.

The following table presents the goodwill activity (in thousands):

| | |
|---|---|
| **Goodwill, October 1, 2018** | **$4,727** |
| Foreign currency adjustment | (29) |
| **Goodwill, September 30, 2019** | **$4,698** |
| Foreign currency adjustment | 33 |
| **Goodwill, September 30, 2020** | **$4,731** |

**9.    Accruals and Provisions**

Accruals and provisions consisted of the following amounts (in thousands):

| | As of September 30 | |
|---|---|---|
| | **2020** | **2019** |
| Accruals | $133,899 | $11,636 |
| Provisions for expected projects losses | 3,019 | 5,966 |
| Other projects related provisions | 1,035 | 285 |
| Total | 137,953 | 17,887 |
| Less: non-current portion | (257) | (85) |
| Current portion | $137,696 | $17,802 |

Accruals are mainly represented by not yet invoiced milestones for deliveries of major equipment for battery-based energy storage projects such as batteries, enclosures, and inverters. According to master supply agreements between the Company, and suppliers of the major equipment, vendor bills are issued according to contracted billing schedules with some milestones invoiced after delivery, upon full installation and commissioning of the equipment at substantial completion and final completion project stages.

**10.    Short-term borrowing and Line of Credit**

The Company had an Uncommitted Line of Credit Agreement with Citibank originally signed on January 29, 2019, which allows the Company to borrow an amount in aggregate not to exceed $2,000 thousand, from time to time, until January 29, 2021. The Line of Credit was further amended to increase the aggregate borrowing amount to $10,000 thousand, $30,000 thousand and $50,000 thousand on May 13, 2020, August 7, 2020 and December 23, 2020, respectively. The expiration date for the Line of Credit was extended to March 31, 2023 on June 2, 2021.

F-17

No amounts were outstanding under the Uncommitted credit facility as of September 30, 2020 and 2019.

**11. Income Taxes**

The following table presents the components of loss before income tax (in thousands):

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Domestic | $(34,929) | $(35,391) |
| Foreign | (5,360) | (12,368) |
| Loss before income taxes | $(40,289) | $(47,759) |

The major components of income tax expense/(benefit) were as follows (in thousands):

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Current income tax expense (benefit): | | |
| Foreign | $1,099 | $ — |
| Deferred income tax expense (benefit): | | |
| Foreign | 1,900 | (843) |
| Withholding income tax expense: | | |
| Foreign | 3,422 | 65 |
| Total income tax expense (benefit) | $6,421 | $(778) |

The following table summarizes a reconciliation of the U.S. statutory federal income tax rate to the Company's effective tax rate.

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Statutory rate | 21.0% | 21.0% |
| Flow-through losses | (18.2)% | (15.6)% |
| Foreign rate differential | 1.4% | 2.5% |
| Withholding taxes | (8.5)% | (0.1)% |
| Valuation allowance | (10.0)% | (6.1)% |
| Permanent differences | (1.2)% | — |
| Other items, net | (0.4)% | (0.1)% |
| Effective Tax Rate | (15.9)% | 1.6% |

F-18

Deferred income tax is generated by its foreign subsidiaries and is comprised of the following (in thousands):

|  | As of September 30, | |
| --- | ---: | ---: |
|  | 2020 | 2019 |
| **Deferred Tax Assets** | | |
| Inventory | $ 1,530 | $ 3,204 |
| Deferred revenue | 1,074 | 1,662 |
| Tax loss carryforwards | 7,879 | 4,470 |
| Trade receivables | 1,607 | — |
| Other deferred taxes | — | 7 |
| Total deferred tax assets | 12,090 | 9,343 |
| Valuation allowance | (8,014) | (3,524) |
| **Net deferred tax assets** | 4,076 | 5,819 |
| **Deferred Tax Liabilities** | | |
| Trade receivables | — | (1,852) |
| Intangible assets | (151) | (141) |
| Accrued and other liabilities | (3,775) | (2,210) |
| Unrealized foreign exchange gains/losses | (313) | — |
| Total deferred tax liabilities | $ (4,239) | $ (4,203) |
| **Total net deferred tax assets (liabilities)** | $ (163) | $ 1,616 |

The foreign net operating loss carryforwards as of September 30, 2020 are approximately $46,768 thousand (2019: $26,608 thousand). The majority of the net operating loss carryforwards are attributable to the Company's German subsidiary. The net operating loss carryforwards have an unlimited carryforward period.

As of September 30, 2020, the Company had recorded a valuation allowance of $8,014 thousand against deferred tax assets of the Company's German and Australian subsidiaries. As of September 30, 2019, the Company had recorded a valuation allowance of $3,524 against the deferred tax assets of the Company's German entity. The Company determined that based on the weight of available evidence, including cumulative losses, it is more-likely-than-not that the net deferred tax assets at its German and Australian entities will not be realized and recorded a valuation allowance against such deferred tax assets.

12. **Commitments and Contingencies**

**Operating Leases**

The Company has entered into operating lease agreements to rent office space. As of September 30, 2020, the future minimum lease payments for the next five fiscal years and thereafter are as follows (in thousands):

|  | Fiscal Year Ended September 30, 2020 |
| --- | ---: |
| Year 1 | $ 1,289 |
| Year 2 | 1,189 |
| Year 3 | 961 |
| Year 4 | 221 |
| Year 5 and thereafter | 265 |
|  | $ 3,925 |

F-19

For the fiscal year ended September 30, 2020, the Company incurred $1,126 thousand (2019: $1,010 thousand) in lease expenses.

**Guarantees**

As of September 30, 2020 and 2019, the Company had outstanding bank guarantees issued as performance security arrangements for several projects. Performance security is a pre-condition to receive any payment from the customer and is reduced in stages according to the project completion status.

Typical turn-key contracts and long-term service agreements contain provisions for performance liquidated damages payments if the solution fails to meet the guaranteed performance thresholds at completion of the project or throughout the service agreement period.

**Purchase Commitments**

The Company has commitments for the minimum volumes of purchases of batteries under a master supply agreement effective as of December 23, 2019. As of September 30, 2020, the Company had future purchase commitments, primarily for batteries, as follows (in thousands):

| | |
|---|---|
| Year 1 | $281,800 |
| Year 2 | 338,750 |
| Year 3 | — |
| Year 4 | — |
| Year 5 | — |
| | $620,550 |

Liquidated damages apply if the minimum purchase volumes are not met. The Company expects to meet the minimum committed volumes of purchases. The Company ordered $128,888 thousand worth of batteries during the calendar year 2020 and exceeded the minimum purchase volume of the first calendar year of $79,250 thousand as defined by the mentioned master supply agreement.

**Legal Contingencies**

From time to time, the Company may be involved in litigation relating to claims that arise out of our operations and businesses and that cover a wide range of matters, including, among others, intellectual property matters, contract and employment claims, personal injury claims, product liability claims and warranty claims. The Company accrues for litigation and claims when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. It is reasonably possible that some matters could be decided unfavorably to the Company and could require the Company to pay damages or make expenditures in amounts that could be material. As of September 30, 2020, no estimate of reasonably possible losses can be determined.

In April 2019, one of the Company's customers experienced a safety incident at one of its energy storage facilities which resulted in damage to the facility and injury to several first responders. The customer owned facility was delivered by and under warranty of AES Energy Storage and the Company was under contract to provide Operations and Maintenance (''O&M'') services to the facility. The Company, its customer, and the battery manufacturer, among others, have investigated the cause of the incident. As of June 2 2021, this safety incident has been fully resolved with all claims been settled. The Company did not incur any significant legal liabilities associated with the incident.

**13.  Related-Party Transactions**

Related parties are represented by Members, their respective subsidiaries and other entities under common control with Members.

*Capital Contributions from Members*

In January 2020, AES made a $2,500 thousand capital contribution in cash (January 2019: $10,000 thousand).

F-20

*Sales Contracts with Related Parties*

Fluence signs back-to-back battery-based energy storage product and related service contracts with AES, Siemens and their subsidiaries (collectively referred to as affiliates) in relation to execution of the affiliates' contracts with external customers and also direct contracts signed with affiliates of the Members. The contract price is similar to the price charged to third-party customers. Revenue from contracts with affiliates is included in revenue from related parties on the Company's consolidated statements of operations and comprehensive loss.

In addition, Fluence purchases material and supplies from its affiliates and records the costs in cost of goods and services on the Company's consolidated statements of operations and comprehensive loss.

*Service Agreements with Affiliates*

Fluence and its affiliates have signed service agreements under which the affiliates provide certain management and administrative services to Fluence. The services include but are not limited to, treasury, information technology services, payroll and human resources services, sales and marketing services, research and development. Cost of services are accrued monthly and included in payables to related parties, and general and administrative sales and marketing or research and development on the Company's consolidated balance sheets and statements of operations and comprehensive loss, respectively.

*Contract Performance Guarantees*

Fluence paid performance guarantee fees to its affiliates in exchange for guaranteeing Fluence's performance obligations in certain contracts with customers. Fluence paid guarantee fees to its affiliates under contractual arrangements and the fees are based on parent costs with a reasonable markup. The guarantee fees are included in costs of goods and services on Fluence's consolidated statements of operations and comprehensive loss.

The following table presents the components of receivables from related parties and payable to related parties on the Company's consolidated balance sheets (in thousands):

|  | As of September 30, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Accounts receivable | $14,216 | $ 5,338 |
| Unbilled receivables | 38,236 | 1,334 |
| Total receivables from related parties | $52,452 | $ 6,672 |
| Accounts payable | $ 9,461 | $ 1,427 |
| Deferred revenue | 11,425 | 60,968 |
| Accrued liabilities | 1,578 | 1,217 |
| Total payables and deferred revenue with related parties | $22,464 | $63,612 |

Unbilled receivables represent the excess of revenues recognized over billings to date on sales or service contracts with related parties.

Deferred revenue represents the excess billings to date over the amount of revenue recognized to date on sales or service contracts with related parties.

Receivables from related parties and payables and deferred revenue with related parties are unsecured and settlement of these balances occurs in cash. No provision has been made related to the receivables from related parties.

F-21

The following table presents the related party transactions that are included the Company's consolidated statements of operations and comprehensive loss for the periods indicated (in thousands):

| | Fiscal Year Ended September 30, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Revenue | $159,647 | $47,169 |
| Cost of goods and services | (14,399) | (5,603) |
| Research and development expenses | (511) | (995) |
| Sales and marketing expenses | (2,105) | (2,529) |
| General and administrative expenses | (1,656) | (1,111) |

In addition, the Company had purchases from related parties capitalized as assets of $1,900 thousand for the fiscal year ended September 30, 2020 (2019: $1,925 thousand).

### 14. Employee Benefit Plan

The Company maintains a 401(k) plan covering all eligible U.S. payroll employees. The 401(k) plan provides that eligible employees may make contributions subject to IRS limitations. Under terms of the 401(k) plan, the Company matches an employee's contributions at a rate of 100% up to 5% of the employee's annual salary. For the fiscal years ended September 30, 2020 the Company contributed approximately $882 thousand (2019: $622 thousand) to the 401(k) plan.

### 15. Customer Concentration Risks

For the fiscal years ended September 30, 2020 and 2019, respectively, the Company had three customers that each accounted for 10% or more of total revenue.

For the fiscal year ended September 30, 2020, our top five customers, in the aggregate, accounted for approximately 90% of our revenue.

The Company has a limited number of suppliers of batteries which is a major component of energy storage products.

### 16. Subsequent Events

The Company has evaluated subsequent events through June 24, 2021, which is the date that these consolidated financial statements were available to be issued.

During FY 2021, the Company spent approximately $18,000 thousand on an acquisition that will offer new capabilities and amplify and extend the Company's energy storage product line. The acquisition represents a business combination. The valuation of acquired assets and liabilities is not completed as of the date these consolidated financial statements were available to be issued.

In October 2020, the Board of Directors of the Company approved an equity-based employee deferred compensation plan. On December 29, 2020 the Company amended their limited liability company agreement, the ''Fluence—Amendment No. 2 to the Amended and Restated LLC Agreement'' to (i) authorize a new class of Units designated as Class A-1 Units to be issuable upon the exercise of awards granted pursuant to the Equity Incentive Plans with distribution subject to the terms specified in the Agreement and (ii) effectuate the Unit Split and Reclassification of 1:1,320 per Unit.

On December 23, 2020, the Uncommitted Line of Credit was further amended to increase the aggregate borrowing amount to $50,000 thousand. On June 2, 2021, the expiration date for the Line of Credit was extended to March 31, 2023.

On December 27, 2020, the Company entered into a subscription agreement with QIA Florence Holdings LLC (''QFH'') for the issuance of 1,250,000 Class B units for a total value of $125,000 thousand. Following the completion of the transaction on June 9, 2021, AES, Siemens, and QFH hold 3,960,000,

F-22

3,960,000, and 1,250,000 units, and 43.2%, 43.2%, and 13.6% of limited liability interests of the Company, respectively. Pursuant to the subscription agreement, QFH has certain rights that may allow it to cause the Company to repurchase the units at fair value five years from the completion of the transaction under conditions outside of the control of the Company. As of June 9, 2021, the Company has three Classes of Membership Interest units, Class A, Class A-1 and Class B. Additionally, Siemens contributed approximately $6,000 thousand in equity to the Company in exchange for certain amendments to the Company's limited liability company agreement.

On April 28, 2021 AES and Siemens agreed to issue an aggregate of up to $120,000 thousand in principal amount under promissory notes to the Company.

On April 28, 2021 and June 3, 2021, the Company borrowed $25,000 thousand and $25,000 thousand from AES, respectively, in the form of one-year promissory notes, each bearing annual interest at 2.86%. On May 3, 2021, the Company borrowed $25,000 thousand from Siemens, in the form of a one-year promissory note with an annual interest rate of 2.86%. The proceeds were used for general working capital needs. As of June 22, 2021, the total $75,000 thousand in borrowings from AES and Siemens were paid off in full.

On April 28, 2021, the Company was notified of an emergency aboard a vessel carrying Fluence inventory while transiting through the Pacific Ocean. The vessel was reporting smoke coming from a cargo hold during severe weather and heavy seas. Based on an initial analysis of the exterior condition of the shipping containers, Fluence believes that some shipping containers came loose while at sea, and Fluence estimates a partial loss of cargo. The cargo in the damaged shipping containers had a value of approximately $30,000 thousand. Inspections of the cargo have not yet been completed and we cannot yet determine the actual amount of losses, including any potential insurance recoveries. Fluence has notified the marine cargo insurers of the incident and also notified each affected customer of this force majeure event, which under relevant supply contracts, provides Fluence an extension of the relevant schedule. If the incident ultimately was determined not to constitute a force majeure event, the Company estimates potential liquidated damages exposure of approximately $15,000 thousand.

**FLUENCE ENERGY, LLC**

**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(U.S. Dollars in Thousands, except per unit amounts)**

| | June 30, 2021 (Unaudited) | September 30, 2020 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $   58,497 | $   93,815 |
| Trade receivables | 61,456 | 32,097 |
| Unbilled receivables | 122,994 | 100,037 |
| Receivables from related parties | 24,574 | 52,452 |
| Advances to suppliers | 14,135 | 2,876 |
| Inventory, net | 333,417 | 37,310 |
| Other current assets | 23,792 | 8,886 |
| Total current assets | 638,865 | 327,473 |
| Non-current assets: | | |
| Property and equipment, net | 7,602 | 5,170 |
| Intangible assets, net | 36,953 | 26,298 |
| Goodwill | 9,201 | 4,731 |
| Other non-current assets | 355 | 353 |
| Total non-current assets | 54,111 | 36,552 |
| Total assets | $ 692,976 | $ 364,025 |
| **Liabilities and members' (deficit) equity** | | |
| Current liabilities: | | |
| Accounts payable | $   68,204 | $   78,132 |
| Deferred revenue | 140,386 | 123,841 |
| Personnel related liabilities | 8,304 | 8,534 |
| Accruals and provisions | 266,823 | 137,696 |
| Payables and deferred revenue with related parties | 166,502 | 22,464 |
| Taxes payable | 5,997 | 5,937 |
| Other current liabilities | 1,825 | 1,636 |
| Total current liabilities | 658,041 | 378,240 |
| Non-current liabilities: | | |
| Personnel related liabilities | 3,150 | 1,829 |
| Accruals and provisions | 257 | 257 |
| Deferred income tax liability | 163 | 163 |
| Other non-current liabilities | 552 | 761 |
| Total non-current liabilities | 4,122 | 3,010 |
| Total liabilities | 662,163 | 381,250 |
| Commitments and contingencies (Note 12) | | |
| Mezzanine equity (1,250,000, and 0 Class B units issued and outstanding as of June 30, 2021 and September 30, 2020, respectively) | 117,272 | — |
| Total mezzanine equity | 117,272 | — |
| Members' deficit | | |
| Capital contributions (7,920,000 Class A units issued and outstanding as of June 30, 2021 and September 30, 2020, respectively) | 106,152 | 99,872 |
| Accumulated other comprehensive (loss) income | (509) | 201 |
| Deficit | (192,102) | (117,298) |
| Total members' deficit | (86,459) | (17,225) |
| Total liabilities, members' deficit, and mezzanine equity | $ 692,976 | $ 364,025 |

The accompanying notes are an integral part of these statements

F-24

**FLUENCE ENERGY, LLC**

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND
COMPREHENSIVE LOSS (UNAUDITED)**
**(U.S. Dollars in Thousands, except unit and per unit data)**

| | Nine Months Ended June 30, | |
| --- | --- | --- |
| | **2021** | **2020** |
| Revenue | $ 430,397 | $ 177,125 |
| Revenue from related parties | 62,164 | 144,734 |
| Total revenue | 492,561 | 321,859 |
| Cost of goods and services | 502,644 | 325,944 |
| Gross loss | (10,083) | (4,085) |
| Operating expenses: | | |
| Research and development | 17,251 | 8,546 |
| Sales and marketing | 16,882 | 12,262 |
| General and administrative | 23,159 | 12,691 |
| Depreciation and amortization | 3,494 | 2,249 |
| Other expense, net | (1,061) | (93) |
| Loss before income taxes | (71,930) | (39,926) |
| Income tax expense | 2,874 | 5,678 |
| Net loss | (74,804) | (45,604) |
| Loss per unit | | |
| Basic and diluted – Class A units | $ (9.44) | $ (5.76) |
| Weighted average number of units | | |
| Basic and diluted – Class A units | 7,920,000 | 7,920,000 |
| Foreign currency translation (loss) gain, net of income tax expense of $0 in each period | (710) | 990 |
| Total other comprehensive (loss) income | (710) | 990 |
| Total comprehensive loss | $ (75,514) | $ (44,614) |

The accompanying notes are an integral part of these statements

F-25

**FLUENCE ENERGY, LLC**

**CONDENSED CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS'**
**(DEFICIT) AND MEZZANINE EQUITY (UNAUDITED)**
**(U.S. Dollars in Thousands except Member Units)**

| | Mezzanine Equity | | Limited Members' Capital | | Accumulated Other Comprehensive | Total Members' | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Units | Amount | Units | Amount | (Loss) Income | (Deficit) | Equity (Deficit) |
| Balance September 30, 2019 | — | — | 7,920,000 | $ 97,372 | $(1,279) | $ (70,588) | $ 25,505 |
| Capital contribution | — | — | — | 2,500 | — | — | 2,500 |
| Net loss | — | — | — | — | — | (45,604) | (45,604) |
| Other comprehensive income, net of income tax benefit of $0 | — | — | — | — | 990 | — | 990 |
| Balance June 30, 2020 | — | — | 7,920,000 | $ 99,872 | $ (289) | $(116,192) | $(16,609) |
| Balance September 30, 2020 | — | — | 7,920,000 | $ 99,872 | $ 201 | $(117,298) | $(17,225) |
| Capital contribution | — | — | — | 6,280 | — | — | 6,280 |
| Issuance of Class B membership units, net | 1,250,000 | 117,272 | — | — | — | — | — |
| Net loss | — | — | — | — | — | (74,804) | (74,804) |
| Other comprehensive loss, net of income tax benefit of $0 | — | — | — | — | (710) | — | (710) |
| Balance June 30, 2021 | 1,250,000 | $117,272 | 7,920,000 | $106,152 | $ (509) | $(192,102) | $(86,459) |

The accompanying notes are an integral part of these statements

F-26

**FLUENCE ENERGY, LLC**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)**
**(U.S. Dollars in Thousands)**

| | Nine Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Operating activities** | | |
| Net loss | $ (74,804) | $ (45,604) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 3,494 | 2,249 |
| Inventory provision | 23,839 | — |
| Deferred income taxes | — | 1,630 |
| Changes in operating assets and liabilities: | | |
| Trade receivables | (29,359) | (37,538) |
| Unbilled receivables | (22,957) | (17,108) |
| Receivables from related parties | 24,689 | (68,816) |
| Advances to suppliers | (11,259) | (26,052) |
| Inventory | (319,946) | (40,510) |
| Other current assets | (13,885) | (2,046) |
| Other non-current assets | (2) | 1,147 |
| Accounts payable | (9,928) | 46,557 |
| Payables and deferred revenue with related parties | 144,038 | (39,720) |
| Deferred revenue | 16,545 | 30,144 |
| Current accruals and provisions | 129,127 | 115,629 |
| Taxes payable | 60 | 1,096 |
| Other current liabilities | (41) | 2,054 |
| Other non-current liabilities | 1,112 | 1,023 |
| Net cash used in operating activities | (139,277) | (75,865) |
| **Investing activities** | | |
| Proceeds from short-term investments | — | 19,306 |
| Cash paid for business acquisition | (18,000) | — |
| Purchase of property and equipment | (2,999) | (1,013) |
| Net cash (used in) provided by investing activities | (20,999) | 18,293 |
| **Financing activities** | | |
| Capital contribution from Members | 6,280 | 2,500 |
| Proceeds from issuance of Class B membership units | 125,000 | — |
| Payment of transaction cost related to issuance of Class B membership units | (7,728) | — |
| Borrowing from promissory notes – related parties | 75,000 | — |
| Repayment of promissory notes – related parties | (75,000) | — |
| Borrowing from line of credit | 50,000 | 8,000 |
| Repayment to line of credit | (50,000) | — |
| Payments of deferred equity issuance costs | (1,012) | — |
| Other | 3,189 | — |
| Net cash provided by financing activities | 125,729 | 10,500 |
| Effect of exchange rate changes on cash and cash equivalents | (763) | 949 |
| Net decrease in cash and cash equivalents | (35,310) | (46,123) |
| Cash, cash equivalents, and restricted cash as of the beginning of the period | 95,051 | 87,020 |
| Cash, cash equivalents, and restricted cash as of the end of the period | $ 59,741 | $ 40,897 |

The accompanying notes are an integral part of these statements

F-27

**FLUENCE ENERGY, LLC**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**

### 1. Organization and Operations

Fluence Energy, LLC (Fluence), a Delaware limited liability company, was formed on June 30, 2017, and commenced operations on January 1, 2018 (Effective Date). Fluence, with its wholly owned subsidiaries including Fluence Energy GmbH in Germany, Fluence Energy Pty Ltd. in Australia, and Fluence Energy Inc. in the Philippines, is primarily engaged in the construction and sale of battery-based energy storage products and provides related operational services. As of June 30, 2021, AES Grid Stability ("AES") holds 3,960,000 Class A units, or 43.2% of our limited liability interest, Siemens Industry ("Siemens") holds 3,960,000 Class A units, or 43.2% of our limited liability interest and Qatar Investment Authority ("QIA") holds 1,250,000 Class B units, or 13.6% of our limited liability interests. Except where the content clearly indicates otherwise, "Fluence," "we," "us," "our" or the "Company" refers to Fluence Energy, LLC and its wholly owned subsidiaries.

The Company's chief operating decision maker ("CODM") is its Chief Executive Officer. The Company's CODM reviews financial information on a condensed consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company has determined that it operates in one operating segment, which corresponds to one reportable segment.

### 2. Summary of Significant Accounting Policies and Estimates

**Principles of Accounting and Consolidation**

The accompanying condensed consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and under the rules of the Securities and Exchange Commission (SEC). The accompanying condensed consolidated financial statements include the accounts of Fluence and its subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

**Unaudited Interim Financial Information**

The accompanying condensed financial statements as of June 30, 2021, and for the nine months ended June 30, 2021 and 2020 are unaudited. The unaudited interim financial statements have been prepared on the same basis as the audited annual financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments, necessary for the fair statement of the Company's financial position as of June 30, 2021 and the results of its operations and its cash flows for the nine months ended June 30, 2021 and 2020. The financial data and other information disclosed in these notes related to the nine months ended June 30, 2021 and 2020 are also unaudited. The results for the nine months ended June 30, 2021 and 2020 are not necessarily indicative of results for the full year ending September 30, 2021 and 2020, any other interim periods, or any future year or period. The balance sheet as of September 30, 2020 included herein was derived from the audited financial statements as of that date. Certain disclosures have been condensed or omitted from the interim financial statements. These financial statements should be read in conjunction with the Company's audited financial statements.

For a complete description of our significant accounting policies, refer to Note 2—*Summary of Significant Accounting Policies and Estimates* on our annual financial statements for the year ended September 2020. We include herein certain updates to those policies.

**Business Combinations**

We allocate acquisition price to the assets acquired and liabilities assumed based on their estimated fair values. The excess of acquisition price over fair value of the acquired assets and liabilities assumed is recorded as goodwill. Such valuations require management to make estimates and assumptions that affect the amounts reported in our unaudited condensed consolidated financial statements and accompanying notes. Actual results could differ from those estimates.

F-28

**Cash, Cash Equivalents, and Restricted Cash**

Cash and cash equivalents include cash on-hand and highly liquid investments readily convertible to cash, with an original maturity of 90 days or less when purchased.

Cash restricted for use as a result of financing or other obligations is classified separately as restricted cash in other current assets.

The following table provides the components of cash, cash equivalents, and restricted cash as shown on the condensed consolidated statements of cash flows (in thousands):

|  | As of June 30, | |
| --- | --- | --- |
|  | **2021** | **2020** |
| Cash and cash equivalents | $58,497 | $38,972 |
| Restricted cash included in other current assets | 1,244 | 1,925 |
| **Total cash, cash equivalents and restricted cash** | $59,741 | $40,897 |

Restricted cash included in "Other current assets" on the condensed consolidated balance sheets as of June 30, 2021 consists of $923 thousand of collateral for credit card program (June 2020: $910 thousand) and $321 thousand of collateral for outstanding bank guarantees (June 2020: $1,015 thousand).

**Revenue and Cost Recognition**

*Revenue from Digital Applications and Solutions:*   In October 2020, Fluence acquired the Advanced Microgrid Solutions ("AMS") software and digital intelligence platform, which became the Fluence Trading Platform. Contracts involving the Fluence Trading Platform are generally entered into with commercial entities that control utility-scale storage and renewable generation assets. Fluence Trading Platform arrangements consist of a promise to provide access to proprietary cloud-based Software-as-a-Service ("SaaS") to promote enhanced financial returns on the utility-scale storage and renewable generation assets. The Fluence Trading Platform is a hosted service that delivers automated, market-compliant bids to local electricity market operators. Customers do not receive legal title or ownership of the software as a result of these arrangements. The term for Fluence's contracts with Trading Platform customers is generally 5 years, which may include certain renewal options to extend the initial contract term or certain termination options to reduce the initial contract term.

The Fluence Trading Platform is technology- and vendor-agnostic (i.e. it can be utilized for wind and solar assets as well as non-Fluence systems). The Fluence Trading Platform is separately identifiable from other promises that Fluence offers to its customers (i.e. it is not highly interrelated or integrated with other solutions). As such, Fluence determined that the Fluence Trading Platform is accounted for as a separate performance obligation. Revenue from the Fluence Trading Platform includes an integration fee and a monthly subscription fee. We consider the access to the Fluence Trading Platform and related support services in a customer contract to be a series of distinct services which comprise a single performance obligation because they are substantially the same and have the same pattern of transfer. We record amounts that have been invoiced in accounts receivable and in deferred revenue or revenues, depending on whether the revenue recognition criteria have been met.

**Fair Value Measurements**

The fair value of the Company's financial assets and liabilities reflects management's estimate of amounts that the Company would have received in connection with the sale of the assets or paid in connection with the transfer of the liabilities in an orderly transaction between market participants at the measurement date. In connection with measuring the fair value of its assets and liabilities, the Company seeks to maximize the use of observable inputs and to minimize the use of unobservable inputs. The following fair value hierarchy, defined by ASC 820, *Fair Value Measurements*, is used to classify assets and liabilities based on the observable inputs and unobservable inputs used to value the assets and liabilities:

Level 1—Quoted prices are available in active markets for identical assets or liabilities as of the reporting date. Active markets are those in which transactions for the asset or liability occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

Level 2—Pricing inputs are other than quoted prices in active markets included in Level 1, which are either directly or indirectly observable as of the reporting date. Level 2 inputs include those financial instruments that are valued using models or other valuation methodologies. These models are primarily industry-standard models that consider various assumptions, including quoted prices, time value, volatility factors, and current market and contractual prices for the underlying instruments, as well as other relevant economic measures. Substantially all of these assumptions are observable in the marketplace throughout the full term of the instrument, can be derived from observable data or are supported by observable levels at which transactions are executed in the marketplace.

Level 3—Pricing inputs include significant inputs that are generally less observable from objective sources. These inputs may be used with internally developed methodologies that result in management's best estimate of fair value from the perspective of a market participant. The Company does not have any recurring Level 3 fair value measurements.

The Company's cash equivalents include term deposits with original maturity of less than three months and are recorded at amortized cost. Fair value of cash equivalents approximates the carrying amount using Level 2 inputs. The carrying amounts of trade receivables, accounts payable and short-term debt obligations approximate fair values due to their short maturities using Level 2 inputs.

**Unit-Based Compensation**

Employees, directors, consultants and other independent contractors are eligible to receive equity awards and other forms of compensation under the 2020 Unit Option Plan ("the Option Plan") and the Phantom Equity Incentive Plan ("the Incentive Plan"). Units awarded under the Option Plan are subject to a service condition and a performance condition (i.e. a liquidity event), as defined within the plan, both of which are required for vesting. Units awarded under the Incentive Plan vest subject to a liquidity event, as defined within the plan. As a liquidity event has not occurred, no compensation costs have been recorded under either plan in the periods presented.

The Company recognizes the costs associated with granting unit-based awards using a fair value-based measure in accordance with the requirements of Accounting Standards Codification 718, *Compensation— Stock Compensation* (ASC 718). The Company estimates the fair value of the unit-based awards, including unit options and phantom awards, using the Black-Scholes option-pricing model. Determining the fair value of unit-based awards requires the use of highly subjective assumptions, including the fair value of the unit underlying the award, the expected term of the award and expected unit price volatility.

The assumptions used in determining the fair value of unit-based awards represent management's estimates, which involve inherent uncertainties and the application of management judgment. As a result, if factors change, and different assumptions are employed, unit-based compensation could be materially different in the future. The risk-free interest rates are based on the U.S. Treasury yield curve in effect at the time of grant, with maturities approximating the expected life of the unit options. The Company uses historical volatility of a selected group of guideline publicly traded entities as the expected volatility assumption.

The Company has made a policy election to account for forfeitures as they occur. If there are any modifications of the underlying invested securities or the terms of the unit option or phantom unit, it may be necessary to accelerate or increase any remaining unamortized unit-based compensation expense.

**Earnings (Loss) per Unit**

As of June 30, 2021, the Company has three Classes of Membership Interest units, Class A, Class A-1 and Class B. Earnings (loss) per unit is calculated and reported under the "two-class" method. The "two-class" method is an earnings allocation method under which earnings (loss) per unit is calculated for each class of common LLC member units considering both distributions declared or accumulated and participation rights in undistributed earnings as if all such earnings (loss) had been distributed during the period. Class B unit holders have a liquidation preference equal to their initial investment and do not have an obligation to fund losses of the business. When calculating the earnings (loss) per unit in the current period, the Class B units are not allocated any losses.

F-30

The Company calculates basic earnings (loss) per common LLC member unit by dividing net income (loss) by the average number of common LLC member unit outstanding during the period, excluding Class B units because of their liquidation preference. Diluted earnings per unit is calculated after consideration of the potential dilutive effect of common LLC member unit equivalents on the average number of common LLC member units outstanding during the period. Dilution is not considered when a net loss is reported. Common LLC member unit equivalents that have an antidilutive effect are excluded from the computation of diluted earnings per common LLC member unit. As of June 30, 2021, the Company had common LLC member unit equivalents in the form of unit options and phantom units, as further discussed in Note 16—*Unit-Based Compensation.*

**Unit Split**

In December 2020, the Company approved an amendment to its Limited Liability Company Agreement to effect a 1:1,320 unit split of the Company's Class A units, which was effected on December 29, 2020. The par value of the common unit was not adjusted as a result of the unit split. All common LLC member units and per unit data have been retrospectively revised to reflect the unit split.

**Income Taxes**

The Company is treated as a partnership for U.S. federal income tax purposes. As such, the members are individually liable for their own distributable share of taxable income or loss. No provision has been made in the accompanying consolidated financial statements for U.S. federal, state or local income taxes.

Foreign subsidiaries of the Company account for income taxes and the related accounts in accordance with ASC 740, *Income Taxes*. Under ASC 740, deferred tax assets and liabilities are determined based on differences between the financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when the differences are expected to reverse.

The Company recognizes the tax benefits from uncertain tax positions if it is more likely than not that the position will be sustained on examination by the taxing authorities. The Company recognizes interest and penalties related to unrecognized tax benefits as a component of income tax expense. For the nine months ended June 30, 2021 and June 30, 2020, the Company did not recognize tax benefits relating to uncertain tax positions.

**Recent Accounting Pronouncements**

In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment*, which removes step 2 of the quantitative goodwill impairment test. Under the amended guidance, a goodwill impairment charge is recognized for the amount by which the carrying value of a reporting unit exceeds its fair value, not to exceed the carrying amount of goodwill. We adopted this standard on October 1, 2020. The adoption of the standard did not have a material impact on our financial statements.

In June 2018, the FASB issued ASU 2018-07, *Compensation—Stock Compensation (Topic 718)—Improvements to Nonemployee Share-Based Payment Accounting*. This update expands the scope of Topic 718, "Compensation—Stock Compensation," to include equity-based awards granted to non-employees in exchange for goods or services. The accounting for employees and non-employees will be substantially aligned. We adopted this standard on October 1, 2020. The adoption of the standard did not have a material impact on our financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820)*—Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement, which amends ASC 820 to add, remove, and modify fair value measurement disclosure requirements. New disclosures required for public companies under ASU 2018-13 include Level 3 changes in unrealized gains or losses and Level 3 range and weighted average used to develop significant unobservable inputs. We adopted this standard on October 1, 2020. The adoption of the standard did not have a material impact on our financial statements.

*Recent Accounting Pronouncements Not Yet Adopted*

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases in ASC 840, *Leases*. This standard requires all leases to be recognized on

F-31

the condensed consolidated balance sheet. ASU 2016-02 was effective for public companies for fiscal quarter beginning after December 15, 2018. As an EGC, Fluence is permitted to defer adoption until the non-public company adoption date, i.e., annual periods starting after December 15, 2021. Early adoption is permitted for all entities. The FASB has issued several amendments to ASU 2016-02, including ASU 2018-11, *Leases (Topic 842)*—Targeted Improvements that introduced an additional transition method permitting an entity to initially apply the new lease standard at the adoption date and recognize a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. ASU 2016-02 includes optional practical expedients intended to reduce the cost and complexity to implement the new lease standard, such as an option to maintain the current lease classification for all existing lease arrangements and the option to use hindsight in evaluating lessee options to extend or terminate a lease. The Company's existing lease population is mainly comprised of operating leases for office space. The Company is currently evaluating the impact of adoption on its condensed consolidated financial statements, as well as the use of the practical expedients allowed under the standard.

In February 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326)*. This standard updates the impairment model for financial assets measured at amortized cost, known as the Current Expected Credit Loss ("CECL") model. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, entities will be required to use a new forward-looking "expected loss" model that generally will result in the earlier recognition of allowance for losses. ASU 2016-13 was effective for public companies for annual periods starting after December 15, 2019. As an EGC, Fluence is permitted to defer adoption until the non-public company adoption date, i.e., annual periods starting after December 15, 2022. Early adoption is permitted. There are various transition methods available upon adoption. The Company is currently evaluating the impact of adoption on its condensed consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740):* Simplifying the Accounting for Income Taxes. This guidance removes certain exceptions related to the approach for intraperiod tax allocations, the methodology for calculating income taxes in an interim period, and the recognition of deferred tax liabilities for outside basis differences. The guidance also clarifies and simplifies other areas of ASC 740. ASU 2019-12 was effective for public companies for fiscal years beginning after December 15, 2020, including interim periods therein. As an EGC, Fluence is permitted to defer adoption until the non-public company adoption date, i.e., annual periods starting December 15, 2021, and for interim periods beginning after December 15, 2022. Early adoption is permitted for all entities. Certain amendments must be applied on a prospective basis, certain amendments must be applied on a retrospective basis, and certain amendments must be applied on a modified retrospective basis through a cumulative-effect adjustment to retained earnings/(deficit) in the period of adoption. The Company is currently evaluating the impact of adoption on its condensed consolidated financial statements.

In March 2020, the FASB issued ASU 2020-04, *Facilitation of the Effects of Reference Rate Reform on Financial Reporting (Topic 848).* The ASU provides optional expedients and exceptions for applying U.S. GAAP to transactions affected by reference rate (e.g., LIBOR) reform if certain criteria are met, for a limited period of time to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. The ASU is effective as of March 12, 2020 through December 31, 2022. The Company will evaluate transactions or contract modifications occurring as a result of reference rate reform and determine whether to apply the optional guidance on an ongoing basis. The ASU is currently not expected to have a material impact on our condensed consolidated financial statements.

F-32

**3. Revenue from Contracts with Customers**

**Disaggregation of revenue**

The following table presents the Company's revenues disaggregated by contract type (in thousands):

| | Nine Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Revenue from sale of battery-based energy storage products | $487,953 | $319,199 |
| Revenue from services | 3,704 | 2,059 |
| Revenue from digital applications and solutions | 534 | — |
| Other | 370 | 601 |
| | $492,561 | $321,859 |

The following table presents the Company's revenue disaggregated by geographical region. Revenues are attributed to countries based on location of customers (in thousands):

| | Nine Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| United States of America | $357,058 | $230,552 |
| Philippines | 102,742 | 55,210 |
| United Kingdom | 13,871 | 1,523 |
| Ireland | 8,394 | 4,593 |
| Belgium | 5,721 | 604 |
| Finland | 1,935 | — |
| Chile | 856 | 12,235 |
| Germany | 690 | 4,217 |
| Canada | 226 | 2,211 |
| Switzerland | 19 | 9,143 |
| Other | 1,049 | 1,571 |
| | $492,561 | $321,859 |

**Deferred Revenue**

Deferred revenue represents the excess billings over the amount of revenue recognized to date. Deferred revenue from related parties is included in payables and deferred revenue with related parties on the Company's condensed consolidated balance sheets. The following table provides information about deferred revenue from contracts with customers (in thousands):

| | Nine Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Deferred revenue beginning of period | $ 123,841 | $ 52,980 |
| Additions | 128,963 | 66,450 |
| Revenue recognized related to amounts that were included in beginning balance of deferred revenue | (112,418) | (36,306) |
| Deferred revenue end of period | $ 140,386 | $ 83,124 |

F-33

| | Nine Months Ended June 30, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Deferred revenue from related parties beginning of period | $ 11,425 | $ 60,968 |
| Additions | 150,758 | 15,170 |
| Revenue recognized related to amounts that were included in beginning balance of deferred revenue | (3,239) | (59,636) |
| Deferred revenue from related parties end of period | $158,944 | $ 16,502 |

**Remaining Performance Obligations**

The Company's remaining performance obligations ("backlog") represent the unrecognized revenue value of its contract commitments, which include deferred revenue and amounts that will be billed and recognized as revenue in future periods. The Company's backlog may vary significantly each reporting period based on the timing of major new contract commitments and the backlog may fluctuate with currency movements. In addition, the Company's customers have the right, under some circumstances, to terminate contracts or defer the timing of our services and their payments to the Company.

As of June 30, 2021, we had $884,592 thousand of remaining performance obligations related to our battery storage product contracts, with respect to which we expect to recognize a majority of the revenue in the next 12 months. The Company also had $185,815 thousand performance obligations related to operational service contracts including maintenance, monitoring, and other minor services of which we expect to recognize 40% in revenue within the next five years and the remainder after five years, and $58,339 thousand remaining performance obligations related to capacity guarantees, 34% of which is expected to be recognized within the next five years and the remainder after five years. Our performance obligation related to digital application and solution contracts after we acquired the AMS software and digital intelligence platform is $2,540 thousand as of June 30, 2021, which we expect to recognize within the next five years.

**Costs to Obtain or Fulfill a Contract**

The Company recognizes the incremental costs incurred to obtain a contract with a customer as an asset when these costs are recoverable. These costs consist primarily of sales commissions.

As of June 30, 2021, the Company recorded costs to obtain a contract of $173 thousand (September 2020: $2,083 thousand) within "Other current assets" on the Company's condensed consolidated balance sheets.

Amortization related to costs to obtain a contract was $1,392 thousand and $768 thousand for the nine months ended June 30, 2021 and 2020, respectively, which was recorded within sales and marketing on the Company's condensed consolidated statements of operations and comprehensive loss.

**4. Business Combinations**

During October 2020, the Company acquired the assets and assumed the liabilities of a US based software and digital intelligence platform. The Company expects the acquisition will offer new capabilities, amplify and extend the Company's energy storage product line, enabling customers to maximize the value of energy storage and renewables while accelerating grid decarbonization. The acquisition price of $18,000 thousand, all of which was fully paid with cash, which amount was adjusted for an immaterial amount to account for changes in net working capital adjustments. The acquisition represents a business combination. Fluence included the financial results of the acquisition in its condensed consolidated financial statements from the date of acquisition. Transaction costs associated with the acquisition were not significant and were expensed as incurred.

The following table summarizes the aggregate fair values and estimated useful lives of the assets acquired and liabilities assumed, as of the date of the acquisition (in thousands):

F-34

| | Fair Value | Estimated Useful Life |
|---|---|---|
| Intangible assets – Developed technology | $12,600 | 12 years |
| Intangible assets – Customer relationships | 780 | 6 years |
| Property and equipment | 171 | various |
| Goodwill | 4,449 | |
| **Cash paid for acquisition** | $18,000 | |

The fair value of developed technology was determined using the multi-period excess earnings method as developed technology is considered to be the primary revenue-generating identifiable intangible asset acquired in the acquisition. The fair value assigned to assets acquired and liabilities assumed are based on management's estimates and assumptions.

The goodwill is primarily attributed to the expanded market opportunities when integrating the acquired entity's technology with the Company's technology and the assembled workforce. Purchase accounting adjustments related to the acquisition have been completed.

The excess of the acquisition price over the fair value of assets acquired and liabilities assumed was recorded to goodwill. The Company expects such goodwill to be deductible for income tax purposes.

5.  **Inventory, Net**

Inventory consisted of the following (in thousands):

| | Cost | Provision | Net |
|---|---|---|---|
| **June 30, 2021** | | | |
| Batteries and equipment | $356,447 | $(23,838) | $332,609 |
| Cases, inverters and other major equipment | 289 | — | 289 |
| Non-projected related raw material and supplies | 419 | | 419 |
| Spare parts | 131 | (31) | 100 |
| **Total** | $357,286 | $(23,869) | $333,417 |

| | Cost | Provision | Net |
|---|---|---|---|
| **September 30, 2020** | | | |
| Batteries and equipment | $36,112 | $ — | $36,112 |
| Cases, inverters and other major equipment | 1,102 | — | 1,102 |
| Spare parts | 126 | (30) | 96 |
| **Total** | $37,340 | $(30) | $37,310 |

Provision as of June 30, 2021 included $19,800 thousand loss recognized for containers damaged in transit related to the 2021 cargo loss incident. Refer to Note 12—*Commitments and Contingencies* for a detail discussion of the 2021 cargo loss incident.

F-35

**6.  Other Current Assets**

Other current assets consisted of the following amounts (in thousands):

| | June 30, 2021 | September 30, 2020 |
|---|---|---|
| Receivable from insurance | $10,000 | $  — |
| Deferred equity issuance costs | 3,421 | 590 |
| Taxes recoverable | 4,437 | 2,167 |
| Prepaid expenses | 1,670 | 1,261 |
| Restricted cash | 1,244 | 1,236 |
| Land held for resale | 849 | 849 |
| Contract acquisition cost | 173 | 2,083 |
| Other | 1,998 | 700 |
| **Total** | **$23,792** | **$8,886** |

Receivable from insurance of $10,000 thousand as of June 30, 2021 represents insurance recoveries that are probable of collection related to the 2021 cargo loss incident. Refer to Note 12—*Commitments and Contingencies* for a detail discussion of the 2021 cargo loss incident.

**7.  Intangible Assets, Net**

Intangible assets are stated at amortized cost and consist of the following (in thousands):

| | June 30, 2021 | Sep 30, 2020 | June 30, 2021 | Sep 30, 2020 | June 30, 2021 | Sep 30, 2020 |
|---|---|---|---|---|---|---|
| | Cost | | Accumulated Amortization | | Net | |
| Patents and licenses | $32,981 | $33,100 | $8,588 | $6,851 | $24,393 | $26,249 |
| Developed technology | 12,600 | — | 787 | — | 11,813 | — |
| Other | 876 | 65 | 129 | 16 | 747 | 49 |
| **Total** | **$46,457** | **$33,165** | **$9,504** | **$6,867** | **$36,953** | **$26,298** |

Included in the developed technology intangible asset and other intangible asset are $12,600 thousand and $780 thousand, respectively, related to the acquisition discussed in Note 4—*Business Combinations*.

Intangible assets are amortized over their estimated useful lives on a straight-line basis. Total amortization expenses for the nine months ended June 30, 2021 were $2,637 thousand (2020: $1,860 thousand).

Total future amortization expense by fiscal years for finite-lived intangible assets was estimated as follows (in thousands):

| | |
|---|---|
| 2021 (remaining 3 months) | $   920 |
| 2022 | 3,676 |
| 2023 | 3,667 |
| 2024 | 3,659 |
| 2025 | 3,659 |
| Thereafter | 21,372 |
| **Total** | **$36,953** |

**8.  Goodwill**

Goodwill is assessed for impairment annually each year during the Company's fourth quarter, or when impairment indicators exist. No impairment was recognized for the nine months ended June 30, 2021 or 2020.

F-36

The following table presents the goodwill activity (in thousands):

| | |
|---|---:|
| Goodwill, September 30, 2019 | $4,698 |
| Foreign currency adjustment | 33 |
| **Goodwill, September 30, 2020** | $4,731 |
| Foreign currency adjustment | 21 |
| Acquisition related goodwill | 4,449 |
| **Goodwill, June 30, 2021** | $9,201 |

Refer to Note 4 — *Business Combinations* for a further discussion of acquisition related to goodwill.

## 9. Accruals and Provisions

Accruals and provisions consisted of the following amounts (in thousands):

| | June 30, 2021 | September 30, 2020 |
|---|---:|---:|
| Accruals | $260,429 | $133,899 |
| Provisions for expected projects losses | 6,023 | 3,019 |
| Other projects related provisions | 628 | 1,035 |
| **Total** | 267,080 | 137,953 |
| Less: non-current portion | (257) | (257) |
| **Current portion** | $266,823 | $137,696 |

Accruals mainly represent not yet invoiced milestones for deliveries of major equipment for battery-based energy storage projects such as batteries, enclosures, and inverters. According to master supply agreements between the Company and suppliers of the major equipment, vendor bills are issued according to contracted billing schedules with some milestones invoiced after delivery, upon full installation and commissioning of the equipment at substantial completion and final completion project stages.

## 10. Short-term Borrowing and Line of Credit

The Company had an Uncommitted Line of Credit Agreement with Citibank originally signed on January 29, 2019, which allows the Company to borrow an amount in aggregate not to exceed $2,000 thousand, from time to time, until January 29, 2021. The Line of Credit was further amended to increase the aggregate borrowing amount to $10,000 thousand, $30,000 thousand and $50,000 thousand on May 13, 2020, August 7, 2020 and December 23, 2020, respectively. The expiration date for the Line of Credit was extended to March 31, 2023 on June 2, 2021.

No amounts were outstanding under the Uncommitted Line of Credit as of June 30, 2021 and September 30, 2020.

Refer to Note 13—*Related-Party Transactions* for borrowing from related parties

## 11. Income Taxes

The Company recorded $2,874 thousand of income tax expense and $5,678 thousand of income tax expense for the nine months ended June 30, 2021 and 2020, respectively. The Company's estimated effective tax rate for the nine months ended June 30, 2021 and 2020 was (4.0)% and (14.2)%, respectively. For the nine months ended June 30, 2021 the Company's effective tax rate differs from the statutory tax rate of 21% primarily due to foreign tax rate differentials, losses incurred by the partnership that flow through to the members, and valuation allowances recorded on foreign deferred tax assets. For the nine months ended June 30, 2020 the Company's effective tax rate differs from the statutory rate of 21% primarily due to foreign tax rate differentials, losses incurred by the partnership that flow through to the members, valuation allowances recorded on foreign deferred tax assets and foreign withholding taxes on royalties.

F-37

The Company does not believe it has any significant uncertain tax positions and therefore has no unrecognized tax benefits as of June 30, 2021 and September 30, 2020, that if recognized, would affect the annual effective tax rate.

As of June 30, 2021 and September 30, 2020, the Company had recorded a full valuation allowance against deferred tax assets of the Company's German and Australian subsidiaries. The Company determined that based on the weight of available evidence, including cumulative losses, it is more-likely-than-not that the net deferred tax assets at its German and Australian entities will not be realized and recorded a valuation allowance against such deferred tax assets.

## 12. Commitments and Contingencies

The Company has certain contractual obligations incurred in the normal course of business that require fixed and determinable payments in the future. These commitments include lease obligations and purchase commitments under a master supply agreement.

The Company did not have significant changes in lease contracts during the nine months ended June 30, 2021.

### Guarantees

As of June 30, 2021 and September 30, 2020, the Company had outstanding bank guarantees issued as performance security arrangements for several projects. Performance security is a pre-condition to receive any payment from the customer and is reduced in stages according to the project completion status.

Typical turn-key contracts and long-term service agreements contain provisions for performance liquidated damages payments if the solution fails to meet the guaranteed performance thresholds at completion of the project or throughout the service agreement period.

### Purchase Commitments

The Company has commitments for minimum volumes of purchases of batteries under a master supply agreement. Liquidated damages apply if the minimum purchase volumes are not met. The Company expects to meet the minimum committed volumes of purchases. The following presents our future minimum purchase commitments by fiscal year, primarily for batteries, and liquidated damages if the minimum purchase volumes are not met as of June 30, 2021(in thousands).

|  | Purchase Commitments | Liquidated Damages |
|---|---|---|
| 2021 (remaining 3 months) | $   141,202 | $        — |
| 2022 | 730,291 | 173,112 |
| 2023 | 1,131,140 | 135,695 |
| 2024 | 762,318 | 118,339 |
| 2025 | 112,492 | 22,498 |
|  | $2,877,443 | $449,644 |

### Legal Contingencies

From time to time, the Company may be involved in litigation relating to claims that arise out of our operations and businesses and that cover a wide range of matters, including, among others, intellectual property matters, contract and employment claims, personal injury claims, product liability claims and warranty claims. The Company accrues for litigation and claims when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. It is reasonably possible that some matters could be decided unfavorably to the Company and could require the Company to pay damages or make expenditures in amounts that could be material. The following discussion covers the Company's potential loss contingencies as of June 30, 2021:

F-38

*2019 Safety Incident*

In April 2019, one of the Company's customers experienced a safety incident at one of its energy storage facilities which resulted in damage to the facility and injury to several first responders. The customer owned facility was delivered by and under warranty of AES Energy Storage and the Company was under contract to provide Operations and Maintenance (O&M) services to the facility. The Company, its customer, and the battery manufacturer, among others, have investigated the cause of the incident. As of June 24, 2021, this safety incident has been fully resolved with all claims being settled. The Company did not incur any significant legal liabilities associated with the incident.

*2021 Cargo Loss Incident*

On April 28, 2021, the Company was notified of an emergency aboard a vessel carrying Fluence inventory while transiting through the Pacific Ocean. The vessel was reporting smoke coming from a cargo hold during severe weather and heavy seas. Based on an initial analysis of the exterior condition of the shipping containers, Fluence believes that some shipping containers came loose while at sea, and Fluence estimates a partial loss of cargo. The cargo in the damaged shipping containers had a carrying value of approximately $30,000 thousand. Inspections of the cargo are in process. Based on the extent of the damage to the cargo in the containers holding Fluence inventory, we believe that the cargo in the moderately or severely damaged containers will not be usable. As of June 30, 2021, Fluence estimated a gross loss of $19,800 thousand based on our best estimate of the net realizable value of the cargo and has recorded an insurance receivable of $10,000 thousand related to non-disputed insurance claims that are probable of collection. The net loss of $9,800 thousand is recognized in "Cost of goods and service" in the consolidated statements of operations for the nine months ended June 30, 2021. However, our estimate of loss is subject to change upon new information that we expect to determine upon fully inspecting the inventory.

Fluence has notified the marine cargo insurers of the incident and also notified each affected customer of this event, which under relevant supply contracts, provides Fluence an extension of the relevant schedule due to the resulting battery supply delays. We believe this event qualifies as force majeure under our BESS contracts with our customers. However, if the incident ultimately was determined not to constitute a force majeure event, the Company estimates potential liquidated damages exposure of approximately $15,000 thousand. As of June 30, 2021, we have not adjusted the transaction price of our contracts with affected customers to include liquidated damages as a result of the cargo loss as none are expected.

**13. Related-Party Transactions**

Related parties are represented by AES, Siemens and QIA (collectively, "Members"), their respective subsidiaries and other entities under common control with Members.

*Capital Contributions from Members*

In June 2021, Siemens made $6,280 thousand capital contribution in cash to the Company in exchange for certain amendments to the Company's limited liability company agreement. In January 2020, AES made a $2,500 thousand capital contribution in cash.

*Borrowings from Related Parties*

On April 28, 2021, and June 3, 2021, the Company borrowed $25,000 thousand and $25,000 thousand from AES, respectively, in the form of one-year subordinated promissory notes, each bearing an annual interest at 2.86 %. On May 3, 2021, the Company borrowed $25,000 thousand from Siemens in the form of a one-year subordinated promissory note with an annual interest rate of 2.86%. The proceeds were used for general working capital needs. As of June 30, 2021, the total $75,000 borrowing from AES and Siemens were paid off in full.

*Sales Contracts with Related Parties*

Fluence signs back-to-back battery-based energy storage product and related service contracts with AES, Siemens and their subsidiaries (collectively refer to as affiliates) in relation to execution of the affiliates'

F-39

contracts with external customers and also direct contracts signed with affiliates of the Members. The contract price is similar to the price charged to third-party customers. Revenue from contracts with affiliates is included in "Revenue from related parties" on the Company's condensed consolidated statements of operations and comprehensive loss.

In addition, Fluence purchases material and supplies from its affiliates and records the costs in cost of goods and services on the Company's condensed consolidated statements of operations and comprehensive loss.

*Service Agreements with Affiliates*

Fluence and its affiliates have signed service agreements under which the affiliates provide certain management and administrative services to Fluence. The services include but are not limited to, treasury, information technology services, payroll and human resources services, sales and marketing services, research and development. Cost of services are accrued monthly and included in payables to related parties, and general and administrative, sales and marketing, or research and development on the Company's condensed consolidated balance sheets and statements of operations and comprehensive loss, respectively.

*Contract Performance Guarantees*

Fluence paid performance guarantee fees to its affiliates in exchange for guaranteeing Fluence's performance obligations in certain contracts with customers. Fluence paid guarantee fees to its affiliates under contractual arrangements and the fees are based on parent costs with a reasonable markup. The guarantee fees are included in "Costs of goods and services" on Fluence's condensed consolidated statements of operations and comprehensive loss.

*Payables and Receivables from Related Parties*

The following table presents the components of receivables from related parties and payable to related parties on the Company's condensed consolidated balance sheets (in thousands):

|  | June 30, 2021 | September 30, 2020 |
|---|---|---|
| Accounts receivable | $ 16,838 | $14,216 |
| Unbilled receivables | 7,736 | 38,236 |
| Total receivables from related parties | $ 24,574 | $52,452 |
| Accounts payable | $ 4,804 | $ 9,461 |
| Deferred revenue | 158,944 | 11,425 |
| Accrued liabilities | 2,754 | 1,578 |
| Total payables and deferred revenue with related parties | $166,502 | $22,464 |

Unbilled receivables represent the excess of revenues recognized over billings to date on sales or service contracts with related parties.

Deferred revenue represents the excess billings to date over the amount of revenue recognized to date on sales or service contracts with related parties.

Receivables from related parties and payables and deferred revenue with related parties are unsecured and settlement of these balances occurs in cash. No provision has been made related to the receivables from related parties.

F-40

*Revenues and Expenses from Related Parties*

The following table presents the related party transactions that are included the Company's condensed consolidated statements of operations and comprehensive loss for the periods indicated:

|  | Nine Months Ended June 30, | |
| --- | --- | --- |
|  | **2021** | **2020** |
| Revenues | $ 62,164 | $144,734 |
| Cost of goods and services | (15,755) | (6,596) |
| Research and development expenses | (103) | (486) |
| Sales and marketing expenses | (2,570) | (1,608) |
| General and administrative expenses | (670) | (920) |

In addition, the Company had purchases from related parties capitalized as assets of $684 thousand in "Property and equipment, net" on the Company's condensed consolidated balance sheets for the nine months ended June 2020. The amount purchased from related parties that was capitalized was insignificant for the nine months ended June 2021.

## 14. Employee Benefit Plan

The Company maintains a 401(k) plan covering all eligible U.S. payroll employees. The 401(k) plan provides that eligible employees may make contributions subject to IRS limitations. Under terms of the 401(k) plan, the Company matches an employee's contributions at a rate of 100% up to 5% of the employee's annual salary. For the nine months ended June 30, 2021, the Company contributed approximately $1,296 thousand (2020: $777 thousand) to the 401(k) plan.

## 15. Unit-Based Compensation

In October 2020, the Board of the Company approved an equity-based employee deferred compensation scheme. The plan authorizes the Company to issue unit options and phantom units. The Compensation Committee of the Company's Board of Directors determines the types of awards to be granted to individual participants as well as the terms and conditions of the awards. A summary of the unit-based awards granted during the nine months ended June 30, 2021 is presented below:

**Unit Options**

Unit options are granted with an exercise price equal to the fair value of the Company's units at the date of grant. Unit option awards vest with the satisfaction of the following two criteria: (1) a service requirement of three years and (2) the occurrence of a liquidity event, such as a change in control or an initial public offering.

The fair value of each option is estimated on the date of grant using a Black-Scholes option valuation model that uses the assumptions noted in the following table:

| | |
| --- | --- |
| Unit Price (reflects 10% discount for lack of marketability) | $32.56 |
| Volatility | 30% |
| Expected term | 6 years |
| Risk-free Rate | 1.14% |
| Exercise Price | $36.17 |

The expected volatility is based on the historical volatility of a selected group of guideline publicly traded entities over the most recent period corresponding to the expected life as of the grant date. The risk-free interest rate for periods during the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of valuation.

During the nine months ended June 2021, we granted 873,490 class A-1 unit options to certain employees and non-employees which contain both service and performance vesting conditions. All options granted vest upon the satisfaction of both a service and a performance condition, if both conditions are met within 10 years. The grant date fair value of these options was $8.91 per option. Unit option awards granted to foreign employees and non-employee directors in certain countries will require cash settlement. The awards which require cash settlement are considered liability awards. The remainder of the options include a contingent cash settlement option outside the control of the holder and as such are considered equity awards.

The following table presents information concerning the outstanding options granted by the Company:

| | Number (Units) | Weighted-Average Exercise Price (U.S. Dollars) | Aggregate Intrinsic Value (000s) | Weighted Average Estimated Useful Life (Years) |
|---|---|---|---|---|
| Outstanding – As of the inception of the Unit Option Plan | — | — | | — |
| Options granted | 873,490 | $36.17 | | 6 |
| Outstanding – As of June 30, 2021 | 873,490 | $36.17 | — | 6 |
| Exercisable as of June 30, 2021 | — | — | — | — |

As of June 30, 2021, the Company has approximately $7,783 thousand unrecognized compensation expense related to unit options, which would be recognized commencing with the period in which the performance condition is deemed probable of achievement.

**Phantom Units**

During the nine months ended June 30, 2021, we granted 177,150 class A-1 phantom units, respectively, to certain employees and non-employees. All units granted vest upon the satisfaction of a performance condition, if the condition is met before the awards' expiration date. The performance condition is satisfied upon the occurrence of a liquidity event, which is the earlier of either six months after the effective date of a registration statement for our IPO or a change in control. The grant date fair value of the phantom units was $32.56 per unit. Phantom units granted to foreign employees and non-employee directors in certain countries will require cash settlement. As such, the awards which require cash settlement are classified as liability awards. The remainder of the phantom units include a contingent cash settlement option outside the control of the holder and as such are classified as equity.

| | Number (Units) | Weighted-Average Exercise Price ( U.S. Dollars) | Aggregate Intrinsic Value (000s) | Weighted Average Estimated Useful Life ( Years) |
|---|---|---|---|---|
| Outstanding – As of the inception of the Phantom Unit Plan | — | — | | — |
| Units granted | 177,150 | — | | 2 |
| Outstanding – As of June 30, 2021 | 177,150 | — | 5,768 | 2 |
| Exercisable as of June 30, 2021 | — | — | | — |

As of June 30, 2021, the Company has approximately $5,768 thousand unrecognized compensation expense related to phantom units, which would be recognized commencing with the period in which the performance condition is deemed probable of achievement.

As of June 30, 2021, the Company determined that the achievement of the performance condition was not probable and therefore, there was no expense recognized for these unit options or phantom units for the period ended June 30, 2021.

**16.  Mezzanine Equity**

On December 27, 2020, the Company entered into a subscription agreement with Qatar Investment Authority for the issuance of 1,250,000 Class B units for a total value of $125,000 thousand. Following the

F-42

completion of the transaction on June 9, 2021, AES, Siemens, and QIA hold 3,960,000, 3,960,000, and 1,250,000 units, and 43.2%, 43.2%, and 13.6% of limited liability interests of the Company, respectively. Pursuant to the subscription agreement, QIA has certain rights that may allow it to cause the Company to repurchase the units at fair value for five years from the completion of the transaction under conditions outside of the control of the Company. QIA's redemption rights are contingent upon the Company not completing a qualified IPO within a specified time period. The Company does not consider QIA's investment probable of becoming redeemable as it is not probable that the company will not complete a qualified IPO by the end of the IPO notice period, which is defined as nine months after QIA provides notice. QIA cannot provide notice until after five years after the effective date of the subscription agreement. This investment was initially recognized at fair value, which approximated the amount of proceeds received, net of issuance costs. At June 30, 2021 the investment is recognized at the carrying value, rather than the redemption value.

**17. Collaborative Arrangement**

In 2021, the Company executed a development agreement with a service provider to design integrated energy storage systems. Under the agreement, the Company makes periodic payments for development activities that will be performed over a three-year period. After development completion, the parties will each hold a license to commercialize certain products developed under the arrangement in exchange for annual royalty payments to the other party. We recorded $3,597 thousand of expense related to this agreement within research and development expense for the nine months ended June 30, 2021.

**18. Subsequent Events**

The Company has evaluated subsequent events through September 3, 2021, which is the date that these condensed consolidated financial statements were available to be issued.

*Borrowing from Line of Credit*

On July 23, August 4, August 11 and August 26, 2021, the Company borrowed $6,000 thousand, $22,000 thousand, $20,000 thousand, and $2,000 thousand, respectively, from its line of credit, to fund its working capital needs.

*Borrowings from Related Parties*

On August 11, 2021, the Company borrowed $25,000 thousand and $25,000 thousand from AES and Siemens, respectively, in the form of subordinated promissory notes, each bearing an annual interest at 2.86%. Each note has a maturity date within a year of its issuance.

F-43



Transforming the way we power our world.

**31,000,000 SHARES**



# Fluence Energy, Inc.

**CLASS A COMMON STOCK**

---

**PROSPECTUS**

---

*(Lead bookrunners listed in alphabetical order by row)*

| | | |
|---|---|---|
| **J.P. Morgan** | | **Morgan Stanley** |
| **Barclays** | | **BofA Securities** |
| **Citigroup** | **Credit Suisse** | **UBS Investment Bank** |
| **Evercore ISI** | **HSBC** | **RBC Capital Markets** |

*Co-Managers*

| | | |
|---|---|---|
| **Nomura** | **Baird** | **Raymond James** |
| **Seaport Global Securities** | **Penserra Securities LLC** | **Siebert Williams Shank** |

---

**, 2021**

**PART II**

**INFORMATION NOT REQUIRED IN THE PROSPECTUS**

*Item 13.   Other expenses of issuance and distribution.*

The following table sets forth all fees and expenses, other than the underwriting discount payable solely by Fluence Energy, Inc. in connection with the offer and sale of the securities being registered. All amounts shown are estimated except for the SEC registration fee, the Financial Industry Regulatory Authority, or FINRA, filing fee and the Nasdaq listing fee.

| | |
|---|---:|
| SEC registration fee | $    79,314 |
| FINRA filing fee | 128,340 |
| Nasdaq listing fee | 250,000 |
| Printing and engraving expenses | 300,000 |
| Legal fees and expenses | 3,000,000 |
| Accounting fees and expenses | 5,700,000 |
| Miscellaneous fees and expenses | 542,346 |
| Total | $10,000,000 |

*Item 14.   Indemnification of directors and officers.*

Section 102(b)(7) of the General Corporation Law of the State of Delaware permits a corporation to eliminate the personal liability of directors of a corporation to the corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director, except where the director breached his duty of loyalty, failed to act in good faith, engaged in intentional misconduct or knowingly violated a law, authorized the payment of a dividend or approved a stock repurchase or redemption in violation of Delaware corporate law or obtained an improper personal benefit. Our amended and restated certificate of incorporation provides that no director of Fluence Energy, Inc. shall be personally liable to it or its stockholders for monetary damages for any breach of fiduciary duty as a director, notwithstanding any provision of law imposing such liability, except to the extent that the General Corporation Law of the State of Delaware prohibits the elimination or limitation of liability of directors for breaches of fiduciary duty.

Section 145 of the General Corporation Law of the State of Delaware provides that a corporation has the power to indemnify a director, officer, employee, or agent of the corporation, or a person serving at the request of the corporation for another corporation, partnership, joint venture, trust or other enterprise in related capacities against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with an action, suit or proceeding to which he was or is a party or is threatened to be made a party to any threatened, ending or completed action, suit or proceeding by reason of such position, if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, in any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful, except that, in the case of actions brought by or in the right of the corporation, no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or other adjudicating court determines that, despite the adjudication of liability but in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Upon consummation of the Transactions, our amended and restated certificate of incorporation and amended and restated bylaws will provide indemnification for our directors and officers to the fullest extent permitted by the General Corporation Law of the State of Delaware. We will indemnify each person who was or is a party or threatened to be made a party to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of us) by reason of the fact that he or she is or was, or has agreed to become, a director or officer, or is or was serving, or has agreed to serve, at our request as a

II-1

director, officer, partner, employee or trustee of, or in a similar capacity with, another corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to as an "Indemnitee"), or by reason of any action alleged to have been taken or omitted in such capacity, against all expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit, or proceeding and any appeal therefrom, if such Indemnitee acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, our best interests, and, with respect to any criminal action or proceeding, he or she had no reasonable cause to believe his or her conduct was unlawful. Our amended and restated certificate of incorporation and amended and restated bylaws will provide that we will indemnify any Indemnitee who was or is a party to an action or suit by or in the right of us to procure a judgment in our favor by reason of the fact that the Indemnitee is or was, or has agreed to become, a director or officer, or is or was serving, or has agreed to serve, at our request as a director, officer, partner, employee or trustee of, or in a similar capacity with, another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action alleged to have been taken or omitted in such capacity, against all expenses (including attorneys' fees) and, to the extent permitted by law, amounts paid in settlement actually and reasonably incurred in connection with such action, suit, or proceeding, and any appeal therefrom, if the Indemnitee acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, our best interests, except that no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to us, unless a court determines that, despite such adjudication but in view of all of the circumstances, he or she is entitled to indemnification of such expenses. Notwithstanding the foregoing, to the extent that any Indemnitee has been successful, on the merits or otherwise, he or she will be indemnified by us against all expenses (including attorneys' fees) actually and reasonably incurred in connection therewith. Expenses must be advanced to an Indemnitee under certain circumstances.

Prior to the consummation of this offering, we intend to enter into separate indemnification agreements with each of our directors and executive officers. Each indemnification agreement will provide, among other things, for indemnification to the fullest extent permitted by law against any and all expenses, judgments, fines, penalties, and amounts paid in settlement of any claim. The indemnification agreements will provide for the advancement or payment of all expenses to the indemnitee and for the reimbursement to us if it is found that such indemnitee is not entitled to such indemnification under applicable law and our amended and restated certificate of incorporation and amended and restated bylaws.

We maintain a general liability insurance policy that covers certain liabilities of directors and officers of our corporation arising out of claims based on acts or omissions in their capacities as directors or officers.

In any underwriting agreement we enter into in connection with the sale of Class A common stock being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act, against certain liabilities.

### Item 15.    Recent sales of unregistered securities.

The following sets forth information regarding securities sold or issued by the predecessors to the registrant in the three years preceding the date of this registration statement. No underwriters were involved in these sales. There was no general solicitation of investors or advertising, and we did not pay or give, directly or indirectly, any commission or other remuneration, in connection with the offering of these shares. In each of the transactions described below, the recipients of the securities represented their intention to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof, and appropriate legends were affixed to the securities issued in these transactions.

(a)   On June 21, 2021, Fluence Energy, Inc. agreed to issue 100 shares of common stock, par value $0.01 per share, which will be redeemed upon the consummation of the Transactions, to an officer of the Company in exchange for $1.00. The issuance was exempt from registration under Section 4(a)(2) of the Securities Act, as a transaction by an issuer not involving any public offering.

(b)   On April 2, 2021, Fluence Energy, LLC granted to Manuel Perez Dubuc options to purchase 1,011,952 aggregate shares of common stock at an exercise price of $2.45 per share under the Unit Option Plan and phantom units in the amount of 306,248 with a strike price of $0.00 per unit. However, in September

II-2

2021, the Company and Mr. Dubuc mutually agreed that Mr. Dubuc would relinquish his phantom units awarded on April 2, 2021, in connection with the compensation review in anticipation of this offering.

(c)   On December 27, 2020, the Company entered into a subscription agreement with QIA Florence Holdings LLC for the issuance of 1,250,000 Class B units for a total value of $125,000,000.

The offers, sales and issuances of the securities described above were deemed to be exempt from registration in reliance upon Section 4(a)(2) of the Securities Act or Rule 701 promulgated under Section 3(b) of the Securities Act as transactions between an issuer not involving any public offering within the meaning of Section 4(a)(2) of the Securities Act or pursuant to benefit plans and contracts relating to compensation as provided under Rule 701. The recipients in each of these transactions acquired the securities for investment only and not with a view to or for sale in connection with any distribution thereof.

***Item 16.   Exhibits and financial statements.***

(a)   Exhibits

The following documents are filed as exhibits to this registration statement.

| Exhibit No. | |
| --- | --- |
| 1.1 | Form of Underwriting Agreement. |
| 3.1* | Certificate of Incorporation of Fluence Energy, Inc., as in effect prior to the consummation of the Transactions. |
| 3.2 | Form of Amended and Restated Certificate of Incorporation of Fluence Energy, Inc., to be in effect upon the consummation of the Transactions. |
| 3.3* | Bylaws of Fluence Energy, Inc., as in effect prior to the consummation of the Transactions. |
| 3.4 | Form of Amended and Restated Bylaws of Fluence Energy, Inc. to be in effect upon the consummation of the Transactions. |
| 4.1 | Specimen Stock Certificate evidencing the shares of Class A common stock. |
| 5.1 | Opinion of Latham & Watkins LLP. |
| 10.1 | Form of Tax Receivable Agreement, to be effective upon the consummation of the Transactions. |
| 10.2 | Form of Third Amended and Restated LLC Agreement of Fluence Energy, LLC, to be effective upon the consummation of the Transactions. |
| 10.3 | Form of Stockholders Agreement, to be effective upon the consummation of the Transactions. |
| 10.4 | Form of Registration Rights Agreement, to be effective upon the consummation of the Transactions. |
| 10.5 | 2021 Incentive Award Plan. |
| 10.6.1 | Form of Restricted Stock Unit Award Agreement (Employee) |
| 10.6.2 | Form of Restricted Stock Unit Award Agreement (Director) |
| 10.7* | 2020 Unit Option Plan and Form Unit Option Award Agreement thereunder |
| 10.8* | Phantom Equity Incentive Plan and Form Phantom Unit Award Agreement thereunder |
| 10.9* | Phantom Cancellation Letter, dated September 23, 2021, with Manuel Perez Dubuc |
| 10.10* | Offer Letter, dated October 27, 2017, with Dennis Fehr |
| 10.11* | Offer Letter, dated May 12, 2021, with Rebecca Boll |
| 10.12 | Non-Employee Independent Director Compensation Policy |
| 10.13 | Form of Indemnification Agreement |
| 10.14 | Form of Revolving Credit Agreement, by and among Fluence Energy, LLC, as the borrower, Fluence Energy, Inc., as a parent guarantor, the subsidiary guarantors party thereto, the lenders party thereto and JP Morgan Chase Bank, N.A., as administrative agent and collateral agent, to be effective upon consummation of the Transactions. |
| 10.15* | Amended and Restated Credit Support and Reimbursement Agreement, dated June 9, 2021, by and among Fluence Energy, LLC, The AES Corporation and Siemens Industry, Inc. |
| 10.16* | Assignment of Rights, dated April 6, 2021, by and among Siemens Aktiengesellschaft and Fluence Energy, LLC. |

II-3

| Exhibit No. | |
| --- | --- |
| 10.17 | Amended and Restated Siemens License Agreement, dated June 9, 2021, by and among Fluence Energy, LLC and Siemens Aktiengesellschaft. |
| 10.18 | Amended and Restated Siemens Industry License Agreement, dated June 9, 2021 by and among and Siemens Industry, Inc. and Fluence Energy, LLC. |
| 10.19 | Intellectual Property Assignment, dated September 9, 2021, amongst the AES Corporation and Fluence Energy, LLC. |
| 10.20 | License Agreement, dated September 9, 2021, by and between Fluence Energy, LLC and The AES Corporation. |
| 10.21 | Form of Amended and Restated Equipment and Services Purchase Agreement, by and among Siemens Industry, Inc. and Fluence Energy, LLC, to be effective upon consummation of the Transactions. |
| 10.22 | Form of Amended and Restated Storage Core Frame Purchase Agreement, by and among AES Grid Stability, LLC and Fluence Energy, LLC, to be effective upon consummation of the Transactions. |
| 10.23 | Form of Amended and Restated Storage Core Frame Purchase Agreement, by and among Siemens Industry, Inc. and Fluence Energy, LLC, to be effective upon consummation of the Transactions. |
| 10.24 | Form of Amended and Restated Trademark Agreement, by and among Fluence Energy, LLC and AES Grid Stability, LLC, to be effective upon consummation of the Transactions. |
| 10.25 | Form of Amended and Restated Trademark Agreement, by and among Fluence Energy, LLC and Siemens Industry, Inc., to be effective upon consummation of the Transactions. |
| 10.26 | Form of Amended and Restated Master Sales Cooperation Agreement, by and among Fluence Energy, LLC and Siemens Industry, Inc., to be effective upon consummation of the Transactions. |
| 10.27 | Form of Amended and Restated AES Cooperation Agreement, by and among Fluence Energy, LLC and AES Grid Stability, LLC, to be effective upon consummation of the Transactions. |
| 10.28* | Promissory Note, dated August 11, 2021, issued to Siemens Industry, Inc. |
| 10.29* | Promissory Note, dated August 11, 2021, issued to AES Grid Stability, LLC. |
| 10.30 | Global Paying Services Agreement between Fluence Energy, LLC as the borrower, and Citibank, N.A. |
| 21.1* | List of Subsidiaries of Fluence Energy, Inc. |
| 23.1 | Consent of Ernst & Young LLP, as to Fluence Energy, LLC. |
| 23.2 | Consent of Latham & Watkins LLP (contained in its opinion filed as Exhibit 5.1 hereto). |
| 24.1* | Power of Attorney (included on signature page). |
| 99.1 | Consent of Cynthia Arnold. |
| 99.2 | Consent of Herman Bulls. |
| 99.3 | Consent of Harald von Heynitz. |
| 99.4 | Consent of Elizabeth Fessenden. |

\*    Previously filed

*Item 17.    Undertakings.*

(a)    The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

(b)    Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of Fluence Energy, Inc. pursuant to the foregoing provisions, or otherwise, Fluence Energy, Inc. has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by Fluence Energy, Inc. of

II-4

expenses incurred or paid by a director, officer or controlling person of Fluence Energy, Inc. in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, Fluence Energy, Inc. will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction, the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(c)  The undersigned registrant hereby further undertakes that:

(1)  For purposes of determining any liability under the Securities Act the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by Fluence Energy, Inc. pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)  For the purpose of determining any liability under the Securities Act each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

II-5

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, Fluence Energy, Inc. has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the city of Arlington, state of Virginia, on this 19th day of October, 2021.

Fluence Energy, Inc.

By:    /s/ Manuel Perez Dubuc
       Manuel Perez Dubuc
       *Chief Executive Officer*

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement on Form S-1 has been signed by the following persons in the capacities set forth opposite their names and on the date indicated above.

| Signature | Title | Date |
|---|---|---|
| /s/ Manuel Perez Dubuc<br>Manuel Perez Dubuc | Chief Executive Officer and Director (Principal Executive Officer) | October 19, 2021 |
| /s/ Dennis Fehr<br>Dennis Fehr | Chief Financial Officer (Principal Financial Officer) | October 19, 2021 |
| /s/ Amrita Chatterjee<br>Amrita Chatterjee | Corporate Controller (Principal Accounting Officer) | October 19, 2021 |
| *<br>Julian Nebreda | Director | October 19, 2021 |
| *<br>Lisa Krueger | Director | October 19, 2021 |
| *<br>Barbara Humpton | Director | October 19, 2021 |
| *<br>Emma Falck | Director | October 19, 2021 |
| *<br>Axel Meier | Director | October 19, 2021 |
| *<br>Chris Shelton | Director | October 19, 2021 |
| *<br>Simon Smith | Director | October 19, 2021 |

*By: /s/ Francis A. Fuselier
       Francis A. Fuselier
       Attorney-in-Fact

II-6

**[●] Shares**

**FLUENCE ENERGY, INC.**

**CLASS A COMMON STOCK, PAR VALUE $0.00001 PER SHARE**

**UNDERWRITING AGREEMENT**

**[●], 2021**

[●], 2021

J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC
As Representatives of the several Underwriters named in Schedule I hereto

c/o J.P. Morgan Securities LLC
   383 Madison Avenue
   New York, New York 10179

c/o Morgan Stanley & Co. LLC
   1585 Broadway
   New York, New York 10036

Ladies and Gentlemen:

Fluence Energy Inc., a Delaware corporation (the "**Company**"), proposes to issue and sell to the several Underwriters named in Schedule I hereto (the "**Underwriters**"), an aggregate of **[●]** shares of its Class A common stock, par value $0.00001 per share (the "**Firm Shares**").

The Company also proposes to issue and sell to the several Underwriters not more than an additional [●] shares of its Class A common stock, par value $0.00001 per share (the "**Additional Shares**"), if and to the extent that J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, as representatives of the several Underwriters (the "**Representatives**"), shall have determined to exercise, on behalf of the Underwriters, the right to purchase such Additional Shares granted to the Underwriters in Section 2 hereof. The Firm Shares and the Additional Shares are hereinafter collectively referred to as the "**Shares.**" The shares of Class A common stock, par value $0.00001 per share, of the Company to be outstanding after giving effect to the sales contemplated hereby are hereinafter referred to as the "**Common Stock**." The Company is a newly formed Delaware corporation and, upon consummation of the offering, will be a holding company and the sole managing member of Fluence Energy LLC, a Delaware limited liability company (the "**Predecessor**"), as a result of the Transactions (as defined in the Time of Sale Prospectus and the Prospectus). For the purposes of Section 1 hereof, all references to the Company shall also refer to the Predecessor prior to the Transactions.

The Company has filed with the Securities and Exchange Commission (the "**Commission**") a registration statement on Form S-1 (File No. 333-259839) including a preliminary prospectus, relating to the Shares. The registration statement as amended at the time it becomes effective, including the information (if any) deemed to be part of the registration statement at the time of effectiveness pursuant to Rule 430A under the Securities Act of 1933, as amended (the "**Securities Act**"), is hereinafter referred to as the "**Registration Statement**"; the prospectus in the form first used to confirm sales of Shares (or in the form first made available to the Underwriters by the Company to meet requests of purchasers pursuant to Rule 173 under the Securities Act) is hereinafter referred to as the "**Prospectus**." If the Company has filed an abbreviated registration statement to register additional shares of Common Stock pursuant to Rule 462(b) under the Securities Act (a "**Rule 462 Registration Statement**"), then any reference herein to the term "**Registration Statement**" shall be deemed to include such Rule 462 Registration Statement.

For purposes of this Underwriting Agreement (this "**Agreement**"), "**free writing prospectus**" has the meaning set forth in Rule 405 under the Securities Act, "**preliminary prospectus**" shall mean each prospectus used prior to the effectiveness of the Registration Statement, and each prospectus that omitted information pursuant to Rule 430A under the Securities Act that was used after such effectiveness and prior to the execution and delivery of this Agreement, "**Time of Sale Prospectus**" means the preliminary prospectus contained in the Registration Statement at the time of its effectiveness together with the documents and pricing information set forth in Schedule II hereto, and "**broadly available road show**" means a "bona fide electronic road show" as defined in Rule 433(h)(5) under the Securities Act that has been made available without restriction to any person. For purposes of this Agreement, (a) except where otherwise expressly provided, the term "**affiliate**" has the meaning set forth in Rule 405 under the Securities Act; (b) the term "**business day**" means any day other than a day on which banks are permitted or required to be closed in New York City; and (c) the term "**subsidiary**" has the meaning set forth in Rule 405 under the Securities Act. As used herein, the terms "Registration Statement," "preliminary prospectus," "Time of Sale Prospectus" and "Prospectus" shall include the documents, if any, incorporated by reference therein as of the date hereof.

Morgan Stanley & Co. LLC has agreed to reserve a portion of the Shares to be purchased by it under this Agreement for sale to the Company's directors, officers, employees, business associates and related persons of the Company (collectively, "**Participants**"), as set forth in each of the Time of Sale Prospectus and the Prospectus under the heading "Underwriters" (the "**Directed Share Program**"). The Shares to be sold by Morgan Stanley & Co. LLC and its affiliates pursuant to the Directed Share Program, at the direction of the Company, are referred to hereinafter as the "**Directed Shares**". Any Directed Shares not orally confirmed for purchase by any Participant by the end of the business day on which this Agreement is executed will be offered to the public by the Underwriters as set forth in the Prospectus.

1.    *Representations and Warranties of the Company*. The Company represents and warrants to and agrees with each of the Underwriters that:

(a)    The Registration Statement has become effective; no stop order suspending the effectiveness of the Registration Statement is in effect, and no proceedings for such purpose or pursuant to Section 8A under the Securities Act are pending before or, to the knowledge of the Company, threatened by the Commission. No order preventing or suspending the use of any preliminary prospectus or any free writing prospectus has been issued by the Commission.

2

(b)      (i) The Registration Statement, when it became effective, did not contain and, as amended or supplemented, if applicable, as of the date of such amendment or supplement, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Registration Statement, the Time of Sale Prospectus and the Prospectus comply and, as amended or supplemented, if applicable, will as of the date of such amendment or supplement, comply in all material respects with the Securities Act and the applicable rules and regulations of the Commission thereunder, (iii) the Time of Sale Prospectus does not, and at the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers and at the Closing Date (as defined in Section 4), the Time of Sale Prospectus, as then amended or supplemented by the Company, if applicable, will not contain, as of the date of such amendment or supplement, any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, (iv) each broadly available road show, if any, when considered together with the Time of Sale Prospectus, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (v) the Prospectus, as of its date, does not contain and, as amended or supplemented, if applicable, will not contain, as of the date of such amendment or supplement and as of the Closing Date and any Option Closing Date (as defined in Section 2), any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, except that the representations and warranties set forth in this paragraph do not apply to statements or omissions in the Registration Statement, the Time of Sale Prospectus or the Prospectus based upon information relating to any Underwriter furnished to the Company in writing by or on behalf of any such Underwriter through the Representatives expressly for use therein.

(c)      The Company is not an "ineligible issuer" in connection with the offering pursuant to Rules 164, 405 and 433 under the Securities Act. Any free writing prospectus that the Company is required to file pursuant to Rule 433(d) under the Securities Act has been, or will be, filed with the Commission in accordance with the requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder. Each free writing prospectus, if any, that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act or that was prepared by or on behalf of or used or referred to by the Company complies or, if filed after the effective time of this Agreement, will comply as of the date of such filing in all material respects with the applicable requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder. Except for the free writing prospectuses, if any, identified in Schedule II hereto, and electronic road shows, if any, each furnished to the Representatives before first use, the Company has not prepared, used or referred to, and will not, without the Representatives' prior consent, prepare, use or refer to, any free writing prospectus.

(d)      The Company has been duly incorporated, is validly existing as a corporation in good standing under the laws of the jurisdiction of its incorporation, has the corporate power and authority to own or lease its property and to conduct its business as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and is duly qualified to transact business and is in good standing (to the extent the concept of good standing is applicable in such jurisdiction) in each jurisdiction in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (to the extent the concept of good standing is applicable in such jurisdiction) would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(e)    Each subsidiary of the Company has been duly incorporated, organized or formed, is validly existing as a corporation or other business entity in good standing under the laws of the jurisdiction of its incorporation (to the extent the concept of good standing is applicable in such jurisdiction), organization or formation, has the corporate or other business entity power and authority to own or lease its property and to conduct its business as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and is duly qualified to transact business and is in good standing in each jurisdiction (to the extent the concept of good standing is applicable in such jurisdiction) in which the conduct of its business or its ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (to the extent the concept of good standing is applicable in such jurisdiction) would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole; all of the issued shares of capital stock or other equity interests of each subsidiary of the Company have been duly and validly authorized and issued (to the extent such concepts are applicable in such jurisdictions), are fully paid and non-assessable and are owned directly or indirectly by the Company, free and clear of all liens, encumbrances, equities or claims, except for any such liens, encumbrances, equity or claims (i) that would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries taken as a whole or (ii) pursuant to any credit facility of the Company or its subsidiaries described in Registration Statement, the Time of Sale Prospectus and the Prospectus.

(f)    This Agreement has been duly authorized, executed and delivered by the Company.

(g)    The authorized capital stock of the Company conforms as to legal matters, in all material respects, to the description thereof contained in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus.

(h)    The shares of Common Stock outstanding prior to the issuance of the Shares to be sold by the Company have been duly authorized and are validly issued, fully paid and non-assessable.

(i)    The Shares to be sold by the Company have been duly authorized and, when issued, delivered and paid for in accordance with the terms of this Agreement, will be duly and validly issued and fully paid and non-assessable, and the issuance of the Shares will not be subject to any preemptive or similar rights that have not been validly waived.

(j)    The execution and delivery by the Company of, and the performance by the Company of its obligations under, this Agreement will not contravene any provision of (i) applicable law, (ii) the certificate of incorporation and bylaws of the Company, (iii) any agreement or other instrument binding upon the Company or any of its subsidiaries that is material to the Company and its subsidiaries, taken as a whole, or to which any of the property or assets of the Company or any of its subsidiaries is subject, or (iv) any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Company or any subsidiary, except, in the case of clauses (i), (iii) and (iv), as would not, singly or in the aggregate, reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, or adversely affect the ability of the Company to perform its obligations under this Agreement and no consent, approval, authorization or order of, or qualification with, any governmental body, agency or court is required for the performance by the Company of its obligations under this Agreement, except such as have been obtained or waived, or may be required by the securities or Blue Sky laws of the various states or foreign jurisdictions or the rules and regulations of the Financial Industry Regulatory Authority ("**FINRA**") in connection with the offer and sale of the Shares.

4

(k)    There has not occurred any material adverse change, or any development involving a prospective material adverse change, in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Time of Sale Prospectus.

(l)    There are no legal or governmental proceedings pending or, to the knowledge of the Company, threatened to which the Company or any of its subsidiaries is a party or to which any of the properties of the Company or any of its subsidiaries is subject (A) other than (i) proceedings accurately described in all material respects in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and (ii) proceedings that would not reasonably be expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole, or on the power or ability of the Company to perform its obligations under this Agreement or to consummate the transactions contemplated by each of the Registration Statement, the Time of Sale Prospectus and the Prospectus or (B) that are required to be described in the Registration Statement, the Time of Sale Prospectus or the Prospectus and are not so described in all material respects; and there are no statutes, regulations, contracts or other documents to which the Company or any of its subsidiaries is subject or by which the Company or any of its subsidiaries is bound that are required to be described in the Registration Statement, the Time of Sale Prospectus or the Prospectus or to be filed as exhibits to the Registration Statement that are not described in all material respects or filed as required.

(m)    Each preliminary prospectus filed as part of the Registration Statement as originally filed or as part of any amendment thereto, or filed pursuant to Rule 424 under the Securities Act, complied when so filed in all material respects with the applicable requirements of the Securities Act and the applicable rules and regulations of the Commission thereunder.

(n)    The Company is not, and immediately after giving effect to the offering and sale of the Shares and the application of the proceeds thereof as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(o)    The Company and each of its subsidiaries (i) are in compliance with all applicable foreign, federal, state and local laws and regulations relating to climate change, to the protection of human health and safety, the environment or natural resources, or to hazardous or toxic substances or wastes, pollutants or contaminants ("**Environmental Laws**"), (ii) have received and maintained all permits, licenses or other approvals required of them under applicable Environmental Laws necessary to conduct their respective businesses as presently conducted and (iii) are in compliance with all terms and conditions of any such permit, license or approval, except where such noncompliance with Environmental Laws, failure to receive and maintain required permits, licenses or other approvals or failure to comply with the terms and conditions of such permits, licenses or approvals would not, singly or in the aggregate, be reasonably expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(p)    (i) There are no costs, obligations or liabilities associated with Environmental Laws (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with Environmental Laws or any permit, license or approval, any related constraints on operating activities and any potential liabilities to third parties), or any obligations to combat, respond to or mitigate the effects of climate change which would, singly or in the aggregate, be reasonably expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole and (ii) neither the Company nor any of its subsidiaries is aware of any pending or threatened notice, claim, proceeding or investigation which would be reasonably expected lead to liability under Environmental Laws, except where the potential liability or obligation would not, individually or in the aggregate, be reasonably expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, except where the potential liability or obligation would not, individually or in the aggregate, be reasonably expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, or result in monetary sanctions in excess of $300,000.

(q)    Except as described in the Registration Statement, the Time of Sale Prospectus and the Prospectus, or validly waived or complied with in connection with the sale of the Shares contemplated hereby, there are no contracts, agreements or understandings between the Company and any person granting such person the right to require the Company to file a registration statement under the Securities Act with respect to any securities of the Company or to require the Company to include such securities with the Shares registered pursuant to the Registration Statement.

(r)    (i) None of the Company or any of its subsidiaries or affiliates, or any director or officer thereof, or, to the Company's knowledge, any employee, agent or representative of the Company or of any of its subsidiaries or affiliates, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment, giving or receipt of money, property, gifts or anything else of value, directly or indirectly, to any government official (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) ("**Government Official**") in order to unlawfully influence official action, or to any person in violation of any applicable anti-corruption laws; (ii) the Company and each of its subsidiaries and affiliates have conducted their businesses in compliance with applicable anti-corruption laws and have instituted and maintained and will continue to maintain policies and procedures reasonably designed to promote and achieve compliance with such laws and with the representations and warranties contained herein; and (iii) neither the Company nor any of its subsidiaries will use, directly or indirectly, the proceeds of the offering in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of any applicable anti-corruption laws.

(s)    The operations of the Company and each of its subsidiaries are and have been conducted at all times in material compliance with all applicable financial recordkeeping and reporting requirements, including those of the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), and the applicable anti-money laundering statutes of jurisdictions where the Company and each of its subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(t)    (i)    None of the Company, any of its subsidiaries, or any director or officer thereof, or, to the Company's knowledge, any employee, agent, affiliate or representative of the Company or any of its subsidiaries, is an individual or entity ("**Person**") that is, or is owned or controlled by one or more Persons that are:

(A)    the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), or

(B)    located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, Crimea, Cuba, Iran, North Korea and Syria).

(ii)    The Company will not, directly or indirectly, use the proceeds of the offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(A)    to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions; or

(B)    in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the offering, whether as underwriter, advisor, investor or otherwise).

(iii)    The Company and each of its subsidiaries have not knowingly engaged in, are not now knowingly engaged in, and will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.

(u)      Subsequent to the respective dates as of which information is given in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, (i) the Company and its subsidiaries, taken as a whole, have not incurred any material liability or obligation, direct or contingent, nor entered into any material transaction; (ii) the Company has not purchased any of its outstanding capital stock, other than from employees or other service providers in connection with such person's termination of service from the Company or its subsidiaries pursuant to the existing terms of the agreements or equity compensation plans described in the Time of Sale Prospectus or in exercise of the Company's right of first refusal upon a proposed transfer, nor declared, paid or otherwise made any dividend or distribution of any kind on its capital stock other than ordinary and customary dividends; and (iii) there has not been any material change in the capital stock (other than the exercise, settlement or conversion of equity awards, warrants or convertible notes or loans or grants of equity awards or forfeiture of equity awards outstanding as of such respective dates as of which information is given in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, in each case granted pursuant to the equity compensation plans described in the Time of Sale Prospectus), short-term debt or long-term debt of the Company and its subsidiaries, taken as a whole, except in each case as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus.

(v)      The Company and each of its subsidiaries do not own any real property and have good and marketable title to all personal property owned by them (excluding intellectual property, which is addressed exclusively in Section 1(w)) which is material to the business of the Company and its subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in the Time of Sale Prospectus or such as do not materially interfere with the use made and proposed to be made of such property by the Company and its subsidiaries; and any real property and buildings held under lease by the Company and its subsidiaries are held by them under valid, subsisting and, to the Company's knowledge, enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its subsidiaries.

(w)      Except as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus or except as would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries taken as a whole, (i) the Company or one of its subsidiaries is the sole and exclusive owner of all right, title and interest in and to all patents, inventions, copyrights, know how, trade secrets, confidential information, trademarks, service marks, trade names, Internet domain names, and all other worldwide intellectual property and proprietary rights (including all registrations and applications for registration of, and all goodwill associated with, any of the foregoing) (collectively, "**Intellectual Property Rights**") that are owned or purported to be owned by the Company and its subsidiaries; (ii) the Company and its subsidiaries have the right to use all other Intellectual Property Rights used in the conduct of their respective businesses as now conducted by them; (iii) the Intellectual Property Rights owned by the Company and its subsidiaries and, to the Company's knowledge, the Intellectual Property Rights exclusively licensed to the Company and its subsidiaries, are valid, subsisting and enforceable, and there is no pending or, to the Company's knowledge, threatened action, suit, proceeding or claim by others challenging the ownership, validity, scope or enforceability of any Intellectual Property Rights owned or used by the Company or any of its subsidiaries; (iv) neither the Company nor any of its subsidiaries has received any written notice alleging any infringement, misappropriation or other violation of Intellectual Property Rights of any Person by the Company or any of its subsidiaries; (v) to the Company's knowledge, no Person is infringing, misappropriating or otherwise violating, or has, in the past three (3) years, infringed, misappropriated or otherwise violated, any Intellectual Property Rights owned or used by the Company or any of its subsidiaries; (vi) to the Company's knowledge, neither the Company nor any of its subsidiaries, nor the conduct and operation of the businesses of the Company and its subsidiaries, as conducted in the past three (3) years, is infringing, misappropriating or violating or has infringed, misappropriated or violated or any Intellectual Property Rights of any Person; (vii) the Company and its subsidiaries use and have used, commercially reasonable efforts to appropriately maintain the confidentiality of the know how, trade secrets and other confidential information of the Company and its subsidiaries the value of which to the Company or any of its subsidiaries is contingent upon maintaining the confidentiality thereof, and, to the Company's knowledge, no such know how, trade secrets, or confidential information have been disclosed other than to Persons bound by confidentiality obligations restricting the disclosure and use of such Intellectual Property Rights; and (viii) neither the Company nor any of its subsidiaries is a party to any source code escrow contract (or a party to any contract obligating such Person to enter into a source code escrow contract or other contract) requiring the deposit of any source code or related materials for any software owned or purported to be owned by the Company or any of its subsidiaries, in each case, which requires the release or disclosure of any source code or related materials to any Person in connection with the consummation of the Transactions.

8

(x)    Except as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus or except as would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, (i) to the extent that the Company and its subsidiaries use, or have used, in any of the products or services of the Company or any of its subsidiaries, any software or other materials distributed under a "free," "open source," or similar licensing model ("**Open Source Software**"), such use is and has been in compliance with all license terms applicable to such Open Source Software; and (ii) neither the Company nor any of its subsidiaries uses, incorporates or distributes or has used, incorporated or distributed any Open Source Software in connection with any products or services of the Company or any of its subsidiaries in any manner that requires or has required (A) the Company or any of its subsidiaries to permit reverse engineering of any software code or other technology owned or purported to be owned by the Company or any of its subsidiaries or (B) any software code or other technology owned or purported to be owned by the Company or any of its subsidiaries to be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works or (3) redistributed at no charge.

(y)    Except as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus or except as would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, for the past three (3) years (i) the Company and each of its subsidiaries have been and are presently in compliance in all material respects with all of the Company's and each of its subsidiaries external written privacy policies, contractual obligations and applicable laws, statutes, judgments, orders, rules, and regulations of any court or arbitrator or other governmental or regulatory authority, in each case, relating to the collection, use, transfer, import, export, storage, protection, disposal and disclosure by the Company or any of its subsidiaries of information defined as "personal information", "personal data" or any equivalent term by applicable data privacy laws ("**Data Security Obligations**," and such data and information, "**Personal Data**"); (ii) the Company and its subsidiaries have not received any written notification of or written complaint regarding non-compliance with any Data Security Obligation by the Company or any of its subsidiaries; and (iii) the Company has not received written notice of any action, suit or proceeding by or before any court or governmental agency, authority or body pending or, to the Company's knowledge, threatened alleging non-compliance with any Data Security Obligation by the Company or any of its subsidiaries.

<div align="center">9</div>

(z)    Except as described in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus and except as would not reasonably be expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, (i) the Company and its subsidiaries own or have a valid right to access and use pursuant to a written agreement, each of their respective information technology assets and equipment, computers, systems, networks, hardware, software, websites, and applications owned or controlled by the Company and its subsidiaries and used in the conduct of their businesses as currently conducted by them ("**IT Systems**") (A) operate and perform in all material respects as reasonably required in connection with the operation of the business of the Company and its subsidiaries as currently conducted and (B) do not, to the Company's knowledge, contain any viruses, worms, trojan horses, bugs, faults or other devices, errors, contaminants or effects that: (x) materially disrupt or adversely affect the functionality of the IT Systems, or (y) enable or assist any Person to access without authorization the IT Systems or Personal Data; (ii) the Company and each of its subsidiaries have (A) established and maintain commercially reasonable technical and organizational measures designed to protect the material IT Systems, as well as Personal Data, and have established and maintain, commercially reasonable information technology, information security, cyber security and data protection controls, policies and procedures, including oversight, access controls, encryption, technological and physical safeguards and business continuity/disaster recovery and security plans that are designed to protect against and prevent any material breach or unauthorized, access, disablement, or other material compromise or misuse of the IT Systems or the material destruction, loss, unauthorized distribution, use, misappropriation or modification of any Personal Data ("**Breach**") and (B) taken commercially reasonable steps to ensure that any third party with access to or otherwise processing Personal Data on behalf of the Company or any of its subsidiaries has implemented and maintained appropriate safeguards; (iii) to the Company's knowledge, there has been no such Breach, and the Company and its subsidiaries have not been notified of and have no knowledge of any event or condition that would reasonably be expected to result in any such Breach; and (iv) the Company and its subsidiaries have not provided or been legally required to provide any notices to any Person in connection with a disclosure of Personal Data.

(aa)    No material labor dispute with the employees of the Company or any of its subsidiaries exists or, to the knowledge of the Company, is imminent; and the Company is not aware of any existing, threatened or imminent labor disturbance by the employees of any of its principal suppliers, manufacturers or contractors that would reasonably be expected have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(bb)    The Company and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as, in the Company's reasonable judgement, are customary in the businesses in which they are engaged; neither the Company nor any of its subsidiaries has been refused any insurance coverage sought or applied for; and neither the Company nor any of its subsidiaries has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(cc)        The Company and each of its subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses as presently conducted, except where the failure to obtain such certificates, authorizations or permits would not, singly or in the aggregate, be reasonably expected to have a material adverse effect on the Company and its subsidiaries, taken as a whole, and neither the Company nor any of its subsidiaries has received any written notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a material adverse effect on the Company and its subsidiaries, taken as a whole.

(dd)        The financial statements included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, together with the related schedules and notes thereto, comply as to form in all material respects with the applicable accounting requirements of the Securities Act and present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates shown and its results of operations and cash flows for the periods shown, and such financial statements have been prepared in conformity with generally accepted accounting principles in the United States ("**U.S. GAAP**") applied on a consistent basis throughout the periods covered thereby except for any normal year-end adjustments in the Company's quarterly financial statements. The other financial information included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus has been derived from the accounting records of the Company and its consolidated subsidiaries and presents fairly in all material respects the information shown thereby. The statistical, industry-related and market-related data included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus are based on or derived from sources which the Company reasonably and in good faith believes are reliable and accurate and such data is consistent with the sources from which they are derived, in each case in all material respects. Except as included therein, no historical or pro forma financial statements or supporting schedules are required to be included in the Registration Statement, the Time of Sale Prospectus or the Prospectus under the Securities Act or the rules and regulations promulgated thereunder. All disclosures contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus regarding "non-GAAP financial measures" (as such term is defined by the rules and regulations of the Commission) comply in all material respects with Regulation G of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") and Item 10 of Regulation S-K of the Securities Act, to the extent applicable.

(ee)        Ernst & Young LLP, who have certified certain financial statements of the Company and its subsidiaries and delivered its report with respect to the audited consolidated financial statements and schedules filed with the Commission as part of the Registration Statement and included in each of the Registration Statement, the Time of Sale Prospectus and the Prospectus, is an independent registered public accounting firm with respect to the Company within the meaning of the Securities Act and the applicable rules and regulations thereunder adopted by the Commission and the Public Company Accounting Oversight Board (United States).

<div align="center">11</div>

(ff)        The Company and its subsidiaries, taken as a whole, maintain a system of internal control over financial reporting (as such term is defined in Rule 13a-15(f) under the Exchange Act) designed by, or under the supervision of, the Company's principal executive officer and principal financial officer, or persons performing similar functions, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP and provides reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Except as described in the Registration Statement, the Time of Sale Prospectus and the Prospectus, since the end of the Company's most recent audited fiscal year, there has been (i) no material weakness in the Company's internal control over financial reporting (whether or not remediated) and (ii) no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. Except as disclosed in the Time of Sale Prospectus, the Company maintains disclosure controls and procedures (as such term is defined in Rule 13a-15(e) under the Exchange Act) that comply with the requirements of the Exchange Act; such disclosure controls and procedures have been designed to ensure that material information relating to the Company and its subsidiaries is made known to the Company's principal executive officer and principal financial officer by others within those entities; and such disclosure controls and procedures are effective.

(gg)        Except as described in the Registration Statement, the Time of Sale Prospectus and the Prospectus, the Company has not sold, issued or distributed any shares of Common Stock during the six-month period preceding the date hereof, including any sales pursuant to Rule 144A under, or Regulation D or S of, the Securities Act, other than shares issued pursuant to employee benefit plans, qualified stock option plans or other employee compensation plans or pursuant to outstanding options, rights or warrants.

(hh)        The Company and each of its subsidiaries have filed all federal, state, local and foreign tax returns required to be filed through the date of this Agreement or have requested extensions thereof (except where the failure to file would not be reasonably expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole) and have paid all taxes required to be paid thereon (except for cases in which the failure to file or pay would not be reasonably expected to, singly or in the aggregate, have a material adverse effect on the Company and its subsidiaries, taken as a whole, or, except as currently being contested in good faith and for which reserves required by U.S. GAAP have been created in the financial statements of the Company), and no tax deficiency has been determined adversely to the Company or any of its subsidiaries which has had (nor does the Company nor any of its subsidiaries have any notice or knowledge of any tax deficiency which could reasonably be expected to be determined adversely to the Company or its subsidiaries and which could reasonably be expected to have) a material adverse effect on the Company and its subsidiaries, taken as a whole.

(ii)        From the time of initial confidential submission of the Registration Statement to the Commission through the date hereof, the Company has been and is an "emerging growth company," as defined in Section 2(a) of the Securities Act (an "**Emerging Growth Company**").

<div align="center">12</div>

(jj)      The Company (i) has not alone engaged in any Testing-the-Waters Communication with any person other than Testing-the-Waters Communications with the consent of the Representatives with entities that are reasonably believed to be qualified institutional buyers within the meaning of Rule 144A under the Securities Act or institutions that are reasonably believed to be accredited investors within the meaning of Rule 501 under the Securities Act and (ii) has not authorized anyone other than the Representatives to engage in Testing-the-Waters Communications. The Company reconfirms that the Representatives have been authorized to act on its behalf in undertaking Testing-the-Waters Communications. The Company has not distributed any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the Securities Act. "**Testing-the-Waters Communication**" means any communication with potential investors undertaken in reliance on Section 5(d) or Rule 163B of the Securities Act.

(kk)      As of the time of each sale of the Shares in connection with the offering when the Prospectus is not yet available to prospective purchasers, none of (A) the Time of Sale Prospectus, (B) any free writing prospectus, when considered together with the Time of Sale Prospectus, and (C) any individual Testing-the-Waters Communication, when considered together with the Time of Sale Prospectus, included, includes or will include an untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, *however*, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to the Company by an Underwriter through or on behalf of the Representatives for use therein.

(ll)      Neither the Company nor any of its subsidiaries has any securities rated by any "nationally recognized statistical rating organization," as such term is defined in Section 3(a)(62) of the Exchange Act.

(mm)      The Registration Statement, the Prospectus, the Time of Sale Prospectus and any preliminary prospectus comply, and any amendments or supplements thereto will comply, with any applicable laws or regulations of foreign jurisdictions in which the Prospectus, the Time of Sale Prospectus or any preliminary prospectus, as amended or supplemented, if applicable, are distributed in connection with the Directed Share Program.

(nn)      No consent, approval, authorization or order of, or qualification with, any governmental body or agency, other than those obtained, is required in connection with the offering of the Directed Shares in any jurisdiction where the Directed Shares are being offered.

(oo)      The Company has not offered, or caused Morgan Stanley & Co. LLC to offer, Shares to any person pursuant to the Directed Share Program with the specific intent to unlawfully influence (i) a customer or supplier of the Company to alter the customer's or supplier's level or type of business with the Company, or (ii) a trade journalist or publication to write or publish favorable information about the Company or its products.

13

(pp)        (i) Each employee benefit plan, within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), that is subject to the funding rules of Section 412 of the Code or Section 302 of ERISA (other than any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA (a "Multiemployer Plan")) for which the Company or any member of its "Controlled Group" (defined as any entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001(a)(14) of ERISA or any entity that would be regarded as a single employer with the Company under Section 414(b),(c),(m) or (o) of the Internal Revenue Code of 1986, as amended (the "Code")) would have any liability (each, a "Plan") has been maintained in compliance with its terms and the requirements of any applicable statutes, orders, rules and regulations, including but not limited to ERISA and the Code; (ii) for each Plan, no Plan has failed (whether or not waived), or is reasonably expected to fail, to satisfy the minimum funding standards (within the meaning of Section 302 of ERISA or Section 412 of the Code) applicable to such Plan; (iii) no Plan is, or is reasonably expected to be, in "at risk status" (within the meaning of Section 303(i) of ERISA) and no "Multiemployer Plan" is in "endangered status" or "critical status" (within the meaning of Sections 304 and 305 of ERISA) (iv) except to the extent that notice would be waived by applicable regulation, no "reportable event" (within the meaning of Section 4043(c) of ERISA and the regulations promulgated thereunder) has occurred or is reasonably expected to occur; and (v) neither the Company nor any member of the Controlled Group has incurred, nor reasonably expects to incur, any liability under Title IV of ERISA (other than contributions to the Plan or premiums to the Pension Benefit Guarantee Corporation, in the ordinary course and without default) in respect of a Plan or Multiemployer Plan, except in each case with respect to the events or conditions set forth in (i) through (v) hereof, as would not, individually or in the aggregate, have a material adverse effect.

(qq)        No subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from paying any dividends to the Company, from making any other distribution on such subsidiary's capital stock or similar ownership interest, from repaying to the Company any loans or advances to such subsidiary from the Company or from transferring any of such subsidiary's properties or assets to the Company or any other subsidiary of the Company, except for any dividend, distribution, repayment or transfer that is prohibited pursuant to any credit facility of the Company's subsidiaries described in the Registration Statement, the Time of Sale Prospectus and the Prospectus.

2.        *Agreements to Sell and Purchase.* The Company hereby agrees to sell to the several Underwriters, and each Underwriter, upon the basis of the representations and warranties herein contained, but subject to the terms and conditions hereinafter stated, agrees, severally and not jointly, to purchase from the Company the respective numbers of Firm Shares set forth in Schedule I hereto opposite its name at $[●] a share (the "**Purchase Price**").

On the basis of the representations and warranties contained in this Agreement, and subject to its terms and conditions, the Company agrees to sell to the Underwriters the Additional Shares, and the Underwriters shall have the right to purchase, severally and not jointly, up to [●] Additional Shares at the Purchase Price, *provided*, *however*, that the amount paid by the Underwriters for any Additional Shares shall be reduced by an amount per share equal to any dividends declared by the Company and payable on the Firm Shares but not payable on such Additional Shares. The Representatives may exercise this right on behalf of the Underwriters in whole or from time to time in part by giving written notice not later than 30 days after the date of this Agreement. Any exercise notice shall specify the number of Additional Shares to be purchased by the Underwriters and the date on which such Additional Shares are to be purchased. Each purchase date must be at least one business day after the written notice is given and may not be earlier than the closing date for the Firm Shares or later than ten business days after the date of such notice. Additional Shares may be purchased as provided in Section 4 hereof solely for the purpose of covering over-allotments made in connection with the offering of the Firm Shares. On each day, if any, that Additional Shares are to be purchased (an "**Option Closing Date**"), each Underwriter agrees, severally and not jointly, to purchase the number of Additional Shares (subject to such adjustments to eliminate fractional shares as the Representatives may determine) that bears the same proportion to the total number of Additional Shares to be purchased on such Option Closing Date as the number of Firm Shares set forth in Schedule I hereto opposite the name of such Underwriter bears to the total number of Firm Shares.

14

3.      *Terms of Public Offering*. The Company is advised by the Representatives that the Underwriters propose to make a public offering of their respective portions of the Shares as soon after the Registration Statement and this Agreement have become effective as in the Representatives' judgment is advisable. The Company is further advised by the Representatives that the Shares are to be offered to the public initially at $[●] a share (the "**Public Offering Price**") and to certain dealers selected by the Representatives at a price that represents a concession not in excess of $[●] a share under the Public Offering Price.

4.      *Payment and Delivery.* Payment for the Firm Shares to be sold by the Company shall be made to the Company in Federal or other funds immediately available in New York City against delivery of such Firm Shares for the respective accounts of the several Underwriters at 10:00 a.m., New York City time, on [●], 2021, or at such other time on the same or such other date, not later than [●], 2021, as shall be designated in writing by the Representatives. The time and date of such payment are hereinafter referred to as the "**Closing Date**."

Payment for any Additional Shares shall be made to the Company in Federal or other funds immediately available in New York City against delivery of such Additional Shares for the respective accounts of the several Underwriters at 10:00 a.m., New York City time, on the date specified in the corresponding notice described in Section 2 or at such other time on the same or on such other date, in any event not later than [●], 2021, as shall be designated in writing by the Representatives.

The Firm Shares and Additional Shares shall be registered in such names and in such denominations as the Representatives shall request in writing not later than one full business day prior to the Closing Date or the applicable Option Closing Date, as the case may be. The Firm Shares and Additional Shares shall be delivered to the Representatives on the Closing Date or an Option Closing Date, as the case may be, for the respective accounts of the several Underwriters, with any transfer taxes payable in connection with the transfer of the Shares to the Underwriters duly paid, against payment of the Purchase Price therefor.

5.      *Conditions to the Underwriters' Obligations*. The obligations of the Company to sell the Shares to the Underwriters and the several obligations of the Underwriters to purchase and pay for the Shares on the Closing Date are subject to the condition that the Registration Statement shall have become effective not later than [●] (New York City time) on the date hereof.

The several obligations of the Underwriters are subject to the following further conditions:

(a)      Subsequent to the execution and delivery of this Agreement and prior to the Closing Date:

(i)      no order suspending the effectiveness of the Registration Statement shall be in effect, no proceeding for such purpose or pursuant to Section 8A under the Securities Act shall be pending before or, to the Company's knowledge, threatened by the Commission; and

15

(ii)        there shall not have occurred any change, or any development involving a prospective change, in the condition, financial or otherwise, or in the earnings, business or operations of the Company and its subsidiaries, taken as a whole, from that set forth in the Time of Sale Prospectus that, in the Representatives' judgment, is material and adverse and that makes it, in the Representatives' judgment, impracticable to market the Shares on the terms and in the manner contemplated in the Time of Sale Prospectus.

(b)        The Underwriters shall have received on the Closing Date a certificate, dated the Closing Date and signed on behalf of the Company by an executive officer of the Company, to the effect set forth in Sections 5(a)(i) and 5(a)(ii) above and to the effect that the representations and warranties of the Company contained in this Agreement are true and correct as of the Closing Date and that the Company has complied with all of the agreements and satisfied all of the conditions on its part to be performed or satisfied hereunder on or before the Closing Date.

The officer signing and delivering such certificate may rely upon the best of his or her knowledge as to proceedings threatened.

(c)        The Underwriters shall have received on the Closing Date an opinion and negative assurance letter of Latham & Watkins LLP, outside counsel for the Company, dated the Closing Date, in form and substance reasonably satisfactory to the Underwriters.

(d)        The Underwriters shall have received on the Closing Date an opinion and negative assurance letter of Weil, Gotshal & Manges LLP, counsel for the Underwriters, dated the Closing Date, in form and substance reasonably satisfactory to the Underwriters.

With respect to the negative assurance letters to be delivered pursuant to Sections 5(c) and 5(d) above, Latham & Watkins LLP and Weil, Gotshal & Manges LLP may state that their opinions and beliefs are based upon their participation in the preparation of the Registration Statement, the Time of Sale Prospectus and the Prospectus and any amendments or supplements thereto and review and discussion of the contents thereof, but are without independent check or verification, except as specified.

The opinions of Latham & Watkins LLP and Weil, Gotshal & Manges LLP described in Sections 5(c) and 5(d) above, respectively, shall be rendered to the Underwriters at the request of the Company and shall so state therein.

(e)        The Underwriters shall have received, on each of the date hereof and the Closing Date, a letter dated the date hereof or the Closing Date, as the case may be, in form and substance satisfactory to the Underwriters, from Ernst & Young LLP, an independent registered public accounting firm, containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the Time of Sale Prospectus and the Prospectus; *provided* that the letter delivered on the Closing Date shall use a "cut-off date" not earlier than the date hereof.

(f)        The "lock-up" agreements, each substantially in the form of Exhibit A hereto, executed by certain shareholders, officers and directors of the Company relating to restrictions on sales and certain other dispositions of shares of Common Stock or certain other securities, delivered to the Representatives on or before the date hereof (the "**Lock-up Agreements**"), shall be in full force and effect on the Closing Date.

(g)        The several obligations of the Underwriters to purchase Additional Shares hereunder are subject to the delivery to the Representatives on the applicable Option Closing Date of the following:

(i)        a certificate, dated the Option Closing Date and signed by an executive officer of the Company, confirming that the certificate delivered on the Closing Date pursuant to Section 5(b) hereof remains true and correct as of such Option Closing Date;

(ii)        an opinion and negative assurance letter of Latham & Watkins LLP, outside counsel for the Company, dated the Option Closing Date, relating to the Additional Shares to be purchased on such Option Closing Date and otherwise to the same effect as the opinion required by Section 5(c) hereof;

(iii)        an opinion and negative assurance letter of Weil, Gotshal & Manges LLP, counsel for the Underwriters, dated the Option Closing Date, relating to the Additional Shares to be purchased on such Option Closing Date and otherwise to the same effect as the opinion required by Section 5(d) hereof;

(iv)        a letter dated the Option Closing Date, in form and substance reasonably satisfactory to the Underwriters, from Ernst & Young LLP, an independent registered public accounting firm, substantially in the same form and substance as the letter furnished to the Underwriters pursuant to Section 5(e) hereof; *provided* that the letter delivered on the Option Closing Date shall use a "cut-off date" not earlier than two business days prior to such Option Closing Date; and

(v)        such other documents as the Representatives may reasonably request, including with respect to the good standing of the Company and its significant subsidiaries, the due authorization and issuance of the Additional Shares to be sold on such Option Closing Date and other matters related to the issuance of such Additional Shares.

6.        *Covenants of the Company*. The Company covenants with each Underwriter as follows:

(a)        To prepare the Prospectus in a form approved by the Representatives and to file such Prospectus pursuant to Rule 424(b) under the Securities Act not later than the Commission's close of business on the second business day following the execution and delivery of this Agreement, or, if applicable, such earlier time as may be required by Rule 430A(a)(3) under the Securities Act; to make no further amendment or any supplement to the Registration Statement or the Prospectus prior to the last time and date for delivery of the Firm Shares which shall be disapproved by the Representatives promptly after reasonable notice thereof; to advise the Representatives, promptly after it receives notice thereof, of the time when any amendment to the Registration Statement has been filed or becomes effective or any amendment or supplement to the Prospectus has been filed; to file promptly all material required to be filed by the Company with the Commission pursuant to Rule 433(d) under the Securities Act; to advise the Representatives, promptly after it receives notice thereof, of the issuance by the Commission of any stop order or of any order preventing or suspending the use of any preliminary prospectus or other prospectus in respect of the Shares, of the suspension of the qualification of the Shares for offering or sale in any jurisdiction, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Registration Statement or the Prospectus or for additional information; and, in the event of the issuance of any stop order or of any order preventing or suspending the use of any preliminary prospectus or other prospectus or suspending any such qualification, to promptly use its best efforts to obtain the withdrawal of such order.

17

(b)        To furnish to the Representatives, at their request, without charge, as many copies of the Registration Statement (including exhibits thereto) as the Representatives may reasonably request and to furnish to the Representatives in New York City, without charge, prior to 10:00 a.m. New York City time on the business day next succeeding the date of this Agreement and during the period mentioned in Section 6(e) or 6(f) below, as many copies of the Time of Sale Prospectus, the Prospectus and any supplements and amendments thereto or to the Registration Statement as the Representatives may reasonably request.

(c)        To furnish to the Representatives a copy of each proposed free writing prospectus to be prepared by or on behalf of, used by, or referred to by the Company and not to use or refer to any proposed free writing prospectus to which the Representatives reasonably object in a timely manner.

(d)        Not to take any action that would result in an Underwriter or the Company being required to file with the Commission pursuant to Rule 433(d) under the Securities Act a free writing prospectus prepared by or on behalf of the Underwriter that the Underwriter otherwise would not have been required to file thereunder.

(e)        If the Time of Sale Prospectus is being used to solicit offers to buy the Shares at a time when the Prospectus is not yet available to prospective purchasers and any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Time of Sale Prospectus in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if any event shall occur or condition exist as a result of which the Time of Sale Prospectus conflicts with the information contained in the Registration Statement then on file, or if, in the opinion of counsel for the Underwriters, it is necessary to amend or supplement the Time of Sale Prospectus to comply with applicable law, forthwith to prepare, file with the Commission and furnish, at its own expense, to the Underwriters and to any dealer upon request, either amendments or supplements to the Time of Sale Prospectus so that the statements in the Time of Sale Prospectus as so amended or supplemented will not, in the light of the circumstances when the Time of Sale Prospectus is delivered to a prospective purchaser, be misleading or so that the Time of Sale Prospectus, as amended or supplemented, will no longer conflict with the Registration Statement, or so that the Time of Sale Prospectus, as amended or supplemented, will comply with applicable law.

(f)        If, during such period after the first date of the public offering of the Shares as in the opinion of counsel for the Underwriters the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is required by law to be delivered in connection with sales by an Underwriter or dealer (the "**Prospectus Delivery Period**"), any event shall occur or condition exist as a result of which it is necessary to amend or supplement the Prospectus in order to make the statements therein, in the light of the circumstances when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is delivered to a purchaser, not misleading, or if, in the opinion of counsel for the Underwriters, it is necessary to amend or supplement the Prospectus to comply with applicable law, forthwith to prepare, file with the Commission and furnish, at its own expense, to the Underwriters and to the dealers (whose names and addresses the Representatives will furnish to the Company) to which Shares may have been sold by the Representatives on behalf of the Underwriters and to any other dealers upon request, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus (or in lieu thereof the notice referred to in Rule 173(a) of the Securities Act) is delivered to a purchaser, be misleading or so that the Prospectus, as amended or supplemented, will comply with applicable law.

(g)        To endeavor to qualify the Shares for offering and sale under the securities or Blue Sky laws of such jurisdictions as the Representatives may reasonably request; *provided* that nothing contained herein shall require the Company to qualify to do business in any jurisdiction, execute a general consent to service of process in any jurisdiction or to subject itself to taxation in any jurisdiction in which it is not otherwise subject.

(h)        To make generally available (which may be satisfied by filing with the Commission on its Electronic Data Gathering Analysis and Retrieval System ("**EDGAR**")) to the Company's security holders and to the Underwriters as soon as practicable but in any event not later than sixteen months after the effective date of the Registration Statement an earnings statement covering a period of at least twelve months beginning with the first fiscal quarter of the Company occurring after the date of this Agreement which shall satisfy the provisions of Section 11(a) of the Securities Act and the rules and regulations of the Commission thereunder.

19

(i)        Whether or not the transactions contemplated in this Agreement are consummated or this Agreement is terminated, the Company agrees to pay or cause to be paid all expenses incident to the performance of its obligations under this Agreement, including: (i) the fees, disbursements and expenses of the Company's counsel and the Company's accountants in connection with the registration and delivery of the Shares under the Securities Act and all other fees or expenses in connection with the preparation and filing of the Registration Statement, any preliminary prospectus, the Time of Sale Prospectus, the Prospectus, any free writing prospectus prepared by or on behalf of, used by, or referred to by the Company and amendments and supplements to any of the foregoing, including all printing costs associated therewith, and the mailing and delivering of copies thereof to the Underwriters and dealers, in the quantities hereinabove specified, (ii) all costs and expenses related to the transfer and delivery of the Shares to the Underwriters, including any transfer or other similar taxes payable thereon, (iii) the cost of printing or producing any Blue Sky or Legal Investment memorandum in connection with the offer and sale of the Shares under state securities laws and all expenses in connection with the qualification of the Shares for offer and sale under state securities laws as provided in Section 6(g) hereof, including filing fees and the reasonable fees and disbursements of counsel for the Underwriters in connection with such qualification and in connection with the Blue Sky or Legal Investment memorandum, (iv) all filing fees and the reasonable fees and disbursements of counsel to the Underwriters incurred in connection with the review and qualification of the offering of the Shares by FINRA (*provided* that the amount payable by the Company with respect to fees and disbursements of counsel for the Underwriters pursuant to subsections (iii) and (iv) shall not exceed $40,000 in the aggregate), (v) all fees and expenses in connection with the preparation and filing of the registration statement on Form 8-A relating to the Common Stock and all costs and expenses incident to listing the Shares on the Nasdaq Global Select Market, (vi) the cost of printing certificates representing the Shares, (vii) the costs and charges of any transfer agent, registrar or depositary, (viii) the costs and expenses of the Company relating to investor presentations on any "road show" undertaken in connection with the marketing of the offering of the Shares, including, without limitation, expenses associated with the preparation or dissemination of any electronic road show, expenses associated with the production of road show slides and graphics, fees and expenses of any consultants engaged in connection with the road show presentations with the prior approval of the Company, travel and lodging expenses of the representatives and officers of the Company and any such consultants, and 50% of the cost of any aircraft chartered in connection with the road show (with the remaining 50% to be paid by the Underwriters), (ix) the document production charges and expenses associated with printing this Agreement, (x) all fees and disbursements of counsel incurred by the Underwriters in connection with the Directed Share Program and stamp duties, similar taxes or duties or other taxes, if any, incurred by the Underwriters in connection with the Directed Share Program, and (xi) all other costs and expenses incident to the performance of the obligations of the Company hereunder for which provision is not otherwise made in this Section. It is understood, however, that except as provided in this Section, Section 8 entitled "Indemnity and Contribution," Section 9 entitled "Directed Share Program Indemnification" and the last paragraph of Section 11 below, the Underwriters will pay all of their costs and expenses, including fees and disbursements of their counsel, share transfer taxes payable on resale of any of the Shares by them and any advertising expenses connected with any offers they may make, and all travel and other expenses of the Underwriters or any of their employees incurred by them in connection with participation in investor presentations on any "road show" undertaken in connection with the marketing of the offering of the Shares, other than the cost of aircraft chartered in connection with the roadshow, for which the Underwriters agree to pay for 50% not paid for by the Company, as described above.

(j)        The Company will promptly notify the Representatives if the Company ceases to be an Emerging Growth Company at any time prior to the later of (i) completion of the distribution of the Shares within the meaning of the Securities Act and (ii) completion of the Restricted Period (as defined in this Section 6).

(k)        If at any time during the Prospectus Delivery Period and following the distribution of any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the Securities Act there occurred or occurs an event or development as a result of which such Testing-the-Waters Communication included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at that subsequent time, not misleading, the Company will promptly notify the Representatives and will promptly amend or supplement, at its own expense, such Testing-the-Waters Communication to eliminate or correct such untrue statement or omission.

20

(l)　　　　The Company will deliver to each Underwriter (or its agent), on the date of execution of this Agreement, a properly completed and executed Certification Regarding Beneficial Owners of Legal Entity Customers, together with copies of identifying documentation, and the Company undertakes to provide such additional supporting documentation as each Underwriter may reasonably request in connection with the verification of the foregoing Certification.

(m)　　　　During a period of three (3) years from the effective date of the Registration Statement, for so long as the Company is subject to the reporting requirements of either Section 13 or Section 15(d) of the Exchange Act, to furnish to its stockholders as soon as practicable after the end of each fiscal year an annual report (including a balance sheet and statements of income, stockholders' equity and cash flows of the Company and its consolidated subsidiaries certified by independent public accountants) and, as soon as practicable after the end of each of the first three quarters of each fiscal year (beginning with the fiscal quarter ending after the effective date of the Registration Statement), to make available to its stockholders consolidated summary financial information of the Company and its subsidiaries for such quarter in reasonable detail; *provided* that the Company will be deemed to have satisfied the requirements of this Section 6(m) to the extent such information is filed through EDGAR.

(n)　　　　During a period of three (3) years from the effective date of the Registration Statement, so long as the Company is subject to the reporting requirements of either Section 13 or Section 15(d) of the Exchange Act, to furnish to the Representatives copies of all reports or other communications (financial or other) furnished to shareholders, and to deliver to the Representatives as soon as they are available, copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange on which any class of securities of the Company is listed; *provided* that the Company will be deemed to have satisfied the requirements of this Section 6(n)to the extent such information is filed through EDGAR.

(o)　　　　To comply with all applicable securities and other laws, rules and regulations in each jurisdiction in which the Directed Shares are offered in connection with the Directed Share Program.

(p)　　　　The Company also covenants with each Underwriter that, without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the Underwriters, it will not, and will not publicly disclose an intention to, during the period beginning on the date of this Agreement and ending at the close of business 180 days after the date of the Prospectus (the "**Restricted Period**"), (1) offer, pledge, sell, contract to sell, sell any option, warrant or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities substantially similar to the Common Stock, convertible into or exercisable or exchangeable for Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise or (3) file any registration statement with the Commission relating to the offering of any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock; *provided* that confidential or non-public submissions to the Commission of any registration statements under the Securities Act may be made if and only if (x) no public announcement of such confidential or non-public submission shall be made during the Restricted Period and (y) the Company shall have provided the Representatives prior written notice of its intention to confidentially submit a draft registration statement with the Commission at least two business days prior to such confidential or non-public submission.

<div align="center">21</div>

The restrictions contained in the preceding paragraph shall not apply to (A) the Shares to be sold hereunder, (B) the issuance by the Company of shares of Common Stock upon the exercise of an option or warrant, the settlement of restricted stock units or share value award, or the conversion of a convertible loan, note or other security outstanding on the date hereof as described in each of the Time of Sale Prospectus and the Prospectus, (C) the grant of options, restricted stock units, share value awards or any other type of equity award pursuant to employee benefit plans in effect on the date hereof and described in the Time of Sale Prospectus and the Prospectus (the "**Plans**") or the issuance of shares of Common Stock by the Company (whether upon the exercise of stock options or other equity awards) to employees, officers, directors, advisors or consultants of the Company pursuant to the Plans, (D) the filing by the Company of a registration statement on Form S-8 relating to issuance, vesting, exercise or settlement of equity awards granted or to be granted pursuant to the Plans, (E) the issuance of or entry into an agreement to issue shares of Common Stock or any securities substantially similar to the Common Stock or convertible into or exercisable or exchangeable for Common Stock in connection with one or more mergers, acquisitions or securities, businesses, property or other assets, products or technologies, joint ventures, commercial relationships or other strategic corporate transactions or alliances; *provided* that the aggregate amount of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (on an as-converted, as-exercised or as-exchanged basis) that the Company may issue or agree to issue pursuant to this clause (E) shall not exceed 10% of the total number of shares of Common Stock of the Company issued and outstanding immediately following the completion of the transactions contemplated by this Agreement determined on a fully diluted basis, and *provided further*, that each recipient of shares of Common Stock or any securities convertible into or exercisable or exchangeable for shares of Common Stock pursuant to this clause (E) shall execute a lock-up agreement substantially in the form of Exhibit A hereto, (F) facilitating the establishing of a trading plan on behalf of a shareholder, officer or director of the Company pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Common Stock, *provided* that (i) such plan does not provide for the transfer of shares of Common Stock during the Restricted Period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by the Company regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of shares of Common Stock may be made under such plan during the Restricted Period or (G) the issuance of Common Stock or other securities to effect the Transactions.

If J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, in their sole discretion, agree to release or waive the restrictions on the transfer of Shares set forth in a Lock-up Agreement for an officer or director of the Company (including, for the avoidance of doubt, in connection with the Final Lock-Up Expiration Date, as defined in the Lock-up Agreement) and provide the Company with notice of the impending release or waiver at least three business days before the effective date of the release or waiver, the Company agrees to announce the impending release or waiver by a press release substantially in the form of Exhibit B hereto through a major news service at least two business days before the effective date of the release or waiver.

22

7.      *Covenants of the Underwriters.* Each Underwriter, severally and not jointly, covenants with the Company not to take any action that would result in the Company being required to file with the Commission under Rule 433(d) a free writing prospectus prepared by or on behalf of such Underwriter that otherwise would not be required to be filed by the Company thereunder, but for the action of the Underwriter.

8.      *Indemnity and Contribution.* (a) The Company agrees to indemnify and hold harmless each Underwriter, the directors, officers and affiliates of each Underwriter within the meaning of Rule 405 under the Securities Act and each person, if any, who controls any Underwriter within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) that arise out of, or are based upon, any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or any amendment thereof, any preliminary prospectus, the Time of Sale Prospectus or any amendment or supplement thereto, any issuer free writing prospectus as defined in Rule 433(h) under the Securities Act, any Company information that the Company has filed, or is required to file, pursuant to Rule 433(d) under the Securities Act, any road show as defined in Rule 433(h) under the Securities Act (a "**road show**"), the Prospectus or any amendment or supplement thereto, or any Testing-the-Waters Communication, or arise out of, or are based upon, any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, (insofar as related to the Prospectus, the Time of Sale Prospectus or any Testing-the-Waters Communication, in the light of the circumstances under which they were made), not misleading, except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any such untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use therein, it being understood and agreed that the only such information furnished by the Underwriters through the Representatives consists of the information described as such in subsection (b) below.

(b)      Each Underwriter agrees, severally and not jointly, to indemnify and hold harmless the Company, its directors, its officers who sign the Registration Statement and each person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to such Underwriter, but only with reference to information relating to such Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in the Registration Statement, any preliminary prospectus, the Time of Sale Prospectus, any issuer free writing prospectus, road show, the Prospectus or any amendment or supplement thereto or Testing the Waters Communication, it being understood and agreed that the only such information furnished by any Underwriter through the Representatives consists of the following information in the Prospectus: [●].

<center>23</center>

(c)        In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to Section 8(a) or 8(b), such person (the "**indemnified party**") shall promptly notify the person against whom such indemnity may be sought (the "**indemnifying party**") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed in writing to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party shall not, in respect of the legal expenses of any indemnified party in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all such indemnified parties and that all such fees and expenses shall be reimbursed as they are incurred. In the case of any such separate firm for the Underwriters and such control persons and affiliates of any Underwriters, such firm shall be designated in writing by the Representatives. In the case of any such separate firm for the Company, and such directors, officers and control persons of the Company, such firm shall be designated in writing by the Company. The indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel as contemplated by the second and third sentences of this paragraph, the indemnifying party agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party shall not have reimbursed the indemnified party in accordance with such request prior to the date of such settlement. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement (x) includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding and (y) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

24

(d)        To the extent the indemnification provided for in Section 8(a) or 8(b) is unavailable to an indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party under such paragraph, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party or parties on the one hand and the indemnified party or parties on the other hand from the offering of the Shares or (ii) if the allocation provided by Section 8(d)(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in Section 8(d)(i) above but also the relative fault of the Company on the one hand and of the Underwriters on the other hand in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the indemnifying party or parties on the one hand and the indemnified party or parties on the other hand in connection with the offering of the Shares shall be deemed to be in the same respective proportions as the net proceeds from the offering of the Shares (after deducting underwriting discounts and commissions but before deducting expenses) received by the Company and the total underwriting discounts and commissions received by the Underwriters, in each case as set forth in the table on the cover of the Prospectus, bear to the aggregate Public Offering Price of the Shares. The relative fault of the indemnifying party or parties on the one hand and the indemnified party or parties on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Underwriters' respective obligations to contribute pursuant to this Section 8 are several in proportion to the respective number of Shares they have purchased hereunder, and not joint.

(e)        The Company and the Underwriters agree that it would not be just or equitable if contribution pursuant to this Section 8 were determined by *pro rata* allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 8(d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in Section 8(d) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 8, no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Shares underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages that such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The remedies provided for in this Section 8 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(f)        The indemnity and contribution provisions contained in this Section 8(f) and the representations, warranties and other statements of the Company contained in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Underwriter, any director, officer, or affiliate of any Underwriter and each person, if any, who controls any Underwriter or by or on behalf of the Company, its officers or directors or any person controlling the Company and (iii) acceptance of and payment for any of the Shares.

<div align="center">25</div>

9.      *Directed Share Program Indemnification.*

(a)      The Company agrees to indemnify and hold harmless Morgan Stanley & Co. LLC, each person, if any, who controls Morgan Stanley & Co. LLC within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act ("**DSP Entities**") from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred in connection with defending or investigating any such action or claim) (i) that arise out of, or are based upon, any untrue statement or alleged untrue statement of a material fact contained in any material prepared by or with the consent of the Company for distribution to Participants in connection with the Directed Share Program or arise out of, or are based upon, any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; (ii) that arise out of, or are based upon, the failure of any Participant to pay for and accept delivery of Directed Shares that the Participant agreed to purchase; or (iii) related to, arising out of, or in connection with the Directed Share Program, other than losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined to have resulted from the bad faith or gross negligence of the DSP Entities.

(b)      In case any proceeding (including any governmental investigation) shall be instituted involving any DSP Entity in respect of which indemnity may be sought pursuant to Section 9(a), the DSP Entity seeking indemnity, shall promptly notify the Company in writing and the Company, upon request of the DSP Entity, shall retain counsel reasonably satisfactory to the DSP Entity to represent the DSP Entity and any others the Company may designate in such proceeding and shall pay the reasonably incurred and documented fees and disbursements of such counsel related to such proceeding. In any such proceeding, any DSP Entity shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such DSP Entity unless (i) the Company shall have agreed in writing to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Company and the DSP Entity and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Company shall not, in respect of the legal expenses of the DSP Entities in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all DSP Entities. Any such separate firm for the DSP Entities shall be designated in writing by Morgan Stanley & Co. LLC, as applicable. The Company shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Company agrees to indemnify the DSP Entities from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time a DSP Entity shall have requested the Company to reimburse it for fees and expenses of counsel as contemplated by the second and third sentences of this paragraph, the Company agrees that it shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the Company of the aforesaid request and (ii) the Company shall not have reimbursed the DSP Entity in accordance with such request prior to the date of such settlement. The Company shall not, without the prior written consent of Morgan Stanley & Co. LLC, as the case may be, effect any settlement of any pending or threatened proceeding in respect of which any DSP Entity is or could have been a party and indemnity could have been sought hereunder by such DSP Entity, unless such settlement (x) includes an unconditional release of the DSP Entities from all liability on claims that are the subject matter of such proceeding and (y) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

26

(c)        To the extent the indemnification provided for in Section 9(a) is unavailable to a DSP Entity or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the Company in lieu of indemnifying the DSP Entity thereunder, shall contribute to the amount paid or payable by the DSP Entity as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the DSP Entities on the other hand from the offering of the Directed Shares or (ii) if the allocation provided by Section 9(c)(i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in Section 9(c)(i) above but also the relative fault of the Company on the one hand and of the DSP Entities on the other hand in connection with any statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the DSP Entities on the other hand in connection with the offering of the Directed Shares shall be deemed to be in the same respective proportions as the net proceeds from the offering of the Directed Shares (after deducting underwriting discounts and commissions but before deducting expenses) and the total underwriting discounts and commissions received by the DSP Entities for the Directed Shares, bear to the aggregate Public Offering Price of the Directed Shares. If the loss, claim, damage or liability arises out of, or is based upon, an untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact, the relative fault of the Company on the one hand and the DSP Entities on the other hand shall be determined by reference to, among other things, whether the untrue or alleged untrue statement or the omission or alleged omission relates to information supplied by the Company or by the DSP Entities and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(d)        The Company and the DSP Entities agree that it would not be just or equitable if contribution pursuant to this Section 9 were determined by pro rata allocation (even if the DSP Entities were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in Section 9(c). The amount paid or payable by the DSP Entities as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by the DSP Entities in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 9, no DSP Entity shall be required to contribute any amount in excess of the amount by which the total price at which the Directed Shares distributed to the public were offered to the public exceeds the amount of any damages that such DSP Entity has otherwise been required to pay. The remedies provided for in this Section 9 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(e)        The indemnity and contribution provisions contained in this Section 9 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any DSP Entity or the Company, its officers or directors or any person controlling the Company and (iii) acceptance of and payment for any of the Directed Shares.

27

10.      *Termination.* The Underwriters may terminate this Agreement by notice given by the Representatives to the Company, if after the execution and delivery of this Agreement and prior to or on the Closing Date or any Option Closing Date, as the case may be, (i) trading generally shall have been suspended or materially limited on, or by, as the case may be, any of the New York Stock Exchange, the NYSE American, the Nasdaq Global Select Market, the Chicago Board of Options Exchange, the Chicago Mercantile Exchange or the Chicago Board of Trade or other relevant exchanges, (ii) trading of any securities of the Company shall have been suspended on any exchange or in any over-the-counter market, (iii) a material disruption in securities settlement, payment or clearance services in the United States shall have occurred, (iv) any moratorium on commercial banking activities shall have been declared by Federal or New York State authorities or (v) there shall have occurred any outbreak or escalation of hostilities, or any change in financial markets or any calamity or crisis that, in the Representatives' judgment, is material and adverse and which, singly or together with any other event specified in this clause (v), makes it, in the Representatives' judgment, impracticable or inadvisable to proceed with the offer, sale or delivery of the Shares on the terms and in the manner contemplated in the Time of Sale Prospectus or the Prospectus.

11.      *Effectiveness; Defaulting Underwriters.* This Agreement shall become effective upon the execution and delivery hereof by the parties hereto.

If, on the Closing Date or an Option Closing Date, as the case may be, any one or more of the Underwriters shall fail or refuse to purchase Shares that it has or they have agreed to purchase hereunder on such date, and the aggregate number of Shares which such defaulting Underwriter or Underwriters agreed but failed or refused to purchase is not more than one-tenth of the aggregate number of the Shares to be purchased on such date, the other Underwriters shall be obligated severally in the proportions that the number of Firm Shares set forth opposite their respective names in Schedule I bears to the aggregate number of Firm Shares set forth opposite the names of all such non-defaulting Underwriters, or in such other proportions as the Representatives may specify, to purchase the Shares which such defaulting Underwriter or Underwriters agreed but failed or refused to purchase on such date; *provided* that in no event shall the number of Shares that any Underwriter has agreed to purchase pursuant to this Agreement be increased pursuant to this Section 11 by an amount in excess of one-ninth of such number of Shares without the written consent of such Underwriter. If, on the Closing Date, any Underwriter or Underwriters shall fail or refuse to purchase Firm Shares and the aggregate number of Firm Shares with respect to which such default occurs is more than one-tenth of the aggregate number of Firm Shares to be purchased on such date, and arrangements satisfactory to the Representatives and the Company for the purchase of such Firm Shares are not made within 36 hours after such default, this Agreement shall terminate without liability on the part of any non-defaulting Underwriter or the Company. In any such case either the Representatives or the Company shall have the right to postpone the Closing Date, but in no event for longer than seven days, in order that the required changes, if any, in the Registration Statement, in the Time of Sale Prospectus, in the Prospectus or in any other documents or arrangements may be effected. If, on an Option Closing Date, any Underwriter or Underwriters shall fail or refuse to purchase Additional Shares and the aggregate number of Additional Shares with respect to which such default occurs is more than one-tenth of the aggregate number of Additional Shares to be purchased on such Option Closing Date, the non-defaulting Underwriters shall have the option to (i) terminate their obligation hereunder to purchase the Additional Shares to be sold on such Option Closing Date or (ii) purchase not less than the number of Additional Shares that such non-defaulting Underwriters would have been obligated to purchase in the absence of such default. Any action taken under this paragraph shall not relieve any defaulting Underwriter from liability in respect of any default of such Underwriter under this Agreement.

28

If this Agreement shall be terminated by the Underwriters, or any of them, because of any failure or refusal on the part of the Company to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company shall be unable to perform its obligations under this Agreement other than by reason of a default by the Underwriters, the Company will reimburse the Underwriters or such Underwriters as have so terminated this Agreement with respect to themselves, severally, for all out-of-pocket expenses (including the reasonably incurred fees and disbursements of their counsel) reasonably incurred by such Underwriters in connection with this Agreement or the offering contemplated hereunder.

12.    *Entire Agreement*. (a) This Agreement, together with any contemporaneous written agreements and any prior written agreements (to the extent not superseded by this Agreement) that relate to the offering of the Shares, represents the entire agreement between the Company, on the one hand, and the Underwriters, on the other, with respect to the preparation of any preliminary prospectus, the Time of Sale Prospectus, the Prospectus, the conduct of the offering, and the purchase and sale of the Shares.

(b)    The Company acknowledges that in connection with the offering of the Shares: (i) the Underwriters have acted at arm's length, are not agents of, and owe no fiduciary duties to, the Company or any other person, (ii) the Underwriters owe the Company only those duties and obligations set forth in this Agreement, any contemporaneous written agreements and prior written agreements (to the extent not superseded by this Agreement), if any, (iii) the Underwriters may have interests that differ from those of the Company, and (iv) none of the activities of the Underwriters in connection with the transactions contemplated herein constitutes a recommendation, investment advice, or solicitation of any action by the Underwriters with respect to any entity or natural person. The Company waives to the full extent permitted by applicable law any claims it may have against the Underwriters arising from an alleged breach of fiduciary duty in connection with the offering of the Shares.

13.    *Recognition of the U.S. Special Resolution Regimes*. (i) In the event that any Underwriter that is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Underwriter of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Agreement, and any such interest and obligation, were governed by the laws of the United States or a state of the United States.

(b)    In the event that any Underwriter that is a Covered Entity or a BHC Act Affiliate of such Underwriter becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against such Underwriter are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if this Agreement were governed by the laws of the United States or a state of the United States.

For purposes of this Section a "**BHC Act Affiliate**" has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k). "**Covered Entity**" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b). "**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable. "**U.S. Special Resolution Regime**" means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

14.       *Counterparts*. This Agreement may be signed in two or more counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law, *e.g.* www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

15.       *Applicable Law*. This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to the conflict of laws principles thereof.

16.       *Submission to Jurisdiction*. The Company irrevocably submits to the non-exclusive jurisdiction of any New York State or United States Federal court sitting in The City of New York (the "Specified Courts") over any suit, action or proceeding arising out of or relating to this Agreement, the Time of Sale Prospectus, the Prospectus, the Registration Statement or the offering of the Shares (each, a "Related Proceeding"). The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any Related Proceeding brought in such a court and any claim that any such Related Proceeding brought in such a court has been brought in an inconvenient forum. To the extent that the Company has or hereafter may acquire any immunity (on the grounds of sovereignty or otherwise) from the jurisdiction of any court or from any legal process with respect to itself or its property, the Company irrevocably waives, to the fullest extent permitted by law, such immunity in respect of any such suit, action or proceeding.

17.       *Headings*. The headings of the sections of this Agreement have been inserted for convenience of reference only and shall not be deemed a part of this Agreement.

18.       *Notices*. All communications hereunder shall be in writing and effective only upon receipt and if to the Underwriters shall be delivered, mailed or sent to J.P. Morgan Securities LLC, 383 Madison Avenue, New York, NY 10179 Attention: Equity Syndicate Desk (Fax: (212) 622-8358); Morgan Stanley & Co. LLC, 1585 Broadway, New York, New York 10036, Attention: Equity Syndicate Desk; and if to the Company shall be delivered, mailed or sent to Fluence Energy, Inc., 4601 Fairfax Drive, Suite 600 Arlington, VA 22203.

Very truly yours,

FLUENCE ENERGY INC.

By: _____

Name:

Title:

Accepted as of the date hereof

J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

Acting severally on behalf of themselves
and the several Underwriters named in
Schedule I hereto.

By: J.P. Morgan Securities LLC

By: _____
    Name:
    Title:

By: Morgan Stanley & Co. LLC

By: _____
    Name:
    Title:

2

**SCHEDULE I**

| Underwriter | Number of Firm Shares To Be Purchased |
|---|---|
| J.P. Morgan Securities LLC | |
| Morgan Stanley & Co. LLC | |
| Barclays Capital Inc. | |
| BofA Securities, Inc. | |
| | |
| Total: | |

I-1

**SCHEDULE II**

**Time of Sale Prospectus**

1.      Preliminary Prospectus issued [●], 2021

2.      [all free writing prospectuses filed by the Company under Rule 433(d) of the Securities Act]

3.      The initial public offering price per share for the Shares is $[●]

4.      The number of Firm Shares purchased by the Underwriters is [●]

5.      The number of Additional Shares that may be purchased by the Underwriters pursuant to the Underwriters' option to purchase Additional Shares is [●]

II-1

**EXHIBIT A**

**FORM OF LOCK-UP AGREEMENT**

[●], 2021

J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC

As Representatives of the several Underwriters named in Schedule I hereto

c/o J.P. Morgan Securities LLC
   383 Madison Avenue
   New York, New York 10179

c/o Morgan Stanley & Co. LLC
   1585 Broadway
   New York, New York 10036

Ladies and Gentlemen:

   The undersigned understands that J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, (the "**Representatives**") propose to enter into an Underwriting Agreement (the "**Underwriting Agreement**") with Fluence Energy, Inc., a Delaware corporation (the "**Company**"), providing for the public offering (the "**Public Offering**") by the several Underwriters, including the Representatives (the "**Underwriters**"), of shares of the Class A common stock, par value $0.00001 per share, of the Company (the "**Class A Shares**"). As used herein, the term "**Common Stock**" refers to shares of the Company's common stock, including any shares of Class A Shares.

   To induce the Underwriters that may participate in the Public Offering to continue their efforts in connection with the Public Offering, the undersigned hereby agrees that, without the prior written consent of J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC on behalf of the Underwriters, it will not, and will not publicly disclose an intention to, during the period beginning on the date of this letter agreement (this "**Lock-Up Agreement**") and ending at the close of business 180 days after the date of the final prospectus relating to the Public Offering (the "**Prospectus**") (such period, the "**Restricted Period**"), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock beneficially owned (as such term is used in Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), by the undersigned or any other securities so owned convertible into or exercisable or exchangeable for shares of Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise. The undersigned acknowledges and agrees that the foregoing precludes the undersigned from engaging in any hedging or other transactions designed or intended, or which could reasonably be expected to lead to or result in, a sale or disposition of any shares of Common Stock, or securities convertible into or exercisable or exchangeable for Common Stock, even if any such sale or disposition transaction or transactions would be made or executed by someone other than the undersigned on their behalf.

A-1

The foregoing shall not apply to:

(a)        transactions relating to Common Stock or other securities acquired in the Public Offering or in open market transactions after the completion of the Public Offering, *provided* that no filing under Section 16(a) of the Exchange Act reporting a reduction in beneficial ownership of Common Stock shall be required or shall be voluntarily made in connection with subsequent sales of Common Stock or other securities acquired in the Public Offering or such open market transactions during the Restricted Period;

(b)        transfers of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock as a bona fide gift, for bona fide estate planning purposes or to any member of the immediate family of the undersigned or to any trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned, *provided* that (i) each recipient shall sign and deliver a lock-up agreement substantially in the form of this Lock-Up Agreement, (ii) no filing under Section 16(a) of the Exchange Act reporting a reduction in beneficial ownership of Common Stock shall be required or shall be voluntarily made during the Restricted Period and (iii) and such transfer does not involve a disposition for value;

(c)        transfers of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock by will or intestate succession upon the death of the undersigned, including to the transferee's nominee or custodian;

(d)        transfers of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock that occurs by operation of law pursuant to a qualified domestic order or in connection with a divorce settlement or other court order; *provided* that any filing required under Section 16(a) of the Exchange Act during the Restricted Period shall clearly indicate in the footnotes thereto that the filing relates to the circumstances described in this clause (d);

(e)        if the undersigned is a corporation, partnership, limited liability company or other business entity, any transfer or distribution of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock, including, without limitation, limited liability company interests in Fluence Energy, LLC ("Units") to limited partners, members, managers, stockholders or holders of similar equity interests in the undersigned or to another corporation, partnership, limited liability company, trust or other business entity that is an affiliate (as defined in Rule 405 as promulgated under the Securities Act of 1933, as amended) of the undersigned or to any investment fund or other entity controlled or managed by the undersigned or affiliates of the undersigned, *provided* that (i) each transferee shall sign and deliver a lock-up agreement substantially in the form of this Lock-Up Agreement and (ii) no filing under Section 16(a) of the Exchange Act, reporting a reduction in beneficial ownership of Common Stock, shall be required or shall be voluntarily made during the Restricted Period;

A-2

(f)        transfers of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock to a nominee or custodian of a person or entity to whom a disposition or transfer would be permissible under clauses (a) through (e) above;

(g)        transfers to the Company of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock in connection with the repurchase by the Company from the undersigned of shares of Common Stock or any security convertible into or exercisable or exchangeable for Common Stock pursuant to a repurchase right arising in connection with the termination of the undersigned's employment with or provision of services to the Company; *provided* that any public announcement or filing under Section 16(a) of the Exchange Act shall clearly indicate in the footnotes thereto that such transfer is being made pursuant to the circumstances described in this clause (g);

(h)        the transfer or other disposition of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock, in each case to the Company, upon a vesting or settlement event of the Company's securities or upon the exercise of options, restricted share units, share value awards, warrants or other equity awards to purchase the Company's securities on a "cashless" or "net exercise" basis to the extent permitted by the instruments representing such securities (including any transfer or other disposition in each case to the Company, necessary to generate such amount of cash needed for the payment of taxes, including estimated taxes, due as a result of such vesting or exercise whether by means of a "net settlement" or otherwise) so long as such "cashless exercise" or "net exercise" is effected solely by surrender of outstanding options, restricted share units, share value awards, warrants or other equity awards (or the Common Stock issuable upon the exercise thereof) to the Company and the Company's cancellation of all or a portion thereof to pay the exercise price and/or withholding tax obligations, but for the avoidance of doubt, excluding all methods of exercise that would involve a sale other than to the Company of any Common Stock relating to such equity awards, whether to cover the applicable exercise price and/or withholding tax obligations or otherwise; *provided* that any filing under Section 16(a) of the Exchange Act shall clearly indicate in the footnotes thereto that (i) the filing relates to the circumstances described in this clause (h), and (ii) any shares received upon exercise or settlement of the option, restricted share unit, share value award or other equity award or exercise of warrants are subject to a lock-up agreement substantially in the form of this Lock-Up Agreement;

(i)        in connection with any reclassification or conversion of any outstanding preferred shares of the Company into Common Stock prior to or in connection with the consummation of the Public Offering or pursuant to any sale, exchange or other transfer to effect the Transactions (as defined in the Prospectus); *provided* that (i) such reclassification, conversion, sale, exchange or other transfer is disclosed in the Prospectus, (ii) any such Common Stock received upon such reclassification, conversion, sale, exchange or other transfer shall be subject to the terms of this Lock-Up Agreement and (iii) any filing required under Section 16(a) of the Exchange Act during the Restricted Period shall clearly indicate in the footnotes thereto that the filing relates to the circumstances described in this clause (i);

(j)        transfers of Common Stock pursuant to a bona fide third-party tender offer, merger, consolidation or other similar transaction after the completion of the Public Offering that is approved by the Board of Directors of the Company and made to all holders of the Company's capital stock involving a Change of Control (as defined below) of the Company, *provided* that in the event that such tender offer, merger, consolidation or other such transaction is not completed, the undersigned's shares of Common Stock shall remain subject to the provisions of this Lock-Up Agreement; or

A-3

(k)        establishing trading plans pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of Common Stock, *provided* that (i) such plan does not provide for the transfer of Common Stock during the Restricted Period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required of or voluntarily made by or on behalf of the undersigned or the Company regarding the establishment of such plan, such announcement or filing shall include a statement to the effect that no transfer of Common Stock may be made under such plan during the Restricted Period.

Nothing in this Lock-Up Agreement shall prevent the undersigned from making a demand for, or exercising any right with respect to, the registration of the undersigned's shares of Common Stock, except for any such demand or any such exercise that is publicly disclosed (or required to be publicly disclosed) by the undersigned or any of its affiliates prior to the expiration of the Lock-Up Period; *provided* that in no event shall the Company be obligated to take an action in violation of Section 6(q) of the Underwriting Agreement. The undersigned also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the undersigned's Common Stock except in compliance with the foregoing restrictions.

For purposes of this letter, "**immediate family**" shall mean any relationship by blood, marriage or adoption, not more remote than first cousin. For purposes of this letter, "**Change of Control**" shall mean the transfer (whether by tender offer, merger, consolidation or other similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an Underwriter pursuant to the Public Offering), of the Company's voting securities if, after such transfer, such person or group of affiliated persons would hold more than 50% of the outstanding voting securities of the Company (or the surviving entity).

If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing restrictions shall be equally applicable to any issuer-directed shares of Common Stock the undersigned may purchase in the offering.

If the undersigned is an officer or director of the Company, (i) J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC severally and not jointly agree that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of Common Stock, J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC will notify the Company of the impending release or waiver, and (ii) the Company has agreed in the Underwriting Agreement to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC hereunder to any such officer or director shall only be effective two business days after the publication date of such press release. The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration or to an immediate family member as defined in FINRA Rule 5130(i)(5) and (b) the transferee has agreed in writing to be bound by the same terms described in this Lock-Up Agreement to the extent and for the duration that such terms remain in effect at the time of the transfer.

A-4

The undersigned understands that the Company and the Underwriters are relying upon this Lock-Up Agreement in proceeding toward consummation of the Public Offering. The undersigned further understands that this Lock-Up Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns.

The undersigned acknowledges and agrees that the Underwriters have not provided any recommendation or investment advice nor have the Underwriters solicited any action from the undersigned with respect to the Public Offering of the Common Stock and the undersigned has consulted their own legal, accounting, financial, regulatory and tax advisors to the extent deemed appropriate. The undersigned further acknowledges and agrees that, although the Underwriters may provide certain Regulation Best Interest and Form CRS disclosures or other related documentation to you in connection with the Public Offering, the Underwriters are not making a recommendation to you to participate in the Public Offering or sell any shares of Common Stock at the price determined in the Public Offering, and nothing set forth in such disclosures or documentation is intended to suggest that any Underwriter is making such a recommendation.

The undersigned hereby consents to receipt of this Lock-Up Agreement in electronic form and understands and agrees that this letter agreement may be signed electronically. If any signature is delivered by facsimile transmission, electronic mail, or otherwise by electronic transmission evidencing an intent to sign this Lock-Up Agreement (including any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com), such facsimile transmission, electronic mail or other electronic transmission shall create a valid and binding obligation of the undersigned with the same force and effect as if such signature were an original. Execution and delivery of this Lock-Up Agreement by facsimile transmission, electronic mail or other electronic transmission is legal, valid and binding for all purposes.

Whether or not the Public Offering actually occurs depends on a number of factors, including market conditions. Any Public Offering will only be made pursuant to an Underwriting Agreement, the terms of which are subject to negotiation between the Company and the Underwriters.

This Lock-Up Agreement shall automatically terminate and the undersigned will be released from all obligations hereunder upon the earliest to occur, if any, of (a) the Company, on the one hand, or the Representatives, on the other hand, advising the other in writing that it has determined not to proceed with the Public Offering prior to the execution of the Underwriting Agreement, (b) the date the registration statement is withdrawn, if prior to the execution of the Underwriting Agreement and the closing of the Public Offering, (c) the date the Underwriting Agreement is terminated, if prior to the closing of the Public Offering, and (d) December 31, 2021, if the Underwriting Agreement has not been executed by such date; *provided* that the Company may by written notice to the undersigned prior to December 31, 2021, extend such date for a period of up to an additional three months.

This Lock-Up Agreement and any claim, controversy or dispute arising thereunder or related hereto shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws principles thereof.

Very truly yours,

**IF AN INDIVIDUAL:**                                   **IF AN ENTITY:**

_____                        _____
*(duly authorized signature)*                          *(please print complete name of entity)*

Name: _____                        By: _____
*(please print full name)*                             *(duly authorized signature)*

                                                       Name: _____
                                                       *(please print full name)*

                                                       Title: _____
                                                       *(please print full title)*

Address: _____                       Address: _____

_____                        _____

_____                        _____

E-mail: _____                       E-mail: _____


A-6

**EXHIBIT B**

**FORM OF WAIVER OF LOCK-UP**

, 20

[Name and Address of
Officer or Director
Requesting Waiver]

Dear Mr./Ms. [Name]:

This letter is being delivered to you in connection with the offering by Fluence Energy Inc. (the "**Company**") of shares of Common Stock, par value $0.00001 per share (the "**Common Stock**"), of the Company and the lock-up agreement dated                , 20    (the "Lock-up Agreement"), executed by you in connection with such offering, and your request for a [waiver] [release] dated                , 20    , with respect to                shares of Common Stock (the "**Shares**").

J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC hereby agree to [waive] [release] the transfer restrictions set forth in the Lock-up Agreement, but only with respect to the Shares, effective                , 20    ; provided, however, that such [waiver] [release] is conditioned on the Company announcing the impending [waiver] [release] by press release through a major news service at least two business days before effectiveness of such [waiver] [release]. This letter will serve as notice to the Company of the impending [waiver] [release].

Except as expressly [waived] [released] hereby, the Lock-up Agreement shall remain in full force and effect.

Very truly yours,

J.P. Morgan Securities LLC
Morgan Stanley & Co. LLC
Acting severally on behalf of themselves and the several Underwriters named in Schedule I hereto

By: _____
    Name:
    Title:

cc:    Company

B-1

**FORM OF PRESS RELEASE**

Fluence Energy, Inc.

[Date]

Fluence Energy, Inc. (the "**Company**") announced today that J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, the lead book-running managers in the Company's recent public sale of              Common Stock, are [waiving][releasing] a lock-up restriction with respect to              shares of the Company's Common Stock held by [certain officers or directors] [an officer or director] of the Company. The [waiver][release] will take effect on              , 20    , and the shares may be sold on or after such date.

**This press release is not an offer for sale of the securities in the United States or in any other jurisdiction where such offer is prohibited, and such securities may not be offered or sold in the United States absent registration or an exemption from registration under the United States Securities Act of 1933, as amended.**

B-2

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**FLUENCE ENERGY, INC.**

Fluence Energy, Inc., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.      The original Certificate of Incorporation of the Corporation was filed with the Office of the Secretary of State of the State of Delaware on June 21, 2021 (the "*Original Certificate*").

2.      The Corporation is filing this Amended and Restated Certificate of Incorporation of the Corporation, which restates, integrates and further amends the Original Certificate, as heretofore amended (the "*Certificate of Incorporation*"), and which was duly adopted by all necessary action of the board of directors of the Corporation and the stockholders of the Corporation in accordance with the provisions of Sections 242, 245 and 228 of the General Corporation Law of the State of Delaware.

3.      The text of the Original Certificate is hereby amended and restated in its entirety by this Certificate of Incorporation to read in full as follows:

**ARTICLE I.**

The name of the corporation is Fluence Energy, Inc. (the "*Corporation*").

**ARTICLE II.**

The address of the Corporation's registered office in the State of Delaware is 251 Little Falls Drive, County of New Castle, Wilmington, Delaware, 19808. The name of its registered agent at such address is The Corporation Trust Company.

**ARTICLE III.**

The nature of the business of the Corporation and the objects or purposes to be transacted, promoted or carried on by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "*DGCL*"), including, without limitation, (i) investing in securities of Fluence Energy, LLC, a Delaware limited liability company, or any successor entities thereto ("*Fluence LLC*") and any of its subsidiaries, (ii) exercising all rights, powers, privileges and other incidents of ownership or possession with respect to the Corporation's assets, including managing, holding, selling and disposing of such assets and (iii) engaging in any other activities incidental or ancillary thereto.

**ARTICLE IV.**

Section 4.1      Authorized Stock. The total number of shares of all classes of stock that the Corporation is authorized to issue is one billion, eight hundred and ten million (1,810,000,000), consisting of:

(a)      1,200,000,0000 shares of Class A common stock, with a par value of $0.00001 per share (the "*Class A Common Stock*");

(b)      300,000,000 shares of Class B-1 common stock, with a par value of $0.00001 per share (the "*Class B-1 Common Stock*");

(c)      300,000,000 shares of Class B-2 common stock, with a par value of $0.00001 per share (the "*Class B-2 Common Stock*" and together with the Class A Common Stock and Class B-1 Common Stock, the "*Common Stock*"); and

(d)        10,000,000 shares of preferred stock, with a par value of $0.00001 per share (the "*Preferred Stock*").

Section 4.2    Preferred Stock. The board of directors of the Corporation (the "*Board of Directors*") is authorized, subject to any limitations prescribed by law or by that certain stockholders agreement, dated as of [●], 2021, by and among the Corporation and the other Persons party thereto (as it may be amended from time to time in accordance with its terms, the "*Stockholders Agreement*") (for so long as it remains in effect), to provide, out of the unissued shares of Preferred Stock, for the issuance of shares of Preferred Stock in one or more series, and by filing a certificate pursuant to the applicable law of the State of Delaware (such certificate being hereinafter referred to as a "*Preferred Stock Designation*"), to establish from time to time the number of shares to be included in each such series and to fix the powers, designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including, without limitation, the authority to fix or alter the dividend rights, dividend rates, conversion rights, exchange rights, voting rights, rights and terms of redemption (including sinking and purchase fund provisions), the redemption price or prices, restrictions on the issuance of shares of such series, the dissolution preferences and the rights in respect of any distribution of assets of any wholly unissued series of Preferred Stock and the number of shares constituting any such series, and the designation thereof, or any of them and to increase (but not above the total number of authorized shares of Preferred Stock) or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series so created (except where otherwise provided in the Preferred Stock Designation), subsequent to the issue of that series. In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series. There shall be no limitation or restriction on any variation between any of the different series of Preferred Stock as to the designations, powers preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof; and the several series of Preferred Stock may vary in any and all respects as fixed and determined by the resolution or resolutions of the Board of Directors or by a committee of the Board of Directors, providing for the issuance of the various series of Preferred Stock.

Section 4.3    Number of Authorized Shares. Subject to any limitations prescribed by the Stockholders Agreement, and except as set forth in any Preferred Stock Designation, the number of authorized shares of any of the Class A Common Stock, Class B-1 Common Stock, Class B-2 Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the outstanding shares of stock of the Corporation entitled to vote thereon, irrespective of the provisions of Section 242(b)(2) of the DGCL, and no vote of the holders of shares of Class A Common Stock, Class B-1 Common Stock, Class B-2 Common Stock or Preferred Stock, or of any series thereof, separately as a class shall be required therefor.

Section 4.4    Common Stock. The powers, preferences and rights of the Class A Common Stock, the Class B-1 Common Stock and the Class B-2 Common Stock, and the qualifications, limitations or restrictions thereof are as follows:

(a)        Voting Rights. Except as otherwise required by law,

(i)        Each share of Class A Common Stock shall entitle the record holder thereof as of the applicable record date to one (1) vote per share in person or by proxy on all matters submitted to a vote of the holders of Class A Common Stock, whether voting separately as a class or otherwise.

(ii)        Each share of Class B-1 Common Stock shall entitle the record holder thereof as of the applicable record date to five (5) votes per share in person or by proxy on all matters submitted to a vote of the holders of Class B-1 Common Stock, whether voting separately as a class or otherwise.

(iii)        Each share of Class B-2 Common Stock shall entitle the record holder thereof as of the applicable record date to one (1) vote per share in person or by proxy on all matters submitted to a vote of the holders of Class B-2 Common Stock, whether voting separately as a class or otherwise.

(iv)        Except as otherwise required in this Certificate of Incorporation or by applicable law, the holders of shares of Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock shall vote together as a single class (or, if any holders of shares of Preferred Stock are entitled to vote together with the holders of Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock, as a single class with such holders of Preferred Stock) on all matters submitted to a vote of stockholders of the Corporation.

(v)        Except as otherwise required by law, holders of Class A Common Stock, Class B-1 Common Stock and Class B-2 Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Preferred Stock Designation).

(vi)        If at any time the ratio at which Common Units (as defined below) are redeemable or exchangeable for shares of Class A Common Stock is amended or adjusted pursuant to the LLC Agreement (as defined below), (A) the number of votes per share of Class B-1 Common Stock to which holders of shares of Class B-1 Common Stock are entitled pursuant to Section 4.4(a)(ii) of this Article IV shall be automatically adjusted so that from and after such time the aggregate number of votes that a holder of Class B-1 Common Stock is entitled to vote with respect to all shares of Class B-1 Common Stock held by such holder is equal to the number of Class A Common Stock subject to be exchanged or redeemed for all Common Units held by such holder and (B) the number of votes per share of Class B-2 Common Stock to which holders of shares of Class B-2 Common Stock are entitled pursuant to Section 4.4(a)(iii) of this Article IV shall be automatically adjusted so that from and after such time the aggregate number of votes that a holder of Class B-2 Common Stock is entitled to vote with respect to all shares of Class B-2 Common Stock held by such holder is equal to the number of Class A Common Stock subject to be exchanged or redeemed for all Common Units held by such holder.

(b)        Dividends; Stock Splits or Combinations.

(i)        Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock or of any class or series of stock having a preference over or the right to participate with the Class A Common Stock with respect to the payment of dividends, dividends may be declared and paid on the Class A Common Stock out of the assets or funds of the Corporation that are by law available therefor, at such times and in such amounts as the Board of Directors in its discretion shall determine. Dividends shall not be declared or paid on the Class B-1 Common Stock or the Class B-2 Common Stock; the holders of shares of Class B-1 Common Stock shall have no right to receive dividends in respect of such shares of Class B-1 Common Stock; and the holders of shares of Class B-2 Common Stock shall have no right to receive dividends in respect of such shares of Class B-2 Common Stock.

(ii)        In no event will any stock dividend, stock split, reverse stock split, combination of stock, reclassification or recapitalization be declared or made on the Class A Common Stock, the Class B-1 Common Stock or the Class B-2 Common Stock (each, a "***Stock Adjustment***") unless (A) a corresponding Stock Adjustment on the Class A Common Stock, the Class B-1 Common Stock or the Class B-2 Common Stock, as the case may be, at the time outstanding is made in the same proportion and the same manner and (B) the Stock Adjustment has been reflected in the same economically equivalent manner on all LLC Units.

(iii)        Stock dividends paid on (A) the Class A Common Stock may only be paid in shares of Class A Common Stock, (B) the Class B-1 Common Stock may only be paid with shares of Class B-1 Common Stock and (C) the Class B-2 Common Stock may only be paid with shares of Class B-2 Common Stock.

(c)        Liquidation Rights. In the event of liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, after payment or provision for payment of the debts and other liabilities of the Corporation and after making provisions for preferential and other amounts, if any, to which the holders of Preferred Stock or any class or series of stock having a preference over or the right to participate with the Common Stock with respect to payments in liquidation shall be entitled, the remaining assets and funds of the Corporation available for distribution shall be divided among and paid ratably to the holders of all outstanding shares of Class A Common Stock in proportion to the number of shares of Class A Common Stock held by them. Without limiting the rights of the holders of Class B-1 Common Stock or Class B-2 Common Stock to have their Common Units redeemed or exchanged in accordance with Article IX of the LLC Agreement, neither the holders of shares of Class B-1 Common Stock nor the holders of Class B-2 Common Stock shall be entitled to receive any assets of the Corporation in any liquidation, dissolution or winding up. A consolidation, reorganization or merger of the Corporation with any other Person or Persons (as defined below), or a sale of all or substantially all of the assets of the Corporation, shall not be considered to be a dissolution, liquidation or winding up of the Corporation within the meaning of this Section 4.4(c).

(d)    <u>Class B-1 Common Stock and Class B-2 Common Stock</u>.

(i)    From and after the effectiveness of this Certificate of Incorporation with the Secretary of State of the State of Delaware (the "***Effective Time***"), (x) shares of Class B-1 Common Stock and Class B-2 Common Stock may be issued only to, and registered only in the name of, the Existing Owners and their respective Permitted Transferees (as defined below) in accordance with <u>Section 4.5</u> (including all subsequent Permitted Transferees) (the Existing Owners together with such persons, collectively, the "***Permitted Owners***") and (y) the aggregate number of shares of Class B-1 Common Stock and Class B-2 Common Stock at any time registered in the name of each such Permitted Owner must be equal to the aggregate number of Common Units held of record at such time by such Permitted Owner under the LLC Agreement (as defined below). As used in this Certificate of Incorporation, (A) "***Existing Owner***" means each of the holders of Common Units (other than the Corporation) of Fluence LLC, as set forth on <u>Schedule A</u> hereto, (B) "***Common Unit***" means a limited liability company interest in Fluence LLC, authorized and issued under the Third Amended and Restated Limited Liability Company Agreement of Fluence LLC, dated as of the date hereof, as such agreement may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "***LLC Agreement***"), and constituting a "Common Unit" as defined in such LLC Agreement and (C) "***Permitted Transferee***" means (1) the Corporation and any of its subsidiaries, (2) any Affiliate (as defined below) of the respective transferor, and (3) any transferee of Common Units pursuant to a transfer made in compliance with the LLC Agreement.

(ii)    Shares of Class B-1 Common Stock and Class B-2 Common Stock may be issued or transferred only in connection with the simultaneous issuance or transfer of an identical number of Common Units. Any purported issuance or transfer of shares of Class B-1 Common Stock or Class B-2 Common Stock not accompanied by a issuance or transfer of the identical number of Common Units shall be null and void and no force or effect, and the shares of Class B-1 Common Stock or Class B-2 Common Stock, as applicable, so issued or transferred shall be automatically transferred and to the Corporation and cancelled for no consideration.

(iii)    Each outstanding share of Class B-1 Common Stock shall automatically convert into one (1) validly issued, fully paid and nonassessable share of Class B-2 Common Stock upon the earliest of (A) any transfer by an Existing Owner of such shares of Class B-1 Common Stock other than to an Affiliate of such Existing Owner, (B) with respect to each Existing Owner and its Affiliates, 5:00 p.m. (New York City time) on a date fixed by the Board of Directors that is not less than 60 days nor more than 180 days following the date that such Existing Owner, together with its Affiliates, ceases to hold an aggregate number of shares of all classes of Common Stock representing at least twenty percent (20%) of the aggregate number of all outstanding shares of all classes of Common Stock, and (C) 5:00 p.m. (New York City time) on the date that is seven (7) years following the closing of the Corporation's initial public offering of Class A Common Stock in a firm commitment underwritten offering pursuant to an effective registration statement under the Securities Act of 1933, as amended.

(iv)    In the event that there is a merger, consolidation or Change of Control (as defined below) of the Corporation, without limiting the rights of the holders of Class B-1 Common Stock and Class B-2 Common Stock to have their Common Units redeemed or exchanged in accordance with <u>Article IX</u> of the LLC Agreement, neither the holders of shares of Class B-1 Common Stock nor the holders of shares of Class B-2 Common Stock shall be entitled to receive any assets of the Corporation, whether in the form of consideration for such shares or in the form of a distribution of the proceeds of a sale of all or substantially all of the assets of the Corporation with respect to such shares.

(e)      Ratio of Common Stock to Common Units. The Corporation shall, to the fullest extent permitted by law, undertake all necessary and appropriate action within its control to ensure that (i) the number of shares of Class A Common Stock issued by the Corporation at any time is equal to the aggregate number of Common Units held of record by the Corporation, and (ii) the number of shares of Class B-1 Common Stock and Class B-2 Common Stock issued by the Corporation at any time to, or otherwise held of record by, any Permitted Owner is no more than the aggregate number of Common Units held of record by such Permitted Owner, in each case, in accordance with the terms of the LLC Agreement.

Section 4.5      Transfer of Class B-1 Common Stock and Class B-2 Common Stock.

(a)      A holder of Class B-1 Common Stock or Class B-2 Common Stock may surrender and transfer shares of such Class B-1 Common Stock or Class B-2 Common Stock, as applicable, to the Corporation for cancellation for no consideration at any time. Following the surrender and transfer, or other acquisition, of any shares of Class B-1 Common Stock or Class B-2 Common Stock to or by the Corporation, the shares shall automatically be cancelled and retired and such shares shall not be re-issued by the Corporation.

(b)      Except as set forth in Section 4.5(a), a holder of Class B-1 Common Stock or Class B-2 Common Stock may Transfer shares of Class B-1 Common Stock or Class B-2 Common Stock only to a Permitted Transferee of such holder, and only if such holder Transfers an equal number of such holder's Common Units to such Permitted Transferee in compliance with the LLC Agreement. The Transfer restrictions described in this Section 4.5(b) are referred to as the "**Restrictions**".

(c)      Any purported Transfer of shares of Class B-1 Common Stock or Class B-2 Common Stock in violation of the Restrictions shall be null and void *ab initio*. If, notwithstanding the Restrictions, a Person, voluntarily or involuntarily (including by way of a foreclosure), purportedly becomes or attempts to become, the purported owner (the "**Purported Owner**") of shares of Class B-1 Common Stock or Class B-2 Common Stock in violation of the Restrictions, then the Purported Owner shall not obtain any rights in, to or with respect to such shares of Class B-1 Common Stock or Class B-2 Common Stock (the "**Restricted Shares**"), and each Restricted Share shall automatically, without any further action on the part of the Corporation, be transferred to the Corporation for no consideration and cancelled.

(d)      The Board of Directors may, to the extent permitted by law, from time to time establish, modify, amend or rescind, by law or otherwise, regulations and procedures not inconsistent with the provisions of this Section 4.5 for determining whether any Transfer or acquisition of shares of Class B-1 Common Stock or Class B-2 Common Stock would violate the Restrictions, and for the orderly application, administration and implementation of the provisions of this Section 4.5. Any such procedures and regulations shall be kept on file with the Secretary of the Corporation and with the Corporation's transfer agent and shall be made available for inspection by and, upon written request shall be mailed to, any requesting holders of shares of Class B-1 Common Stock or Class B-2 Common Stock, as applicable.

(e)      As used in this Section 4.5, the term "Transfer", as it relates to the shares of Class B-1 Common Stock or Class B-2 Common Stock, shall not be deemed to include any *bona fide* pledge or collateralization by a holder thereof to a financial institution in connection with any *bona fide* loan or debt transaction, but such term shall include any foreclosure on such shares by such financial institution following or in connection with any such pledge or collateralization.

Section 4.6      Certificates. All certificates or book entries representing shares of Class B-1 Common Stock or Class B-2 Common Stock shall bear a legend substantially in the following form (or in such other form as the Board of Directors may determine):

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE RESTRICTIONS (INCLUDING RESTRICTIONS ON TRANSFER) SET FORTH IN THE CERTIFICATE OF INCORPORATION OF THE CORPORATION (A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE CORPORATION AND SHALL BE PROVIDED FREE OF CHARGE TO ANY STOCKHOLDER MAKING A REQUEST THEREFOR).

**ARTICLE V.**

The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock, solely for the purpose of effecting a redemption of the Common Units, such number of shares of Class A Common Stock as shall from time to time be sufficient to effect the redemption of all outstanding Common Units (other than those held by the Corporation and any direct or indirect majority-owned subsidiary of the Corporation) in exchange for shares of Class A Common Stock.

**ARTICLE VI.**

Subject to the Stockholders Agreement (for so long as it remains in effect), the Board of Directors is expressly authorized to adopt, amend, repeal or rescind the bylaws of the Corporation (the "*Bylaws*"). The affirmative vote of at least a majority of the Board of Directors then in office shall be required in order for the Board of Directors to adopt, amend, repeal, or rescind the Bylaws. The stockholders shall also have power to adopt, repeal, alter, amend or rescind the Bylaws. In addition to any vote of the holders of any class or series of stock of the Corporation required by applicable law or by this Certificate of Incorporation (including any Preferred Stock outstanding at any time), such adoption, repeal, alteration, amendment or rescission of the Bylaws by the stockholders shall require the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

**ARTICLE VII.**

Section 7.1    <u>Ballot</u>. Elections of directors (each such director, in such capacity, a "*Director*") need not be by written ballot unless the Bylaws shall so provide.

Section 7.2    <u>Number and Terms of the Board of Directors</u>. Subject to the terms of the Stockholders Agreement (for so long as it remains in effect) and the rights of the holders of any series of Preferred Stock to elect directors under specified circumstances, the number of Directors shall be fixed from time to time exclusively by resolution adopted by a majority of the total number of authorized directors (from time to time) whether or not there exist any vacancies in previously authorized directorships; <u>provided</u>, that for as long as the Stockholders Agreement is in effect, the number of Directors shall never be less than the aggregate number of Directors that the parties to the Stockholders Agreement are entitled to designate from time to time pursuant to Section 1 thereof.

Section 7.3    <u>Newly Created Directorships and Vacancies</u>. Except as otherwise required by law and subject to the Stockholders Agreement (for so long as it remains in effect) and the separate rights of the holders of any series of Preferred Stock then outstanding, unless the Board of Directors otherwise determines, newly created directorships resulting from any increase in the authorized number of directors or any vacancies on the Board of Directors resulting from the death, resignation, disqualification, removal from office or other cause shall be filled only by a majority vote of the Directors then in office, though less than a quorum, or by a sole remaining Director entitled to vote thereon, and not by the stockholders. Subject to the Stockholders Agreement (for so long as it remains in effect), any Director so chosen shall hold office until his or her successor shall be elected and qualified.

Section 7.4    <u>Notice</u>. Advance notice of stockholder nominations for election of Directors and other business to be brought by stockholders before a meeting of stockholders shall be given in the manner provided by the Bylaws.

**ARTICLE VIII.**

Subject to the rights of the holders of any series of Preferred Stock with respect to such series of Preferred stock, from and after the Voting Threshold Date (as defined below), any action required or permitted to be taken at any annual or special meeting of stockholders may only be taken at a duly called annual or special meeting of stockholders and may not be taken by written consent in lieu of a meeting. "*Voting Threshold Date*" shall mean 5:00 p.m. (New York City time) on the first day falling on or after the date on which the aggregate number of outstanding shares of Class B-1 Common Stock and Class B-2 Common Stock, voting together as a single class, cease to represent at least fifty percent (50%) of the total voting power of the outstanding shares of capital stock of the Corporation then entitled to vote generally in the election of directors.

**ARTICLE IX.**

Subject to the Stockholders Agreement (for so long as it remains in effect), the Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation; provided that, notwithstanding any other provision of this Certificate of Incorporation or any provision of law that might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of the Corporation, and, as applicable, such other approvals of the Board of Directors, as are required by law or by this Certificate of Incorporation, (A) the affirmative vote of the holders of sixty-six and two-thirds percent (66 2/3%) of the voting power of the outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal, or adopt any provision of this Certificate of Incorporation inconsistent with, Article IV, Article V, Article VI, Article VII, Article VIII, this Article IX, Article X, Article XI, Article XII, and Article XIII; and (B) for so long as any shares of Class B-1 Common Stock or Class B-2 Common Stock are outstanding, (i) the affirmative vote of the holders at least eighty percent (80%) of the shares of Class B-1 Common Stock and Class B-2 Common Stock outstanding at the time of such vote, voting together as a single class, shall be required to amend or repeal, or adopt any provision of this Certificate of Incorporation inconsistent with Section 4.4 of Article IV or this clause (B) of Article IX, and (ii) the affirmative vote of the holders of a majority of the shares of Class A Common Stock outstanding at the time of such vote, voting as a separate class, shall be required to amend or repeal, by merger or otherwise, or adopt any provision of this Certificate of Incorporation that provides the holders of the Class B-1 Common Stock or Class B-2 Common Stock (1) any rights to receive Dividends or any other kind of distribution, (2) other than redemptions as permitted by the LLC Agreement, any right to convert into or be exchanged for shares of Class A Common Stock or (3) any other economic rights.

If any provision or provisions of this Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any Person or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Certificate of Incorporation (including, without limitation, each portion of any sentence of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other Persons and circumstances shall not in any way be affected or impaired thereby.

**ARTICLE X.**

The Corporation is authorized to indemnify, and to advance expenses to, each current or former Director, officer, employee or agent of the Corporation to the fullest extent permitted by Section 145 of the DGCL as it presently exists or may hereafter be amended. To the fullest extent permitted by the laws of the State of Delaware as it exists on the date hereof or as it may hereafter be amended, no Director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of his or her fiduciary duties as a director. No amendment to, or modification or repeal of, this Article X shall adversely affect any right or protection of a Director or of any officer, employee or agent of the Corporation existing hereunder with respect to any act or omission occurring prior to such amendment, modification or repeal.

**ARTICLE XI.**

Section 11.1    <u>Corporate Opportunity</u>.

(a)        To the fullest extent permitted by the laws of the State of Delaware and in accordance with Section 122(17) of the DGCL, (i) the Corporation hereby renounces all interest and expectancy that it otherwise would be entitled to have in, and all rights to be offered an opportunity to participate in, any business opportunity that from time to time may be presented to (1) AES Grid Stability, any Directors who are employees of or Affiliates of AES Grid Stability (other than any such Director who is also an employee of the Corporation or its subsidiaries), (2) Siemens Industry, any Directors who are employees of or Affiliates of Siemens Industry (other than any such Director who is also an employee of the Corporation or its subsidiaries), (3) QIA, any Directors who are employees of or Affiliates of QIA (other than any such Director who is also an employee of the Corporation or its subsidiaries) or (4) any Director or stockholder who is not employed by the Corporation or its subsidiaries (each such Person in clauses (1) through (4), an "***Exempt Person***"); (ii) no Exempt Person will have any duty to refrain from (1) engaging in a corporate opportunity in the same or similar lines of business in which the Corporation or its subsidiaries from time to time is engaged or proposes to engage or (2) otherwise competing, directly or indirectly, with the Corporation or any of its subsidiaries; and (iii) if any Exempt Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity both for such Exempt Person or any of his or her respective Affiliates, on the one hand, and for the Corporation or its subsidiaries, on the other hand, such Exempt Person shall have no duty to communicate or offer such transaction or business opportunity to the Corporation or its subsidiaries and such Exempt Person may take any and all such transactions or opportunities for itself or offer such transactions or opportunities to any other Person. Notwithstanding the foregoing, the preceding sentence of this <u>Section 11.1(a)</u> shall not apply to any potential transaction or business opportunity (x) that is expressly offered to a Director, executive officer or employee of the Corporation or its subsidiaries, solely in his or her capacity as a Director, executive officer or employee of the Corporation or its subsidiaries or (y) is agreed to be offered to the Corporation by AES Grid Stability or Siemens Industry pursuant to contractual arrangements among such parties.

(b)        To the fullest extent permitted by the laws of the State of Delaware, no potential transaction or business opportunity may be deemed to be a corporate opportunity of the Corporation or its subsidiaries unless (i) the Corporation or its subsidiaries would be permitted to undertake such transaction or opportunity in accordance with this Certificate of Incorporation, (ii) the Corporation or its subsidiaries at such time have sufficient financial resources to undertake such transaction or opportunity, (iii) the Corporation or its subsidiaries have an interest or expectancy in such transaction or opportunity and (iv) such transaction or opportunity would be in the same or similar line of business in which the Corporation or its subsidiaries are then engaged or a line of business that is reasonably related to, or a reasonable extension of, such line of business.

Section 11.2    <u>Liability</u>. To the fullest extent permitted by law, no stockholder and no Director will be liable to the Corporation or its subsidiaries or stockholders for breach of any duty solely by reason of any activities or omissions of the types referred to in this <u>Article XI</u>, except to the extent such actions or omissions are in breach of this <u>Article XI</u>.

**ARTICLE XII.**

Unless the Corporation consents in writing to the selection of an alternative forum, (A) the Court of Chancery of the State of Delaware (or, if such court does not have subject matter jurisdiction thereof, the federal district court of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for: (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for or based on a breach of a fiduciary duty owed by any current or former director, officer, other employee, agent or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any current or former director, officer, employee, agent or stockholder of the Corporation arising pursuant to any provision of the DGCL or the Corporation's Certificate of Incorporation or Bylaws (as either may be amended and/or restated from time to time) or as to which the DGCL confers jurisdiction on the Court of Chancery of the State of Delaware, or (iv) any action asserting a claim related to or involving the Corporation that is governed by the internal affairs doctrine; and (B) subject to the preceding provisions of this <u>Article XII</u>, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

Notwithstanding the foregoing, this <u>Article XII</u> shall not apply to claims seeking solely to enforce any liability or duty created by the Securities Exchange Act of 1934, as amended, or any other claim for which the U.S. federal courts have exclusive jurisdiction.

To the fullest extent permitted by law, any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this <u>Article XII</u>.

<div align="center">

**ARTICLE XIII.**

</div>

Section 13.1    <u>Section 203 of the DGCL</u>. The Corporation expressly elects not to be governed by Section 203 of the DGCL and the restrictions and limitations set forth therein.

Section 13.2    <u>Interested Stockholder Transactions</u>. Notwithstanding anything to the contrary set forth in this Certificate of Incorporation, the Corporation shall not engage in any Business Combination (as defined below) at any point in time at which the Corporation's Class A Common Stock or Class B-1 Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act with any Interested Stockholder (as defined below) for a period of three (3) years following the time that such stockholder became an Interested Stockholder, unless:

(a)    prior to such time that such stockholder became an Interested Stockholder, the Board of Directors approved either the Business Combination or the transaction which resulted in such stockholder becoming an Interested Stockholder; or

(b)    at or subsequent to such time that such stockholder became an Interested Stockholder, the Business Combination is approved by the Board of Directors and authorized at an annual or special meeting of stockholders by the affirmative vote of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the outstanding shares of capital stock of the Corporation which is not owned by such Interested Stockholder; or

(c)    upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least eighty-five percent (85%) of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding (but not the outstanding voting stock owned by the interested stockholder) those shares owned (i) by persons who are directors and also officers and (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

(d)    a stockholder becomes an interested stockholder inadvertently and (A) as soon as practicable divests itself of ownership of sufficient shares so that the stockholder ceases to be an interested stockholder; and (B) would not, at any time within the three- year period immediately prior to a business combination between the Corporation and such stockholder, have been an interested stockholder but for the inadvertent acquisition of ownership; or

(e)    the business combination is proposed prior to the consummation or abandonment of and subsequent to the earlier of the public announcement or the notice required hereunder of a proposed transaction which (A) constitutes one of the transactions described in the second sentence of this Section 13 of Article XIII; (B) the business combination is with or by a person who either was not an interested stockholder during the previous three years or who became an interested stockholder with the approval of the Board; and (C) is approved or not opposed by a majority of the directors then in office (but not less than one) who were directors prior to any person becoming an interested stockholder during the previous three years or were recommended for election or elected to succeed such directors by a majority of such directors. The proposed transactions referred to in the preceding sentence are limited to (x) a merger or consolidation of the Corporation (except for a merger in respect of which, pursuant to Section 251(f) of the DGCL, no vote of the stockholders of the Corporation is required); (y) a sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation (other than to any direct or indirect wholly-owned subsidiary or to the Corporation) having an aggregate market value equal to fifty percent (50%) or more of either that aggregate market value of all of the assets of the Corporation determined on a consolidated basis or the aggregate market value of all the outstanding stock (as defined hereinafter) of the Corporation; or (z) a proposed tender or exchange offer for fifty percent (50%) or more of the outstanding voting stock of the Corporation. The Corporation shall give not less than 20 days' notice to all interested stockholders prior to the consummation of any of the transactions described in clause (x) or (y) of the second sentence of this Section 13(ii) of Article XIII.

Section 13.3    Definitions. As used in this Certificate of Incorporation, the following terms shall have the following meaning:

(a)      "**AES Grid Stability**" means AES Grid Stability, LLC, a Delaware limited liability company.

(b)      "**AES Related Parties**" means AES Grid Stability and its Affiliates.

(c)      **"Affiliate"** means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another Person;

(d)      **"Associate"**, when used to indicate a relationship with any Person, means: (i) any corporation, partnership, unincorporated association or other entity of which such Person is a director, officer or partner or is, directly or indirectly, the owner of twenty percent (20%) or more of any class of shares of voting stock of the Corporation; (ii) any trust or other estate in which such Person has at least a twenty percent (20%) beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity; and (iii) any relative or spouse of such Person, or any relative of such spouse, who has the same residence as such Person.

(e)      **"Business Combination"** means (i) any merger or consolidation of the Corporation or any direct or indirect majority-owned subsidiary of the Corporation with the Interested Stockholder or (ii) any sale, lease, exchange, mortgage, pledge, Transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of the Corporation, to or with the Interested Stockholder, whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation which assets have an aggregate market value equal to ten percent (10%) or more of either the aggregate market value of all the assets of the Corporation determined on a consolidated basis or the aggregate market value of all the outstanding shares of capital stock of the Corporation.

(f)      **"Change of Control"** means the occurrence of any of the following events: (1) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of shares of Class A Common Stock, Class B-1 Common Stock, Preferred Stock and/or any other class or classes of capital stock of the Corporation (if any) representing in the aggregate more than fifty percent (50%) of the voting power of all of the outstanding shares of capital stock of the Corporation entitled to vote; (2) the stockholders of the Corporation approve a plan of complete liquidation or dissolution of the Corporation or there is consummated a transaction or series of related transactions for the sale), lease, exchange or other disposition, directly or indirectly, by the Corporation of all or substantially all of the Corporation's assets (including a sale of all or substantially all of the assets of Fluence LLC); (3) there is consummated a merger or consolidation of the Corporation with any other corporation or entity, and, immediately after the consummation of such merger or consolidation, the voting securities of the Corporation immediately prior to such merger or consolidation do not continue to represent, or are not converted into, voting securities representing more than fifty percent (50%) of the combined voting power of the outstanding voting securities of the Person resulting from such merger or consolidation or, if the surviving company is a subsidiary, the ultimate parent thereof; or (4) the Corporation ceases to be the sole managing member of Fluence LLC; provided, however, that a "Change of Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of related transactions immediately following which (a) the beneficial owners of the Class A Common Stock, Class B-1 Common Stock, Preferred Stock and/or any other class or classes of capital stock of the Corporation immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in and voting control over, and own substantially all of the shares of, an entity which owns all or substantially all of the assets of the Corporation immediately following such transaction or series of transactions or (b) in the case of the foregoing clauses (1) or (3), either the AES Related Parties or the Siemens Related Parties are the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of shares of Class A Common Stock, Class B-1 Common Stock, Preferred Stock and/or any other class or classes of capital stock of the Corporation (if any) representing in the aggregate more than fifty percent (50%) of the voting power of all of the outstanding shares of capital stock of the Corporation entitled to vote (or), in the case of a transaction described in the foregoing clause (3), more than fifty percent (50%) of the combined voting power of the then outstanding voting securities of the Person resulting from such merger of consolidation or, if the surviving company is a subsidiary, the ultimate parent thereof).

(g)       *"Exchange Act"* means the U.S. Securities Exchange Act of 1934, as amended, and any applicable rules and regulations promulgated thereunder, and any successor to such statute, rules or regulations.

(h)       *"Interested Stockholder"* means any Person (other than the Corporation and any direct or indirect majority-owned subsidiary of the Corporation) that (i) is the beneficial owner (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of fifteen percent (15%) or more of the outstanding shares of capital stock of the Corporation that are entitled to vote generally in an election of directors, or (ii) is an Affiliate of the Corporation and was the beneficial owner of fifteen percent (15%) or more of the outstanding shares of capital stock of the Corporation that are entitled to vote generally in an election of directors at any time within the three-year period immediately prior to the date on which it is sought to be determined whether such Person is an Interested Stockholder, and the Affiliates and Associates of such Person. Notwithstanding anything in this Article XIII to the contrary, the term "Interested Stockholder" shall not include: (x) the AES Related Parties or any of their current or future Affiliates (so long as such Affiliate remains an Affiliate) or Associates or any other Person with whom any of the foregoing are acting as a group or in concert for the purpose of acquiring, holding, voting or disposing of shares of capital stock of the Corporation, (y) the Siemens Related Parties or any of their current or future Affiliates (so long as such Affiliate remains an Affiliate) or Associates, or any other Person with whom any of the foregoing are acting as a group or in concert for the purpose of acquiring, holding, voting or disposing of shares of capital stock of the Corporation, or (z) any Person who acquires beneficial ownership of fifteen percent (15%) or more of the then- outstanding shares of capital stock of the Corporation that are entitled to vote generally in an election of directors directly or indirectly from a AES Related Party or a Siemens Related Party, and excluding, for the avoidance of doubt, any Person who acquires voting stock of the Corporation through a broker's transaction executed on any securities exchange or other over-the-counter market or pursuant to an underwritten public offering.

(i)       *"Person"* means any individual, corporation, partnership, limited liability company, unincorporated association or other entity.

(j)       "*QIA*" refers to QIA Florence Holding LLC.

(k)       *"Securities Act"* means the U.S. Securities Act of 1933, as amended, and applicable rules and regulations promulgated thereunder, and any successor to such statute, rules or regulations.

(l)       "*Siemens Industry*" refers to Siemens Industry, Inc., a Delaware corporation.

(m)       "*Siemens Related Parties"* means Siemens Industry and its Affiliates.

(n)       *"Transfer"* (and, with a correlative meaning, *"Transferring"*) means any sale, transfer, assignment, redemption or other disposition of (whether directly or indirectly, whether with or without consideration and whether voluntarily or involuntarily or by operation of Law) (a) any interest (legal or beneficial) in any shares of capital of stock of the Corporation or (b) any equity or other interest (legal or beneficial) in any stockholder if substantially all of the assets of such stockholder consist solely of shares of capital stock of the Corporation.

<p style="text-align:center">*   *   *</p>

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Incorporation to be signed on [●], 2021.

**FLUENCE ENERGY, INC.**

By: _____
Name:
Title:

[*Signature Page to Amended and Restated Certificate of Incorporation*]

**SCHEDULE A**

**ISSUANCE OF CLASS B-1 COMMON STOCK**

**AMENDED AND RESTATED BYLAWS**

**OF**

**FLUENCE ENERGY, INC.**

Dated as of [●], 2021

**CONTENTS**

| | | Page |
|---|---|---|
| **ARTICLE I. MEETINGS OF STOCKHOLDERS** | | 1 |
| Section 1.01 | Place of Meetings | 1 |
| Section 1.02 | Annual Meetings | 1 |
| Section 1.03 | Special Meetings | 1 |
| Section 1.04 | Notice of Meetings | 1 |
| Section 1.05 | Adjournments | 2 |
| Section 1.06 | Quorum | 2 |
| Section 1.07 | Organization | 2 |
| Section 1.08 | Voting; Proxies | 3 |
| Section 1.09 | Fixing Date for Determination of Stockholders of Record | 3 |
| Section 1.10 | List of Stockholders Entitled to Vote | 4 |
| Section 1.11 | Action by Written Consent in Lieu of a Meeting | 5 |
| Section 1.12 | Inspectors of Election | 5 |
| Section 1.13 | Conduct of Meetings | 6 |
| Section 1.14 | Advance Notice Procedures for Business Brought before a Meeting | 6 |
| Section 1.15 | Advance Notice Procedures for Nominations of Directors | 10 |
| **ARTICLE II. BOARD OF DIRECTORS** | | 13 |
| Section 2.01 | Number; Tenure; Qualifications | 13 |
| Section 2.02 | Election; Resignation; Removal; Vacancies | 13 |
| Section 2.03 | Regular Meetings | 14 |
| Section 2.04 | Special Meetings | 14 |
| Section 2.05 | Telephonic Meetings Permitted | 14 |
| Section 2.06 | Quorum; Vote Required for Action | 14 |
| Section 2.07 | Organization | 14 |
| Section 2.08 | Action by Unanimous Consent of Directors | 15 |
| Section 2.09 | Compensation of Directors | 15 |
| Section 2.10 | Chairperson | 15 |
| **ARTICLE III. COMMITTEES** | | 15 |
| Section 3.01 | Committees | 15 |
| Section 3.02 | Committee Minutes | 16 |
| Section 3.03 | Committee Rules | 16 |
| **ARTICLE IV. OFFICERS** | | 16 |
| Section 4.01 | Officers | 16 |
| Section 4.02 | Appointment of Officers | 16 |
| Section 4.03 | Subordinate Officers | 16 |
| Section 4.04 | Removal and Resignation of Officers | 17 |
| Section 4.05 | Vacancies in Offices | 17 |

| | | |
|---|---|---|
| Section 4.06 | Chief Executive Officer | 17 |
| Section 4.07 | President | 17 |
| Section 4.08 | Vice Presidents and Senior Vice Presidents | 17 |
| Section 4.09 | Secretary | 17 |
| Section 4.10 | Chief Financial Officer | 18 |
| Section 4.11 | Treasurer | 18 |
| Section 4.12 | Representation of Shares of Other Entities | 18 |
| Section 4.13 | Authority and Duties of Officers | 18 |
| Section 4.14 | Compensation | 19 |

ARTICLE V. STOCK     19

| | | |
|---|---|---|
| Section 5.01 | Certificates | 19 |
| Section 5.02 | Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates | 19 |

ARTICLE VI. INDEMNIFICATION AND ADVANCEMENT OF EXPENSES     19

| | | |
|---|---|---|
| Section 6.01 | Right to Indemnification | 19 |
| Section 6.02 | Indemnification of Others | 20 |
| Section 6.03 | Advancement of Expenses | 20 |
| Section 6.04 | Claims | 20 |
| Section 6.05 | Non-exclusivity of Rights | 20 |
| Section 6.06 | Insurance | 20 |
| Section 6.07 | Other Sources | 21 |
| Section 6.08 | Continuation of Indemnification | 21 |
| Section 6.09 | Amendment or Repeal | 21 |
| Section 6.10 | Other Indemnification and Advancement of Expenses | 21 |

ARTICLE VII. MISCELLANEOUS     21

| | | |
|---|---|---|
| Section 7.01 | Fiscal Year | 21 |
| Section 7.02 | Execution of Corporate Contracts and Instruments | 21 |
| Section 7.03 | Dividends | 21 |
| Section 7.04 | Registered Stockholders | 21 |
| Section 7.05 | Corporate Seal | 22 |
| Section 7.06 | Construction; Definitions | 22 |
| Section 7.07 | Manner of Notice | 22 |
| Section 7.08 | Waiver of Notice of Meetings of Stockholders, Directors and Committees | 23 |
| Section 7.09 | Form of Records | 23 |
| Section 7.10 | Amendment of Bylaws | 23 |

ARTICLE I.
MEETINGS OF STOCKHOLDERS

Section 1.01    Place of Meetings. Meetings of stockholders of Fluence Energy, Inc., a Delaware corporation (the "*Corporation*"; and such stockholders, the "*Stockholders*"), may be held at any place, within or without the State of Delaware, as may be designated by or in the manner determined by the board of directors of the Corporation (the "*Board of Directors*"). In the absence of such designation, meetings of Stockholders shall be held at the principal executive office of the Corporation. The Board of Directors may, in its sole discretion, determine that a meeting of Stockholders shall not be held at any place, but may instead be held solely by means of remote communication authorized by and in accordance with Section 211(a) of the General Corporation Law of the State of Delaware (the "*DGCL*").

Section 1.02    Annual Meetings. The annual meeting of Stockholders shall be held for the election of members of the Board of Directors (the "*Directors*") at such date and time as may be designated by or in the manner determined by resolution of the Board of Directors from time to time. Any other business as may be properly brought before the annual meeting of Stockholders may be transacted at the annual meeting of Stockholders. The Board of Directors may postpone, reschedule or cancel any annual meeting of Stockholders previously scheduled by the Board of Directors.

Section 1.03    Special Meetings. Special meetings of the Stockholders may be called only by such persons and only in such manner as may be set forth in the Certificate of Incorporation of the Corporation (as the same may be amended, restated, amended and restated or otherwise modified from time to time, the "*Certificate of Incorporation*") and in these bylaws. From and after the Voting Threshold Date (as defined in the Certificate of Incorporation), special meetings of Stockholders for any purpose or purposes may be called only by (i) the chairperson of the Board of Directors (the "*Chairperson*") or (ii) an officer of the Corporation pursuant to a resolution adopted by a majority of the Directors then in office. Special meetings of Stockholders validly called in accordance with this Section 1.03 of these bylaws (as the same may be amended, restated, amended and restated or otherwise modified from time to time, these "*Bylaws*") may be held at such date and time as specified in the applicable notice of such meeting. Notice of every special meeting of Stockholders shall state the purpose or purposes of the meeting, and the business transacted at any special meeting of Stockholders shall be limited to the purpose or purposes stated in the notice. Upon the prior written consent of a majority of the Directors then in office, the Board of Directors may postpone, reschedule or cancel any special meeting of Stockholders previously scheduled by the Chairperson or Board of Directors.

Section 1.04    Notice of Meetings. Whenever Stockholders are required or permitted to take any action at a meeting of Stockholders, a notice of the meeting shall be given that shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the Stockholders entitled to vote at the meeting (if such date is different from the record date for Stockholders entitled to notice of the meeting) and, in the case of a special meeting of Stockholders, the purpose or purposes for which the meeting is called. Unless otherwise required by applicable law, the Certificate of Incorporation or these Bylaws, the notice of any meeting of Stockholders shall be given not less than 10 nor more than 60 days before the date of the meeting to each Stockholder entitled to vote at the meeting as of the record date for determining the Stockholders entitled to notice of the meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Section 1.05    <u>Adjournments</u>. Any meeting of Stockholders, annual or special, may be adjourned from time to time by the chairperson of the meeting (or by the Stockholders in accordance with <u>Section 1.06</u>) to reconvene at the same or some other place, if any, and the same or some other time, and notice need not be given to the Stockholders of any such adjourned meeting if the time and place, if any, thereof, and the means of remote communications, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting of Stockholders, the Corporation may transact any business which might have been transacted at the original meeting of Stockholders. If the adjournment is for more than 30 days, a notice of the adjourned meeting of Stockholders shall be given to each Stockholder of record entitled to vote at the adjourned meeting of Stockholders. If after the adjournment a new record date for determination of Stockholders entitled to vote is fixed for the adjourned meeting of Stockholders, the Board of Directors shall fix a new record date for determining Stockholders entitled to notice of such adjourned meeting of Stockholders in accordance with <u>Section 1.09(a</u>) of these Bylaws, and shall give notice of the adjourned meeting of Stockholders to each Stockholder of record entitled to vote at such adjourned meeting of Stockholders as of the record date fixed for notice of such adjourned meeting of Stockholders. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Section 1.06    <u>Quorum</u>. At any meeting of the Stockholders, the holders of a majority of the voting power of the outstanding shares of capital stock of the Corporation ("***Stock***") entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum for all purposes, unless or except to the extent that the presence of a larger number may be required by applicable law, the rules of any stock exchange upon which the Corporation's securities are listed, the Certificate of Incorporation or these Bylaws. In the absence of a quorum, then either (i) the chairperson of the meeting or (ii) the Stockholders by the affirmative vote of a majority of the voting power of the outstanding shares of Stock entitled to vote thereon, present in person or represented by proxy, shall have the power to adjourn the meeting of Stockholders from time to time in the manner provided in <u>Section 1.05</u> of these Bylaws until a quorum is present or represented. Where a separate vote by a class or classes or series of Stock is required by applicable law or the Certificate of Incorporation, the holders of a majority of voting power of the shares of such class or classes or series of Stock issued and outstanding and entitled to vote on such matter, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on such matter. A quorum, once established at a meeting, shall not be broken by the withdrawal of enough votes to leave less than a quorum.

Section 1.07    <u>Organization</u>. Meetings of Stockholders shall be presided over by the Chairperson or by such other officer of the Corporation or Director as designated by the Board of Directors or the Chairperson, or in the absence of such person or designation, by a chairperson chosen at the meeting by the affirmative vote of a majority of the voting power of the outstanding shares of Stock present or represented at the meeting and entitled to vote at the meeting (provided there is a quorum). The Secretary of the Corporation ("***Secretary***") shall act as secretary of the meeting, but in his or her absence, the chairperson of the meeting may appoint any person to act as secretary of the meeting.

Section 1.08    <u>Voting; Proxies</u>. Each Stockholder entitled to vote at any meeting of Stockholders shall be entitled to the number of votes, if any, for each share of Stock held of record by such Stockholder which has voting power upon the matter in question as set forth in the Certificate of Incorporation. Each Stockholder entitled to vote at a meeting of Stockholders or express consent to corporate action in writing without a meeting (if permitted by the Certificate of Incorporation) may authorize another person or persons to act for such Stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy may be authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A Stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person (or by means of remote communication, if applicable) or by delivering to the Secretary a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of Stockholders need not be by written ballot. Unless otherwise provided in the Certificate of Incorporation, at all meetings of Stockholders for the election of Directors at which a quorum is present, a plurality of the votes cast shall be sufficient to elect Directors. No holder of shares of Stock shall have the right to cumulate votes. All other elections and questions presented to the Stockholders at a meeting at which a quorum is present shall be decided by the affirmative vote of the holders of a majority of votes cast (excluding abstentions and broker non-votes) on such matter, unless a different or minimum vote is required by the Certificate of Incorporation, these Bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its securities, in which case such different or minimum vote shall be the applicable vote on the matter.

Section 1.09    <u>Fixing Date for Determination of Stockholders of Record</u>.

(a)    In order that the Corporation may determine the Stockholders entitled to notice of any meeting of Stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by applicable law, not be more than 60 nor less than 10 days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the Stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining Stockholders entitled to notice of and to vote at a meeting of Stockholders shall be at the close of business on the day immediately preceding the day on which notice is given, or, if notice is waived, at the close of business on the day immediately preceding the day on which the meeting is held. A determination of Stockholders of record entitled to notice of or to vote at a meeting of Stockholders shall apply to any adjournment of the meeting; *provided, however*, that the Board of Directors may fix a new record date for determination of Stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for Stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of Stockholders entitled to vote in accordance with the foregoing provisions of this <u>Section 1.09</u>(<u>a</u>) at the adjourned meeting.

3

(b)        In order that the Corporation may determine the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of Stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall not be more than 60 days prior to such action. If no such record date is fixed, the record date for determining Stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c)        Unless otherwise restricted by the Certificate of Incorporation, in order that the Corporation may determine the Stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date for determining Stockholders entitled to consent to corporate action in writing without a meeting is fixed by the Board of Directors, (i) when no prior action of the Board of Directors is required by applicable law or the Certificate of Incorporation, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law and (ii) if prior action by the Board of Directors is required by applicable law or the Certificate of Incorporation, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 1.10    List of Stockholders Entitled to Vote. The Corporation shall prepare, at least 10 days before every meeting of Stockholders, a complete list of the Stockholders entitled to vote at the meeting (*provided, however*, if the record date for determining the Stockholders entitled to vote is less than 10 days before the date of the meeting, the list shall reflect the Stockholders entitled to vote as of the 10th day before the meeting date), arranged in alphabetical order, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder as of the record date (or such other date). Such list shall be open to the examination of any Stockholder, for any purpose germane to the meeting at least 10 days prior to the meeting (i) on a reasonably accessible electronic network, *provided* that the information required to gain access to such list is provided with the notice of the meeting or (ii) during ordinary business hours at the principal place of business of the Corporation. If the meeting is to be held at a place, then a list of Stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any Stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any Stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Except as otherwise provided by law, the "stock ledger" shall be the only evidence as to who are the Stockholders entitled to examine the list of Stockholders required by this Section 1.10 or to vote in person or by proxy at any meeting of Stockholders. For purposes of these Bylaws, the term "stock ledger" means one or more records administered by or on behalf of the Corporation in which the names of all of the Corporation's Stockholders of record, the address and number of shares registered in the name of each such Stockholder, and all issuances and transfers of stock of the Corporation are recorded.

<div align="center">4</div>

Section 1.11    Action by Written Consent in Lieu of a Meeting. Any action required or permitted to be taken at any annual or special meeting of Stockholders may be taken without a meeting, without prior notice and without a vote, only (i) to the extent set forth in the Certificate of Incorporation of the Corporation, and (ii) if a consent or consents in writing, setting forth the action so taken, are signed by the holders of outstanding shares of the relevant class(es) or series of Stock representing not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of Stock then issued and outstanding (other than treasury Stock) entitled to vote thereon were present and voted and are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of Stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Section 1.12    Inspectors of Election. The Corporation may, and shall if required by law, in advance of any meeting of Stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and to make a written report thereof. The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. In the event that no inspector so appointed or designated is able to act at a meeting of Stockholders, the person presiding at the meeting may, and to the extent required by law, shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability. Any report or certificate made by the inspectors of election is prima facie evidence of the facts stated therein. The inspector or inspectors so appointed or designated shall (i) ascertain the number of shares of Stock outstanding and the voting power of each such share, (ii) determine the shares of Stock represented at the applicable meeting of the Stockholders and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares of Stock represented at the meeting and such inspectors' count of all votes and ballots. Such certification and report shall specify such other information as may be required by applicable law. In determining the validity and counting of proxies and ballots cast at any meeting of Stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for an office at an election may serve as an inspector at such election.

Section 1.13    Conduct of Meetings. The date and time of the opening and the closing of the polls for each matter upon which the Stockholders will vote at a meeting of the Stockholders shall be announced at the meeting by the person presiding over the meeting designated in accordance with Section 1.07 of these Bylaws. After the polls close, no ballots, proxies or votes or any revocations or changes thereto may be accepted. The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of Stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the person presiding over any meeting of Stockholders shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such presiding person, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the presiding person of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to Stockholders entitled to vote at the meeting, their duly authorized and constituted proxies or such other persons as the presiding person of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. The presiding person at any meeting of Stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine that a matter or business was not properly brought before the meeting and if such presiding person should so determine, such presiding person shall so declare to such meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board of Directors or the person presiding over the applicable meeting of Stockholders, meetings of Stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

Section 1.14    Advance Notice Procedures for Business Brought before a Meeting. This Section 1.14 shall apply to any business that may be brought before an annual meeting of Stockholders other than nominations for election to the Board of Directors at such a meeting, which shall be governed by Section 1.15 of these Bylaws. Stockholders seeking to nominate Persons for election to the Board of Directors must comply with Section 1.15 of these Bylaws, and this Section 1.14 shall not be applicable to nominations for election to the Board of Directors except as expressly provided in Section 1.15 of these Bylaws.

(a)    At an annual meeting of the Stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting of the Stockholders, business must be (a) specified in a notice of meeting of the Stockholders given by or at the direction of the Board of Directors or a duly authorized committee thereof, (b) if not specified in a notice of meeting of the Stockholders, otherwise brought before the meeting by the Board of Directors or the chairperson of the meeting, or (c) otherwise properly brought before the meeting by a Stockholder present in person who (A)(1) was a Stockholder of record of the Corporation both at the time of giving the notice provided for in this Section 1.14 and at the time of the meeting, (2) is entitled to vote at the meeting and (3) has complied with this Section 1.14 or (B) properly made such proposal in accordance with Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "*Exchange Act*"). The foregoing clause (c) shall be the exclusive means for a Stockholder to propose business to be brought before an annual meeting of the Stockholders. The only matters that may be brought before a special meeting of the Stockholders are the matters specified in the Corporation's notice of meeting of the Stockholders given by or at the direction of the Person calling the meeting pursuant to the Certificate of Incorporation and Section 1.03 of these Bylaws. For purposes of these Bylaws, "*Person*" shall mean any individual, general partnership, limited partnership, limited liability company, corporation, trust, business trust, joint stock company, joint venture, unincorporated association, cooperative or association or any other legal entity or organization of whatever nature, and shall include any successor (by merger or otherwise) of such entity. For purposes of this Section 1.14 and Section 1.15 of these Bylaws, "*present in person*" shall mean that the Stockholder proposing that the business be brought before the annual meeting or special meeting of the Stockholders, as applicable, or, if the proposing Stockholder is not an individual, a qualified representative of such proposing Stockholder, appear in person at such annual or special meeting, and a "qualified representative" of such proposing Stockholder shall be, if such proposing Stockholder is (x) a general or limited partnership, any general partner or Person who functions as a general partner of the general or limited partnership or who controls the general or limited partnership, (y) a corporation or a limited liability company, any officer or Person who functions as an officer of the corporation or limited liability company or any officer, director, general partner or Person who functions as an officer, director or general partner of any entity ultimately in control of the corporation or limited liability company or (z) a trust, any trustee of such trust.

6

(b)        Without qualification, for business to be properly brought before an annual meeting of the Stockholders by a Stockholder, the Stockholder must (a) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary and (b) provide any updates or supplements to such notice at the times and in the forms required by this Section 1.14. To be timely, a Stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than 90 days nor more than 120 days prior to the one-year anniversary of the immediately preceding year's annual meeting (which anniversary, in the case of the first annual meeting of the Stockholders following the closing of the Corporation's initial public offering, shall be deemed to be February 28, 2022); *provided, however*, that if the date of the annual meeting of the Stockholders is more than 30 days before or more than 60 days after such anniversary date, notice by such Stockholder to be timely must be so delivered, or mailed and received, not later than the later of (A) the 90th day prior to such annual meeting and (B) the 10th day following the day on which public disclosure of the date of such annual meeting was first made (such notice within such time periods, "*Timely Notice*"). In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

(c)        To be in proper form for purposes of this Section 1.14, a Stockholder's notice to the Secretary shall set forth:

(i)        As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records); and (B) the number of shares of each class or series of Stock of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Person, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of Stock of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future (the disclosures to be made pursuant to the foregoing clauses (A) and (B) are referred to as "*Stockholder Information*");

7

(ii)         As to each Proposing Person, (A) the full notional amount of any securities that, directly or indirectly, underlie any "derivative security" (as such term is defined in Rule 16a-1(c) under the Exchange Act) that constitutes a "call equivalent position" (as such term is defined in Rule 16a-1(b) under the Exchange Act) ("***Synthetic Equity Position***") and that is, directly or indirectly, held or maintained by such Proposing Person with respect to any shares of any class or series of Stock of the Corporation; *provided* that, for the purposes of the definition of "Synthetic Equity Position," the term "derivative security" shall also include any security or instrument that would not otherwise constitute a "derivative security" as a result of any feature that would make any conversion, exercise or similar right or privilege of such security or instrument becoming determinable only at some future date or upon the happening of a future occurrence, in which case the determination of the amount of securities into which such security or instrument would be convertible or exercisable shall be made assuming that such security or instrument is immediately convertible or exercisable at the time of such determination; and, *provided*, *further*, that any Proposing Person satisfying the requirements of Rule 13d-1(b)(1) under the Exchange Act (other than a Proposing Person that so satisfies Rule 13d-1(b)(1) under the Exchange Act solely by reason of Rule 13d-1(b)(1)(ii)(E)) shall not be deemed to hold or maintain the notional amount of any securities that underlie a Synthetic Equity Position held by such Proposing Person as a hedge with respect to a bona fide derivatives trade or position of such Proposing Person arising in the ordinary course of such Proposing Person's business as a derivatives dealer, (B) any rights to dividends on the shares of any class or series of Stock of the Corporation owned beneficially by such Proposing Person that are separated or separable from the underlying shares of the Corporation, (C) any material pending or threatened legal proceeding in which such Proposing Person is a party or material participant involving the Corporation or any of its officers or Directors, or any affiliate of the Corporation, (D) any other material relationship between such Proposing Person, on the one hand, and the Corporation or any affiliate of the Corporation, on the other hand, (E) any direct or indirect material interest in any material contract or agreement of such Proposing Person with the Corporation or any affiliate of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement) and (F) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the applicable meeting of the Stockholders pursuant to Section 14(a) of the Exchange Act (the disclosures to be made pursuant to the foregoing clauses (A) through (F) are referred to as "***Disclosable Interests***"); *provided*, *however*, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the Stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner; and

8

(iii)        As to each item of business that the Stockholder proposes to bring before the annual meeting of the Stockholders, (A) a brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration and the text of any proposed amendment to these Bylaws), (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other Person or entity (including their names) in connection with the proposal of such business by such Stockholder and (D) any other information relating to such item of business that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act; *provided*, *however*, that the disclosures required by this Section 1.14(c)(iii) shall not include any disclosures with respect to any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the Stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner.

(d)        For purposes of this Section 1.14, the term "***Proposing Person***" shall mean (a) the Stockholder providing the notice of business proposed to be brought before an annual meeting of the Stockholders, (b) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting of the Stockholders is made, (c) any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such Stockholder in such solicitation.

(e)        A Proposing Person shall update and supplement its notice to the Corporation of its intent to propose business at an annual meeting of the Stockholders, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 1.14 shall be true and correct as of the record date for notice of the meeting and as of the date that is ten business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five business days after the record date for notice of the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of 10 business days prior to the meeting or any adjournment or postponement thereof).

(f)        Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at an annual meeting of the Stockholders that is not properly brought before the meeting in accordance with this Section 1.14. The presiding officer of the meeting shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 1.14, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

(g)        In addition to the requirements of this Section 1.14 with respect to any business proposed to be brought before an annual meeting of the Stockholders, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such business. Nothing in this Section 1.14 shall be deemed to affect the rights of Stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(h)        For purposes of these Bylaws, "public disclosure" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

Section 1.15    <u>Advance Notice Procedures for Nominations of Directors</u>.

(a)        Nominations of any Person for election to the Board of Directors at an annual meeting or at a special meeting of the Stockholders (but only if the election of Directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such meeting only (a) by or at the direction of the Board of Directors, including by any committee or Persons authorized to do so by the Board of Directors or these Bylaws, or (b) by a Stockholder present in Person (as defined in <u>Section 1.14</u>) (1) who was a Stockholder of record of the Corporation both at the time of giving the notice provided for in this <u>Section 1.15</u> and at the time of the meeting, (2) is entitled to vote at the meeting and (3) has complied with this <u>Section 1.15</u> as to such notice and nomination. Other than as provided in that certain stockholders agreement, dated as of [●], 2021, by and among the Corporation and the other Persons party thereto (as it may be amended from time to time in accordance with its terms, the "***Stockholders Agreement***") for so long as it remains in effect, the foregoing clause (b) shall be the exclusive means for a Stockholder to make any nomination of a Person or Persons for election to the Board of Directors at any annual meeting or special meeting of Stockholders.

(i)        Without qualification, for a Stockholder to make any nomination of a Person or Persons for election to the Board of Directors at an annual meeting of the Stockholders, the Stockholder must (a) provide Timely Notice (as defined in <u>Section 1.14(b</u>) of these Bylaws) thereof in writing and in proper form to the Secretary at the principal executive offices of the Corporation, (b) provide the information, agreements and questionnaires with respect to such Stockholder and its candidate for nomination as required by this <u>Section 1.15</u>, and (c) provide any updates or supplements to such notice at the times and in the forms required by this <u>Section 1.15</u>.

(ii)        Without qualification, if the election of Directors is a matter specified in the notice of meeting given by or at the direction of the person calling a special meeting of the Stockholders, then for a Stockholder to make any nomination of a person or persons for election to the Board of Directors at a special meeting of the Stockholders, the Stockholder must (a) provide timely notice thereof in writing and in proper form to the Secretary at the principal executive offices of the Corporation, (b) provide the information, agreements and questionnaires with respect to such Stockholder and its candidate for nomination required by this <u>Section 1.15</u>, and (c) provide any updates or supplements to such notice at the times and in the forms required by this <u>Section 1.15</u>. To be timely for purposes of this <u>Section 1.15(b)(ii)</u>, a Stockholder's notice for nominations to be made at a special meeting of the Stockholders must be delivered to, or mailed to and received by the Secretary not earlier than the 120th day prior to such special meeting and not later than the 90th day prior to such special meeting or, if later, the 10th day following the day on which public disclosure (as defined in <u>Section 1.14(h</u>)) of the date of such special meeting was first made.

10

(iii) In no event shall any adjournment or postponement of an annual meeting or special meeting of the Stockholders or the announcement thereof commence a new time period for the giving of a Stockholder's notice as described above.

(iv) In no event may a Nominating Person (as defined below) provide notice under this <u>Section 1.15</u> or otherwise with respect to a greater number of Director candidates than are subject to election by Stockholders at the applicable meeting. If the Corporation shall, subsequent to such notice, increase the number of Directors subject to election at the meeting, such notice as to any additional nominees shall be due on the later of (i) the conclusion of the time period for Timely Notice (with respect to an annual meeting of the Stockholders), (ii) the date set forth in <u>Section 1.15(b)(ii)</u> (with respect to a special meeting) or (iii) the 10th day following the date of public disclosure (as defined in <u>Section 1.14(h)</u>) of such increase.

(b) To be in proper form for purposes of this <u>Section 1.15</u>, a Stockholder's notice to the Secretary shall set forth:

(i) As to each Nominating Person, the Stockholder Information (as defined in <u>Section 1.14(c)(i)</u> of these Bylaws) except that for purposes of this <u>Section 1.15</u>, the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in <u>Section 1.14(c)(i)</u>;

(ii) As to each Nominating Person, any Disclosable Interests (as defined in <u>Section 1.14(c)(ii)</u>, except that for purposes of this <u>Section 1.15</u> the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in <u>Section 1.14(c)(ii)</u> and the disclosure with respect to the business to be brought before the meeting of the Stockholders in <u>Section 1.14(c)(iii)</u> shall be made with respect to nomination of each Person for election as a Director at such meeting); and

(iii) As to each candidate whom a Nominating Person proposes to nominate for election as a Director, (A) all information with respect to such candidate for nomination that would be required to be set forth in a Stockholder's notice pursuant to this <u>Section 1.15</u> if such candidate for nomination were a Nominating Person, (B) all information relating to such candidate for nomination that is required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of Directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such candidate's written consent to being named in the Corporation's proxy statement as a nominee and to serving as a Director if elected), (C) a description of any direct or indirect material interest in any material contract or agreement between or among any Nominating Person, on the one hand, and each candidate for nomination or any other participants in such solicitation, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if such Nominating Person were the "registrant" for purposes of such rule and the candidate for nomination were a Director or executive officer of such registrant (the disclosures to be made pursuant to the foregoing clauses (A) through (C) are referred to as "***Nominee Information***"), and (D) a completed and signed questionnaire, representation and agreement as provided in <u>Section 1.15(f)</u>.

<div align="center">11</div>

(c)        For purposes of this <u>Section 1.15</u>, the term "***Nominating Person***" shall mean (a) the Stockholder providing the notice of the nomination proposed to be made at the meeting of the Stockholders, (b) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the nomination proposed to be made at the meeting is made and (c) any other participant in such solicitation.

(d)        A Stockholder providing notice of any nomination proposed to be made at a meeting of the Stockholders shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this <u>Section 1.15</u> shall be true and correct as of the record date for notice of the meeting and as of the date that is 10 business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five business days after the record date for notice of the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of 10 business days prior to the meeting or any adjournment or postponement thereof).

(e)        To be eligible to be a candidate for election as a Director at an annual or special meeting of the Stockholders, a candidate must be nominated in the manner prescribed in this <u>Section 1.15</u> and the candidate for nomination, whether nominated by the Board of Directors or by a Stockholder of record, must have previously delivered (in accordance with the time period prescribed for delivery in a notice to such candidate given by or on behalf of the Board of Directors), to the Secretary at the principal executive offices of the Corporation, (a) a completed written questionnaire (in the form provided by the Corporation) with respect to the background, qualifications, stock ownership and independence of such candidate for nomination and (b) a written representation and agreement (in the form provided by the Corporation) that such candidate for nomination (A) is not, and will not become a party to, any agreement, arrangement or understanding with any Person or entity other than the Corporation with respect to any direct or indirect compensation or reimbursement for service as a Director that has not been disclosed in such written questionnaire and (B) if elected as a Director, will comply with all applicable corporate governance, conflict of interest, confidentiality, stock ownership and trading and other policies and guidelines of the Corporation applicable to all Directors and in effect during such Person's term in office as a Director (and, if requested by any candidate for nomination, the Secretary shall provide to such candidate for nomination all such policies and guidelines then in effect).

(f)        The Board of Directors may also require any proposed candidate for nomination as a Director to furnish such other information as may reasonably be requested by the Board of Directors in writing prior to the meeting of Stockholders at which such candidate's nomination is to be acted upon in order for the Board of Directors to determine the eligibility of such candidate for nomination to be an independent Director in accordance with the Corporation's Corporate Governance Guidelines.

<p style="text-align:center">12</p>

(g)        In addition to the requirements of this <u>Section 1.15</u> with respect to any nomination proposed to be made at a meeting, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations.

(h)        No candidate shall be eligible for nomination as a Director unless such candidate for nomination and the Nominating Person seeking to place such candidate's name in nomination has complied with this <u>Section 1.15</u>, as applicable. The presiding officer at the meeting shall, if the facts warrant, determine that a nomination was not properly made in accordance with this <u>Section 1.15</u>, and if he or she should so determine, he or she shall so declare such determination to the meeting, the defective nomination shall be disregarded and any ballots cast for the candidate in question (but in the case of any form of ballot listing other qualified nominees, only the ballots case for the nominee in question) shall be void and of no force or effect.

(i)        Notwithstanding anything in these Bylaws to the contrary, no candidate for nomination shall be eligible to be seated as a Director unless nominated and elected in accordance with this <u>Section 1.15</u>.

(j)        Notwithstanding anything in this <u>Section 1.15</u> to the contrary, the requirements of this <u>Section 1.15</u> shall not apply to a Stockholder exercising its rights to designate persons for nomination for election to the Board of Directors in accordance with the provisions of the Stockholders Agreement for so long as it remains in effect.

<center>ARTICLE II.
BOARD OF DIRECTORS</center>

Section 2.01        <u>Number; Tenure; Qualifications</u>. Subject to the Certificate of Incorporation, the terms of the Stockholders Agreement (for so long as it remains in effect) and the separate rights of holders of any series of Preferred Stock to elect Directors, the total number of Directors constituting the entire Board of Directors shall be fixed from time to time exclusively by resolution adopted by a majority of the Directors then in office. Each Director shall hold office until such time as provided in the Certificate of Incorporation. Directors need not be Stockholders to be qualified for election or service as a Director.

Section 2.02        <u>Election; Resignation; Removal; Vacancies</u>. Except as otherwise provided in the Certificate of Incorporation or these Bylaws, Directors shall be elected at the annual meeting of Stockholders by such Stockholders that have the right to vote on such election. Any Director may resign at any time upon written or electronic notice to the Corporation. Such resignation shall be effective upon delivery unless otherwise specified. Subject to the rights of holders of any series of Preferred Stock and the terms of the Stockholders Agreement (for so long as it remains in effect), Directors may be removed only as expressly provided in the Certificate of Incorporation. Except as otherwise required by applicable law, and subject to and in accordance with the rights of the holders of any series of Preferred Stock then outstanding and the terms of the Stockholders Agreement (for so long as it remains in effect), unless the Board of Directors otherwise determines, newly created directorships resulting from any increase in the authorized number of Directors or any vacancies on the Board of Directors resulting from the death, resignation, disqualification, removal from office or other cause shall be filled only by a majority vote of the Directors then in office, though less than a quorum, or by a sole remaining Director entitled to vote thereon, and not by the Stockholders. Any Director so chosen shall hold office until his or her successor shall be elected and qualified.

<center>13</center>

Section 2.03    Regular Meetings. Regular meetings of the Board of Directors may be held at such places, if any, within or without the State of Delaware, and at such times as the Board of Directors may from time to time determine. A notice of regular meetings of the Board of Directors shall not be required.

Section 2.04    Special Meetings. Special meetings of the Board of Directors may be called by the Chairperson, the Chief Executive Officer or a majority of the Directors then in office and shall be held at such time, date and place, if any, within or without the State of Delaware as he or she or they shall fix. Notice to Directors of the date, place and time of any special meeting of the Board of Directors shall be given to each Director by the Secretary or by the officer or one of the Directors calling the meeting. Such notice may be given in person, by recognized international express courier service, or by e-mail, telephone, telecopier, facsimile or other means of electronic transmission. If the notice is delivered in person, by e-mail, telephone, telecopier, facsimile or other means of electronic transmission, it shall be delivered or sent at least 24 hours before the time of holding of the meeting. If the notice is sent by recognized international express courier service, it shall be deposited with such courier service at least seven days before the time of the holding of the meeting.

Section 2.05    Telephonic Meetings Permitted. Members of the Board of Directors may participate in any meetings of the Board of Directors thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting of the Board of Directors pursuant to this Section 2.05 shall constitute presence in person at such meeting.

Section 2.06    Quorum; Vote Required for Action. At all meetings of the Board of Directors a majority of the total number of authorized Directors shall constitute a quorum for the transaction of business; provided that, solely for the purposes of filling vacancies pursuant to Section 2.02 of these Bylaws, a meeting of the Board of Directors may be held if a majority of the Directors then in office participate in such meeting. The affirmative vote of a majority of the Directors present at any meeting of the Board of Directors at which a quorum is present shall be the act of the Board of Directors, except as may be otherwise specifically required by applicable law, the Certificate of Incorporation or these Bylaws.

Section 2.07    Organization. Meetings of the Board of Directors shall be presided over by the Chairperson, or in his or her absence by the person whom the Chairperson shall designate, or in the absence of the foregoing persons by a chairperson chosen at the meeting by the affirmative vote of a majority of the Directors present at the meeting. The Secretary shall act as secretary of the meeting, but in his or her absence, the chairperson of the meeting may appoint any person to act as secretary of the meeting.

Section 2.08    <u>Action by Unanimous Consent of Directors</u>. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting of the Board of Directors if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission. Thereafter, the writing or writings or electronic transmissions shall be filed with the minutes of proceedings of the Board of Directors or such committee in accordance with applicable law.

Section 2.09    <u>Compensation of Directors</u>. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of Directors. The Directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary or other compensation as a Director. No such payment shall preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed compensation for attending committee meetings. Any Director may decline any or all such compensation payable to such Director in his or her discretion.

Section 2.10    <u>Chairperson</u>. Subject to the provisions of the Stockholders Agreement for so long as it is in effect, the Board of Directors may appoint from its members a Chairperson. The Board of Directors may, in its sole discretion, from time to time appoint one or more vice chairpersons (each, a "***Vice Chairperson***"), each of whom in such capacity shall report directly to the Chairperson.

<div align="center">

ARTICLE III.
COMMITTEES

</div>

Section 3.01    <u>Committees</u>. Subject to the provisions of the Stockholders Agreement for so long as it is in effect, the Board of Directors may designate one or more committees, each committee to consist of one or more of the Directors. The Board of Directors may designate one or more Directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of a member of any committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member. Any such committee, to the extent permitted by applicable law and to the extent provided in a resolution of the Board of Directors, shall have and may exercise all of the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation (if one be adopted) to be affixed to all papers which may require it. Except as otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee. Except as otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating the committee (or resolution of the committee designating the subcommittee, if applicable), a majority of the Directors then serving on a committee or subcommittee, as applicable, shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee or subcommittee, as applicable, present at a meeting at which a quorum is present shall be the act of the committee or subcommittee, as applicable. Special meetings of any committee of the Board of Directors may be held at any time or place, if any, within or without the State of Delaware whenever called by the Chairperson or a majority of the members of such committee.

<div align="center">15</div>

Section 3.02      Committee Minutes. Each committee of the Board of Directors shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

Section 3.03      Committee Rules. Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may make, alter and repeal rules for the conduct of its business. In the absence of such rules, each such committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article II of these Bylaws.

ARTICLE IV.
OFFICERS

Section 4.01      Officers. The officers of the Corporation shall be a Chief Executive Officer, a President and a Secretary. The offices of Chief Executive Officer and President may be held by the same person. The Corporation may also have, at the discretion of the Board of Directors, a Chairperson of the Board of Directors (subject to the requirements of the Stockholders Agreement for so long as it is in effect), a Vice Chairperson of the Board of Directors, a Chief Financial Officer, one or more Senior Vice Presidents, one or more Vice Presidents, a Treasurer (who may be the same person as the Chief Financial Officer), one or more Assistant Treasurers, one or more Assistant Secretaries, and any such other officers as may be appointed in accordance with the provisions of these Bylaws. Each officer of the Corporation shall hold office for such term as may be prescribed by the Board of Directors and until his or her successor is duly elected and qualified or until his or her earlier death, resignation or removal. No officer need be a Stockholder or Director.

Section 4.02      Appointment of Officers. The Board of Directors shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 4.03 of these Bylaws.

Section 4.03      Subordinate Officers. The Board of Directors may appoint, or empower the Chief Executive Officer of the Corporation or, in the absence of a Chief Executive Officer of the Corporation, the President of the Corporation, to appoint, such other officers and agents as the business of the Corporation may require (any such officer or agent, a "Subordinate Officer"). Each of such Subordinate Officer shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board of Directors may from time to time determine.

16

Section 4.04    Removal and Resignation of Officers. Any officer may be removed, either with or without cause, by an affirmative vote of the Board of Directors at any regular or special meeting of the Board of Directors; *provided further* that any Subordinate Officer may also be removed, either with or without cause, by the Chief Executive Officer of the Corporation or, in the absence of a Chief Executive Officer of the Corporation, the President of the Corporation. Any officer may resign at any time by giving notice in writing or by electronic transmission to the Corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. If a resignation is made effective at a later date and the Corporation accepts the future effective date, the Board of Directors may fill the pending vacancy before the effective date if the Board of Directors provides that the successor shall not take office until the effective date. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

Section 4.05    Vacancies in Offices. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors or as provided in Section 4.03.

Section 4.06    Chief Executive Officer. Subject to any supervisory powers as may be given by the Board of Directors to the Chairperson (if any), the Chief Executive Officer of the Corporation shall, subject to the control of the Board of Directors, have general supervision, direction, and control of the business and the officers of the Corporation. He or she shall preside at all meetings of the Stockholders and, in the absence or nonexistence of a Chairperson, at all meetings of the Board of Directors at which he or she is present and shall have the general powers and duties of management usually vested in the office of chief executive officer of a corporation and shall have such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

Section 4.07    President. The Board of Directors may, but is not obligated to, appoint a President of the Corporation. Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairperson (if any) or the Chief Executive Officer, the President of the Corporation, if appointed, shall have general supervision, direction, and control of the business and other officers of the Corporation. He or she shall have the general powers and duties of management usually vested in the office of president of a corporation and such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

Section 4.08    Vice Presidents and Senior Vice Presidents. The Board of Directors may, but is not obligated to, appoint one or more Vice Presidents and Senior Vice Presidents of the Corporation. The Vice Presidents and Senior Vice Presidents of the Corporation, if appointed, shall have supervision, direction, and control of those functions and departments the business of the Corporation as the Board of Directors or the Chief Executive Officer prescribe for such persons from time to time.

Section 4.09    Secretary. The Secretary shall keep or cause to be kept, at the principal executive office of the Corporation or such other place as the Board of Directors may direct, a book of minutes of all meetings and actions of the Board of Directors, committees of the Board of Directors, and Stockholders. The minutes shall show the time and place of each such meeting, the names of those present at such Directors' meetings or committee meetings, the number of shares of Stock present or represented at such Stockholders' meetings, and the proceedings thereof. The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, as determined by resolution of the Board of Directors, a share register, or a duplicate share register, showing the names of all Stockholders and their addresses, the number and classes of shares of Stock held by each, the number and date of certificates evidencing such shares, and the number and date of cancellation of every certificate surrendered for cancellation. The Secretary shall give, or cause to be given, notice of all meetings of the Stockholders and of the Board of Directors required to be given by applicable law or by these Bylaws. He or she shall keep the seal of the Corporation, if one be adopted, in safe custody and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by these Bylaws. The Board of Directors or the Chief Executive Officer may, but are not obligated to, appoint one or more Assistant Secretaries to assist the Secretary in his or her duties and to perform such duties during any absence of the Secretary.

17

Section 4.10    Chief Financial Officer. The Chief Financial Officer of the Corporation shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the Corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any Director. The Chief Financial Officer shall deposit all moneys and other valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board of Directors. He or she shall disburse the funds of the Corporation as may be ordered by the Board of Directors, shall render to the President, if any is appointed, the Chief Executive Officer, or the Directors, upon request, an account of all his or her transactions as Chief Financial Officer and of the financial condition of the Corporation, and shall have other powers and perform such other duties as may be prescribed by the Board of Directors or these Bylaws. If at any time there shall be no Treasurer of the Corporation, then the Chief Financial Officer shall be the Treasurer.

Section 4.11    Treasurer. The Board of Directors or the Chief Executive Officer may, but shall not be obligated to, appoint a Treasurer of the Corporation to assist and hold office separate from the Chief Financial Officer of the Corporation. The Treasurer shall deposit all moneys and other valuables in the name and to the credit of the Corporation with such depositories as may be designated by the Board of Directors. He or she shall disburse the funds of the Corporation as may be ordered by the Board of Directors, shall render to the Chief Financial Officer, the Chief Executive Officer, or the Directors, upon request, an account of all his or her transactions as Treasurer, and shall have other powers and perform such other duties as may be prescribed by the Board of Directors, the Chief Executive Officer or these Bylaws. The Board of Directors or the Chief Executive Officer may, but are not obligated to, appoint one or more Assistant Treasurers to assist the Treasurer in his or her duties and to perform such duties during any absence of the Treasurer.

Section 4.12    Representation of Shares of Other Entities. Unless otherwise directed by the Board of Directors, the Chief Executive Officer, or any other person authorized by the Board of Directors or the Chief Executive Officer, is authorized to vote, represent and exercise on behalf of the Corporation all rights incident to any and all shares, securities or interests of any other corporation or entity standing in the name of the Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

Section 4.13    Authority and Duties of Officers. All officers of the Corporation shall respectively have such powers and authority and shall perform such duties in the management of the business of the Corporation as may be provided herein or designated from time to time by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.

18

Section 4.14    Compensation. The compensation of the officers of the Corporation for their services as such shall be fixed from time to time by or at the direction of the Board of Directors. An officer of the Corporation shall not be prevented from receiving compensation by reason of the fact that he or she is also a Director.

ARTICLE V.
STOCK

Section 5.01    Certificates. The shares of Stock shall be represented by certificates, *provided* that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of Stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Every holder of Stock represented by certificates shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, representing the number of shares held by such holder registered in certificate form. Each such certificate shall be signed in a manner that complies with Section 158 of the DGCL.

Section 5.02    Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates. The Corporation may issue a new certificate for shares of Stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate. The Board of Directors may establish regulations, rules or procedures concerning the proof required for adequately alleging the loss, theft or destruction of any Stock certificate and concerning the giving of a satisfactory bond or bonds of indemnity.

ARTICLE VI.
INDEMNIFICATION AND ADVANCEMENT OF EXPENSES

Section 6.01    Right to Indemnification. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law (including as it presently exists or may hereafter be amended, but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), any person (a "***Covered Person***") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (any such action, suit or proceeding, a "***proceeding***"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a Director or officer of the Corporation or, while a Director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another Person, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees, judgments, fines ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, except as otherwise provided in Section 6.04 of these Bylaws or with respect to any compulsory counterclaim brought by such Covered Person, the Corporation shall be required to indemnify a Covered Person in connection with a proceeding (or part thereof) commenced by such Covered Person only if the commencement of such proceeding (or part thereof) by the Covered Person was authorized in the specific case by the Board of Directors.

19

Section 6.02    Indemnification of Others. The Corporation shall have the power (but not the obligation) to indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any employee or agent of the Corporation who was or is made or is threatened to be made a party or is otherwise involved in any proceeding by reason of the fact that he or she, or a Person for whom he or she is the legal representative, is or was an employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Person, including service with respect to employee benefit plans, against all liability and loss suffered and expenses reasonably incurred by such Person in connection with any such proceeding.

Section 6.03    Advancement of Expenses. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any proceeding in advance of its final disposition, *provided, however*, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article VI or otherwise.

Section 6.04    Claims. If a claim for indemnification under this Article VI (following the final disposition of such proceeding) is not paid in full within 60 days after the Corporation has received a written claim therefor by the Covered Person, or if a claim for any advancement of expenses under this Article VI is not paid in full within 30 days after the Corporation has received a written statement or statements requesting such amounts to be advanced, the Covered Person shall thereupon (but not before) be entitled to file suit to recover the unpaid amount of such claim. If successful in whole or in part, the Covered Person shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by applicable law. In any such action, the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

Section 6.05    Non-exclusivity of Rights. The rights conferred on any Covered Person by this Article VI shall not be exclusive of any other rights which such Covered Person may have or hereafter acquires under any applicable statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of Stockholders or disinterested Directors or otherwise.

Section 6.06    Insurance. The Corporation may purchase and maintain insurance on behalf of any Person who is or was a Director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Person against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of the DGCL.

<div align="center">20</div>

Section 6.07      Other Sources. The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of another Person shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such other Person.

Section 6.08      Continuation of Indemnification. The rights to indemnification and to advancement of expenses provided by, or granted pursuant to, this Article VI shall continue as to a Person who has ceased to be a Director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributees of such Person.

Section 6.09      Amendment or Repeal. Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of these Bylaws or an amendment to the Certificate of Incorporation after the occurrence of the act or omission that is the subject of the proceeding for which indemnification or advancement of expenses is sought.

Section 6.10      Other Indemnification and Advancement of Expenses. This Article VI shall not limit the right of the Corporation, to the extent and in the manner permitted by applicable law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

ARTICLE VII.
MISCELLANEOUS

Section 7.01      Fiscal Year. The fiscal year of the Corporation shall be determined by resolution of the Board of Directors.

Section 7.02      Execution of Corporate Contracts and Instruments. The Board of Directors, except as otherwise provided in these Bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 7.03      Dividends. The Board of Directors, subject to any restrictions contained in either (i) the DGCL or (ii) the Certificate of Incorporation, may declare and pay dividends upon the shares of its Stock. Dividends may be paid in cash, in property or in shares of the Corporation's Stock. The Board of Directors may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Corporation, and meeting contingencies.

Section 7.04      Registered Stockholders. The Corporation: (i) shall be entitled to recognize the exclusive right of a Person registered on its books as the owner of shares of Stock to receive dividends and to vote as such owner; and (ii) shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another Person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

Section 7.05    <u>Corporate Seal</u>. The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board of Directors. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Section 7.06    <u>Construction; Definitions</u>. Unless the context requires otherwise, the general provisions, rules of construction and definitions in the DGCL shall govern the construction of these Bylaws. Without limiting the generality of this provision, the singular number includes the plural and the plural number includes the singular.

Section 7.07    <u>Manner of Notice</u>.

(a)    *Notice by Electronic Transmission*. Without limiting the manner by which notice otherwise may be given effectively to Stockholders pursuant to the DGCL, the Certificate of Incorporation or these Bylaws, any notice to Stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission to the extent permitted by applicable law.

Subject to the provisions of the Stockholders Agreement for so long as it is in effect, any notice given pursuant to the preceding paragraph shall be deemed given (a) if by facsimile telecommunication, when directed to a number at which the Stockholder has consented to receive notice; (b) if by electronic mail, when directed to such Stockholder's electronic mail address unless the Stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail; (c) if by a posting on an electronic network together with separate notice to the Stockholder of such specific posting, upon the later of (i) such posting and (ii) the giving of such separate notice; and (d) if by any other form of electronic transmission, when directed to the Stockholder. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For the purposes of these Bylaws, an "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

(b)    *Notice to Stockholders Sharing an Address*. Without limiting the manner by which notice otherwise may be given effectively to Stockholders, and except as prohibited by applicable law, any notice to Stockholders given by the Corporation under any provision of applicable law, the Certificate of Incorporation, or these Bylaws shall be effective if given by a single written notice to Stockholders who share an address if consented to by the Stockholders at that address to whom such notice is given. Any such consent shall be revocable by the Stockholder by written notice to the Corporation. Any Stockholder who fails to object in writing to the Corporation, within 60 days of having been given written notice by the Corporation of its intention to send the single notice permitted under this <u>Section 7.07</u>, shall be deemed to have consented to receiving such single written notice.

<div align="center">22</div>

(c)         *Notice to Directors.* Except as otherwise provided herein or permitted by applicable law, notices to any Director may be in writing and delivered personally, or delivered by recognized international courier service to such Director at such Director's address appearing on the books of the Corporation, or mailed to such Director at such Director's address appearing on the books of the Corporation, or may be given by telephone or by any means of electronic transmission (including, without limitation, electronic mail) directed to an address for receipt by such Director of electronic transmissions appearing on the books of the Corporation.

Section 7.08    Waiver of Notice of Meetings of Stockholders, Directors and Committees. A written waiver of any notice, signed by the person entitled to notice, or waiver by electronic transmission by such person, whether given before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Stockholders, Board of Directors, or committee or subcommittee of the Board of Directors need be specified in a waiver of notice.

Section 7.09    Form of Records. Any records maintained by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device, method or one or more electronic networks or databases, provided that the records so kept can be converted into clearly legible paper form within a reasonable time, and the stock ledger is maintained in accordance with applicable law.

Section 7.10    Amendment of Bylaws. Except as otherwise provided in the Certificate of Incorporation and subject to the Stockholders Agreement (for so long as it remains in effect), these Bylaws may be altered, amended or repealed, and new bylaws made, only by the affirmative vote of (i) at least a majority of the Directors then in office or (ii) holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the then outstanding shares of Stock entitled to vote generally in the election of Directors, voting together as a single class.

*    *    *

23





1271 Avenue of the Americas
New York, New York  10020-1401
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

**LATHAM&WATKINS**LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

October 18, 2021

Fluence Energy, Inc.
4601 Fairfax Drive, Suite 600
Arlington, Virginia 22203

Re:  Registration Statement No. 333-259839;
     35,650,000 shares of Class A common stock, par value $0.00001 per share

Ladies and Gentlemen:

We have acted as special counsel to Fluence Energy, Inc., a Delaware corporation (the "*Company*"), in connection with the proposed issuance of up to 35,650,000 shares of Class A common stock, $0.00001 par value per share, which are being offered by the Company (the "*Shares*"). The Shares are included in a registration statement on Form S-1 under the Securities Act of 1933, as amended (the "*Act*"), initially filed with the Securities and Exchange Commission (the "*Commission*") on September 28, 2021 (Registration No. 333-259839, as amended, the "*Registration Statement*"). The term "Shares" shall include any additional shares of common stock registered by the Company pursuant to Rule 462(b) under the Act in connection with the offering contemplated by the Registration Statement. This opinion is being furnished in connection with the requirements of Item 601(b)(5) of Regulation S-K under the Act, and no opinion is expressed herein as to any matter pertaining to the contents of the Registration Statement or related Prospectus, other than as expressly stated herein with respect to the issue of the Shares.

As such counsel, we have examined such matters of fact and questions of law as we have considered appropriate for purposes of this letter. With your consent, we have relied upon certificates and other assurances of officers of the Company and others as to factual matters without having independently verified such factual matters. We are opining herein as to General Corporation Law of the State of Delaware, and we express no opinion with respect to any other laws.

Subject to the foregoing and the other matters set forth herein, it is our opinion that, as of the date hereof, upon the proper filing of the amended and restated certificate of incorporation of the Company, substantially in the form most recently filed as an exhibit to the Registration Statement, with the Secretary of State of Delaware and when such Shares shall have been duly registered on the books of the transfer agent and registrar therefor in the name or on behalf of the purchasers and have been issued by the Company against payment therefor (not less than par value) in the circumstances contemplated by the form of underwriting agreement most recently filed as an exhibit to the Registration Statement, the issue and sale of the Shares will have been duly authorized by all necessary corporate action of the Company, and the Shares will be validly issued, fully paid and nonassessable. In rendering the foregoing opinion, we have assumed that the Company will comply with all applicable notice requirements regarding uncertificated shares provided in the General Corporation Law of the State of Delaware.

**October 18, 2021**
**Page 2**

**LATHAM&WATKINS**LLP

This opinion is for your benefit in connection with the Registration Statement and may be relied upon by you and by persons entitled to rely upon it pursuant to the applicable provisions of the Act. We consent to your filing this opinion as an exhibit to the Registration Statement and to the reference to our firm in the Prospectus under the heading "Legal Matters." We further consent to the incorporation by reference of this letter and consent into any post-effective amendment to the Registration Statement filed pursuant to Rule 462(b) with respect to the Shares. In giving such consent, we do not thereby admit that we are in the category of persons whose consent is required under Section 7 of the Act or the rules and regulations of the Commission thereunder.

Very truly yours,

/s/ Latham & Watkins LLP

**TAX RECEIVABLE AGREEMENT**

by and among

**FLUENCE ENERGY, INC.,**

**FLUENCE ENERGY, LLC,**

**the several TRA PARTIES (as defined herein),**

and

**OTHER PERSONS FROM TIME TO TIME PARTY HERETO**

Dated as of [_____]

**CONTENTS**

                                                                                           **Page**

ARTICLE I. DEFINITIONS                                                                        1

    Section 1.1    Definitions                                                            1
    Section 1.2    Rules of Construction                                                  8

ARTICLE II. DETERMINATION OF REALIZED TAX BENEFIT                                             9

    Section 2.1    Attribute Schedule                                                     9
    Section 2.2    Tax Benefit Schedule                                                   10
    Section 2.3    Procedures, Amendments.                                                10

ARTICLE III. TAX BENEFIT PAYMENTS                                                            11

    Section 3.1    Timing and Amount of Tax Benefit Payments                              11
    Section 3.2    No Duplicative Payments                                                12
    Section 3.3    Pro Rata Payments.                                                     12

ARTICLE IV. TERMINATION                                                                      12

    Section 4.1    Early Termination of Agreement; Breach of Agreement                    12
    Section 4.2    Early Termination Notice                                               13
    Section 4.3    Payment upon Early Termination.                                        13

ARTICLE V. SUBORDINATION AND LATE PAYMENTS                                                   14

    Section 5.1    Subordination                                                          14
    Section 5.2    Late Payments by the Corporation                                       14

ARTICLE VI. TAX MATTERS; CONSISTENCY; COOPERATION                                            14

    Section 6.1    Participation in the Corporation's and the LLC's Tax Matters           14
    Section 6.2    Consistency                                                            15
    Section 6.3    Cooperation                                                            15

ARTICLE VII. MISCELLANEOUS                                                                                    15

    Section 7.1     Notices                                                                           15
    Section 7.2     Counterparts; Electronic Signature                                                16
    Section 7.3     Entire Agreement; No Third Party Beneficiaries                                    16
    Section 7.4     Governing Law                                                                     16
    Section 7.5     Severability                                                                      16
    Section 7.6     Assignments; Amendments; Successors; No Waiver                                    16
    Section 7.7     Titles and Subtitles                                                              17
    Section 7.8     Resolution of Disputes                                                            17
    Section 7.9     Reconciliation                                                                    18
    Section 7.10    Withholding                                                                       18
    Section 7.11    Consolidated Group; Transfers of Corporate Assets                                 19
    Section 7.12    Confidentiality                                                                   19
    Section 7.13    Change in Law                                                                     20
    Section 7.14    Interest Rate Limitation                                                          20
    Section 7.15    Independent Nature of Rights and Obligations                                      21
    Section 7.16    LLC Agreement                                                                     21
    Section 7.17    Tax Characterization and Elections                                               21
    Section 7.18    Payment Amounts                                                                   21

**Annexes**

Annex A    -    Form of Joinder Agreement
Annex B    -    TRA Parties

ii

**TAX RECEIVABLE AGREEMENT**

This TAX RECEIVABLE AGREEMENT (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), dated [_____], is hereby entered into by and among Fluence Energy, Inc., a Delaware corporation (the "<u>Corporation</u>") (and, along with any other member of any U.S. federal income tax consolidated group including the Corporation, the "<u>Corporate Group</u>"), Fluence Energy, LLC, a Delaware limited liability company (the "<u>LLC</u>"), and each of the TRA Parties from time to time party hereto. Capitalized terms used but not otherwise defined herein have the respective meanings set forth in Section 1.01.

**RECITALS**

WHEREAS, the TRA Parties hold (or prior to an Exchange will hold) equity interests in the LLC (the "<u>Units</u>");

WHEREAS, after the date hereof, pursuant to, and subject to the provisions of, the LLC Agreement and any other applicable documentation, each TRA Party has the right from time to time to require the LLC to redeem (a "<u>Redemption</u>") all or a portion of such TRA Party's Units, which Redemption may be effected, at the Corporation's election, for cash or Class A Common Stock (to be paid by the LLC), or by the Corporation effecting a direct exchange (a "<u>Direct Exchange</u>") for such Units, and as a result of such sales, Redemptions or Direct Exchanges the Corporation or the Corporate Group may be entitled to utilize (or otherwise be entitled to the benefits arising out of) the Covered Tax Assets;

WHEREAS, the income, gain, loss, expense, deduction and other Tax items of the Corporation or the Corporate Group may be affected by the Covered Tax Assets;

WHEREAS, the parties to this Agreement desire to make certain arrangements with respect to the effects of the Covered Tax Assets;

NOW, THEREFORE, in connection with the foregoing and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

**ARTICLE I.**
**DEFINITIONS**

Section 1.1      <u>Definitions</u>. As used in this Agreement, the terms set forth in this Article I shall have the following meanings (such meanings to be equally applicable to both (i) the singular and plural and (ii) the active and passive forms of the terms defined).

"<u>Actual Tax Liability</u>" means, with respect to any Taxable Year, the actual liability for U.S. federal, state and local income Taxes of (i) the Corporation or the Corporate Group, as applicable, and (ii) without duplication, the LLC, but in the case of this clause (ii) only with respect to U.S. federal, state and local income Taxes imposed on the LLC and allocable to the Corporation or the Corporate Group, in each case using the same methods, elections, conventions, and practices used on the relevant Tax Return; provided, that the actual liability for Taxes described in clauses (i) and (ii) shall be calculated (a) using the Assumed State and Local Tax Rate, solely for purposes of calculating the state and local Actual Tax Liability and (b) assuming, solely for purposes of calculating the liability for U.S. federal income Taxes, that state and local income and franchise Taxes are not deductible by the Corporation or the Corporate Group for U.S. federal income Tax purposes.

"Advance Payment" is defined in Section 3.1(b) of this Agreement.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

"Agreed Rate" means a per annum rate of LIBOR plus 100 basis points.

"Agreement" is defined in the preamble.

"Amended Schedule" is defined in Section 2.3(b) of this Agreement.

"Assumed State and Local Tax Rate" means six percent (6%), (which amount, for the avoidance of doubt, was selected by taking into account and is intended to reflect the deductibility by the Corporation for federal income tax purposes of state and local income taxes under current law), *provided* that the Corporation may adjust the Assumed State and Local Tax Rate from time to time (a) in the event of a change in Law, (b) in the event of a change in material fact or (c) if the Corporation otherwise determines in good faith from time to time that such adjustment is necessary or advisable.

"Attributable" is defined in Section 3.1(b) of this Agreement.

"Attribute Schedule" is defined in Section 2.1 of this Agreement.

"Basis Adjustment" means the increase or decrease to the tax basis of, or the Corporation's share of, the tax basis of the Reference Assets (i) under Section 734(b), 743(b) and 754 of the Code and, in each case, the comparable sections of U.S. state and local tax law (in situations where, following an Exchange, the LLC remains in existence as an entity for tax purposes) and (ii) under Sections 732 and 1012 of the Code and, in each case, the comparable sections of U.S. state and local tax law (in situations where, as a result of one or more Exchanges, the LLC becomes an entity that is disregarded as separate from its owner for tax purposes), in each case, as a result of any Exchange and any payments made under this Agreement. For purposes of determining the Basis Adjustments (and any payments made hereunder with respect to such Basis Adjustments) that are attributable to Reference Assets held by an entity in which the LLC owns a direct or indirect interest and where obtaining information necessary to determine the allocation of the Basis Adjustments is not practicable (as reasonably determined by the Corporation), the Corporation may make reasonable estimates and assumptions, including if determined by the Corporation assuming that such Basis Adjustments will be allocable to property that is depreciable or amortizable over a 15-year period. Notwithstanding any other provision of this Agreement, the amount of any Basis Adjustment resulting from an Exchange of one or more Units shall be determined without regard to any Pre-Exchange Transfer of such Units and as if any such Pre-Exchange Transfer had not occurred.

"Business Day" means any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in New York are closed.

2

"Change of Control" means the occurrence of any of the following events:

(a)        any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act (as defined in the LLC Agreement), but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of shares of Class A Common Stock, Class B Common Stock, preferred stock and/or any other class or classes of capital stock of the Corporation (if any) representing in the aggregate more than fifty percent (50%) of the voting power of all of the outstanding shares of capital stock of the Corporation entitled to vote;

(b)        the stockholders of the Corporation approve a plan of complete liquidation or dissolution of the Corporation or there is consummated an agreement or series of related agreements for the sale or other disposition, directly or indirectly, by the Corporation of all or substantially all of the Corporation's assets (including a sale of all or substantially all of the assets of the Company);

(c)        there is consummated a merger or consolidation of the Corporation with any other corporation or entity, and, immediately after the consummation of such merger or consolidation, the voting securities of the Corporation immediately prior to such merger or consolidation do not continue to represent, or are not converted into, more than fifty percent (50%) of the combined voting power of the then outstanding voting securities of the Person resulting from such merger or consolidation or, if the surviving company is a Subsidiary, the ultimate parent thereof; or

(d)        the Corporation ceases to be the sole Managing Member (as defined in the LLC Agreement) of the LLC.

Notwithstanding the foregoing, a "Change of Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the record holders of the Class A Common Stock, Class B Common Stock, preferred stock and/or any other class or classes of capital stock of the Corporation immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in and voting control over, and own substantially all of the shares of, an entity which owns all or substantially all of the assets of the Corporation immediately following such transaction or series of transactions.

"Class A Common Stock" means Class A common stock, $0.00001 par value per share, of the Corporation.

"Class B Common Stock" means Class B-1 common stock, $0.00001 par value per share, of the Corporation, and Class B-2 common stock, $0.00001 par value per share, of the Corporation.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, or successor statute, as applicable.

3

"<u>Control</u>" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or other agreement.

"<u>Corporation</u>" is defined in the preamble to this Agreement.

"<u>Covered Tax Assets</u>" means, with respect to a TRA Party, (i) Basis Adjustments and (ii) Imputed Interest. The determination of the Covered Tax Assets that are allocable to Units being exchanged by a TRA Party (and payments made hereunder with respect thereto) shall be determined in good faith by the Corporation in consultation with its tax return preparer, including by taking into account reasonable estimates and assumptions as determined by the Corporation. For the avoidance of doubt, Covered Tax Assets shall include any carryforwards or similar attributes that are attributable to the Tax items described in clauses (i) through (ii).

"<u>Cumulative Net Realized Tax Benefit</u>" for a Taxable Year means the cumulative amount of Realized Tax Benefits for all Taxable Years of the Corporation or the Corporate Group, as applicable, up to and including such Taxable Year, net of the cumulative amount of Realized Tax Detriments for the same period. The Realized Tax Benefit and Realized Tax Detriment for each Taxable Year shall be based on the most recent Tax Benefit Schedules or Amended Schedules, if any, in existence at the time of such determination.

"<u>Default Rate</u>" means a per annum rate of LIBOR plus 500 basis points.

"<u>Determination</u>" shall have the meaning ascribed to such term in Section 1313(a) of the Code or similar provision of law, as applicable, or any other event (including the execution of IRS Form 870-AD) that finally and conclusively establishes the amount of any liability for tax and shall also include the acquiescence of the Corporation to the amount of any assessed liability for Tax.

"<u>Direct Exchange</u>" is defined in the recitals to this agreement.

"<u>Dispute</u>" is defined in Section 7.8(a) of this Agreement.

"<u>Early Termination Agreed Rate</u>" means LIBOR plus 100 basis points.

"<u>Early Termination Date</u>" means the date of an Early Termination Notice for purposes of determining the Early Termination Payment.

"<u>Early Termination Effective Date</u>" is defined in Section 4.2 of this Agreement.

"<u>Early Termination Notice</u>" is defined in Section 4.2 of this Agreement.

"<u>Early Termination Payment</u>" is defined in Section 4.3(b) of this Agreement.

"<u>Early Termination Rate</u>" means the lesser of (i) 6.50% per annum, compounded annually, and (ii) the Early Termination Agreed Rate.

"<u>Early Termination Schedule</u>" is defined in Section 4.2 of this Agreement.

"Exchange" means any Direct Exchange or Redemption.

"Expert" is defined in Section 7.9 of this Agreement.

"Governing Body" means the board of directors of the Corporation.

"Hypothetical Tax Liability" means, with respect to any Taxable Year, the liability for U.S. federal, state and local income Taxes of (i) the Corporation or the Corporate Group, as applicable, and (ii) without duplication, the LLC, but in the case of this clause (ii) only with respect to U.S. federal, state and local income Taxes imposed on the LLC and allocable to the Corporation or the Corporate Group, in each case using the same methods, elections, conventions, and practices used on the relevant Tax Return; provided, that the actual liability for Taxes described in clauses (i) and (ii) shall be calculated (a) calculated without taking into account the Covered Tax Assets (including, for the avoidance of doubt, any carryforward or carryback of any tax item attributable to the Covered Tax Assets), (b) using the Assumed State and Local Tax Rate, solely for purposes of calculating the state and local Hypothetical Tax Liability, and (c) assuming, solely for purposes of calculating the liability for U.S. federal income Taxes, that state and local income and franchise Taxes are not deductible by the Corporation or the Corporate Group for U.S. federal income Tax purposes.

"Imputed Interest" in respect of a TRA Party shall mean any interest imputed under the provisions of the Code with respect to the Corporation's payment obligations in respect of such TRA Party under this Agreement.

"Interest Amount" is defined in Section 3.1(b) of this Agreement.

"IPO" means the initial public offering of shares of Class A Common Stock by the Corporation.

"IPO Date" means the closing date of the IPO.

"IRS" means the U.S. Internal Revenue Service.

"Joinder" means a joinder to this Agreement, in form and substance substantially similar to Annex A to this Agreement.

"Joinder Requirement" is defined in Section 7.6(b) of this Agreement.

"LIBOR" means during any period, the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by the Corporation as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (an "Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the first day of such period as the London interbank offered rate for U.S. dollars having a borrowing date and a maturity comparable to such period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by the Corporation at such time, which determination shall be conclusive absent manifest error; provided, that at no time shall LIBOR be less than 0%.

5

"LLC" is defined in the recitals to this Agreement.

"LLC Agreement" means that certain Third Amended and Restated Limited Liability Company Agreement of the LLC, dated as of the date hereof, as such agreement may be further amended, restated, supplemented and/or otherwise modified from time to time.

"Market Value" means the Common Unit Redemption Price (as defined in the LLC Agreement), determined as of an Early Termination Date (treating such Early Termination Date as a Redemption Date (as defined in the LLC Agreement) for such purpose).

"Net Tax Benefit" is defined in Section 3.1(b) of this Agreement.

"Objection Notice" is defined in Section 2.3(a) of this Agreement.

"Person" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity.

"Pre-Exchange Transfer" means any transfer of one or more Units (including upon the death of a Member) (i) that occurs after the IPO but prior to a Redemption or Direct Exchange of such Units and (ii) to which Section 743(b) of the Code applies.

"Realized Tax Benefit" means, for a Taxable Year, the excess, if any, of the Hypothetical Tax Liability over the Actual Tax Liability. If all or a portion of the actual liability for such Taxes for the Taxable Year arises as a result of an audit by a Taxing Authority of any Taxable Year, such liability shall not be included in determining the Realized Tax Benefit until there has been a Determination.

"Realized Tax Detriment" means, for a Taxable Year, the excess, if any, of the Actual Tax Liability over the Hypothetical Tax Liability. If all or a portion of the actual liability for such Taxes for the Taxable Year arises as a result of an audit by a Taxing Authority of any Taxable Year, such liability shall not be included in determining the Realized Tax Detriment unless and until there has been a Determination.

"Reconciliation Dispute" is defined in Section 7.9 of this Agreement.

"Reconciliation Procedures" is defined in Section 2.3(a) of this Agreement.

"Redemption" has the meaning in the recitals to this Agreement.

"Reference Asset" means any tangible or intangible asset of the LLC or any of its successors or assigns, and any asset held by any entity in which the LLC owns a direct or indirect equity interest and that is treated as a partnership or disregarded entity for U.S. federal income Tax purposes (but only to the extent such entity is held either directly or only through other entities treated as partnerships or disregarded entities) for purposes of the applicable Tax, as of the relevant date. A Reference Asset also includes any asset that is "substituted basis property" under Section 7701(a)(42) of the Code with respect to a Reference Asset.

"<u>Schedule</u>" means any of the following: (i) an Attribute Schedule, (ii) a Tax Benefit Schedule, or (iii) the Early Termination Schedule, and, in each case, any amendments thereto.

"<u>Senior Obligations</u>" is defined in Section 5.1 of this Agreement.

"<u>Stockholders Agreement</u>" means the Stockholders Agreement, dated as of the date hereof, by and among the Corporation and the other persons party thereto or that may become parties thereto from time to time, as the same may be amended, restated, supplemented and/or otherwise modified, from time to time.

"<u>Subsidiary</u>" means, with respect to any Person and as of the date of any determination, any other Person as to which such Person, owns, directly or indirectly, or otherwise controls, more than 50% of the voting power or other similar interests, or the sole general partner interest, or managing member or similar interest, of such Person.

"<u>Tax Benefit Payment</u>" is defined in Section 3.1(b) of this Agreement.

"<u>Tax Benefit Schedule</u>" is defined in Section 2.2(a) of this Agreement.

"<u>Tax Return</u>" means any return, declaration, report or similar statement filed or required to be filed with respect to Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

"<u>Taxable Year</u>" means a taxable year of the Corporation or the Corporate Group under the Code or comparable sections of U.S. state or local tax law, as applicable (and, therefore, for the avoidance of doubt, may include a period of less than 12 months for which a Tax Return is made), ending on or after the closing date of the IPO.

"<u>Taxes</u>" means any and all United States federal, state or local taxes, assessments or other charges that are based on or measured with respect to net income or profits (including alternative minimum taxes).

"<u>Taxing Authority</u>" means any national, federal, state, county, municipal, or local government, or any subdivision, agency, commission or authority thereof, or any quasi-governmental body, or any other authority of any kind, exercising regulatory or other authority in relation to tax matters.

"<u>TRA Parties</u>" means the Persons listed on Annex B.

"<u>Treasury Regulations</u>" means the final, temporary, and (to the extent they can be relied upon) proposed regulations under the Code, as promulgated from time to time (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

"<u>U.S.</u>" means the United States of America.

"<u>Units</u>" is defined in the recitals to this Agreement.

"Valuation Assumptions" means, as of an Early Termination Date, the assumptions that:

(1)        in each Taxable Year ending on or after such Early Termination Date, the Corporation or the Corporate Group, as applicable, will have taxable income sufficient to fully use the Covered Tax Assets (other than any such Covered Tax Assets that constitute or have resulted in net operating losses, excess interest deduction, or credit carryforwards or carryovers (determined as of the Early Termination Date), which shall be governed by paragraph 4 below) during such Taxable Year or future Taxable Years in which such deductions or other attributes would become available;

(2)        the U.S. federal income tax rates that will be in effect for each such Taxable Year will be those specified for each such Taxable Year by the Code and other law as in effect on the Early Termination Date, except to the extent any change to such tax rates for such Taxable Year has already been enacted into law;

(3)        all taxable income of the Corporation or the Corporate Group, as applicable, will be subject to the maximum applicable tax rate for U.S. federal income tax purposes throughout the relevant period, and the tax rate for U.S. state and local income taxes shall be the Assumed State and Local Tax Rate as in effect for the Taxable Year of the Early Termination Date;

(4)        any net operating loss, excess interest deduction, or credit carryovers or carrybacks (or similar items with respect to carryovers or carrybacks) generated by any Covered Tax Asset and available as of the Early Termination Date will be used by the Corporation ratably over a period beginning on the Early Termination Date and ending on the earlier of (i) 15 years following the Early Termination Date, or (ii) the scheduled expiration date, if any, under applicable Tax law of such net operating losses, excess interest deductions, or credit carryovers or carrybacks (or similar items with respect to carryovers or carrybacks);

(5)        any non-amortizable assets (other than equity interests in Subsidiaries that are treated as corporations for U.S. federal income tax purposes) will be disposed of in a fully taxable transaction on the fifteenth anniversary of the IPO Date (or, if later, on the Early Termination Date) ; provided, that in the event of a Change of Control, (i) such non-amortizable assets shall be disposed of at the time of the sale of the relevant asset (if earlier than such fifteenth anniversary); and (ii) such non-amortizable assets shall be considered to have been disposed of on the date of the Change of Control, if such Change of Control occurs more than 15 years after the applicable Exchange or IPO Date, as applicable;

(6)        if, on the Early Termination Date, any TRA Party has Units that have not been Exchanged, then such Units shall be deemed to be Exchanged for the Market Value that would be received by such TRA Party if such Units had been Exchanged on the Early Termination Date, and such TRA Party shall be entitled to receive the amount of cash such TRA Party would have been entitled to pursuant to Section 4.3(a) had such Units actually been Exchanged on the Early Termination Date; and

(7)        any payment obligations pursuant to this Agreement will be satisfied on the date that any Tax Return to which such payment obligation relates is required to be filed excluding any extensions.

Section 1.2        Rules of Construction. Unless otherwise specified herein:

(a)        The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)      For purposes of interpretation of this Agreement:

(i)        The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision thereof.

(ii)        References in this Agreement to a Schedule, Article, Section, clause or sub-clause refer to the appropriate Schedule to, or Article, Section, clause or subclause in, this Agreement.

(iii)        References in this Agreement to dollars or "$" refer to the lawful currency of the United States of America.

(iv)        The term "including" is by way of example and not limitation.

(v)        The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)        In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)        Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

(e)        Unless otherwise expressly provided herein, (a) references to organization documents (including the LLC Agreement), agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted hereby; and (b) references to any law (including the Code and the Treasury Regulations) shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

<div align="center">

**ARTICLE II.**
**DETERMINATION OF REALIZED TAX BENEFIT**

</div>

Section 2.1        <u>Attribute Schedule</u>. Following the IPO Date, within one hundred twenty (120) calendar days after the filing of Form 1120 (or any successor form) of the Corporation or the Corporate Group for a given Taxable Year, the Corporation shall deliver to the TRA Parties a schedule (the "<u>Attribute Schedule</u>") that shows, in reasonable detail, the Covered Tax Assets that are available for use by the Corporation or the Corporate Group with respect to such Taxable Year with respect to each TRA Party (including the Basis Adjustments with respect to the Reference Assets resulting from any Exchanges and the periods over which such Basis Adjustments are amortizable or depreciable). The Attribute Schedule shall also list any limitations on the ability of the Corporation or the Corporate Group to utilize any Covered Tax Assets under applicable laws (including as a result of the operation of Section 197(f)(9) of the Code, Section 382 of the Code or Section 383 of the Code).

<div align="center">9</div>

Section 2.2        Tax Benefit Schedule.

(a)        Tax Benefit Schedule. Within one hundred twenty (120) calendar days after the filing of the Form 1120 (or any successor form) of the Corporation or the Corporate Group for any Taxable Year, the Corporation shall provide to the TRA Parties a schedule showing, in reasonable detail, the calculation of the Tax Benefit Payment in respect of each TRA Party for such Taxable Year and the calculation of the Realized Tax Benefit and Realized Tax Detriment and the components thereof for such Taxable Year (a "Tax Benefit Schedule"). Each Tax Benefit Schedule will become final as provided in Section 2.3(a) and may be amended as provided in Section 2.3(b) (subject to the procedures set forth in Section 2.3(b)).

(b)        Applicable Principles. For purposes of calculating the Realized Tax Benefit or Realized Tax Detriment for any period, carryovers or carrybacks of any Tax item attributable to the Covered Tax Assets shall be considered to be subject to the rules of the Code and the Treasury Regulations, as applicable, governing the use, limitation and expiration of carryovers or carrybacks of the relevant type. If a carryover or carryback of any Tax item includes a portion that is attributable to a Covered Tax Asset and another portion that is not, such respective portions shall be considered to be used in accordance with the "with and without" methodology. For the avoidance of doubt, the Corporation shall be entitled to make reasonable simplifying assumptions in making determinations contemplated by this Agreement, including reasonable assumptions regarding basis recovery periods (and the parties hereby agree that, among other things, the Corporation's determination of the Realized Tax Benefit and Realized Tax Detriment with respect to U.S. state and local taxes might not take into account jurisdiction-specific U.S. state and local adjustments to the U.S. federal taxable income base or to the U.S. federal rules regarding the utilization of tax attribute carryovers).

Section 2.3        Procedures, Amendments.

(a)        Procedure. Every time the Corporation delivers to the TRA Parties a Schedule under this Agreement, including any Amended Schedule delivered pursuant to Section 2.3(b), and any Early Termination Schedule or amended Early Termination Schedule, the Corporation shall also (x) deliver to the TRA Parties schedules, valuation reports, if any, and work papers, as determined by the Corporation or reasonably requested by the TRA Parties, providing reasonable detail regarding the preparation of the Schedule, and (y) allow the TRA Parties reasonable access at no cost to the appropriate representatives of the Corporation, as determined by the Corporation or requested by the TRA Parties in connection with the review of such Schedule. Without limiting the application of the preceding sentence, each time the Corporation delivers to the TRA Parties a Tax Benefit Schedule, in addition to the Tax Benefit Schedule duly completed, the Corporation shall deliver to the TRA Parties a reasonably detailed calculation of the applicable Hypothetical Tax Liability and a reasonably detailed calculation of the applicable Actual Tax Liability, as well as any other work papers as determined by the Corporation or reasonably requested by the TRA Parties, provided that the Corporation shall not be required to provide any information that it reasonably believes is unnecessary for purposes of determining the items in the applicable Schedule or amendment thereto. An applicable Schedule or amendment thereto shall become final and binding on all parties sixty (60) calendar days after the first date on which the TRA Parties have received the applicable Schedule or amendment thereto unless (i) a TRA Party provides the Corporation with notice of a material objection to such Schedule ("Objection Notice") made in good faith or (ii) each TRA Party provides a written waiver of such right of any Objection Notice within the period described in clause (i) above, in which case such Schedule or amendment thereto becomes binding on the date the last such waiver is received by the Corporation. If the Corporation and the TRA Parties, for any reason, are unable to successfully resolve the issues raised in an Objection Notice within thirty (30) calendar days after receipt by the Corporation of an Objection Notice, then the Corporation and the TRA Parties shall employ the reconciliation procedures described in Section 7.9 of this Agreement (the "Reconciliation Procedures").

10

(b)         Amended Schedule. The applicable Attribute Schedule or Tax Benefit Schedule for any Taxable Year may be amended from time to time by the Corporation (i) in connection with a Determination affecting such Schedule, (ii) to correct inaccuracies in the Schedule identified after the date the Schedule was provided to the TRA Parties, (iii) to comply with the Expert's determination under the Reconciliation Procedures, (iv) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to a carryback or carryforward of a loss or other tax item to such Taxable Year, (v) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to an amended Tax Return filed for such Taxable Year or (vi) as otherwise determined in good faith by the Corporation to be reasonably necessary or appropriate (any such Schedule, an "Amended Schedule"). The Attribute Schedule shall be appropriately amended by the Corporation and the TRA Parties to the extent that, as a result of a Determination, the Corporation is required to calculate its Tax liability in a manner inconsistent with the Attribute Schedule. The Corporation shall provide an Amended Schedule to the TRA Parties within one hundred twenty (120) calendar days of the occurrence of an event referenced in clauses (i) through (vi) of the first sentence of this Section 2.3(b).

## ARTICLE III.
## TAX BENEFIT PAYMENTS

Section 3.1         Timing and Amount of Tax Benefit Payments.

(a)         Within five (5) Business Days after a Tax Benefit Schedule delivered to the TRA Parties becomes final in accordance with Section 2.3(a), the Corporation shall pay or cause to be paid to each TRA Party for such Taxable Year an amount equal to the excess, if any, of (i) the Tax Benefit Payment in respect of such TRA Party for such Taxable Year determined pursuant to Section 3.1(b) over (ii) the aggregate amount of Advance Payments previously made to such TRA Party in respect of such Taxable Year; provided that, if the Corporation makes Advance Payments, it shall make Advance Payments to all parties eligible to receive payments under this Tax Receivable Agreement with respect to a particular Taxable Year in proportion to their respective amount of anticipated payments under this Tax Receivable Agreement in respect of such Taxable Year, as determined by the Corporation. Each such Tax Benefit Payment or such Advance Payment shall be made by wire transfer of immediately available funds to the bank account previously designated by such TRA Party to the Corporation or as otherwise agreed by the Corporation and such TRA Party.

(b)         A "Tax Benefit Payment" in respect of a TRA Party means an amount, not less than zero, equal to the sum of the portion of the Net Tax Benefit that is Attributable to such TRA Party and the Interest Amount with respect thereto. A Net Tax Benefit is "Attributable" to a TRA Party to the extent that is derived from a Covered Tax Asset this is allocable to Units that were Exchanged by such TRA Party, as determined by the Corporation in accordance with the definition of "Covered Tax Assets." The "Net Tax Benefit" for a Taxable Year shall be an amount equal to the excess, if any, of (i) 85% of the Cumulative Net Realized Tax Benefit as of the end of such Taxable Year over (ii) the sum of the total amount of payments previously made under Section 3.1(a) (excluding payments attributable to Interest Amounts) and the Advance Payments previously made under Section 3.1(b) of this Agreement; provided, for the avoidance of doubt, that (1) a TRA Party shall not be required to return any portion of any previously made Tax Benefit Payment or Advance Payment it receives under this Agreement; (2) no amounts due to a TRA Party under this Agreement shall be escrowed and (3) no TRA Party shall be required to make a payment to the Corporation on account of a Realized Tax Detriment. The "Interest Amount" in respect of the TRA Party shall equal the interest on the amount of the unpaid Net Tax Benefit Attributable to such TRA Party for a Taxable Year, which interest shall accrue on any unpaid Net Tax Benefit from and after the date on which the calculation of such Tax Benefit Payment for such Taxable Year becomes final pursuant to Section 2.3(a), calculated at the Agreed Rate, until the date such unpaid amounts are paid. For the avoidance of doubt, for Tax purposes, the Interest Amount shall not be treated as interest but instead shall be treated as additional consideration in the Exchange unless otherwise required by law. "Advance Payments" in respect of a TRA Party for a Taxable Year means the payments, if any, made by the Corporation to such TRA Party as an advance of such TRA Party's anticipated Tax Benefit Payment for such Taxable Year. The Corporation shall be entitled at its option to make Advance Payments. Notwithstanding the foregoing, for each Taxable Year ending on or after the date of a Change of Control, all Tax Benefit Payments shall be calculated by utilizing Valuation Assumptions (1) and (5), substituting in (1) "the date of a Change of Control" for the term "Early Termination Date." Notwithstanding anything to the contrary in this Agreement, after any lump-sum payment under Article IV of this Agreement in respect of present or future Covered Tax Assets, such Covered Tax Assets shall no longer be considered Covered Tax Assets for purposes of determining Tax Benefit Payments or the Net Tax Benefit.

11

Section 3.2        No Duplicative Payments. It is intended that the provisions of this Agreement will not result in duplicative payment of any amount (including interest) required under this Agreement. The provisions of this Agreement shall be construed consistent with such intent.

Section 3.3        Pro Rata Payments.

(a)        Notwithstanding anything in Section 3.1 to the contrary, to the extent that the aggregate amount of the tax benefit to the Corporation or the Corporate Group from the reduction in Tax Liability as a result of the Covered Tax Assets is limited in a particular Taxable Year because the Corporation or the Corporate Group does not have sufficient taxable income to fully utilize available deductions and other attributes, the Net Tax Benefit giving rise to Tax Benefit Payments shall be allocated among the TRA Parties in proportion to the respective amounts of Tax Benefit Payments that would have been paid under this Agreement if the Corporation or the Corporate Group, as applicable, had sufficient taxable income so that there were no such limitation; provided, that, for the avoidance of doubt, for purposes of allocating among the TRA Parties the aggregate Tax Benefit Payments payable under this Agreement with respect to any Taxable Year, the operation of this Section 3.3(a) with respect to any prior Taxable Years shall be taken into account. Consistent with the foregoing, the Attribute Schedule for a given Taxable Year shall reflect the operation of this Section 3.3(a) in respect of previous Taxable Years, with the Covered Tax Assets described in such Attribute Schedule that are attributable to a TRA Party being adjusted to reflect payments received in respect of such Covered Tax Assets (the intention of the parties being to avoid duplicative payments and maintain records sufficient to allow the Corporation to allocate Tax Benefit Payments consistent with the terms of this Section 3.3(a)).

(b)        After taking into account Section 3.3(a), if for any reason the Corporation does not fully satisfy its payment obligations to make Tax Benefit Payments due under this Agreement in respect of a particular Taxable Year (for example, as a result of having insufficient cash to make the Tax Benefit Payments due hereunder), then the Corporation and the TRA Parties agree that (i) the Corporation shall make payments due hereunder to the TRA Parties in respect of a Taxable Year in the same proportion as such payments would have been made if the relevant payment had been made in full by the Corporation, and (ii) no Tax Benefit Payment shall be made in respect of any Taxable Year until all Tax Benefit Payments in respect of prior Taxable Years have been paid.

(c)        To the extent the Corporation makes a payment to a TRA Party in respect of a particular Taxable Year under Section 3.1(a) of this Agreement (taking into account Section 3.3(a) and (b)) in an amount in excess of the amount of such payment that should have been made to the TRA Party in respect of such Taxable Year, then (i) the TRA Party shall not receive further payments under Section 3.1(a) until the TRA Party has foregone an amount of payments equal to such excess and (ii) the Corporation shall pay the amount of the TRA Party's foregone payments to other TRA Parties (to the extent applicable) in a manner such that each of the other TRA Parties, to the extent possible, shall have received aggregate payments under Section 3.1(a) and (b) in the amount it would have received if there had been no excess payment to the TRA Party.

**ARTICLE IV.**
**TERMINATION**

Section 4.1        Early Termination of Agreement; Breach of Agreement.

(a)        With the prior written approval of each of a majority of the "independent directors" (within the meaning of Rule 10A-3 promulgated under the Exchange Act and the Nasdaq rules) of the Governing Body, the Corporation may terminate this Agreement with respect to all amounts payable to the TRA Parties at any time by paying to each TRA Party the Early Termination Payment in respect of the TRA Party; provided, however, that (i) this Agreement shall only terminate pursuant to this Section 4.1(a) upon the receipt in full of the Early Termination Payment by the TRA Parties; (ii) the Corporation shall deliver an Early Termination Notice only if it is able to make all required Early Termination Payments under this Agreement and (iii) the Corporation may withdraw any notice to execute its termination rights under this Section 4.1(a) prior to the time at which any Early Termination Payment has been paid.

(b)        In the event that the Corporation breaches any of its material obligations under this Agreement, whether as a result of a failure to make any payment when due, a failure to honor any other material obligation required hereunder or by operation of law as a result of the rejection of this Agreement in a case commenced under the Bankruptcy Code or otherwise, and the Corporation fails to cure such breach within thirty (30) Business Days of a TRA Party notifying the Corporation in writing of such breach, then, at the election of the TRA Parties, subject to the following proviso, all obligations hereunder shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the date of such breach; provided, that (i) each TRA Party's election shall apply only in respect of such TRA Party and (ii) at least five (5) Business Days prior to making any such election, the applicable TRA Party shall provide written notice to the other TRA Parties in order to permit each other TRA Party, if it wishes, to make its election simultaneously. Procedures similar to the procedures of Section 4.2 shall apply, *mutatis mutandis*, with respect to the determination of the amounts payable by the Corporation pursuant to this Section 4.1(b). Notwithstanding the foregoing, in the event that the Corporation breaches any of its material obligations under this Agreement, in lieu of electing to receive the amounts referred to in this Section 4.1(b) pursuant to the provisions hereof, the TRA Parties may seek specific performance of the terms of this Agreement. Notwithstanding anything in this Agreement to the contrary, it shall not be a breach of this Agreement if Corporation fails to make any Tax Benefit Payment when due; provided, that (x) the interest provisions of Section 5.2 shall apply to such late payment, and (y) solely with respect to a Tax Benefit Payment, if the Corporation does not have sufficient cash to make such payment as a result of limitations imposed by existing credit agreements or other indebtedness to which the LLC is a party, Section 5.2 shall apply, but the Default Rate shall be replaced by the Agreed Rate; *provided* that it shall be a breach of a material obligation under this Agreement if the Corporation makes any distribution of cash or other property with respect to any equity interest in the Corporation while any Tax Benefit Payment is due and payable under this Agreement but unpaid (excluding, for the avoidance of doubt, (i) issuances of Class A Common Stock or Class B Common Stock, (ii) issuances of rights to purchase Class A Common Stock or Class B Common Stock pursuant to a shareholders' rights or similar plan and (iii) any compensation, withholdings or other payments under the Corporation's or its subsidiaries' equity incentive plans and awards thereunder as in effect from time to time).

(c)        In connection with a Change of Control, at the election of the TRA Parties, all obligations hereunder with respect to the TRA Parties shall be terminated. The Corporation hereby agrees to provide twenty (20) calendar days prior written notice to each TRA Party of a Change of Control. Within ten (10) calendar days of receipt of such notice, each TRA Party shall provide written notice as to whether it will terminate this Agreement. If a TRA Party elects to terminate the Agreement, then all obligations under this Agreement with respect to the applicable TRA Party shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the date of the Change of Control. Procedures similar to the procedures of Section 4.2 shall apply, *mutatis mutandis*, with respect to the determination of the amounts payable by the Corporation.

Section 4.2        Early Termination Notice. If the Corporation chooses to exercise its right of early termination under Section 4.1(a) above, the Corporation shall deliver to the TRA Parties notice of such intention to exercise such right ("Early Termination Notice"). In addition, if the Corporation chooses to exercise its right of early termination under Section 4.1(a) above, the obligations under this Agreement are accelerated under Section 4.1(b) above or a TRA Party exercises their right to terminate this Agreement under Section 4.1(c) above, the Corporation shall deliver to the TRA Parties a schedule (the "Early Termination Schedule") showing in reasonable detail the calculation of the Early Termination Payment due to each TRA Party. Such Early Termination Schedule shall become final and binding on all parties consistent with the procedures described in Section 2.3(a). The date on which the Early Termination Schedule becomes final shall be the "Early Termination Effective Date."

Section 4.3        Payment upon Early Termination.

(a)        Within three (3) calendar days after an Early Termination Effective Date, the Corporation shall pay to each of the TRA Parties an amount equal to the Early Termination Payment in respect of such TRA Party. Such payment shall be made by wire transfer of immediately available funds to a bank account or accounts designated by the TRA Party or as otherwise agreed by the Corporation and such TRA Party.

13

(b)　　"Early Termination Payment" in respect of a TRA Party shall equal, without duplication, (i) the present value, discounted at the Early Termination Rate, as of the date of the Early Termination Notice, of all Tax Benefit Payments in respect of such TRA Party that would be required to be paid by the Corporation beginning from the date of the Early Termination Notice and applying the Valuation Assumptions, plus (ii) any Tax Benefit Payment determined by the Corporation to be due and payable with respect to such TRA Party that is unpaid as of the date of the Early Termination Notice, plus (iii) any other Tax Benefit Payment due and payable with respect to such TRA Party for a Taxable Year ending prior to the date of the Early Termination Notice, plus (iv) interest accruing on the amounts described in clauses (i) through (iii) (which shall include interest accruing on the amount described in clause (i) from the date of the Early Termination Notice).

(c)　　Upon the payment of the Early Termination Payment by the Corporation to a TRA Party, the Corporation shall not have any further payment obligations under this Agreement in respect of such TRA Party.

**ARTICLE V.**
**SUBORDINATION AND LATE PAYMENTS**

Section 5.1　　Subordination. Notwithstanding any other provision of this Agreement to the contrary, any Tax Benefit Payment or Early Termination Payment required to be made by the Corporation under this Agreement shall rank subordinate and junior in right of payment to any principal, interest, or other amounts due and payable in respect of any obligations owed in respect of secured or unsecured indebtedness for borrowed money of the Corporation and its Subsidiaries ("Senior Obligations") and shall rank *pari passu* in right of payment with all current or future unsecured obligations of the Corporation that are not Senior Obligations. To the extent that any payment under this Agreement is not permitted to be made at the time payment is due as a result of this Section 5.1 and the terms of the agreements governing Senior Obligations, such payment obligation nevertheless shall accrue for the benefit of the applicable TRA Parties and the Corporation shall make such payments at the first opportunity that such payments are permitted to be made in accordance with the terms of the Senior Obligations. Except as otherwise determined by the Governing Body with the approval of the TRA Parties, (i) payments under any other tax receivable agreement (or similar agreement) entered into by the Corporation, the LLC or their Subsidiaries after the date hereof shall be subordinate to all payments owed pursuant to this Agreement, and no such payments shall be made (x) for so long as the Corporation has any unpaid obligation pursuant to this Agreement and (y) with respect to any particular taxable period governed by such tax receivable agreement until payments with respect to such taxable period under this Agreement have been determined and (if any) paid and (ii) the Actual Tax Liability and Hypothetical Tax Liability under this Agreement shall be calculated by assuming that any tax attributes that are subject to a tax receivable agreement (or similar agreement) described in the preceding clause (i) (for the avoidance of doubt, other than this Agreement) did not exist.

Section 5.2　　Late Payments by the Corporation. The amount of all or any portion of any Tax Benefit Payment, Early Termination Payment or other payment under this Agreement not made to the TRA Parties when due under the terms of this Agreement shall be payable together with any interest thereon, computed at the Default Rate and commencing from the date on which such Tax Benefit Payment, Early Termination Payment or other payment was due and payable.

**ARTICLE VI.**
**TAX MATTERS; CONSISTENCY; COOPERATION**

Section 6.1　　Participation in the Corporation's and the LLC's Tax Matters. Except as otherwise provided herein, the Corporation shall have full responsibility for, and sole discretion over, all tax matters concerning the Corporation and the LLC and its Subsidiaries, including without limitation the preparation, filing or amending of any Tax Return and defending, contesting or settling any issue pertaining to taxes; provided, however, that the Corporation shall notify the TRA Parties of, and keep them reasonably informed with respect to, the portion of any audit of the Corporation, the LLC or any of their Subsidiaries the outcome of which is reasonably expected to adversely affect the rights and obligations of the TRA Parties under this Agreement in a material respect, and shall provide to the TRA Parties reasonable opportunity to provide information and other input to the Corporation, the LLC and their Subsidiaries concerning the conduct of any such portion of such audit, which information and other input the Corporation, the LLC and their Subsidiaries, as applicable, shall consider in good faith.

14

Section 6.2        Consistency. The Corporation, the LLC and the TRA Parties agree to report and cause to be reported for all purposes, including federal, state and local Tax purposes, all Tax-related items (including, without limitation, the Basis Adjustments and each Tax Benefit Payment) in a manner consistent with that specified in any Schedule finalized consistent with the terms of this Agreement, unless otherwise required by Law.

Section 6.3        Cooperation. Each of the Corporation, the LLC and the TRA Parties shall (a) furnish to the other parties in a timely manner such information, documents and other materials as the other party may reasonably request for purposes of making any determination or computation necessary or appropriate under this Agreement, completing any financial statement audit, preparing any Tax Return or defending any audit, examination or controversy with any Taxing Authority, (b) make itself available to the other party and its representatives to provide explanations of documents and material and such other information as the other party or its representatives may reasonably request in connection with any of the matters described in clause (a) above, and (c) reasonably cooperate in connection with any such matter, and the Corporation shall reimburse each TRA Party for any reasonable third-party costs and expenses incurred pursuant to this Section at the request of the Corporation or the LLC.

**ARTICLE VII.**
**MISCELLANEOUS**

Section 7.1        Notices. All notices, requests, consents and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by courier service, by fax, by electronic mail (delivery receipt requested) or by certified or registered mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be as specified in a notice given in accordance with this Section 7.1). All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

If to the Corporation or the LLC, to:

> c/o Fluence Energy, Inc.
> 4601 Fairfax Drive, Suite 600
> Arlington, VA 22203
> Attention: Francis A. Fuselier
> Email: frank.fuselier@fluenceenergy.com

with a copy (which shall not constitute notice to the Corporation or the LLC) to:

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, NY 10020
> Attention: Senet S. Bischoff
>                  Matthew C. Dewitz
> Facsimile No.: (212) 751-4864
> E-mail: senet.bischoff@lw.com
>          matthew.dewitz@lw.com

If to AES Grid Stability, LLC:

> AES Grid Stability, LLC
> 4300 Wilson Boulevard
> Suite 1100
> Arlington, VA 22203
> Attention: Paul Freedman, General Counsel of The AES Corporation
> Email: paul.freedman @aes.com

15

with a copy (which shall not constitute notice to AES Grid Stability, LLC) to:

>AES Grid Stability, LLC
>4300 Wilson Boulevard
>Suite 1100
>Arlington, VA 22203
>Attention: Chris Shelton, Senior Vice President,
>Chief Product Officer and President, AES Next
>Email: chris.shelton@aes.com

If to Siemens Industry, Inc.:

>Siemens Industry, Inc.
>4800 North Point Parkway
>Alpharetta, GA 30005, USA
>Attention: Craig Langley
>Email: Langley.craig@siemens.com

Any Party may change its address, fax number or e-mail address by giving each of the other Parties written notice thereof in the manner set forth above.

Section 7.2    Counterparts; Electronic Signature. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties, it being understood that all Parties need not sign the same counterpart. Delivery of an executed signature page to this Agreement by facsimile transmission or electronic delivery (i.e. by email of a PDF signature page) shall be as effective as delivery of a manually signed counterpart of this Agreement and shall constitute and original for all purposes. The parties hereto hereby agree that this Agreement may be executed by way of electronic signatures and that the electronic signature has the same binding effect as a physical signature. For the avoidance of doubt, the parties hereto further agree that this Agreement, or any part thereof, shall not be denied legal effect, validity or enforceability solely on the ground that it is in the form of an electronic record.

Section 7.3    Entire Agreement; No Third Party Beneficiaries. This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 7.4    Governing Law. This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware, without regard to the conflicts of laws principles thereof that would mandate the application of the laws of another jurisdiction.

Section 7.5    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 7.6    Assignments; Amendments; Successors; No Waiver.

(a)    Assignment. No TRA Party may assign, sell, pledge, or otherwise alienate or transfer any interest in this Agreement, including the right to receive any Tax Benefit Payments under this Agreement, to any Person without (i) the prior written consent of the Governing Body (or any Person(s) to whom the Governing Body has delegated such authority) (such consent not to be unreasonably withheld) and (ii) such Person executing and delivering a Joinder agreeing to succeed to all or the applicable portion of such TRA Party's interest in this Agreement and to become a Party for all purposes of this Agreement (the "Joinder Requirement"). For the avoidance of doubt, if a TRA Party transfers Units in accordance with the terms of the LLC Agreement but does not assign to the transferee of such Units its rights under this Agreement with respect to such transferred Units, such TRA Party shall continue to be entitled to receive the Tax Benefit Payments arising in respect of such Units (and any such transferred Units shall be separately identified, so as to facilitate the determination of Tax Benefit Payments hereunder). The Corporation may not assign any of its rights or obligations under this Agreement to any Person (other than any direct or indirect successor (whether by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Corporation) without the prior written consent of each of TRA Parties (and any purported assignment without such consent shall be null and void).

16

(b)        Amendments. No provision of this Agreement may be amended unless such amendment is approved in writing by each of (i) the Governing Body (or any Person(s) to whom the Governing Body has delegated such authority); and (ii) the TRA Parties who collectively would be entitled to receive at least a majority of any Early Termination Payments that would be hypothetically payable to all TRA Parties (assuming all equity interests in the LLC that have redemption rights under the LLC Agreement are redeemed and exchanged for shares of Class A Common Stock at such time and using the Valuation Assumptions).

(c)        Successors. Except as provided in Section 7.6(a), all of the terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of and be enforceable by, the Parties hereto and their respective successors, assigns, heirs, executors, administrators and legal representatives. The Corporation shall require and cause any direct or indirect successor (whether by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Corporation, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to perform if no such succession had taken place.

(d)        Waiver. No failure by any Party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition.

Section 7.7        Titles and Subtitles. The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

Section 7.8        Resolution of Disputes.

(a)        Except for Reconciliation Disputes subject to Section 7.9, any and all disputes which cannot be settled amicably, including any ancillary claims of any party, arising out of, relating to or in connection with this Agreement (each a "Dispute") shall be finally resolved by arbitration in accordance with the International Institute for Conflict Prevention and Resolution Rules for Administered Arbitration (the "Rules") by three arbitrators, of which the Corporation shall appoint one arbitrator and the TRA Parties shall jointly appoint two arbitrators in accordance with the "screened" appointment procedure provided in Rule 5.4. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrators may be entered by any court having jurisdiction thereof. The place of the arbitration shall be New York, New York.

(b)        Notwithstanding the provisions of paragraph (a), any party may bring an action or special proceeding in any court of competent jurisdiction for the purpose of compelling another party to arbitrate, seeking temporary or preliminary relief in aid of an arbitration hereunder, and/or enforcing an arbitration award and, for the purposes of this paragraph (b), each party (i) expressly consents to the application of paragraph (c) of this Section 7.8 to any such action or proceeding, and (ii) agrees that proof shall not be required that monetary damages for breach of the provisions of this Agreement would be difficult to calculate and that remedies at law would be inadequate. For the avoidance of doubt, this Section 7.8 shall not apply to Reconciliation Disputes to be settled in accordance with the procedures set forth in Section 7.9.

(c)        Each party irrevocably consents to service of process by means of notice in the manner provided for in Section 7.1. Nothing in this Agreement shall affect the right of any party to serve process in any other manner permitted by law.

(d)        WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(e)        In the event the parties are unable to agree whether a dispute between them is a Reconciliation Dispute subject to the dispute resolution procedure set forth in Section 7.9 or a Dispute subject to the dispute resolution procedure set forth in this Section 7.8, such disagreement shall be decided and resolved in accordance with the procedure set forth in this Section 7.8.

17

Section 7.9    <u>Reconciliation</u>. In the event that the Corporation and one or more TRA Parties are unable to resolve a disagreement with respect to a Schedule (a "<u>Reconciliation Dispute</u>"), the Reconciliation Dispute shall be submitted for determination to a nationally recognized expert (the "<u>Expert</u>") in the particular area of disagreement mutually acceptable to such parties. The Expert shall be a partner or principal in a nationally recognized accounting firm, and unless the Corporation and such TRA Parties agree otherwise, the Expert shall not, and the firm that employs the Expert shall not, have any material relationship with the Corporation or such TRA Parties or other actual or potential conflict of interest. If the Corporation and such TRA Parties are unable to agree on an Expert within fifteen (15) calendar days of receipt by the respondent(s) of written notice of a Reconciliation Dispute, the selection of an Expert shall be treated as a Dispute subject to Section 7.8 and an arbitration panel shall pick an Expert from a nationally recognized accounting firm that does not have any material relationship with the Corporation or such TRA Parties or other actual or potential conflict of interest. The Expert shall resolve any matter relating to a Schedule or an amendment thereto as soon as reasonably practicable and in any event within thirty (30) calendar days after the matter has been submitted to the Expert for resolution. Notwithstanding the preceding sentence, if the matter is not resolved before any payment that is the subject of a disagreement would be due (in the absence of such disagreement) or any Tax Return reflecting the subject of a disagreement is due, the undisputed amount shall be paid on the date prescribed by this Agreement and such Tax Return may be filed as prepared by the Corporation, subject to adjustment or amendment upon resolution. The costs and expenses relating to the engagement of such Expert or amending any Tax Return shall be borne by the Corporation except as provided in the next sentence. The Corporation and the TRA Parties shall each bear their own costs and expenses of such proceeding, unless (i) the Expert entirely adopts the position of the TRA Parties, in which case the Corporation shall reimburse the TRA Parties for any reasonable and documented out-of-pocket costs and expenses in such proceeding, or (ii) the Expert entirely adopts the Corporation's position, in which case whichever of the TRA Parties (or all of them) that disputed the position shall reimburse the Corporation for any reasonable and documented out-of-pocket costs and expenses in such proceeding. The Expert shall finally determine any Reconciliation Dispute and the determinations of the Expert pursuant to this Section 7.9 shall be binding on the Corporation and the TRA Parties and may be entered and enforced in any court having competent jurisdiction.

Section 7.10    <u>Withholding</u>. The Corporation and its affiliates and representatives shall be entitled to deduct and withhold from any payment that is payable to any TRA Party pursuant to this Agreement such amounts as are required to be deducted or withheld with respect to the making of such payment in accordance with the Code or any provision of U.S. state, local or foreign tax law (including for this purpose any withholding required by the Corporation or its affiliates that may be required in connection with a Redemption or a Direct Exchange). To the extent that amounts are so deducted or withheld and paid over to the appropriate Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid by the Corporation to the relevant TRA Party. Each TRA Party shall promptly provide the Corporation with any applicable tax forms and certifications reasonably requested by the Corporation in connection with determining whether any such deductions and withholdings are required under the Code or any provision of U.S. state, local or foreign tax law, including under Sections 1441, 1442, 1445 or 1446 of the Code. The Corporation will consider in good faith any applicable certificates, forms or documentation provided by a TRA Party that in such TRA Party's reasonable determination reduce or eliminate any such withholding.

<p style="text-align:center">18</p>

Section 7.11    <u>Consolidated Group; Transfers of Corporate Assets</u>.

(a)    The parties acknowledge that the Corporation is not currently a member of a Corporate Group, but may become a member of a Corporate Group in the future, and that in such event, the provisions of this Agreement shall be applied with respect to such Corporate Group (and any other affiliated or consolidated Tax group of which the Corporation becomes a part), and that Tax Benefit Payments, Early Termination Payments, and other applicable items hereunder shall be computed with reference to the consolidated taxable income of the group as a whole.

(b)    If the Corporation, its successors in interest or any member of a group described in Section 7.11(a) transfers one or more assets to a corporation (or a Person classified as a corporation for U.S. income tax purposes) with which the Corporation does not file a consolidated Tax Return for U.S. federal income Tax purposes (or if any entity that holds Reference Assets transfers any Reference Asset to a corporation (or a Person classified as a corporation for U.S. federal income tax purposes) with which the Corporation does not file a consolidated Tax Return for U.S. federal income Tax purposes), such entity, for purposes of calculating the amount of any Tax Benefit Payment or Early Termination Payment due hereunder, shall, unless otherwise agreed by the Corporation and each TRA Party, be treated as having disposed of such asset (or Reference Asset) in a fully taxable transaction on the date of such transfer. The consideration deemed to be received by such entity shall be equal to the fair market value of the transferred asset. For purposes of this Section 7.11 a transfer of a partnership interest shall be treated as a transfer of the transferring partner's share of each of the assets and liabilities of that partnership. Notwithstanding anything to the contrary set forth herein, if the Corporation, its successor in interest or any member of a group described in Section 7.11(a), transfers its assets pursuant to a transaction that qualifies as a "reorganization" (within the meaning of Section 368(a) of the Code) in which such entity does not survive or pursuant to any other transaction to which Section 381(a) of the Code applies (other than any such reorganization or any such other transaction, in each case, pursuant to which such entity transfers assets to a corporation with which the Corporation, its successor in interest or any member of the group described in Section 7.11(a) (other than any such member being transferred in such reorganization or other transaction) does not file a consolidated Tax Return for U.S. federal income Tax purposes), the transfer will not cause such entity to be treated as having transferred any assets to a corporation (or a Person classified as a corporation for U.S. federal income tax purposes) pursuant to this Section 7.11(b) so long as the relevant successor is bound by the provisions of this Agreement.

Section 7.12    <u>Confidentiality</u>. Each TRA Party and its assignees acknowledges and agrees that the information of the Corporation and its Affiliates provided pursuant to this Agreement is confidential and, except in the course of performing any duties as necessary for the Corporation and its Affiliates, as required by law or legal process or to enforce the terms of this Agreement, such Person shall keep and retain in the strictest confidence and not disclose to any Person any confidential matters, acquired pursuant to this Agreement, of the Corporation and its Affiliates and successors, learned by any TRA Party heretofore or hereafter. This Section 7.12 shall not apply to (i) any information that has been made publicly available by the Corporation, becomes public knowledge (except as a result of an act of any TRA Party in violation of this Agreement) or is generally known to the business community, (ii) the disclosure of information to the extent necessary for a TRA Party to prosecute or defend claims arising under or relating to this Agreement, (iii) the disclosure of information to the extent necessary for a TRA Party to prepare and file its Tax Returns, to respond to any inquiries regarding the same from any Taxing Authority or to prosecute or defend any action, proceeding or audit by any Taxing Authority with respect to such Tax Returns, and (iv) the disclosure of information necessary to effect an assignment, sale, pledge, alienation or transfer of any interest in this Agreement pursuant to Section 7.6(a). If a TRA Party or an assignee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 7.12, the Corporation shall have the right and remedy to have the provisions of this Section 7.12 specifically enforced by injunctive relief or otherwise by any court of competent jurisdiction without the need to post any bond or other security, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to the Corporation or any of its Subsidiaries and that money damages alone shall not provide an adequate remedy to such Persons. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity.

Section 7.13    <u>Change in Law</u>. Notwithstanding anything herein to the contrary, if, as a result of or, in connection with an actual or proposed change in Tax law, a TRA Party reasonably believes that the existence of this Agreement could have material adverse tax consequences to such TRA Party or any direct or indirect owner of such TRA Party, then at the written election of such TRA Party in its sole discretion (in an instrument signed by such TRA Party and delivered to the Corporation) and to the extent specified therein by such TRA Party, this Agreement shall cease to have further effect and shall not apply to an Exchange with respect to such TRA Party occurring after a date specified by such TRA Party, or may be amended by the Corporation in a manner reasonably acceptable to such TRA Party, *provided* that such amendment shall not result in an increase in any payments owed by the Corporation under this Agreement at any time as compared to the amounts and times of payments that would have been due in the absence of such amendment and provided, further, that such amendment shall not have any adverse effect on any other TRA Party.

Section 7.14    <u>Interest Rate Limitation</u>. Notwithstanding anything to the contrary contained herein, the interest paid or agreed to be paid hereunder with respect to amounts due to any TRA Party hereunder shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "<u>Maximum Rate</u>"). If any TRA Party shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the Tax Benefit Payment, Advance Payment or Early Termination Payment, as applicable (but in each case exclusive of any component thereof comprising interest) or, if it exceeds such unpaid non-interest amount, refunded to the Corporation. In determining whether the interest contracted for, charged, or received by any TRA Party exceeds the Maximum Rate, such TRA Party may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the payment obligations owed by the Corporation to such TRA Party hereunder. Notwithstanding the foregoing, it is the intention of the Parties to conform strictly to any applicable usury laws.

<div align="center">20</div>

Section 7.15    <u>Independent Nature of Rights and Obligations</u>. The rights and obligations of each TRA Party hereunder are several and not joint with the rights and obligations of any other Person. A TRA Party shall not be responsible in any way for the performance of the obligations of any other Person hereunder, nor shall a TRA Party have the right to enforce the rights or obligations of any other Person hereunder (other than the Corporation). Nothing contained herein or in any other agreement or document delivered at any closing, and no action taken by any TRA Party pursuant hereto or thereto, shall be deemed to constitute the TRA Parties acting as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the TRA Parties are in any way acting in concert or as a group with respect to such rights or obligations or the transactions contemplated hereby, and the Corporation acknowledges that the TRA Party are not acting in concert or as a group and will not assert any such claim with respect to such rights or obligations or the transactions contemplated hereby.

Section 7.16    <u>LLC Agreement</u>. This Agreement shall be treated as part of the LLC Agreement as described in Section 761(c) of the Code and Sections 1.704-1(b)(2)(ii)(h) and 1.761-1(c) of the Treasury Regulations.

Section 7.17    <u>Tax Characterization and Elections</u>. The parties intend that (A) each Direct Exchange shall give rise to Basis Adjustments, (B) each Redemption using cash contributed to the LLC by the Corporation shall be treated as a direct purchase of Units from the applicable TRA Parties pursuant to Section 707(a)(2)(B) of the Code that shall give rise to Basis Adjustments and (C) payments pursuant to this Agreement with respect to an Exchange (except with respect to amounts that constitute Imputed Interest) shall be treated as consideration in respect of such Exchange that give rise to additional Basis Adjustments. The Corporation will ensure that, on and after the date hereof and continuing through the term of this Agreement, the LLC and each of its direct and indirect subsidiaries that they control and that is treated as a partnership for U.S. federal income tax purposes will have in effect an election under Section 754 of the Code.

Section 7.18    <u>Payment Amounts</u>. The Corporation and the TRA Parties agree that, as of the date of this Agreement and as of the date of any future Exchange that may be subject to this Agreement, the aggregate value of the Tax Benefit Payments cannot be reasonably ascertained for U.S. federal income tax purposes. Notwithstanding any provision of this Agreement to the contrary, any TRA Holder may elect with respect to any Exchange to limit the aggregate Tax Benefit Payments made to such TRA Holder in respect of that Exchange to a specified dollar amount, a specified percentage of the amount realized by the TRA Holder with respect to the Exchange, or a specified portion of the Basis Adjustment with respect to the Adjusted Assets as a result of the Exchange. The TRA Holder shall exercise its rights under the preceding sentence by including a notice of its desire to impose such a limit and the specified limitation and such other details as may be reasonably necessary (including whether such limitation includes the Additional Amounts in respect of any such Exchange) in the Exchange Notice delivered in accordance with the Exchange Agreement. For the avoidance of doubt, this Section 7.18 shall not limit any amounts payable in connection with an Early Termination Payment.

[*Signature Page Follows This Page*]

21

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**CORPORATION:**

**FLUENCE ENERGY, INC.**

By: _____
Name:
Title:

**THE LLC:**

**FLUENCE ENERGY LLC**

By: _____

Name:

Title:

**AES GRID STABILITY, LLC**

By:  _____

Name:

Title:

**SIEMENS INDUSTRY, INC.**

By:  _____

Name:

Title:

By:  _____

Name:

Title:

Annex A

**FORM OF JOINDER AGREEMENT**

This JOINDER AGREEMENT, dated as of _____ (this "Joinder"), is delivered pursuant to that certain Tax Receivable Agreement, dated as of [_____] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Tax Receivable Agreement") by and among Fluence Energy, Inc., a Delaware corporation (the "Corporation"), Fluence Energy, LLC, a Delaware limited liability company ("the LLC"), and the other persons time to time party thereto. Capitalized terms used but not otherwise defined herein have the respective meanings set forth in the Tax Receivable Agreement.

1. Joinder to the Tax Receivable Agreement. Upon the execution of this Joinder by the undersigned and delivery hereof to the Corporation, the undersigned hereby is and hereafter will be a TRA Party under the Tax Receivable Agreement and a Party thereto, with all the rights, privileges and responsibilities of a TRA Party thereunder. The undersigned hereby agrees that it shall comply with and be fully bound by the terms of the Tax Receivable Agreement as if it had been a signatory thereto as of the date thereof.

2. Incorporation by Reference. All terms and conditions of the Tax Receivable Agreement are hereby incorporated by reference in this Joinder as if set forth herein in full.

3. Address. All notices under the Tax Receivable Agreement to the undersigned shall be direct to:

   [Name]
   [Address]
   [City, State, Zip Code]
   Attn:
   Facsimile:
   E-mail:

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Joinder as of the day and year first above written.

**[NAME OF NEW PARTY]**

By: _____
Name:
Title:

Acknowledged and agreed
as of the date first set forth above:

**FLUENCE ENERGY, INC.**

By: _____
Name:
Title:

**Annex B**

**TRA Parties**

1.  AES Grid Stability, LLC
2.  Siemens Industry, Inc.

Exhibit 10.2

**THIRD AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**of**

**FLUENCE ENERGY, LLC**

Dated as of [·], 2021

THE LIMITED LIABILITY COMPANY INTERESTS IN FLUENCE ENERGY, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, THE SECURITIES LAWS OF ANY STATE, OR ANY OTHER APPLICABLE SECURITIES LAWS, AND HAVE BEEN OR ARE BEING ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH INTERESTS MAY BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY STATE AND ANY OTHER APPLICABLE SECURITIES LAWS; (II) THE TERMS AND CONDITIONS OF THIS THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT; AND (III) ANY OTHER TERMS AND CONDITIONS AGREED TO IN WRITING BETWEEN THE MANAGING MEMBER AND ANY HOLDER OF SUCH INTERESTS.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| ARTICLE I. DEFINITIONS AND USAGE | | 2 |
| Section 1.01 | Definitions | 2 |
| Section 1.02 | Other Definitional and Interpretative Provisions | 16 |
| ARTICLE II. THE COMPANY | | 16 |
| Section 2.01 | Continuation of the Company | 16 |
| Section 2.02 | Name | 17 |
| Section 2.03 | Commencement and Term | 17 |
| Section 2.04 | Principal Place of Business | 17 |
| Section 2.05 | Registered Agent and Registered Office | 17 |
| Section 2.06 | Purposes | 17 |
| Section 2.07 | Powers of the Company | 17 |
| Section 2.08 | Partnership Tax Status | 17 |
| Section 2.09 | Regulation of Internal Affairs | 17 |
| Section 2.10 | Ownership of Property | 17 |
| ARTICLE III. UNITS; MEMBERS; BOOKS AND RECORDS; REPORTS | | 18 |
| Section 3.01 | Units; Admission of Members | 18 |
| Section 3.02 | Substitute Members and Additional Members | 18 |
| Section 3.03 | Tax and Accounting Information | 19 |
| Section 3.04 | Recapitalization; PubCo's Capital Contribution; PubCo's Purchase of Common Units; the IPO Unit Redemption | 21 |
| Section 3.05 | Books and Records | 21 |
| ARTICLE IV. MANAGING MEMBER OWNERSHIP; RESTRICTIONS ON MANAGING MEMBER UNITS | | 21 |
| Section 4.01 | Managing Member Ownership | 21 |
| Section 4.02 | Restrictions on Managing Member Units | 22 |
| Section 4.03 | Equity Plans | 23 |
| ARTICLE V. CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS | | 24 |
| Section 5.01 | Capital Contributions | 24 |
| Section 5.02 | Capital Accounts | 24 |
| Section 5.03 | Amounts and Priority of Distributions | 26 |
| Section 5.04 | Allocations | 28 |
| Section 5.05 | Other Allocation Rules | 30 |
| Section 5.06 | Tax Withholding; Withholding Advances | 31 |
| Section 5.07 | Tax Proceedings | 33 |

| | | | |
|---|---|---|---|
| ARTICLE VI. CERTAIN TAX MATTERS | | | 33 |
| | Section 6.01 | Company Representative | 33 |
| | Section 6.02 | Tax Elections | 34 |
| ARTICLE VII. MANAGEMENT OF THE COMPANY | | | 34 |
| | Section 7.01 | Management by the Managing Member | 34 |
| | Section 7.02 | Withdrawal of the Managing Member | 35 |
| | Section 7.03 | Decisions by the Members | 35 |
| | Section 7.04 | Fiduciary Duties | 35 |
| | Section 7.05 | Officers | 36 |
| ARTICLE VIII. TRANSFERS OF INTERESTS | | | 37 |
| | Section 8.01 | Restrictions on Transfers | 37 |
| | Section 8.02 | Certain Permitted Transfers | 38 |
| | Section 8.03 | Registration of Transfers | 38 |
| | Section 8.04 | Restricted Units Legend | 38 |
| ARTICLE IX. REDEMPTION AND EXCHANGE RIGHTS | | | 39 |
| | Section 9.01 | Redemption Right of a Member | 39 |
| | Section 9.02 | Reservation of Shares of Class A Common Stock; Listing; Certificate of PubCo, etc. | 42 |
| | Section 9.03 | Effect of Exercise of Redemption | 42 |
| | Section 9.04 | Tax Treatment | 43 |
| | Section 9.05 | Other Redemption Matters | 43 |
| | Section 9.06 | PubCo Change of Control; PubCo Approved Recap Transaction | 44 |
| ARTICLE X. LIMITATION ON LIABILITY, EXCULPATION AND INDEMNIFICATION | | | 46 |
| | Section 10.01 | Limitation on Liability | 46 |
| | Section 10.02 | Exculpation and Indemnification | 46 |
| ARTICLE XI. DISSOLUTION AND TERMINATION | | | 48 |
| | Section 11.01 | Dissolution | 48 |
| | Section 11.02 | Winding Up of the Company | 49 |
| | Section 11.03 | Termination | 50 |
| | Section 11.04 | Survival | 50 |
| ARTICLE XII. MISCELLANEOUS | | | 50 |
| | Section 12.01 | Expenses | 50 |
| | Section 12.02 | Further Assurances | 50 |
| | Section 12.03 | Notices | 50 |
| | Section 12.04 | Binding Effect; Benefit; Assignment | 51 |
| | Section 12.05 | Jurisdiction | 51 |
| | Section 12.06 | WAIVER OF JURY TRIAL | 52 |

| Section 12.07 | Counterparts | 52 |
| Section 12.08 | Entire Agreement | 52 |
| Section 12.09 | Severability | 52 |
| Section 12.10 | Amendment | 53 |
| Section 12.11 | Confidentiality | 53 |
| Section 12.12 | Governing Law | 54 |
| Section 12.13 | No Presumption | 54 |
| Section 12.14 | Attorney-In-Fact | 54 |
| Section 12.15 | Immunity Waiver | 54 |
| Section 12.16 | Specific Performance | 55 |

Schedule A          Member Schedule

iii

**THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT** (this "<u>Agreement</u>") of FLUENCE ENERGY, LLC, a Delaware limited liability company (the "<u>Company</u>"), dated as of [·], 2021 (the "<u>Restatement Date</u>"), by and among the Company, FLUENCE ENERGY, INC., a Delaware corporation ("<u>PubCo</u>", as the Managing Member as defined below), and the Members (as defined below).

W I T N E S E T H :

WHEREAS, the Company was formed as a limited liability company under the Act by the filing a Certificate of Formation with the Secretary of State of the State of Delaware on June 30, 2017;

WHEREAS, AES Grid Stability, LLC ("<u>AES</u>"), a limited liability company duly organized and validly existing under the laws of Delaware, and Siemens Industry, Inc. ("<u>Siemens</u>"), a corporation duly organized and validly existing under the laws of Delaware, executed the Amended and Restated Limited Liability Company Agreement of the Company on January 1, 2018 (the "<u>A&RLLCA</u>"), which was further amended by that certain Amendment No. 1 to the Amended and Restated Limited Liability Company Agreement, dated June 29, 2020 ("<u>Amendment No. 1</u>") and that certain Amendment No. 2 to the Amended and Restated Limited Liability Company Agreement, dated December 27, 2020 ("<u>Amendment No. 2</u>", and the A&RLLCA as amended by Amendment No. 1 and Amendment No. 2, the "<u>Prior Agreement</u>");

WHEREAS, the Company amended and restated the Prior Agreement in its entirety, and entered into that certain Second Amended & Restated Limited Liability Company Agreement, dated as of June 9, 2021 (the "<u>Second Restated Agreement</u>"), pursuant to which AES and Siemens remained Class A Members, certain Persons were admitted as Class B Members and certain provisions regarding the rights, powers and interests of the Members with respect to the Company and their Membership Interests therein were revised, which the Class A Members and the Class B Members executed in their capacity as members (including pursuant to consents and joinders thereto) (collectively, the "<u>Pre-IPO Members</u>");

WHEREAS, in connection with the IPO (as defined below), the Company is, substantially concurrently with the execution of this Agreement, a party to a series of reorganization transactions with PubCo (the "<u>Transactions</u>") and various other parties pursuant to which, among other matters, (i) Fluence Energy Merger Sub, LLC a wholly-owned subsidiary of PubCo, merged with and into QIA Florence Holding LLC ("<u>QIA Blocker</u>"), with QIA Blocker surviving (the "<u>Merger</u>"), with shares of Class A Common Stock being issued to QIA Blocker's sole member, Qatar Holding LLC, in consideration for the Merger and (ii) subsequently, QIA Blocker was merged with and into PubCo, with PubCo surviving, and PubCo was admitted as a Pre-IPO Member;

WHEREAS, in connection with the IPO, the Company, PubCo and the other Pre-IPO Members have authorized the conversion of certain of the Original Units (as defined below) into Common Units (as defined below), to be held by PubCo, AES and Siemens (collectively, the "<u>Recapitalization</u>") as set forth herein;

**WHEREAS**, PubCo will sell shares of its Class A Common Stock to public investors in the IPO and will contribute the net proceeds received from the IPO (the "IPO Net Proceeds") to the Company in exchange for newly issued Common Units pursuant to the IPO Common Unit Subscription Agreement and issue shares of its Class B Common Stock to AES and Siemens; and

**WHEREAS**, in connection with the foregoing matters, the Company and the Members desire to continue the Company without dissolution and amend and restate the Second Restated Agreement in its entirety as of the date hereof to reflect, among other things, (a) the Recapitalization, (b) the addition of PubCo as a Member and its designation as sole Managing Member of the Company and (c) the other rights and obligations of the Members, the Company and PubCo, in each case, as provided and agreed upon in the terms of this Agreement as of the date hereof, at which time the Second Restated Agreement shall be superseded entirely by this Agreement and shall be of no further force or effect.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Second Restated Agreement is hereby amended and restated in its entirety and the Company, PubCo and the other Members, each intending to be legally bound, each hereby agree as follows:

ARTICLE I.

DEFINITIONS AND USAGE

Section 1.01    Definitions.

(a)    The following terms shall have the following meanings for the purposes of this Agreement:

"Act" has the meaning set forth in Section 8.04.

"Additional Member" means any Person admitted as a Member of the Company pursuant to Section 3.02 in connection with the issuance of new Units to such Person after the Restatement Date.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    credit to such Capital Account any amounts that such Member is deemed to be obligated to restore pursuant to the penultimate sentence in Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

2

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"AES" shall have the meaning assigned to such term in the recitals of this Agreement.

"AES Initial Member" means AES.

"AES Member" means collectively, the AES Initial Member and any Subsequent Transferee of the AES Initial Member (unless the AES Member notifies the Managing Member prior to any Transfer that such Subsequent Transferee shall not be an AES Member, in which case such Person shall be deemed a Member) and any Affiliate of the AES Member who becomes a Member in accordance with the provisions of this Agreement. In the event that the AES Member refers to multiple Persons, any action required or permitted to be taken or determination required or permitted to be made by the AES Member shall require the approval of one or more Persons holding a majority of the Common Units held by all AES Members.

"Affiliate" of any specified Person means any other Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such first specified Person; provided, that for purposes of this Agreement, (i) no Member (or equityholder of such Member) shall be deemed to be an Affiliate of any other Member (or equityholder of such Member) solely by virtue of this Agreement and (ii) the Company, on the one hand, and each of the Members (and each equityholder of any such Member), on the other hand, shall not be deemed to be Affiliates of each other solely by virtue of this Agreement.

"Agreement" has the meaning set forth in the Preamble.

"Available Cash" means, as of a particular date, the amount of cash on hand which the Managing Member, in its reasonable discretion, deems available for distribution to the Members, taking into account all debts, liabilities and obligations of the Company then due and amounts that the Managing Member, in its reasonable discretion, deems necessary to expend or retain for working capital or to place into reserves for customary and usual claims with respect to the Company's operations.

"Black-Out Period" means any "black-out" or similar period under PubCo's policies covering trading in PubCo's securities (including any Trading Policy) to which the applicable Redeeming Member is subject (or may be subject at such time as it owns Class A Common Stock), which period restricts the ability of such Redeeming Member to immediately resell shares of Class A Common Stock to be delivered to such Redeeming Member in connection with a Share Settlement.

"Business Day" means any day excluding Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required by Law or other governmental action to close.

"Capital Account" means the capital account established and maintained for each Member pursuant to Section 5.02.

3

"Capital Contribution" means, with respect to any Member, the amount of money and the initial Carrying Value of any Property (other than money) contributed to the Company with respect to any Units held or purchased by such Member.

"Carrying Value" means, with respect to any Property (other than money), such Property's adjusted basis for U.S. federal income tax purposes, except as follows:

(a)     the initial Carrying Value of any such Property contributed by a Member to the Company shall be the fair market value of such Property, as determined by the Managing Member; and

(b)     the Carrying Values of all Properties may, as determined by the Managing Member, be adjusted to equal their respective fair market values in accordance with Section 5.02(c).

In the case of any Property that has a Carrying Value that differs from its adjusted basis for U.S. federal income tax purposes, the Carrying Value shall be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Loss.

"Cash Settlement" means, with respect to any Redemption, immediately available funds in U.S. dollars in an amount equal to the number of Redeemed Units subject thereto, multiplied by the Common Unit Redemption Price.

"Certificate" means the Company's Certificate of Formation as filed with the Secretary of State of the State of Delaware, as amended or amended and restated from time to time.

"Change of Control" means the occurrence of any of the following events:

(a)     any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of shares of Class A Common Stock, Class B Common Stock, preferred stock and/or any other class or classes of capital stock of PubCo (if any) representing in the aggregate more than fifty percent (50%) of the voting power of all of the outstanding shares of capital stock of PubCo entitled to vote;

(b)     the stockholders of PubCo approve a plan of complete liquidation or dissolution of PubCo or there is consummated an agreement or series of related agreements for the sale or other disposition, directly or indirectly, by PubCo of all or substantially all of PubCo's assets (including a sale of all or substantially all of the assets of the Company);

(c)     there is consummated a merger or consolidation of PubCo with any other corporation or entity, and, immediately after the consummation of such merger or consolidation, the voting securities of PubCo immediately prior to such merger or consolidation do not continue to represent, or are not converted into, more than fifty percent (50%) of the combined voting power of the then outstanding voting securities of the Person resulting from such merger or consolidation or, if the surviving company is a Subsidiary, the ultimate parent thereof; or

4

(d)        PubCo ceases to be the sole Managing Member of the Company.

Notwithstanding the foregoing, a "Change of Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the record holders of the Class A Common Stock, Class B Common Stock, preferred stock and/or any other class or classes of capital stock of PubCo immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in and voting control over, and own substantially all of the shares of, an entity which owns all or substantially all of the assets of PubCo immediately following such transaction or series of transactions.

"Change of Control Exchange Date" has the meaning set forth in Section 9.06(a).

"Class A Common Stock" means, as applicable, (a) Class A common stock, $0.00001 par value per share, of PubCo or (b) following any consolidation, merger, reclassification or other similar event involving PubCo, any shares or other securities of PubCo or any other Person or cash or other property that become payable in consideration for the Class A Common Stock or into which the Class A Common Stock is exchanged or converted as a result of such consolidation, merger, reclassification or other similar event.

"Class B Common Stock" means, as applicable, (a) Class B common stock, $0.00001 par value per share, of PubCo or (b) following any consolidation, merger, reclassification or other similar event involving PubCo, any shares or other securities of PubCo or any other Person or cash or other property that become payable in consideration for the Class B Common Stock or into which the Class B Common Stock is exchanged or converted as a result of such consolidation, merger, reclassification or other similar event.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Common Unit" means a limited liability company interest in the Company, designated herein as a "Common Unit."

"Common Unit Redemption Price" means, with respect to any Redemption Date, the price for a share of Class A Common Stock on the Stock Exchange, as reported on bloomberg.com or such other reliable source as determined by the Managing Member in good faith, at the close of trading on the last full Trading Day immediately prior to the Redemption Date, subject to appropriate and equitable adjustment for any stock splits, reverse splits, stock dividends or similar events affecting the Class A Common Stock. In the event the shares of Class A Common Stock are not publicly traded at the time of a Redemption, then the Managing Member shall determine the Common Unit Redemption Price in good faith.

"Company" has the meaning set forth in the Preamble.

"Company Minimum Gain" means "partnership minimum gain," as defined in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

5

"Company Representative" has, with respect to taxable periods beginning after December 31, 2017, the meaning assigned to the term "partnership representative" in Section 6223 of the Code and any Treasury Regulations or other administrative or judicial pronouncements promulgated thereunder and, with respect to taxable periods beginning on or before December 31, 2017, the meaning assigned to the term "tax matters partner" as defined in Code Section 6231(a)(7) prior to its amendment by Title XI of the Bipartisan Budget Act of 2015, in each case as appointed pursuant to Section 6.01(a).

"Confidential Information" has the meaning set forth in Section 12.11.

"Control" (including the terms "Controlling" and "Controlled"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of such subject Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

"Controlled Entities" has the meaning set forth in Section 10.02(c)(ii).

"Covered Person" means (i) each Member or an Affiliate thereof, in each case in such capacity, (ii) each officer, director, equityholder, member, partner, employee, representative, agent or trustee of a Member or an Affiliate thereof, in each case in such capacity, and (iii) each officer, director, shareholder, member, partner, employee, representative, agent or trustee of the Managing Member, the Company or an Affiliate controlled thereby of, in each case in such capacity.

"Delaware Act" means the Delaware Limited Liability Company Act, as amended from time to time.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Carrying Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Carrying Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero (0), Depreciation with respect to such asset shall be determined with reference to such beginning Carrying Value using any reasonable method selected by the Managing Member.

"DGCL" means the Delaware General Corporation Law, as amended from time to time.

"Direct Redemption" has the meaning set forth in Section 9.01(c).

"Dissolution Event" has the meaning set forth in Section 11.01(c).

"Election Notice" has the meaning set forth in Section 9.01(a).

6

"Equity Plan" means any stock or equity purchase plan, restricted stock or equity plan or other similar equity compensation plan now or hereafter adopted by PubCo.

"Equity Securities" means, as applicable, (a) any capital stock, membership interests or other share capital, (b) any securities directly or indirectly convertible into or exchangeable for any capital stock, membership interests or other share capital or containing any profit participation features, (c) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, membership interests, other share capital or securities containing any profit participation features or to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable for any capital stock, membership interests, other share capital or securities containing any profit participation features, (d) any share appreciation rights, phantom share rights or other similar rights, or (e) any Equity Securities issued or issuable with respect to the securities referred to in clauses (a) through (d) above in connection with a combination of units (or shares), recapitalization, merger, consolidation or other reorganization.

"Event of Withdrawal" means the bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company. "Event of Withdrawal" shall not include an event that (a) terminates the existence of a Member for income tax purposes (including, without limitation, (i) a change in entity classification of a Member under Treasury Regulations Section 301.7701-3, (ii) a sale of assets by, or liquidation of, a Member pursuant to an election under Code Sections 336 or 338, or (iii) merger, severance, or allocation within a trust or among sub-trusts of a trust that is a Member) but that (b) does not terminate the existence of such Member under applicable state law (or, in the case of a trust that is a Member, does not terminate the trusteeship of the fiduciaries under such trust with respect to all the Units of such trust that is a Member).

"Exchange Act" means the Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Exchange Act shall be deemed to include any corresponding provisions of future Law.

"Expenses" has the meaning set forth in Section 10.02(c)(ii).

"Fair Market Value" of a specific asset of the Company will mean the amount which the Company would receive in an all-cash sale of such asset in an arms-length transaction with a willing unaffiliated third party, with neither party having any compulsion to buy or sell, consummated on the day immediately preceding the date on which the event occurred which necessitated the determination of the Fair Market Value (and after giving effect to any transfer taxes payable in connection with such sale), as such amount is determined by the Managing Member (or, if pursuant to a Liquidation, the liquidators) in its good faith judgment using all factors, information and data it deems to be pertinent.

"Fiscal Year" means (i) the Company's fiscal year, which shall initially be the twelve (12) month period ending on September 30 of each year and which may be changed from time to time as determined by the Managing Member; and, (ii) for purposes of the allocations described in Article V, any other tax period for which such allocations will be made.

7

"<u>Governmental Authority</u>" means any transnational, domestic or foreign federal, state or local governmental, regulatory or administrative authority, department, court, agency or official, including any political subdivision thereof and the SEC, any non-U.S. regulatory agency and any other regulatory authority or body (including any state or provincial securities authority and any self-regulatory organization) with jurisdiction over the Company or any of its Subsidiaries.

"<u>Indemnification Sources</u>" has the meaning set forth in <u>Section 10.02(c)(ii)</u>.

"<u>Indemnitee-Related Entities</u>" has the meaning set forth in <u>Section 10.02(c)(ii)(A)</u>.

"<u>Initial Capital Account Balance</u>" means, with respect to any Member, the positive Capital Account balance of such Member as of immediately following the execution hereof, the amount of which is set forth on the Member Schedule.

"<u>IPO</u>" means the initial underwritten public offering of shares of PubCo's Class A Common Stock.

"<u>IPO Common Unit Subscription</u>" has the meaning set forth in <u>Section 3.04(b)</u>.

"<u>IPO Common Unit Subscription Agreement</u>" means that certain Common Unit Subscription Agreement, dated as of or about the date of this Agreement, by and between PubCo and the Company.

"<u>IPO Net Proceeds</u>" has the meaning set forth in the Recitals.

"<u>IPO Unit Redemption</u>" has the meaning set forth in the Recitals.

"<u>Jointly Indemnifiable Claims</u>" has the meaning set forth in <u>Section 10.02(c)(ii)(B)</u>.

"<u>Law</u>" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person or its assets, in each case, as amended unless expressly specified otherwise.

"<u>Liquidation</u>" means a liquidation or winding up of the Company.

"<u>Managing Member</u>" means (i) PubCo so long as PubCo has not withdrawn as the Managing Member pursuant to <u>Section 7.02</u> and (ii) any successor thereof appointed as Managing Member in accordance with <u>Section 7.02</u>.

<div align="center">8</div>

"Market Price" means, with respect to a share of Class A Common Stock as of a specified date, the last sale price per share of Class A Common Stock, regular way, or if no such sale took place on such day, the average of the closing bid and asked prices per share of Class A Common Stock, regular way, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the Stock Exchange or, if the Class A Common Stock is not listed or admitted to trading on the Stock Exchange, as reported on the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the Class A Common Stock is listed or admitted to trading or, if the Class A Common Stock is not listed or admitted to trading on any national securities exchange, the last quoted price, or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotation System or, if such system is no longer in use, the principal other automated quotation system that may then be in use or, if the Class A Common Stock is not quoted by any such system, the average of the closing bid and asked prices as furnished by a professional market maker making a market in shares of Class A Common Stock selected by the PubCo Board or, in the event that no trading price is available for the shares of Class A Common Stock, the fair market value of a share of Class A Common Stock, as determined in good faith by the PubCo Board.

"Member" means any Person named as a Member of the Company on Schedule A and the books and records of the Company, as the same may be amended from time to time to reflect any Person admitted as an Additional Member or a Substitute Member, for so long as such Person continues to be a Member of the Company.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount with respect to each "partner nonrecourse debt" (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Company Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

"Member Schedule" has the meaning set forth in Section 3.01(b).

"Net Income" and "Net Loss" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments (without duplication):

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition of "Net Income" and "Net Loss" shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income and Net Loss pursuant to this definition of "Net Income" and "Net Loss," shall be subtracted from such taxable income or loss;

9

(c)        gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Carrying Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Carrying Value;

(d)        in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of Depreciation;

(e)        to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) of the Code is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Net Income or Net Loss;

(f)        if the Carrying Value of any Company asset is adjusted in accordance with clause (b) of the definition of Carrying Value, the amount of such adjustment shall be taken into account in the taxable year of such adjustment as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss; and

(g)        notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 5.04(b) shall not be taken into account in computing Net Income and Net Loss.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.04(b) shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (e) above.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"Officers" has the meaning set forth in Section 7.05(a).

"Original Units" means the (i) Class A Common Units of the Company as of immediately prior to the Recapitalization, (ii) Class A-1 Common Units of the Company as of immediately prior to the Recapitalization, and (iii) Class B Common Units as of immediately prior to the Recapitalization.

"Partnership Tax Audit Rules" means Sections 6221 through 6241 of the Code, as amended, together with any final or temporary Treasury Regulations, Revenue Rulings, and case law and other official guidance interpreting Sections 6221 through 6241 of the Code, as amended (and any analogous provision of state or local tax law).

"Percentage Interest" means, with respect to any Member, a fractional amount, expressed as a percentage: (i) the numerator of which is the aggregate number of Common Units owned of record thereby and (ii) the denominator of which is the aggregate number of Common Units issued and outstanding. The sum of the outstanding Percentage Interests of all Members shall at all times equal 100%.

"Permitted Transferees" means any person or entity to whom a Member is permitted to transfer such Common Units pursuant to Section 8.02 of this Agreement.

"Person" means any individual, firm, corporation, partnership, limited liability company, trust, estate, joint venture, Governmental Authority or other entity.

"Pre-IPO Members" has the meaning set forth in the Recitals.

"Prime Rate" means the rate of interest from time to time identified by *The Wall Street Journal*, as being the "prime" rate (or if *The Wall Street Journal* does not identify such a rate, the "prime" rate as identified by another newspaper of national circulation).

"Process Agent" has the meaning set forth in Section 12.05(a).

"Property" means an interest of any kind in any real or personal (or mixed) property, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"PubCo" has the meaning set forth in the Preamble.

"PubCo Board" means the board of directors of PubCo.

"PubCo Approved Change of Control" means any Change of Control of PubCo that meets the following conditions: (i) such Change of Control was approved by the board of directors of PubCo prior to such Change of Control, (ii) such Change of Control results in an early termination of and acceleration of payments under the Tax Receivable Agreement, (iii) the terms of such Change of Control provide for the consideration for the Units in such Change of Control to consist solely of (A) freely and immediately tradeable common equity securities of an issuer listed on a national securities exchange and/or (B) cash and (iv) if such common equity securities would be Registrable Securities (as defined in the Registration Rights Agreement) of such issuer for any stockholder party to the Registration Rights Agreement, the issuer of such listed equity securities has become a party thereto as a successor to PubCo effective upon closing of such Change of Control.

"PubCo Approved Recap Transaction" has the meaning set forth in Section 9.06(b).

"PubCo Modified Distribution Amount" has the meaning set forth in Section 5.03(e)(ii).

"Recapitalization" has the meaning set forth in the Recitals.

"Redeemed Units" has the meaning set forth in Section 9.01(a).

"Redeeming Member" has the meaning set forth in Section 9.01(a).

11

"Redemption" has the meaning set forth in Section 9.01(a).

"Redemption Date" has the meaning set forth in Section 9.01(a).

"Redemption Notice" has the meaning set forth in Section 9.01(a).

"Redemption Right" has the meaning set forth in Section 9.01(a).

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated on or about the date hereof, by and among PubCo, certain stockholders of PubCo and the Members (as it may be amended from time to time in accordance with its terms).

"Regulatory Allocations" has the meaning set forth in Section 5.04(c).

"Relative Percentage Interest" means, with respect to any Member relative to another Member or Members, a fractional amount, expressed as a percentage, the numerator of which is the Percentage Interest of such Member; and the denominator of which is (x) the Percentage Interest of such Member plus (y) the aggregate Percentage Interest of such other Member or Members.

"Restatement Date" has the meaning set forth in the Preamble.

"Restricted Person" has the meaning set forth in that certain letter agreement dated as of the date hereof by and among the Company, AES and Siemens.

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future Law.

"Share Settlement" means, with respect to any applicable Redemption, a number of shares of Class A Common Stock equal to the number of Redeemed Units.

"Siemens" shall have the meaning assigned to such term in the recitals of this Agreement.

"Siemens Initial Member" means Siemens.

"Siemens Member" means collectively, the Siemens Initial Member and any Subsequent Transferee of the Siemens Initial Member (unless the Siemens Member notifies the Managing Member prior to any Transfer that such Subsequent Transferee shall not be a Siemens Member, in which case such Person shall be deemed a Member) and any Affiliate of the Siemens Member who becomes a Member in accordance with the provisions of this Agreement. In the event that the Siemens Member refers to multiple Persons, any action required or permitted to be taken or determination required or permitted to be made by the Siemens Member shall require the approval of one or more Persons holding a majority of the Common Units held by all Siemens Members.

12

"Specified Audit" has the meaning set forth in Section 5.07(b).

"Specified Covenants" has the meaning set forth in Section 10.02(a).

"Sponsor Members" means AES and Siemens, provided that such Persons are Members.

"Stock Exchange" means the Nasdaq Stock Market or such other securities exchange or interdealer quotation system on which shares of Class A Common Stock are then listed or quoted.

"Stockholders Agreement" means the Stockholders Agreement, dated as of the date hereof, by and among PubCo and the other persons party thereto or that may become parties thereto from time to time, as the same may be amended, restated, supplemented and/or otherwise modified, from time to time.

"Subsequent Transferees" means, with respect to any Member, each Person that becomes a Substitute Member of the Company by virtue of such Person's receiving all or a portion of its Units from such Member or from such Member's Subsequent Transferees, in each case, in accordance with this Agreement.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing member, general partner or analogous controlling Person of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"Substitute Member" means any Person admitted as a Member of the Company pursuant to Section 3.02 in connection with the Transfer of then-existing Units to such Person.

"Tax Distribution" means a distribution made by the Company pursuant to Section 5.03(e)(i) or Section 5.03(e)(ii).

13

"Tax Distribution Amount" means, with respect to any Member, an amount equal to the excess of (i) the product of (A) the Tax Rate multiplied by (B) the estimated or actual cumulative taxable income or gain of the Company, as determined for U.S. federal income tax purposes, allocated to such Member for any Fiscal Year (or portion thereof) beginning on or after the Restatement Date (including, without duplication, the amount of any income required to be recognized by such Member pursuant to Section 951 of the Code, Section 951A of the Code or Section 956 of the Code, in each case, as a result of such Member's ownership of interests in the Company), less prior taxable loss or deductions of the Company allocated to such Member for full or partial Fiscal Years commencing on or after the Restatement Date, in each case, as reasonably determined by the Managing Member over (ii) the cumulative distributions made to such Member after the Restatement Date pursuant to Section 5.03(e) with respect to Fiscal Years (including any portion thereof) beginning on or after the Restatement Date. The Tax Distribution Amount with respect to PubCo for a Fiscal Year shall in no event be less than an amount that will enable PubCo to meet its tax obligations and PubCo's obligations pursuant to the Tax Receivable Agreement for the relevant Fiscal Year. The Tax Distribution Amounts of the Members shall be determined without taking into account the effects of Section 743(b) of the Code.

"Tax Rate" means the highest marginal tax rates for a corporation that is resident in the City of New York applicable to ordinary income, qualified dividend income or capital gains, as appropriate, taking into account the holding period of the assets disposed of and the year in which the taxable net income is recognized by the Company, and taking into account the deductibility of state and local income taxes as applicable at the time for federal income tax purposes and any limitations thereon including pursuant to Section 68 of the Code or Section 164 of the Code.

"Tax Receivable Agreement" means that certain Tax Receivable Agreement, dated as or around the date hereof, by and among PubCo, the Company and the other parties thereto.

"Trading Day" means a day on which the Stock Exchange or such other principal United States securities exchange on which the Class A Common Stock is listed or admitted to trading is open for the transaction of business (unless such trading shall have been suspended for the entire day).

"Trading Policy" means any exchange and/or insider trading policy that may be established by PubCo, as may be amended from time to time.

"Transfer" means the (a) sale or assignment of, offer to sell, contract or agreement to sell, hypothecate, pledge, grant of any option to purchase or otherwise dispose of or agreement to dispose of, directly or indirectly, or establishment or increase of a put equivalent position or liquidation with respect to or decrease of a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to, any security, (b) entry into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) public announcement of any intention to effect any transaction specified in clause (a) or (b); provided, that "Transfer" shall be deemed not to include (a) any transfer of equity securities of an entity holding (directly or indirectly) Units of the Company that (A) was not formed for the purpose of investing in the Company or (B) is an "alternative investment vehicle" of an investment fund that was not formed for the purpose of investing in the Company, or (b) any pledge to any third-party pledgee in a bona fide transaction as collateral to secure obligations pursuant to lending or other arrangements, between such third parties (or their affiliates or designees) and a Member and/or its affiliates or any similar arrangement relating to a financing agreement for the benefit of a Member and/or its affiliates. The terms "Transferring" and "Transferred" when used as verbs shall have their correlative meanings.

14

"<u>Transferor Member</u>" has the meaning set forth in <u>Section 5.02(b)</u>.

"<u>Treasury Regulations</u>" means the regulations promulgated under the Code, as amended from time to time, including temporary and (to the extent they can be relied upon) proposed regulations.

"<u>Units</u>" means Common Units or any other type, class or series of limited liability company interests in the Company designated by the Company after the date hereof in accordance with this Agreement; <u>provided</u>, that any type, class or series of Units shall have the designations, preferences and/or special rights set forth or referenced in this Agreement, and the limited liability company interests of the Company represented by such type, class or series of Units shall be determined in accordance with such designations, preferences and/or special rights.

"<u>Unvested PubCo Shares</u>" means shares of Class A Common Stock issuable pursuant to awards granted under any Equity Plan that are not Vested PubCo Shares.

"<u>Value</u>" means (a) for any stock option under any Equity Plan, the Market Price for the Trading Day immediately preceding the date of exercise of such stock option and (b) for any awards under any Equity Plan other than a stock option, the Market Price for the Trading Day immediately preceding the Vesting Date.

"<u>Vested PubCo Shares</u>" means the shares of Class A Common Stock issued pursuant to awards granted under any Equity Plan that are vested pursuant to the terms thereof or any award or similar agreement relating thereto.

"<u>Vesting Date</u>" means the date on which a Person's rights with respect to all or a portion of Class A Common Stock subject to an Equity Plan may become fully vested.

"<u>Withholding Advances</u>" has the meaning set forth in <u>Section 5.06(b)</u>.

(b)        Each of the following terms is defined in the Section set forth opposite such term:

Section 1.02        <u>Other Definitional and Interpretative Provisions</u>. The definitions in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections and Schedules are to Articles, Sections and Schedules of this Agreement unless otherwise specified. All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. The terms "clause(s)" and "subparagraph(s)" shall be used herein interchangeably. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. Unless otherwise expressly provided herein, any agreement or instrument defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement or instrument as from time to time amended, modified, supplemented or restated, including by waiver or consent, and references to all attachments thereto and instruments incorporated therein, but in the case of each of the foregoing, only to the extent that such amendment, modification, supplement, restatement, waiver or consent is effected in accordance with this Agreement. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Unless otherwise expressly provided herein, any statute defined or referred to herein or in any agreement or instrument that is referred to herein means such statute as from time to time amended, modified, supplemented or restated, including by succession of comparable successor statutes. Unless otherwise expressly provided herein, when any approval, consent or other matter requires any action or approval of any group of Members, including any holders of any class of Units, such approval, consent or other matter shall require the approval of a majority in interest of such group of Members. Except to the extent otherwise expressly provided herein, all references to any Member shall be deemed to refer solely to such Person in its capacity as such Member and not in any other capacity.

ARTICLE II.

THE COMPANY

Section 2.01        <u>Continuation of the Company</u>. The Company was originally formed on June 30, 2017, as a Delaware limited liability company by the filing of the Certificate with the Secretary of State of the State of Delaware (the filing of such certificate by an "authorized person" of the Company within the meaning of the Delaware Act, being hereby approved and ratified in all respects). The Persons listed on the Schedule of Members as of the date hereof hereby continue or are hereby admitted, as applicable, as the Members of the Company. This Agreement shall be effective on the Restatement Date. The Members as of the date hereof agree and acknowledge that this Agreement replaces the Second Restated Agreement, which is no longer in effect. The rights and obligations of the Members and the terms and conditions of the Company shall be governed by the Delaware Act and this Agreement. To the extent the Delaware Act and this Agreement are inconsistent with respect to any subject matter covered in this Agreement, this Agreement shall govern to the extent permitted by law. The Managing Member shall cause to be executed and filed on behalf of the Company all other instruments or documents, and shall do or cause to be done all such filing, recording, or other acts as may be necessary or appropriate from time to time to comply with the requirements of law for the continuation and operation of a limited liability company in Delaware and in the other states and jurisdictions in which the Company shall transact business.

16

Section 2.02    Name. The name of the Company shall be "Fluence Energy, LLC." The name of the Company shall be the exclusive property of the Company, and no Member shall have any rights, commercial or otherwise, in the Company's name or any derivation thereof. The Company's name may be changed only by an amendment to the Certificate of the Company.

Section 2.03    Commencement and Term. The Company commenced on June 30, 2017 as a Delaware limited liability company and shall hereby continue until it is dissolved, its affairs are wound up and final liquidating distributions are made pursuant to this Agreement.

Section 2.04    Principal Place of Business. The principal place of business of the Company shall be at such place as the Managing Member may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices (within or without the State of Delaware) as the Managing Member may designate from time to time.

Section 2.05    Registered Agent and Registered Office. The registered office of the Company required by the Delaware Act to be maintained in Delaware shall be the office identified in the Certificate, or such other office as the Managing Member may designate from time to time in the manner provided by law.

Section 2.06    Purposes. The purposes of the Company shall be to engage in any activity for which limited liability companies may be organized in the State of Delaware, all on the terms and conditions and subject to the limitations set forth in this Agreement. Subject to the Delaware Act and this Agreement, the Company shall operate in a manner similar to that of a Delaware corporation.

Section 2.07    Powers of the Company. The Company shall have the power and authority to take any and all actions necessary, appropriate or advisable to or for the furtherance of the purposes set forth in Section 2.06.

Section 2.08    Partnership Tax Status. The Members agree that the Company shall be classified as a partnership for U.S. federal and applicable state and local tax purposes, and the Members and the Company agree that they shall refrain from making any elections under the Treasury Regulations or other applicable Law, filing any tax returns or reports, and otherwise taking any actions, in each case, that are inconsistent with such classification. The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes other than as set forth in the immediately preceding sentence.

Section 2.09    Regulation of Internal Affairs. The internal affairs of the Company and the conduct of its business shall be regulated by this Agreement, and to the extent not provided for herein, shall be determined by the Managing Member.

Section 2.10    Ownership of Property. Legal title to all Property conveyed to, or held by, the Company or its Subsidiaries shall reside in the Company or its Subsidiaries, as applicable, and shall be conveyed only in the name of the Company or its Subsidiaries, as applicable, and no Member or any other Person, individually, shall have any ownership of such Property.

ARTICLE III.

UNITS; MEMBERS; BOOKS AND RECORDS; REPORTS

Section 3.01    Units; Admission of Members.

(a)    (i) In connection with the Transactions, PubCo acquired Original Units (which will be converted into Common Units pursuant to the Recapitalization in accordance with Section 3.04) and was admitted as a Member and (ii) PubCo will acquire additional Common Units pursuant to the IPO Common Unit Subscription Agreement. Each Member's ownership interest in the Company shall be represented by Units, which may be divided into one or more types, classes or series, or subseries of any type, class or series, with each type, class or series, or subseries thereof, having the rights and privileges, set forth in this Agreement.

(b)    The number and type of Units issued to each Member shall be set forth opposite such Member's name on the schedule of Members of the Company held by the Company in its books and records (the "Member Schedule"). The Member Schedule shall be maintained by the Managing Member on behalf of the Company in accordance with this Agreement. When any Units or other Equity Securities of the Company are issued, repurchased, redeemed, converted or Transferred in accordance with this Agreement, the Member Schedule shall be amended by the Managing Member to reflect such issuance, repurchase, redemption or Transfer, the admission of Additional Members or Substitute Members and the resulting Percentage Interest of each Member. Following the date hereof, no Person shall be admitted as a Member and no additional Units shall be issued except as expressly provided herein.

(c)    No Member shall be required or, except as approved by the Managing Member and in accordance with the other provisions of this Agreement, permitted to (i) loan any money or property to the Company, (ii) borrow any money or property from the Company or (iii) make any additional Capital Contributions.

(d)    The Managing Member may cause the Company to authorize and issue from time to time such other Units or other Equity Securities of any type, class or series, in each case, having the designations, preferences and/or special rights as may be determined by the Managing Member. Such Units or other Equity Securities may be issued pursuant to such agreements as the Managing Member shall approve in its discretion. When any such other Units or other Equity Securities are authorized and issued, the Member Schedule and this Agreement shall be amended by the Managing Member to reflect such additional issuances.

(e)    Unless the Managing Member otherwise directs, Units will not be represented by certificates.

Section 3.02    Substitute Members and Additional Members.

(a)    No Transferee of any Units or Person to whom any Units are issued pursuant to this Agreement shall be admitted as a Member hereunder or acquire any rights hereunder, including any voting rights or the right to receive distributions and allocations in respect of the Transferred or issued Units, as applicable, unless (i) such Units are Transferred or issued in compliance with the provisions of this Agreement (including Article VIII) and (ii) such Transferee or recipient shall have executed and delivered to the Company such instruments as the Managing Member deems necessary or desirable, in its reasonable discretion, to effectuate the admission of such Transferee or recipient as a Member and to confirm the agreement of such Transferee or recipient to be bound by all the terms and provisions of this Agreement. Upon complying with the immediately preceding sentence, without the need for any further action of any Person, a Transferee or recipient shall be deemed admitted to the Company as a Member. A Substitute Member shall enjoy the same rights, and be subject to the same obligations, as the Transferor; provided, that such Transferor shall not be relieved of any obligation or liability hereunder arising prior to the consummation of such Transfer but shall, except as explicitly set forth herein, be relieved of all future obligations with respect to the Units so Transferred. As promptly as practicable after the admission of any Person as a Member, the books and records of the Company shall be changed to reflect such admission of a Substitute Member or Additional Member. In the event of any admission of a Substitute Member or Additional Member pursuant to this Section 3.02(a), this Agreement shall be deemed amended to reflect such admission, and any formal amendment of this Agreement (including Schedule A) in connection therewith shall only require execution by the Company and such Substitute Member or Additional Member, as applicable, to be effective.

18

(b)        If a Member shall Transfer all (but not less than all) of its Units, the Member shall thereupon cease to be a Member of the Company.

Section 3.03    Tax and Accounting Information.

(a)        Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managing Member in accordance with Law and to the extent applicable with accounting methods followed for federal income tax purposes. In making such decisions, the Managing Member may rely upon the advice of the independent accountants of the Company.

(b)        Records and Accounting Maintained. For financial reporting purposes, unless otherwise determined by PubCo's audit committee, the books and records of the Company shall be kept on the accrual method of accounting applied in a consistent manner and shall reflect all Company transactions. For tax purposes, the books and records of the Company shall be kept on the accrual method. The Fiscal Year of the Company shall be used for financial reporting and for federal income tax purposes to the extent permitted under applicable Law.

(c)        Financial Reports.

(i)        The books and records of the Company shall be audited as of the end of each Fiscal Year by the same accounting firm that audits the books and records of PubCo (or, if such firm declines to perform such audit, by an accounting firm selected by the Managing Member).

19

(ii)        In the event that neither PubCo nor the Company is required to file an annual report on Form 10-K or quarterly report on Form 10-Q, the Company shall deliver, or cause to be delivered, the following to each Member:

(A)        not later than ninety (90) days after the end of each Fiscal Year of the Company, a copy of the audited consolidated balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Year and the related statements of operations and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail; and

(B)        not later than forty five (45) days or such later time as permitted under applicable securities law after the end of each of the first three fiscal quarters of each Fiscal Year, the unaudited consolidated balance sheet of the Company and its Subsidiaries, and the related statements of operations and cash flows for such quarter and for the period commencing on the first day of the Fiscal Year and ending on the last day of such quarter.

(d)        <u>Tax Returns</u>.

(i)        The Company shall timely cause to be prepared all federal, state, local and foreign tax returns (including information returns) of the Company and its Subsidiaries, which may be required by a jurisdiction in which the Company and its Subsidiaries operate or conduct business for each year or period for which such returns are required to be filed and shall cause such returns to be timely filed. Upon request of any Member, the Company shall furnish to each Member a copy of such tax return.

(ii)        The Company shall furnish to each Member (a) as soon as reasonably practicable after the end of each Fiscal Year, information concerning the Company and its Subsidiaries reasonably required for the preparation of federal, state and local income tax returns of such Members (or any beneficial owner(s) of such Member), including a Schedule K-1 within one hundred fifty (150) days following the end of such Fiscal Year, indicating each Member's share of the Company's taxable income, gain, credits, losses and deductions for such year, in sufficient detail to enable such Member to prepare its federal, state and local income tax returns; <u>provided</u>, that the Managing Member shall use commercially reasonable efforts to provide estimates of such information believed by the Managing Member in good faith to be reasonable, (b) as soon as reasonably practicable after the close of the relevant fiscal period, such information concerning the Company as is required to enable such Member (or any beneficial owner of such Member) to pay estimated taxes (and, as soon as reasonably practicable but in no event later than five (5) business days prior to the applicable quarterly estimated tax payment due date, tax information necessary for the Members to make their quarterly estimated tax payments) and (c) as soon as reasonably practicable after a request by such Member, such other information concerning the Company and its Subsidiaries that is reasonably requested by such Member for compliance with its tax obligations (or the tax obligations of any beneficial owner(s) of such Member) or for tax planning purposes.

(e)        <u>Inconsistent Positions</u>. No Member shall take a position on its income tax return with respect to any item of Company income, gain, deduction, loss or credit that is different from the position taken on the Company's income tax return with respect to such item unless such Member notifies the Company of the different position the Member desires to take and the Company's regular tax advisors, after consulting with the Member, are unable to provide an opinion that (after taking into account all of the relevant facts and circumstances) the arguments in favor of the Company's position outweigh the arguments in favor of the Member's position. Nothing in this Section 3.03(e) shall limit the other provisions of this Agreement and the Tax Receivable Agreement specifically providing for the tax characterization of transactions contemplated thereby.

20

Section 3.04    <u>Recapitalization; PubCo's Capital Contribution; PubCo's Purchase of Common Units; the IPO Unit Redemption</u>.

(a)    In order to effect the Recapitalization, the number of Original Units that were issued and outstanding and held by the Pre-IPO Members prior to the date hereof as set forth opposite the respective Pre-IPO Member in <u>Schedule A</u> are hereby converted, as of the date hereof, and after giving effect to such conversion and the other transactions related to the Recapitalization, into the number of Common Units, as applicable, set forth opposite the name of the respective Member on the Schedule of Members attached hereto as <u>Schedule A</u> (provided, for the avoidance of doubt, that the number of Common Units set forth on <u>Schedule A</u> shall include the Common Units issued to PubCo pursuant to the IPO Common Unit Subscription Agreement), and such Common Units are hereby issued and outstanding as of the date hereof and the holders of such Common Units are Members hereunder. (b) Following the Recapitalization, the Company shall issue to PubCo, and PubCo will acquire [●] newly issued Common Units in exchange for a portion of the IPO Net Proceeds payable to the Company upon consummation of the IPO pursuant to the IPO Common Unit Subscription Agreement (the "<u>IPO Common Unit Subscription</u>"). For the avoidance of doubt, PubCo shall be admitted as a Member with respect to all Common Units it holds from time to time.

Section 3.05    <u>Books and Records</u>. The Company shall keep full and accurate books of account and other records of the Company at its principal place of business.

<div align="center">ARTICLE IV.</div>

<div align="center">MANAGING MEMBER OWNERSHIP; RESTRICTIONS ON MANAGING MEMBER UNITS</div>

Section 4.01    <u>Managing Member Ownership</u>.

(a)    Except as otherwise determined by the Managing Member, the Company and PubCo shall undertake all actions, including, without limitation, an issuance, reclassification, distribution, division or recapitalization, with respect to the Common Units and the Class A Common Stock to maintain at all times (i) a one-to-one ratio between the number of Common Units owned by PubCo and / or any wholly-owned Subsidiary of PubCo, in the aggregate, and the number of outstanding shares of Class A Common Stock, in the aggregate, and (ii) a one-to-one ratio between the number of Common Units owned by each Member (other than PubCo), directly or indirectly, and the number of outstanding shares of Class B Common Stock owned by such Member in each case, disregarding, for purposes of maintaining the one-to-one ratio contemplated by clause (i) and clause (ii) above, (A) Unvested PubCo Shares (to the extent the shares of Class A Common Stock underlying the applicable award are not actually issued and outstanding), (B) treasury stock, and (C) preferred stock or other debt or equity securities (including, without limitation, warrants, options or rights) issued by PubCo that are convertible into or exercisable or exchangeable for Class A Common Stock (except to the extent the net proceeds from such other securities, including any exercise or purchase price payable upon conversion, exercise or exchange thereof, have been contributed by PubCo to the equity capital of the Company). Except as otherwise determined by the Managing Member, in the event PubCo issues, transfers or delivers from treasury stock or repurchases or redeems PubCo's preferred stock in a transaction not contemplated in this Agreement, the Managing Member and PubCo shall take all actions such that, after giving effect to all such issuances, transfers, deliveries, repurchases or redemptions, PubCo, directly or indirectly, holds (in the case of any issuance, transfer or delivery) or ceases to hold (in the case of any repurchase or redemption) equity interests in the Company which (in the good faith determination by the Managing Member) are in the aggregate substantially economically equivalent to the outstanding preferred stock of PubCo so issued, transferred, delivered, repurchased or redeemed. Except as otherwise determined by the Managing Member in its reasonable discretion, the Company and PubCo shall not undertake any subdivision (by any Common Unit split, stock split, Common Unit distribution, stock distribution, reclassification, division, recapitalization or similar event) or combination (by reverse Common Unit split, reverse stock split, reclassification, division, recapitalization or similar event) of the Common Units, Class A Common Stock or Class B Common Stock, as applicable, that is not accompanied by an identical subdivision or combination of Class A Common Stock, Class B Common Stock or Common Units, respectively, to maintain at all times (x) a one-to-one ratio between the number of Common Units owned by PubCo and / or any wholly-owned subsidiary of PubCo, in the aggregate, and the number of outstanding shares of Class A Common Stock, in the aggregate, or (y) a one-to-one ratio between the number of Common Units owned by each Member (other than PubCo), directly or indirectly, and the number of outstanding shares of Class B Common Stock owned by such Member, directly or indirectly, in each case, unless such action is necessary to maintain at all times a one-to-one ratio between the number of Common Units owned by PubCo and / or any wholly owned subsidiary of PubCo, in the aggregate, and the number of outstanding shares of Class A Common Stock, in the aggregate, or the number of Common Units owned by Members (other than PubCo), directly or indirectly, and the number of outstanding shares of Class B Common Stock, as contemplated by the first sentence of this <u>Section 4.01(a)</u>.

<div align="center">21</div>

(b)        The Company shall only be permitted to issue additional Common Units, and/or establish other classes or series of Units or other Equity Securities in the Company to the Persons and on the terms and conditions provided for in <u>Section 3.01</u>, this <u>Section 4.01</u>, <u>Section 4.03</u> and <u>Section 9.01</u>. Subject to the foregoing, the Managing Member may cause the Company to issue additional Common Units authorized under this Agreement and/or establish other classes or series of Units or other Equity Securities in the Company at such times and upon such terms as the Managing Member shall determine and the Managing Member shall amend this Agreement as necessary in connection with the issuance of additional Common Units and admission of additional Members under this <u>Section 4.01</u> without the requirement of any consent or acknowledgement of any other Member.

Section 4.02        <u>Restrictions on Managing Member Units</u>. Except as otherwise determined by the Managing Member in connection with the use of cash or other assets held by PubCo, if at any time, any shares of Class A Common Stock are repurchased or redeemed (whether by exercise of a put or call, automatically or by means of another arrangement) by PubCo for cash, then the Managing Member shall cause the Company, immediately prior to such repurchase or redemption of Class A Common Stock, to redeem a corresponding number of Common Units held (directly or indirectly) by PubCo, at an aggregate redemption price equal to the aggregate purchase or redemption price of the shares of Class A Common Stock being repurchased or redeemed by PubCo (plus any expenses related thereto) and upon such other terms as are the same for the shares of Class A Common Stock being repurchased or redeemed by PubCo; *provided*, if PubCo uses funds received from distributions from the Company or the net proceeds from an issuance of Class A Common Stock to fund such repurchase or redemption, then the Company shall cancel a corresponding number of Common Units held (directly or indirectly) by PubCo for no consideration. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any repurchase or redemption if such repurchase or redemption would violate any applicable Law.

<div align="center">22</div>

Section 4.03    <u>Equity Plans</u>.

(a)    If at any time or from time to time, in connection with any Equity Plan, a stock option granted over shares of Class A Common Stock to a Person is duly exercised:

(i)    PubCo shall, as soon as practicable after such exercise, make a Capital Contribution to the Company in an amount equal to the exercise price paid to PubCo by such exercising Person in connection with the exercise of such stock option.

(ii)    Notwithstanding the amount of the Capital Contribution actually made pursuant to <u>Section 4.03(a)(i)</u>, PubCo shall be deemed to have contributed to the Company as a Capital Contribution, in lieu of the Capital Contribution actually made and in consideration of additional Common Units, an amount equal to the Value of a share of Class A Common Stock as of the date of such exercise multiplied by the number of shares of Class A Common Stock then being issued by PubCo in connection with the exercise of such stock option.

(iii)    PubCo shall receive in exchange for such Capital Contributions (as deemed made under <u>Section 4.03(a)(ii)</u>), a number of Common Units equal to the number of shares of Class A Common Stock for which such option was exercised.

(b)    If at any time or from time to time, in connection with any Equity Plan, any shares of Class A Common Stock are issued to a Person:

(i)    PubCo shall issue such number of shares of Class A Common Stock as are to be issued to such Person in accordance with the Equity Plan;

(ii)    on the Vesting Date, the following events will be deemed to have occurred: (1) PubCo shall be deemed to have sold such shares of Class A Common Stock to the Company for a purchase price equal to the Value of such shares of Class A Common Stock, (2) the Company shall be deemed to have delivered such shares of Class A Common Stock to such Person, (3) PubCo shall be deemed to have contributed the purchase price for such shares of Class A Common Stock to the Company as a Capital Contribution, and (4) in the case where such Person is an employee of a Subsidiary, the Company shall be deemed to have contributed such amount to the capital of the Subsidiary; and

<center>23</center>

(iii)        the Company shall issue to PubCo on the Vesting Date a number of Common Units equal to the number of shares of Class A Common Stock issued under Section 4.03(b)(i) in consideration for a Capital Contribution that the Corporation is deemed to make to the Company pursuant to clause (3) of Section 4.03(b)(ii) above.

ARTICLE V.

CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS;
DISTRIBUTIONS; ALLOCATIONS

Section 5.01    Capital Contributions.

(a)        From and after the date hereof, no Member shall have any obligation to the Company, to any other Member or to any creditor of the Company to make any further Capital Contribution, except as expressly provided in this Agreement.

(b)        Except as expressly provided herein or in the Act, no Member, in its capacity as a Member, shall have the right to receive any Property of the Company.

Section 5.02    Capital Accounts.

(a)        Maintenance of Capital Accounts. The Company shall maintain a Capital Account for each Member on the books of the Company in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv) and, to the extent consistent with such provisions, the following provisions:

(i)        Each Member listed on the Member Schedule shall be credited with the Initial Capital Account Balance set forth on the Member Schedule. The Member Schedule shall be amended by the Managing Member from time to time to reflect adjustments to the Members' Capital Accounts made in accordance with Sections 5.02(a)(ii), 5.02(a)(iii), 5.02(a)(iv), 5.02(c) or otherwise.

(ii)        To each Member's Capital Account there shall be credited: (A) such Member's Capital Contributions, (B) such Member's distributive share of Net Income and any item in the nature of income or gain that is allocated pursuant to Section 5.04 and (C) the amount of any Company liabilities assumed by such Member or that are secured by any Property distributed to such Member.

(iii)        To each Member's Capital Account there shall be debited: (A) the amount of money and the Carrying Value of any Property distributed to such Member pursuant to any provision of this Agreement, (B) such Member's distributive share of Net Loss and any items in the nature of expenses or losses that are allocated to such Member pursuant to Section 5.04 and (C) the amount of any liabilities of such Member assumed by the Company or that are secured by any Property contributed by such Member to the Company.

24

(iv)    In determining the amount of any liability for purposes of subparagraphs (ii) and (iii) above there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event that the Managing Member shall reasonably determine that it is necessary to modify the manner in which the Capital Accounts or any debits or credits thereto are maintained (including debits or credits relating to liabilities that are secured by contributed or distributed Property or that are assumed by the Company or the Members) to comply with the Code and Treasury Regulations, the Managing Member may (acting reasonably and in good faith) make such modification so long as such modification will not have any effect on the amounts distributed to any Person pursuant to Article XI upon the dissolution of the Company. The Managing Member also may (i) make any adjustments that are necessary or appropriate to maintain equality between Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(b)    Succession to Capital Accounts. In the event any Person becomes a Substitute Member in accordance with the provisions of this Agreement, such Substitute Member shall succeed to the Capital Account of the former Member (the "Transferor Member") to the extent such Capital Account relates to the Transferred Units.

(c)    Adjustments of Capital Accounts. The Company shall revalue the Capital Accounts of the Members in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) at the following times: (i) immediately prior to the contribution of more than a *de minimis* amount of money or other property to the Company by a new or existing Member as consideration for one or more Units; (ii) immediately prior to the distribution by the Company to a Member of more than a *de minimis* amount of property in respect of one or more Units; (iii) immediately prior to the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); (iv) in connection with the issuance by the Company of more than a *de minimis* amount of Units as consideration for the provision of services to or for the benefit of the Company (as described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iii)) and (v) at other times as determined by the Managing Member; provided, however, that adjustments pursuant to clauses (i), (ii) and (iv) above need not be made if the Managing Member reasonably determines that such adjustments are not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustments does not adversely and disproportionately affect any Member. The Company shall be entitled to take all actions necessary (as determined by the Managing Member) to comply with the provisions of the Code and Treasury Regulations relating to non-compensatory options.

(d)    No Member shall be entitled to withdraw capital or receive distributions except as specifically provided herein. A Member shall have no obligation to the Company, to any other Member or to any creditor of the Company to restore any negative balance in the Capital Account of such Member. Except as expressly provided elsewhere herein, no interest shall be paid on the balance in any Member's Capital Account.

(e)        Whenever it is necessary for purposes of this Agreement to determine a Member's Capital Account on a per Unit basis, such amount shall be determined by dividing the Capital Account of such Member attributable to the applicable class of Units held of record by such Member by the number of Units of such class held of record by such Member, with appropriate adjustments if necessary to reflect the economic differences between Units.

Section 5.03        Amounts and Priority of Distributions.

(a)        Distributions Generally. Except as otherwise provided in Article XI, distributions shall be made to the Members as set forth in this Section 5.03, at such times and in such amounts as the Managing Member, in its sole discretion, shall determine.

(b)        Distributions to the Members. Subject to Section 5.03(e) at such times and in such amounts as the Managing Member, in its sole discretion, shall determine, distributions shall be made to the Members in proportion to their respective Percentage Interests.

(c)        PubCo Distributions. Notwithstanding the provisions of Section 5.03(b), the Managing Member, in its sole discretion, may authorize that (i) cash be paid to PubCo (which payment shall be made without pro rata distributions to the other Members) in exchange for the redemption, repurchase or other acquisition of Units held by PubCo to the extent that such cash payment is used to redeem, repurchase or otherwise acquire an equal number of corresponding Equity Securities of PubCo in accordance with Article IV, and (ii) to the extent that the Managing Member determines that expenses or other obligations of PubCo are related to its role as the Managing Member or the business and affairs of PubCo that are conducted through the Company or any of the Company's direct or indirect Subsidiaries, cash (and, for the avoidance of doubt, only cash) distributions may be made to PubCo (which distributions shall be made without pro rata distributions to the other Members) in amounts required for PubCo to pay (w) operating, administrative and other similar costs incurred by PubCo, to the extent the proceeds are used or will be used by PubCo to pay expenses described in this clause (ii), and payments pursuant to any legal, tax, accounting and other professional fees and expenses (but, for the avoidance of doubt, excluding any tax liabilities of PubCo and any amounts that PubCo is required to pay pursuant to the Tax Receivables Agreement), (x) any judgments, settlements, penalties, fines or other costs and expenses in respect of any claims against, or any litigation or proceedings involving, PubCo, (y) fees and expenses (including any underwriters' discounts and commissions) related to any securities offering, investment or acquisition transaction (whether or not successful) authorized by PubCo, as the Managing Member and (z) other fees and expenses in connection with the maintenance of the existence of PubCo. For the avoidance of doubt, distributions made under this Section 5.03(c) may not be used to pay or facilitate dividends or distributions on the common stock of PubCo and must be used solely for one of the express purposes set forth under clause (i) or (ii) of the immediately preceding sentence.

(d)        Distributions in Kind. Any distributions in kind shall be made at such times and in such amounts as the Managing Member, in its sole discretion, shall determine based on their Fair Market Value as determined by the Managing Member in the same proportions as if distributed in accordance with Section 5.03(b). If cash and property are to be distributed in kind simultaneously, the Company shall distribute such cash and property in kind in the same proportion to each Member.

26

(e)        Tax Distributions.

(i)        Notwithstanding any other provision of this Section 5.03 to the contrary (but subject to Section 5.03(e)(ii)), to the extent permitted by Law and consistent with the Company's obligations to its creditors as determined by the Managing Member, to the extent out of Available Cash, the Company shall make cash distributions pursuant to this Section 5.03(e)(i) to each Member at least two (2) Business Days prior to the date on which any U.S. federal corporate estimated tax payments are due (or at such other times as are necessary to permit the Members or their beneficial owners to discharge their U.S. federal, state and local estimated tax payment responsibilities, as reasonably determined by the Managing Member), in an amount equal to such Member's Tax Distribution Amount (estimated on a quarterly basis by the Managing Member, taking into account estimated taxable income or loss of the Company through the end of the relevant quarterly period). A final accounting for Tax Distributions shall be made after the allocation of the Company's actual net taxable income or loss has been determined for a fiscal year (or applicable portion thereof) and, unless otherwise determined by the Managing Member, any shortfall in the amount of Tax Distributions a Member received for such fiscal year based on such final accounting shall, to the extent permitted by law and consistent with the Company's obligations to its creditors as determined by the Managing Member, be promptly distributed to such Member.

(ii)        To the extent a Member otherwise would be entitled to receive less than its Percentage Interest of the aggregate Tax Distributions to be paid pursuant to this Section 5.03(e) on any given date, then unless otherwise determined by the Managing Member and such Member acting reasonably and in good faith, the Tax Distributions to such Member shall be increased to ensure that all such Tax Distributions made pursuant to this Section 5.03(e) are made *pro rata* in accordance with the Members' respective Percentage Interests. If, on a Tax Distribution date, there are insufficient funds on hand to distribute to the Members the full amount of the Tax Distributions to which such Members are otherwise entitled, Tax Distributions pursuant to this Section 5.03(e) shall be made to the Members to the extent of available funds in accordance with the Tax Distributions that would have been paid to them had no such limitation existed and the Company shall make future Tax Distributions (pro rata in accordance with the Tax Distributions that would have been paid to the Members had no applicable limitation existed) promptly after funds become available sufficient to pay the remaining portion of Tax Distributions to which such Members would have been entitled had sufficient funds been available. In addition, notwithstanding the foregoing, to the extent that a Tax Distribution that would be made to PubCo exceeds the PubCo Modified Distribution Amount, the Managing Member may reduce the Tax Distribution payable to PubCo in an amount up to the amount of such excess (and, if there are insufficient funds on hand to distribute to the Members other than PubCo the full amount of the Tax Distributions to which such other Members are otherwise entitled, then the Managing Member shall, pursuant to this sentence, reduce the Tax Distribution payable to PubCo in an amount equal to the lesser of (i) the amount of such excess or (ii) the aggregate amount required to permit the other Members to receive Tax Distributions equal to the amount they would have received under this Section 5.03(e) were sufficient cash available to make full Tax Distributions under such provision, with the amount of any such reduction being paid as Tax Distributions to the other Members pro rata in accordance with the Tax Distributions to which such other Members are otherwise entitled). For purposes of this clause (ii), the "PubCo Modified Distribution Amount" shall mean the Tax Distribution Amount of PubCo, adjusted as determined by the Managing Member to (w) reflect the marginal combined corporate income tax rates to which PubCo is subject, (x) reflect any adjustments with respect to PubCo pursuant to Section 743(b) of the Code, (y) include any amounts that PubCo is required to pay pursuant to the Tax Receivable Agreement and (z) take into account other reductions or modifications as determined by the Managing Member. Any distributions paid pursuant to Section 5.03(b) during a fiscal year shall, to the extent of Tax Distributions otherwise required to be paid during such fiscal year, be treated as Tax Distributions paid during such fiscal year.

(iii)    Tax Distributions with respect to income or gain allocations made for periods (or portions thereof) beginning on or after the Restatement Date shall be treated as advances of amounts otherwise distributable to any Member pursuant to this Section 5.03 (other than this Section 5.03(e)) or Section 11.02(b)(i), and accordingly shall be applied against and reduce (without duplication) the next amounts that would otherwise be payable to such Member pursuant to such provisions (provided, that in no event will the distributions payable to PubCo in respect of Units transferred to PubCo in connection with a Redemption or Direct Redemption be increased or reduced (as compared to Common Units held by PubCo as of the date hereof) as a result of Tax Distributions made (or not made) in respect of such Units prior to their transfer to PubCo in connection with the applicable Redemption or Direct Redemption).

Section 5.04    Allocations.

(a)    Net Income and Net Loss. Except as otherwise provided in this Agreement, and after giving effect to the special allocations set forth in Section 5.04(b), Section 5.04(c) and Section 5.04(d), Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss, deduction or credit) of the Company shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal to (i) the distributions that would be made to such Member pursuant to Section 5.03(b) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Carrying Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section 5.03(b), to the Members immediately after making such allocation, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

(b)    Special Allocations. The following special allocations shall be made in the following order:

(i)    Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article V, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the immediately preceding sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f)(6) and 1.704-2(j)(2). This Section 5.04(b)(i) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

28

(ii)        Member Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article V, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 5.04(b)(ii) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iii)        Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as promptly as possible; provided, that an allocation pursuant to this Section 5.04(b)(iii) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been tentatively made as if this Section 5.04(b)(iii) were not in the Agreement.

(iv)        Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Members in accordance with their relative Percentage Interests.

(v)        Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Sections 1.704-2(i)(1) and 1.704-2(j)(1).

(vi)        Section 754 Adjustments. (A) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Sections 734(b) or 743(b) of the Code is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of such asset) or loss (if the adjustment decreases the basis of such asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income and Net Loss; and (B) to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Sections 734(b) or 743(b) of the Code is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to such Members in accordance with their interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

29

(c)          Curative Allocations. The allocations set forth in Section 5.04(b)(i) through Section 5.04(b)(iv) and Section 5.04(d) (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 5.04(c). Therefore, notwithstanding any other provision of this Article V (other than the Regulatory Allocations), the Managing Member shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 5.04.

(d)          Loss Limitation. Net Loss (or individual items of loss or deduction) allocated pursuant to Section 5.04 hereof shall not exceed the maximum amount of Net Loss (or individual items of loss or deduction) that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Net Loss (or individual items of loss or deduction) pursuant to Section 5.04 hereof, the limitation set forth in this Section 5.04(d) shall be applied on a Member by Member basis and Net Loss (or individual items of loss or deduction) not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Net Loss to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). Any reallocation of Net Loss pursuant to this Section 5.04(d) shall be subject to chargeback pursuant to the curative allocation provision of Section 5.04(c).

Section 5.05        Other Allocation Rules.

(a)          Interim Allocations Due to Percentage Adjustment. If the Members' interests in the Company change pursuant to the terms of the Agreement during any Fiscal Year, the amount of Net Income and Net Loss (or items thereof) to be allocated to the Members for such entire Fiscal Year shall be allocated to the portion of such Fiscal Year which precedes the date of such Transfer or change (and if there shall have been a prior Transfer or change in such Fiscal Year, which commences on the date of such prior Transfer or change) and to the portion of such Fiscal Year which occurs on and after the date of such Transfer or change (and if there shall be a subsequent Transfer or change in such Fiscal Year, which precedes the date of such subsequent Transfer or change), and the amounts of the items so allocated to each such portion shall be credited or charged to the Members in accordance with Section 5.04 as in effect during each such portion of the Fiscal Year in question. Such allocation shall be in accordance with Section 706 of the Code and the Treasury Regulations thereunder and made without regard to the date, amount or receipt of any distributions that may have been made with respect to the transferred interest to the extent consistent with Section 706 of the Code and the Treasury Regulations thereunder, and shall be made using any method permitted by Section 706 of the Code and such regulations as determined by the Managing Member. As of the date of such Transfer, the Transferee Member shall succeed to the Capital Account of the Transferor Member with respect to the transferred Units.

30

(b)     <u>Tax Allocations: Code Section 704(c)</u>. In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company and with respect to reverse Code Section 704(c) allocations described in Treasury Regulations Section 1.704-3(a)(6) shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Carrying Value or its Carrying Value determined pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) (computed in accordance with the definition of Carrying Value) using (unless otherwise determined by the Managing Member) the "traditional method"; provided, that with respect to the "forward" layer for any such Property contributed by any Pre-IPO Member, no method other than the "traditional method" described in Treasury Regulations Section 1.704-3(b) shall be used without the prior written consent of such Pre-IPO Member. Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this <u>Section 5.05(b)</u>, Section 704(c) of the Code (and the principles thereof), and Treasury Regulations Section 1.704-1(b)(4)(i) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Loss, other items, or distributions pursuant to any provision of this Agreement.

Section 5.06     <u>Tax Withholding; Withholding Advances</u>.

(a)     <u>Tax Withholding</u>.

(i)     If requested by the Managing Member, each Member shall, if able to do so, deliver to the Managing Member: (A) an affidavit in form satisfactory to the Company that the applicable Member (or its partners, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Law; (B) any certificate that the Company may reasonably request with respect to any such Laws; and/or (C) any other form or instrument reasonably requested by the Company relating to any Member's status under such Law. In the event that a Member fails or is unable to deliver to the Company an affidavit described in subclause (A) of this clause (i), for the avoidance of doubt, the Company may withhold amounts from such Member in accordance with <u>Section 5.06(b)</u>.

31

(ii)        After receipt of a written request of any Member, the Company shall provide such information to such Member and take such other action as may be reasonably requested and necessary to assist such Member in making any necessary filings, applications or elections to obtain any available exemption from, or any available refund of, any withholding imposed by any taxing authority with respect to amounts distributable or items of income allocable to such Member hereunder, in each case, to the extent not adverse to the Company or any Member. In addition, the Company shall, at the request of any Member, make or cause to be made (or cause the Company to make) any such filings, applications or elections; provided, that any such requesting Member shall cooperate with the Company, with respect to any such filing, application or election to the extent reasonably determined by the Company and that any filing fees, taxes or other out-of-pocket expenses reasonably incurred and related thereto shall be paid and borne by such requesting Member or, if there is more than one requesting Member, by such requesting Members in accordance with their Relative Percentage Interests.

(b)        Withholding Advances. Subject to and without limitation of Section 5.06(e), to the extent PubCo or the Company is required by Law to withhold or to make tax payments on behalf of or with respect to any Member (e.g., in connection with the delivery of consideration in connection with a Redemption, backup withholding, Section 1445 of the Code, Section 1446 of the Code or any "imputed underpayment" within the meaning of the Code or, in each case, similar provisions of state, local or other tax Law) ("Withholding Advances"), PubCo or the Company, as the case may be, may withhold such amounts and make such tax payments as so required. The Managing Member shall reasonably determine the portion of any "imputed underpayment" within the meaning of the Code that is attributable to each Member (including a former Member and such former Member's assignee(s) or transferee(s)).

(c)        Repayment of Withholding Advances. All Withholding Advances made on behalf of a Member, plus interest thereon at a rate equal to the Prime Rate as of the date of such Withholding Advances plus 2.0% per annum, shall (i) be paid on demand by the Member on whose behalf such Withholding Advances were made (it being understood that no such payment shall increase such Member's Capital Account), or (ii) with the consent of the Managing Member be repaid by reducing the amount of the current or next succeeding distribution or distributions that would otherwise have been made to such Member or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Member. Whenever repayment of a Withholding Advance by a Member is made as described in clause (ii) of this Section 5.06(c), for all other purposes of this Agreement such Member shall be treated as having received all distributions (whether before or upon any Dissolution Event) unreduced by the amount of such Withholding Advance and interest thereon.

(d)        Withholding Advances — Reimbursement of Liabilities. Each Member hereby agrees to reimburse the Company for any liability with respect to Withholding Advances (including interest thereon) required or made on behalf of or with respect to such Member (including penalties imposed with respect thereto). The obligations of a Member with respect to the repayment and reimbursement of Withholding Advances will survive the termination, liquidation, winding up and dissolution of the Company and will survive the partial or complete transfer or redemption of a Member's interests in the Company.

32

Section 5.07    Tax Proceedings.

(a)    In representing the Company before any taxing authorities and courts in tax matters affecting the Company and the Members in their capacity as such that the Managing Member determines are reasonably expected to be material to such Members, the Company Representative shall, to the extent practicable and permitted under the circumstances, keep the Members promptly informed with respect to any such administrative and judicial proceedings. For the avoidance of doubt, nothing in this Section 5.07 shall prevent the Company (or any of its Subsidiaries) from taking actions explicitly provided to be taken by the Company pursuant to this Agreement (including for this purpose making an election pursuant to Section 754 of the Code (or analogous provisions of state or local Law)).

(b)    Without limiting the foregoing, the Company Representative shall give prompt written notice to the Sponsor Members of the commencement of any material audit or proceeding of the Company or any of its Subsidiaries with respect to U.S. income taxes, to the extent that such income taxes would "pass through" to the Sponsor Members for the applicable U.S. income tax purposes and are reasonably expected to have a disproportionate and material adverse impact on the Sponsor Members (a "Specified Audit"). The Company Representative shall (i) keep the Sponsor Members reasonably informed of the material developments and status of any such Specified Audit, (ii) permit each Sponsor Member (or its designee) to participate (including using separate counsel), in each case at the Sponsor Members' sole cost and expense, in any such Specified Audit, and (iii) promptly notify each Sponsor Members of receipt of a notice of a final partnership adjustment (or equivalent under applicable Laws) or a final decision of a court or IRS Appeals panel (or equivalent body under applicable Laws) with respect to such Specified Audit. The Company Representative or the Company shall promptly provide the Sponsor Members with copies of all material correspondence between the Company Representative or the Company (as applicable) and any Governmental Authority in connection with such Specified Audit and shall give the Sponsor Members a reasonable opportunity to review and comment on any material correspondence, submission (including settlement or compromise offers) or filing in connection with any such Specified Audit, which the Company Representative shall consider in good faith. The Company Representative shall obtain the prior written consent of each Sponsor Member (which consent shall not be unreasonably withheld, conditioned or delayed) before making an election under Section 6226(a) of the Code (or any analogous provision of U.S. state or local tax Law) with respect to any period ending on or before the Restatement Date.

ARTICLE VI.

CERTAIN TAX MATTERS

Section 6.01    Company Representative.

(a)    The Managing Member is specially authorized and appointed to act as the Company Representative and in any similar capacity under state or local Law; provided, that the Managing Member may appoint and replace the Company Representative. The Company Representative may also designate a "designated individual" in accordance with Treasury Regulations Section 301.6223-1(b)(3)(i). The Company and the Members (including any Member designated as the Company Representative prior to the date hereof) shall cooperate fully with each other and shall use reasonable best efforts to cause the Managing Member (or any Person subsequently designated) to become the Company Representative with respect to any taxable period of the Company with respect to which the statute of limitations has not yet expired, including (as applicable) by filing certifications pursuant to Treasury Regulations Section 301.6231(a)(7)-1(d).

33

(b)        The Company Representative may retain, at the Company's expense, such outside counsel, accountants and other professional consultants as it may reasonably deem necessary in the course of fulfilling its obligations as the Company Representative. Subject to the other terms of this Agreement, the Company Representative is authorized to take such actions and execute and file all statements and forms on behalf of the Company that are approved by the Managing Member and are permitted or required by the applicable provisions of the Partnership Tax Audit Rules. Each Member agrees to reasonably cooperate with the Company Representative and to use commercially reasonable efforts to do or refrain from doing any or all things requested by the Company Representative (including paying any and all resulting taxes, additions to tax, penalties and interest in a timely fashion) in connection with any examination of the Company's affairs by any federal, state, or local tax authorities, including resulting administrative and judicial proceedings.

Section 6.02      Tax Elections. Except as otherwise provided in this Agreement, the Managing Member and the Company Representative shall be entitled to cause the Company to make (or not make) any tax elections under applicable law; provided, that the Company shall make and maintain in effect an election under Section 754 of the Code for the taxable year that includes the Restatement Date and for subsequent years.

ARTICLE VII.

MANAGEMENT OF THE COMPANY

Section 7.01      Management by the Managing Member. Except as otherwise specifically set forth in this Agreement, the Managing Member shall be deemed to be a "manager" for purposes of the Delaware Act. Except as expressly provided in this Agreement or the Delaware Act, the day-to-day business and affairs of the Company and its Subsidiaries shall be managed, operated and controlled exclusively by the Managing Member in accordance with the terms of this Agreement, and no other Members shall have management authority or rights over the Company or its Subsidiaries. The Managing Member is, to the extent of its rights and powers set forth in this Agreement, an agent of the Company for the purpose of the Company's and its Subsidiaries' business, and the actions of the Managing Member taken in accordance with such rights and powers, shall bind the Company (and no other Members shall have such right). Except as expressly provided in this Agreement, the Managing Member shall have all necessary powers to carry out the purposes, business, and objectives of the Company and its Subsidiaries. The Managing Member may delegate to Members, employees, officers or agents of the Company or any Subsidiary in its discretion the authority to sign agreements and other documents on behalf of the Company or any Subsidiary. The Managing Member shall have the exclusive power and authority, on behalf of the Company and its Subsidiaries to take such actions not inconsistent with this Agreement as the Managing Member deems necessary or appropriate to carry on the business and purposes of the Company and its Subsidiaries.

34

Section 7.02      Withdrawal of the Managing Member. PubCo may withdraw as the Managing Member and appoint as its successor at any time upon written notice to the Company (i) any wholly-owned Subsidiary of PubCo, (ii) any Person into which PubCo is merged or consolidated or (iii) any transferee of all or substantially all of the assets of PubCo, which withdrawal and replacement shall be effective upon the delivery of such notice. No appointment of a Person as Managing Member shall be effective unless PubCo and the new Managing Member provide all other Members with contractual rights, directly enforceable by such other Members against the new Managing Member, to cause the new Managing Member to comply with all the Managing Member's obligations under this Agreement.

Section 7.03      Decisions by the Members.

(a)      Other than the Managing Member, the Members shall take no part in the management of the Company's business, shall transact no business for the Company and shall have no power to act for or to bind the Company; provided, however, that the Company may engage any Member or principal, partner, member, shareholder or interest holder thereof as an employee, independent contractor or consultant to the Company, in which event the duties and liabilities of such Person with respect to the Company as an employee, independent contractor or consultant, as applicable, shall be governed by the terms of such engagement with the Company.

(b)      Except as otherwise expressly provided herein in the Stockholders Agreement, no Member shall have the power or authority to vote, approve or consent to any matter or action taken by the Company (or by PubCo, as Managing Member).

Section 7.04      Fiduciary Duties.

(a)      This Agreement is not intended to, and does not, create or impose any duty (including any fiduciary duty) on any of the Members (including without limitation, the Managing Member) hereto or on their respective Affiliates. Further, notwithstanding any other provision of this Agreement or any duty otherwise existing at law or in equity, the parties hereto agree that no Member or Managing Member shall, to the fullest extent permitted by law, have duties (including fiduciary duties) to any other Member or to the Company, and in doing so, recognize, acknowledge and agree that their duties and obligations to one another and to the Company are only as expressly set forth in this Agreement; provided, however, that each Member shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

(b)      To the extent that, at law or in equity, any Member (including without limitation, the Managing Member) has duties (including fiduciary duties) and liabilities relating thereto to the Company, to another Member or to another Person who is a party to or is otherwise bound by this Agreement, the Members (including without limitation, the Managing Member) acting under this Agreement will not be liable to the Company, to any such other Member or to any such other Person who is a party to or is otherwise bound by this Agreement, for their good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities relating thereto of any Member (including without limitation, the Managing Member) otherwise existing at law or in equity, are agreed by the Members to replace to that extent such other duties and liabilities of the Members relating thereto (including without limitation, the Managing Member).

35

(c)        The Managing Member may consult with legal counsel, accountants and financial or other advisors selected by it, and any act or omission taken by the Managing Member on behalf of the Company or in furtherance of the interests of the Company in good faith in reliance upon and in accordance with the advice of such Person as to matters the Managing Member reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion or advice, and the Managing Member will be fully protected in so acting or omitting to act so long as such counsel or accountants or financial or other advisors were selected with reasonable care.

(d)        Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the Managing Member is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Managing Member shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable Law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or the Members, or (ii) in its "good faith" or under another expressed standard, such Managing Member shall act under such express standard and shall not be subject to any other or different standards.

Section 7.05    <u>Officers</u>.

(a)        <u>Appointment of Officers</u>. The Managing Member may appoint individuals as officers ("<u>Officers</u>") of the Company, which may include such officers as the Managing Member determines are necessary or appropriate. No Officer need be a Member. An individual may be appointed to more than one office.

(b)        <u>Authority of Officers</u>. The Officers shall have the duties, rights, powers and authority as may be prescribed by the Managing Member from time to time.

(c)        <u>Removal, Resignation and Filling of Vacancy of Officers</u>. Unless otherwise set forth in the employment agreement of the applicable Officer, the Managing Member may remove any Officer, for any reason or for no reason, at any time. Any Officer may resign at any time by giving written notice to the Company, and such resignation shall take effect at the date of the receipt of that notice or any later time specified in that notice; provided, that, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any such resignation shall be without prejudice to the rights, if any, of the Company or such Officer under this Agreement. A vacancy in any office because of death, resignation, removal or otherwise shall be filled by the Managing Member.

ARTICLE VIII.

TRANSFERS OF INTERESTS

Section 8.01     Restrictions on Transfers.

(a)        Except as expressly permitted by Section 8.02, and subject to Section 8.01(b), Section 8.01(c) and Section 8.01(d) and/or any other agreement between such Member and the Company, PubCo or any of their respective controlled Affiliates, without the prior written approval of the Managing Member, no Member shall directly or indirectly Transfer all or any part of its Units or any right or economic interest pertaining thereto, including the right to vote or consent on any matter or to receive or have any economic interest in distributions or advances from the Company pursuant thereto. Any such Transfer which is not in compliance with the provisions of this Agreement shall be deemed a Transfer by such Member of Units in violation of this Agreement (and a breach of this Agreement by such Member) and shall be null and void *ab initio.*

(b)        Except as otherwise expressly provided herein, it shall be a condition precedent to any Transfer otherwise permitted or approved pursuant to this Article VIII that:

(i)        the Transferor shall have provided to the Company prior notice of such Transfer;

(ii)        the Transferee shall agree in writing to be bound by this Agreement by signing and delivering to the Company a joinder substantially in a form acceptable to the Company;

(iii)        the Transfer shall comply with all applicable Laws;

(iv)        to the knowledge of the Transferee and Transferor after reasonable inquiry of the Company, the Transfer shall not impose material liability or material reporting obligations on the Company or any Member thereof in any jurisdiction, whether domestic or foreign, or result in the Company or any Member thereof becoming subject to the jurisdiction of any Governmental Authority anywhere, other than the Governmental Authorities in which the Company is then subject to such liability, reporting obligation or jurisdiction; and

(v)        such Transfer shall comply with Article IX (to the extent Article IX governs such Transfer of Units).

(c)        Notwithstanding any other provision of this Agreement to the contrary, no Member shall Transfer all or any part of its Units or any right or economic interest pertaining thereto if such Transfer, in the reasonable discretion of the Managing Member, would cause the Company to (i) be classified as a "publicly traded partnership" as that term is defined in Section 7704 of the Code and Regulations promulgated thereunder or (ii) fail to qualify for the safe harbor contained in Treasury Regulations Section 1.7704-1(h) or for other safe harbor treatment under Section 7704 of the Code on which the Company intends to rely (as determined by the Managing Member).

37

(d)        Any Transfer of Units pursuant to this Agreement, including this <u>Article VIII</u>, shall be subject to the provisions of <u>Section 3.01</u> and <u>Section 3.02</u>.

Section 8.02        <u>Certain Permitted Transfers</u>. Subject to compliance with <u>Sections 8.01(b)</u> through <u>(d)</u>, following the Restatement Date (unless such time restriction is waived by the Managing Member in its sole discretion with respect to any proposed Transfer(s)), the following Transfers shall be permitted:

(a)        any Transfer pursuant to the terms of <u>Article IX</u>;

(b)        any Transfer contemplated by <u>Section 9.06</u> in connection with a PubCo Approved Change of Control or PubCo Approved Recap Transaction;

(c)        in the case of the AES Member or the Siemens Member, any Transfer of all (but not less than all) of its respective Units to any Person other than a Restricted Person; and

(d)        any Transfer to an Affiliate of the applicable Member.

Section 8.03        <u>Registration of Transfers</u>. When any Units are validly Transferred in accordance with the terms of this Agreement, the Company shall cause such Transfer to be registered on the books of the Company.

Section 8.04        <u>Restricted Units Legend</u>. The Units have not been registered under the Securities Act and, therefore, in addition to the other restrictions on Transfer contained in this Agreement, cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is then available. To the extent such Units have been certificated, each certificate evidencing Units and each certificate issued in exchange for or upon the Transfer of any Units (if such securities remain Units as defined herein after such Transfer) shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ISSUED ON _____ _____, 2021, AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SPECIFIED IN THE THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF FLUENCE ENERGY, LLC, AS MAY BE AMENDED AND MODIFIED FROM TIME TO TIME, AND FLUENCE ENERGY, LLC RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITIES UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED WITH RESPECT TO ANY TRANSFER. A COPY OF SUCH CONDITIONS SHALL BE FURNISHED BY FLUENCE ENERGY, LLC TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

The Company shall imprint such legend on certificates (if any) evidencing Units. The legend set forth above shall be removed from the certificates (if any) evidencing any units which cease to be Units in accordance with the definition thereof.

38

ARTICLE IX.

REDEMPTION AND EXCHANGE RIGHTS

Section 9.01    Redemption Right of a Member.

(a)    Each Member (other than PubCo) shall be entitled to cause the Company to redeem (a "Redemption") its Common Units (excluding any Common Units that are subject to vesting conditions or subject to Transfer limitations pursuant to this Agreement) in whole or in part (the "Redemption Right") at any time and from time to time. A Member desiring to exercise its Redemption Right (a "Redeeming Member") shall exercise such right by giving written notice (the "Redemption Notice") to the Company, with a copy to PubCo. The Redemption Notice shall specify the number of Common Units (the "Redeemed Units") that the Redeeming Member intends to have the Company redeem and a date, not less than two (2) Business Days nor more than ten (10) Business Days after delivery of such Redemption Notice (unless and to the extent that the Managing Member in its sole discretion agrees in writing to waive such time periods), on which exercise of the Redemption Right shall be completed (the "Redemption Date"); provided, that the Redemption Notice may specify that the Redemption is to be contingent (including as to the timing) upon the consummation of a purchase by another Person (whether in a tender or exchange offer, an underwritten offering or otherwise) of the Share Settlement into which the Redeemed Units are exchangeable, or contingent (including as to timing) upon the closing of an announced merger, consolidation or other transaction or event in which the Share Settlement would be exchanged or converted or become exchangeable for or convertible into cash or other securities or property; provided, further that the Redeeming Member may withdraw or amend a Redemption Notice, in whole or in part, prior to the effectiveness of the Redemption, at any time prior to 5:00 p.m. New York City time, on the Business Day immediately preceding the Redemption Date (or any such later time as may be required by Law) by delivery of a written notice of withdrawal to the Company (with a copy to PubCo), specifying (1) the number of withdrawn Units, (2) if any, the number of Units as to which the Redemption Notice remains in effect and (3) if the Redeeming Member so determines, a new Redemption Date or any other new or revised information permitted in the Redemption Notice. Following receipt of the Redemption Notice, and in any event at least one (1) Business Days prior to the Redemption Date, PubCo shall deliver to the Redeeming Member a notice, specifying whether it elects (which shall be determined solely by the independent directors of PubCo (within the meaning of the rules of the Nasdaq Stock Market) who are disinterested) to settle the Redemption with a Share Settlement or a Cash Settlement (an "Election Notice"). If the Election Notice specifies a Cash Settlement, then on the Redemption Date (to be effective immediately prior to the close of business on the Redemption Date):

(i)    PubCo shall contribute the proceeds of the Cash Settlement to the Company in exchange for a number of Common Units equal to the number of Redeemed Units (and for the avoidance of doubt, PubCo shall be permitted to elect a Cash Settlement only if such Cash Settlement is fully paid with cash proceeds from the issuance and sale by PubCo of a number of shares of Class A Common Stock equal to the number of Redeemed Units to be redeemed with such Cash Settlement, which amount is contributed to the Company by PubCo substantially contemporaneously with the payment of such Cash Settlement); provided, that notwithstanding anything to the contrary in this Agreement, (x) PubCo shall be obligated to contribute to the Company only an amount in respect of such Cash Settlement equal to the net proceeds (after deduction of any underwriters' discounts or commissions and brokers' fees or commissions) from such issuance and sale by PubCo of such shares of Class A Common Stock and (y) PubCo's Capital Account shall be increased by an amount that includes any such underwriters' discounts or commissions and brokers' fees or commissions relating to such issuance and sale of shares of Class A Common Stock by PubCo;

39

(ii)        the Redeeming Member shall Transfer and surrender, free and clear of all liens and encumbrances (x) the Redeemed Units to the Company, and (y) an equal number of shares of Class B Common Stock to PubCo;

(iii)        the Company shall (x) cancel the Redeemed Units, (y) pay to the Redeeming Member the applicable Cash Settlement, and (z) if the Units are certificated, issue to the Redeeming Member a certificate for a number of Common Units equal to the difference (if any) between the number of Common Units evidenced by the certificate surrendered by the Redeeming Member pursuant to clause (i) of this Section 9.01(a) and the Redeemed Units; and

(iv)        PubCo shall cancel and retire for no consideration the shares of Class B Common Stock that were Transferred to PubCo pursuant to Section 9.01(a)(ii)(y) above.

(b)        If the Election Notice specifies a Share Settlement, a Redeeming Member shall be entitled to revoke its Redemption Notice or delay the consummation of a Redemption if any of the following conditions exists:

(i)        any registration statement pursuant to which the resale of the Class A Common Stock to be registered for such Redeeming Member at or immediately following the consummation of the Redemption shall have ceased to be effective pursuant to any action or inaction by the SEC or no such resale registration statement has yet become effective;

(ii)        PubCo shall have failed to cause any related prospectus to be supplemented by any required prospectus supplement necessary to effect such Redemption;

(iii)        PubCo shall have exercised its right to defer, delay or suspend the filing or effectiveness of a registration statement and such deferral, delay or suspension shall affect the ability of such Redeeming Member to have its Class A Common Stock registered at or immediately following the consummation of the Redemption;

(iv)        PubCo shall have disclosed in good faith to such Redeeming Member any material non-public information concerning PubCo, the receipt of which results in such Redeeming Member being prohibited or restricted from selling Class A Common Stock at or immediately following the Redemption without disclosure of such information (and PubCo does not permit such disclosure);

(v)        any stop order relating to the registration statement pursuant to which the Class A Common Stock was to be registered by such Redeeming Member at or immediately following the Redemption shall have been issued by the SEC;

40

(vi)        there shall have occurred a material disruption in the securities markets generally or in the market or markets in which the Class A Common Stock is then traded;

(vii)       there shall be in effect an injunction, a restraining order or a decree of any nature of any Governmental Authority that restrains or prohibits the Redemption; or

(viii)      PubCo shall have failed to comply in all material respects with its obligations under the Registration Rights Agreement, and such failure shall have affected the ability of such Redeeming Member to consummate the resale of Class A Common Stock to be received upon such Redemption pursuant to an effective registration statement; or

(ix)        the Redemption Date would occur three (3) Business Days or less prior to, or during, a Black-Out Period.

(c)        If the Election Notice specifies a Share Settlement, unless the Redeeming Member has revoked the applicable Redemption as provided in Section 9.01(b), PubCo shall settle such Redemption on the Redemption Date by Transferring the Share Settlement directly to the Redeeming Member in exchange for the Redeemed Units (a "Direct Redemption"). In connection with a Direct Redemption, on the Redemption Date (to be effective immediately prior to the close of business on the Redemption Date), (1) the Redeeming Member shall Transfer and surrender, free and clear of all liens and encumbrances the Redeemed Units and an equal number of shares of Class B Common Stock to PubCo; (2) PubCo shall Transfer to the Redeeming Member (or other Person(s) whose name or names in which the Share Settlement is to be issued) the Share Settlement; (3) PubCo shall cancel and retire for no consideration such shares of Class B Common Stock and (4) the Company shall register PubCo as the owner of the Redeemed Units and, if the Redeemed Units are certificated, shall issue to the Redeeming Member a certificate for a number of Common Units equal to the difference (if any) between the number of Common Units evidenced by the certificate surrendered by the Redeeming Member pursuant to clause (1) of this Section 9.01(c) and the Redeemed Units. In furtherance of the foregoing, each of the Company, and the Redeeming Member shall take all actions reasonably requested by PubCo to effect the transactions contemplated by this Section 9.01(c), including executing and delivering any document reasonably requested by PubCo in connection therewith.

(d)        The number of shares of Class A Common Stock applicable to any Share Settlement or Cash Settlement shall not be adjusted on account of dividends previously paid with respect to Class A Common Stock or cash or cash equivalents held by PubCo or on account of Tax Distributions previously paid by the Company in respect of the Redeemed Units; provided, however, that if a Redeeming Member causes the Company to redeem Redeemed Units and the Redemption Date occurs subsequent to the record date for any distribution with respect to the Redeemed Units but prior to payment of such distribution, the Redeeming Member shall be entitled to receive such distribution with respect to the Redeemed Units on the date that it is made notwithstanding that the Redeeming Member Transferred and surrendered the Redeemed Units to the Company prior to such date; provided, further, however, that a Redeeming Member shall be entitled to receive any and all Tax Distributions that such Redeeming Member otherwise would have received in respect of income allocated to such Member for the portion of any Fiscal Year irrespective of whether such Tax Distribution(s) are declared or made after the Redemption Date.

41

(e)         In the case of a Share Settlement, in the event a reclassification or other similar transaction occurs following delivery of a Redemption Notice, but prior to the Redemption Date, as a result of which shares of Class A Common Stock are converted into another security, then a Redeeming Member shall be entitled to receive the amount of such other security that the Redeeming Member would have received if such Redemption Right had been exercised and the Redemption Date had occurred immediately prior to the record date of such reclassification or other similar transaction.

Section 9.02      Reservation of Shares of Class A Common Stock; Listing; Certificate of PubCo, etc.

(a)         At all times PubCo shall reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon a Share Settlement in a Redemption such number of shares of Class A Common Stock as shall be issuable upon any such Redemption; provided, that nothing contained herein shall be construed to preclude PubCo from satisfying its obligations in respect of any such Redemption by delivery of purchased Class A Common Stock (which may or may not be held in the treasury of PubCo). PubCo shall deliver Class A Common Stock that has been registered under the Securities Act with respect to any Redemption in which a Share Settlement is made, to the extent a registration statement is effective and available for such shares. PubCo shall use its commercially reasonable efforts to list the Class A Common Stock required to be delivered upon any such Redemption prior to such delivery upon each national securities exchange upon which the outstanding shares of Class A Common Stock are listed at the time of such Redemption (it being understood that any such shares may be subject to transfer restrictions under applicable securities Laws). PubCo covenants that all Class A Common Stock issued upon a Redemption in which a Share Settlement is made will, upon issuance, be validly issued, fully paid and non-assessable. The provisions of this Article IX shall be interpreted and applied in a manner consistent with any corresponding provisions of PubCo's certificate of incorporation (if any).

(b)         Subject to the terms of the Registration Rights Agreement, PubCo covenants and agrees to deliver shares of the Share Settlement, if requested, pursuant to an effective registration statement under the Securities Act with respect to any Redemption to the extent that a registration statement is effective and available for such shares. In the event that any Redemption in accordance with this Agreement is to be effected at a time when any required registration has not become effective or otherwise is unavailable, upon the request and with the reasonable cooperation of the Redeeming Member requesting such Redemption, PubCo and the Company shall use reasonable best efforts to promptly facilitate such Redemption pursuant to an available exemption from such registration requirements.

(c)         PubCo agrees that it has taken all or will take such steps as may be required to cause to qualify for exemption under Rule 16b-3(d) or (e), as applicable, under the Exchange Act, and to be exempt for purposes of Section 16(b) under the Exchange Act, any acquisitions from, or dispositions to, PubCo of equity securities of PubCo (including derivative securities with respect thereto) and any securities that may be deemed to be equity securities or derivative securities of PubCo for such purposes that result from the transactions contemplated by this Agreement, by each officer or director of PubCo. The authorizing resolutions shall be approved by the PubCo Board.

Section 9.03      Effect of Exercise of Redemption. This Agreement shall continue notwithstanding the consummation of a Redemption and all other rights set forth herein shall be exercised by the remaining Members and the Redeeming Member (to the extent of such Redeeming Member's remaining interest in the Company). No Redemption shall relieve such Redeeming Member of any prior breach of this Agreement.

42

Section 9.04    <u>Tax Treatment</u>. Unless otherwise required by Law, the parties hereto acknowledge and agree that any Redemption (whether effected with a Cash Settlement or a Share Settlement) shall be treated as a direct exchange between PubCo and the Redeeming Member for U.S. federal and applicable state and local income tax purposes.

Section 9.05    <u>Other Redemption Matters</u>.

(a)    Each Redemption shall be deemed to be effective immediately prior to the close of business on the Redemption Date, and, in the case of a Share Settlement, the Redeeming Member (or other Person(s) whose name or names in which the Share Settlement is to be issued) shall be deemed to be a holder of the Equity Securities issued in such Share Settlement, from and after that time, until such Equity Securities have been disposed of. As promptly as practicable on or after the Redemption Date, PubCo shall deliver or cause to be delivered to the Redeeming Member (or other Person(s) whose name or names in which the Share Settlement is to be issued) the number of the Share Settlement deliverable upon such Redemption, registered in the name of such Redeeming Member (or other Person(s) whose name or names in which the Share Settlement is to be issued). To the extent the Share Settlement is settled through the facilities of The Depository Trust Company, PubCo will, upon the written instruction of a Redeeming Member, deliver or cause to be delivered the shares of the Share Settlement deliverable to such Redeeming Member (or other Person(s) whose name or names in which the Share Settlement is to be issued), through the facilities of The Depository Trust Company, to the account of the participant of The Depository Trust Company designated by such Redeeming Member.

(b)    The shares of Share Settlement issued upon a Redemption shall bear a legend in substantially the following form:

THE TRANSFER OF THESE SECURITIES HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION, AND MAY NOT BE SOLD OR TRANSFERRED OTHER THAN IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (OR OTHER APPLICABLE LAW), OR AN EXEMPTION THEREFROM.

(c)    If (i) any shares of the Share Settlement may be sold pursuant to a registration statement that has been declared effective by the Securities and Exchange Commission, (ii) all of the applicable conditions of Rule 144 are met, or (iii) the legend (or a portion thereof) otherwise ceases to be applicable, PubCo, upon the written request of the Redeeming Member thereof shall promptly provide such Redeeming Member or its respective transferees, without any expense to such Persons (other than applicable transfer taxes and similar governmental charges, if any) with new certificates (or evidence of book-entry share) for securities of like tenor not bearing the provisions of the legend with respect to which the restriction has terminated. In connection therewith, such Redeeming Member shall provide PubCo with such information in its possession as PubCo may reasonably request in connection with the removal of any such legend.

43

(d)        PubCo shall bear all of its own expenses in connection with the consummation of any Redemption, whether or not any such Redemption is ultimately consummated, including any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, any Redemption; provided, however, that if any of the Share Settlement is to be delivered in a name other than that of the Redeeming Member that requested the Redemption (or The Depository Trust Company or its nominee for the account of a participant of The Depository Trust Company that will hold the shares for the account of such Redeeming Member), then such Redeeming Member and/or the Person in whose name such shares are to be delivered shall pay to PubCo the amount of any transfer taxes, stamp taxes or duties, or other similar taxes in connection with, or arising by reason of, such Redemption or shall establish to the reasonable satisfaction of PubCo that such tax has been paid or is not payable. The Redeeming Member shall bear all of its own expenses in connection with the consummation of any Redemption (including, for the avoidance of doubt, expenses incurred by such Redeeming Member in connection with any Redemption that are invoiced to the Company).

Section 9.06        PubCo Change of Control; PubCo Approved Recap Transaction.

(a)        In connection with a PubCo Approved Change of Control, PubCo shall have the right, in its sole discretion, to require each Member (other than the AES Member or the Siemens Member, in each case, to the extent the Percentage Interest of such Member at the time in question is at least fifteen percent (15%)) to effect a Redemption of all or a portion of such Member's and all other Members' Units together with an equal number of shares of Class B Common Stock, pursuant to which such Units and such shares of Class B Common Stock will be exchanged for shares of Class A Common Stock (or economically equivalent cash and securities of a successor entity that would be received by holders of shares of Class A Common Stock), *mutatis mutandis*, in accordance with the Redemption provisions of this Article IX (applied for this purpose as if PubCo had delivered an Election Notice that specified a Share Settlement with respect to such exchanges) and otherwise in accordance with this Section 9.06. Any such exchange pursuant to this Section 9.06(a) shall be effective immediately prior to the consummation of the PubCo Approved Change of Control (and, for the avoidance of doubt, shall not be effective if such PubCo Approved Change of Control is not consummated) (the date of such exchange, the "Change of Control Exchange Date"). From and after the Change of Control Exchange Date, (i) the Units and any shares of Class B Common Stock subject to such exchange shall be deemed to be transferred to PubCo on the Change of Control Exchange Date and (ii) each such Member shall cease to have any rights with respect to the Units and any shares of Class B Common Stock subject to such exchange (other than the right to receive shares of Class A Common Stock (or economically equivalent cash or equity securities in a successor entity) pursuant to such exchange, and without limiting any rights in respect of the Tax Receivable Agreement). PubCo shall provide written notice of an expected PubCo Approved Change of Control to all Members within the earlier of (x) five (5) Business Days following the execution of an agreement with respect to such PubCo Approved Change of Control and (y) ten (10) Business Days before the proposed date upon which the contemplated PubCo Approved Change of Control is to be effected, including in such notice such information as may reasonably describe the PubCo Approved Change of Control transaction, subject to Law, including the date of execution of such agreement or such proposed effective date, as applicable, the amount and types of consideration to be paid for shares of Class A Common Stock in the PubCo Approved Change of Control, any election with respect to types of consideration that a holder of shares of Class A Common Stock, as applicable, shall be entitled to make in connection with such PubCo Approved Change of Control (which election shall be available to each Member on the same terms as holders of shares of Class A Common Stock). Following delivery of such notice and on or prior to the Change of Control Exchange Date, the participating Members shall take all actions reasonably requested by PubCo to effect such exchange, including taking any action and delivering any document required pursuant to this Section 9.06 to effect such exchange. In the case of any PubCo Approved Change of Control that was initially proposed by PubCo, PubCo shall use reasonable best efforts to enable and permit the Members to participate in such transaction to the same extent or on an economically equivalent basis as the holders of shares of Class A Common Stock, and to enable such Members to participate in such transaction without being required to exchange Units or shares of Class B Common Stock in connection therewith.

44

(b)          In the event that a tender offer, share exchange offer, issuer bid, take-over bid, recapitalization or similar transaction with respect to all or any portion of shares of PubCo's issued and outstanding Class A Common Stock is proposed by PubCo or PubCo's stockholders and approved by the PubCo Board, or is otherwise consented to or approved by the PubCo board of directors (a "PubCo Approved Recap Transaction"), PubCo shall provide written notice of the PubCo Approved Recap Transaction to all Members within the earlier of (i) five (5) Business Days following the execution of an agreement (if applicable) with respect to, or the commencement of (if applicable), such PubCo Approved Recap Transaction and (ii) ten (10) Business Days before the proposed date upon which the PubCo Approved Recap Transaction is to be effected, including in such notice such information as may reasonably describe the PubCo Approved Recap Transaction, subject to Law, including the date of execution of such agreement (if applicable) or of such commencement (if applicable), the material terms of such PubCo Approved Recap Transaction, including the amount and types of consideration to be received by holders of shares of Class A Common Stock in the PubCo Approved Recap Transaction, any election with respect to types of consideration that a holder of shares of Class A Common Stock, as applicable, shall be entitled to make in connection with such PubCo Approved Recap Transaction, and the number of Units (and the corresponding shares of Class B Common Stock) held by such Member that is applicable to such PubCo Approved Recap Transaction. The Members (other than PubCo) shall be permitted to participate in such offer by delivering a written notice of participation that is effective immediately prior to the consummation of such offer (and that is contingent upon consummation of such offer), and shall include such information necessary for consummation of such offer as requested by PubCo. In the case of any PubCo Approved Recap Transaction that was initially proposed by PubCo, PubCo shall use its reasonable best efforts to enable and permit the Members to participate in such transaction to the same extent or on an economically equivalent basis as the holders of shares of Class A Common Stock, and to enable such Members to participate in such transaction without being required to exchange Units or shares of Class B Common Stock in connection therewith.

ARTICLE X.

LIMITATION ON LIABILITY, EXCULPATION
AND INDEMNIFICATION

Section 10.01    Limitation on Liability. The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company; provided, that the foregoing shall not alter a Member's obligation to return funds wrongfully distributed to it.

Section 10.02    Exculpation and Indemnification.

(a)        Subject to the duties of the Managing Member and the Officers set forth in Section 7.04 and any employment agreement and/or restrictive covenants agreement with the Company as in effect from time to time (collectively, the "Specified Covenants"), neither the Managing Member nor any other Covered Person shall be liable, including under any legal or equitable theory of fiduciary duty or other theory of liability, to the Company or to any other Covered Person for any losses, claims, damages or liabilities incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company. There shall be, and each Covered Person shall be entitled to, a presumption that such Covered Person acted in good faith.

(b)        A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such Person's professional or expert competence.

(c)            (i) The Company shall indemnify, defend and hold harmless each Covered Person against any losses, claims, damages, liabilities, expenses (including all reasonable fees and expenses of counsel), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, in which such Covered Person may be involved or become subject to, in connection with any matter arising out of or in connection with the Company's business or affairs, or this Agreement or any related document, unless such loss, claim, damage, liability, expense, judgment, fine, settlement or other amount is as a result of a Covered Person not acting in good faith on behalf of the Company or arose as a result of the willful commission by such Covered Person of any act that is dishonest and materially injurious to the Company or (ii) results from its contractual obligations under any Transaction Document to be performed in a capacity other than as a Covered Person or results from a breach by such Covered Person of a Specified Covenant. If any Covered Person becomes involved in any capacity in any action, suit, proceeding or investigation in connection with any matter arising out of or in connection with the Company's business or affairs, or this Agreement or any related document (other than any Transaction Document), other than (x) by reason of any act or omission performed or omitted by such Covered Person that was not in good faith on behalf of the Company or constituted a willful commission by such Covered Person of an act that is dishonest and materially injurious to the Company, or (y) as a result of any breach by such Covered Person of a Specified Covenant, the Company shall reimburse such Covered Person for its reasonable legal and other reasonable out-of-pocket expenses (including the cost of any investigation and preparation) as they are incurred in connection therewith; provided, that such Covered Person shall promptly repay to the Company the amount of any such reimbursed expenses paid to it if it shall be finally judicially determined that such Covered Person was not entitled to indemnification by, or contribution from, the Company in connection with such action, suit, proceeding or investigation. If for any reason (other than the bad faith of a Covered Person or the willful commission by such Covered Person of an act that is dishonest and materially injurious to the Company) the foregoing indemnification is unavailable to such Covered Person, or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Covered Person as a result of such loss, claim, damage, liability, expense, judgment, fine, settlement or other amount in such proportion as is appropriate to reflect any relevant equitable considerations. There shall be, and each Covered Person shall be entitled to, a rebuttable presumption that such Covered Person acted in good faith.

46

(i)    The obligations of the Company under this Section 10.02(c) shall be satisfied solely out of and to the extent of the Company's assets, and no Covered Person shall have any personal liability on account thereof.

(ii)    Given that certain Jointly Indemnifiable Claims may arise by reason of the service of a Covered Person to the Company and/or as a director, trustee, officer, partner, member, manager, employee, consultant, fiduciary or agent of other corporations, limited liability companies, partnerships, joint ventures, trusts, employee benefit plans or other enterprises controlled by the Company (collectively, the "Controlled Entities"), or by reason of any action alleged to have been taken or omitted in any such capacity, the Company acknowledges and agrees that the Company shall, and to the extent applicable shall cause the Controlled Entities to, be fully and primarily responsible for the payment to the Covered Person in respect of indemnification or advancement of all out-of-pocket costs of any type or nature whatsoever (including, without limitation, all attorneys' fees and related disbursements) in each case, actually and reasonably incurred by or on behalf of a Covered Person in connection with either the investigation, defense or appeal of a claim, demand, action, suit or proceeding or establishing or enforcing a right to indemnification under this Agreement or otherwise incurred in connection with a claim that is indemnifiable hereunder (collectively, "Expenses") in connection with any such Jointly Indemnifiable Claim, pursuant to and in accordance with (as applicable) the terms of (A) the Delaware Act, (B) this Agreement, (C) any other agreement between the Company or any Controlled Entity and the Covered Person pursuant to which the Covered Person is indemnified, (D) the Laws of the jurisdiction of incorporation or organization of any Controlled Entity and/or (E) the certificate of incorporation, certificate of organization, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership, certificate of qualification or other organizational or governing documents of any Controlled Entity ((A) through (E) collectively, the "Indemnification Sources"), irrespective of any right of recovery the Covered Person may have from the Indemnitee-Related Entities. Under no circumstance shall the Company or any Controlled Entity be entitled to any right of subrogation or contribution by the Indemnitee-Related Entities and no right of advancement or recovery the Covered Person may have from the Indemnitee-Related Entities shall reduce or otherwise alter the rights of the Covered Person or the obligations of the Company or any Controlled Entity under the Indemnification Sources. In the event that any of the Indemnitee-Related Entities shall make any payment to the Covered Person in respect of indemnification or advancement of Expenses with respect to any Jointly Indemnifiable Claim, (x) the Company shall, and to the extent applicable shall cause the Controlled Entities to, reimburse the Indemnitee-Related Entity making such payment to the extent of such payment promptly upon written demand from such Indemnitee-Related Entity, (y) to the extent not previously and fully reimbursed by the Company and/or any Controlled Entity pursuant to clause (x), the Indemnitee-Related Entity making such payment shall be subrogated to the extent of the outstanding balance of such payment to all of the rights of recovery of the Covered Person against the Company and/or any Controlled Entity, as applicable, and (z) the Covered Person shall execute all papers reasonably required and shall do all things that may be reasonably necessary to secure such rights, including the execution of such documents as may be necessary to enable the Indemnitee-Related Entities effectively to bring suit to enforce such rights. The Company and the Covered Person agree that each of the Indemnitee-Related Entities shall be third-party beneficiaries with respect to this Section 10.02(c), entitled to enforce this Section 10.02(c) as though each such Indemnitee-Related Entity were a party to this Agreement. The Company shall cause each of the Controlled Entities to perform the terms and obligations of this Section 10.02(c) as though each such Controlled Entity was the "Company" under this Agreement. For purposes of this Section 10.02(c), the following terms shall have the following meanings:

47

(A)        The term "Indemnitee-Related Entities" means any corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (other than the Company, any Controlled Entity or the insurer under and pursuant to an insurance policy of the Company or any Controlled Entity) from whom a Covered Person may be entitled to indemnification or advancement of Expenses with respect to which, in whole or in part, the Company or any Controlled Entity may also have an indemnification or advancement obligation.

(B)        The term "Jointly Indemnifiable Claims" shall be broadly construed and shall include, without limitation, any claim, demand, action, suit or proceeding for which the Covered Person shall be entitled to indemnification or advancement of Expenses from both (i) the Company and/or any Controlled Entity pursuant to the Indemnification Sources, on the one hand, and (ii) any Indemnitee-Related Entity pursuant to any other agreement between any Indemnitee-Related Entity and the Covered Person pursuant to which the Covered Person is indemnified, the Laws of the jurisdiction of incorporation or organization of any Indemnitee-Related Entity and/or the certificate of incorporation, certificate of organization, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or other organizational or governing documents of any Indemnitee-Related Entity, on the other hand.

ARTICLE XI.

DISSOLUTION AND TERMINATION

Section 11.01    Dissolution.

(a)        The Company shall not be dissolved by the admission of Additional Members or Substitute Members pursuant to Section 3.02.

48

(b)    No Member shall (i) resign from the Company prior to the dissolution and winding up of the Company except in connection with a Transfer of Units pursuant to and in accordance with the terms of this Agreement or (ii) take any action to dissolve, terminate or liquidate the Company or to require apportionment, appraisal or partition of the Company or any of its assets, or to file a bill for an accounting, except as specifically provided in this Agreement, and each Member, to the fullest extent permitted by Law, hereby waives any rights to take any such actions under Law, including any right to petition a court for judicial dissolution under Section 18-802 of the Delaware Act.

(c)    The Company shall be dissolved and its business wound up only upon the earliest to occur of any one of the following events (each a "Dissolution Event"):

(i)    the expiration of forty-five (45) days after the sale or other disposition of all or substantially all the assets of the Company;

(ii)    the decision of the Managing Member, together with any written approval of the AES Member and the Siemens Member required pursuant to the Stockholders Agreement, to dissolve the Company; or

(iii)    the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act, in contravention of this Agreement.

Except as otherwise set forth in this Article XI, the Company is intended to have perpetual existence. An Event of Withdrawal shall not in and of itself cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement. The Members hereby agree that the Company shall not dissolve prior to the occurrence of a Dissolution Event and that no Member shall seek a dissolution of the Company, under Section 18-802 of the Delaware Act or otherwise, other than based on the matters set forth in subsections (i), (ii) and (iii) above. If it is determined by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event, the Members hereby agree to continue the business of the Company without a Liquidation.

(d)    The death, retirement, resignation, expulsion, bankruptcy, insolvency or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member of the Company shall not in and of itself cause dissolution of the Company.

Section 11.02    Winding Up of the Company.

(a)    The Managing Member shall promptly notify the other Members of any Dissolution Event. Upon dissolution, the Company's business shall be liquidated in an orderly manner. The Managing Member shall appoint a liquidating trustee to wind up the affairs of the Company pursuant to this Agreement. In performing its duties, the liquidating trustee is authorized to sell, distribute, exchange or otherwise dispose of the assets of the Company in accordance with the Delaware Act and in any reasonable manner that the liquidating trustee shall determine to be in the best interest of the Members.

(b)        The proceeds of the liquidation of the Company shall be distributed in the following order and priority:

(i)        <u>first</u>, to the creditors (including any Members or their respective Affiliates that are creditors) of the Company in satisfaction of all of the Company's liabilities (whether by payment or by making reasonable provision for payment thereof, including the setting up of any reserves which are, in the judgment of the liquidating trustee, reasonably necessary therefor); and

(ii)        <u>second</u>, to the Members in the same manner as distributions under <u>Section 5.03(b</u>).

(a)        <u>Distribution of Property</u>. In the event it becomes necessary in connection with the Liquidation to make a distribution of Property in-kind, subject to the priority set forth in <u>Section 11.02(b</u>), the liquidating trustee shall have the right to compel each Member, treating each such Member in a substantially similar manner, to accept a distribution of any Property in-kind (with such Property, as a percentage of the total liquidating distributions to such Member), corresponding as nearly as possible to the distributions such Member would receive under <u>Section 11.02(b</u>) with such distribution being based upon the amount of cash that would be distributed to such Members if such Property were sold for an amount of cash equal to the fair market value of such Property, as determined by the liquidating trustee in good faith.

Section 11.03    <u>Termination</u>. The Company shall terminate when all of the assets of the Company, after payment of or reasonable provision for the payment of all debts and liabilities of the Company, shall have been distributed to the Members in the manner provided for in this <u>Article XI</u>, and the Certificate shall have been cancelled in the manner required by the Delaware Act.

Section 11.04    <u>Survival</u>. Termination, dissolution or Liquidation of the Company for any reason shall not release any party from any liability which at the time of such termination, dissolution or Liquidation already had accrued to any other party or which thereafter may accrue in respect to any act or omission prior to such termination, dissolution or Liquidation.

ARTICLE XII.

MISCELLANEOUS

Section 12.01    <u>Expenses</u>. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such cost or expense.

Section 12.02    <u>Further Assurances</u>. Each Member agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be required by Law or as, in the reasonable judgment of the Managing Member, may be necessary or advisable to carry out the intent and purposes of this Agreement.

Section 12.03    <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission and electronic mail ("<u>e-mail</u>") transmission, so long as a receipt of such e-mail is requested and received) and shall be given to such party at the address, facsimile number or e-mail address specified for such party on the Member Schedule hereto or to such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding Business Day in the place of receipt.

50

Section 12.04    <u>Binding Effect; Benefit; Assignment</u>.

(a)    The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

(b)    Except as provided in <u>Article VIII</u>, no Member may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Managing Member.

Section 12.05    <u>Jurisdiction</u>.

(a)    The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby (whether brought by any party or any of its Affiliates or against any party or any of its Affiliates) shall be brought in the Delaware Chancery Court or, if such court shall not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Section 12.03</u> shall be deemed effective service of process on such party.

(b)    EACH OF THE COMPANY AND THE MEMBERS HEREBY IRREVOCABLY DESIGNATES CORPORATION SERVICE COMPANY (IN SUCH CAPACITY, THE "<u>PROCESS AGENT</u>"), WITH AN OFFICE AT 251 LITTLE FALLS DRIVE, WILMINGTON, DELAWARE 19808, AS ITS DESIGNEE, APPOINTEE AND AGENT TO RECEIVE, FOR AND ON ITS BEHALF SERVICE OF PROCESS IN SUCH JURISDICTION IN ANY LEGAL ACTION OR PROCEEDINGS WITH RESPECT TO THIS AGREEMENT OR ANY OTHER AGREEMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT, AND SUCH SERVICE SHALL BE DEEMED COMPLETE UPON DELIVERY THEREOF TO THE PROCESS AGENT; PROVIDED THAT IN THE CASE OF ANY SUCH SERVICE UPON THE PROCESS AGENT, THE PARTY EFFECTING SUCH SERVICE SHALL ALSO DELIVER A COPY THEREOF TO EACH OTHER SUCH PARTY IN THE MANNER PROVIDED IN <u>SECTION 12.03</u> OF THIS AGREEMENT. EACH PARTY SHALL TAKE ALL SUCH ACTION AS MAY BE NECESSARY TO CONTINUE SAID APPOINTMENT IN FULL FORCE AND EFFECT OR TO APPOINT ANOTHER AGENT SO THAT SUCH PARTY SHALL AT ALL TIMES HAVE AN AGENT FOR SERVICE OF PROCESS FOR THE ABOVE PURPOSES IN WILMINGTON, DELAWARE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW. EACH PARTY EXPRESSLY ACKNOWLEDGES THAT THE FOREGOING WAIVER IS INTENDED TO BE IRREVOCABLE UNDER THE LAWS OF THE STATE OF DELAWARE AND OF THE UNITED STATES OF AMERICA.

51

Section 12.06    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.07    Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

Section 12.08    Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement. Nothing in this Agreement shall create any third-party beneficiary rights in favor of any Person or other party, except to the extent provided herein with respect to Indemnitee-Related Entities, each of whom are intended third-party beneficiaries of those provisions that specifically relate to them with the right to enforce such provisions as if they were a party hereto.

Section 12.09    Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

Section 12.10    <u>Amendment</u>.

(a)    This Agreement can be amended at any time and from time to time by the written consent of the Managing Member; provided, however, that any proposed amendment that adversely modifies in any material respect the Common Units (or the rights, preferences or privileges of the Common Units) then held by any Members in any materially disproportionate manner to those then held by any other Members will require the prior written consent of a majority in interest of such disproportionately affected Member or Members; provided further, that notwithstanding the foregoing, no amendment, including any amendment effected by way of merger, consolidation or transfer of all or substantially all the assets of the Company, may adversely affect the rights in any material respect of (i) the AES Member without the consent of the AES Member or (ii) the Siemens Member without the consent of the Siemens Member. For the avoidance of doubt, the Managing Member, acting alone, may amend this Agreement, including the Schedule of Members, to reflect to reflect the admission of new Members or Transfers of Units, each as provided by and in accordance with, the terms of this Agreement.

(b)    No waiver of any provision or default under, nor consent to any exception to, the terms of this Agreement or any agreement contemplated hereby shall be effective unless in writing and signed by the party to be bound and then only to the specific purpose, extent and instance so provided.

Section 12.11    <u>Confidentiality</u>.

(a)    Each of the Members (other than PubCo) agrees to hold the Company's Confidential Information in confidence and may not disclose or use such information except as otherwise authorized separately in writing by the Managing Member. "<u>Confidential Information</u>" as used herein includes all non-public information concerning the Company or its Subsidiaries including, but not limited to, ideas, financial product structuring, business strategies, innovations and materials, all aspects of the Company's business plan, proposed operation and products, corporate structure, financial and organizational information, analyses, proposed partners, software code and system and product designs, employees and their identities, equity ownership, the methods and means by which the Company plans to conduct its business, all trade secrets, trademarks, tradenames and all intellectual property associated with the Company's business. With respect to each Member to which these provisions apply, Confidential Information does not include information or material that: (a) is rightfully in the possession of such Member at the time of disclosure by the Company; (b) before or after it has been disclosed to such Member by the Company, becomes part of public knowledge, not as a result of any action or inaction of such Member in violation of this Agreement; (c) is approved for release by written authorization of the Chief Executive Officer, Chief Financial Officer or General Counsel of the Company or of PubCo, or any other Officer designated by the Managing Member; (d) is disclosed to such Member or their representatives by a third party not, to the knowledge of such Member, in violation of any obligation of confidentiality owed to the Company with respect to such information; or (e) is or becomes independently developed by such Member or their respective representatives without use of or reference to the Confidential Information.

(b)    Solely to the extent it is reasonably necessary or appropriate to fulfill its obligations or to exercise its rights under this Agreement, each of the Members may disclose Confidential Information to its Subsidiaries, Affiliates, partners, directors, officers, employees, counsel, advisers, consultants, outside contractors and other agents, on the condition that such Persons keep the Confidential Information confidential to the same extent as such Member is required to keep the Confidential Information confidential; *provided*, that such Member shall remain liable with respect to any breach of this <u>Section 12.11</u> by any such Subsidiaries, Affiliates, partners, directors, officers, employees, counsel, advisers, consultants, outside contractors and other agents (as if such Persons were party to this Agreement for purposes of this <u>Section 12.11</u>).

(c)        Notwithstanding <u>Section 12.11(a)</u> or <u>Section 12.11(b)</u>, each of the Members may disclose Confidential Information (i) to the extent that such Member is required by Law (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, (ii) for purposes of reporting to its stockholders and direct and indirect equity holders (each of whom are bound by customary confidentiality obligations) the performance of the Company and its Subsidiaries and for purposes of including applicable information in its financial statements to the extent required by applicable Law or applicable accounting standards; or (iii) to any *bona fide* prospective purchaser of the equity or assets of a Member, or the Common Units held by such Member (*provided*, in each case, that such Member determines in good faith that such prospective purchaser would be a Permitted Transferee), or a prospective merger partner of such Member (*provided*, that such Persons will be informed by such Member of the confidential nature of such information and shall agree in writing to keep such information confidential in accordance with the contents of this Agreement). Notwithstanding any of the foregoing, nothing in this <u>Section 12.11</u> will restrict in any manner the ability of PubCo to comply with its disclosure obligations under Law, and the extent to which any Confidential Information is necessary or desirable to disclose.

Section 12.12    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to the conflicts of law rules of such State that would result in the application of the Laws of any other State.

Section 12.13    <u>No Presumption</u>. With regard to each and every term and condition of this Agreement, the parties hereto understand and agree that the same have or has been mutually negotiated, prepared and drafted, and if at any time the parties hereto desire or are required to interpret or construe any such term or condition, no consideration will be given to the issue of which party hereto actually prepared, drafted or requested any term or condition of this Agreement.

Section 12.14    <u>Attorney-In-Fact</u>. Each Member (other than any Member that is entitled to appoint a director to the PubCo Board) hereby appoints the Company as such Member's attorney-in-fact (with full power of substitution) and hereby authorizes the Company to the execute and deliver in such Member's name and on its behalf any amendment of this Agreement or other document relating hereto in furtherance of such Member's rights and obligations pursuant to this Agreement. Each such Member hereby acknowledges and agrees that such proxy is coupled with an interest and shall not terminate upon any bankruptcy, dissolution, liquidation, death or incapacity of such Member.

Section 12.15    <u>Immunity Waiver</u>. Each Member acknowledges that it is a commercial entity and is a separate entity distinct from its ultimate shareholders and/or the executive organs of the government of any state and is capable of suing and being sued. The entry by each Member into this Agreement constitutes, and the exercise by each Member of its respective rights and performance of its respective obligations hereunder will constitute, private and commercial acts performed for private and commercial purposes that shall not be deemed as being entered into in the exercise of any public function.

<div align="center">54</div>

Section 12.16  <u>Specific Performance</u>. It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that, in the event of any such failure, an aggrieved Member or other party or third-party beneficiary specified in <u>Section 12.08</u> will be irreparably damaged and will not have an adequate remedy at Law. Any such Person shall, therefore, be entitled (in addition to any other remedy to which such party may be entitled at Law or in equity) to injunctive relief, including specific performance, to enforce such obligations, without the posting of any bond and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the Company or Members shall raise the defense that there is an adequate remedy at Law.

[**signature pages follow**]

55

IN WITNESS WHEREOF, the parties hereto have caused this Third Amended and Restated Limited Liability Company Agreement to be duly executed as of the day and year first written above.

**FLUENCE ENERGY, LLC**

By: _____
Name:
Title:

**FLUENCE ENERGY, INC.**

By: _____
Name:
Title:

**AES GRID STABILITY, LLC**

By: _____
Name:
Title:

**SIEMENS INDUSTRY, INC.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**QIA FLORENCE HOLDING LLC.**

By: _____
Name:
Title:

[Signature Page to the Third Amended and Restated
Limited Liability Company Agreement of Fluence Energy, LLC]

**Schedule A**

**SCHEDULE OF MEMBERS**

| NAME AND ADDRESS OF MEMBER | NUMBER OF ORIGINAL UNITS | NUMBER OF COMMON UNITS |
|---|---|---|
| **AES Grid Stability, LLC**<br>4300 Wilson Boulevard<br>Suite 1100<br>Arlington, VA 22203<br>Attention: Paul Freedman, General Counsel of The AES Corporation<br>Email: paul.freedman@aes.com | 3,960,000 Class A Units | [●] |
| **Siemens Industry, Inc.**<br>4800 North Point Parkway<br>Alpharetta, GA 30005<br>Attention: Craig Langley<br>Email: langley.craig@siemens.com | 3,960,000 Class A Units | [●] |
| **Fluence Energy, Inc.**<br>4601 N. Fairfax Drive, Suite 600<br>Arlington, VA 22203<br>Attention: Manuel Perez Dubuc<br>Email: manuel.perez@fluenceenergy.com | 1,250,000 Class B Units | [●] |

**STOCKHOLDERS AGREEMENT OF**
**FLUENCE ENERGY, INC.**

This STOCKHOLDERS AGREEMENT (as the same may be amended from time to time in accordance with its terms, the "Agreement") is entered into as of [•], 2021, by and among (i) Fluence Energy, Inc., a Delaware corporation (the "Corporation"); (ii) AES Grid Stability, LLC ("AES"), a limited liability company duly organized and validly existing under the laws of Delaware; (iii) Siemens Industry, Inc. ("Siemens"), a corporation duly organized and validly existing under the laws of Delaware, (iv) Qatar Holding LLC ("QIA"), and (v) any other Person who becomes a party hereto pursuant to Section 11 (each a "Stockholder" and, collectively, the "Stockholders"). Certain terms used in this Agreement are defined in Section 7.

**RECITALS**

**WHEREAS**, each of Fluence Energy, Inc., AES and Siemens owns, directly or indirectly, outstanding membership interests in Fluence Energy, LLC, a Delaware limited liability company ("Fluence LLC"), which membership interests constitute and are defined as "Common Units" pursuant to the Third Amended and Restated Limited Liability Company Agreement of Fluence LLC, dated as of [•], 2021, as such agreement may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "LLC Agreement" and such membership interests, the "Common Units");

**WHEREAS**, the Corporation is contemplating an offering and sale of the shares of Class A common stock, par value $0.00001 per share, of the Corporation (the "Class A Common Stock") in an underwritten initial public offering (the "IPO") and using a portion of the net proceeds received from the IPO to purchase Common Units;

**WHEREAS**, pursuant to that certain Common Unit Subscription Agreement by and between the Corporation and Fluence LLC, dated as of [•], 2021 (the "Common Unit Subscription Agreement"), the Corporation will hold Common Units;

**WHEREAS**, upon consummation of the transactions contemplated by the Common Unit Subscription Agreement, it is contemplated that the Corporation will be admitted as a member, and appointed as the sole managing member, of Fluence LLC;

**WHEREAS**, in connection with, and prior to, the issuance of Class A Common Stock of the Corporation to the underwriters in its initial public offering, it is anticipated that (a) AES, Siemens and the Corporation will enter into a series of related transactions pursuant to which AES and Siemens will become holders of the Corporation's Class B-1 Common Stock, par value $0.00001 per share (together with any Class B-2 Common Stock, the "Class B Stock") and (b) QIA shall, through the recapitalization of Fluence LLC contemplated by the LLC Agreement and certain related transactions, become a holder of shares of Class A Common Stock;

**WHEREAS**, immediately following the issuance of Class A Common Stock of the Corporation to the underwriters in its initial public offering, AES (together with its Permitted Transferees, in such capacity, the "AES Related Parties") will be the record holder of shares of Class B Stock;

**WHEREAS**, immediately following the issuance of Class A Common Stock of the Corporation to the underwriters in its initial public offering, Siemens (and together with its Permitted Transferees, in such capacity, the "Siemens Related Parties") will be the record holders of shares of Class B Stock;

**WHEREAS,** immediately following the issuance of Class A Common Stock of the Corporation to the underwriters in its initial public offering, QIA (and together with its Permitted Transferees, in such capacity, the "QIA Related Parties") will be the record holders of shares of Class A Common Stock; and

**WHEREAS**, in order to induce AES and Siemens (x) to approve the sale and issuance of Common Units by Fluence LLC to the Corporation and the appointment of the Corporation as the sole managing member of Fluence LLC in connection with the IPO and (y) to take certain other actions as shall be necessary to effectuate the transactions contemplated by the IPO, the parties hereto desire to set forth their agreement with respect to the matters set forth herein in connection with their respective investments in the Corporation.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Corporation, AES, Siemens and QIA agree as follows:

**AGREEMENT**

Section 1.         Election of the Board of Directors.

(a)         Subject to this Section 1(a), the AES Related Parties shall be entitled to designate for nomination by the Board up to three (3) Directors from time to time (any Director designated by the AES Related Parties, a "AES Director"). The right of the AES Related Parties to designate for nomination the AES Directors as set forth in this Section 1(a) shall be subject to the following: (i) if at any time the AES Related Parties Beneficially Own, directly or indirectly, in the aggregate twenty percent (20%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), the AES Related Parties shall be entitled to designate for nomination three (3) AES Directors, (ii) if at any time the AES Related Parties Beneficially Own, directly or indirectly, in the aggregate less than twenty percent (20%) but at least ten percent (10%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), the AES Related Parties shall only be entitled to designate for nomination two (2) AES Directors, and (iii) if at any time the AES Related Parties Beneficially Own, directly or indirectly, in the aggregate less than ten percent (10%) but at least five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), the AES Related Parties shall only be entitled to designate for nomination one (1) AES Director. The AES Related Parties shall not be entitled to designate for nomination any AES Directors in accordance with this Section 1(a) if at any time the AES Related Parties Beneficially Own, directly or indirectly, in the aggregate less than five percent (5%) of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares).

2

(b)        Subject to this <u>Section 1(b)</u>, the Siemens Related Parties shall be entitled to designate for nomination by the Board up to three (3) Directors from time to time (any Director designated by the Siemens Related Parties, a "<u>Siemens Director</u>"). The right of the Siemens Related Parties to designate for nomination the Siemens Directors as set forth in this <u>Section 1(b)</u> shall be subject to the following: (i) if at any time the Siemens Related Parties Beneficially Own, directly or indirectly, in the aggregate twenty percent (20%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), the Siemens Related Parties shall be entitled to designate for nomination three (3) Siemens Directors, (ii) if at any time the Siemens Related Parties Beneficially Own, directly or indirectly, in the aggregate less than twenty percent (20%) but at least ten percent (10%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), the Siemens Related Parties shall only be entitled to designate for nomination two (2) Siemens Directors and (iii) if at any time the Siemens Related Parties Beneficially Own, directly or indirectly, in the aggregate less than ten percent (10%) but at least five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), the Siemens Related Parties shall only be entitled to designate for nomination one (1) Siemens Director. The Siemens Related Parties shall not be entitled to designate for nomination any Siemens Directors in accordance with this <u>Section 1(b)</u> if at any time the Siemens Related Parties Beneficially Own, directly or indirectly, in the aggregate less than five percent (5%) of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares).

(c)        Subject to this <u>Section 1(c)</u>, the QIA Related Parties shall be entitled to designate for nomination by the Board one (1) Director from time to time (any Director designated by the QIA Related Parties, a "<u>QIA Director</u>") if at any time the QIA Related Parties Beneficially Own, directly or indirectly, in the aggregate five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares). The QIA Related Parties shall not be entitled to designate for nomination a QIA Director in accordance with this <u>Section 1(c)</u> if at any time the QIA Related Parties Beneficially Own, directly or indirectly, in the aggregate less than five percent (5%) of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares).

(d)        Subject to <u>Section 1(a)</u>, <u>Section 1(b)</u> and <u>Section 1(c)</u>, as of the date hereof, each of AES, Siemens and QIA hereby agree to vote, or cause to be voted, all outstanding shares of Class A Common Stock and Class B Stock, as applicable, held by the AES Related Parties, Siemens Related Parties and QIA Related Parties as of the date hereof, at any annual or special meeting of stockholders of the Corporation at which Directors of the Corporation are to be elected or removed, or to take all Necessary Action to cause the election or removal of the AES Directors, Siemens Directors and QIA Director as a Director, as provided herein and to implement and enforce the provisions set forth in <u>Section 3</u>.

(e)        So long as the Corporation qualifies as a "controlled company" for purposes of Stock Exchange rules, the Corporation may elect to be a "controlled company" for purposes of Stock Exchange rules, and will disclose in its annual meeting proxy statement that it is a "controlled company" and the basis for that determination. If the Corporation ceases to qualify as a "controlled company" for purposes of Stock Exchange rules, each Stockholder and the Corporation will take whatever Necessary Action may be reasonably necessary in relation to such party, if any, to cause the Corporation to comply with Stock Exchange rules as then in effect within the timeframe for compliance available under such rules.

<div align="center">3</div>

Section 2.        Vacancies and Replacements.

(a)        If the number of Directors that the AES Related Parties, Siemens Related Parties or the QIA Related Parties have the right to designate for nomination to the Board is decreased pursuant to Section 1(a), Section 1(b) or Section 1(c) (each such occurrence, a "Decrease in Designation Rights"), then:

(i)        unless a majority of Directors (with the affected party's Board designees abstaining) agree in writing that a Director or Directors shall not resign as a result of a Decrease in Designation Rights, each of the AES Related Parties, Siemens Related Parties or the QIA Related Parties, as applicable, shall use its reasonable best efforts to cause each of (x) the appropriate number of AES Directors that the AES Related Parties cease to have the right to designate for nomination to serve as a AES Director, (y) the appropriate number of Siemens Directors that the Siemens Related Parties cease to have the right to designate for nomination to serve as a Siemens Director or (y) the QIA Director that the QIA Related Parties cease to have the right to designate for nomination to serve as the QIA Director, respectively, to offer to tender his, her or their resignation(s), and each of such AES Directors, Siemens Directors or QIA Director so tendering a resignation, as applicable, shall resign within thirty (30) days from the date that the AES Related Parties, Siemens Related Parties and/or the QIA Related Parties, as applicable, incurs a Decrease in Designation Rights. In the event any such AES Director, Siemens Director or QIA Director, as applicable, does not resign as a Director by such time as is required by the foregoing, the AES Related Parties, Siemens Related Parties and the QIA Related Parties, as holders of Class A Common Stock and Class B Stock, the Corporation and the Board, to the fullest extent permitted by law and, with respect to the Board, subject to its fiduciary duties, shall thereafter take all Necessary Action, including voting in accordance with Section 1(d), to cause the removal of such individual as a Director; and

(ii)        the vacancy or vacancies created by such resignation(s) and/or removal(s) shall be filled with one or more Directors, as applicable, designated by the Board upon the recommendation of the Nominating and Corporate Governance Committee (with the affected party's Board designees abstaining), so long as it is established; *provided*, that the Board, upon the recommendation of the Nominating and Corporate Governance Committee (with the affected party's Board designees abstaining), may decline to fill such vacancy or vacancies and elect instead to reduce the total number of Directors constituting the full Board correspondingly; *provided* in no event shall the total number of Directors constituting the full Board be fewer than nine (9).

4

(b)        Each of the AES Related Parties, Siemens Related Parties and the QIA Related Parties shall have the sole right to request that one or more of their respective designated Directors, as applicable, tender their resignations as Directors of the Board (each, a "Removal Right"), in each case, with or without cause at any time, by sending a written notice to such Director and the Corporation's Secretary stating the name of the Director or Directors whose resignation from the Board is requested (the "Removal Notice"). If the Director subject to such Removal Notice does not resign within thirty (30) days from receipt thereof by such Director, the AES Related Parties, Siemens Related Parties and the QIA Related Parties, as holders of Class A Common Stock and Class B Stock, the Corporation and the Board, to the fullest extent permitted by law and, with respect to the Board, subject to its fiduciary duties to the Corporation's stockholders, shall thereafter take all Necessary Action, including voting in accordance with Section 1(d) to cause the removal of such Director from the Board (and such Director shall only be removed by the parties to this Agreement in such manner as provided herein).

(c)        Except with respect to a Decrease in Designation Rights subject to Section 2(a), each of the AES Related Parties, Siemens Related Parties and the QIA Related Parties, as applicable, shall have the exclusive right to designate for nomination a replacement Director for nomination or election by the Board to fill vacancies created as a result of not designating their respective Directors initially or by death, disability, retirement, resignation, removal (with or without cause) of their respective Directors, or otherwise by designating a successor for nomination or election by the Board to fill the vacancy of their respective Directors created thereby on the terms and subject to the conditions of Section 1 whereupon the Corporation and the Board, to the fullest extent permitted by law and, with respect to the Board, subject to its fiduciary duties, shall take all Necessary Action to cause such designee to be elected or appointed by the Board to fill such vacancy.

Section 3.        Initial Directors and Corporate Governance.

(a)        Initial Directors. The initial AES Directors pursuant to Section 1(a) shall initially be Julian Nebreda, Lisa Krueger and John Shelton. The initial Siemens Directors pursuant to Section 1(b) shall initially be Axel Meier, Barbara Humpton and Emma Falck. The initial QIA Director pursuant to Section 1(c) shall initially be Simon James Smith. Herman Bulls shall serve as the initial Chairperson of the Board (as defined in the Bylaws) for the initial term, in accordance with this Agreement and the Bylaws, after which the Chairperson of the Board shall be determined in accordance with this Agreement and the Bylaws.

(b)        Nominating Committee. For so long as the AES Related Parties have the ability pursuant to Section 1(a) to designate for nomination at least one (1) Director, the AES Related Parties shall have, to the fullest extent permitted by applicable law, subject to the Stock Exchange rules and in compliance with other applicable laws, rules and regulations, and subject to the requirements of the charter for the Nominating and Corporate Governance Committee, the right, but not the obligation, to designate one (1) member of the Nominating and Corporate Governance Committee. For so long as the Siemens Related Parties have the ability pursuant to Section 1(b) to designate for nomination at least one (1) Director, the Siemens Related Parties shall have, to the fullest extent permitted by applicable law, subject to the Stock Exchange rules and in compliance with other applicable laws, rules and regulations, and subject to the requirements of the charter for the Nominating and Corporate Governance Committee, the right, but not the obligation, to designate one (1) member of the Nominating and Corporate Governance Committee.

(c)        Chief Executive Officer. Immediately following the consummation of the IPO, the Chief Executive Officer of the Corporation shall be Manuel Perez Dubuc.

(d)        Other Rights of AES Directors, Siemens Directors and QIA Directors.

(i)        Each AES Director, Siemens Director and QIA Director serving on the Board shall be entitled to the same rights and privileges applicable to all other members of the Board generally or to which all such members of the Board are entitled. In furtherance of the foregoing, the Corporation shall indemnify, exculpate, and reimburse fees and expenses of each AES Director, Siemens Director and QIA Director (including by entering into an indemnification agreement in a form substantially similar to the Corporation's form director indemnification agreement) and provide each AES Director, Siemens Director and QIA Director with director and officer insurance to the same extent it indemnifies, exculpates, reimburses and provides insurance for the other members of the Board pursuant to the certificate of incorporation or bylaws of the Corporation, applicable law or otherwise.

(ii)        The AES Directors and Siemens Directors shall, each respectively, have the right to review and to approve the Corporation's annual business plan and annual capital expenditure and operating budget (collectively, the "Budget") prior to the implementation by the Corporation of the Budget. In the event that the Board of Directors fails to approve a Budget for any Fiscal Year prior to the first day of such Fiscal Year, (i) any items of the proposed Budget that have been approved will become operative, and (ii) the approved Budget for the immediately preceding Fiscal Year shall continue in effect after giving effect to any dispositions or other material changes to the business, subject to a fifteen percent (15%) year-over-year increase with respect to overhead and fixed costs.

Section 4.        Rights of the AES, Siemens and QIA Stockholders.

(a)        In addition to any voting requirements contained in the organizational documents of the Corporation or any of its Subsidiaries, the Corporation shall not take, and shall cause Fluence LLC and its Subsidiaries not to take, any of the following actions (whether by merger, consolidation or otherwise) without the prior written approval of (i) the AES Related Parties as long as they Beneficially Own, directly or indirectly, in the aggregate ten percent (10%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares) and (ii) the Siemens Related Parties for as long as they Beneficially Own, directly or indirectly, in the aggregate ten percent (10%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares):

(i)        any buyback, purchase, repurchase, redemption or other acquisition by the Corporation or Fluence LLC of any of the securities of the Corporation, Fluence LLC or any of their respective Subsidiaries, other than repurchases made pursuant to any incentive plan adopted by the Board and stockholders of the Corporation, or in connection with any redemption or exchange of Common Units as set forth in the LLC Agreement, or other than in connection with buybacks, purchases, repurchases, redemptions or other acquisitions by the Corporation or Fluence LLC of any of the securities of the Corporation, Fluence LLC or any of their respective Subsidiaries that are available to all equity holders of such entity *pro rata* to their then-existing equity holdings in such entity;

6

(ii)        the creation of a new class or series of capital stock or equity securities of the Corporation, Fluence LLC or any of their respective Subsidiaries; *provided* that this clause shall not prohibit Fluence LLC from causing any of its direct or indirect wholly-owned Subsidiaries from revising the capitalization of such direct or indirect wholly-owned Subsidiaries in the ordinary course of business and that such new class or series of equity securities is held by Fluence LLC or its wholly-owned Subsidiaries; or

(iii)        any issuance of additional shares of Class A Common Stock, Class B Stock, or other equity securities of the Corporation, Fluence LLC or any of their respective Subsidiaries after the date hereof, other than (1) any issuance of additional shares of Class A Common Stock or other equity securities of the Corporation or its Subsidiaries (i) under any stock option or other equity compensation plan of the Corporation or any of its Subsidiaries approved by the Board or the compensation committee of the Board or (ii) in connection with any redemption of Common Units as set forth in the LLC Agreement; or (2) any issuance of equity securities by the direct or indirect wholly-owned Subsidiaries of Fluence LLC to Fluence LLC or to other wholly-owned Subsidiaries of Fluence LLC.

Notwithstanding anything in the organizational documents of the Corporation to the contrary, each of (i) the Siemens Related Parties for as long as the Siemens Related Parties Beneficially Own, directly or indirectly, in the aggregate ten percent (10%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares) and (ii) the AES Related Parties for as long as the AES Related Parties Beneficially Own, directly or indirectly, in the aggregate ten percent (10%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares), shall have the right to call a special meeting of stockholders of the Corporation for any purpose.

(b)        In addition to any voting requirements contained in the organizational documents of the Corporation or any of its Subsidiaries, the Corporation shall not take, and shall cause Fluence LLC and its Subsidiaries not to take, any of the following actions (whether by merger, consolidation or otherwise) without the prior written approval of (i) the AES Related Parties as long as they Beneficially Own, directly or indirectly, in the aggregate five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares) and (ii) the Siemens Related Parties for as long as they Beneficially Own, directly or indirectly, in the aggregate of five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares):

(i)        the appointment of the Company Representative under (and as defined in) the LLC Agreement, the making of any tax election outside the ordinary course of business, or any change or revocation of any material tax election, or any election to classify Fluence LLC or any Subsidiary thereof as a corporation for federal income tax purposes; or

7

(ii)     the (x) resignation, replacement or removal of the Corporation as the sole manager of Fluence LLC or (y) appointment of any additional Person as a manager of Fluence LLC.

(c)     In addition to any voting requirements contained in the organizational documents of the Corporation or any of its Subsidiaries, the Corporation shall not take, and shall cause Fluence LLC and its Subsidiaries not to take, any of the following actions (whether by merger, consolidation or otherwise) without the prior written approval of (i) the AES Related Parties as long as they Beneficially Own, directly or indirectly, in the aggregate five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares), (ii) the Siemens Related Parties for as long as they Beneficially Own, directly or indirectly, in the aggregate of five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares) and (iii) the QIA Related Parties for as long as they Beneficially Own, directly or indirectly, in the aggregate five percent (5%) or more of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares):

(i)     any increase or decrease of the size of the Board;

(ii)     the reorganization, recapitalization, voluntary bankruptcy, liquidation, dissolution or winding-up of the Corporation, Fluence LLC or any of their respective Subsidiaries; or

(iii)     any amendment or modification of this Agreement or the organizational documents of the Corporation, Fluence LLC or any Subsidiary that would adversely modify the rights, preferences or privileges of any of AES, Siemens or QIA in a materially disproportionate manner to the non-affected stockholders among AES, Siemens or QIA.

(d)     Tag-Along Rights. If during the three (3) year period commencing on the date of this Agreement:

(i)     either the AES Related Parties or the Siemens Related Parties (each in such capacity, an "Initiating Stockholder") (x) desires to Transfer (as defined in the LLC Agreement) to any Person (other than their respective Affiliates or to the Corporation) (a "Third Party") one hundred percent (100%) of its shares of Class A Common Stock, if any, and Common Units (in the case of Common Units, together with the applicable shares of Class B Stock) and (y) such shares of Class A Common Stock and Common Units being sold to such Third Party (the "Subject Securities") represent less than twenty percent (20%) of the aggregate issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), then (A) the Initiating Stockholder may sell such Subject Securities to the Third Party, (B) the Initiating Stockholder is not permitted to assign or transfer any of its rights under this Agreement to such Third Party and (C) the QIA Related Parties shall not have any right to participate in such sale to such Third Party pursuant to this Section 4(d)(i);

8

(ii)        either Initiating Stockholder desires to Transfer (as defined in the LLC Agreement) to a Third Party, one hundred percent (100%) of its Subject Securities and such Subject Securities represent twenty percent (20%) or more of the aggregate issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), then the Initiating Stockholder may, in its sole discretion, (1) elect to (x) Transfer its Subject Securities and (y) transfer or assign its rights under this Agreement to such Third Party, provided that in connection with such Transfer, such Initiating Stockholders shall provide the QIA Related Parties with the right to participate in the sale of such Subject Securities and sell one hundred percent (100%) of their shares of Class A Common Stock pursuant to Sections 4(d)(v), (vi) and (vii) (the rights of the QIA Related Parties to participate in any Transfer of Subject Securities under this Section 4(d) shall be referred to as the "Tag Along Rights") or (2) Transfer the Subject Securities to the Third Party without transferring or assigning its rights under this Agreement, in which case the QIA Related Parties will not have any Tag Along Rights. In respect of clause (1) herein, the applicable Initiating Stockholder shall use its reasonable best efforts to cause the Third Party purchaser to acquire the applicable shares of Class A Common Stock of the QIA Related Parties pursuant to the terms of this Section 4(d); provided that, if such Third Party elects not to acquire such shares of Class A Common Stock of the QIA Related Parties, (A) the applicable Initiating Stockholder shall not be permitted to transfer or assign its rights under this Agreement to such Third Party and (B) the QIA Related Parties will not have any Tag Along Rights;

(iii)       both Initiating Stockholders desire collectively to Transfer (as defined in the LLC Agreement) to a Third Party a number of their Subject Securities representing (x) less than one hundred percent (100%) of such Initiating Stockholder's Subject Securities and (y) thirty percent (30%) or greater of the aggregate issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), then (1) the Initiating Stockholders shall not be permitted to assign their rights under this Agreement to the Third Party, and (2) the QIA Related Parties shall have the Tag Along Rights with respect to a sale of a pro rata portion of their Class A Common in the sale of such Subject Securities pursuant to the terms of this Section 4(d);

(iv)       both Initiating Stockholders desire collectively to Transfer (as defined in the LLC Agreement) to a Third Party one hundred percent (100%) of their Subject Securities and such Subject Securities represent thirty percent (30%) or greater of the aggregate issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares), then the Initiating Stockholders (x) may Transfer their collective Subject Securities to the Third Party and (y) may assign their respective rights under this Agreement to such Third Party and (z) shall provide the QIA Related Parties with the Tag Along Rights and the ability to participate in the sale of such Subject Securities and sell one hundred percent (100%) of their shares of Class A Common Stock pursuant to the terms of this Section 4(d);

(v)        Prior to any proposed sale of the Subject Securities by the Initiating Stockholders to a Third Party to which Tag Along Rights apply as set forth in Section 4(d)(ii) through Section 4(d)(iv), the applicable Initiating Stockholder shall provide the QIA Related Parties with a written notice (the "Tag Along Notice"), which shall include (i) the identity of the prospective purchaser (the "Prospective Purchaser"), (ii) the number of the Subject Securities proposed to be sold by the Initiating Stockholders, (iii) the per share consideration and the material terms and conditions upon which the proposed sale is to be made, and (iv) the number of the Subject Securities held by the applicable Initiating Stockholders to be included in such Tag Along Transfer, expressed as a percentage of their aggregate holdings (the "Tag Percentage");

9

(vi)        Following receipt of a Tag Along Notice hereunder, the QIA Related Parties, in their sole discretion, will have ten (10) business days to exercise, by delivery of written notice to the Initiating Stockholders (the "Tag Election"), the right to sell to the Prospective Purchaser a number of shares of Class A Common Stock up to the product of the total number of Class A Common Stock held by the QIA Related Parties *multiplied by* the Tag Percentage set forth in the Tag Along Notice (for clarity, in such a joint sale by the AES Related Parties and the Siemens Related Parties where the number of the Subject Securities being included in such sale by one party is different from that of the other party, the QIA Related Parties may use the greater of the two individual Tag Percentages in calculating the number of its *pro rata* portion of the applicable Subject Securities) (any of the QIA Related Parties exercising such right, a "Tagging Stockholder" and any such shares of Class A Common Stock designated for sale by a Tagging Stockholder, collectively, the "Tag Along Securities"). For purposes of this Section 4(d), Subject Securities will be counted as follows: (A) each share of Class A Common Stock will be counted as one (1) Subject Security and (B) each share of Class B Common Stock and Common Unit together will be counted as one (1) Subject Security. Any such exercise of the Tag Along Rights by a Tagging Stockholder shall be irrevocable. If the QIA Related Parties have not delivered a Tag Election within such ten (10) business day period, the Initiating Stockholders shall have the right to freely Transfer to the Prospective Purchaser all, but not less than all, of the Subject Securities proposed to be sold as set forth in the Tag Along Notice for a period not to exceed one hundred and eighty (180) days following the end of such ten (10) day period, subject to extension to allow pending applicable governmental consents and approvals; provided, that such Transfer is otherwise on the same or substantially similar or less preferable (to the Initiating Stockholders) terms and conditions as those set forth in the Tag Along Notice. If, at the end of such one hundred and eighty (180) day period (as extended to permit pending governmental consents and approvals), the Initiating Stockholders have not completed the Tag Along Transfer in accordance with the terms and conditions of the Tag Along Notice, all the restrictions on a Transfer contained in this Section 4(d) with respect to the Subject Securities owned by the Initiating Stockholders shall again be in effect; and

(vii)        The Tag Along Securities will be included in the relevant Transfer on the same terms and subject to the same conditions set forth in the Tag Along Notice and applicable to the Subject Securities that the Initiating Stockholders are selling (except that governmental consents and approvals shall be obtained by each Tagging Stockholder as required under applicable law, even if different from those required from the Initiating Stockholders in connection with the Tag Along Transfer). Each Tagging Stockholder agrees that it will take such actions and execute such other agreements as the Initiating Stockholders may reasonably request in connection with the consummation of the Tag Along Transfer and the transactions contemplated thereby, including any purchase agreement, proxies, custody agreements, powers of attorney, written consents in lieu of meetings or waiver of appraisal rights.

(e)        Drag-Along Rights.

(i)        Notwithstanding the provisions of Section 4(d) above, in the event that AES and Siemens collectively Transfer (as defined in the LLC Agreement) to a Third Party one hundred percent (100%) of their respective Subject Securities (a "Drag-Along Transaction") and (A) as a result of such Drag-Along Transaction, such Third Party acquires at least sixty percent (60%) (in the aggregate) of the issued and outstanding shares of Class A Common Stock (including for these purposes the Underlying Class A Shares) and (B) the purchase price set forth in the bona fide offer from the Third Party purchaser represents at least a thirty percent (30%) increase on the 30-day average trading price for the shares of Class A Common Stock (a "Drag Offer"), then AES and Siemens may, at their option, require the QIA Related Parties to sell one hundred percent (100%) of their shares of Class A Common Stock to the third party by giving written notice (the "Drag Notice") to the QIA Related Parties not less than thirty (30) days prior to the date stated in the Drag Offer for consummation of the sale contemplated by the Drag Offer (the "Approved Sale"). The Drag Notice shall contain written notice of the exercise of AES and Siemens' rights pursuant to this Section 4(e), and shall set forth the consideration to be paid by the third party and the other material terms and conditions of the Drag Offer.

(ii)        The purchase of shares of Class A Common Stock from the QIA Related Parties pursuant to this Section 4(e) shall be on substantially the same terms and conditions and for the same type of consideration payable to AES and Siemens.

(iii)        If AES and Siemens exercise their rights pursuant to this Section 4(e), the QIA Related Parties shall sell, exchange or otherwise dispose to such Third Party one hundred percent (100%) of their shares of Class A Common Stock.

(iv)        In connection with the consummation of any Approved Sale, QIA acknowledges and agrees that it shall:

a.        consent to and raise no objections against any such Approved Sale; and

b.        not exercise any rights of appraisal, dissenters' rights or similar rights, all of which are hereby waived.

Section 5.        Covenants of the Corporation.

(a)        The Corporation agrees to take all Necessary Action to (i) cause the Board to be comprised of at least nine (9) Directors or such other number of Directors as the Board may determine, subject to the terms of this Agreement, the Charter or the Bylaws of the Corporation; (ii) cause the individuals designated for nomination in accordance with Section 1 to be included in the slate of nominees to be elected to the Board at the next annual or special meeting of stockholders of the Corporation at which Directors are to be elected, in accordance with the Bylaws, Charter and General Corporation Law of the State of Delaware and at each annual meeting of stockholders of the Corporation thereafter at which such Director's term expires; (iii) cause the individuals designated for nomination in accordance with Section 2(c) to fill the applicable vacancies on the Board, in accordance with the Bylaws, Charter, Securities Laws, General Corporation Law of the State of Delaware and the New York Stock Exchange rules and (iv) to adhere to, implement and enforce the provisions set forth in Section 4.

11

(b)        The AES Related Parties, the Siemens Related Parties and the QIA Related Parties shall comply with the requirements of the Charter and Bylaws when designating and nominating individuals as Directors, in each case, to the extent such requirements are applicable to Directors generally. Notwithstanding anything to the contrary set forth herein, in the event that the Board determines, within sixty (60) days after compliance with the first sentence of this Section 5(b), in good faith, after consultation with outside legal counsel, that its nomination, appointment or election of a particular Director designated for nomination in accordance with Section 1 or Section 2, as applicable, would constitute a breach of its fiduciary duties or does not otherwise comply with any requirements of the Charter or Bylaws, then the Board shall inform the AES Related Parties, Siemens Related Parties and/or the QIA Related Parties, as applicable, of such determination in writing and explain in reasonable detail the basis for such determination and shall, to the fullest extent permitted by law, nominate, appoint or elect another individual designated for nomination, election or appointment to the Board by the AES Related Parties, Siemens Related Parties and/or the QIA Related Parties, as applicable (subject in each case to this Section 5(b)). The Board and the Corporation shall, to the fullest extent permitted by law, take all Necessary Action required by this Section 5 with respect to the election of such substitute designees to the Board.

(c)        In addition to any voting requirements contained in this Agreement or the organizational documents of the Corporation or any of its Subsidiaries, the Corporation shall not, directly or indirectly, enter into or conduct business or operations or hold or acquire assets in its own name or otherwise other than through Fluence LLC and its Subsidiaries without the prior written approval of (i) AES for as long as the AES Related Parties Beneficially Own, directly or indirectly any of the issued and outstanding Common Units and (ii) Siemens for as long as the Siemens Related Parties Beneficially Own, directly or indirectly any of the issued and outstanding Common Units; provided, however, that nothing in this clause (c) shall be deemed to prohibit the Corporation from, and no consent of AES, Siemens or any other Person shall be required for the Corporation to engage in, (i) holding or using cash received by the Corporation as a result of the Corporation's investment in Fluence LLC or (ii) re-investing cash into Fluence LLC (whether by way of intercompany loan, investment or otherwise).

(d)        Upon the request of either the AES Related Parties or the Siemens Related Parties that wish to (x) pledge, hypothecate or grant security interests in any or all of the shares of Common Stock held by it including to banks or financial institutions as collateral or security for loans, advances or extensions of credit or (y) transfer all (but not less than all) of the shares of Common Stock and/or Common Units held by it, including to a third party transferee, in a transfer not prohibited by the LLC Agreement, each of the Corporation and Fluence LLC agrees to cooperate with the AES Related Parties or the Siemens Related Parties, as the case may be, in taking any action reasonably necessary to consummate any such pledge, hypothecation, grant or transfer, including without limitation, delivery of letter agreements to lenders in form and substance reasonably satisfactory to such lenders (which may include agreements by the Corporation and Fluence LLC in respect of the exercise of remedies by such lenders), instructing the transfer agent to transfer any such shares of Common Stock subject to the pledge, hypothecation or grant into the facilities of The Depository Trust Company without restricted legends and cooperating in diligence or other matters as may reasonably requested by either AES Related Parties or the Siemens Related Parties in connection therewith.

<div align="center">12</div>

(e)        In the event that the Corporation effects the separation of any portion of its business into one or more entities (each, a "NewCo"), whether existing or newly formed, including without limitation by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, and any Stockholder will receive equity interests in any such NewCo as part of such separation, the Corporation shall cause any such NewCo to enter into a Stockholders agreement with the Stockholders that provides AES, Siemens and QIA with rights vis-á-vis such NewCo that are substantially identical to those set forth in this Agreement.

Section 6.        Termination.

This Agreement shall terminate upon the earliest to occur of any one of the following events:

(a)        each of (i) the AES Related Parties, (ii) the Siemens Related Parties and (iii) the QIA Related Parties ceasing to own any shares of Class A Common Stock (including for these purposes any Underlying Class A Shares) or Class B Stock;

(b)        each of (i) the AES Related Parties, (ii) the Siemens Related Parties and (iii) the QIA Related Parties ceasing to have any Director designation rights under Section 1; and

(c)        the unanimous written consent of the parties hereto; provided, however, that notwithstanding any of the foregoing in this Section 6, the QIA Related Parties shall have the option to terminate, at their sole discretion and solely with respect to such QIA Related Parties, this Agreement and their rights and obligations hereunder if at any time (i)(A) the Board no longer has a QIA Director and (B) the QIA Related Parties beneficially own, directly or indirectly, in the aggregate less than five percent (5%) of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares) or (ii) following a Transfer to a Third Party by the AES Related Parties or the Siemens Related Parties of its shares of Class A Common Stock and/or Common Units (in the case of Common Units, together with the applicable shares of Class B Stock) and the associated right to designate for nomination one or more Directors, the QIA Related Parties determine that they would not be able to vote (or cause to be voted) for any director candidate nominated by such Third Party.

For the avoidance of doubt, the rights and obligations (i) of the AES Related Parties under this Agreement shall terminate upon the AES Related Parties ceasing to own any shares of Class A Common Stock (including for these purposes the Underlying Class A Shares), or Class B Stock, (ii) of the Siemens Related Parties under this Agreement shall terminate upon the Siemens Related Parties ceasing to own any shares of Class A Common Stock (including for these purposes any Underlying Class A Shares) or Class B Stock, or (iii) of the QIA Related Parties under this Agreement shall terminate upon the QIA Related Parties ceasing to own any shares of Class A Common Stock. Notwithstanding the foregoing, nothing in this Agreement shall modify, limit or otherwise affect, in any way, any and all rights to indemnification, exculpation and/or contribution owed by any of the parties hereto, to the extent arising out of or relating to events occurring prior to the date of termination of this Agreement or the date the rights and obligations of such party under this Agreement terminates in accordance with this Section 6.

13

Section 7.        Definitions.

As used in this Agreement, any term that it is not defined herein, shall have the following meanings:

"Affiliate" has the meaning ascribed thereto in Rule 12b-2 promulgated under the Exchange Act, as in effect on the date hereof

"Beneficially Own" has the meaning set forth in Rule 13d-3 promulgated under the Exchange Act; provided that for purposes of this Agreement, a Stockholder shall not be deemed to Beneficially Own any shares of Class A Common Stock (including any Underlying Class A Shares) in which such Stockholder does not have a direct or indirect pecuniary interest.

"Board" means the board of directors of the Corporation.

"Bylaws" means the amended and restated bylaws of the Corporation, dated as of the date hereof, as the same may be further amended, restated, amended and restated or otherwise modified from time to time.

"Combined Voting Power" means the combined voting power of all classes and series of Voting Securities, according to each class' or series' respective votes per share, voting together as a single class.

"Charter" means the amended and restated certificate of incorporation of the Corporation, effective as of the date hereof, as the same may be further amended, restated, amended and restated or otherwise modified from time to time.

"Director" means a member of the Board.

"Necessary Action" means, with respect to a specified result, all commercially reasonable actions required to cause such result that are within the power of a specified Person, including (i) voting or providing a written consent or proxy with respect to the equity securities owned by the Person obligated to undertake the necessary action, (ii) voting in favor of the adoption of stockholders' resolutions and amendments to the organizational documents of the Corporation, (iii) executing agreements and instruments, and (iv) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result.

"Nominating and Corporate Governance Committee" means the nominating and corporate governance committee of the Board or any committee of the Board authorized to perform the function of recommending to the Board the nominees for election as Directors or nominating the nominees for election as Directors.

"Permitted Transferees" has the meaning set forth in the Charter or, in relation to a Stockholder's Common Units in Fluence LLC, in the LLC Agreement.

14

"Person" means any individual, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other entity or organization, including a government or any subdivision or agency thereof.

"Pro Rata Percentage" means the percentage obtained by dividing (i) the aggregate number of Subject Securities being sold pursuant to Section 4(d), by (ii) the aggregate number of Subject Securities owned by the AES Related Parties and Siemens Related Parties immediately preceding the transactions contemplated by Section 4(d).

"Related Parties" means, collectively, the AES Related Parties, the Siemens Related Parties and the QIA Related Parties.

"Securities Laws" means the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder.

"Stock Exchange" means the Nasdaq Global Market or such other securities exchange or interdealer quotation system on which shares of Class A Common Stock are then listed or quoted.

"Subsidiary" means with respect to any Person, any corporation, limited liability company, partnership, association, trust or other form of legal entity, of which (a) such first Person directly or indirectly owns or controls at least a majority of the securities or other interests having by their terms voting power to elect a majority of the board of directors or others performing similar functions, or (b) such first Person is a general partner or managing member (excluding partnerships in which such Person or any Subsidiary thereof does not have a majority of the voting interests in such partnership).

"Underlying Class A Shares" means all shares of Class A Common Stock issuable upon redemption of Common Units, assuming all such Common Units are redeemed for Class A Common Stock on a one-for-one basis (excluding, for clarity, Common Units held directly or indirectly by the Corporation).

"Voting Securities" means, at any time, outstanding shares of any class of Common Stock of the Corporation, which are then entitled to vote generally in the election of directors.

Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article" or "Section" refer to the specified Article or Section of this Agreement; (v) the word "including" shall mean "including, without limitation"; (vi) each defined term has its defined meaning throughout this Agreement, whether the definition of such term appears before or after such term is used; and (vii) the word "or" shall be disjunctive but not exclusive. References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto. References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations (including rules of any Stock Exchange) shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

15

Section 8.        Information.

(a)        The Corporation shall, and shall cause its Subsidiaries to, keep proper books, records and accounts, in which full and correct entries shall be made of all financial transactions and the assets and business of the Corporation and each of its Subsidiaries in accordance with generally accepted accounting principles. The Corporation shall, and shall cause its Subsidiaries to, (i) permit the Stockholders and their respective designated representatives (or other designees), at reasonable times and upon reasonable prior notice to the Corporation, to review the books and records of the Corporation or any of such Subsidiaries and to discuss the affairs, finances and condition of the Corporation or any of such Subsidiaries with the officers of the Corporation or any such Subsidiary and (ii) unless and until a Stockholder notifies the Corporation in writing that it no longer desires to receive information under this clause (ii), provide such Stockholder all information of a type, at such times and in such manner as is consistent with the Corporation's past practice or that is otherwise reasonably requested by such Stockholder from time to time (all such information so furnished pursuant to this Section 8(a), the "Information"). Subject to Section 8(c) any Stockholder (and any party receiving Information from a Stockholder) who shall receive Information shall maintain the confidentiality of such Information. Notwithstanding the foregoing, that the Corporation shall not be required to disclose any privileged Information of the Corporation so long as the Corporation has used commercially reasonable efforts to enter into an arrangement pursuant to which it may provide such information to the Stockholders without the loss of any such privilege.

(b)        The Corporation shall deliver or cause to be delivered to the Stockholders, at their request:

(i)        to the extent otherwise prepared by the Corporation, operating and capital expenditure budgets and periodic information packages relating to the operations and cash flows of the Corporation and its Subsidiaries; and

(ii)        to the extent otherwise prepared by the Corporation, such other reports and information as may be reasonably requested by the Stockholders; provided, however, that the Corporation shall not be required to disclose any privileged information of the Corporation so long as the Corporation has used commercially reasonable efforts to enter into an arrangement pursuant to which it may provide such information to the Stockholders without the loss of any such privilege.

(c)        Each Stockholder agrees that it will, and will direct its designated representatives to, keep confidential and not disclose any Confidential Information; provided, however, that such Stockholder and its designated representatives may disclose Confidential Information to the other Stockholders, to their respective Related Parties and to (a) its Affiliates and its Affiliates' attorneys, accountants, consultants, insurers, financing sources and other advisors in connection with such Stockholder's investment in the Corporation, (b) any Person, including a prospective purchaser of Common Stock, as long as such Person has agreed, in writing, to maintain the confidentiality of such Confidential Information, (c) any of such Stockholder's or its respective Affiliates' partners, members, stockholders, directors, officers, employees or agents in the ordinary course of business (the Persons referenced in clauses (a), (b) and (c), a Stockholder's "designated representatives") or (d) as the Corporation may otherwise consent in writing; provided, further, however, that each Stockholder agrees to be responsible for any breaches of this Section 8(c) by such Stockholder's designated representatives.

16

(d)        Each party hereto acknowledges and agrees that the Related Parties may share any information concerning the Corporation and its Subsidiaries received by them from or on behalf of the Corporation or its designated representatives with each Stockholder and its designated representatives (subject to such Stockholder's obligation to maintain the confidentiality of Confidential Information in accordance with Section 8(c)).

Section 9.        Choice of Law and Venue; Waiver of Right to Jury Trial.

(a)        THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE. EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT IN THE EVENT OF ANY BREACH OF THIS AGREEMENT, THE NON-BREACHING PARTY WOULD BE IRREPARABLY HARMED AND COULD NOT BE MADE WHOLE BY MONETARY DAMAGES, AND THAT, IN ADDITION TO ANY OTHER REMEDY TO WHICH THEY MAY BE ENTITLED AT LAW OR IN EQUITY, THE PARTIES SHALL BE ENTITLED TO SUCH EQUITABLE OR INJUNCTIVE RELIEF AS MAY BE APPROPRIATE. THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OF A DELAWARE FEDERAL OR STATE COURT, OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE SUCH A JUDGMENT, IN ANY OTHER APPROPRIATE JURISDICTION.

(b)        IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (1) AGREE UNDER ALL CIRCUMSTANCES ABSOLUTELY AND IRREVOCABLY TO SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURT OF CHANCERY OF THE STATE OF DELAWARE, OR IF (AND ONLY IF) SUCH COURT FINDS IT LACKS SUBJECT MATTER JURISDICTION, THE SUPERIOR COURT OF THE STATE OF DELAWARE (COMPLEX COMMERCIAL DIVISION), OR IF UNDER APPLICABLE LAW, SUBJECT MATTER JURISDICTION OVER THE MATTER THAT IS THE SUBJECT OF THE ACTION OR PROCEEDING IS VESTED EXCLUSIVELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, AND APPELLATE COURTS FROM ANY THEREOF, WITH RESPECT TO ALL ACTIONS AND PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY; (2) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, SUCH PARTIES WILL CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION OF ANY SUCH COURT DESCRIBED IN CLAUSE (1) OF THIS SECTION 9(B) AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; (3) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN ANY INCONVENIENT FORUM; (4) AGREE TO WAIVE ANY RIGHTS TO A JURY TRIAL TO RESOLVE ANY DISPUTES OR CLAIMS RELATING TO THIS AGREEMENT; (5) AGREE TO SERVICE OF PROCESS IN ANY LEGAL PROCEEDING BY MAILING OF COPIES THEREOF TO SUCH PARTY AT ITS ADDRESS SET FORTH HEREIN FOR COMMUNICATIONS TO SUCH PARTY; (6) AGREE THAT ANY SERVICE MADE AS PROVIDED HEREIN SHALL BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (7) AGREE THAT NOTHING HEREIN SHALL AFFECT THE RIGHTS OF ANY PARTY TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 10.    Notices.

Any notice, request, claim, demand, document and other communication hereunder to any party shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or sent by facsimile, or by electronic mail, or first class mail, or by Federal Express or other similar courier or other similar means of communication, as follows:

(a)    If to AES Grid Stability, LLC, addressed as follows:

AES Grid Stability, LLC
4300 Wilson Boulevard
Suite 1100
Arlington, VA 22203
Attention: Paul Freedman, General Counsel of The AES Corporation
Email: paul.freedman @aes.com

with a copy (which copy shall not constitute notice) to:

AES Grid Stability, LLC
4300 Wilson Boulevard
Suite 1100
Arlington, VA 22203
Attention: Chris Shelton, Senior Vice President, Chief Product Officer and
President, AES Next
Email: chris.shelton@aes.com

(b)    If to Siemens Industry, Inc., addressed as follows:

Siemens Industry, Inc.
4800 North Point Parkway
Alpharetta, GA 30005, USA
Attention: Craig Langley
Email: Langley.craig@siemens.com

with a copy (which copy shall not constitute notice) to:

Siemens Corporation
527 Madison Avenue
New York, New York 10022
Attention: Kenneth R. Meyers
Email: kenneth.meyers@siemens.com

18

(c)    If to Qatar Holding LLC, addressed as follows:

Qatar Holding LLC
Ooredoo Tower (Building 14)
Al Dafna Street (Street 801)
Al Dafna (Zone 61)
Doha, Qatar
Email: notices.legal@qia.qa; notices_industrials@qia.qa

with a copy (which copy shall not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn: Paul Shim; Kimberly Spoerri
Facsimle: 212.225.3999
Email: pshim@cgsh.com; kspoerri@cgsh.com

(d)    If to the Corporation, addressed as follows:

Fluence Energy, Inc.
c/o Manuel Perez Dubuc, Chief Executive Officer
4601 N. Fairfax Drive, Suite 600
Arlington, VA 22203
Email: manuel.perez@fluenceenergy.com

with a copy (which copy shall not constitute notice) to:

Dennis Fehr, CFO
Email: dennis.fehr@fluenceenergy.com

and

Francis Fuselier, General Counsel and Secretary
Email: frank.fuselier@fluenceenergy.com

or, in each case, to such other address or email address as such party may designate in writing to each party by written notice given in the manner specified herein. All such communications shall be deemed to have been given, delivered or made when so delivered by hand or sent by facsimile (with confirmed transmission), on the next business day if sent by overnight courier service (with confirmed delivery) or when received if sent by first class mail, or in the case of notice by electronic mail, when the relevant email enters the recipient's server.

19

Section 11.        Assignment.

Except as otherwise provided herein, all of the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective successors and permitted assigns of the parties hereto. This Agreement may not be assigned (by operation of law or otherwise) without the express prior written consent of the other parties hereto, and any attempted assignment, without such consents, will be null and void; *provided*, *however*, that each of AES, Siemens and QIA is permitted to assign this Agreement to their respective Permitted Transferees, so long as such Permitted Transferee agrees to become a party to this Agreement; and *provided further*, that each of AES, Siemens and QIA is permitted, without the consent of the Corporation or any other Person, to assign its rights and obligations under this Agreement to a transferee of all (but not less than all) of its respective Common Stock and/or Common Units, as applicable, in a transfer not prohibited by the LLC Agreement, so long as such transferee, if not already a party to this Agreement, agrees to become party to, and be bound by all of the provisions of this Agreement as a "Stockholder" and an "AES Related Party," "Siemens Related Party" or "QIA Related Party," as applicable, whereupon such transferee shall be deemed a "Stockholder" and an "AES Related Party," "Siemens Related Party" or "QIA Related Party," as applicable, hereunder. This Agreement will inure to the benefit of and be binding on the parties hereto and their respective successors and permitted assigns.

Section 12.        Amendment and Modification; Waiver of Compliance.

This Agreement may not be amended, modified, altered or supplemented except by means of a written instrument executed on behalf of each of the parties hereto. For clarity, each Stockholder may without the consent of any other Person waive or terminate its respective rights to designate directors for nomination to the Board at any time by written notice to the Corporation. Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party or parties granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

Section 13.        Waiver.

No failure on the part of either party hereto to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of either party hereto in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver thereof; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

Section 14.        Severability.

If any provision of this Agreement, or the application of such provision to any Person or circumstance or in any jurisdiction, shall be held to be invalid or unenforceable to any extent, (i) the remainder of this Agreement shall not be affected thereby, and each other provision hereof shall be valid and enforceable to the fullest extent permitted by law, (ii) as to such Person or circumstance or in such jurisdiction such provision shall be reformed to be valid and enforceable to the fullest extent permitted by law and (iii) the application of such provision to other Persons or circumstances or in other jurisdictions shall not be affected thereby.

20

Section 15.        Counterparts.

This Agreement may be executed in any number of counterparts and signatures may be delivered by facsimile, each of which may be executed by less than all parties, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

Section 16.        Further Assurances.

At any time or from time to time after the date hereof, the parties hereto agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as any other party may reasonably request in order to evidence or effectuate the provisions of this Agreement and to otherwise carry out the intent of the parties hereunder.

Section 17.        Titles and Subtitles.

The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

Section 18.        No Third Party Beneficiaries.

This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors, and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 19.        Recapitalizations; Exchanges, Etc.

The provisions of this Agreement shall apply to the full extent set forth herein with respect to any and all shares of capital stock of the Corporation or any successor or assign of the Corporation (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or in substitution of such shares of capital stock, by reason of a stock dividend, stock split, stock issuance, reverse stock split, combination, recapitalization, reclassification, merger, consolidation or otherwise.

Section 20.        Representations and Warranties.

(a)        Each of AES, Siemens, QIA and each Person who becomes a party to this Agreement after the date hereof, severally and not jointly and solely with respect to itself, represents and warrants to the Corporation as of the time such party becomes a party to this Agreement that (a) if applicable, it is duly authorized to execute, deliver and perform this Agreement; (b) this Agreement has been duly executed by such party and is a valid and binding agreement of such party, enforceable against such party in accordance with its terms; and (c) the execution, delivery and performance by such party of this Agreement does not violate or conflict with or result in a breach of or constitute (or with notice or lapse of time or both constitute) a default under any agreement to which such party is a party or, if applicable, the organizational documents of such party.

(b)        The Corporation represents and warrants to each other party hereto that (a) the Corporation is duly authorized to execute, deliver and perform this Agreement; (b) this Agreement has been duly authorized, executed and delivered by the Corporation and is a valid and binding agreement of the Corporation, enforceable against the Corporation in accordance with its terms; and (c) the execution, delivery and performance by the Corporation of this Agreement does not violate or conflict with or result in a breach by the Corporation of or constitute (or with notice or lapse of time or both constitute) a default by the Corporation under the Charter or Bylaws, any existing applicable law, rule, regulation, judgment, order, or decree of any governmental authority exercising any statutory or regulatory authority of any of the foregoing, domestic or foreign, having jurisdiction over the Corporation or any of its Subsidiaries or any of their respective properties or assets, or any agreement or instrument to which the Corporation or any of its Subsidiaries is a party or by which the Corporation or any of its Subsidiaries or any of their respective properties or assets may be bound.

21

Section 21.        Interpretative Provisions.

This Agreement shall be deemed to be collectively prepared by the parties hereto, and no ambiguity herein shall be construed for or against any party based upon the identity of the author of this Agreement or any provision hereof.

Section 22.        No Recourse.

This Agreement may only be enforced against, and any claims or cause of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, the transactions contemplated hereby or the subject matter hereof may only be made against the parties hereto and no past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any party hereto or any past, present or future Affiliate, director, officer, employee, incorporator, member, manager, partner, stockholder, agent, attorney or representative of any of the foregoing (each, a "Non-Recourse Party") shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby. Without limiting the rights of any party against the other parties hereto, in no event shall any party or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non-Recourse Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

22

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the day and year first above written.

**FLUENCE ENERGY, INC.**

By: _____
Name:   Manuel Perez Dubuc
Title:    Chief Executive Officer

**FLUENCE ENERGY, LLC**

By: Fluence Energy, Inc., as managing member

By: _____
Name:   Manuel Perez Dubuc
Title:    Chief Executive Officer

**AES GRID STABILITY, LLC.**

By: _____
Name:
Title:    Authorized Person

**SIEMENS INDUSTRY, INC.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**QATAR HOLDING LLC**

By:
its

By: _____
Name:
Title:    Authorized Person

[*Signature Page to Stockholders Agreement*]

**REGISTRATION RIGHTS AGREEMENT**

This REGISTRATION RIGHTS AGREEMENT (this "*Agreement*") is made as of October [ ● ], 2021 by and among Fluence Energy, Inc., a Delaware corporation (the "*Corporation*"), and each Person identified on the Schedule of Holders attached hereto as of the date hereof (such Persons, collectively, the "*Original Equity Owners*").

**RECITALS**

WHEREAS, the Corporation is contemplating an offer and sale of its shares of Class A common stock, par value $0.00001 per share (the "*Class A Common Stock*" and, such shares, the "*Shares*"), to the public in an underwritten initial public offering (the "*IPO*");

WHEREAS, the Corporation desires to use a portion of the net proceeds from the IPO to purchase LLC Interests (as defined below) of Fluence Energy, LLC, a Delaware limited liability company (the "*Company*"), and the Company desires to issue its LLC Interests to the Corporation in exchange for such portion of the net proceeds from the IPO;

WHEREAS, immediately prior to or simultaneous with the purchase by the Corporation of the LLC Interests, the Corporation, the Company and the Original Equity Owners will enter into that certain Third Amended and Restated Limited Liability Company Agreement of the Company (such agreement, as it may be amended, restated, amended and restated, supplemented or otherwise modified form time to time, the "*LLC Agreement*");

WHEREAS, in connection with the closing of the IPO, (i) the Corporation will become the sole managing member of the Company, (ii) under the LLC Agreement, the equity interests in the Company held by the Original Equity Owners prior to such time will be converted into common units (the "*LLC Interests*") of the Company, (iii) each Person identified on the Schedule of Holders attached hereto as a "Former LLC Equity Owner" (such Persons, collectively, the "*Former LLC Equity Owners*") will, through merger or otherwise, exchange their direct and indirect interests in the LLC Interests for shares of Class A Common Stock, (iv) each Person identified on the Schedule of Holders attached hereto as a "Continuing Equity Owner" (such Persons, collectively, the "*Continuing Equity Owners*") will become non-managing members of the Company, but otherwise continue to hold LLC Interests in the Company and will receive newly issued shares of Class B-1 common stock of the Corporation, and (v) in consideration of the Corporation acquiring the LLC Interests and becoming the managing member of the Company and for other good consideration, the Company has provided the Continuing Equity Owners with a redemption right pursuant to which the Continuing Equity Owners can have their LLC interests redeemed for, at the Corporation's option, shares of Class A Common Stock or cash with the proceeds of a new issuance of Class A Common Stock on the terms set forth in the LLC Agreement; and

WHEREAS, in connection with the IPO and the transactions described above, the Corporation has agreed to grant to the Holders (as defined below) certain rights with respect to the registration of the Registrable Securities (as defined below) on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

Section 1.   <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1</u>:

"***Adverse Disclosure***" means public disclosure of material, non-public information, which disclosure, in the good faith judgment of the Chief Executive Officer or the Chief Financial Officer of the Corporation, after consultation with external counsel to the Corporation, (i) would be required to be made in any Registration Statement or prospectus filed with the SEC by the Corporation so that such Registration Statement or prospectus would not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in light of the circumstances under which they were made) not misleading and would not be required to be made at such time but for the filing of such Registration Statement, prospectus or preliminary prospectus; and (ii) the Corporation has a bona fide business purpose for not disclosing such information publicly.

"***Affiliate***" of any Person means any other Person controlled by, controlling or under common control with such Person; *provided* that the Corporation and its Subsidiaries shall not be deemed to be Affiliates of any Holder. As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities, by contract or otherwise).

"***Agreement***" has the meaning set forth in the recitals.

"***Business Day***" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close. With respect to any circumstances where actions are required by Qatar Holding LLC or any Affiliate of Qatar Holding LLC under this Agreement, "***Business Day***" shall not include Friday, Saturday, Sunday or any other day on which commercial banks in New York, New York or Doha, Qatar are authorized or required by law to close.

"***Capital Stock***" means (i) with respect to any Person that is a corporation, any and all shares, interests or equivalents in capital stock of such corporation (whether voting or nonvoting and whether common or preferred), (ii) with respect to any Person that is not a corporation, individual or governmental entity, any and all partnership, membership, limited liability company or other equity interests of such Person that confer on the holder thereof the right to receive a share of the profits and losses of, or the distribution of assets of the issuing Person, and (iii) any and all warrants, rights (including conversion and exchange rights) and options to purchase any security described in the clause (i) or (ii) above.

"***Class A Common Stock***" has the meaning set forth in the recitals.

"***Class B Common Stock***" means the Corporation's Class B-1 and/or B-2 common stock, par value $0.00001 per share.

2

"*Company*" has the meaning set forth in the recitals.

"*Continuing Equity Owners*" has the meaning set forth in the recitals, and shall be deemed to include their respective Affiliates, immediate family members, heirs, successors and assigns who may succeed to such Person as a Holder hereunder.

"*Corporation*" has the meaning set forth in the recitals.

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended from time to time, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

"*FINRA*" means the Financial Industry Regulatory Authority.

"*Former LLC Equity Owners*" has the meaning set forth in the recitals, and shall be deemed to include their respective Affiliates, immediate family members, heirs, successors and assigns who may succeed to such Person as a Holder hereunder.

"*Form S-3*" means such form under the Securities Act as in effect on the date hereof or any successor form under the Securities Act that permits significant incorporation by reference of the Corporation's subsequent public filings under the Exchange Act

"*Free Writing Prospectus*" means a free-writing prospectus, as defined in Rule 405.

"*Holder*" means any Person that is a party to this Agreement from time to time, as set forth on the signature pages hereto (or pursuant to a Joinder hereto), so long as such Person continues to hold Registrable Securities.

"*Initiating Holder*" has the meaning set forth in subsection 2(b).

"*IPO*" has the meaning set forth in the recitals.

"*Joinder*" has the meaning set forth in Section 15.

"*LLC Agreement*" has the meaning set forth in the recitals.

"*LLC Interests*" has the meaning set forth in the recitals.

"*MNPI*" means material non-public information within the meaning of Regulation FD promulgated under the Exchange Act.

"*Opt-Out Request*" has the meaning set forth in Section 16(b).

"*Original Equity Owners*" has the meaning set forth in the recitals, and shall be deemed to include their respective Affiliates, immediate family members, heirs, successors and assigns who may succeed to such Person as a Holder hereunder.

3

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"**Policies**" has the meaning set forth in Section 16.

"**Public Offering**" means any sale or distribution to the public of Capital Stock of the Corporation pursuant to an offering registered under the Securities Act, whether by the Corporation, by Holders and/or by any other holders of the Corporation's Capital Stock.

"**register**," "**registered**," and "**registration**" refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement or document.

"**Registrable Securities**" means (i) any Class A Common Stock (A) issued by the Corporation in connection with the IPO in exchange for the LLC Interests of the Former LLC Equity Owners, (B) issued by the Corporation in a Share Settlement in connection with (x) the redemption by the Company of LLC Interests owned by any Continuing Equity Owners or (y) at the election of the Corporation, in a direct exchange for LLC Interests owned by any Continuing Equity Owners, in each case in accordance with the terms of the LLC Agreement, (ii) any Capital Stock of the Corporation or of any Subsidiary of the Corporation issued or issuable with respect to the securities referred to in clause (i) above by way of dividend, distribution, split or combination of securities, or any recapitalization, merger, consolidation or other reorganization, and (iii) any other Shares owned, directly or indirectly, by Holders from time to time. As to any particular Registrable Securities owned by any Person, such securities shall cease to be Registrable Securities on the date such securities (a) have been sold or distributed pursuant to a Public Offering, (b) have been sold in compliance with Rule 144 following the consummation of the IPO so that all transfer restrictions, and restrictive legends with respect thereto, if any, are removed upon the consummation of such sale, (c) have been repurchased by the Corporation or a Subsidiary of the Corporation, or (d) have been sold or transferred sold by a person in a transaction in which his or her rights under this Agreements are not assigned. For purposes of this Agreement, a Person shall be deemed to be a Holder, and the Registrable Securities shall be deemed to be in existence, whenever such Person has the right to acquire, directly or indirectly, such Registrable Securities (upon conversion or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such acquisition has actually been effected, and such Person shall be entitled to exercise the rights of a holder of Registrable Securities hereunder; *provided* a holder of Registrable Securities may only request that Registrable Securities in the form of Capital Stock of the Corporation that is registered or to be registered as a class under Section 12 of the Exchange Act be registered pursuant to this Agreement. For the avoidance of doubt, while LLC Interests and shares of Class B Common Stock may constitute Registrable Securities, under no circumstances shall the Corporation be obligated to register LLC Interests or shares of Class B Common Stock, and only Shares issuable upon redemption, exchange or conversion of LLC Interests will be registered.

"**Registrable Securities then outstanding**" shall be determined by the number of shares of Class A Common Stock then outstanding (assuming the exchange of all membership interests of the Company (other than membership interests held by the Corporation) for a corresponding number of shares of Class A Common Stock in accordance with the LLC Agreement), and including all shares of Class A Common Stock issuable upon such exchange, which are Registrable Securities.

4

"**Rule 144**," "**Rule 158**," "**Rule 405**" and "**Rule 415**" mean, in each case, such rule promulgated under the Securities Act (or any successor provision) by the Securities and Exchange Commission, as the same shall be amended from time to time, or any successor rule then in force.

"**SEC**" means the Securities and Exchange Commission

"**Schedule of Holders**" means the schedule attached to this Agreement entitled "Schedule of Holders," which shall reflect each Holder from time to time party to this Agreement.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended from time to time, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

"**Share Settlement**" means "Share Settlement" as defined in the LLC Agreement.

"**Shares**" has the meaning set forth in the recitals.

"**Shelf Registration**" has the meaning set forth in Section 2(a).

"**Shelf Registration Statement**" means a registration statement of the Corporation filed with the SEC on Form S-3 (or any other appropriate form under the Securities Act) for an offering to be made on a continuous basis pursuant to Rule 415 (or any successor provision) under the Securities Act covering all or any portion of the Registrable Securities, as applicable. To the extent that the Corporation is a WKSI, a "Shelf Registration Statement" shall be deemed to refer to an "automatic shelf registration statement," as such term is defined in Rule 405 (or any successor or similar rule) of the Securities Act.

"**Subsidiary**" means, with respect to the Corporation, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of Capital Stock of such Person entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or indirectly, by the Corporation, or (ii) if a limited liability company, partnership, association or other business entity, either (x) a majority of the Capital Stock of such Person entitled (without regard to the occurrence of any contingency) to vote in the election of managers, general partners or other oversight board vested with the authority to direct management of such Person is at the time owned or controlled, directly or indirectly, by the Corporation or (y) the Corporation or one of its Subsidiaries is the sole manager or general partner of such Person.

"**Suspension Event**" has the meaning set forth in Section 2(c).

"**Violation**" has the meaning set forth in Section 10(a).

"**WKSI**" means a "well-known seasoned issuer" as defined under Rule 405.

5

Section 2.    <u>Request for Registration</u>.

(a)    Subject to the terms and conditions of this Agreement, if the Corporation shall receive at any time following one hundred eighty (180) days after the effective date of the registration of the IPO, a written request from the Holders of at least ten percent (10%) of the Registrable Securities then outstanding that the Corporation file a registration statement under the Securities Act covering the registration of at least ten percent (10%) of the Registrable Securities then outstanding, then the Corporation shall, within 10 days of the receipt thereof, give written notice of such request to all Holders and shall, subject to the limitations of <u>subsection 2(b)</u>, use its reasonable best efforts to effect, as soon as practicable following the receipt of, and in any event within sixty (60) days of the receipt of, such request, such registration (including, without limitation, filing post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act) as would permit or facilitate the sale and distribution of all Registrable Securities which the Holders request to be registered within 20 days of the mailing of such notice by the Corporation; provided, however, that the Corporation shall not be obligated to effect any such registration, qualification or compliance pursuant to this <u>Section 2</u> in any particular jurisdiction in which the Corporation would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Corporation is already subject to service in such jurisdiction and except as may be required by the Securities Act.

(b)    If the Holders initiating the registration request under <u>subsection 2(a)</u> (each, an "***Initiating Holder***") intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Corporation as a part of their request made pursuant to this <u>Section 2</u> and the Corporation shall include such information in the written notice referred to in <u>subsection 2(a)</u>. The underwriter will be selected by the Corporation and shall be reasonably acceptable to a majority in interest of the Initiating Holders. In such event, the right of any Holder to include his Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Corporation as provided in <u>subsection 5(f)</u>) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting. Notwithstanding any other provision of this <u>Section 2</u>, if the underwriter advises the Corporation in writing that marketing factors require a limitation of the number of equity interests to be underwritten, then the Corporation shall so advise all Holders of Registrable Securities which would otherwise be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be allocated among all participating Holders thereof, including the Initiating Holders, in proportion (as nearly as practicable) to the amount of Registrable Securities of the Corporation owned by each participating Holder; <u>provided</u>, <u>however</u>, that the number of Registrable Securities to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting.

(c)    Notwithstanding the foregoing, if the Corporation shall furnish to the Initiating Holders a certificate signed by the Chief Executive Officer of the Corporation stating that in the good faith judgment of the Board of Directors of the Corporation, it would be materially detrimental to the Corporation and its Members for such registration statement contemplated by <u>subsection 2(a)</u> to be filed and it is therefore essential to defer the filing of such registration statement, because such action would require the Corporation to make an Adverse Disclosure (such event, a "***Suspension Event***"), upon giving prompt written notice to the Members, the Corporation shall have the right to defer such filing for a period of time determined in good faith by the Board to be necessary for such purpose and in no event longer than ninety (90) days after receipt of the request of the Initiating Holders, as applicable, and any time periods with respect to filing or effectiveness thereof shall be tolled correspondingly; <u>provided</u>, <u>however</u>, that the Corporation may not utilize this right more than once in any twelve-month period. In the event that the Corporation exercises its right under the preceding sentence, the Corporation shall promptly give the Holders written notice thereof and shall use its reasonable best efforts to cause such registration statement to become effective or to amend or supplement such registration statement on a post-effective basis or to take such action as is necessary to permit resumed use of such registration statement or filing thereof as soon as reasonably practicable following the conclusion of the applicable Suspension Event and its effect. The Corporation shall promptly give the Holders written notice of the conclusion of any Suspension Event and its effect.

(d)        In addition, the Corporation shall not be obligated to effect, or to take any action to effect, any registration pursuant to this <u>Section 2</u>:

(i)        After the Corporation has effected three (3) registrations on behalf of the Initiating Holders pursuant to this <u>Section 2</u> and such registrations have been declared or ordered effective; *provided*, *however*, that a registration pursuant to this <u>Section 2</u> shall only count for the purposes of this clause (i) if at least seventy five percent (75%) of the Registrable Securities which Holders request to be sold are sold in such requested registration;

(ii)        Prior to 180 days after the effective date of the IPO registration statement; or

(iii)        If the Initiating Holders propose to dispose of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to <u>Section 4</u>.

Section 3.    <u>Corporation Registration.</u> If (but without any obligation to do so) the Corporation proposes to register (including for this purpose a registration effected by the Corporation for persons other than the Holders) any of its equity interests under the Securities Act in connection with the public offering of such securities solely for cash (other than (i) a registration statement on Form S-4 or any successor form thereto, (ii) a registration in which the only equity interests being registered are equity interests issuable upon conversion of debt securities which are also being registered, (iii) a registration on Form S-8 or (iv) a registration related to a dividend reinvestment plan (each, a "**Special Registration Statement**")), the Corporation shall, at such time, promptly give each Holder written notice of such registration. Upon the written request of each Holder given within 20 days after mailing of such notice by the Corporation, the Corporation shall, subject to the provisions of Section 8, cause to be registered under the Securities Act all of the Registrable Securities that each such Holder has requested to be registered. If a Holder decides not to include all of its Registrable Securities in any registration statement thereafter filed by the Corporation, such Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent registration statement or registration statements as may be filed by the Corporation with respect to offerings of its securities, all upon the terms and conditions set forth herein.

<div align="center">7</div>

Section 4.    Shelf Registration.

(a)    After the IPO, at any time when the Corporation qualifies to use a Form S-3, the Holders of at least ten percent (10%) of the Registrable Securities then outstanding of the Corporation may make a written request (a "**Shelf Notice**") to the Corporation to file with the SEC a Shelf Registration Statement, which Shelf Notice shall specify the aggregate amount of Registrable Securities of such Holder to be registered therein and the intended methods of distribution thereof (any such requested Shelf Registration Statement, a "**Shelf Registration**"). Following the delivery of a Shelf Notice, the Corporation (i) shall file promptly (and, in any event, within thirty (30) days following delivery of such Shelf Notice) with the SEC such Shelf Registration Statement (which shall be an automatic Shelf Registration Statement if the Corporation qualifies at such time to file such a Shelf Registration Statement) relating to the offer and sale of all Registrable Securities by the applicable Holder from time to time in accordance with the methods of distribution elected by such Holder and set forth in the Shelf Registration Statement and (ii) shall use its reasonable best efforts to cause such Shelf Registration Statement promptly to become effective under the Securities Act. Registrations effected pursuant to subsection 4(a) shall not be counted as demands for registration or registrations effected pursuant to Sections 2 or 3, respectively.

(b)    The Corporation shall not be obligated to effect any such registration pursuant to subsection 4(a): (i) if Form S-3 is not available for such offering by the Holders; (ii) if the Corporation shall furnish to the Holders a certificate signed by the Chief Executive Officer of the Corporation stating that in the good faith judgment of the Board of Directors of the Corporation, it would be materially detrimental to the Corporation and its Members for such Shelf Registration to be effected at such time, or to delay or suspend the effectiveness thereof, because of an applicable Suspension Event, in which event the Corporation shall have the right to defer the filing of such Shelf Registration statement for a period of time determined in good faith by the Board to be necessary for such purpose and in no event longer than 90 days after receipt of the request of the Holder or Holders under subsection 4(a); provided, however, that the Corporation shall not utilize this right more than once in any 12-month period; (iii) in any particular jurisdiction in which the Corporation would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Corporation is already subject to service in such jurisdiction and except as may be required by the Securities Act; (iv) during the applicable lock-up period ending after the effective date of a registration statement subject to Section 3 (v) if the Corporation has, within the twelve-month period preceding the date of such request, already effected two (2) registrations on Form S-3 for the Holders, or (vi) if the aggregate price to the public (net of any underwriters' discounts or commissions) is less than $5,000,000. In the event that the Corporation exercises its suspension right under this subsection 4(b), the Corporation shall promptly give the Holders written notice thereof and shall use its reasonable best efforts to cause such registration statement to become effective or to amend or supplement such registration statement on a post-effective basis or to take such action as is necessary to permit resumed use of such registration statement or filing thereof as soon as reasonably practicable following the conclusion of the applicable Suspension Event and its effect. The Corporation shall promptly give the Holders written notice of the conclusion of any Suspension Event and its effect.

8

(c)        The Corporation shall use its reasonable best efforts to keep a Shelf Registration Statement continuously effective under the Securities Act in order to permit a prospectus forming a part thereof to be usable in connection with any Shelf Take- Down until the earliest of (i) the date as of which all Registrable Securities held by the selling Holder have been sold pursuant to the Shelf Registration Statement or another registration statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(a)(3) of the Securities Act and Rule 174 thereunder) or otherwise cease to be Registrable Securities; (ii) the termination of this Agreement; and (iii) such shorter period as the applicable Holder shall agree in writing (such period of effectiveness, the "**Shelf Period**") and to re-file such Shelf Registration Statement upon its expiration. The Corporation shall not be deemed to have used its reasonable best efforts to keep the Shelf Registration Statement effective during the Shelf Period if the Corporation voluntarily takes any action (or omits to take any action), without the consent of the applicable Holder, that would result in such Holder not being able to offer and sell any Registrable Securities pursuant to such Shelf Registration Statement during the Shelf Period, unless such action (or omission) is (x) reasonably necessary for the Corporation to avoid being required to make an Adverse Disclosure or (y) required by applicable law, rule or regulation.

(d)        Promptly upon delivery of any Shelf Notice pursuant to <u>subsection 4(a)</u> (but in no event more than five (5) Business Days after delivery of the Shelf Notice), the Corporation shall deliver a written notice of such Shelf Notice to all Members other than the selling Holder that delivered the Shelf Notice, and the Corporation shall include in such Shelf Registration all such Registrable Securities of such Holders which the Corporation has received written requests for inclusion therein within five (5) Business Days after such written notice is delivered to such Holders (each such Holder delivering such a request, together with such selling Holder, a "**Shelf Holder**").

(e)        Shelf Take-Downs.

(i)        Subject to subsection 4(b), an offering or sale of Registrable Securities pursuant to a Shelf Registration Statement (each, a "**Shelf Take-Down**") may be initiated at any time by any selling Holder.

(ii)        If such selling Holder elects by written request to the Corporation, a Shelf Take-Down shall be in the form of an underwritten offering (such written request, an "**Underwritten Shelf Take-Down Notice**") and the Corporation shall amend or supplement the Shelf Registration Statement for such purpose as soon as practicable. The Corporation shall have the right to select the managing underwriter or underwriters to administer such offering; <u>provided</u> that such managing underwriter or underwriters shall be reasonably acceptable to such Selling Holder.

(iii)        Promptly upon delivery of such Underwritten Shelf Take-Down Notice (but in no event more than two (2) Business Days thereafter), the Corporation shall promptly deliver a written notice (a "**Underwritten Shelf Take-Down Corporation Notice**") of such Shelf Take-Down to all Shelf Holders (other than the selling Holder that delivered the Underwritten Shelf Take-Down Notice), and the Corporation shall include in such Shelf Take-Down all such Registrable Securities of such Shelf Holders that are Registered on such Shelf Registration Statement for which the Corporation has received written requests, which requests must specify the aggregate amount of such Registrable Securities of such Holders to be offered and sold pursuant to such Shelf Take-Down, for inclusion therein within two (2) Business Days after the date that such Underwritten Shelf Take-Down Notice has been delivered.

<p style="text-align:center">9</p>

(iv)        If the managing underwriter or underwriters of any proposed underwritten offering of Registrable Securities included in a Shelf Take-Down informs the Members or the Corporation in writing that, in its or their opinion, the number of securities requested to be included in such Shelf Take-Down exceeds the number that can be sold in such offering without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the securities to be included in such Shelf Take-Down shall be allocated (i) first, *pro rata* among the Shelf Holders that have requested to participate in such Shelf Take-Down based on the relative number of Registrable Securities then held by each such Shelf Holder; <u>provided</u> that any securities thereby allocated to a Shelf Holder that exceed such Shelf Holder's request shall be reallocated among the remaining requesting Shelf Holders in like manner; (ii) second, and only if all the Registrable Securities referred to in clause (i) have been included in such Shelf Take-Down, to the Corporation up to the number of securities that the Corporation proposes to include in such Shelf Take-Down that, in the opinion of the managing underwriter or underwriters, can be sold without having such adverse effect; and (iii) third, and only if all of the securities referred to in clause (ii) have been included in such Shelf Take-Down, to those Persons holding any other securities eligible for inclusion in such Shelf Take- Down, up to the number of securities that in the opinion of the managing underwriter or underwriters, can be sold without having such adverse effect. For purposes of this subsection 4(e)(iv) concerning apportionment, for any Shelf Holder that is a partnership, limited liability Corporation, or corporation, the partners, members, retired partners, retired members, stockholders, and Affiliates of such Shelf Holder shall be deemed to be a single "selling Shelf Holder," and any pro rata reduction with respect to such selling Shelf Holder shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Shelf Holder," as defined in this sentence.

Section 5.    Obligations of the Corporation. Whenever required under this Agreement to effect the registration of any Registrable Securities, the Corporation shall, as expeditiously as reasonably possible:

(a)        Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its reasonable best efforts to cause such registration statement to become effective and keep such registration statement effective for (i) up to 120 days or until the distribution described in such registration statement is completed, if earlier or (ii) in the case of any registration under Section 4, until all the Registrable Securities are sold; *provided, however*, that, the Corporation shall provide each participating Holder and its counsel reasonable opportunity to participate in the preparation of such registration statement.

10

(b) Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for (i) up to 120 days or until the distribution described in such registration statement is completed, if earlier, or (ii) in the case of any registration under Section 4, until all the Registrable Securities are sold and, in connection with any registration on Form S-3 pursuant to Section 4, timely file all reports required under the Exchange Act in order to maintain the right to continue to use such Form and to maintain such registration in effect; provided, however, that, the Corporation shall provide each Holder and its counsel reasonable opportunity to participate in the preparation of such amendments, supplements and prospectus.

(c) Before filing any Free Writing Prospectus relating to an offer of Registrable Securities or any amendments or supplements thereto, furnish to the underwriters, if any, and the Holders, if any, copies of such documents, which documents shall be subject to the review of such underwriters and any Holders and their respective counsel.

(d)        Furnish to the Holders, without charge, such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them.

(e)        Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders; *provided* that the Corporation shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions, unless the Corporation is already subject to service in such jurisdiction and except as may be required by the Securities Act.

(f)        In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(g)        Promptly make available for inspection by the Holder, any managing underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the Holders, all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct customary due diligence in connection therewith.

<div align="center">11</div>

(B)        Promptly notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the existence of any fact of which the Corporation is aware or the happening of any event which has resulted in (A) the registration statement, as then in effect, containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make any statements therein not misleading or (B) containing an untrue statement of a material fact or omitting to state a material fact required to be stated therein or necessary to make any statements therein, in the light of the circumstances under which they were made, not misleading.

(i)        Promptly notify each selling Holder covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, (A) of the issuance by the SEC of any stop order suspending the effectiveness of the registration statement or the initiation or threat of any proceedings for that purpose, or any request by the SEC for any amendment or supplement to, or additional information in connection with, any registration statement, prospectus or prospectus supplement related to any of them, (B) of any delisting or pending delisting of equity securities of the Corporation by any national securities exchange or market on which such equity securities are then listed or quoted or (C) of the receipt by the Corporation of any notification with respect to the suspension of the qualification of any Registrable Securities under the securities or blue sky laws of any jurisdiction or the initiation of any proceeding for such purpose.

(j)        Use its reasonable best efforts to prevent the issuance of any order suspending the effectiveness of registration statement covering any Registrable Securities, and, if any order suspending the effectiveness of any such registration statement is issued, shall promptly use its reasonable best efforts to obtain the withdrawal of such order.

(k)        In the event of any event or occurrence giving rise to an obligation of the Corporation to send to the selling Members any notice pursuant to subsection 5(j), promptly, and in no event later than twenty (20) days after the date of such event or occurrence, prepare and file with the SEC, and furnish to the selling Members a reasonable number of copies of, a supplement or post-effective amendment to such registration statement or related prospectus or any document incorporated therein by reference or file any other required document, and shall use its reasonable best efforts to have such supplement or amendment declared effective, if required, as soon as possible after filing, so that (i) such registration statement shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading and (ii) as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

12

(l)        Promptly notify each selling Holder, promptly after the Corporation receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed.

(a)        After such registration statement becomes effective, promptly notify each selling Holder of any request by the SEC that the Corporation amend or supplement such registration statement or prospectus.

(b)        Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Corporation are then listed.

(o)        Provide a transfer agent and registrar for all Registrable Securities registered pursuant hereunder and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration.

(p)        Furnish, at the request of any Holder requesting registration of Registrable Securities pursuant to Agreement, on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Agreement, if such securities are being sold through underwriters, (i) an opinion, dated such date, of the counsel representing the Corporation for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, including without limitation any letter or opinion as to the absence of material misstatements or omissions in the registration statement or prospectus, addressed to the underwriters and (ii) a letter dated such date (and another letter dated the date the underwriting agreement is signed), from the independent certified public accountants of the Corporation, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters.

(q) [RESERVED];

(r)        Cooperate with each seller of Registrable Securities and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA.

(s)        Have appropriate officers of the Corporation prepare and make presentations at a reasonable number of "road shows" and before analysts and rating agencies, as the case may be, and other information meetings reasonably organized by the underwriters and otherwise use its reasonable best efforts to cooperate as reasonably requested by the Holders and the underwriters in the offering, marketing or selling of the Registrable Securities.

13

Section 6.    <u>Furnish Information</u>. The Corporation may require that any selling Holder shall furnish to the Corporation such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as shall be reasonably required to effect the registration of such Holder's Registrable Securities. The Corporation shall have no obligation with respect to any registration requested pursuant to Section 2 or Section 4 if, as a result of the application of the preceding sentence, the number of equity interests, or the anticipated aggregate offering price of the Registrable Securities to be included in the registration does not equal or exceed the number of equity interests or the anticipated aggregate offering price required to originally trigger the Corporation's obligation to initiate such registration as specified in <u>subsection 4(a</u>).

Section 7.    <u>Expenses of Registration.</u>

(a)    **Demand Registration**. All expenses (other than underwriting discounts and commissions) incurred in connection with a registration requested under <u>Section 2</u> (which right may be assigned as provided in <u>Section 1</u>), filings or qualifications pursuant to <u>Section 2</u>, including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Corporation, and the reasonable fees and disbursements of one counsel for the selling Holders selected by Holders of a majority of the Registrable Securities to be registered, shall be borne by the Corporation; *provided, however,* that the Corporation shall not be required to pay for any expenses of any registration proceeding begun pursuant to <u>Section 2</u> if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all participating Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration); *provided further, however,* that if at the time of such withdrawal, the selling Holders have (i) learned of a material adverse change in the condition, business, or prospects of the Corporation from that known to the selling Holders at the time of their request or have been advised by the underwriter that the registration should be withdrawn (either a "**Withdrawal Event**") and (ii) have withdrawn the request with reasonable promptness following the occurrence of such Withdrawal Event, then the selling Holders shall not be required to pay any of such expenses and shall retain their rights pursuant to <u>Section 2</u>. If the Holders are required to pay any expenses, such expenses shall be borne by the holders of the securities (including Registrable Securities) requesting such registration in proportion to the number of securities for which registration was requested. If the Corporation is required to pay the expenses due to a Withdrawal Event, then the Holders shall not forfeit their rights to a demand registration.

(b)    **Corporation Registration**. All expenses (other than underwriting discounts and commissions) incurred in connection with registrations, filings or qualifications of Registrable Securities pursuant to <u>Section 3</u> for each Holder (which right may be assigned as provided in <u>Section 15</u>), including (without limitation) all registration, filing, and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Corporation and the reasonable fees and disbursements of one counsel for the selling Holder or Holders selected by Holders of a majority of the Registrable Securities to be registered shall be borne by the Corporation.

<div align="center">14</div>

(c)      **Shelf Registration**. All expenses (other than underwriting discounts and commissions) incurred in connection with registrations, filings or qualifications of Registrable Securities pursuant to Section 4 for each Holder (which right may be assigned as provided in Section 15), including (without limitation) all registration, filing, and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Corporation and the reasonable fees and disbursements of one counsel for the selling Holder or Holders selected by Holders of a majority of the Registrable Securities to be included in a registration or Shelf Takedown pursuant to Section 4 shall be borne by the Corporation.

Section 8.      Underwriting Requirements.

(i)      In connection with any offering involving an underwriting of equity interests of the Corporation described in Section 3, the Corporation shall not be required under Section 3 to include any of the Holders' securities in such underwriting unless they accept the terms of the underwriting as agreed upon between the Corporation and the underwriters selected by it (or by other persons entitled to select the underwriters), and then only in such quantity as the underwriters determine in their sole discretion will not jeopardize the success of the offering by the Corporation. If the total amount of securities, including Registrable Securities, requested by Members to be included in such offering exceeds the amount of securities sold other than by the Corporation that the underwriters determine in their sole discretion is compatible with the success of the offering, then the Corporation shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters determine in their sole discretion will not jeopardize the success of the offering (the securities so included to be apportioned pro rata among the selling Holders *pro rata* among them based on the relative number of Registrable Securities then held by each such participating Holder or in such other proportions as shall mutually be agreed to by such selling Holders) but in no event shall (i) the amount of securities of the selling Holders included in the offering be reduced below twenty-five percent (25%) of the total amount of securities included in such offering or (ii) any securities held by a person who is not a Holder of Registrable Securities be included if any securities held by any selling Holder are excluded. For purposes of the preceding parenthetical concerning apportionment, for any selling Holder which is a holder of Registrable Securities and which is a partnership or corporation, the partners, retired partners and equity owners of such holder shall be deemed to be a single "selling Holder," and any pro-rata reduction with respect to such "selling Holder" shall be based upon the aggregate amount of equity interests carrying registration rights owned by all entities and individuals included in such "selling Holder," as defined in this sentence.

Section 9.      Delay of Registration. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Agreement.

15

Section 10.    <u>Indemnification and Contribution</u>.

(a)    The Corporation will indemnify and hold harmless each Holder, any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, and each partner, director, officer, member, manager, employee and agent of any of the foregoing, against any losses, claims, damages, or liabilities (or actions in respect thereof) to which they may become subject under the Securities Act, the Exchange Act or other federal, state or common law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements, alleged statements, omissions, alleged omissions or violations or alleged violations (collectively a "*Violation*"): (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, or in any Free Writing Prospectus that the Corporation has filed, or is required to file, under Rule 433(d) under the Securities Act, or any amendment or supplement thereof (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading (in the case of any prospectus or amendment or supplement thereto, in light of the circumstances under which they are made), or (iii) any violation or alleged violation by the Corporation of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law; and the Corporation will pay to each such Holder, underwriter or controlling person and each other person entitled to indemnification pursuant to this <u>subsection 10(a)</u>, as incurred, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action; <u>provided</u>, <u>however</u>, that the indemnity agreement contained in this <u>subsection 10(a)</u> shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Corporation (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall the Corporation be liable to any Holder, underwriter or controlling person for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs as a result of, in reliance upon and in conformity with written information furnished expressly for use in such registration statement by any such Holder, underwriter or controlling person.

(b)    To the fullest extent permitted by law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Corporation, each of its directors, each of its officers who has signed the registration statement, each Person, if any, who controls the Corporation within the meaning of the Securities Act, any underwriter, any other Holder selling securities in such registration statement, and any controlling Person of any such other Holder against any losses, claims, damages, or liabilities to which any of the foregoing persons may become subject, under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, that occurs as a result of, in reliance upon and in conformity with written information furnished by or on behalf of such Holder expressly for use in such registration statement; and each such Holder will pay, as incurred, any legal or other expenses reasonably incurred by any person intended to be indemnified pursuant to this <u>subsection 10(b)</u>, in connection with investigating or defending any such loss, claim, damage, liability, or action; <u>provided</u>, <u>however</u>, that the indemnity agreement contained in this <u>subsection 10(b)</u> shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder, which consent shall not be unreasonably withheld, conditioned or delayed; <u>provided</u>, that in no event shall the aggregate amounts payable by any Holder by way of indemnity under this <u>subsection 10(b)</u> exceed the net proceeds from the offering received by such Holder.

16

(c)    Promptly after receipt by an indemnified party under this Section 10 of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 10, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in such action, and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties which may be represented without conflict by one (1) counsel) shall have the right to retain one (1) separate counsel, with the reasonable fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, but only if materially prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 10, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 10. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement that (x) does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release, in form and substance reasonably satisfactory to the indemnified party, from all liability in respect to such claim or litigation, (y) includes a statement about or an admission of fault, culpability or a failure to act by or on behalf of the indemnified party or (z) involves the imposition of equitable remedies or the imposition of any obligations on the indemnified party or adversely affects the indemnified party other than as a result of financial obligations for which such indemnified party would be entitled to indemnification hereunder.

(d)    If the indemnification provided for in this Section 10 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage or expense referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the indemnified party, on the other, in connection with the statements or omissions that resulted in such loss, liability, claim, damage or expense as well as any other relevant equitable considerations; provided, that in no event shall, (x) any contribution by a Holder under this subsection 10(d) exceed the net proceeds from the offering received by such Holder, except in the case of willful fraud by such Holder and (y) no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

17

(e)         Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control; provided, however, that that to the extent the underwriting agreement does not address a matter addressed by this Agreement, the failure to address such matter shall not be deemed a conflict between the provisions of this Agreement and the underwriting agreement.

(f)         Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Corporation and Holders under this Section 10 shall survive the completion of any offering of Registrable Securities in a registration statement under this Agreement, and otherwise shall survive the termination of this Agreement.

Section 11.         Reports Under the Exchange Act. With a view to making available to the Holders the benefits of Rule 144 promulgated under the Securities Act and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Corporation to the public without registration or pursuant to a registration on Form S-3, the Corporation shall, following the consummation of the IPO:

(a)         make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Corporation for the IPO;

(b)         take such action, including the voluntary registration of its equity interests under Section 12 of the Exchange Act, as is necessary to enable the Holders to utilize Form S-3 for the sale of their Registrable Securities, such action to be taken as soon as practicable after the end of the fiscal year in which the first registration statement filed by the Corporation for the offering of its securities to the general public is declared effective;

18

(c)        file with the SEC in a timely manner all reports and other documents required of the Corporation under the Securities Act and the Exchange Act; and

(d)        furnish to any Holder upon request, so long as the Holder owns any Registrable Securities, forthwith upon request (i) a written statement by the Corporation that it has complied with the reporting requirements of SEC Rule 144, the Securities Act and the Exchange Act (at any time after ninety (90) days after the effective date of the registration statement filed by the Corporation for the IPO), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Corporation and such other reports and documents so filed by the Corporation, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to such form (at any time after the Corporation has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Corporation so qualifies to use such form).

Section 12.        <u>Limitations on Subsequent Registration Rights</u>. The Corporation shall not, without the prior written consent of the Holders of a majority of the outstanding Registrable Securities, enter into any agreement with any holder or prospective holder of any securities of the Corporation which would (a) allow such holder or prospective holder to include such securities in any registration filed under Section 2 or Section 3, unless under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of his securities will not reduce the amount of the Registrable Securities of the Holders which is included,(b) allow such holder or prospective holder to make a demand registration which could result in such registration statement being declared effective within 120 days of the effective date of any registration effected pursuant to Section 2 or (c) otherwise conflict with the rights of Holders under this Agreement; *provided, however*, except as set forth in clause (c) above, this Section 12 shall not limit the rights of the Corporation with respect to Special Registration Statements.

Section 13.        <u>Lock-Up Agreements</u>.

(a)        In connection with the IPO, each Holder (each a "**Lock-Up Party**") has entered into a customary lock-up agreement with J.P. Morgan Securities LLC and Morgan Stanley & Co. LLC, as representatives (the "**Representatives**") of the several underwriters, pursuant to which each Lock-Up Party has agreed to certain restrictions relating to the shares of Capital Stock and certain other securities held by them (collectively, the "**Lock-Up Restrictions**"). The Corporation may impose stop-transfer instructions with respect to the shares of Capital Stock and other securities subject to the Lock-Up Restrictions.

<div align="center">19</div>

(b)        In connection with (i) any offering involving an underwriting of equity interests of the Corporation described in <u>Section 3</u> or (ii) any other underwritten offering in which Holders have an opportunity to participate under this Agreement and upon request of the underwriters managing such offering, each Holder agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Corporation, however or whenever acquired (other than those included in the registration) or engage in any swap or derivative transactions involving the Corporation's securities (the "**Lock-Up Restrictions**"), in each case as provided in an agreement with such managing underwriters, without the prior written consent of such managing underwriters, for such period of time as may be requested by such managing underwriters (commencing as of the effective date of such registration or pricing date of such offering as the case may be and ending no later than 90 days thereafter or the lesser of such period and any shorter period agreed to by the managing underwriters) and to execute an agreement reflecting the foregoing as may be requested by the managing underwriters at the time of such offering; provided that (i) no Holder will be required to agree to any Lock-Up Restrictions which do not apply to each other Holder and (ii) any waiver of a Lock-Up Restriction by the underwriter for the benefit of one Holder shall apply to all other Holders.

(c)        The obligations described in <u>subsection 13(b)</u> shall apply only if all officers and directors of the Corporation, and all holders of Registrable Securities holding at least five percent (5%) of the Corporation's voting securities, enter into similar agreements, and shall not apply to a registration relating solely to participants in the Corporation's equity plans or a transaction covered by Rule 145 under the Securities Act.

(d)        In order to enforce the foregoing covenants, the Corporation may impose stop-transfer instructions with respect to the securities of each Holder (and the securities of every other person subject to the restrictions in <u>subsection 13(a)</u> and <u>subsection 13(b)</u>).

Section 14.        <u>Subsidiary Public Offering</u>. If, after an initial public offering of the Capital Stock of one of its Subsidiaries (including the Company), the Corporation distributes securities of such Subsidiary to its equityholders, then the rights and obligations of the Corporation pursuant to this Agreement shall apply, mutatis mutandis, to such Subsidiary, and the Corporation shall cause such Subsidiary to comply with such Subsidiary's obligations under this Agreement.

Section 15.        <u>Transfer of Registrable Securities</u>. Notwithstanding anything to the contrary contained herein, except in the case of (i) a transfer to the Corporation, (ii) a transfer by any Original Equity Owner to any of its Affiliates or to their respective equityholders, (iii) a Public Offering, (iv) a sale pursuant to Rule 144 after the completion of the IPO or (v) a transfer in connection with a sale of the Corporation, prior to transferring any Registrable Securities to any Person (including, without limitation, by operation of law), the transferring Holder shall cause the prospective transferee to execute and deliver to the Corporation a joinder agreement in the form attached as Exhibit A hereto (a "*Joinder*") agreeing to be bound by the terms of this Agreement whereupon such transferee shall be a "Holder" for purposes of this Agreement. The Corporation agrees to countersign any Joinder executed by Affiliate of an Original Equity Owner to whom Registrable Securities have been transferred. Any transfer or attempted transfer of any Registrable Securities in violation of any provision of this Agreement shall be void, and the Corporation shall not record such transfer on its books or treat any purported transferee of such Registrable Securities as the owner thereof for any purpose.

<center>20</center>

Section 16.        MNPI Provisions.

(a)        Each Holder acknowledges that the provisions of this Agreement that require communications by the Corporation or other Holders to such Holder may result in such Holder and its directors, officers, employees, agents, attorneys, affiliates and financial and other advisors acquiring MNPI (which may include, solely by way of illustration, the fact that an offering of the Corporation's securities is pending or the number of Corporation securities or the identity of the selling Holders).

(b)        Each Holder shall have the right, at any time and from time to time (including after receiving information regarding any potential Public Offering), to elect to not receive any notice that the Corporation or any other Holders otherwise are required to deliver pursuant to this Agreement by delivering to the Corporation a written statement signed by such Holder that it does not want to receive any notices hereunder (an "*Opt-Out Request*"); in which case and notwithstanding anything to the contrary in this Agreement the Corporation and other Holders shall not be required to, and shall not, deliver any notice or other information required to be provided to Holders hereunder to the extent that the Corporation or such other Holders reasonably expect would result in a Holder acquiring MNPI. An Opt-Out Request may state a date on which it expires or, if no such date is specified, shall remain in effect indefinitely. A Holder who previously has given the Corporation an Opt-Out Request may revoke such request at any time, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-Out Requests; *provided* that each Holder shall use commercially reasonable efforts to minimize the administrative burden on the Corporation arising in connection with any such Opt-Out Requests.

(c)        Each Holder agrees that it will maintain the confidentiality of such MNPI and, to the extent such Holder is not a natural person, such confidential treatment shall be in accordance with procedures adopted by it in good faith to protect confidential information of third parties delivered to such Holder ("**Policies**"); *provided* that a holder may deliver or disclose MNPI to (i) its directors, officers, employees, agents, attorneys, affiliates and financial and other advisors, but solely to the extent such disclosure reasonably relates to its evaluation of exercise of its rights under this Agreement and the sale of any Registrable Securities in connection with the subject of the notice, (ii) any federal or state regulatory authority having jurisdiction over such Holder, (iii) any Person if necessary to effect compliance with any law, rule, regulation or order applicable to such Holder, (iv) in response to any subpoena or other legal process, or (v) in connection with any litigation to which such Holder is a party; provided further, that in the case of clause (i), the recipients of such MNPI are subject to the Policies or agree to hold confidential the MNPI in a manner substantially consistent with the terms of this Section 16 and that in the case of clauses (ii) through (v), such disclosure is required by law and such Holder shall promptly notify the Corporation of such disclosure to the extent such Holder is legally permitted to give such notice.

21

Section 17.        General Provisions.

(a)        Amendments and Waivers. Except as otherwise provided herein, the provisions of this Agreement may be amended, modified, terminated or waived only with the prior written consent of the Corporation and each affected Holder. The failure or delay of any Person to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such Person thereafter to enforce each and every provision of this Agreement in accordance with its terms. A waiver or consent to or of any breach or default by any Person in the performance by that Person of his, her or its obligations under this Agreement shall not be deemed to be a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person under this Agreement.

(b)        Remedies. The parties to this Agreement shall be entitled to enforce their rights under this Agreement specifically (without posting a bond or other security), to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that a breach of this Agreement would cause irreparable harm and money damages would not be an adequate remedy for any such breach and that, in addition to any other rights and remedies existing hereunder, any party shall be entitled to specific performance and/or other injunctive relief from any court of law or equity of competent jurisdiction (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement.

(c)        Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited, invalid, illegal or unenforceable in any respect under any applicable law or regulation in any jurisdiction, such prohibition, invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such prohibited, invalid, illegal or unenforceable provision had never been contained herein.

(d)        Entire Agreement. Except as otherwise provided herein, this Agreement contains the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof in any way.

(e)        Successors and Assigns. This Agreement shall bind and inure to the benefit and be enforceable by the Corporation and its successors and assigns and the Holders and their respective successors and assigns (whether so expressed or not). In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit Holders are also for the benefit of, and enforceable by, any subsequent or successor Holder.

22

(f)        Notices. Any notice, demand or other communication to be given under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) when sent by confirmed electronic mail f sent during normal business hours of the recipient but, if not, then on the next Business Day, (iii) one Business Day after it is sent to the recipient by reputable overnight courier service (charges prepaid) or (iv) three Business Days after it is mailed to the recipient by first class mail, return receipt requested. Such notices, demands and other communications shall be sent to the Corporation at the address specified below and to any Original Equity Owner or to any other party subject to this Agreement at such address as indicated on the Schedule of Holders, or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. Any party may change such party's address for receipt of notice by providing prior written notice of the change to the sending party as provided herein. The Corporation's address is:

Fluence Energy, Inc.
4601 Fairfax Drive, Suite 600
Arlington, Virginia 22203
Attn: General Counsel
Email: frank.fuselier@fluenceenergy.com

With a copy to:

Fluence Energy, Inc.
4601 Fairfax Drive, Suite 600
Arlington, Virginia 22203
Attn: Chief Financial Officer

Email: dennis.fehr@fluenceenergy.com

With a copy to (which shall not serve as notice):
Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attn: Senet S. Bischoff, Esq.
Facsimile: (212) 751-4864

or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.

(g)        Business Days. If any time period for giving notice or taking action hereunder expires on a day that is not a Business Day, the time period shall automatically be extended to the immediately following Business Day.

(h)        Governing Law. The corporate law of the State of Delaware shall govern all issues and questions concerning the relative rights of the Corporation and its stockholders. All other issues and questions concerning the construction, validity, interpretation and enforcement of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

23

(i)         MUTUAL WAIVER OF JURY TRIAL. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), EACH PARTY HERETO EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY.

(j)         CONSENT TO JURISDICTION AND SERVICE OF PROCESS. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE CITY AND COUNTY OF NEW YORK BOROUGH OF MANHATTAN, FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH OF THE PARTIES HERETO FURTHER AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY U.S. REGISTERED MAIL TO SUCH PARTY'S RESPECTIVE ADDRESS SET FORTH ABOVE SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION, SUIT OR PROCEEDING WITH RESPECT TO ANY MATTERS TO WHICH IT HAS SUBMITTED TO JURISDICTION IN THIS PARAGRAPH. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF THIS AGREEMENT, ANY RELATED DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, AND HEREBY AND THEREBY FURTHER IRREVOCABLY AND UNCONDITIONALLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION, SUIT OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(k)         No Recourse. Notwithstanding anything to the contrary in this Agreement, the Corporation and each Holder agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement, shall be had against any current or future director, officer, employee, general or limited partner or member of any Holder or of any Affiliate or assignee thereof, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future officer, agent or employee of any Holder or any current or future member of any Holder or any current or future director, officer, employee, partner or member of any Holder or of any Affiliate or assignee thereof, as such for any obligation of any Holder under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

(l)         Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. The use of the word "including" in this Agreement shall be by way of example rather than by limitation.

(m)         No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

<div align="center">24</div>

(n)        Counterparts. This Agreement may be executed in multiple counterparts, any one of which need not contain the signature of more than one party, but all such counterparts taken together shall constitute one and the same agreement.

(o)        Electronic Delivery. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent executed and delivered by means of a photographic, photostatic, or similar reproduction of such signed writing using electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(p)        Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Holder shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated hereby.

(q)        No Inconsistent Agreements. The Corporation shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders in this Agreement.

(r)        Termination. Qatar Holding LLC shall have the option to terminate, at their sole discretion and solely with respect to Qatar Holding LLC and any of its Affiliates or assignees who have delivered (or have the right to deliver) a Joinder or who otherwise have rights or obligations under this Agreement, this Agreement and their rights and obligations hereunder (other than rights and obligations under Sections 10, 16 and 17 of this Agreement) if at any time (A) the Board no longer has a QIA Director and (B) the QIA Related Parties beneficially own, directly or indirectly, in the aggregate less than ten percent (10%) of all issued and outstanding shares of Class A Common Stock (including for this purpose the Underlying Class A Shares). Defined terms included in this subsection (r), other than "Affiliates", "Agreement" and "Joinder" shall have the meanings set forth in the Stockholders Agreement of Fluence Energy, Inc. dated as of [ ● ], 2021.

* * * * *

25

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**FLUENCE ENERGY, INC.**

By: _____
Name:   Manuel Perez Dubuc
Title:    Chief Executive Officer

By: _____
Name:   Dennis Fehr
Title:    Chief Financial Officer

[*Signature Page to Registration Rights Agreement*]

**AES Grid Stability, LLC**

By: [ ● ],
its [ ● ]

By: _____
Name:
Title:

[*Signature Page to Registration Rights Agreement*]

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 474 of 1007 PageID# 1453

**AES Grid Stability, LLC**

By: [ ● ],
its [ ● ]

By:
Name:
Title:

[*Signature Page to Registration Rights Agreement*]

**SIEMENS INDUSTRY, INC.**

By: _____
Name:
Title:

By: _____
Name:
Title:

[*Signature Page to Registration Rights Agreement*]

**QATAR HOLDING LLC**

By: [ ● ],
its [ ● ]

By:  _____
Name:
Title:

[*Signature Page to Registration Rights Agreement*]

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 476 of 1007
PageID# 1455

**QATAR HOLDING LLC**

By: [ ● ],
its [ ● ]

By:
Name:
Title:

[*Signature Page to Registration Rights Agreement*]

**SCHEDULE OF HOLDERS**

| **Holder** | **Continuing Equity Owner/ Former LLC Equity Owner** |
| --- | --- |
| AES Grid Stability, LLC | Continuing Equity Owner |
| Siemens Industry, Inc. | Continuing Equity Owner |
| Qatar Holding LLC | Former LLC Equity Owner |

30

**EXHIBIT A**

**REGISTRATION RIGHTS AGREEMENT JOINDER**

The undersigned is executing and delivering this Joinder pursuant to the Registration Rights Agreement dated as of October [ ● ], 2021 (as the same may hereafter be amended, the "***Registration Rights Agreement***"), among Fluence Energy, Inc., a Delaware corporation (the "***Corporation***"), and the other person named as parties therein.

By executing and delivering this Joinder to the Corporation, and upon acceptance hereof by the Corporation upon the execution of a counterpart hereof, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Registration Rights Agreement as a Holder of Registrable Securities in the same manner as if the undersigned were an original signatory to the Registration Rights Agreement, and the undersigned's shares of Class A Common Stock shall be included as Registrable Securities under the Registration Rights Agreement to the extent provided therein. The Corporation is directed to add the address below the undersigned's signature on this Joinder to the Schedule of Holders attached to the Registration Rights Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the day of _____, 20__.

Signature of Stockholder

_____

Print Name of Stockholder

Its:

Address:

Agreed and Accepted as of _____, 20__

**Fluence Energy, Inc.**

By: _____

Name:

Its:

31

**Exhibit 10.5**

| |
|---|
| **FLUENCE ENERGY, INC.**<br>**2021 INCENTIVE AWARD PLAN** |

## ARTICLE I.
## PURPOSE

The Plan's purpose is to enhance the Company's ability to attract, retain and motivate persons who make (or are expected to make) important contributions to the Company by providing these individuals with equity ownership opportunities. Capitalized terms used in the Plan are defined in Article **XI.**

## ARTICLE II.
## ELIGIBILITY

Service Providers are eligible to be granted Awards under the Plan, subject to the limitations described herein.

## ARTICLE III.
## ADMINISTRATION AND DELEGATION

3.1        <u>Administration</u>. The Plan is administered by the Administrator. The Administrator has authority to determine which Service Providers receive Awards, grant Awards and set Award terms and conditions, subject to the conditions and limitations in the Plan. The Administrator also has the authority to take all actions and make all determinations under the Plan, to interpret the Plan and Award Agreements and to adopt, amend and repeal Plan administrative rules, guidelines and practices as it deems advisable. The Administrator may correct defects and ambiguities, supply omissions and reconcile inconsistencies in the Plan or any Award as it deems necessary or appropriate to administer the Plan and any Awards. The Administrator's determinations under the Plan are in its sole discretion and will be final and binding on all persons having or claiming any interest in the Plan or any Award.

3.2        <u>Appointment of Committees</u>. To the extent Applicable Laws permit, the Board may delegate any or all of its powers under the Plan to one or more Committees. The Board may abolish any Committee or re-vest in itself any previously delegated authority at any time.

## ARTICLE IV.
## STOCK AVAILABLE FOR AWARDS

4.1        <u>Number of Shares</u>. Subject to adjustment under Article **VIII** and the terms of this Article **IV**, Awards may be made under the Plan covering up to the Overall Share Limit. Shares issued under the Plan may consist of authorized but unissued Shares, Shares purchased on the open market or treasury Shares.

4.2        <u>Share Recycling</u>. If all or any part of an Award expires, lapses or is terminated, exchanged for cash, surrendered, repurchased, canceled without having been fully exercised or forfeited, in any case, in a manner that results in the Company acquiring Shares at a price not greater than the price (as adjusted to reflect any Equity Restructuring) paid by the Participant for such Shares or not issuing any Shares covered by the Award, the unused Shares covered by the Award will, as applicable, become or again be available for Award grants under the Plan. Further, Shares delivered (either by actual delivery or attestation) to the Company by a Participant to satisfy the applicable exercise or purchase price of an Award and/or to satisfy any applicable tax withholding obligation (including Shares retained by the Company from the Award being exercised or purchased and/or creating the tax obligation) will not, as applicable, become or again be available for Award grants under the Plan. The payment of Dividend Equivalents in cash in conjunction with any outstanding Awards shall not count against the Overall Share Limit.

4.3         Incentive Stock Option Limitations. Notwithstanding anything to the contrary herein, no more than 9,500,000 Shares may be issued pursuant to the exercise of Incentive Stock Options.

4.4         Substitute Awards. In connection with an entity's merger or consolidation with the Company or the Company's acquisition of an entity's property or stock, the Administrator may grant Substitute Awards in respect of any options or other stock or stock-based awards granted before such merger or consolidation by such entity or its affiliate in accordance with Applicable Laws. Substitute Awards may be granted on such terms as the Administrator deems appropriate, notwithstanding limitations on Awards in the Plan. Substitute Awards will not count against the Overall Share Limit (nor shall Shares subject to a Substitute Award be added back to the Shares available for Awards under the Plan as provided in Section 4.2 above), except that Shares acquired by exercise of substitute Incentive Stock Options will count against the maximum number of Shares that may be issued pursuant to the exercise of Incentive Stock Options under the Plan. Additionally, in the event that a company acquired by the Company or any Affiliate or with which the Company or any Affiliate combines has shares available under a pre-existing plan approved by stockholders and not adopted in contemplation of such acquisition or combination, the shares available for grant pursuant to the terms of such pre-existing plan (as adjusted, to the extent appropriate, using the exchange ratio or other adjustment or valuation ratio or formula used in such acquisition or combination to determine the consideration payable to the holders of common stock of the entities party to such acquisition or combination) may be used for Awards under the Plan and shall not count against the Overall Share Limit (and Shares subject to such Awards shall not be added to the Shares available for Awards under the Plan as provided above in Section 4.2); provided that Awards using such available shares shall not be made after the date awards or grants could have been made under the terms of the pre-existing plan, absent the acquisition or combination, and shall only be made to individuals who were not Employees or Directors prior to such acquisition or combination.

4.5         Non-Employee Director Compensation. Notwithstanding any provision to the contrary in the Plan, the Administrator may establish compensation for non-employee Directors from time to time, subject to the limitations in the Plan. The Administrator will from time to time determine the terms, conditions and amounts of all such non-employee Director compensation in its discretion and pursuant to the exercise of its business judgment, taking into account such factors, circumstances and considerations as it shall deem relevant from time to time, provided that the sum of any cash compensation, or other compensation, and the value (determined as of the grant date in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 718, or any successor thereto) of Awards granted to a non-employee Director as compensation for services as a non-employee Director during any fiscal year of the Company may not exceed $500,000, increased to $750,000 for a non-employee Director's initial fiscal year of service as a non-employee Director. The Administrator may make exceptions to these limits for individual non-employee Directors in extraordinary circumstances, as the Administrator may determine in its discretion, provided that the non-employee Director receiving such additional compensation may not participate in the decision to award such compensation or in other contemporaneous compensation decisions involving non-employee Directors.

<div align="center">

**ARTICLE V.**
**STOCK OPTIONS AND STOCK APPRECIATION RIGHTS**

</div>

5.1         General. The Administrator may grant Options or Stock Appreciation Rights to Service Providers subject to the limitations in the Plan, including any limitations in the Plan that apply to Incentive Stock Options. The Administrator will determine the number of Shares covered by each Option and Stock Appreciation Right, the exercise price of each Option and Stock Appreciation Right and the conditions and limitations applicable to the exercise of each Option and Stock Appreciation Right. A Stock Appreciation Right will entitle the Participant (or other person entitled to exercise the Stock Appreciation Right) to receive from the Company upon exercise of the exercisable portion of the Stock Appreciation Right an amount determined by multiplying the excess, if any, of the Fair Market Value of one Share on the date of exercise over the exercise price per Share of the Stock Appreciation Right by the number of Shares with respect to which the Stock Appreciation Right is exercised, subject to any limitations of the Plan or that the Administrator may impose and payable in cash, Shares valued at such Fair Market Value or a combination of the two as the Administrator may determine or provide in the Award Agreement.

5.2        Exercise Price. The Administrator will establish each Option's and Stock Appreciation Right's exercise price and specify the exercise price in the Award Agreement. Unless otherwise determined by the Administrator, the exercise price will not be less than 100% of the Fair Market Value of a Share on the grant date of the Option or Stock Appreciation Right.

5.3        Duration. Each Option or Stock Appreciation Right will be exercisable at such times and as specified in the Award Agreement, provided that, unless otherwise determined by the Administrator in accordance with Applicable Laws, the term of an Option or Stock Appreciation Right will not exceed ten years. Notwithstanding the foregoing, if the Participant, prior to the end of the term of an Option or Stock Appreciation Right, violates the non-competition, non-solicitation, confidentiality or other similar restrictive covenant provisions of any employment contract, confidentiality and nondisclosure agreement or other agreement between the Participant and the Company or any Affiliate, the right of the Participant and the Participant's transferees to exercise any Option or Stock Appreciation Right issued to the Participant shall terminate immediately upon such violation unless the Administrator otherwise determines.

5.4        Exercise. Options and Stock Appreciation Rights may be exercised by delivering to the Company a written notice of exercise, in a form the Administrator approves (which may be electronic), signed by the person authorized to exercise the Option or Stock Appreciation Right, together with, as applicable, payment in full (i) as specified in Section 5.5 for the number of Shares for which the Award is exercised and (ii) as specified in Section 9.5 for any applicable taxes. Unless the Administrator otherwise determines, an Option or Stock Appreciation Right may not be exercised for a fraction of a Share.

5.5        Payment Upon Exercise. Subject to Section 10.8, any Company insider trading policy (including blackout periods) and Applicable Laws, the exercise price of an Option must be paid by:

(a)        cash, wire transfer of immediately available funds or by check payable to the order of the Company, provided that the Company may limit the use of one of the foregoing payment forms if one or more of the payment forms below is permitted;

(b)        if there is a public market for Shares at the time of exercise, unless the Company otherwise determines, (A) delivery (including telephonically to the extent permitted by the Company) of an irrevocable and unconditional undertaking by a broker acceptable to the Company to deliver promptly to the Company sufficient funds to pay the exercise price, or (B) the Participant's delivery to the Company of a copy of irrevocable and unconditional instructions to a broker acceptable to the Company to deliver promptly to the Company cash or a check sufficient to pay the exercise price; provided that such amount is paid to the Company at such time as may be required by the Administrator;

(c)        to the extent permitted by the Administrator, delivery (either by actual delivery or attestation) of Shares owned by the Participant valued at their Fair Market Value;

(d)        to the extent permitted by the Administrator, surrendering Shares then issuable upon the Option's exercise valued at their Fair Market Value on the exercise date;

(e)        to the extent permitted by the Administrator, delivery of any other property that the Administrator determines is good and valuable consideration; or

(f)        to the extent permitted by the Company, any combination of the above payment forms approved by the Administrator.

**ARTICLE VI.**
**RESTRICTED STOCK; RESTRICTED STOCK UNITS**

6.1        <u>General</u>. The Administrator may grant Restricted Stock, or the right to purchase Restricted Stock, to any Service Provider, subject to the Company's right to repurchase all or part of such shares at their issue price or other stated or formula price from the Participant (or to require forfeiture of such shares) if conditions the Administrator specifies in the Award Agreement are not satisfied before the end of the applicable restriction period or periods that the Administrator establishes for such Award. In addition, the Administrator may grant to Service Providers Restricted Stock Units, which may be subject to vesting and forfeiture conditions during the applicable restriction period or periods, as set forth in an Award Agreement. The Administrator will determine and set forth in the Award Agreement the terms and conditions for each Restricted Stock and Restricted Stock Unit Award, subject to the conditions and limitations contained in the Plan.

6.2        <u>Restricted Stock</u>.

(a)        <u>Dividends</u>. Participants holding shares of Restricted Stock will be entitled to all ordinary cash dividends paid with respect to such Shares, unless the Administrator provides otherwise in the Award Agreement. In addition, unless the Administrator provides otherwise, if any dividends or distributions are paid in Shares, or consist of a dividend or distribution to holders of Common Stock of property other than an ordinary cash dividend, the Shares or other property will be subject to the same restrictions on transferability and forfeitability as the shares of Restricted Stock with respect to which they were paid.

(b)        <u>Stock Certificates</u>. The Company may require that the Participant deposit in escrow with the Company (or its designee) any stock certificates issued in respect of shares of Restricted Stock, together with a stock power endorsed in blank.

(c)        <u>Section 83(b) Election</u>. If a Participant makes an election under Section 83(b) of the Code to be taxed with respect to the Restricted Stock as of the date of transfer of the Restricted Stock rather than as of the date or dates upon which such Participant would otherwise be taxable under Section 83(a) of the Code, such Participant shall be required to deliver a copy of such election to the Company promptly after filing such election with the Internal Revenue Service along with proof of the timely filing thereof.

6.3        <u>Restricted Stock Units.</u>

(a)        <u>Settlement</u>. The Administrator may provide that settlement of Restricted Stock Units will occur upon or as soon as reasonably practicable after the Restricted Stock Units vest or will instead be deferred, on a mandatory basis or at the Participant's election, in a manner intended to comply with Section 409A.

(b)        Stockholder Rights. A Participant will have no rights of a stockholder with respect to Shares subject to any Restricted Stock Unit unless and until the Shares are delivered in settlement of the Restricted Stock Unit.

(c)        Dividend Equivalents. If the Administrator provides, a grant of Restricted Stock Units may provide a Participant with the right to receive Dividend Equivalents. Dividend Equivalents may be paid currently or credited to an account for the Participant, settled in cash or Shares and subject to the same restrictions on transferability and forfeitability as the Restricted Stock Units with respect to which the Dividend Equivalents are granted and subject to other terms and conditions as set forth in the Award Agreement.

## ARTICLE VII.
### OTHER STOCK OR CASH BASED AWARDS

7.1        Other Stock or Cash Based Awards may be granted to Participants, including Awards entitling Participants to receive Shares to be delivered in the future and including annual or other periodic or long-term cash bonus awards (whether based on specified Performance Criteria or otherwise), in each case subject to any conditions and limitations in the Plan. Such Other Stock or Cash Based Awards will also be available as a payment form in the settlement of other Awards, as standalone payments and as payment in lieu of compensation to which a Participant is otherwise entitled. Other Stock or Cash Based Awards may be paid in Shares, cash or other property, as the Administrator determines. Subject to the provisions of the Plan, the Administrator will determine the terms and conditions of each Other Stock or Cash Based Award, including any purchase price, performance goal (which may be based on the Performance Criteria), transfer restrictions, and vesting conditions, which will be set forth in the applicable Award Agreement.

## ARTICLE VIII.
### ADJUSTMENTS FOR CHANGES IN COMMON STOCK AND CERTAIN OTHER EVENTS

8.1        Equity Restructuring(a). In connection with any Equity Restructuring, notwithstanding anything to the contrary in this Article VIII, the Administrator will equitably adjust each outstanding Award as it deems appropriate to reflect the Equity Restructuring, which may include adjusting the number and type of securities subject to each outstanding Award and/or the Award's exercise price or grant price (if applicable), granting new Awards to Participants, and making a cash payment to Participants. The adjustments provided under this Section 8.1 will be nondiscretionary and final and binding on the affected Participant and the Company; provided that the Administrator will determine whether an adjustment is equitable.

8.2        Corporate Transactions. In the event of any dividend or other distribution (whether in the form of cash, Common Stock, other securities, or other property), reorganization, merger, consolidation, combination, amalgamation, repurchase, recapitalization, liquidation, dissolution, or sale, transfer, exchange or other disposition of all or substantially all of the assets of the Company, or sale or exchange of Common Stock or other securities of the Company, Change in Control, issuance of warrants or other rights to purchase Common Stock or other securities of the Company, other similar corporate transaction or event, other unusual or nonrecurring transaction or event affecting the Company or its financial statements or any change in any Applicable Laws or accounting principles, the Administrator, on such terms and conditions as it deems appropriate, either by the terms of the Award or by action taken prior to the occurrence of such transaction or event (except that action to give effect to a change in Applicable Law or accounting principles may be made within a reasonable period of time after such change) and either automatically or upon the Participant's request, is hereby authorized to take any one or more of the following actions whenever the Administrator determines that such action is appropriate in order to (x) prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available under the Plan or with respect to any Award granted or issued under the Plan, (y) to facilitate such transaction or event or (z) give effect to such changes in Applicable Laws or accounting principles:

5

(a)        To provide for the cancellation of any such Award in exchange for either an amount of cash or other property with a value equal to the amount that could have been obtained upon the exercise or settlement of the vested portion of such Award or realization of the Participant's rights under the vested portion of such Award, as applicable; provided that, if the amount that could have been obtained upon the exercise or settlement of the vested portion of such Award or realization of the Participant's rights, in any case, is equal to or less than zero, then the Award may be terminated without payment;

(b)        To provide that such Award shall vest and, to the extent applicable, be exercisable as to all shares covered thereby, notwithstanding anything to the contrary in the Plan or the provisions of such Award;

(c)        To provide that such Award be assumed by the successor or survivor corporation, or a parent or subsidiary thereof, or shall be substituted for by awards covering the stock of the successor or survivor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and/or applicable exercise or purchase price, in all cases, as determined by the Administrator;

(d)        To make adjustments in the number and type of shares of Common Stock (or other securities or property) subject to outstanding Awards and/or with respect to which Awards may be granted under the Plan (including, but not limited to, adjustments of the limitations in Article IV hereof on the maximum number and kind of shares which may be issued) and/or in the terms and conditions of (including the grant or exercise price), and the criteria included in, outstanding Awards;

(e)        To replace such Award with other rights or property selected by the Administrator; and/or

(f)        To provide that the Award will terminate and cannot vest, be exercised or become payable after the applicable event.

8.3        Administrative Stand Still. In the event of any pending stock dividend, stock split, combination or exchange of shares, merger, consolidation or other distribution (other than normal cash dividends) of Company assets to stockholders, or any other extraordinary transaction or change affecting the Shares or the share price of Common Stock, including any Equity Restructuring or any securities offering or other similar transaction, for administrative convenience, the Administrator may refuse to permit the exercise of any Award for up to sixty days before or after such transaction.

8.4        General. Except as expressly provided in the Plan or the Administrator's action under the Plan, no Participant will have any rights due to any subdivision or consolidation of Shares of any class, dividend payment, increase or decrease in the number of Shares of any class or dissolution, liquidation, merger, or consolidation of the Company or other corporation. Except as expressly provided with respect to an Equity Restructuring under Section 8.1 above or the Administrator's action under the Plan, no issuance by the Company of Shares of any class, or securities convertible into Shares of any class, will affect, and no adjustment will be made regarding, the number of Shares subject to an Award or the Award's grant price or exercise price (if applicable). The existence of the Plan, any Award Agreements and the Awards granted hereunder will not affect or restrict in any way the Company's right or power to make or authorize (i) any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, (ii) any merger, consolidation dissolution or liquidation of the Company or sale of Company assets or (iii) any sale or issuance of securities, including securities with rights superior to those of the Shares or securities convertible into or exchangeable for Shares. The Administrator may treat Participants and Awards (or portions thereof) differently under this Article VIII.

6

**ARTICLE IX.**
**GENERAL PROVISIONS APPLICABLE TO AWARDS**

9.1          Transferability. Except as the Administrator may determine or provide in an Award Agreement or otherwise for Awards other than Incentive Stock Options, Awards may not be sold, assigned, transferred, pledged or otherwise encumbered, either voluntarily or by operation of law, except by will or the laws of descent and distribution, or, subject to the Administrator's consent, pursuant to a domestic relations order, and, during the life of the Participant, will be exercisable only by the Participant. References to a Participant, to the extent relevant in the context, will include references to a Participant's authorized transferee that the Administrator specifically approves.

9.2          Documentation. Each Award will be evidenced in an Award Agreement, which may be written or electronic, as the Administrator determines. Each Award may contain terms and conditions in addition to those set forth in the Plan.

9.3          Discretion. Except as the Plan otherwise provides, each Award may be made alone or in addition or in relation to any other Award. The terms of each Award to a Participant need not be identical, and the Administrator need not treat Participants or Awards (or portions thereof) uniformly.

9.4          Termination of Service; Change in Status. The Administrator will determine, in its sole discretion, the effect of all matters and questions relating to any Termination of Service, including, without limitation, whether a Termination of Service has occurred, whether a Termination of Service resulted from a discharge for Cause and all questions of whether a particular leave of absence constitutes a Termination of Service or whether any other change or purported change in a Participant's Service Provider status affects an Award and the extent to which, and the period during which, the Participant, the Participant's legal representative, conservator, guardian or Designated Beneficiary may exercise rights under the Award, if applicable.

9.5          Withholding. Each Participant must pay the Company, or make provision satisfactory to the Administrator for payment of, any taxes required by Applicable Law to be withheld in connection with such Participant's Awards by the date of the event creating the tax liability. The Company may deduct an amount sufficient to satisfy such tax obligations based on the applicable statutory withholding rates (or such other rate as may be determined by the Company after considering any accounting consequences or costs) from any payment of any kind otherwise due to a Participant. Subject to Section 10.8 and any Company insider trading policy (including blackout periods), Participants may satisfy such tax obligations (i) in cash, by wire transfer of immediately available funds, or by check made payable to the order of the Company, provided that the Company may limit the use of one of the foregoing payment forms if one or more of the payment forms below is permitted, (ii) to the extent permitted by the Administrator, in whole or in part by delivery of Shares, including Shares retained from the Award creating the tax obligation, valued at their Fair Market Value, (iii) if there is a public market for Shares at the time the tax obligations are to be satisfied, unless the Company otherwise determines, (A) delivery (including telephonically to the extent permitted by the Company) of an irrevocable and unconditional undertaking by a broker acceptable to the Company to deliver promptly to the Company sufficient funds to satisfy the tax obligations, or (B) delivery by the Participant to the Company of a copy of irrevocable and unconditional instructions to a broker acceptable to the Company to deliver promptly to the Company cash or a check sufficient to satisfy the tax withholding; provided that such amount is paid to the Company at such time as may be required by the Administrator, or (iv) to the extent permitted by the Company, any combination of the foregoing payment forms approved by the Administrator. If any tax withholding obligation will be satisfied under clause (ii) of the immediately preceding sentence by the Company's retention of Shares from the Award creating the tax obligation and there is a public market for Shares at the time the tax obligation is satisfied, the Company may elect to instruct any brokerage firm determined acceptable to the Company for such purpose to sell on the applicable Participant's behalf some or all of the Shares retained and to remit the proceeds of the sale to the Company or its designee, and each Participant's acceptance of an Award under the Plan will constitute the Participant's authorization to the Company and instruction and authorization to such brokerage firm to complete the transactions described in this sentence.

9.6     Amendment of Award; Repricing. The Administrator may amend, modify or terminate any outstanding Award, including by substituting another Award of the same or a different type, changing the exercise or settlement date, and converting an Incentive Stock Option to a Non-Qualified Stock Option. The Participant's consent to such action will be required unless (i) the action, taking into account any related action, does not materially and adversely affect the Participant's rights under the Award, or (ii) the change is permitted under Article VIII or pursuant to Section 10.6. Notwithstanding the foregoing or anything in the Plan to the contrary, the Administrator may not, without the approval of the stockholders of the Company, (i) reduce the exercise price per share of outstanding Options or Stock Appreciation Rights (ii) cancel outstanding Options or Stock Appreciation Rights in exchange for Options or Stock Appreciation Rights with an exercise price per share that is less than the exercise price per share of the original Options or Stock Appreciation Rights, or (iii) cancel outstanding underwater Options or Stock Appreciation Rights in exchange for cash or other Awards.

9.7     Conditions on Delivery of Stock. The Company will not be obligated to deliver any Shares under the Plan or remove restrictions from Shares previously delivered under the Plan until (i) all Award conditions have been met or removed to the Company's satisfaction, (ii) as determined by the Company, all other legal matters regarding the issuance and delivery of such Shares have been satisfied, including any applicable securities laws and stock exchange or stock market rules and regulations, and (iii) the Participant has executed and delivered to the Company such representations or agreements as the Administrator deems necessary or appropriate to satisfy any Applicable Laws. The Company's inability to obtain authority from any regulatory body having jurisdiction, which the Administrator determines is necessary to the lawful issuance and sale of any securities, will relieve the Company of any liability for failing to issue or sell such Shares as to which such requisite authority has not been obtained.

9.8     Acceleration. The Administrator may at any time provide that any Award will become immediately vested and fully or partially exercisable, free of some or all restrictions or conditions, or otherwise fully or partially realizable.

9.9     Additional Terms of Incentive Stock Options. The Administrator may grant Incentive Stock Options only to employees of the Company, any of its present or future parent or subsidiary corporations, as defined in Sections 424(e) or (f) of the Code, respectively, and any other entities the employees of which are eligible to receive Incentive Stock Options under the Code. If an Incentive Stock Option is granted to a Greater Than 10% Stockholder, the exercise price will not be less than 110% of the Fair Market Value of a Share on the Option's grant date, and the term of the Option will not exceed five years. All Incentive Stock Options will be subject to and construed consistently with Section 422 of the Code. By accepting an Incentive Stock Option, the Participant agrees if requested by the Company to give prompt notice to the Company of dispositions or other transfers (other than in connection with a Change in Control) of Shares acquired under the Option made within (i) two years from the grant date of the Option or (ii) one year after the transfer of such Shares to the Participant, specifying the date of the disposition or other transfer and the amount the Participant realized, in cash, other property, assumption of indebtedness or other consideration, in such disposition or other transfer. Neither the Company nor the Administrator will be liable to a Participant, or any other party, if an Incentive Stock Option fails or ceases to qualify as an "incentive stock option" under Section 422 of the Code. Any Incentive Stock Option or portion thereof that fails to qualify as an "incentive stock option" under Section 422 of the Code for any reason, including becoming exercisable with respect to Shares having a fair market value exceeding the $100,000 limitation under Treasury Regulation Section 1.422-4, will be a Non-Qualified Stock Option.

8

**ARTICLE X.**
**MISCELLANEOUS**

10.1      <u>No Right to Employment or Other Status</u>. No person will have any claim or right to be granted an Award, and the grant of an Award will not be construed as giving a Participant the right to continued employment or any other relationship with the Company or any Affiliate. The Company expressly reserves the right at any time to dismiss or otherwise terminate its relationship with a Participant free from any liability or claim under the Plan or any Award, except as expressly provided in an Award Agreement.

10.2      <u>No Rights as Stockholder; Certificates</u>. Subject to the Award Agreement, no Participant or Designated Beneficiary will have any rights as a stockholder with respect to any Shares to be distributed under an Award until becoming the record holder of such Shares. Notwithstanding any other provision of the Plan, unless the Administrator otherwise determines or Applicable Laws require, the Company will not be required to deliver to any Participant certificates evidencing Shares issued in connection with any Award and instead such Shares may be recorded in the books of the Company (or, as applicable, its transfer agent or stock plan administrator). The Company may place legends on stock certificates issued under the Plan that the Administrator deems necessary or appropriate to comply with Applicable Laws.

10.3      <u>Effective Date and Term of Plan</u>. The Plan will become effective on the Pricing Date and, unless earlier terminated by the Board, will remain in effect until the earlier of (i) the earliest date as of which all Awards granted under the Plan have been satisfied in full or terminated and no Shares approved for issuance under the Plan remain available to be granted under new Awards or (ii) the earlier of the tenth anniversary of (A) the date the Plan was adopted by the Board or (B) the date the Plan was approved by the Company's stockholders, but Awards previously granted may extend beyond that date in accordance with the Plan. If the Plan is not approved by the Company's stockholders, the Plan will not become effective and no Awards will be granted under the Plan.

10.4      <u>Amendment of Plan</u>. The Administrator may amend, suspend or terminate the Plan at any time; provided that no amendment, other than an increase to the Overall Share Limit, may materially and adversely affect any Award outstanding at the time of such amendment in a manner disproportionate to other similarly-situated Awards without the affected Participant's consent. No Awards may be granted under the Plan during any suspension period or after Plan termination. Awards outstanding at the time of any Plan suspension or termination will continue to be governed by the Plan and the Award Agreement, as in effect before such suspension or termination. The Company will obtain stockholder approval of any Plan amendment to the extent necessary to comply with Applicable Laws.

10.5      <u>Provisions for Foreign Participants</u>. The Administrator may modify Awards granted to Participants who are foreign nationals or employed outside the United States or establish subplans or procedures under the Plan to address differences in laws, rules, regulations or customs of such foreign jurisdictions with respect to tax, securities, currency, employee benefit or other matters.

9

10.6        Section 409A.

(a)        General. The Company intends that all Awards be structured to comply with, or be exempt from, Section 409A, such that no adverse tax consequences, interest, or penalties under Section 409A apply. Notwithstanding anything in the Plan or any Award Agreement to the contrary, the Administrator may, without a Participant's consent, amend this Plan or Awards, adopt policies and procedures, or take any other actions (including amendments, policies, procedures and retroactive actions) as are necessary or appropriate to preserve the intended tax treatment of Awards, including any such actions intended to (A) exempt this Plan or any Award from Section 409A, or (B) comply with Section 409A, including regulations, guidance, compliance programs and other interpretative authority that may be issued after an Award's grant date. The Company makes no representations or warranties as to an Award's tax treatment under Section 409A or otherwise. The Company will have no obligation under this Section 10.6 or otherwise to avoid the taxes, penalties or interest under Section 409A with respect to any Award and will have no liability to any Participant or any other person if any Award, compensation or other benefits under the Plan are determined to constitute noncompliant "nonqualified deferred compensation" subject to taxes, penalties or interest under Section 409A.

(b)        Separation from Service. If an Award constitutes "nonqualified deferred compensation" under Section 409A, any payment or settlement of such Award upon a termination of a Participant's Service Provider relationship will, to the extent necessary to avoid taxes under Section 409A, be made only upon the Participant's "separation from service" (within the meaning of Section 409A), whether such "separation from service" occurs upon or after the Termination of Service of a Participant. For purposes of this Plan or any Award Agreement relating to any such payments or benefits, references to a "termination," "termination of employment," Termination of Service or like terms means a "separation from service."

(c)        Payments to Specified Employees. Notwithstanding any contrary provision in the Plan or any Award Agreement, any payment(s) of "nonqualified deferred compensation" required to be made under an Award to a "specified employee" (as defined under Section 409A and as the Administrator determines) due to his or her "separation from service" will, to the extent necessary to avoid taxes under Section 409A(a)(2)(B)(i) of the Code, be delayed for the six-month period immediately following such "separation from service" (or, if earlier, until the specified employee's death) and will instead be paid (as set forth in the Award Agreement) on the day immediately following such six-month period or as soon as administratively practicable thereafter (without interest). Any payments of "nonqualified deferred compensation" under such Award payable more than six months following the Participant's "separation from service" will be paid at the time or times the payments are otherwise scheduled to be made.

10.7        Limitations on Liability. Notwithstanding any other provisions of the Plan, no individual acting as a director, officer, other employee or agent of the Company or any Affiliate will be liable to any Participant, former Participant, spouse, beneficiary, or any other person for any claim, loss, liability, or expense incurred in connection with the Plan or any Award, and such individual will not be personally liable with respect to the Plan because of any contract or other instrument executed in his or her capacity as an Administrator, director, officer, other employee or agent of the Company or any Affiliate. The Company will indemnify and hold harmless each director, officer, other employee and agent of the Company or any Affiliate that has been or will be granted or delegated any duty or power relating to the Plan's administration or interpretation, against any cost or expense (including attorneys' fees) or liability (including any sum paid in settlement of a claim with the Administrator's approval) arising from any act or omission concerning this Plan unless arising from such person's own fraud or bad faith.

10.8    Lock-Up Period. The Company may, at the request of any underwriter representative or otherwise, in connection with registering the offering of any Company securities under the Securities Act, prohibit Participants from, directly or indirectly, selling or otherwise transferring any Shares or other Company securities during a period of up to one hundred eighty days following the effective date of a Company registration statement filed under the Securities Act, or such longer period as determined appropriate by the underwriter or the Administrator.

10.9    Data Privacy. As a condition for receiving any Award, each Participant explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of personal data as described in this section by and among the Company and any Affiliate exclusively for implementing, administering and managing the Participant's participation in the Plan. The Company and the Affiliates may hold certain personal information about a Participant, including the Participant's name, address and telephone number; birthdate; social security, insurance number or other identification number; salary; nationality; job title(s); any Shares held in the Company or any Affiliate; and Award details, to implement, manage and administer the Plan and Awards (the "***Data***"). The Company and the Affiliates may transfer the Data amongst themselves as necessary to implement, administer and manage a Participant's participation in the Plan, and the Company and the Affiliates may transfer the Data to third parties assisting the Company with Plan implementation, administration and management. These recipients may be located in the Participant's country, or elsewhere, and the Participant's country may have different data privacy laws and protections than the recipients' country. By accepting an Award, each Participant authorizes such recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, to implement, administer and manage the Participant's participation in the Plan, including any required Data transfer to a broker or other third party with whom the Company or the Participant may elect to deposit any Shares. The Data related to a Participant will be held only as long as necessary to implement, administer, and manage the Participant's participation in the Plan. A Participant may, at any time, view the Data that the Company holds regarding such Participant, request additional information about the storage and processing of the Data regarding such Participant, recommend any necessary corrections to the Data regarding the Participant or refuse or withdraw the consents in this Section 10.9 in writing, without cost, by contacting the local human resources representative. The Company may cancel Participant's ability to participate in the Plan and, in the Administrator's discretion, the Participant may forfeit any outstanding Awards if the Participant refuses or withdraws the consents in this Section 10.9. For more information on the consequences of refusing or withdrawing consent, Participants may contact their local human resources representative.

10.10    Severability. If any portion of the Plan or any action taken under it is held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Plan, and the Plan will be construed and enforced as if the illegal or invalid provisions had been excluded, and the illegal or invalid action will be null and void.

10.11    Governing Documents. If any contradiction occurs between the Plan and any Award Agreement or other written agreement between a Participant and the Company (or any Affiliate) that the Administrator has approved, the Plan will govern, unless it is expressly specified in such Award Agreement or other written agreement that a specific provision of the Plan will not apply.

10.12    Governing Law. The Plan and all Awards will be governed by and interpreted in accordance with the laws of the State of Delaware, disregarding any state's choice-of-law principles requiring the application of a jurisdiction's laws other than the State of Delaware.

10.13     Claw-back Provisions. All Awards (including any proceeds, gains or other economic benefit the Participant actually or constructively receives upon receipt or exercise of any Award or the receipt or resale of any Shares underlying the Award) will be subject to any Company claw-back policy as in effect from time to time, including any claw-back policy adopted to comply with Applicable Laws (including the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or regulations promulgated thereunder).

10.14     Titles and Headings. The titles and headings in the Plan are for convenience of reference only and, if any conflict, the Plan's text, rather than such titles or headings, will control.

10.15     Conformity to Securities Laws. Participant acknowledges that the Plan is intended to conform to the extent necessary with Applicable Laws. Notwithstanding anything herein to the contrary, the Plan and all Awards will be administered only in conformance with Applicable Laws. To the extent Applicable Laws permit, the Plan and all Award Agreements will be deemed amended as necessary to conform to Applicable Laws.

10.16     Relationship to Other Benefits. No payment under the Plan will be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Affiliate except as expressly provided in writing in such other plan or an agreement thereunder.

10.17     Broker-Assisted Sales. In the event of a broker-assisted sale of Shares in connection with the payment of amounts owed by a Participant under or with respect to the Plan or Awards, including amounts to be paid under the final sentence of Section 9.5: (a) any Shares to be sold through the broker-assisted sale will be sold on the day the payment first becomes due, or as soon thereafter as practicable; (b) such Shares may be sold as part of a block trade with other Participants in the Plan in which all participants receive an average price; (c) the applicable Participant will be responsible for all broker's fees and other costs of sale, and by accepting an Award, each Participant agrees to indemnify and hold the Company harmless from any losses, costs, damages, or expenses relating to any such sale; (d) to the extent the Company or its designee receives proceeds of such sale that exceed the amount owed, the Company will pay such excess in cash to the applicable Participant as soon as reasonably practicable; (e) the Company and its designees are under no obligation to arrange for such sale at any particular price; and (f) in the event the proceeds of such sale are insufficient to satisfy the Participant's applicable obligation, the Participant may be required to pay immediately upon demand to the Company or its designee an amount in cash sufficient to satisfy any remaining portion of the Participant's obligation.

**ARTICLE XI.**
**DEFINITIONS**

As used in the Plan, the following words and phrases will have the following meanings:

11.1     "*Administrator*" means the Board or a Committee to the extent that the Board's powers or authority under the Plan have been delegated to such Committee.

11.2     "*Affiliate*" means (i) any Subsidiary and (ii) any other person or entity that directly or indirectly controls, is controlled by or is under common control with the Company or Fluence Energy, LLC. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any person or entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person or entity, whether through the ownership of voting or other securities, by contract or otherwise. For the avoidance of doubt, AES or Siemens are not Affiliates.

12

11.3        "*Applicable Laws*" means the requirements relating to the administration of equity incentive plans under U.S. federal and state securities, tax and other applicable laws, rules and regulations, the applicable rules of any stock exchange or quotation system on which the Common Stock is listed or quoted and the applicable laws and rules of any foreign country or other jurisdiction where Awards are granted.

11.4        "*Award*" means, individually or collectively, a grant under the Plan of Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units or Other Stock or Cash Based Awards.

11.5        "*Award Agreement*" means a written agreement evidencing an Award, which may be electronic, that contains such terms and conditions as the Administrator determines, consistent with and subject to the terms and conditions of the Plan.

11.6        "*Board*" means the Board of Directors of the Company.

11.7        "*Cause*" means (i) if a Participant is a party to a written employment, severance or consulting agreement with the Company or any of its Affiliates or an Award Agreement in which the term "cause" is defined (a "*Relevant Agreement*"), "cause" as defined in the Relevant Agreement, and (ii) if no Relevant Agreement exists, (A) a material breach by the Participant of any of his or her obligations set forth in any written agreement with the Company or any of its Affiliates as the same may then be in effect; (B) fraud, embezzlement, theft or other material dishonesty by the Participant in connection with services to or otherwise with respect to the Company or any of its Affiliates; (C) the Participant's commission of any act or omission that results in or could reasonably be expected to result in any material damage or harm to the business, property or reputation of the Company or any of its Affiliates; (D) the Participant's commission of, indictment for, or a plea of nolo contendere to, any felony under any state, federal or foreign law or any crime involving moral turpitude or dishonesty; (E) the Participant's unlawful use (including being under the influence) or possession of illegal drugs, or repeated intoxication with alcohol, at the premises of the Company or any of its Affiliates or otherwise while performing (or holding himself or herself as performing) services for or on behalf of the Company or any of its Affiliates; (vi) Participant's prolonged and unexcused absence from work (other than by reason of Disability); or (F) refusal or failure by the Participant to attempt in good faith to follow or carry out the reasonable instructions of the Board or the Participant's supervisor which failure, if curable, does not cease within fifteen (15) days after written notice of such failure is given to the Participant by the Company or any Affiliate.

11.8        "*Change in Control*" means and includes each of the following:

(a)        A transaction or series of transactions (other than an offering of Common Stock (including an acquisition by underwriters for intended resale) to the general public through a registration statement filed with the Securities and Exchange Commission or a transaction or series of transactions that meets the requirements of clauses (i) and (ii) of subsection (c) below) whereby any "person" or related "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) (other than one or more underwriters purchasing shares in an offering with the intent of reselling them to the general public, the Company, any of its Affiliates, an employee benefit plan maintained by the Company or any of its Affiliates, or a "person" or "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) that, prior to such transaction, directly or indirectly controls, is controlled by, or is under common control with, the Company, Siemens AG or any of its subsidiaries or affiliates ("*Siemens*"), The AES Corporation or any of its subsidiaries or affiliates ("*AES*"), or any "group" of "persons" (as such terms are used in Sections 13(d) and 14(d)(2) of the Exchange Act) of which AES or Siemens is a member so long as AES and/or Siemens (individually or in the aggregate) directly or indirectly has beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of a greater percentage of the combined voting power of the Company's securities outstanding immediately after such acquisition than any other member of such "group") directly or indirectly acquires beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company possessing more than 50 % of the total combined voting power of the Company's securities outstanding immediately after such acquisition; or

13

(b)        During any period of two consecutive years, individuals who constitute the Board at the beginning of such period, together with any new Director(s) whose election or nomination for election was (a) previously so approved by a vote of at least 75% of the other Directors, or (b) was made by The AES Corporation, Siemens Industry, Inc. or Qatar Holding LLC or their respective successors pursuant to the terms of the Stockholders Agreement of contemporaneous date herewith, cease for any reason to constitute a majority of the Board; or

(c)        The consummation by the Company (whether directly involving the Company or indirectly involving the Company through one or more intermediaries) of (x) a merger, consolidation, reorganization, or business combination or (y) a sale or other disposition of all or substantially all of the Company's assets in any single transaction or series of related transactions or (z) the acquisition of assets or stock of another entity, in each case other than a transaction:

(i)        which results in the Company's voting securities outstanding immediately before the transaction continuing to represent (either by remaining outstanding or by being converted into voting securities of the Company or the person that, as a result of the transaction, controls, directly or indirectly, the Company or owns, directly or indirectly, all or substantially all of the Company's assets or otherwise succeeds to the business of the Company (the Company or such person, the "*Successor Entity*")) directly or indirectly, at least a majority of the combined voting power of the Successor Entity's outstanding voting securities immediately after the transaction, and

(ii)        after which no person or group beneficially owns voting securities representing 50% or more of the combined voting power of the Successor Entity; provided, however, that no person or group shall be treated for purposes of this clause (ii) as beneficially owning 50% or more of the combined voting power of the Successor Entity solely as a result of the voting power held in the Company prior to the consummation of the transaction.

Notwithstanding the foregoing, if a Change in Control constitutes a payment event with respect to any Award (or portion of any Award) that provides for the deferral of compensation that is subject to Section 409A, to the extent required to avoid the imposition of additional taxes under Section 409A, the transaction or event described in subsection (a), (b) or (c) with respect to such Award (or portion thereof) shall only constitute a Change in Control for purposes of the payment timing of such Award if such transaction also constitutes a "change in control event," as defined in Treasury Regulation Section 1.409A-3(i)(5).

The Administrator shall have full and final authority, which shall be exercised in its discretion, to determine conclusively whether a Change in Control has occurred pursuant to the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto; provided that any exercise of authority in conjunction with a determination of whether a Change in Control is a "change in control event" as defined in Treasury Regulation Section 1.409A-3(i)(5) shall be consistent with such regulation.

11.9      "*Code*" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

14

11.10      "*Committee*" means one or more committees or subcommittees of the Board, which may include one or more Directors or executive officers of the Company, or one or more committees consisting of executive officers of the Company, in each case, to the extent Applicable Laws permit. To the extent required to comply with the provisions of Rule 16b-3, it is intended that each member of the Committee will be, at the time the Committee takes any action with respect to an Award that is subject to Rule 16b-3, a "non-employee director" within the meaning of Rule 16b-3; however, a Committee member's failure to qualify as a "non-employee director" within the meaning of Rule 16b-3 will not invalidate any Award granted by the Committee that is otherwise validly granted under the Plan.

11.11      "*Common Stock*" means the Class A common stock, par value $0.00001 per share, of the Company.

11.12      "*Company*" means Fluence Energy, Inc., a Delaware corporation, or any successor.

11.13      "*Consultant*" means any person, including any adviser, engaged by the Company or its parent or Affiliate to render services to such entity if the consultant or adviser: (i) renders bona fide services to the Company; (ii) renders services not in connection with the offer or sale of securities in a capital-raising transaction and does not directly or indirectly promote or maintain a market for the Company's securities; and (iii) is a natural person.

11.14      "*Designated Beneficiary*" means the beneficiary or beneficiaries the Participant designates, in a manner the Administrator determines, to receive amounts due or exercise the Participant's rights if the Participant dies or becomes incapacitated. Without a Participant's effective designation, "Designated Beneficiary" will mean the Participant's estate.

11.15      "*Director*" means a Board member.

11.16      "*Disability*" means the Board has made a good faith determination that the Participant has become physically or mentally incapacitated or disabled such that the Participant is unable to perform for the Company substantially the same services, with or without accommodation, as the Participant performed prior to incurring such incapacity or disability, and such incapacity or disability exists for an aggregate of three (3) calendar months in any twelve (12) month period. In connection with making such determination, the Company, at its option and expense, shall be entitled to select and retain a physician to confirm the existence of such incapacity or disability, and the determination made by such physician shall be binding on the parties for the purposes of this Plan and any Award Agreements.

11.17      "*Dividend Equivalents*" means a right granted to a Participant under the Plan to receive the equivalent value (in cash or Shares) of dividends paid on Shares.

11.18      "*Employee*" means any employee of the Company or any of its Affiliates.

11.19      "*Equity Restructuring*" means a nonreciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, spin-off or recapitalization through a large, nonrecurring cash dividend, that affects the number or kind of Shares (or other Company securities) or the share price of Common Stock (or other Company securities) and causes a change in the per share value of the Common Stock underlying outstanding Awards.

11.20      "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

11.21      "*Fair Market Value*" means, as of any date, the value of Common Stock determined as follows: (i) if the Common Stock is listed on any established stock exchange, its Fair Market Value will be the closing sales price for such Common Stock as quoted on such exchange for such date, or if no sale occurred on such date, the last day preceding such date during which a sale occurred, as reported in The Wall Street Journal or another source the Administrator deems reliable; (ii) if the Common Stock is not traded on a stock exchange but is quoted on a national market or other quotation system, the closing sales price on such date, or if no sales occurred on such date, then on the last date preceding such date during which a sale occurred, as reported in The Wall Street Journal or another source the Administrator deems reliable; or (iii) in any case the Administrator may determine the Fair Market Value in its discretion to the extent such determination does not constitute a "material revision" to the Plan under applicable stock exchange or stock market rules and regulations (or otherwise require stockholder approval).

11.22 "*Greater Than 10% Stockholder*" means an individual then owning (within the meaning of Section 424(d) of the Code) more than 10% of the total combined voting power of all classes of stock of the Company or its parent or subsidiary corporation, as defined in Section 424(e) and (f) of the Code, respectively.

11.23 "*Incentive Stock Option*" means an Option intended to qualify as an "incentive stock option" as defined in Section 422 of the Code.

11.24 "*Non-Qualified Stock Option*" means an Option not intended or not qualifying as an Incentive Stock Option.

11.25 "*Option*" means an option to purchase Shares.

11.26 "*Other Stock or Cash Based Awards*" means cash awards, awards of Shares, and other awards valued wholly or partially by referring to, or are otherwise based on, Shares or other property.

11.27 "*Overall Share Limit*" means the 9,500,000 Shares.

11.28 "*Participant*" means a Service Provider who has been granted an Award.

11.29 "*Performance Criteria*" mean the criteria (and adjustments) that the Administrator may select for an Award to establish performance goals for a performance period, which may include the following: net earnings or losses (either before or after one or more of interest, taxes, depreciation, amortization, and non-cash equity-based compensation expense); gross or net sales or revenue or sales or revenue growth; net income (either before or after taxes) or adjusted net income; profits (including but not limited to gross profits, net profits, profit growth, net operation profit or economic profit), profit return ratios or operating margin; budget or operating earnings (either before or after taxes or before or after allocation of corporate overhead and bonus); cash flow (including operating cash flow and free cash flow or cash flow return on capital); return on assets; return on capital or invested capital; cost of capital; return on stockholders' equity; total stockholder return; return on sales; costs, reductions in costs and cost control measures; expenses; working capital; earnings or loss per share; adjusted earnings or loss per share; price per share or dividends per share (or appreciation in or maintenance of such price or dividends); regulatory achievements or compliance; implementation, completion or attainment of objectives relating to research, development, regulatory, commercial, or strategic milestones or developments; market share; economic value or economic value added models; division, group or corporate financial goals; customer satisfaction/growth; customer service; employee satisfaction; recruitment and maintenance of personnel; human resources management; supervision of litigation and other legal matters; strategic partnerships and transactions; financial ratios (including those measuring liquidity, activity, profitability or leverage); debt levels or reductions; sales-related goals; business development goals; financing and other capital raising transactions; cash on hand; acquisition activity; investment sourcing activity; marketing initiatives; ESG initiatives or goals; and other measures of performance selected by the Board or Committee whether or not listed herein, any of which may be measured in absolute terms, as compared to any incremental increase or decrease or qualitatively in the Board or Committee's sole discretion. Such performance goals also may be based solely by reference to the Company's performance or the performance of an Affiliate, division, business segment or business unit of the Company or an Affiliate, or based upon performance relative to performance of other companies or upon comparisons of any of the indicators of performance relative to performance of other companies. The Committee may provide for exclusion of the impact of an event or occurrence which the Committee determines should appropriately be excluded, including (a) restructurings, discontinued operations, extraordinary items, and other unusual, infrequently occurring or non-recurring charges or events, (b) asset write-downs, (c) litigation or claim judgments or settlements, (d) acquisitions or divestitures, (e) reorganization or change in the corporate structure or capital structure of the Company, (f) an event either not directly related to the operations of the Company, an Affiliate, division, business segment or business unit or not within the reasonable control of management, (g) foreign exchange gains and losses, (h) a change in the fiscal year of the Company, (i) the refinancing or repurchase of bank loans or debt securities, (j) unbudgeted capital expenditures, (k) the issuance or repurchase of equity securities and other changes in the number of outstanding shares, (l) conversion of some or all of convertible securities to Common Stock, (m) any business interruption event (n) the cumulative effects of tax or accounting changes in accordance with U.S. generally accepted accounting principles, or (o) the effect of changes in other laws or regulatory rules affecting reported results.

16

11.30      "*Plan*" means this 2021 Incentive Award Plan, as may be amended from time to time.

11.31      "*Pricing Date*" means the date upon which the Company's Registration Statement on Form S-1 filed with the Securities and Exchange Commission relating to the registered underwritten public offering of shares of Common Stock becomes effective.

11.32      "*Restricted Stock*" means Shares awarded to a Participant under Article VI subject to certain vesting conditions and other restrictions.

11.33      "*Restricted Stock Unit*" means an unfunded, unsecured right to receive, on the applicable settlement date, one or more Shares or an amount in cash or other consideration determined by the Administrator to be of equal value as of such settlement date, subject to certain vesting conditions and other restrictions.

11.34      "*Rule 16b-3*" means Rule 16b-3 promulgated under the Exchange Act.

11.35      "*Section 409A*" means Section 409A of the Code and all regulations, guidance, compliance programs and other interpretative authority thereunder.

11.36      "*Securities Act*" means the Securities Act of 1933, as amended.

11.37      "*Service Provider*" means an Employee, Consultant or Director.

11.38      "*Shares*" means shares of Common Stock.

11.39      "*Stock Appreciation Right*" means a stock appreciation right granted under Article V.

11.40      "*Subsidiary*" means any entity (other than the Company), whether domestic or foreign, in an unbroken chain of entities beginning with the Company if each of the entities other than the last entity in the unbroken chain beneficially owns, at the time of the determination, securities or interests representing at least 50% of the total combined voting power of all classes of securities or interests in one of the other entities in such chain.

17

11.41        "*Substitute Awards*" shall mean Awards granted or Shares issued by the Company in assumption of, or in substitution or exchange for, awards previously granted, or the right or obligation to make future awards, in each case by a company acquired by the Company or any Affiliate or with which the Company or any Affiliate combines.

11.42        "*Termination of Service*" means the date the Participant ceases to be a Service Provider.

**\* \* \* \* \***

18

---

**FLUENCE ENERGY, INC.**
**2021 INCENTIVE AWARD PLAN**

---

**RESTRICTED STOCK UNIT GRANT NOTICE**

Capitalized terms not specifically defined in this Restricted Stock Unit Grant Notice (the "*Grant Notice*") have the meanings given to them in the 2021 Incentive Award Plan (as amended from time to time, the "*Plan*") of Fluence Energy, Inc. (the "*Company*").

The Company has granted to the participant listed below ("*Participant*") the Restricted Stock Units described in this Grant Notice (the "*RSUs*"), subject to the terms and conditions of the Plan and the Restricted Stock Unit Agreement attached as **Exhibit A** (the "*Agreement*"), both of which are incorporated into this Grant Notice by reference.

**Participant:**

**Grant Date:**

**Number of RSUs:**

**Vesting Commencement Date:**

**Vesting Schedule:**                                    [To be specified in individual grant notices]

**[Withholding Tax Election:** By accepting this Award electronically through the Plan service provider's online grant acceptance policy, the Participant understands and agrees that as a condition of the grant of the RSUs hereunder, the Participant is required to, and hereby affirmatively elects to (the "Sell to Cover Election"), (1) sell that number of Shares determined in accordance with Section 3.2 of the Agreement as may be necessary to satisfy all applicable withholding obligations with respect to any taxable event arising in connection with the RSUs, and (2) to allow the Agent (as defined in the Agreement) to remit the cash proceeds of such sale(s) to the Company. Furthermore, the Participant directs the Company to make a cash payment equal to the required tax withholding from the cash proceeds of such sale(s) directly to the appropriate taxing authorities. **The Participant has carefully reviewed Section 3.2 of the Agreement and the Participant hereby represents and warrants that on the date hereof he or she is not aware of any material, nonpublic information with respect to the Company or any securities of the Company, is not subject to any legal, regulatory or contractual restriction that would prevent the Agent from conducting sales, does not have, and will not attempt to exercise, authority, influence or control over any sales of Shares effected by the Agent pursuant to the Agreement, and is entering into the Agreement and this election to "sell to cover" in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1 (regarding trading of the Company's securities on the basis of material nonpublic information) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). It is the Participant's intent that this election to "sell to cover" comply with the requirements of Rule 10b5-1(c)(1)(i)(B) under the Exchange Act and be interpreted to comply with the requirements of Rule 10b5-1(c) under the Exchange Act.]**

By Participant's signature below, Participant agrees to be bound by the terms of this Grant Notice, the Plan and the Agreement. Participant has reviewed the Plan, this Grant Notice and the Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Grant Notice and fully understands all provisions of the Plan, this Grant Notice and the Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan, this Grant Notice or the Agreement.

**FLUENCE ENERGY, INC.**                                          **PARTICIPANT**

By: _____

Name: _____                              [Participant Name]

Title: _____

2

<div align="right">**Exhibit A**</div>

<div align="center">

**RESTRICTED STOCK UNIT AGREEMENT**

</div>

Capitalized terms not specifically defined in this Agreement have the meanings specified in the Grant Notice or, if not defined in the Grant Notice, in the Plan.

<div align="center">

**ARTICLE I.**
**GENERAL**

</div>

1.1      Award of RSUs.

(a)          The Company has granted the RSUs to Participant effective as of the grant date set forth in the Grant Notice (the "***Grant Date***"). Each RSU represents the right to receive one Share or, at the option of the Company, an amount of cash, in either case, as set forth in this Agreement. Participant will have no right to the distribution of any Shares or payment of any cash until the time (if ever) the RSUs have vested.

1.2      Incorporation of Terms of Plan. The RSUs are subject to the terms and conditions set forth in this Agreement and the Plan, which is incorporated herein by reference. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan will control.

1.3      Unsecured Promise. The RSUs will at all times prior to settlement represent an unsecured Company obligation payable only from the Company's general assets.

<div align="center">

**ARTICLE II.**
**VESTING; FORFEITURE AND SETTLEMENT**

</div>

2.1      Vesting; Forfeiture. The RSUs will vest according to the vesting schedule in the Grant Notice except that any fraction of an RSU that would otherwise be vested will be accumulated and will vest only when a whole RSU has accumulated. In the event of Participant's Termination of Service for any reason, all unvested RSUs will immediately and automatically be cancelled and forfeited, except as otherwise determined by the Administrator or provided in a binding written agreement between Participant and the Company.

2.2      Settlement.

(a)          RSUs will be paid in Shares or cash, at the Company's option, as soon as administratively practicable after the vesting of the applicable RSU, but in no event more than sixty (60) days after the RSU's vesting date. Notwithstanding the foregoing, the Company may delay any payment under this Agreement that the Company reasonably determines would violate Applicable Law until the earliest date the Company reasonably determines the making of the payment will not cause such a violation (in accordance with Treasury Regulation Section 1.409A-2(b)(7)(ii)), provided the Company reasonably believes the delay will not result in the imposition of excise taxes under Section 409A.

(b)        If an RSU is paid in cash, the amount of cash paid with respect to the RSU will equal the Fair Market Value of a Share on the day immediately preceding the payment date.

**ARTICLE III.**
**TAXATION AND TAX WITHHOLDING**

3.1        <u>Representation</u>. Participant represents to the Company that Participant has reviewed with Participant's own tax advisors the tax consequences of this Award and the transactions contemplated by the Grant Notice and this Agreement. Participant is relying solely on such advisors and not on any statements or representations of the Company or any of its agents.

3.2        <u>Tax Withholding</u>. Notwithstanding any other provision of this Agreement:

(a)        [As set forth in Section 9.5 of the Plan, the Company shall have the authority and the right to deduct or withhold, or to require the Participant to remit to the Company, an amount sufficient to satisfy all applicable federal, state and local taxes required by law to be withheld with respect to any taxable event arising in connection with the RSUs. In satisfaction of such tax withholding obligations and in accordance with the Sell to Cover Election included in the Grant Notice, the Participant has irrevocably elected to sell the portion of the Shares to be delivered under the RSUs necessary so as to satisfy the tax withholding obligations and shall execute any letter of instruction or agreement required by the Company's transfer agent (together with any other party the Company determines necessary to execute the Sell to Cover Election, the "<u>Agent</u>") to cause the Agent to irrevocably commit to forward the proceeds necessary to satisfy the tax withholding obligations directly to the Company and/or its Affiliates. Notwithstanding any other provision of this Agreement, the Company shall not be obligated to deliver any new certificate representing Shares to the Participant or the Participant's legal representative or enter such Shares in book entry form unless and until the Participant or the Participant's legal representative shall have paid or otherwise satisfied in full the amount of all federal, state and local taxes applicable to the taxable income of the Participant resulting from the grant or vesting of the RSUs or the issuance of Shares. In accordance with Participant's Sell to Cover Election pursuant to the Grant Notice, the Participant hereby acknowledges and agrees:

(i)        The Participant hereby appoints the Agent as the Participant's agent and authorizes the Agent to (1) sell on the open market at the then prevailing market price(s), on the Participant's behalf, as soon as practicable on or after the Shares are issued upon the vesting of the RSUs, that number (rounded up to the next whole number) of the Shares so issued necessary to generate proceeds to cover (x) any tax withholding obligations incurred with respect to such vesting or issuance and (y) all applicable fees and commissions due to, or required to be collected by, the Agent with respect thereto and (2) apply any remaining funds to the Participant's federal tax withholding.

(ii)        The Participant hereby authorizes the Company and the Agent to cooperate and communicate with one another to determine the number of Shares that must be sold pursuant to subsection (i) above.

(iii)       The Participant understands that the Agent may effect sales as provided in subsection (i) above in one or more sales and that the average price for executions resulting from bunched orders will be assigned to the Participant's account. In addition, the Participant acknowledges that it may not be possible to sell Shares as provided by subsection (i) above due to (1) a legal or contractual restriction applicable to the Participant or the Agent, (2) a market disruption, or (3) rules governing order execution priority on the national exchange where the Shares may be traded. The Participant further agrees and acknowledges that in the event the sale of Shares would result in material adverse harm to the Company, as determined by the Company in its sole discretion, the Company may instruct the Agent not to sell Shares as provided by subsection (i) above. In the event of the Agent's inability to sell Shares, the Participant will continue to be responsible for the timely payment to the Company and/or its Affiliates of all federal, state, local and foreign taxes that are required by applicable laws and regulations to be withheld, including but not limited to those amounts specified in subsection (i) above.

(iv)       The Participant acknowledges that regardless of any other term or condition of this Section 3.2(a), the Agent will not be liable to the Participant for (1) special, indirect, punitive, exemplary, or consequential damages, or incidental losses or damages of any kind, or (2) any failure to perform or for any delay in performance that results from a cause or circumstance that is beyond its reasonable control.

(v)        The Participant hereby agrees to execute and deliver to the Agent any other agreements or documents as the Agent reasonably deems necessary or appropriate to carry out the purposes and intent of this Section 3.2(a). The Agent is a third-party beneficiary of this Section 3.2(a).

(vi)       This Section 3.2(a) shall terminate not later than the date on which all tax withholding obligations arising in connection with the vesting or settlement of the Award have been satisfied.

(b)        The Company shall not be obligated to deliver any certificate representing Shares issuable with respect to the RSUs to, or to cause any such Shares to be held in book-entry form by, Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the vesting or settlement of the RSUs or any other taxable event related to the RSUs.

(c)        Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs, regardless of any action the Company or any Affiliate takes with respect to any tax withholding obligations that arise in connection with the RSUs. Neither the Company or any Affiliate makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or settlement of the RSUs or the subsequent sale of Shares. The Company or any Affiliate does not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax liability.]

(a)        [The Company and its Affiliates have the authority to deduct or withhold, or require Participant to remit to the Company or any Affiliate, an amount sufficient to satisfy any applicable federal, state, local and foreign taxes (including the employee portion of any FICA obligation) required by Applicable Law to be withheld with respect to any taxable event arising pursuant to this Agreement. The Company or any of its Affiliates may withhold or Participant may make such payment in one or more of the forms specified below:

A-3

(i)        by cash or check made payable to the Company or any of its Affiliates with respect to which the withholding obligation arises;

(ii)        by the deduction of such amount from other compensation payable to Participant;

(iii)        with respect to any withholding taxes arising in connection with the vesting or settlement of the RSUs, with the consent of the Administrator, by requesting that the Company withhold a net number of vested shares of Stock otherwise issuable pursuant to the RSUs having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Company or any of its Affiliates based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

(iv)        with respect to any withholding taxes arising in connection with the vesting or settlement of the RSUs, with the consent of the Administrator, by tendering to the Company vested shares of Stock having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Company or any of its Affiliates based on the maximum statutory withholding rates in Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes that are applicable to such taxable income;

(v)        with respect to any withholding taxes arising in connection with the vesting or settlement of the RSUs, through the delivery of a notice that Participant has placed a market sell order with a broker acceptable to the Company with respect to shares of Stock then issuable to Participant pursuant to the RSUs, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company or any of its Affiliates with respect to which the withholding obligation arises in satisfaction of such withholding taxes; *provided* that payment of such proceeds is then made to the applicable Company or any of its Affiliates at such time as may be required by the Administrator, but in any event not later than the settlement of such sale; or

(vi)        in any combination of the foregoing.

(b)        With respect to any withholding taxes arising in connection with the RSUs, in the event Participant fails to provide timely payment of all sums required pursuant to Section 3.2(a), the Company shall have the right and option, but not the obligation, to treat such failure as an election by Participant to satisfy all or any portion of Participant's required payment obligation pursuant to Section 3.2(a)(ii) or Section 3.2(a)(iii) above, or any combination of the foregoing as the Company may determine to be appropriate. The Company shall not be obligated to deliver any certificate representing shares of Stock issuable with respect to the RSUs to Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the vesting or settlement of the RSUs or any other taxable event related to the RSUs.

(c)        In the event any tax withholding obligation arising in connection with the RSUs will be satisfied under <u>Section 3.2(a)(iii)</u>, then the Company may elect to instruct any brokerage firm determined acceptable to the Company for such purpose to sell on Participant's behalf a whole number of shares from those shares of Stock then issuable to Participant pursuant to the RSUs as the Company determines to be appropriate to generate cash proceeds sufficient to satisfy the tax withholding obligation and to remit the proceeds of such sale to the Participating Company with respect to which the withholding obligation arises. Participant's acceptance of this Award constitutes Participant's instruction and authorization to the Company and such brokerage firm to complete the transactions described in this <u>Section 3.2(c)</u>, including the transactions described in the previous sentence, as applicable. The Company may refuse to issue any shares of Stock in settlement of the RSUs to Participant until the foregoing tax withholding obligations are satisfied, provided that no payment shall be delayed under this Section 2.5(c) if such delay will result in a violation of Section 409A of the Code.

(d)        Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs, regardless of any action Company or any of its Affiliates takes with respect to any tax withholding obligations that arise in connection with the RSUs. Neither Company or any of its Affiliates makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or payment of the RSUs or the subsequent sale of Shares. The Company or any of its Affiliates does not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax liability.]

**ARTICLE IV.**
**OTHER PROVISIONS**

4.1        <u>Adjustments</u>. Participant acknowledges that the RSUs, the Shares subject to the RSUs are subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan.

4.2        <u>Notices</u>. Any notice to be given under the terms of this Agreement to the Company must be in writing and addressed to the Company in care of the Company's Secretary at the Company's principal office or the Secretary's then-current email address or facsimile number. Any notice to be given under the terms of this Agreement to Participant must be in writing and addressed to Participant at Participant's last known mailing address, email address or facsimile number in the Company's personnel files. By a notice given pursuant to this Section, either party may designate a different address for notices to be given to that party. Any notice will be deemed duly given when actually received, when sent by email, when sent by certified mail (return receipt requested) and deposited with postage prepaid in a post office or branch post office regularly maintained by the United States Postal Service, when delivered by a nationally recognized express shipping company or upon receipt of a facsimile transmission confirmation.

4.3        <u>Titles</u>. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

4.4        <u>Conformity to Securities Laws</u>. Participant acknowledges that the Plan, the Grant Notice and this Agreement are intended to conform to the extent necessary with all Applicable Laws and, to the extent Applicable Laws permit, will be deemed amended as necessary to conform to Applicable Laws.

4.5        <u>Successors and Assigns</u>. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement will inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in the Plan, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

A-5

4.6    <u>Limitations Applicable to Section 16 Persons</u>. Notwithstanding any other provision of the Plan or this Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, the Grant Notice, this Agreement, the RSUs and the Dividend Equivalents will be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3) that are requirements for the application of such exemptive rule. To the extent Applicable Laws permit, this Agreement will be deemed amended as necessary to conform to such applicable exemptive rule.

4.7    <u>Entire Agreement</u>. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof.

4.8    <u>Agreement Severable</u>. In the event that any provision of the Grant Notice or this Agreement is held illegal or invalid, the provision will be severable from, and the illegality or invalidity of the provision will not be construed to have any effect on, the remaining provisions of the Grant Notice or this Agreement.

4.9    <u>Limitation on Participant's Rights</u>. Participation in the Plan confers no rights or interests other than as herein provided. This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and may not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. Participant will have only the rights of a general unsecured creditor of the Company with respect to amounts credited and benefits payable, if any, with respect to the RSUs, and rights no greater than the right to receive cash or the Shares as a general unsecured creditor with respect to the RSUs, as and when settled pursuant to the terms of this Agreement.

4.10    <u>Not a Contract of Employment</u>. Nothing in the Plan, the Grant Notice or this Agreement confers upon Participant any right to continue in the employ or service of the Company or any Affiliate or interferes with or restricts in any way the rights of the Company and its Subsidiaries, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without Cause, except to the extent expressly provided otherwise in a written agreement between the Company or an Affiliate and Participant.

4.11    <u>Counterparts</u>. The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which will be deemed an original and all of which together will constitute one instrument.

4.12    <u>Electronic Signature and Delivery.</u> By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by the U.S. Securities and Exchange Commission rules. Without limiting the foregoing, the Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an online or electronic system established and maintained by the Company or a third party designated by the Company.

4.13    <u>Section 409A.</u> The RSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Administrator may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and/or (iii) maintain, to the maximum extent practicable, the original interest and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 4.13 does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A of the Code.

4.14    <u>Clawback.</u> The RSUs shall at all times be subject to any clawback or similar policy or program established by the Company, as may be amended from time to time (a "<u>Clawback Policy</u>"). In addition (and without limiting the Company's rights and the Participant's obligations under any Clawback Policy), to the extent required by applicable law or the rules and regulations of the Nasdaq Global Market or any other securities exchange or interdealer quotation on which the Common Stock is listed or quote, the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

**\* \* \* \* \***

A-7

Exhibit 10.6.2

| |
| --- |
| **FLUENCE ENERGY, INC.**<br>**2021 INCENTIVE AWARD PLAN** |

**RESTRICTED STOCK UNIT GRANT NOTICE**

Capitalized terms not specifically defined in this Restricted Stock Unit Grant Notice (the "*Grant Notice*") have the meanings given to them in the 2021 Incentive Award Plan (as amended from time to time, the "*Plan*") of Fluence Energy, Inc. (the "*Company*").

The Company has granted to the participant listed below ("*Participant*") the Restricted Stock Units described in this Grant Notice (the "*RSUs*"), subject to the terms and conditions of the Plan and the Restricted Stock Unit Agreement attached as **Exhibit A** (the "*Agreement*"), both of which are incorporated into this Grant Notice by reference.

**Participant:**

**Grant Date:**

**Number of RSUs:**

**Vesting Commencement Date:**

**Vesting Schedule:**

By Participant's signature below, Participant agrees to be bound by the terms of this Grant Notice, the Plan and the Agreement. Participant has reviewed the Plan, this Grant Notice and the Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Grant Notice and fully understands all provisions of the Plan, this Grant Notice and the Agreement. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan, this Grant Notice or the Agreement.

**FLUENCE ENERGY, INC.**                                    **PARTICIPANT**

By: _____

Name: _____            [Participant Name]

Title: _____

2

**FLUENCE ENERGY, INC.** Case 1:25-cv-00444-PTG-IDD   Document 69-4   Filed 07/11/25   Page 507 of 1007 **PARTICIPANT** PageID# 1486

By: _____

Name: _____            [Participant Name]

Title: _____

**RESTRICTED STOCK UNIT AGREEMENT**

Capitalized terms not specifically defined in this Agreement have the meanings specified in the Grant Notice or, if not defined in the Grant Notice, in the Plan.

## ARTICLE I.
## GENERAL

1.1      Award of RSUs.

(a)      The Company has granted the RSUs to Participant effective as of the grant date set forth in the Grant Notice (the "**Grant Date**"). Each RSU represents the right to receive one Share or, at the option of the Company, an amount of cash, in either case, as set forth in this Agreement. Participant will have no right to the distribution of any Shares or payment of any cash until the time (if ever) the RSUs have vested.

1.2      Incorporation of Terms of Plan. The RSUs are subject to the terms and conditions set forth in this Agreement and the Plan, which is incorporated herein by reference. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan will control.

1.3      Unsecured Promise. The RSUs will at all times prior to settlement represent an unsecured Company obligation payable only from the Company's general assets.

## ARTICLE II.
## VESTING; FORFEITURE AND SETTLEMENT

2.1      Vesting; Forfeiture. The RSUs will vest according to the vesting schedule in the Grant Notice except that any fraction of an RSU that would otherwise be vested will be accumulated and will vest only when a whole RSU has accumulated. In the event of Participant's Termination of Service for any reason, all unvested RSUs will immediately and automatically be cancelled and forfeited, except as otherwise determined by the Administrator or provided in a binding written agreement between Participant and the Company.

(a)        RSUs will be paid in Shares or cash, at the Company's option, as soon as administratively practicable after the vesting of the applicable RSU, but in no event more than sixty (60) days after the RSU's vesting date. Notwithstanding the foregoing, the Company may delay any payment under this Agreement that the Company reasonably determines would violate Applicable Law until the earliest date the Company reasonably determines the making of the payment will not cause such a violation (in accordance with Treasury Regulation Section 1.409A-2(b)(7)(ii)), provided the Company reasonably believes the delay will not result in the imposition of excise taxes under Section 409A.

(b)        If an RSU is paid in cash, the amount of cash paid with respect to the RSU will equal the Fair Market Value of a Share on the day immediately preceding the payment date.

## ARTICLE III.
### TAXATION AND TAX WITHHOLDING

3.1        Representation. Participant represents to the Company that Participant has reviewed with Participant's own tax advisors the tax consequences of this Award and the transactions contemplated by the Grant Notice and this Agreement. Participant is relying solely on such advisors and not on any statements or representations of the Company or any of its agents.

3.2        Tax Withholding.

(a)        The provisions of Section 9.5 of the Plan are incorporated herein by reference and made a part hereof. Participant represents to the Company that Participant has reviewed with Participant's own tax advisors the tax consequences of this Award and the transactions contemplated by the Grant Notice and this Agreement. Participant is relying solely on such advisors and not on any statements or representations of the Company or any of its employees, agents or representatives.

(b)        Participant acknowledges that Participant is ultimately liable and responsible for all taxes owed in connection with the RSUs regardless of any action the Company or any Affiliate takes with respect to any tax withholding obligations that arise in connection with the RSUs Neither the Company nor any Affiliate makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, vesting or payment of the RSUs or the subsequent sale of Shares. The Company and the Affiliates do not commit and are under no obligation to structure the RSUs to reduce or eliminate Participant's tax liability.

## ARTICLE IV.
### OTHER PROVISIONS

4.1        Adjustments. Participant acknowledges that the RSUs, the Shares subject to the RSUs are subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan.

4.2        Notices. Any notice to be given under the terms of this Agreement to the Company must be in writing and addressed to the Company in care of the Company's Secretary at the Company's principal office or the Secretary's then-current email address or facsimile number. Any notice to be given under the terms of this Agreement to Participant must be in writing and addressed to Participant at Participant's last known mailing address, email address or facsimile number in the Company's personnel files. By a notice given pursuant to this Section, either party may designate a different address for notices to be given to that party. Any notice will be deemed duly given when actually received, when sent by email, when sent by certified mail (return receipt requested) and deposited with postage prepaid in a post office or branch post office regularly maintained by the United States Postal Service, when delivered by a nationally recognized express shipping company or upon receipt of a facsimile transmission confirmation.

4.3     Titles. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

4.4     Conformity to Securities Laws. Participant acknowledges that the Plan, the Grant Notice and this Agreement are intended to conform to the extent necessary with all Applicable Laws and, to the extent Applicable Laws permit, will be deemed amended as necessary to conform to Applicable Laws.

4.5     Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement will inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in the Plan, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

4.6     Limitations Applicable to Section 16 Persons. Notwithstanding any other provision of the Plan or this Agreement, if Participant is subject to Section 16 of the Exchange Act, the Plan, the Grant Notice, this Agreement, the RSUs will be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3) that are requirements for the application of such exemptive rule. To the extent Applicable Laws permit, this Agreement will be deemed amended as necessary to conform to such applicable exemptive rule.

4.7     Entire Agreement. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof.

4.8     Agreement Severable. In the event that any provision of the Grant Notice or this Agreement is held illegal or invalid, the provision will be severable from, and the illegality or invalidity of the provision will not be construed to have any effect on, the remaining provisions of the Grant Notice or this Agreement.

4.9     Limitation on Participant's Rights. Participation in the Plan confers no rights or interests other than as herein provided. This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and may not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. Participant will have only the rights of a general unsecured creditor of the Company with respect to amounts credited and benefits payable, if any, with respect to the RSUs and rights no greater than the right to receive cash or the Shares as a general unsecured creditor with respect to the RSUs as and when settled pursuant to the terms of this Agreement.

4.10    Not a Contract of Employment. Nothing in the Plan, the Grant Notice or this Agreement confers upon Participant any right to continue in the employ or service of the Company or any Affiliate or interferes with or restricts in any way the rights of the Company and its Subsidiaries, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without Cause, except to the extent expressly provided otherwise in a written agreement between the Company or an Affiliate and Participant.

4.11    Counterparts. The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which will be deemed an original and all of which together will constitute one instrument.

4.12    Electronic Signature and Delivery. By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by the U.S. Securities and Exchange Commission rules. Without limiting the foregoing, the Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an online or electronic system established and maintained by the Company or a third party designated by the Company.

4.13    Section 409A. The RSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Administrator may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and/or (iii) maintain, to the maximum extent practicable, the original interest and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 4.13 does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A of the Code.

4.14    Clawback. The RSUs shall at all times be subject to any clawback or similar policy or program established by the Company, as may be amended from time to time (a "Clawback Policy"). In addition (and without limiting the Company's rights and the Participant's obligations under any Clawback Policy), to the extent required by applicable law or the rules and regulations of the Nasdaq Global Market or any other securities exchange or interdealer quotation on which the Common Stock is listed or quote, the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

* * * * *

A-4

Exhibit 10.12

**FLUENCE ENERGY, INC.**
**NON-EMPLOYEE INDEPENDENT DIRECTOR COMPENSATION POLICY**

Non-employee independent members of the board of directors (the "***Board***") of Fluence Energy, Inc. (the "***Company***") shall be eligible to receive cash and equity compensation as set forth in this Non-Employee Independent Director Compensation Policy (this "***Policy***"). The cash and equity compensation described in this Policy shall be paid or be made, as applicable, automatically and without further action of the Board, to each member of the Board who (a) is not an employee of the Company or any parent or subsidiary of the Company and (b) was not nominated to the Board by The AES Corporation ("AES"), Siemens Industry, Inc. ("SII") or Qatar Holding LLC ("QHL") or any of their respective affiliates pursuant to their respective nomination rights set forth in the Stockholders Agreement, dated as of the Effective Date, by and among the Company, AES, SII and QHL (each, a "***Non-Employee Independent Director***") who may be eligible to receive such cash or equity compensation, unless such Non-Employee Independent Director declines the receipt of such cash or equity compensation by written notice to the Company. This Policy shall become effective after the effectiveness of the Company's Form S-1 Registration (the "***Effective Date***") and shall remain in effect until it is revised or rescinded by further action of the Board. This Policy may be amended, modified or terminated by the Board at any time in its sole discretion. The terms and conditions of this Policy shall supersede any prior cash and/or equity compensation arrangements for service as a member of the Board between the Company and any of its Non-Employee Independent Directors and between any subsidiary of the Company and any of its non-employee independent directors.

1.      Cash Compensation.

(a)      Annual Retainers. Each Non-Employee Independent Director shall receive an annual retainer of $50,000 for service on the Board.

(b)      Additional Annual Retainers. In addition, a Non-Employee Independent Director shall receive the following annual retainers:

(i)      Chairperson of the Board. A Non-Employee Independent Director serving as Chairperson of the Board shall receive an additional annual retainer of $25,000 for such service.

(ii)      Audit Committee. A Non-Employee Independent Director serving as Chairperson of the Audit Committee shall receive an additional annual retainer of $10,000 for such service.

(iii)      Compensation Committee. A Non-Employee Independent Director serving as Chairperson of the Compensation Committee shall receive an additional annual retainer of $10,000 for such service.

(iv)      Nominating and Corporate Governance Committee. A Non-Employee Independent Director serving as Chairperson of the Nominating and Corporate Governance Committee shall receive an additional annual retainer of $10,000 for such service.

   (c)  <u>Payment of Retainers</u>. The annual retainers described in Sections 1(a) and 1(b) shall be earned on a quarterly basis based on a calendar quarter and shall be paid by the Company in arrears not later than the fifteenth day following the end of each calendar quarter. In the event a Non-Employee Independent Director does not serve as a Non-Employee Independent Director, or in the applicable positions described in Section 1(b), for an entire calendar quarter, such Non-Employee Independent Director shall receive a prorated portion of the retainer(s) otherwise payable to such Non-Employee Independent Director for such calendar quarter pursuant to Sections 1(a) and 1(b), with such prorated portion determined by multiplying such otherwise payable retainer(s) by a fraction, the numerator of which is the number of days during which the Non-Employee Independent Director serves as a Non-Employee Independent Director or in the applicable positions described in Section 1(b) during the applicable calendar quarter and the denominator of which is the number of days in the applicable calendar quarter.

   2.  <u>Equity Compensation</u>. Non-Employee Independent Directors shall be granted the equity awards described below. The awards described below shall be granted under and shall be subject to the terms and provisions of the Company's 2021 Incentive Award Plan or any other applicable Company equity incentive plan then-maintained by the Company (such plan, as may be amended from time to time, the "***Equity Plan***") and shall be granted subject to the execution and delivery of award agreements, including attached exhibits, in substantially the forms previously approved by the Board. All applicable terms of the Equity Plan apply to this Policy as if fully set forth herein, and all equity grants hereunder are subject in all respects to the terms of the Equity Plan.

   (a)  <u>Effective Date Awards</u>. Each Non-Employee Independent Director who (i) serves on the Board as of the Effective Date and (ii) will continue to serve as a Non-Employee Independent Director immediately following the Effective Date, shall be automatically granted, on the Effective Date, an award of restricted stock units that has an aggregate fair value on the date of grant of $100,000 (as determined in accordance with FASB Accounting Codification Topic 718 ("***ASC 718***") and subject to adjustment as provided in the Equity Plan in each case). The awards described in this Section 2(a) shall be referred to herein as the "***Effective Date Awards***"). For the avoidance of doubt, a Non-Employee Independent Director eligible to receive an Effective Date Award shall not be eligible to receive an Initial Award (as defined below).

   (b)  <u>Annual Awards</u>. Each Non-Employee Independent Director who (i) serves on the Board as of the date of any annual meeting of the Company's stockholders (an "***Annual Meeting***") after the Effective Date and (ii) will continue to serve as a Non-Employee Independent Director immediately following such Annual Meeting, shall be automatically granted, on the date of such Annual Meeting, an award of restricted stock units that has an aggregate fair value on the date of grant of $100,000 (as determined in accordance with ASC 718 and subject to adjustment as provided in the Equity Plan). The awards described in this Section 2(b) shall be referred to as the "***Annual Awards***." For the avoidance of doubt, a Non-Employee Independent Director elected for the first time to the Board at an Annual Meeting shall receive only an Annual Award in connection with such election, and shall not receive any Initial Award on the date of such Annual Meeting as well.

(c)    Initial Awards. Except as otherwise determined by the Board, each Non-Employee Independent Director who is initially elected or appointed to the Board after the Effective Date on any date other than the date of an Annual Meeting shall be automatically granted, on the date of such Non-Employee Independent Director's initial election or appointment (such Non-Employee Independent Director's "*Start Date*"), an award of restricted stock units that has an aggregate fair value on such Non-Employee Independent Director's Start Date equal to the product of (i) $100,000 (as determined in accordance with ASC 718) and (ii) a fraction, the numerator of which is (x) 365 minus (y) the number of days in the period beginning on the date of the Annual Meeting immediately preceding such Non-Employee Independent Director's Start Date (or, if no such Annual Meeting has occurred, the Effective Date) and ending on such Non-Employee Independent Director's Start Date and the denominator of which is 365 (with the number of shares of common stock underlying each such award subject to adjustment as provided in the Equity Plan). The awards described in this Section 2(c) shall be referred to as "*Initial Awards*." For the avoidance of doubt, no Non-Employee Independent Director shall be granted more than one Initial Award.

(d)    Termination of Employment of Employee Directors. Members of the Board who are employees of the Company or any parent or subsidiary of the Company who subsequently terminate their employment with the Company and any parent or subsidiary of the Company and remain on the Board will not receive an Initial Award pursuant to Section 2(c) above, but to the extent that they are otherwise eligible, will be eligible to receive, after termination from employment with the Company and any parent or subsidiary of the Company, Annual Awards as described in Section 2(b) above.

(e)    Vesting of Awards Granted to Non-Employee Independent Directors. Each Effective Date Award shall vest on the first anniversary of the date of grant, subject to the Non-Employee Independent Director continuing in service on the Board through the applicable vesting date, and each Annual Award and Initial Award shall vest on the earlier of (i) the day immediately preceding the date of the first Annual Meeting following the date of grant and (ii) the first anniversary of the date of grant, subject to the Non-Employee Independent Director continuing in service on the Board through the applicable vesting date. No portion of an Effective Date Award, Annual Award or Initial Award that is unvested at the time of a Non-Employee Independent Director's termination of service on the Board shall become vested thereafter. All of a Non-Employee Independent Director's Effective Date Awards, Annual Awards and Initial Awards shall vest in full immediately prior to the occurrence of a Change in Control (as defined in the Equity Plan), to the extent outstanding at such time.

* * * * *

3

**INDEMNIFICATION AND ADVANCEMENT AGREEMENT**

This Indemnification and Advancement Agreement (the "Agreement") is made as of _____, 202__ by and between Fluence Energy, Inc. a Delaware corporation (the "Company"), and _____ ("Indemnitee"). This Agreement supersedes and replaces any and all previous Agreements between the Company and Indemnitee covering indemnification and advancement.

**RECITALS**

WHEREAS, the Board of Directors of the Company (the "Board") believes that highly competent persons have become more reluctant to serve publicly-held corporations as directors, officers or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification and advancement of expenses against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

WHEREAS, the Board has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers, and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself. The Bylaws and Certificate of Incorporation of the Company require indemnification of the officers and directors of the Company. Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware (the "DGCL"). The Bylaws, Certificate of Incorporation, and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the board of directors, officers, and other persons with respect to indemnification and advancement of expenses;

WHEREAS, the uncertainties relating to such insurance, to indemnification, and to advancement of expenses may increase the difficulty of attracting and retaining such persons;

WHEREAS, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company and its stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

WHEREAS, this Agreement is a supplement to and in furtherance of the Bylaws, Certificate of Incorporation and any resolutions adopted pursuant thereto, and is not a substitute therefor, nor diminishes or abrogates any rights of Indemnitee thereunder; and

WHEREAS, Indemnitee does not regard the protection available under the Bylaws, Certificate of Incorporation, DGCL and insurance as adequate in the present circumstances, and may not be willing to serve or continue to serve as a director, officer or other employee or agent without adequate additional protection, and the Company desires Indemnitee to serve or continue to serve in such capacity. Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that Indemnitee be so indemnified and be advanced expenses.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

Section 1.    Services to the Company. Indemnitee has agreed to serve as a director, officer or other employee or agent of the Company. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law). This Agreement does not create any obligation on the Company to continue Indemnitee in such position and is not an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee.

Section 2.    Definitions. As used in this Agreement:

(a)    "Agent" means any person who is authorized by the Company or an Enterprise to act for or represent the interests of the Company or an Enterprise, respectively.

(b)    A "Change in Control" occurs upon the earliest to occur after the date of this Agreement of any of the following events:

i.    Acquisition of Stock by Third Party. Any Person (as defined below) other than the Sponsor Entities is or becomes the Beneficial Owner (as defined below), directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities unless the change in relative beneficial ownership of the Company's securities by any Person results solely from a reduction in the aggregate number of outstanding shares of securities entitled to vote generally in the election of directors;

ii.    Change in Board of Directors. During any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 2(b)(i), 2(b)(iii) or 2(b)(iv) of this Agreement) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Board;

<div align="center">2</div>

iii.        Corporate Transactions. The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 51% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such surviving entity;

iv.        Liquidation. The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets; and

v.        Other Events. There occurs any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or a response to any similar item on any similar schedule or form) promulgated under the Exchange Act (as defined below), whether or not the Company is then subject to such reporting requirement.

vi.        For purposes of this Section 2(b), the following terms have the following meanings:

1        "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

2        "Person" has the meaning as set forth in Sections 13(d) and 14(d) of the Exchange Act; provided, however, that Person excludes (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

3        "Beneficial Owner" has the meaning given to such term in Rule 13d-3 under the Exchange Act; provided, however, that Beneficial Owner excludes any Person otherwise becoming a Beneficial Owner by reason of the stockholders of the Company approving a merger of the Company with another entity.

(c)      "Corporate Status" describes the status of a person who is or was acting as a director, officer, employee, fiduciary, or Agent of the Company or an Enterprise.

(d)        "Disinterested Director" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(e)        "Enterprise" means any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other entity for which Indemnitee is or was serving at the request of the Company as a director, officer, employee, or Agent.

<div align="center">3</div>

(f)    "Expenses" includes all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts and other professionals, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, Employee Retirement Income Security Act of 1974, as amended, ("ERISA") excise taxes and penalties, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 14(d) of this Agreement only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. The parties agree that for the purposes of any advancement of Expenses for which Indemnitee has made written demand to the Company in accordance with this Agreement, all Expenses included in such demand that are certified by affidavit of Indemnitee's counsel as being reasonable in the good faith judgment of such counsel will be presumed conclusively to be reasonable. Expenses, however, do not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g)    "Independent Counsel" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning the Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" does not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(h)    The term "Proceeding" includes any threatened, pending or completed action, suit, claim, counterclaim, cross claim, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative, legislative, or investigative (formal or informal) nature, including any appeal therefrom, in which Indemnitee was, is or will be involved as a party, potential party, non-party witness or otherwise by reason of Indemnitee's Corporate Status or by reason of any action taken by Indemnitee (or a failure to take action by Indemnitee) or of any action (or failure to act) on Indemnitee's part while acting pursuant to Indemnitee's Corporate Status, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification, reimbursement, or advancement of Expenses can be provided under this Agreement. A Proceeding also includes a situation the Indemnitee believes in good faith may lead to or culminate in the institution of a Proceeding.

(i)    "Sponsor Entities" means entities affiliated with AES Grid Stability, LLC, Siemens Industry, Inc. and/or Qatar Investment Authority.

<div align="center">4</div>

Section 3.    <u>Indemnity in Third-Party Proceedings.</u> The Company will indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, the Company will indemnify Indemnitee to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, penalties, fines and amounts paid in settlement) actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal Proceeding had no reasonable cause to believe that Indemnitee's conduct was unlawful.

Section 4.    <u>Indemnity in Proceedings by or in the Right of the Company.</u> The Company will indemnify Indemnitee in accordance with the provisions of this Section 4 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 4, the Company will indemnify Indemnitee to the fullest extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company. The Company will not indemnify Indemnitee for Expenses under this Section 4 related to any claim, issue or matter in a Proceeding for which Indemnitee has been finally adjudged by a court to be liable to the Company, unless, and only to the extent that, the Delaware Court of Chancery or any court in which the Proceeding was brought determines upon application by Indemnitee that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification.

Section 5.    <u>Indemnification for Expenses of an Indemnitee Who is Wholly or Partly Successful.</u> Notwithstanding any other provisions of this Agreement, to the fullest extent permitted by applicable law, the Company will indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with any Proceeding to the extent that Indemnitee is successful, on the merits or otherwise. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company will indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with or related to each successfully resolved claim, issue or matter to the fullest extent permitted by law. For purposes of this Section 5 and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, will be deemed to be a successful result as to such claim, issue or matter.

Section 6.    <u>Indemnification For Expenses of a Witness.</u> Notwithstanding any other provision of this Agreement and to the fullest extent permitted by applicable law, the Company will indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with any Proceeding to which Indemnitee is not a party but to which Indemnitee is a witness, deponent, interviewee, or otherwise asked to participate.

5

Section 7.　　Partial Indemnification. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses, but not, however, for the total amount thereof, the Company will indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

Section 8.　　Additional Indemnification. Notwithstanding any limitation in Sections 3, 4 or 5 of this Agreement, the Company will indemnify Indemnitee to the fullest extent permitted by applicable law (including, but not limited to, the DGCL and any amendments to or replacements of the DGCL adopted after the date of this Agreement that expand the Company's ability to indemnify its officers and directors) if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor).

Section 9.　　Exclusions. Notwithstanding any provision in this Agreement, the Company is not obligated under this Agreement to make any indemnification payment to Indemnitee in connection with any Proceeding:

(a)　　for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except to the extent provided in Section 15(b) of this Agreement and except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b)　　for (i) an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act (as defined in Section 2(b) hereof) or similar provisions of state statutory law or common law, (ii) any reimbursement of the Company by the Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by the Indemnitee from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act) or (iii) any reimbursement of the Company by Indemnitee of any compensation pursuant to any compensation recoupment or clawback policy adopted by the Board or the compensation committee of the Board, including, but not limited, to any such policy adopted to comply with stock exchange listing requirements implementing Section 10D of the Exchange Act; or

(c)　　initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Proceeding or part of any Proceeding is to enforce Indemnitee's rights to indemnification or advancement of Expenses, including a Proceeding (or any part of any Proceeding) initiated pursuant to Section 14 of this Agreement, (ii) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation (it being understood and agreed that such authorization or consent shall not be unreasonably withheld in connection with any compulsory counterclaim brought by Indemnitee in response to any Proceeding otherwise indemnifiable under this Agreement) or (iii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

Section 10.    <u>Advances of Expenses.</u>

(a)    The Company will advance, to the extent not prohibited by law, the Expenses incurred by Indemnitee in connection with any Proceeding (or any part of any Proceeding) not initiated by Indemnitee or any Proceeding (or any part of any Proceeding) initiated by Indemnitee if (i) the Proceeding or part of any Proceeding is to enforce Indemnitee's rights to obtain indemnification or advancement of Expenses from the Company or Enterprise, including a proceeding initiated pursuant to Section 14 of this Agreement or (ii) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation (it being understood and agreed that such authorization or consent shall not be unreasonably withheld in connection with any compulsory counterclaim brought by Indemnitee in response to any Proceeding otherwise indemnifiable under this Agreement). The Company will advance the Expenses within thirty (30) days after the receipt by the Company of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any Proceeding.

(b)    Advances will be unsecured and interest free. Indemnitee undertakes to repay the amounts advanced (without interest) to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company, thus Indemnitee qualifies for advances upon the execution of this Agreement and delivery to the Company. No other form of undertaking is required other than the execution of this Agreement. The Company will make advances without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement.

Section 11.    <u>Procedure for Notification of Claim for Indemnification or Advancement.</u>

(a)    Indemnitee will notify the Company in writing of any Proceeding with respect to which Indemnitee intends to seek indemnification or advancement of Expenses hereunder as soon as reasonably practicable following the receipt by Indemnitee of written notice thereof. Indemnitee will include in the written notification to the Company a description of the nature of the Proceeding and the facts underlying the Proceeding and provide such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to advancement of Expenses or indemnification following the final disposition of such Proceeding. Indemnitee's failure to notify the Company will not relieve the Company from any obligation it may have to Indemnitee under this Agreement, and any delay in so notifying the Company will not constitute a waiver by Indemnitee of any rights under this Agreement. The Secretary of the Company will, promptly upon receipt of such a request for indemnification or advancement, advise the Board in writing that Indemnitee has requested indemnification or advancement.

(b)    The Company will be entitled to participate in the Proceeding at its own expense.

Section 12.    <u>Procedure Upon Application for Indemnification.</u>

(a)    Unless a Change of Control has occurred, the determination of Indemnitee's entitlement to indemnification will be made:

i.    by a majority vote of the Disinterested Directors, even though less than a quorum of the Board;

7

ii. by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Board;

iii. if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by written opinion provided by Independent Counsel selected by the Board; or

iv. if so directed by the Board, by the stockholders of the Company.

(b) If a Change in Control has occurred, the determination of Indemnitee's entitlement to indemnification will be made by written opinion provided by Independent Counsel selected by Indemnitee (unless Indemnitee requests such selection be made by the Board).

(c) The party selecting Independent Counsel pursuant to subsection (a)(iii) or (b) of this Section 12 will provide written notice of the selection to the other party. The notified party may, within ten (10) days after receiving written notice of the selection of Independent Counsel, deliver to the selecting party a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 2 of this Agreement, and the objection will set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected will act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or the Delaware Court of Chancery has determined that such objection is without merit. If, within thirty (30) days after the later of submission by Indemnitee of a written request for indemnification pursuant to Section 11(a) hereof and the final disposition of the Proceeding, Independent Counsel has not been selected or, if selected, any objection to has not been resolved, either the Company or Indemnitee may petition the Delaware Court of Chancery for the appointment as Independent Counsel of a person selected by such court or by such other person as such court designates. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 14(a) of this Agreement, Independent Counsel will be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(d) Indemnitee will cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. The Company will advance and pay any Expenses incurred by Indemnitee in so cooperating with the person, persons or entity making the indemnification determination irrespective of the determination as to Indemnitee's entitlement to indemnification and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom. The Company promptly will advise Indemnitee in writing of the determination that Indemnitee is or is not entitled to indemnification, including a description of any reason or basis for which indemnification has been denied and providing a copy of any written opinion provided to the Board by Independent Counsel.

(e) If it is determined that Indemnitee is entitled to indemnification, the Company will make payment to Indemnitee within thirty (30) days after such determination.

Section 13.    <u>Presumptions and Effect of Certain Proceedings.</u>

(a)    In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination will, to the fullest extent not prohibited by law, presume Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 11(a) of this Agreement, and the Company will, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, will be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b)    If the determination of the Indemnitee's entitlement to indemnification has not made pursuant to Section 12 of this Agreement within sixty (60) days after the later of (i) receipt by the Company of Indemnitee's request for indemnification pursuant to Section 11(a) and (ii) the final disposition of the Proceeding for which Indemnitee requested Indemnification (the "Determination Period"), the requisite determination of entitlement to indemnification will, to the fullest extent not prohibited by law, be deemed to have been made and Indemnitee will be entitled to such indemnification, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law. The Determination Period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making the determination with respect to entitlement to indemnification in good faith requires such additional time for the obtaining or evaluating of documentation and/or information relating thereto; and provided, further, the Determination Period may be extended an additional fifteen (15) days if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 12(a)(iv) of this Agreement.

(c)    The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of <u>nolo contendere</u> or its equivalent, will not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

(d)    For purposes of any determination of good faith, Indemnitee will be deemed to have acted in good faith if Indemnitee acted based on the records or books of account of the Company, its subsidiaries, or an Enterprise, including financial statements, or on information supplied to Indemnitee by the directors or officers of the Company, its subsidiaries, or an Enterprise in the course of their duties, or on the advice of legal counsel for the Company, its subsidiaries, or an Enterprise or on information or records given or reports made to the Company or an Enterprise by an independent certified public accountant or by an appraiser, financial advisor or other expert selected with reasonable care by or on behalf of the Company, its subsidiaries, or an Enterprise. Further, Indemnitee will be deemed to have acted in a manner "not opposed to the best interests of the Company," as referred to in this Agreement if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan. The provisions of this Section 13(d) is not exclusive and does not limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

9

(e)      The knowledge and/or actions, or failure to act, of any director, officer, trustee, partner, managing member, fiduciary, agent or employee of the Enterprise may not be imputed to Indemnitee for purposes of determining Indemnitee's right to indemnification under this Agreement.

Section 14.    <u>Remedies of Indemnitee.</u>

(a)      Indemnitee may commence litigation against the Company in the Delaware Court of Chancery to obtain indemnification or advancement of Expenses provided by this Agreement in the event that (i) a determination is made pursuant to Section 12 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) the Company does not advance Expenses pursuant to Section 10 of this Agreement, (iii) the determination of entitlement to indemnification is not made pursuant to Section 12 of this Agreement within the Determination Period, (iv) the Company does not indemnify Indemnitee pursuant to Section 5 or 6 or the second to last sentence of Section 12(d) of this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) the Company does not indemnify Indemnitee pursuant to Section 3, 4, 7 or 8 of this Agreement within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification, or (vi) in the event that the Company or any other person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or Proceeding designed to deny, or to recover from, the Indemnitee the benefits provided or intended to be provided to the Indemnitee hereunder. Alternatively, Indemnitee, at Indemnitee's or the Company's option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee must commence such Proceeding seeking an adjudication or an award in arbitration within one-hundred and eighty (180) days following the date on which Indemnitee first has the right to commence such Proceeding pursuant to this Section 14(a); <u>provided</u>, <u>however</u>, that the foregoing clause does not apply in respect of a Proceeding brought by Indemnitee to enforce Indemnitee's rights under Section 5 of this Agreement. The Company will not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b)      If a determination is made pursuant to Section 12 of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 14 will be conducted in all respects as a *de novo* trial, or arbitration, on the merits and Indemnitee may not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 14 the Company will have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be and will not introduce evidence of the determination made pursuant to Section 12 of this Agreement.

10

(c)    If a determination is made pursuant to Section 12 of this Agreement that Indemnitee is entitled to indemnification, the Company will be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 14, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    The Company is, to the fullest extent not prohibited by law, precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 14 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and will stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement.

(e)    It is the intent of the Company that, to the fullest extent permitted by law, the Indemnitee not be required to incur legal fees or other Expenses associated with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to the Indemnitee hereunder. The Company, to the fullest extent permitted by law, will (within thirty (30) days after receipt by the Company of a written request therefor) advance to Indemnitee such Expenses which are incurred by Indemnitee in connection with any action concerning this Agreement, Indemnitee's right to indemnification or advancement of Expenses from the Company, or concerning any directors' and officers' liability insurance policies maintained by the Company. and will indemnify Indemnitee against any and all such Expenses unless the court determines that each of the Indemnitee's claims in such Proceeding were made in bad faith or were frivolous or are prohibited by law.

Section 15.    <u>Non-exclusivity; Survival of Rights; Insurance; Subrogation.</u>

(a)    The indemnification and advancement of Expenses provided by this Agreement are not exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. The indemnification and advancement of Expenses provided by this Agreement may not be limited or restricted by any amendment, alteration or repeal of this Agreement in any way with respect to any action taken or omitted by Indemnitee in Indemnitee's Corporate Status occurring prior to any amendment, alteration or repeal of this Agreement. To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Bylaws, Certificate of Incorporation, or this Agreement, it is the intent of the parties hereto that Indemnitee enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy is cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, will not prevent the concurrent assertion or employment of any other right or remedy.

11

(b)    The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by one or more other Persons with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities). The relationship between the Company and such other Persons, other than an Enterprise, with respect to the Indemnitee's rights to indemnification, advancement of Expenses, and insurance is described by this subsection, subject to the provisions of subsection (d) of this Section 15 with respect to a Proceeding concerning Indemnitee's Corporate Status with an Enterprise.

i.    The Company hereby acknowledges and agrees:

1)    the Company is the indemnitor of first resort with respect to any request for indemnification or advancement of Expenses made pursuant to this Agreement concerning any Proceeding arising from or related to Indemnitee's Corporate Status with the Company;

2)    the Company is primarily liable for all indemnification and indemnification or advancement of Expenses obligations for any Proceeding arising from or related to Indemnitee's Corporate Status, whether created by law, organizational or constituent documents, contract (including this Agreement) or otherwise;

3)    any obligation of any other Persons with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities) to indemnify Indemnitee and/or advance Expenses to Indemnitee in respect of any proceeding are secondary to the obligations of the Company's obligations;

4)    the Company will indemnify Indemnitee and advance Expenses to Indemnitee hereunder to the fullest extent provided herein without regard to any rights Indemnitee may have against any other Person with whom or which Indemnitee may be associated (including, any Sponsor Entities) or insurer of any such Person; and

ii.    the Company irrevocably waives, relinquishes and releases (A) any other Person with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities) from any claim of contribution, subrogation, reimbursement, exoneration or indemnification, or any other recovery of any kind in respect of amounts paid by the Company to Indemnitee pursuant to this Agreement and (B) any right to participate in any claim or remedy of Indemnitee against any Person (including, without limitation, any Sponsor Entities), whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Person (including, without limitation, any Sponsor Entities), directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right.

iii.    In the event any other Person with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities) or their insurers advances or extinguishes any liability or loss for Indemnitee, the payor has a right of subrogation against the Company or its insurers for all amounts so paid which would otherwise be payable by the Company or its insurers under this Agreement. In no event will payment by any other Person with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities) or their insurers affect the obligations of the Company hereunder or shift primary liability for the Company's obligation to indemnify or advance Expenses to any other Person with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities).

iv.    Any indemnification or advancement of Expenses provided by any other Person with whom or which Indemnitee may be associated (including, without limitation, any Sponsor Entities) is specifically in excess over the Company's obligation to indemnify and advance Expenses or any valid and collectible insurance (including but not limited to any malpractice insurance or professional errors and omissions insurance) provided by the Company.

12

(c)      The Company shall use its reasonable best efforts to purchase and maintain a policy or policies of insurance with reputable insurance companies, providing Indemnitee with coverage for any liability asserted against, and incurred by, Indemnitee or on Indemnitee's behalf by reason of Indemnitee's Corporate Status, whether or not the Company would have the power to indemnify Indemnitee against such liability under the provisions of this Agreement. Such insurance policies shall have coverage terms and policy limits at least as favorable to Indemnitee as the insurance coverage provided to any other director, officer, employee or agent of the Company, as applicable. To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees or agents of the Enterprise, the Company will obtain a policy or policies covering Indemnitee to the maximum extent of the coverage available for any such director, officer, employee or agent under such policy or policies, including coverage in the event the Company does not or cannot, for any reason, indemnify or advance Expenses to Indemnitee as required by this Agreement. If, at the time of the receipt of a notice of a claim pursuant to this Agreement, the Company has director and officer liability insurance in effect, the Company will give prompt notice of such claim or of the commencement of a Proceeding, as the case may be, to the insurers in accordance with the procedures set forth in the respective policies. The Company will thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies. Indemnitee agrees to assist the Company efforts to cause the insurers to pay such amounts and will comply with the terms of such policies, including selection of approved panel counsel, if required.

(d)      The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee for any Proceeding concerning Indemnitee's Corporate Status with an Enterprise will be reduced by any amount Indemnitee has actually received as indemnification or advancement of Expenses from such Enterprise. The Company and Indemnitee intend that any such Enterprise (and its insurers) be the indemnitor of first resort with respect to indemnification and advancement of Expenses for any Proceeding related to or arising from Indemnitee's Corporate Status with such Enterprise. The Company's obligation to indemnify and advance Expenses to Indemnitee is secondary to the obligations the Enterprise or its insurers owe to Indemnitee. Indemnitee agrees to take all reasonably necessary and desirable action to obtain from an Enterprise indemnification and advancement of Expenses for any Proceeding related to or arising from Indemnitee's Corporate Status with such Enterprise.

(e)      In the event of any payment made by the Company under this Agreement, the Company will be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee from any Enterprise or insurance carrier. Indemnitee will execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

13

Section 16.    <u>Duration of Agreement.</u> This Agreement continues until and terminates upon the later of: (a) ten (10) years after the date that Indemnitee ceases to have Corporate Status or (b) one (1) year after the final termination of any Proceeding then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any Proceeding commenced by Indemnitee pursuant to Section 14 of this Agreement relating thereto. The indemnification and advancement of Expenses rights provided by or granted pursuant to this Agreement are binding upon and be enforceable by the parties hereto and their respective successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or of any other Enterprise, and inure to the benefit of Indemnitee and Indemnitee's spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.

Section 17.    <u>Severability.</u> If any provision or provisions of this Agreement is held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) will not in any way be affected or impaired thereby and remain enforceable to the fullest extent permitted by law; (b) such provision or provisions will be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) will be construed so as to give effect to the intent manifested thereby.

Section 18.    <u>Interpretation</u>. Any ambiguity in the terms of this Agreement will be resolved in favor of Indemnitee and in a manner to provide the maximum indemnification and advancement of Expenses permitted by law. The Company and Indemnitee intend that this Agreement provide to the fullest extent permitted by law for indemnification and advancement in excess of that expressly provided, without limitation, by the Certificate of Incorporation, the Bylaws, vote of the Company stockholders or disinterested directors, or applicable law.

Section 19.    <u>Enforcement.</u>

(a)    The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director, officer or other employee or agent of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving or continuing to serve the Company.

(b)    This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; provided, however, that this Agreement is a supplement to and in furtherance of the Certificate of Incorporation, the Bylaws and applicable law, and is not a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder.

Section 20.    <u>Modification and Waiver.</u> No supplement, modification or amendment of this Agreement is binding unless executed in writing by the parties hereto. No waiver of any of the provisions of this Agreement will be deemed or constitutes a waiver of any other provisions of this Agreement nor will any waiver constitute a continuing waiver.

<div align="center">14</div>

Section 21.    Notice by Indemnitee. Indemnitee agrees promptly to notify the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of Expenses covered hereunder. The failure of Indemnitee to so notify the Company does not relieve the Company of any obligation which it may have to the Indemnitee under this Agreement or otherwise.

Section 22.    Notices. All notices, requests, demands and other communications under this Agreement will be in writing and will be deemed to have been duly given if (a) delivered by hand to the other party, (b) sent by reputable overnight courier to the other party or (c) sent by facsimile transmission or electronic mail, with receipt of oral confirmation that such communication has been received:

(a)    If to Indemnitee, at the address indicated on the signature page of this Agreement, or such other address as Indemnitee provides to the Company.

(b)    If to the Company to:

Fluence Energy, Inc.
4601 N. Fairfax Drive, Suite 600
Arlington, VA 22203
Attn: General Counsel
Email: frank.fuselier@fluenceenergy.com

with a copy, which shall not constitute notice, to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention: Senet Bischoff
Telephone: (212) 906-1834

or to any other address as may have been furnished to Indemnitee by the Company.

Section 23.    Contribution. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, will contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

15

Section 24.    <u>Applicable Law and Consent to Jurisdiction.</u> This Agreement and the legal relations among the parties are governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 14(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or Proceeding arising out of or in connection with this Agreement may be brought only in the Delaware Court of Chancery and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court of Chancery for purposes of any action or Proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or Proceeding in the Delaware Court of Chancery, and (iv) waive, and agree not to plead or to make, any claim that any such action or Proceeding brought in the Delaware Court of Chancery has been brought in an improper or inconvenient forum.

Section 25.    <u>Identical Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which will for all purposes be deemed to be an original but all of which together constitutes one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

Section 26.    <u>Headings.</u> The headings of this Agreement are inserted for convenience only and do not constitute part of this Agreement or affect the construction thereof.

[*Signature Pages Follow*]

16

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as of the day and year first above written.

**COMPANY**

**FLUENCE ENERGY, INC.**

By: _____
Name:
Title:

By: _____
Name:
Title:

*[Signature Page to Indemnification Agreement]*

INDEMNITEE

By: _____
    Name:
    Address:

*[Signature Page to Indemnification Agreement]*

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 532 of 1007 PageID# 1511

REVOLVING CREDIT AGREEMENT

dated as of

[_], 2021 among

FLUENCE ENERGY, LLC,
as the Borrower,

FLUENCE ENERGY, INC.,
as the Parent

THE GUARANTORS PARTY HERETO

THE LENDERS PARTY HERETO
and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

JPMORGAN CHASE BANK, N.A.,
MORGAN STANLEY SENIOR FUNDING, INC.
BARCLAYS BANK PLC,
and
BOFA SECURITIES, INC.
as Joint Lead Arrangers and Joint Bookrunners

MORGAN STANLEY SENIOR FUNDING, INC.,
as Syndication Agent

BARCLAYS BANK PLC
and
BANK OF AMERICA, N.A.,
as Documentation Agents

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---:|
| ARTICLE 1 | DEFINITIONS | 1 |
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Classification of Loans and Borrowings | 48 |
| Section 1.03 | Terms Generally | 48 |
| Section 1.04 | Accounting Terms; GAAP | 49 |
| Section 1.05 | Interest Rates; LIBOR Notification | 50 |
| Section 1.06 | Divisions | 51 |
| Section 1.07 | Letter of Credit Amounts | 51 |
| Section 1.08 | Exchange Rates; Currency Equivalents | 51 |
| Section 1.09 | Certain Calculations and Tests | 52 |
| Section 1.10 | Australian Terms | 53 |
| ARTICLE 2 | THE CREDITS | 54 |
| Section 2.01 | Commitments | 54 |
| Section 2.02 | Loans and Borrowings | 54 |
| Section 2.03 | Requests for Borrowings | 55 |
| Section 2.04 | Funding of Borrowings | 55 |
| Section 2.05 | Interest Elections | 56 |
| Section 2.06 | Termination and Reduction of Commitments | 58 |
| Section 2.07 | Repayment of Loans; Evidence of Debt | 58 |
| Section 2.08 | Prepayment of Loans | 59 |
| Section 2.09 | Fees | 60 |
| Section 2.10 | Interest | 61 |
| Section 2.11 | Alternate Rate of Interest | 62 |
| Section 2.12 | Increased Costs | 66 |
| Section 2.13 | Break Funding Payments | 67 |
| Section 2.14 | Taxes | 68 |
| Section 2.15 | Payments Generally; Pro Rata Treatment; Sharing of Set-offs | 72 |
| Section 2.16 | Mitigation Obligations; Replacement of Lenders | 73 |
| Section 2.17 | Defaulting Lenders/Subordinated Lender | 74 |
| Section 2.18 | Incremental Facility | 78 |
| Section 2.19 | Letters of Credit | 79 |
| Section 2.20 | Judgment Currency | 84 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES | 84 |
| Section 3.01 | Organization; Powers | 84 |
| Section 3.02 | Authorization; Enforceability | 85 |
| Section 3.03 | Governmental Approvals; No Conflicts | 85 |
| Section 3.04 | Financial Condition; No Material Adverse Change | 85 |
| Section 3.05 | Properties | 86 |
| Section 3.06 | Litigation and Environmental Matters | 86 |
| Section 3.07 | Compliance with Laws and Agreements; No Default | 86 |

Section 3.08     Investment Company Status                                                                 87
Section 3.09     Margin Stock                                                                              87
Section 3.10     Taxes                                                                                     87
Section 3.11     ERISA                                                                                     87
Section 3.12     Disclosure                                                                                88
Section 3.13     Subsidiaries                                                                              89
Section 3.14     Solvency                                                                                  89
Section 3.15     Anti-Terrorism Law                                                                        89
Section 3.16     Anti-Corruption Laws and Sanctions                                                        90
Section 3.17     Security Documents                                                                        90
Section 3.18     Australian Representations                                                                91

ARTICLE 4        CONDITIONS                                                                                92

Section 4.01     Effective Date                                                                            92
Section 4.02     Each Credit Event                                                                         94

ARTICLE 5        AFFIRMATIVE COVENANTS                                                                     95

Section 5.01     Financial Statements; Ratings Change and Other Information                                95
Section 5.02     Notices of Material Events                                                                97
Section 5.03     Existence; Conduct of Business                                                            98
Section 5.04     Payment of Taxes                                                                          98
Section 5.05     Maintenance of Properties; Protection of Intellectual Property; Insurance                 98
Section 5.06     Maintenance of Material Agreements                                                        98
Section 5.07     Books and Records; Inspection Rights                                                      98
Section 5.08     ERISA Events                                                                              99
Section 5.09     Compliance with Laws and Agreements                                                       99
Section 5.10     Use of Proceeds                                                                           99
Section 5.11     Guarantors; Additional Collateral                                                         99
Section 5.12     Cash Management                                                                           101
Section 5.13     Further Assurances                                                                        102
Section 5.14     Accuracy of Information                                                                   102

ARTICLE 6        NEGATIVE COVENANTS                                                                        102

Section 6.01     Indebtedness                                                                              102
Section 6.02     Liens                                                                                     105
Section 6.03     Fundamental Changes                                                                       107
Section 6.04     Investments, Loans, Advances, Guarantees and Acquisitions                                 108
Section 6.05     Restricted Payments                                                                       111
Section 6.06     Restrictive Agreements                                                                    114
Section 6.07     Transactions with Affiliates                                                              115
Section 6.08     Use of Proceeds                                                                           115
Section 6.09     Disposition of Property                                                                   115
Section 6.10     Financial Covenants                                                                       117
Section 6.11     Swap Agreements                                                                           117
Section 6.12     Permitted Activities of Parent                                                            117

ii

| ARTICLE 7 | EVENTS OF DEFAULT | 119 |
|---|---|---|
| | | |
| Section 7.01 | Events of Default | 119 |
| Section 7.02 | Right to Cure | 122 |
| Section 7.03 | Application of Proceeds | 123 |
| | | |
| ARTICLE 8 | THE AGENTS | 124 |
| | | |
| Section 8.01 | Appointment of Administrative Agent | 124 |
| Section 8.02 | Powers and Duties | 124 |
| Section 8.03 | General Immunity | 125 |
| Section 8.04 | Administrative Agent Entitled to Act as Lender | 126 |
| Section 8.05 | Lenders' Representations, Warranties and Acknowledgment | 126 |
| Section 8.06 | Right to Indemnity | 127 |
| Section 8.07 | Successor Administrative Agent | 127 |
| Section 8.08 | Guaranty and Security Documents | 128 |
| Section 8.09 | Withholding Taxes | 128 |
| Section 8.10 | Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim | 129 |
| Section 8.11 | Acknowledgment of Lenders and Issuing Banks | 130 |
| Section 8.12 | Authorization of the Administrative Agent under German Law | 131 |
| | | |
| ARTICLE 9 | GUARANTY | 133 |
| | | |
| Section 9.01 | Guaranty | 133 |
| Section 9.02 | Additional Agreements | 135 |
| Section 9.03 | Information | 135 |
| Section 9.04 | Guarantor Notices | 136 |
| Section 9.05 | Termination | 136 |
| Section 9.06 | Right of Set Off | 136 |
| Section 9.07 | Additional Guarantors | 136 |
| Section 9.08 | Article IX Severability | 136 |
| | | |
| ARTICLE 10 | MISCELLANEOUS | 137 |
| | | |
| Section 10.01 | Notices | 137 |
| Section 10.02 | Waivers; Amendments | 139 |
| Section 10.03 | Expenses; Indemnity; Damage Waiver | 140 |
| Section 10.04 | Successors and Assigns | 143 |
| Section 10.05 | Survival | 147 |
| Section 10.06 | Counterparts; Integration; Effectiveness | 147 |
| Section 10.07 | Severability | 149 |
| Section 10.08 | Right of Setoff | 149 |
| Section 10.09 | Governing Law; Jurisdiction; Consent to Service of Process | 149 |
| Section 10.10 | Waiver Of Jury Trial | 150 |
| Section 10.11 | Headings | 150 |
| Section 10.12 | Confidentiality | 151 |
| Section 10.13 | Interest Rate Limitation | 152 |
| Section 10.14 | No Advisory or Fiduciary Responsibility | 152 |

iii

| Section 10.15 | Electronic Execution of Assignments and Certain Other Documents | 153 |
| Section 10.16 | USA PATRIOT Act | 153 |
| Section 10.17 | Releases of Guarantors and Liens | 153 |
| Section 10.18 | Acknowledgement Regarding Any Supported QFCs | 154 |
| Section 10.19 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 155 |
| Section 10.20 | Parallel Debt (Covenant to pay the Administrative Agent) | 156 |
| Section 10.21 | Subordinated Lender | 156 |
| Section 10.22 | Restricted Lender | 157 |

iv

SCHEDULE 1.01          Existing Letters of Credit
SCHEDULE 2.01          Commitments
SCHEDULE 3.06          Litigation or Environmental Matters
SCHEDULE 3.10          Taxes
SCHEDULE 3.13          Subsidiaries
SCHEDULE 4.01(b)       Foreign Security Agreements
SCHEDULE 4.01(l)       Foreign Security Filings
SCHEDULE 5.06          Material Agreements
SCHEDULE 6.01          Indebtedness
SCHEDULE 6.02          Permitted Liens
SCHEDULE 6.04(b)(ii)   Existing Investments
SCHEDULE 6.06          Permitted Restrictive Agreements
SCHEDULE 6.07          Transactions with Affiliates

EXHIBIT A       Form of Assignment and Assumption
EXHIBIT B-1     Form of Borrowing Request
EXHIBIT B-2     Form of Letter of Credit Request
EXHIBIT C       Form of Interest Election Request
EXHIBIT D       Form of Revolving Note
EXHIBIT E       Form of Guaranty Supplement
EXHIBIT F       Form of Compliance Certificate
EXHIBIT G       Form of Agreed Security Principles
EXHIBIT H-1     U.S. Tax Certificate (For Non-U.S. Lenders that are not Partnerships for U.S. Federal Income Tax Purposes)
EXHIBIT H-2     U.S. Tax Certificate (For Non-U.S. Lenders that are Partnerships for U.S. Federal Income Tax Purposes)
EXHIBIT H-3     U.S. Tax Certificate (For Non-U.S. Participants that are not Partnerships for U.S. Federal Income Tax Purposes)
EXHIBIT H-4     U.S. Tax Certificate (For Non-U.S. Participants that are Partnerships for U.S. Federal Income Tax Purposes)

v

REVOLVING CREDIT AGREEMENT dated as of [_], 2021 among FLUENCE, ENERGY LLC, a Delaware limited liability company, as the Borrower, FLUENCE ENERGY, INC., a Delaware corporation, as the Parent, the LENDERS party hereto and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

The parties hereto agree as follows:

<div align="center">

**ARTICLE 1**
**DEFINITIONS**

</div>

Section 1.01    <u>Defined Terms</u>. As used in this Agreement, the following terms have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate. All ABR Loans shall be denominated in Dollars.

"**Adjusted EURIBOR Rate**" means, with respect to any Term Benchmark Borrowing denominated in Euros for any Interest Period, an interest rate per annum equal to (a)  the EURIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"**Adjusted LIBO Rate**" means, with respect to any Term Benchmark Borrowing denominated in Dollars for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"**Administrative Agent**" means JPMorgan Chase Bank, N.A. (or any of its designated branch offices or affiliates), in its capacity as administrative agent for the Lenders hereunder, or any successor administrative agent.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**AES**" means The AES Corporation, a Delaware corporation, and its subsidiaries and affiliates, including AES Grid Stability, LLC, a Delaware limited liability company.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agent Parties**" has the meaning set forth in <u>Section 10.01</u>.

"**Agents**" means the Administrative Agent, the Arrangers, the Syndication Agent and the Documentation Agents.

"**Agreed Currency**" means Dollars and any Alternative Currency.

"**Agreed Security Principles**" has the meaning assigned to such term in <u>Exhibit G</u>.

"**Agreement**" means this Revolving Credit Agreement, as the same may hereafter be modified, supplemented, extended, amended, restated or amended and restated from time to time.

"**Alternate Base Rate**" means, for any day, a rate *per annum* equal to the greatest of (a) the Prime Rate in effect on such day, (b) the NYFRB Rate in effect on such day plus $\frac{1}{2}$ of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1%, <u>provided</u> that for the purpose of this definition, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate (or if the LIBO Screen Rate is not available for such one month Interest Period, the LIBO Interpolated Rate) at approximately 11:00 a.m. London time on such day. Any change in the Alternate Base Rate due to a change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the NYFRB Rate or the Adjusted LIBO Rate, respectively. If the Alternate Base Rate is being used as an alternate rate of interest pursuant to <u>Section 2.11</u> hereof (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to <u>Section 2.11(b)</u>), then the Alternate Base Rate shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above. For the avoidance of doubt, if the Alternate Base Rate as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"**Alternative Currency**" means Pounds Sterling, Euros, Australian Dollars and any additional currencies determined after the Effective Date by mutual agreement of the Borrower, Lenders, Issuing Banks and Administrative Agent; <u>provided</u> that each such currency is a lawful currency that is readily available, freely transferable and not restricted, able to be converted into Dollars and available in the London interbank deposit market.

"**Alternative Currency Payment Office**" of the Administrative Agent means, for each Alternative Currency, the office, branch, affiliate or correspondent bank of the Administrative Agent for such currency as specified from time to time by notice to the Borrower and each Lender.

"**Ancillary Document**" has the meaning set forth in <u>Section 10.06(b)</u>.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Parent, the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"**Anti-Terrorism Laws**" has the meaning set forth in <u>Section 3.15(a)(ii)</u>.

"**Applicable Percentage**" means, with respect to any Lender, the percentage of the total Commitments represented by such Lender's Commitment. If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

2

"**Applicable Rate**" means, for any day, with respect to any Term Benchmark Loans, ABR Loans, RFR Loans, CBR Loans or the commitment fees payable hereunder, as the case may be, the applicable rate *per annum* set forth under the caption "Applicable Rate" across from the caption "Term Benchmark Loans", "ABR Loans", "RFR Loans", "CBR Loans" or "Commitment Fee" in the table below, as the case may be.

| Type | Applicable Rate |
| --- | --- |
| Term Benchmark Loans | 3.00% |
| ABR Loans | 2.00% |
| RFR Loans | 3.1193% |
| Commitment Fee | 0.55% |

"**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arrangers**" means each of JPMorgan Chase Bank, N.A., Morgan Stanley Senior Funding, Inc., Barclays Bank PLC and BofA Securities, Inc., in their respective capacities as lead arranger and bookrunner, and any successors thereto.

"**ASR Agreement**" has the meaning set forth in Section 6.05(vi).

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.04), and accepted by the Administrative Agent, in the form of Exhibit A or any other form (including electronic records generated by the use of an electronic platform) approved by the Administrative Agent.

"**AUD Interpolated Rate**" means, at any time, the rate per annum determined by the Administrative Agent to be equal to the rate that results from interpolating on a linear basis between: (a) the AUD Screen Rate for the longest period for which that AUD Screen Rate is available that is shorter than the Impacted AUD Interest Period and (b) the AUD Screen Rate for the shortest period for which that AUD Screen Rate is available that exceeds the Impacted AUD Interest Period, in each case, at such time. If at any time the AUD Interpolated Rate is less than zero, the AUD Interpolated Rate shall be deemed to be zero for purposes of this Agreement.

"**AUD Rate**" means, with respect to any Term Benchmark Borrowing denominated in Australian Dollars and for any Interest Period, the AUD Screen Rate at approximately 11:00 A.M., Sydney, Australia time, on the first day of such Interest Period; provided, that, if the AUD Screen Rate shall not be available at such time for such Interest Period (an "**Impacted AUD Interest Period**"), then the AUD Rate shall be the AUD Interpolated Rate.

3

"**AUD Screen Rate**" means with respect to any Interest Period:

(1)        the Australian Bank Bill Swap Reference Rate (Bid) administered by ASX Benchmarks Pty Limited (ACN 616 075 417) (or any other Person that takes over the administration of such rate) for Australian Dollar bills of exchange with a tenor equal in length to such Interest Period as displayed on page BBSY of the Reuters screen (or, in the event such rate does not appear on such Reuters page, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at or about 11:00 a.m. (Sydney, Australia time) on the first day of such Interest Period. If the AUD Screen Rate shall be less than zero, the AUD Screen Rate shall be deemed to be zero for purposes of this Agreement; and

(2)        if the rate described in sub-paragraph (1) above is not available, the sum of:

(A)        the Australian Bank Bill Swap Reference Rate administered by ASX Benchmarks Pty Limited (or any other person which takes over the administration of that rate) for the relevant period displayed on page BBSW of the Reuters Screen (or any replacement Reuters page which displays that rate) (or, in the event such rate does not appear on such Reuters page, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion) at or about 11:00 a.m. (Sydney, Australia time) on the first day of such Interest Period; and

(B)        0.05 per cent per annum;

(3)        if (i) for any reason that rate is not displayed for a term equivalent to that period; or (ii) the basis on which that rate is displayed is changed or the relevant rate is otherwise unascertainable pursuant to the foregoing provision, and it is not possible to determine the AUD Interpolated Rate, then the AUD Screen Rate will be the rate determined by the Administrative Agent to be the average of the buying rates quoted to the Administrative Agent by three Reference Banks at or about that time on that date; provided, however, that such rate shall not be less than 0%. The buying rates must be for bills of exchange accepted by a leading Australian bank and which have a term equivalent to the period.

"**Australia**" means the Commonwealth of Australia, including its states and territories (and "Australian" should be construed accordingly).

"**Australian Banking Code of Practice**" means the Banking Code of Practice published by the Australian Banking Association, as amended, revised or amended and restated from time to time.

"**Australian Collateral Agreements**" shall mean the security agreements set forth on Schedule 4.01(b) under the heading [*] which agreements shall be granted in accordance with the Agreed Security Principles, in each case as may be amended, restated, supplemented or otherwise modified from time to time, and any other security agreement, pledge agreement or similar document governed by Australian law delivered by any Loan Party in favor of the Administrative Agent.

4

"**Australian Controller**" has the meaning given to the term "controller" in section 9 of the Corporations Act.

"**Australian Corporations Act**" means the *Corporations Act 2001* (Cth) (Australia).

"**Australian Dollars**" and "**A$**" means lawful money of the Commonwealth of Australia.

"**Australian GST**" means goods and services tax or similar value added tax levied or imposed in Australia under the Australian GST Act.

"**Australian GST Act**" means the *A New Tax System (Goods and Services Tax) Act 1999* (Cth).

"**Australian Loan Party**" means a Loan Party that is incorporated in Australia. As of the Effective Date, the Australian Loan Parties shall constitute Fluence Energy Pty Ltd (ACN 627 071 461), an Australian corporation.

"**Australian PPS Act**" means the Personal Property Securities Act 2009 (Cth) (Australia).

"**Australian PPS Law**" means (a) the Australian PPS Act, (b) any regulations made under the Australian PPS Act, (c) any legislative instrument made under the Australian PPS Act, (d) any amendment to any of the above, made at any time, or (e) any amendment made at any time to any other legislation as a consequence of an Australian PPS Law referred to in clauses (a) to (d).

"**Australian Tax Act**" means the *Income Tax Assessment Act 1936* (Cth) (Australia) or the *Income Tax Assessment Act* 1997 (Cth) (Australia), as applicable.

"**Australian Tax Consolidated Group**" means a Consolidated Group or a MEC Group as defined in the Australian Tax Act.

"**Australian Tax Funding Agreement**" means any tax funding agreement for Australian tax consolidation purposes.

"**Australian Tax Sharing Agreement**" means any tax sharing agreement for Australian tax consolidation purposes that satisfies the requirements of section 721-25 of the Australian Tax Act for being a valid tax sharing agreement.

"**Availability Period**" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark for any Agreed Currency, as applicable, any tenor for such Benchmark (or component thereof) or payment period for interest calculated with reference to such Benchmark (or component thereof), as applicable, that is or may be used for determining the length of an Interest Period for any term rate or otherwise, for determining any frequency of making payments of interest calculated pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (f) of Section 2.11.

5

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Benchmark**" means, initially, with respect to any (i) RFR Loan in any Agreed Currency, the applicable Relevant Rate for such Agreed Currency or (ii) Term Benchmark Loan, the Relevant Rate for such Agreed Currency; provided that if a Benchmark Transition Event, a Term SOFR Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to the applicable Relevant Rate or the then-current Benchmark for such Agreed Currency, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) or clause (c) of Section 2.11.

"**Benchmark Replacement**" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date; provided that, in the case of any Loan denominated in an Alternative Currency or in the case of an Other Benchmark Rate Election, "Benchmark Replacement" shall mean the alternative set forth in (3) below:

(1)    in the case of any Loan denominated in Dollars, the sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

(2)    in the case of any Loan denominated in Dollars, the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(3)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable Agreed Currency at such time in the United States and (b) the related Benchmark Replacement Adjustment;

6

provided that, in the case of clause (1), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; provided further that, in the case of clause (3), when such clause is used to determine the Benchmark Replacement in connection with the occurrence of an Other Benchmark Rate Election, the alternate benchmark rate selected by the Administrative Agent and the Borrower shall be the term benchmark rate that is used in lieu of a LIBOR-based rate in the relevant other Dollar-denominated syndicated credit facilities; provided further that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, upon the occurrence of a Term SOFR Transition Event, and the delivery of a Term SOFR Notice, on the applicable Benchmark Replacement Date the "Benchmark Replacement" shall revert to and shall be deemed to be the sum of (a) Term SOFR and (b) the related Benchmark Replacement Adjustment, as set forth in clause (1) of this definition (subject to the first proviso above).

If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

(1)    for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Administrative Agent:

(a)    the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b)    the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Interest Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

7

(2)     for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date and/or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable Agreed Currency at such time;

provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides in its reasonable and good faith discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides in its reasonable good faith discretion that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines in its reasonable good faith discretion that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Benchmark Replacement Date**" means, with respect to any Benchmark, the earliest to occur of the following events with respect to such then-current Benchmark:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative; provided, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date;

8

(3)    in the case of a Term SOFR Transition Event, the date that is thirty (30) days after the date a Term SOFR Notice is provided to the Lenders and the Borrower pursuant to Section 2.11(c); or

(4)    in the case of an Early Opt-in Election or an Other Benchmark Rate Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election or Other Benchmark Rate Election, as applicable, is provided to the Lenders, so long as the Administrative Agent has not received, by 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Early Opt-in Election or Other Benchmark Rate Election, as applicable, is provided to the Lenders, written notice of objection to such Early Opt-in Election or Other Benchmark Rate Election, as applicable, from Lenders comprising the Required Lenders.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means, with respect to any Benchmark, the occurrence of one or more of the following events with respect to such then-current Benchmark:

(1) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the NYFRB, the central bank for the Agreed Currency applicable to such Benchmark, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), in each case, which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

9

(3) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" means, with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.11(b) and (y) ending at the time that a Benchmark Replacement has replaced such then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.11(b).

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**BHC Act Affiliate**" of a party means an "affiliate' (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Board**" means the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" means Fluence Energy, LLC, a Delaware limited liability company.

"**Borrower Competitor**" means any competitor of the Borrower and/or any of its Subsidiaries.

"**Borrowing**" means Loans of the same Type and Agreed Currency, made, converted or continued on the same date and, in the case of Term Benchmark Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

10

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, (a) when used in connection with a Term Benchmark Loan, the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market, (b) when used in connection with Loans denominated in Euros and in relation to the calculation or computation of EURIBOR, any day which is a TARGET Day, (c) in relation to Loans denominated in Australian Dollars and in relation to the calculation or computation of BBSY or BBSW, any day (other than a Saturday or a Sunday) on which banks are open for business in Sydney, Australia and (d) in relation to RFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any such RFR Loan, or any other dealings in the applicable Agreed Currency of such RFR Loan, any such day that is only an RFR Business Day.

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; provided that, for the avoidance of doubt, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Effective Date and any similar lease entered into after the Effective Date by such Person shall be accounted for as obligations relating to an operating lease and not as Capital Lease Obligations.

"**Captive Insurance Company**" means each Subsidiary of the Borrower formed from time to time that engages primarily in the business of insuring risks of the Borrower and its Subsidiaries.

"**Cash Collateralize**" means, in respect of an Obligation, to provide and pledge (as a first priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the applicable Issuing Bank (and "**Cash Collateralization**" has a corresponding meaning). "**Cash Collateral**" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"**Cash Equivalents**" means:

(a)        direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof or issued by FNMA, FHLMC or FFCB), in each case maturing within one year from the date of acquisition thereof;

(b)        investments in commercial paper maturing within one (1) year from the date of acquisition thereof and (i) issued by any Lender or bank holding company owning any Lender or (ii) rated at least "A-2" or the equivalent thereof by S&P or at least "P-2" or the equivalent thereof by Moody's, respectively (in each case, at the time of acquisition);

11

(c)        investments in certificates of deposit, floating rate certificates of deposit, bankers' acceptances and time deposits (including eurodollar deposits) maturing within one (1) year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by (i) any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $100 million; or (ii) any Lender or bank holding company owning any Lender (in each case, at the time of acquisition);

(d)        fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)        money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5 billion;

(f)        securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority thereof or by any foreign government, and rated at least "A" by S&P or "A" by Moody's (in each case, at the time of acquisition);

(g)        securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (c) above (in each case, at the time of acquisition);

(h)        corporate notes issued by domestic corporations that are rated at least "A" by S&P or "A" by Moody's, in each case maturing within one year from the date of acquisition;

(i)        auction rate securities including taxable municipals, taxable auction notes, and money market preferred; provided that the credit quality is consistent with clause (g) of this definition;

(j)        marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(k)        short term investments similar to the foregoing made by foreign Subsidiaries of the Parent consistent with the Parent's or the Borrower's, as applicable, investment guidelines or as approved from time to time by the Parent's or the Borrower's, as applicable, board of directors or governing body;

(l)        money market mutual funds that invest primarily in the foregoing items (determined at the time such investment in such fund is made); and

(m)        such other comparable investments as may be approved by the Administrative Agent from time to time.

12

"**CBR Loan**" means a Loan that bears interest at a rate determined by reference to the Central Bank Rate.

"**Central Bank Rate**" means, (A) the greater of (i) for any Loan denominated in (a) Sterling, the Bank of England (or any successor thereto)'s "Bank Rate" as published by the Bank of England (or any successor thereto) from time to time, (b) Euro, one of the following three rates as may be selected by the Administrative Agent in its reasonable discretion: (1) the fixed rate for the main refinancing operations of the European Central Bank (or any successor thereto), or, if that rate is not published, the minimum bid rate for the main refinancing operations of the European Central Bank (or any successor thereto), each as published by the European Central Bank (or any successor thereto) from time to time, (2) the rate for the marginal lending facility of the European Central Bank (or any successor thereto), as published by the European Central Bank (or any successor thereto) from time to time or (3) the rate for the deposit facility of the central banking system of the Participating Member States, as published by the European Central Bank (or any successor thereto) from time to time and (c) any other Alternative Currency, a central bank rate as determined by the Administrative Agent in its reasonable discretion and (ii) 0%; plus (B) the applicable Central Bank Rate Adjustment.

"**Central Bank Rate Adjustment**" means, for any day, for any Loan denominated in (a) Euro, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of the EURIBOR Rate for the five most recent Business Days preceding such day for which the EURIBOR Screen Rate was available (excluding, from such averaging, the highest and the lowest EURIBOR Rate applicable during such period of five Business Days) minus (ii) the Central Bank Rate in respect of Euro in effect on the last Business Day in such period, (b) Sterling, a rate equal to the difference (which may be a positive or negative value or zero) of (i) the average of SONIA for the five most recent RFR Business Days preceding such day for which SONIA was available (excluding, from such averaging, the highest and the lowest SONIA applicable during such period of five RFR Business Days) minus (ii) the Central Bank Rate in respect of Sterling in effect on the last RFR Business Day in such period and (c) any other Alternative Currency, a Central Bank Rate Adjustment as determined by the Administrative Agent in its reasonable discretion. For purposes of this definition, (x) the term Central Bank Rate shall be determined disregarding clause (B) of the definition of such term and (y) the EURIBOR Rate on any day shall be based on the EURIBOR Screen Rate on such day at approximately the time referred to in the definition of such term for deposits in the applicable Agreed Currency for a maturity of one month (or, in the event the EURIBOR Screen Rate for deposits in the applicable Agreed Currency is not available for such maturity of one month, shall be based on the EURIBOR Interpolated Rate as of such time); provided that if such rate shall be less than 0.00%, such rate shall be deemed to be 0.00%.

"**CFC**" has the meaning assigned to it in the definition of "Excluded Subsidiary."

"**CFC Holdco**" has the meaning assigned to it in the definition of "Excluded Subsidiary."

"**Change in Control**" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act and the rules of the SEC thereunder) (other than the Permitted Holders), of Equity Interests in each of the Parent and the Borrower (i) representing more than 40% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in each of the Parent and the Borrower and (ii) representing more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in each of the Parent and the Borrower than the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in each of the Parent and the Borrower that are owned, directly or indirectly, beneficially or of record, by the Permitted Holders, or (b) the Parent or any successor thereto in accordance with Section 6.12(d) shall at any time cease to be the sole managing member of the Borrower.

13

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Charges**" has the meaning set forth in Section 10.13.

"**Citi Supplier Financing Agreement**" means that certain Global Paying Services Agreement, dated as of July 22, 2021 between the Borrower and Citibank, N.A., as it may be amended, restated, supplemented, replaced or otherwise modified from time to time.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all property and rights of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, provided that Collateral shall not include any Excluded Property.

"**Commercial Letter of Credit**" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by the Borrower or any of its subsidiaries in the ordinary course of business of such Person.

"**Commitment**" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.04. The initial amount of each Lender's Commitment as of the Effective Date is set forth on Schedule 2.01 opposite such Lender's name under the caption "Commitment". The initial aggregate amount of the Lenders' Commitments as of the Effective Date is $200,000,000.

14

"**Commitment Fee**" has the meaning set forth in Section 2.09(a).

"**Communications**" has the meaning set forth in Section 10.01.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated EBITDA**" means, for the Parent and its Subsidiaries for any period, Consolidated Net Income for such period adjusted (i) to exclude (a) gains or losses from disposed, abandoned, transferred, closed or discontinued operations, (b) any gains or losses attributable to business dispositions or asset dispositions other than in the ordinary course of business (as reasonably determined by the Borrower acting in good faith), (c) any extraordinary or non-recurring gains or losses, (d) any non-cash gains, losses, charges or expenses, (e) the cumulative effect of changes in accounting principles, including any changes to Accounting Standards Codification 715 (or any subsequently adopted standards relating to pension and postretirement benefits) adopted by the Financial Accounting Standards Board after the date hereof, (f) Interest Expense, (g) consolidated tax expense or income, (h) all depreciation and amortization expense, including the depreciation of property, plant and equipment, the amortization of intangible assets, deferred financing fees and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, (i) all other non-cash charges, including actuarial gains or losses from pension and postretirement plans, impairment charges and asset write-offs, non-cash expense realized or resulting from stock option plans, employee benefit plans or post-employment benefit plans, or grants or sales of stock, stock appreciation or similar rights, stock options, restricted stock or other Equity Interests, or non-cash compensation charges, (j) any costs and expenses related to employment of terminated employees or realized in connection with or resulting from stock appreciation or similar rights, stock options, restricted stock or other Equity Interests, (k) any gains or losses attributable to the early extinguishment of Indebtedness, Swap Agreements or other derivative instruments, (l) any currency translation gains and losses, and any realized or unrealized net loss or gain resulting from hedging transactions, (m) any expenses or charges related to any issuance of Equity Interests, Investment, acquisition, Disposition, recapitalization, Restricted Payment, or incurrence or repayment of Indebtedness permitted hereunder or any other Specified Transaction (in each case, whether or not consummated), (n) restructuring losses and expenses and (o) any payments by the Parent to the Permitted Holders under the Tax Receivable Agreement and (ii) to include proceeds received from business interruption insurance. For purposes of this definition, whenever Pro Forma Effect is to be given to any event, the Pro Forma Effect calculations shall be made in good faith by a Financial Officer of the Borrower.

"**Consolidated Leverage Ratio**" means, for any Measurement Period, the ratio of (a) Net Debt for Borrowed Money of the Parent (excluding Indebtedness attributable to the Parent Convertible Notes) and its Subsidiaries as of the end of such period to (b) Consolidated EBITDA of the Parent and its Subsidiaries for such period.

15

"**Consolidated Net Income**" means, for the Parent and its Subsidiaries for any period, the net income of the Parent and its Subsidiaries, determined on a consolidated basis for such period in accordance with GAAP.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Account Agreement**" means any tri-party agreement by and among a U.S. Loan Party, the Administrative Agent and a depositary bank or securities intermediary at which such U.S. Loan Party maintains a Controlled Account, in each case in form and substance reasonably satisfactory to the Administrative Agent and which shall provide that, upon the occurrence and during the continuance of any Event of Default, the Administrative Agent can cause the applicable depositary bank or securities intermediary to honor the instructions of the Administrative Agent with respect to any such Controlled Account on terms set forth therein.

"**Controlled Account**" has the meaning set forth in Section 5.12.

"**Corresponding Debt**" has the meaning assigned to such term in Section 10.20(b).

"**Corresponding Tenor**" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"**Covered Entity**" means any of the following:

(i)        a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)       a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)      a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Covered Party**" has the meaning assigned to it in Section 10.18.

"**Cure Amount**" has the meaning specified in Section 7.02(a).

"**Cure Expiration Date**" has the meaning specified in Section 7.02(a).

"**Cure Right**" has the meaning specified in Section 7.02(a).

"**Cure Quarter**" has the meaning specified in Section 7.02(e).

"**Daily Simple RFR**" means, for any day (an "**RFR Interest Day**"), for any RFR Loan denominated in Sterling, an interest rate per annum equal to the greater of (a) SONIA for the day that is five Business Days prior to (A) if such RFR Interest Day is a Business Day, such RFR Interest Day or (B) if such RFR Interest Day is not a Business Day, the Business Day immediately preceding such RFR Interest Day and (b) 0.00%. Any change in Daily Simple RFR due to a change in the applicable RFR shall be effective from and including the effective date of such change in the RFR without notice to the Borrower.

16

"**Daily Simple SOFR**" means, for any day, SOFR, with the conventions for this rate (which may include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

["**Debt Purchase Transaction**" means, in relation to a person, a transaction where such person:

(a) purchases by way of assignment or transfer;

(b) enters into any sub-participation in respect of; or

(c) enters into any other agreement or arrangement having an economic effect substantially similar to a sub-participation in respect of,

any Commitment or amount outstanding under this Agreement.]

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Deemed LC Issuance**" has the meaning set forth in Section 2.19(l).

"**Deemed LC Request**" has the meaning set forth in Section 2.19(l).

"**Deemed LC Termination**" has the meaning set forth in Section 2.19(l).

"**Default**" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

17

"**Defaulting Lender**" means, subject to Section 2.17(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to such funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (ii) fund any portion of its participation in Letters of Credit hereunder within two Business Days of the date when due or (iii) pay to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower, (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender, or (e) has become the subject of a Bail-In Action. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (e) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.17(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Disposition**" means, with respect to any property or right, any sale, lease, sale and leaseback, assignment, license, conveyance, transfer or other disposition thereof (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise). "**Dispose**" and "**Disposed of**" have meanings correlative thereto.

"**Disqualified Lender**" means (a) any Person identified in writing by name to the Arrangers prior to the Effective Date, (b) any Person that is or becomes a Borrower Competitor, and is designated by name by the Borrower as such in a writing provided to the Administrative Agent after the Effective Date, and (c) any Affiliate of any Person referred to in clauses (a) and (b) above that (i) have been identified to the Administrative Agent by the Borrower in writing from time to time or (ii) otherwise are reasonably identifiable on the basis of their name; provided that no written notice delivered pursuant to clauses (b) and (c) above shall (A) apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Loans or entered into a trade for either of the foregoing or (B) become effective until two Business Days after such written notice is delivered to the Administrative Agent.

18

["**Distributed Amount**" means the amount distributed or paid to the Secured Parties or to the Administrative Agent on behalf of the Secured Parties (or any of them) by the person responsible for the distribution of the assets (including any payments) of a Loan Party which is insolvent or otherwise subject to insolvency or similar proceedings.]

"**Dividing Person**" has the meaning assigned to it in the definition of "Division".

"**Division**" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"**Documentation Agent**" means each of Barclays Bank PLC and Bank of America, N.A. in their capacities as documentation agents, and any successors thereto.

"**Dollar Equivalent**" means, for any amount, at the time of determination thereof, (a) if such amount is expressed in Dollars, such amount, (b) if such amount is expressed in an Alternative Currency, the equivalent of such amount in Dollars determined by using the rate of exchange for the purchase of Dollars with the Alternative Currency last provided (either by publication or otherwise provided to the Administrative Agent) by Reuters on the Business Day (New York City time) immediately preceding the date of determination or if such service ceases to be available or ceases to provide a rate of exchange for the purchase of Dollars with the Alternative Currency, as provided by such other publicly available information service which provides that rate of exchange at such time in place of Reuters chosen by the Administrative Agent in its sole discretion (or if such service ceases to be available or ceases to provide such rate of exchange, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its sole discretion) and (c) if such amount is denominated in any other currency, the equivalent of such amount in Dollars as determined by the Administrative Agent using any method of determination it deems appropriate in its reasonable discretion; provided that, in the case of any such amount that is expressed in a currency other than Dollars, to the extent such amount is the subject of a currency hedge arrangement evidenced by a Swap Agreement, the "Dollar Equivalent" of such amount shall be the equivalent of such amount in Dollars determined by using the rate of exchange for the purchase of Dollars with such currency as set forth in such Swap Agreement.

"**Dollars**" or "**$**" refers to lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the laws of any political subdivision of the United States, excluding (x) any such Subsidiary substantially all of the assets of which consist of Equity Interests in one or more Subsidiaries that are "controlled foreign corporations" within the meaning of Section 957 of the Code and (y) any such Subsidiary that is owned (directly or indirectly, in whole or in part) by one or more Subsidiaries that are "controlled foreign corporations" within the meaning of Section 957 of the Code.

19

"**Early Opt-in Election**" means, if the then current Benchmark with respect to Dollars is LIBO Rate, the occurrence of:

(1)     a notification by the Administrative Agent to (or the request by the Borrower to the Administrative Agent to notify) each of the other parties hereto that at least five currently outstanding Dollar denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate (and such syndicated credit facilities are identified in such notice and are publicly available for review), and

(2)     the joint election by the Administrative Agent and the Borrower to trigger a fallback from LIBO Rate and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the date on which each of the conditions set forth in Section 4.01 have been satisfied (or waived in accordance with Section 10.02), which date occurred on [_], 2021.

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, use, handling, transportation, storage, treatment, disposal, management, release or threatened release of any Hazardous Material or to health and safety matters (to the extent related to Hazardous Material).

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation, reclamation or remediation, fines, penalties or indemnities), of the Parent, the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any Environmental Law, including compliance or noncompliance therewith, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

20

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest; provided that Equity Interests shall not include any debt securities that are convertible into or exchangeable for any combination of Equity Interests and/or cash.

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" means any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Parent, the Borrower or a Subsidiary under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**ERISA Event**" means any one or more of the following: (a) any reportable event, as defined in Section 4043 of ERISA, with respect to a Plan, as to which the PBGC has not waived under subsection .22, .23, .25, .26, .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event; (b) the termination of any Plan under Section 4041(c) of ERISA; (c) the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (d) the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; (e) the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; or a determination that any Plan is considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (f) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to a Plan; (g) the complete or partial withdrawal of the Parent, any Borrower, Subsidiary or any ERISA Affiliate from a Multiemployer Plan which results in the imposition of Withdrawal Liability or the insolvency under Title IV of ERISA of any Multiemployer Plan or (h) a determination that any Multiemployer Plan is in endangered or critical status under Section 432 of the Code or Section 305 of ERISA.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**", "**EUR**" and "**€**" mean the single currency of the Participating Member States.

"**EURIBOR Interpolated Rate**" means, at any time, with respect to any Term Benchmark Borrowing denominated in Euros and for any Interest Period, the rate per annum (rounded to the same number of decimal places as the EURIBOR Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the EURIBOR Screen Rate for the longest period (for which the EURIBOR Screen Rate is available for Euros) that is shorter than the Impacted EURIBOR Rate Interest Period; and (b) the EURIBOR Screen Rate for the shortest period (for which the EURIBOR Screen Rate is available for Euros) that exceeds the Impacted EURIBOR Rate Interest Period, in each case, at such time; provided that, if any EURIBOR Interpolated Rate shall be less than 0.00%, such rate shall be deemed to be 0.00% for the purposes of this Agreement.

21

"**EURIBOR Rate**" means, with respect to any Term Benchmark Borrowing denominated in Euros and for any Interest Period, the EURIBOR Screen Rate at approximately 11:00 a.m., Brussels time, two TARGET Days prior to the commencement of such Interest Period; provided that, if the EURIBOR Screen Rate shall not be available at such time for such Interest Period (an "**Impacted EURIBOR Rate Interest Period**") with respect to Euros then the EURIBOR Rate shall be the EURIBOR Interpolated Rate.

"**EURIBOR Screen Rate**" means the euro interbank offered rate administered by the European Money Markets Institute (or any other person which takes over the administration of that rate) for the relevant period displayed (before any correction, recalculation or republication by the administrator) on page EURIBOR01 of the Thomson Reuters screen (or any replacement Thomson Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters as of 11:00 a.m. Brussels time two TARGET Days prior to the commencement of such Interest Period. If such page or service ceases to be available, the Administrative Agent may specify another page or service displaying the relevant rate after consultation with the Borrower. If the EURIBOR Screen Rate shall be less than 0.00%, the EURIBOR Screen Rate shall be deemed to be 0.00% for purposes of this Agreement.

"**Event of Default**" has the meaning set forth in Article 7.

"**Excluded Property**" means (a) any fee interest in real property having a value of at least $2,500,000 and any leasehold interest in real property, (b) any property that secures Indebtedness permitted to be incurred pursuant to Section 6.01(d) to the extent the documents governing such Indebtedness do not permit any other Lien on such property, (c) motor vehicles, aircraft, boats and other assets subject to a certificate of title to the extent a Lien on such other assets cannot be perfected by filing a UCC-1 financing statement, (d) property the grant of a security interest thereon to secure the Obligations is (1) prohibited by applicable law, rule or regulation (in each case, except to the extent such prohibition is unenforceable after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code) or (2) which requires governmental consent, approval, license or authorization to be pledged (unless such consent, approval, license or authorization has been received and the Borrower shall be under no obligation to seek such consent), (e) any lease, license or other agreement and any property subject thereto on the Effective Date or on the date of the acquisition of such property (other than any property acquired by a Loan Party subject to any such contract or other agreement to the extent such contract or other agreement was incurred in contemplation of such acquisition) to the extent that a grant of a security interest therein to secure the Obligations would violate or invalidate such lease, license, contract or agreement or create a right of termination in favor of any other party thereto (other than the Borrower, any other Loan Party or any Subsidiary) after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (f) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby or require the consent of any Governmental Authority (to the extent such consent has not been obtained; provided that the Borrower shall be under no obligation to seek such consent) after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (g) pending United States "intent-to-use" trademark applications for which a verified statement of use or an amendment to allege use has not been filed with and accepted by the United States Patent and Trademark Office, (h) (A) payroll, healthcare and other employee wage and benefit accounts, (B) tax accounts, including, without limitation, sales tax accounts, (C) escrow, defeasance and redemption accounts, (D) fiduciary or trust accounts, (E) cash collateral accounts encumbered by Liens pursuant to Section 6.02(z) and (F) bank accounts containing an average daily balance not to exceed $2,500,000 in the aggregate for all such accounts for any fiscal month (items (h)(A) through (F) hereof, the "**Unrestricted Accounts**"); (l) commercial tort claims in an amount not exceeding $2,500,000 individually; (i) assets to the extent a security interest in such assets could reasonably be expected to result in adverse tax consequences as determined in good faith by the Borrower; (j) those assets or Equity Interests as to which the Administrative Agent and the Borrower reasonably agree that the costs or other consequence (including any adverse tax consequence) of obtaining or perfecting such a security interest or perfection thereof are excessive in relation to the value of the security to be afforded thereby and (k) Excluded Securities.

22

"**Excluded Securities**" means (a) voting Equity Interests of any CFC or any CFC Holdco (except to the extent such CFC is a Foreign Guarantor) in excess of 65% of the outstanding voting Equity Interests of such Subsidiary, (b) any Equity Interests or Indebtedness to the extent and for so long as the pledge thereof would be prohibited by any applicable law after giving effect to the applicable anti-assignment provisions of Article 9 of the Uniform Commercial Code, (c) any Equity Interests in any person that is not a wholly-owned Subsidiary, (d) any Equity Interests in any Excluded Subsidiary (other than any Excluded Subsidiary as defined in clauses (b), (c), (d), (g) (except to the extent the assumed Indebtedness prohibits the Equity Interests in such Subsidiary from being pledged) and (i) (unless the Equity Interests in such Subsidiary are otherwise excluded pursuant to this definition of "Excluded Securities") in the definition thereof), (e) any margin stock (as defined in Regulation U and Regulation X of the Board of Governors of the Federal Reserve System) and (f) Equity Interests of the Borrower that are not owned by the Parent.

"**Excluded Subsidiary**" means (a) each Subsidiary that is not a direct or indirect wholly-owned Subsidiary of the Borrower, (b) each Immaterial Subsidiary, (c) any Subsidiary that is a "controlled foreign corporation" within the meaning of the Code (a "**CFC**") except if such CFC is otherwise a Foreign Guarantor hereunder as elected by the Borrower, (d) any Subsidiary substantially all the assets of which consist of Equity Interests (or Equity Interests and Indebtedness) of one or more CFCs (a "**CFC Holdco**") or other CFC Holdcos, (e) any Subsidiary of a CFC, (f) any Subsidiary that is prohibited by Law, regulation or contractual obligation existing on the Effective Date or on the date such entity becomes a Subsidiary after the Effective Date (so long as such prohibition did not arise in contemplation of such entity becoming a subsidiary) from providing the Guaranty or that would require a an approval of a Governmental Authority or third party (pursuant to a contractual obligation) consent, approval, license or authorization in order to grant such Guaranty that has not been obtained, (g) any Subsidiary acquired pursuant to a permitted Investment financed with Indebtedness permitted to be assumed pursuant to the Loan Documents and any Subsidiary thereof that Guarantees such Indebtedness, in each case to the extent such Indebtedness prohibits such Subsidiary from becoming a Guarantor, provided that such Indebtedness is not created in contemplation of or in connection with such permitted Investment or such Person becoming a Subsidiary, (h) any Special Purpose Subsidiary, and (i) each Subsidiary as to which the Administrative Agent and the Borrower reasonably agree that the costs or other consequence (including any adverse tax consequence) of obtaining a guaranty therefrom are excessive in relation to the value to be afforded thereby; provided, however, in each case of the foregoing that, if the Borrower has elected to cause a Subsidiary that would otherwise constitute an Excluded Subsidiary to become a Foreign Guarantor hereunder, such Foreign Guarantor shall not be an Excluded Subsidiary; provided, further that any Person that is or that becomes (i) a Foreign Guarantor, shall not, except as a result of any Change in Law that could reasonably be expected to result in adverse tax consequences (as reasonably determined by the Borrower in consultation with the Administrative Agent), at any time thereafter be designated as or deemed an Excluded Subsidiary or (ii) a Guarantor (other than a Foreign Guarantor), shall not, except to the extent such Guarantor, at any time, is determined by the Borrower and notified to the Administrative Agent to be an "Excluded Subsidiary" pursuant to clauses (a), (b), (d), (e) and (i) above or as a result of any Change in Law that could reasonably be expected to result in adverse tax consequences (as reasonably determined by the Borrower in consultation with the Administrative Agent), at any time thereafter be designated as or deemed an Excluded Subsidiary; provided further that, to the extent a Guarantor is determined to be an Excluded Subsidiary pursuant to the proviso set forth immediately above, at the time of such determination, all outstanding Investments which prior thereto were made by a Loan Party in such Subsidiary shall be deemed to have been made in an Excluded Subsidiary for the purposes of Section 6.04.

23

"**Excluded Swap Obligation**" with respect to any Guarantor, (a) any Swap Agreement Obligation if, and to the extent that, and only for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Agreement Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Agreement Obligation. If a Swap Agreement Obligation arises under a master agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such Swap Agreement Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Issuing Bank, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Parent or the Borrower, as applicable, hereunder, (a) Taxes imposed on (or measured by) its net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that otherwise are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (other than pursuant to an assignment request by Borrower under Section 2.16(b)) or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office or assignment, to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.14(a), (c) Taxes attributable to such recipient's failure to comply with Section 2.14(f), (d) any withholding Taxes imposed under FATCA, (e) any Taxes imposed by Germany solely due to the fact that the Loans are secured by real estate located in Germany (inländischer Grundbesitz) or by German rights subject to the civil code provisions relating to real estate (inländische Rechte, die den Vorschriften des bürgerlichen Rechts über Grundstücke unterliegen)(including any withholding requested by the German tax authorities pursuant to Sec. 50a para. 7 German Income Tax Act) and (f) any Taxes which are imposed solely because the payment is made with respect to a Lender incorporated, having its place of effective management, or acting through a lending office or office, as the case may be, located in a Non-Cooperative Jurisdiction, (g) withholding required on account of the payee receiving a direction under section 255 of the Australian Taxation Act or section 260-5 of Schedule 1 of the Taxation Administration Act 1953 (Cth), (h) Taxes imposed because the payee has not received written notice of that recipient's tax file number or Australian business number or evidence of any exemption that recipient may have from the need to advise its tax file number or Australian business number; and (i) any Indirect Tax (which, for the avoidance of doubt, shall be handled in accordance with clause 2.14(i)).

24

"**Executive Order**" has the meaning set forth in Section 3.15(a)(i).

"**Existing Letters of Credit**" shall mean the letters of credit described in Schedule 1.01.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code or any published intergovernmental agreement and any fiscal or regulatory legislation, rules or official practices adopted pursuant to any published intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"**FCA**" has the meaning assigned to such term in Section 1.05.

"**Federal Funds Effective Rate**" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate, provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"**Fee Letter**" means that certain Fee Letter, dated as of [_], 2021, by and among the Borrower and the Administrative Agent.

25

"**Fiduciary Account**" means (i) any account maintained in the ordinary course of business by the Parent or any of its Subsidiaries in order to hold, as a fiduciary or on a contractual basis, funds owned by another Person or (ii) any escrow account.

"**Financial Officer**" means the chief financial officer, principal accounting officer, treasurer, vice president of finance or corporate controller of the Borrower.

"**Floor**" means the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to LIBO Rate, EURIBOR Rate, AUD Rate or Daily Simple RFR, as applicable.

"**Foreign Guarantor**" means each Subsidiary of the Parent that is organized under the laws of a jurisdiction other than the United States (or any State thereof) and has been designated by the Borrower, in writing to the Administrative Agent, as a "Foreign Guarantor" hereunder. As of the Effective Date, the Foreign Guarantors shall constitute Fluence Energy GmbH, a German corporation, Fluence Energy Pty Ltd. (ACN 627 071 461), an Australian corporation, and Fluence Energy Inc., a Philippine corporation.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Security Agreement**" means each of the agreements set forth on Schedule 4.01(b), including the Australian Collateral Agreements or otherwise entered into from time to time by any Foreign Guarantor in accordance with Section 5.01 and the Agreed Securities Principles.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, with respect to any Issuing Bank, such Defaulting Lender's Applicable Percentage of the outstanding Obligations with respect to Letters of Credit issued by such Issuing Bank other than such Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"**GAAP**" means generally accepted accounting principles in the United States of America, as set forth in the Accounting Standards Codification of the Financial Accounting Standards Board from time to time.

["**German Security**" means any security interest created under the German Security Documents.

"**German Security Document**" means any Security Document which is governed by German law.]

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

26

"**Guarantee**" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business, or customary indemnification obligations entered into in connection with any acquisition or disposition of assets or of other entities (other than to the extent that the primary obligations that are the subject of such indemnification obligation would be considered Indebtedness hereunder).

"**Guarantor**" means any Subsidiary (not including an Excluded Subsidiary) of the Parent party hereto or that has executed a guaranty supplement pursuant to Section 5.11 or Section 9.07, the Parent and, other than with respect to its own Obligations, the Borrower.

"**Guaranty**" means the guaranty and other provisions in Article IX.

"**Guaranty Subordinated Debt**" has the meaning set forth in Section 9.02(b).

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Immaterial Subsidiary**" means any Subsidiary that (a) did not, as of the last day of the fiscal quarter of the Borrower most recently ended for which financials have been delivered pursuant to Section 5.01(a) or (b), have (i) total assets with a value in excess of 5% of the Total Assets, or (ii) revenues representing in excess of 5% of the Total Revenues, for the four fiscal quarters ended as of such date and (b) taken together with all Immaterial Subsidiaries as of the last day of the fiscal quarter of the Borrower most recently ended for which financials have been delivered pursuant to Section 5.01(a) or (b), did not have (i) total assets with a value in excess of 10% of the Total Assets, or (ii) revenues representing in excess of 10% of the Total Revenues for the four fiscal quarters ended as of such date. Each Immaterial Subsidiary as of the Effective Date shall be set forth in Schedule 3.13.

"**Impacted AUD Interest Period**" has the meaning assigned to such term in the definition of "AUD Rate".

27

"**Impacted EURIBOR Rate Interest Period**" has the meaning assigned to such term in the definition of "EURIBOR Rate."

"**Impacted LIBO Rate Interest Period**" has the meaning set forth in the definition of "LIBO Rate".

"**Increased Amount Date**" has the meaning set forth in Section 2.18.

"**Incremental Amount**" means $50,000,000.

"**Indebtedness**" of any Person at any date means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services to the extent required to be included as a liability on the balance sheet of such Person at such time in accordance with GAAP (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) any earn-out obligation to the extent such obligation is (or is required to be) listed as a liability on the balance sheet of such Person in accordance with GAAP, has not been paid when due and is not disputed in good faith, (g) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of bankers' acceptances, letters of credit, surety bonds or similar arrangements, (h) all Guarantees of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned or acquired by such Person, whether or not such Person has assumed or become liable for the payment of such obligation (other than Liens granted on Equity Interests of an Excluded Subsidiary to secure obligations of such Excluded Subsidiary and its Subsidiaries). The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" has the meaning set forth in Section 10.03(b).

"**Indirect Tax**" means any goods and services tax (including Australian GST), consumption tax, value added tax or any tax of a similar nature imposed by any Governmental Authority, including any interest, additions to indirect tax and penalties applicable thereto.

"**Information**" has the meaning set forth in Section 10.12(a).

28

"**Intellectual Property**" has the meaning set forth in the Security Agreement.

"**Interest Coverage Ratio**" means, for any Measurement Period, the ratio of (a) Consolidated EBITDA to (b) Interest Expense (excluding any Interest Expense attributable to the Parent Convertible Notes) of the Parent and its Subsidiaries for such Period.

"**Interest Election Request**" has the meaning set forth in Section 2.05(b).

"**Interest Expense**" means, with reference to any period, total cash interest expense (including that attributable to Capital Lease Obligations) of the Parent and its Subsidiaries for such period with respect to all outstanding Indebtedness of the Parent and its Subsidiaries (including all net payments and receipts (if any) under Swap Agreements in respect of interest rates to the extent such net payments and receipts are made in cash in such period and allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Parent and its Subsidiaries for such period in accordance with GAAP.

"**Interest Payment Date**" means (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December, (b) with respect to any RFR Loan, (1) the last Business Day of each March, June, September and December; and (2) the Maturity Date and (c) with respect to any Term Benchmark Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Term Benchmark Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"**Interest Period**" means, with respect to any Term Benchmark Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months (or, with the consent of each Lender, twelve months or less than one month) thereafter, (in each case, subject to the availability for the Benchmark applicable to the relevant Loan or Commitment for any Agreed Currency) as the Borrower may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Term Benchmark Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"**Investment**" has the meaning given to such term in Section 6.04.

"**IPO**" means a bona fide underwritten sale to the public of common stock of the Parent pursuant to a registration statement (other than on Form S-8 or any other form relating to securities issuable under any benefit plan of the Parent or any of its Subsidiaries, as the case may be) that is declared effective by the SEC.

29

"**IRS**" means the U.S. Internal Revenue Service.

"**ISDA Definitions**" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc. or such successor thereto.

"**Issuing Bank**" means, with respect to a particular Letter of Credit, (a) each of JPMorgan Chase Bank N.A., Morgan Stanley Senior Funding, Inc., Bank of America, N.A., Barclays Bank PLC and Citibank, N.A., each in its capacity as the issuer of such Letter of Credit, and its successors in such capacity as provided in Section 2.19(j), (b) such other Lender selected by the Borrower from time to time to issue such Letter of Credit hereunder upon receipt by the Administrative Agent of documentation in form and substance reasonably satisfactory to the Administrative Agent pursuant to which such Lender agrees to assume the rights and obligations of an Issuing bank hereunder (provided that no Lender shall be required to become an Issuing Bank pursuant to this subclause (b) without such Lender's consent), and/or (c) any Lender selected by the Borrower (with the prior consent of the Administrative Agent (not to be unreasonably withheld, delayed or conditioned)) to replace a Lender who is a Defaulting Lender at the time of such Lender's appointment as an Issuing Bank (provided that no Lender shall be required to become an Issuing Bank pursuant to this subclause (c) without such Lender's consent) or any successor in such capacity as provided in Section 2.19(j). Any Issuing Bank may, in its reasonable discretion, arrange for one or more Letters of Credit (including Existing Letters of Credit) to be issued by Affiliates or branches of such Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate or branch.

"**Joinder Agreement**" means a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent.

"**LC Commitment**" means, with respect to any Issuing Bank, the amount set forth on Schedule 2.01 opposite such Issuing Bank's name under the caption "LC Commitments".

"**LC Disbursement**" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"**LC Sublimit**" means the lesser of (a) $200,000,000 and (b) the aggregate unused amount of the Commitments then in effect; provided that no Issuing Bank shall be required to issue Letters of Credit in an aggregate amount outstanding at any time in excess of the LC Commitment of such Issuing Bank.

30

"**Lenders**" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption. Unless the context otherwise requires, the term "Lenders" includes the Issuing Banks.

"**Letter of Credit**" means any letter of credit issued (or deemed to be issued) under and pursuant to this Agreement, including any Existing Letters of Credit. A Letter of Credit may be issued in Dollars or in any Alternative Currency.

"**Letter of Credit Request**" means a request by the Borrower for a Letter of Credit in accordance with Section 2.19.

"**LIBO Interpolated Rate**" means, at any time with respect to any Term Benchmark Borrowing denominated in Dollars and for any Interest Period, the rate per annum (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available for the applicable Agreed Currency) that is shorter than the Impacted LIBO Rate Interest Period; and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available for the applicable Agreed Currency) that exceeds the Impacted LIBO Rate Interest Period, in each case, at such time; provided that if any LIBO Interpolated Rate shall be less than 0.00%, such rate shall be deemed to be 0.00% for the purposes of this Agreement.

"**LIBO Rate**" means, with respect to any Term Benchmark Borrowing denominated in Dollars and for any Interest Period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "**Impacted LIBO Rate Interest Period**") with respect to such Agreed Currency, then the LIBO Rate shall be the LIBO Interpolated Rate.

"**LIBO Screen Rate**" means, for any day and time, with respect to any Term Benchmark Borrowing denominated in Dollars and for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, provided that if the LIBO Screen Rate shall be less than 0.00%, such rate shall be deemed 0.00% for the purposes of this Agreement.

"**LIBOR**" has the meaning assigned to such term in Section 1.05.

31

"**Lien**" means, with respect to any asset or right, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset or right (including a "security interest" within the meaning of section 12(1) and section 12(2) of the Australian PPSA, but not section 12(3) unless that security interest in substance secures payment or performance of an obligation), and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or right.

"**Loan Documents**" means this Agreement (including any amendment hereto or waiver hereunder), the Notes (if any), any Joinder Agreement, any guaranty supplement delivered pursuant to Section 5.11 hereof, the Security Documents, the Fee Letter and any other agreement, instrument or document executed by one or more Loan Parties after the Effective Date and designated by its terms as a Loan Document.

"**Loan Parties**" means the Borrower and the Guarantors.

"**Loans**" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"**Local Time**" means (a) in the case of a Loan, Borrowing or LC Disbursement denominated in Dollars, New York City time, and (b) in the case of a Loan, Borrowing or LC Disbursement denominated in an Alternative Currency, local time (it being understood that such local time shall mean London, England time unless otherwise notified by the Administrative Agent) and (c) in the case of a Borrowing in Australian Dollars, "Local Time" shall mean Sydney time (daylight or standard, as applicable).

"**Material Adverse Effect**" means a material adverse effect on (a) the business, property, financial condition or results of operations of the Parent and its Subsidiaries taken as a whole, (b) the ability of the Parent or the Borrower to perform any of its payment obligations under this Agreement or any other Loan Document or (c) the rights of or remedies available to the Agents and the Lenders, taken as a whole, under this Agreement or any other Loan Document.

"**Material Indebtedness**" means Indebtedness (other than any Indebtedness under the Loan Documents and Letters of Credit hereunder), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent and its Subsidiaries having an outstanding principal amount exceeding $15,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"**Maturity Date**" means the fourth anniversary of the Effective Date.

["**Maximum Amount**" means the amount which would, but for any reduction or prohibition of payment or other distribution due to the relationship between any Subordinated Lender and a Loan Party, have been distributed or distributable to the Secured Parties or to the Administrative Agent on behalf of the relevant Secured Parties (or any of them).]

32

"**Maximum ASR Amount**" has the meaning set forth in Section 6.05(vi).

"**Maximum Rate**" has the meaning set forth in Section 10.13.

"**Measurement Period**" means, at any date of determination, the most recently completed four consecutive fiscal quarters of the Parent ended on or prior to such date.

"**Minimum Collateral Amount**" means, at any time, with respect to Cash Collateral consisting of cash or deposit account balances, an amount equal to 103% of the Fronting Exposure of an Issuing Bank with respect to Letters of Credit issued and outstanding at such time.

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or would be an obligation to contribute of) the Parent, the Borrower or a Subsidiary or an ERISA Affiliate, and each such plan for the five- year period immediately following the latest date on which the Parent, the Borrower, or a Subsidiary or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"**Net Debt for Borrowed Money**" of the Parent and its Subsidiaries means, as of any date of determination, an amount equal to (i) the sum of (a) the outstanding principal amount of all Indebtedness for borrowed money (including reimbursement obligations with respect to any drawn letters of credit) of all such Persons on a consolidated basis, (b) the aggregate amount of all Capital Lease Obligations of all such Persons on a consolidated basis, and (c) to the extent not duplicative with the Indebtedness and obligations specified in clauses (a) and (b) above, all Guarantees of all such Persons on a consolidated basis with respect to outstanding Indebtedness and obligations of the types specified in clauses (a) and (b) above of other Persons *minus* (ii) all cash and Cash Equivalents (except, for the avoidance of doubt, any Restricted Cash) of the Parent and its Subsidiaries in an aggregate amount not to exceed $75,000,000. For the avoidance of doubt, the amount of Net Debt for Borrowed Money shall be deemed to be zero with respect to any letter of credit, unless and until a drawing is made with respect thereto.

"**New Commitments**" has the meaning set forth in Section 2.18.

"**New Lender**" has the meaning set forth in Section 2.18.

"**New Loans**" has the meaning set forth in Section 2.18.

"**Non-Consenting Lender**" means any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.02 and (ii) has been approved by the Required Lenders.

"**Non-Cooperative Jurisdiction**" means a "non-cooperative tax jurisdiction" (nicht kooperatives Steuerhoheitsgebiet) as set out in the German Act to avert tax evasion and unfair tax competition (Gesetz zur Abwehr von Steuervermeidung und unfairem Steuerwettbewerb) and the respective legislative decree (Rechtsverordnung) as amended from time to time.

33

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-U.S. Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States by the Parent, the Borrower or one or more Subsidiaries primarily for the benefit of employees of the Parent, the Borrower or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Note**" has the meaning set forth in Section 2.07.

"**NYFRB**" means the Federal Reserve Bank of New York.

"**NYFRB's Website**" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"**NYFRB Rate**" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received to the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Obligations**" means all amounts owing by any Loan Party to the Administrative Agent, any Issuing Bank or any Lender (or, in the case of (x) Specified Cash Management Agreements, any Affiliate of any Lender and (y) Specified Swap Agreements, any Person that was a Lender or an Affiliate of a Lender at the time the relevant Swap Agreement was entered into) pursuant to the terms of this Agreement or any other Loan Document, including any obligation to provide Cash Collateral, or in respect of any Letter of Credit, any Specified Swap Agreement or any Specified Cash Management Agreement (including all interest which accrues after the commencement of any case or proceeding in bankruptcy after the insolvency of, or for the reorganization of the Parent or any of its Subsidiaries, whether or not allowed in such case or proceeding).

"**Other Benchmark Rate Election**" means, with respect to any Loan denominated in Dollars, if the then-current Benchmark is the LIBO Rate, the occurrence of:

(a) a request by the Borrower to the Administrative Agent to notify each of the other parties hereto that, at the determination of the Borrower, Dollar-denominated syndicated credit facilities at such time contain (as a result of amendment or as originally executed), in lieu of a LIBOR-based rate, a term benchmark rate as a benchmark rate, and

(b) the Administrative Agent, in its sole discretion, and the Borrower jointly elect to trigger a fallback from the LIBO Rate and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders.

34

"**Other Connection Taxes**" means, with respect to the Administrative Agent, any Issuing Bank, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Parent or the Borrower, as applicable, hereunder, Taxes imposed as a result of a present or former connection between such Administrative Agent, Issuing Bank, Lender or other recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Administrative Agent, Issuing Bank, Lender or recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan, Letter of Credit or Loan Document).

"**Other Taxes**" means any and all present or future stamp, court or documentary taxes or any other excise, property, intangible, recording, filing or similar Taxes which arise from any payment made, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and the other Loan Documents; excluding, however, such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than such Taxes imposed with respect to an assignment that occurs as a result of the Borrower's request pursuant to Section 2.16(b)).

"**Overnight Bank Funding Rate**" means, for any day, the rate comprised of both overnight federal funds and overnight Term Benchmark borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate (from and after such date as the NYFRB shall commence to publish such composite rate).

"**Parallel Debt**" has the meaning assigned to such term in Section 10.20(a).

"**Parent**" means Fluence Energy, Inc., a Delaware corporation.

"**Parent Convertible Notes**" means senior unsecured convertible notes issued by the Parent which (i) are not guaranteed by or otherwise of recourse to the Borrower or any of its Subsidiaries, (ii) do not mature or require any principal payments prior to the date that is 180 days following the Maturity Date and (iii) contain terms which (x) are customary for similar types of Indebtedness at such time (as reasonably determined by the Parent) and (y) are not more restrictive on the Parent and its Subsidiaries than this Agreement and do not contain any financial maintenance covenants.

"**Participant**" has the meaning set forth in Section 10.04(c)(i).

"**Participant Register**" has the meaning set forth in Section 10.04(c)(iii).

35

"**Participating Member State**" means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Payment**" has the meaning specified in Section 8.11(a).

"**Payment Notice**" has the meaning specified in Section 8.11(b).

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Pension Plan**" means any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA, other than a Multiemployer Plan, that is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA and is maintained in whole or in part by the Parent, the Borrower, any Subsidiary or any ERISA Affiliate or with respect to which any of the Parent, the Borrower, any Subsidiary or any ERISA Affiliate has actual or contingent liability.

"**Permitted Bond Hedge Transaction**" means any call or capped call option (or substantively equivalent derivative transaction) on the Parent's common stock purchased by the Parent in connection with the issuance of the Parent Convertible Notes; provided that the purchase price for such Permitted Bond Hedge Transaction, less the proceeds received by the Parent from the sale of any related Permitted Warrant Transaction, does not exceed the net proceeds received by the Parent from the sale of such Parent Convertible Notes issued in connection with the Permitted Bond Hedge Transaction.

"**Permitted Encumbrances**" means:

(a)        Liens imposed by law for taxes, assessments or governmental charges or levies that are not yet delinquent or are being contested in compliance with Section 5.04;

(b)         carriers', warehousemen's, mechanics', materialmen's, landlord's, supplier's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 90 days or are being contested in compliance with Section 5.04;

(c)         pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)         deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business and to secure surety and appeal bonds in respect of judgments that do not constitute an Event of Default under Section 7.01(k);

(e)        Liens in respect of judgments that do not constitute an Event of Default under Section 7.01(k);

(f)         easements, zoning restrictions, rights-of-way, encroachments and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Parent, the Borrower or any Subsidiary;

36

(g)        Uniform Commercial Code financing statements filed (or similar filings under applicable law) solely as a precautionary measure in connection with operating leases;

(h)        leases or subleases granted to other Persons and not interfering in any material respect, individually or taken as a whole, with the business of the lessor or sublessor;

(i)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)        deposits made or other security provided to secure liabilities to insurance carriers under insurance or self-insurance arrangements;

(k)        rights of consignors of goods in goods consigned, whether or not perfected by the filing of a financing statement or other registration, recording or filing;

(l)        Liens (i) of a collection bank arising under Section 4-210 of the UCC or any comparable or successor provision on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of banking institutions encumbering deposits (including the right of set-off);

(m)        any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially detract from the value of the affected property or interfere with the ordinary conduct of the business of Holdings and its Subsidiaries, taken as a whole;

(n)        Liens encumbering reasonable customary initial deposits and margin deposits and Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(o)        Liens given to a public utility or any Governmental Authority when required by such utility or Governmental Authority in connection with the operations of that Person in the ordinary course of its business;

(p)        operating leases of vehicles or equipment which are entered into in the ordinary course of the business; and

(q)        customary restrictions in any license agreement with the Borrower as a licensee, including without limitation, with respect to the sale of Inventory (provided that the Borrower shall give the Administrative Agent prompt notice of the execution of any such license agreement).

"**Permitted Holders**" means one or more of AES and Siemens.

37

"**Permitted Refinancing**" means, with respect to any Indebtedness, any Indebtedness constituting a refinancing or replacement thereof so long as (a) on the date of such refinancing or replacement, no Event of Default shall have occurred and be continuing or would arise therefrom; (b) any such refinancing or replacement Indebtedness shall (i) not have a stated maturity or, other than in the case of a revolving credit facility, a weighted average life to maturity that is shorter than that of the Indebtedness being refinanced or replaced, (ii) if the Indebtedness being refinanced or replaced (or the Liens securing such Indebtedness) is subordinated to the Obligations (or to the Liens securing the Obligations, if applicable) by its terms or by the terms of any agreement or instrument relating to such Indebtedness, be (and be secured by Liens, if applicable) at least as subordinate to the Obligations (or to the Liens securing the Obligations) as the Indebtedness being refinanced or replaced (and unsecured if the refinanced or replaced Indebtedness is unsecured) and (iii) be in a principal amount that does not exceed the principal amount so refinanced or replaced plus, accrued interest, any customary premium or other payment required to be paid in connection with such refinancing or replacement, the amount of customary fees and expenses of the Borrower or any of its Subsidiaries incurred in connection with such refinancing or replacement, and any unutilized commitments thereunder; and (c) the obligors on such refinancing or replacement Indebtedness shall be the obligors on such Indebtedness being refinanced or replaced; provided that any Loan Party shall be permitted to guarantee any such refinancing or replacement Indebtedness of any other Loan Party.

"**Permitted Third Party Bank**" means any bank or other financial institution, other than the Lenders, with whom any U.S. Loan Party maintains a Controlled Account.

"**Permitted Warrant Transaction**" means any call option, warrant or right to purchase (or substantively equivalent derivative transaction) on the Parent's common stock sold by the Parent substantially concurrently with any purchase by the Parent of a related Permitted Bond Hedge Transaction.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA maintained or contributed to by the Parent, the Borrower, a Subsidiary or any ERISA Affiliate or to which the Parent, the Borrower, a Subsidiary or an ERISA Affiliate has or would have an obligation to contribute, and each such plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA for the five-year period immediately following the latest date on which the Parent, the Borrower, a Subsidiary or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"**Platform**" has the meaning set forth in Section 10.01.

"**Pounds Sterling**" and "**£**" mean the lawful currency of the United Kingdom.

38

"**Prime Rate**" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"**Principal Office**" means the office of the Administrative Agent as set forth in Section 10.01, or such other office or office of a third party or sub-agent, as appropriate, as the Administrative Agent may from time to time designate in writing to Borrower and each Lender.

"**Pro Forma Basis**" or "**Pro Forma Effect**" means, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.09.

"**Proceeds**": all "proceeds" as such term is defined in Section 9-102(a)(64) of the New York UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"**Purchase Money Indebtedness**" means Indebtedness incurred to finance the acquisition, construction or improvement of any fixed or capital asset to the extent incurred prior to or within 180 days following such acquisition, construction or improvement.

"**QFC**" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"**QFC Credit Support**" has the meaning assigned to it in Section 10.18.

"**Qualified Keepwell Provider**" has the meaning assigned to it in Section 9.01(i).

"**Reference Banks**" shall mean Commonwealth Bank of Australia, Westpac Banking Corporation, National Australia Bank or Australia and New Zealand Banking Group Limited or such other bank or financial institution agreed in writing by the Administrative Agent and the Borrower from time to time that actively trades or lends Australian Dollars.

"**Reference Time**" with respect to any setting of the then-current Benchmark means (1) if such Benchmark is LIBO Rate, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such setting, (2) if such Benchmark is EURIBOR Rate, 11:00 a.m. Brussels time two TARGET Days preceding the date of such setting, (3) if the RFR for such Benchmark is SONIA, then 11:00 a.m. (London time) on the day that is four Business Days prior to such setting, (4) if such Benchmark is AUD Rate, 11:00 a.m. Sydney, Australia time two Business Days preceding the date of such setting or (5) if such Benchmark is not the LIBO Rate, the EURIBOR Rate, AUD Rate or SONIA, the time determined by the Administrative Agent in its reasonable discretion.

39

"**Register**" has the meaning set forth in Section 10.04(b).

"**Regulation D**" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Relevant Governmental Body**" means (i) with respect to a Benchmark Replacement in respect of Loans denominated in Dollars, the Federal Reserve Board and/or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto, (ii) with respect to a Benchmark Replacement in respect of Loans denominated in Sterling, the Bank of England, or a committee officially endorsed or convened by the Bank of England or, in each case, any successor thereto, (iii) with respect to a Benchmark Replacement in respect of Loans denominated in Euros, the European Central Bank, or a committee officially endorsed or convened by the European Central Bank or, in each case, any successor thereto and (iv) with respect to a Benchmark Replacement in respect of Loans denominated in any other currency, (a) the central bank for the currency in which such Benchmark Replacement is denominated or any central bank or other supervisor which is responsible for supervising either (1) such Benchmark Replacement or (2) the administrator of such Benchmark Replacement or (b) any working group or committee officially endorsed or convened by (1) the central bank for the currency in which such Benchmark Replacement is denominated, (2) any central bank or other supervisor that is responsible for supervising either (A) such Benchmark Replacement or (B) the administrator of such Benchmark Replacement, (3) a group of those central banks or other supervisors or (4) the Financial Stability Board or any part thereof.

"**Relevant Rate**" means (i) with respect to any Term Benchmark Borrowing denominated in Dollars, the LIBO Rate, (ii) with respect to any Term Benchmark Borrowing denominated in Euros, the EURIBOR Rate, (iii) with respect to any Term Benchmark Borrowing denominated in Australian Dollars, the AUD Rate and (iv) with respect to any Borrowing denominated in Sterling, Daily Simple RFR.

"**Relevant Screen Rate**" means (i) with respect to any Term Benchmark Borrowing denominated in Dollars, the LIBO Screen Rate, (ii) with respect to any Term Benchmark Borrowing denominated in Euros, the EURIBOR Screen Rate and (iii) with respect to any Term Benchmark Borrowing denominated in Australian Dollars, the AUD Screen Rate, as applicable.

"**Required Lenders**" means, at any time, Lenders (a) having Revolving Credit Exposures and unused Commitments representing more than 50% of the sum of the total Revolving Credit Exposures and unused Commitments of all Lenders at such time, or (b) at any time after the Commitments of all Lenders shall have been terminated, holding more than 50% of the total Revolving Credit Exposures at such time; provided that, for purposes of this definition of "Required Lenders", a Lender and its Affiliates shall be deemed to be one Lender. The Revolving Credit Exposure and Commitment of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

40

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means any of the president, the chief executive officer or any Financial Officer of the applicable Loan Party, or any other Person designated by any such Loan Party in writing to the Administrative Agent from time to time, acting singly.

"**Restricted Cash**" means, at any time, the cash and Cash Equivalents of the Borrower to the extent (a) classified (or required to be classified) as restricted cash or restricted cash equivalents on the balance sheet of the Borrower in accordance with GAAP or (b) such cash or Cash Equivalents are subject to any Lien (other than (x) Liens in favor of the Secured Parties pursuant to the Security Documents and (y) Liens permitted pursuant to clauses (a), (b), (e), (l)(i) and (l)(iii) of Permitted Encumbrances and under Section 6.02(l)).

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary of the Parent, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interest. For the avoidance of doubt, the receipt or acceptance by the Borrower or any Subsidiary of the return of Equity Interests issued by the Borrower or any Subsidiary to the seller of a Person, business or division as consideration for the purchase of such Person, business or division, which return is in settlement of indemnification claims owed by such seller in connection with such acquisition, shall not be deemed to be a Restricted Payment.

"**Reuters**" means, as applicable, Thomson Reuters Corp., Refinitiv, or any successor thereto.

"**Revaluation Date**" shall mean (a) with respect to any Loan denominated in any Alternative Currency, each of the following: (i) the date of the Borrowing of such Loan, (ii) with respect to any Term Benchmark Loan, each date of a conversion into or continuation of such Loan pursuant to the terms of this Agreement, and (iii) with respect to any RFR Loan, each Interest Payment Date; (b) with respect to any Letter of Credit denominated in an Alternative Currency, each of the following: (i) the date on which such Letter of Credit is issued, (ii) the first Business Day of each calendar month, (iii) the date of any  extension of such Letter of Credit, (iv) the date of any amendment of such letter of Credit that has the effect of increasing the face amount thereof and (v) each date of any payment by the applicable Issuing Bank under any Letter of Credit denominated in an Alternative Currency; (c) for purposes of calculating the Commitment Fee, the last day of any fiscal quarter; and (d) any additional date as the Administrative Agent may determine at any time when an Event of Default exists.

41

"**Revolving Credit Exposure**" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and its LC Exposure at such time.

"**RFR**" means, for any RFR Loan denominated in Sterling, SONIA.

"**RFR Administrator**" means the SONIA Administrator.

"**RFR Borrowing**" means, as to any Borrowing, the RFR Loans comprising such Borrowing.

"**RFR Business Day**" means, for any Loan denominated in Sterling, any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which banks are closed for general business in London.

"**RFR Interest Day**" has the meaning specified in the definition of "Daily Simple RFR".

"**RFR Loan**" means a Loan that bears interest at a rate based on Daily Simple RFR.

"**S&P**" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC business.

"**Sanctioned Country**" means, at any time, a country, region or territory which is the subject or target of any country-wide or territory-wide Sanctions (and, as of the Effective Date, Crimea, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, any EU member state, Her Majesty's Treasury of the United Kingdom or any other applicable sanctions authority in which the Borrower and its Subsidiaries operate, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"**Sanctions**" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or any other applicable sanctions authority in which the Borrower and its Subsidiaries operate.

"**SEC**" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"**Secured Parties**" has the meaning assigned to such term in the Security Agreement.

"**Security Agreement**" means the Security Agreement, dated on or about the Effective Date, between the Borrower, the Parent, [_] and the Administrative Agent for the benefit of the Secured Parties, as amended, supplemented or otherwise modified from time to time, including by each joinder agreement thereto.

42

"**Security Documents**" means the collective reference to the Security Agreement, Foreign Security Agreements, the Control Account Agreements and all other security documents hereafter delivered to the Administrative Agent by a Loan Party granting or perfecting a Lien on any property or right of any person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"**Shareholder Loan Agreement**" means, collectively, (i) the Promissory Note, dated August 11, 2021, issued by the Borrower to Siemens Industry, Inc. and (ii) the Promissory Note, dated August 11, 2021, issued by the Borrower to AES Grig Stability, LLC.

["**Shortfall Amount**" means the amount by which the Maximum Amount exceeds the Distributed Amount.]

"**Siemens**" refers to Siemens AG, a company incorporated under the laws of Germany, and its subsidiaries and affiliates, including Siemens Industry, Inc., a Delaware corporation.

"**SOFR**" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website on the immediately succeeding Business Day.

"**SOFR Administrator**" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"**SOFR Administrator's Website**" means the NYFRB's website, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"**Solvent**" means, with respect to the Parent and its Subsidiaries on a particular date, that on such date (a) the fair value of the assets of the Parent and its Subsidiaries, on a consolidated basis, is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of the Parent and its Subsidiaries, on a consolidated basis, (b) the present fair saleable value of the assets of the Parent and its Subsidiaries, on a consolidated basis, is not less than the total amount of liabilities, including contingent liabilities, of the Parent and its Subsidiaries, on a consolidated basis, (c) the Parent and its Subsidiaries, on a consolidated basis, do not intend to, and do not believe that they will, incur debts or liabilities (including current obligations and contingent liabilities) beyond their ability to pay such debts and liabilities as they mature in the ordinary course of business, (d) the Parent and its Subsidiaries on a consolidated basis have, and will have, adequate capital with which to conduct the business they are presently conducting and reasonably anticipate conducting and (e) with respect to any Australian Loan Party, it is solvent (within the meaning of section 95A of the Australian Corporations Act) and able to pay its debts as and when they fall due). The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5 (ASC 450)).

43

"**SONIA**" means, with respect to any Business Day, a rate per annum equal to the Sterling Overnight Index Average for such Business Day published by the SONIA Administrator on the SONIA Administrator's Website on the immediately succeeding Business Day.

"**SONIA Administrator**" means the Bank of England (or any successor administrator of the Sterling Overnight Index Average).

"**SONIA Administrator's Website**" means the Bank of England's website, currently at http://www.bankofengland.co.uk, or any successor source for the Sterling Overnight Index Average identified as such by the SONIA Administrator from time to time.

"**Special Purpose Subsidiary**" means (a) any not-for-profit Subsidiary and (b) any Captive Insurance Company.

"**Specified Cash Management Agreement**" means any agreement providing for treasury, depositary, purchasing card or cash management services, including in connection with any automated clearing house transfers of funds or any similar transactions between the Borrower or any Guarantor and any Lender or affiliate thereof, which is in effect as of the Effective Date or which has been designated by such Lender and the Borrower, by notice to the Administrative Agent not later than 90 days after the execution and delivery by the Borrower or such Guarantor, as a "Specified Cash Management Agreement".

"**Specified Swap Agreement**" means any Swap Agreement in respect of interest rates or currency exchange rates entered into by the Borrower or any Guarantor and any Person that is a Lender or an Affiliate of a Lender at the time such Swap Agreement is entered into; provided that such Swap Agreement is entered into to hedge or mitigate risks, and not for speculative purposes, in the ordinary course of the Borrower or such Guarantor's business or in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or such Guarantor.

"**Specified Transaction**" means (a) any incurrence or repayment of Indebtedness of the Borrower or a Subsidiary, (b) any Investment that results in a Person becoming a Subsidiary, (c) any Disposition, (d) the establishment, acquisition or creation of any new joint venture of the Borrower or any Subsidiary, (e) any issuance of Equity Interests, and (f) any acquisition or Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or of all or substantially all of the assets of a Person.

"**Standby Letter of Credit**" means any Letter of Credit other than any Commercial Letter of Credit.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate or Adjusted EURIBOR Rate, as applicable, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentage shall include those imposed pursuant to such Regulation D. Term Benchmark Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

44

"**Sterling**" or "**£**" mean the lawful currency of the United Kingdom.

["**Subordinated Lender**" means any Lender which has a relationship with a Loan Party which leads to a reduction or prohibition of payment (including payments in form of an insolvency quota) or other distribution (including the proceeds from the enforcement of any Collateral) by that Loan Party (including any administrator or insolvency administrator) to that Lender, including, without limitation, by reason of that Lender:

(i) being a Subsidiary of the Parent or an Affiliate thereof; or

(ii) having acquired (directly or indirectly) any Commitment, participation in any Loan and/or any other participation rights (including by way of sub-participation) in any of the Loans and/or any other rights and obligations under the Loan Documents from a Subsidiary of the Parent or an Affiliate thereof in accordance with Section 10.04 or otherwise.]

"**Subsidiary**" means, unless otherwise specified, any subsidiary of the Parent.

"**subsidiary**" means, with respect to any Person (the "**parent**") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent and which is required by GAAP to be consolidated in the consolidated financial statements of the parent.

"**Supplier Financing Excess Amount**" has the meaning assigned to it in Section 6.01(k).

"**Supported QFC**" has the meaning assigned to it in Section 10.18.

"**Swap Agreement**" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent or its Subsidiaries shall be a Swap Agreement.

45

"**Swap Obligation**" has the meaning assigned to it in Section 9.01(i).

"**Syndication Agent**" means Morgan Stanley Senior Funding, Inc., in its capacity as syndication agent, and any successor thereto.

"**TARGET2**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilizes a single shared platform and which was launched on November 19, 2007.

"**TARGET Day**" means any day on which TARGET2 (or, if such payment system ceases to be operative, such other payment system, if any, determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"**Tax Receivable Agreement**" means that certain Tax Receivable Agreement, dated as of [_], among the Parent, the Borrower and the other parties thereto, as the same may hereafter be modified, supplemented, extended, amended, restated or amended and restated from time to time.

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, goods and services tax including Indirect Tax, charges, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Benchmark**" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate, the Adjusted EURIBOR Rate or the AUD Rate.

"**Term SOFR**" means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Term SOFR Notice**" means a notification by the Administrative Agent to the Lenders and the Borrower of the occurrence of a Term SOFR Transition Event.

"**Term SOFR Transition Event**" means the determination by the Administrative Agent that (a) Term SOFR has been recommended for use by the Relevant Governmental Body, (b) the administration of Term SOFR is administratively feasible for the Administrative Agent and (c) a Benchmark Transition Event or an Early Opt-in Election, as applicable (and, for the avoidance of doubt, not in the case of an Other Benchmark Rate Election), has previously occurred resulting in a Benchmark Replacement in accordance with Section 2.11(b) that is not Term SOFR.

"**Total Assets**" means, as of any date of determination, the total assets of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP, as shown on the most recent balance sheet of the Parent delivered pursuant to Section 5.01(a) or (b).

"**Total Liquidity**" means, at any time, the sum of (a) all cash and Cash Equivalents (except, for the avoidance of doubt, any Restricted Cash) held by (i) the U.S. Loan Parties, other than cash and Cash Equivalents held in a Controlled Account of a U.S. Loan Party which is not subject to a Control Account Agreement following the date that is ninety (90) days after (x) the Effective Date or (y) (in the case of a Controlled Account opened with a Lender after the Effective Date) the date such account is opened, and (ii) the Foreign Guarantors to the extent that such cash and Cash Equivalents are held in a deposit, securities or other account which is subject to an enforceable Lien of the Administrative Agent pursuant to the Security Documents under which it may cause the applicable depositary bank or other relevant institution to honor its instructions upon enforcement of such Lien under applicable law, in each case at such time and (b) the aggregate unused amount of the Commitments then in effect and which are then available to be drawn under this Agreement.

46

"**Total Revenues**" means, as of any date of determination, the gross revenues of the Parent and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the most recent income statement of the Parent delivered pursuant to Section 5.01(a) or (b).

"**Transactions**" means the execution, delivery and performance by the Loan Parties of each Loan Document to which it is a party, the borrowing of Loans and the issuance of Letters of Credit hereunder, the use of the proceeds thereof, consummation of the IPO and the use of the proceeds thereof, and the payment of fees and expenses relating to each of the foregoing.

"**Trigger Date**" means the first date to occur following the later of (1) the last day of a fiscal quarter for which Consolidated EBITDA of Parent and its Subsidiaries, calculated for the four consecutive fiscal quarter period ended on such day, is not less than $150,000,000 and (2) the date on which the Borrower shall have provided an irrevocable notice to the Administrative Agent informing the Administrative Agent of the event described in clause (1) above and including a reasonable calculation of such Consolidated EBITDA.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate, the Adjusted EURIBOR Rate, the AUD Rate, the Daily Simple RFR or the Alternate Base Rate.

"**UK Financial Institutions**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

47

"**Unrestricted Account**" has the meaning set forth in the definition of "Excluded Property".

"**USA Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended from time to time.

"**U.S. Loan Party**" means any Loan Party organized or existing under the laws of the United States of America, any State of the United States or the District of Columbia or any territory thereto.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Special Resolution Regime**" has the meaning assigned to it in Section 10.18.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"**Withholding Agent**" means any Loan Party and the Administrative Agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02     Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Term Benchmark Loan" or an "RFR Loan"). Borrowings also may be classified and referred to by Type (e.g., a "Term Benchmark Borrowing" or an "RFR Borrowing").

Section 1.03     Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, amendments and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

48

Section 1.04     Accounting Terms; GAAP. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Notwithstanding the foregoing, all financial covenants contained herein shall be calculated (1) without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (ASC 825) (or any similar accounting principle) permitting or requiring a Person to value its financial liabilities or Indebtedness at the fair value thereof, (2) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (3) all leases and obligations under any leases of any Person that are or would be characterized as operating leases and/or operating lease obligations in accordance with GAAP on December 14, 2018 (whether or not such operating leases and/or operating lease obligations were in effect on such date) shall continue to be accounted for as operating leases and/or operating lease obligations (and not as Capital Lease Obligations) for purposes of this Agreement regardless of any change in GAAP following the date that would otherwise require such obligations to be recharacterized as Capital Lease Obligations. Prior to the first delivery of financial statements pursuant to Section 5.01(a) or (b) on or after the Effective Date, any reference in this Agreement to the financial statements delivered pursuant to Section 5.01(a) or (b) or similar reference to the same effect shall be deemed to refer to the most recently delivered financial statements.

49

Section 1.05    <u>Interest Rates; LIBOR Notification</u>. The interest rate on a Loan denominated in dollars or an Alternative Currency may be derived from an interest rate benchmark that is, or may in the future become, the subject of regulatory reform. Regulators have signaled the need to use alternative benchmark reference rates for some of these interest rate benchmarks and, as a result, such interest rate benchmarks may cease to comply with applicable laws and regulations, may be permanently discontinued, and/or the basis on which they are calculated may change. The London interbank offered rate ("**LIBOR**") is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. On March 5, 2021, the U.K. Financial Conduct Authority ("**FCA**") publicly announced that: (a) immediately after December 31, 2021, publication of all seven euro LIBOR settings, all seven Swiss Franc LIBOR settings, the spot next, 1-week, 2-month and 12-month Japanese Yen LIBOR settings, the overnight, 1-week, 2-month and 12-month British Pound Sterling LIBOR settings, and the 1-week and 2-month U.S. Dollar LIBOR settings will permanently cease; immediately after June 30, 2023, publication of the overnight and 12-month U.S. Dollar LIBOR settings will permanently cease; immediately after December 31, 2021, the 1-month, 3-month and 6-month Japanese Yen LIBOR settings and the 1-month, 3-month and 6-month British Pound Sterling LIBOR settings will cease to be provided or, subject to consultation by the FCA, be provided on a changed methodology (or "synthetic") basis and no longer be representative of the underlying market and economic reality they are intended to measure and that representativeness will not be restored; and immediately after June 30, 2023, the 1-month, 3-month and 6-month U.S. Dollar LIBOR settings will cease to be provided or, subject to the FCA's consideration of the case, be provided on a synthetic basis and no longer be representative of the underlying market and economic reality they are intended to measure and that representativeness will not be restored. There is no assurance that dates announced by the FCA will not change or that the administrator of LIBOR and/or regulators will not take further action that could impact the availability, composition, or characteristics of LIBOR or the currencies and/or tenors for which LIBOR is published. Each party to this Agreement should consult its own advisors to stay informed of any such developments. Public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of LIBOR. Upon the occurrence of a Benchmark Transition Event, a Term SOFR Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, <u>Section 2.11(b)</u> and <u>(c)</u> provide a mechanism for determining an alternative rate of interest. The Administrative Agent will promptly notify the Borrower, pursuant to <u>Section 2.11(b)</u>, of any change to the reference rate upon which the interest rate on Term Benchmark Loans is based. However, the Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to the Daily Simple RFR, LIBOR or other rates in the definition of "LIBO Rate" (or "EURIBOR Rate" or "AUD Rate") or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation, (i) any such alternative, successor or replacement rate implemented pursuant to <u>Section 2.11(b)</u> or (c), whether upon the occurrence of a Benchmark Transition Event, a Term SOFR Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, and (ii) the implementation of any Benchmark Replacement Conforming Changes pursuant to <u>Section 2.11(b)</u>)), including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the Daily Simple RFR, the LIBO Rate (or the EURIBOR Rate or AUD Rate, as applicable) or have the same volume or liquidity as did the London interbank offered rate (or the euro interbank offered rate or the Tokyo interbank offered rate, as applicable) prior to its discontinuance or unavailability. The Administrative Agent and its affiliates and/or other related entities may engage in transactions that affect the calculation of any Daily Simple RFR, any alternative, successor or alternative rate (including any Benchmark Replacement) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any RFR, Daily Simple RFR or the Term Benchmark Rate, any component thereof, or rates referenced in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

50

Section 1.06      Divisions. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.07      Letter of Credit Amounts. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the Dollar Equivalent of the stated amount of such Letter of Credit available to be drawn at such time; provided that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit agreement related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Equivalent of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is available to be drawn at such time.

Section 1.08      Exchange Rates; Currency Equivalents. (a) The Administrative Agent or the Issuing Bank, as applicable, shall determine the Dollar Equivalent amounts of Term Benchmark Borrowings or Letter of Credit extensions denominated in Alternative Currencies. Such Dollar Equivalent shall become effective as of such Revaluation Date and shall be the Dollar Equivalent of such amounts until the next Revaluation Date to occur. Except for purposes of financial statements delivered by the Borrower hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any Agreed Currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as so determined by the Administrative Agent or the Issuing Bank, as applicable.

51

(b)        Wherever in this Agreement in connection with a Borrowing, conversion, continuation or prepayment of a Term Benchmark Loan or an RFR Loan or the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Borrowing, Loan or Letter of Credit is denominated in an Alternative Currency, such amount shall be the Dollar Equivalent of such amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the Administrative Agent or the Issuing Bank, as the case may be.

Section 1.09    Certain Calculations and Tests.

(a)        Notwithstanding anything to the contrary herein, the Consolidated Leverage Ratio and the Interest Coverage Ratio (and the component definitions thereof) shall be calculated in the manner prescribed by this Section 1.09; provided that, notwithstanding anything to the contrary in subsections (b) or (c) of this Section 1.09, when calculating the Consolidated Leverage Ratio and the Interest Coverage Ratio (and the component definitions thereof), as applicable, for purposes of determining actual compliance (and not Pro Forma compliance or compliance on a Pro Forma Basis) with any financial covenant pursuant to Section 6.10, the events described in this Section 1.09 that occurred subsequent to the end of the applicable Measurement Period shall not be given Pro Forma Effect.

(b)        For purposes of calculating the Consolidated Leverage Ratio and the Interest Coverage Ratio (and the component definitions thereof), Specified Transactions that have been consummated (i) during the applicable Measurement Period or (ii) subsequent to such Measurement Period and prior to or simultaneously with the event for which the calculation of any such ratio is made in each case shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Measurement Period. If, since the beginning of any applicable Measurement Period, any Person that subsequently became a Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Subsidiaries since the beginning of such Measurement Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.09, then the Consolidated Leverage Ratio and the Interest Coverage Ratio (and the component definitions thereof) shall be calculated to give Pro Forma Effect thereto in accordance with this Section 1.09.

(c)        In the event that the Borrower or any Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, prepayment, retirement, exchange, extinguishment or satisfaction and discharge) any Indebtedness included in the calculations of the Consolidated Leverage Ratio and the Interest Coverage Ratio (and the component definitions thereof), as the case may be (in each case, other than Indebtedness incurred or repaid under this Agreement), (i) during the applicable Measurement Period and/or (ii) subsequent to the end of the applicable Measurement Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Consolidated Leverage Ratio and the Interest Coverage Ratio (and the component definitions thereof) shall be calculated giving Pro Forma Effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on (A) the last day of the applicable Measurement Period in the case of the Consolidated Leverage Ratio and (B) the first day of the applicable Measurement Period in the case of the Interest Coverage Ratio. If any Indebtedness bears a floating rate of interest and is being given Pro Forma Effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of the event for which the calculation of the Interest Coverage Ratio is made had been the applicable rate for the entire period (taking into account any hedging obligations applicable to such Indebtedness); provided that, in the case of repayment of any Indebtedness, to the extent actual interest related thereto was included during all or any portion of the applicable Measurement Period, the actual interest may be used for the applicable portion of such Measurement Period. Interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a Financial Officer of the Borrower to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a London interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower may designate.

52

(d)        Notwithstanding anything to the contrary herein, unless the Borrower otherwise notifies the Administrative Agent, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not require compliance with a financial ratio or test (any such amounts, the "Fixed Amounts") substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with a financial ratio or test (any such amounts, the "Incurrence-Based Amounts"), it is understood and agreed that the Fixed Amounts shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence-Based Amounts in connection with such substantially concurrent incurrence.

(e)        For the avoidance of doubt, notwithstanding any classification under GAAP of any Person or business in respect of which a definitive agreement for the Disposition thereof has been entered into as discontinued operations, the earnings of such Person or business shall not be excluded from the calculation of Consolidated EBITDA until such Disposition shall have been consummated.

Section 1.10        Australian Terms.

(a)        Without limiting Section 8.08, in relation to Security Documents that are governed by the laws of Australia, each present and future Secured Party appoints and authorizes the Administrative Agent (in its capacity as "collateral agent") to hold each such Security Document as security trustee on its behalf.

(b)        The parties agree that the Australian Banking Code of Practice does not apply to the Loan Documents and the transactions under them.

53

**ARTICLE 2**
**THE CREDITS**

Section 2.01     <u>Commitments</u>. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Loans in Dollars or in one or more Alternative Currencies to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (a) the Dollar Equivalent of such Lender's Revolving Credit Exposure exceeding such Lender's Commitment or (b) the sum of the Dollar Equivalents of the total Revolving Credit Exposures of all Lenders exceeding the total Commitments of all Lenders. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Loans.

Section 2.02     <u>Loans and Borrowings</u>.

(a)          Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders in accordance with their respective Applicable Percentages. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; <u>provided</u> that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)          Subject to <u>Section 2.11</u>, each Borrowing shall be comprised (A) in the case of Borrowings in Dollars, entirely of ABR Loans or Term Benchmark Loans and (B) in the case of Borrowings in any other Agreed Currency, entirely of Term Benchmark Loans or RFR Loans, as applicable, in each case of the same Agreed Currency, as the Borrower may request in accordance herewith. Each Lender at its option may make any Term Benchmark Loan or RFR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; <u>provided</u> that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)          At the commencement of each Interest Period for any Term Benchmark Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Dollar Equivalent of $1,000,000 and not less than the Dollar Equivalent of $1,000,000. At the time that each ABR Borrowing and/or RFR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Dollar Equivalent of $1,000,000 and not less than the Dollar Equivalent of $1,000,000; <u>provided</u> that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by <u>Section 2.19(e)</u>. Borrowings of more than one Type may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of fifteen Term Benchmark Borrowings or RFR Borrowings outstanding.

(d)          Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

54

Section 2.03    <u>Requests for Borrowings</u>. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone or telecopy (i) in the case of a Term Benchmark Borrowing, not later than 12:00 noon, New York City time, three Business Days before the date of the proposed Borrowing, (ii) in the case of an RFR Borrowing denominated in Sterling, not later than 11:00a.m., New York City time, five Business Days before the date of the proposed Borrowing or (iii) in the case of an ABR Borrowing, not later than 10:00 a.m., New York City time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be confirmed promptly by delivery to the Administrative Agent of a written Borrowing Request in substantially the form of <u>Exhibit B-1</u> attached hereto and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with <u>Section 2.02</u>:

    (i)    the Agreed Currency and aggregate amount of the requested Borrowing;

    (ii)    the date of such Borrowing, which shall be a Business Day;

    (iii)    whether such Borrowing is to be an ABR Borrowing, a Term Benchmark Borrowing or an RFR Borrowing;

    (iv)    in the case of a Term Benchmark Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

    (v)    the location and number of the account or accounts to which funds are to be disbursed, which shall comply with the requirements of <u>Section 2.04</u>.

If no election as to the currency of a Borrowing is specified, then the requested Revolving Borrowing shall be made in Dollars. If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Term Benchmark Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing. Except as otherwise provided herein, a Borrowing Notice for a Term Benchmark Borrowing shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to make a borrowing in accordance therewith. As soon as practicable after 10:00 a.m., New York City time, on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Term Benchmark Borrowing for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

Section 2.04    <u>Funding of Borrowings</u>.

(a)    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account or accounts designated by the Borrower in the applicable Borrowing Request; <u>provided</u> that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in <u>Section 2.19(e)</u> shall be remitted by the Administrative Agent to the applicable Issuing Bank.

55

(b)         Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Applicable Percentage of such Borrowing, the Administrative Agent may assume that such Lender has made such Applicable Percentage available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its Applicable Percentage of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.05     Interest Elections.

(a)         Each Borrowing initially shall be of the Type and Agreed Currency specified in the applicable Borrowing Request and, in the case of a Term Benchmark Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term Benchmark Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated among the Lenders holding the Loans comprising such Borrowing in accordance with their respective Applicable Percentages, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)         To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written request (an "**Interest Election Request**") in substantially the form of Exhibit C attached hereto and signed by the Borrower.

(c)         Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)         The Agreed Currency and principal amount of the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

56

(ii)        the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)        whether the resulting Borrowing is to be an ABR Borrowing (in the case of Borrowings denominated in Dollars) or a Term Benchmark Borrowing; and

(iv)        if the resulting Borrowing is a Term Benchmark Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "**Interest Period**".

If any such Interest Election Request requests a Term Benchmark Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)        Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing. Except as otherwise provided herein, an Interest Election Request for conversion to, or continuation of, any Term Benchmark Borrowing shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

(e)        If the Borrower fails to deliver a timely Interest Election Request with respect to a Term Benchmark Revolving Borrowing in Dollars prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing at the end of such Interest Period. If the Borrower fails to deliver a timely and complete Interest Election Request with respect to a Term Benchmark Borrowing in an Alternative Currency prior to the end of the Interest Period therefor, then, unless such Term Benchmark Borrowing is repaid as provided herein, the Borrower shall be deemed to have selected that such Term Benchmark Borrowing shall automatically be continued as a Term Benchmark Borrowing in its original Agreed Currency with an Interest Period of one month at the end of such Interest Period. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Term Benchmark Borrowing and (ii) unless repaid, (x) each Term Benchmark Borrowing denominated in Dollars shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto and (y) each Term Benchmark Borrowing denominated in an Alternative Currency shall bear interest at the Central Bank Rate for the applicable Agreed Currency plus the Applicable Rate for Term Benchmark Loans; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for the applicable Agreed Currency cannot be determined, any outstanding affected Term Benchmark Loans denominated in any Agreed Currency other than Dollars shall either be (A) converted to an ABR Borrowing denominated in Dollars (in an amount equal to the Dollar Equivalent of such Alternative Currency) at the end of the Interest Period, as applicable, therefor or (B) prepaid at the end of the applicable Interest Period, as applicable, in full; provided that if no election is made by the Borrower by the earlier of (x) the date that is three Business Days after receipt by the Borrower of such notice and (y) the last day of the current Interest Period for the applicable Term Benchmark Loan, the Borrower shall be deemed to have elected clause (A) above.

57

Section 2.06        Termination and Reduction of Commitments.

(a)        Unless previously terminated, the Commitments shall terminate on the Maturity Date.

(b)        The Borrower may at any time terminate, or from time to time reduce, the Commitments; provided that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Borrower shall not terminate or reduce the Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.08, the sum of the Dollar Equivalents of the Revolving Credit Exposures would exceed the total Commitments.

(c)        The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Commitments delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities or another transaction, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Commitments shall be permanent. Each reduction of the Commitments shall be applied to the Lenders in accordance with their respective Applicable Percentages.

Section 2.07        Repayment of Loans; Evidence of Debt.

(a)        The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Maturity Date.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)        The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof, the currency thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

58

(d)	The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e)	Any Lender may request that Loans made by it be evidenced by a promissory note (each such promissory note being called a "**Note**" and all such promissory notes being collectively called the "**Notes**"). In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in substantially the form of Exhibit D attached hereto. Thereafter, the Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.08	Prepayment of Loans.

(a)	The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty (subject to the requirements of Section 2.13), subject to prior notice in accordance with paragraph (b) of this Section.

(b)	The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy or delivery of written notice) or telecopy of any prepayment hereunder (i)(x) in the case of prepayment of a Term Benchmark Borrowing denominated in Dollars, not later than 12:00 noon, New York City time, three Business Days before the date of prepayment, (y) in the case of prepayment of a Term Benchmark Borrowing denominated in Euros, not later than 12:00 noon, New York City time, three Business Days before the date of prepayment and (z) in the case of prepayment of an RFR Borrowing denominated in Sterling, not later than 11:00 a.m., New York City time five Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 noon, New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by Section 2.06, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.06. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans of the Lenders in accordance with their respective Applicable Percentages. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.10 and any costs incurred as contemplated by Section 2.13.

59

(c)        The Borrower shall from time to time prepay the Loans to the extent necessary so that the Dollar Equivalent of the aggregate principal amount of all outstanding Loans shall not at any time exceed the Commitments then in effect.

(d)        If at any time, (i) other than as a result of fluctuations in currency exchange rates, the Dollar Equivalent of the Lenders' aggregate Revolving Credit Exposures (calculated, with respect to any Loans or LC Exposure denominated in an Alternative Currency, as of the most recent Revaluation Date with respect to such Loan or LC Exposure) exceeds the aggregate Commitments then in effect, or (ii) solely as a result of fluctuations in currency exchange rates, the Dollar Equivalent of the Lenders' aggregate Revolving Credit Exposures (so calculated), as of the most recent Revaluation Date, exceeds one hundred ten percent (110%) of the aggregate Commitments then in effect, the Borrower shall immediately repay Borrowings and cash collateralize LC Exposure in accordance with the procedures set forth in Section 2.17(d) in an aggregate principal amount sufficient to cause the Dollar Equivalent of the Lenders' aggregate Revolving Credit Exposures (so calculated) to be less than or equal to the aggregate Commitments then in effect.

Section 2.09    Fees.

(a)        The Borrower agrees to pay to the Administrative Agent for the account of each Lender (other than any Defaulting Lender) a commitment fee (the "**Commitment Fee**"), which shall accrue at the relevant percentage set forth in the row entitled "Commitment Fee" in the definition of "Applicable Rate" on the average daily amount of the unused Commitment of such Lender during the period from and including the Effective Date to but excluding the date on which such Commitment terminates. Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the date on which the Commitments terminate, commencing on the first such date to occur after the Effective Date; provided that any commitment fees accruing after the date on which the Commitments terminate shall be payable on demand. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)        The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at 2.75% *per annum* on the Dollar Equivalent of the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to the applicable Issuing Bank a fronting fee, which shall accrue at the rate or rates *per annum* separately agreed upon between the Borrower and such Issuing Bank (but not to exceed 0.20% *per annum*) on the Dollar Equivalent of the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, as well as such Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Accrued participation fees and fronting fees shall be payable on the last day of March, June, September and December of each year, commencing on the first such date to occur after the Effective Date; provided that all such fees shall be payable on the date on which the Commitments terminate and any such fees accruing after the date on which the Commitments terminate shall be payable on demand. Any other fees payable to any Issuing Bank pursuant to this paragraph shall be payable within 10 days after demand. All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

60

(c)        The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent in the Fee Letter.

(d)        All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent (or to the applicable Issuing Bank, in the case of fees payable to it) for distribution, in the case of commitment fees and participation fees, to the Lenders. Fees paid shall not be refundable under any circumstances.

Section 2.10        Interest.

(a)        The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate *plus* the Applicable Rate.

(b)        The Loans comprising each Term Benchmark Borrowing shall bear interest at the Adjusted LIBO Rate, the Adjusted EURIBOR Rate, or the AUD Rate, as applicable, for the Interest Period in effect for such Borrowing *plus* the Applicable Rate.

(c)        Each RFR Loan shall bear interest at a rate per annum equal to the applicable Daily Simple RFR plus the Applicable Rate.

(d)        Notwithstanding the foregoing, at all times when an Event of Default listed in paragraph (a) or (b) of Section 7.01 has occurred hereunder and is continuing, all overdue amounts outstanding hereunder shall bear interest, after as well as before judgment, at a rate *per annum* equal to (i) in the case of overdue principal of any Loan, 2% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other overdue amount, 2% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section.

(e)        Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Term Benchmark Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)        Interest computed by reference to the LIBO Rate or the EURIBOR Rate hereunder shall be computed on the basis of a year of 360 days. Interest computed by reference to the Daily Simple RFR with respect to Sterling or the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year). Interest computed by reference to the AUD Rate shall be computed on the basis of a year of 365 days. In each case interest shall be payable for the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination. The applicable Alternate Base Rate, Adjusted LIBO Rate, LIBO Rate, Adjusted EURIBOR Rate, EURIBOR Rate, AUD Rate, or Daily Simple RFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

61

Section 2.11    <u>Alternate Rate of Interest</u>. (a) Subject to clauses (<u>b</u>), (<u>c</u>), (<u>d</u>), (<u>e</u>), (<u>f</u>) and (<u>g</u>) of this <u>Section 2.11</u>, if:

(i)        the Administrative Agent determines (which determination shall be conclusive absent manifest error) (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the LIBO Rate, the Adjusted EURIBOR Rate, the EURIBOR Rate or the AUD Rate, as applicable (including because the Relevant Screen Rate is not available or published on a current basis), for the applicable Agreed Currency and such Interest Period or (B) at any time, that adequate and reasonable means do not exist for ascertaining the applicable Daily Simple RFR or RFR for the applicable Agreed Currency; or

(ii)        the Administrative Agent is advised by the Required Lenders that (A) prior to the commencement of any Interest Period for a Term Benchmark Borrowing, the Adjusted LIBO Rate, the LIBO Rate, the Adjusted EURIBOR Rate, the EURIBOR Rate or the AUD Rate for the applicable Agreed Currency and such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for the applicable Agreed Currency and such Interest Period or (B) at any time, the applicable Daily Simple RFR or RFR for the applicable Agreed Currency will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for the applicable Agreed Currency;

62

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone, telecopy or electronic mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (A) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term Benchmark Borrowing shall be ineffective, (B) if any Borrowing Request requests a Term Benchmark Borrowing in Dollars, such Borrowing shall be made as an ABR Borrowing and (C) if any Borrowing Request requests a Term Benchmark Borrowing or an RFR Borrowing for the relevant rate above in an Alternative Currency, then such request shall be ineffective; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then all other Types of Borrowings shall be permitted. Furthermore, if any Term Benchmark Loan or RFR Loan in any Agreed Currency is outstanding on the date of the Borrower's receipt of the notice from the Administrative Agent referred to in this Section 2.11(i) with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) if such Term Benchmark Loan is denominated in Dollars, then on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), such Loan shall be converted by the Administrative Agent to, and shall constitute, an ABR Loan denominated in Dollars on such day, (ii) if such Term Benchmark Loan is denominated in any Agreed Currency other than Dollars, then such Loan shall, on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day) bear interest at the Central Bank Rate for the applicable Agreed Currency plus the Applicable Rate for Term Benchmark Loans; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for the applicable Agreed Currency cannot be determined, any outstanding affected Term Benchmark Loans denominated in any Agreed Currency other than Dollars shall, at the Borrower's election prior to such day: (A) be prepaid by the Borrower on such day or (B) solely for the purpose of calculating the interest rate applicable to such Term Benchmark Loan, such Term Benchmark Loan denominated in any Agreed Currency other than Dollars shall be deemed to be a Term Benchmark Loan denominated in Dollars and shall accrue interest at the same interest rate applicable to Term Benchmark Loans denominated in Dollars at such time or (iii) if such RFR Loan is denominated in any Agreed Currency other than Dollars, then such Loan shall bear interest at the Central Bank Rate for the applicable Agreed Currency plus the Applicable Rate for RFR Loans; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for the applicable Agreed Currency cannot be determined, any outstanding affected RFR Loans denominated in any Agreed Currency other than Dollars, at the Borrower's election, shall either (A) be converted into ABR Loans denominated in Dollars (in an amount equal to the Dollar Equivalent of such Alternative Currency) immediately or (B) be prepaid in full immediately.

(b)        Notwithstanding anything to the contrary herein or in any other Loan Document (and any Swap Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 2.11(b)), if a Benchmark Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" with respect to Dollars for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" with respect to any Agreed Currency for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

63

(c)        Notwithstanding anything to the contrary herein or in any other Loan Document and subject to the proviso below in this paragraph, with respect to a Loan denominated in Dollars, if a Term SOFR Transition Event and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then the applicable Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; provided that, this clause (c) shall not be effective unless the Administrative Agent has delivered to the Lenders and the Borrower a Term SOFR Notice. For the avoidance of doubt, the Administrative Agent shall not be required to deliver a Term SOFR Notice after the occurrence of a Term SOFR Transition Event and may do so in its sole discretion.

(d)        In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(e)        The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event, an Early Opt-in Election or an Other Benchmark Rate Election, as applicable, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.11(e), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.11(e).

(f)        Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR, LIBO Rate, EURIBOR Rate or AUD Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Administrative Agent may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

64

(g)        Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Term Benchmark Borrowing or RFR Borrowing of, conversion to or continuation of Term Benchmark Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, either (x) the Borrower will be deemed to have converted any request for a Term Benchmark Borrowing denominated in Dollars into a request for a Borrowing of or conversion to ABR Loans or (y) any Term Benchmark Borrowing or RFR Borrowing denominated in an Alternative Currency shall be ineffective. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR. Furthermore, if any Term Benchmark Loan or RFR Loan in any Agreed Currency is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to a Relevant Rate applicable to such Term Benchmark Loan or RFR Loan, then until such time as a Benchmark Replacement for such Agreed Currency is implemented pursuant to this Section 2.11(g), (i) if such Term Benchmark Loan is denominated in Dollars, then on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), such Loan shall be converted by the Administrative Agent to, and shall constitute, an ABR Loan denominated in Dollars on such day, (ii) if such Term Benchmark Loan is denominated in any Agreed Currency other than Dollars, then such Loan shall, on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day) bear interest at the Central Bank Rate for the applicable Agreed Currency plus the Applicable Rate for Term Benchmark Loans; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for the applicable Agreed Currency cannot be determined, any outstanding affected Term Benchmark Loans denominated in any Agreed Currency other than Dollars shall, at the Borrower's election prior to such day: (A) be prepaid by the Borrower on such day or (B) solely for the purpose of calculating the interest rate applicable to such Term Benchmark Loan, such Term Benchmark Loan denominated in any Agreed Currency other than Dollars shall be deemed to be a Term Benchmark Loan denominated in Dollars and shall accrue interest at the same interest rate applicable to Term Benchmark Loans denominated in Dollars at such time or (iii) if such RFR Loan is denominated in any Agreed Currency other than Dollars, then such Loan shall bear interest at the Central Bank Rate for the applicable Agreed Currency plus the Applicable Rate for RFR Loans; provided that, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the Central Bank Rate for the applicable Agreed Currency cannot be determined, any outstanding affected RFR Loans denominated in any Agreed Currency, at the Borrower's election, shall either (A) be converted into ABR Loans denominated in Dollars (in an amount equal to the Dollar Equivalent of such Alternative Currency) immediately or (B) be prepaid in full immediately.

65

Section 2.12    Increased Costs.

(a)        If any Change in Law shall:

(i)            impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate or Adjusted EURIBOR Rate) or any Issuing Bank;

(ii)            subject the Administrative Agent, any Issuing Bank, any Lender, the London or other applicable offshore interbank market for the applicable Agreed Currency or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)            impose on any Lender or Issuing Bank or the London interbank market any other condition, cost or expense (other than Indemnified Taxes and Excluded Taxes) affecting this Agreement or Term Benchmark Loans made by such Lender or any Letter of Credit or participation therein; and the result of any of the foregoing shall be to increase the cost to such Lender or Issuing Bank of making, continuing, converting to or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or Issuing Bank such additional amount or amounts as will compensate such Lender or Issuing Bank for such additional costs incurred or reduction suffered.

(b)        If any Lender or Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments hereunder or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company would have achieved but for such Change in Law (taking into consideration such Lender's or Issuing Bank's policies and the policies of such Lender's or Issuing Bank's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender or Issuing Bank such additional amount or amounts as will compensate such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company for any such reduction suffered.

(c)        A certificate of a Lender or Issuing Bank setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender or Issuing Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

66

(d)        Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; <u>provided</u> that the Borrower shall not be required to compensate a Lender or Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or Issuing Bank notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefore; <u>provided further</u> that, if the Change in Law giving rise to such increased costs or reductions is retroactive (or has retroactive effect), then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)        Notwithstanding the foregoing, increased costs due to a Change in Law resulting from the Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III may only be requested by a Lender imposing such increased costs on borrowers similarly situated to the Borrower under syndicated credit facilities comparable to those provided hereunder.

Section 2.13        <u>Break Funding Payments</u>. (a) With respect to Loans that are not RFR Loans, in the event of (i) the payment or prepayment of any principal of any Term Benchmark Loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise), (ii) the conversion of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto, (iii) the failure to borrow, convert, continue or prepay any Term Benchmark Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under <u>Section 2.08(b)</u> and is revoked in accordance therewith), (iv) the assignment of any Term Benchmark Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to <u>Section 2.16</u> or (v) the failure by the Borrower to make any payment of any Loan or drawing under any Letter of Credit (or interest due thereof) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Term Benchmark Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate or the Adjusted EURIBOR Rate, as applicable, that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in the applicable Agreed Currency of a comparable amount and period from other banks in the applicable offshore interbank market for such Agreed Currency. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

67

(b)        With respect to RFR Loans, in the event of (i) the payment of any principal of any RFR Loan other than on the Interest Payment Date applicable thereto (including as a result of an Event of Default or an optional or mandatory prepayment of Loans), (ii) the failure to borrow or prepay any RFR Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.08(b) and is revoked in accordance therewith), (iii) the assignment of any RFR Loan other than on the Interest Payment Date applicable thereto as a result of a request by the Borrower pursuant to Section 2.16 or (iv) the failure by the Borrower to make any payment of any Loan or drawing under any Letter of Credit (or interest due thereof) denominated in an Alternative Currency on its scheduled due date or any payment thereof in a different currency, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 2.14    Taxes.

(a)        Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall make such deduction or withholding and timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary (or, where the Indemnified Tax is a Tax imposed by Australia, the applicable Withholding Agent shall pay an additional amount to the Administrative Agent, Issuing Bank or Lender (as the case may be)) so that after making such deduction or withholding for Indemnified Taxes (including such deductions and withholdings for Indemnified Taxes applicable to additional sums payable under this Section) the Administrative Agent, Issuing Bank or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deduction or withholding for Indemnified Taxes been made.

(b)        In addition, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)        The Loan Parties shall jointly and severally indemnify the Administrative Agent, each Issuing Bank and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes paid by the Administrative Agent, such Issuing Bank or such Lender, as the case may be, or required to be withheld or deducted from any payment to such recipient by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by an Issuing Bank or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of an Issuing Bank or a Lender, shall be conclusive absent manifest error.

68

(d)        Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)        As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)        Any Foreign Lender, if it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be required by law or requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter as required by law or upon the reasonable request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)        executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party;

(ii)        executed originals of IRS Form W-8ECI;

(iii)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable;

(iv)        to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a portfolio interest certificate in compliance with Section 2.14(f)(iii), IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate in compliance with Section 2.14(f)(iii) on behalf of such direct or indirect partner or partners; or

69

(v)        any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made unless, in the Foreign Lender's reasonable determination, such completion would subject such Foreign Lender to any material cost or expense or would materially prejudice the legal or commercial position of such Foreign Lender.

In addition, any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as required by law or upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding. In addition, each Lender shall deliver such forms (including those forms required pursuant to Section 2.14(g)) promptly upon the obsolescence or invalidity of any form previously delivered by such Lender or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

In addition, the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter as required by law or upon the reasonable request of the Borrower), an executed original of IRS Form W-9 certifying that such Administrative Agent is exempt from U.S. federal backup withholding.

(g)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender failed to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such other documentation reasonably requested by the Borrower and the Administrative Agent sufficient for the Administrative Agent and the Borrower to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.14(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)        If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h), the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

70

(i)        Indirect Tax.

(i)        All payments to be made by a Loan Party under or in connection with any Loan Document have been calculated without regard to Indirect Tax. If all or part of any such payment is the consideration for a taxable supply or chargeable without Indirect Tax then, when the Loan Party makes the payment: (a) it must pay to the Administrative Agent, Issuing Bank or Lender (as the case may be) an additional amount equal to that payment (or part) multiplied by the appropriate rate of Indirect Tax; and (b) the Administrative Agent, Issuing Bank or Lender (as the case may be) will promptly provide to the Loan Party a tax invoice complying with the relevant law relating to that Indirect Tax.

(ii)        Where a Loan Document requires a Loan Party to reimburse or indemnify the Administrative Agent, an Issuing Bank or a Lender (as the case may be) for any costs or expenses, that Loan Party shall also at the same time pay and indemnify that Administrative Agent, Issuing Bank or Lender against all Indirect Tax incurred by that Administrative Agent, Issuing Bank or Lender in respect of the costs or expenses save to the extent that that Administrative Agent, Issuing Bank or Lender is entitled to repayment or credit in respect of the Indirect Tax. The Administrative Agent, Issuing Bank or Lender (as the case may be) will promptly provide to the Loan Party a tax invoice complying with the relevant law relating to that Indirect Tax.

(j)        Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(k)        For purposes of this Section, the term "Lender" includes any Issuing Bank and the term applicable law includes FATCA.

71

Section 2.15     <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)          (i) Except with respect to principal of and interest on Loans denominated in an Alternative Currency, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under <u>Sections 2.12</u>, <u>2.13</u> or <u>2.14</u>, or otherwise) in Dollars prior to 12:00 noon, Local Time, on the date when due and (ii) all payments with respect to principal and interest on Loans denominated in an Alternative Currency shall be made in such Alternative Currency not later than the Local Time specified by the Administrative Agent on the dates specified herein, in each case, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent (i) in the case of payments denominated in Dollars, at its Principal Office and (ii) in the case of payments denominated in an Alternative Currency, at its Alternative Currency Payment Office for such Alternative Currency; <u>provided</u> that payments pursuant to <u>Sections 2.12</u>, <u>2.13</u> or <u>2.14</u> and <u>Section 10.03</u> shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment or performance hereunder shall be due on a day that is not a Business Day, the date for payment or performance shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder of principal or interest in respect of any Loan or LC Disbursement shall, except as otherwise expressly provided herein, be made in the currency of such Loan or LC Disbursement, and all other payments hereunder and under each other Loan Document shall be made in Dollars. Notwithstanding the foregoing provisions of this Section, if, after the making of any Loan or LC Disbursement in any Alternative Currency, currency control or exchange regulations are imposed in the country which issues such Alternative Currency with the result that such Alternative Currency no longer exists or the Borrower is not able to make payment to the Administrative Agent for the account of the Lenders in such Alternative Currency, then all payments to be made by the Borrower hereunder in such Alternative Currency shall instead be made when due in a currency that replaced such Alternative Currency or, if no such replacement currency exists, in Dollars in an amount equal to the Dollar Equivalent (as of the date of repayment) of such payment due, it being the intention of the parties hereto that the Borrower takes all risks of the imposition of any such currency control or exchange regulations.

(b)          If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall (subject to the provisions of <u>Section 10.21</u>) be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

72

(c)    Subject to the provisions of Section 10.21, if any Lender shall, by exercising any right of set off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the applicable Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the applicable Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.04(b), paragraph (d) or (e) of Section 2.19, or paragraph (d) of this Section, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.16    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.14, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

73

(b)        If (i) any Lender requests compensation under <u>Section 2.12</u>, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.14</u> or (iii) any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 10.04</u>), all its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and if a Commitment is being assigned, the Issuing Banks), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents, from the assignee (to the extent of such outstanding principal and accrued interest and fees so assigned) or the Borrower (in the case of all other amounts so assigned), (iii) in the case of any such assignment resulting from a claim for compensation under <u>Section 2.12</u> or payments required to be made pursuant to <u>Section 2.14</u>, such assignment will result in a reduction in such compensation or payments, (iv) such assignment does not conflict with applicable law and (v) in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, (x) the applicable assignee shall have consented to, or shall consent to, the applicable amendment, waiver or consent and (y) the Borrower exercises its rights pursuant to this clause (b) with respect to all Non-Consenting Lenders relating to the applicable amendment, waiver or consent; <u>provided</u>, <u>further</u>, that in the event such Lender shall have received payment of the amount referred to in clause (ii) above, such Lender shall be deemed to have so assigned and delegated all its interests, rights and obligations under this Agreement and the other Loan Documents pursuant to the terms set forth in <u>Exhibit A</u> hereto. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.17    <u>Defaulting Lenders/Subordinated Lender</u>.

(a)        Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)        Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and in <u>Section 10.02</u>.

74

(ii)        Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 7 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Banks hereunder; *third*, to Cash Collateralize each Issuing Bank's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.17(d); *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize each Issuing Bank's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with Section 2.17(d); *sixth*, to the payment of any amounts owing to the Lenders or the Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any Lender or any Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or reimbursement obligations with respect to Letters of Credit in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and reimbursement obligations with respect to Letters of Credit owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or reimbursement obligations with respect to Letters of Credit owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in Letters of Credit are held by the Lenders pro rata in accordance with the Commitments without giving effect to Section 2.17(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.17(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)        (A) No Defaulting Lender shall be entitled to receive any commitment fee pursuant to Section 2.09(a) or participation fees pursuant to Section 2.09(b)(i) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender); provided that such Defaulting Lender shall be entitled to receive participation fees pursuant to Section 2.09(b)(i) for any period during which that Lender is a Defaulting Lender only to extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.17(d); and (B) with respect to any fees not required to be paid to any Defaulting Lender pursuant to clause (A) above, the Borrower shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letters of Credit that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to each Issuing Bank the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Bank's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

75

(iv)        So long as no Event of Default shall have occurred and be continuing, all or any part of such Defaulting Lender's participation in Letters of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that such reallocation does not cause the Dollar Equivalent of the aggregate Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Commitment. Subject to Section 10.19, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)        If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, Cash Collateralize each Issuing Bank's Fronting Exposure in accordance with the procedures set forth in Section 2.17(d).

(b)        If the Borrower, the Administrative Agent and each Issuing Bank agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held on a pro rata basis by the Lenders in accordance with their respective Applicable Percentages (without giving effect to Section 2.17(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)        So long as any Lender is a Defaulting Lender, each Issuing Bank shall not be required to issue, extend, renew or increase any Letter of Credit unless it is satisfied that the participations in any then existing Letters of Credit as well as the new, extended, renewed or increased Letter of Credit has been or will be fully allocated among the Non-Defaulting Lenders in a manner consistent with clause (a)(iv) above and such Defaulting Lender shall not participate therein except to the extent such Defaulting Lender's participation has been or will be fully Cash Collateralized in accordance with Section 2.17(d).

76

(d)        At any time that there shall exist a Defaulting Lender, within one Business Day following the written request of the Administrative Agent or any Issuing Bank (with a copy to the Administrative Agent), the Borrower shall Cash Collateralize such Issuing Bank's Fronting Exposure with respect to such Defaulting Lender (determined after giving effect to Section 2.17(a)(iv) and any Cash Collateral provided by such Defaulting Lender) in an amount not less than the Minimum Collateral Amount.

(i)        The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the Issuing Banks, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for the Defaulting Lenders' obligation to fund participations in respect of Letters of Credit, to be applied pursuant to clause (ii) below. If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and the Issuing Banks as herein provided, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(ii)        Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section 2.17 in respect of Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of Letters of Credit (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(iii)        Cash Collateral (or the appropriate portion thereof) provided to reduce each Issuing Bank's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section 2.17 following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender) or (ii) the determination by the Administrative Agent and such Issuing Bank that there exists excess Cash Collateral; provided that, subject to the other provisions of this Section 2.17, the Person providing Cash Collateral and such Issuing Bank may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations.

(e)        [Each Subordinated Lender agrees that to the extent and for so long as its Commitment, participation in any Loan or subparticipation or other agreement or arrangement relating to a Commitment, including, without limitation, following a Debt Purchase Transaction, could result in the subordination of claims of any other Lender under the Loans pursuant to any law regarding the subordination of shareholder loans or prejudice or adversely affect the Collateral or guarantee and indemnity pursuant to [●] (or their enforceability) in any way, the relevant Subordinated Lender shall not be a secured or guaranteed party (however described) under and for the purposes of any Loan Document and no amount owing to it under any Loan Document shall be secured by the Security Documents (unless the subordination ceases to apply or subsequently or at the same time applies to the Lenders generally (other than where such subordination of the Lenders generally is caused by a Debt Purchase Transaction by a Subordinated Lender)).]

77

Section 2.18     Incremental Facility.

(a)       The Borrower may by written notice to the Administrative Agent elect to request prior to the Maturity Date, one or more increases to the existing Commitments (any such increase, the "**New Commitments**"), in Dollars or an Alternative Currency, by an amount not in excess of the Incremental Amount in the aggregate and not less than $5,000,000 individually (or such lesser amount which shall be approved by the Administrative Agent or such lesser amount that shall constitute the difference between the Incremental Amount and all such New Commitments obtained prior to such date), and integral multiples of $1,000,000 in excess of that amount. Each such notice shall specify (A) the date (each, an "**Increased Amount Date**") on which the Borrower proposes that the New Commitments shall be effective, which shall be a date not less than 5 Business Days after the date on which such notice is delivered to the Administrative Agent (unless otherwise agreed by the Administrative Agent in its sole discretion), (B) the proposed currency denomination and the requested amount of the New Commitment, and (C) the identity of each Lender or other Person that is an eligible assignee under Section 10.04(b), subject to approval thereof by the Administrative Agent in the case of a Person that is not a Lender (such approval not to be unreasonably withheld or delayed) (each, a "**New Lender**"), to whom the Borrower proposes any portion of such New Commitments be allocated and the amounts of such allocations; provided that any Lender approached to provide all or a portion of the New Commitments may elect or decline, in its sole discretion, to provide a New Commitment; and provided, further that any Lender approached to provide all or a portion of the New Commitments and that does not respond in writing within 5 Business Days of receipt of such offer shall be deemed to have declined. Such New Commitments shall become effective as of such Increased Amount Date; provided that (1) on such Increased Amount Date before or after giving effect to such New Commitments, each of the conditions set forth in Section 4.02 shall be satisfied; (2) the New Commitments shall be effected pursuant to one or more Joinder Agreements executed and delivered by the Borrower, the New Lenders and the Administrative Agent, and each of which shall be recorded in the Register and each New Lender shall be subject to the requirements set forth in Section 2.14; (3) the Borrower shall make any payments required pursuant to Sections 2.12 and 2.13 in connection with the New Commitments; and (4) the Borrower shall deliver or cause to be delivered any legal opinions or other documents reasonably requested by the Administrative Agent in connection with any such transaction.

(b)       On any Increased Amount Date on which New Commitments are effected, subject to the satisfaction (or waiver by the Required Lenders) of the foregoing terms and conditions, (i) each of the Lenders shall assign to each of the New Lenders, and each of the New Lenders shall purchase from each of the Lenders, at the principal amount thereof (together with accrued interest), such interests in the Loans outstanding on such Increased Amount Date as shall be necessary in order that, after giving effect to all such assignments and purchases, such Loans will be held by existing Lenders and New Lenders ratably in accordance with their Commitments after giving effect to the addition of such New Commitments to the Commitments, (ii) each New Commitment shall be deemed for all purposes a Commitment and each Loan made thereunder (a "**New Loan**") shall be deemed, for all purposes, a Loan and (iii) each New Lender shall become a Lender for all purposes hereunder.

78

(c)        The Administrative Agent shall notify Lenders promptly upon receipt of the Borrower's notice of each Increased Amount Date and in respect thereof (i) the New Commitments and the New Lenders, and (ii) the respective interests in such Lender's Loans, in each case subject to the assignments contemplated by this Section 2.18.

(d)        The terms and provisions (including pricing) of the New Loans shall be identical to the existing Loans. Notwithstanding anything in Section 10.02 to the contrary, each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate in the opinion of the Administrative Agent to effect the provision of this Section 2.18, including, to the extent the New Commitments are incurred in an Alternative Currency, any amendments to reflect such Alternative Currency hereunder.

Section 2.19     Letters of Credit.

(a)        General. Subject to the terms and conditions set forth herein, the Borrower may request the issuance of (and subject to the terms of this Section 2.19, each Issuing Bank shall issue) Letters of Credit as the applicant thereof for the support of its or its Subsidiaries' obligations, in a form reasonably acceptable to the Administrative Agent and the applicable Issuing Bank, at any time and from time to time during the Availability Period. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the applicable Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. Notwithstanding anything herein to the contrary, (i) the Borrower shall not request, and no Issuing Bank shall issue, any Letter of Credit the proceeds of which would be made to any Person (A) to fund any activity or business of or with any Sanctioned Person, or in any country, region or territory, that at the time of such funding is a Sanctioned Country or (B) in any manner that would result in a violation of any Sanctions by any party to this Agreement, (ii) no Issuing Bank shall have any obligation hereunder to issue any Letter of Credit if the issuance of such Letter of Credit would violate one or more policies of such Issuing Bank now or hereafter in effect applicable to letters of credit generally, (iii) no Issuing Bank shall have any obligation hereunder to issue any Letter of Credit (1) if the aggregate LC Exposure with respect to all Letters of Credit issued by such Issuing Bank would exceed such Issuing Bank's LC Commitment, (2) denominated in a currency other than Dollars or with respect to each Issuing Bank, any applicable Alternative Currency set forth adjacent to its name on Schedule 2.01, or otherwise consented to by such Issuing Bank or (3) unless it is a Standby Letter of Credit (or, with the consent of such Issuing Bank (in its sole discretion), a Commercial Letter of Credit) and (iv) the Borrower shall not request, and no Issuing Bank shall issue, any Letter of Credit if after giving effect to such issuance of a Letter of Credit, (1) the Dollar Equivalent of any Lender's Revolving Credit Exposure would exceed such Lender's Commitment or (2) the sum of the Dollar Equivalents of the total Revolving Credit Exposures of all Lenders would exceed the total Commitments of all Lenders. All Existing Letters of Credit shall be deemed to have been issued pursuant hereto, and from and after the Effective Date shall be subject to and governed by the terms and conditions hereof.

79

(b)        Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and the Administrative Agent (reasonably in advance of the requested date of issuance, amendment, renewal or extension, but in any event no less than three Business Days in connection with a Letter of Credit denominated in Dollars and five Business Days in connection with a Letter of Credit denominated in a currency other than Dollars) a written Letter of Credit Request in substantially the form of Exhibit B-2 attached hereto and signed by the Borrower requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the Agreed Currency applicable thereto, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. If requested by the applicable Issuing Bank, the Borrower also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit, the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the Dollar Equivalent of the LC Exposure shall not exceed the LC Sublimit, (ii) the sum of the Dollar Equivalents of the total Revolving Credit Exposures shall not exceed the total Commitments, (iii) the Dollar Equivalent of the LC Exposure of the applicable Issuing Bank shall not exceed the LC Sublimit applicable to such Issuing Bank and (iv) the Dollar Equivalent of the Revolving Credit Exposure of the applicable Issuing Bank shall not exceed the Commitment of such Issuing Bank.

(c)        Currency; Expiration Date. Each Letter of Credit shall be denominated in Dollars or any Alternative Currency to the extent provided in Section 2.19(a) above. Each Letter of Credit shall expire (or be subject to termination by notice from the applicable Issuing Bank to the beneficiary thereof) at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit unless otherwise consented to by the applicable Issuing Bank (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Maturity Date; provided that, notwithstanding anything to the contrary in this paragraph (c), a Letter of Credit may expire on a date following the Maturity Date if the Borrower provides Cash Collateral for, "backstops" or replaces such Letter of Credit, in each case, in an amount equal to 103% of the applicable Issuing Bank's LC Exposure attributable to such Letter of Credit plus any accrued and unpaid interest thereon and pursuant to arrangements (and with "backstop" letter of credit issuers) reasonably acceptable to the applicable Issuing Bank.

(d)        Participations. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of any Issuing Bank or the Lenders, the applicable Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the applicable Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit; provided that the Lenders' participations in a Letter of Credit shall terminate upon giving effect to any Deemed LC Termination in respect of such Letter of Credit. In consideration and in furtherance of the foregoing, each Lender hereby absolutely, unconditionally and irrevocably agrees to pay to the Administrative Agent, for the account of such Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute, unconditional and irrevocable and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

80

(e)        Reimbursement. If any Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement in the applicable Agreed Currency within one (1) Business Day after the Borrower shall have received notice of such LC Disbursement; provided that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 that such payment be financed with an ABR Borrowing in an amount equal to the Dollar Equivalent of such LC Disbursement and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing. If the Borrower fails to make such payment when due, (x) any LC Disbursement denominated in an Alternative Currency shall automatically be converted to an LC Disbursement denominated in Dollars in an amount equal to the Dollar Equivalent of such LC Disbursement at such time and (y) the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.04 with respect to Loans made by such Lender (and Section 2.04 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this paragraph to reimburse any Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement. If the Borrower's reimbursement of, or obligation to reimburse, any amounts in any Alternative Currency would subject the Administrative Agent, any Issuing Bank or any Lender to any stamp duty, ad valorem charge or similar tax that would not be payable if such reimbursement were made or required to be made in Dollars, the Borrower shall, at its option, either (x) pay the amount of any such tax requested by the Administrative Agent, such Issuing Bank or such Lender or (y) reimburse each LC Disbursement made in such Alternative Currency in Dollars, in an amount equal to the Dollar Equivalent of such LC Disbursement on the date such LC Disbursement is made.

(f)        Obligations Absolute. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by any Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. Neither the Administrative Agent, the Lenders nor the Issuing Banks, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of any Issuing Bank; provided that the foregoing shall not be construed to excuse any Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of any Issuing Bank (as finally determined by a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, any Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

81

(g)        Disbursement Procedures. Each Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Such Issuing Bank shall promptly notify the Administrative Agent by telephone (confirmed by telecopy) of such demand for payment and whether such Issuing Bank has made or will make an LC Disbursement thereunder and, upon receipt of such notice, the Administrative Agent shall promptly notify the Borrower by telephone (confirmed by telecopy) of the same; provided that any failure to give or delay by the Issuing Bank or the Administrative Agent in giving such notice shall not relieve the Borrower of its obligation to reimburse such Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)        Interim Interest. If any Issuing Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the reimbursement is due and payable at the rate *per annum* then applicable to ABR Loans; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.10(d) shall apply. Interest accrued pursuant to this paragraph shall be for the account of such Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to paragraph (e) of this Section to reimburse such Issuing Bank shall be for the account of such Lender to the extent of such payment.

82

(i)        Cash Collateralization. If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Administrative Agent, any Issuing Bank or the Required Lenders (or, if the maturity of the Loans has been accelerated, Lenders with LC Exposure representing greater than 50.0% of the total LC Exposure) demanding the deposit of Cash Collateral pursuant to this paragraph, the Borrower shall provide Cash Collateral in an amount equal to 103% of the LC Exposure as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such Cash Collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (h) or (i) of Article 7. Such Cash Collateral shall be held by the Administrative Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the applicable Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of each Issuing Bank), be applied to satisfy other obligations of the Borrower under this Agreement. If the Borrower is required to provide an amount of Cash Collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(j)        Replacement of an Issuing Bank. Any Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of any Issuing Bank. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.09(b). From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(k)        Resignation of an Issuing Bank. Any Issuing Bank may resign at any time that such Issuing Bank (or its applicable Affiliate) ceases to hold a Commitment hereunder. The Administrative Agent shall notify the Lenders of any such resignation of any Issuing Bank. After the resignation of an Issuing Bank hereunder, the resigning Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit.

83

(l) <u>Deemed Letter of Credit Requests</u>. The Borrower may, from time to time, request (a "**Deemed LC Request**") that (i) any undrawn Letter of Credit issued hereunder be deemed to be terminated and issued under a separate letter of credit facility with the applicable Issuing Bank (a "**Deemed LC Termination**") or (ii) any undrawn letter of credit issued under a separate letter of credit facility with an Issuing Bank be deemed to be terminated and issued hereunder as a Letter of Credit (a "**Deemed LC Issuance**"). Any such Deemed LC Request shall identify the applicable Letter of Credit, and the Deemed LC Termination or Deemed LC Issuance specified therein shall, subject to the prior written consent of each of the Administrative Agent and the applicable Issuing Bank (which consent may be withheld in its sole discretion) and, in the case of any Deemed LC Issuance, the satisfaction of the conditions set forth in <u>Section 4.02</u>, be effective upon receipt of such written consent.

Section 2.20 <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due from the Borrower hereunder in the currency expressed to be payable herein (the "<u>specified currency</u>") into another currency, the parties hereto agree, to the fullest extent that they may effectively do so, that the rate of exchange used shall be that at which the Administrative Agent could, in accordance with normal banking procedures applicable to arm's length transactions, purchase the specified currency with such other currency at the Administrative Agent's Principal Office on the Business Day immediately preceding that on which final, non-appealable judgment is given. The obligations of the Borrower in respect of any sum due to the Administrative Agent, any Issuing Bank or any Lender hereunder shall, notwithstanding any judgment in a currency other than the specified currency, be discharged only to the extent that on the Business Day following receipt by the Administrative Agent, such Issuing Bank or such Lender of any sum adjudged to be so due in such other currency, the Administrative Agent, such Issuing Bank or such Lender may in accordance with normal, reasonable banking procedures purchase the specified currency with such other currency. If the amount of the specified currency so purchased is less than the sum originally due to the Administrative Agent, such Issuing Bank or such Lender in the specified currency, the Borrower agrees, to the fullest extent that it may effectively do so, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent, such Issuing Bank or such Lender against such loss, and if the amount of the specified currency so purchased exceeds (a) the sum originally due to the Administrative Agent, such Issuing Bank or such Lender in the specified currency and (b) any amounts shared with other Lenders as a result of allocations of such excess as a disproportionate payment to such Lender under <u>Section 2.15(c)</u>, the Administrative Agent, such Issuing Bank or such Lender agrees to remit such excess to the Borrower.

<div align="center">

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

</div>

The Parent and the Borrower, as applicable, represent and warrant to the Lenders that:

Section 3.01 Organization; Powers. Each of the Parent and its Subsidiaries is duly organized or formed, validly existing and (to the extent the concept is applicable in such jurisdiction) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

84

Section 3.02     Authorization; Enforceability. The Transactions are within the Borrower's and each Guarantor's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, equity holder action. Each of the Borrower and the Guarantors has duly executed and delivered each of the Loan Documents to which it is party, and each of such Loan Documents constitute its legal, valid and binding obligations, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03     Governmental Approvals; No Conflicts. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) those approvals, consents, registrations, filings or other actions, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect, (b) except as would not reasonably be expected to have a Material Adverse Effect, will not violate any applicable law or regulation or any order of any Governmental Authority, (c) will not violate any charter, by-laws or other organizational document of the Parent or any of its Subsidiaries, (d) except as would not reasonably be expected to have a Material Adverse Effect, will not violate or result in a default under any indenture, agreement or other instrument (other than the agreements and instruments referred to in clause (c)) binding upon the Parent or any of its Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Parent or any of its Subsidiaries, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent or any of its Subsidiaries (other than Liens arising pursuant to the Security Documents or permitted under Section 6.02).

Section 3.04     Financial Condition; No Material Adverse Change.

(a)          The Borrower has heretofore furnished to the Administrative Agent (i) the Borrower's consolidated balance sheets and related consolidated statements of operations and comprehensive loss, consolidated statements of changes in members' (deficit) equity, and consolidated statements of cash flows as of and for the fiscal years ended September 30, 2019 and September 30, 2020, reported on by Ernst & Young LLP, independent public accountants and (ii) its condensed consolidated balance sheets and related condensed consolidated statements of operations and comprehensive loss, condensed consolidated statements of changes in members' (deficit) equity, and condensed consolidated statements of cash flows as of the end of and for the fiscal quarters ended December 31, 2020, March 31, 2021 and June 30, 2021 and the then elapsed portion of the fiscal year. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP.

85

(b)        Since September 30, 2020, no event, development or circumstance exists or has occurred that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.05        <u>Properties</u>.

(a)        Each of the Parent and its Subsidiaries has good title to, or valid leasehold interests in or rights to use, all its real and tangible personal property material to its business, other than minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes or those Liens permitted by Section 6.02, except in each case where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)        Each of the Parent and its Subsidiaries owns, or has the valid right to use, all Intellectual Property material to its business as currently conducted, free and clear of all Liens other than Liens permitted by <u>Section 6.02</u> except to the extent such failure to own or have the right to use, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, and the operation of such business or the use of such Intellectual Property rights by the Parent and its Subsidiaries does not infringe upon, misappropriate, or otherwise violate the rights of any other Person, except for any such infringements, misappropriations, or violations that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.06        <u>Litigation and Environmental Matters</u>. Except as set forth on <u>Schedule 3.06</u>, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Parent or the Borrower, threatened in writing (including "cease and desist" letters and invitations to take a patent license) against or affecting the Parent or any of its Subsidiaries (i) that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement, any other Loan Document or the Transactions.

(a)        Except with respect to any matter that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, or (iii) has received notice of any claim with respect to any Environmental Liability.

Section 3.07        <u>Compliance with Laws and Agreements; No Default</u>. Each of the Parent and its Subsidiaries is in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and rights and all indentures, agreements, and other instruments binding upon it or its property and rights, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

86

Section 3.08    Investment Company Status. None of the Parent or any of its Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 3.09    Margin Stock. None of the Parent or any of its Subsidiaries is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U and Regulation X issued by the Board).

Section 3.10    Taxes. Except as set forth on Schedule 3.10 or as would not reasonably be expected to result in a Material Adverse Effect, (i) each of the Parent and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed with respect to income, properties or operations of the Parent and its Subsidiaries, (ii) such returns accurately reflect in all material respects all liability for Taxes of the Parent and its Subsidiaries as a whole for the periods covered thereby and (iii) each of the Parent and its Subsidiaries has paid or caused to be paid all Taxes required to have been paid by it, except Taxes that are being contested in good faith by appropriate proceedings and, to the extent required by GAAP, for which the Parent or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.

Section 3.11    ERISA.

(a)    Each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to result in any Material Adverse Effect. Each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification). No ERISA Event has occurred, or is reasonably expected to occur, other than as would not, individually or in the aggregate, reasonably be expected to result in any Material Adverse Effect).

(b)    There exists no Unfunded Pension Liability with respect to any Plan, except as would not reasonably be expected to result in a Material Adverse Effect.

(c)    None of the Borrower, any Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions, or has within any of the five calendar years immediately preceding the date this assurance is given or deemed given, made or accrued an obligation to make contributions to any Multiemployer Plan.

87

(d)        There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower, any Subsidiary or any ERISA Affiliate, threatened, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to result in any Material Adverse Effect.

(e)        The Borrower, its Subsidiaries and its ERISA Affiliates have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Plan or Multiemployer Plan save where any failure to comply, individually or in the aggregate, would not reasonably be expected to result in any Material Adverse Effect.

(f)        No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period, within the meaning of Section 412 of the Code or Section 302 or 304 of ERISA. The Borrower, any Subsidiary, and any ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions. None of the Borrower, any Subsidiary or any ERISA Affiliate have incurred or reasonably expect to incur any liability to PBGC except as would not reasonably be expected to result in a Material Adverse Effect, save for any liability for premiums due in the ordinary course or other liability which would not reasonably be expected to result in a Material Adverse Effect, and no lien imposed under the Code or ERISA on the assets of the Borrower or any Subsidiary or any ERISA Affiliate exists or, to the knowledge of the Borrower, is likely to arise on account of any Plan. None of the Borrower, any Subsidiary or any ERISA Affiliate has engaged in a transaction that would reasonably be expected to be subject to Section 4069 or 4212(c) of ERISA.

(g)        Each Non-U.S. Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, except as would not reasonably be expected to result in a Material Adverse Effect. All contributions required to be made with respect to a Non-U.S. Plan have been timely made, except as would not reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan, except as would not reasonably be expected to result in a Material Adverse Effect. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities, except as would not reasonably be expected to result in a Material Adverse Effect.

Section 3.12    Disclosure.

(a)        All written information provided by any Responsible Officer of the Parent or the Borrower, as applicable (other than any projected financial information, estimates, budgets, forward looking statements and other than information of a general economic or industry specific nature) to the Administrative Agent or any Lender in connection with this Agreement or delivered hereunder, as modified or supplemented by other information so furnished and when taken as a whole together with any information disclosed in the Parent's public filings with the SEC, does not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading; provided that, with respect to any projected financial information, the Parent and the Borrower, as applicable, represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time furnished (it being understood that such projected financial information and all information concerning future proposed and intended activities are forward-looking statements by their nature and are subject to significant uncertainties and contingencies, any of which are beyond the Parent's and the Borrower's control, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projected financial information may differ significantly from the projected results and such differences may be material).

88

(b)        As of the Effective Date, to the best knowledge of the Borrower, to the extent required to be delivered pursuant to Section 4.01(h), the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all material respects.

Section 3.13        Subsidiaries. Schedule 3.13 sets forth as of the Effective Date a list of all Subsidiaries, together with (a) the percentage ownership (directly or indirectly) of the Parent and the Borrower, as applicable, therein and (b) whether such Subsidiary is a Guarantor or an Excluded Subsidiary. Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the shares of capital stock or other ownership interests of all Subsidiaries of the Parent and the Borrower, as applicable, are fully paid and non-assessable and are owned by the Parent and the Borrower, as applicable, directly or indirectly, free and clear of all Liens other than Liens permitted under Section 6.02.

Section 3.14        Solvency. On the Effective Date, the Parent and its consolidated Subsidiaries are and, after giving effect to the incurrence of any Loans being incurred on such date, will be Solvent.

Section 3.15        Anti-Terrorism Law.

(a)        None of (x) the Parent, any of its Subsidiaries or any of their respective directors, officers or employees, or (y) to the knowledge of the Parent or the Borrower, any agent or Affiliate of the Parent, the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is any of the following:

(i)        a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**");

89

(ii)	a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)	a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any legal requirement relating to applicable laws with respect to terrorism or money laundering (collectively, "**Anti-Terrorism Laws**");

(iv)	a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)	a Sanctioned Person.

(b)	Neither the Parent nor any of its Subsidiaries, nor, to the knowledge of the Parent or the Borrower, any of their respective Affiliates, (i) conducts any business with, or engages in making or receiving any contribution of funds, goods or services to or for the benefit of, a Person described in Section 3.15(a)(i)-(v) above, except as permitted under U.S. law, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(c)	The Parent will not use, and will not permit any of its Subsidiaries or Affiliates to use, the proceeds of the Loans or Letters of Credit or otherwise make available such proceeds to any Person described in Section 3.15(a)(i)-(v) above, for the purpose of financing the activities of any Person described in Section 3.15(a)(i)-(v) above, in any Sanctioned Country or in any other manner that would violate any Anti-Terrorism Laws or Sanctions by any party hereto.

Section 3.16	Anti-Corruption Laws and Sanctions.

(a)	No part of the proceeds of the Loans or Letters of Credit will be used by the Borrower or any of its Subsidiaries, or, to the knowledge of the Parent, the Borrower, any of their respective Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or any applicable Anti-Corruption Law.

(b)	The Parent has implemented and maintains in effect policies and procedures designed to ensure compliance by the Parent, the Borrower, their respective Subsidiaries and their respective directors, officers, employees, Affiliates and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent, the Borrower, their respective Subsidiaries and their respective directors, officers and employees, and, to the knowledge of the Parent, the Borrower, their respective Affiliates and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.

Section 3.17	Security Documents. The Security Documents (other than the Australian Collateral Agreements) are effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable security interest (subject to Liens permitted by Section 6.02) in the Collateral described therein and proceeds thereof. In the case of any Equity Interests required to be pledged under the Security Agreement (other than the Australian Collateral Agreements), when stock certificates representing such Equity Interests are delivered to the Administrative Agent (together with a properly completed and signed stock power or endorsement), and in the case of the other Collateral described in the Security Agreement, when financing statements and other filings specified on Schedule 3 to the Security Agreement in appropriate form are filed in the offices specified on Schedule 3 to the Security Agreement, the Security Agreement shall constitute a fully perfected Lien on, and security interest (subject to Liens permitted by Section 6.02) in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof (to the extent perfection is required pursuant to this Agreement and the Security Documents), as security for the Obligations, in each case prior and superior in right to any other Person (except for Liens permitted by Section 6.02), to the extent that such Liens can be perfected by (i) the filing of financing statements, (ii) the delivery to the Administrative Agent of stock certificates representing Equity Interests pledged pursuant to the Security Documents accompanied by stock power or endorsement, and (iii) the recordation of intellectual property security agreements with the United States Patent and Trademark Office or the United States Copyright Office, as applicable.

90

Section 3.18      Australian Representations. In respect of any Australian Loan Party:

(a)       *Australian Collateral Agreements*: The security interests created under the Australian Collateral Agreements will, upon execution thereof, create the legal, valid and enforceable security interest it is expressed to create with the ranking and priority it is expressed to have over the property to which it is expressed to apply, in each case subject to the principles of equity, stamping and registration, statute of limitations and laws affecting creditors' rights generally.

(b)       *Trustee*. It is not the trustee of any trust or settlement other than as disclosed to the Administrative Agent in writing and accepted by, prior to the date it became a Loan Party or any trust which arises in the ordinary course of its trading activities.

(c)       *Related Party Benefit and Financial Assistance*. It has not contravened nor will it contravene Chapter 2E or 2J.3 of the Australian Corporations Act by entering into any Loan Document to which it is a party or participating in any transaction in connection with any Loan Document to which it is a party to the extent that any contravention could not reasonably be expected to have a Material Adverse Effect.

(d)       *Tax Consolidation*. Neither it nor any other Subsidiary incorporated in Australia is a member of an Australian Consolidated Tax Group unless it has entered into an Australian Tax Sharing Agreement or an Australian Tax Funding Agreement in form and substance satisfactory to the Administrative Agent (acting reasonably).

91

**ARTICLE 4**
**CONDITIONS**

Section 4.01    Effective Date. The obligations of the Lenders to make Loans and the Issuing Banks to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 10.02):

(a)    The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include telecopy or electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)    The Administrative Agent shall have received (i) the Security Agreement, executed and delivered by the Borrower, the Parent, and all other U.S. Loan Parties and in form and substance reasonably acceptable to the Administrative Agent, (ii) each short-form intellectual property security agreement required pursuant to Section 4.8(j) of the Security Agreement, (iii) each Foreign Security Agreement set forth on Schedule 4.01(b) and (iv) a Note executed by the Borrower in favor of each Lender requesting a Note at least 5 Business Days prior to the Effective Date.

(c)    The Administrative Agent shall have received favorable written opinions (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of (i) Latham & Watkins, LLP, counsel for the Loan Parties, (ii) Gilbert + Tobin as Australian Counsel to the Lenders, (iii) [German local law opinion] and (iv) [Philippines local law opinion], in each case, in form and substance reasonably satisfactory to the Administrative Agent. The Borrower hereby requests each such counsel to deliver such opinion.

(d)    The Administrative Agent shall have received (i) certified copies of the resolutions of the board of directors of the Borrower and the Guarantors (or in the case of an Australian Loan Party, extracts of resolutions) approving the transactions contemplated by the Loan Documents to which each such Loan Party is a party and the execution and delivery of such Loan Documents to be delivered by such Loan Party on the Effective Date, and all documents evidencing other necessary organizational action and governmental approvals, if any, with respect to the Loan Documents, and in the case of each Australian Loan Party, providing a statement of corporate benefit and (ii) all other documents reasonably requested by the Administrative Agent relating to the organization, existence and good standing of the Guarantors and the Borrower and authorization of the transactions contemplated hereby.

(e)    The Administrative Agent shall have received a certificate of the Secretary or an Assistant Secretary of the Borrower and each Guarantor (or director, in the case of the Australian Loan Party) certifying the names and true signatures of the officers of such entity authorized to sign the Loan Documents to which it is a party, to be delivered by such entity on the Effective Date and the other documents to be delivered hereunder on the Effective Date.

(f)    The Administrative Agent shall have received (i) a certificate, dated the Effective Date and signed on behalf of the Borrower by the President, a Vice President or a Financial Officer of the Borrower, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02 as of the Effective Date, and (ii) a certificate, dated the Effective Date and signed on behalf of the Borrower by the chief financial officer of the Borrower, certifying that, as of the Effective Date, the Parent is, individually and together with its Subsidiaries, and after giving effect to the incurrence of any Indebtedness and obligations being incurred in connection herewith will be, Solvent.

92

(g)         The Lenders, the Administrative Agent and the Arrangers shall have received all fees required to be paid by the Borrower on the Effective Date, and all expenses required to be reimbursed by the Borrower for which invoices have been presented at least three business days prior to the Effective Date, on or before the Effective Date.

(h)         (i) The Administrative Agent shall have received, to the extent reasonably requested by any of the Lenders at least five Business Days prior to the Effective Date, all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA Patriot Act and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least three days prior to the Effective Date, any Lender that has requested, in a written notice to the Borrower at least ten days prior to the Effective Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(i)         The Administrative Agent shall have received (i) audited consolidated financial statements of the Borrower for the two most recent fiscal years ended at least 90 days prior to the Effective Date as to which such financial statements are available, (ii) unaudited interim consolidated financial statements of the Borrower for each quarterly period ended subsequent to the date of the latest financial statements delivered pursuant to clause (i) of this paragraph and at least 45 days prior to the Effective Date as to which such financial statements are available and (iii) reasonably detailed projections of the Parent and its Subsidiaries through its fiscal year ending September 30, 2025.

(j)         All outstanding Equity Interests (other than Excluded Securities) owned by or on behalf of any Loan Party shall have been pledged pursuant to the Security Agreement or a Foreign Security Agreement and the Administrative Agent shall have received certificates or other instruments representing all such Equity Interests (if any), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank.

(k)         The Administrative Agent shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 6.02 or discharged on or prior to the Effective Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(l)         Each document (including any Uniform Commercial Code financing statement (or similar filings under applicable law as set forth on Schedule 4.01(l)) required by the Security Documents or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Lenders, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

93

(m)        An underwritten sale to the public of Class A common stock of the Parent pursuant to a registration statement on Form S-1 (as approved by the Arrangers without any changes thereto which are materially adverse to the interests of the Arrangers or the Lenders, unless consented to by the Arrangers (such consent not to be unreasonably withheld, conditioned or delayed)), that has been declared effective by the SEC shall have been consummated and which shall have generated gross cash proceeds of at least $600.0 million.

(n)        Evidence reasonably satisfactory to the Administrative Agent of repayment and termination of the Shareholder Loan Agreement.

(o)        In the case of the Australian Loan Party, a certificate, dated the Effective Date and signed on behalf of the Australian Loan Party by the Secretary or a Director of the Australian Loan Party confirming that:

(i)        the Australian Loan Party is solvent for the purposes of section 95A of the Australian Corporations Act and there are no grounds for suspecting that it will not continue to be so after executing and complying with its obligations under the Finance Documents; and

(ii)        the Australian Loan Party is not prevented by Chapter 2E of the Australian Corporations Act from entering into and performing any of its obligations under the Loan Documents to which it is (or will become) a party.

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Without limiting the generality of the provisions of Article 8, for purposes of determining compliance with the conditions specified in this Section, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

Section 4.02        Each Credit Event. The obligation of each Lender to make a Loan on the occasion of any Borrowing (provided that a conversion or a continuation shall not constitute a "Borrowing" for purposes of this Section 4.02), and of the applicable Issuing Bank to issue, renew or extend any Letter of Credit, is subject to the satisfaction (or waiver by the Required Lenders) of the following conditions:

(a)        The representations and warranties of the Parent and the Borrower, as applicable, set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, renewal or extension of such Letter of Credit, as applicable, except that (i) for purposes of this Section, the representations and warranties contained in Section 3.04(a) shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b) (subject, in the case of unaudited financial statements furnished pursuant to clause (b), to year-end audit adjustments and the absence of footnotes), respectively, of Section 5.01, (ii) to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date and (iii) to the extent that such representations and warranties are already qualified or modified by materiality in the text thereof, they shall be true and correct in all respects; and

(b)        At the time of and immediately after giving effect on a Pro Forma Basis to such Borrowing or the issuance, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

94

(c)        At the time of and immediately after giving effect on a Pro Forma Basis to such Borrowing or the issuance of such Letter of Credit, as applicable, the Borrower shall be in compliance with Section 6.10(i)(x).

Each Borrowing and each issuance, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower that the conditions specified in paragraphs (a) and (b) of this Section have been satisfied as of the date thereof.

## ARTICLE 5
## AFFIRMATIVE COVENANTS

Until each of (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Loan and all other Obligations hereunder (including unreimbursed LC Disbursements, but excluding contingent obligations as to which no claim has been asserted) shall have been paid in full or otherwise satisfied, and (iii) all Letters of Credit shall have (x) expired or terminated, in each case, without any pending draw, (y) been backstopped or Cash Collateralized in an amount not less than the Minimum Collateral Amount or (z) been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank, the Parent and the Borrower, as applicable, covenant and agree with the Lenders that:

Section 5.01        Financial Statements; Ratings Change and Other Information. The Parent will furnish to the Administrative Agent (for distribution to each Lender):

(a)        on or before the date on which such financial statements are required to be filed with the SEC after the end of each fiscal year of the Parent (or, if such financial statements are not required to be filed with the SEC, within 120 days after the end of each fiscal year of the Parent), its audited consolidated balance sheet and related consolidated statements of operations and comprehensive income (loss), changes in stockholders' equity, and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception (other than a qualification related to the maturity of the Commitments and the Loans at the Maturity Date or upcoming maturity date under any other Indebtedness occurring within one year from the time such report is delivered or potential inability to satisfy a financial covenant under this Agreement or other Indebtedness) and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

95

(b)        on or before the date on which such financial statements are required to be filed with the SEC after the end of each of the first three fiscal quarters of each fiscal year of the Parent (or, if such financial statements are not required to be filed with the SEC, within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent), its consolidated balance sheets and related consolidated statements of operations and comprehensive income (loss), changes in stockholders' equity, and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Parent and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)        concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower in substantially the form of Exhibit F attached hereto (i) certifying as to whether a Default has occurred and is continuing as of the date thereof and, if a Default has occurred and is continuing as of the date thereof, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) demonstrating compliance with Section 6.10, (iii) if and to the extent that any change in GAAP that has occurred since the date of the audited financial statements referred to in Section 3.04 had an impact on such financial statements, specifying the effect of such change on the financial statements accompanying such certificate and (iv) setting forth a list of any issued patents, registered trademarks or registered copyrights acquired by the Parent and its Subsidiaries since the Effective Date or the date of the most recent certificate delivered pursuant to this Section 5.01(c) prior to the date thereof, as applicable, which Intellectual Property (including any applications therefor) was not included in the Collateral as of the Effective Date or date of such certificate, as applicable;

(d)        promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent or any Subsidiary with the SEC or any Governmental Authority succeeding to any or all of the functions of said Commission under Section 13 or 15(d) of the Securities Exchange Act of 1934, as the case may be, in each case that is not otherwise required to be delivered to the Administrative Agent pursuant hereto; and

(e)        promptly following any reasonable request in writing (including any electronic message) therefor, (i) such other information regarding the operations, business affairs and financial condition of the Parent or any Subsidiary, or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Beneficial Ownership Regulation, provided that, notwithstanding the foregoing, none of the Parent or any of its Subsidiaries shall be required to disclose any document, information or other matter that (A) constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable law or any third party contract legally binding on the Parent or its Subsidiaries or (C) is subject to attorney, client or similar privilege or constitutes attorney work-product.

96

Information required to be delivered pursuant to Section 5.01(a) or Section 5.01(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such information is posted on the Borrower's or the Parent's behalf on an Internet or intranet website, if any, to which the Lenders and the Administrative Agent have been granted access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

Notwithstanding the foregoing, the obligations in Section 5.01(a) or Section 5.01(b) may be satisfied by furnishing (A) the applicable financial statements or other information required by such clauses of Parent (or any other parent company) or (B) the Parent's or the Borrower's (or any other parent company), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC or any securities exchange, in each case, within the time periods specified in such paragraphs; provided that, with respect to each of clauses (A) and (B), upon reasonable request by the Administrative Agent, (i) to the extent such financial statements are delivered under Section 5.01(a) or Section 5.01(b) and relate to the Parent, such financial statements shall be accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Parent, on the one hand, and the information relating to the Borrower on a standalone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of the Borrower as having been fairly presented and (ii) to the extent such statements are in lieu of statements required to be provided under Section 5.01(a), such statements shall be accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall satisfy the applicable requirements set forth in Section 5.01(a).

Section 5.02    Notices of Material Events. The Borrower will furnish to the Administrative Agent (for distribution to each Lender) prompt written notice of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Parent or any of its Subsidiary thereof that would reasonably be expected to result in a Material Adverse Effect; and

(c)    any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

97

Section 5.03        Existence; Conduct of Business. The Parent will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence in its jurisdiction of organization and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that (i) the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03 and (ii) none of the Parent or any of its Subsidiaries shall be required to preserve, renew or keep in full force and effect its rights, licenses, permits, privileges or franchises where failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 5.04        Payment of Taxes. The Parent will, and will cause each of its Subsidiaries to, pay all Tax liabilities, including all Taxes imposed upon it or upon its income or profits or upon any properties belonging to it that, if not paid, would reasonably be expected to result in a Material Adverse Effect, before the same shall become delinquent or in default, and all lawful claims other than Tax liabilities that, if unpaid, would become a Lien upon any properties of the Parent or any of its Subsidiaries not otherwise permitted under Section 6.02, in both cases except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and (b) to the extent required by GAAP, the Parent or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

Section 5.05        Maintenance of Properties; Protection of Intellectual Property; Insurance. The Parent will, and will cause each of its Subsidiaries to, (a) keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear and casualty events excepted, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect, (b) preserve, renew and maintain in full force and effect all rights, licenses, intellectual property, copyright, trademarks, trade names, patents, domain names, permits, privileges, authorizations and other rights necessary for the conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect and (c) maintain insurance with financially sound and reputable insurance companies in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses or owning assets in the general areas in which the Borrower and its Subsidiaries operate.

Section 5.06        Maintenance of Material Agreements. The Parent will, and will cause each of its Subsidiaries to maintain in full force and effect the agreements listed on Schedule 5.06 hereto, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 5.07        Books and Records; Inspection Rights. The Parent will, and will cause each of its Subsidiaries to, keep proper books of record and account in which entries full, true and correct in all material respects are made and are sufficient to prepare financial statements in accordance with GAAP. The Parent will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender (pursuant to the request made through the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records to the extent reasonably necessary, and to discuss its affairs, finances and condition with its officers and independent accountants (provided that the Parent or such Subsidiary shall be afforded the opportunity to participate in any discussions with such independent accountants), all at such reasonable times and as often as reasonably requested (but no more than once annually if no Event of Default exists). Notwithstanding anything to the contrary in this Section, none of the Parent or any of its Subsidiaries shall be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by applicable law or any third party contract legally binding on the Parent or its Subsidiaries or (iii) is subject to attorney, client or similar privilege or constitutes attorney work-product.

98

Section 5.08    ERISA Events. The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect.

Section 5.09    Compliance with Laws and Agreements. The Parent will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and rights and all indentures, agreements, and other instruments binding upon it or its property and rights, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. The Parent will maintain in effect and enforce policies and procedures designed to ensure compliance by the Parent, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, Anti-Terrorism Laws and applicable Sanctions.

Section 5.10    Use of Proceeds. The proceeds of the Loans and Letters of Credit will be used only for working capital and general corporate purposes, including, without limitation, for stock repurchases under stock repurchase programs approved by the Borrower and for acquisitions not prohibited hereunder. No part of the proceeds of any Loan or Letter of Credit will be used, whether directly or indirectly, to purchase or carry margin stock (within the meaning of Regulations U and X of the Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

Section 5.11    Guarantors; Additional Collateral.

(a)    If, as of the date of the most recently available financial statements delivered pursuant to Section 5.01(a) or (b), as the case may be, any Person shall have become (1) a Domestic Subsidiary (other than an Excluded Subsidiary), then the Parent or the Borrower, as applicable, shall, within 60 days (or such longer period of time as the Administrative Agent may agree in its reasonable discretion) after delivery of such financial statements, cause such Domestic Subsidiary to (i) enter into a guaranty supplement in the form of Exhibit E hereto to become a Guarantor under this Agreement and (ii) (A) enter into a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent to the Security Agreement and (B) take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected first priority security interest (subject to Liens permitted by Section 6.02) in the Collateral described in the Security Agreement with respect to such Domestic Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions, and filings with the United States Patent and Trademark Office and United States Copyright Office, as may be required by the Security Agreement or as may be reasonably requested by the Administrative Agent and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions consistent with the legal opinions delivered on the Effective Date, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and/or (2) a foreign Subsidiary (other than an Excluded Subsidiary) and such foreign Subsidiary has been designated as a "Foreign Guarantor" by the Borrower, then the Parent or the Borrower, as applicable, shall, within 60 days (or such longer period of time as the Administrative Agent may agree in its reasonable discretion) after delivery of such financial statements, cause such foreign Subsidiary to take all actions necessary to (i) ensure that the Administrative Agent shall have a valid, perfected and enforceable security interest in its assets in accordance with the Agreed Security Principles, (ii) cause such foreign Subsidiary to enter into a guaranty supplement in the form of Exhibit E hereto or otherwise reasonably satisfactory to the Administrative Agent and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions consistent with the legal opinions delivered on the Effective Date, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent; provided that the Parent and its Subsidiaries shall not be required to take any action under this Section 5.11(a) if prior to the end of such 60 day period (or such longer period of time as the Administrative Agent may agree in its sole discretion) such Person becomes an Excluded Subsidiary as a result of a transfer of assets from such Person to the Borrower in a transaction or transactions permitted under this Agreement;

99

(b)        If, as of the date of the most recently available financial statements delivered pursuant to Section 5.01(a) or (b), as the case may be, any foreign Subsidiary (not including any such foreign Subsidiary that becomes a Guarantor as provided for in Section 5.11(a)(2)) that is a direct Subsidiary of any Loan Party shall have been created or acquired after the Effective Date by any Loan Party, the Parent or Borrower, as applicable, will, or will cause the applicable Guarantor to, except to the extent the Equity Interests in such foreign Subsidiary constitute Excluded Securities, within 60 days (or such longer period of time as the Administrative Agent may agree in its sole discretion) after delivery of such financial statements, (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest (subject to Liens permitted by Section 6.02) in 65% of the total outstanding voting Equity Interests of any such foreign Subsidiary, (ii) deliver to the Administrative Agent any certificates representing such Equity Interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Loan Party, and take such other action as may be necessary or, in the opinion of the Administrative Agent, reasonably required to perfect the Administrative Agent's security interest therein, and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)        If, as of the date of the most recently available financial statements delivered pursuant to Section 5.01(a) or (b), as the case may be, any property shall be acquired by any Loan Party (other than (x) any property described in paragraphs (a) or (b) above or paragraph (d) below and (y) any property subject to a Lien expressly permitted by Section 6.02) as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien, to the extent required by the Security Documents, the Parent or the Borrower, as applicable, will, or will cause the applicable Loan Party to, within 60 days (or such longer period of time as the Administrative Agent may agree in its sole discretion) after the delivery of such financial statements (i) execute and deliver to the Administrative Agent such amendments to the applicable Security Documents or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements (or similar filings under applicable law) in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Administrative Agent, in each case subject to Section 5.11(e).

100

(d)        If, as of the date of the most recently available financial statements delivered pursuant to Section 5.01(a) or (b), as the case may be, any fee interest in any real property having a value (together with improvements thereof) of at least $2,500,000 shall be acquired by any Loan Party (other than any such real property subject to a Lien expressly permitted by Section 6.02), the Parent or the Borrower, as applicable, will, or will cause the applicable Loan Party to, within 60 days (or such longer period of time as the Administrative Agent may agree in its sole discretion) after the delivery of such financial statements (i) execute and deliver a first priority mortgage, in favor of the Administrative Agent, for the benefit of the Lenders, covering such real property, (ii) if reasonably requested by the Administrative Agent, provide the Lenders with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably satisfactory to the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary by the Administrative Agent in connection with such mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(e)        Notwithstanding the foregoing or anything to the contrary in this Agreement, none of the Parent or its Subsidiaries shall be required to take any action to create or perfect any security interest in the Collateral (including the registration of Intellectual Property in, and the execution of any agreement, document or other instrument governed by the law of, and the filing of any agreement, document or other instrument) in any jurisdiction other than (i) the United States, any State thereof or the District of Columbia or (ii) the jurisdiction of organization or incorporation of any Foreign Guarantor. In addition, in no event shall (i) any landlord, mortgagee and bailee waivers be required, or (ii) notices be required to be sent to account debtors or other contractual third parties absent an Event of Default.

Section 5.12    Cash Management. The Parent shall, and shall cause each other U.S. Loan Party to, maintain all cash management and treasury business with the Lenders or Permitted Third Party Banks, including, without limitation, all deposit accounts, disbursement accounts, investment accounts and lockbox accounts which, as of the Effective Date, are specified in Schedule 4.2 of the Security Agreement (other than any Unrestricted Account) (each such deposit account, disbursement account, investment account and lockbox account, a "**Controlled Account**"); provided that within ninety (90) days following the Effective Date (or, if any such Controlled Account is opened after the Effective Date, within ninety (90) days after such account is opened) (or such later time as may be agreed by the Administrative Agent in its reasonable discretion), each such Controlled Account shall be subject to a Control Account Agreement.

101

Section 5.13    <u>Further Assurances</u>. Promptly upon the reasonable request by the Administrative Agent, the Borrower will (a) correct any error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) perfect and maintain the validity, effectiveness and priority of any of the Security Documents and any of the Liens created thereunder and (ii) assure, preserve, protect and confirm more effectively unto the Lenders, or the Administrative Agent for the benefit of the Lenders, the rights granted to the Lenders, or the Administrative Agent for the benefit of the Lenders, under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party.

Section 5.14    <u>Accuracy of Information</u>. The Borrower will ensure that any information, including financial statements or other documents, furnished to the Administrative Agent or the Lenders in connection with this Agreement or any amendment or modification hereof or waiver hereunder contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading.

**ARTICLE 6**
**NEGATIVE COVENANTS**

Until each of (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Loan and all other Obligations hereunder (including unreimbursed LC Disbursements, but excluding contingent obligations as to which no claim has been asserted) shall have been paid in full or otherwise satisfied, and (iii) all Letters of Credit shall have (x) expired or terminated, in each case, without any pending draw, (y) been backstopped or Cash Collateralized in an amount not less than the Minimum Collateral Amount or (z) been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank, the Parent and the Borrower, as applicable, covenant and agree with the Lenders that:

Section 6.01    <u>Indebtedness</u>. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness other than:

(a)        Indebtedness existing on the date hereof and set forth in <u>Schedule 6.01</u> and any Permitted Refinancing thereof;

(b)        (i) Indebtedness of the Borrower owing to any Subsidiary and of any Subsidiary owing to the Borrower or any other Subsidiary; <u>provided</u> that such Indebtedness is permitted by <u>Section 6.04</u> and (ii) Indebtedness of the Borrower owing to Parent;

102

(c)         Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of the Borrower or any other Subsidiary; provided that such Guarantees are permitted by Section 6.04;

(d)         Indebtedness of the Borrower or any Subsidiary constituting Capital Lease Obligations and Purchase Money Indebtedness; provided that the aggregate principal amount of Indebtedness pursuant to this clause (d) shall not exceed in an aggregate principal amount at any time outstanding the greater of (i) $17,500,000 and (ii) 2.5% of the Total Assets at any time outstanding;

(e)         Indebtedness of the Borrower or any Subsidiary in an aggregate principal amount at any time outstanding not to exceed the greater of (i) $69,500,000 and (ii) 10% of the Total Assets at any time outstanding; provided that such Indebtedness is (x) if incurred or guaranteed only by Loan Parties, is either unsecured or secured by a Lien permitted pursuant to Section 6.02(o), and (y) if incurred or guaranteed by any Subsidiary that is not a Guarantor, the aggregate principal amount thereof shall not exceed the greater of (i) $10,500,000 and (ii) 1.5% of the Total Assets at any time outstanding;

(f)         Indebtedness of the Borrower or any Subsidiary so long as the Consolidated Leverage Ratio does not exceed 2.50:1.00 after giving Pro Forma Effect thereto; provided that any Indebtedness incurred or guaranteed pursuant to this clause (f) (i) is incurred or guaranteed solely by Loan Parties, (ii) is unsecured, (iii) shall not mature prior to the Maturity Date, (iv) either (x) shall not require any payment of principal prior to the Maturity Date or (y) shall not require payments of principal in an aggregate amount *per annum* in excess of 1.0% of the principal amount thereof and (v) contains terms customary for similar issuances of Indebtedness at such time (as determined in good faith by the Borrower) (it being understood that, other than in the case of any issuance of a debt security, such terms shall be no more restrictive, taken as a whole (as determined in good faith by the Borrower), than the Loans, and in any event no such Indebtedness (including any debt securities) shall contain a financial maintenance covenant more restrictive than any financial maintenance covenant contained herein));

(g)         unsecured Indebtedness of the Borrower or any Subsidiary in an aggregate principal amount not to exceed the greater of (i) $17,500,000 and (ii) 2.5% of the Total Assets at any time outstanding;

(h)         Indebtedness of Subsidiaries that are not Loan Parties in an aggregate principal amount not to exceed the greater of (i) $8,750,000 and (ii) 1.25% of the Total Assets at any time outstanding;

(i)         Indebtedness incurred pursuant to any agreement or arrangement to provide ordinary course facilities or services related to cash management, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements;

(j)         Obligations under the Loan Documents;

103

(k)        Indebtedness incurred under the Citi Supplier Financing Agreement, only to the extent (i) such agreement pertains to ordinary course supplier financing arrangements and (ii) the aggregate principal amount of Indebtedness outstanding thereunder does not exceed $200.0 million at any time; provided, however, that (I) the Borrower shall be in compliance with Section 6.10 on a Pro Forma Basis on each date that it incurs Indebtedness under the Citi Supplier Financing Agreement that results in the outstanding amount thereunder exceeding $100.0 million (such excess amount, the "Supplier Financing Excess Amount"), it being understood and agreed that solely for the purposes of such pro forma calculation the amount of "Total Liquidity" shall be deemed reduced by the Supplier Financing Excess Amount then outstanding and (II) the Supplier Financing Excess Amount outstanding during any fiscal quarter of the Parent shall not be greater than (x) $25.0 million plus (y) the highest Supplier Financing Excess Amount that was outstanding in compliance with this Section 6.01(k) during the immediately preceding fiscal quarter of the Parent;

(l)        Indebtedness of the Borrower or any Subsidiary in connection with one or more letters of credit, bankers' acceptances, worker's compensation claims, surety bonds, appeal bonds, performance bonds or completion guarantees issued in the ordinary course of business or pursuant to self-insurance and similar obligations and not in connection with the borrowing of money or the obtaining of advances or credit;

(m)        Subject to the Borrower being in compliance with Section 6.10 on a Pro Forma Basis, (i) Indebtedness of any Person acquired by, or merged into or consolidated or amalgamated with, the Borrower or any Subsidiary after the Effective Date as part of an Investment otherwise permitted by Section 6.04 (provided that such Indebtedness exists at the time such Person becomes a Subsidiary and is not created in contemplation of, or in connection with, such Person becoming a Subsidiary); and (ii) any Permitted Refinancing thereof;

(n)        obligations under Swap Agreements entered into by the Borrower or its Subsidiaries not for speculative purposes;

(o)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business;

(p)        Indebtedness arising from agreements of the Borrower or any Subsidiary providing for deferred purchase price for goods or services, earnouts, indemnification, adjustment of purchase price, seller notes or similar obligations, in each case, incurred or assumed in connection with the acquisition or Disposition of any business, assets or Person otherwise permitted by this Agreement;

(q)        Indebtedness consisting of the financing of insurance premiums or take-or-pay obligations contained in supply arrangements; and

(r)        Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower or any Subsidiary incurred in the ordinary course of business.

Notwithstanding the foregoing, any Indebtedness owed by a Loan Party to a Subsidiary that is not a Loan Party shall be permitted only to the extent subordinated to the Obligations on customary terms reasonably satisfactory to the Administrative Agent.

104

Section 6.02    Liens. The Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it except:

(a)    Permitted Encumbrances;

(b)    any Lien on any property or asset of the Borrower or any Subsidiary existing on the Effective Date and set forth in Schedule 6.02 and any modifications, renewals and extensions thereof and any Lien granted as a replacement or substitute therefor; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or any Subsidiary other than improvements thereon or proceeds thereof and (ii) such Lien shall secure only those obligations which it secures on the Effective Date and any refinancing, extension, renewal or replacement thereof that does not increase the outstanding principal amount thereof except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing, extensions, renewals or replacements;

(c)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Effective Date prior to the time such Person becomes a Subsidiary; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of the Borrower or any Subsidiary and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be, and any Permitted Refinancing thereof;

(d)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such security interests secure Indebtedness that is permitted by Section 6.01(d), (ii) such security interests and the Indebtedness secured thereby are initially incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement and (iii) such security interests shall not apply to any other property or assets of the Borrower or any Subsidiary other than the property financed by such Indebtedness and any additions, accessions, parts, attachments or improvements thereon or proceeds and products hereof and customary security deposits and related property; provided that individual financings provided by one lender may be cross-collateralized to other financings provided by such lender;

(e)    licenses, sublicenses, leases or subleases granted to others in the ordinary course of business not interfering in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole;

(f)    the interest and title of a lessor under any lease or sublease entered into by the Borrower or any Subsidiary in the ordinary course of its business and other statutory and common law landlords' Liens under leases;

(g)    the rights reserved or vested in any Person (including any Governmental Authority) by the terms of any lease, sublease, license, or sublicense held by the Parent or any of its Subsidiaries or by a statutory provision, to terminate any such lease, sublease, license, or sublicense, or to require annual or periodic payments as a condition to the continuance thereof;

105

(h)        the interests of licensors and sublicensors under license and sublicense agreements;

(i)        in connection with the sale or transfer of any assets in a transaction not prohibited hereunder, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof;

(j)        Liens securing Indebtedness to finance insurance premiums owing in the ordinary course of business to the extent such financing is not prohibited hereunder;

(k)        Liens on earnest money deposits of cash or cash equivalents made in connection with any acquisition not prohibited hereunder;

(l)        bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the banks, securities intermediaries or other depository institutions with which such accounts are maintained, securing amounts owing to such institutions with respect to cash management and operating account arrangements;

(m)        Liens in the nature of the right of setoff in favor of counterparties to contractual agreements not otherwise prohibited hereunder with the Borrower or any of its Subsidiaries in the ordinary course of business;

(n)        Liens created pursuant to the Security Documents;

(o)        other Liens securing obligations in an aggregate amount at any time outstanding not to exceed the greater of (i) $69,500,000 and (ii) 10% of the Total Assets at any time outstanding; provided that (A) any such Liens on the Collateral shall be subordinated to the Liens of the Administrative Agent under the Security Documents pursuant to a customary intercreditor agreement that is reasonably acceptable to the Administrative Agent and (B) any such Liens on assets that are not Collateral shall secure obligations in an aggregate amount at any time not to exceed the greater of (x) $10,500,000 and (ii) 1.50% of the Total Assets at any time outstanding;

(p)        Liens on assets of Excluded Subsidiaries securing Indebtedness incurred by Excluded Subsidiaries; provided that such security interests secure Indebtedness that is permitted by Section 6.01;

(q)        any customary encumbrance or restriction (including put and call arrangements) with respect to capital stock of any joint venture or similar customary arrangement pursuant to any joint venture or similar agreement;

(r)        Liens on Equity Interests not required to be pledged pursuant hereto;

106

(s)        rights reserved to or vested in any Governmental Authority to control or regulate, or obligations or duties to any Governmental Authority with respect to (i) the use of any real property or vessel, or (ii) any right, power, franchise, grant, license, or permit, including present or future zoning laws, building codes and ordinances, zoning restrictions, or other laws and ordinances restricting the occupancy, use, or enjoyment of real property or vessel;

(t)        Liens on assets of a Person existing at the time such Person is acquired or merged with or into or consolidated with the Borrower or any Subsidiary (and not created in connection with or in anticipation or contemplation thereof); provided, however, that such Liens do not extend to assets not subject to such Liens at the time of acquisition (other than improvements and attachments thereon, accessions thereto and proceeds thereof

(u)        Liens ratably secured by the Collateral in favor of counterparties to Swap Agreements permitted under Section 6.01(n);

(v)        Liens securing Indebtedness incurred pursuant to Section 6.01(c);

(w)        Liens on cash and Cash Equivalents (and on the related escrow accounts or similar accounts, if any) required to be paid to the lessors (or lenders to such lessors) under leases or maintained in an escrow account or similar account pending application of such proceeds in accordance with the applicable lease;

(x)        Liens encumbering deposits made to secure obligations arising from statutory or regulatory requirements of that Person or its Subsidiaries;

(y)        any encumbrance or restriction (including put and call arrangements) with respect to the Equity Interests of any joint venture or similar arrangement pursuant to any joint venture or similar agreement; and

(z)        Liens securing Indebtedness permitted under Section 6.01(l) (i) on cash collateral or (ii) arising from a backstop letter of credit arrangement.

Section 6.03        Fundamental Changes.

(a)        The Borrower will not, and will not permit any Subsidiary to, (x) merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, (y) otherwise Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or all or substantially all of the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or (z) liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing:

(i)        any Subsidiary or any other Person (except the Parent) may merge into or consolidate with the Borrower in a transaction in which the Borrower is the surviving corporation;

(ii)        any Person (other than the Borrower or the Parent) may merge into or consolidate with any Subsidiary in a transaction in which the surviving entity is a Subsidiary (provided that any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity or the surviving entity becoming a Guarantor as part of the transaction);

107

(iii)        any Excluded Subsidiary may Dispose of its assets to any Loan Party (other than the Parent) or to any other Excluded Subsidiary;

(iv)        any Loan Party may Dispose of its assets to any other Loan Party (other than the Parent);

(v)        in connection with any Investment permitted under Section 6.04, any Loan Party may merge into or consolidate with any other Person (other than the Parent), so long as the Person surviving such merger or consolidation shall be a Loan Party (provided that (x) any such merger or consolidation involving a Guarantor must result in a Guarantor as the surviving entity or the surviving entity becoming a Guarantor as part of the transaction and (y) any such merger or consolidation involving the Borrower must result in the Borrower as the surviving entity);

(vi)        subject to compliance with Section 6.04(d), any Loan Party may Dispose of its assets in order to effect any Investment permitted under Section 6.04(d); and

(vii)        any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; and any Subsidiary may consummate a Division as the Dividing Person if, immediately upon the consummation of the Division, all the assets of the applicable Dividing Person are held by one or more Subsidiaries at such time; provided that, if the applicable Dividing Person is a Loan Party, all of the assets of such Dividing Person shall be held by one or more Loan Parties at such time;

provided that any such any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)        The Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any material line of business substantially different from those lines of businesses conducted or proposed to be conducted by the Borrower and its Subsidiaries on the Effective Date and businesses substantially related or incidental thereto.

Section 6.04        Investments, Loans, Advances, Guarantees and Acquisitions. The Borrower will not, and will not permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (the foregoing activities are collectively referred to herein as "Investments"), except:

108

(a)        Investments in cash and Cash Equivalents;

(b)        (i) Investments by the Borrower existing on the date hereof in the capital stock of its Subsidiaries; and (ii) Investments in existence, contemplated or made pursuant to binding commitments in effect on the Effective Date and identified on Schedule 6.04(b)(ii);

(c)        (i) Investments made by the Borrower or any Subsidiary, in the Borrower or any other Subsidiary that is a Loan Party; and (ii) Investments by Excluded Subsidiaries in other Excluded Subsidiaries;

(d)        Investments made by the Borrower in any Excluded Subsidiary, or by any Subsidiary that is a Loan Party in any Excluded Subsidiary, provided that the aggregate amount of such Investments shall not exceed the greater of (i) $24,500,000 and (ii) 3.5% of the Total Assets at any time outstanding;

(e)        Investments in an aggregate amount at any time outstanding not to exceed the greater of (i) $10,500,000 and (ii) 1.5% of the Total Assets at any time outstanding;

(f)        [reserved];

(g)        Investments received in settlement of debts, claims or disputes owed to the Borrower or any Subsidiary that arose out of transactions in the ordinary course of business;

(h)        advances and extensions of credit in the nature of accounts receivable arising from the sale or lease of goods or services or the licensing of property in the ordinary course of business;

(i)        Investments made by the Borrower or any Subsidiary in the Parent to the extent permitted to be made as a Restricted Payment by Section 6.05;

(j)        Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements, drag-along rights, put rights, call rights or similar arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(k)        Investments among Loan Parties and their Subsidiaries pursuant to any agreement or arrangement to provide ordinary course facilities or services related to cash management, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements;

(l)        Guarantees constituting Indebtedness permitted by Section 6.01;

(m)        so long as no Default or Event of Default then exists or would result therefrom, the Borrower may make Investments (except in the Parent) and other acquisitions if the Borrower is in compliance with Section 6.10 on a Pro Forma Basis after giving effect to such Investment or acquisition;

(n)        Investments funded with (i) Equity Interests of the Parent (or any parent company thereof) or the Borrower or (ii) net cash proceeds from (x) the issuance of the Equity Interests of the Parent (or any parent company thereof) and contributed as common equity to the Borrower or (y) the issuance of the Equity Interests of the Borrower;

109

(o)        Investments consisting of the licensing, sublicensing or contribution of any Intellectual Property pursuant to joint marketing, collaboration or other similar arrangements with other Persons;

(p)        advances up to an aggregate principal amount of $500,000 per year to officers, directors and employees of the Borrower and its Subsidiaries for travel, entertainment, relocation and analogous ordinary business purposes;

(q)        purchases or redemption of the Parent's or the Borrower's Equity Interests to the extent permitted by Section 6.05;

(r)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss (including in connection with the bankruptcy or reorganization of such account debtors);

(s)        capital expenditures and Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property in the ordinary course of business;

(t)        Investments representing all or a portion of the sales price for property sold to another Person;

(u)        any Investment made in lieu of payment of a Tax or in consideration of a reduction in Tax;

(v)        Investments of a Person existing at the time such Person is acquired, becomes a Subsidiary or is amalgamated, merged or consolidated with or into the Borrower or any Subsidiary after the Effective Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, designation, redesignation, amalgamation, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(w)        Investments resulting from pledges and deposits under clauses (c), (d), (e), (l) and (n) of Permitted Encumbrances and Sections 6.02(u), (w) and (x);

(x)        Investments constituting non-cash consideration for Dispositions permitted under Section 6.09;

(y)        Investments in connection with Swap Agreements permitted under Section 6.01; and

(z)        to the extent constituting Investments, transactions permitted under Section 6.03.

110

For purposes of this <u>Section 6.04</u>, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment, but, except to the extent the Borrower shall otherwise elect, deducted by the amount of any repayment, interest, return, profit, distribution, income or similar amount in respect of such Investment which has actually been received in cash or Cash Equivalents or has been converted into cash or Cash Equivalents.

Section 6.05    <u>Restricted Payments</u>. The Borrower will not, and will not permit any of its Subsidiaries to, declare or make any Restricted Payments with respect to the Borrower or any of its Subsidiaries, except:

(i)    (A) any Subsidiary of the Borrower may make Restricted Payments to the Borrower or to any direct or indirect wholly-owned Subsidiary of the Borrower that is a Loan Party, and (B) any non-wholly-owned Subsidiary may make Restricted Payments to the Borrower or any of its other Subsidiaries that are Loan Parties and to each other owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests of the relevant class of Equity Interests;

(ii)    the Borrower may declare and make dividends payable solely in the form of additional shares of the Borrower's or the Parent's Equity Interests;

(iii)    the Borrower may repurchase fractional shares of its Equity Interests (or Equity Interests of the Parent) arising out of stock dividends, splits or combinations, business combinations or conversions of convertible securities or, so long as no Default or Event of Default then exists or would result therefrom, make cash settlement payments upon the exercise of warrants to purchase its Equity Interests (or Equity Interests of the Parent), or "net exercise" or "net share settle" warrants;

(iv)    the Borrower may redeem or otherwise cancel Equity Interests or rights in respect thereof granted to (or make payments on behalf of) directors, officers, employees or other providers of services to the Parent, the Borrower and the Subsidiaries in an amount required to satisfy tax withholding obligations relating to the vesting, settlement or exercise of such Equity Interests or rights;

(v)    the Borrower may make any Restricted Payment that has been declared by the Parent or the Borrower, so long as (A) such Restricted Payment would be otherwise permitted under clause (ix) of this <u>Section 6.05</u> at the time so declared (and shall be deemed to be a utilization of such capacity from and after such time) and (B) such Restricted Payment is made within 60 days of such declaration;

(vi)    the Borrower may make any repurchase (or deemed repurchase) of Equity Interests pursuant to any accelerated stock repurchase or similar agreement (each, an "**ASR Agreement**") publicly announced by the Parent or the Borrower and specifying the maximum aggregate amount of the stock to be repurchased pursuant to such ASR Agreement (the "**Maximum ASR Amount**"); <u>provided</u> that, at the time such ASR Agreement is publicly announced, the Borrower would be in compliance with <u>Section 6.10</u> immediately after giving Pro Forma Effect to the Maximum ASR Amount;

111

(vii)    the Borrower may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans or agreements for directors, management, employees or other eligible service providers of the Borrower, the Parent or its Subsidiaries, including the repurchase of Equity Interests or rights in respect thereof granted to directors, management, employees or other eligible service providers of the Borrower or its Subsidiaries pursuant to a right of repurchase set forth in any such stock option plans or other benefit plans or agreements in connection with a cessation of service;

(viii)    so long as no Default or Event of Default then exists or would result therefrom, the Borrower may make Restricted Payments not otherwise permitted under this Section 6.05 in an amount not to exceed the amount of proceeds of any substantially concurrent issuance of Equity Interests of the Parent (or any parent company thereof) which have been contributed as common equity to the Borrower or of any substantially concurrent issuance of Equity Interests of the Borrower;

(ix)    so long as no Default or Event of Default then exists or would result therefrom, the Borrower may make Restricted Payments not otherwise permitted under this Section 6.05 in an unlimited amount (a) if, prior to the Trigger Date, Total Liquidity immediately after giving Pro Forma Effect to such Restricted Payment is equal to or greater than $600,000,000 or (b) if, on or after the Trigger Date, the Consolidated Leverage Ratio immediately after giving Pro Forma Effect to such Restricted Payment is less than or equal to 2.00:1.00; and

(x)    the Borrower may make and pay Restricted Payments to the Parent (and in the cases of clauses (A) and (B), to the other equity owners of the Borrower):

(A)    (1) with respect to any taxable period (x) for which the Borrower and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar income tax group for U.S. federal and/or applicable state or local income Tax purposes of which the Parent or any holding company of the Parent is the common parent, or (y) for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local income Tax purposes, in an amount not to exceed the amount of any U.S. federal, state and/or local income Taxes that the Borrower and/or its Subsidiaries, as applicable, would have paid for such taxable period had the Borrower and/or its Subsidiaries, as applicable, been a stand-alone corporate taxpayer or a stand-alone corporate group and (2) such amounts as are needed to pay any amounts owed by the Parent under the Tax Receivable Agreement but which shall not include any amounts required to be paid due to a change of control or any early termination payments; provided that distributions pursuant to clause (A)(1) in respect of an Excluded Subsidiary shall be permitted only to the extent that cash distributions were made by such Excluded Subsidiary to the Borrower or any other Subsidiary that is a Loan Party for such purpose;

112

(B)        (1) with respect to any taxable period ending after the Effective Date for which the Borrower is a partnership or disregarded entity for U.S. federal income Tax purposes (other than a partnership or disregarded entity described in clause (x)(A)(1)(y) above), distributions to its owners in amounts not to exceed (x) the taxable income of the Borrower and its Subsidiaries for such fiscal year (as determined based on such assumptions as may be made by the managing member (or equivalent governing body) of Borrower, including, without limitation, not taking into account for this purpose for any such taxable period any adjustments under Sections 743(b) of the Code), multiplied by (y) the highest combined federal, state and local tax rates applicable to the income of individuals or corporations, resident of New York, New York, whichever is higher and (2) if payments to the Parent pursuant to the foregoing clause (1) are not sufficient for the Parent to pay its income tax liabilities and also the amounts owed by the Parent under the Tax Receivable Agreement, such additional amounts as are needed to pay any amounts owed by the Parent under the Tax Receivable Agreement but which shall not include any amounts required to be paid due to a change of control or any early termination payments; provided that no payment may be made pursuant to both this subclause (B) and subclause (A) of this clause (x) with respect to any period ;

(C)        the proceeds of which shall be used to allow the Parent to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and other professional costs and expenses) to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(D)        [intentionally omitted];

(E)        the proceeds of which shall be used to allow the Parent to pay fees and expenses related to any equity issuance or offering or debt issuance, incurrence or offering, Disposition or acquisition or investment transaction permitted by this Agreement, whether or not consummated;

(F)        the proceeds of which shall be used to pay fees and expenses (including real and personal property Taxes, and franchise, excise or similar taxes) required to maintain its corporate existence or good standing under applicable law, travel expenses, customary salary, bonus, long-term incentive plan awards, severance and other benefits payable to, and indemnities provided on behalf of, directors, officers, members of management, employees and consultants of the Parent, and any payroll, social security or similar taxes thereof, to the extent such fees, expenses, salaries, bonuses, other benefits and indemnities are attributable to the ownership or operation of the Borrower and its Subsidiaries;

(G)        so long as no Default or Event of Default then exists or would result therefrom and subject to the Borrower being in compliance with Section 6.10 immediately after giving Pro Forma Effect to such Restricted Payment, the proceeds of which shall be used to pay interest payments on the Parent Convertible Notes;

(H)        to pay monitoring, consulting, management, transaction, advisory, termination or similar fees relating to the ownership or operations of the Borrower and/or its subsidiaries;

113

(I)         to pay audit and other accounting and reporting expenses at the Parent to the extent relating to the ownership or operations of the Borrower and/or its subsidiaries;

(J)         to pay insurance premiums to the extent relating to the ownership or operations of the Borrower and/or its subsidiaries; and

(K)         the proceeds of which shall be used by the Parent to make payments and consummate other transactions otherwise contemplated to be Restricted Payments permitted to be made by the Borrower for the purposes set forth in this Section 6.05 (and shall be deemed to be a utilization of such capacity from and after such time); and

(xi)         the Borrower may make Restricted Payments in accordance with [Article IX] of the Third Amended and Restated Limited Liability Company Agreement of the Borrower, so long as such Restricted Payments are funded with Equity Interests of the Parent or the proceeds from an issuance of Equity Interests of the Parent to the extent such proceeds were contributed to the Borrower.

Section 6.06      Restrictive Agreements. The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or of any Subsidiary to Guarantee Indebtedness of the Borrower or any other Subsidiary under the Loan Documents; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement or any other Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the Effective Date identified on Schedule 6.06 (and shall apply to any extension or renewal of, or any amendment or modification materially expanding the scope of, any such restrictions or conditions taken as a whole), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or assets of the Borrower or any Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary or assets to be sold and such sale is not prohibited hereunder, (iv) the foregoing shall not apply to any agreement or restriction or condition in effect at the time any Subsidiary becomes a Subsidiary of the Borrower, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of the Borrower, (v) the foregoing shall not apply to customary provisions in joint venture agreements and other similar agreements applicable to joint ventures, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (vii) clause (a) of the foregoing shall not apply to customary provisions in leases, licenses, subleases and sublicenses and other contracts, (viii) the foregoing shall not apply to restrictions or conditions set forth in any agreement governing Indebtedness not prohibited by Section 6.01; provided that such restrictions and conditions are customary for such Indebtedness, and (ix) the foregoing shall not apply to restrictions on cash or other deposits (including escrowed funds) imposed under contracts entered into in the ordinary course of business.

114

Section 6.07    <u>Transactions with Affiliates</u>. The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (other than between or among the Borrower and its Subsidiaries to the extent otherwise permitted hereunder), except (a) on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) payment of customary directors' fees, reasonable out-of-pocket expense reimbursement, indemnities (including the provision of directors and officers insurance) and compensation arrangements for members of the board of directors, officers or other employees of the Borrower or any of its Subsidiaries, (c) transactions approved by a majority of the disinterested directors of the Borrower's board of directors, (d) any transaction involving amounts less than, in the aggregate, the greater of (i) $17,500,000 and (ii) 2.50% of the Total Assets at any time outstanding, (e) any Restricted Payment permitted by <u>Section 6.05</u> and (f) the agreements listed on <u>Schedule 6.07</u> hereto.

Section 6.08    <u>Use of Proceeds</u>. The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.09    <u>Disposition of Property</u>. The Borrower will not, and will not permit any of its Subsidiaries to, Dispose of any of its property, whether now owned or hereafter acquired, in each case, except:

(a)    Dispositions of obsolete or worn out property in the ordinary course of business or property that is no longer used or useful in the Borrower's or its Subsidiaries' business and the leasing or subleasing in the ordinary course of business of owned or leased properties which are excess properties or are no longer used or useful in the Borrower's or its Subsidiaries' businesses;

(b)    the sale of inventory and other assets in the ordinary course of business;

(c)    (i) Dispositions to a Loan Party (other than the Parent), (ii) Dispositions by an Excluded Subsidiary to any other Excluded Subsidiary, and (iii) Dispositions by a Loan Party to an Excluded Subsidiary that are otherwise permitted under <u>Section 6.04</u>;

(d)    (i) Dispositions that constitute Investments that are permitted under <u>Section 6.04</u> and (ii) Dispositions that constitute Restricted Payments that are permitted under <u>Section 6.05</u>;

(e)    [reserved];

(f)    Dispositions permitted by <u>clause (iii)</u>, <u>(iv)</u> or <u>(vi)</u> of <u>Section 6.03(a)</u>;

115

(g)        the grant in the ordinary course of business of any non-exclusive license of patents, trademarks, registrations therefor and other similar intellectual property;

(h)        the lapse, abandonment, or other Dispositions of Intellectual Property of the Parent or any of its Subsidiaries that, in the good faith determination of the Parent or such Subsidiary, is no longer economically desirable to maintain or useful in the conduct of the business of the such Person;

(i)        the sale or issuance of any Subsidiary's Equity Interests to the Borrower or any Guarantor that is a wholly owned Subsidiary;

(j)        the Disposition of other property having a fair market value not to exceed $5,000,000 in the aggregate for each fiscal year of the Parent;

(k)        Dispositions of other property having a fair market value not to exceed $10,000,000 in the aggregate; provided that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Event of Default exists or would result therefrom), no Event of Default then exists or would result from such Disposition, (ii) such Disposition is for fair market value as reasonably determined by the Borrower, and (iii) not less than 75% of the purchase price for the asset or property sold in such Disposition shall be in the form of cash or Cash Equivalents (with (A) any debt secured by such property assumed by the purchaser of such property, (B) any consideration received in the form of Indebtedness that is converted into cash within 90 days after the Disposition of such property, and (C) aggregate non-cash consideration received by the Borrower or applicable Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed in the aggregate the greater of (i) $17,500,000 and (ii) 2.50% of the Total Assets at any time outstanding, in each case deemed to be cash for purposes of this provision);

(l)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements, drag-along rights, put rights, call rights or similar arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(m)        Dispositions, terminations or non-renewals of leases or subleases or licensing or sublicensing agreements (i) the Disposition, termination or non-renewal of which will not materially interfere with the business of the Borrower and their Subsidiaries or (ii) which relate to closed facilities or the discontinuation of any product line to the extent such closing or discontinuation is permitted pursuant to the terms herein, or (iii) is made in the ordinary course of business;

(n)        Dispositions of cash, Cash Equivalents and short-term marketable securities;

(o)        Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

116

(p)        Disposition of receivables in connection with the compromise, settlement or collection thereof; and

(q)        any surrender or waiver of contractual rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind that occur in the ordinary course of the Borrower's or any Subsidiary's business.

Section 6.10      Financial Covenants. The Parent and the Borrower will not, and will not permit any of its respective Subsidiaries to, (i) from the Effective Date until the Trigger Date, (x) permit Total Liquidity to be less than $350,000,000 as of the last day of any fiscal quarter of the Parent or on any date on which any Borrowing of a Loan or issuance of any Letter of Credit is made pursuant to Section 4.02 and (y) permit Total Revenues for any Measurement Period ending on any date set forth below to be less than the amount set forth below opposite such date:

| Date of Determination | Minimum Revenue |
|---|---|
| December 31, 2021 | $ 570,000,000 |
| March 31, 2022 | $ 635,000,000 |
| June 30, 2022 | $ 690,000,000 |
| September 30, 2022 | $ 880,000,000 |
| December 31, 2022 | $ 950,000,000 |
| March 31, 2023 | $ 985,000,000 |
| June 30, 2023 | $ 1,140,000,000 |
| September 30, 2023 | $ 1,185,000,000 |
| December 31, 2023 | $ 1,345,000,000 |
| March 31, 2024 | $ 1,445,000,000 |
| June 30, 2024 | $ 1,675,000,000 |
| September 30, 2024 | $ 1,890,000,000 |
| December 31, 2024 | $ 2,020,000,000 |
| March 31, 2025 | $ 2,100,000,000 |
| June 30, 2025 | $ 2,285,000,000 |

; and

(ii) from and after the Trigger Date, (x) permit the Consolidated Leverage Ratio to exceed 3.50:1.00 and (y) permit the Interest Coverage Ratio to be less than 3.00:1.00, in each case, as of the last day of each Measurement Period.

Section 6.11      Swap Agreements. Neither the Borrower nor any other Guarantor will enter into any Swap Agreement for purely speculative purposes.

Section 6.12      Permitted Activities of Parent. Parent shall not:

(a)        incur any Indebtedness for borrowed money other than (i) Guarantees of Indebtedness or other obligations of the Borrower and/or any Subsidiary, which Indebtedness or other obligations are otherwise permitted hereunder, (ii) Indebtedness owed to the Borrower or any Subsidiary otherwise permitted hereunder and (iii) Parent Convertible Notes, subject to the Parent being in compliance with Section 6.10 immediately after giving Pro Forma Effect to the issuance of any such Parent Convertible Notes;

117

(b)         create or suffer to exist any Lien on any property or asset now owned or hereafter acquired by it other than (i) the Liens created under the Security Documents and (ii) Liens of the type permitted under Section 6.02 (other than in respect of Indebtedness for borrowed money not referred to in clause (a) of this Section 6.12); or

(c)         engage in any material business activity or own any material assets other than (i) holding the Equity Interest of the Borrower, and, indirectly, any other subsidiary of the Borrower (and/or any joint venture of any thereof) or Indebtedness owing by, the Borrower, (ii) performing its obligations under the Loan Documents and other Indebtedness, Liens (including the granting of Liens) and Guarantees permitted hereunder; (iii) issuing its own Equity Interests (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Equity Interest permitted hereunder) and the maintenance and administration of equity subscriptions, stock option and stock ownership plans and activities incidental thereto; (iv) filing tax reports and paying Taxes, including tax distributions made pursuant to Section 6.05(x) and other customary obligations in the ordinary course (and contesting any Taxes); (v) preparing reports to Governmental Authorities and to its shareholders; (vi) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable laws; (vii) effecting any public offering of its Equity Interests; (viii) holding (A) cash, Cash Equivalents and other assets received in connection with permitted distributions or dividends received from, or permitted Investments or permitted Dispositions made by, any of its subsidiaries or permitted contributions to the capital of, or proceeds from the issuance of Equity Interest of, Parent pending the application thereof, or otherwise received and held so long as such other assets are not "operated" and (B) the proceeds of Indebtedness permitted by Section 6.01; (ix) providing indemnification for its officers, directors, members of management, employees and advisors or consultants and other ordinary course obligations; (x) participating in tax, accounting and other administrative matters; (xi) the performance of its obligations under any document, agreement and/or investment contemplated by the Transactions or otherwise not prohibited under this Agreement, including the preparation of financial statements and other reporting obligations required under this Agreement; (xii) complying with applicable laws (including with respect to the maintenance of its corporate existence and activities incidental thereto); (xiii) financing activities, including the receipt and payment of dividends and distributions and the making of certain other Restricted Payments, making contributions to the capital of its Subsidiaries and guaranteeing the obligations of the Borrower and the Borrower's Subsidiaries to the extent permitted hereunder; (xiv) activities incidental to acquisitions permitted hereunder or similar investments consummated by the Borrower and/or any Subsidiaries, including the formation of acquisition vehicle entities and intercompany loans and/or investments incidental to such acquisitions permitted hereunder or similar investments; (xv) the maintenance of its legal existence (including the ability to incur and pay, as applicable, fees, costs and expenses and taxes related to such maintenance); (xvi) any transaction expressly permitted pursuant to clauses (a), (b) and/or (d) of this Section 6.12, (xvii) the obtainment of, and the payment of any fees and expenses for, management, consulting, investment banking and advisory services to the extent otherwise permitted under this Agreement, (xviii) entry into Permitted Bond Hedge Transactions and Permitted Warrant Transactions, (xix) participation and the making of payments under the Tax Receivable Agreement, and (xx) activities incidental or reasonably related to any of the foregoing; or

118

(d)        consolidate or amalgamate with, or merge with or into, or convey, sell or otherwise transfer all or substantially all of its assets to, any Person; provided that, so long as no Default or Event of Default exists or would result therefrom, Parent may consolidate or amalgamate with, or merge with or into, any other Person (other than the Borrower and any of its Subsidiaries) so long as (i) Parent is the continuing or surviving Person or (ii) if the Person formed by or surviving any such consolidation, amalgamation or merger is not Parent, (x) (A) the successor Person expressly assumes all obligations of Parent under this Agreement and the other Loan Documents to which Parent is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent and (B) the successor Person will be a Person organized or existing under the laws of the United States of America, any State of the United States or the District of Columbia or any territory thereto, and (y) the Administrative Agent shall have received all documentation and other information required by regulatory authorities with respect to the successor Person under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act reasonably requested by the Lenders.

**ARTICLE 7**
**EVENTS OF DEFAULT**

Section 7.01    Events of Default. If any of the following events (each, an "**Event of Default**") shall occur:

(a)        the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable and in the Agreed Currency required hereunder, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)        the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under any of the Loan Documents, when and as the same shall become due and payable and in the Agreed Currency required hereunder, and such failure shall continue unremedied for a period of five Business Days;

(c)        any representation or warranty made or deemed made by or on behalf of the Parent, the Borrower or any Loan Party in this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement, any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

119

(d)           the Parent or the Borrower, as applicable, shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 5.02</u>(<u>a</u>), <u>Section 5.03</u> (solely with respect to the Parent's or the Borrower's existence), <u>Section 5.10</u> or in <u>Article 6</u>;

(e)           the Parent or the Borrower, as applicable, shall fail to observe or perform any covenant, condition or agreement contained in any of the Loan Documents (other than those specified in clause (a), (b) or (d) of this Article of this Agreement), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower;

(f)           the Parent, the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure shall have continued after the applicable notice or cure period, if any;

(g)           any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both, but with all applicable grace periods in respect of such event or condition under the documentation representing such Material Indebtedness having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; <u>provided</u> that this clause (g) shall not apply to (w) any requirement to, or any offer, to repurchase, prepay or redeem Indebtedness of a Person acquired in an acquisition permitted hereunder, to the extent such offer is required as a result of, or in connection with, such acquisition, so long as such requirement is satisfied at the time of such acquisition, (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (y) any redemption, repurchase, conversion or settlement with respect to any convertible debt instrument including the Parent Convertible Notes (including any termination of any related Swap Agreement) pursuant to its terms unless such redemption, repurchase, conversion or settlement results from a default thereunder or an event of the type that constitutes an Event of Default or (z) an early payment requirement, unwinding or termination with respect to any Swap Agreement except (i) an early payment, unwinding or termination that results from a default or non-compliance thereunder by the Parent, the Borrower or any Subsidiary, or another event of the type that would constitute an Event of Default or (ii) an early termination of such Swap Agreement by the counterparty thereto;

(h)           an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Parent, the Borrower or any Subsidiary or of a substantial part of its assets, under any Debtor Relief Law or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Parent, the Borrower or any Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

120

(i)        except as may otherwise be permitted under Section 6.03, the Parent, the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Debtor Relief Law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section 7.01, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Parent, the Borrower or any Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)        the Parent, the Borrower or any Subsidiary shall become unable and admit in writing its inability or fail generally to pay its debts as they become due;

(k)        one or more judgments for the payment of money in excess of $15,000,000 in the aggregate shall be rendered against the Parent, the Borrower, any Subsidiary or any combination thereof (to the extent not paid or covered by a reputable and solvent independent third-party insurance company which has not disputed coverage) and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent, the Borrower or any Subsidiary to enforce any such judgment and such action shall not be stayed;

(l)        one or more ERISA Events shall have occurred that would reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect;

(m)        a Change in Control shall occur; or

(n)        any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the obligations hereunder or thereunder, ceases to be in full force and effect thereto; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Lien created by any of the Security Documents shall cease to be enforceable on a material portion of the Collateral and of the same effect and priority (subject to Liens permitted by Section 6.02) to be created thereby for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations; then, and in every such event (other than an event with respect to the Parent or the Borrower described in clause (h) or (i) of this Article and subject to Section 7.02), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) Cash Collateralize any outstanding Letters of Credit and (iii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Parent or the Borrower described in clause (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

121

Section 7.02    <u>Right to Cure</u>.

(a)        Notwithstanding anything to the contrary contained in <u>Section 7.01</u>, but subject to <u>Sections 7.02(b)</u>, <u>7.02(c)</u> and <u>7.02(d)</u>, for the purpose of determining whether an Event of Default resulting from a failure to comply with <u>Section 6.10</u> as of the last day of any fiscal quarter has occurred, the Borrower may on one or more occasions, during the period from the commencement of the relevant fiscal quarter through the Cure Expiration Date (as defined below), designate any portion of the net cash proceeds from a sale or issuance of Equity Interests of Parent or the Borrower or of any cash contribution to the equity capital of Parent (which, in turn, will be contributed in cash to the common equity capital of the Borrower) or the Borrower (the "**Cure Right**"), and upon the receipt by the Borrower of such cash (the "**Cure Amount**"), pursuant to the exercise by the Borrower of such Cure Right, as an increase to Consolidated EBITDA or Total Revenue, as applicable, for the applicable fiscal quarter; <u>provided</u> that (i) such amounts to be designated are actually received by the Borrower on or prior to the fifteenth Business Day after the date on which a certificate is or is required to be delivered pursuant to <u>Section 5.01(c)</u> with respect to such applicable fiscal quarter (the "**Cure Expiration Date**"), (ii) such amounts to be designated do not exceed the minimum aggregate amount necessary to cure any Event of Default resulting from a failure to comply with <u>Section 6.10</u> as of such date and (iii) the Borrower shall have provided written notice to the Administrative Agent on the date such amounts are designated as a "Cure Amount" (it being understood that to the extent such notice is provided in advance of delivery of a certificate pursuant to <u>Section 5.01(c)</u> for the applicable period, the amount of such net cash proceeds that is designated as the Cure Amount may be lower than the amount specified in such notice to the extent that the amount actually necessary to cure any Event of Default resulting from a failure to comply with <u>Section 6.10</u> is less than the full amount of such originally designated amount). The Cure Amount used to increase Consolidated EBITDA or Total Revenue, as applicable, for the applicable fiscal quarter shall be used and included when calculating Consolidated EBITDA or Total Revenue, as applicable, for each period that includes such fiscal quarter. The parties hereby acknowledge that the Cure Amount (<u>1</u>) may not be relied on for purposes of calculating Consolidated EBITDA or Total Revenue, as applicable, other than as applicable to <u>Section 6.10</u> (and shall not be included in Consolidated EBITDA or Total Revenue, as applicable, for any other purposes) and (<u>2</u>) shall not result in any adjustment to any amounts (including the amount of Indebtedness) or increase in cash with respect to the fiscal quarter with respect to which such Cure Amount was made. Notwithstanding anything to the contrary contained in <u>Section 7.01</u>, (<u>A</u>) upon designation of the Cure Amount by the Borrower, to the extent applicable, <u>Section 6.10</u> shall be deemed satisfied and complied with as of the end of the relevant fiscal quarter with the same effect as though there had been no failure to comply with <u>Section 6.10</u> and any Event of Default resulting from a failure to comply with <u>Section 6.10</u> (and any other Default as a result thereof) shall be deemed not to have occurred for purposes of the Loan Documents, and (<u>B</u>) neither the Administrative Agent nor any Lender may exercise any rights or remedies under this Agreement or any other Loan Document on the basis of any actual or purported Event of Default resulting from a failure to comply with <u>Section 6.10</u> (and any other Default as a result thereof) with respect to the applicable period until and unless the Cure Expiration Date has occurred without the Cure Amount having been received by the Borrower in at least the amount required to cure the applicable Event of Default, in which case such Event of Default shall be reinstated as though the Borrower had not designated such Cure Amount. For the avoidance of doubt, no portion of any Cure Amount may be used to make a Restricted Payment.

122

(b)        In each period of four consecutive fiscal quarters there shall be at least two fiscal quarters in which no cure set forth in Section 7.02(a) is made.

(c)        The cure rights set forth in <u>Section 7.02(a)</u> may not be exercised with respect to more than four fiscal quarters during the term of this Agreement.

(d)        Notwithstanding anything herein to the contrary, upon the designation of any Cure Amount until the receipt by the Borrower thereof in an amount sufficient to cure the relevant Event of Default, Borrower shall not be permitted to request (and none of the Administrative Agent, the Lenders or the Issuing Banks shall be obligated to extend any Commitments or issue any Letters of Credit, as applicable) any Commitments (including any issuance or extension (including automatic renewals) of any Letter of Credit).

(e)        To the extent a fiscal quarter in respect of which a Cure Amount for an Event of Default resulting from a failure to comply with <u>Section 6.10</u> is received (such fiscal quarter a "**Cure Quarter**") is included in the calculation of Consolidated EBITDA or Total Revenue for a subsequent fiscal period, the Consolidated EBITDA or Total Revenue attributable solely to such Cure Quarter shall be deemed permanently increased by such amount for purposes of calculating Consolidated EBITDA or Total Revenue for a subsequent fiscal period including such Cure Quarter; <u>provided</u>, that the Cure Amount shall be included in the calculation of Consolidated EBITDA or Total Revenue solely for the purpose of determining compliance with the financial covenant contained in <u>Section 6.10</u> and not for any other purposes.

Section 7.03        <u>Application of Proceeds</u>. If an Event of Default shall have occurred and be continuing, after the acceleration of the Obligations pursuant to Section 7.01 or the exercise of other remedies provided for in Section 7.01, the Administrative Agent shall apply all or any part of any proceeds of the Collateral (including all Proceeds) and all payments received by it in respect of any of the Obligations in the following order:

<u>First</u>, to pay incurred and unpaid fees and expenses of the Administrative Agent under the Loan Documents in its capacity as such;

<u>Second</u>, to the Administrative Agent, for application by it towards payment of amounts remaining unpaid in respect of the Obligations, pro rata among the Secured Parties according to the amounts of such Obligations then due and owing and remaining unpaid to the Secured Parties;

<u>Third</u>, to the Administrative Agent, for application by it towards payment of all other Obligations, pro rata among the Secured Parties according to the amounts of such Obligations then held by the Secured Parties; and

123

Fourth, any balance remaining after the Obligations shall have been paid in full shall be paid over to the Borrower, the Loan Parties or to whomsoever may be lawfully entitled to receive the same.

Notwithstanding the foregoing, no amounts received from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

# ARTICLE 8
# THE AGENTS

Section 8.01    Appointment of Administrative Agent. JPMorgan Chase Bank, N.A. is hereby appointed Administrative Agent hereunder and under the other Loan Documents and each Lender hereby authorizes JPMorgan Chase Bank, N.A. to act as Administrative Agent in accordance with the terms hereof and the other Loan Documents. Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Loan Documents, as applicable. The provisions of this Article 8 are solely for the benefit of the Agents and Lenders and no Loan Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower, the Parent or any of its Subsidiaries. As of the Effective Date, none of the Arrangers, Syndication Agent or the Documentation Agents in such capacity shall have any obligations but shall be entitled to all benefits of this Article 8. The Arrangers, the Syndication Agent and the Documentation Agents may resign from such role at any time, with immediate effect, by giving prior written notice thereof to the Administrative Agent and the Borrower.

Section 8.02    Powers and Duties. Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

124

Section 8.03    General Immunity.

(a)    No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Loan Party to any Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, the Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans, the Revolving Credit Exposures or the component amounts thereof or any Dollar Equivalent.

(b)    No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Loan Documents except to the extent caused by such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Required Lenders (or such other Lenders as may be required to give such instructions under Section 10.02) and, upon receipt of such instructions from Required Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Parent and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of Required Lenders (or such other Lenders as may be required to give such instructions under Section 10.02).

125

(c)      The Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 8.03 and of Section 8.06 shall apply to any the Affiliates of the Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 8.03 and of Section 8.06 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by the Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Loan Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to the Administrative Agent and not to any Loan Party, Lender or any other Person and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

Section 8.04      Administrative Agent Entitled to Act as Lender. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with the Parent, the Borrower or any of their respective Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Parent or the Borrower, as applicable, for services in connection herewith and otherwise without having to account for the same to Lenders.

Section 8.05      Lenders' Representations, Warranties and Acknowledgment.

(a)      Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Parent and its Subsidiaries in connection with Loans hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Parent and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)      Each Lender, by delivering its signature page to this Agreement, an Assignment and Assumption or a Joinder Agreement and funding its Loans on or after the Effective Date or by the funding of any New Loans, as the case may be, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Issuing Bank or Lender, as applicable on the Effective Date or as of the date of funding of such New Loans.

126

Section 8.06    Right to Indemnity. Each Lender, in proportion to its Applicable Percentage, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Loan Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Loan Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Applicable Percentage thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

Section 8.07    Successor Administrative Agent. The Administrative Agent shall have the right to resign at any time by giving prior written notice thereof to Lenders and the Borrower. The Administrative Agent shall have the right to appoint a financial institution to act as the Administrative Agent hereunder, subject to the reasonable satisfaction of (i) except if an Event of Default has occurred and is continuing, the Borrower and (ii) the Required Lenders, and the Administrative Agent's resignation shall become effective on the earliest of (i) 30 days after delivery of the notice of resignation (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor Administrative Agent by the Borrower and the Required Lenders or (iii) such other date, if any, agreed to by the Required Lenders. Upon any such notice of resignation, if a successor Administrative Agent has not already been appointed by the retiring Administrative Agent, Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor Administrative Agent. If neither the Required Lenders nor the Administrative Agent have appointed a successor Administrative Agent, the Required Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall promptly (i) transfer to such successor Administrative Agent all sums held under the Loan Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, and (ii) take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent of the Loan Documents, whereupon such retiring Administrative Agent shall be discharged from its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Article). After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Article 8 and Section 10.03 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

127

(a)          Each Lender hereby further authorizes the Administrative Agent, on behalf of and for the benefit of the Lenders, to be the agent for and representative of the Lenders with respect to the Guaranty and the Loan Documents. Subject to Section 10.02, without further written consent or authorization from any Lender, the Administrative Agent may execute any documents or instruments necessary to release any Guarantor from the Guaranty pursuant to Section 10.17 or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 10.02) have otherwise consented.

(b)          Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each Lender hereby agree that no Lender shall have any right individually to enforce the Guaranty or the Security Documents, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent, for the benefit of the Lenders in accordance with the terms hereof and thereof.

(c)          Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (including unreimbursed LC Disbursements, but excluding contingent obligations as to which no claim has been asserted) have been paid in full and all Commitments have terminated or expired and no Letter of Credit shall be outstanding or subject to any pending draw (or otherwise Cash Collateralized or backstopped or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank), upon request of the Borrower, the Administrative Agent shall take such actions as shall be required to release all guarantee obligations provided for in and Liens created by any Loan Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Section 8.09          Withholding Taxes. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if the Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

128

Section 8.10    Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or Obligation under a Letter of Credit shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)       to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)       to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its respective agents and counsel and all other amounts due Administrative Agent under Sections 2.09 and 9.03 allowed in such judicial proceeding); and

(c)       to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Bank to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Administrative Agent under Sections 2.09 and 9.03. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due to the Administrative Agent under Sections 2.09 and 9.03 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders or the Issuing Banks may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

129

(a)          Each Lender hereby agrees that (x) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "**Payment**") were erroneously transmitted to such Lender (whether or not known to such Lender), and demands the return of such Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect, and (y) to the extent permitted by applicable law, such Lender shall not assert, and hereby waives, as to the Administrative Agent, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Payments received, including without limitation any defense based on "discharge for value" or any similar doctrine. A notice of the Administrative Agent to any Lender under this Section 8.11(a) shall be conclusive, absent manifest error.

(b)          Each Lender hereby further agrees that if it receives a Payment from the Administrative Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Payment (a "**Payment Notice**") or (y) that was not preceded or accompanied by a Payment Notice, it shall be on notice, in each such case, that an error has been made with respect to such Payment.  Each Lender agrees that, in each such case, or if it otherwise becomes aware a Payment (or portion thereof) may have been sent in error, such Lender shall promptly notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in no event later than one Business Day thereafter, return to the Administrative Agent the amount of any such Payment (or portion thereof) as to which such a demand was made in same day funds, together with interest thereon in respect of each day from and including the date such Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)          The Borrower and each other Loan Party hereby agrees that (x) in the event an erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; provided that this Section 8.11(c) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such erroneous Payment is, and solely with respect to the amount of such erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

130

Each party's obligations under this Section 8.11(a) shall survive the resignation or replacement of the Administrative Agent or any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations under any Loan Document.

Section 8.12    Authorization of the Administrative Agent under German Law.

For the purposes of any German Security, in addition to the provisions set out in this Article 8, the specific provisions set out in paragraph (a) through (h) below of this Section 8.12 shall be applicable. With respect to German Security, in the case of any inconsistency, the provisions set forth in this Section 8.12 shall prevail.

(a)    Subject to German law, with respect to any German Security constituted by non– accessory (*nicht akzessorische*) security interests, the Administrative Agent shall hold, administer and, as the case may be, enforce or release such German Security in its own name, but for the benefit of the Secured Parties.

(b)    Subject to German law, the Administrative Agent shall administer and (subject to the same having become enforceable and to the terms of this Agreement) realise any German Security which is pledged (*Verpfändung*) to it and/or the Secured Parties (or any of them) under an accessory security right (*akzessorische Sicherheit*) for the benefit of the Secured Parties.

(c)    If and when acting in its capacity as creditor of the Parallel Debt, the Administative Agent shall hold:

(i)    any German Security which is created in favour of the Administrative Agent as creditor of the Parallel Debt by way of a pledge (*Verpfändung*) or any other German law accessory security right (*akzessorische Sicherheit*);

(ii)    any proceeds of such German Security; and

(iii)    the benefit of this paragraph (c) and of the Parallel Debt,

as creditor in its own right but (also) for the benefit of the (other) Secured Parties in accordance with this Agreement.

(d)    With regard to any Security Document creating any accessory (*akzessorische*) German Security and for the purposes of entering into any such Security Document, performing the rights and obligations thereunder, amending, enforcing and/or releasing such Security Document, each Secured Party hereby instructs and authorizes the Administrative Agent to act as its agent (*Stellvertreter*), and releases the Administrative Agent from the restrictions imposed by Section 181 German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other applicable law, in each case (i) with the right of sub-delegation and the right to release the sub-delegates from the restrictions of such Section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other applicable law and (ii) limited to the extent legally possible to such Secured Party. A Secured Party which is barred by its constitutional documents or bylaws from granting such exemption shall notify the Administrative Agent accordingly.

131

(e)	At the request of the Administrative Agent, each Secured Party shall provide the Administrative Agent with a separate written power of attorney (*Spezialvollmacht*) for the purposes of executing any relevant agreements and documents on their behalf. Each Secured Party hereby ratifies and approves all acts previously done by the Administrative Agent on such Secured Party's behalf.

(f)	The Administrative Agent accepts its appointment as agent and administrator of the German Security on the terms and subject to the conditions set out in this Agreement and the Secured Parties (other than the Administrative Agent), the Administrative Agent and all other parties to this Agreement agree that, in relation to the German Security, no Secured Party (other than the Administrative Agent) shall exercise any independent power to enforce any German Security or take any other action in relation to the enforcement of the German Security, or make or receive any declarations in relation thereto.

(g)	Each Secured Party (other than the Administrative Agent) hereby instructs the Administrative Agent (with the right of sub-delegation and the right to release the sub-delegates from the restrictions of such Section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other applicable law) to enter into any documents evidencing German Security and to make and accept all declarations and take all actions it considers necessary or useful in connection with any German Security on behalf of such Secured Party (other than the Administrative Agent). The Administrative Agent shall further be entitled to rescind, release, amend and/or execute new and different documents representing/relating to the German Security.

(h)	If and to the extent that the Administrative Agent has already made any statements or declarations or taken any other actions (including, but not limited to, the granting of sub-powers of attorney (including any indemnifications, waivers and consents on behalf of each Secured Party as reasonably agreed upon by the Administrative Agent) and the release of any sub-representatives from the restrictions of Section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other applicable law) which fall within the scope of this Section 8.12, such statements, declarations and actions are hereby ratified and approved (*genehmigt*).

132

ARTICLE 9
GUARANTY

Section 9.01    <u>Guaranty</u>.

(a)    Each Guarantor hereby irrevocably and unconditionally guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the Obligations of the Borrower. Each Guarantor further agrees that the due and punctual payment of the Obligations of the Borrower may be extended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee hereunder notwithstanding any such extension or renewal of any Obligation.

(b)    To the maximum extent permitted by applicable law, each Guarantor waives presentment to, demand of payment from and protest to the Borrower of any of the Obligations, and also waives notice of acceptance of its obligations and notice of protest for nonpayment. The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any Lender to assert any claim or demand or to enforce any right or remedy against the Borrower under the provisions of this Agreement, any other Loan Document or otherwise; (ii) any extension or renewal of any of the Obligations; (iii) any rescission, waiver, amendment or modification of, or release from, any of the terms or provisions of this Agreement or any other Loan Document or other agreement; (iv) the failure or delay of any Lender to exercise any right or remedy against any other guarantor of the Obligations; (v) the failure of any Lender to assert any claim or demand or to enforce any remedy under any Loan Document or any other agreement or instrument; (vi) any default, failure or delay, willful or otherwise, in the performance of the Obligations; or (vii) any other act, omission or delay to do any other act which may or might in any manner or to any extent vary the risk of such Guarantor or otherwise operate as a discharge of such Guarantor as a matter of law or equity or which would impair or eliminate any right of any Guarantor to subrogation (other than payment in full of the Obligations (excluding contingent obligations as to which no claim has been made) or release pursuant to <u>Section 10.17</u>).

(c)    Each Guarantor further agrees that its guarantee hereunder constitutes a promise of payment when due (whether or not any bankruptcy or similar proceeding shall have stayed the accrual or collection of any of the Obligations or operated as a discharge thereof) and not merely of collection, and waives any right to require that any resort be had by any Lender or any Issuing Bank to any balance of any deposit account or credit on the books of any Lender or any Issuing Bank in favor of the Borrower or any Subsidiary or any other Person.

(d)    Except for the release or termination of a Guarantor's obligations hereunder as provided in <u>Section 10.17</u>, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason other than the payment in full in cash of the Obligations (excluding contingent obligations as to which no claim has been made), and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever, by reason of the invalidity, illegality or unenforceability of the Obligations, any impossibility in the performance of the Obligations or otherwise.

(e)    Each Guarantor further agrees that its obligations hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by any Lender upon the bankruptcy or reorganization of the Borrower or otherwise.

133

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 672 of 1007 PageID# 1651

(f)  In furtherance of the foregoing and not in limitation of any other right which any Lender may have at law or in equity against any Guarantor by virtue hereof, upon the failure of the Borrower to pay any Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will, upon receipt of written demand by the Administrative Agent, forthwith pay, or cause to be paid, to the Administrative Agent for distribution to the applicable Lenders in cash an amount equal to the unpaid principal amount of such Obligation.

(g)  Notwithstanding anything to the contrary in this Agreement, each Guarantor shall be liable under this Agreement only for amounts aggregating up to the largest amount that would not render its obligations hereunder subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provision of any other applicable law.

(h)  Upon payment in full by any Guarantor of any Obligation of the Borrower, each Lender and Issuing Bank shall, in a reasonable manner, assign to such Guarantor the amount of such Obligation owed to such Lender or Issuing Bank and so paid, such assignment to be *pro tanto* to the extent to which the Obligation in question was discharged by such Guarantor, or make such disposition thereof as such Guarantor shall direct (all without recourse to any Lender or Issuing Bank and without any representation or warranty by any Lender or Issuing Bank). Upon payment by any Guarantor of any sums as provided above, all rights of such Guarantor against the Borrower arising as a result thereof by way of right of subrogation or otherwise shall in all respects be subordinated and junior in right of payment to the prior payment in full of all the Obligations owed by the Borrower to the Lenders and Issuing Banks (it being understood that, after the discharge of all the Obligations due and payable from the Borrower, such rights may be exercised by such Guarantor notwithstanding that the Borrower may remain contingently liable for indemnity or other Obligations).

(i)  Each Qualified Keepwell Provider hereby jointly and severally absolutely, unconditionally, and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of such Loan Party's obligations under this guarantee in respect of any obligation to pay or perform under any Swap Agreement (a "**Swap Obligation**") (provided, however, that each Qualified Keepwell Provider shall only be liable under this Section 9.01(i) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.01(i), or otherwise under this guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified Keepwell Provider under this Section 9.01(i) shall remain in full force and effect until termination of this Agreement. A "**Qualified Keepwell Provider**" shall mean, in respect of any Swap Obligation, each Loan Party that, at the time the relevant guarantee (or grant of the relevant security interest, as applicable) becomes effective with respect to such Swap Obligation, has total assets exceeding $10,000,000 or otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" with respect to such Swap Obligation at such time by entering into a keepwell or guarantee pursuant to Section 1a(18)(A)(v)(II) of the Commodity Exchange Act. Each Qualified Keepwell Provider intends that this Section 9.01(i) constitute, and this Section 9.01(i) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

134

Section 9.02    Additional Agreements.

(a)        Until the Commitments have expired or terminated and all Obligations (excluding contingent obligations as to which no claim has been made) have been paid in full and no Letter of Credit shall be outstanding or subject to any pending draw (or otherwise Cash Collateralized or backstopped or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank), each Guarantor covenants and agrees with the Administrative Agent for the benefit of the Lenders and Issuing Banks that it will be bound by each of the covenants contained herein to the extent applicable to such Guarantor.

(b)        Each Guarantor hereby agrees that upon the occurrence of any Event of Default, any Indebtedness of the Parent, Borrower or any other Guarantor now or hereafter owing to it, whether heretofore, now or hereafter created (the "**Guaranty Subordinated Debt**"), is hereby subordinated to all of the Obligations under this Agreement and the Notes, and that, except as expressly permitted by this Agreement, the Guaranty Subordinated Debt shall not be paid in whole or in part until such Obligations (excluding contingent obligations as to which no claim has been made) have been paid in full and this Agreement is terminated and of no further force or effect. No Guarantor shall accept any payment of or on account of any Guaranty Subordinated Debt at any time in contravention of the foregoing. Upon the occurrence and during the continuance of an Event of Default, the Parent, the Borrower and any other applicable Guarantor shall pay to the Administrative Agent any payment of all or any part of the Guaranty Subordinated Debt and any amount so paid to the Administrative Agent shall be applied to payment of the Obligations under this Agreement and the Notes as provided herein. Each payment on the Guaranty Subordinated Debt received in violation of any of the provisions hereof shall be deemed to have been received by the Guarantors as trustee for the Administrative Agent and the Lenders and shall be paid over to the Administrative Agent immediately on account of the Obligations, but without otherwise affecting in any manner the Guarantors' liability under this Agreement. Each Guarantor agrees to file all claims against the Parent, the Borrower or any other applicable Guarantor in any bankruptcy or other proceeding in which the filing of claims is required by law in respect of any Guaranty Subordinated Debt, and the Administrative Agent shall be entitled to all of such Guarantor's rights thereunder. If for any reason any Guarantor fails to file such claim at least ten (10) Business Days prior to the last date on which such claim should be filed, such Guarantor hereby irrevocably appoints the Administrative Agent as its true and lawful attorney-in-fact and is hereby authorized to act as attorney-in-fact in such Guarantor's name to file such claim or, in the Administrative Agent's discretion, to assign such claim to and cause proof of claim to be filed in the name of the Administrative Agent or its nominee. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the Administrative Agent the full amount payable on the claim in the proceeding, and, to the full extent necessary for that purpose, each Guarantor hereby assigns to the Administrative Agent all of such Guarantor's rights to any payments or distributions to which such Guarantor otherwise would be entitled. If the amount so paid is greater than such Guarantor's liability hereunder, the Administrative Agent shall pay the excess amount to the party entitled thereto.

Section 9.03    Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any Lender will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

135

Section 9.04    Guarantor Notices. All communications and notices to any Guarantor shall be given to it in care of the Borrower as provided in Section 10.01.

Section 9.05    Termination. The Guarantees set forth in this Article IX shall terminate when all the Obligations (excluding contingent obligations as to which no claim has been made) have been paid in full and no Letter of Credit shall be outstanding or subject to any pending draw (or otherwise Cash Collateralized or backstopped or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank), and the Lenders have no further commitment to lend and the Issuing Banks has no further obligation to issue Letters of Credit.

Section 9.06    Right of Set Off. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of any Guarantor against any of and all the obligations of such Guarantor now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify such Guarantor and the Administrative Agent promptly after any such setoff and application; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

Section 9.07    Additional Guarantors. It is understood and agreed that any Subsidiary of the Parent that is required to execute a counterpart of, or joinder to, this Agreement after the date hereof pursuant to Section 5.11 shall become a Guarantor hereunder by (x) executing and delivering a guaranty supplement in the form of Exhibit E hereto and delivering the same to the Administrative Agent and (y) taking all actions as specified in this Agreement as would have been taken by such Guarantor had it been an original party to this Agreement, in each case with all documents and actions required to be taken above to be taken to the reasonable satisfaction of the Administrative Agent.

Section 9.08    Article IX Severability. In the event any one or more of the provisions contained in this Article IX should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Article IX shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

136

ARTICLE 10

Miscellaneous

Section 10.01    Notices.

(a)        Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)        if to the Borrower, to it at:

Fluence Energy, LLC
4601 Fairfax Drive, Suite 600
Arlington, VA 22203
United States
Attention: Samuel Chong and Jie Yuan
Email: samuel.chong@fluenceenergy.com; jie.yuan@fluenceenergy.com

(ii)        if to the Administrative Agent, to it at:

JPMorgan Chase Bank, N.A.
500 Stanton Christiana Road
NCC 5, 1st Floor
Newark, DE 19713
Attention: Bryan Cook
Telephone: (302) 455-3768
Email: bryan.a.cook@jpmchase.com

(iii)        if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(iv)        if to JPMorgan Chase Bank, N.A., as an Issuing Bank, to it at:

JPMorgan Chase Bank, N.A.
10420 Highland Manor Dr. 4th Floor
Tampa, FL 33610
Attention: Standby LC Unit
Tel: 800-364-1969
Fax: 856-294-5267
Email: GTS.Client.Services@jpmchase.com

137

With a copy to:

JPMorgan Chase Bank, N.A.
500 Stanton Christiana Rd.
NCC5 / 1st Floor
Newark, DE 19713
Attention: Loan & Agency Services Group
Tel: 1 302 455 3768
Fax: 12012443629@tls.ldsprod.com
Email: bryan.a.cook@jpmchase.com

(v)        With respect to any other Issuing Bank, at its address provided by notice to the other parties hereto.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)        Notices and other communications to the Lenders and the Issuing Banks hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)        Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.

138

(d)    The Borrower agrees that the Administrative Agent may make the Communications (as defined below) available to the Lenders and the Issuing Banks by posting the Communications on Debt Domain, IntraLinks, SyndTrak or another similar electronic system (the "**Platform**"). THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications effected thereby (the "**Communications**"). No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") be responsible or liable for damages arising from the unauthorized use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission, except to the extent that such damages have resulted from the willful misconduct or gross negligence of such Agent Party (as determined in a final, non-appealable judgment by a court of competent jurisdiction).

Section 10.02    <u>Waivers; Amendments</u>.

(a)    No failure or delay by the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Issuing Banks and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in similar or other circumstances. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of such Default at the time.

(b)    Subject to <u>Section 2.11(b)</u> and <u>(d)</u>, <u>Section 10.02(c)</u> and <u>Section 10.02(d)</u> below, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall: (i) amend the definition of "Applicable Percentage" without the consent of each Lender, or extend or increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby; <u>provided</u>, <u>however</u>, that notwithstanding clause (ii) or (iii) of this <u>Section 10.02(b)</u>, only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the default rate set forth in <u>Section 2.10(d)</u>, (iv) change <u>Section 2.15(b)</u>, <u>Section 2.15(c)</u> or any other Section hereof providing for the ratable treatment of the Lenders, in each case in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender, (v) release all or substantially all of the value of the Guaranty or release all or substantially all of the Collateral, without the written consent of each Lender, except to the extent the release of any Guarantor or the Collateral is permitted pursuant to <u>Article 8</u> or <u>Section 10.17</u> (in which case such release may be made by the Administrative Agent acting alone), (vi) change any of the provisions of this Section or the percentage referred to in the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, (vii) subordinate the Liens on all or substantially all the value of the Collateral to the Liens securing any other Indebtedness, or contractually subordinate with respect to payment any Obligations, without the written consent of each Lender adversely affected thereby, <u>provided</u> that any Lender that is provided a bona fide offer to participate on a ratable basis and on substantially the same terms offered to each other Lender in the issuance of such Indebtedness shall be deemed not to be adversely affected, (viii) amend <u>Section 7.03</u> without the written consent of the Administrative Agent and each Lender adversely affected thereby or (ix) amend the definition of "Alternative Currency" without the written consent of the Administrative Agent and each Lender adversely affected thereby. Notwithstanding anything to the contrary herein, no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or any Issuing Bank hereunder without the prior written consent of the Administrative Agent or such Issuing Bank, as the case may be.

139

(c)        This Agreement may be amended as contemplated by Section 2.08 to effect New Commitments pursuant to a Joinder Agreement with the consent only of the Administrative Agent, the Borrower and the New Lenders providing New Commitments. If the Administrative Agent and the Borrower acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement.

(d)        Except as provided in Section 9.07, no provision of Article IX may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into between the Administrative Agent and each Guarantor with respect to which such waiver, amendment or modification is to apply, in accordance with this Section 10.02.

Section 10.03    Expenses; Indemnity; Damage Waiver.

(a)        The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable and documented fees, disbursements and other charges of one firm of counsel for all such Persons taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected indemnified persons, taken as a whole, in each such relevant material jurisdiction) in connection with the syndication of the credit facilities provided for herein, the preparation, execution, delivery and administration of this Agreement, any other Loan Document or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) costs, expenses, Taxes, assessments and other charges incurred by any Lender in connection with any filing, registration, recording, or perfection of any security interest contemplated by this Agreement, (iii) all reasonable out-of-pocket expenses incurred by any Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iv) all out-of-pocket expenses incurred by the Administrative Agent, any Issuing Bank or any Lender, including the fees, disbursements and other charges of one firm of counsel for all such Persons taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected indemnified persons, taken as a whole, in each such relevant material jurisdiction), in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

140

(b) Each Loan Party, jointly and severally, shall indemnify the Administrative Agent, the Arrangers, any Issuing Bank and each Lender, and each Related Party, successor, partner, representative or assign of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented out-of-pocket fees, charges and disbursements of one firm of counsel for all such Persons taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected indemnified persons, taken as a whole, in each such relevant material jurisdiction) for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the Transactions or any other transactions contemplated hereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by the Parent or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation or proceeding is brought by the Parent, the Borrower or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available, (x) with respect to Taxes and amounts relating thereto (other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim), the indemnification for which shall be governed solely and exclusively by Section 2.14, (y) to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence, willful misconduct or material breach of the Loan Documents by such Indemnitee or (z) to the extent that such losses, claims, damages, liabilities or related expenses arise from any proceeding that does not involve the Parent, the Borrower or any of their respective Affiliates and that is brought by an Indemnitee against any other Indemnitee, other than any proceeding against the Administrative Agent or any Arranger, in each case acting in such capacity.

141

(c)     To the extent that the Borrower or any other Guarantor, as applicable, fails to pay any amount required to be paid by it to the Administrative Agent or any Issuing Bank under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent and the applicable Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or such Issuing Bank in their capacity as such; provided, further, that, notwithstanding anything to the contrary herein, no Lender shall be liable for any portion of any such unreimbursed expenses or indemnified loss, claim, damage, liability or related expense, as the case may be, of the Administrative Agent and/or the Issuing Banks (or, in each case, any Affiliate thereof) as a result of the bad faith, gross negligence or willful misconduct of the relevant Person or Persons, as determined by a court of competent jurisdiction by a final or non-appealable judgment.

(d)     Without limiting in any way the indemnification obligations of the Guarantors pursuant to Section 10.03(b) or of the Lenders pursuant to Section 8.06, to the extent permitted by applicable law, each party hereto shall not assert, and hereby waives, any claim against any Indemnitee or the Borrower or any of its Subsidiaries, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Loan or Letter of Credit or the use of the proceeds thereof; provided that nothing in this clause (d) shall relieve any Guarantor of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(e)     All amounts due under this Section shall be payable promptly after written demand therefor.

142

Section 10.04  <u>Successors and Assigns</u>.

(a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no Guarantor shall have the right to assign or transfer any of its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby (including any Affiliate of any Issuing Bank that issues any Letter of Credit), the Related Parties of each of the Administrative Agent, the Issuing Banks and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (but not to the Borrower or an Affiliate thereof) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, participations in Letters of Credit and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)  the Borrower; <u>provided</u> that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; and <u>provided</u> *further* that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof;

(B)  the Administrative Agent; <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of any Commitment to an assignee that is a Lender with a Commitment immediately prior to giving effect to such assignment, an Affiliate of a Lender, or an Approved Fund; and

(C)  each Issuing Bank.

(ii)  Assignments shall be subject to the following additional conditions:

(A)  except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 (or a greater amount that is an integral multiple of $1,000,000) unless each of the Borrower and the Administrative Agent otherwise consent; <u>provided</u> that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)  each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

143

(C)   the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)   the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Parent, the Borrower and their respective Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws;

(E)   no such assignment shall be made to (i) any Loan Party nor any Affiliate of a Loan Party, and (ii) any Defaulting Lender or any of its subsidiaries, or any Person, who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this subsection (E)(ii);

(F)   in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs; and

(G)   no assignment shall be made to any Disqualified Lender; provided that notwithstanding anything in this Agreement or any other Loan Document to the contrary, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders. Without limiting the generality of the foregoing, the Administrative agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or potential Lender or Participant is a Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to, or the restrictions on any exercise of rights or remedies of, any Disqualified Lender.

144

(iii)  Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.13, Section 2.14 and Section 10.03); provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and amounts (including interest) on the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent, the Issuing Banks and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice. The Loans (including principal and interest) are registered obligations and the right, title, and interest of any Lender or its assigns in and to such Loans shall be transferable only upon notation of such transfer in the Register.

(v)  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.04(b), Section 2.15(d) or Section 8.06, the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

145

(c)    (i)    Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent or any Issuing Bank, sell participations to one or more banks or other entities (but not to the Borrower, an Affiliate thereof or to a Disqualified Lender) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.02(b) that affects such Participant. Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.15(c) as though it were a Lender.

(ii)    A Participant shall not be entitled to receive any greater payment under Sections 2.12 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant except to the extent such entitlement to receive a greater payment results from a Change in Law requiring a payment under Section 2.12 that occurs after the Participant acquired the applicable participation. Participants entitled to the benefits of Sections 2.12, 2.13 and 2.14 are entitled to such benefits subject to the requirements and limitations therein, including the requirements under Section 2.14(f) (it being understood that the documentation required under Section 2.14(f) shall be delivered to the participating Lender).

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Proposed Treasury Regulations Section 1.163-5(b) (and, in each case, any amended or successor version). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

146

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 10.05  Survival. All covenants, agreements, representations and warranties made by the Parent, the Borrower, or the Guarantors as applicable, herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement, the other Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding or subject to any pending draw and so long as the Commitments have not expired or terminated. The provisions of Section 2.12, Section 2.13, Section 2.14 and Section 10.03 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments, the resignation of the Administrative Agent, the replacement of any Lender, or the termination of this Agreement or any provision hereof.

Section 10.06  Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be construed as a separate agreement with respect to each Guarantor and may be amended, modified, supplemented, waived or released with respect to any Guarantor without the approval of any other Guarantor and without affecting the obligations of any other Guarantor hereunder.

147

(b)    Delivery of an executed counterpart of a signature page of (x) this Agreement, (y) any other Loan Document and/or (z) any document, amendment, approval, consent, information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 9.01), certificate, request, statement, disclosure or authorization related to this Agreement, any other Loan Document and/or the transactions contemplated hereby and/or thereby (each an "**Ancillary Document**") that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement, such other Loan Document or such Ancillary Document, as applicable. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the Administrative Agent to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept any Electronic Signature, the Administrative Agent and each of the Lenders shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of the Borrower or any other Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic signature and (ii) upon the request of the Administrative Agent or any Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, the Borrower and each Loan Party hereby (A) agree that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the Administrative Agent, the Lenders, the Borrower and the Loan Parties, Electronic Signatures transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this Agreement, any other Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (B) agree that the Administrative Agent and each of the Lenders may, at its option, create one or more copies of this Agreement, any other Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (C) waive any argument, defense or right to contest the legal effect, validity or enforceability of this Agreement, any other Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this Agreement, such other Loan Document and/or such Ancillary Document, respectively, including with respect to any signature pages thereto and (D) waive any claim against any Person for any Liabilities arising solely from the Administrative Agent's and/or any Lender's reliance on or use of Electronic Signatures and/or transmissions by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of the Borrower and/or any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

148

Section 10.07  <u>Severability</u>. Subject to <u>Section 9.08</u>, any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.08  <u>Right of Setoff</u>. If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held by, and other obligations (in whatever currency) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.15</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application. Notwithstanding the foregoing, to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

Section 10.09  <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)    This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any Federal court of the United States of America sitting in New York County, Borough of Manhattan (or, in the event such court lacks subject matter jurisdiction, the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan) and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, any Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Guarantor or its properties in the courts of any jurisdiction.

149

(c)     Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10  Waiver Of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11  Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

150

Section 10.12  <u>Confidentiality</u>.

(a)    Each of the Administrative Agent, the Issuing Banks and the Lenders agrees to maintain the confidentiality of the Information (as defined below) and to not use the Information for any purpose except in connection with the Loan Documents, except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, and agents, including accountants, legal counsel and other professionals, experts or advisors, or to any credit insurance provider relating to the Borrower and its obligations, in each case whom it reasonably determines needs to know such information in connection with this Agreement and the transactions contemplated hereby and who are informed of the confidential nature of such Information and instructed to keep such Information confidential, (ii) to the extent requested by any regulatory authority, examiner regulating banks or banking, or other self-regulatory authority having oversight over the Administrative Agent, any Issuing Bank, any Lender or any of their respective Affiliates, (iii) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable laws or regulations or by any subpoena or similar legal process based on the advice of counsel (in which case the Administrative Agent, such Issuing Bank or such Lender, as applicable, agrees, to the extent permitted by applicable law, to inform the Borrower promptly thereof), (iv) to any other party to this Agreement, (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or prospective Participant in, any of its rights or obligations under this Agreement, or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (vii) with the consent of the Borrower, (viii) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section, (B) becomes available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower or (C) is independently developed by the Administrative Agent, an Issuing Bank or a Lender without use of or reference to any such confidential information and otherwise without violating this <u>Section 10.12</u>, (ix) on a confidential basis to any rating agency in connection with rating the Borrower or any of its Subsidiaries or the Loans hereunder, (x) to the CUSIP bureau, solely to the extent such confidential information is necessary to obtain CUSIP numbers and in consultation with the Borrower or (xi) for purposes of establishing a "due diligence" defense. In addition, the Administrative Agent, the Issuing Banks and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent, the Issuing Banks and the Lenders in connection with the administration of this Agreement, the other Loan Documents, the Letters of Credit and the Loans. For the purposes of this Section, "**Information**" means all memoranda or other information received from or on behalf of the Parent, the Borrower or any of its Subsidiary relating to the Parent, the Borrower or any Subsidiary or any of their respective business that is identified by the Borrower as confidential, other than any such information that is available to the Administrative Agent, any Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN <u>SECTION 10.12(A)</u> FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

151

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER AND ITS RELATED PARTIES OR ITS SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.13  Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.14  No Advisory or Fiduciary Responsibility. In connection with all aspects of each Transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Parent and the Borrower acknowledge and agree, and acknowledge their respective Subsidiaries' understanding, that: (a) (i) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arrangers, the Syndication Agent, the Documentation Agents, the Issuing Banks and the Lenders are arm's-length commercial transactions between the Parent, the Borrower and their respective Affiliates, on the one hand, and the Administrative Agent, the Arrangers, the Syndication Agent, the Documentation Agents, the Issuing Banks and the Lenders, on the other hand, (ii) each of the Parent and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each of the Parent and the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the Transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Administrative Agent, the Arrangers, the Syndication Agent, the Documentation Agents, the Issuing Banks and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Parent, the Borrower or any of their respective Subsidiaries, or any other Person and (ii) neither the Administrative Agent, any Arranger, the Syndication Agent, any Documentation Agent, any Issuing Bank, nor any Lender has any obligation to the Parent, the Borrower or any of their respective Affiliates with respect to the Transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Arrangers, the Syndication Agent, the Documentation Agents, the Issuing Banks and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Parent, the Borrower and their respective Affiliates, and neither the Administrative Agent, any Arranger, the Syndication Agent, any Documentation Agent, any Issuing Bank, nor any Lender has any obligation to disclose any of such interests to the Borrower or its Affiliates. Each of the Parent and the Borrower, on behalf of itself and each of its Subsidiaries, agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Administrative Agent, any Arranger, the Syndication Agent, any Documentation Agent, any Issuing Bank or any Lender, on the one hand, and the Parent, the Borrower, any of their respective Subsidiaries, or their respective stockholders or affiliates, on the other.

152

Section 10.15  <u>Electronic Execution of Assignments and Certain Other Documents</u>. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include Electronic Signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.16  <u>USA PATRIOT Act</u>. Each Lender and each Issuing Bank that is subject to the requirements of the USA Patriot Act hereby notifies the Borrower and each Guarantor that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes the name and address of the Borrower and each Guarantor and other information that will allow such Lender or such Issuing Bank to identify the Borrower and each Guarantor in accordance with the USA Patriot Act. The Borrower and each Guarantor shall, promptly following a request by the Administrative Agent, any Issuing Bank or any Lender, provide all documentation and other information that the Administrative Agent, such Issuing Bank or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

Section 10.17  <u>Releases of Guarantors and Liens</u>.

(a)    In the event that (i) all the Equity Interests in any Guarantor are sold, transferred or otherwise disposed of to a Person other than the Borrower or its Subsidiaries in a transaction permitted under this Agreement, or (ii) a Guarantor ceases to be a Subsidiary or becomes an Excluded Subsidiary (including as a result of any Change in Law that could reasonably be expected to result in adverse tax consequences and which the Borrower has determined shall become an Excluded Subsidiary in accordance with the definition thereof and has notified the Administrative Agent), then (x) such Guarantor shall be immediately, automatically and irrevocably released from its guarantee under the Loan Documents without any action of any Person and (y) the Administrative Agent shall, at the Borrower's expense, promptly take such action and execute such documents as the Borrower may reasonably request to terminate the guarantee of such Guarantor and to release the Collateral owned by such Guarantor from the Liens created by the Security Documents.

153

(b)    If (i) any of the Collateral shall be sold, transferred or otherwise disposed of by any Loan Party to a Person other than the Borrower or its Subsidiaries in a transaction permitted under Section 6.09 of this Agreement, (ii) any of the Collateral constitutes or becomes Excluded Property, (iii) any of the Collateral is owned by a Guarantor that is released from the Guaranty in accordance with the terms hereof or (iv) otherwise approved, authorized or ratified in writing in accordance with Section 10.02, then (x) the Lien on such Collateral in favor of the Administrative Agent pursuant to the Loan Documents shall be immediately, automatically and irrevocably terminated and released without any action of any Person and (y) the Administrative Agent shall, at the Borrower's expense, promptly take such action and execute such documents as the Borrower may reasonably request to release the Liens created by the Security Documents on such Collateral.

(c)    At such time as all Obligations (including unreimbursed LC Disbursements, but excluding contingent obligations as to which no claim has been asserted) have been paid in full and all Commitments have terminated or expired and no Letter of Credit shall be outstanding or subject to any pending draw (or otherwise Cash Collateralized or backstopped or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank), the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

(d)    The Administrative Agent may subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (d) of the "Permitted Encumbrances", clauses (c), (d) and (r) of Section 6.02 to the extent the documents governing such Indebtedness do not permit any other Lien (or any senior Lien, as applicable) on such property, and consent to and enter into (and execute documents permitting the filing and recording, where appropriate) the grant of easements and covenants and subordination rights with respect to real property, conditions, restrictions and declarations on customary terms, and subordination, non-disturbance and attornment agreements on customary terms reasonably requested by the Borrower with respect to leases entered into by the Parent and its Subsidiaries, to the extent requested by the Borrower and reasonably acceptable to the Administrative Agent.

Section 10.18    Acknowledgement Regarding Any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

154

In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 10.19  <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

155

Section 10.20  [Parallel Debt (Covenant to pay the Administrative Agent).

(a)    Each Loan Party, by way of an independent payment obligation, hereby irrevocably and unconditionally undertakes to pay to the Administrative Agent, as creditor in its own right and not as representative of the other Secured Parties, amounts equal to and in the currency of each amount payable by such Loan Party to each of the Secured Parties under any Loan Document as and when that amount falls due for payment under the relevant Loan Document or would have fallen due but for any discharge from failure of another Secured Party to take appropriate steps, in insolvency proceedings affecting that Loan Party, to preserve its entitlement to be paid that amount (the "**Parallel Debt**").

(b)    Each Loan Party and the Administrative Agent acknowledge that the obligations of each Loan Party under paragraph (a) above are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of that Loan Party to any Secured Party under any Loan Document (its "**Corresponding Debt**") nor shall the amounts for which each Loan Party is liable under paragraph (a) above (its Parallel Debt) be limited or affected in any way by its Corresponding Debt provided that: (i) the Administrative Agent shall not demand payment with regard to the Parallel Debt of any Loan Party to the extent that such Loan Party's Corresponding Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and (ii) neither the Administrative Agent nor any Secured Party shall demand payment with regard to the Corresponding Debt of any Loan Party to the extent that such Loan Party's Parallel Debt has been irrevocably paid or (in the case of guarantee obligations) discharged.

(c)    For the purpose of this Section 10.20, the Administrative Agent acts in its own name and not as a trustee, and it shall have its own independent right to demand payment of the amounts payable by each Loan Party under this Section 10.20, irrespective of any discharge of such Loan Party's obligation to pay those amounts to the other Secured Parties resulting from failure by them to take appropriate steps, in insolvency proceedings affecting that Loan Party, to preserve their entitlement to be paid those amounts.

(d)    The rights of the Secured Parties (other than the Administrative Agent) to receive payment of amounts payable by each Loan Party under the Loan Documents are several and are separate and independent from, and without prejudice to, the rights of the Administrative Agent to receive payment under this Section 10.20.

(e)    Without limiting or affecting the Administrative Agent's rights against the Loan Parties (whether under this Section 10.20 or under any other provision of the Loan Documents), each Loan Party acknowledges that: (i) nothing in this Section 10.20 shall impose any obligation on the Administrative Agent to advance any sum to any Loan Party or otherwise under any Loan Document, except in its capacity as a Lender (other than as Administrative Agent); and (ii) for the purpose of any vote taken under any Loan Document, the Administrative Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a Lender (other than as Administrative Agent).

Section 10.21  Subordinated Lender.

(a)    If the Distributed Amount is less than the Maximum Amount, then, upon application of the Distributed Amount (or any part thereof) pursuant to Section 2.15(b) towards the discharge of the obligations of a Loan Party under the Loan Documents (including principal, interest, fees and commissions), the amount which would otherwise be required to be applied towards any such obligations under the Loan Documents owed to a Subordinated Lender shall be reduced by the Shortfall Amount attributable to that Subordinated Lender and such amount shall in addition be applied towards the discharge of the obligations (including principal, interest, fees, commission) towards the other Lenders pro rata in accordance with Section 2.15(b).

156

(b)     Any risk of a shortfall between the Maximum Amount and the Distributed Amount (whether arising from the prohibition and/or reduction of payments to the Subordinated Lender and/or from any contestation (*Anfechtung*) under applicable law) shall for all purposes of the Loan Documents be borne by the relevant Subordinated Lender.

(c)     A Subordinated Lender shall not have the benefit, but only the obligations, of any sharing provisions under the Loan Documents, including under Section 2.15(c), and shall not be entitled to receive any payment, and the Administrative Agent shall not be required to make any payment to any Subordinated Lender under or in connection with the Loan Documents in respect of the Shortfall Amount.

Section 10.22   Restricted Lender.

(a)     In relation to each Lender resident in Germany (*Inländer*) within the meaning of section 2 paragraph 15 German Foreign Trade Law (*Außenwirtschaftsgesetz*) or that otherwise notifies the Administrative Agent that it is a "Restricted Lender" for the purpose of this Section 10.22 (each a "**Restricted Lender**"), the representations and undertakings under Section 3.15, 3.16 and 5.09 (together, the "**Sanctions Provisions**") shall only apply for the benefit of that Restricted Lender to the extent that it would not result in any violation of, conflict with or liability under (i) section 7 of the German Foreign Trade Regulation (*Außenwirtschaftsverordnung*) (in conjunction with section 4 paragraph 1 a no 3 German Foreign Trade Law (*Außenwirtschaftsgesetz*), (ii) any provision of the Council Regulation (EC) No 2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom and/or (iii) any other applicable anti-boycott laws or regulations.

(b)     In connection with any amendment, waiver, determination or direction relating to any part of a Sanctions Provision of which a Restricted Lender does not have the benefit pursuant to paragraph (a) above, the Commitments of that Restricted Lender will be excluded for the purpose of determining whether the consent of the Required Lenders has been obtained or whether the determination or direction by the Required Lenders has been made.]

[Remainder of page intentionally left blank; signature pages follow]

157

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

FLUENCE ENERGY, LLC, a Delaware limited liability company, as Borrower

By: _____

Name:
Title:

[Signature Page to Revolving Credit Agreement]

FLUENCE ENERGY, INC., a Delaware corporation, as Parent

By: _____

Name:

Title:

[Signature Page to Revolving Credit Agreement]

| Signed, sealed and delivered by FLUENCE ENERGY PTY LTD in accordance with section 127 of the *Corporations Act 2001* (Cth) by: | | |
|---|---|---|
| Signature of director | | Signature of director/secretary |
| Name of director (print) | | Name of director/secretary (print) |

[Signature Page to Revolving Credit Agreement]

FLUENCE ENERGY GMBH, a German corporation, as a Guarantor

By: _____
  Name:
  Title:

[Signature Page to Revolving Credit Agreement]

FLUENCE ENERGY GLOBAL PRODUCTION OPERATION, LLC, a Delaware limited liability company, as a Guarantor

By: _____

    Name:

    Title:

[Signature Page to Revolving Credit Agreement]

FLUENCE ENERGY, INC., a Philippine corporation, as a Guarantor

By: _____

Name:

Title:

[Signature Page to Revolving Credit Agreement]

JPMORGAN CHASE BANK, N.A., as Administrative Agent, an Issuing Bank and a Lender

By: _____
     Name:
     Title: Authorized Officer

[Signature Page to Revolving Credit Agreement]

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 702 of 1007
PageID# 1681

JPMORGAN CHASE BANK, N.A., as Administrative Agent, an Issuing Bank and a Lender

By: _____
     Name:
     Title: Authorized Officer

[Signature Page to Revolving Credit Agreement]

[_], as a Lender

By: _____
Name:
Title: Authorized Signatory

[Signature Page to Revolving Credit Agreement]

Execution Version

# AMENDED AND RESTATED SIEMENS LICENSE AGREEMENT

This **AMENDED AND RESTATED SIEMENS LICENSE AGREEMENT** (this "*Agreement*"), dated as of June 9, 2021 (the "*Effective Date*"), is entered into by and between Fluence Energy, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware (the "*Company*"), and Siemens Aktiengesellschaft, with registered seats in Berlin and Munich, Federal Republic of Germany ("*Siemens*"). The Company and Siemens are each referred to herein as a "*Party*" and are collectively referred to herein as the "*Parties*."

## PRELIMINARY STATEMENTS:

1. Pursuant to that certain Equity Contribution Agreement between AES Grid Stability LLC ("*AES*") and Siemens Industry, Inc. dated July 9, 2017 (the "*ECA*"), and in connection with the Share Sale and Transfer Agreement between Siemens and the Company contemplated under the ECA, Siemens agreed to contribute to Newco (as defined in the ECA) certain Siemens Intellectual Property to the Company and to grant a license to the Company to use certain other Siemens Intellectual Property (excluding the Siemens Trademarks and Branding, which is licensed to the Company pursuant to the Siemens Company Name Affix and Trademark License Agreement); and

2. The Parties entered into the Siemens License Agreement dated as of July 9, 2017 (the "*Original Agreement*"), pursuant to which the Company, in accordance with the ECA, acquired the right to license in certain Siemens Intellectual Property (excluding the Siemens Trademarks and Branding, which will be licensed to the Company pursuant to the Siemens Company Name Affix and Trademark License Agreement) on the terms and subject to the conditions set forth in the Original Agreement and the ECA.

3. The Parties desire to amend and restate the Original Agreement as provided herein.

NOW, THEREFORE, in consideration of the mutual agreements, covenants, representations and warranties set forth herein, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE ONE
## DEFINITIONS AND PRINCIPLES OF INTERPRETATION

1.1 *Definitions*. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the ECA and in the Amended and Restated LLC Agreement dated January 01, 2018 (the "Amended and Restated LLC Agreement"). Notwithstanding the foregoing, terms in capital letters used in this Agreement shall have the meaning defined in this Article 1 of this Agreement.

(a)    "*Back-License*" shall have the meaning set forth in Section 3.1 of this Agreement.

(b)    "*Business*" shall mean the battery-based energy storage business conducted by the Siemens Energy Management Division prior to the Closing Date, encompassing

development, marketing, and sale of Integrated Solutions for Applications, as such terms shall be defined in the Amended and Restated LLC Agreement.

(c)    "*Business Purpose*" means the purpose of the Company which shall be to develop and globally market and sell stationary energy storage systems and solutions based on battery technology for utility-scale and commercial industrial applications and residential applications, together with such other lawful activities as a limited liability company may undertake in connection therewith. The Business Purpose includes energy storage mediums such as supercapacitors, primary batteries, and secondary batteries such as lithium, Li-Ion, flow batteries, sodium-ion, and metal-air but excludes developing or producing the technology for the storage medium itself (e.g., battery chemistry) and inverters.

(d)    "*Closing Date*" means January 01, 2018.

(e)    "*Contributed Siemens Intellectual Property ("IP")*" means the Siemens Software or Know-How contributed under the Local Asset Transfer Agreement that is transferred to the Company on the Closing Date or other Siemens IP that is transferred to the Company at a later date through the function of Section 4.7 and/or Section 4.8.

(f)    "*Company Roadmap*" means a document mutually agreed by Siemens and AES prior to or on the Closing Date that contains technical details of R&D work to be undertaken by the Company after the Closing Date and will be included in Exhibit B, as amended upon mutual written agreement of the Parties up to and until the Closing Date.

(g)    "*Derived IP*" shall have the meaning set forth in Section 3.2 of this Agreement.

(h)    "*Exclusive Activities*" shall have the meaning ascribed to them in the Amended and Restated LLC Agreement.

(i)    "*Know-How*" means all proprietary and confidential information and data (irrespective as to whether such information or data is available by way of documentation, orally or in electronic format, or protected by copyrights), including business and trade secrets, technical and business information and data, know-how and similar proprietary rights in confidential information and processes, discoveries, analytic models, improvements, techniques, devices, methods, patterns, formulations and specifications, all to the extent that such information and data are proprietary and confidential and neither Software nor a Patent.

(j)    "*Licensed Object Code Software*" means Software in object code which is licensed to Company, if any, to the extent that the Company can prove Use or Preparatory Use with respect to such Software and Software in object code listed in Exhibit A.

(k)    "*Licensed Siemens Intellectual Property ("IP")*" means all Patents and Know-How owned by the Siemens Group (where those Patents have a priority date prior to or on the Closing Date and where that Know-How was developed or conceived prior to or on the Closing Date), other than the Contributed Siemens IP, to the extent (1) used by the Company for Exclusive Activities or Non-Exclusive Activities for the Business Purpose or (2) that the Company can prove Preparatory Use with respect to such IP. With respect to the foregoing clause 2 of this definition,

2

when Intellectual Property is identified pre- or post-closing that the Company believes falls under this definition and requires proof of Preparatory Use, the Company will identify such Intellectual Property and the Preparatory Use of such Intellectual Property to the Siemens SI DS FG Head, who will coordinate with the relevant Siemens department(s) in good faith to determine in a commercially reasonable manner if the Company has satisfied its burden of proof regarding Preparatory Use and, if this is the case, Siemens will, within a reasonable time frame, acknowledge in writing that such Intellectual Property is Licensed Siemens IP and will include such Licensed Siemens IP on the Third List for Dual Use IP.

(l)    "*Licensed SieStorage Know-How*" means all SieStorage Know-How and SIMATIC configuration relating to Power Quality (MS UPS) and Microgrid and Islands applications, as shall be defined in the Amended and Restated LLC Agreement. For avoidance of doubt, Licensed SieStorage Know-How does not include the Contributed Siemens IP.

(m)    "*Licenses*" means, collectively, the licenses granted to the Company under Sections 2.1 and 2.2.

(n)    "*Listed Dual Use Intellectual Property ("IP")*" means IP owned by the Siemens Group, if any, which is listed in Exhibit D, as amended upon mutual written agreement of the Parties up to and until the Closing Date. It comprises IP that the Company requires to conduct its business in the Exclusive Activities and for any such Listed Dual Use IP, the Company is not required to prove Use or Preparatory Use with respect to the Exclusive Activities; such Use or Preparatory Use is presumed.

(o)    "*Non-Exclusive Activities*" means activities within the Business Purpose which are not Exclusive Activities.

(p)    "*Patents*" means all patents, utility models, patent and utility model applications, and all priorities and rights related thereto, including all reissues, reexaminations, divisions, continuations, continuations-in-part, provisionals, continued prosecution applications, substitutions, extensions, additions or renewals of any of the foregoing.

(q)    "*Permitted Sublicensing*" means sublicensing by Company to: (i) Subsidiaries of the applicable licensee, but only for the period of time during which such sub-licensee is a Subsidiary of that licensee and only with respect to the Business Purpose; (ii) suppliers, subcontractors, contract manufacturers, or contract developers of the applicable licensee, if and to the extent such sub-license is necessary to allow such supplier, subcontractor, contract manufacturer, or contract developer to manufacture and deliver products to or for that licensee or to perform services for that licensee with respect to the Business Purpose; and (iii) to customers of the applicable licensee, if and to the extent such sub-license is necessary to allow such customer to use, resell, transfer or customize a product or benefit from services sold or provided by that licensee with respect to the Business Purpose. Permitted Sublicensing cannot have a broader scope than the main license from which it flows.

(r)    "*Preparatory Use*" means preparatory actions to use Licensed Siemens IP by the Business on or before the Closing Date or, with respect to the Exclusive Activities, reflected in the SieStorage Roadmap, the Advancion™ Roadmap, the Company Roadmap, or the Company

3

Business Plan, all as attached to this document in Exhibit B, as amended upon mutual written agreement of the Parties up to and until the Closing Date. With respect to the Exclusive Activities only, Preparatory Use can be established by comparing patent claims in patents owned by the Siemens Group, if any, with planned activities of the Business or the Company as documented in the SieStorage Roadmap, the Advancion™ Roadmap, the Company Roadmap, or the Company Business Plan, to the extent that any such document contains sufficient technical details to be mapped to specific IP of the Siemens Group. With respect to the Non-Exclusive Activities, Preparatory Use can be established by comparison of patent claims in patents owned by the Siemens Group with technical documents or specifications existing in the Business or before the Closing Date. Preparatory Use of Know-How can be established by comparing Know-How of the Siemens Group with technical documents or specifications that existed within the Business prior to or on the Closing Date. For the avoidance of doubt, Licensed Siemens IP can be identified and proven by the Parties before, on or after the Closing Date, but Use or Preparatory Use must occur before the Closing Date.

(s)    "*Restricted Party*" shall have the meaning set forth in Section 4.10 of this Agreement.

(t)    "*Siemens Group*" means Siemens, all Affiliates of Siemens (including Siemens Aktiengesellschaft), and each of their Subsidiaries, with the exception of Gamesa Corporación Technológica S.A. and Siemens Healthineers AG, and their respective group or regional companies.

(u)    "*Siemens SI DS FG Head*" shall mean the lead executive of Smart Infrastructure Distribution Systems Future Grid, which at the date hereof is Mr. Jean-Christoph Heyne.

(v)    "*SieStorage Dual Use Patents*" means all Patents in all countries of the world that claim priority from the Patents identified in Exhibit E (which may be updated and amended with mutual agreement of the Parties up to and until the Closing Date).

(w)    "*Software*" means all computer programs, operating systems, applications, systems, firmware, and software of any nature, whether operational, active, under development, or design, non-operational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, test scripts, user manuals, and other documentation therefore, whether in machine-readable form, programming language, or any other language or symbols, and whether stored, encoded, recorded, or written on disk, tape, film, memory device, paper, or other media of any nature and all databases necessary or appropriate to operate any such computer program, operating system, applications systems, firmware, or software.

(x)    "*Third List for Dual Use IP*" means a list of Licensed Siemens IP that does not satisfy the definition of either Listed Dual Use IP or SieStorage Dual Use Patents. Use or Preparatory Use for all IP on this list must be proven by the Company. This list can be created pre- or post-Closing, and will not serve as an Exhibit (or other annex) to this Agreement. For the

4

avoidance of doubt, Sections 4.5, 4.7, or 4.8 do not apply to IP contained on the Third List for Dual Use IP. Section 4.9 shall, however, apply to the Third List for Dual Use IP.

(y) "*Use*" shall mean actual use of Licensed Siemens IP by the Business on or before the Closing Date. Use of Patents can be established by comparing patent claims in Patents owned by the Siemens Group, if any, with products of the Business that existed prior to or on the Closing Date. Use of Know-How can be established by comparing Know-How of the Siemens Group with technical documents or specifications existing within the Business or Know-How used in products of the Business prior to or on the Closing Date.

1.2    Rules of Interpretation. In this Agreement:

(a) The singular shall include the plural and the masculine shall include the feminine and neuter as the context requires.

(b) References to "*Articles*" and "*Sections*" shall be to articles or sections of this Agreement.

(c) The words "*herein,*" "*hereof,*" and "*hereunder*" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement; the words "*include,*" "*includes*" or "*including*" shall mean "*including, but not limited to.*"

(d) Any reference to a statute, regulation or law, including Applicable Laws, shall include any amendment thereof or any successor thereto and any rules and regulations promulgated there under.

## ARTICLE TWO
## LICENSES TO THE COMPANY

2.1    Non-Exclusive Activities.

(a) Licensed Siemens IP. With effect as of the Closing Date, Siemens hereby grants to the Company under the Licensed Siemens IP a worldwide, nonexclusive, non-transferable, perpetual, royalty-free license to conduct any Non-Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing, licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution, or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(b) Licensed Object Code Software and Licensed SieStorage Know-How. With effect as of the Closing Date, Siemens hereby grants to the Company a worldwide, non-exclusive, non-transferable, perpetual royalty-free license to use and to engage in Permitted Sublicensing with respect to: (i) the Licensed Object Code Software, if any, when used to conduct Non-Exclusive Activities; and (ii) the Licensed SieStorage Know-How, if any, when used to conduct Non-Exclusive Activities.

(c) SieStorage Dual Use Patents. With effect as of the Closing Date, Siemens hereby grants to the Company under the SieStorage Dual Use Patents a worldwide, non-exclusive,

5

non-transferable, perpetual, royalty-free license to conduct any Non-Exclusive Activities and to engage in Permitted Sublicensing.

(d)    Additional Patents. If, after the Closing Date, the Company determines that it requires a license for products developed by the Company after the Closing Date under a Patent owned by the Siemens Group (other than the SieStorage Dual Use Patents, the Licensed Siemens IP, if any, and the Third List for Dual Use IP) in order to conduct any Non-Exclusive Activities, the Company will identify that Patent and the Company's intended use in writing to the Siemens SI DS FG Head. Upon such notification, the Parties will negotiate in good faith the terms and conditions of a separate license agreement governing the Company's use of the identified Patent and any associated royalties and other consideration to be paid to Siemens by the Company in connection with that license agreement.

(e)    Restricted IP. For the avoidance of doubt, SIMATIC (programmable logic controller used in the SieStorage solution) will not be assigned to the Company nor licensed under this Agreement; usage will be made available through a separate software license. For the further avoidance of doubt, the Microgrid Controller, the Fast Switch hardware, and PCS (inverter) will be supplied to the Company through the Siemens Equipment and Services Purchase Agreement.

2.2    Exclusive Field – Exclusive Activities.

(a)    Licensed Siemens IP. With effect as of the Closing Date, Siemens hereby grants to the Company under the Licensed Siemens IP a worldwide, non- exclusive, non-transferable, perpetual, royalty-free license to conduct any activities within the Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing, licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution, or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(b)    Licensed Object Code Software and Licensed SieStorage Know-How. With effect as of the Closing Date, Siemens hereby grants to the Company a worldwide, non-exclusive, non-transferable, perpetual royalty-free license to use and to engage in Permitted Sublicensing with respect to: (i) the Licensed Object Code Software when used to conduct Exclusive Activities; and (ii) the Licensed SieStorage Know-How when used to conduct Exclusive Activities.

(c)    Listed Dual Use IP/SieStorage Dual Use Patents. With effect as of the Closing Date, Siemens hereby grants to the Company under the SieStorage Dual Use Patents and Listed Dual Use IP, if any, a worldwide, non-exclusive, non-transferable, perpetual, royalty-free license to conduct any activities within the Exclusive Activities and to engage in Permitted Sublicensing.

(d)    Additional Patents. If, after the Closing Date, the Company determines that it requires a license for products developed by Company after the Closing Date under a Patent owned by the Siemens Group, if any, (other than the SieStorage Dual Use Patents, the Licensed Siemens IP, Listed Dual Use IP, and the Third List for Dual Use IP, if any) in order to conduct any activities within the Exclusive Activities, the Company will identify that Patent and the Company's

6

intended use in writing to the Siemens SI DG FG Head. Upon such notification, the Parties will negotiate in good faith the terms and conditions of a separate license agreement governing the Company's use of the identified Patent and any associated royalties and other consideration to be paid to Siemens by the Company in connection with that license agreement.

(e)     Restricted IP. For the avoidance of doubt, SIMATIC (programmable logic controller used in the SieStorage solution) will not be assigned to the Company nor licensed under this Agreement; usage will be made available through a separate software license. For the further avoidance of doubt, the Microgrid Controller, the Fast Switch hardware, and PCS (inverter) will be supplied to the Company through the Siemens Equipment and Services Purchase Agreement.

2.3     Termination of the Licenses. The Licenses may be terminated, in whole or in part, by Siemens only in accordance with the procedure set forth in Section 8.2(b) of this Agreement if the Company has materially breached this Agreement, and such breach has not been cured within thirty (30) business days. On the termination of the Licenses, in whole or in part: (a) all rights of the Company under the terminated License(s) shall terminate forthwith and shall revert immediately to Siemens; and (b) the Company may no longer use the IP licensed to the Company pursuant to the terminated License(s) and shall promptly transfer to Siemens, free of charge, all registrations, filings and rights with regard to such Intellectual Property which it may have possessed at any time. For purposes of this Section 2.3, a material breach will require a breach of the license grant by Company involving: (a) sublicensing by Company under the licenses granted in Sections 2.1 or 2.2 that is not Permitted Sublicensing, or (b) activities by Company violating the licenses granted in Section 2.1 or Section 2.2.

**ARTICLE THREE**
**LICENSES TO SIEMENS**

3.1     With effect as of the Effective Date, Siemens hereby irrevocably and perpetually retains and the Company hereby grants to Siemens a perpetual, non-exclusive, worldwide, non-transferable (except as provided in Article 5), sublicenseable pursuant to Section 3.5, right to do any acts within the current and future fields of business of the Siemens Group which are not Exclusive Activities and which would otherwise infringe any of the Contributed Siemens IP (the "*Back-License*"), under fair, reasonable and non-discriminatory ("*FRAND*") royalty terms, to be negotiated by the Parties before such Back-License is exercised. Except to the extent retained by Siemens or licensed to Siemens under this Agreement, the Company will have all rights with respect to the Contributed Siemens IP, including the sole right to prepare, file, prosecute, obtain, maintain and enforce the Contributed Siemens IP, to the extent applicable. For the avoidance of doubt, the License to the IP set out in Section 3.1 shall include a license to Siemens (except for Exclusive Activities) to any Patents that are applied for by the Company after the Closing Date on inventions included in the Contributed Siemens IP; as well as a license to Siemens (except for Exclusive Activities) to any Software included in the Contributed Siemens IP, in both source code and object code format, in the form that such Software in source code format existed on the Closing Date, which license includes the right to develop, copy, use, modify, and create derivative works of that Software in source code and object code format, and a license to any copyrights, registered or unregistered, owned by the Company after the Closing Date on Software included in the Contributed Siemens IP; and shall not include a license to Siemens to do any acts which are

7

Exclusive Activities. This Section 3.1 shall not retroactively apply to the time period between the Closing Date and the Effective Date.

3.2     With effect as of the Effective Date, Siemens hereby perpetually retains and the Company hereby grants to Siemens a perpetual, non-exclusive, worldwide, non-transferable (except as provided in Article 5), sublicenseable pursuant to Section 3.5, right to do any acts within the current and future fields of business of the Siemens Group which are not Exclusive Activities and which would otherwise infringe any IP owned by the Company which was derived from: (i) the Contributed Siemens IP, provided however, that with respect to any derivations of any Software in source code format included in the Contributed Siemens IP made by or on behalf of the Company, the license granted to Siemens under this Section 3.2 only includes a license to use that derived Software, if any, in object code format, and not in source code format; (ii) the SieStorage Dual Use Patents; (iii) the Licensed Siemens IP ; or (iv) the Additional Patents, if any, licensed to the Company under Section 2.1(d) or 2.2(d) hereunder (the IP specified in Section 3.2(i)-(iv) above is referred to, collectively, as the "*Derived IP*"), under FRAND royalty terms to be negotiated by the Parties before such licenses to the Derived IP are exercised (hereinafter the "*Back-Licenses to Derived IP*"); provided that such Derived IP was developed when Siemens or any of its Affiliates collectively owned at least twenty percent (20%) of the equity of the Company. For the avoidance of doubt, the *Back-Licenses to Derived IP* shall include a license to Siemens (except for Exclusive Activities) to any Patents that are applied for by the Company after the Closing Date on improvements and modifications to the Contributed Siemens IP that are developed by or on behalf of the Company; and shall not include a license to Siemens to do any acts which are Exclusive Activities. The Company will notify Siemens in writing of any Patent derived from the above-mentioned IP promptly after filing that application. This Section 3.2 shall not retroactively apply to the time period between the Closing Date and the Effective Date. The Company hereby represents and warrants that it did not make any material Derived IP during the time period between the Closing Date and the Effective Date of this Amendment.

3.3     Siemens may request that Company provide it a copy of the derived Software in object code format described in section 3.2(i), above, if any. Such request will be a written request and Company shall deliver to Siemens such copy in a commercially reasonable manner and time; provided, however, that Company shall not be obligated to respond to such a written request more frequently than four times each calendar year.

3.4     The Back-Licenses to Derived IP may be terminated, in whole or in part, by Company in accordance with the procedure set forth in Section 8.2 of this Agreement if Siemens has materially breached this Agreement, and such breach has not been timely cured within thirty (30) days. On the termination of the Back-Licenses to Derived IP, in whole or in part: (a) all rights of Siemens under the terminated Back-Licenses to Derived IP shall terminate forthwith and shall revert immediately to the Company; and (b) Siemens may no longer use the Derived IP licensed to Siemens pursuant to the terminated Back-Licenses to Derived IP and shall promptly transfer to the Company, free of charge, all registrations, filings and rights with regard to such Intellectual Property which it may have possessed at any time. For purposes of this Section 3.4, a material breach will require a breach by Siemens of the Back-Licenses to Derived IP involving: (a) sublicensing by Siemens which is not permitted sublicensing, or (b) activities by Siemens that violate the licenses granted in Section 3.2.

8

3.5    The license granted under Sections 3.1 and 3.2 are sublicensable to Affiliates, provided that (i) the Affiliate agrees to abide by and be subject to terms and provisions substantially consistent with this Section 3; (ii) the Affiliate shall have no further right to grant sublicenses under this Agreement; (iii) Siemens remains fully liable for the performance of its sublicensed Affiliates obligations hereunder; (iv) Siemens provides Company with all executed sublicenses; and (v) any sublicense shall terminate on the date any sublicensed Affiliate ceases to be an Affiliate of Siemens.

## ARTICLE FOUR
## OBLIGATIONS AND RESTRICTIONS

4.1    The Company shall not do or suffer to be done any act or thing which may materially adversely affect any rights of Siemens in or to any of the IP licensed to the Company by Siemens pursuant to the Licenses or any registrations thereof.

4.2    Siemens shall not do or suffer to be done any act or thing which may materially adversely affect any rights of the Company in or to the Contributed Siemens IP or any registrations thereof.

4.3    Siemens shall undertake, at its own expense, the prosecution and maintenance of all IP licensed to the Company pursuant to the Licenses.  In the event that Company identifies an office action issued during prosecution of the SieStorage Dual Use Patents or the Listed Dual Use IP, if any, it may request that Siemens provide Company commercially reasonable consultation rights in connection with responding to such office action, which rights will be provided to the extent they do not cause an unreasonable delay in such prosecution, e.g., by requiring an extension of time to respond to the office action.

4.4    Company shall undertake, at its own expense, the prosecution and maintenance of (a) any of the Contributed Siemens IP and (b) any other IP owned by the Company, including but not limited to Derived IP.  Siemens shall undertake, at its own expense, to reasonably cooperate with the Company to perfect rights in such IP.

4.5    Patent Litigation.

(a)    The Company will promptly give written notice to the Siemens SI DS FG Head if the Company becomes aware of any actual, threatened, or suspected infringement of, or any unauthorized use or any challenge to the validity of, any of the Intellectual Property licensed to the Company pursuant to the Licenses, including the SieStorage Dual Use Patents, if any.

(b)    Without limiting the obligations under Section 4.5(a), Siemens will consult in good faith with the Company in evaluating the strength of a claim of any actual, threatened, or suspected infringement of the SieStorage Dual Use Patents or the Listed Dual Use IP.  This will consist of generating a patent claim chart that shows why each and every element in at least one independent patent claim in one or more of the SieStorage Dual Use Patents or the Listed Dual Use IP is shown in a product sold or distributed by a Third Party before any patent litigation is considered.  Siemens will consider the pros and cons of proceeding against any Third Party in a commercially reasonable manner, and in the event that the pros materially outweigh the cons, Siemens will proceed.  The ultimate decision to proceed rests with Siemens.

9

(c)    If the foregoing process identifies and confirms a potential infringement of the SieStorage Dual Use Patents or Listed Dual Use IP, if any, the Siemens SI DS FG Head will consult with the Company's management team to determine whether a patent infringement litigation should be pursued. In circumstances where the potential patent infringement identified is of a SieStorage Dual Use Patent or a Listed Dual Use IP, and the Company's management team believes a patent infringement action should be undertaken, the Siemens SI DS FG Head will: (i) coordinate an internal review of the Company's request to initiate a patent litigation; and (ii) determine (in good faith and in consultation with the appropriate managers and executives of Siemens) whether a patent litigation is merited based on the aforementioned claim chart(s).

(d)    If Siemens believes that infringement of a SieStorage Dual Use Patent or a Listed Dual Use IP has not been reasonably established, the Siemens SI DS FG Head will, before making a final decision on whether to pursue a patent litigation, collaborate with the Company to obtain any further information to establish patent infringement and facilitate discussions between Siemens' internal corporate Intellectual Property department and the Company on why Siemens believes that patent infringement has not been reasonably established.

(e)    If the Company and Siemens believe that infringement of the respective SieStorage Dual Use Patent or the Listed Dual Use IP has been reasonably established and the validity of that SieStorage Dual Use Patent or the Listed Dual Use IP has been confirmed, the Siemens SI DS FG Head will diligently coordinate with the rest of the Siemens organization to confirm that a patent litigation will be initiated (which process shall account for any relationship, such as a supply relationship, between Siemens and the applicable Third Party) and, if confirmed, Siemens will (within sixty (60) business days) initiate a patent litigation. Upon the initiation of such patent litigation, the Parties will continue to consult regarding on-going litigation activities and the Company will provide to Siemens commercially reasonable information required in connection with the proceedings (including technical information) based on the nature of those proceedings. All commercially reasonable costs associated with a patent litigation initiated pursuant to this Section 4.5 will be split between the Company and Siemens, as determined by the Parties on a case-by-case basis.

4.6    The Back-License and the Back-Licenses to Derived IP (as set out in Article Three of this Agreement) shall apply to any IP transferred or sold to the Company under Sections 4.7, 4.8 and 4.9.

4.7    If Siemens receives a bona fide offer to purchase any of the SieStorage Dual Use Patents, Siemens will communicate in writing to the Company the full terms of the offer. The Company may elect to purchase the applicable SieStorage Dual Use Patents on the terms set forth in the offer by providing Siemens written notice of the election to do so within thirty (30) business days after Siemens' communication of the offer. If the Company fails to give written notice of election within thirty (30) business days, Siemens may sell to the offeror on the terms offered, subject to Article 5 this Agreement.

4.8    Siemens shall notify the Company in writing if Siemens decides to abandon any of the SieStorage Dual Use Patents or the Listed Dual Use IP, if any, in which case Siemens will offer those SieStorage Dual Use Patents or the Listed Dual Use IP to the Company at no cost and, if accepted by the Company: (i) Siemens will ensure that those SieStorage Dual Use Patents or the

10

Listed Dual Use IP are promptly assigned to the Company, with the Company assuming any direct fees or costs of assignment; and (ii) the Company may, at its discretion, file, prosecute, and maintain those SieStorage Dual Use Patents or Listed Dual Use IP at the Company's cost.

4.9    For a period of four (4) years after the Closing Date, Siemens shall notify the Company in writing if Siemens decides to abandon any of the IP on the Third List for Dual Use IP, in which case Siemens will offer such IP to the Company at no cost and, if accepted by the Company: (i) Siemens will ensure that the respective IP is promptly assigned to the Company, with the Company assuming any direct fees or costs of assignment; and (ii) the Company may, at its discretion, file, prosecute, and maintain such IP from the Third List for Dual Use IP. Both the obligation to notify of the abandonment decision as well as the obligation to offer Company such IP shall cease to exist on the fourth anniversary of the Closing Date. In addition, upon written request of the Company concerning possible third-party challenges to the validity of specific IP on the Third List for Dual Use IP, Siemens shall inform the Company of any such challenges of which it is aware.

4.10    Export Control Laws. The Parties agree to comply with U.S. export laws and regulations pertaining to the export of technical data, services and commodities, including the International Traffic in Arms Regulations (22 C.F.R. § 120 et seq.), the Export Administration Regulations (15 C.F.R. § 730 et seq.), the regulations administered by the Treasury Department's Office of Foreign Assets Control (31 C.F.R. § 500, et seq.), and the Anti-Boycott Regulations (15 C.F.R. § 760). The Parties shall cooperate with each other to facilitate compliance with these laws and regulations. The Parties understand that sharing controlled technical data with non-U.S. persons is an export to that person's country of citizenship that is subject to U.S. export laws and regulations, even if the transfer occurs in the United States. Siemens shall obtain, at its own expense, any necessary U.S. government license or other authorization required pursuant to the U.S. export control laws and regulations for the export or re-export of any commodity, service or technical data covered by this Agreement, including under the Back-License and the BackLicenses to Derived IP, as each is set forth in Sections 3.1 and 3.2. Each Party represents that it is not designated as an entity for which U.S. persons are required to obtain U.S. government authorization to enter into financial or export transactions (a "**_Restricted Party_**"). Any Party to this Agreement shall immediately notify the other Party if, at any time during the term of this Agreement, it becomes a Restricted Party.

**ARTICLE FIVE**
**ASSIGNMENT**

5.1    Neither Party may assign all or any part of this Agreement, or any rights or obligations hereunder (including, with respect to the Company, the Licenses; and, with respect to Siemens, the Back-License and the Back-Licenses to Derived IP), without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any purported assignment which fails to comply with the requirements of this Section 5.1 shall be null and void. Notwithstanding the foregoing, either Party may, without the prior written consent of the other Party, assign all or any part of this Agreement, or any rights or obligations hereunder, to an Affiliate, which will accept such assignment and assume all obligations related to this Agreement; provided that, notwithstanding any such assignment, the assigning Party shall not be relieved of

11

any of its obligations hereunder by reason of such assignment and shall remain liable hereunder for the fulfillment of the obligations to the extent the assignee does not fulfill such obligations.

5.2     Notwithstanding anything to the contrary herein, Siemens shall ensure that the SieStorage Dual Use Patents, Listed Dual Use IP, or IP on the Third List for Dual Use IP licensed to the Company pursuant to the Licenses, and the Company's rights under this Agreement therein and thereto, remain unaffected in case of a transfer of the SieStorage Dual Use Patents, Listed Dual Use IP, or IP on the Third List for Dual Use IP by Siemens to a subsequent purchaser by contractually obligating such subsequent purchaser to respect such Licenses and all related obligations of Siemens so that the Company can directly enforce such rights against such subsequent purchaser.

5.3     Notwithstanding anything to the contrary herein, the Company shall ensure that the Contributed Siemens IP and all IP transferred or sold to Company under Sections 4.6, 4.7 and 4.8, and Siemens' rights under this Agreement therein and thereto, remain unaffected in case of a transfer of the respective IP by the Company to a subsequent purchaser by contractually obligating such subsequent purchaser to respect such licenses and all related obligations of the Company (including the Back-License and the Back-Licenses to Derived IP) so that Siemens can directly enforce such rights against such subsequent purchaser.

**ARTICLE SIX**
**WARRANTIES, INDEMNIFICATION, AND DISCLAIMERS**

6.1     Siemens represents and warrants that:

(a)     It has the full legal right and authority to enter into this Agreement and to convey the rights and licenses that it conveys under this Agreement; and

(b)     To the knowledge of Siemens, there is no action, suit or proceeding pending against it or any of its Affiliates challenging the validity or enforceability of the SieStorage Dual Use Patents or the Listed Dual Use IP. At Company's request, Siemens will provide information concerning actions, suits or proceedings relating to any IP transferred or sold to Company under Sections 4.7, 4.8 and 4.9.

Siemens will defend the Company against all Third Party claims, actions, suits, or other proceedings against the Company arising out of or resulting from a breach of the representations and warranties under this Section 6.1, and shall indemnify and hold the Company harmless from and against all judgments, losses, liabilities, damages, costs and expenses (including without limitation, reasonable attorneys' fees) arising out of or incurred in connection with all such claims, actions, suits, or other proceedings.

6.2     EXCEPT AS EXPRESSLY SET FORTH IN SECTION 6.1, SIEMENS EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THE INTELLECTUAL PROPERTY LICENSED TO THE COMPANY PURSUANT TO THE LICENSES AND THE RIGHTS GRANTED PURSUANT TO THIS AGREEMENT, INCLUDING ANY WARRANTIES WITH RESPECT TO MERCHANTABILITY, SUITABILITY FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND ANY

12

WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR TRADE USAGE.

6.3    The Company will defend Siemens against all Third Party claims, actions, suits, or other proceedings against Siemens arising out of or resulting from any claims or allegations of the Company that a Third Party has infringed or otherwise misappropriated the Company's rights in or to any Intellectual Property, including any counterclaims brought by that Third Party in connection therewith; and the Company shall indemnify and hold Siemens harmless from and against all judgments, losses, liabilities, damages, costs and expenses (including without limitation, reasonable attorneys' fees) arising out of or incurred in connection with all such claims, actions, suits, or other proceedings.

6.4    EXCEPT AS EXPRESSLY SET FORTH IN SECTION 6.3, COMPANY EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THE INTELLECTUAL PROPERTY LICENSED TO SIEMENS PURSUANT TO THE BACK-LICENSE, THE BACK-LICENSES TO DERIVED IP, AND THE RIGHTS GRANTED PURSUANT TO THIS AGREEMENT, INCLUDING ANY WARRANTIES WITH RESPECT TO MERCHANTABILITY, SUITABILITY FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR TRADE USAGE.

## ARTICLE SEVEN
## LIMITATION OF LIABILITY

TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY SHALL BE LIABLE TO OTHER PARTY OR ANY OTHER PERSON FOR ANY INJURY TO OR LOSS OF GOODWILL, REPUTATION, BUSINESS, PRODUCTION, REVENUES, PROFITS, ANTICIPATED PROFITS, CONTRACTS OR OPPORTUNITIES (REGARDLESS OF HOW THESE ARE CLASSIFIED AS DAMAGES), OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE OR ENHANCED DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PRODUCT LIABILITY OR OTHERWISE (INCLUDING THE ENTRY INTO, PERFORMANCE OR BREACH OF THIS AGREEMENT), REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS FORESEEABLE OR THE PARTY AGAINST WHOM SUCH LIABILITY IS CLAIMED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

## ARTICLE EIGHT
## MISCELLANEOUS

8.1    Notwithstanding any provision to the contrary set forth herein or in the ECA or in any document, instrument, or agreement executed in connection herewith or therewith, no provision of this Agreement in any way waives, restricts, alters, diminishes, or limits the express provisions (including the warranties, covenants, agreements, conditions, representations and obligations and indemnifications, and the limitations related thereto, of the Parties) set forth in the

13

ECA, this Agreement being intended solely to effect the Licenses, the Back-License, and the Back-Licenses to Derived IP strictly in accordance with the terms of the ECA. In the event of a conflict between the terms of this Agreement and the terms of the ECA, the terms of this Agreement shall prevail and govern.

8.2    This Agreement is exclusively governed by, and shall be exclusively construed in accordance with, the Laws of Germany with the exclusion of the Vienna Convention on the International Sale of Goods and without regard to the conflicts of Law principles that would require the application of any other Law

(a)    If one of the Parties concludes that a dispute (other than a dispute over whether a material breach of this Agreement has been committed (or has been cured) by either Party as set out in Section 2.3 or Section 3.4 which shall be resolved solely pursuant to Section 8.2(b)) has arisen under this Agreement it will so inform the other Party in a written notice (the "*Notice*"). The Notice shall set forth the issues requiring resolution. The Notice shall be effective on the date that it is received by the receiving Party. The receiving Party may respond within five (5) business days from the effective date of the Notice with a list of issues to be added to the Notice. The Parties shall thereafter engage in good faith negotiations to attempt to amicably resolve the issues raised in the Notice. If the Parties are unable to resolve the issues raised in the Notice within 30 (thirty) business days after the effective date of the Notice, the issues shall be submitted to mediation under the Mediation Rules of the International Centre for Dispute Resolution (ICDR). The place of mediation shall be Washington D.C. The language of mediation shall be English. The mediator shall be selected from the roster of accredited mediators of ICDR. Neither Party may veto the selection of a mediator except for compelling reasons of conflict of interest. The mediation shall be concluded no more than 60 (sixty) business days after the effective date of the Notice.

(b)    If either Party determines that it intends to terminate any of the licenses granted in this Agreement because the other Party has materially breached this Agreement as set out in Section 2.3 or Section 3.4, as applicable (such Party intending to terminate the Agreement, the "**Claimant**"), it shall notify the other Party hereof in writing, describing the alleged material breach in reasonable detail (such other Party, the "**Recipient**", and such notice, "**Breach Notice**"). Within thirty (30) business days upon receipt of the Breach Notice, the Recipient shall either notify the Claimant that it has cured the breach (or is in the process of curing the breach and requires an additional ten (10) business days to complete such cure which additional time shall be subject to Claimant's approval not to be unreasonably withheld) (such 30 business day rectification period or such longer period approved by Claimant pursuant to the foregoing, "**Rectification Period**") or notify the Claimant that it does not agree with the Breach Notice stating the reasons for such disagreement ("**Disagreement Notice**"). Within 10 business days after the issuance of the Disagreement Notice or within 10 business days after the Rectification Period has elapsed without cure to the material breach, then either Party may, by notice to the other Party and the International Centre for Dispute Resolution, demand mediation under the Mediation Rules of the International Centre for Dispute Resolution. The place of mediation shall be Washington D.C. The language of mediation shall be English. The mediator shall be selected from the roster of accredited mediators of International Centre for Dispute Resolution. Neither Party may veto the selection of a mediator except for compelling reasons of conflict of interest. If settlement through mediation is not reached within 60 business days after service of a written demand for mediation, the

14

Claimant's determination to terminate the Licenses or Back-Licenses, as applicable, granted herein shall be subject to arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules. In any arbitration under this Agreement, the place of arbitration shall be Washington, D.C., United States. The language of the arbitration shall be English. There shall be three arbitrators, each of which with at least fifteen years of experience as an attorney with a primary practice area in intellectual property law, arbitrating intellectual property disputes, or a combination of both. Within 30 business days after the commencement of arbitration, each Party shall appoint a person to serve as an arbitrator. The Parties shall then appoint the presiding arbitrator within 30 business days after selection of the Party appointees. If any arbitrators are not selected within these time periods, the International Centre for Dispute Resolution shall, at the written request of any Party, complete the appointments that have not been made. Nothing in this Agreement shall be construed or interpreted as granting the arbitrators the power to award punitive or consequential damages as part of any award rendered relating to this Agreement or the transactions contemplated hereby. The determination of the arbitrators shall be final, binding and nonappealable by the Parties and any judgment or award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The costs and expenses of such arbitration shall be shared equally by the Parties.

8.3     This Agreement is for the sole benefit of the Parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties hereto and such successors and assigns, any legal or equitable rights, remedy or claim hereunder.

8.4     No amendment to this Agreement shall be effective unless it shall be in writing and signed by each of the Parties hereto.

8.5     If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

8.6     Each of the Parties hereto is sophisticated and has been (or had full opportunity and means to be) represented by counsel who have carefully negotiated the provisions hereof. As a consequence, the Parties do not intend that the presumptions of any Laws or other rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive their effects.

8.7     This Agreement (and any amendment hereto) may be executed in one or more counterparts, including by facsimile or email, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Party.

8.8     The rights and obligations of each Party under this Agreement are conditioned upon and subject to the occurrence of the Closing contemplated under the ECA. For the avoidance of doubt, if the Closing does not occur, this Agreement will be null and void.

15

8.9    This Agreement constitutes an amendment and restatement of the Original Agreement effective from and after the Effective Date. The execution and delivery of this Agreement shall not constitute a novation or waiver of any rights or obligations under the Original Agreement based on facts or events occurring or existing prior to the Effective Date and shall be without prejudice to any rights or obligations that have arisen prior to the Effective Date. As of the Effective Date, the Original Agreement is hereby amended, supplemented, modified and restated, as applicable, to the extent provided for herein.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

Fluence Energy, LLC

By:_____

Name: Dennis Fehr
Title: Chief Financial Officer

By:_____

Name: Francis A. Fuselier
Title: General Counsel and Secretary

Siemens Aktiengesellschaft

By:_____
Name:
Title:

By:_____
Name:
Title:

[Signature Page to the Amended and Restated Siemens AG License Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

Fluence Energy, LLC

By:_____
Name:
Title:


By:_____
Name:
Title:


Siemens Aktiengesellschaft

By: _p.p.a_ _hhrüh_
Name: Uwe Schrieh
Title: head of JP SI

By: i.V. _____
Name: David Peukert
Title: Lead IP Counsel SI DG & DS

[Signature Page to the Amended and Restated Siemens AG License Agreement]

**EXHIBIT A
TO THE
SIEMENS AG LICENSE AGREEMENT**

**Licensed Object Code Software**

Dedicated Rulestream/ETO SieStorage module (dedicated development for SieStorage business, to be used in conjunction with commercial Rulestream/ETO platform license)

**EXHIBIT B**
**TO THE**
**SIEMENS AG LICENSE AGREEMENT**

<u>**Relevant Roadmaps and Company Business Plan**</u>

See attached.

**EXHIBIT D**
**TO THE**
**SIEMENS AG LICENSE AGREEMENT**

Listed Dual Use IP

| Title of Each Patent Family, Including Subsequent Filings Not Shown, Licensed | Exemplary Publication, Application or Grant number | Status / Countries |
|---|---|---|
| Einrichtung zur Spitzenlast-Abdeckung / Electrical consumer's peak load covering device for public electricity network, has control device to estimate consumer's energy consumption quantity, and inverter to assist consumer's electricity supply if estimation rises above threshold | US7388364 | Granted: DE, US |
| Vorrichtung und Verfahren zur dezentralen Energieversorgung / Decentralized power supply device, has power inverter supplying electrical energy of energy source to power supply systems, where energy source is connected with controller for connecting part of protective devices to power supply systems | EP1925062 | Granted: DE, ES, FR |
| Wechselrichter und Verfahren zum Betrieb des Wechselrichters / Inverter for connection of direct-current source to alternating current network, has current supplies switched on and switched off by electrically programmable logic device that is accessible by micro-computer | EP1833155 | Application |
| Wechselrichter, insbesondere Solarwechselrichter, mit einem aktiven Netzfilter / Inverter i.e. solar inverter, for feeding multiphase line current into mixing point of power network, has downstream line filter that is active line filter connected parallel to output of inverter | DE102008018497 | Granted: DE |
| PERFORMANCE TRACKING OF AN ELECTRICAL ENERGY STORAGE SYSTEM / Method for predicting performance of electrical energy storage system e.g. battery, involves calculating performance indicators of electrical energy storage system based on simulated dynamics of electrical energy storage system | US20170038432 | Application: EP, AU, BR, CA, CL, IN, TH, US |

**For clarity purposes, this list of Listed Dual Use IP is intended to include all future filings in any country for each Patent Family Listed.**

**EXHIBIT E**
**TO THE**
**SIEMENS AG LICENSE AGREEMENT**

**SieStorage Dual Use Patents**

| Title of Each Patent Family, Including Subsequent Filings Not Shown, Licensed | Exemplary Publication, Application or Grant number | Status / Countries |
|---|---|---|
| Elektrische Einrichtung mit verringerter Isolationsstrecke / Electrical device, has electrical circuits adapted to differ with respect to type of insulation, where disconnection gap divides two electrical circuits by interface with intermediate potential | EP2885860 | Granted: DE, FR, IT, PT |
| Erfassen der Betriebsführung eines Batteriespeichers / Method for detecting management of storage battery of energy-storage system, involves performing continuous creation of statistics imaging utilization profiles describing operational management of storage battery | US20170052229 | Application: DE, CN, US |
| Verfahren zum Betrieb einer Stromrichteranlage / Method for operating power converter system for connection of three-phase alternating current (AC) and direct current (DC) systems, involves computing remaining operational parameters and control angle by respective function | DE102014214536 | Application: DE |
| DC-Überspannungsschutz für ein Energiespeichersystem / DC Overvoltage Protection for an Energy Storage System | DE102016218219.6 | Application: DE, WO |
| Elektrisches Energiespeichersystem / Electric energy-storage system, has battery comprising battery management system, and monitoring system for monitoring independent state of battery management system and critical states of battery and comprising computing unit | DE102016203730 | Application: DE, WO |
| DC-Überspannungsschutz für ein Energiesystem / DC Overvoltage Protection for an Energy System / The subject of the invention is a DC overvoltage protection means for an energy storage system and/or energy-generating system, an energy storage system and/or energy generating system with said DC overvoltage protection means, a method of operating a DC overvoltage protection means for an energy storage system and/or energy-generating system, and a method of operating an energy storage system and/or energy-generating system with said DC overvoltage protection means, whereby said DC overvoltage protection means exhibits at least one shunt release on the AC switch that causes said AC switch to be interrupted. | DE102016218242.0 | Application: DE, WO |
| Luftkühlung eines Wechselrichters / Air Cooling of an Inverter | DE102016221404.7 | Application: DE, WO |

| Title of Each Patent Family, Including Subsequent Filings Not Shown, Licensed | Exemplary Publication, Application or Grant number | Status / Countries |
|---|---|---|
| Containerbeschattung / Shading device mounted in container or standard container used for transporting general cargo, has longitudinal profiles that are arranged on opposite side of carrier elements such that profiles extend on opposite side of carrier elements | DE102016222479 | Granted: DE<br>Application: WO |
| Design Converter Cabinet Siestorage S800 Umrichter / Inverter | EU register No.: 001452387 | Application: EU, AU, CN, IN |
| Anordnung zum Ausgleich von Spannungseinbrüchen und System mit solch einer Anordnung / Compensation arrangement for voltage dips and system with such an arrangement | DE102017211356.1 | Application: DE |
| Energiespeichervorrichtung und deren Verwendung / Energy Storage Unit and Its Use | DE102017202136.5 | Application: DE |
| Unterbrechungsfreie Stromversorgung / Uninterruptable power supply | DE102017211354.5 | Application: DE |
| Unterbrechungsfreie Stromversorgung / Uninterruptable power supply | DE102017211351.0 | Application: DE |
| Anordnung zum Ausgleich von Spannungseinbrüchen und System mit solch einer Anordnung / Compensation arrangement for voltage dips and system with such an arrangement | DE102017211355.3 | Application: DE |

**For clarity purposes, this list of SieStorage Dual Use Patents is intended to include all future filings in any country for each Patent Family Listed.**

Execution Version

## AMENDED AND RESTATED SIEMENS INDUSTRY LICENSE AGREEMENT

This **AMENDED AND RESTATED SIEMENS INDUSTRY LICENSE AGREEMENT** (this "*Agreement*"), dated as of June 9, 2021 (the "*Effective Date*"), is entered into by and between Fluence Energy, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware (the "*Company*"), and Siemens Industry, Inc., a corporation duly organized and validly existing under the laws of the State of Delaware ("*Siemens*"). The Company and Siemens are each referred to herein as a "*Party*" and are collectively referred to herein as the "*Parties*."

### PRELIMINARY STATEMENTS:

1.      Pursuant to that certain Equity Contribution Agreement between AES Grid Stability LLC ("*AES*") and Siemens dated July 9, 2017 (the "*ECA*"), Siemens agreed to contribute certain Siemens Intellectual Property to the Company and to grant a license to the Company to use certain other Siemens Intellectual Property (excluding the Siemens Trademarks and Branding, which is licensed to the Company pursuant to the Siemens Company Name Affix and Trademark License Agreement); and

2.      The Parties entered into the Siemens License Agreement dated as of July 9, 2017 (the "*Original Agreement*"), pursuant to which the Company, in accordance with the ECA, acquired the right to license in certain Siemens Intellectual Property (excluding the Siemens Trademarks and Branding, which will be licensed to the Company pursuant to the Siemens Company Name Affix and Trademark License Agreement) on the terms and subject to the conditions set forth in the Original Agreement and the ECA.

3.      Between the execution date of the Subscription Agreement (as defined below) and the Effective Date, for the purposes of evaluating the credit to the Capital Account under Article 3.4 (b) of the Amended and Restated LLC Agreement, the Company has used reasonable efforts to notify Siemens of any Additionally Licensed Patents and Non-Asserted Siemens IP that the Company has identified as being used by it prior to the Effective Date by sending a written notice to Siemens identifying the respective Additionally Licensed Patents and Non-Asserted Siemens IP as well as the products and services of the Company in which these are used and providing further information reasonably required to establish the initial Gross Asset Value of such Additionally Licensed Patents and Non-Asserted Siemens IP, provided, however, that (i) the Additionally Licensed Patents and the Non-Asserted Siemens IP are not required to be identified in order for them to be licensed under Sections 2.1(a) and 2.2(a) of this Agreement and be subject to the non-assertion covenants under Sections 2.1(d) and 2.2(e), as applicable, and (ii) the identification of, or the failure to identify, any Additionally Licensed Patents or Non-Asserted Siemens IP do not limit in any way the scope of Additionally Licensed Patents or Non-Asserted Siemens IP or the scope of the Licenses under Sections 2.1(a) and 2.2(a) and the non-assertion covenants under Sections 2.1(d) and 2.2(e) of this Agreement.

4.      The Parties desire to amend and restate the Original Agreement as provided herein in connection with the transactions contemplated under that certain Subscription Agreement, dated December 27, 2020, between the Company and QIA Florence Holding LLC ("the *Subscription Agreement*").

NOW, THEREFORE, in consideration of the mutual agreements, covenants, representations and warranties set forth herein, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE ONE
## DEFINITIONS AND PRINCIPLES OF INTERPRETATION

1.1     Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the ECA and in the Amended and Restated LLC Agreement, dated January 01, 2018 "The Amended and Restated LLC Agreement".  Notwithstanding the foregoing, terms in capital letters used in this Agreement shall have the meaning defined in this Article 1 of this Agreement.

(a)     "*Additionally Licensed Patents*" shall mean Patents owned by Siemens Group (where those Patents have a priority date  prior to or on the Effective Date), other than the Contributed Siemens IP and Licensed Siemens Intellectual Property, to the extent used by the Company for the  Business Purpose prior to or on the Effective Date.

(b)     "*Back-License*" shall have the meaning set forth in Section 3.1 of this Agreement.

(c)     "*Business*" shall mean the battery-based energy storage business conducted by the Siemens Energy Management Division prior to the Closing Date, encompassing development, marketing, and sale of Integrated Solutions for Applications, as such terms shall be defined in the Amended and Restated LLC Agreement.

(d)     "*Business Purpose*"  means the purpose of the Company which shall be to develop and globally market and sell stationary energy storage systems and solutions based on battery technology for utility-scale and commercial industrial applications and residential applications together with such other lawful activities as a limited liability company may undertake in connection therewith. The Business Purpose includes energy storage mediums such as supercapacitors, primary batteries, and secondary batteries such as lithium, Li-Ion, flow batteries, sodium-ion, and metal-air but excludes developing or producing the technology for the storage medium itself (e.g., battery chemistry) and inverters.

(e)     "*Closing Date*" means January 01, 2018.

(f)     "*Contributed Siemens Intellectual Property ("IP")*" means the Siemens Software or Know-How contributed under the ECA and Siemens Contribution Agreement that is transferred to the Company on the Closing Date or other Siemens IP that is transferred to the Company at a later date through the function of Section 4.7 and/or Section 4.8.

(g)     "*Company Roadmap*" means a document mutually agreed by Siemens and AES prior to or on the Closing Date that contains technical details of R&D work to be undertaken by the Company after the Closing Date and will be included in Exhibit B, as amended upon mutual written agreement of the Parties up to and until the Closing Date.

2

(h)     *"Derived IP"* shall have the meaning set forth in Section 3.2 of this Agreement.

(i)     *"Exclusive Activities"* shall have the meaning ascribed to them in the Amended and Restated LLC Agreement.

(j)     *"Know-How"* means all proprietary and confidential information and data (irrespective as to whether such information or data is available by way of documentation, orally or in electronic format, or protected by copyrights), including business and trade secrets, technical and business information and data, know-how and similar proprietary rights in confidential information and processes, discoveries, analytic models, improvements, techniques, devices, methods, patterns, formulations and specifications, all to the extent that such information and data are proprietary and confidential and neither Software nor a Patent.

(k)     *"Licensed Object Code Software"* means Software in object code which is licensed to Company, if any, to the extent that the Company can prove Use or Preparatory Use with respect to such Software.

(l)     *"Licensed Siemens Intellectual Property ("IP")"* means all Patents and Know-How owned by Siemens (where those Patents have a priority date prior to or on the Closing Date and where that Know-How was developed or conceived prior to or on the Closing Date), other than the Contributed Siemens IP, to the extent (1) used by the Company for Exclusive Activities or Non-Exclusive Activities for the Business Purpose or (2) that the Company can prove Preparatory Use with respect to such IP. With respect to the foregoing clause 2 of this definition, when Intellectual Property is identified pre- or post-closing that the Company believes falls under this definition and requires proof of Preparatory Use, the Company will identify such Intellectual Property and the Preparatory Use of such Intellectual Property to the Siemens SI DS FG Head, who will coordinate with the relevant Siemens department(s) in good faith to determine in a commercially reasonable manner if the Company has satisfied its burden of proof regarding Preparatory Use and, if this is the case, Siemens will, within a reasonable time frame, acknowledge in writing that such Intellectual Property is Licensed Siemens IP and will include such Licensed Siemens IP on the Third List for Dual Use IP.

(m)     *"Licensed SieStorage Know-How"* means all SieStorage KnowHow and SIMATIC configuration relating to Power Quality (MS UPS) and Microgrid and Islands applications, as shall be defined in the Amended and Restated LLC Agreement. For avoidance of doubt, Licensed SieStorage Know-How does not include the Contributed Siemens IP.

(n)     *"Licenses"* means, collectively, the licenses granted to the Company under Sections 2.1 and 2.2.

(o)     *"Listed Dual Use Intellectual Property ("IP")"* means IP owned by the Siemens Group which is listed in <u>Exhibit D</u>, as amended upon mutual written agreement of the Parties up to and until the Closing Date. It comprises IP that the Company requires to conduct its business in the Exclusive Activities and for any such Listed Dual Use IP, the Company is not required to prove Use or Preparatory Use with respect to the Exclusive Activities; such Use or Preparatory Use is presumed.

3

(p)　　*"Non-Asserted Siemens IP"* means Know-how and Software, owned by Siemens or Siemens Group and created  prior to or on the Effective Date, other than the Contributed Siemens Intellectual Property  and Licensed Siemens Intellectual Property, to the extent disclosed or provided by Siemens or Siemens Group to the Company and used by the Company for the  Business Purpose.

(q)　　*"Non-Exclusive Activities"* means activities within the Business Purpose which are not Exclusive Activities.

(r)　　*"Patents"* means all patents, utility models, patent and utility model applications, and all priorities and rights related thereto, including all reissues, reexaminations, divisions, continuations, continuations-in-part, provisionals, continued prosecution applications, substitutions, extensions, additions or renewals of any of the foregoing. *"Permitted Sublicensing"* means sublicensing by Company to: (i) Subsidiaries of the applicable licensee, but only for the period of time during which such sub-licensee is a Subsidiary of that licensee and only with respect to the  Business Purpose; (ii) suppliers, subcontractors, contract manufacturers, or contract developers of the applicable licensee, if and to the extent such sub-license is necessary to allow such supplier, subcontractor, contract manufacturer, or contract developer to manufacture and deliver products to or for that licensee or to perform services for that licensee with respect to the Business Purpose; and (iii) to customers of the applicable licensee, if and to the extent such sub-license is necessary to allow such customer to use, resell, transfer or customize a product or benefit from services sold or provided by that licensee with respect to the Business Purpose.  Permitted Sublicensing cannot have a broader scope than the main license from which it flows.

(s)　　*"Preparatory Use"* means preparatory actions to use Licensed Siemens IP by the Business on or before the Closing Date or, with respect to the Exclusive Activities, reflected in the SieStorage Roadmap, the Advancion™ Roadmap, the Company Roadmap, or the Company Business Plan, all as attached to this document in Exhibit B, as amended upon mutual written agreement of the Parties up to and until the Closing Date.  With respect to the Exclusive Activities only, Preparatory Use can be established by comparing patent claims in patents owned by the Siemens Group, if any, with planned activities of the Business or the Company as documented in the SieStorage Roadmap, the Advancion™ Roadmap, the Company Roadmap, or the Company Business Plan, to the extent that any such document contains sufficient technical details to be mapped to specific IP of the Siemens Group.  With respect to the Non-Exclusive Activities, Preparatory Use can be established by comparison of patent claims in patents owned by the Siemens Group, if any, with technical documents or specifications existing in the Business on or before the Closing Date.  Preparatory Use of Know-How can be established by comparing Know-How of the Siemens Group with technical documents or specifications that existed within the Business prior to or on the Closing Date.  For the avoidance of doubt, Licensed Siemens IP can be identified and proven by the Parties before, on or after the Closing Date, but Use or Preparatory Use must occur before the Closing Date.

(t)　　*"Restricted IP"* means SIMATIC (programmable logic controller used in the SieStorage solution), the Microgrid Controller, the Fast Switch hardware and PCS (inverter).

4

(u)    **"Restricted Party"** shall have the meaning set forth in Section 4.10 of this Agreement.

(v)    **"Siemens Additional Patent License Agreement"** shall mean the Siemens Additional License Agreement, dated _____, 2021, between Siemens Aktiengesellschaft and Siemens granting Siemens the right to sublicense the rights granted herein.

(w)    **"Siemens Group"** means Siemens, all Affiliates of Siemens (including Siemens Aktiengesellschaft), and each of their Subsidiaries, with the exception of Gamesa Corporación Technológica S.A. and Siemens Healthineers AG, and their respective group or regional companies.

(x)    **"Siemens SI DS FG Head"** shall mean the lead executive of Smart Infrastructure Distribution Systems Future Grid, which at the date hereof is Mr. Jean-Christoph Heyne.

(y)    **"SieStorage Dual Use Patents"** means all Patents in all countries of the world that claim priority from the Patents identified in Exhibit E (which may be updated and amended with mutual agreement of the Parties up to and until the Closing Date).

(z)    **"Software"** means all computer programs, operating systems, applications, systems, firmware, and software of any nature, whether operational, active, under development, or design, non-operational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, test scripts, user manuals, and other documentation therefore, whether in machine-readable form, programming language, or any other language or symbols, and whether stored, encoded, recorded, or written on disk, tape, film, memory device, paper, or other media of any nature and all databases necessary or appropriate to operate any such computer program, operating system, applications systems, firmware, or software.

(aa)    **"Third List for Dual Use IP"** means a list of Licensed Siemens IP that does not satisfy the definition of either Listed Dual Use IP or SieStorage Dual Use Patents. Use or Preparatory Use for all IP on this list must be proven by the Company. This list can be created pre- or post-Closing, and will not serve as an Exhibit (or other annex) to this Agreement. For the avoidance of doubt, Sections 4.5, 4.7, or 4.8 do not apply to IP contained on the Third List for Dual Use IP. Section 4.9 shall, however, apply to the Third List for Dual Use IP.

(bb)    **"Use"** shall mean actual use of Licensed Siemens IP by the Business on or before the Closing Date. Use of Patents can be established by comparing patent claims in Patents owned by the Siemens Group, if any, with products of the Business that existed prior to or on the Closing Date. Use of Know-How can be established by comparing Know-How of the Siemens Group with technical documents or specifications existing within the Business or Know-How used in products of the Business prior to or on the Closing Date.

1.2    Rules of Interpretation. In this Agreement:

5

(a)    The singular shall include the plural and the masculine shall include the feminine and neuter as the context requires.

(b)    References to "*Articles*" and "*Sections*" shall be to articles or sections of this Agreement.

(c)    The words "*herein*," "*hereof*," and "*hereunder*" shall refer to this Agreement as a whole and not to any particular section or subsection of this Agreement; the words "*include*," "*includes*" or "*including*" shall mean "*including, but not limited to*."

(d)    Any reference to a statute, regulation or law, including Applicable Laws, shall include any amendment thereof or any successor thereto and any rules and regulations promulgated there under.

## ARTICLE TWO
## LICENSES TO THE COMPANY

2.1    Non-Exclusive Activities.

(a)    Licensed Siemens IP.  With effect as of the Closing Date, Siemens hereby grants to the Company under the Licensed Siemens IP and with effect as of the Closing  Date, Siemens hereby grants to the Company under the Additionally Licensed Patents a worldwide, non-exclusive, non-transferable, perpetual, royalty-free license to conduct any Non-Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing, licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution, or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(b)    Sublicensed Siemens IP.  With the effect as of the Closing Date, and pursuant to the Siemens Additional Patent License Agreement, Siemens hereby grants to the Company under the Additionally Licensed Patents a worldwide, nonexclusive, non-transferrable, perpetual, royalty-free sublicense to conduct any Non-Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing, licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(c)    Licensed Object Code Software and Licensed SieStorage Know-How. With effect as of the Closing Date, Siemens hereby grants to the Company a worldwide, non-exclusive, non-transferable, perpetual royalty-free license to use and to engage in Permitted Sublicensing with respect to: (i) the Licensed Object Code Software, if any, when used to conduct Non-Exclusive Activities; and (ii) the Licensed SieStorage Know-How, if any, when used to conduct Non-Exclusive Activities.

(d)    SieStorage Dual Use Patents.  With effect as of the Closing Date, Siemens hereby grants to the Company under the SieStorage Dual Use Patents a worldwide, non-exclusive, non-transferable, perpetual, royalty-free license to conduct any Non-Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing,

6

licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(e)     Additional Patents. If, after the Closing Date, the Company determines that it requires a license for products developed by the Company after the Closing Date under a Patent owned by the Siemens Group, if any, (other than the SieStorage Dual Use Patents, the Licensed Siemens IP, and the Third List for Dual Use IP, if any) in order to conduct any Non-Exclusive Activities, the Company will identify that Patent and the Company's intended use in writing to the Siemens SI DS FG Head. Upon such notification, the Parties will negotiate in good faith the terms and conditions of a separate license agreement governing the Company's use of the identified Patent and any associated royalties and other consideration to be paid to Siemens by the Company in connection with that license agreement.

(f)     Restricted IP. For the avoidance of doubt, SIMATIC (programmable logic controller used in the SieStorage solution) will not be assigned to the Company nor licensed under this Agreement; usage will be made available through a separate software license. For the further avoidance of doubt, the Microgrid Controller, the Fast Switch hardware, and PCS (inverter) will be supplied to the Company through the Siemens Equipment and Services Purchase Agreement.

(g)     Non-Assertion. Siemens hereby agrees that it and Siemens Group shall not sue or assert any claim or demand or seek any other remedy in any way, in or out of a legal proceeding, against the Company or its assigns in accordance with Article 5 of this agreement, and with respect to Fluence products only, its agents, contractors, distributors or customers, for the use of any Non-Asserted Siemens IP for the Non-Exclusive Activities, except to the extent (1) such use constitutes misappropriation of Know-How or (2) the Non-Asserted Siemens IP is used by the Company for (i) development, marketing, sales or licensing of any stand-alone digital services or solutions which are not part of the Integrated Solution, or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company. The foregoing non-assertion covenant shall not be construed to prohibit Siemens, or Siemens Group, from raising any arguments that it has developed and/or is the owner of the Non-Asserted Siemens IP in defending against any claim or demand brought by the Company against Siemens or Siemens Group alleging that Siemens or Siemens Group has breached the terms of this Agreement or infringed the Company's Know-How or Patents. For clarity purposes, this non-assert does not apply to Restricted IP where Company will continue to obtain usage rights through separate software licenses or through the Siemens Equipment and Services Purchase Agreement.

2.2    Exclusive Field – Exclusive Activities.

(a)     Licensed Siemens IP. With effect as of the Closing Date, Siemens hereby grants to the Company under the Licensed Siemens IP and with effect as of the Closing Date, Siemens hereby grants to the Company under the Additionally Licensed Patents a worldwide, non-exclusive, non-transferable, perpetual, royalty-free license to conduct any activities within the Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing. licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution, or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

7

(b) <u>Sublicensed Siemens IP.</u> With the effect as of the Closing Date, and pursuant to the Siemens Additional Patent License Agreement, Siemens hereby grants to the Company a worldwide, nonexclusive, non-transferrable, perpetual, royalty free-sublicense to conduct any Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing, licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(c) <u>Licensed Object Code Software and Licensed SieStorage Know-How.</u> With effect as of the Closing Date, Siemens hereby grants to the Company a worldwide, non-exclusive, non-transferable, perpetual royalty-free license to use and to engage in Permitted Sublicensing with respect to: (i) the Licensed Object Code Software, if any, when used to conduct Exclusive Activities; and (ii) the Licensed SieStorage Know-How, if any, when used to conduct Exclusive Activities.

(d) <u>Listed Dual Use IP/SieStorage Dual Use Patents.</u> With effect as of the Closing Date, Siemens hereby grants to the Company under the SieStorage Dual Use Patents and Listed Dual Use IP, if any, a worldwide, non-exclusive, non-transferable, perpetual, royalty-free license to conduct any activities within the Exclusive Activities for the Business Purpose and to engage in Permitted Sublicensing, except for (i) development, marketing, licensing or sale of any stand-alone digital services or solutions which are not part of the Integrated Solution or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company.

(e) <u>Additional Patents.</u> If, after the Closing Date, the Company determines that it requires a license for products developed by Company after the Closing Date under a Patent owned by the Siemens Group (other than the SieStorage Dual Use Patents, the Licensed Siemens IP, Listed Dual Use IP, and the Third List for Dual Use IP) in order to conduct any activities within the Exclusive Activities, the Company will identify that Patent and the Company's intended use in writing to the Siemens  SI DS FG Head.  Upon such notification, the Parties will negotiate in good faith the terms and conditions of a separate license agreement governing the Company's use of the identified Patent and any associated royalties and other consideration to be paid to Siemens by the Company in connection with that license agreement.

(f) <u>Restricted IP.</u> For the avoidance of doubt, SIMATIC (programmable logic controller used in the SieStorage solution) will not be assigned to the Company nor licensed under this Agreement; usage will be made available through a separate software license.  For the further avoidance of doubt, the Microgrid Controller, the Fast Switch hardware, and PCS (inverter) will be supplied to the Company through the Siemens Equipment and Services Purchase Agreement.

(g) <u>Non-Assertion.</u> Siemens hereby agrees that it and Siemens Group shall not sue or assert any claim or demand or seek any other remedy in any way, in or out of a legal proceeding, against the Company or its assigns in accordance with Article 5 of this agreement, and with respect to Fluence products only, its agents, contractors, distributors or customers, for the use of any Non-Asserted Siemens IP  for the Exclusive Activities, except to the extent (1) such use constitutes misappropriation of Know-How or (2) the Non-Asserted Siemens  IP is used by the Company for (i) development, marketing, sales or licensing of any stand-alone digital services or

8

solutions which are not part of the Integrated Solution, or (ii) conducting any activities resulting from or relating to the acquisition of Advanced Microgrid Solutions by Company, The foregoing non-assertion covenant shall not be construed to prohibit Siemens, or Siemens Group, from raising any arguments that it has developed and/or is the owner of the Non-Asserted Siemens IP in defending against any claim or demand brought by the Company against Siemens or Siemens Group alleging that Siemens or Siemens Group has breached the terms of this Agreement or infringed the Company's Know-How or Patents. For clarity purposes, this non-assert does not apply to Restricted IP where Company will continue to obtain usage rights through separate software licenses or through the Siemens Equipment and Services Purchase Agreement.

2.3    Termination of the Licenses. The Licenses may be terminated, in whole or in part, by Siemens only in accordance with the procedure set forth in Section 8.2(b) of this Agreement if the Company has materially breached this Agreement, and such breach has not been cured within thirty (30) business days. On the termination of the Licenses, in whole or in part: (a) all rights of the Company under the terminated License(s) shall terminate forthwith and shall revert immediately to Siemens; and (b) the Company may no longer use the IP licensed to the Company pursuant to the terminated License(s) and shall promptly transfer to Siemens, free of charge, all registrations, filings and rights with regard to such Intellectual Property which it may have possessed at any time. For purposes of this Section 2.3, a material breach will require a breach of the license grant by Company involving: (a) sublicensing by Company under the licenses granted in Sections 2.1 or 2.2 that is not Permitted Sublicensing, or (b) activities by Company violating the licenses granted in Section 2.1 or Section 2.2.

2.4    Identification of Additionally Licensed Patents and Non-Asserted Siemens  For the purposes of evaluating the credit to the Capital Account under Article 3.4 (b) of the Amended and Restated LLC Agreement, Company shall on or after the Effective Date use reasonable efforts to notify Siemens of any Additionally Licensed Patents and Non-Asserted Siemens IP that the Company identifies as being used by it prior to or on the Effective Date by sending a written notice to Siemens identifying the respective Additionally Licensed Patents and Non-Asserted Siemens IP as well as the products and services of the Company in which these are used and providing further information reasonably required to establish the initial Gross Asset Value of such IP, provided, however, that, for the avoidance of doubt, (i) the Additionally Licensed Patents and the Non-Asserted Siemens IP are not required to be identified in order for them to be licensed under Sections 2.1(a) and 2.2(a) of this Agreement and be subject to the non-assertion covenants under Sections 2.1(d) and 2.2(e), as applicable, and (ii) the identification of, or the failure to identify, any Additionally Licensed Patents or Non-Asserted Siemens IP shall not limit in any way the scope of Additionally Licensed Patents or Non-Asserted Siemens IP or the scope of the Licenses under Sections 2.1(a) and 2.2(a) and the non-assertion covenants under Sections 2.1(d) and 2.2(e) of this Agreement.

**ARTICLE THREE**
**LICENSES TO SIEMENS**

3.1    With effect as of the Effective Date, Siemens hereby irrevocably and perpetually retains and the Company hereby grants to Siemens a perpetual, non-exclusive, worldwide, non-transferable (except as provided in Article 5), sublicenseable pursuant to Section 3.5, right to do any acts within the current and future fields of business of the Siemens Group which are not

9

Exclusive Activities and which would otherwise infringe any of the Contributed Siemens IP (the "***Back-License***"), under fair, reasonable and non-discriminatory ("***FRAND***") royalty terms, to be negotiated by the Parties before such Back-License is exercised. Except to the extent retained by Siemens or licensed to Siemens under this Agreement, the Company will have all rights with respect to the Contributed Siemens IP, including the sole right to prepare, file, prosecute, obtain, maintain and enforce the Contributed Siemens IP, to the extent applicable. For the avoidance of doubt, the License to the IP set out in Section 3.1 shall include a license to Siemens (except for Exclusive Activities) to any Patents that are applied for by the Company after the Closing Date on inventions included in the Contributed Siemens IP; as well as a license to Siemens (except for Exclusive Activities) to any Software included in the Contributed Siemens IP, in both source code and object code format, in the form that such Software in source code format existed on the Closing Date, which license includes the right to develop, copy, use, modify, and create derivative works of that Software in source code and object code format, and a license to any copyrights, registered or unregistered, owned by the Company after the Closing Date on Software included in the Contributed Siemens IP; and shall not include a license to Siemens to do any acts which are Exclusive Activities. This Section 3.1 shall not retroactively apply to the time period between the Closing Date and the Effective Date.

3.2    With effect as of the Effective Date, Siemens hereby perpetually retains and the Company hereby grants to Siemens a perpetual, non-exclusive, worldwide, non-transferable (except as provided in Article 5), sublicenseable pursuant to Section 3.5, right to do any acts within the current and future fields of business of the Siemens Group which are not Exclusive Activities and which would otherwise infringe any IP owned by the Company which was derived from: (i) the Contributed Siemens IP, provided however, that with respect to any derivations of any Software in source code format included in the Contributed Siemens IP made by or on behalf of the Company, the license granted to Siemens under this Section 3.2 only includes a license to use that derived Software, if any, in object code format, and not in source code format; (ii) the SieStorage Dual Use Patents; (iii) the Licensed Siemens IP; (iv) the Additional Patents, if any, licensed to the Company under Sections 2.1(d) or 2.2(d) hereunder; (v) the Additionally Licensed Patents, licensed to the Company under Sections 2.1(a) or 2.2(a) or (vi) the Sublicensed Siemens IP under Sections 2.1(b) or 2.2(b) (the IP specified in Section 3.2(i)-(vi) above is referred to, collectively, as the "***Derived IP***"), under FRAND royalty terms to be negotiated by the Parties before such licenses to the Derived IP are exercised (hereinafter the "***Back-Licenses to Derived IP***"); provided that such Derived IP was developed when Siemens or any of its Affiliates collectively owned at least twenty percent (20%) of the equity of the Company. For the avoidance of doubt, the ***Back-Licenses to Derived IP*** shall include a license to Siemens (except for Exclusive Activities) to any Patents that are applied for by the Company after the Closing Date on improvements and modifications to the Contributed Siemens IP that are developed by or on behalf of the Company; and shall not include a license to Siemens to do any acts which are Exclusive Activities. The Company will notify Siemens in writing of any Patent derived from the above-mentioned IP promptly after filing that application. This Section 3.2 shall not retroactively apply to the time period between the Closing Date and the Effective Date. The Company hereby represents and warrants that it did not make any material Derived IP during the time period between the Closing Date and the Effective Date of this Amendment.

3.3    Siemens may request that Company provide it a copy of the derived Software in object code format described in section 3.2(i), above, if any. Such request will be a written request

10

and Company shall deliver to Siemens such copy in a commercially reasonable manner and time; provided, however, that Company shall not be obligated to respond to such a written request more frequently than four times each calendar year.

3.4     The Back-Licenses to Derived IP may be terminated, in whole or in part, by Company in accordance with the procedure set forth in Section 8.2 of this Agreement if Siemens has materially breached this Agreement, and such breach has not been cured within thirty (30) days.  On the termination of the Back-Licenses to Derived IP, in whole or in part: (a) all rights of Siemens under the terminated Back-Licenses to Derived IP shall terminate forthwith and shall revert immediately to the Company; and (b) Siemens may no longer use the Derived IP licensed to Siemens pursuant to the terminated Back-Licenses to Derived IP and shall promptly transfer to the Company, free of charge, all registrations, filings and rights with regard to such Intellectual Property which it may have possessed at any time.  For purposes of this Section 3.4, a material breach will require a breach by Siemens of the Back-Licenses to Derived IP involving: (a) sublicensing by Siemens which is not permitted sublicensing, or (b) activities by Siemens that violate the licenses granted in Section 3.2.

3.5     The license granted under Sections 3.1 and 3.2 are sublicensable to Affiliates, provided that (i) the Affiliate agrees to abide by and be subject to terms and conditions substantially consistent with this Section 3; (ii) the Affiliate shall have no further right to grant sublicenses under this Agreement; (iii) Siemens remains fully liable for the performance of its sublicensed Affiliates obligations hereunder; (iv) Siemens provides Company with all executed sublicenses; and (v) any sublicense shall terminate on the date any sublicensed Affiliate ceases to be an Affiliate of Siemens.

### ARTICLE FOUR
### OBLIGATIONS AND RESTRICTIONS

4.1     The Company shall not do or suffer to be done any act or thing which may materially adversely affect any rights of Siemens in or to any of the IP licensed to the Company by Siemens pursuant to the Licenses or any registrations thereof.

4.2     Siemens shall not do or suffer to be done any act or thing which may materially adversely affect any rights of the Company in or to the Contributed Siemens IP or any registrations thereof.

4.3     Siemens shall undertake, at its own expense, the prosecution and maintenance of all IP licensed to the Company pursuant to the Licenses.  In the event that Company identifies an office action issued during prosecution of the SieStorage Dual Use Patents or the Listed Dual Use IP, if any, it may request that Siemens provide Company commercially reasonable consultation rights in connection with responding to such office action, which rights will be provided to the extent they do not cause an unreasonable delay in such prosecution, e.g., by requiring an extension of time to respond to the office action.

4.4     Company shall undertake, at its own expense, the prosecution and maintenance of (a) any of the Contributed Siemens IP and (b) any other IP owned by the Company, including but

11

not limited to Derived IP. Siemens shall undertake, at its own expense, to reasonably cooperate with the Company to perfect rights in such IP.

4.5    Patent Litigation.

(a)    The Company will promptly give written notice to the Siemens SI DS FG Head if the Company becomes aware of any actual, threatened, or suspected infringement of, or any unauthorized use or any challenge to the validity of, any of the Intellectual Property licensed to the Company pursuant to the Licenses, including the SieStorage Dual Use Patents, if any.

(b)    Without limiting the obligations under Section 4.5(a), Siemens will consult in good faith with the Company in evaluating the strength of a claim of any actual, threatened, or suspected infringement of the SieStorage Dual Use Patents or the Listed Dual Use IP, if any. This will consist of generating a patent claim chart that shows why each and every element in at least one independent patent claim in one or more of the SieStorage Dual Use Patents or the Listed Dual Use IP is shown in a product sold or distributed by a Third Party before any patent litigation is considered. Siemens will consider the pros and cons of proceeding against any Third Party in a commercially reasonable manner, and in the event that the pros materially outweigh the cons, Siemens will proceed. The ultimate decision to proceed rests with Siemens.

(c)    If the foregoing process identifies and confirms a potential infringement of the SieStorage Dual Use Patents or Listed Dual Use IP, if any, the Siemens SI DS FG Head will consult with the Company's management team to determine whether a patent infringement litigation should be pursued. In circumstances where the potential patent infringement identified is of a SieStorage Dual Use Patent or a Listed Dual Use IP, and the Company's management team believes a patent infringement action should be undertaken, the Siemens SI DS FG Head will: (i) coordinate an internal review of the Company's request to initiate a patent litigation; and (ii) determine (in good faith and in consultation with the appropriate managers and executives of Siemens) whether a patent litigation is merited based on the aforementioned claim chart(s).

(d)    If Siemens believes that infringement of a SieStorage Dual Use Patent or a Listed Dual Use IP, if any, has not been reasonably established, the Siemens SI DS FG Head will, before making a final decision on whether to pursue a patent litigation, collaborate with the Company to obtain any further information to establish patent infringement and facilitate discussions between Siemens' internal corporate Intellectual Property department and the Company on why Siemens believes that patent infringement has not been reasonably established.

(e)    If the Company and Siemens believe that infringement of the respective SieStorage Dual Use Patent or the Listed Dual Use IP, if any, has been reasonably established and the validity of that SieStorage Dual Use Patent or the Listed Dual Use IP has been confirmed, the Siemens SI-DS FG  Head will diligently coordinate with the rest of the Siemens organization to confirm that a patent litigation will be initiated (which process shall account for any relationship, such as a supply relationship, between Siemens and the applicable Third Party) and, if confirmed, Siemens will (within sixty (60) business days) initiate a patent litigation. Upon the initiation of such patent litigation, the Parties will continue to consult regarding on-going litigation activities and the Company will provide to Siemens commercially reasonable information required in connection with the proceedings (including technical information) based on the nature of those

12

proceedings. All commercially reasonable costs associated with a patent litigation initiated pursuant to this Section 4.5 will be split between the Company and Siemens, as determined by the Parties on a case-by-case basis.

4.6 The Back-License and the Back-Licenses to Derived IP (as set out in Article Three of this Agreement) shall apply to any IP transferred or sold to the Company under Sections 4.7, 4.8 and 4.9.

4.7 If Siemens receives a bona fide offer to purchase any of the SieStorage Dual Use Patents, if any, Siemens will communicate in writing to the Company the full terms of the offer. The Company may elect to purchase the applicable SieStorage Dual Use Patents on the terms set forth in the offer by providing Siemens written notice of the election to do so within thirty (30) business days after Siemens' communication of the offer. If the Company fails to give written notice of election within thirty (30) business days, Siemens may sell to the offeror on the terms offered, subject to Article 5 this Agreement.

4.8 Siemens shall notify the Company in writing if Siemens decides to abandon any of the SieStorage Dual Use Patents or the Listed Dual Use IP, if any, in which case Siemens will offer those SieStorage Dual Use Patents or the Listed Dual Use IP to the Company at no cost and, if accepted by the Company: (i) Siemens will ensure that those SieStorage Dual Use Patents or the Listed Dual Use IP are promptly assigned to the Company, with the Company assuming any direct fees or costs of assignment; and (ii) the Company may, at its discretion, file, prosecute, and maintain those SieStorage Dual Use Patents or Listed Dual Use IP at the Company's cost.

4.9 For a period of four (4) years after the Closing Date, Siemens shall notify the Company in writing if Siemens decides to abandon any of the IP on the Third List for Dual Use IP, in which case Siemens will offer such IP to the Company at no cost and, if accepted by the Company: (i) Siemens will ensure that the respective IP is promptly assigned to the Company, with the Company assuming any direct fees or costs of assignment; and (ii) the Company may, at its discretion, file, prosecute, and maintain such IP from the Third List for Dual Use IP. Both the obligation to notify of the abandonment decision as well as the obligation to offer Company such IP shall cease to exist on the fourth anniversary of the Closing Date. In addition, upon written request of the Company concerning possible third-party challenges to the validity of specific IP on the Third List for Dual Use IP, Siemens shall inform the Company of any such challenges of which it is aware.

4.10 Export Control Laws. The Parties agree to comply with U.S. export laws and regulations pertaining to the export of technical data, services and commodities, including the International Traffic in Arms Regulations (22 C.F.R. § 120 et seq.), the Export Administration Regulations (15 C.F.R. § 730 et seq.), the regulations administered by the Treasury Department's Office of Foreign Assets Control (31 C.F.R. § 500, et seq.), and the Anti-Boycott Regulations (15 C.F.R. § 760). The Parties shall cooperate with each other to facilitate compliance with these laws and regulations. The Parties understand that sharing controlled technical data with non-U.S. persons is an export to that person's country of citizenship that is subject to U.S. export laws and regulations, even if the transfer occurs in the United States. Siemens shall obtain, at its own expense, any necessary U.S. government license or other authorization required pursuant to the U.S. export control laws and regulations for the export or re-export of any commodity, service or

13

technical data covered by this Agreement, including under the Back-License and the Back Licenses to Derived IP, as each is set forth in Sections 3.1 and 3.2. Each Party represents that it is not designated as an entity for which U.S. persons are required to obtain U.S. government authorization to enter into financial or export transactions (a "***Restricted Party***"). Any Party to this Agreement shall immediately notify the other Party if, at any time during the term of this Agreement, it becomes a Restricted Party.

## ARTICLE FIVE
## <u>ASSIGNMENT</u>

5.1    Neither Party may assign all or any part of this Agreement, or any rights or obligations hereunder (including, with respect to the Company, the Licenses; and, with respect to Siemens, the Back-License and the Back-Licenses to Derived IP), without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any purported assignment which fails to comply with the requirements of this Section 5.1 shall be null and void. Notwithstanding the foregoing, either Party may, without the prior written consent of the other Party, assign all or any part of this Agreement, or any rights or obligations hereunder, to an Affiliate, which will accept such assignment and assume all obligations related to this Agreement; <u>provided</u> <u>that</u>, notwithstanding any such assignment, the assigning Party shall not be relieved of any of its obligations hereunder by reason of such assignment and shall remain liable hereunder for the fulfillment of the obligations to the extent the assignee does not fulfill such obligations.

5.2    Notwithstanding anything to the contrary herein, Siemens shall ensure that the SieStorage Dual Use Patents, Listed Dual Use IP, or IP on the Third List for Dual Use IP licensed to the Company pursuant to the Licenses, and the Company's rights under this Agreement therein and thereto, remain unaffected in case of a transfer of the SieStorage Dual Use Patents, Listed Dual Use IP, or IP on the Third List for Dual Use IP by Siemens to a subsequent purchaser by contractually obligating such subsequent purchaser to respect such Licenses and all related obligations of Siemens so that the Company can directly enforce such rights against such subsequent purchaser.

5.3    Notwithstanding anything to the contrary herein, the Company shall ensure that the Contributed Siemens IP and all IP transferred or sold to Company under Sections 4.6, 4.7 and 4.8, and Siemens' rights under this Agreement therein and thereto, remain unaffected in case of a transfer of the respective IP by the Company to a subsequent purchaser by contractually obligating such subsequent purchaser to respect such licenses and all related obligations of the Company (including the Back-License and the Back-Licenses to Derived IP) so that Siemens can directly enforce such rights against such subsequent purchaser.

## ARTICLE SIX
## <u>WARRANTIES, INDEMNIFICATION, AND DISCLAIMERS</u>

6.1    Siemens represents and warrants that:

(a)    It has the full legal right and authority to enter into this Agreement and to convey the rights and licenses that it conveys under this Agreement; and

14

(b)    To the knowledge of Siemens, there is no action, suit or proceeding pending against it or any of its Affiliates challenging the validity or enforceability of the SieStorage Dual Use Patents or the Listed Dual Use IP.  At Company's request, Siemens will provide information concerning actions, suits or proceedings relating to any IP transferred or sold to Company under Sections 4.7, 4.8 and 4.9.

Siemens will defend the Company against all Third Party claims, actions, suits, or other proceedings against the Company arising out of or resulting from a breach of the representations and warranties under this Section 6.1, and shall indemnify and hold the Company harmless from and against all judgments, losses, liabilities, damages, costs and expenses (including without limitation, reasonable attorneys' fees) arising out of or incurred in connection with all such claims, actions, suits, or other proceedings.

6.2    EXCEPT AS EXPRESSLY SET FORTH IN SECTION 6.1, SIEMENS EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THE INTELLECTUAL PROPERTY LICENSED TO THE COMPANY PURSUANT TO THE LICENSES AND THE RIGHTS GRANTED PURSUANT TO THIS AGREEMENT, INCLUDING ANY WARRANTIES WITH RESPECT TO MERCHANTABILITY, SUITABILITY FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR TRADE USAGE.

6.3    The Company will defend Siemens against all Third Party claims, actions, suits, or other proceedings against Siemens arising out of or resulting from any claims or allegations of the Company that a Third Party has infringed or otherwise misappropriated the Company's rights in or to any Intellectual Property, including any counterclaims brought by that Third Party in connection therewith; and the Company shall indemnify and hold Siemens harmless from and against all judgments, losses, liabilities, damages, costs and expenses (including without limitation, reasonable attorneys' fees) arising out of or incurred in connection with all such claims, actions, suits, or other proceedings.

6.4    EXCEPT AS EXPRESSLY SET FORTH IN SECTION 6.3, COMPANY EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WHATSOEVER, WHETHER EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THE INTELLECTUAL PROPERTY LICENSED TO SIEMENS PURSUANT TO THE BACK-LICENSE, THE BACK-LICENSES TO DERIVED IP, AND THE RIGHTS GRANTED PURSUANT TO THIS AGREEMENT, INCLUDING ANY WARRANTIES WITH RESPECT TO MERCHANTABILITY, SUITABILITY FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE, OR TRADE USAGE.

**ARTICLE SEVEN**
**LIMITATION OF LIABILITY**

TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY SHALL BE LIABLE TO OTHER PARTY OR ANY OTHER PERSON FOR ANY INJURY TO OR LOSS

15

OF GOODWILL, REPUTATION, BUSINESS, PRODUCTION, REVENUES, PROFITS, ANTICIPATED PROFITS, CONTRACTS OR OPPORTUNITIES (REGARDLESS OF HOW THESE ARE CLASSIFIED AS DAMAGES), OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE OR ENHANCED DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PRODUCT LIABILITY OR OTHERWISE (INCLUDING THE ENTRY INTO, PERFORMANCE OR BREACH OF THIS AGREEMENT), REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS FORESEEABLE OR THE PARTY AGAINST WHOM SUCH LIABILITY IS CLAIMED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

### ARTICLE EIGHT
### MISCELLANEOUS

8.1     Notwithstanding any provision to the contrary set forth herein or in the ECA or in any document, instrument, or agreement executed in connection herewith or therewith, no provision of this Agreement in any way waives, restricts, alters, diminishes, or limits the express provisions (including the warranties, covenants, agreements, conditions, representations and obligations and indemnifications, and the limitations related thereto, of the Parties) set forth in the ECA, this Agreement being intended solely to effect the Licenses, the Back-License, and the Back-Licenses to Derived IP strictly in accordance with the terms of the ECA. In the event of a conflict between the terms of this Agreement and the terms of the ECA, the terms of this Agreement shall prevail and govern.

8.2     This Agreement is exclusively governed by, and shall be exclusively construed in accordance with, the Laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of Law principles that would require the application of any other Law.

(a)     If one of the Parties concludes that a dispute (other than a dispute over whether a material breach of this Agreement has been committed (or has been cured) by either Party as set out in Section 2.3 or Section 3.4 which shall be resolved solely pursuant to Section 8.2(b)) has arisen under this Agreement it will so inform the other Party in a written notice (the "*Notice*"). The Notice shall set forth the issues requiring resolution. The Notice shall be effective on the date that it is received by the receiving Party. The receiving Party may respond within five (5) business days from the effective date of the Notice with a list of issues to be added to the Notice. The Parties shall thereafter engage in good faith negotiations to attempt to amicably resolve the issues raised in the Notice. If the Parties are unable to resolve the issues raised in the Notice within 30 (thirty) business days after the effective date of the Notice, the issues shall be submitted to mediation under the Mediation Rules of the International Centre for Dispute Resolution (ICDR). The place of mediation shall be Washington D.C. The language of mediation shall be English.  The mediator shall be selected from the roster of accredited mediators of ICDR. Neither Party may veto the selection of a mediator except for compelling reasons of conflict of interest. The mediation shall be concluded no more than 60 (sixty) business days after the effective date of the Notice.

16

(b)    If either Party determines that it intends to terminate any of the licenses granted in this Agreement because the other Party has materially breached this Agreement as set out in Section 2.3 or Section 3.4, as applicable (such Party intending to terminate the Agreement, the "**Claimant**"), it shall notify the other Party hereof in writing, describing the alleged material breach in reasonable detail (such other Party, the "**Recipient**", and such notice, "**Breach Notice**"). Within thirty (30) business days upon receipt of the Breach Notice, the Recipient shall either notify the Claimant that it has cured the breach (or is in the process of curing the breach and requires an additional ten (10) business days to complete such cure which additional time shall be subject to Claimant's approval not to be unreasonably withheld) (such 30 business day rectification period or such longer period approved by Claimant pursuant to the foregoing, "**Rectification Period**") or notify the Claimant that it does not agree with the Breach Notice stating the reasons for such disagreement ("**Disagreement Notice**"). Within 10 business days after the issuance of the Disagreement Notice or within 10 business days after the Rectification Period has elapsed without cure to the material breach, then either Party may, by notice to the other Party and the International Centre for Dispute Resolution, demand mediation under the Mediation Rules of the International Centre for Dispute Resolution. The place of mediation shall be Washington D.C. The language of mediation shall be English. The mediator shall be selected from the roster of accredited mediators of International Centre for Dispute Resolution. Neither Party may veto the selection of a mediator except for compelling reasons of conflict of interest. If settlement through mediation is not reached within 60 business days after service of a written demand for mediation, the Claimant's determination to terminate the Licenses or Back-Licenses, as applicable, granted herein shall be subject to arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules. In any arbitration under this Agreement, the place of arbitration shall be Washington D.C., United States. The language of the arbitration shall be English. There shall be three arbitrators, each of which with at least fifteen years of experience as an attorney with a primary practice area in intellectual property law, arbitrating intellectual property disputes, or a combination of both. Within 30 business days after the commencement of arbitration, each Party shall appoint a person to serve as an arbitrator. The Parties shall then appoint the presiding arbitrator within 30 business days after selection of the Party appointees. If any arbitrators are not selected within these time periods, the International Centre for Dispute Resolution shall, at the written request of any Party, complete the appointments that have not been made. Nothing in this Agreement shall be construed or interpreted as granting the arbitrators the power to award punitive or consequential damages as part of any award rendered relating to this Agreement or the transactions contemplated hereby. The determination of the arbitrators shall be final, binding and nonappealable by the Parties and any judgment or award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The costs and expenses of such arbitration shall be shared equally by the Parties.

8.3    This Agreement is for the sole benefit of the Parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties hereto and such successors and assigns, any legal or equitable rights, remedy or claim hereunder.

8.4    No amendment to this Agreement shall be effective unless it shall be in writing and signed by each of the Parties hereto.

17

8.5    If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

8.6    Each of the Parties hereto is sophisticated and has been (or had full opportunity and means to be) represented by counsel who have carefully negotiated the provisions hereof. As a consequence, the Parties do not intend that the presumptions of any Laws or other rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive their effects.

8.7    This Agreement (and any amendment hereto) may be executed in one or more counterparts, including by facsimile or email, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Party.

8.8    The rights and obligations of each Party under this Agreement are conditioned upon and subject to the occurrence of the Closing contemplated under the ECA. For the avoidance of doubt, if the Closing does not occur, this Agreement will be null and void.

8.9    This Agreement constitutes an amendment and restatement of the Original Agreement effective from and after the Effective Date. The execution and delivery of this Agreement shall not constitute a novation or waiver of any rights or obligations under the Original Agreement based on facts or events occurring or existing prior to the Effective Date and shall be without prejudice to any rights or obligations that have arisen prior to the Effective Date. As of the Effective Date, the Original Agreement is hereby amended, supplemented, modified and restated, as applicable, to the extent provided for herein.

*[SIGNATURE PAGE FOLLOWS]*

18

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

Fluence Energy, LLC

By:_____
Name: Dennis Fehr
Title: Chief Financial Officer

By:_____
Name: Francis A. Fuselier
Title: General Counsel and Secretary

Siemens Industry, Inc.

By:_____
Name:
Title:

By:_____
Name:
Title:

[Signature Page to the Amended and Restated Siemens Industry License Agreement]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

Fluence Energy, LLC

By:_____
Name:
Title:

By:_____
Name:
Title:

Siemens Industry, Inc.

By:_____
Gratzke Ruth
Digitally signed by Gratzke Ruth
DN: cn=Gratzke Ruth, o=Siemens,
email=ruth.gratzke@siemens.com
Date: 2021.04.19 13:27:42 -04'00'

Name: Ruth Gratzke
Title:  Chief Executive Officer

By:_____
Smith Marsha
Digitally signed by Smith Marsha
DN: cn=Smith Marsha, o=Siemens,
email=marsha.smith@siemens.com
Date: 2021.04.19 12:45:59 -04'00'

Name: Marsha Smith
Title:  Chief Financial Officer

[Signature Page to the Amended and Restated Siemens Industry License Agreement]

**EXHIBIT B**
**TO THE**
**SIEMENS LICENSE AGREEMENT**

**Relevant Roadmaps and Company Business Plan**

See attached.

**EXHIBIT D**
**TO THE**
**SIEMENS LICENSE AGREEMENT**

Listed Dual Use IP

| Title of Each Patent Family, Including Subsequent Filings Not Shown, Licensed | Exemplary Publication, Application or Grant number | Status / Countries |
|---|---|---|
| Einrichtung zur Spitzenlast-Abdeckung / Electrical consumer's peak load covering device for public electricity network, has control device to estimate consumer's energy consumption quantity, and inverter to assist consumer's electricity supply if estimation rises above threshold | US7388364 | Granted: DE, US |
| Vorrichtung und Verfahren zur dezentralen Energieversorgung / Decentralized power supply device, has power inverter supplying electrical energy of energy source to power supply systems, where energy source is connected with controller for connecting part of protective devices to power supply systems | EP1925062 | Granted: DE, ES, FR |
| Wechselrichter und Verfahren zum Betrieb des Wechselrichters / Inverter for connection of direct-current source to alternating current network, has current supplies switched on and switched off by electrically programmable logic device that is accessible by micro-computer | EP1833155 | Application |
| Wechselrichter, insbesondere Solarwechselrichter, mit einem aktiven Netzfilter / Inverter i.e. solar inverter, for feeding multiphase line current into mixing point of power network, has downstream line filter that is active line filter connected parallel to output of inverter | DE102008018497 | Granted: DE |
| PERFORMANCE TRACKING OF AN ELECTRICAL ENERGY STORAGE SYSTEM / Method for predicting performance of electrical energy storage system e.g. battery, involves calculating performance indicators of electrical energy storage system based on simulated dynamics of electrical energy storage system | US20170038432 | Application: EP, AU, BR, CA, CL, IN, TH, US |

**For clarity purposes, this list of Listed Dual Use IP is intended to include all future**
**filings in any country for each Patent Family Listed.**

EXHIBIT E
TO THE
SIEMENS LICENSE AGREEMENT

### SieStorage Dual Use Patents

| Title of Each Patent Family, Including Subsequent Filings Not Shown, Licensed | Exemplary Publication, Application or Grant number | Status / Countries |
|---|---|---|
| Elektrische Einrichtung mit verringerter Isolationsstrecke / Electrical device, has electrical circuits adapted to differ with respect to type of insulation, where disconnection gap divides two electrical circuits by interface with intermediate potential | EP2885860 | Granted: DE, FR, IT, PT |
| Erfassen der Betriebsführung eines Batteriespeichers / Method for detecting management of storage battery of energy-storage system, involves performing continuous creation of statistics imaging utilization profiles describing operational management of storage battery | US20170052229 | Application: DE, CN, US |
| Verfahren zum Betrieb einer Stromrichteranlage / Method for operating power converter system for connection of three-phase alternating current (AC) and direct current (DC) systems, involves computing remaining operational parameters and control angle by respective function | DE102014214536 | Application: DE |
| DC-Überspannungsschutz für ein Energiespeichersystem / DC Overvoltage Protection for an Energy Storage System | DE102016218219.6 | Application: DE, WO |
| Elektrisches Energiespeichersystem / Electric energy-storage system, has battery comprising battery management system, and monitoring system for monitoring independent state of battery management system and critical states of battery and comprising computing unit | DE102016203730 | Application: DE, WO |
| DC-Überspannungsschutz für ein Energiesystem / DC Overvoltage Protection for an Energy System / The subject of the invention is a DC overvoltage protection means for an energy storage system and/or energy-generating system, an energy storage system and/or energy generating system with said DC overvoltage protection means, a method of operating a DC overvoltage protection means for an energy storage system and/or energy-generating system, and a method of operating an energy storage system and/or energy-generating system with said DC overvoltage protection means, whereby said DC overvoltage protection means exhibits at least one shunt release on the AC switch that causes said AC switch to be interrupted. | DE102016218242.0 | Application: DE, WO |
| Luftkühlung eines Wechselrichters / Air Cooling of an Inverter | DE102016221404.7 | Application: DE, WO |

| Title of Each Patent Family, Including Subsequent Filings Not Shown, Licensed | Exemplary Publication, Application or Grant number | Status / Countries |
|---|---|---|
| Containerbeschattung / Shading device mounted in container or standard container used for transporting general cargo, has longitudinal profiles that are arranged on opposite side of carrier elements such that profiles extend on opposite side of carrier elements | DE102016222479 | Granted: DE<br><br>Application: WO |
| Design Converter Cabinet Siestorage S800 Umrichter / Inverter | EU register No.: 001452387 | Application: EU, AU, CN, IN |
| Anordnung zum Ausgleich von Spannungseinbrüchen und System mit solch einer Anordnung / Compensation arrangement for voltage dips and system with such an arrangement | DE102017211356.1 | Application: DE |
| Energiespeichervorrichtung und deren Verwendung / Energy Storage Unit and Its Use | DE102017202136.5 | Application: DE |
| Unterbrechungsfreie Stromversorgung / Uninterruptable power supply | DE102017211354.5 | Application: DE |
| Unterbrechungsfreie Stromversorgung / Uninterruptable power supply | DE102017211351.0 | Application: DE |
| Anordnung zum Ausgleich von Spannungseinbrüchen und System mit solch einer Anordnung / Compensation arrangement for voltage dips and system with such an arrangement | DE102017211355.3 | Application: DE |

**For clarity purposes, this list of SieStorage Dual Use Patents is intended to include all future filings in any country for each Patent Family Listed.**

Execution Version

**INTELLECTUAL PROPERTY ASSIGNMENT**

THIS ASSIGNMENT, dated as of September 9, 2021 (the "Effective Date"), by **The AES Corporation** (hereinafter referred to as "the Assignor") having its principal place of business at **4300 Wilson Blvd, Arlington, VA 22203**, respectively, witnesseth:

WHEREAS, the Assignor is the owner of certain new and useful improvements set forth in the patents and patent applications set forth on Exhibit A to this IP Assignment (collectively, "Assigned IP").

WHEREAS, **Fluence Energy, LLC**, (hereinafter referred to as "the Assignee") having its principal place of business at **4601 N. Fairfax Drive, Suite 600, Arlington, VA 22203**, is desirous of acquiring all of Assignor's right, title, and interest in and to said Assigned IP.

NOW, THEREFORE, for good and sufficient consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor and Assignee agree as follows:

1. Assignor has sold, assigned, transferred, conveyed and delivered, and hereby sells, assigns, transfers, conveys, and delivers, to Assignee and its successors and assigns, and Assignee hereby acquires and accepts from Assignor, all of Assignor's right, title and interest in, to and under the Assigned IP.

2. The foregoing assignment of the Assigned IP includes (a) all rights to file for and maintain registrations for the Assigned IP, including all rights to seek and obtain corrections and extensions thereon, including continuation, divisional, continuation-in-part, reexamination and reissue applications, (b) all rights of action accrued, accruing and to accrue under and by virtue of the Assigned IP; and (c) all right to sue or otherwise recover for past, present and future infringement and to receive all damages, payments, costs and fees associated therewith.

3. To the extent applicable, Assignor hereby authorizes Assignee to request the applicable Governmental Entities to record Assignee as the assignee and owner of the Assigned IP, and hereby consents to such recordal.

4. At Assignee's request and for no additional consideration, Assignor agrees to execute and deliver any additional documents and other instruments and do such other acts as may be reasonably necessary to effect such assignment and transfer.

5. This IP Assignment may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this IP Assignment by facsimile, email or other electronic transfer shall be effective as delivery of a manually executed counterpart to this IP Assignment.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties have executed this Intellectual Property Assignment as of the Effective Date.

**ASSIGNOR:**                                          **ASSIGNEE:**

**The AES Corporation**                                **Fluence Energy, LLC**

By:  /s/ Chris Shelton                                 By: _____
Name: Chris Shelton                                    Name:
Title: Senior Vice President and Chief Product Officer  Title:

[Signature Page to Intellectual Property Assignment]

IN WITNESS WHEREOF, the parties have executed this Intellectual Property Assignment as of the Effective Date.

**ASSIGNOR:**                                                **ASSIGNEE:**

**The AES Corporation**                                      **Fluence Energy, LLC**

By: _____       By:      /s/ Brett L Galura
Name:                                                        Name:   Brett L Galura
Title:                                                       Title:   SVP & Chief Technology Officer

                                                             /s/ Francis A. Fuselier
                                                             Francis A. Fuselier
                                                             SVP, General Counsel and Secretary

[Signature Page to Intellectual Property Assignment]

**Exhibit A**

**ASSIGNED IP**

[see attached]

Case 1:25-cv-00444-PTG-IDD   Document 69-4   Filed 07/11/25   Page 754 of 1007
PageID# 1733

| MLB Reference No. | Title | Country | Status | Appl. Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|---|---|---|
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Brazil | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | METHOD AND SYSTEM FOR CONTROLLING A STATE OF CHARGE (SOC) OF AN ENERGY STORAGE DEVICE AND FOR ADJUSTING A RATE OF CHANGE OF AN OUTPUT OF A VARIABLE ENERGY GENERATION SOURCE WITH AN ENERGY STORAGE UNIT BY ADJUSTING RESPONSES TO GRID OPERATOR COMMANDS IN... | Chile | Granted | 2014-01491 | 07-Dec-2012 | 56.090 | 04-Apr-2018 |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | China (People's Republic) | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | European Patent Convention | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | India | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Patent Cooperation Treaty | Completed | PCT/US12/68566 | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Russian Federation | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | METHOD AND SYSTEM FOR PERFORMANCE MANAGEMENT OF AN ENERGY STORAGE DEVICE | United States of America | Allowed | 14/362,856 | 04-Jun-2014 | | |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Austria | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Belgium | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Brazil | Pending | PI0919662-5 | 08-Oct-2009 | | |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Chile | Granted | 801-2011 | 08-Oct-2009 | 53.438 | 23-Sep-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | China (People's Republic) | Granted | 200980149553.0 | 08-Oct-2009 | ZL200980149553.0 | 14-Jan-2015 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Czech Republic | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Denmark | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | European Patent Convention | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Finland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | France | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Germany | Granted | 09819560.5 | 08-Oct-2009 | 602009038270.5 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Hungary | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | India | Pending | 3128/DELNP/2011 | 08-Oct-2009 | | |

Schedule A - Page 1

| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Ireland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
|---|---|---|---|---|---|---|---|
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Italy | Granted | 09819560.5 | 08-Oct-2009 | 502016000074213 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Netherlands | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Norway | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Patent Cooperation Treaty | Completed | PCT/US09/005511 | 08-Oct-2009 | | |
| 042785-04-5003 | METHOD AND SYSTEM FOR MANAGING THE STATE OF CHARGE OF ENERGY STORAGE DEVICES FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID AND IN RESPONSE TO OPERATION FREQUENCY PARAMETER CHANGES ON THE ELECTRICAL POWER GRID | Peru | Granted | 870-2011 | 08-Oct-2009 | 7689 | 30-Dec-2015 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Poland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Russian Federation | Granted | 2011117931 | 08-Oct-2009 | 2492566 | 10-Sep-2013 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Spain | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Sweden | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Switzerland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Turkey | Granted | 09819560.5 | 08-Oct-2009 | 201610194 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | United Kingdom | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | United States of America | Granted | 12/248,106 | 09-Oct-2008 | 7,839,027 | 23-Nov-2010 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Argentina | Granted | 20110100769 | 11-Mar-2011 | AR080498B1 | 30-Aug-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Austria | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Belgium | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Brazil | Granted | 112012022923-0 | 10-Mar-2011 | 112012022923-0 | 11/26/2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Chile | Granted | 2505-2012 | 10-Mar-2011 | 52.075 | 10-Mar-2011 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | China (People's Republic) | Granted | 201180020603.2 | 10-Mar-2011 | ZL201180020603.2 | 01-Mar-2017 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Czech Republic | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Denmark | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | European Patent Convention | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Finland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | France | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Germany | Granted | 11753720.9 | 10-Mar-2011 | 602011062906.9 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Hungary | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | India | Granted | 8239/DELNP/2012 | 10-Mar-2011 | 373173 | 29-Jul-2021 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Ireland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Italy | Granted | 11753720.9 | 10-Mar-2011 | 502020000002638 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Netherlands | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Norway | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Patent Cooperation Treaty | Completed | PCT/US11/000446 | 10-Mar-2011 | | |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Poland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Portugal | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Russian Federation | Granted | 2012143401 | 10-Mar-2011 | 2565235 | 16-Sep-2015 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Slovakia | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Spain | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Sweden | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Switzerland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Turkey | Granted | 11753720.9 | 10-Mar-2011 | 201922033 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | United Kingdom | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | United States of America | Granted | 12/722,271 | 11-Mar-2010 | 8,914,158 | 16-Dec-2014 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Austria | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Belgium | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Brazil | Pending | BR112013032742-1 | 19-Jun-2012 | | |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Chile | Granted | 2013-03690 | 19-Jun-2012 | 53104 | 04-Aug-2016 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | China (People's Republic) | Granted | 201280040497.9 | 19-Jun-2012 | ZL 201280040497.9 | 08-Sep-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Czech Republic | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Denmark | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | European Patent Convention | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Finland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | France | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Germany | Granted | 12803361.0 | 19-Jun-2012 | 602012039284.3 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Hungary | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | India | Pending | 11066/DELNP/2013 | 19-Jun-2012 | | |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Ireland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |

Schedule A - Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Italy | Granted | 12803361.0 | 19-Jun-2012 | 502018000003240 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Netherlands | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Norway | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Patent Cooperation Treaty | Completed | PCT/US12/43138 | 19-Jun-2012 | | |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Poland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Russian Federation | Granted | 2014101451 | 19-Jun-2012 | 2642422 | 25-Jan-2018 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Spain | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Sweden | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Switzerland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Turkey | Granted | 12803361.0 | 19-Jun-2012 | 201801202 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | United Kingdom | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | United States of America | Granted | 13/527,290 | 19-Jun-2012 | 9,559,520 | 31-Jan-2017 |
| 042785-04-5005 / 01 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | United States of America | Granted | 15/394,400 | 29-Dec-2016 | 9,847,648 | 19-Dec-2017 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Brazil | Pending | BR112013032908-4 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Chile | Granted | 3689-2013 | 19-Jun-2012 | 52531 | 10-Mar-2016 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | China (People's Republic) | Granted | 201280040458.9 | 19-Jun-2012 | ZL201280040458.9 | 02-Mar-2016 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | European Patent Convention | Published | 12803431.1 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | India | Pending | 11069/DELNP/2013 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Patent Cooperation Treaty | Completed | PCT/US12/43143 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Russian Federation | Granted | 2014101450 | 19-Jun-2012 | 2601957 | 18-Oct-2016 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | United States of America | Granted | 13/527,354 | 19-Jun-2012 | 9,020,800 | 28-Apr-2015 |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Brazil | Pending | BR102016011590-6 | 20-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Chile | Allowed | 2016-01237 | 23-May-2016 | 59861 | 4/22/2020 |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | China (People's Republic) | Abandoned | 201610363480.7 | 26-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | European Patent Convention | Abandoned | 16171154.4 | 24-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | India | Pending | 201614017856 | 24-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Korea, Republic of | Published | 10-2016-63992 | 25-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Philippines | Published | 1-2016-000205 | 26-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Russian Federation | Abandoned | 2016120583 | 25-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | United States of America | Granted | 14/721,522 | 26-May-2015 | 10,272,567 | 30-Apr-2019 |
| 042785-04-5007 / 01 | AUTOMATED ROBOTIC BATTERY TUG | United States of America | Published | 16/399,549 | 30-Apr-2019 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Austria | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Belgium | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Brazil | Pending | BR102016011934-0 | 25-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Chile | Allowed | 2016-01259 | 24-May-2016 | 60540 | 6/8/2020 |

Schedule A - Page 4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | China (People's Republic) | Allowed | 201610362322.X | 26-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Czech Republic | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Denmark | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | European Patent Convention | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Finland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | France | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Germany | Granted | 16171170.0 | 24-May-2016 | 602016033379.1 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Hungary | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | India | Pending | 201614017858 | 24-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Ireland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Italy | Granted | 16171170.0 | 24-May-2016 | 502020000054988 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Korea, Republic of | Published | 10-2016-64825 | 26-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Netherlands | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Norway | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Philippines | Allowed | 1-2016-000207 | 26-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Poland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Russian Federation | Granted | 2016120358 | 25-May-2016 | 2690003 | 30-May-2019 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Spain | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Sweden | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Switzerland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Turkey | Granted | 16171170.0 | 24-May-2016 | 202010481 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | United Kingdom | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | United States of America | Granted | 14/721,582 | 26-May-2015 | 9,929,594 | 27-Mar-2018 |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Brazil | Abandoned | BR102016019472-5 | 24-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Chile | Granted | 2016-02139 | 24-Aug-2016 | 57.927 | 05-Jun-2019 |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | China (People's Republic) | Published | 201610730320.1 | 25-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | European Patent Convention | Published | 16185831.1 | 26-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | India | Abandoned | 201614027513 | 11-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Korea, Republic of | Published | 10-2016-107556 | 24-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Philippines | Abandoned | 1-2016-000301 | 25-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Russian Federation | Granted | 2016134797 | 25-Aug-2016 | 2690507 | 04-Jun-2019 |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | United States of America | Abandoned | 14/836,340 | 26-Aug-2015 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Austria | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Belgium | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Brazil | Published | BR102016011925-1 | 25-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Chile | Allowed | 2016-01270 | 25-May-2016 | 59869 | 30-Apr-2020 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | China (People's Republic) | Published | 201610363604.1 | 26-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Czech Republic | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Denmark | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | European Patent Convention | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Finland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | France | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Germany | Granted | 16171174.2 | 24-May-2016 | 602016022441.0 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Hungary | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | India | Pending | 201614017857 | 24-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Ireland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Italy | Granted | 16171174.2 | 24-May-2016 | 502020000001282 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Korea, Republic of | Published | 10-2016-64208 | 25-May-2016 | | |

Schedule A - Page 5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Netherlands | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Norway | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Philippines | Allowed | 1-2016-000206 | 26-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Poland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Russian Federation | Granted | 2016120585 | 25-May-2016 | 2713427 | 05-Feb-2020 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Spain | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Sweden | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Switzerland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Turkey | Granted | 16171174.2 | 24-May-2016 | 201919625 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | United Kingdom | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | United States of America | Granted | 14/721,533 | 26-May-2015 | 9,819,708 | 14-Nov-2017 |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Brazil | Published | 1120200197602 | 22-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Chile | Published | 202002527 | 30-Sep-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | China (People's Republic) | Published | 201980023823.7 | 30-Sep-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | European Patent Convention | Published | 19775922.8 | 30-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | India | Pending | 202017046127 | 22-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Korea, Republic of | Published | 2020-7031277 | 29-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Philippines | Pending | 12020551563 | 25-Sep-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Russian Federation | Pending | 2020135633 | 29-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | United States of America | Published | 16/369,600 | 29-Mar-2019 | | |

Schedule A - Page 6

**Exhibit 10.20**

**Execution Version**

**LICENSE AGREEMENT**

This LICENSE AGREEMENT (this "Agreement"), dated as of September 9, 2021 (the "Effective Date"), in entered into by and between **Fluence Energy, LLC**, a limited liability company duly organized and validly existing under the laws of the State of Delaware ("**FLUENCE**") ("**LICENSOR**") and **The AES Corporation**, a corporation duly formed and validly existing under the laws of the State of Delaware ("**AES**") ("**LICENSEE**") . Each of **LICENSOR**, and **LICENSEE** is sometimes referred to herein as a "Party" and, together, as the "Parties."

WITNESSETH

WHEREAS, **AES** having assigned to **FLUENCE** and **FLUENCE** having taken assignment from **AES** of certain patents and patent applications (the "Patent Transfer"); and

WHEREAS, as a condition to such Patent Transfer, **FLUENCE** has agreed to grant to **AES**, and **AES** wishes to receive, a license under the Licensed Intellectual Property on the terms and conditions set forth below and as necessary to accomplish the purposes of this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the respective covenants and agreements hereinafter contained, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE 1 DEFINITIONS**

1.1    "Affiliates" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1.2    "Stationary Energy Storage Field" means the development, manufacturing, marketing, and/or sale of stationary energy storage systems and solutions based on battery technology for utility-scale and commercial industrial applications and residential applications, together with such other lawful activities as a limited liability company may undertake in connection therewith, and includes energy storage mediums such as supercapacitors, primary batteries, and secondary batteries such as lithium, Li-Ion, flow batteries, sodium-ion, and metal-air but excludes developing or producing the technology for the storage medium itself (e.g., battery chemistry) and inverters.

1.3    "Exclusive Field" means the Stationary Energy Storage Field.

1.4    "Improvement" means any improvement, enhancement, modification, or other derivative work of the Licensed Patents, the Licensed Process, the Licensed Product or the Licensed Know-How after the Effective Date, including all Intellectual Property rights therein.

1.5    "Intellectual Property" means any and all Patents, copyrights, trademarks, trade dress, know-how, trade secrets, industrial design rights, inventions (whether or not patentable), processes, methodologies, procedures, works of authorship, moral rights, Software, domain names, specifications, production tools, designs and models as well as any applications therefor and any related rights in or to any of the foregoing, confidential information, and any other corresponding rights and all other intellectual property rights (whether registered or unregistered) anywhere in the world.

**1.6**  "Know-How" means trade secrets, know-how, and all other confidential or proprietary information, including but not limited to: design Software, manufacturing Software, inspection Software, repair Software, process specifications, material specifications, bills of material, drawings, methodologies, design procedures, manufacturing procedures, inspection procedures, repair procedures, parameters and/or specifications for machines, special tools, and/or fixtures, and undocumented expertise.

**1.7**  "Licensed Intellectual Property" means the Licensed Patents, the Licensed Process, the Licensed Product. the Licensed Know-How, and the Improvement Intellectual Property licensed under Section 3.1.

**1.8**  "Licensed Know-How" means Know-How related to the Licensed Patents or that is necessary or useful for implementing the Licensed Patents.

**1.9**  "Licensed Patents" shall mean all Patents set forth in **Exhibit A**.

**1.10**  "Licensed Process" means any process that is covered by a Licensed Patent.

**1.11**  "Licensed Product" means any service or product that (i) is covered by the Licensed Patents; or (ii)  is manufactured using a Licensed Process.

**1.12**  "Non-Exclusive Field" means all fields excluding the Exclusive Field. For avoidance of doubt, the Non-Exclusive Field includes (i) uninterruptable power supply (UPS) systems (other than for use in Applications), (ii) a virtual energy storage network built out of individual, connected, geographically distributed product units of less than 150 kilowatts per unit (a "swarm"), (iii) static synchronous compensators (Statcom), (iv) supercapacitors, (v) the technology for the storage medium (e.g. batteries), (vi) energy storage inverters, (vii) stationary storage systems sold as part of an integrated product in conjunction with the sale of energy storage systems on board of vessels, vehicles or locomotives, where the main purpose of the stationary storage system is to charge or to be charged by such on-board energy storage system or the vehicle brake energy and (viii)  stationary storage systems providing power directly and primarily to electric vehicle charging stations.

**1.13**  "Patents" means any patents (utility and design, or their equivalents) together with any extensions, reexaminations and reissues of such patents, patents of addition, patent applications (including provisional patent applications), divisions, continuations, continuations-in-part, and any subsequent filings in any country or jurisdiction claiming priority therefrom.

**1.14**  "Person" means any natural person, business trust, corporation, partnership, limited liability company, joint stock company, proprietorship, association, trust, joint venture, unincorporated association or organization, labor union, group (as defined in the Securities Exchange Act of 1934, as amended) or any other legal entity of whatever nature.

**1.15**  "Software" means any computer program, operating system, applications system, firmware or software of any nature, whether operational, under development or inactive, including all object code, source code, data files, rules, custom databases, libraries, compilations, tool sets, compilers, higher level or "proprietary" languages, definitions or methodology derived from the foregoing and any derivations, updates, enhancements and customization of any of the foregoing, processes, know-how, operating procedures, methods and all other Intellectual Property embodied in the foregoing, technical manuals, user manuals and other documentation and materials related thereto, whether in machine-readable form, programming language or any other language or symbols and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature.

**ARTICLE 2 LICENSE RIGHTS**

2.1 <u>Exclusive Patent License Grant</u>. **LICENSOR** hereby grants, in each case for the life of each of the Licensed Patents, to **LICENSEE** and its Affiliates a worldwide, exclusive (except with respect to **LICENSOR**, **LICENSOR's** subsidiaries and Fluence Energy, Inc., a Delaware corporation), perpetual, irrevocable, sublicensable, non-transferable (except in connection with a permitted transfer of this Agreement as a whole), royalty-free, fully paid up license under the Licensed Patents to develop, improve, make, have made, sell, offer for sale, distribute, import and use Licensed Products and Licensed Processes, and otherwise commercially exploit the Licensed Patents in the Non-Exclusive Field.

2.2 <u>Exclusive Know-How License Grant</u>. **LICENSOR** hereby grant to **LICENSEE** and its Affiliates a worldwide, exclusive (except with respect to **LICENSOR**, **LICENSOR's** subsidiaries and Fluence Energy, Inc., a Delaware corporation), perpetual, irrevocable, sublicensable, non-transferable (except in connection with a permitted transfer of this Agreement as a whole), royalty-free, fully paid up license under the Licensed Know-How, including any copyright rights and moral rights contained therein, in each case as necessary to develop, improve, make, have made, sell, offer for sale, distribute, import, use, reproduce, modify, make derivative works, and otherwise commercially exploit (i) all current service and products developed, manufactured, marketed, and sold by **LICENSEE** and its Affiliates in the Non-Exclusive Field as of the Effective Date ("Current Products") and (ii) any improvements to the Current Products as permitted hereunder. To the extent **LICENSOR**, as of the Effective Date, are contractually or otherwise legally prohibited from granting any of the exclusive licenses in this Article 2.2, then such a license shall be non-exclusive but otherwise on identical terms, and **LICENSOR** hereby grants such a non-exclusive license. In the event any exclusive license grant is converted to a non-exclusive license grant pursuant to this section, **LICENSOR** shall not grant any future licenses in the Non-Exclusive Field on any such licensed Know-How.

2.3 <u>Moral Rights</u>. For the avoidance of doubt, to the extent any of the Licensed Intellectual Property may be subject to a claim of moral rights under any law, **LICENSOR** agrees to waive, and does hereby unconditionally waive, such rights including, but not limited to, the rights of attribution and integrity, and **LICENSOR** expressly acknowledges that **LICENSEE** has the right to make changes to the Licensed Intellectual Property.

**ARTICLE 3 IMPROVEMENTS AND FUTURE TECHNOLOGY**

3.1 <u>Ownership of Improvements</u>. All right, title and interest in or to all Improvements together with all Intellectual Property and other proprietary rights arising therefrom ("<u>Improvement Intellectual Property</u>", shall be owned and held solely and exclusively by **LICENSOR**. **LICENSEE** and its Affiliates shall have a right to a worldwide, exclusive or non-exclusive (to be determined), perpetual, irrevocable, sublicensable, non-transferable (except in connection with a permitted transfer of this Agreement as a whole) license ("<u>Licensee Back-License to Improvements</u>") under fair, reasonable and non-discriminatory ("<u>FRAND</u>") royalty terms, and subject to the Exclusive Field and Non-Exclusive Field restrictions herein, to be negotiated by the Parties before such Licensee Back-License to Improvements is exercised. Such Licensee Back-License to Improvements shall include the right to obtain technical assistance from the developing Party on terms to be negotiated. If such Improvement is developed jointly by **LICENSOR** and a third party, then (i) if **LICENSOR** is not contractually or legally prevented from licensing such Improvements to **LICENSEE**, then **LICENSEE** shall have the right to a license pursuant to this Article 3.1 or (ii) if **LICENSOR** is contractually or legally prevented from licensing or disclosing such Improvements to **LICENSEE**, then **LICENSOR** agrees to cooperate with **LICENSEE** in obtaining access to such Improvements, including executing any multiparty agreements, the negotiation of which shall be done in good faith

3

**3.2**     All Improvement Intellectual Property licensed to **LICENSEE** and its Affiliates under this Article 3 shall be afforded the same rights, remedies, and obligations provided for Licensed Intellectual Property under this Agreement. For avoidance of doubt, this includes all rights, remedies, and obligations under Articles 4 through 9.

## ARTICLE 4 PATENT PROSECUTION AND MAINTENANCE

**4.1**     Obligation of **LICENSOR**. **LICENSOR** shall use commercially reasonable efforts to prosecute and maintain all Licensed Patents. To the extent that any inventor of a Licensed Patent is an employee of **LICENSEE**, **LICENSEE** shall, at the applicable **LICENSOR'S** request and cost, make reasonable accommodations to permit such employee to take actions reasonably necessary to perfect that **LICENSOR'S** title in and/or to enforce such Licensed Patent.

**4.2**     Rights of **LICENSEE**. If, following exercise of all commercially reasonable efforts, **LICENSOR** elects not to, or to abandon its efforts to, file, prosecute or maintain one or more of the Licensed Patents, **LICENSOR** shall provide **LICENSEE** with written notice thereof, which notice shall be provided at least forty-five (45) calendar days before the date on which (i) any filing concerning the Licensed Patent must be made in order to avoid a material adverse effect on the Patent rights at issue, or (ii) any hearing or other proceeding concerning the Licensed Patent is scheduled to be conducted before the U.S. Patent and Trademark Office, or any foreign counterpart thereof. Following such notice, **LICENSEE** shall have the right, but not the obligation, to file, prosecute or maintain such Licensed Patents in such country, either, on behalf of and in the name of **LICENSOR** or **LICENSEE**, at **LICENSEE'S** sole expense. In such event, **LICENSOR** shall execute and deliver to **LICENSEE** all such instruments and other documents, including assignment of the Licensed Patent, and shall take such other actions as may be necessary or reasonably requested by **LICENSEE**, in connection therewith. Any fees payable by **LICENSEE** pursuant to this Section 4.2 shall be (x) paid directly by **LICENSEE** or (y) if paid by **LICENSOR** following a request by **LICENSEE** to **LICENSOR**, be reimbursed to **LICENSOR** within thirty (30) calendar days following any written request for such reimbursement. In the event that **LICENSEE** elects to prosecute or maintain a Licensed Patent pursuant to this Section 4.2, upon written notice from **LICENSEE**, **LICENSOR** shall, within thirty (30) calendar days, assign the applicable Licensed Patent to **LICENSEE** at no further cost or expense to **LICENSEE**.

**4.3**     Right of First Refusal. Except in connection with the sale of **LICENSOR'S** business as a whole, **LICENSEE** has a Right of First Refusal ("ROFR") with respect to the sale of any Licensed Patent ("ROFR Patents"), which must be exercised within forty-five (45) calendar days of notice to **LICENSEE** by **LICENSOR** of such sale or intent to sell. If **LICENSEE** exercises its ROFR, the Parties agree to conduct good-faith negotiations for ninety (90) calendar days from the expiration of Licensee's 45-calendar day response period to enter into a purchase agreement for the ROFR Patents. If the Parties are unable to enter into an agreement during the 90-calendar day good-faith negotiation period, **LICENSOR** shall be entitled to enter into a sale or similar transfer agreement with a third party in connection with such ROFR Patents, provided that, prior to executing such agreement with such third party, **LICENSOR** is required to make the identical offer to **LICENSEE**, and **LICENSEE** shall have twenty (20) business days to accept such offer.

**4.4**     If, after making commercial best efforts, any of the notice deadlines in Articles 4.2 to 4.3 are not met, then the relevant notice shall be provided as soon as possible, but in no event shall such notice be less than thirty (30) calendar days.

**ARTICLE 5 ENFORCEMENT**

**5.1**     Obligation to Notify. Should either Party become aware of any infringement or potential infringement of the Licensed Intellectual Property by a third party (each, an "Infringement"), such Party shall provide the other Party with prompt written notification thereof, including in such notification all known or reasonably ascertainable details and facts relating thereto.

**5.2**     **LICENSEE** Enforcement Right. **LICENSEE** shall, at its own expense, have the right (but not the obligation) to engage in proceedings involving the Infringement of the Licensed Intellectual Property in the Non-Exclusive Field or take such steps as may be necessary in order to terminate such improper use by unauthorized Persons. Should **LICENSEE** proceed with any such action, (i) **LICENSEE** shall keep **LICENSOR** reasonably informed of the status of, and its activities regarding, such action; and (ii) **LICENSOR** shall reasonably cooperate with **LICENSEE** in any such action, including joining the action as a party if necessary to maintain standing, at **LICENSEE's** expense. If **LICENSOR** becomes a party to any action pursuant to this Section 5.2, they shall have the right to be represented by their own counsel if they so choose, at their own expense. Any award, or portion of an award, recovered by **LICENSEE** in any action commenced by it pursuant to this Section 5.2 shall belong solely to **LICENSEE** after recovery by the Parties of their respective actual out-of-pocket costs.

**5.3**     **LICENSOR** Enforcement Right. **LICENSOR** shall, at their own expense, have the right (but not the obligation) to engage in proceedings involving Infringement of the Licensed Intellectual Property or to take such steps as may be necessary in order to terminate such improper use by unauthorized Persons. Should **LICENSOR** proceed with any such action, (i) **LICENSOR** shall keep **LICENSEE** reasonably informed of the status of, and their activities regarding, such action; and (ii) **LICENSEE** shall reasonably cooperate with **LICENSOR** in any such action, including joining the action as a party if necessary to maintain standing, at **LICENSOR'S** expense. If **LICENSEE** becomes a party to any action pursuant to this 5.3, it shall have the right to be represented by its own counsel if it so chooses, at its own expense. Any award, or portion of an award, recovered by **LICENSOR** in any action commenced by them pursuant to this Section 5.3 shall belong solely to **LICENSOR** after recovery by the Parties of their respective actual out-of-pocket costs.

**5.4**     Additional Enforcement Rights. If the Party with the original right to engage in enforcement activities pursuant to Section 5.2 or Section 5.3 (in each case, the "First Right Party") refuses to take action against an Infringement within ninety (90) calendar days of the Notice provided by either Party pursuant to Section 5.1, such First Right Party shall notify the other Party (the "Second Right Party") of such decision and the Second Right Party may, at its sole risk, cost and expense, commence and prosecute legal proceedings in its own name. Should the Second Right Party proceed with any such action, (i) the Second Right Party shall keep the First Right Party reasonably informed of the status of, and its activities regarding, such action; and (ii) the First Right Party shall reasonably cooperate with the Second Right Party in any such action, including joining the action as a party if necessary to maintain standing, at the Second Right Party's expense. If the First Right Party becomes a party to any action pursuant to this Section 5.4, it shall have the right to be represented by its own counsel if it so chooses, at its own expense. Any award, or portion of an award, recovered by the Second Right Party in any action commenced by it pursuant to this Section 5.4 shall belong solely to the Second Right Party after recovery by both Parties of their respective actual out-of-pocket costs.

<center>5</center>

**5.5**    <u>Settlement</u>. **LICENSOR** will not settle any dispute with any third party at any time regarding the Licensed Intellectual Property that in any way affects **LICENSEE's** rights under this Agreement without the prior written consent of **LICENSEE**. **LICENSEE** will not settle any dispute with any third party at any time regarding the Licensed Intellectual Property without the prior written consent of **LICENSOR**.

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES; ADDITIONAL COVENANTS**

**6.1**    <u>Representations and Warranties of Both Parties</u>. Each Party represents and warrants to the other Party as follows:

(a)    Such Party is duly organized, validly existing and in good standing under the laws of its place of incorporation or registration.

(b)    The execution and delivery of this Agreement have been duly authorized by all necessary corporate action on the part of such Party.

(c)    This Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity.

(d)    The execution and delivery of this Agreement, and the performance by such Party of its obligations hereunder, will not (i) contravene or result in the breach or violation of, or a default under, any agreement or understanding by which such Party is bound, or (ii) violate any law, rule, regulation, statute, order or decree to which such Party or any of its Affiliates is a party or by which any of them, or any of their property, is subject or bound.

**6.2**    <u>Specific Assurances</u>: If there is any material third-party Intellectual Property licensed to or otherwise made available to a **LICENSOR** that (i) cannot be sublicensed or disclosed to **LICENSEE** under this Agreement, and (ii) is used in or necessary for the operation of the business of the **LICENSEE** and its Affiliates in the Non-Exclusive Field as of the Effective Date ("Material Third-Party IP"), and, during the term of this Agreement, either Party becomes aware of Material Third-Party IP, then **LICENSOR** agree to use commercial best efforts to assist **LICENSEE** in obtaining access to such Material Third-Party IP, including executing any multiparty agreements, the negotiation of which shall be done in good faith.

**6.3**    <u>Further Assurances</u>. Each of the Parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Agreement. Without limiting the generality of the foregoing, **LICENSOR** agrees to fully cooperate with the **LICENSEE** and shall take all actions reasonably requested by the **LICENSEE** to perfect, confirm, register, or record any of its rights in and to the Licensed Intellectual Property under this Agreement, as well as this Agreement, with apportionment of reasonable expenses to be determined by the Parties.

**ARTICLE 7 DISCLAIMERS AND LIMITATIONS OF LIABILITY**

7.1    <u>No Additional Warranties</u>. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 5, NEITHER PARTY MAKES ANY WARRANTIES TO THE OTHER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, CONCERNING THE LICENSED INTELLECTUAL PROPERTY OR ANY OTHER MATTER COVERED BY THIS AGREEMENT. SPECIFICALLY, BUT WITHOUT LIMITING THE FOREGOING, EACH PARTY DISCLAIMS ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.2    <u>Limitation on Damages</u>. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR ANY OF ITS AFFILIATES FOR ANY INCIDENTAL, SPECIAL, SPECULATIVE, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, BUSINESS OR GOODWILL) SUFFERED OR INCURRED BY SUCH OTHER PARTY OR ITS AFFILIATES IN CONNECTION WITH A BREACH OR ALLEGED BREACH OF THIS AGREEMENT, EVEN IF THE FIRST PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7.3    <u>Acknowledgment</u>. Each Party hereby acknowledges and agrees that the foregoing disclaimer and limitation of liability represent bargained for allocations of risk, and that the economies, terms and conditions of this agreement reflect such allocations.

**ARTICLE 8 TERM**

8.1    <u>Term</u>. The term of this Agreement shall commence on the Effective Date and shall continue perpetually thereafter. For the avoidance of doubt: (i) the licenses granted in this Agreement may not be terminated for any reason and no Party shall have the right to terminate, rescind, revoke or otherwise cancel or void this Agreement or any license granted herein for any reason whatsoever, and no remedy permitting or requiring the same shall be imposed for any reason whatsoever; and (ii) the sole and exclusive remedies in the event of a breach (material or otherwise) of this Agreement shall be monetary damages, an injunction or other equitable relief (which, for the avoidance of doubt, may not include termination, revocation, rescission or other cancellation or voiding of this Agreement) with respect to any breach of this Agreement. Each Party acknowledges and agrees that the foregoing limitation on remedies is a necessary inducement for the other Party to enter into this Agreement and such limitation shall not cause this Agreement to, and no Party shall claim that this Agreement does, fail of its essential purpose for lack of remedy or otherwise.

**ARTICLE 9 MISCELLANEOUS**

9.1    <u>Confidentiality</u>. **LICENSEE** agrees to keep confidential, and shall cause its sublicensees and instruct their officers, directors, employees and advisors to keep confidential, all non-public information relating to any Know-How included in the Licensed Intellectual Property, except to the extent such information (i) is or becomes generally known to and available for use by the public other than as a result of **LICENSEE's** breach or the breach of any other Person bound by a duty of confidentiality to the **LICENSEE** or its sublicensees, (ii) which is demonstrated by **LICENSEE** to be or to have been independently developed by **LICENSEE** without reference to the confidential information relating to the Know-How included in the Licensed Intellectual Property or (iii) is or was lawfully acquired by **LICENSEE** from sources other than **LICENSOR** or its Affiliates which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If **LICENSEE** or any of its sublicensees or their respective representatives are legally required to disclose any such information by judicial or administrative process or by other requirements of law, such Person shall reasonably promptly notify **LICENSOR** in writing and shall disclose only that portion of such information which such Person is advised by its legal counsel is legally required to be disclosed.

7

9.2    <u>Entire Agreement</u>. This Agreement contains the entire understanding among the Parties hereto with respect to the transactions contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All exhibits and schedules hereto are expressly made a part of this Agreement as fully as though completely set forth herein.

9.3    <u>Amendment; Waiver</u>. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by all of the Parties hereto, or in the case of a waiver, by the Party waiving compliance. Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

9.4    <u>Severability</u>. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect. To the extent permitted by law, each Party hereto waives any provision of law that renders any such provision prohibited or unenforceable in any respect.

9.5    <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the Party to whom notice is to be given; (b) on the day of transmission if sent via email transmission to the email address given below; (c) on the day after deposit for next day delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the Party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, return receipt requested and properly addressed, to the Party as follows:

if to **LICENSOR**:

Fluence Energy, LLC.
Brett Galura, CTO
4601 N. Fairfax Drive, Suite 600
Arlington, VA 22203
Brett.galura@fluenceenergy.com

With a copy to:    Francis A. Fuselier
General Counsel
Frank.fuselier@fluenceenergy.com

8

if to **LICENSEE**:

>
> Ms. Jennifer Gillcrist
> The AES Corporation
> 4300 Wilson Blvd
> Arlington, VA 22203

With a copy to:    Morgan Lewis & Bockius LLP
1111 Pennsylvania Ave, NW
Washington, DC 20004-2541
Attn: Jeffrey G. Killian

Any Party may change its address for the purpose of this Section by giving the other Party written notice of its new address in the manner set forth above. Any notice to **LICENSEE** required by Article 4 may be satisfied by email addressed to all of the following:

jennifer.gillcrist@aes.com

9.6    No Joint Venture. This Agreement does not constitute a partnership, joint venture or agency between the Parties hereto, nor shall either of the Parties hold itself out as such contrary to the terms hereof by advertising or otherwise, nor shall either of the Parties become bound or become liable because of any representation, action, or omission of the other.

9.7    No Third-Party Beneficiaries; Performance by Affiliates. Except to the extent that a license under this Agreement extends to Affiliates or to permitted sublicensees, this Agreement is not intended to, and shall not, provide any Person not a party hereto with any rights of any nature whatsoever against any of the Parties hereto, and no Person not a party hereto shall have any right, power, or privilege in respect of any party hereto, or have any benefit or interest, arising out of this Agreement. For the avoidance of doubt, any **LICENSEE** obligation under this Agreement shall be deemed satisfied if such obligation is performed by an Affiliate of **LICENSEE**.

9.8    Negotiated Agreement. The Parties hereby acknowledge that the terms and language of this Agreement were the result of negotiations among the Parties and, as a result, there shall be no presumption that any ambiguities in this Agreement shall be resolved against any particular Party. Any controversy over construction of this Agreement shall be decided without regard to events of authorship or negotiation.

9.9    Assignment. This Agreement may not be assigned by a Party, or transferred under operation of law or otherwise by a Party, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, except that this Agreement may be assigned by a Party to any of its Affiliates, or to any successor to all or substantially all of such Party's stock, assets to which this Agreement relates or business operations to which this Agreement relates, provided that the Affiliate or successor agrees in writing to accept the terms and conditions of this Agreement. This Agreement shall be binding on the successors and permitted assigns of each Party. In the event that any Intellectual Property licensed under this Agreement is sold, assigned, or otherwise transferred to a third party, **LICENSOR** shall require the successor to such rights to be bound by all of the terms and conditions of this Agreement applicable to such transferred Intellectual Property. Any purported assignment or transfer of this Agreement or the Intellectual Property licensed under this Agreement in violation of this Section 9.9 shall be null and void.

**9.10**    Governing Law; Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by, and construed and enforced in accordance with the laws of the state of Delaware in all respects without giving effect to the conflict of law principles thereof. The sole forum for resolving disputes arising under or relating to this Agreement shall be the state and Federal courts located in the state of Delaware, and all related appellate courts, and the Parties hereby consent to the jurisdiction of such courts and agree that venue shall be in the state of Delaware. Process in any proceeding referred to in the preceding sentence may be served on any Party anywhere in the world. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY HERETO THAT THIS SECTION 9.10 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 9.10 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

**9.11**    Counterparts. This Agreement may be executed and delivered in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, photostatic and PDF copies of signatures to this Agreement (including copies received as attachments to electronic mail) shall be deemed to be originals and may be relied upon with the same force and effect as originals.

**9.12**    Execution and Delivery. This Agreement shall be deemed executed by the Parties when any one or more counterparts hereof, individually or taken together, bears the signatures of each of the Parties hereto. This Agreement, once executed by a Party, may be delivered to the other Party by facsimile transmission of a copy thereof that bears the signature of the Party so delivering it.

**9.13**    Interpretation. Unless the context of this Agreement clearly requires otherwise, (a) references to the plural include the singular, the singular the plural, the part the whole, (b) references to any gender include all genders, (c) "including" has the inclusive meaning frequently identified with the phrase "but not limited to," (d) references to "hereunder" or "herein" relate to this Agreement, (e) a reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns and (e) any reference to any legislation or to any provision of any legislation shall include any modification or re -enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto. The Section and other headings contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect. Section, paragraph and Exhibit references are to this Agreement unless otherwise specified.

*[Signature Page Follows]*

10

IN WITNESS WHEREOF, **LICENSOR** and **LICENSEE** have caused this Agreement to be executed as the date first above written, by their respective officers thereunto duly authorized.

**LICENSOR**

**FLUENCE ENERGY, LLC**

/s/ Francis A. Fuselier

Francis A. Fuselier
SVP, General Counsel and Secretary

By:    /s/ Brett L Galura

Name: Brett L Galura
Title:  SVP & Chief Technology Officer

**LICENSEE**

**THE AES CORPORATION**

By:

Name:
Title:

[Signature Page to Fluence License to AES]

IN WITNESS WHEREOF, **LICENSOR** and **LICENSEE** have caused this Agreement to be executed as the date first above written, by their respective officers thereunto duly authorized.

**LICENSOR**
**FLUENCE ENERGY, LLC**

By: _____

Name:

Title:

**LICENSEE**
**THE AES CORPORATION**

By:      /s/ Chris Shelton

Name:   Chris Shelton

Title:    Senior Vice President and Chief Product Officer

[Signature Page to Fluence License to AES]

**Exhibit A**

**LIST OF LICENSED PATENTS**

[see attached]

| MLB Reference No. | Title | Country | Status | Appl. Number | Filing Date | Patent Number | Issue Date |
|---|---|---|---|---|---|---|---|
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Brazil | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | METHOD AND SYSTEM FOR CONTROLLING A STATE OF CHARGE (SOC) OF AN ENERGY STORAGE DEVICE AND FOR ADJUSTING A RATE OF CHANGE OF AN OUTPUT OF A VARIABLE ENERGY GENERATION SOURCE WITH AN ENERGY STORAGE UNIT BY ADJUSTING RESPONSES TO GRID OPERATOR COMMANDS IN... | Chile | Granted | 2014-01491 | 07-Dec-2012 | 56.090 | 04-Apr-2018 |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | China (People's Republic) | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | European Patent Convention | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | India | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Patent Cooperation Treaty | Completed | PCT/US12/68566 | 07-Dec-2012 | | |
| 042785-04-5002 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Russian Federation | Closed | | 07-Dec-2012 | | |
| 042785-04-5002 | METHOD AND SYSTEM FOR PERFORMANCE MANAGEMENT OF AN ENERGY STORAGE DEVICE | United States of America | Allowed | 14/362,856 | 04-Jun-2014 | | |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Austria | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Belgium | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Brazil | Pending | PI0919662-5 | 08-Oct-2009 | | |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Chile | Granted | 801-2011 | 08-Oct-2009 | 53.438 | 23-Sep-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | China (People's Republic) | Granted | 200980149553.0 | 08-Oct-2009 | ZL200980149553.0 | 14-Jan-2015 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Czech Republic | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Denmark | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | European Patent Convention | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Finland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | France | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Germany | Granted | 09819560.5 | 08-Oct-2009 | 602009038270.5 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Hungary | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | India | Pending | 3128/DELNP/2011 | 08-Oct-2009 | | |

Schedule A - Page 1

| Matter | Title | Country | Status | Application No. | Filing Date | Patent No. | Issue Date |
|---|---|---|---|---|---|---|---|
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Ireland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Italy | Granted | 09819560.5 | 08-Oct-2009 | 502016000074213 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Netherlands | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Norway | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Patent Cooperation Treaty | Completed | PCT/US09/005511 | 08-Oct-2009 | | |
| 042785-04-5003 | METHOD AND SYSTEM FOR MANAGING THE STATE OF CHARGE OF ENERGY STORAGE DEVICES FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID AND IN RESPONSE TO OPERATION FREQUENCY PARAMETER CHANGES ON THE ELECTRICAL POWER GRID | Peru | Granted | 870-2011 | 08-Oct-2009 | 7689 | 30-Dec-2015 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Poland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Russian Federation | Granted | 2011117931 | 08-Oct-2009 | 2492566 | 10-Sep-2013 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Spain | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Sweden | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Switzerland | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | Turkey | Granted | 09819560.5 | 08-Oct-2009 | 201610194 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | United Kingdom | Granted | 09819560.5 | 08-Oct-2009 | 2351189 | 27-Apr-2016 |
| 042785-04-5003 | FREQUENCY RESPONSIVE CHARGE SUSTAINING CONTROL OF ELECTRICITY STORAGE SYSTEMS FOR ANCILLARY SERVICES ON AN ELECTRICAL POWER GRID | United States of America | Granted | 12/248,106 | 09-Oct-2008 | 7,839,027 | 23-Nov-2010 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Argentina | Granted | 20110100769 | 11-Mar-2011 | AR080498B1 | 30-Aug-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Austria | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Belgium | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Brazil | Granted | 112012022923-0 | 10-Mar-2011 | 112012022923-0 | 11/26/2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Chile | Granted | 2505-2012 | 10-Mar-2011 | 52.075 | 10-Mar-2011 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | China (People's Republic) | Granted | 201180020603.2 | 10-Mar-2011 | ZL201180020603.2 | 01-Mar-2017 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Czech Republic | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Denmark | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | European Patent Convention | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Finland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | France | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Germany | Granted | 11753720.9 | 10-Mar-2011 | 602011062906.9 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Hungary | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | India | Granted | 8239/DELNP/2012 | 10-Mar-2011 | 373173 | 29-Jul-2021 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Ireland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Italy | Granted | 11753720.9 | 10-Mar-2011 | 502020000002638 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Netherlands | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Norway | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Patent Cooperation Treaty | Completed | PCT/US11/000446 | 10-Mar-2011 | | |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Poland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Portugal | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Russian Federation | Granted | 2012143401 | 10-Mar-2011 | 2565235 | 16-Sep-2015 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Slovakia | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Spain | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Sweden | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Switzerland | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | Turkey | Granted | 11753720.9 | 10-Mar-2011 | 201922033 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | United Kingdom | Granted | 11753720.9 | 10-Mar-2011 | 2545632 | 23-Oct-2019 |
| 042785-04-5004 | REGULATION OF CONTRIBUTION OF SECONDARY ENERGY SOURCES TO POWER GRID | United States of America | Granted | 12/722,271 | 11-Mar-2010 | 8,914,158 | 16-Dec-2014 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Austria | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Belgium | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Brazil | Pending | BR112013032742-1 | 19-Jun-2012 | | |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Chile | Granted | 2013-03690 | 19-Jun-2012 | 53104 | 04-Aug-2016 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | China (People's Republic) | Granted | 201280040497.9 | 19-Jun-2012 | ZL 201280040497.9 | 08-Sep-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Czech Republic | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Denmark | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | European Patent Convention | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Finland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | France | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Germany | Granted | 12803361.0 | 19-Jun-2012 | 602012039284.3 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Hungary | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | India | Pending | 11066/DELNP/2013 | 19-Jun-2012 | | |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Ireland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |

Schedule A - Page 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Italy | Granted | 12803361.0 | 19-Jun-2012 | 502018000003240 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Netherlands | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Norway | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Patent Cooperation Treaty | Completed | PCT/US12/43138 | 19-Jun-2012 | | |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Poland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Russian Federation | Granted | 2014101451 | 19-Jun-2012 | 2642422 | 25-Jan-2018 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Spain | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Sweden | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Switzerland | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | Turkey | Granted | 12803361.0 | 19-Jun-2012 | 201801202 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | United Kingdom | Granted | 12803361.0 | 19-Jun-2012 | 2721710 | 01-Nov-2017 |
| 042785-04-5005 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | United States of America | Granted | 13/527,290 | 19-Jun-2012 | 9,559,520 | 31-Jan-2017 |
| 042785-04-5005 / 01 | HYBRID ELECTRIC GENERATING POWER PLANT THAT USES A COMBINATION OF REAL-TIME GENERATION FACILITIES AND ENERGY STORAGE SYSTEM | United States of America | Granted | 15/394,400 | 29-Dec-2016 | 9,847,648 | 19-Dec-2017 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Brazil | Pending | BR112013032908-4 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Chile | Granted | 3689-2013 | 19-Jun-2012 | 52531 | 10-Mar-2016 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | China (People's Republic) | Granted | 201280040458.9 | 19-Jun-2012 | ZL201280040458.9 | 02-Mar-2016 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | European Patent Convention | Published | 12803431.1 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | India | Pending | 11069/DELNP/2013 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Patent Cooperation Treaty | Completed | PCT/US12/43143 | 19-Jun-2012 | | |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | Russian Federation | Granted | 2014101450 | 19-Jun-2012 | 2601957 | 18-Oct-2016 |
| 042785-04-5006 | METHOD AND APPARATUS FOR CONTROLLING ENERGY SERVICES BASED ON MARKET DATA | United States of America | Granted | 13/527,354 | 19-Jun-2012 | 9,020,800 | 28-Apr-2015 |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Brazil | Pending | BR102016011590-6 | 20-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Chile | Allowed | 2016-01237 | 23-May-2016 | 59861 | 4/22/2020 |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | China (People's Republic) | Abandoned | 201610363480.7 | 26-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | European Patent Convention | Abandoned | 16171154.4 | 24-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | India | Pending | 201614017856 | 24-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Korea, Republic of | Published | 10-2016-63992 | 25-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Philippines | Published | 1-2016-000205 | 26-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | Russian Federation | Abandoned | 2016120583 | 25-May-2016 | | |
| 042785-04-5007 | AUTOMATED ROBOTIC BATTERY TUG | United States of America | Granted | 14/721,522 | 26-May-2015 | 10,272,567 | 30-Apr-2019 |
| 042785-04-5007 / 01 | AUTOMATED ROBOTIC BATTERY TUG | United States of America | Published | 16/399,549 | 30-Apr-2019 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Austria | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Belgium | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Brazil | Pending | BR102016011934-0 | 25-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Chile | Allowed | 2016-01259 | 24-May-2016 | 60540 | 6/8/2020 |

Schedule A - Page 4

| Docket | Title | Country | Status | Application No. | App. Date | Patent No. | Grant Date |
|---|---|---|---|---|---|---|---|
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | China (People's Republic) | Allowed | 201610362322.X | 26-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Czech Republic | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Denmark | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | European Patent Convention | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Finland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | France | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Germany | Granted | 16171170.0 | 24-May-2016 | 602016033379.1 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Hungary | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | India | Pending | 201614017858 | 24-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Ireland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Italy | Granted | 16171170.0 | 24-May-2016 | 502020000054988 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Korea, Republic of | Published | 10-2016-64825 | 26-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Netherlands | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Norway | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Philippines | Allowed | 1-2016-000207 | 26-May-2016 | | |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Poland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Russian Federation | Granted | 2016120358 | 25-May-2016 | 2690003 | 30-May-2019 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Spain | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Sweden | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Switzerland | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | Turkey | Granted | 16171170.0 | 24-May-2016 | 202010481 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | United Kingdom | Granted | 16171170.0 | 24-May-2016 | 3098927 | 08-Apr-2020 |
| 042785-04-5008 | MODULAR ENERGY STORAGE METHOD AND SYSTEM | United States of America | Granted | 14/721,582 | 26-May-2015 | 9,929,594 | 27-Mar-2018 |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Brazil | Abandoned | BR102016019472-5 | 24-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Chile | Granted | 2016-02139 | 24-Aug-2016 | 57.927 | 05-Jun-2019 |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | China (People's Republic) | Published | 201610730320.1 | 25-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | European Patent Convention | Published | 16185831.1 | 26-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | India | Abandoned | 201614027513 | 11-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Korea, Republic of | Published | 10-2016-107556 | 24-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Philippines | Abandoned | 1-2016-000301 | 25-Aug-2016 | | |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | Russian Federation | Granted | 2016134797 | 25-Aug-2016 | 2690507 | 04-Jun-2019 |
| 042785-04-5009 | BATTERY BACKUP CAPACITY METHOD AND SYSTEM | United States of America | Abandoned | 14/836,340 | 26-Aug-2015 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Austria | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Belgium | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Brazil | Published | BR102016011925-1 | 25-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Chile | Allowed | 2016-01270 | 25-May-2016 | 59869 | 30-Apr-2020 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | China (People's Republic) | Published | 201610363604.1 | 26-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Czech Republic | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Denmark | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | European Patent Convention | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Finland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | France | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Germany | Granted | 16171174.2 | 24-May-2016 | 602016022441.0 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Hungary | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | India | Pending | 201614017857 | 24-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Ireland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Italy | Granted | 16171174.2 | 24-May-2016 | 502020000001282 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Korea, Republic of | Published | 10-2016-64208 | 25-May-2016 | | |

Schedule A - Page 5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Netherlands | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Norway | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Philippines | Allowed | 1-2016-000206 | 26-May-2016 | | |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Poland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Russian Federation | Granted | 2016120585 | 25-May-2016 | 2713427 | 05-Feb-2020 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Spain | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Sweden | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Switzerland | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | Turkey | Granted | 16171174.2 | 24-May-2016 | 201919625 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | United Kingdom | Granted | 16171174.2 | 24-May-2016 | 3098926 | 16-Oct-2019 |
| 042785-04-5010 | METHOD AND SYSTEM FOR SELF-REGISTRATION AND SELF-ASSEMBLY OF ELECTRICAL DEVICES | United States of America | Granted | 14/721,533 | 26-May-2015 | 9,819,708 | 14-Nov-2017 |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Brazil | Published | 1120200197602 | 22-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Chile | Published | 202002527 | 30-Sep-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | China (People's Republic) | Published | 201980023823.7 | 30-Sep-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | European Patent Convention | Published | 19775922.8 | 30-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | India | Pending | 202017046127 | 22-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Korea, Republic of | Published | 2020-7031277 | 29-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Philippines | Pending | 12020551563 | 25-Sep-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | Russian Federation | Pending | 2020135633 | 29-Oct-2020 | | |
| 042785-04-5017 | UTILITY-SCALE RENEWABLE PEAKER PLANT, TIGHTLY COUPLED SOLAR PV AND ENERGY STORAGE | United States of America | Published | 16/369,600 | 29-Mar-2019 | | |

Schedule A - Page 6

**Amended and Restated**

**Equipment and Services Purchase Agreement**

by and between

Fluence Energy, LLC

as Buyer

and

Siemens Industry, Inc.

as Supplier

dated [●], 2021

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 780 of 1007 Exhibit 10.21
PageID# 1759

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| 1. | DEFINITIONS; INTERPRETATION | 1 |
| 1.1. | Definitions | 1 |
| 1.2. | Interpretation | 7 |
| 2. | TERM AND TERMINATION OF AGREEMENT | 8 |
| 2.1. | Term | 8 |
| 2.2. | Early Termination | 8 |
| 3. | SCOPE OF AGREEMENT | 8 |
| 3.1. | Scope Generally | 8 |
| 3.2. | Further Buyer Contracting Parties | 9 |
| 3.3. | Cooperation | 9 |
| 3.4. | Interfaces | 9 |
| 4. | ORDERS | 9 |
| 4.1. | Pricing Requests | 9 |
| 4.2. | Purchase Orders | 10 |
| 4.3. | Most Favored Nation Pricing | 10 |
| 4.4. | Payment Terms | 10 |
| 4.5. | Disputed Payments | 11 |
| 4.6. | Late Payments | 11 |
| 4.7. | Taxes; Export and Import Duties | 11 |
| 5. | DELIVERY | 11 |
| 5.1. | Delivery Terms; Inspection | 11 |
| 5.2. | Guaranteed Delivery Date | 11 |
| 5.3. | Delay Liquidated Damages | 12 |
| 6. | TITLE, RISK OF LOSS AND CARE, CUSTODY AND CONTROL | 12 |
| 6.1. | Transfer of Title and Risk of Loss | 12 |
| 6.2. | Warranty of Title | 12 |
| 7. | INSPECTION AND QUALITY CONTROL. | 12 |
| 7.1. | Inspection Rights | 12 |
| 7.2. | Quality Control | 13 |
| 8. | WARRANTIES | 13 |
| 8.1. | Equipment Warranty | 13 |
| 8.2. | Services Warranty | 13 |
| 8.3. | Notification Requirements | 13 |
| 8.4. | Corrective Action | 13 |
| 8.5. | Warranty Exclusions | 14 |
| 8.6. | NO IMPLIED WARRANTIES | 14 |
| 8.7. | Reserved Rights | 14 |
| 9. | BUYER FURNISHED PROPERTY | 15 |
| 10. | PACKAGING | 15 |
| 11. | FORCE MAJEURE | 15 |
| 11.1. | Effect of Force Majeure | 15 |
| 11.2. | Procedures | 15 |
| 11.3. | Termination for Extended Force Majeure | 16 |
| 12. | CHANGE ORDERS | 16 |
| 12.1. | Change Order | 16 |
| 12.2. | Change Order Process | 16 |
| 12.3. | Change Order Restrictions | 17 |
| 12.4. | No Change | 17 |

i

| 13. | INTELLECTUAL PROPERTY | 17 |
|---|---|---|
| 13.1. | Grant of License | 17 |
| 13.2. | No Copies | 17 |
| 13.3. | Proprietary Notices | 18 |
| 13.4. | Security | 18 |
| 13.5. | No Reverse Engineering | 18 |
| 13.6. | Open Source Software | 18 |
| 13.7. | Reporting | 18 |
| 13.8. | Relief | 18 |
| 13.9. | Improvements | 18 |
| 13.10. | Ownership | 19 |
| 13.11. | Enforcement | 20 |
| 13.12. | Duration and Transfers | 20 |
| 13.13. | Government End Users | 21 |
| 13.14. | Reservation of Rights | 21 |
| 14. | DEFAULTS AND REMEDIES. | 21 |
| 14.1. | Supplier Defaults | 21 |
| 14.2. | Buyer Defaults | 21 |
| 14.3. | Remedies | 22 |
| 15. | INDEMNIFICATION | 22 |
| 15.1. | General | 22 |
| 15.2. | Infringement Indemnification by Supplier | 23 |
| 15.3. | Infringement Indemnification by Buyer | 24 |
| 15.4. | Indemnification Procedures | 25 |
| 15.5. | Limited Waiver of Certain Immunities | 25 |
| 15.6. | Survival | 26 |
| 16. | LIMITATIONS OF LIABILITY | 26 |
| 16.1. | WAIVER OF CERTAIN DAMAGES | 26 |
| 16.2. | MAXIMUM LIABILITY | 26 |
| 16.3. | EFFECTIVENESS | 26 |
| 16.4. | Commencement of Claims | 26 |
| 17. | CONFIDENTIALITY. | 27 |
| 17.1. | Confidential Information | 27 |
| 17.2. | Non-Disclosure | 27 |
| 17.3. | Exceptions | 27 |
| 17.4. | Representatives Bound | 27 |
| 17.5. | Survival | 27 |
| 18. | REPRESENTATIONS AND WARRANTIES | 28 |
| 18.1. | Representations of the Parties | 28 |
| 18.2. | Additional Representations of Supplier | 28 |
| 19. | ENVIRONMENT, HEALTH AND SAFETY | 29 |
| 19.1. | Compliance and Related Matters | 29 |
| 19.2. | On-Site Environmental and Safety Responsibility | 30 |
| 19.3. | Health and Safety Plan | 30 |
| 20. | OPEN SOURCE SOFTWARE. | 31 |
| 21. | EXPORT CONTROL AND FOREIGN TRADE REGULATIONS | 31 |
| 21.1. | Acknowledgement and Compliance | 31 |
| 21.2. | Export Licenses | 31 |
| 21.3. | Provision of Trade Data | 31 |
| 21.4. | Changes | 32 |
| 21.5. | Additional Buyer's Obligations | 32 |
| 21.6. | Certain Relief | 32 |

ii

| 22. | CODE OF CONDUCT | 32 |
|---|---|---|
| 23. | COMPLIANCE WITH LAWS AND PERMITS | 32 |
| 24. | DISPUTE RESOLUTION | 33 |
| 24.1. | Referral to Senior Management | 33 |
| 24.2. | Referral to Arbitration | 33 |
| 24.3. | Neutral Arbitrators | 33 |
| 24.4. | Procedures and Costs | 33 |
| 24.5. | Award | 34 |
| 24.6. | Confidentiality | 34 |
| 24.7. | Continued Performance; Provisional Remedies | 34 |
| 24.8. | Waiver of Jury Trial | 34 |
| 25. | MISCELLANEOUS | 34 |
| 25.1. | Governing Law | 34 |
| 25.2. | Records | 34 |
| 25.3. | Intentionally Omitted | 35 |
| 25.4. | Insurance | 35 |
| 25.5. | Assignment; Successors | 35 |
| 25.6. | Subcontracting | 35 |
| 25.7. | Other Terms and Amendments | 35 |
| 25.8. | Government Contracts | 35 |
| 25.9. | Relationship of the Parties | 35 |
| 25.10. | Publicity | 35 |
| 25.11. | Non-Exclusive Remedies and Non-Waivers | 36 |
| 25.12. | Severability | 36 |
| 25.13. | Survival | 36 |
| 25.14. | Affirmative Action | 36 |
| 25.15. | Complete Agreement and Counterparts | 36 |
| 25.16. | Counterparts | 36 |
| 25.17. | No Pre-Printed Terms | 36 |
| 25.18. | Priority | 37 |
| 25.19. | Notices | 37 |
| 25.20. | Joint Effort | 38 |
| 25.21. | Language of the Agreement, Correspondence, Documentation | 38 |

Exhibits

| Exhibit A | Form of Purchase Order |
|---|---|
| Exhibit B | Form of Joinder Agreement |
| Exhibit C | Substance Declaration |
| Exhibit D | Code of Conduct |
| Exhibit E | Insurance |
| Exhibit F | Affirmative Action |

Attachment A Description of Supplier's Equipment and Services

iii

THIS **AMENDED AND RESTATED EQUIPMENT AND SERVICES PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into on [●], 2021, between **Siemens Industry, Inc.,** whose principal place of business is at 100 Technology Drive, Alpharetta, Georgia 30005 hereinafter referred to as "**Supplier**" and **Fluence Energy, LLC**, whose principal place of business is 4601 N. Fairfax Drive, Suite 600, Arlington, Virginia 22203 hereinafter referred to as "**Buyer**". Each of Supplier and Buyer are referred to herein as a "**Party**" and collectively are referred to herein as the "**Parties**."

WHEREAS, Buyer sells electrical storage solutions to Customers;

WHEREAS, Supplier sells electrical balance of plant equipment and related services which Buyer may want to purchase to incorporate within its energy storage equipment and related services projects;

WHEREAS, Supplier wishes to cooperate with Buyer in order to fulfill Buyer's requirements and provide preferred purchasing conditions to Buyer for those electrical balance of plant equipment and related services;

WHEREAS, Supplier and Buyer are parties to that certain Equipment and Services Purchase Agreement, dated as of January 1, 2018, by and between Supplier and Buyer (the "**Prior Agreement**"); and

WHEREAS, Supplier is party to the Second Amended and Restated Limited Liability Company Agreement of Buyer, dated as of June 9, 2021(the "**LLC Agreement**");

WHEREAS, Supplier, Buyer and certain other parties are entering into a series of transactions in connection with the formation of Fluence Energy, Inc., a Delaware corporation ("**Issuer**") to serve as the vehicle through which the public will own indirect interests in Buyer through an initial public offering; and

WHEREAS, in connection with the closing of initial public offering, the LLC Agreement is being amended and restated in its entirety by the Third Amended and Restated Limited Liability Company Agreement, dated on or about the date hereof (the "**Restated LLC Agreement**"), to, among other things, reflect Issuer's ownership of Supplier and the restructuring of Supplier and its Affiliates.

NOW, THEREFORE, the Parties agree that on the Effective Date, the Prior Agreement is hereby amended and restated in its entirety by this Agreement, and further agree as follows:

**1.**      **DEFINITIONS; INTERPRETATION.**

1.1.    <u>Definitions</u>. Initially-capitalized terms used in this Agreement (including the preamble and Recitals hereto) and not otherwise defined herein shall have the meanings specified below.

"**Affiliate**" means, at any time, and with respect to any Person or group of Persons, a Person that at such time directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person or group of Persons. No Person shall be considered an Affiliate of another Person or under the Control of such other Person so long as (i) it is owned less than 50% by such other Person, (ii) such other Person has no capacity to elect or appoint the majority of the board of directors or similar governing body of the subject Person, (iii) such other Person does not consolidate the subject Person in its financial reporting and (iv) there is no other management or services agreement pursuant to which such other Person exerts control over the subject Person. With respect to Supplier, none of Gamesa Corporación Technológica S.A., Siemens Healthineers AG nor any of their respective Subsidiaries shall be considered an Affiliate of Supplier.

"**Agreement**" has the meaning set forth in the Preamble hereto.

"**Applicable Law**" means any applicable constitutional provision, statute, act, code, law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision or declaration of a Governmental Authority having valid jurisdiction.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Buyer**" has the meaning set forth in the Preamble hereto.

"**Buyer Event of Default**" has the meaning set forth in Section 14.2.

"**Buyer Furnished Property**" has the meaning set forth in Article 9.

"**Change Order**" has the meaning set forth in Section 12.1.

"**Change Order Information**" has the meaning set forth in Section 12.2.

"**Claims**" has the meaning set forth in Section 15.1.

"**Confidential Information**" has the meaning set forth in Section 17.1.

"**Control**" means, with respect to the relationship between two or more Persons, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise. The terms "Controlled" or "under common Control with" have correlative meanings.

"**Defect**" means any material defect in design, manufacturing, materials or workmanship in or to the Equipment, or any failure of the Equipment to materially comply with the Technical Specifications, excluding in all cases any of the foregoing attributable to or caused by ordinary wear and tear of the Warranted Equipment.

"**Deliver**", "**Delivered**" or "**Delivery**" means that Supplier has caused the delivery of the applicable Equipment to the Delivery Point in accordance with the terms of this Agreement.

"**Delivery Point**" means the delivery location set forth in a Pricing Notice, provided that, if no such location is specified in the applicable Pricing Notice, the Delivery Point for the Equipment shall be the location of Supplier's facility.

"**Derivative Software**" has the meaning set forth in Article 20.

"**EAR**" has the meaning set forth in Section 21.1.

"**Effective Date**" shall have the meaning assigned to such term in Section 2.1.

"**EHS Laws**" has the meaning set forth in Section 19.1.

"**Enforcement Action**" has the meaning set forth in Section 13.11.

"**Equipment**" means any electrical balance of plant equipment offered by Supplier pursuant to this Agreement, as set forth in Attachment A.

"**Equipment Warranty**" has the meaning set forth in Section 8.1.

"**Equipment Warranty Period**" has the meaning set forth in Section 8.1.

"**Export Controls and Sanctions Laws**" has the meaning set forth in Section 21.1.

"**Force Majeure**" means any event which is not within the reasonable control of the Party affected and with the exercise of due diligence could not reasonably be prevented, avoided or removed by such Party, which causes the affected Party to be delayed, in whole or in part, or unable, using commercially reasonable efforts, to partially or wholly perform its obligations under this Agreement (other than an obligation for the payment of money) and is not caused by or resulting from the negligence or breach or failure of such Party to perform its obligations under this Agreement, which, subject to the foregoing, may include: acts of God or the public enemy, natural disasters, war, terrorism, insurrection, sabotage, unavoidable accidents, orders, decrees, rulings and policies of any Governmental Authority, fires, floods, earthquakes, volcanic activity, severe weather conditions not reasonably foreseeable taking into account the location of performance and the climate patterns applicable thereto, explosions, riots, general strikes and area lockouts. Force Majeure shall not include a Party's financial inability to perform under this Agreement or any Purchase Order.

"**Further Buyer Contracting Parties**" has the meaning set forth in Section 3.2.

"**Governmental Authority**" means a federal, state, local or foreign governmental authority (including any regulatory authority); a state, province, commonwealth, territory or district thereof; a county; a city, town, township, or other municipality; a district, ward or other subdivision of any of the foregoing; any executive, legislative or other governing body of any of the foregoing; any agency, authority, board, department, system, service, office, commission, committee, council or other administrative body of any of the foregoing; any court or other judicial body; and any officer, official or other representative of any of the foregoing.

"**Guaranteed Delivery Date**" has the meaning set forth in Section 5.2.

"**Hazardous Materials**" has the meaning set forth in Section 19.1.

"**Indemnified Party**" has the meaning set forth in Section 15.1.

"**Indemnifying Party**" has the meaning set forth in Section 15.1.

"**Infringement Claim Costs**" means any and all judgments, damages, fines, awards, penalties, and interest associated with any of the foregoing, that, in each case, are finally awarded in a claim for which an Indemnifying Party is obligated to indemnify an Indemnified Party under Section 15.2 or 15.3, as applicable, and costs and expenses, including reasonable attorneys' fees, court costs and other reasonable costs of suit, arbitration, dispute resolution or other similar proceedings, associated with such claim.

"**Initial Term**" has the meaning set forth in Section 2.1.

"**Intellectual Property**" means United States and foreign: (a) Patents; (b) Trademarks; (c) copyrights, whether registered or unregistered, and all applications and registrations therefor, web sites, proprietary domain names, mask works, and all applications and registrations therefor; (d) Know-How; (e) Software; and (f) similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing.

"**Know-How**" means all proprietary and confidential information and data (irrespective as to whether such information or data is available by way of documentation, orally or in electronic format, or protected by copyrights), including business and trade secrets, technical and business information and data, know-how and similar proprietary rights in confidential information and processes, discoveries, analytic models, improvements, techniques, devices, methods, patterns, formulations and specifications, all to the extent that such information and data are proprietary and confidential and neither Software nor a Patent.

"**License**" has the meaning set forth in Section 13.1.

"**Licensed Technology**" means, collectively, all of the following to the extent owned by, or licensed (with the right to grant sublicenses) to, Supplier, relating to the Equipment or the uses and purposes contemplated in connection with this Agreement or any Purchase Order issued hereunder for such Equipment: (a) Software embedded in or integrated with the Equipment, (b) any other trade secrets, proprietary information, know-how or other Intellectual Property incorporated into or embedded within the Equipment or necessary for the installation, operation, maintenance, and ownership of the Equipment, (c) any improvements of or updates to any of the foregoing provided to Buyer pursuant to this Agreement, if any, and (d) all Intellectual Property rights of Supplier in the Licensed Technology listed in any of clauses (a) through (d) above, in each case, for use solely in connection with the installation, commissioning, operation and maintenance of the Equipment at the Project Site or such other site as Buyer shall elect.

"**LLC Agreement**" has the meaning set forth in the Recitals hereto.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**Open License Terms**" has the meaning set forth in Article 20.

"**Open Source Software**" has the meaning set forth in Article 20.

"**Party**" has the meaning set forth in the Preamble hereto.

"**Parties**" has the meaning set forth in the Preamble hereto.

4

"**Patents**" means all patents, utility models, patent and utility model applications, and all priorities and rights related thereto, including all reissues, reexaminations, divisions, continuations, continuations-in-part, provisionals, continued prosecution applications, substitutions, extensions, additions or renewals of any of the foregoing.

"**Person**" means any natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company or any other entity (whether or not having separate legal personality), and shall include any successor (by merger or otherwise) of such entity.

"**Pricing Notice**" has the meaning set forth in Section 4.1.

"**Pricing Request**" has the meaning set forth in Section 4.1.

"**Prohibited Person**" means (i) any individual or entity that has been determined by competent authority to be the subject of a prohibition in any law, regulation, rule, or executive order administered by OFAC or the U.S. Department of State; (ii) the government, including any political subdivision, agency or instrumentality thereof, of a Sanctioned Country; (iii) any individual or entity that acts on behalf of or is owned or controlled by the government of a Sanctioned Country; (iv) any individual or entity that has been identified on the OFAC Specially Designated Nationals and Blocked Persons List (Appendix A to 31 C.F.R. Ch. V) or any other similar list published by OFAC, including, but not limited to, the Foreign Sanctions Evaders List, the Part 561 List, and the Non SDN Iranian Sanctions List; (v) any individual or entity that has been designated on any similar list or order published by the United States government, including, without limitation, the Denied Persons List, Entity List, or Unverified List of the U.S. Department of Commerce, or the Debarred List or Nonproliferation Sanctions List of the U.S. Department of State; or (vi) any entity beneficially owned or controlled, directly or indirectly, by, any of the individuals or entities listed in subparagraphs (i)-(v) above.

"**Prudent Industry Practices**" means those practices, methods, specifications and standards of safety, performance, dependability, efficiency and economy generally recognized by electrical utility industry members, including Supplier, in the U.S. as good and proper, and such other practices, methods or acts which, in the exercise of reasonable judgment by those reasonably experienced in the industry in light of the facts known at the time a decision is made, would be expected to accomplish the result intended at a reasonable cost and consistent with Applicable Laws, reliability, safety and expedition. Prudent Industry Practices are not intended to be limited to the optimum practices, methods or acts to the exclusion of all others, but rather to be a spectrum of good and proper practices, methods and acts.

"**Purchase Order**" means a purchase order in the form attached hereto as Exhibit A issued for the purchase of Equipment and Services pursuant to and in accordance with the terms and conditions of this Agreement.

"**Representatives**" means, with respect to any Person, such Person's shareholders, members, officers, directors, employees, accountants, consultants, legal counsel, financial advisors and other representatives and agents.

"**Sanctioned Country**" means any country or territory against which the United States maintains comprehensive economic sanctions or embargoes, including, without limitation, Crimea, Cuba, Iran, North Korea, Sudan and Syria.

"**Services**" means any Equipment related services offered for sale by Supplier pursuant to this Agreement, as set forth in Attachment A.

"**Services Warranty**" has the meaning set forth in Section 8.2.

"**Services Warranty Period**" has the meaning set forth in Section 8.2.

"**Software**" means all computer programs, operating systems, applications, systems, firmware, and software of any nature, whether operational, active, under development, or design, non-operational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, test scripts, user manuals, and other documentation therefore, whether in machine-readable form, programming language, or any other language or symbols, and whether stored, encoded, recorded, or written on disk, tape, film, memory device, paper, or other media of any nature and all databases necessary or appropriate to operate any such computer program, operating system, applications system, firmware, or software.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing member, general partner or analogous controlling Person of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries.

"**Supplier**" has the meaning set forth in the Preamble hereto.

"**Supplier Documents**" means the documents and deliverables to be provided by Supplier to Buyer to the extent reasonably required for the installation, commissioning, operation and maintenance of the Equipment, as more fully set forth in the applicable Purchase Order.

"**Supplier Event of Default**" has the meaning set forth in Section 14.1.

6

"**Taxes**" means any and all forms of taxation, charges, duties, imposts, levies and rates whenever imposed by any Governmental Authority, including income tax, withholding tax, corporation tax, capital gains tax, capital transfer tax, sales tax, business and occupation tax, inheritance tax, water rates, value added tax, customs duties, capital duty, excise duties, betterment levy, stamp duty, stamp duty reserve tax, national insurance, social security or other similar contributions, and generally any tax, duty, impost, levy, rate or other amount and any interest, penalty or fine in connection therewith.

"**Technical Specifications**" means the technical specifications for the Equipment as set forth in the applicable Purchase Order.

"**Term**" has the meaning set forth in Section 2.1.

"**Territory**" means (i) for purposes of the sales and marketing by Buyer of the Equipment, worldwide and (ii) for all other use of the Equipment, the country in which the Equipment is installed for use.

"**Trademarks**" means all trademarks, trademark applications, service marks, service mark applications, trade dress, trade names, identifying symbols, words, colors, designs, product names, company names, slogans, logos or insignia, whether registered or unregistered, and all applications and registrations therefor, and all goodwill associated therewith.

"**TSCA**" has the meaning set forth in Section 19.1.

"**Work Site**" has the meaning set forth in Section 19.2.

1.2.    <u>Interpretation</u>.

(a)    References to Recitals, Articles, Sections, Exhibits, Annexes and Attachments are, unless otherwise indicated, to Recitals, Articles, Sections, Exhibits, Annexes and Attachments to this Agreement. All Exhibits, Annexes and Attachments to this Agreement are incorporated herein by this reference and made a part hereof for all purposes.

(b)    As used in this Agreement, the masculine gender shall include the feminine and neuter and the singular number shall include the plural, and vice versa.

(c)    Unless expressly stated otherwise, references to a Person include its successors and permitted assigns and, in the case of a Governmental Authority, any Person succeeding to its functions and capacities.

(d)    As used in this Agreement, references to "days" shall mean calendar days, unless the term "Business Days" is used. If the term "Business Days" is used and the time for performing an obligation under this Agreement expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

(e)    As used in this Agreement, where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder" and "hereof" refer to this Agreement, taken as a whole, and not to any particular provision of this Agreement; "including" means "including, for example and without limitation," and other forms of the verb "to include" are to be interpreted similarly.

7

(f)        As used in this Agreement, all references to a given agreement, instrument or other document shall be a reference to that agreement, instrument or other document as modified, amended, supplemented and restated through the date as of which such reference is made. Any term defined or provision incorporated in this Agreement by reference to another document, instrument or agreement shall continue to have the meaning or effect ascribed thereto whether or not such other document, instrument or agreement is in effect.

**2.        TERM AND TERMINATION OF AGREEMENT.**

2.1.    <u>Term</u>. This Agreement shall become effective and the term shall commence on the day on which the Class A Common Stock of the Issuer is issued to the underwriters in its initial public offering (the "**Effective Date**"); provided, that if the Effective Date does not occur on or prior to December 31, 2021, this Agreement shall be deemed terminated as of such date and of no force or effect without further notice or action by the Parties, and the Prior Agreement shall remain in full force and effect without any amendment thereto. The term of this Agreement shall continue until the fourth (4th) anniversary of the Effective Date (the "**Initial Term**") and thereafter shall be automatically extended in successive one (1) year increments (the Initial Term together with any such extensions, the "**Term**").

2.2.    <u>Early Termination</u>. Either Party may terminate this Agreement effective upon the expiration of the Initial Term or the expiration of any extension thereof upon not less than six (6) months prior written notice of termination furnished to the other Party. No termination of this Agreement pursuant to this Section 2.2 shall affect any Purchase Orders executed between the Parties prior to the date of termination. If this Agreement is terminated pursuant to this Section 2.2, the Parties shall attempt, in fair dealing and good faith, to agree on reasonable post-termination procedures in compliance with applicable law and antitrust requirements.

**3.        SCOPE OF AGREEMENT.**

3.1.    <u>Scope Generally</u>. This Agreement shall apply to all purchases by Buyer from Supplier of Equipment and Services during the Term. Notwithstanding the foregoing, nothing herein shall be construed to mean that either Buyer or Supplier is committing to any specific level of business or quantity of Equipment and Services to be purchased or supplied other than that specified in Purchase Orders issued to Supplier during the Term of this Agreement by Buyer; provided, however, Buyer shall consider Equipment and Services from Supplier when sourcing Equipment and Services available from Supplier hereunder as long as the "most favored nation" pricing described in <u>Section 4.3</u> remains in effect. Attachment A hereto sets forth the various standard Equipment and Services offerings of Supplier, it being understood that any project-specific requirements associated with any particular order hereunder shall be as set forth in the applicable Purchase Order therefor. Supplier may from time to time update the Equipment and Services offered for sale hereunder by furnishing to Buyer an update to Attachment A hereto, it being agreed that no such update shall affect any previously issued Purchase Order unless and to the extent set forth in a Change Order thereto.

<div align="center">8</div>

3.2.    Further Buyer Contracting Parties. Buyer and its Subsidiary companies (hereinafter referred to as "**Further Buyer Contracting Parties**") shall be entitled to conclude individual Purchase Orders under the terms of this Agreement provided that such Further Buyer Contracting Parties either: (a) execute a joinder agreement acceptable to Supplier and otherwise in the form of Exhibit B hereto; or (b) agree that that the terms of this Agreement will govern the subject transaction by including a conspicuous cross-reference in the applicable Purchase Order which confirms that the Terms of the Equipment and Services Purchase Agreement will apply to the Purchase Order.

3.3.    Cooperation. The Parties agree to jointly review opportunities to optimize Equipment, Services and Software for inclusion in the Equipment and Services (as such terms are defined in the Storage Core Frame Purchase Agreement entered into by Buyer and Supplier).

3.4.    Interfaces. In order to implement Section 3.3, the Parties shall nominate permanent contact persons on both sides to act as liaison for effective cooperation and communication between Supplier and Buyer. These contact persons shall schedule regular meetings. These contact persons include, but are not limited to, the following for day to day interactions on the procurement of Equipment and Services:

(a)    Buyer Procurement; and

(b)    Supplier MS PA eBoP Program Manager.

These contact persons include, but are not limited to, the following for system optimization and market requirement exchange:

(a)    Supplier MS PA eBoP Program Manager;

(b)    Supplier PLM Inverters (MS PA);

(c)    Supplier PLM Microgrid (Digital Grid);

(d)    Supplier PLM PSS (Digital Grid);

(e)    Buyer PLM (Product Requirement); and

(f)    Buyer R&D.

**4.    ORDERS.**

4.1.    Pricing Requests. If Buyer desires to purchase Equipment and Services from Supplier during the Term, Buyer shall furnish Supplier with written request (a "**Pricing Request**") detailing the Equipment and Services it wishes to purchase and requesting pricing therefor from Supplier, including in such Pricing Request such information as may be reasonably necessary for Supplier to determine pricing therefor and any other project-specific requirements, including Buyer's requested delivery schedule. Supplier shall provide Buyer with a written notice (a "**Pricing Notice**") detailing Supplier's pricing and delivery schedule for the Equipment and Services that Buyer wishes to purchase (including therein any terms, conditions and specifications required by Supplier in connection with the particular project and/or purchase contemplated by Buyer, which terms and conditions may be different than, and shall supersede, those set forth in this Agreement), which Pricing Notice Supplier shall endeavor to provide within ten (10) Business Days of receipt of Buyer's Pricing Request. If Buyer does not issue a Purchase Order to Supplier pursuant to Section 4.2 in response to the Pricing Notice within ten (10) Business Days of issuance thereof, the Pricing Notice shall be deemed rejected.

4.2.    Purchase Orders. If Buyer desires to purchase the Equipment and Services on the terms specified in a Pricing Request, it shall issue a Purchase Order to Supplier in the form attached hereto as Exhibit A, which Purchase Order shall include: (i) the pricing and any other terms, conditions and specifications set forth in Supplier's Pricing Notice; and (ii) a detailed description of the Equipment and Services to be purchased, consistent with those set forth in the Pricing Request and to the extent modified thereby, the Pricing Notice. Purchase Orders shall only be binding when issued in compliance with the requirements of this Agreement and sent by e-mail, by fax or by electronic data interchange to Supplier. Supplier shall accept or reject a Purchase Order within ten (10) Business Days after receipt. Acceptance or rejection shall be declared in the form of the Purchase Order. If a Purchase Order is neither accepted nor rejected within ten (10) Business Days after receipt, it shall be deemed rejected.

4.3.    Most Favored Nation Pricing. Subject to Applicable Law, during the Term, Supplier will offer its Equipment and Services to Buyer at Most Favored Nation Pricing in the Pricing Notice so long as Supplier and its Affiliates collectively own at least a twenty percent (20%) interest in Buyer.  "Most Favored Nation Pricing" shall be reasonably determined by the Supplier by reference to recent (last six (6) months) sales arrangements with customers, resellers or project developers, as applicable, taking into account purchase volumes, regional market conditions, the geographic location of the projects, and the relative size and technology to be used.  Supplier shall not be obligated to provide such pricing if it no longer offers the relevant products or services for sale and Supplier shall have no obligations to offer or continue to offer any such products or services for sale. If requested by Buyer, Supplier shall furnish to Buyer a certificate executed by an executive officer of Supplier and attesting to the methodology used by Supplier in determining the Most Favored Nation Pricing set forth in the applicable Pricing Notice. Supplier shall provide Buyer with supporting information concerning the comparable purchase volumes, regional market conditions, the geographic location of the projects, relative size and technology to be used, and any other variables that Supplier considered when determining the Most Favored Nation Pricing; provided that Suppler may always anonymize information about other customers' projects, in Supplier's sole discretion. In the event that Buyer believes the price indicated in the Pricing Notice does not accurately reflect Most Favored Nation Pricing, then the parties shall retain a mutually-agreeable auditing firm to independently and confidentially review Supplier's methodology and pricing inputs and to render a decision regarding whether Supplier must offer a lower price in order to satisfy its Most Favored Nation Pricing obligation as set forth above. The decision of the independent auditor shall be final and binding on both Parties. The costs of the independent auditor shall be shared equally between Supplier and Buyer.

4.4.    Payment Terms. Unless otherwise provided in a Pricing Notice, all payments for Equipment are due and payable net thirty (30) days following invoice based on delivery of the applicable Equipment. Unless otherwise provided in a Purchase Order, all payments for Services are due and payable net thirty (30) days following invoice based on progress of the Services being performed.  Payment(s) shall be by electronic banking method identified on the Purchase Order. Buyer will not make payments to Supplier in cash or bearer instruments, nor to an account other than that specified in the Purchase Order..  Buyer will make no unlawful payments, nor make payments through any trust, intermediate entity or other party.  Buyer will not make payment(s) to an individual, employee, or other designee of Supplier.

<div align="center">10</div>

4.5.    Disputed Payments. If a dispute arises regarding the payments to be made hereunder, Buyer or Supplier, as applicable, shall pay all undisputed amounts, and the Parties shall attempt in good faith to resolve the dispute as promptly as practicable.

4.6.    Late Payments. Any amount owed by a Party hereunder beyond the date that such amount first becomes due and payable under this Agreement shall accrue interest from the date that it first became due and payable until the date that it is paid at the lesser of (a) LIBOR plus four percent (4%) per annum or (b) the maximum rate permitted by Applicable Law.

4.7.    Taxes; Export and Import Duties. Notwithstanding anything herein to the contrary, (i) Supplier shall collect and withhold any and all sales taxes arising in connection with or relating to the supply, sale or Delivery of the Equipment and imposed by any Governmental Authority having jurisdiction over Supplier at the Delivery Point and (ii) Buyer shall be responsible for any and all other Taxes arising in connection with or relating to the supply, sale or Delivery of the Equipment, any and all export duties from the jurisdiction or jurisdictions in which the Equipment is manufactured or from which the Equipment may be shipped and any and all import duties, in each case, arising in connection with or relating to the supply, sale or Delivery of the Equipment. Buyer shall also be responsible for and pay all Taxes in relation to the operation of its business, including in connection with the use of the Equipment. Buyer and Seller shall cooperate to obtain exemption from, or to minimize, any Taxes.

**5.    DELIVERY.**

5.1.    Delivery Terms; Inspection. Unless otherwise provided in a Pricing Notice, delivery of the Equipment shall be made FCA (Incoterms 2010) at Supplier's facility. Prior to Delivery a representative of Supplier and a representative of Buyer may inspect the Equipment for damage and record such damage, if any.

5.2.    Guaranteed Delivery Date. Supplier shall use commercially reasonable efforts to Deliver Equipment to the applicable Delivery Point by the applicable guaranteed Delivery date therefore, if any, as set forth in the applicable Purchase Order, subject to extension as provided under this Agreement (as may be extended hereunder, the "**Guaranteed Delivery Date**"). Any other dates in a Purchase Order for performance by Supplier of any work and any other obligations of Supplier pursuant to such Purchase Order are estimated, and not guaranteed, dates. The failure of Supplier to timely achieve such other Supplier milestones or obligations by the applicable dates set forth in the Purchase Order shall not be a breach under this Agreement. Neither the Purchase Order nor any milestone date contained therein, including the Guaranteed Delivery Date for the Equipment, may be changed unless the same has been modified by a duly executed Change Order. If an unexcused delay originates with Supplier or its Representatives, Supplier shall be solely responsible for expedited delivery and other charges to meet Delivery dates.

11

5.3.   Delay Liquidated Damages. Except as may be otherwise agreed in a Purchase Order, if Delivery of the Equipment has not occurred by the Guaranteed Delivery Date for reasons that are not excused hereunder, and Buyer can prove that as a direct result thereof it must pay delay liquidated damages to its Customer, Supplier shall reimburse Buyer for such delay liquidated damages (such reimbursement not to exceed an amount equal to 0.5% of the price set forth in the Purchase Order allocable to the delayed Equipment for every completed week of delay) for each completed week after the Guaranteed Delivery Date that Buyer pays such liquidated damages to its Customer as a result of Supplier's delay, provided, however, that the amount of delay liquidated damages payable by Supplier shall be reduced by any amounts received by Buyer under any delay in startup insurance policies providing coverage for any such losses or damages. Payment of the delay liquidated damages shall be the sole and exclusive remedy of Buyer for delay and under no circumstances shall the total aggregate liability of Supplier exceed five percent (5%) of the price set forth in the applicable Purchase Order.

5.4   Buyer Caused Delay. If Buyer fails to perform any obligations under a Purchase Order or otherwise causes a delay in the performance by Supplier of its obligations under a Purchase Order, and such failure or delay results in an increase in Supplier's costs and/or impacts Supplier's ability to meet any Supplier milestone in accordance with the schedule contemplated by the applicable Purchase Order, Supplier shall be entitled to a Change Order increasing the price payable under the applicable Purchase Order and extending the date for completion of any Supplier milestones commensurate with such delay and added cost, including overtime charges for labor and equipment.

**6.    TITLE, RISK OF LOSS AND CARE, CUSTODY AND CONTROL.**

6.1.   Transfer of Title and Risk of Loss. Title, care, custody, control and risk of loss of any portion of the Equipment shall pass to Buyer upon Delivery of the Equipment to the Delivery Point. Notwithstanding the foregoing, in no event will title to the Licensed Technology or any other Intellectual Property used in the Equipment or otherwise provided to Buyer, including any Software, transfer to Buyer.

6.2.   Warranty of Title. Supplier warrants to Buyer that, when title to the Equipment or any portion thereof is transferred to Buyer in accordance herewith, Buyer shall have good title to the Equipment or such portion thereof free and clear of all Liens, other than any such Liens which may arise in connection with Buyer's failure to make payments as they become due under this Agreement. In the event of any nonconformity with the foregoing, Supplier, at its own expense, upon written notice of such failure, shall indemnify Buyer from the consequences of such nonconformity and defend the title to such Equipment, and Supplier shall either promptly replace such Equipment or any affected portion thereof or remedy the title defect.

**7.    INSPECTION AND QUALITY CONTROL.**

7.1.   Inspection Rights. Supplier shall permit Buyer, its Representatives and/or customer(s), at Buyer's expense, to inspect Equipment/Services during manufacture at Supplier's facilities or during performance and shall use commercially reasonable efforts to facilitate similar inspections at the manufacturing facilities of third party suppliers. Buyer shall provide Supplier with written notice of its intent to make any such inspection not less than ten (10) Business Days prior to the proposed inspection date. Buyer's inspections/tests will not unduly interfere with Supplier's business or the business of its third party suppliers.

12

7.2.    Quality Control. Supplier shall maintain quality control with respect to the Equipment and Services as mutually agreed upon by the Parties and provide Buyer with quality assurance documentation, manuals or certifications.

**8.    WARRANTIES.**

8.1.    Equipment Warranty. Supplier warrants to Buyer that (i) the Equipment as Delivered shall be new at the time of Delivery and shall have been manufactured using new components and (ii) during the Equipment Warranty Period the Equipment shall be free of any Defects (the "**Equipment Warranty**"). As used herein or otherwise agreed in a Purchase Order, the "**Equipment Warranty Period**" means the period of time commencing on the earlier to occur of (i) the date that the Equipment is placed into service as evidenced by the operation thereof for commercial purposes and (ii) the day that is sixty (60) days after the date of Delivery of the Equipment and continuing to and ending on (A) the first (1st) anniversary of such date or (B) such longer period as required by Applicable Law applicable to a particular Purchase Order.

8.2.    Services Warranty. Supplier warrants to Buyer that any Services shall at the time of performance thereof and during the Services Warranty Period be (i) performed in a good and workmanlike manner and free of any fault, defect or deficiency that would preclude or impair the ability of such Services to fulfill the purposes set forth in the applicable Purchase Order therefor in all material respects, (ii) consistent with a level of care, skill and judgment which conforms with Prudent Industry Practices, and (iii) in compliance with the requirements of this Agreement and the applicable Purchase Order (the "**Services Warranty**"). As used herein or otherwise agreed in a Purchase Order, the "**Services Warranty Period**" means the period of time commencing on the date of performance of the applicable Service and continuing to and ending on (A) the first (1st) anniversary of such date or (B) such longer period as required by Applicable Law applicable to a particular Purchase Order.

8.3.    Notification Requirements. Buyer shall promptly (but in any event within ten (10) Business Days after obtaining notice or knowledge thereof) notify Supplier of any failure of the Equipment to satisfy the Equipment Warranty or any failure of the Services to satisfy the Services Warranty, in each case by delivering written notice to Supplier of a warranty claim. The written notice of warranty claim shall, to the extent reasonably practicable, identify the applicable failure and the circumstances or conditions observed by Buyer that indicates the presence of such failure.

8.4.    Corrective Action. If, at any time prior to the expiration of the Equipment Warranty Period, either Party discovers any Defect, Supplier agrees that it shall Deliver a replacement for the applicable Defective part, without cost or expense to Buyer. When a Defective part has been Delivered to Buyer, such replaced part shall be covered by the Equipment Warranty until the later of (a) twelve (12) months from the time such replacement part was Delivered to Buyer, and (b) the end of the Equipment Warranty Period. All replacement parts shall be of good and workmanlike quality and shall be new or newly refurbished. If, at any time prior to the expiration of the Services Warranty Period, either Party discovers any failure of the Services to satisfy the Services Warranty, Supplier agrees that it shall, in its sole discretion, either correctly re-perform or otherwise correct the defective Services, without cost or expense to Buyer. When a defective Service has been remedied, such remedied Service shall be covered by the Services Warranty until the later of (a) twelve (12) months from the time such remedy was completed, and (b) the end of the Services Warranty Period.

13

8.5.    <u>Warranty Exclusions</u>. The Equipment Warranty and the Services Warranty shall not apply if (a) the applicable Defect or failure is attributable to Buyer's failure to operate, repair or maintain the Equipment in material compliance with the procedures set forth in any Supplier Documents furnished to Buyer, which procedures are identified therein as necessary to maintain the effectiveness of the warranties or (b) the applicable Defect or failure is attributable to Buyer's or Buyer's contractor's misuse or abuse of the Equipment (c) if the Equipment has been used in a manner contrary to Supplier's instructions set forth in the Supplier Documents that are identified therein as necessary to maintain the effectiveness of the warranties; (d) the applicable Defect or failure is attributable to any materials or equipment provided by Buyer; or (e) if the Equipment has failed as a result of ordinary wear and tear.

8.6.    <u>NO IMPLIED WARRANTIES</u>. THE WARRANTIES OF SUPPLIER SET FORTH IN THIS AGREEMENT ARE SUPPLIER'S SOLE AND EXCLUSIVE WARRANTIES AND ARE MADE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE. THE REMEDIES SET FORTH HEREIN WITH RESPECT TO SUCH WARRANTIES ARE BUYER'S SOLE AND EXCLUSIVE REMEDIES, AND SUPPLIER'S SOLE AND EXCLUSIVE LIABILITY, FOR ANY BREACH OF SUCH WARRANTIES. OTHER THAN THE WARRANTIES OF SUPPLIER SET FORTH IN THIS AGREEMENT, SUPPLIER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL OTHER EXPRESS WARRANTIES AND ALL OTHER WARRANTIES, CONDITIONS, DUTIES AND OBLIGATIONS, STATUTORY OR OTHERWISE, IMPLIED IN LAW, INCLUDING THOSE OF PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, CUSTOM, USAGE, OR OTHERWISE. THERE ARE NO OTHER WARRANTIES, CONDITIONS, AGREEMENTS, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, OR UNDERSTANDINGS, WHETHER OR NOT IN A CONTEMPORANEOUSLY EXECUTED OR DATED AGREEMENT OR SPECIFICATION, THAT EXTEND BEYOND THOSE SET FORTH HEREIN AND NO OTHER WARRANTIES, CONDITIONS, AGREEMENTS, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, WHICH MIGHT HAVE BEEN GIVEN BY AN EMPLOYEE, AGENT OR REPRESENTATIVE OF SUPPLIER OR ITS AFFILIATES ARE AUTHORIZED BY SUPPLIER.

8.7.    <u>Reserved Rights</u>. Without limiting Supplier's obligations hereunder to remedy Defects, Supplier reserves the right (i) to make changes and improvements in its equipment and products without incurring any obligation to make such changes and improvements to any Equipment previously sold under a Purchase Order pursuant to this Agreement; and (ii) to change the terms of the warranty it provides to other Persons in the future without incurring any right or obligation to make the revised terms applicable to any Equipment previously sold under a Purchase Order pursuant to this Agreement. The provisions of this Section 8.7 shall survive the termination or expiration of this Agreement.

<div align="center">14</div>

9.    **BUYER FURNISHED PROPERTY.**

The term "**Buyer Furnished Property**" shall mean all tools, patterns, equipment, materials or other property which is either supplied by, or purchased by or on behalf of, Buyer or its Representatives to Supplier to perform the Services or furnish the Equipment. Title to Buyer Furnished Property shall remain with Buyer and risk of loss shall be with the Party who has possession. For Buyer Furnished Property in Supplier's possession, custody or control, Supplier shall insure against loss and damage in an amount equal to full replacement cost. Buyer Furnished Property shall carry no guarantee or warranty, express or implied. Supplier shall not use Buyer Furnished Property on any work other than the Equipment/Services. Supplier shall clearly mark Buyer Furnished Property to show Buyer's ownership and prevent a lien, encumbrance or challenge to Buyer's title thereto. Supplier shall, at its own expense, maintain and repair Buyer Furnished Property returning it to Buyer in the condition in which received, reasonable wear and tear excepted. Upon expiration or termination of the Purchase Order, Supplier shall dispose of Buyer Furnished Property as Buyer directs in writing. Buyer reserves the right to abandon Buyer Furnished Property at no additional cost to Buyer. The applicable Purchase Order pursuant to which Buyer Furnished Property was furnished to Seller shall remain in effect so long as Supplier possesses Buyer Furnished Property.

10.    **PACKAGING.**

Except where the Purchase Order includes alternative requirements, Supplier shall be responsible for packaging Equipment, and the clear and conspicuous marking of Equipment and packaging, in accordance with Applicable Law, industry standards and in a manner sufficient to permit efficient handling, to provide adequate protection and comply with requirements of carrier and Applicable Law. Packing slips identifying the Purchase Order number, and part number must accompany each shipment. The exterior of each shipping container or package will be clearly marked with Buyer's Purchase Order number and country of origin, which shall also be marked on Equipment, in a clear, conspicuous and permanent manner. Supplier shall provide all necessary shipping documents, including, but not limited to, customs invoices and packing lists in accordance with Buyer's requirements and Applicable Law. Damages and costs incurred by Buyer, its Representative or customer resulting from Supplier or its Representative's failure to comply with this Article 10 shall be paid by Supplier. If Supplier imports wood packaging materials, in accordance with 7 CFR 319.40, Supplier warrants that such wood packaging material is treated and marked under an official program developed and overseen by the National Plant Protection Organization in the country of export.

11.    **FORCE MAJEURE.**

11.1.    <u>Effect of Force Majeure</u>. A Party shall not be considered to be in breach or default of this Agreement or any Purchase Order hereunder if and to the extent that its failure or delay in performance or its efforts to cure are prevented by Force Majeure.

11.2.    <u>Procedures</u>. If either Party, as a result of the occurrence of a Force Majeure, is rendered wholly or partially unable to perform its obligations under this Agreement or any Purchase Order, such Party shall comply with the following:

(a)    the affected Party shall promptly notify the other Party hereto in writing, and in any event within five (5) Business Days after the affected Party becomes aware of the occurrence of such Force Majeure event, describing in such notice the particulars of the occurrence;

(b)    the affected Party shall give the other Party written notice estimating the event's expected duration and probable impact on the performance of such Party's obligations under this Agreement, and such affected Party shall continue to furnish timely regular reports with respect thereto during the continuation of the event;

15

(c)      the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the event;

(d)      no liability of either Party which arose before the occurrence of the event causing the suspension of performance shall be excused as a result of the occurrence;

(e)      the affected Party shall exercise all reasonable efforts to mitigate or limit damages to the other Party, promptly taking appropriate and sufficient corrective action, including the expenditure of all reasonable sums of money;

(f)      the affected Party shall use all reasonable efforts to continue to perform its obligations under this Agreement and to correct or cure the event excusing performance; and

(g)      when the affected Party is able to resume performance of the affected obligations under this Agreement, the affected Party shall promptly resume performance and give the other Party written notice to that effect.

11.3.    Termination for Extended Force Majeure. If Supplier experiences a Force Majeure Event completely preventing Supplier's performance for more than forty-five (45) consecutive days, Buyer shall have the right to terminate the applicable Purchase Order and shall be entitled to a refund of all monies advanced to Supplier.

## 12.    CHANGE ORDERS.

12.1.    Change Order. A "**Change Order**" is a written instrument signed by the Parties and stating their mutual agreement upon a change in the obligations of the Parties under this Agreement or any Purchase Order, including if applicable the amount of the adjustment in the purchase price and the extent of any adjustment to the Delivery schedule, including the Guaranteed Delivery Date.

12.2.    Change Order Process. In addition to circumstances set forth herein where the Parties are entitled to a Change Order, either Party may request changes in the obligations of the Parties under this Agreement within the scope of this Agreement consisting of additions, deletions, or other revisions to such obligations. If either Buyer or Supplier wishes to change such obligations, it shall submit a change request to the other Party in writing. If the requested change relates to a change to the Equipment supply obligations or results from a condition in which Supplier is entitled to a Change Order under this Agreement, then, within fifteen (15) Business Days following receipt or delivery, as applicable, of the requested change, Supplier shall submit a proposal to Buyer stating (i) the increase or decrease, if any, in the purchase price and changes to the Delivery schedule and/or the Guaranteed Delivery Date, if any, that would result from such change (collectively, the "**Change Order Information**"). If the proposed change relates to any other matter, the requesting Party, at the time the request for the change is made, shall provide the proposed Change Order Information. Within five (5) Business Days following receipt of the Change Order Information, the Parties shall meet and, acting reasonably, negotiate in good faith a mutually acceptable Change Order in accordance with the principles set forth herein. Following agreement on the terms and conditions of the Change Order, the Parties shall execute the same. If the Parties do not agree upon the terms and conditions of the Change Order, and the proposed change relates to circumstances in which a Party is entitled to a Change Order under this Agreement, then either Party may submit the matter to dispute resolution pursuant to Article 24.

16

12.3.    <u>Change Order Restrictions</u>. Notwithstanding anything herein to the contrary, Buyer shall not be entitled reduce the scope of the Equipment supply obligations under any Purchase Order.

12.4.    <u>No Change</u>. Supplier shall not be obligated to proceed with any change in the Equipment supply obligations requested by Buyer unless and until a Change Order is executed by the Parties in relation to such change. Further, Supplier shall not be required to implement a requested change in the Equipment supply obligations by Buyer if Supplier reasonably believes the implementation of such change would impair Supplier's ability to comply with any of the warranties or the covenants set forth in this Agreement or the applicable Purchase Order.

## 13.    <u>INTELLECTUAL PROPERTY</u>.

13.1.    <u>Grant of License</u>. Upon transfer of title with respect to any Equipment purchased hereunder and upon providing parts under the Equipment Warranty hereunder, Supplier hereby grants to Buyer a non-exclusive, transferable, fully paid-up with no further royalty obligation, worldwide, license in and to, all Intellectual Property owned or licensed by Supplier which are necessary for the use and enjoyment by Buyer of Equipment hereunder (the "**License**") to import into the Territory and use the Licensed Technology (including any Intellectual Property in the Licensed Technology) within the Territory, and solely in accordance with the terms of this Agreement. Such license includes a perpetual license to use software provided for the operation of the Equipment including but not limited to all modifications or additions to software upon payment of commercially reasonable service charges to be negotiated, as well as all related documentation and technical information. With respect to any Confidential Information contained within the Licensed Technology, Buyer may disclose such Confidential Information to third party contractors who have a need to know such parts of the Licensed Technology solely for Buyer's use and operation of the Equipment and in accordance with the terms of this Agreement; <u>provided</u> that such third parties shall first execute a confidentiality agreement consistent with this Agreement containing restrictions on disclosure and use at least as restrictive as those in Article 17 (and such third party contractors shall not be permitted to disclose the Licensed Technology to any other third party). The Licensed Technology is Confidential Information of Supplier as defined in Section 17.1 even if not marked as "confidential," "proprietary" or with other such similar language, except where an exception in Section 17.3 applies.

13.2.    <u>No Copies</u>. Except as otherwise permitted by this Agreement, Buyer shall not make any copies of the Licensed Technology without first obtaining express written permission from Supplier. Notwithstanding the foregoing, Buyer may make such number of copies of (i) the documentation and manuals for the Equipment or other Intellectual Property licensed hereunder that is not embedded in the Equipment as are required for Buyer's normal use and operation hereunder (including such copies as may be included in or attached to electronic mail messages by Buyer for delivery to Persons who are otherwise permitted recipients of Supplier's Confidential Information hereunder) and (ii) the Licensed Technology as are reasonably required for back-up, disaster recovery and archival purposes.

17

13.3.    Proprietary Notices. Buyer shall not remove or alter, or permit to be removed or altered, any proprietary notices that appear on or with the Licensed Technology. Buyer shall include on and with the Licensed Technology a written notice stating: "Confidential and Proprietary Information of Siemens Industry, Inc.. Access and Use Restricted by License." or such other or additional notice as Supplier reasonably may prescribe.

13.4.    Security. Buyer shall take all reasonable steps to ensure that no unauthorized persons have access to the Licensed Technology, and to ensure that no persons authorized to have such access shall take any action which would be in violation of this Agreement. Such steps shall include, but shall not be limited to, imposing password restrictions on use of the Licensed Technology securing Buyer's network on which such Licensed Technology resides from outside intrusion, preventing the making of unauthorized copies of the Licensed Technology and administering and monitoring use of the Licensed Technology.

13.5.    No Reverse Engineering. The Licensed Technology includes trade secrets of Supplier or its Affiliates. In order to protect the Licensed Technology, Buyer shall not modify, translate, decompile, reverse engineer, decrypt, extract or disassemble the Licensed Technology or otherwise reduce or attempt to reduce any Software in the Licensed Technology to source code form. Buyer shall ensure, both during and (if Buyer still has possession of the Licensed Technology) after the performance of this Agreement, that (a) Persons who are not bound by a confidentiality agreement consistent with this Agreement shall not have access to the Licensed Technology and (b) Persons who are so bound are put on written notice that the Licensed Technology contains trade secrets, owned by and proprietary to Supplier or its Affiliates.

13.6.    Open Source Software. Buyer shall not sell, sublicense, or otherwise make available the Licensed Technology or any part thereof as Open Source Software, nor combine the Licensed Technology with any Open Source Software in a manner that could require the release, disclosure or distribution of the Licensed Technology, or otherwise infect the Licensed Technology so as to impose any obligation on Supplier or diminish any rights Supplier may have therein.

13.7.    Reporting. Buyer shall promptly report to Supplier any actual or suspected violation of this Article 13, and shall take such further steps as may reasonably be requested by Supplier to prevent or remedy any such violation.

13.8.    Relief. Because unauthorized use or transfer of the Licensed Technology is likely to diminish substantially the value of such Licensed Technology and irreparably harm Supplier and will not be susceptible of cure by the payment of monetary damages, if Buyer breaches the provisions of this Article 13, Supplier shall be entitled to injunctive and/or other equitable relief, in addition to other remedies afforded by law, to prevent or restrain such breach.

13.9.    Improvements.

(a)    By Supplier. Any improvement hereafter made by or for Supplier or any of its Affiliates in the Licensed Technology (including those set out in (b) and (c) below) that is approved and adopted by Supplier for use by Buyer under this Agreement shall be included in the Licensed Technology for purposes of the License. The Parties agree that Supplier may decide in its sole discretion which improvements it shall approve and adopt for purposes of Buyer's use under the License; provided, however, that if Supplier makes improvements available to buyers similarly situated to Buyer in terms of project scope and fees paid, Supplier also shall make such improvements available to Buyer on terms at least as favorable to Buyer as the terms generally provided to such similarly situated buyers.

18

(b)    <u>By Buyer with respect to Licensed Technology, excluding the Inverter Hardware ("Non-IH Licensed Technology")</u>. Buyer may not modify the Non-IH Licensed Technology except as expressly permitted in this Section 13.9(b). Buyer may suggest modifications in the Non-IH Licensed Technology to Supplier. Any modification or improvement in the Non-IH Licensed Technology suggested by Buyer must first be approved by Supplier in accordance with Section 13.9(a).

(c)    <u>By Buyer with respect to Inverter Hardware</u>. Buyer will be permitted to make modifications or improvements to the Inverter Hardware listed in Annex A. Supplier will provide to Buyer Know-How that is reasonably requested by Buyer and that is required to enable Buyer to make modifications or improvements pursuant to this Section 13.9(c). Any modifications or improvements made by Buyer pursuant to this Section 13.9(c) will be owned by Supplier and will be licensed under Section 13.1. Notwithstanding the foregoing, Supplier shall have no liability to Buyer as a result of Buyer's modifications or improvements to the Inverter Hardware.

(d)    With respect to both Section 13.9(b) and 13.9(c), Buyer shall own any modifications or improvements to both the Non-IH Licensed Technology and the Inverter Hardware, only if such ownership is mandated by Applicable Law. If Buyer's ownership is legally mandated, Buyer hereby grants to Supplier and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free license to make, have made, import, offer for sale, sell, copy, make derivative works, use and sublicense to others the right to use these modifications or improvements.

13.10.   <u>Ownership</u>.

(a)    <u>Supplier</u>. As between the Parties, Supplier or its Affiliates shall own the Licensed Technology, including any modifications, discoveries, derivative works and improvements derived from or based on it, whether developed by Supplier, by Buyer, or by the Parties jointly, all Intellectual Property therein and any Intellectual Property developed during, or arising out of, the performance of Supplier's obligations under this Agreement, to the extent permitted by Applicable Law. Buyer acquires only certain rights to use the Licensed Technology under the License, strictly in compliance with the terms of this Agreement, and does not acquire any ownership rights or title to it.

(b)    <u>Buyer</u>. As between the Parties, Buyer or its Affiliates shall own (1) any Intellectual Property developed or acquired by Buyer prior to or independently of this Agreement, and (2) all Intellectual Property therein, excluding in each case any of the Licensed Technology incorporated therein or any Intellectual Property in any combination of the Licensed Technology.

(c)    <u>Cooperation</u>. Buyer shall reasonably cooperate with Supplier to assist in perfecting Supplier's ownership in any Intellectual Property in modifications, discoveries, derivative works and improvements to Licensed Technology developed by Supplier or by the Parties jointly, including by executing declarations, oaths, assignments or other formalities documents as needed.

19

13.11.  <u>Enforcement</u>. Each Party shall notify the other promptly in writing of any suspected infringement by a third party of the Licensed Technology or any of the Intellectual Property therein. Supplier shall have the exclusive right to enforce and defend the rights appurtenant to the Licensed Technology or the Intellectual Property therein in Supplier's sole discretion and shall have the sole right of control of any such enforcement action or proceeding it elects to initiate (an "**Enforcement Action**"), at Supplier's sole cost and expense. Supplier shall keep Buyer timely and reasonably informed as to significant events during the course of all such Enforcement Actions as would reasonably be expected to affect Buyer's use of the Licensed Technology whether conducted for Supplier's or Buyer's account. Buyer shall provide on Supplier's written request reasonable assistance in preparing and advancing Supplier's case, in consideration of which Supplier shall reimburse Buyer's reasonable out-of-pocket costs incurred in doing so (including reasonable attorneys' fees). Supplier may retain any monetary damages or other compensation or recovery awarded to it in any Enforcement Action under this Section 13.11. Notwithstanding the foregoing, Buyer may participate and be represented in any Enforcement Action by its own counsel at its own expense, to the extent such participation and representation does not materially interfere with Supplier's right to control such Enforcement Action. Supplier shall not settle any such Enforcement Action in a manner materially and adversely affecting Buyer's rights in this Agreement, or in a manner including an admission of wrongdoing by Buyer, without obtaining the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Buyer has no right to enforce Supplier's Intellectual Property in the Licensed Technology against any third parties.

13.12.  <u>Duration and Transfers</u>. Subject to termination in accordance with this Agreement, the License (i) shall continue for so long as Buyer or any successor retains ownership of the Equipment and continues operating the same (ii) shall terminate automatically if and when the Equipment is permanently removed from service (subject to earlier termination in accordance herewith) and (iii) shall transfer as part of an assignment that is permitted under Section 25.5. If Buyer sells or transfers the Equipment, or any portion thereof, apart from an Assignment of this Agreement, the License will terminate as to Buyer with respect to the Equipment, or any portion thereof sold or transferred and Buyer must, as a condition thereof, notify Supplier in writing and assign to the transferee thereof the License with respect to the Equipment, or any portion thereof sold or transferred, and procure from the transferee an assumption of such License, on substantially the same terms as set forth in this Article 13 and in form subject to Supplier's prior reasonable approval, to the extent the License is applicable to the assets being sold or transferred. The License may not be assigned, transferred or sublicensed except as expressly permitted in this Section 13.12. Buyer shall be responsible for, and indemnify, defend and hold harmless Supplier, Supplier's Parent, Supplier's Affiliates, and their respective officers, directors, members, agents and employees from and against any damage, injury or loss resulting from the failure of Buyer to comply with the terms of this Article 13. Supplier may terminate the License, except with respect to any Licensed Technology that is integrated in any Equipment as to which title has transferred to Buyer hereunder, on written notice to Buyer if Buyer (a) fails to cure any material breach of an obligation in this Article 13 which is capable of being cured within thirty (30) days after Supplier's written notice specifying the breach, or (b) on more than two (2) occasions in any five (5) year period, Buyer is found, through resolution of a Dispute, whether by settlement or otherwise, to have materially breached the terms and conditions of this Article 13 in substantially the same manner.

<div align="center">20</div>

13.13.  <u>Government End Users</u>. The Software portion of the Licensed Technology is a "commercial item" as that term is defined at 48 CFR 2.101, and includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 CFR 12.212 and in the event the Licensed Technology is provided to the US Government, such Licensed Technology shall be provided to the US Government only as a commercial end item. Consistent with 48 CFR 12.212, civilian US Government end users acquire the Software and documentation with only those license rights set forth herein as restricted by 48 CFR 12.212(a)(1) and (a)(2); Department of Defense end users acquire the Software and documentation with only those license rights set forth herein as restricted by 48 CFR 227.7202-1 through 227.7202-4.

13.14.  <u>Reservation of Rights</u>. Supplier reserves all rights in the Licensed Technology not expressly granted to Buyer in this Agreement. No right or license is granted (expressly or by implication or estoppel) by Supplier to Buyer or its Affiliates under any tangible, Intellectual Property, or other proprietary right.

**14.    <u>DEFAULTS AND REMEDIES.</u>**

14.1.  <u>Supplier Defaults</u>. The occurrence of any one or more of the following events shall constitute an event of default by Supplier hereunder (a "**Supplier Event of Default**"):

(a)     Supplier fails to pay to Buyer any payment required under this Agreement (which is not subject to a good faith dispute) when due, and such failure continues for ten (10) Business Days after receipt of written notice of such failure;

(b)     Supplier voluntarily commences bankruptcy, insolvency, reorganization, stay, moratorium or similar debtor-relief proceedings, or shall have become insolvent or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors;

(c)     Insolvency, receivership, reorganization, bankruptcy, or similar proceedings shall have been commenced against Supplier and such proceedings remain undismissed or unstayed for a period of ninety (90) days;

(d)     Supplier fails to deliver Equipment by the date upon which Supplier exhausts its liability for liquidated damages for delayed deliveries under Section 5.3; or

(e)     Except as otherwise expressly provided for in this Section 14.1, Supplier is in material breach of its obligations under this Agreement and such material breach continues uncured for sixty (60) days after receipt of written notice from Buyer.

14.2.  <u>Buyer Defaults</u>. The occurrence of any one or more of the following events shall constitute an event of default by Buyer hereunder (a "**Buyer Event of Default**"):

(a)     Buyer fails to pay to Supplier any payment required under this Agreement (which is not subject to a good faith dispute) when due, and such failure continues for ten (10) Business Days after receipt of written notice of such failure;

21

(b)    Buyer voluntarily commences bankruptcy, insolvency, reorganization, stay, moratorium or similar debtor-relief proceedings, or shall have become insolvent or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors;

(c)    Insolvency, receivership, reorganization, bankruptcy, or a similar proceeding shall have been commenced against Buyer and such proceeding remains undismissed or unstayed for a period of ninety (90) days;

(d)    Any Assignment by Buyer not in conformity with Section 25.5; or

(e)    Except as otherwise expressly provided for in this Section 14.2, Buyer is in material breach of its obligations under this Agreement and such material breach continues uncured for sixty (60) days after receipt of written notice from Supplier.

14.3.    <u>Remedies</u>. Upon the occurrence of a Supplier Event of Default, Buyer may, by written notice to Supplier, terminate the outstanding Purchase Order(s) under which the Supplier Event of Default has arisen and/or shall be entitled to such rights and remedies as may be available at law or in equity. Upon the occurrence of a Buyer Event of Default, Supplier may, by written notice to Buyer, terminate the outstanding Purchase Order(s) under which the Buyer Event of Default has arisen and/or shall be entitled to such rights and remedies as may be available at law or in equity. Any rights and remedies available under Applicable Law upon termination of this Agreement pursuant to this Section 14.3 shall be limited in all respects by the limitations of liability set forth in Article 16. For sake of clarity, in the event that there are more than one Buyer under this Agreement, (i) a Buyer Event of Default by one such Buyer shall not constitute a Buyer Event of Default by any other Buyer and any remedies available to Supplier shall be exercisable only as against the defaulting Buyer and as regards the non-defaulting Buyer(s) this Agreement and any related Purchase Orders shall continue in full force and effect, and (ii) a Supplier Event of Default with respect to any particular Purchase Order shall only count as a Supplier Event of Default for the applicable Purchase Order and as regards any other Purchase Orders and any other Buyer(s), this Agreement and any related Purchase Orders shall continue in full force and effect.

**15.    <u>INDEMNIFICATION.</u>**

15.1.    <u>General</u>. Each Party (the "**Indemnifying Party**") shall indemnify, defend and hold harmless the other Party, its Affiliates, and their Representatives and assigns (the "**Indemnified Party**") from and against all claims, suits, causes of action, losses, liabilities, liens, damages, assessments, costs, expenses, demands, complaints or actions including but not limited to reasonable attorneys' fees and court costs (collectively, "**Claims**") of third parties concerning: (i) death, personal injury, or property damage of third parties, (ii) nonpayment of wages, benefits, fees, amounts owed, and/or any taxes (including penalties and interest) associated therewith arising from the Indemnifying Party's Representatives, suppliers, contractors, and/or materialmen which may include liens or encumbrances on the Equipment/Services or the premises on which located and (iii) violations by the Indemnifying Party or any Person for whom the Indemnifying Party is responsible of Applicable Law; in each case to the extent arising or resulting from the Indemnifying Party's or its Representative's negligence, willful misconduct, or breach of this Agreement. For sake of clarity, if both Parties are negligent or otherwise at fault or strictly liable without fault, then the obligations of indemnification under this Section 15.1 shall continue, but the Indemnifying Party shall indemnify the Indemnified Party only for the percentage of responsibility for the damage or injuries attributable to the Indemnifying Party.

22

15.2.    <u>Infringement Indemnification by Supplier</u>.

(a)    <u>Indemnity</u>. If an action is brought or threatened against Buyer claiming that Buyer's use, as permitted herein, of the Licensed Technology within the Territory infringes any Intellectual Property arising or existing under Applicable Law, Supplier shall defend, indemnify and hold harmless Buyer, its Affiliates, and their Representatives and assigns at Supplier's expense from and against any and all Infringement Claim Costs of Buyer to the extent arising from such action or claim.

(b)    <u>Corrective Actions</u>. If Buyer's permitted use of the Licensed Technology within the Territory is materially impaired or if Supplier's performance of the Equipment supply obligations under this Agreement or any other obligation is materially impaired by reason of such third party claim, Supplier shall use commercially reasonable efforts, at its expense, to continue its performance of the Equipment supply obligations under this Agreement or the other affected obligations, including, at its own election and expense (i) to substitute an equivalent non-infringing item or process for the allegedly infringing item or process, (ii) to modify the allegedly infringing item or process so that it no longer infringes but remains functionally equivalent or better or (iii) to obtain for Buyer the right to continue using such item or process. Supplier shall, prior to proceeding with any of the foregoing actions, consult with Buyer as to the proposed action and consider in good faith any reasonable request of Buyer in respect thereof. Nothing herein constitutes a guarantee by Supplier that such efforts will succeed in avoiding the infringement claim or that Supplier will be able to replace the infringing item or process with an item or process of comparable functionality or effectiveness. If Supplier reasonably believes that an injunction against use of the Licensed Technology in the Territory may be granted against Buyer, either imminently or with the passage of time, Supplier may at its expense, and upon reasonable prior written notice to Buyer, take any of the foregoing actions in order to minimize its liability.

(c)    <u>Exclusions</u>. This Section 15.2 does not apply to, and Supplier assumes no liability with respect to, claims for patent infringement or copyright infringement or improper use of other proprietary rights (including any license or Intellectual Property, whether by way of copyright or otherwise) to the extent that such claims relate, in whole or in part, to (i) Buyer's modification or alteration of the Licensed Technology (except, subject to clause (iv) below, to the extent permitted by this Agreement) or the Equipment, in either case made without Supplier's written consent or contrary to Supplier's instructions, (ii) the combination of the Licensed Technology with other Software, products, materials, equipment, parts or apparatus and not approved in writing by Supplier, (iii) a failure to promptly install an update required by Supplier or (iv) Buyer's modifications or improvements to the Inverter Hardware pursuant to Section 13.9(c).

(d)    <u>Entire Liability</u>. THE FOREGOING PROVISIONS OF THIS SECTION 15.2 STATE THE ENTIRE LIABILITY AND OBLIGATION OF SUPPLIER AND ITS AFFILIATES AND THE EXCLUSIVE REMEDY OF BUYER, WITH RESPECT TO ANY ACTUAL OR ALLEGED INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS OR OTHER INTELLECTUAL PROPERTY BY THE EQUIPMENT OR THE LICENSED TECHNOLOGY OR ANY PART THEREOF, EXCEPT TO THE EXTENT THAT SUCH LIABILITY CANNOT BE EXCLUDED IN ACCORDANCE WITH MANDATORY LEGAL REQUIREMENTS.

23

(e)    Notifications. Buyer shall promptly notify Supplier in writing following receipt of written notice of any claims alleging infringement of patents or other proprietary rights (including Intellectual Property) in connection with Buyer's permitted use of the Licensed Technology or Supplier's performance of the Equipment supply obligations under this Agreement or Equipment Warranty obligations, and shall provide Supplier with all information in its possession relevant to such claim. In turn, Supplier shall notify Buyer as soon as practical in writing of any claims which Supplier may receive alleging infringement of patents or other proprietary rights which may affect Supplier's performance of the Equipment supply obligations under this Agreement or Equipment Warranty obligations under this Agreement or Buyer's right to own, operate and maintain the Equipment.

15.3.    Infringement Indemnification by Buyer.

(a)    Indemnity. If an action is brought or threatened against Supplier claiming that any condition or event described in Section 15.2(c) results in an infringement upon any Intellectual Property within the Territory arising or existing under Applicable Law, Buyer shall defend, indemnify and hold harmless the Supplier Indemnified Parties at Buyer's expense from and against any and all Infringement Claim Costs of Supplier to the extent arising from such action or claim.

(b)    Corrective Actions. If performance of Supplier's obligations hereunder is enjoined by reason of a claim subject to Section 15.3(a), Buyer shall use commercially reasonable efforts, at its option and expense, at its own election (i) to substitute an equivalent non-infringing item or process for the allegedly infringing item or process, (ii) to modify the allegedly infringing item or process so that it no longer infringes but remains functionally equivalent, or (iii) to obtain for Supplier the right to continue using such item or process. Nothing herein constitutes a guarantee by Buyer that such efforts will succeed in avoiding the infringement claim or that Buyer will be able to replace the infringing item or process with an item or process of comparable functionality or effectiveness.

(c)    Exclusions. This Section 15.3 does not apply to, and Buyer assumes no liability with respect to, claims for patent infringement or copyright infringement or improper use of other proprietary rights (including any license or Intellectual Property, whether by way of copyright or otherwise), to the extent that such claims relate, in whole or in part, to (i) a modification to the Licensed Technology or the Equipment requested by Buyer but executed by Supplier or with Supplier's supervision and control (except for Buyer's modifications or improvements to Inverter Hardware pursuant to Section 13.9(c) for which Supplier shall have no liability) or (ii) the combination of the Licensed Technology with other products, materials, equipment, parts or apparatus approved in writing by Supplier.

24

15.4.    <u>Indemnification Procedures</u>.

(a)    If an Indemnified Party receives written notice of a Claim, the Indemnified Party shall give prompt written notice to the Indemnifying Party, including a reasonably detailed description of the facts and circumstances relating to such Claim, a complete copy of all notices, pleadings and other papers related thereto, and a description in reasonable detail of the basis for the potential claim for indemnification with respect thereto. The Indemnified Party's delay or deficiency in notifying Supplier shall not relieve Supplier of liability or obligation except to the extent (and only to the extent) such delay materially impacts the defense of the Claim.

(b)    The Indemnifying Party shall be entitled to assume the defense and to represent the interests of the Indemnified Party, which shall include the right to select and direct legal counsel and other consultants (all of whom shall be reasonably acceptable to the Indemnified Party), appear in proceedings on behalf of the Indemnified Party and to propose, accept or reject offers of settlement, subject to Section 15.4(c) below, all at its sole cost. Nothing herein shall prevent an Indemnified Party from retaining its own legal counsel and other consultants or participating in its own defense at its own cost and expense. Notwithstanding the foregoing, if (i) the claim is primarily for non-monetary damages against the Indemnified Party, or primarily for an injunction or other equitable relief that, if granted, would reasonably be expected to be material to the Indemnified Party, (ii) there is a material actual or potential conflict of interest that makes representation of the Indemnifying Party and the Indemnified Party by the same counsel or the counsel selected by the Indemnifying Party inappropriate, or (iii) the claim is a criminal proceeding, then in each case the Indemnified Party may, upon notice to the Indemnifying Party, assume the exclusive right to defend (and in the case of clause (iii) above, compromise and settle), such claim and the reasonable fees and expenses of the Indemnified Party's separate counsel shall be borne by the Indemnifying Party; however the settlement of any claim pursuant to clauses (i) and (ii) above shall be governed by Section 15.4(c) below. Notwithstanding anything to the contrary herein, for sake of clarity, the Parties agree that the foregoing provisions shall not be construed so as to permit the Indemnified Party to control or assume the defense of any action, lawsuit, proceeding, investigation, demand or other claim brought against the Indemnifying Party concurrently with or in a joint proceeding in respect of any claim that is the subject of an indemnification claim hereunder by the Indemnified Party.

(c)    Notwithstanding anything to the contrary herein, the Indemnifying Party shall not compromise or settle, or admit any liability with respect to any third party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), unless the relief consists solely of (i) money damages (all of which the Indemnifying Party shall pay), and (ii) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all liability with respect thereto. If the Indemnified Party assumes the defense of or represents their own interests, no settlement shall be made without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

15.5.    <u>Limited Waiver of Certain Immunities</u>. Each of the Parties hereby specifically and expressly agrees that with respect to any and all claims against an Indemnified Party by any representative of an Indemnifying Party, any indemnification available hereunder shall not be limited by reason of any immunity to which such Indemnifying Party may be entitled under any workers compensation and/or industrial insurance acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for the Indemnifying Party to such representative with respect to any such claim. For the sake of clarity, the Indemnifying Party's waiver of immunity by the provisions of this section extends only to indemnification claims against the Indemnifying Party by or on behalf of the Indemnified Party under or pursuant to this Agreement, and does not apply to any claims made by the Indemnifying Party's representatives directly against the Indemnifying Party.

15.6.    Survival. The indemnities set forth in this Article 15 shall survive the termination or expiration of this Agreement.

**16.    LIMITATIONS OF LIABILITY.**

16.1.    WAIVER OF CERTAIN DAMAGES. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR ANY PURCHASE ORDER EXECUTED HEREUNDER TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE, WHETHER BASED IN CONTRACT, GUARANTY, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, STRICT LIABILITY, INDEMNITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, FOR: LOSS OF USE, REVENUE, SAVINGS, PROFIT, INTEREST, GOODWILL OR OPPORTUNITY, COSTS OF CAPITAL, COSTS OF REPLACEMENT OR SUBSTITUTE USE OR PERFORMANCE, LOSS OF INFORMATION AND DATA, LOSS OF POWER, VOLTAGE IRREGULARITIES OR FREQUENCY FLUCTUATION, CLAIMS ARISING FROM BUYER'S THIRD PARTY CONTRACTS, OR FOR ANY TYPE OF INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY, COLLATERAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR ANY OTHER LOSS OR COST OF A SIMILAR TYPE.

16.2.    MAXIMUM LIABILITY. SUPPLIER'S MAXIMUM LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE PURCHASE PRICE SET FORTH IN THE APPLICABLE PURCHASE ORDER PURSUANT TO WHICH THE APPLICABLE CLAIM AROSE.

16.3.    EFFECTIVENESS. THE PARTIES AGREE THAT THE EXCLUSIONS AND LIMITATIONS IN THIS ARTICLE 16 WILL PREVAIL OVER ANY CONFLICTING TERMS AND CONDITIONS IN THIS AGREEMENT OR ANY PURCHASE ORDER EXECUTED HEREUNDER AND MUST BE GIVEN FULL FORCE AND EFFECT, WHETHER OR NOT ANY OR ALL SUCH REMEDIES ARE DETERMINED TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE. THESE LIMITATIONS OF LIABILITY ARE EFFECTIVE EVEN IF SUPPLIER HAS BEEN ADVISED BY BUYER OF THE POSSIBILITY OF SUCH DAMAGES. THE WAIVERS AND DISCLAIMERS OF LIABILITY, RELEASES FROM LIABILITY AND LIMITATIONS ON LIABILITY EXPRESSED IN THIS ARTICLE 16 EXTEND TO THE PARTIES' RESPECTIVE AFFILIATES, PARTNERS, PRINCIPALS, MEMBERS SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, SUPPLIERS, AGENTS, AND SUCCESSORS AND ASSIGNS.

16.4.    Commencement of Claims. Except with respect to claims arising under Article 13, Article 15 or Article 17, any legal action of either Party arising under this Agreement or any Purchase Order issued hereunder must be commenced within two (2) years after the Delivery of the applicable Equipment or performance of the applicable Service. To the maximum extent permitted by Applicable Law, each Party hereby waives any right to commence any claim or action after such two (2) year period.

26

**17.    CONFIDENTIALITY**.

17.1.    Confidential Information. Each Party shall, and shall cause its respective Affiliates and Representatives to, keep confidential any information which it may have or acquire before or after the date of this Agreement, concerning the other Party and its assets, business, operations, affairs, financial condition or such information, "**Confidential Information**").

17.2.    Non-Disclosure. Neither Party shall use any Confidential Information in any manner detrimental to the other Party nor shall any of them disclose, publish or make accessible, directly or indirectly, any Confidential Information to any person. In addition, the Parties shall exercise all reasonable efforts to prevent any other person from gaining access to such Confidential Information and take such protective measures as may be or become reasonably necessary to preserve the confidentiality of such Confidential Information.

17.3.    Exceptions. Notwithstanding Section 17.1 and Section 17.2, either Party may disclose Confidential Information:

(a)        to any Representative of such Party, provided that such Representative has a need to know and has been informed of the confidential nature of the information pursuant to Section 17.4;

(b)        to the extent required by (i) any Applicable Law of any Governmental Authority (including any rule or regulation of the Securities and Exchange Commission), (ii) any stock exchange rule or regulation or (iii) any binding judgment, order or requirement of any court or other Governmental Authority of competent jurisdiction; provided, that the Party required to disclose Confidential Information, as the case may be, has delivered written notice to and consulted, to the extent practicable, with the other Party prior to disclosure of such Confidential Information; and

(c)        to the extent such Confidential Information becomes available within the public domain (otherwise than as a result of a breach of this Article 17).

17.4.    Representatives Bound. Each Party shall inform any representative to whom it provides Confidential Information that such information is confidential and shall instruct them (a) to keep such Confidential Information confidential and (b) not to disclose it to any third party (other than those persons to whom such Confidential Information has already been disclosed in accordance with the terms of this Agreement). The disclosing Party shall be responsible for any breach of this Article 17 by the person to whom the Confidential Information is disclosed.

17.5.    Survival. Notwithstanding anything herein to the contrary, the provisions of this Article 17 shall survive the termination of this Agreement for a period of three (3) years and, with respect to each Party, shall survive for a period of three (3) years following the date on which such Party is no longer a Party.

18.    **REPRESENTATIONS AND WARRANTIES**.

18.1.    Representations of the Parties.As of the Effective Date (or, with respect to each Further Buyer Contracting Party that becomes a Buyer hereunder, as of the time of execution of a joinder hereto), and as of the entry into of each Purchase Order hereunder, each Party represents to the other Party as follows:

(a)    Due Formation. Such Party (i) is a duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) has the requisite power and authority to own its properties and carry on its business as now being conducted and currently proposed to be conducted and to execute, deliver and perform its obligations under this Agreement, and (iii) is qualified to do business in every jurisdiction in which failure so to qualify could be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(b)    Authorization; Enforceability. Such Party has taken all action necessary to authorize it to execute, deliver and perform its obligations under this Agreement. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable in accordance with its terms, subject to bankruptcy, reorganization, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and subject to general principles of equity.

(c)    No Conflict. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any Applicable Law, (ii) result in any breach of such Party's constituent documents or (iii) conflict with, violate or result in a breach of or constitute a default under any agreement or instrument to which such Party or any of its properties or assets is bound or result in the imposition or creation of any lien or security interest in or with respect to any of such Party's property or assets, other than in each case any such violations, conflicts, breaches or impositions which could not be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(d)    No Authorization. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any third party (other than those which have been obtained) is required for the due execution, delivery and performance by such Party of this Agreement, other than any such authorizations, approvals or actions the failure of which to obtain could not reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(e)    Litigation. Such Party is not a party to any legal, administrative, arbitration or other proceeding, and, to such Party's knowledge, no such proceeding is threatened, before any Governmental Authority that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of this Agreement, the subject matter hereof, or that which could be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

18.2.    Additional Representations of Supplier.In addition to representations and warranties set forth elsewhere in this Agreement, Supplier hereby represents and warrants as of the Effective Date and as of the entry into of each Purchase Order hereunder as follows:

(a)    None of Supplier, its Affiliates or Representatives is the target of or designated under any sanctions program that is established by statute or regulation of the United States, by Executive Order of the President of the United States, or by designations of any department or agency of the United States government including but not limited to those designations reflected in the "list of Specially Designated Nationals and Blocked Persons" of the Office of Foreign Asset Control, U.S. Department of the Treasury;

28

(b)     Supplier's Representatives are legally authorized to work in the United States and Supplier shall complete as required by Applicable Law the Department of Labor's Form I-9 and to retain it for the statutorily designated period and, if requested by Buyer, Supplier shall provide copies of such Forms I-9 to Buyer unless such disclosure shall be prohibited by Applicable Law;

(c)     For Services provided at Buyer's, it's customer or third party's premises, Supplier has examined the worksite in order to acquaint itself with the local conditions, including applicable regulations codes, permits, licenses, registrations, environmental standards, and notification requirements concerning site safety and/or security;

Supplier has not and will not, absent prior written approval from Buyer, take any actions that: (i) create, or purport to create, any obligation on behalf of Buyer, or (ii) grant, or purport to grant, any rights or immunities to any third party under Buyer's intellectual property or proprietary rights; and

(d)     The bank account named by Supplier to Buyer for all payments to be effected in connection with any Purchase Order hereunder is held in Supplier's name and solely for its account.

## 19.     ENVIRONMENT, HEALTH AND SAFETY.

19.1.   Compliance and Related Matters.

(a)     Each of the Parties shall, in addition to other obligations set forth in this Agreement, during the course of performance of their respective obligations under this Agreement or any Purchase Order issued hereunder:

(i)      comply with Applicable Laws concerning health, the environment, safety, or pertaining to or regulating pollutants, contaminants, or hazardous, toxic or radioactive substances, materials or wastes, including without limitation the handling, transportation and disposal thereof, or governing or regulating the health and safety of personnel, including but not limited to the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act, and the Toxic Substance Control Act ("**TSCA**"), as amended (collectively referred to as "**EHS Laws**") (pollutants, contaminants, or hazardous, toxic or radioactive substances, materials or wastes as defined under EHS Laws shall be referred to collectively as "**Hazardous Materials**");

(ii)     take reasonable and prudent measures, as appropriate, consistent with applicable industry standards, to mitigate hazards to the environment and to the health and safety of persons;

29

(iii)    select and use only equipment, including but not limited to personal protection equipment, that comports with EHS Laws, implement programs to train its Representatives in the use of such equipment in a safe and lawful manner, and maintain such equipment in good working order at all times; and

(iv)    promptly notify the other Party of any incident involving death, injury or damage to any person or property in connection with any Equipment or Purchase Order.

(b)    Supplier shall, in addition to other obligations set forth in this Agreement, during the course of performance of its obligations under this Agreement or any Purchase Order issued hereunder:

(i)    ensure that Equipment/Services comply with EHS Laws;

(ii)    ensure the Equipment, and any and all parts, components, or material thereof, as Delivered by Supplier, bear all markings, labels, warnings, notices or other information required under applicable EHS Laws at the time of such Delivery; and

(iii)    comply with any applicable substance declarations and other requirements set forth in Exhibit C.

19.2.    <u>On-Site Environmental and Safety Responsibility</u>. Where the Purchase Order includes the presence of Supplier or its Representatives on the premises of Buyer, Buyer's customer, or any other location other than the premises of Supplier ("**Work Site**"), Supplier shall: (1) be responsible for the safety, health, medical surveillance, industrial hygiene, training and all other matters required under EHS Laws relating to safety and health of its Representatives at the Work Site, (2) appoint a competent person as its representative for environmental, health and safety who shall take part in safety discussions with Buyer, its Representatives, customer, or the owner of the Work Site, (3)  be responsible for the handling, use, transportation and disposal of any and all substances regulated under the EHS Laws which Supplier or its Representatives bring onto the Work Site or generate in the performance of Supplier's work pursuant to the applicable Purchase Order, including but not limited to excess, waste or residue, containers or any of such substances not consumed, and for any spills, releases or discharges of such substances to the extent attributable to acts or omissions of Supplier or its Representatives, strictly in accordance with EHS Laws, and (4) ensure Supplier's Representatives participate in any site-specific safety training and comply with all rules and requirements of Buyer, its customer, or such other owner of the Work Site, in each case, of which Buyer provides Supplier advance written notice.

19.3.    <u>Health and Safety Plan</u>. Prior to commencing any Services at a Work Site, Supplier shall, in accordance with EHS Laws provide and comply with a site specific health and safety plan, Work Site requirements, and shall make the same available to Buyer or its Representatives at Buyer's request. If Supplier fails to comply with this Article 19, Buyer may, at its sole option and without limiting its other rights, order Supplier or its Representatives to cease Services until Supplier complies at Supplier's sole cost and expense. If Supplier is unable or refuses to take corrective action hereunder Buyer may contract with a third party or otherwise continue such Services at the Work Site and charge Supplier any excess cost reasonably incurred by Buyer. Buyer shall have the right, at its sole discretion, to remove Supplier or its Representatives from a Work Site for violation of this Article 19.

**20.**      <u>**OPEN SOURCE SOFTWARE**</u>**.**

Supplier shall inform Buyer no later than ten (10) Business Days following receipt of any written request from Buyer in connection with a Purchase Order, whether the Equipment/Services contemplated thereby include "Open Source Software." As used herein "**Open Source Software**" means any Software that is licensed royalty-free (i.e., fees for exercising the licensed rights are prohibited, whereas fees for reimbursement of costs incurred by licensor can be permitted) under any license terms or other contract terms ("**Open License Terms**") which require, as a condition of use, modification and/or distribution of such Software and/or any other Software incorporated into, derived from or distributed with such software ("**Derivative Software**"), either of the following: (i) that the source code of such Software and/or any Derivative Software be made available to third parties; or (ii) that permission for creating derivative works of such software and/or any Derivative Software be granted to third parties. If Open Source Software is included, Supplier shall deliver to Buyer, not later than the date of order confirmation, (A) a schedule of all Open Source Software files known to be used, indicating the relevant license(s) to the extent known by Supplier; and (B) a written notice that Supplier is not aware of any violation of such license(s) due to such Use of Open Source Software.

**21.**      <u>**EXPORT CONTROL AND FOREIGN TRADE REGULATIONS**</u>**.**

21.1.      <u>Acknowledgement and Compliance</u>. The Parties acknowledge that all Equipment to be delivered and Services to be provided according to this Agreement are subject to export control and sanctions laws and regulations, including, without limitation, the U.S. Export Administration Regulations ("**EAR**") (15 C.F.R. §§ 730-774), the U.S. Foreign Trade Regulations (15 C.F.R. Part 30), and the regulations, rules, and executive orders administered by OFAC (collectively, the "**Export Controls and Sanctions Laws**"). Each Party agrees to comply with all Export Controls and Sanctions Laws applicable to any such Equipment/Services and shall not take any action that will cause the other Party to violate or be subject to penalty under the Export Controls and Sanctions Laws.

21.2.      <u>Export Licenses</u>. Supplier shall obtain all necessary export licenses, unless Buyer or any party other than Supplier is required to apply for the export licenses pursuant to the applicable Export Controls and Sanctions Laws. To the extent Supplier is requested to deliver Equipment/Services regulated under the Arms Export Control Act or the Atomic Energy Act, Supplier shall advise Buyer in advance of order or contract acceptance.

21.3.      <u>Provision of Trade Data</u>. At the request of Buyer, Supplier shall provide Buyer for Equipment and Services delivered the following trade data as applicable: (i) "Export Control Classification Number" according to the EAR's Commerce Control List (ECCN) or the Munitions List Category Designation according to the US International Traffic in Arms Regulations, and all other export control list numbers; (ii) the statistical commodity code according to the current commodity classification for foreign trade statistics and the HS (Harmonized System) coding; (iii) the country of origin (non-preferential origin); and (iv) Supplier's declaration for preferential origin (in case of European suppliers) or preferential certificates, Supplier's declaration for preferential origin (in case of European suppliers) or preferential certificates (in case of non-European suppliers) such as NAFTA certificates of origin.

<div align="center">31</div>

21.4.    <u>Changes</u>. In the event Supplier has knowledge of any alterations to origin and/or characteristics of the Equipment/Services, it shall notify the Buyer not later than ten (10) Business Days after discovery thereof.

21.5.    <u>Additional Buyer's Obligations</u>. Buyer agrees that it will not, in violation of applicable Export Controls and Sanctions Laws:

(a)    directly or indirectly, export, reexport, or transfer Equipment or Services to, or transship Equipment or Services through, a Sanctioned Country;

(b)    directly or indirectly, release, sell, provide, export, reexport, transfer, divert, loan, lease, consign, allow access to, or otherwise dispose of Equipment or Services to a Prohibited Person; or

(c)    use Equipment or Services to produce products that will be shipped, sold, or supplied, directly or indirectly, to a Sanctioned Country or a Prohibited Person.

21.6.    <u>Certain Relief</u>. No Party shall be obligated to fulfill this Agreement if such fulfillment is prevented by any impediments arising out of national or international foreign trade or customs requirements or any embargoes or other sanctions.

## 22.    <u>CODE OF CONDUCT</u>.

Supplier shall comply with the principles and requirements of the "Code of Conduct" attached hereto as Exhibit D (hereinafter the "**Code of Conduct**"). If and as requested by Buyer, Supplier shall, not more than once a year (at its option), provide to Buyer either (A) a written self-assessment in substantially the form provided by Buyer or (B) a written report reasonably acceptable to Buyer describing the actions taken or to be taken by Supplier to assure compliance with the Code of Conduct. In addition to any other rights and remedies Buyer may have, in the event of Supplier's material or repeated failure to comply with the Code of Conduct, after providing Supplier reasonable notice and a reasonable opportunity to remedy, Buyer may terminate any outstanding Purchase Orders under this Agreement without any liability whatsoever. Material failures include, but are not limited to, incidents of child labor, corruption and bribery. The notice and remedy provisions herein shall not apply to material failures set forth in the preceding sentence.

## 23.    <u>COMPLIANCE WITH LAWS AND PERMITS</u>.

The Parties and their Representatives shall comply with all Applicable Laws in the course of the performance of their respective obligations under this Agreement and any Purchase Orders issued hereunder. In addition, Supplier and Buyer shall each obtain all required licenses, permits, authorizations, registrations or approvals required with respect to the performance of their respective obligations under this Agreement and any Purchase Orders issued hereunder.

**24.**    **DISPUTE RESOLUTION**.

24.1.    <u>Referral to Senior Management</u>. Except as otherwise provided by this Agreement, any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof (which breach or alleged breach by a Party remains uncured within ten (10) Business Days after receipt of written notice thereof from another Party) or the validity or termination hereof or the relationship created between the Parties by and/or through this Agreement (a "**Dispute**") shall first be settled as far as possible by good faith negotiations between the parties to the Dispute, in the form of meetings between senior- management level representatives of such Parties, upon the written request by any such Party to the other parties to the Dispute, which writing shall set forth in reasonable detail the nature and extent of the Dispute.

24.2.    <u>Referral to Arbitration</u>. If the parties to the Dispute are unable for any reason to resolve a Dispute within thirty (30) days after receipt by any Party of written notice of a Dispute, then any Party may submit the Dispute to arbitration to be finally and exclusively resolved under the Arbitration Rules of the American Arbitration Association ("**AAA**") then in effect, except as modified herein, with respect to Equipment and Services to be provided to a Customer with the United States (as applicable, the "**Rules**"). There shall be three (3) arbitrators. If there are two (2) parties to the Dispute, each of the parties to the Dispute shall nominate one (1) arbitrator in accordance with the Rules. If there are more than two (2) parties to the Dispute, the arbitrators shall be nominated in accordance with the Rules; provided, however, that any Party and its Affiliates shall be entitled to nominate only one (1) such arbitrator. The arbitrators so nominated, once confirmed by the AAA, shall nominate an additional arbitrator to serve as chairman, such nomination to be made within fifteen (15) days of the confirmation by the AAA of the second arbitrator. If the initial arbitrators shall fail to nominate an additional arbitrator within such fifteen (15) day period, such additional arbitrator shall be appointed by the AAA. The arbitrators shall be required to submit a written statement of their findings and conclusions. Except as otherwise agreed by the parties to such Dispute, exclusive venue of arbitration with the AAA will be Wilmington, Delaware, and the language of the arbitration shall be English. Each of the Parties will submit to the non-exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware for preliminary relief in aid of arbitration and for the enforcement of any arbitral award from AAA. By agreeing to arbitration, the Parties do not intend to deprive any national court of its jurisdiction to issue any pre-arbitral injunction, pre-arbitral attachment or other order in aid of arbitration proceedings.

24.3.    <u>Neutral Arbitrators</u>. None of the Parties or the arbitrators shall select any arbitrator for the arbitral tribunal who has any interest in the Dispute or who has, or within the immediately preceding five (5) years has had, any economic or other relationship with any party to the Dispute.

24.4.    <u>Procedures and Costs</u>. The arbitrators shall not have the right to award consequential, incidental, indirect, special, treble, multiple or punitive damages. The arbitral tribunal shall not be empowered to decide any dispute ex aequo et bono or amiable compositeur, and the arbitral tribunal shall decide the Dispute under the substantive laws of the State of Delaware, without regard to applicable choice of law provisions thereof. The arbitration award shall be decided by majority opinion and issued in writing in the English language and shall state the reasons upon which it is based. It may be made public only with the consent of each participating Party or as may be required by law or regulatory authority or as necessary for enforcement of such award. The arbitrators shall allocate the fees and costs of the arbitration. The losing Party(ies) shall pay the prevailing Party(ies)' attorney's fees and costs and the costs associated with the arbitration, including the expert fees and costs and the arbitrators' fees and costs borne by the prevailing Party(ies), all as determined by the arbitrators. Each Party shall bear its own fees and costs until the arbitrators determine which, if any, Party is the prevailing Party(ies) and the amount that is due to such prevailing Party(ies).

33

24.5. <u>Award</u>. The award rendered by the arbitrators shall be final and binding on the participating Parties and shall be the sole and exclusive remedy between and among the participating Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal. The award shall be issued no later than one hundred twenty (120) days from the signing or ratification of the Terms of Reference (as defined in the Rules) or as soon thereafter as practicable. The award shall be paid within thirty (30) days after the date it is issued and shall be paid in U.S. Dollars in immediately available funds, free and clear of any Liens, Taxes or other deductions. A judgment confirming or enforcing such award may be rendered by any court of competent jurisdiction.

24.6. <u>Confidentiality</u>. The arbitration shall be confidential. No Party may disclose the fact of the arbitration, any award relating thereto or any settlement relating to any Dispute without the prior consent of the other Party(ies); provided, that such matters may be disclosed without the prior consent of the other Party(ies) to lenders, auditors, tax or other Governmental Authority or as may be required by law or regulatory authorities or as necessary to enforce any award.

24.7. <u>Continued Performance; Provisional Remedies</u>. Notwithstanding the existence of any Dispute, the Parties shall continue to perform their respective obligations under this Agreement unless the Parties otherwise mutually agree in writing. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent the Parties from seeking temporary injunctive relief at any time as may be available under Law or in equity to preserve its rights pending the outcome of any arbitration. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies or order the Parties to request that a court modify or vacate any temporary or preliminary relief issued by a court, and to award damages for the failure of any Party to respect the arbitral tribunal's orders to that effect. The Parties agree that any issue regarding the arbitrability of any claims or disputes arising under, relating to or in connection with this Agreement is an issue solely for the arbitrators, not a court, to decide.

24.8. <u>Waiver of Jury Trial</u>. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY OR OTHERWISE ON ANY CLAIM, CAUSE OF ACTION, SUIT OR PROCEEDING PERMITTED UNDER THIS ARTICLE 24. THE PROVISIONS OF THIS AGREEMENT RELATING TO WAIVER OF TRIAL BY JURY SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.

**25.** **<u>MISCELLANEOUS</u>.**

25.1. <u>Governing Law</u>. This Agreement shall be controlled by and construed in accordance with the substantive laws of the State of Delaware without regard to conflict of laws principles. The United Nations Convention on Contracts for the International Sale of Equipment of April 11, 1980 shall be excluded.

25.2. <u>Records</u>. Supplier and its Representatives shall maintain accurate and complete records of all contracts, papers, correspondence, copybooks, applications, accounts, invoices, and/or other information reasonably relating to this Agreement and any Purchase Orders issued hereunder (collectively, "**Records**") in accordance with recognized commercial accounting practices, and shall retain such Records for a period of seven (7) years unless a longer period is required under Applicable Law.

<div align="center">34</div>

25.3.    <u>Intentionally Omitted</u>.

25.4.    <u>Insurance</u>. Supplier and its Representatives shall comply with the Insurance requirements set forth in Exhibit E attached hereto.

25.5.    <u>Assignment; Successors</u>. Neither Party may assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any purported assignment which fails to comply with the requirements of this Section 25.5 shall be null and void. Notwithstanding the foregoing: (i) either Party may, without the prior written consent of the other Party, assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, to an Affiliate, which will accept such assignment and assume all obligations related to this Agreement and any applicable Purchase Orders (including by executing a joinder to this Agreement in the form of Exhibit B hereto); <u>provided</u>  <u>that</u>, notwithstanding any such assignment, the assigning Party shall not be relieved of any of its obligations hereunder by reason of such assignment and shall remain liable hereunder to the same degree that the assigning Party would be responsible had there been no assignment.

25.6.    <u>Subcontracting</u>. Supplier shall be solely responsible for the proper selection, supervision, acts and omissions of its subcontractors.

25.7.    <u>Other Terms and Amendments</u>. The terms and conditions contained in any sales order, acknowledgment, invoice, website, letter, writing, software or file (such as "clickwrap", "shrinkwrap", or website terms of use), or other document or medium shall not be applicable or amend this Agreement or any Purchase Order issued hereunder nor bind the Parties hereto or their Affiliates or Representatives. This Agreement and any Purchase Order issued hereunder may only be amended by a written instrument signed by authorized Representatives of the Parties.

25.8.    <u>Government Contracts</u>. When the Equipment/Services are to be used in the performance of a contract or subcontract with a Governmental Authority, applicable government contract requirements attached to this Agreement shall apply and are incorporated herein by reference.

25.9.    <u>Relationship of the Parties</u>. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, employee-employer relationship, trust or other association of any kind between the Parties and each Party shall be individually responsible only for its obligations as set forth in this Agreement. Any Services provided by Supplier, its Affiliates and Representatives pursuant to this Agreement are provided as independent contractors of Buyer and not in the capacity of an employee or agent of Buyer.

25.10.    <u>Publicity</u>. No Party hereto shall refer to or use, or permit any persons to refer to or use, any other Party's name, trademarks, service marks or logos in any advertising, promotional materials, press releases or other publicity without obtaining the prior written consent of the applicable Party.

25.11.  Non-Exclusive Remedies and Non-Waivers. No delay or omission by the Parties in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy nor shall it be construed as a bar to or waiver of any such right or remedy on any future occasion. Any waiver authorized on one occasion must be made in writing and is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion. The rights and remedies of the Parties herein shall not be exclusive and are in addition to any other rights and remedies provided by Applicable Law or in equity.

25.12.  Severability. Any provision of this Agreement or any Purchase Order issued hereunder that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof (provided the substance of the agreement between the Parties is not thereby materially altered), and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Laws, the Parties hereto hereby waive any provision of Applicable Law which renders any provision hereof prohibited or unenforceable in any respect.

25.13.  Survival. The Title and Risk of Loss, Warranties, Intellectual Property, Defaults and Remedies, Indemnification, Limitations of Liability, Confidentiality, Export Control and Foreign Trade Regulations, Dispute Resolution and Miscellaneous sections of this Agreement, and any provision that contemplates performance or observance subsequent to termination or expiration shall survive termination or expiration of this Agreement.

25.14.  Affirmative Action. Supplier shall, to the extent applicable, comply with Buyer's requirements as promulgated by the U.S. Department of Labor, Office of Federal Contract Compliance Programs set forth in Exhibit F.

25.15.  Complete Agreement and Counterparts. This Agreement, together with all Purchase Orders issued hereunder, shall constitute the entire agreement between Buyer and Supplier and shall supersede all previous communications, representations, agreements or understandings, whether oral or written, with respect to the subject matter hereof. The headings used in this Agreement are for reference and shall not limit or affect the meaning or interpretation of any of the terms hereof. Upon the effectiveness of this Agreement, if at all, the Prior Agreement shall be deemed amended and restated and superseded and replaced in its entirety by this Agreement, and shall be of no further force or effect.

25.16.  Counterparts. This Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

25.17.  No Pre-Printed Terms. Pre-printed terms or conditions in any invoice, quotation, shipping notice or order acknowledgement issued by Buyer or Supplier shall be of no force or effect, except to the extent included in a Pricing Notice. The terms and conditions applicable to each Purchase Order issued by Buyer shall be those set forth herein and in such Purchase Order and the applicable Pricing Notice therefor.

36

25.18.  Priority. In the event of inconsistency between or among the provisions of this Agreement, a Purchase Order and the applicable Pricing Notice therefor, the following order of precedence, from highest to lowest, shall govern:

(a)     mutually agreed Change Orders;

(b)     Purchase Order;

(c)     this Agreement.

25.19.  Notices.

(a)     All notices and other communications which either Party is required or may desire to serve upon the other shall be addressed to the Party to be served as follows, unless a different address is designated in writing by the Party to be served:

To Supplier:

Siemens Industry, Inc.
4800 North Point Parkway
Alpharetta, GA 30005
Attn: Craig Langley, Associate General Counsel
Email: langley.craig@siemens.com

To Buyer:

Fluence Energy, LLC
4601 N. Fairfax Drive, Suite 600
Arlington, VA 22203
Attn: Marek Wolek, SVP – Strategy & Partnerships
Email: marek.wolek@fluenceenergy.com

With a copy to:

Fluence Energy, LLC
4601 N. Fairfax Drive, Suite 600
Arlington, VA 22203
Attn: Frank Fuselier, General Counsel
Email: frank.fuselier@fluenceenergy.com

37

(b)    All notices, requests, consents and other communications under this Agreement must be in writing and shall be deemed to have been duly given and effective (i) immediately (or, if not delivered or sent on a Business Day, the next Business Day) if delivered or sent and received by electronic mail, (ii) on the date of delivery if by hand delivery (or, if not delivered on a Business Day, the next Business Day) or (iii) on the first Business Day following the date of dispatch (or, if not sent on a Business Day, the next Business Day after the date of dispatch) if by a nationally recognized overnight delivery service (all fees prepaid). In the case of notice via email, each Party shall provide confirmation of receipt or non-receipt upon the request of the transmitting Party.

(c)    All notices, requests, consents and other communications under this Agreement shall include reference to the applicable Purchase Order number, if any.

25.20.    <u>Joint Effort</u>. Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other. Any rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, or any amendments or Exhibits hereto.

25.21.    <u>Language of the Agreement, Correspondence, Documentation</u>. The language of this Agreement shall be English. Unless to the extent agreed otherwise, correspondence, technical and commercial documents as well as any other information exchanged between the Consortium Members relating to this Agreement shall be in English.

[SIGNATURE PAGE FOLLOWS]

38

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first below above.

**Siemens Industry, Inc.**

By: _____

Name:

Title:

By: _____

Name:

Title:

**Fluence Energy, LLC**

By: _____

Name:

Title:

By: _____

Name:

Title:

[Signature Page to Amended and Restated Equipment and Services Purchase Agreement]

39

**Exhibit A**

**Form of Purchase Order**

The following sets forth the minimum terms and conditions to be included on a Purchase Order under this Agreement, which terms and conditions may be modified or supplemented by the mutual agreement of the Parties:

Equipment:

1. Type of Equipment

2. Quantity of Equipment

3. Unit Price of Equipment

4. Total Price of Equipment on this Purchase Order

5. Manufacturing Location

6. Incoterms and Delivery Location

7. Guaranteed Delivery Date

8. Insurance

9. Equipment Warranty Period

10. IP/Software Terms

11. Supplier Documents

12. Technical Specifications

13. Special Packaging Requirements

Services:

1. Type of Services

2. Amount of Services

3. Price of Services

4. Total Price of Services on this Purchase Order

5. Performance Location

6. Performance Date(s)

7. Insurance

8. Services Warranty Period

9. IP/Software Terms

10. Supplier Documents

11. Specifications

Other Terms:

1. Electronic Banking Method for Payments

2. Buyer Furnished Property

**EXHIBIT B**

**Joinder Agreement Template**

**This Joinder Agreement (the "Joinder Agreement") to the Equipment and Services Purchase Agreement, dated January 1, 2018 between Siemens Industry, Inc. and Fluence Energy, LLC is made and entered into**

**by and between**

**___**

**with its registered seat in [Place], [Country]**

**- hereinafter referred to as "Supplier" -**

**and**

**___,**

**with its registered seat in [Place], [Country]**

**- hereinafter referred to as "Buyer" -**

**- Supplier and Buyer are hereinafter individually referred to as a "Party" and collectively as the "Parties" -**

WHEREAS, Supplier and **Fluence Energy, LLC** ("Fluence") entered on January 1, 2018 into the Equipment and Services Purchase Agreement (the "Agreement") which is attached hereto as <u>Annex 1</u>;

**WHEREAS,** Buyer is an Affiliate of Fluence and wishes to become a party to the Agreement and to adopt the terms and conditions thereof, and consequently Supplier and Buyer wish to enter into this Joinder Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and premises contained herein, the Parties agree as follows:

**ADOPTION OF THE AGREEMENT**

a)  Buyer hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, Buyer shall be deemed a party to the Agreement for all purposes of the Agreement, and shall have all of the obligations of a "Buyer" under the Agreement, as though an original party to the Agreement. Buyer hereby ratifies, as of the date hereof, and agrees to be bound by, and subject to, all of the covenants, terms, provisions and conditions applicable to "Buyer" contained in the Agreement. The terms and conditions as set out in the Agreement are incorporated herein by reference and are made applicable between the Parties.

b)  Without limiting the generality of the foregoing, Buyer hereby represents and warrants that each of the representations and warranties of "Buyer" contained in the Agreement is true and correct as of the date of the execution and delivery of this Joinder Agreement.

c)  This Joinder Agreement shall be controlled by and construed in accordance with the substantive laws of the State of Delaware without regard to conflict of laws principles.

d)  This Joinder Agreement contains the entire agreement between the Parties and supersedes any and all prior negotiations, correspondence, understandings between the Parties concerning the subject matter hereof. It may not be changed orally, but only by an agreement in writing signed by both Parties hereto.

e)  This Joinder Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Joinder Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

**SPECIFIC STIPULATIONS UNDER THIS JOINDER AGREEMENT**

[**ONLY** country specific deviations from the Agreement are to be stipulated here.]

a)   [Delivery and Payment terms]

b)   [Term and Termination]

c)   [Country specific regulations (jurisdiction, governing law, tax etc.)]

d)   ...

**ORDER OF PRECEDENCE BETWEEN THE AGREEMENT AND THE ADOPTION AGREEMENT**

In the event of any conflict or inconsistency between the terms of this Joinder Agreement and the Agreement, the Joinder Agreement shall prevail over the Agreement.

**Supplier**                                                        **Buyer**

Place, Date:                                                        Place, Date:

_____                                            _____


_____    _____    _____    _____
Name:                      Name:                      Name:                      Name:
_____    _____    _____    _____
        (Print)                    (Print)                    (Print)                    (Print)
Title:                     Title:                     Title:                     Title:
_____    _____    _____    _____

**Annex 1**: Equipment and Services Purchase Agreement

**Exhibit C**

**Substance Declaration**

If Supplier furnishes Equipment that is subject to restrictions, rules or regulations for Hazardous Materials or other substances comprising, part of or contained in such Equipment, including but not limited to (1) EHS Laws, including TSCA, (2) other statutes, rules, regulations, codes, rules, standards and requirements governing, controlling or regulating Hazardous Materials, including but not limited to the Restriction on the Use of Certain Hazardous Substances in Electrical and Electronic Equipment (hereinafter "RoHS"), Directives 2002/96/EC and 2012/19/EU as well as their respective incorporation into EU member states' legislation including any amendments thereto (hereinafter "WEEE"), (3) the Regulation EC 1907/2006 of the European Parliament and of the Council of the European Union concerning the Registration, Evaluation, Authorization and Restriction of Chemicals including any amendment thereto (hereinafter "REACH"), and/or (4) EC Directive 2006/66/EC on Batteries and Accumulators and Waste Batteries and Accumulators, without limiting Supplier's obligations under this Agreement, Supplier shall comply with the requirements of this "Substance Declaration".

Supplier shall submit to Buyer with the Equipment, a list of the chemical substances contained therein, and/or Material Safety Data Sheets, Safety Data Sheets or other such documentation as required by Applicable Laws (including without limitation the OSHA Hazardous Communication Standard 29 CFR 1910.1200 et seq.). If Supplier furnishes Equipment that is subject to substance restrictions, rules or regulations including but not limited to those identified in this Exhibit, Supplier shall declare such substances on the Buyer web database BOMcheck (www.BOMcheck.net) or, only if and approved in writing in advance by Buyer, in another reasonable format provided to Buyer no later than first delivery date of the Equipment, and Supplier shall prior to Supplier's first delivery of Equipment complete and comply with the Declarable Substances-Form (hereinafter "Substance Declaration") in the Buyer supplier portal "c4seasy" or in hard copy forwarded to Buyer. In addition, for Equipment that is subject to substance restrictions, rules or regulations Supplier shall provide Buyer with a safety data sheet required in Article 31 of the Regulation EC 1907/2006 (REACH ) for Equipment that is or contains substances subject to such substance restrictions, rules or regulations, and Supplier shall keep this Substance Declaration up to date. Should a delivery hereunder contain "dangerous goods" as so classified pursuant to Applicable Laws, Supplier shall notify Buyer in writing in sufficient detail to identify the Equipment, the hazards, and the laws, rules or regulations applicable thereto no later than three (3) business days after receipt of the Purchase Order.

**Exhibit D**

**Code of Conduct**

This Code of Conduct defines the basic requirements placed on Buyer's suppliers and third party intermediaries concerning their responsibilities towards their stakeholders and the environment. Buyer reserves the right to reasonably change the requirements of this Code of Conduct. In such event Buyer expects the supplier to accept such reasonable changes.

**The supplier and/or third party intermediary declares herewith:**

- **Legal compliance**
  - o    to comply with the laws of the applicable legal Equipment and Services.
- **Prohibition of corruption and bribery**
  - o    to tolerate no form of and not to engage directly or indirectly in any form of corruption or bribery and not to grant, offer or promise anything of value to a government official or to a counterparty in the private sector to influence official action or obtain an improper advantage.
- **Fair competition, anti-trust laws and intellectual property rights**
  - o    to act in accordance with national and international competition laws and not to participate in price fixing, market or customer allocation, market sharing or bid rigging with competitors;
  - o    to respect the intellectual property rights of others.
- **Conflicts of interest**
  - o    to avoid all conflicts of interest that may adversely influence business relationships.
- **Respect for the basic human rights of employees**
  - o    to promote equal opportunities for and treatment of its employees irrespective of skin color, race, nationality, social background, disabilities, sexual orientation, political or religious conviction, sex or age;
  - o    to respect the personal dignity, privacy and rights of each individual;
  - o    to refuse to employ or make anyone work against his will;
  - o    to refuse to tolerate any unacceptable treatment of employees, such as mental cruelty, sexual harassment or discrimination;
  - o    to prohibit behavior including gestures, language and physical contact, that is sexual, coercive, threatening, abusive or exploitative;
    - o    to provide fair remuneration and to guarantee the applicable national statutory minimum wage;
    - o    to comply with the maximum number of working hours laid down in the applicable laws;
  - o    to recognize, as far as legally possible, the right of free association of employees and to neither favor nor discriminate against members of employee organizations or trade unions.
- **Prohibition of child labor**
  - o    to employ no workers under the age of 15 or, in those countries subject to the developing country exception of the ILO Convention 138, to employ no workers under the age of 14.
- **Health and safety of employees**
  - o    to take responsibility for the health and safety of its employees;
  - o    to control hazards and take the best reasonably possible precautionary measures against accidents and occupational diseases;

- o    to provide training and ensure that employees are educated in health and safety issues;
- o    to set up or use a reasonable occupational health & safety management system.

- **Environmental protection**
  - o    to act in accordance with the applicable statutory and international standards regarding environmental protection;
  - o    to minimize environmental pollution and make continuous improvements in environmental protection;
  - o        to set up or use a reasonable environmental management system

- **Supply chain**
  - o    to use reasonable efforts to promote among its suppliers compliance with this Code of Conduct;
  - o    to comply with the principles of nondiscrimination with regard to supplier selection and treatment.

- **Conflict Minerals**
  - o    to take reasonable efforts to avoid in its products the use of raw materials which directly or indirectly finance armed groups who violate human rights.

**Exhibit E**

## Insurance

(A)  Supplier shall, at its sole expense, maintain, and shall require its Representatives to maintain, the types of insurance coverage(s) listed below. The coverage limits for each type of insurance listed below shall be the greater of: (i) the coverage limits listed below; or (ii) if the applicable Attachments require Supplier to maintain higher limits, then the coverage limits specified in the Attachments. Evidence of insurance required by this Agreement is to be furnished before any Equipment/Services is commenced. Supplier and its Representatives shall maintain such insurance in full force and effect during the term of this Agreement, and, in addition, for as long as Supplier is under any warranty obligations arising out of this Agreement. All insurers on required insurance coverage(s) shall have an A.M. Best Rating of A- /VIII or better. Buyer and its subsidiaries, affiliates, and its or their Representatives, and/or any other party designated on the Face Page as applicable shall be named as an additional insured, with respect to the Commercial General Liability and Automobile Liability policies/coverage(s). All insurance certificates shall be in a form satisfactory to Buyer. Supplier shall deliver the certificates of insurance, naming Buyer and, if applicable, Buyer's customer, as the Certificate Holder. All of Supplier's policies of insurance, except for Workers' Compensation and Employers Liability, shall be primary insurance and noncontributing with any other insurance maintained by Buyer, Buyer's customer and/or other parties. All of Supplier's policies of insurance, except for Worker's Compensation and Employer's Liability, shall contain a cross-liability or severability of interest clause. The limits of insurance set forth below may be satisfied by any combination of excess and primary insurance coverage. Supplier shall require all its insurers to waive all rights of subrogation against Buyer, Buyer's customer, and their respective subsidiaries, affiliates, and Representatives, and any other party designated as an additional insured.

B) Supplier shall maintain the following insurance coverage(s):

**Worker's Compensation Insurance** in accordance with the statutory requirements of the location in which the Purchase Order is performed. If there is an exposure to injury to Supplier's employee under the U.S. Longshoremen's and Harbor Worker's Compensation Act, the Jones Act or under laws, regulations or statutes applicable to maritime employees, coverage required by law shall be provided for same.

**Employer's Liability Insurance** with the following limits of liability:

·    $1,000,000 for each occurrence;

·    $1,000,000 Disease Policy

·    $1,000,000 Each Employee.

**Commercial General Liability Insurance**, in occurrence coverage form, with minimum limits of $5 million per occurrence, including the following coverages:

·    Products and Completed Operations

·    Contractual Liability insuring the obligations assumed by Supplier under this Agreement

· Premises/Operations

· Underground, Undermining, Explosion and Collapse (XCU) Hazard,

· Supplier's Contractor's Protective Liability

· Broad Form Property Damage (including Completed Operations)

**Automobile Liability Insurance**, including coverage for owned, hired, and non-owned automobiles and trucks used by or on behalf of the Supplier providing insurance for bodily injury, liability and property damage liability with minimum limits for each type of coverage of $5,000,000 per occurrence.

(C ) The following are required if a Purchase Order involves such exposures: (i) Exposure to Hazardous Materials, then Environmental Impairment Liability Insurance (including Asbestos) with limits of $5,000,000 per occurrence; (ii) Involves watercraft owned, operated or chartered by Supplier or its Representatives, liability arising out of such watercraft shall be insured by the General Liability or by Protection and Indemnity Insurance with a CSL of no less than $1,000,000 per each occurrence; (iii) Involves the hauling and/or rigging of property in excess of $100,000, Supplier shall carry "All Risk" Transit Insurance, or "All Risk" Motor Truck Cargo Insurance (Such insurance shall provide a limit of not less than the replacement cost of the highest value single lift or highest value being moved, whichever is greater, and insuring the interest of Supplier, Buyer and Buyer's customer, as their respective interests may appear); (iv) Involves aircraft (fixed wing or helicopter) owned, operated or chartered by Supplier or its Representatives, liability arising out of such aircraft shall be insured for not less than $1,000,000 CSL each occurrence. If required by a Purchase Order, Supplier shall obtain insurance covering loss or damage to Buyer or Buyer's customer's property under the care, custody and control of Supplier or Supplier's Representatives on a 100 percent replacement cost basis, and/or if the Equipment/Services involve access, storage, transmission or processing of Buyer's, its customer's, its or their Representatives' confidential information, a Cyber Liability Errors and Omissions Policy shall be procured by Supplier providing coverage, on a per occurrence basis, for acts, errors, omissions, and negligence of employees and contractors giving rise to potential liability, financial and other losses relating to data security and privacy, including cost of defense and settlement, in an amount of at least $2,000,000.

(D) The procurement, maintenance or acceptance of insurance coverage by Buyer, if any, shall not: (i) relieve Supplier of liability for loss or damage in excess of the policy coverage limits specified herein; or (ii) limit or release Supplier of its obligations or liabilities under the Purchase Order.

(E) No delay or failure in declaring any default or in enforcing any of the requirements of this Section, and no course of dealing between Buyer and Supplier shall constitute a waiver of any of the requirements of this Section.

**Exhibit F**

**Affirmative Action**

Should Buyer become a federal contractor/subcontractor, Buyer will be required to comply with certain federal regulations, including the regulations promulgated by the U.S. Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP"). Should Buyer become a federal contractor, Buyer will also be required to ensure compliance of the OFCCP by its subcontractors, vendors and suppliers covered under the OFCCP (each, a "Covered Party"). Supplier is hereby notified of Buyer's policy related to affirmative action and its mutual OFCCP obligations to the extent Supplier, its subcontractors, vendors or suppliers is a Covered Party.

Buyer is an equal opportunity/affirmative action employer and does not discriminate on the basis of race, color, creed, religion, national origin, ancestry, sex, age, physical or mental disability, marital status, pregnancy, genetic information, sexual orientation, gender identity, protected veteran or military status, or any other consideration not related to the person's ability to do the job or otherwise made unlawful by federal, state or local law in the following employment practices, including among others: recruiting, hiring, placement, transfer, promotion, demotion, selection for training, layoff, termination, shift assignment, determination of service, rates of pay, benefit plans, and all forms of compensation and other personnel actions.

Should Buyer become a federal contractor/subcontractor, Buyer's Covered Parties (including Supplier and its Covered Parties, if applicable) will also have an obligation to comply with equal opportunity and affirmative action principles. Therefore, Buyer's Covered Parties (including Supplier and its Covered Parties, if applicable) will take appropriate action in support of these principles. Through our mutual effort and cooperation, we will continue to provide a working environment that appreciates and encourages diversity, promotes equal employment opportunity and is free from any type of discrimination.

Supplier and its Covered Parties, if applicable, shall abide by the requirements of the "Equal Opportunity Clause" in Section 202 of Executive Order 11246. See 41 CFR 60-1.4(a).

The following shall also apply if the Supplier is a Covered Party:

**For contracts of $100,000 or more, Supplier shall comply with the following: This Supplier, contractor and subcontractor shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans.**

**For contracts of $10,000 or more, Supplier shall comply with the following: This Supplier, contractor and subcontractor shall abide by the requirements of 41 CFR 60-741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.**

**Attachment A**

### DESCRIPTION OF SUPPLIER'S EQUIPMENT AND SERVICES

See attached.[1]

---

[1] Within sixty (60) days of the Effective Date, the Parties agree to discuss and use reasonable efforts to update Attachment A, if mutually desired, to meet the expectations of the Parties.

**Amended and Restated**

**Storage Core Frame Purchase Agreement**

by and between

AES Grid Stability, LLC

as Buyer

and

Fluence Energy, LLC

as Supplier

dated [ ● ], 2021

**Table of Contents**

**Page**

1.    DEFINITIONS; INTERPRETATION ....................................................... 1
   1.1.    Definitions ................................................................................. 1
   1.2.    Interpretation ............................................................................ 8
2.    TERM AND TERMINATION OF AGREEMENT ................................. 9
   2.1.    Term ......................................................................................... 9
   2.2.    Early Termination ..................................................................... 9
3.    SCOPE OF AGREEMENT ..................................................................... 10
   3.1.    Scope Generally ........................................................................ 10
   3.2.    Further Buyer Contracting Parties ............................................ 10
4.    ORDERS .................................................................................................. 10
   4.1.    Pricing Requests ....................................................................... 10
   4.2.    Purchase Orders ........................................................................ 10
   4.3.    Exclusivity and Certain Related Priorities ............................... 11
   4.4.    Non-Competition ...................................................................... 13
   4.5.    Payment Terms ......................................................................... 16
   4.6.    Disputed Payments .................................................................... 16
   4.7.    Late Payments ........................................................................... 16
   4.8.    Taxes; Export and Import Duties .............................................. 16
5.    DELIVERY .............................................................................................. 16
   5.1.    Delivery Terms; Inspection ...................................................... 16
   5.2.    Guaranteed Delivery Date ........................................................ 17
   5.3.    Delay Liquidated Damages ....................................................... 17
   5.4.    Buyer Caused Delay .................................................................. 17
6.    TITLE, RISK OF LOSS AND CARE, CUSTODY AND CONTROL ... 17
   6.1.    Transfer of Title and Risk of Loss ........................................... 17
   6.2.    Warranty of Title ...................................................................... 17
7.    INSPECTION AND QUALITY CONTROL ........................................... 18
   7.1.    Inspection Rights ...................................................................... 18
   7.2.    Quality Control ......................................................................... 18
8.    WARRANTIES ........................................................................................ 18
   8.1.    Equipment Warranty ................................................................. 18
   8.2.    Services Warranty ..................................................................... 18
   8.3.    Notification Requirements ........................................................ 18
   8.4.    Corrective Action ...................................................................... 19
   8.5.    Warranty Exclusions ................................................................. 19
   8.6.    NO IMPLIED WARRANTIES .................................................. 19
   8.7.    Reserved Rights ........................................................................ 19
   8.8.    Access to Buyer Data ................................................................ 20
9.    BUYER FURNISHED PROPERTY ....................................................... 20
10.    PACKAGING ......................................................................................... 20
11.    FORCE MAJEURE ................................................................................ 21
   11.1.    Effect of Force Majeure .......................................................... 21
   11.2.    Procedures ............................................................................... 21
   11.3.    Termination for Extended Force Majeure ............................... 21
12.    CHANGE ORDERS ............................................................................... 21
   12.1.    Change Order .......................................................................... 21
   12.2.    Change Order Process ............................................................. 22
   12.3.    Change Order Restrictions ...................................................... 22
   12.4.    No Change ............................................................................... 22

| | | |
|---|---|---|
| 13. | INTELLECTUAL PROPERTY | 22 |
| 13.1. | Grant of License | 22 |
| 13.2. | No Copies | 23 |
| 13.3. | Proprietary Notices | 23 |
| 13.4. | Security | 23 |
| 13.5. | No Reverse Engineering | 23 |
| 13.6. | Open Source Software | 23 |
| 13.7. | Reporting | 23 |
| 13.8. | Relief | 24 |
| 13.9. | Improvements | 24 |
| 13.10. | Ownership | 24 |
| 13.11. | Enforcement | 25 |
| 13.12. | Duration and Transfers | 25 |
| 13.13. | Government End Users | 26 |
| 13.14. | Reservation of Rights | 26 |
| 14. | DEFAULTS AND REMEDIES | 26 |
| 14.1. | Supplier Defaults | 26 |
| 14.2. | Buyer Defaults | 27 |
| 14.3. | Remedies | 27 |
| 15. | INDEMNIFICATION | 27 |
| 15.1. | General | 27 |
| 15.2. | Infringement Indemnification by Supplier | 28 |
| 15.3. | Infringement Indemnification by Buyer | 29 |
| 15.4. | Indemnification Procedures | 30 |
| 15.5. | Limited Waiver of Certain Immunities | 31 |
| 15.6. | Survival | 31 |
| 16. | LIMITATIONS OF LIABILITY | 31 |
| 16.1. | WAIVER OF CERTAIN DAMAGES | 31 |
| 16.2. | MAXIMUM LIABILITY | 31 |
| 16.3. | EFFECTIVENESS | 31 |
| 16.4. | Commencement of Claims | 31 |
| 17. | CONFIDENTIALITY | 32 |
| 17.1. | Confidential Information | 32 |
| 17.2. | Non-Disclosure | 32 |
| 17.3. | Exceptions | 32 |
| 17.4. | Representatives Bound | 32 |
| 17.5. | Survival | 32 |
| 18. | REPRESENTATIONS AND WARRANTIES | 33 |
| 18.1. | Representations of the Parties | 33 |
| 18.2. | Additional Representations of Supplier | 34 |
| 19. | ENVIRONMENT, HEALTH AND SAFETY | 34 |
| 19.1. | Compliance and Related Matters | 34 |
| 19.2. | On-Site Environmental and Safety Responsibility | 35 |
| 19.3. | Health and Safety Plan | 35 |
| 20. | OPEN SOURCE SOFTWARE | 36 |
| 21. | EXPORT CONTROL AND FOREIGN TRADE REGULATIONS | 36 |
| 21.1. | Acknowledgement and Compliance | 36 |
| 21.2. | Export Licenses | 36 |
| 21.3. | Provision of Trade Data | 36 |
| 21.4. | Changes | 37 |
| 21.5. | Additional Buyer's Obligations | 37 |
| 21.6. | Certain Relief | 37 |

ii

| 22. | BUYER CODE OF CONDUCT | 37 |
|---|---|---|
| 23. | COMPLIANCE WITH LAWS AND PERMITS | 37 |
| 24. | DISPUTE RESOLUTION | 38 |
| 24.1. | Referral to Senior Management | 38 |
| 24.2. | Referral to Arbitration | 38 |
| 24.3. | Neutral Arbitrators | 38 |
| 24.4. | Procedures and Costs | 38 |
| 24.5. | Award | 39 |
| 24.6. | Confidentiality | 39 |
| 24.7. | Continued Performance; Provisional Remedies | 39 |
| 24.8. | Waiver of Jury Trial | 39 |
| 25. | MISCELLANEOUS | 39 |
| 25.1. | Governing Law | 39 |
| 25.2. | Records | 40 |
| 25.3. | Intentionally Omitted | 40 |
| 25.4. | Insurance | 40 |
| 25.5. | Assignment; Successors | 40 |
| 25.6. | Subcontracting | 40 |
| 25.7. | Other Terms and Amendments | 40 |
| 25.8. | Government Contracts | 40 |
| 25.9. | Relationship of the Parties | 40 |
| 25.10. | Publicity | 41 |
| 25.11. | Non-Exclusive Remedies and Non-Waivers | 41 |
| 25.12. | Severability | 41 |
| 25.13. | Survival | 41 |
| 25.14. | Affirmative Action | 41 |
| 25.15. | Complete Agreement and Counterparts | 41 |
| 25.16. | Counterparts | 41 |
| 25.17. | No Pre-Printed Terms | 41 |
| 25.18. | Priority | 42 |
| 25.19. | Notices | 42 |
| 25.20. | Joint Effort | 43 |
| 25.21. | Language of the Agreement, Correspondence, Documentation | 43 |

Schedule 1.1(a) Applications

Exhibits

Exhibit A   Form of Purchase Order
Exhibit B   Form of Joinder Agreement
Exhibit C   Substance Declaration
Exhibit D   Code of Conduct
Exhibit E   Insurance
Exhibit F   Affirmative Action Requirements
Exhibit G   Key Agreements

Attachment A Description of Supplier's Battery Storage Equipment and Services

iii

THIS **AMENDED AND RESTATED STORAGE CORE FRAME PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into on [ ● ], 2021 (the "**Effective Date**"), between AES Grid Stability, LLC. hereinafter referred to as "**Buyer**" and **Fluence Energy, LLC**, whose principal place of business is 4601 N. Fairfax Drive, Suite 600, Arlington, VA 22203 hereinafter referred to as "**Supplier**". Each of Buyer and Supplier are referred to herein as a "**Party**" and collectively are referred to herein as the "**Parties**."

WHEREAS, Buyer sells electrical transmission and distribution projects to Customers;

WHEREAS, Buyer may want to purchase energy storage equipment and related services to incorporate within its electrical transmission and distribution projects;

WHEREAS, Supplier sells energy storage equipment and related services;

WHEREAS, Supplier wishes to cooperate with Buyer in order to fulfill Buyer's requirements and provide preferred purchasing conditions to Buyer for those energy storage equipment and related services;

WHEREAS, Supplier and Buyer are parties to that certain Storage Core Frame Purchase Agreement, dated as of January 1, 2018, by and between Supplier and Buyer (the "**Prior Agreement**"); and

WHEREAS, Buyer is party to the Second Amended and Restated Limited Liability Company Agreement of Supplier, dated as of June 9, 2021(the "**LLC Agreement**");

WHEREAS, Supplier, Buyer and certain other parties are entering into a series of transactions in connection with the formation of Fluence Energy, Inc., a Delaware corporation ("**Issuer**") to serve as the vehicle through which the public will own indirect interests in Supplier through an initial public offering;

WHEREAS, in connection with the closing of the initial public offering, the LLC Agreement is being amended and restated in its entirety by the Third Amended and Restated Limited Liability Company Agreement, dated on or about the date hereof (the "**Restated LLC Agreement**"), to, among other things, reflect Issuer's ownership of Supplier and the restructuring of Supplier and its Affiliates; and

NOW, THEREFORE, the Parties agree that on the Effective Date the Prior Agreement is hereby amended and restated in its entirety by this Agreement, and further agree as follows:

**1.    DEFINITIONS; INTERPRETATION.**

1.1.    Definitions. Initially-capitalized terms used in this Agreement (including the preamble and Recitals hereto) and not otherwise defined herein shall have the meanings specified below.

"**Affiliate**" means, at any time, and with respect to any Person or group of Persons, a Person that at such time directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person or group of Persons. No Person shall be considered an Affiliate of another Person or under the Control of such other Person so long as (i) it is owned less than 50% by such other Person, (ii) such other Person has no capacity to elect or appoint the majority of the board of directors or similar governing body of the subject Person, (iii) such other Person does not consolidate the subject Person in its financial reporting and (iv) there is no other management or services agreement pursuant to which such other Person exerts control over the subject Person.

"**Agreement**" has the meaning set forth in the Preamble hereto.

"**Applicable Law**" means any applicable constitutional provision, statute, act, code, law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision or declaration of a Governmental Authority having valid jurisdiction.

"**Application**" means one of the stationary, battery based energy storage solutions and services for the grid connected storage market (including systems both in front of and behind the meter) set forth on Schedule 1.1(a).

"**Battery**" means a battery included within the Equipment supplied pursuant to this Agreement.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Buyer**" has the meaning set forth in the Preamble hereto.

"**Buyer Data**" has the meaning set forth in Section 13.10(b).

"**Buyer Event of Default**" has the meaning set forth in Section 14.2.

"**Buyer Furnished Property**" has the meaning set forth in Article 9.

"**Change Order**" has the meaning set forth in Section 12.1.

"**Change Order Information**" has the meaning set forth in Section 12.2.

"**Claims**" has the meaning set forth in Section 15.1.

"**Confidential Information**" has the meaning set forth in Section 17.1.

"**Control**" means, with respect to the relationship between two or more Persons, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise. The terms "Controlled" or "under common Control with" have correlative meanings.

"**Defect**" means any material defect in design, manufacturing, materials or workmanship in or to the Equipment, or any failure of the Equipment to materially comply with the Technical Specifications, excluding in all cases any of the foregoing attributable to or caused by ordinary wear and tear of the Warranted Equipment.

"**Deliver**", "**Delivered**" or "**Delivery**" means that Supplier has caused the delivery of the applicable Equipment to the Delivery Point in accordance with the terms of this Agreement.

"**Delivery Point**" means the delivery location set forth in a Pricing Notice, provided that, if no such location is specified in the applicable Pricing Notice, the Delivery Point for Equipment comprised of batteries shall be at the facility of the supplier thereof and the Delivery Point for all other Equipment shall the location of Supplier's facility.

"**Derivative Software**" has the meaning set forth in Article 20.

"**EAR**" has the meaning set forth in Section 21.1.

"**Effective Date**" shall have the meaning assigned to such term in Section 2.1.

"**EHS Laws**" has the meaning set forth in Section 19.1.

"**Enforcement Action**" has the meaning set forth in Section 13.11.

"**Equipment**" means any energy storage equipment offered for sale by Supplier pursuant to this Agreement, as set forth in Attachment A.

"**Equipment Warranty**" has the meaning set forth in Section 8.1.

"**Equipment Warranty Period**" has the meaning set forth in Section 8.1.

"**Exclusive Activities**" means the development, marketing and sale of an Integrated Solution for one or more Applications, where the size of such Integrated Solution is equal to or greater than 500 kilowatts, including those Integrated Solutions marketed, sold and delivered through a Buyer sales channel or another Supplier sales channel as contemplated in Supplier's then current business plan.

"**Export Controls and Sanctions Laws**" has the meaning set forth in Section 21.1.

"**Force Majeure**" means any event which is not within the reasonable control of the Party affected and with the exercise of due diligence could not reasonably be prevented, avoided or removed by such Party, which causes the affected Party to be delayed, in whole or in part, or unable, using commercially reasonable efforts, to partially or wholly perform its obligations under this Agreement (other than an obligation for the payment of money) and is not caused by or resulting from the negligence or breach or failure of such Party to perform its obligations under this Agreement, which, subject to the foregoing, may include: acts of God or the public enemy, natural disasters, war, terrorism, insurrection, sabotage, unavoidable accidents, orders, decrees, rulings and policies of any Governmental Authority, fires, floods, earthquakes, volcanic activity, severe weather conditions not reasonably foreseeable taking into account the location of performance and the climate patterns applicable thereto, explosions, riots, general strikes and area lockouts. Force Majeure shall not include a Party's financial inability to perform under this Agreement or any Purchase Order.

"**Further Buyer Contracting Parties**" has the meaning set forth in Section 3.2.

"**Governmental Authority**" means a federal, state, local or foreign governmental authority (including any regulatory authority); a state, province, commonwealth, territory or district thereof; a county; a city, town, township, or other municipality; a district, ward or other subdivision of any of the foregoing; any executive, legislative or other governing body of any of the foregoing; any agency, authority, board, department, system, service, office, commission, committee, council or other administrative body of any of the foregoing; any court or other judicial body; and any officer, official or other representative of any of the foregoing.

"**Guaranteed Delivery Date**" has the meaning set forth in Section 5.2.

"**Hazardous Materials**" has the meaning set forth in Section 19.1.

"**Indemnified Party**" has the meaning set forth in Section 15.1.

"**Indemnifying Party**" has the meaning set forth in Section 15.1.

"**Infringement Claim Costs**" means any and all judgments, damages, fines, awards, penalties, and interest associated with any of the foregoing, that, in each case, are finally awarded in a claim for which an Indemnifying Party is obligated to indemnify an Indemnified Party under Section 15.2 or 15.3, as applicable, and costs and expenses, including reasonable attorneys' fees, court costs and other reasonable costs of suit, arbitration, dispute resolution or other similar proceedings, associated with such claim.

"**Integrated Solution**" means an integrated, stationary, battery based energy storage solution, comprised of inverters, a control system including software, and electrical battery. Notwithstanding the foregoing, the following will not be considered Integrated Solutions: (i) uninterruptable power supply (UPS) systems (other than for use in Applications), (ii) a virtual energy storage network built out of individual, connected, geographically distributed product units of less than 150 kilowatts per unit (a "swarm"), (iii) static synchronous compensators (Statcom), (iv) supercapacitors, (v) the technology for the storage medium (e.g. batteries), (vi) energy storage inverters, (vii) stationary storage systems sold as part of an integrated product in conjunction with the sale of energy storage systems on board of vessels, vehicles or locomotives, where the main purpose of the stationary storage system is to charge or to be charged by such on board energy storage system or the vehicle brake energy and (viii) stationary storage systems providing power directly and primarily to electric vehicle charging stations.

"**Intellectual Property**" means United States and foreign: (a) Patents; (b) Trademarks; (c) copyrights, whether registered or unregistered, and all applications and registrations therefor, web sites, proprietary domain names, mask works, and all applications and registrations therefor; (d) Know-How; (e) Software; and (f) similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing.

"**Key Agreements**" means the various contracts between Supplier and certain of its members or their Affiliates listed on Exhibit G, as the same may be amended and/or restated from time to time.

"**Know-How**" means all proprietary and confidential information and data (irrespective as to whether such information or data is available by way of documentation, orally or in electronic format, or protected by copyrights), including business and trade secrets, technical and business information and data, know-how and similar proprietary rights in confidential information and processes, discoveries, analytic models, improvements, techniques, devices, methods, patterns, formulations and specifications, all to the extent that such information and data are proprietary and confidential and neither Software nor a Patent.

4

"**License**" has the meaning set forth in Section 13.1.

"**Licensed Technology**" means, collectively, all of the following to the extent owned by, or licensed (with the right to grant sublicenses) to, Supplier, relating to the Equipment or the uses and purposes contemplated in connection with this Agreement or any Purchase Order issued hereunder for such Equipment: (a) Software embedded in or integrated with the Equipment, (b) any other trade secrets, proprietary information, know-how or other Intellectual Property incorporated into or embedded within the Equipment or necessary for the installation, operation, maintenance, and ownership of the Equipment, (c) any improvements of or updates to any of the foregoing provided to Buyer pursuant to this Agreement, if any, and (d) all Intellectual Property rights of Supplier in the Licensed Technology listed in any of clauses (a) through (d) above, in each case, for use solely in connection with the installation, commissioning, operation and maintenance of the Equipment at the Project Site or such other site as Buyer shall elect.

"**LLC Agreement**" has the meaning set forth in the Recitals hereto.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**Open License Terms**" has the meaning set forth in Article 20.

"**Open Source Software**" has the meaning set forth in Article 20.

"**Party**" has the meaning set forth in the Preamble hereto.

"**Parties**" has the meaning set forth in the Preamble hereto.

"**Patents**" means all patents, utility models, patent and utility model applications, and all priorities and rights related thereto, including all reissues, reexaminations, divisions, continuations, continuations-in-part, provisionals, continued prosecution applications, substitutions, extensions, additions or renewals of any of the foregoing.

"**Person**" means any natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company or any other entity (whether or not having separate legal personality), and shall include any successor (by merger or otherwise) of such entity.

"**Potential Project**" shall have the meaning assigned to such term in Section 4.3(b)(ii).

"**Pricing Notice**" has the meaning set forth in Section 4.1.

"**Pricing Request**" has the meaning set forth in Section 4.1.

"**Prohibited Person**" means (i) any individual or entity that has been determined by competent authority to be the subject of a prohibition in any law, regulation, rule, or executive order administered by OFAC or the U.S. Department of State; (ii) the government, including any political subdivision, agency or instrumentality thereof, of a Sanctioned Country; (iii) any individual or entity that acts on behalf of or is owned or controlled by the government of a Sanctioned Country; (iv) any individual or entity that has been identified on the OFAC Specially Designated Nationals and Blocked Persons List (Appendix A to 31 C.F.R. Ch. V) or any other similar list published by OFAC, including, but not limited to, the Foreign Sanctions Evaders List, the Part 561 List, and the Non SDN Iranian Sanctions List; (v) any individual or entity that has been designated on any similar list or order published by the United States government, including, without limitation, the Denied Persons List, Entity List, or Unverified List of the U.S. Department of Commerce, or the Debarred List or Nonproliferation Sanctions List of the U.S. Department of State; or (vi) any entity beneficially owned or controlled, directly or indirectly, by, any of the individuals or entities listed in subparagraphs (i)-(v) above.

"**Project Bid**" shall have the meaning assigned to such term in Section 4.3(c)(iv).

"**Prudent Industry Practices**" means those practices, methods, specifications and standards of safety, performance, dependability, efficiency and economy generally recognized by electrical utility industry members, including Supplier, in the U.S. as good and proper, and such other practices, methods or acts which, in the exercise of reasonable judgment by those reasonably experienced in the industry in light of the facts known at the time a decision is made, would be expected to accomplish the result intended at a reasonable cost and consistent with Applicable Laws, reliability, safety and expedition. Prudent Industry Practices are not intended to be limited to the optimum practices, methods or acts to the exclusion of all others, but rather to be a spectrum of good and proper practices, methods and acts.

"**Purchase Order**" means a purchase order in the form attached hereto as Exhibit A issued for the purchase of Equipment and Services pursuant to and in accordance with the terms and conditions of this Agreement.

"**Representatives**" means, with respect to any Person, such Person's shareholders, members, officers, directors, employees, accountants, consultants, legal counsel, financial advisors and other representatives and agents.

"**Revised Project Bid**" shall have the meaning assigned to such term in Section 4.3(b)(v).

"**Sanctioned Country**" means any country or territory against which the United States maintains comprehensive economic sanctions or embargoes, including, without limitation, Crimea, Cuba, Iran, North Korea, Sudan and Syria.

"**Services**" means any Equipment related services offered for sale by Supplier pursuant to this Agreement, as set forth in Attachment A.

"**Services Warranty**" has the meaning set forth in Section 8.2.

"**Services Warranty Period**" has the meaning set forth in Section 8.2.

"**Shares**" means (i) the Class A Common Stock of the Issuer, calculated on a fully diluted basis and assuming that all options, warrants and any other rights to purchase shares of Class A Common Stock of the Issuer have been exercised in full, including, for sake of clarity, the Underlying Class A Shares plus (ii) any other equity securities now or hereafter issued by the Issuer, together with any options thereon and any other shares of stock or other equity securities issued or issuable with respect thereto (whether by way of a stock dividend, stock split or in exchange for or in replacement or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization); provided, however, that in no event shall the Shares include the Class B Common Stock of the Issuer.

"**Siemens Storage Core Frame Purchase Agreement**" means that certain Amended and Restated Storage Core Frame Purchase Agreement, dated as of even date herewith, between Siemens Industry, Inc. and Supplier.

"**Software**" means all computer programs, operating systems, applications, systems, firmware, and software of any nature, whether operational, active, under development, or design, non-operational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, test scripts, user manuals, and other documentation therefore, whether in machine-readable form, programming language, or any other language or symbols, and whether stored, encoded, recorded, or written on disk, tape, film, memory device, paper, or other media of any nature and all databases necessary or appropriate to operate any such computer program, operating system, applications system, firmware, or software.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing member, general partner or analogous controlling Person of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries.

"**Sunset Date**" means the earlier to occur of (i) the seventh (7th) anniversary of the Effective Date and (ii) that date on which Buyer and Affiliates collectively hold Shares representing less than twenty percent (20%) of the then outstanding Voting Power.

"**Supplier**" has the meaning set forth in the Preamble hereto.

"**Supplier Documents**" means the documents and deliverables to be provided by Supplier to Buyer to the extent reasonably required for the installation, commissioning, operation and maintenance of the Equipment, as more fully set forth in the applicable Purchase Order.

"**Supplier Event of Default**" has the meaning set forth in Section 14.1.

"**Taxes**" means any and all forms of taxation, charges, duties, imposts, levies and rates whenever imposed by any Governmental Authority, including income tax, withholding tax, corporation tax, capital gains tax, capital transfer tax, sales tax, business and occupation tax, inheritance tax, water rates, value added tax, customs duties, capital duty, excise duties, betterment levy, stamp duty, stamp duty reserve tax, national insurance, social security or other similar contributions, and generally any tax, duty, impost, levy, rate or other amount and any interest, penalty or fine in connection therewith.

"**Technical Specifications**" means the technical specifications for the Equipment as set forth in the applicable Purchase Order.

"**Term**" has the meaning set forth in Section 2.1.

"**Terminating Event**" shall have the meaning assigned to such term in Section 4.3(a)(i).

"**Territory**" means (i) for purposes of the sales and marketing by Buyer of the Equipment, worldwide and (ii) for all other use of the Equipment, the country in which the Equipment is installed for use.

"**Third Party**" means any Person, other than a member of Supplier or such member's Affiliates.

"**Trademarks**" means all trademarks, trademark applications, service marks, service mark applications, trade dress, trade names, identifying symbols, words, colors, designs, product names, company names, slogans, logos or insignia, whether registered or unregistered, and all applications and registrations therefor, and all goodwill associated therewith.

"**TSCA**" has the meaning set forth in Section 19.1.

"**Underlying Class A Shares**" means all shares of Class A Common Stock of the Issuer issuable upon redemption of Common Units of the Supplier, assuming all such Common Units are redeemed for Class A Common Stock of the Issuer on a one-for-one basis.

"**Voting Power**" means the total voting power of all Shares entitled to vote generally in the election of directors.

"**Work Site**" has the meaning set forth in Section 19.2.

1.2.    Interpretation.

(a)     References to Recitals, Articles, Sections, Exhibits, Annexes and Attachments are, unless otherwise indicated, to Recitals, Articles, Sections, Exhibits, Annexes and Attachments to this Agreement. All Exhibits, Annexes and Attachments to this Agreement are incorporated herein by this reference and made a part hereof for all purposes.

8

(b)    As used in this Agreement, the masculine gender shall include the feminine and neuter and the singular number shall include the plural, and vice versa.

(c)    Unless expressly stated otherwise, references to a Person include its successors and permitted assigns and, in the case of a Governmental Authority, any Person succeeding to its functions and capacities.

(d)    As used in this Agreement, references to "days" shall mean calendar days, unless the term "Business Days" is used. If the term "Business Days" is used and the time for performing an obligation under this Agreement expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

(e)    As used in this Agreement, where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder" and "hereof" refer to this Agreement, taken as a whole, and not to any particular provision of this Agreement; "including" means "including, for example and without limitation," and other forms of the verb "to include" are to be interpreted similarly.

(f)    As used in this Agreement, all references to a given agreement, instrument or other document shall be a reference to that agreement, instrument or other document as modified, amended, supplemented and restated through the date as of which such reference is made. Any term defined or provision incorporated in this Agreement by reference to another document, instrument or agreement shall continue to have the meaning or effect ascribed thereto whether or not such other document, instrument or agreement is in effect.

## 2.    TERM AND TERMINATION OF AGREEMENT.

2.1.    Term. This Agreement shall become effective and the term shall commence on the day on which the Class A Common Stock of the Issuer is issued to the underwriters in its initial public offering (the "**Effective Date**"); provided, that if the Effective Date does not occur on or prior to December 31, 2021, this Agreement shall be deemed terminated as of such date and of no force or effect without further notice or action by the Parties, and the Prior Agreement shall remain in full force and effect without any amendment thereto. The term of this Agreement shall continue from the Effective Date until the date that the obligations contained in Section 4.4(a) (*Non-Competition*) cease to apply to Buyer (the "**Term**"). The expiration or early termination of the Term of this Agreement shall not affect any Purchase Orders executed between the Parties prior to the date of termination or expiration, and in such event the Parties shall attempt, in fair dealing and good faith, to agree on reasonable post-termination or post-expiration procedures in compliance with Applicable Law and antitrust requirements.

**3.**    **SCOPE OF AGREEMENT.**

3.1.    Scope Generally. This Agreement shall apply to all purchases by Buyer from Supplier of Equipment and Services during the Term. Notwithstanding the foregoing, nothing herein shall be construed to mean that either Buyer or Supplier is committing to any specific level of business or quantity of Equipment and Services to be purchased or supplied other than that specified in Purchase Orders issued to Supplier during the Term of this Agreement by Buyer. Attachment A hereto sets forth the various standard Equipment and Services offerings of Supplier, it being understood that any project-specific requirements associated with any particular order hereunder shall be as set forth in the applicable Purchase Order therefor. Supplier may from time to time update the Equipment and Services offered for sale hereunder by furnishing to Buyer an update to Attachment A hereto, it being agreed that no such update shall affect any previously issued Purchase Order unless and to the extent set forth in a Change Order thereto.

3.2.    Further Buyer Contracting Parties. The AES Corporation and its Subsidiary companies (hereinafter referred to as "**Further Buyer Contracting Parties**") shall be entitled to conclude individual Purchase Orders under the terms of this Agreement provided that such Further Buyer Contracting Parties either: (a) execute a joinder agreement acceptable to Supplier and otherwise in the form of Exhibit B hereto or (b) agree that the terms of this Agreement will govern the subject transaction by including a conspicuous cross-reference in the applicable Purchase Order which confirms that the terms of this Agreement will apply to the Purchase Order.

**4.**    **ORDERS.**

4.1.    Pricing Requests. If Buyer desires to purchase Equipment and Services from Supplier during the Term, Buyer shall furnish Supplier with written request (a "**Pricing Request**") detailing the Equipment and Services it wishes to purchase and requesting pricing therefor from Supplier, including in such Pricing Request such information as may be reasonably necessary for Supplier to determine pricing therefor and any other project-specific requirements, including Buyer's requested delivery schedule. Supplier shall endeavor to provide an initial response to any Pricing Request within five (5) Business Days, indicating (i) whether or not Supplier intends to furnish an offer to Buyer for the requested Equipment and Services on the timeline requested by Buyer and (ii) indicating what, if any, additional information Supplier may need in order to furnish such offer. Within fourteen (14) days after a final written scope of work is agreed with Buyer, or one of its Affiliates, Supplier shall provide Buyer with a written notice (a "**Pricing Notice**") detailing Supplier's pricing and delivery schedule for the Equipment and Services that Buyer wishes to purchase (including therein any terms, conditions and specifications required by Supplier in connection with the particular project and/or purchase contemplated by Buyer, which terms and conditions may be different than, and shall supersede, those set forth in this Agreement), which Pricing Notice Supplier shall endeavor to provide within ten (10) Business Days of receipt of Buyer's Pricing Request. If Buyer does not issue a Purchase Order to Supplier pursuant to Section 4.2 in response to the Pricing Notice within ten (10) Business Days of issuance thereof, the Pricing Notice shall be deemed rejected.

4.2.    Purchase Orders. If Buyer desires to purchase the Equipment and Services on the terms specified in a Pricing Request, it shall issue a Purchase Order to Supplier in the form attached hereto as Exhibit A, which Purchase Order shall include: (i) the pricing and any other terms, conditions and specifications set forth in Supplier's Pricing Notice; and (ii) a detailed description of the Equipment and Services to be purchased, consistent with those set forth in the Pricing Request and to the extent modified thereby, the Pricing Notice. Purchase Orders shall only be binding when issued in compliance with the requirements of this Agreement and sent by e-mail, by fax or by electronic data interchange to Supplier. Supplier shall accept or reject a Purchase Order within ten (10) Business Days after receipt. Acceptance or rejection shall be declared in the form of the Purchase Order. If a Purchase Order is neither accepted nor rejected within ten (10) Business Days after receipt, it shall be deemed rejected.

10

4.3.   Exclusivity and Certain Related Priorities.

(a)   Subject to Applicable Law, during the period from the Effective Date until the Sunset Date, Buyer shall and shall cause its Affiliates (except certain Affiliates of Buyer that (1) are prohibited from being bound by the exclusivity terms set forth below as a result of rights held by Third Party equity investors in such Affiliates pursuant to the terms of such Affiliate's organizational or governance documents (including charters, bylaws, and shareholder, partnership, limited liability company, joint venture and similar agreements) or (2) that reasonably determine that compliance with such exclusivity requirements would, due to their status as regulated utilities, cause complications with the applicable regulatory bodies having jurisdiction over such Affiliates) to:

(i)   purchase exclusively from Supplier any battery-based energy storage technology systems/solutions that are (A) within the Exclusive Activities (provided that for the purposes of this paragraph only, the term "**Application**" within Exclusive Activities shall also include power quality and microgrid/island applications (in each case as described on Schedule 1.1(a))) and (B) offered for sale by Supplier; *provided*, *however*, it is hereby agreed that the exclusive purchase obligations contained in this Section 4.3(a)(i) shall immediately cease to apply with respect to the particular purchase opportunity in the event that (1) either (x) Supplier fails to provide an initial response within five (5) Business Days following receipt of a Pricing Request from Buyer or one of its Affiliates, or (y) Supplier fails to submit a bona fide Pricing Notice within fourteen (14) days after a final written scope of work is agreed with Buyer, or one of its Affiliates, provided that if a shorter response time is required for a final bid by the customer or project related thereto, the parties will discuss and mutually agree on such shorter time period, or (2) the prerequisite of a public tender specifies using a particular vendor, other than Supplier, to provide such battery-based energy storage technology systems/solutions (the matters set forth in the immediately preceding clause (1) and clause (2), may each individually be referred to herein as a "**Terminating Event**"); and

(ii)   prioritize the purchase of any other battery-based energy storage technology systems/solutions that are offered for sale by Supplier and request that each of its Affiliates notify Supplier if it intends to purchase such systems/solutions, such that Supplier shall have an opportunity to sell such systems/solutions thereto. It is hereby agreed that any opportunity described above is subject to other factors, including that such systems/solutions offered by Supplier are competitive in the discretion of its Affiliates, taking into account economic, financial and technological aspects as well as the ability to perform and deliver in terms of timeframes and logistics, that such systems/solutions comply with specific customer requirements, country-specific requirements or mandatory external regulation and in all cases subject to Applicable Laws.

11

In each case of clause (i) and (ii) above, the above provisions shall apply to the extent that such systems/solutions are needed as components of, or parts for, its other products/services or for its own needs or for reselling; excluding, however, inverters, which may be sourced independently.

(b)     With respect to Sections 4.3(a)(ii), it is hereby agreed that the following shall apply with respect to any requirement to prioritize the purchase of any battery-based energy storage technology systems/solutions that are offered for sale by Supplier:

(i)     (A) any such opportunity described therein is subject to other factors, including that such systems/solutions offered by Supplier are competitive in the discretion of the applicable Affiliate taking into account economic, financial and technological aspects as well as the ability to perform and deliver in terms of timeframes and logistics, that such systems/solutions comply with specific customer requirements, country-specific requirements or mandatory external regulation and in all cases subject to Applicable Laws and (B) the purchase priority obligations contained in Sections 4.3(a)(ii) shall immediately cease to apply with respect to the particular purchase opportunity upon the occurrence of a Terminating Event;

(ii)     Buyer shall cause its Affiliates to consult regarding Supplier's products, solutions and technology and keep regular contact with such applicable Affiliates concerning projects and opportunities for which Supplier's products, solutions and technology may be suitable (each, a "**Potential Project**");

(iii)     Buyer shall cause its Affiliates to notify Supplier of each such Potential Project and support Supplier's preparing bids or proposals therefor, subject to Applicable Law and Third Party contractual restrictions;

(iv)     In the event that Supplier makes a formal bid or proposal with respect to a Potential Project (each, a "**Project Bid**") and such Project Bid is not accepted by the applicable Affiliate, subject to Applicable Law and Third Party contractual restrictions, Buyer shall cause the applicable Affiliate to inform Supplier of the main considerations of such Affiliate, which led to Supplier's Project Bid not being accepted with respect to such Potential Project;

(v)     If Supplier is able to submit a revised Project Bid to the Affiliate (the "**Revised Project Bid**"), and such Revised Project Bid is not accepted, subject to Applicable Law and Third Party contractual restrictions, Buyer shall cause the applicable Affiliate to inform Supplier of the main considerations of such Affiliate which led to Supplier's Revised Project Bid not being accepted with respect to such Potential Project. If Supplier is able to submit a Project Bid and, if applicable, a Revised Project Bid to the applicable Affiliate for the Potential Project and such Revised Project Bid is satisfactory to such Affiliate in all respects and is deemed by such Affiliate in its judgment to be the best bid for the Potential Project, then such Affiliate shall proceed with Supplier's Revised Project Bid. In the event that Supplier is ultimately not chosen by such Affiliate for such Potential Project based on its initial Project Bid or subsequent Revised Project Bid, Buyer shall cause such Affiliate to discuss with Supplier how Supplier can improve the competitiveness of its products, solutions and technology for future offerings.

12

(c)    Subject to Applicable Law, during the period from the Effective Date until the Sunset Date, Supplier will offer its Equipment and Services to Buyer and its Affiliates at Most Favored Nation Pricing in the Pricing Notice.  "**Most Favored Nation Pricing**" shall be reasonably determined by the Supplier by reference to recent (last six (6) months) sales arrangements with customers, resellers or project developers, as applicable, taking into account purchase volumes, regional market conditions, the geographic location of the projects, and the relative size and technology to be used. Supplier shall not be obligated to provide such pricing if it no longer offers the relevant products or services for sale and Supplier shall have no obligations to offer or continue to offer any such products or services for sale. If requested by Buyer, Supplier shall furnish to Buyer a certificate executed by an executive officer of Supplier and attesting to the methodology used by Supplier in determining the Most Favored Nation Pricing set forth in the applicable Pricing Notice. Supplier shall provide Buyer with supporting information concerning the comparable purchase volumes, regional market conditions, the geographic location of the projects, relative size and technology to be used, and any other variables that Supplier considered when determining the Most Favored Nation Pricing; provided that Supplier may always anonymize information about other customers' projects, in Supplier's sole discretion. In the event that Buyer believes the price indicated in the Pricing Notice does not accurately reflect Most Favored Nation Pricing, then the parties shall retain a mutually-agreeable auditing firm to independently and confidentially review Supplier's methodology and pricing inputs and to render a decision regarding whether Supplier must offer a lower price in order to satisfy its Most Favored Nation Pricing obligation as set forth above. The decision of the independent auditor shall be final and binding on both Parties. The costs of the independent auditor shall be shared equally between Supplier and Buyer.

4.4.    <u>Non-Competition</u>.

(a)    Subject to compliance with Applicable Law or regulatory requirements, Buyer agrees that until the earlier to occur of (i) the seventh (7th) anniversary of the Effective Date and (ii) that date on which Buyer and its Affiliates collectively hold Shares representing less than ten percent (10%) of the then outstanding Voting Power, neither it nor its Affiliates will directly or indirectly engage in any Exclusive Activities; provided, however, that beginning on October 1, 2023, if Supplier has not achieved at least $25,000,000 in average annual gross revenues over a rolling period of three fiscal years (such rolling period commencing on October 1, 2020) for Application No. 4 (as set forth on Schedule 1.1(a)), then Buyer, at its sole discretion, may, upon written notice to the other members of Supplier, remove Application No. 4 as an Exclusive Activity for all purposes hereunder). If Buyer removes Application No. 4 as an Exclusive Activity pursuant to this Section 4.4(a), then Application No. 4 shall simultaneously and automatically also be removed as an "Exclusive Activity" under the Siemens Storage Core Frame Purchase Agreement. In addition, if Siemens Industry, Inc. removes Application No. 9 as an "Exclusive Activity" pursuant to the Siemens Storage Core Frame Purchase Agreement, then Application No. 9 shall simultaneously and automatically also be removed as an Exclusive Activity under this Agreement.

13

(b)     Notwithstanding the foregoing, the restrictions set forth in this Section 4.4 shall not affect or prohibit Buyer or its Affiliates from:

(i)     (A) engaging in activities expressly permitted or contemplated herein or in the Key Agreements, or as otherwise approved by Issuer as Supplier's managing member, (B) selling Supplier's Equipment and Services to Buyer's customers with Supplier acting as a sub-supplier to Buyer, or (C) engaging in the development and sale of larger solutions incorporating an Integrated Solution from a Third Party, which is subject to the provisions of Section 4.3 hereof;

(ii)     acquiring and owning, through its venture capital or growth capital activities, a non-controlling interest of up to thirty-five percent (35%) of the equity or debt securities of any legal entity that is engaged in whole or in part in any Exclusive Activity, provided, that the products and/or services of such legal entity that are included within the scope of Exclusive Activities are not sold or marketed by Buyer or its Affiliates;

(iii)     acquiring or owning any debt or equity securities of any legal entity engaged in whole or in part in any Exclusive Activities through any employee benefit or pension plan maintained by Buyer or its Affiliates or solely for purposes of asset or treasury management; or

(iv)     acquiring control of a business or legal entity (an "**Acquired Business**") engaged in whole or in part in any Exclusive Activities (a "**Competing Business**") where the annual revenues attributable to the Competing Business of the Acquired Business over its previous fiscal year were less than both (A) twenty-five percent (25%) of the total annual revenues of the Acquired Business for such fiscal year, and (B) twenty-five percent (25%) of the total annual revenues of the Issuer and its' Subsidiaries for such fiscal year(collectively, the "**Non-Triggering Acquisition Thresholds**"); provided, that the Non-Triggering Acquisition Threshold set forth in clause (B) above shall only apply in the case where the annual revenues attributable to the Competing Business of the Acquired Business over its previous fiscal year were more than $25.0 million; and provided, further, that in each case where revenue is only available for a part of a fiscal year, references to annual revenues in this Section 4.4(b)(iv) and in Section 4.4(b)(v) shall mean the annualized revenues reasonably determined by extrapolation from such partial fiscal year revenues;

14

(v)    either (i) acquiring control of an Acquired Business where at the time of such acquisition the annual revenues attributable to the Competing Business of the Acquired Business over its most recent fiscal year (x) equal or exceed either of the Non-Triggering Acquisition Thresholds and (y) are less than forty percent (40%) of the total annual revenues of the Acquired Business for its most recently completed fiscal year, (ii) acquiring control of an Acquired Business where at the time of such acquisition the annual revenues attributable to the Competing Business of the Acquired Business over its most recent fiscal year (x) equal or exceed forty percent (40%) of the total annual revenues of the Acquired Business for its most recently completed fiscal year and (y) are equal to or less than twenty-five million dollars ($25,000,000) for its most recently completed fiscal year, or (iii) continuing to own and control a Competing Business of an Acquired Business at any time after such acquisition when the non-compete restrictions herein apply, once the annual revenues attributable to the Competing Business of the Acquired Business over its most recent fiscal year equal or exceed both twenty-five percent (25%) of the total annual revenues of the Issuer and its' Subsidiaries for such fiscal year and twenty-five million dollars ($25,000,000) (either such circumstance as described in clauses (i), (ii) or (iii) above, a "**Triggering Event**"); provided, that, within thirty (30) days following the occurrence of such Triggering Event, Buyer shall, or shall cause its Affiliate to, (A) offer to sell the equity interests or assets comprising the Competing Business to Issuer for a price not greater than the Fair Market Value thereof (appropriately taking into account the assumption of liabilities and Indebtedness of (to the extent not included in determining or calculating the purchase price or valuation for)), the Competing Business (which, in the case of a Triggering Event existing as of the closing of an acquisition of an Acquired Business, shall not exceed that portion of the price paid by Buyer or its Affiliate that was allocable in good faith to the Competing Business) (each, a "**Competing Business Offer**") and (B) provide Issuer with such material information regarding the applicable Competing Business, subject to any restrictions of confidentiality or Applicable Law, that Buyer or its Affiliate determines in good faith will permit Issuer to make an informed decision as to whether to accept or reject such Competing Business Offer.

(c)    Buyer or its Affiliate shall provide such additional information regarding the applicable Competing Business, subject to any restrictions of confidentiality or Applicable Law, as may be reasonably requested by Issuer following Issuer's receipt of the Competing Business Offer that it determines is reasonably necessary to permit Issuer to make an informed decision as to such Competing Business Offer.

(d)    In the event that the Issuer accepts a Competing Business Offer, Buyer and Supplier shall (and shall cause their respective Affiliates to) act in good faith to consummate the acquisition of such Competing Business which is the subject of the Competing Business Offer, including with respect to securing financing, either through equity or debt financing, as necessary;

(e)    Issuer shall have eighteen (18) months from receipt of such Competing Business Offer to enter into a legally binding commitment with Buyer or its Affiliate to acquire the Competing Business which is the subject of the Competing Business Offer. In addition, Issuer shall have up to six (6) months after entering into such legally binding commitment to consummate such acquisition, or such longer period as may be reasonably required to obtain any required regulatory approvals. Failure to meet either of the timelines set forth above notwithstanding the good faith efforts of Buyer, Supplier, and their respective Affiliates to consummate the transaction will be deemed to be a rejection of the Competing Business Offer.

15

(f)    In case of rejection of a Competing Business Offer, Buyer or its Affiliate shall be free to continue to own and control the Competing Business.

4.5.    Payment Terms. Unless otherwise provided in a Pricing Notice, all payments for Equipment are due and payable net thirty (30) days following invoice. Payment terms will be mutually agreed in the Purchase Order and may be milestone based such that payments match cost outflow timing and conditions similar to 20%, 30%, 40%, 10% for Order, Delivery, Project Substantial Completion, Project Final Completion. Unless otherwise provided in a Purchase Order, all payments for Services are due and payable net thirty (30) days following invoice based on progress of the Services being performed. Payment(s) shall be by electronic banking method identified on the Purchase Order.  Buyer will not make payments to Supplier in cash or bearer instruments, nor to an account other than that specified in the Purchase Order..  Buyer will make no unlawful payments, nor make payments through any trust, intermediate entity or other party.  Buyer will not make payment(s) to an individual, employee, or other designee of Supplier.

4.6.    Disputed Payments. If a dispute arises regarding the payments to be made hereunder, Buyer or Supplier, as applicable, shall pay all undisputed amounts, and the Parties shall attempt in good faith to resolve the dispute as promptly as practicable.

4.7.    Late Payments. Any amount owed by a Party hereunder beyond the date that such amount first becomes due and payable under this Agreement shall accrue interest from the date that it first became due and payable until the date that it is paid at the lesser of (a) LIBOR plus four percent (4%) per annum or (b) the maximum rate permitted by Applicable Law.

4.8.    Taxes; Export and Import Duties. Notwithstanding anything herein to the contrary, (i) Supplier shall collect and withhold any and all sales taxes arising in connection with or relating to the supply, sale or Delivery of the Equipment and imposed by any Governmental Authority having jurisdiction over Supplier at the Delivery Point and (ii) Buyer shall be responsible for any and all other Taxes arising in connection with or relating to the supply, sale or Delivery of the Equipment, any and all export duties from the jurisdiction or jurisdictions in which the Equipment is manufactured or from which the Equipment may be shipped and any and all import duties, in each case, arising in connection with or relating to the supply, sale or Delivery of the Equipment. Buyer shall also be responsible for and pay all Taxes in relation to the operation of its business, including in connection with the use of the Equipment. Buyer and Seller shall cooperate to obtain exemption from, or to minimize, any Taxes.

**5.    DELIVERY.**

5.1.    Delivery Terms; Inspection. Unless otherwise provided in a Pricing Notice, delivery of Equipment comprised of Batteries shall be made FCA (Incoterms 2010) at facility of the supplier thereof and delivery of all other Equipment shall be FCA (Incoterms 2010) Supplier location. Prior to Delivery a representative of Supplier and a representative of Buyer may inspect the Equipment for damage and record such damage, if any.

5.2.    Guaranteed Delivery Date. Supplier shall use commercially reasonable efforts to Deliver Equipment to the applicable Delivery Point by the applicable guaranteed Delivery date therefore, if any, as set forth in the applicable Purchase Order, subject to extension as provided under this Agreement (as may be extended hereunder, the "**Guaranteed Delivery Date**"). Any other dates in a Purchase Order for performance by Supplier of any work and any other obligations of Supplier pursuant to such Purchase Order are estimated, and not guaranteed, dates. The failure of Supplier to timely achieve such other Supplier milestones or obligations by the applicable dates set forth in the Purchase Order shall not be a breach under this Agreement. Neither the Purchase Order nor any milestone date contained therein, including the Guaranteed Delivery Date for the Equipment, may be changed unless the same has been modified by a duly executed Change Order. If an unexcused delay originates with Supplier or its Representatives, Supplier shall be solely responsible for expedited delivery and other charges to meet Delivery dates.

5.3.    Delay Liquidated Damages. Except as may be otherwise agreed in a Purchase Order, if Delivery of the Equipment has not occurred by the Guaranteed Delivery Date for reasons that are not excused hereunder, and Buyer can prove that as a direct result thereof it must pay delay liquidated damages to its Customer, Supplier shall reimburse Buyer for such delay liquidated damages (such reimbursement not to exceed an amount equal to 0.5% of the price set forth in the Purchase Order allocable to the delayed Equipment for every completed week of delay) for each completed week after the Guaranteed Delivery Date that Buyer pays such liquidated damages to its Customer as a result of Supplier's delay, provided, however, that the amount of delay liquidated damages payable by Supplier shall be reduced by any amounts received by Buyer under any delay in startup insurance policies providing coverage for any such losses or damages. Payment of the delay liquidated damages shall be the sole and exclusive remedy of Buyer for delay and under no circumstances shall the total aggregate liability of Supplier exceed five percent (5%) of the price set forth in the applicable Purchase Order.

5.4.    Buyer Caused Delay. If Buyer fails to perform any obligations under a Purchase Order or otherwise causes a delay in the performance by Supplier of its obligations under a Purchase Order, and such failure or delay results in an increase in Supplier's costs and/or impacts Supplier's ability to meet any Supplier milestone in accordance with the schedule contemplated by the applicable Purchase Order, Supplier shall be entitled to a Change Order increasing the price payable under the applicable Purchase Order and extending the date for completion of any Supplier milestones commensurate with such delay and added cost, including overtime charges for labor and equipment.

**6.    TITLE, RISK OF LOSS AND CARE, CUSTODY AND CONTROL.**

6.1.    Transfer of Title and Risk of Loss. Title, care, custody, control and risk of loss of any portion of the Equipment shall pass to Buyer upon Delivery of the Equipment to the Delivery Point. Notwithstanding the foregoing, in no event will title to the Licensed Technology or any other Intellectual Property used in the Equipment or otherwise provided to Buyer, including any Software, transfer to Buyer.

6.2.    Warranty of Title. Supplier warrants to Buyer that, when title to the Equipment or any portion thereof is transferred to Buyer in accordance herewith, Buyer shall have good title to the Equipment or such portion thereof free and clear of all Liens, other than any such Liens which may arise in connection with Buyer's failure to make payments as they become due under this Agreement. In the event of any nonconformity with the foregoing, Supplier, at its own expense, upon written notice of such failure, shall indemnify Buyer from the consequences of such nonconformity and defend the title to such Equipment, and Supplier shall either promptly replace such Equipment or any affected portion thereof or remedy the title defect.

17

**7.**   **INSPECTION AND QUALITY CONTROL.**

7.1.   Inspection Rights. Supplier shall permit Buyer, its Representatives and/or customer(s), at Buyer's expense, to inspect Equipment/Services during manufacture at Supplier's facilities or during performance and shall use commercially reasonable efforts to facilitate similar inspections at the manufacturing facilities of third party suppliers. Buyer shall provide Supplier with written notice of its intent to make any such inspection not less than ten (10) Business Days prior to the proposed inspection date. Buyer's inspections/tests will not unduly interfere with Supplier's business or the business of its third party suppliers.

7.2.   Quality Control. Supplier shall maintain quality control with respect to the Equipment and Services as mutually agreed upon by the Parties and provide Buyer with quality assurance documentation, manuals or certifications.

**8.**   **WARRANTIES.**

8.1.   Equipment Warranty. Supplier warrants to Buyer that (i) the Equipment as Delivered shall be new at the time of Delivery and shall have been manufactured using new components and (ii) during the Equipment Warranty Period the Equipment shall be free of any Defects (the "**Equipment Warranty**"). As used herein, the "**Equipment Warranty Period**" means the period of time commencing on the earlier to occur of (i) the date that the Equipment is placed into service as evidenced by the operation thereof for commercial purposes and (ii) the day that is sixty (60) days after the date of Delivery of the Equipment and continuing to and ending on the first (1st) anniversary of such date. Notwithstanding the foregoing, (i) the Parties may agree in any particular Purchase Order to address defect warranties with respect to Batteries separately and (ii) any performance guarantees with respect to Batteries shall be solely as set forth in the applicable Purchase Order.

8.2.   Services Warranty. Supplier warrants to Buyer that any Services shall at the time of performance thereof and during the Services Warranty Period be (i) performed in a good and workmanlike manner and free of any fault, defect or deficiency that would preclude or impair the ability of such Services to fulfill the purposes set forth in the applicable Purchase Order therefor in all material respects, (ii) consistent with a level of care, skill and judgment which conforms with Prudent Industry Practices, and (iii) in compliance with the requirements of this Agreement and the applicable Purchase Order (the "**Services Warranty**"). As used herein, the "**Services Warranty Period**" means the period of time commencing on the date of performance of the applicable Service and continuing to and ending on the first (1st) anniversary of such date.

8.3.   Notification Requirements. Buyer shall promptly (but in any event within ten (10) Business Days after obtaining notice or knowledge thereof) notify Supplier of any failure of the Equipment to satisfy the Equipment Warranty or any failure of the Services to satisfy the Services Warranty, in each case by delivering written notice to Supplier of a warranty claim. The written notice of warranty claim shall, to the extent reasonably practicable, identify the applicable failure and the circumstances or conditions observed by Buyer that indicates the presence of such failure.

8.4.    Corrective Action. If, at any time prior to the expiration of the Equipment Warranty Period, either Party discovers any Defect, Supplier agrees that it shall Deliver a replacement for the applicable Defective part, without cost or expense to Buyer. When a Defective part has been Delivered to Buyer, such replaced part shall be covered by the Equipment Warranty until the later of (a) twelve (12) months from the time such replacement part was Delivered to Buyer, and (b) the end of the Equipment Warranty Period. All replacement parts shall be of good and workmanlike quality and shall be new or newly refurbished. If, at any time prior to the expiration of the Services Warranty Period, either Party discovers any failure of the Services to satisfy the Services Warranty, Supplier agrees that it shall, in its sole discretion, either correctly re-perform or otherwise correct the defective Services, without cost or expense to Buyer. When a defective Service has been remedied, such remedied Service shall be covered by the Services Warranty until the later of (a) twelve (12) months from the time such remedy was completed, and (b) the end of the Services Warranty Period.

8.5.    Warranty Exclusions. The Equipment Warranty and the Services Warranty shall not apply if (a) the applicable Defect or failure is attributable to Buyer's failure to operate, repair or maintain the Equipment in material compliance with the procedures set forth in any Supplier Documents furnished to Buyer, which procedures are identified therein as necessary to maintain the effectiveness of the warranties or (b) the applicable Defect or failure is attributable to Buyer's or Buyer's contractor's misuse or abuse of the Equipment (c) if the Equipment has been used in a manner contrary to Supplier's instructions set forth in the Supplier Documents that are identified therein as necessary to maintain the effectiveness of the warranties; (d) the applicable Defect or failure is attributable to any materials or equipment provided by Buyer; or (e) if the Equipment has failed as a result of ordinary wear and tear.

8.6.    NO IMPLIED WARRANTIES. THE WARRANTIES OF SUPPLIER SET FORTH IN THIS AGREEMENT ARE SUPPLIER'S SOLE AND EXCLUSIVE WARRANTIES AND ARE MADE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE. THE REMEDIES SET FORTH HEREIN WITH RESPECT TO SUCH WARRANTIES ARE BUYER'S SOLE AND EXCLUSIVE REMEDIES, AND SUPPLIER'S SOLE AND EXCLUSIVE LIABILITY, FOR ANY BREACH OF SUCH WARRANTIES. OTHER THAN THE WARRANTIES OF SUPPLIER SET FORTH IN THIS AGREEMENT, SUPPLIER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL OTHER EXPRESS WARRANTIES AND ALL OTHER WARRANTIES, CONDITIONS, DUTIES AND OBLIGATIONS, STATUTORY OR OTHERWISE, IMPLIED IN LAW, INCLUDING THOSE OF PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, CUSTOM, USAGE, OR OTHERWISE. THERE ARE NO OTHER WARRANTIES, CONDITIONS, AGREEMENTS, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, OR UNDERSTANDINGS, WHETHER OR NOT IN A CONTEMPORANEOUSLY EXECUTED OR DATED AGREEMENT OR SPECIFICATION, THAT EXTEND BEYOND THOSE SET FORTH HEREIN AND NO OTHER WARRANTIES, CONDITIONS, AGREEMENTS, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, WHICH MIGHT HAVE BEEN GIVEN BY AN EMPLOYEE, AGENT OR REPRESENTATIVE OF SUPPLIER OR ITS AFFILIATES ARE AUTHORIZED BY SUPPLIER.

8.7.    Reserved Rights. Without limiting Supplier's obligations hereunder to remedy Defects, Supplier reserves the right (i) to make changes and improvements in its equipment and products without incurring any obligation to make such changes and improvements to any Equipment previously sold under a Purchase Order pursuant to this Agreement; and (ii) to change the terms of the warranty it provides to other Persons in the future without incurring any right or obligation to make the revised terms applicable to any Equipment previously sold under a Purchase Order pursuant to this Agreement. The provisions of this Section 8.7 shall survive the termination or expiration of this Agreement.

8.8.    <u>Access to Buyer Data</u>. Real time access on a 24/7 basis to all Buyer Data shall be determined on a case by case basis and set forth in the applicable Purchase Order.

**9.    BUYER FURNISHED PROPERTY.**

The term "**Buyer Furnished Property**" shall mean all tools, patterns, equipment, materials or other property which is either supplied by, or purchased by or on behalf of, Buyer or its Representatives to Supplier to perform the Services or furnish the Equipment. Title to Buyer Furnished Property shall remain with Buyer and risk of loss shall be with the Party who has possession. For Buyer Furnished Property in Supplier's possession, custody or control, Supplier shall insure against loss and damage in an amount equal to full replacement cost. Buyer Furnished Property shall carry no guarantee or warranty, express or implied. Supplier shall not use Buyer Furnished Property on any work other than the Equipment/Services. Supplier shall clearly mark Buyer Furnished Property to show Buyer's ownership and prevent a lien, encumbrance or challenge to Buyer's title thereto. Supplier shall, at its own expense, maintain and repair Buyer Furnished Property returning it to Buyer in the condition in which received, reasonable wear and tear excepted. Upon expiration or termination of the Purchase Order, Supplier shall dispose of Buyer Furnished Property as Buyer directs in writing. Buyer reserves the right to abandon Buyer Furnished Property at no additional cost to Buyer. The applicable Purchase Order pursuant to which Buyer Furnished Property was furnished to Seller shall remain in effect so long as Supplier possesses Buyer Furnished Property.

**10.    PACKAGING.**

Except where the Purchase Order includes alternative requirements, Supplier shall be responsible for packaging Equipment, and the clear and conspicuous marking of Equipment and packaging, in accordance with Applicable Law, industry standards and in a manner sufficient to permit efficient handling, to provide adequate protection and comply with requirements of carrier and Applicable Law. Packing slips identifying the Purchase Order number, and part number must accompany each shipment. The exterior of each shipping container or package will be clearly marked with Buyer's Purchase Order number and country of origin, which shall also be marked on Equipment, in a clear, conspicuous and permanent manner. Supplier shall provide all necessary shipping documents, including, but not limited to, customs invoices and packing lists in accordance with Buyer's requirements and Applicable Law. Damages and costs incurred by Buyer, its Representative or customer resulting from Supplier or its Representative's failure to comply with this Article 10 shall be paid by Supplier. If Supplier imports wood packaging materials, in accordance with 7 CFR 319.40, Supplier warrants that such wood packaging material is treated and marked under an official program developed and overseen by the National Plant Protection Organization in the country of export.

## 11.    FORCE MAJEURE.

11.1.    Effect of Force Majeure. A Party shall not be considered to be in breach or default of this Agreement or any Purchase Order hereunder if and to the extent that its failure or delay in performance or its efforts to cure are prevented by Force Majeure.

11.2.    Procedures. If either Party, as a result of the occurrence of a Force Majeure, is rendered wholly or partially unable to perform its obligations under this Agreement or any Purchase Order, such Party shall comply with the following:

(a)    the affected Party shall promptly notify the other Party hereto in writing, and in any event within five (5) Business Days after the affected Party becomes aware of the occurrence of such Force Majeure event, describing in such notice the particulars of the occurrence;

(b)    the affected Party shall give the other Party written notice estimating the event's expected duration and probable impact on the performance of such Party's obligations under this Agreement, and such affected Party shall continue to furnish timely regular reports with respect thereto during the continuation of the event;

(c)    the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the event;

(d)    no liability of either Party which arose before the occurrence of the event causing the suspension of performance shall be excused as a result of the occurrence;

(e)    the affected Party shall exercise all reasonable efforts to mitigate or limit damages to the other Party, promptly taking appropriate and sufficient corrective action, including the expenditure of all reasonable sums of money;

(f)    the affected Party shall use all reasonable efforts to continue to perform its obligations under this Agreement and to correct or cure the event excusing performance; and

(g)    when the affected Party is able to resume performance of the affected obligations under this Agreement, the affected Party shall promptly resume performance and give the other Party written notice to that effect.

11.3.    Termination for Extended Force Majeure. If Supplier experiences a Force Majeure Event completely preventing Supplier's performance for more than forty-five (45) consecutive days, Buyer shall have the right to terminate the applicable Purchase Order and shall be entitled to a refund of all monies advanced to Supplier.

## 12.    CHANGE ORDERS.

12.1.    Change Order. A "**Change Order**" is a written instrument signed by the Parties and stating their mutual agreement upon a change in the obligations of the Parties under this Agreement or any Purchase Order, including if applicable the amount of the adjustment in the purchase price and the extent of any adjustment to the Delivery schedule, including the Guaranteed Delivery Date.

21

12.2.  Change Order Process. In addition to circumstances set forth herein where the Parties are entitled to a Change Order, either Party may request changes in the obligations of the Parties under this Agreement within the scope of this Agreement consisting of additions, deletions, or other revisions to such obligations. If either Buyer or Supplier wishes to change such obligations, it shall submit a change request to the other Party in writing. If the requested change relates to a change to the Equipment supply obligations or results from a condition in which Supplier is entitled to a Change Order under this Agreement, then, within fifteen (15) Business Days following receipt or delivery, as applicable, of the requested change, Supplier shall submit a proposal to Buyer stating (i) the increase or decrease, if any, in the purchase price and changes to the Delivery schedule and/or the Guaranteed Delivery Date, if any, that would result from such change (collectively, the "**Change Order Information**"). If the proposed change relates to any other matter, the requesting Party, at the time the request for the change is made, shall provide the proposed Change Order Information. Within five (5) Business Days following receipt of the Change Order Information, the Parties shall meet and, acting reasonably, negotiate in good faith a mutually acceptable Change Order in accordance with the principles set forth herein. Following agreement on the terms and conditions of the Change Order, the Parties shall execute the same. If the Parties do not agree upon the terms and conditions of the Change Order, and the proposed change relates to circumstances in which a Party is entitled to a Change Order under this Agreement, then either Party may submit the matter to dispute resolution pursuant to Article 24.

12.3.  Change Order Restrictions. Notwithstanding anything herein to the contrary, Buyer shall not be entitled reduce the scope of the Equipment supply obligations under any Purchase Order.

12.4.  No Change. Supplier shall not be obligated to proceed with any change in the Equipment supply obligations requested by Buyer unless and until a Change Order is executed by the Parties in relation to such change. Further, Supplier shall not be required to implement a requested change in the Equipment supply obligations by Buyer if Supplier reasonably believes the implementation of such change would impair Supplier's ability to comply with any of the warranties or the covenants set forth in this Agreement or the applicable Purchase Order.

**13.    INTELLECTUAL PROPERTY.**

13.1.  Grant of License. Upon transfer of title with respect to any Equipment purchased hereunder and upon providing parts under the Equipment Warranty hereunder, Supplier hereby grants to Buyer a non-exclusive, transferable, fully paid-up with no further royalty obligation, worldwide, license in and to, all Intellectual Property owned or licensed by Supplier which are necessary for the use and enjoyment by Buyer of Equipment hereunder (the "**License**") to import into the Territory and use the Licensed Technology (including any Intellectual Property in the Licensed Technology) within the Territory, and solely in accordance with the terms of this Agreement. Such license includes a perpetual license to use software provided for the operation of the Equipment, including but not limited to all modifications or additions to software upon payment of commercially reasonable service charges to be negotiated, as well as all related documentation and technical information. With respect to any Confidential Information contained within the Licensed Technology, Buyer may disclose such Confidential Information to third party contractors who have a need to know such parts of the Licensed Technology solely for Buyer's use and operation of the Equipment and in accordance with the terms of this Agreement; provided that such third parties shall first execute a confidentiality agreement consistent with this Agreement containing restrictions on disclosure and use at least as restrictive as those in Article 17 (and such third party contractors shall not be permitted to disclose the Licensed Technology to any other third party). The Licensed Technology is Confidential Information of Supplier as defined in Section 17.1 even if not marked as "confidential," "proprietary" or with other such similar language, except where an exception in Section 17.3 applies.

22

13.2.     No Copies. Except as otherwise permitted by this Agreement, Buyer shall not make any copies of the Licensed Technology without first obtaining express written permission from Supplier. Notwithstanding the foregoing, Buyer may make such number of copies of (i) the documentation and manuals for the Equipment or other Intellectual Property licensed hereunder that is not embedded in the Equipment as are required for Buyer's normal use and operation hereunder (including such copies as may be included in or attached to electronic mail messages by Buyer for delivery to Persons who are otherwise permitted recipients of Supplier's Confidential Information hereunder) and (ii) the Licensed Technology as are reasonably required for back-up, disaster recovery and archival purposes.

13.3.     Proprietary Notices. Buyer shall not remove or alter, or permit to be removed or altered, any proprietary notices that appear on or with the Licensed Technology. Buyer shall include on and with the Licensed Technology a written notice stating: "Confidential and Proprietary Information of Supplier. Access and Use Restricted by License." or such other or additional notice as Supplier reasonably may prescribe.

13.4.     Security. Buyer shall take all reasonable steps to ensure that no unauthorized persons have access to the Licensed Technology, and to ensure that no persons authorized to have such access shall take any action which would be in violation of this Agreement. Such steps shall include, but shall not be limited to, imposing password restrictions on use of the Licensed Technology securing Buyer's network on which such Licensed Technology resides from outside intrusion, preventing the making of unauthorized copies of the Licensed Technology and administering and monitoring use of the Licensed Technology.

13.5.     No Reverse Engineering. The Licensed Technology includes trade secrets of Supplier or its Affiliates. In order to protect the Licensed Technology, Buyer shall not modify, translate, decompile, reverse engineer, decrypt, extract or disassemble the Licensed Technology or otherwise reduce or attempt to reduce any Software in the Licensed Technology to source code form. Buyer shall ensure, both during and (if Buyer still has possession of the Licensed Technology) after the performance of this Agreement, that (a) Persons who are not bound by a confidentiality agreement consistent with this Agreement shall not have access to the Licensed Technology and (b) Persons who are so bound are put on written notice that the Licensed Technology contains trade secrets, owned by and proprietary to Supplier or its Affiliates.

13.6.     Open Source Software. Buyer shall not sell, sublicense, or otherwise make available the Licensed Technology or any part thereof as Open Source Software, nor combine the Licensed Technology with any Open Source Software in a manner that could require the release, disclosure or distribution of the Licensed Technology, or otherwise infect the Licensed Technology so as to impose any obligation on Supplier or diminish any rights Supplier may have therein.

13.7.     Reporting. Buyer shall promptly report to Supplier any actual or suspected violation of this Article 13, and shall take such further steps as may reasonably be requested by Supplier to prevent or remedy any such violation.

23

13.8.  <u>Relief</u>. Because unauthorized use or transfer of the Licensed Technology is likely to diminish substantially the value of such Licensed Technology and irreparably harm Supplier and will not be susceptible of cure by the payment of monetary damages, if Buyer breaches the provisions of this Article 13, Supplier shall be entitled to injunctive and/or other equitable relief, in addition to other remedies afforded by law, to prevent or restrain such breach.

13.9.  <u>Improvements</u>.

(a)  <u>By Supplier</u>. Any improvement hereafter made by or for Supplier or any of its Affiliates in the Licensed Technology that is approved and adopted by Supplier for use by Buyer under this Agreement shall be included in the Licensed Technology for purposes of the License. The Parties agree that Supplier may decide in its sole discretion which improvements it shall approve and adopt for purposes of Buyer's use under the License; <u>provided</u>, <u>however</u>, that if Supplier makes improvements available to buyers similarly situated to Buyer in terms of project scope and fees paid, Supplier also shall make such improvements available to Buyer on terms at least as favorable to Buyer as the terms generally provided to such similarly situated buyers.

(b)  <u>By Buyer</u>. Buyer may not modify the Licensed Technology except as expressly permitted in this Section 13.9(b). Buyer may suggest modifications in the Licensed Technology to Supplier. Any modification in the Licensed Technology suggested by Buyer must first be approved by Supplier in its sole discretion in writing before it is used by Buyer hereunder. If Buyer develops any material modification or improvement in the Licensed Technology (whether permitted or not), it shall promptly disclose it to Supplier in writing. If and only if, and to the extent, Applicable Law mandates that Buyer own any modifications to or improvements in the Licensed Technology, in whole or in part, and notwithstanding the terms of this Agreement, Buyer hereby grants to Supplier and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free license to make, have made, import, offer for sale, sell, copy, make derivative works, use and sublicense others to use these modifications or improvements.

13.10.  <u>Ownership</u>.

(a)  <u>Supplier</u>. As between the Parties, Supplier or its Affiliates shall own the Licensed Technology, including any modifications, discoveries, derivative works and improvements derived from or based on it, whether developed by Supplier, by Buyer, or by the Parties jointly, all Intellectual Property therein and any Intellectual Property developed during, or arising out of, the performance of Supplier's obligations under this Agreement, to the extent permitted by Applicable Law. Buyer acquires only certain rights to use the Licensed Technology under the License, strictly in compliance with the terms of this Agreement, and does not acquire any ownership rights or title to it.

(b)  <u>Buyer</u>. As between the Parties, Buyer or its Affiliates shall own (1) any Intellectual Property developed or acquired by Buyer prior to or independently of this Agreement, (2) all data generated or collected by the Equipment or Buyer or its customer during the commercial use of the Equipment (the "**Buyer Data**"), and (3) all Intellectual Property therein, excluding in each case any of the Licensed Technology incorporated therein or any Intellectual Property in any combination of the Licensed Technology and Buyer Data.

24

(c)      <u>Cooperation</u>. Buyer shall reasonably cooperate with Supplier to assist in perfecting Supplier's ownership in any Intellectual Property in modifications, discoveries, derivative works and improvements to Licensed Technology developed by Supplier or by the Parties jointly, including by executing declarations, oaths, assignments or other formalities documents as needed.

13.11.    <u>Enforcement</u>. Each Party shall notify the other promptly in writing of any suspected infringement by a third party of the Licensed Technology or any of the Intellectual Property therein. Supplier shall have the exclusive right to enforce and defend the rights appurtenant to the Licensed Technology or the Intellectual Property therein in Supplier's sole discretion and shall have the sole right of control of any such enforcement action or proceeding it elects to initiate (an "**Enforcement Action**"), at Supplier's sole cost and expense. Supplier shall keep Buyer timely and reasonably informed as to significant events during the course of all such Enforcement Actions as would reasonably be expected to affect Buyer's use of the Licensed Technology whether conducted for Supplier's or Buyer's account. Buyer shall provide on Supplier's written request reasonable assistance in preparing and advancing Supplier's case, in consideration of which Supplier shall reimburse Buyer's reasonable out-of-pocket costs incurred in doing so (including reasonable attorneys' fees). Supplier may retain any monetary damages or other compensation or recovery awarded to it in any Enforcement Action under this Section 13.11. Notwithstanding the foregoing, Buyer may participate and be represented in any Enforcement Action by its own counsel at its own expense, to the extent such participation and representation does not materially interfere with Supplier's right to control such Enforcement Action. Supplier shall not settle any such Enforcement Action in a manner materially and adversely affecting Buyer's rights in this Agreement, or in a manner including an admission of wrongdoing by Buyer, without obtaining the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Buyer has no right to enforce Supplier's Intellectual Property in the Licensed Technology against any third parties.

13.12.    <u>Duration and Transfers</u>. Subject to termination in accordance with this Agreement, the License (i) shall continue for so long as Buyer or any successor retains ownership of the Equipment and continues operating the same (ii) shall terminate automatically if and when the Equipment is permanently removed from service (subject to earlier termination in accordance herewith) and (iii) shall transfer as part of an assignment that is permitted under Section 25.5. If Buyer sells or transfers the Equipment, or any portion thereof, apart from an Assignment of this Agreement, the License will terminate as to Buyer with respect to the Equipment, or any portion thereof sold or transferred and Buyer must, as a condition thereof, notify Supplier in writing and assign to the transferee thereof the License with respect to the Equipment, or any portion thereof sold or transferred, and procure from the transferee an assumption of such License, on substantially the same terms as set forth in this Article 13 and in form subject to Supplier's prior reasonable approval, to the extent the License is applicable to the assets being sold or transferred. The License may not be assigned, transferred or sublicensed except as expressly permitted in this Section 13.12. Buyer shall be responsible for, and indemnify, defend and hold harmless Supplier, Supplier's Parent, Supplier's Affiliates, and their respective officers, directors, members, agents and employees from and against any damage, injury or loss resulting from the failure of Buyer to comply with the terms of this Article 13. Supplier may terminate the License, except with respect to any Licensed Technology that is integrated in any Equipment as to which title has transferred to Buyer hereunder, on written notice to Buyer if Buyer (a) fails to cure any material breach of an obligation in this Article 13 which is capable of being cured within thirty (30) days after Supplier's written notice specifying the breach, or (b) on more than two (2) occasions in any five (5) year period, Buyer is found, through resolution of a Dispute, whether by settlement or otherwise, to have materially breached the terms and conditions of this Article 13 in substantially the same manner.

<div align="center">25</div>

13.13.  Government End Users. The Software portion of the Licensed Technology is a "commercial item" as that term is defined at 48 CFR 2.101, and includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 CFR 12.212 and in the event the Licensed Technology is provided to the US Government, such Licensed Technology shall be provided to the US Government only as a commercial end item. Consistent with 48 CFR 12.212, civilian US Government end users acquire the Software and documentation with only those license rights set forth herein as restricted by 48 CFR 12.212(a)(1) and (a)(2); Department of Defense end users acquire the Software and documentation with only those license rights set forth herein as restricted by 48 CFR 227.7202-1 through 227.7202-4.

13.14.  Reservation of Rights. Supplier reserves all rights in the Licensed Technology not expressly granted to Buyer in this Agreement. No right or license is granted (expressly or by implication or estoppel) by Supplier to Buyer or its Affiliates under any tangible, Intellectual Property, or other proprietary right.

**14.  DEFAULTS AND REMEDIES.**

14.1.  Supplier Defaults. The occurrence of any one or more of the following events shall constitute an event of default by Supplier hereunder (a "**Supplier Event of Default**"):

(a)      Supplier fails to pay to Buyer any payment required under this Agreement (which is not subject to a good faith dispute) when due, and such failure continues for ten (10) Business Days after receipt of written notice of such failure;

(b)      Supplier voluntarily commences bankruptcy, insolvency, reorganization, stay, moratorium or similar debtor-relief proceedings, or shall have become insolvent or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors;

(c)      Insolvency, receivership, reorganization, bankruptcy, or similar proceedings shall have been commenced against Supplier and such proceedings remain undismissed or unstayed for a period of ninety (90) days;

(d)      Supplier fails to deliver Equipment by the date upon which Supplier exhausts its liability for liquidated damages for delayed deliveries under Section 5.3; or

(e)      Except as otherwise expressly provided for in this Section 14.1, Supplier is in material breach of its obligations under this Agreement and such material breach continues uncured for sixty (60) days after receipt of written notice from Buyer.

26

14.2.  <u>Buyer Defaults</u>. The occurrence of any one or more of the following events shall constitute an event of default by Buyer hereunder (a "**Buyer Event of Default**"):

    (a)  Buyer fails to pay to Supplier any payment required under this Agreement (which is not subject to a good faith dispute) when due, and such failure continues for ten (10) Business Days after receipt of written notice of such failure;

    (b)  Buyer voluntarily commences bankruptcy, insolvency, reorganization, stay, moratorium or similar debtor-relief proceedings, or shall have become insolvent or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors;

    (c)  Insolvency, receivership, reorganization, bankruptcy, or a similar proceeding shall have been commenced against Buyer and such proceeding remains undismissed or unstayed for a period of ninety (90) days;

    (d)  Any Assignment by Buyer not in conformity with Section 25.5; or

    (e)  Except as otherwise expressly provided for in this Section 14.2, Buyer is in material breach of its obligations under this Agreement and such material breach continues uncured for sixty (60) days after receipt of written notice from Supplier.

14.3.  <u>Remedies</u>. Upon the occurrence of a Supplier Event of Default, Buyer may, by written notice to Supplier, terminate the outstanding Purchase Order(s) under which the Supplier Event of Default has arisen and/or shall be entitled to such rights and remedies as may be available at law or in equity. Upon the occurrence of a Buyer Event of Default, Supplier may, by written notice to Buyer, terminate the outstanding Purchase Order(s) under which the Buyer Event of Default has arisen and/or shall be entitled to such rights and remedies as may be available at law or in equity. Any rights and remedies available under Applicable Law upon termination of this Agreement pursuant to this Section 14.3 shall be limited in all respects by the limitations of liability set forth in Article 16. For sake of clarity, in the event that there are more than one Buyer under this Agreement, (i) a Buyer Event of Default by one such Buyer shall not constitute a Buyer Event of Default by any other Buyer and any remedies available to Supplier shall be exercisable only as against the defaulting Buyer and as regards the non-defaulting Buyer(s) this Agreement and any related Purchase Orders shall continue in full force and effect, and (ii) a Supplier Event of Default with respect to any particular Purchase Order shall only count as a Supplier Event of Default for the applicable Purchase Order and as regards any other Purchase Orders and any other Buyer(s), this Agreement and any related Purchase Orders shall continue in full force and effect.

## 15.  **INDEMNIFICATION.**

15.1.  <u>General</u>. Each Party (the "**Indemnifying Party**") shall indemnify, defend and hold harmless the other Party, its Affiliates, and their Representatives and assigns (the "**Indemnified Party**") from and against all claims, suits, causes of action, losses, liabilities, liens, damages, assessments, costs, expenses, demands, complaints or actions including but not limited to reasonable attorneys' fees and court costs (collectively, "**Claims**") of third parties concerning: (i) death, personal injury, or property damage of third parties, (ii) nonpayment of wages, benefits, fees, amounts owed, and/or any taxes (including penalties and interest) associated therewith arising from the Indemnifying Party's Representatives, suppliers, contractors, and/or materialmen which may include liens or encumbrances on the Equipment/Services or the premises on which located and (iii) violations by the Indemnifying Party or any Person for whom the Indemnifying Party is responsible of Applicable Law; in each case to the extent arising or resulting from the Indemnifying Party's or its Representative's negligence, willful misconduct, or breach of this Agreement. For sake of clarity, if both Parties are negligent or otherwise at fault or strictly liable without fault, then the obligations of indemnification under this Section 15.1 shall continue, but the Indemnifying Party shall indemnify the Indemnified Party only for the percentage of responsibility for the damage or injuries attributable to the Indemnifying Party.

15.2.    <u>Infringement Indemnification by Supplier</u>.

(a)    <u>Indemnity</u>. If an action is brought or threatened against Buyer claiming that Buyer's use, as permitted herein, of the Licensed Technology within the Territory infringes any Intellectual Property arising or existing under Applicable Law, Supplier shall defend, indemnify and hold harmless Buyer, its Affiliates, and their Representatives and assigns at Supplier's expense from and against any and all Infringement Claim Costs of Buyer to the extent arising from such action or claim.

(b)    <u>Corrective Actions</u>. If Buyer's permitted use of the Licensed Technology within the Territory is materially impaired or if Supplier's performance of the Equipment supply obligations under this Agreement or any other obligation is materially impaired by reason of such third party claim, Supplier shall use commercially reasonable efforts, at its expense, to continue its performance of the Equipment supply obligations under this Agreement or the other affected obligations, including at its own election and expense (i) to substitute an equivalent non-infringing item or process for the allegedly infringing item or process, (ii) to modify the allegedly infringing item or process so that it no longer infringes but remains functionally equivalent or better or (iii) to obtain for Buyer the right to continue using such item or process. Supplier shall, prior to proceeding with any of the foregoing actions, consult with Buyer as to the proposed action and consider in good faith any reasonable request of Buyer in respect thereof. Nothing herein constitutes a guarantee by Supplier that such efforts will succeed in avoiding the infringement claim or that Supplier will be able to replace the infringing item or process with an item or process of comparable functionality or effectiveness. If Supplier reasonably believes that an injunction against use of the Licensed Technology in the Territory may be granted against Buyer, either imminently or with the passage of time, Supplier may at its expense, and upon reasonable prior written notice to Buyer, take any of the foregoing actions in order to minimize its liability.

(c)    <u>Exclusions</u>. This Section 15.2 does not apply to, and Supplier assumes no liability with respect to, claims for patent infringement or copyright infringement or improper use of other proprietary rights (including any license or Intellectual Property, whether by way of copyright or otherwise) to the extent that such claims relate, in whole or in part, to (i) Buyer's modification or alteration of the Licensed Technology (except to the extent permitted by this Agreement) or the Equipment, in either case made without Supplier's written consent or contrary to Supplier's instructions, (ii) the combination of the Licensed Technology with other Software, products, materials, equipment, parts or apparatus and not approved in writing by Supplier or (iii) a failure to promptly install an update required by Supplier.

(d)     Entire Liability. THE FOREGOING PROVISIONS OF THIS SECTION 15.2 STATE THE ENTIRE LIABILITY AND OBLIGATION OF SUPPLIER AND ITS AFFILIATES

AND THE EXCLUSIVE REMEDY OF BUYER, WITH RESPECT TO ANY ACTUAL OR ALLEGED INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS OR OTHER INTELLECTUAL PROPERTY BY THE EQUIPMENT OR THE LICENSED TECHNOLOGY OR ANY PART THEREOF, EXCEPT TO THE EXTENT THAT SUCH LIABILITY CANNOT BE EXCLUDED IN ACCORDANCE WITH MANDATORY LEGAL REQUIREMENTS.

(e)     Notifications. Buyer shall promptly notify Supplier in writing following receipt of written notice of any claims alleging infringement of patents or other proprietary rights (including Intellectual Property) in connection with Buyer's permitted use of the Licensed Technology or Supplier's performance of the Equipment supply obligations under this Agreement or Equipment Warranty obligations, and shall provide Supplier with all information in its possession relevant to such claim. In turn, Supplier shall notify Buyer as soon as practical in writing of any claims which Supplier may receive alleging infringement of patents or other proprietary rights which may affect Supplier's performance of the Equipment supply obligations under this Agreement or Equipment Warranty obligations under this Agreement or Buyer's right to own, operate and maintain the Equipment.

15.3.    Infringement Indemnification by Buyer.

(a)     Indemnity. If an action is brought or threatened against Supplier claiming that any condition or event described in Section 15.2(c) results in an infringement upon any Intellectual Property within the Territory arising or existing under Applicable Law, Buyer shall defend, indemnify and hold harmless the Supplier Indemnified Parties at Buyer's expense from and against any and all Infringement Claim Costs of Supplier to the extent arising from such action or claim.

(b)     Corrective Actions. If performance of Supplier's obligations hereunder is enjoined by reason of a claim subject to Section 15.3(a), Buyer shall use commercially reasonable efforts, at its option and expense, at its own election (i) to substitute an equivalent non-infringing item or process for the allegedly infringing item or process, (ii) to modify the allegedly infringing item or process so that it no longer infringes but remains functionally equivalent, or (iii) to obtain for Supplier the right to continue using such item or process. Nothing herein constitutes a guarantee by Buyer that such efforts will succeed in avoiding the infringement claim or that Buyer will be able to replace the infringing item or process with an item or process of comparable functionality or effectiveness.

(c)     Exclusions. This Section 15.3 does not apply to, and Buyer assumes no liability with respect to, claims for patent infringement or copyright infringement or improper use of other proprietary rights (including any license or Intellectual Property, whether by way of copyright or otherwise), to the extent that such claims relate, in whole or in part, to (i) a modification to the Licensed Technology or the Equipment requested by Buyer but executed by Supplier or with Supplier's supervision and control or (ii) the combination of the Licensed Technology with other products, materials, equipment, parts or apparatus approved in writing by Supplier.

29

15.4.    <u>Indemnification Procedures</u>.

(a)    If an Indemnified Party receives written notice of a Claim, the Indemnified Party shall give prompt written notice to the Indemnifying Party, including a reasonably detailed description of the facts and circumstances relating to such Claim, a complete copy of all notices, pleadings and other papers related thereto, and a description in reasonable detail of the basis for the potential claim for indemnification with respect thereto. The Indemnified Party's delay or deficiency in notifying Supplier shall not relieve Supplier of liability or obligation except to the extent (and only to the extent) such delay materially impacts the defense of the Claim.

(b)    The Indemnifying Party shall be entitled to assume the defense and to represent the interests of the Indemnified Party, which shall include the right to select and direct legal counsel and other consultants (all of whom shall be reasonably acceptable to the Indemnified Party), appear in proceedings on behalf of the Indemnified Party and to propose, accept or reject offers of settlement, subject to Section 15.4(c) below, all at its sole cost. Nothing herein shall prevent an Indemnified Party from retaining its own legal counsel and other consultants or participating in its own defense at its own cost and expense. Notwithstanding the foregoing, if (i) the claim is primarily for non-monetary damages against the Indemnified Party, or primarily for an injunction or other equitable relief that, if granted, would reasonably be expected to be material to the Indemnified Party, (ii) there is a material actual or potential conflict of interest that makes representation of the Indemnifying Party and the Indemnified Party by the same counsel or the counsel selected by the Indemnifying Party inappropriate, or (iii) the claim is a criminal proceeding, then in each case the Indemnified Party may, upon notice to the Indemnifying Party, assume the exclusive right to defend (and in the case of clause (iii) above, compromise and settle), such claim and the reasonable fees and expenses of the Indemnified Party's separate counsel shall be borne by the Indemnifying Party; however the settlement of any claim pursuant to clauses (i) and (ii) above shall be governed by Section 15.4(c) below. Notwithstanding anything to the contrary herein, for sake of clarity, the Parties agree that the foregoing provisions shall not be construed so as to permit the Indemnified Party to control or assume the defense of any action, lawsuit, proceeding, investigation, demand or other claim brought against the Indemnifying Party concurrently with or in a joint proceeding in respect of any claim that is the subject of an indemnification claim hereunder by the Indemnified Party.

(c)    Notwithstanding anything to the contrary herein, the Indemnifying Party shall not compromise or settle, or admit any liability with respect to any third party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), unless the relief consists solely of (i) money damages (all of which the Indemnifying Party shall pay), and (ii) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all liability with respect thereto. If the Indemnified Party assumes the defense of or represents their own interests, no settlement shall be made without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

<div align="center">30</div>

15.5.    <u>Limited Waiver of Certain Immunities</u>. Each of the Parties hereby specifically and expressly agrees that with respect to any and all claims against an Indemnified Party by any representative of an Indemnifying Party, any indemnification available hereunder shall not be limited by reason of any immunity to which such Indemnifying Party may be entitled under any workers compensation and/or industrial insurance acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for the Indemnifying Party to such representative with respect to any such claim. For the sake of clarity, the Indemnifying Party's waiver of immunity by the provisions of this section extends only to indemnification claims against the Indemnifying Party by or on behalf of the Indemnified Party under or pursuant to this Agreement, and does not apply to any claims made by the Indemnifying Party's representatives directly against the Indemnifying Party.

15.6.    <u>Survival</u>. The indemnities set forth in this Article 15 shall survive the termination or expiration of this Agreement.

**16.    <u>LIMITATIONS OF LIABILITY</u>.**

16.1.    <u>WAIVER OF CERTAIN DAMAGES</u>. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR ANY PURCHASE ORDER EXECUTED HEREUNDER TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE, WHETHER BASED IN CONTRACT, GUARANTY, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, STRICT LIABILITY, INDEMNITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, FOR: LOSS OF USE, REVENUE, SAVINGS, PROFIT, INTEREST, GOODWILL OR OPPORTUNITY, COSTS OF CAPITAL, COSTS OF REPLACEMENT OR SUBSTITUTE USE OR PERFORMANCE, LOSS OF INFORMATION AND DATA, LOSS OF POWER, VOLTAGE IRREGULARITIES OR FREQUENCY FLUCTUATION, CLAIMS ARISING FROM BUYER'S THIRD PARTY CONTRACTS, OR FOR ANY TYPE OF INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY, COLLATERAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR ANY OTHER LOSS OR COST OF A SIMILAR TYPE.

16.2.    <u>MAXIMUM LIABILITY</u>. SUPPLIER'S MAXIMUM LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE PURCHASE PRICE SET FORTH IN THE APPLICABLE PURCHASE ORDER PURSUANT TO WHICH THE APPLICABLE CLAIM AROSE.

16.3.    <u>EFFECTIVENESS</u>. THE PARTIES AGREE THAT THE EXCLUSIONS AND LIMITATIONS IN THIS ARTICLE 16 WILL PREVAIL OVER ANY CONFLICTING TERMS AND CONDITIONS IN THIS AGREEMENT OR ANY PURCHASE ORDER EXECUTED HEREUNDER AND MUST BE GIVEN FULL FORCE AND EFFECT, WHETHER OR NOT ANY OR ALL SUCH REMEDIES ARE DETERMINED TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE. THESE LIMITATIONS OF LIABILITY ARE EFFECTIVE EVEN IF SUPPLIER HAS BEEN ADVISED BY BUYER OF THE POSSIBILITY OF SUCH DAMAGES. THE WAIVERS AND DISCLAIMERS OF LIABILITY, RELEASES FROM LIABILITY AND LIMITATIONS ON LIABILITY EXPRESSED IN THIS ARTICLE 16 EXTEND TO THE PARTIES' RESPECTIVE AFFILIATES, PARTNERS, PRINCIPALS, MEMBERS SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, SUPPLIERS, AGENTS, AND SUCCESSORS AND ASSIGNS.

16.4.    <u>Commencement of Claims</u>. Except with respect to claims arising under Article 13, Article 15 or Article 17, any legal action of either Party arising under this Agreement or any Purchase Order issued hereunder must be commenced within two (2) years after the Delivery of the applicable Equipment or performance of the applicable Service. To the maximum extent permitted by Applicable Law, each Party hereby waives any right to commence any claim or action after such two (2) year period.

31

**17.    CONFIDENTIALITY.**

17.1.    <u>Confidential Information</u>. Each Party shall, and shall cause its respective Affiliates and Representatives to, keep confidential any information which it may have or acquire before or after the date of this Agreement, concerning the other Party and its assets, business, operations, affairs, financial condition or such information, "**Confidential Information**").

17.2.    <u>Non-Disclosure</u>. Neither Party shall use any Confidential Information in any manner detrimental to the other Party nor shall any of them disclose, publish or make accessible, directly or indirectly, any Confidential Information to any person. In addition, the Parties shall exercise all reasonable efforts to prevent any other person from gaining access to such Confidential Information and take such protective measures as may be or become reasonably necessary to preserve the confidentiality of such Confidential Information.

17.3.    <u>Exceptions</u>. Notwithstanding Section 17.1 and Section 17.2, either Party may disclose Confidential Information:

(a)    to any Representative of such Party, provided that such Representative has a need to know and has been informed of the confidential nature of the information pursuant to Section 17.4;

(b)    to the extent required by (i) any Applicable Law of any Governmental Authority (including any rule or regulation of the Securities and Exchange Commission), (ii) any stock exchange rule or regulation or (iii) any binding judgment, order or requirement of any court or other Governmental Authority of competent jurisdiction; provided, that the Party required to disclose Confidential Information, as the case may be, has delivered written notice to and consulted, to the extent practicable, with the other Party prior to disclosure of such Confidential Information; and

(c)    to the extent such Confidential Information becomes available within the public domain (otherwise than as a result of a breach of this Article 17).

17.4.    <u>Representatives Bound</u>. Each Party shall inform any representative to whom it provides Confidential Information that such information is confidential and shall instruct them (a) to keep such Confidential Information confidential and (b) not to disclose it to any third party (other than those persons to whom such Confidential Information has already been disclosed in accordance with the terms of this Agreement). The disclosing Party shall be responsible for any breach of this Article 17 by the person to whom the Confidential Information is disclosed.

17.5.    <u>Survival</u>. Notwithstanding anything herein to the contrary, the provisions of this Article 17 shall survive the termination of this Agreement for a period of three (3) years and, with respect to each Party, shall survive for a period of three (3) years following the date on which such Party is no longer a Party.

<div align="center">32</div>

**18.    REPRESENTATIONS AND WARRANTIES.**

18.1.    <u>Representations of the Parties</u>. As of the Effective Date (or, with respect to each Further Buyer Contracting Party that becomes a Buyer hereunder, as of the time of execution of a joinder hereto), and as of the entry into of each Purchase Order hereunder, each Party represents to the other Party as follows:

(a)    <u>Due Formation</u>. Such Party (i) is a duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) has the requisite power and authority to own its properties and carry on its business as now being conducted and currently proposed to be conducted and to execute, deliver and perform its obligations under this Agreement, and (iii) is qualified to do business in every jurisdiction in which failure so to qualify could be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(b)    <u>Authorization; Enforceability</u>. Such Party has taken all action necessary to authorize it to execute, deliver and perform its obligations under this Agreement. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable in accordance with its terms, subject to bankruptcy, reorganization, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and subject to general principles of equity.

(c)    <u>No Conflict</u>. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any Applicable Law, (ii) result in any breach of such Party's constituent documents or (iii) conflict with, violate or result in a breach of or constitute a default under any agreement or instrument to which such Party or any of its properties or assets is bound or result in the imposition or creation of any lien or security interest in or with respect to any of such Party's property or assets, other than in each case any such violations, conflicts, breaches or impositions which could not be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(d)    <u>No Authorization</u>. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any third party (other than those which have been obtained) is required for the due execution, delivery and performance by such Party of this Agreement, other than any such authorizations, approvals or actions the failure of which to obtain could not reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(e)    <u>Litigation</u>. Such Party is not a party to any legal, administrative, arbitration or other proceeding, and, to such Party's knowledge, no such proceeding is threatened, before any Governmental Authority that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of this Agreement, the subject matter hereof, or that which could be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

<div align="center">33</div>

18.2.  Additional Representations of Supplier. In addition to representations and warranties set forth elsewhere in this Agreement, Supplier hereby represents and warrants as of the Effective Date and as of the entry into of each Purchase Order hereunder as follows:

(a)  None of Supplier, its Affiliates or Representatives is the target of or designated under any sanctions program that is established by statute or regulation of the United States, by Executive Order of the President of the United States, or by designations of any department or agency of the United States government including but not limited to those designations reflected in the "list of Specially Designated Nationals and Blocked Persons" of the Office of Foreign Asset Control, U.S. Department of the Treasury;

(b)  Supplier's Representatives are legally authorized to work in the United States and Supplier shall complete as required by Applicable Law the Department of Labor's Form I-9 and to retain it for the statutorily designated period and, if requested by Buyer, Supplier shall provide copies of such Forms I-9 to Buyer unless such disclosure shall be prohibited by Applicable Law;

(c)  For Services provided at Buyer's, it's customer or third party's premises, Supplier has examined the worksite in order to acquaint itself with the local conditions, including applicable regulations codes, permits, licenses, registrations, environmental standards, and notification requirements concerning site safety and/or security;

Supplier has not and will not, absent prior written approval from Buyer, take any actions that: (i) create, or purport to create, any obligation on behalf of Buyer, or (ii) grant, or purport to grant, any rights or immunities to any third party under Buyer's intellectual property or proprietary rights; and

(d)  The bank account named by Supplier to Buyer for all payments to be effected in connection with any Purchase Order hereunder is held in Supplier's name and solely for its account.

## 19.  **ENVIRONMENT, HEALTH AND SAFETY.**

19.1.  Compliance and Related Matters.

(a)  Each of the Parties shall, in addition to other obligations set forth in this Agreement, during the course of performance of their respective obligations under this Agreement or any Purchase Order issued hereunder:

(i)  comply with Applicable Laws concerning health, the environment, safety, or pertaining to or regulating pollutants, contaminants, or hazardous, toxic or radioactive substances, materials or wastes, including without limitation the handling, transportation and disposal thereof, or governing or regulating the health and safety of personnel, including but not limited to the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act, and the Toxic Substance Control Act ("**TSCA**"), as amended (collectively referred to as "**EHS Laws**") (pollutants, contaminants, or hazardous, toxic or radioactive substances, materials or wastes as defined under EHS Laws shall be referred to collectively as "**Hazardous Materials**");

34

(ii) take reasonable and prudent measures, as appropriate, consistent with applicable industry standards, to mitigate hazards to the environment and to the health and safety of persons;

(iii) select and use only equipment, including but not limited to personal protection equipment, that comports with EHS Laws, implement programs to train its Representatives in the use of such equipment in a safe and lawful manner, and maintain such equipment in good working order at all times; and

(iv) promptly notify the other Party of any incident involving death, injury or damage to any person or property in connection with any Equipment or Purchase Order.

(b) Supplier shall, in addition to other obligations set forth in this Agreement, during the course of performance of its obligations under this Agreement or any Purchase Order issued hereunder:

(i) ensure that Equipment/Services comply with EHS Laws;

(ii) ensure the Equipment, and any and all parts, components, or material thereof, as Delivered by Supplier, bear all markings, labels, warnings, notices or other information required under applicable EHS Laws at the time of such Delivery; and

(iii) comply with any applicable substance declarations and other requirements set forth in Exhibit C.

19.2. <u>On-Site Environmental and Safety Responsibility</u>. Where the Purchase Order includes the presence of Supplier or its Representatives on the premises of Buyer, Buyer's customer, or any other location other than the premises of Supplier ("**Work Site**"), Supplier shall: (1) be responsible for the safety, health, medical surveillance, industrial hygiene, training and all other matters required under EHS Laws relating to safety and health of its Representatives at the Work Site, (2) appoint a competent person as its representative for environmental, health and safety who shall take part in safety discussions with Buyer, its Representatives, customer, or the owner of the Work Site, (3)  be responsible for the handling, use, transportation and disposal of any and all substances regulated under the EHS Laws which Supplier or its Representatives bring onto the Work Site or generate in the performance of Supplier's work pursuant to the applicable Purchase Order, including but not limited to excess, waste or residue, containers or any of such substances not consumed, and for any spills, releases or discharges of such substances to the extent attributable to acts or omissions of Supplier or its Representatives, strictly in accordance with EHS Laws, and (4) ensure Supplier's Representatives participate in any site-specific safety training and comply with all rules and requirements of Buyer, its customer, or such other owner of the Work Site, in each case, of which Buyer provides Supplier advance written notice.

19.3. <u>Health and Safety Plan</u>. Prior to commencing any Services at a Work Site, Supplier shall, in accordance with EHS Laws provide and comply with a site specific health and safety plan, Work Site requirements, and shall make the same available to Buyer or its Representatives at Buyer's request. If Supplier fails to comply with this Article 19, Buyer may, at its sole option and without limiting its other rights, order Supplier or its Representatives to cease Services until Supplier complies at Supplier's sole cost and expense. If Supplier is unable or refuses to take corrective action hereunder Buyer may contract with a third party or otherwise continue such Services at the Work Site and charge Supplier any excess cost reasonably incurred by Buyer. Buyer shall have the right, at its sole discretion, to remove Supplier or its Representatives from a Work Site for violation of this Article 19.

<center>35</center>

**20.**    **OPEN SOURCE SOFTWARE.**

Supplier shall inform Buyer no later than ten (10) Business Days following receipt of any written request from Buyer in connection with a Purchase Order, whether the Equipment/Services contemplated thereby include "Open Source Software." As used herein "**Open Source Software**" means any Software that is licensed royalty-free (i.e., fees for exercising the licensed rights are prohibited, whereas fees for reimbursement of costs incurred by licensor can be permitted) under any license terms or other contract terms ("**Open License Terms**") which require, as a condition of use, modification and/or distribution of such Software and/or any other Software incorporated into, derived from or distributed with such software ("**Derivative Software**"), either of the following: (i) that the source code of such Software and/or any Derivative Software be made available to third parties; or (ii) that permission for creating derivative works of such software and/or any Derivative Software be granted to third parties. If Open Source Software is included, Supplier shall deliver to Buyer, not later than the date of order confirmation, (A) a schedule of all Open Source Software files known to be used, indicating the relevant license(s) to the extent known by Supplier; and (B) a written notice that Supplier is not aware of any violation of such license(s) due to such Use of Open Source Software.

**21.**    **EXPORT CONTROL AND FOREIGN TRADE REGULATIONS.**

21.1.    Acknowledgement and Compliance. The Parties acknowledge that all Equipment to be delivered and Services to be provided according to this Agreement are subject to export control and sanctions laws and regulations, including, without limitation, the U.S. Export Administration Regulations ("**EAR**") (15 C.F.R. §§ 730-774), the U.S. Foreign Trade Regulations (15 C.F.R. Part 30), and the regulations, rules, and executive orders administered by OFAC (collectively, the "**Export Controls and Sanctions Laws**"). Each Party agrees to comply with all Export Controls and Sanctions Laws applicable to any such Equipment/Services and shall not take any action that will cause the other Party to violate or be subject to penalty under the Export Controls and Sanctions Laws.

21.2.    Export Licenses. Supplier shall obtain all necessary export licenses, unless Buyer or any party other than Supplier is required to apply for the export licenses pursuant to the applicable Export Controls and Sanctions Laws. To the extent Supplier is requested to deliver Equipment/Services regulated under the Arms Export Control Act or the Atomic Energy Act, Supplier shall advise Buyer in advance of order or contract acceptance.

21.3.    Provision of Trade Data. At the request of Buyer, Supplier shall provide Buyer for Equipment and Services delivered the following trade data as applicable: (i) "Export Control Classification Number" according to the EAR's Commerce Control List (ECCN) or the Munitions List Category Designation according to the US International Traffic in Arms Regulations, and all other export control list numbers; (ii) the statistical commodity code according to the current commodity classification for foreign trade statistics and the HS (Harmonized System) coding; (iii) the country of origin (non-preferential origin); and (iv) Supplier's declaration for preferential origin (in case of European suppliers) or preferential certificates, Supplier's declaration for preferential origin (in case of European suppliers) or preferential certificates (in case of non-European suppliers) such as NAFTA certificates of origin.

<div align="center">36</div>

21.4.    <u>Changes</u>. In the event Supplier has knowledge of any alterations to origin and/or characteristics of the Equipment/Services, it shall notify the Buyer not later than ten (10) Business Days after discovery thereof.

21.5.    <u>Additional Buyer's Obligations</u>. Buyer agrees that it will not, in violation of applicable Export Controls and Sanctions Laws:

(a)    directly or indirectly, export, reexport, or transfer Equipment or Services to, or transship Equipment or Services through, a Sanctioned Country;

(b)    directly or indirectly, release, sell, provide, export, reexport, transfer, divert, loan, lease, consign, allow access to, or otherwise dispose of Equipment or Services to a Prohibited Person; or

(c)    use Equipment or Services to produce products that will be shipped, sold, or supplied, directly or indirectly, to a Sanctioned Country or a Prohibited Person.

21.6.    <u>Certain Relief</u>. No Party shall be obligated to fulfill this Agreement if such fulfillment is prevented by any impediments arising out of national or international foreign trade or customs requirements or any embargoes or other sanctions.

**22.    <u>BUYER CODE OF CONDUCT</u>.**

Supplier shall comply with the principles and requirements of the "Code of Conduct for AES Suppliers and Third Party Intermediaries" attached hereto as Exhibit D (hereinafter the "**Code of Conduct**"). If and as requested by Buyer, Supplier shall, not more than once a year (at its option), provide to Buyer either (A) a written self-assessment in substantially the form provided by Buyer or (B) a written report reasonably acceptable to Buyer describing the actions taken or to be taken by Supplier to assure compliance with the Code of Conduct. In addition to any other rights and remedies Buyer may have, in the event of Supplier's material or repeated failure to comply with the Code of Conduct, after providing Supplier reasonable notice and a reasonable opportunity to remedy, Buyer may terminate any outstanding Purchase Orders under this Agreement without any liability whatsoever. Material failures include, but are not limited to, incidents of child labor, corruption and bribery. The notice and remedy provisions herein shall not apply to material failures set forth in the preceding sentence.

**23.    <u>COMPLIANCE WITH LAWS AND PERMITS</u>.**

The Parties and their Representatives shall comply with all Applicable Laws in the course of the performance of their respective obligations under this Agreement and any Purchase Orders issued hereunder. In addition, Supplier and Buyer shall each obtain all required licenses, permits, authorizations, registrations or approvals required with respect to the performance of their respective obligations under this Agreement and any Purchase Orders issued hereunder.

37

**24.    DISPUTE RESOLUTION.**

24.1.    <u>Referral to Senior Management</u>. Except as otherwise provided by this Agreement, any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof (which breach or alleged breach by a Party remains uncured within ten (10) Business Days after receipt of written notice thereof from another Party) or the validity or termination hereof or the relationship created between the Parties by and/or through this Agreement (a "**Dispute**") shall first be settled as far as possible by good faith negotiations between the parties to the Dispute, in the form of meetings between senior- management level representatives of such Parties, upon the written request by any such Party to the other parties to the Dispute, which writing shall set forth in reasonable detail the nature and extent of the Dispute.

24.2.    <u>Referral to Arbitration</u>. If the parties to the Dispute are unable for any reason to resolve a Dispute within thirty (30) days after receipt by any Party of written notice of a Dispute, then any Party may submit the Dispute to arbitration to be finally and exclusively resolved under the Arbitration Rules of the American Arbitration Association ("**AAA**") then in effect, except as modified herein, with respect to Equipment and Services to be provided to a Customer with the United States (as applicable, the "**Rules**"). There shall be three (3) arbitrators. If there are two (2) parties to the Dispute, each of the parties to the Dispute shall nominate one (1) arbitrator in accordance with the Rules. If there are more than two (2) parties to the Dispute, the arbitrators shall be nominated in accordance with the Rules; provided, however, that any Party and its Affiliates shall be entitled to nominate only one (1) such arbitrator. The arbitrators so nominated, once confirmed by the AAA, shall nominate an additional arbitrator to serve as chairman, such nomination to be made within fifteen (15) days of the confirmation by the AAA of the second arbitrator. If the initial arbitrators shall fail to nominate an additional arbitrator within such fifteen (15) day period, such additional arbitrator shall be appointed by the AAA. The arbitrators shall be required to submit a written statement of their findings and conclusions. Except as otherwise agreed by the parties to such Dispute, exclusive venue of arbitration with AAA will be Wilmington, Delaware, and the language of the arbitration shall be English. Each of the Parties will submit to the non-exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware for preliminary relief in aid of arbitration and for the enforcement of any arbitral award from AAA. By agreeing to arbitration, the Parties do not intend to deprive any national court of its jurisdiction to issue any pre-arbitral injunction, pre-arbitral attachment or other order in aid of arbitration proceedings.

24.3.    <u>Neutral Arbitrators</u>. None of the Parties or the arbitrators shall select any arbitrator for the arbitral tribunal who has any interest in the Dispute or who has, or within the immediately preceding five (5) years has had, any economic or other relationship with any party to the Dispute.

24.4.    <u>Procedures and Costs</u>. The arbitrators shall not have the right to award consequential, incidental, indirect, special, treble, multiple or punitive damages. The arbitral tribunal shall not be empowered to decide any dispute ex aequo et bono or amiable compositeur, and the arbitral tribunal shall decide the Dispute under the substantive laws of the State of Delaware, without regard to applicable choice of law provisions thereof. The arbitration award shall be decided by majority opinion and issued in writing in the English language and shall state the reasons upon which it is based. It may be made public only with the consent of each participating Party or as may be required by law or regulatory authority or as necessary for enforcement of such award. The arbitrators shall allocate the fees and costs of the arbitration. The losing Party(ies) shall pay the prevailing Party(ies)' attorney's fees and costs and the costs associated with the arbitration, including the expert fees and costs and the arbitrators' fees and costs borne by the prevailing Party(ies), all as determined by the arbitrators. Each Party shall bear its own fees and costs until the arbitrators determine which, if any, Party is the prevailing Party(ies) and the amount that is due to such prevailing Party(ies).

38

24.5.    Award. The award rendered by the arbitrators shall be final and binding on the participating Parties and shall be the sole and exclusive remedy between and among the participating Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal. The award shall be issued no later than one hundred twenty (120) days from the signing or ratification of the Terms of Reference (as defined in the Rules) or as soon thereafter as practicable. The award shall be paid within thirty (30) days after the date it is issued and shall be paid in U.S. Dollars in immediately available funds, free and clear of any Liens, Taxes or other deductions. A judgment confirming or enforcing such award may be rendered by any court of competent jurisdiction.

24.6.    Confidentiality. The arbitration shall be confidential. No Party may disclose the fact of the arbitration, any award relating thereto or any settlement relating to any Dispute without the prior consent of the other Party(ies); provided, that such matters may be disclosed without the prior consent of the other Party(ies) to lenders, auditors, tax or other Governmental Authority or as may be required by law or regulatory authorities or as necessary to enforce any award.

24.7.    Continued Performance; Provisional Remedies. Notwithstanding the existence of any Dispute, the Parties shall continue to perform their respective obligations under this Agreement unless the Parties otherwise mutually agree in writing. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent the Parties from seeking temporary injunctive relief at any time as may be available under Law or in equity to preserve its rights pending the outcome of any arbitration. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies or order the Parties to request that a court modify or vacate any temporary or preliminary relief issued by a court, and to award damages for the failure of any Party to respect the arbitral tribunal's orders to that effect. The Parties agree that any issue regarding the arbitrability of any claims or disputes arising under, relating to or in connection with this Agreement is an issue solely for the arbitrators, not a court, to decide.

24.8.    Waiver of Jury Trial. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY OR OTHERWISE ON ANY CLAIM, CAUSE OF ACTION, SUIT OR PROCEEDING PERMITTED UNDER THIS ARTICLE 24. THE PROVISIONS OF THIS AGREEMENT RELATING TO WAIVER OF TRIAL BY JURY SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.

**25.    MISCELLANEOUS.**

25.1.    Governing Law. This Agreement shall be controlled by and construed in accordance with the substantive laws of the State of Delaware without regard to conflict of laws principles. The United Nations Convention on Contracts for the International Sale of Equipment of April 11, 1980 shall be excluded.

39

25.2.     Records. Supplier and its Representatives shall maintain accurate and complete records of all contracts, papers, correspondence, copybooks, applications, accounts, invoices, and/or other information reasonably relating to this Agreement and any Purchase Orders issued hereunder (collectively, "**Records**") in accordance with recognized commercial accounting practices, and shall retain such Records for a period of seven (7) years unless a longer period is required under Applicable Law.

25.3.     Intentionally Omitted.

25.4.     Insurance. Supplier and its Representatives shall comply with the Insurance requirements set forth in Exhibit E attached hereto.

25.5.     Assignment; Successors. Neither Party may assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any purported assignment which fails to comply with the requirements of this Section 25.5 shall be null and void. Notwithstanding the foregoing: (i) either Party may, without the prior written consent of the other Party, assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, to an Affiliate, which will accept such assignment and assume all obligations related to this Agreement and any applicable Purchase Orders (including by executing a joinder to this Agreement in the form of Exhibit B hereto); provided that, notwithstanding any such assignment, the assigning Party shall not be relieved of any of its obligations hereunder by reason of such assignment and shall remain liable hereunder to the same degree that the assigning Party would be responsible had there been no assignment.

25.6.     Subcontracting. Supplier shall be solely responsible for the proper selection, supervision, acts and omissions of its subcontractors.

25.7.     Other Terms and Amendments. The terms and conditions contained in any sales order, acknowledgment, invoice, website, letter, writing, software or file (such as "clickwrap", "shrinkwrap", or website terms of use), or other document or medium shall not be applicable or amend this Agreement or any Purchase Order issued hereunder nor bind the Parties hereto or their Affiliates or Representatives. This Agreement and any Purchase Order issued hereunder may only be amended by a written instrument signed by authorized Representatives of the Parties.

25.8.     Government Contracts. When the Equipment/Services are to be used in the performance of a contract or subcontract with a Governmental Authority, applicable government contract requirements attached to this Agreement shall apply and are incorporated herein by reference.

25.9.     Relationship of the Parties. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, employee-employer relationship, trust or other association of any kind between the Parties and each Party shall be individually responsible only for its obligations as set forth in this Agreement. Any Services provided by Supplier, its Affiliates and Representatives pursuant to this Agreement are provided as independent contractors of Buyer and not in the capacity of an employee or agent of Buyer.

25.10.  <u>Publicity</u>. No Party hereto shall refer to or use, or permit any persons to refer to or use, any other Party's name, trademarks, service marks or logos in any advertising, promotional materials, press releases or other publicity without obtaining the prior written consent of the applicable Party.

25.11.  <u>Non-Exclusive Remedies and Non-Waivers</u>. No delay or omission by the Parties in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy nor shall it be construed as a bar to or waiver of any such right or remedy on any future occasion. Any waiver authorized on one occasion must be made in writing and is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion. The rights and remedies of the Parties herein shall not be exclusive and are in addition to any other rights and remedies provided by Applicable Law or in equity.

25.12.  <u>Severability</u>. Any provision of this Agreement or any Purchase Order issued hereunder that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof (provided the substance of the agreement between the Parties is not thereby materially altered), and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Laws, the Parties hereto hereby waive any provision of Applicable Law which renders any provision hereof prohibited or unenforceable in any respect.

25.13.  <u>Survival</u>. The Title and Risk of Loss, Warranties, Intellectual Property, Defaults and Remedies, Indemnification, Limitations of Liability, Confidentiality, Export Control and Foreign Trade Regulations, Dispute Resolution and Miscellaneous sections of this Agreement, and any provision that contemplates performance or observance subsequent to termination or expiration shall survive termination or expiration of this Agreement.

25.14.  <u>Affirmative Action</u>. Supplier shall, to the extent applicable, comply with Buyer's requirements as promulgated by the U.S. Department of Labor, Office of Federal Contract Compliance Programs set forth in Exhibit F.

25.15.  <u>Complete Agreement and Counterparts</u>. This Agreement, together with all Purchase Orders issued hereunder, shall constitute the entire agreement between Buyer and Supplier and shall supersede all previous communications, representations, agreements or understandings, whether oral or written, with respect to the subject matter hereof. The headings used in this Agreement are for reference and shall not limit or affect the meaning or interpretation of any of the terms hereof. Upon the effectiveness of this Agreement, the Prior Agreement shall be deemed amended and restated and superseded and replaced in its entirety by this Agreement, and shall be of no further force or effect.

25.16.  <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

25.17.  <u>No Pre-Printed Terms</u>. Pre-printed terms or conditions in any invoice, quotation, shipping notice or order acknowledgement issued by Buyer or Supplier shall be of no force or effect, except to the extent included in a Pricing Notice. The terms and conditions applicable to each Purchase Order issued by Buyer shall be those set forth herein and in such Purchase Order and the applicable Pricing Notice therefor.

25.18.  <u>Priority</u>. In the event of inconsistency between or among the provisions of this Agreement, a Purchase Order and the applicable Pricing Notice therefor, the following order of precedence, from highest to lowest, shall govern:

(a)  mutually agreed Change Orders;

(b)  Purchase Order;

(c)  this Agreement.

25.19.  <u>Notices</u>.

(a)  All notices and other communications which either Party is required or may desire to serve upon the other shall be addressed to the Party to be served as follows, unless a different address is designated in writing by the Party to be served:

To Buyer:

AES Grid Stability, LLC
4300 Wilson Boulevard
Suite 1100
Arlington, VA 22203
Attention: Paul Freedman, General Counsel of The AES Corporation
Email: paul.freedman @aes.com

With a copy to:

AES Grid Stability, LLC
4300 Wilson Boulevard
Suite 1100
Arlington, VA 22203
Attention: Chris Shelton, Senior Vice President, Chief Product Officer and President, AES Next
Email: chris.shelton@aes.com

To Supplier:

Fluence Energy, LLC
4602 N. Fairfax Drive
Suite 600
Arlington, VA 22203
Attn: Dennis Fehr, SVP and Chief Financial Officer
Email: dennis.fehr@fluenceenergy.com

42

With a copy to:

Fluence Energy, LLC
4601 N. Fairfax Drive
Suite 600
Arlington, VA 22203
Attn: Francis A. Fuselier, SVP, General Counsel and Secretary
Email: frank.fuselier@fluenceenergy.com

(b)     All notices, requests, consents and other communications under this Agreement must be in writing and shall be deemed to have been duly given and effective (i) immediately (or, if not delivered or sent on a Business Day, the next Business Day) if delivered or sent and received by electronic mail, (ii) on the date of delivery if by hand delivery (or, if not delivered on a Business Day, the next Business Day) or (iii) on the first Business Day following the date of dispatch (or, if not sent on a Business Day, the next Business Day after the date of dispatch) if by a nationally recognized overnight delivery service (all fees prepaid). In the case of notice via email, each Party shall provide confirmation of receipt or non-receipt upon the request of the transmitting Party.

(c)     All notices, requests, consents and other communications under this Agreement shall include reference to the applicable Purchase Order number, if any.

25.20.   <u>Joint Effort</u>. Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other. Any rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, or any amendments or Exhibits hereto.

25.21.   <u>Language of the Agreement, Correspondence, Documentation</u>. The language of this Agreement shall be English. Unless to the extent agreed otherwise, correspondence, technical and commercial documents as well as any other information exchanged between the Consortium Members relating to this Agreement shall be in English.

[SIGNATURE PAGE FOLLOWS]

43

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first below above.

**AES Grid Stability, LLC**

By: _____
Name:
Title:

**Fluence Energy, LLC**

By: _____
Name:
Title:

By: _____
Name:
Title:

[Signature Page to AES Amended and Restated Storage Core Frame Purchase Agreement]

**Schedule 1.1(a)**

The information contained in columns C and D is provided for informational purposes only. For purposes of this Agreement, the definition of "**Applications**" shall include Column E.

| A | B | C | D | E |
|---|---|---|---|---|
| *No* | *Application* | *Typical Customer* | *Typical system Size in MW* | *Definition* |
| 1 | Flexible capacity | Power Plant | 50 to 100 MW | Flexible capacity is the use of energy storage as a substitute for peak generating capacity or to meet flexible dispatch ability needs in order to secure grid stability. Such fast acting power sources are an integral part of the grid to provide the required flexible capacity. The control system is designed such to monitor the grid condition, recognize the need and acts immediately until the grid returns to stable condition, or to be dispatched by the grid operator. The system is connected to Grids with a Voltage level > 1kV. The control system makes sure the storage is at the needed stage of charge (subject to setting) |
| 2 | Conventional hybrid | Power Plant | up to 10MW | Conventional hybrid is the use of energy storage in conjunction with a conventional generation resource to react on e.g. peak demands. The system is connected to Grids with a Voltage level > 1kV. The storage is monitoring and acting based on its own control system |
| 3 | Frequency Control | TSO / DSO & PP / Investor | up to 50MW and greater single system size | Frequency regulation is the use of energy storage to regulate electric system frequency as a primary, secondary, or contingency reserve resource. Energy Storage system is installed usually before the meter and secures the power grid frequency within the frequency band defined by the regulator. Spinning reserve is a subset of frequency control to deliver the mandatory reserve power out of a storage unit instead of a Power Plant. The system is connected to Grids with a Voltage level > 1kV. |
| 4 | Renewable hybrid | TSO / DSO & PP / Investor | up to 5MW | Renewable hybrid is the use of energy storage in conjunction with a renewable generation resource; (e.g. wind and solar) to control (integral control system) the ramp-up and ramp-down of the power generation or to make the power injection into the power grid stable in relation to the forecast considering parameter such as weather forecast. The system is connected to Grids with a Voltage level > 1kV. |
| 5 | T&D investment/ replacement deferment | TSO / DSO | up to 10MW | Transmission and distribution investment, replacement and deferral is the use of energy storage to replace or defer investment in new conventional electric transmission or distribution infrastructure assets. The system is connected to Grids with a Voltage level > 1kV. The storage is monitoring and acting based on its TSO / DSO up to 10MW own control system |
| 6 | T&D capacity release | TSO / DSO | up to 10MW | Transmission and distribution capacity release is the use of energy storage to improve the utilization of existing conventional electric transmission or distribution infrastructure assets. The system is connected to Grids with a Voltage level > 1kV. The own Storage control system is monitoring the grid conditions and takes corrective action if needed |

| No | Application | Typical Customer | Typical system Size in MW | Definition |
|---|---|---|---|---|
| 7 | Microgrid and Islands* | On shore Microgrid owners and utilities on geographical islands | 1-3MW | Energy Storage systems combined with a Microgrid controller providing the micro or island grid master role resulting in a maximized usage of renewable power generation vs. conventional power generation on a geographical or grid island while keeping system voltage and frequency stable monitored and controlled by the storage control systems.  Improving the efficiency of conventional diesel generation where applicable.  The system is connected to Grids with a Voltage level > 1kV. |
| 8 | Power Quality (MS UPS)* | Industry / Transportation | 1-25MW | Energy Storage system placed behind the meter typically in an industrial environment injecting power in case of grid failure and or voltage dip.  The ability to disconnect ultrafast (<10ms) from the grid to avoid the storage feeding a grid failure.  In addition the system can bridge 15 to 30 minutes power interruption, possibly combined with a diesel power generation.  The system operates on Voltage level > 1kV. The storage control system is monitoring and acting driven by its on control system. |
| 9 | Consumer peak shaving (demand charge mgmt.) | Industry / Transportation | 1-25MW | Consumer peak shaving, the use of energy storage to reduce an electric consumer's bill, optimize an electric consumer's consumption, or to provide other reliability services to the electric consume r.  This energy Storage system is placed behind the meter.  The system operates on Voltage level > 1kV.  The 1 – 25 MW storage control system is monitoring and acting automatically following the given settings. |
| 10 | Black start | Gas Turbine power Plants and wind power generation | 1-25MW | Black start, the use of energy storage to support generation start-up during recovery from a partial or total shutdown of an electric system as an emergency Gas turbine start up solution.  The Energy Storage system providing power according a defined process until ignition of a gas turbine.  The system operates on Voltage level > 1kV.  The initiation of the Black Start is usually manually, the control system makes sure the black star process as such is following a defined procedure. |

\* Included in the definition of "**Application**" solely for purposes of Section 4.3.

**Exhibit A**

**Form of Purchase Order**

The following sets forth the minimum terms and conditions to be included on a Purchase Order under this Agreement, which terms and conditions may be modified or supplemented by the mutual agreement of the Parties:

Equipment:

1. Type of Equipment

2. Quantity of Equipment

3. Unit Price of Equipment

4. Total Price of Equipment on this Purchase Order

5. Manufacturing Location

6. Incoterms and Delivery Location

7. Guaranteed Delivery Date

8. Insurance

9. Equipment Warranty Period

10. IP/Software Terms

11. Supplier Documents

12. Technical Specifications

13. Special Packaging Requirements

Services:

1. Type of Services

2. Amount of Services

3. Price of Services

4. Total Price of Services on this Purchase Order

5. Performance Location

6. Performance Date(s)

7. Insurance

8. Services Warranty Period

9. IP/Software Terms

10. Supplier Documents

11. Specifications

Other Terms:

1. Electronic Banking Method for Payments

2. Buyer Furnished Property

**EXHIBIT B**

**Joinder Agreement Template**

**This Joinder Agreement (the "Joinder Agreement") to the Amended and Restated Storage Core Frame Purchase Agreement, dated _____, 2021 between AES GRID STABILITY, LLC and FLUENCE ENERGY, LLC is made and entered into**

**by and between**

**\_\_\_**
**with its registered seat in [Place], [Country]**

**- hereinafter referred to as "Supplier" -**

**and**

**AES (Local Company) \_\_\_,**
**with its registered seat in [Place], [Country]**

**- hereinafter referred to as "Buyer" -**

**- Supplier and Buyer are hereinafter individually**
**referred to as a "Party" and collectively as the "Parties" -**

WHEREAS, Supplier and **AES GRID STABILITY, LLC** ("AES") entered on XXXXX, 2021 into the Amended and Restated Storage Core Frame Purchase Agreement (the "Agreement") which is attached hereto as <u>Annex 1</u>;

**WHEREAS,** Buyer is an Affiliate of AES and wishes to become a party to the Agreement and to adopt the terms and conditions thereof, and consequently Supplier and Buyer wish to enter into this Joinder Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and premises contained herein, the Parties agree as follows:

**ADOPTION OF THE AGREEMENT**

a)  Buyer hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, Buyer shall be deemed a party to the Agreement for all purposes of the Agreement, and shall have all of the obligations of a "Buyer" under the Agreement, as though an original party to the Agreement. Buyer hereby ratifies, as of the date hereof, and agrees to be bound by, and subject to, all of the covenants, terms, provisions and conditions applicable to "Buyer" contained in the Agreement. The terms and conditions as set out in the Agreement are incorporated herein by reference and are made applicable between the Parties.

b)  Without limiting the generality of the foregoing, Buyer hereby represents and warrants that each of the representations and warranties of "Buyer" contained in the Agreement is true and correct as of the date of the execution and delivery of this Joinder Agreement.

c)  This Joinder Agreement shall be controlled by and construed in accordance with the substantive laws of the State of Delaware without regard to conflict of laws principles.

d)  This Joinder Agreement contains the entire agreement between the Parties and supersedes any and all prior negotiations, correspondence, understandings between the Parties concerning the subject matter hereof. It may not be changed orally, but only by an agreement in writing signed by both Parties hereto.

e)  This Joinder Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Joinder Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

**SPECIFIC STIPULATIONS UNDER THIS JOINDER AGREEMENT**

[**ONLY** country specific deviations from the Agreement are to be stipulated here.]

a)    [Delivery and Payment terms]

b)    [Term and Termination]

c)    [Country specific regulations (jurisdiction, governing law, tax etc.)]

d)    ...

---

**SPECIFIC STIPULATIONS UNDER THIS JOINDER AGREEMENT**

[**ONLY** country specific deviations from the Agreement are to be stipulated here.]

a)    [Delivery and Payment terms]

b)    [Term and Termination]

c)    [Country specific regulations (jurisdiction, governing law, tax etc.)]

d)    ...

**ORDER OF PRECEDENCE BETWEEN THE AGREEMENT AND THE ADOPTION AGREEMENT**

In the event of any conflict or inconsistency between the terms of this Joinder Agreement and the Agreement, the Joinder Agreement shall prevail over the Agreement.

**Supplier**                                   **Buyer**

Place, Date:                                   Place, Date:

_____                        _____

_____        _____        _____

Name:                                          Name:                                          Name:

_____        _____        _____
        (Print)                                        (Print)                                        (Print)

Title:                                         Title:                                         Title:

_____        _____        _____

**Annex 1**: Amended and Restated Storage Core Frame Purchase Agreement

**Exhibit C**

**Substance Declaration**

If Supplier furnishes Equipment that are subject to restrictions, rules or regulations for Hazardous Materials or other substances comprising, part of or contained in such Equipment, including but not limited to statutes, rules, regulations, codes, rules, standards and requirements of (1) EHS Laws, (2) governing, controlling or regulating Hazardous Materials, including but not limited to the Restriction on the Use of Certain Hazardous Substances in Electrical and Electronic Equipment (hereinafter "RoHS"), Directives 2002/96/EC and 2012/19/EU as well as their respective incorporation into EU member states' legislation including any amendments thereto (hereinafter "WEEE"), (3) the Regulation EC 1907/2006 of the European Parliament and of the Council concerning the Registration, Evaluation, Authorization and Restriction of Chemicals including any amendment thereto (hereinafter "REACH"), (4) EC Directive 2006/66/EC on Batteries and Accumulators and Waste Batteries and Accumulators and/or (5) TSCA, without limiting Supplier's obligations under this Purchase Order, Supplier shall comply with the requirements of this "Substance Declaration".

Supplier shall submit to Buyer with each Equipment, the chemical substances contained therein or in the Service deliverable, and/or Material Safety Data Sheets, Safety Data Sheets or other such documentation as required by Applicable Laws (including without limitation the OSHA Hazardous Communication Standard 29 CFR 1910.1200 et seq.). If Supplier furnishes Equipment that are subject to substance restrictions, rules or regulations including but not limited to those identified in this Exhibit, Supplier shall declare such substances on the Buyer's web database BOMcheck (www.BOMcheck.net) or, only if and approved in writing in advance by Buyer, in another reasonable format provided to Buyer no later than first delivery date of the Equipment, and Supplier shall prior to Supplier 's first delivery of Equipment complete and comply with the Declarable Substances-Form (hereinafter "Substance Declaration") in the Buyer supplier portal "SCM STAR" or in hard copy forwarded to Buyer. In addition, for Equipment that are subject to substance restrictions, rules or regulations Supplier shall provide ordering entity with a safety data sheet required in Article 31of the Regulation EC 1907/2006 (REACH) and Supplier shall keep this Substance Declaration up to date.

Should a delivery hereunder contain "dangerous goods" as so classified pursuant to Applicable Laws, Supplier shall notify Buyer in writing in sufficient detail to identify the Equipment, the hazards, and the laws, rules or regulations applicable thereto no later than three (3) business days after receipt of the Purchase Order.

**Exhibit D**

**Code of Conduct for AES Suppliers and Third Party Intermediaries**

This Code of Conduct defines the basic requirements placed on AES' suppliers and third party intermediaries concerning their responsibilities towards their stakeholders and the environment. AES reserves the right to reasonably change the requirements of this Code of Conduct. In such event AES expects the supplier to accept such reasonable changes.

**The supplier and/or third party intermediary declares herewith:**

- **Legal compliance**
  - to comply with the laws of the applicable legal Equipment and Services.
- **Prohibition of corruption and bribery**
  - to tolerate no form of and not to engage directly or indirectly in any form of corruption or bribery and not to grant, offer or promise anything of value to a government official or to a counterparty in the private sector to influence official action or obtain an improper advantage.
- **Fair competition, anti-trust laws and intellectual property rights**
  - to act in accordance with national and international competition laws and not to participate in price fixing, market or customer allocation, market sharing or bid rigging with competitors;
  - to respect the intellectual property rights of others.
- **Conflicts of interest**
  - to avoid all conflicts of interest that may adversely influence business relationships.
- **Respect for the basic human rights of employees**
  - to promote equal opportunities for and treatment of its employees irrespective of skin color, race, nationality, social background, disabilities, sexual orientation, political or religious conviction, sex or age;
  - to respect the personal dignity, privacy and rights of each individual;
  - to refuse to employ or make anyone work against his will;
  - to refuse to tolerate any unacceptable treatment of employees, such as mental cruelty, sexual harassment or discrimination;
  - to prohibit behavior including gestures, language and physical contact, that is sexual, coercive, threatening, abusive or exploitative;
  - to provide fair remuneration and to guarantee the applicable national statutory minimum wage;
  - to comply with the maximum number of working hours laid down in the applicable laws;
  - to recognize, as far as legally possible, the right of free association of employees and to neither favor nor discriminate against members of employee organizations or trade unions.
- **Prohibition of child labor**
  - to employ no workers under the age of 15 or, in those countries subject to the developing country exception of the ILO Convention 138, to employ no workers under the age of 14.

- **Health and safety of employees**
  - o   to take responsibility for the health and safety of its employees;
  - o   to control hazards and take the best reasonably possible precautionary measures against accidents and occupational diseases;
  - o   to provide training and ensure that employees are educated in health and safety issues;
  - o   to set up or use a reasonable occupational health & safety management system.
- **Environmental protection**
  - o   to act in accordance with the applicable statutory and international standards regarding environmental protection;
        to minimize environmental pollution and make continuous improvements in environmental protection;
  - o   to set up or use a reasonable environmental management system.
- **Supply chain**
  - o   to use reasonable efforts to promote among its suppliers compliance with this Code of Conduct;
  - o   to comply with the principles of nondiscrimination with regard to supplier selection and treatment.
- **Conflict Minerals**
  - o   to take reasonable efforts to avoid in its products the use of raw materials which directly or indirectly finance armed groups who violate human rights.

**Exhibit E**

**Insurance**

(A) Supplier shall, at its sole expense, maintain the types of insurance coverage(s) listed below. The coverage limits for each type of insurance listed below shall be the greater of: (i) the coverage limits listed below; or (ii) if the Purchase Order requires Supplier to maintain higher limits, then the coverage limits specified in the Purchase Order. Evidence of insurance required by this Purchase Order is to be furnished before any Goods/Services is commenced. Supplier and its Representatives shall maintain such insurance in full force and effect during the term of this Purchase Order, and, in addition, for as long as Supplier is under any warranty obligations arising out of this Purchase Order. All insurers on required insurance coverage(s) shall have an A.M. Best Rating of A- /VIII or better. Customer and its subsidiaries, Affiliates, and its or their Representatives, and/or any other party designated on the Purchase Order as applicable shall be named as an additional insured, with respect to the Commercial General Liability and Automobile Liability policies/coverage(s). All insurance certificates shall be in a form satisfactory to Customer. Supplier shall deliver the certificates of insurance, naming Customer and, if applicable, Customer's customer/end user, as the Certificate Holder. All of Supplier's policies of insurance, except for Workers' Compensation and Employers Liability, shall be primary insurance and noncontributing with any other insurance maintained by Customer, Customer's customer/end user and/or other parties. All of Supplier's policies of insurance, except for Worker's Compensation and Employer's Liability, shall contain a cross-liability or severability of interest clause. The limits of insurance set forth below may be satisfied by any combination of excess and primary insurance coverage. Supplier shall require all its insurers to waive all rights of subrogation against Customer, Customer's customer/end user, and their respective subsidiaries, Affiliates, and Representatives, and any other party designated as an additional insured.

(B) Supplier shall maintain the following insurance coverage(s):

(i) **Worker's Compensation Insurance** in accordance with the statutory requirements of the location in which the Purchase Order is performed. If there is an exposure to injury to Supplier's employee under the U.S. Longshoremen's and Harbor Worker's Compensation Act, the Jones Act or under laws, regulations or statutes applicable to maritime employees, coverage required by law shall be provided for same.

(ii) **Employer's Liability Insurance** with the following limits of liability:

• $1,000,000 for each occurrence;
• $1,000,000 Disease Policy
• $1,000,000 Each Employee.

(iii) **Commercial General Liability Insurance**, in occurrence coverage form, with minimum limits of $5,000,000 per occurrence, including the following coverages:

• Products and Completed Operations
• Contractual Liability insuring the indemnity obligations assumed by Supplier under this Purchase Order

• Premises/Operations
• Underground, Undermining, Explosion and Collapse (XCU) Hazard,
• Broad Form Property Damage (including Completed Operations)

     (iv) **Automobile Liability Insurance**, including coverage for owned, hired, and non-owned automobiles and trucks used by or on behalf of the Supplier providing insurance for bodily injury, liability and property damage liability with minimum limits for each type of coverage of $5,000,000 per occurrence.

(C) The following coverages are specifically required if a Purchase Order involves: (i) [intentionally omitted]; (ii) watercraft owned, operated or chartered by Supplier or its Representatives, liability arising out of such watercraft shall be insured by the General Liability or by Protection and Indemnity Insurance with a CSL of no less than $1,000,000 per each occurrence; (iii) the hauling and/or rigging of property in excess of $100,000, Supplier shall carry "All Risk" Transit Insurance, or "All Risk" Motor Truck Cargo Insurance (Such insurance shall provide a limit of not less than the replacement cost of the highest value single lift or highest value being moved, whichever is greater, and insuring the interest of Supplier, Customer and Customer's customer/end user, as their respective interests may appear); (iv) aircraft (fixed wing or helicopter) owned, operated or chartered by Supplier or its Representatives, liability arising out of such aircraft shall be insured for not less than $1,000,000 CSL each occurrence; (v) access, storage, transmission or processing of Customer's, its customer's /end user's, its or their Representatives' confidential information, a Cyber Liability Errors and Omissions Policy shall be procured by Supplier providing coverage, for acts, errors, omissions, and negligence of employees and contractors giving rise to potential liability, financial and other losses relating to data security and privacy, including cost of defense and settlement, in an amount of at least $2,000,000 each claim and in the aggregate; (vi) engineering, design and/or development services, Supplier shall procure Professional Liability and Errors and Omissions Liability Insurance providing coverage for acts, errors, omissions arising out of insured's negligence in an amount not less than $5,000,000 (USD) per claim and in the aggregate; (viii) Supplier, its Affiliates and/or its and their respective Representative being granted access to Customer or Customer's Affiliate's facilities, premises and/or systems, Supplier shall procure Employee Dishonesty and Computer Fraud Insurance covering losses arising out of or in connection with any fraudulent or dishonest acts committed by its personnel, acting alone or with others, in an amount not less than $1,000,000 (USD) per occurrence. Furthermore, on a case by case basis, where a Purchase Order specifies that environmental liability insurance is required for that specific project, then Supplier shall obtain Environmental Impairment Liability Insurance for such project with limits of $5,000,000 per occurrence and in the aggregate.

(D) The procurement, maintenance or acceptance of insurance coverage by Customer, if any, shall not: (i) relieve Supplier of liability for loss or damage in excess of the policy coverage limits specified herein; or (ii) limit or release Supplier of its obligations or liabilities under the Purchase Order.

(E) No delay or failure in declaring any default or in enforcing any of the requirements of this Exhibit E, and no course of dealing between Customer and Supplier shall constitute a waiver of any of the requirements of this Exhibit E.

**Exhibit F**

**Affirmative Action**

Should Buyer become a federal contractor/subcontractor, Buyer will be required to comply with certain federal regulations, including the regulations promulgated by the U.S. Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP"). Should Buyer become a federal contractor, Buyer will also be required to ensure compliance of the OFCCP by its subcontractors, vendors and suppliers covered under the OFCCP (each, a "Covered Party"). Supplier is hereby notified of Buyer's policy related to affirmative action and its mutual OFCCP obligations to the extent Supplier, its subcontractors, vendors or suppliers is a Covered Party.

Buyer is an equal opportunity/affirmative action employer and does not discriminate on the basis of race, color, creed, religion, national origin, ancestry, sex, age, physical or mental disability, marital status, pregnancy, genetic information, sexual orientation, gender identity, protected veteran or military status, or any other consideration not related to the person's ability to do the job or otherwise made unlawful by federal, state or local law in the following employment practices, including among others: recruiting, hiring, placement, transfer, promotion, demotion, selection for training, layoff, termination, shift assignment, determination of service, rates of pay, benefit plans, and all forms of compensation and other personnel actions.

Should Buyer become a federal contractor/subcontractor, Buyer's Covered Parties (including Supplier and its Covered Parties, if applicable) will also have an obligation to comply with equal opportunity and affirmative action principles. Therefore, Buyer's Covered Parties (including Supplier and its Covered Parties, if applicable) will take appropriate action in support of these principles. Through our mutual effort and cooperation, we will continue to provide a working environment that appreciates and encourages diversity, promotes equal employment opportunity and is free from any type of discrimination.

Supplier and its Covered Parties, if applicable, shall abide by the requirements of the "Equal Opportunity Clause" in Section 202 of Executive Order 11246. See 41 CFR 60-1.4(a).

The following shall also apply if the Supplier is a Covered Party:

**For contracts of $100,000 or more, Supplier shall comply with the following: This Supplier, contractor and subcontractor shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans.**

**For contracts of $10,000 or more, Supplier shall comply with the following: This Supplier, contractor and subcontractor shall abide by the requirements of 41 CFR 60-741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.**

**Exhibit G**

**Key Agreements**

1. Third Amended and Restated Limited Liability Company Agreement of Fluence Energy, LLC, dated as of [      ].
2. Amended and Restated AES License Agreement, dated as of June 9, 2021, between Fluence Energy, LLC and AES Grid Stability LLC.
3. Amended and Restated AES License Agreement, dated as of June 9, 2021, between Fluence Energy, LLC and The AES Corporation.
4. Services Agreement, dated as of January 1, 2018, between The AES Corporation, Fluence Energy, LLC and such other companies as set forth therein.
5. Amended and Restated Storage Core Frame Purchase Agreement, dated as of the date hereof, between AES Grid Stability, LLC and Fluence Energy, LLC
6. Amended and Restated Company Name Affix and Trademark License Agreement, dated [ ], between The AES Corporation and Fluence Energy, LLC.
7. Amended and Restated Credit Support and Reimbursement Agreement, dated as of June 9, 2021, by and among Fluence Energy, LLC, The AES Corporation and Siemens Industry, Inc.

**Attachment A**

**DESCRIPTION OF SUPPLIER'S BATTERY STORAGE EQUIPMENT AND SERVICES**

**Amended and Restated**

**Storage Core Frame Purchase Agreement**

by and between

Siemens Industry, Inc.

as Buyer

and

Fluence Energy, LLC

as Supplier

dated [●], 2021

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| 1. | DEFINITIONS; INTERPRETATION | 1 |
| 1.1. | Definitions | 1 |
| 1.2. | Interpretation | 9 |
| 2. | TERM AND TERMINATION OF AGREEMENT | 10 |
| 2.1. | Term | 10 |
| 2.2. | Early Termination | 10 |
| 3. | SCOPE OF AGREEMENT | 10 |
| 3.1. | Scope Generally | 10 |
| 3.2. | Further Siemens Contracting Parties | 10 |
| 4. | ORDERS | 11 |
| 4.1. | Pricing Requests | 11 |
| 4.2. | Purchase Orders | 11 |
| 4.3. | Exclusivity and Certain Related Priorities | 11 |
| 4.4. | Non-Competition | 14 |
| 4.5. | Payment Terms | 16 |
| 4.6. | Disputed Payments | 17 |
| 4.7. | Late Payments | 17 |
| 4.8. | Taxes; Export and Import Duties | 17 |
| 5. | DELIVERY | 17 |
| 5.1. | Delivery Terms; Inspection | 17 |
| 5.2. | Guaranteed Delivery Date | 17 |
| 5.3. | Delay Liquidated Damages | 18 |
| 5.4. | Buyer Caused Delay | 18 |
| 6. | TITLE, RISK OF LOSS AND CARE, CUSTODY AND CONTROL | 18 |
| 6.1. | Transfer of Title and Risk of Loss | 18 |
| 6.2. | Warranty of Title | 18 |
| 7. | INSPECTION AND QUALITY CONTROL | 18 |
| 7.1. | Inspection Rights | 18 |
| 7.2. | Quality Control | 19 |
| 8. | WARRANTIES | 19 |
| 8.1. | Equipment Warranty | 19 |
| 8.2. | Services Warranty | 19 |
| 8.3. | Notification Requirements | 19 |
| 8.4. | Corrective Action | 19 |
| 8.5. | Warranty Exclusions | 20 |
| 8.6. | NO IMPLIED WARRANTIES | 20 |
| 8.7. | Reserved Rights | 20 |
| 8.8. | Access to Buyer Data | 20 |
| 9. | BUYER FURNISHED PROPERTY | 21 |
| 10. | PACKAGING | 21 |
| 11. | FORCE MAJEURE. | 21 |
| 11.1. | Effect of Force Majeure | 21 |
| 11.2. | Procedures | 21 |
| 11.3. | Termination for Extended Force Majeure | 22 |
| 12. | CHANGE ORDERS | 22 |
| 12.1. | Change Order | 22 |
| 12.2. | Change Order Process | 22 |
| 12.3. | Change Order Restrictions | 23 |
| 12.4. | No Change | 23 |

i

| | | |
|---|---|---:|
| 13. | INTELLECTUAL PROPERTY | 23 |
| 13.1. | Grant of License | 23 |
| 13.2. | No Copies | 23 |
| 13.3. | Proprietary Notices | 24 |
| 13.4. | Security | 24 |
| 13.5. | No Reverse Engineering | 24 |
| 13.6. | Open Source Software | 24 |
| 13.7. | Reporting | 24 |
| 13.8. | Relief | 24 |
| 13.9. | Improvements | 24 |
| 13.10. | Ownership | 25 |
| 13.11. | Enforcement | 26 |
| 13.12. | Duration and Transfers | 26 |
| 13.13. | Government End Users | 27 |
| 13.14. | Reservation of Rights | 27 |
| 14. | DEFAULTS AND REMEDIES | 27 |
| 14.1. | Supplier Defaults | 27 |
| 14.2. | Buyer Defaults | 27 |
| 14.3. | Remedies | 28 |
| 15. | INDEMNIFICATION | 28 |
| 15.1. | General | 28 |
| 15.2. | Infringement Indemnification by Supplier | 29 |
| 15.3. | Infringement Indemnification by Buyer | 30 |
| 15.4. | Indemnification Procedures | 30 |
| 15.5. | Limited Waiver of Certain Immunities | 31 |
| 15.6. | Survival | 32 |
| 16. | LIMITATIONS OF LIABILITY | 32 |
| 16.1. | WAIVER OF CERTAIN DAMAGES | 32 |
| 16.2. | MAXIMUM LIABILITY | 32 |
| 16.3. | EFFECTIVENESS | 32 |
| 16.4. | Commencement of Claims | 32 |
| 17. | CONFIDENTIALITY | 32 |
| 17.1. | Confidential Information | 32 |
| 17.2. | Non-Disclosure | 33 |
| 17.3. | Exceptions | 33 |
| 17.4. | Representatives Bound | 33 |
| 17.5. | Survival | 33 |
| 18. | REPRESENTATIONS AND WARRANTIES | 33 |
| 18.1. | Representations of the Parties | 33 |
| 18.2. | Additional Representations of Supplier | 34 |
| 19. | ENVIRONMENT, HEALTH AND SAFETY | 35 |
| 19.1. | Compliance and Related Matters | 35 |
| 19.2. | On-Site Environmental and Safety Responsibility | 36 |
| 19.3. | Health and Safety Plan | 36 |
| 20. | OPEN SOURCE SOFTWARE | 37 |
| 21. | EXPORT CONTROL AND FOREIGN TRADE REGULATIONS | 37 |
| 21.1. | Acknowledgement and Compliance | 37 |
| 21.2. | Export Licenses | 37 |
| 21.3. | Provision of Trade Data | 37 |
| 21.4. | Changes | 37 |
| 21.5. | Additional Buyer's Obligations | 38 |
| 21.6. | Certain Relief | 38 |

| | | |
|---|---|---:|
| 22. | BUYER CODE OF CONDUCT. | 38 |
| 23. | COMPLIANCE WITH LAWS AND PERMITS | 38 |
| 24. | DISPUTE RESOLUTION | 38 |
| 24.1. | Referral to Senior Management | 38 |
| 24.2. | Referral to Arbitration | 39 |
| 24.3. | Neutral Arbitrators | 39 |
| 24.4. | Procedures and Costs | 39 |
| 24.5. | Award | 39 |
| 24.6. | Confidentiality | 40 |
| 24.7. | Continued Performance; Provisional Remedies | 40 |
| 24.8. | Waiver of Jury Trial | 40 |
| 25. | MISCELLANEOUS | 40 |
| 25.1. | Governing Law | 40 |
| 25.2. | Records | 40 |
| 25.3. | Intentionally Omitted | 40 |
| 25.4. | Insurance | 40 |
| 25.5. | Assignment; Successors | 41 |
| 25.6. | Subcontracting | 41 |
| 25.7. | Other Terms and Amendments | 41 |
| 25.8. | Government Contracts | 41 |
| 25.9. | Relationship of the Parties | 41 |
| 25.10. | Publicity | 41 |
| 25.11. | Non-Exclusive Remedies and Non-Waivers | 41 |
| 25.12. | Severability | 42 |
| 25.13. | Survival | 42 |
| 25.14. | Affirmative Action | 42 |
| 25.15. | Complete Agreement and Counterparts | 42 |
| 25.16. | Counterparts | 42 |
| 25.17. | No Pre-Printed Terms | 42 |
| 25.18. | Priority | 42 |
| 25.19. | Notices | 43 |
| 25.20. | Joint Effort | 44 |
| 25.21. | Language of the Agreement, Correspondence, Documentation | 44 |

Schedule 1.1(a) Applications

Exhibits

| | |
|---|---|
| Exhibit A | Form of Purchase Order |
| Exhibit B | Form of Joinder Agreement |
| Exhibit C | Substance Declaration |
| Exhibit D | Code of Conduct |
| Exhibit E | Insurance |
| Exhibit F | Affirmative Action Requirements |
| Exhibit G | Key Agreements |

Attachment A Description of Supplier's Battery Storage Equipment and Services

iii

THIS **AMENDED AND RESTATED STORAGE CORE FRAME PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into on [·], 2021 between Siemens Industry, Inc. hereinafter referred to as "**Buyer**" and **Fluence Energy, LLC**, whose principal place of business is 4601 N. Fairfax Drive, Suite 600, Arlington, Virginia 22203 hereinafter referred to as "**Supplier**". This Agreement shall become effective upon the Effective Date defined in Section 2.1 below. Each of Buyer and Supplier are referred to herein as a "**Party**" and collectively are referred to herein as the "**Parties**."

WHEREAS, Buyer is a company providing products, services and solutions to the buildings and energy markets;

WHEREAS, Buyer may want to purchase energy storage equipment and related services to incorporate within its electrical transmission and distribution projects;

WHEREAS, Supplier sells energy storage equipment and related services; WHEREAS, Supplier wishes to cooperate with Buyer in order to fulfill Buyer's requirements and provide preferred purchasing conditions to Buyer for those energy storage equipment and related services;

WHEREAS, Supplier and Buyer are parties to that certain Storage Core Frame Purchase Agreement, dated as of January 1, 2018, by and between Supplier and Buyer (the "**Prior Agreement**"); and

WHEREAS, Buyer is party to the Second Amended and Restated Limited Liability Company Agreement of Supplier, dated as of June 9, 2021(the "**LLC Agreement**");

WHEREAS, Supplier, Buyer and certain other parties are entering into a series of transactions in connection with the formation of Fluence Energy, Inc., a Delaware corporation ("**Issuer**") to serve as the vehicle through which the public will own indirect interests in Supplier through an initial public offering;

WHEREAS, in connection with the closing of initial public offering, the LLC Agreement is being amended and restated in its entirety by the Third Amended and Restated Limited Liability Company Agreement, dated on or about the date hereof (the "**Restated LLC Agreement**"), to, among other things, reflect Issuer's ownership of Supplier and the restructuring of Supplier and its Affiliates; and

NOW, THEREFORE, the Parties agree that on the Effective Date, the Prior Agreement is hereby amended and restated in its entirety by this Agreement, and further agree as follows:

1.     **DEFINITIONS; INTERPRETATION.**

1.1.     <u>Definitions</u>. Initially-capitalized terms used in this Agreement (including the preamble and Recitals hereto) and not otherwise defined herein shall have the meanings specified below.

"**AES Grid Stability**" means AES Grid Stability, LLC.

"**AES Storage Core Frame Purchase Agreement**" means that certain Amended and Restated Storage Core Frame Purchase Agreement, dated of even date herewith, between AES Grid Stability and Supplier.

"**Affiliate**" means, at any time, and with respect to any Person or group of Persons, a Person that at such time directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person or group of Persons. No Person shall be considered an Affiliate of another Person or under the Control of such other Person so long as (i) it is owned less than 50% by such other Person, (ii) such other Person has no capacity to elect or appoint the majority of the board of directors or similar governing body of the subject Person, (iii) such other Person does not consolidate the subject Person in its financial reporting and (iv) there is no other management or services agreement pursuant to which such other Person exerts control over the subject Person. With respect to Buyer, none of Gamesa Corporación Technológica S.A., Siemens Healthineers AG nor any of their respective Subsidiaries shall be considered an Affiliate of Buyer.

"**Agreement**" has the meaning set forth in the Preamble hereto.

"**Applicable Law**" means any applicable constitutional provision, statute, act, code, law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision or declaration of a Governmental Authority having valid jurisdiction.

"**Application**" means one of the stationary, battery based energy storage solutions and services for the grid connected storage market (including systems both in front of and behind the meter) set forth on Schedule 1.1(a).

"**Battery**" means a battery included within the Equipment supplied pursuant to this Agreement.

"**Business Day**" means any day except a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Buyer**" has the meaning set forth in the Preamble hereto.

"**Buyer Data**" has the meaning set forth in Section 13.10(b).

"**Buyer Event of Default**" has the meaning set forth in Section 14.2.

"**Buyer Furnished Property**" has the meaning set forth in Article 9.

"**Change Order**" has the meaning set forth in Section 12.1.

"**Change Order Information**" has the meaning set forth in Section 12.2.

"**Claims**" has the meaning set forth in Section 15.1.

"**Confidential Information**" has the meaning set forth in Section 17.1.

"**Control**" means, with respect to the relationship between two or more Persons, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise. The terms "Controlled" or "under common Control with" have correlative meanings.

"**Defect**" means any material defect in design, manufacturing, materials or workmanship in or to the Equipment, or any failure of the Equipment to materially comply with the Technical Specifications, excluding in all cases any of the foregoing attributable to or caused by ordinary wear and tear of the Warranted Equipment.

"**Deliver**", "**Delivered**" or "**Delivery**" means that Supplier has caused the delivery of the applicable Equipment to the Delivery Point in accordance with the terms of this Agreement.

"**Delivery Point**" means the delivery location set forth in a Pricing Notice, provided that, if no such location is specified in the applicable Pricing Notice, the Delivery Point for Equipment comprised of batteries shall be at the facility of the supplier thereof and the Delivery Point for all other Equipment shall the location of Supplier's facility.

"**Derivative Software**" has the meaning set forth in Article 20.

"**EAR**" has the meaning set forth in Section 21.1.

"**eBoP**" shall have the meaning assigned to such term in Section 4.3(d).

"**Effective Date**" shall have the meaning assigned to such term in Section 2.1.

"**EHS Laws**" has the meaning set forth in Section 19.1.

"**Enforcement Action**" has the meaning set forth in Section 13.11.

"**Equipment**" means any energy storage equipment offered for sale by Supplier pursuant to this Agreement, as set forth in Attachment A.

"**Equipment Warranty**" has the meaning set forth in Section 8.1.

"**Equipment Warranty Period**" has the meaning set forth in Section 8.1.

"**Exclusive Activities**" means the development, marketing and sale of an Integrated Solution for one or more Applications, where the size of such Integrated Solution is equal to or greater than 500 kilowatts, including those Integrated Solutions marketed, sold and delivered through a Buyer sales channel or another Supplier sales channel as contemplated in Supplier's then current business plan.

"**Export Controls and Sanctions Laws**" has the meaning set forth in Section 21.1.

"**Force Majeure**" means any event which is not within the reasonable control of the Party affected and with the exercise of due diligence could not reasonably be prevented, avoided or removed by such Party, which causes the affected Party to be delayed, in whole or in part, or unable, using commercially reasonable efforts, to partially or wholly perform its obligations under this Agreement (other than an obligation for the payment of money) and is not caused by or resulting from the negligence or breach or failure of such Party to perform its obligations under this Agreement, which, subject to the foregoing, may include: acts of God or the public enemy, natural disasters, war, terrorism, insurrection, sabotage, unavoidable accidents, orders, decrees, rulings and policies of any Governmental Authority, fires, floods, earthquakes, volcanic activity, severe weather conditions not reasonably foreseeable taking into account the location of performance and the climate patterns applicable thereto, explosions, riots, general strikes and area lockouts. Force Majeure shall not include a Party's financial inability to perform under this Agreement or any Purchase Order.

3

"**Further Siemens Contracting Parties**" has the meaning set forth in Section 3.2.

"**Governmental Authority**" means a federal, state, local or foreign governmental authority (including any regulatory authority); a state, province, commonwealth, territory or district thereof; a county; a city, town, township, or other municipality; a district, ward or other subdivision of any of the foregoing; any executive, legislative or other governing body of any of the foregoing; any agency, authority, board, department, system, service, office, commission, committee, council or other administrative body of any of the foregoing; any court or other judicial body; and any officer, official or other representative of any of the foregoing.

"**Guaranteed Delivery Date**" has the meaning set forth in Section 5.2.

"**Hazardous Materials**" has the meaning set forth in Section 19.1.

"**Indemnified Party**" has the meaning set forth in Section 15.1.

"**Indemnifying Party**" has the meaning set forth in Section 15.1.

"**Infringement Claim Costs**" means any and all judgments, damages, fines, awards, penalties, and interest associated with any of the foregoing, that, in each case, are finally awarded in a claim for which an Indemnifying Party is obligated to indemnify an Indemnified Party under Section 15.2 or 15.3, as applicable, and costs and expenses, including reasonable attorneys' fees, court costs and other reasonable costs of suit, arbitration, dispute resolution or other similar proceedings, associated with such claim.

"**Integrated Solution**" means an integrated, stationary, battery based energy storage solution, comprised of inverters, a control system including software, and electrical battery. Notwithstanding the foregoing, the following will not be considered Integrated Solutions: (i) uninterruptable power supply (UPS) systems (other than for use in Applications), (ii) a virtual energy storage network built out of individual, connected, geographically distributed product units of less than 150 kilowatts per unit (a "swarm"), (iii) static synchronous compensators (Statcom), (iv) supercapacitors, (v) the technology for the storage medium (e.g. batteries), (vi) energy storage inverters, (vii) stationary storage systems sold as part of an integrated product in conjunction with the sale of energy storage systems on board of vessels, vehicles or locomotives, where the main purpose of the stationary storage system is to charge or to be charged by such on board energy storage system or the vehicle brake energy and (viii) stationary storage systems providing power directly and primarily to electric vehicle charging stations.

"**Intellectual Property**" means United States and foreign: (a) Patents; (b) Trademarks; (c) copyrights, whether registered or unregistered, and all applications and registrations therefor, web sites, proprietary domain names, mask works, and all applications and registrations therefor; (d) Know-How; (e) Software; and (f) similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing.

4

"**Key Agreements**" means the various contracts between Supplier and certain of its members or their Affiliates listed on Exhibit G, as the same may be amended and/or restated from time to time.

"**Know-How**" means all proprietary and confidential information and data (irrespective as to whether such information or data is available by way of documentation, orally or in electronic format, or protected by copyrights), including business and trade secrets, technical and business information and data, know-how and similar proprietary rights in confidential information and processes, discoveries, analytic models, improvements, techniques, devices, methods, patterns, formulations and specifications, all to the extent that such information and data are proprietary and confidential and neither Software nor a Patent.

"**License**" has the meaning set forth in Section 13.1.

"**Licensed Technology**" means, collectively, all of the following to the extent owned by, or licensed (with the right to grant sublicenses) to, Supplier, relating to the Equipment or the uses and purposes contemplated in connection with this Agreement or any Purchase Order issued hereunder for such Equipment: (a) Software embedded in or integrated with the Equipment, (b) any other trade secrets, proprietary information, know-how or other Intellectual Property incorporated into or embedded within the Equipment or necessary for the installation, operation, maintenance, and ownership of the Equipment, (c) any improvements of or updates to any of the foregoing provided to Buyer pursuant to this Agreement, if any, and (d) all Intellectual Property rights of Supplier in the Licensed Technology listed in any of clauses (a) through (d) above, in each case, for use solely in connection with the installation, commissioning, operation and maintenance of the Equipment at the Project Site or such other site as Buyer shall elect.

"**LLC Agreement**" has the meaning set forth in the Recitals hereto.

"**Lockup Period**" shall have the meaning assigned to such term in Section 4.3(a).

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**Open License Terms**" has the meaning set forth in Article 20.

"**Open Source Software**" has the meaning set forth in Article 20.

"**Party**" has the meaning set forth in the Preamble hereto.

"**Parties**" has the meaning set forth in the Preamble hereto.

"**Patents**" means all patents, utility models, patent and utility model applications, and all priorities and rights related thereto, including all reissues, reexaminations, divisions, continuations, continuations-in-part, provisionals, continued prosecution applications, substitutions, extensions, additions or renewals of any of the foregoing.

"**Person**" means any natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company or any other entity (whether or not having separate legal personality), and shall include any successor (by merger or otherwise) of such entity.

"**Potential Project**" shall have the meaning assigned to such term in Section 4.3(b)(ii).

"**Pricing Notice**" has the meaning set forth in Section 4.1.

"**Pricing Request**" has the meaning set forth in Section 4.1.

"**Prohibited Person**" means (i) any individual or entity that has been determined by competent authority to be the subject of a prohibition in any law, regulation, rule, or executive order administered by OFAC or the U.S. Department of State; (ii) the government, including any political subdivision, agency or instrumentality thereof, of a Sanctioned Country; (iii) any individual or entity that acts on behalf of or is owned or controlled by the government of a Sanctioned Country; (iv) any individual or entity that has been identified on the OFAC Specially Designated Nationals and Blocked Persons List (Appendix A to 31 C.F.R. Ch. V) or any other similar list published by OFAC, including, but not limited to, the Foreign Sanctions Evaders List, the Part 561 List, and the Non SDN Iranian Sanctions List; (v) any individual or entity that has been designated on any similar list or order published by the United States government, including, without limitation, the Denied Persons List, Entity List, or Unverified List of the U.S. Department of Commerce, or the Debarred List or Nonproliferation Sanctions List of the U.S. Department of State; or (vi) any entity beneficially owned or controlled, directly or indirectly, by, any of the individuals or entities listed in subparagraphs (i)-(v) above.

"**Project Bid**" shall have the meaning assigned to such term in Section 4.3(b)(iv).

"**Prudent Industry Practices**" means those practices, methods, specifications and standards of safety, performance, dependability, efficiency and economy generally recognized by electrical utility industry members, including Supplier, in the U.S. as good and proper, and such other practices, methods or acts which, in the exercise of reasonable judgment by those reasonably experienced in the industry in light of the facts known at the time a decision is made, would be expected to accomplish the result intended at a reasonable cost and consistent with Applicable Laws, reliability, safety and expedition. Prudent Industry Practices are not intended to be limited to the optimum practices, methods or acts to the exclusion of all others, but rather to be a spectrum of good and proper practices, methods and acts.

"**Purchase Order**" means a purchase order in the form attached hereto as Exhibit A issued for the purchase of Equipment and Services pursuant to and in accordance with the terms and conditions of this Agreement.

"**Representatives**" means, with respect to any Person, such Person's shareholders, members, officers, directors, employees, accountants, consultants, legal counsel, financial advisors and other representatives and agents.

"**Revised Project Bid**" shall have the meaning assigned to such term in Section 4.3(b)(v).

"**Sanctioned Country**" means any country or territory against which the United States maintains comprehensive economic sanctions or embargoes, including, without limitation, Crimea, Cuba, Iran, North Korea, Sudan and Syria.

"**Services**" means any Equipment related services offered for sale by Supplier pursuant to this Agreement, as set forth in Attachment A.

"**Services Warranty**" has the meaning set forth in Section 8.2.

"**Services Warranty Period**" has the meaning set forth in Section 8.2.

"**Shares"** means (i) the Class A Common Stock of the Issuer, calculated on a fully diluted basis and assuming that all options, warrants and any other rights to purchase shares of Class A Common Stock of the Issuer have been exercised in full, including, for sake of clarity, the Underlying Class A Shares plus (ii) any other equity securities now or hereafter issued by the Issuer, together with any options thereon and any other shares of stock or other equity securities issued or issuable with respect thereto (whether by way of a stock dividend, stock split or in exchange for or in replacement or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization); provided, however, that in no event shall the Shares include the Class B Common Stock of the Issuer.

"**Siemens AG**" means Siemens Aktiengesellschaft, a German corporation headquartered in Munich and Berlin.

"**Siemens BUs**" means, separately and collectively in the aggregate, Siemens DG, Siemens DS and Siemens EP. In the event the lines of business conducted by Siemens DG, Siemens DS or Siemens EP as of the date hereof are transferred to other business units within the Siemens organizational structure, such lines of business shall continue to be subject to the terms and conditions of this Agreement to the same extent as if they remained part of the applicable Siemens BUs.

"**Siemens DG**" means the business unit of Siemens AG that serves as a global supplier of hardware and software products, systems, solutions, micro-grid solutions, information technology integration, engineering, consulting and services for protections and control, automation and control, power quality and substation automation of infrastructure grids for utilities (power transmission, distribution, generation, multi-utilities), municipalities, industry, critical infrastructure (e.g. but not limited to dams/water reservoirs, bridges, telecommunication towers/stations) and other related infrastructure or such business as conducted by any successor thereto.

"**Siemens DS**" means the business units of Siemens AG that serves as a global supplier of products, systems, solutions and services for the distribution of electrical power to its customers (primarily utility companies and industrial customers), whose portfolio currently includes utility scale and large commercial scale battery based electrical energy storage systems and solutions, low-voltage power distribution products and solutions, medium-voltage switchgear and devices, eBoP, emobility or such business as conducted by any successor thereto.

"**Siemens EP**" means the business unit of Siemens AG that serves as a global supplier of low and medium voltage distribution products, control components and systems for industrial applications, infrastructure, buildings and low voltage power grids (M4 market excluded) or such business as conducted by any successor thereto.

7

"**Software**" means all computer programs, operating systems, applications, systems, firmware, and software of any nature, whether operational, active, under development, or design, non-operational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, test scripts, user manuals, and other documentation therefore, whether in machine-readable form, programming language, or any other language or symbols, and whether stored, encoded, recorded, or written on disk, tape, film, memory device, paper, or other media of any nature and all databases necessary or appropriate to operate any such computer program, operating system, applications system, firmware, or software.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing member, general partner or analogous controlling Person of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries.

"**Sunset Date**" means the earlier to occur of (i) the seventh (7th) anniversary of the Effective Date and (ii) that date on which Buyer and Affiliates collectively hold Shares representing less than twenty percent (20%) of the then outstanding Voting Power.

"**Supplier**" has the meaning set forth in the Preamble hereto.

"**Supplier Documents**" means the documents and deliverables to be provided by Supplier to Buyer to the extent reasonably required for the installation, commissioning, operation and maintenance of the Equipment, as more fully set forth in the applicable Purchase Order.

"**Supplier Event of Default**" has the meaning set forth in Section 14.1.

"**Taxes**" means any and all forms of taxation, charges, duties, imposts, levies and rates whenever imposed by any Governmental Authority, including income tax, withholding tax, corporation tax, capital gains tax, capital transfer tax, sales tax, business and occupation tax, inheritance tax, water rates, value added tax, customs duties, capital duty, excise duties, betterment levy, stamp duty, stamp duty reserve tax, national insurance, social security or other similar contributions, and generally any tax, duty, impost, levy, rate or other amount and any interest, penalty or fine in connection therewith.

"**Technical Specifications**" means the technical specifications for the Equipment as set forth in the applicable Purchase Order.

"**Term**" has the meaning set forth in Section 2.1.

"**Terminating Event**" shall have the meaning assigned to such term in Section 4.3(a)(i).

"**Territory**" means (i) for purposes of the sales and marketing by Buyer of the Equipment, worldwide and (ii) for all other use of the Equipment, the country in which the Equipment is installed for use.

"**Third Party**" means any Person, other than a member of Supplier or such member's Affiliates.

"**Trademarks**" means all trademarks, trademark applications, service marks, service mark applications, trade dress, trade names, identifying symbols, words, colors, designs, product names, company names, slogans, logos or insignia, whether registered or unregistered, and all applications and registrations therefor, and all goodwill associated therewith.

"**TSCA**" has the meaning set forth in Section 19.1.

"**Underlying Class A Shares**" means all shares of Class A Common Stock of the Issuer issuable upon redemption of Common Units of the Supplier, assuming all such Common Units are redeemed for Class A Common Stock of the Issuer on a one for one basis.

"**Voting Power**" means the total voting power of all Shares entitled to vote generally in the election of directors (for clarity, on a basis that assumes that all Common Units of Supplier have been redeemed for shares of Class A Common Stock of the Issuer on a one for one basis and that there are no shares of Class B Common Stock of the Issuer outstanding).

"**Work Site**" has the meaning set forth in Section 19.2.

1.2.    Interpretation.

(a)    References to Recitals, Articles, Sections, Exhibits, Annexes and Attachments are, unless otherwise indicated, to Recitals, Articles, Sections, Exhibits, Annexes and Attachments to this Agreement. All Exhibits, Annexes and Attachments to this Agreement are incorporated herein by this reference and made a part hereof for all purposes.

(b)    As used in this Agreement, the masculine gender shall include the feminine and neuter and the singular number shall include the plural, and vice versa.

(c)    Unless expressly stated otherwise, references to a Person include its successors and permitted assigns and, in the case of a Governmental Authority, any Person succeeding to its functions and capacities.

(d)    As used in this Agreement, references to "days" shall mean calendar days, unless the term "Business Days" is used. If the term "Business Days" is used and the time for performing an obligation under this Agreement expires on a day that is not a Business Day, the time shall be extended until that time on the next Business Day.

(e)     As used in this Agreement, where a word or phrase is specifically defined, other grammatical forms of such word or phrase have corresponding meanings; the words "herein," "hereunder" and "hereof" refer to this Agreement, taken as a whole, and not to any particular provision of this Agreement; "including" means "including, for example and without limitation," and other forms of the verb "to include" are to be interpreted similarly.

(f)     As used in this Agreement, all references to a given agreement, instrument or other document shall be a reference to that agreement, instrument or other document as modified, amended, supplemented and restated through the date as of which such reference is made. Any term defined or provision incorporated in this Agreement by reference to another document, instrument or agreement shall continue to have the meaning or effect ascribed thereto whether or not such other document, instrument or agreement is in effect.

**2.      TERM AND TERMINATION OF AGREEMENT.**

2.1.    <u>Term</u>. This Agreement shall become effective and the term shall commence on the day on which the Class A Common Stock of the Issuer is issued to the underwriters in its initial public offering (the "**Effective Date**"); provided, that if the Effective Date does not occur on or prior to December 31, 2021, this Agreement shall be deemed terminated as of such date and of no force or effect without further notice or action by the Parties, and the Prior Agreement shall remain in full force and effect without any amendment thereto. The term of this Agreement shall continue from the Effective Date until the date that the obligations contained in Section 4.4(a) (*Non-Competition*) cease to apply to Buyer (the "**Term**"). The expiration or early termination of the Term of this Agreement shall not affect any Purchase Orders executed between the Parties prior to the date of termination or expiration, and in such event the Parties shall attempt, in fair dealing and good faith, to agree on reasonable post-termination or post-expiration procedures in compliance with Applicable Law and antitrust requirements.

**3.      SCOPE OF AGREEMENT.**

3.1.    <u>Scope Generally</u>. This Agreement shall apply to all purchases by Buyer from Supplier of Equipment and Services during the Term. Notwithstanding the foregoing, nothing herein shall be construed to mean that either Buyer or Supplier is committing to any specific level of business or quantity of Equipment and Services to be purchased or supplied other than that specified in Purchase Orders issued to Supplier during the Term of this Agreement by Buyer. Attachment A hereto sets forth the various standard Equipment and Services offerings of Supplier, it being understood that any project-specific requirements associated with any particular order hereunder shall be as set forth in the applicable Purchase Order therefor. Supplier may from time to time update the Equipment and Services offered for sale hereunder by furnishing to Buyer an update to Attachment A hereto, it being agreed that no such update shall affect any previously issued Purchase Order unless and to the extent set forth in a Change Order thereto.

3.2.    <u>Further Siemens Contracting Parties</u>. Siemens AG and its Subsidiary companies (hereinafter referred to as "**Further Siemens Contracting Parties**") shall be entitled to conclude individual Purchase Orders under the terms of this Agreement provided that such Further Siemens Contracting Parties either: (a) execute a joinder agreement acceptable to Supplier and otherwise in the form of Exhibit B hereto or (b) agree that the terms of this Agreement will govern the subject transaction by including a conspicuous cross-reference in the applicable Purchase Order which confirms that the terms of this Agreement will apply to the Purchase Order.

**4.**    **ORDERS.**

4.1.    <u>Pricing Requests</u>. If Buyer desires to purchase Equipment and Services from Supplier during the Term, Buyer shall furnish Supplier with written request (a "**Pricing Request**") detailing the Equipment and Services it wishes to purchase and requesting pricing therefor from Supplier, including in such Pricing Request such information as may be reasonably necessary for Supplier to determine pricing therefor and any other project-specific requirements, including Buyer's requested delivery schedule. Supplier shall endeavor to provide an initial response to any Pricing Request within five (5) Business Days, indicating (i) whether or not Supplier intends to furnish an offer to Buyer for the requested Equipment and Services on the timeline requested by Buyer and (ii) indicating what, if any, additional information Supplier may need in order to furnish such offer. Within fourteen (14) days after a final written scope of work is agreed with Buyer, or one of its Affiliates, Supplier shall provide Buyer with a written notice (a "**Pricing Notice**") detailing Supplier's pricing and delivery schedule for the Equipment and Services that Buyer wishes to purchase (including therein any terms, conditions and specifications required by Supplier in connection with the particular project and/or purchase contemplated by Buyer, which terms and conditions may be different than, and shall supersede, those set forth in this Agreement), which Pricing Notice Supplier shall endeavor to provide within ten (10) Business Days of receipt of Buyer's Pricing Request. If Buyer does not issue a Purchase Order to Supplier pursuant to Section 4.2 in response to the Pricing Notice within ten (10) Business Days of issuance thereof, the Pricing Notice shall be deemed rejected.

4.2.    <u>Purchase Orders</u>. If Buyer desires to purchase the Equipment and Services on the terms specified in a Pricing Request, it shall issue a Purchase Order to Supplier in the form attached hereto as Exhibit A, which Purchase Order shall include: (i) the pricing and any other terms, conditions and specifications set forth in Supplier's Pricing Notice; and (ii) a detailed description of the Equipment and Services to be purchased, consistent with those set forth in the Pricing Request and to the extent modified thereby, the Pricing Notice. Purchase Orders shall only be binding when issued in compliance with the requirements of this Agreement and sent by e-mail, by fax or by electronic data interchange to Supplier. Supplier shall accept or reject a Purchase Order within ten (10) Business Days after receipt. Acceptance or rejection shall be declared in the form of the Purchase Order. If a Purchase Order is neither accepted nor rejected within ten (10) Business Days after receipt, it shall be deemed rejected.

4.3.    <u>Exclusivity and Certain Related Priorities</u>.

(a)    Subject to Applicable Law, during the period from the Effective Date until the Sunset Date, Buyer shall cause the Siemens BUs to:

(i)    purchase exclusively from Supplier any battery-based energy storage technology systems/solutions that are (A) within the Exclusive Activities (provided that for the purposes of this paragraph only, the term "**Application**" within Exclusive Activities shall also include power quality and microgrid/island applications (in each case as described on Schedule 1.1(a))) and (B) offered for sale by Supplier; *provided*, *however*, it is hereby agreed that the exclusive purchase obligations contained in this Section 4.3(a)(i) shall immediately cease to apply with respect to the particular purchase opportunity in the event that (1) either (x) Supplier fails to provide an initial response within five (5) Business Days following receipt of a Pricing Request from Buyer, or one of its Affiliates, or (y) Supplier fails to submit a bona fide Pricing Notice within fourteen (14) days after a final written scope of work is agreed with Buyer, or one of its Affiliates, provided that if a shorter response time is required for a final bid by the customer or project related thereto, the parties will discuss and mutually agree on such shorter time period, or (2) the prerequisite of a public tender specifies using a particular vendor, other than Supplier, to provide such battery-based energy storage technology systems/solutions (the matters set forth in the immediately preceding clause (1) and clause (2), may each individually be referred to herein as a "**Terminating Event**"); and

11

(ii)        prioritize the purchase of any other battery-based energy storage technology systems/solutions that are offered for sale by Supplier and request that each of the Siemens BUs notify Supplier if it intends to purchase such systems/solutions, such that Supplier shall have an opportunity to sell such systems/solutions thereto. It is hereby agreed that any opportunity described above is subject to other factors, including that such systems/solutions offered by Supplier are competitive in the discretion of the Siemens BUs, taking into account economic, financial and technological aspects as well as the ability to perform and deliver in terms of timeframes and logistics, that such systems/solutions comply with specific customer requirements, country-specific requirements or mandatory external regulation and in all cases subject to Applicable Laws.

In each case of clause (i) and (ii) above, the above provisions shall apply to the extent that such systems/solutions are needed as components of, or parts for, its other products/services or for its own needs or for reselling; excluding, however, inverters, which may be sourced independently.

(b)    With respect to Section 4.3(a)(ii), it is hereby agreed that the following shall apply with respect to any requirement to prioritize the purchase of any battery-based energy storage technology systems/solutions that are offered for sale by Supplier:

(i)    (A) any such opportunity described therein is subject to other factors, including that such systems/solutions offered by Supplier are competitive in the discretion of the applicable Siemens BU, taking into account economic, financial and technological aspects as well as the ability to perform and deliver in terms of timeframes and logistics, that such systems/solutions comply with specific customer requirements, country-specific requirements or mandatory external regulation and in all cases subject to Applicable Laws and (B) the purchase priority obligations contained in Section 4.3(a)(ii) shall immediately cease to apply with respect to the particular purchase opportunity upon the occurrence of a Terminating Event;

12

(ii)    Buyer shall cause the Siemens' BUs to consult regarding Supplier's products, solutions and technology and keep regular contact with the Siemens' BUs concerning projects and opportunities for which Supplier's products, solutions and technology may be suitable (each, a "**Potential Project**");

(iii)    Buyer shall cause the Siemens BUs to notify Supplier of each such Potential Project and support Supplier's preparing bids or proposals therefor, subject to Applicable Law and Third Party contractual restrictions;

(iv)    In the event that Supplier makes a formal bid or proposal with respect to a Potential Project (each, a "**Project Bid**") and such Project Bid is not accepted by the applicable Siemens BU, subject to Applicable Law and Third Party contractual restrictions, Buyer shall cause the applicable Siemens BU to inform Supplier of the main considerations of such Siemens BU which led to Supplier's Project Bid not being accepted with respect to such Potential Project;

(v)    If Supplier is able to submit a revised Project Bid to the applicable Siemens BU (the "**Revised Project Bid**"), and such Revised Project Bid is not accepted, subject to Applicable Law and Third Party contractual restrictions, Buyer shall cause the applicable Siemens BU to inform Supplier of the main considerations of such Siemens BU which led to Supplier's Revised Project Bid not being accepted with respect to such Potential Project. If Supplier is able to submit a Project Bid and, if applicable, a Revised Project Bid to the applicable Siemens BU for the Potential Project and such Revised Project Bid is satisfactory to such Siemens BU in all respects and is deemed by such Siemens BU in its judgment to be the best bid for the Potential Project, then such Siemens BU shall proceed with Supplier's Revised Project Bid. In the event that Supplier is ultimately not chosen by such Siemens BU for such Potential Project based on its initial Project Bid or subsequent Revised Project Bid, Buyer shall cause such Siemens BU to discuss with Supplier how Supplier can improve the competitiveness of its products, solutions and technology for future offerings.

(c)    Subject to Applicable Law, during the period from the Effective Date until the Sunset Date, Supplier will offer its Equipment and Services to Buyer and the Siemens BUs at Most Favored Nation Pricing in the Pricing Notice.  "**Most Favored Nation Pricing**" shall be reasonably determined by the Supplier by reference to recent (last six (6) months) sales arrangements with customers, resellers or project developers, as applicable, taking into account purchase volumes, regional market conditions, the geographic location of the projects, and the relative size and technology to be used. Supplier shall not be obligated to provide such pricing if it no longer offers the relevant products or services for sale and Supplier shall have no obligations to offer or continue to offer any such products or services for sale. If requested by Buyer, Supplier shall furnish to Buyer a certificate executed by an executive officer of Supplier and attesting to the methodology used by Supplier in determining the Most Favored Nation Pricing set forth in the applicable Pricing Notice. Supplier shall provide Buyer with supporting information concerning the comparable purchase volumes, regional market conditions, the geographic location of the projects, relative size and technology to be used, and any other variables that Supplier considered when determining the Most Favored Nation Pricing; provided that Suppler may always anonymize information about other customers' projects, in Supplier's sole discretion. In the event that Buyer believes the price indicated in the Pricing Notice does not accurately reflect Most Favored Nation Pricing, then the parties shall retain a mutually-agreeable auditing firm to independently and confidentially review Supplier's methodology and pricing inputs and to render a decision regarding whether Supplier must offer a lower price in order to satisfy its Most Favored Nation Pricing obligation as set forth above. The decision of the independent auditor shall be final and binding on both Parties. The costs of the independent auditor shall be shared equally between Supplier and Buyer.

(d)      Subject to Applicable Law, during the period from the Effective Date until the Sunset Date, if Supplier seeks certain non-exclusive supply agreements to make use of Buyer electrical balance of plant ("**eBoP**") components (e.g. inverters, switch gear or other electrical components etc.) and/or services, in each case, as used in the Core Offering (as defined in Supplier's then current business plan) where applicable, Buyer shall provide "most favored nation pricing" to Supplier for such eBoP components and/or services, it being understood that Buyer shall not be obligated to provide such pricing if it no longer offers the relevant products or services for sale and Buyer shall have no obligation to offer or continue to offer any such products or services for sale.

4.4.    <u>Non-Competition</u>.

(a)      Subject to compliance with Applicable Law or regulatory requirements, Buyer agrees that until the earlier to occur of (i) the seventh (7th) anniversary of the Effective Date and (ii) that date on which Buyer and Affiliates collectively hold Shares representing less than ten percent (10%) of the then outstanding Voting Power, neither it nor its Affiliates will directly or indirectly engage in any Exclusive Activities; provided, however, that beginning on October 1, 2023, if Supplier has not achieved at least $25,000,000 in average annual gross revenues over a rolling period of three fiscal years (such rolling period commencing on October 1, 2020) for Application No. 9 (as set forth on Schedule 1.1(a)), then Buyer, at its sole discretion, may, upon written notice to the other members of Supplier, remove Application No. 9 as an Exclusive Activity for all purposes hereunder). If Buyer removes Application No. 9 as an Exclusive Activity pursuant to this Section 4.4(a), then Application No. 9 shall simultaneously and automatically also be removed as an "Exclusive Activity" under the AES Storage Core Frame Purchase Agreement. In addition, if AES Grid Stability removes Application No. 4 as an "Exclusive Activity" pursuant to the AES Storage Core Frame Purchase Agreement, then Application No. 4 shall simultaneously and automatically also be removed as an Exclusive Activity under this Agreement.

(b)      Notwithstanding the foregoing, the restrictions set forth in this Section 4.4 shall not affect or prohibit Buyer or its Affiliates from:

(i)      (A) engaging in activities expressly permitted or contemplated herein or in the Key Agreements, or as otherwise approved by Issuer as Supplier's managing member, (B) selling Supplier's Equipment and Services to Buyer's customers with Supplier acting as a sub-supplier to Buyer, or (C) engaging in the development and sale of larger solutions incorporating an Integrated Solution from a Third Party, which is subject to the provisions of Section 4.3 hereof;

14

(ii)      acquiring and owning, through its venture capital or growth capital activities, a non-controlling interest of up to thirty-five percent (35%) of the equity or debt securities of any legal entity that is engaged in whole or in part in any Exclusive Activity, provided, that the products and/or services of such legal entity that are included within the scope of Exclusive Activities are not sold or marketed by Buyer or its Affiliates; or

(iii)     acquiring or owning any debt or equity securities of any legal entity engaged in whole or in part in any Exclusive Activities through any employee benefit or pension plan maintained by Buyer or its Affiliates or solely for purposes of asset or treasury management; or

(iv)      acquiring control of a business or legal entity (an "**Acquired Business**") engaged in whole or in part in any Exclusive Activities (a "**Competing Business**") where the annual revenues attributable to the Competing Business of the Acquired Business over its previous fiscal year were less than both (A) twenty-five percent (25%) of the total annual revenues of the Acquired Business for such fiscal year, and (B) twenty-five percent (25%) of the total annual revenues of the Issuer and its Subsidiaries for such fiscal year(collectively, the "**Non-Triggering Acquisition Thresholds**"); provided, that the Non-Triggering Acquisition Threshold set forth in clause (B) above shall only apply in the case where the annual revenues attributable to the Competing Business of the Acquired Business over its previous fiscal year were more than $25.0 million; and provided, further, that in each case where revenue is only available for a part of a fiscal year, references to annual revenues in this Section 4.4(b)(iv) and in Section 4.4(b)(v) shall mean the annualized revenues reasonably determined by extrapolation from such partial fiscal year revenues;

(v)       either (i) acquiring control of an Acquired Business where at the time of such acquisition the annual revenues attributable to the Competing Business of the Acquired Business over its most recent fiscal year (x) equal or exceed either of the Non-Triggering Acquisition Thresholds and (y) are less than forty percent (40%) of the total annual revenues of the Acquired Business for its most recently completed fiscal year, (ii) acquiring control of an Acquired Business where at the time of such acquisition the annual revenues attributable to the Competing Business of the Acquired Business over its most recent fiscal year (x) equal or exceed forty percent (40%) of the total annual revenues of the Acquired Business for its most recently completed fiscal year and (y) are equal to or less than twenty-five million dollars ($25,000,000) for its most recently completed fiscal year, or (iii) continuing to own and control a Competing Business of an Acquired Business at any time after such acquisition when the non-compete restrictions herein apply, once the annual revenues attributable to the Competing Business of the Acquired Business over its most recent fiscal year equal or exceed both twenty-five percent (25%) of the total annual revenues of the Issuer and its Subsidiaries for such fiscal year and twenty-five million dollars ($25,000,000) (either such circumstance as described in clauses (i), (ii) or (iii) above, a "**Triggering Event**"); provided, that, within thirty (30) days following the occurrence of such Triggering Event, Buyer shall, or shall cause its Affiliate to, (A) offer to sell the equity interests or assets comprising the Competing Business to Issuer for a price not greater than the Fair Market Value thereof (appropriately taking into account the assumption of liabilities and Indebtedness of (to the extent not included in determining or calculating the purchase price or valuation for)), the Competing Business (which, in the case of a Triggering Event existing as of the closing of an acquisition of an Acquired Business, shall not exceed that portion of the price paid by Buyer or its Affiliate that was allocable in good faith to the Competing Business) (each, a "**Competing Business Offer**") and (B) provide Issuer with such material information regarding the applicable Competing Business, subject to any restrictions of confidentiality or Applicable Law, that Buyer or its Affiliate determines in good faith will permit Issuer to make an informed decision as to whether to accept or reject such Competing Business Offer.

15

(c)     Buyer or its Affiliate shall provide such additional information regarding the applicable Competing Business, subject to any restrictions of confidentiality or Applicable Law, as may be reasonably requested by Issuer following Issuer's receipt of the Competing Business Offer that it determines is reasonably necessary to permit Issuer to make an informed decision as to such Competing Business Offer.

(d)     In the event that the Issuer accepts a Competing Business Offer, Buyer and Supplier shall (and shall cause their respective Affiliates to) act in good faith to consummate the acquisition of such Competing Business which is the subject of the Competing Business Offer, including with respect to securing financing, either through equity or debt financing, as necessary;

(e)     Issuer shall have eighteen (18) months from receipt of such Competing Business Offer to enter into a legally binding commitment with Buyer or its Affiliate to acquire the Competing Business which is the subject of the Competing Business Offer. In addition, Issuer shall have up to six (6) months after entering into such legally binding commitment to consummate such acquisition, or such longer period as may be reasonably required to obtain any required regulatory approvals. Failure to meet either of the timelines set forth above notwithstanding the good faith efforts of Buyer, Supplier, and their respective Affiliates to consummate the transaction will be deemed to be a rejection of the Competing Business Offer.

(f)     In case of rejection of a Competing Business Offer, Buyer or its Affiliate shall be free to continue to own and control the Competing Business.

4.5.    <u>Payment Terms</u>. Unless otherwise provided in a Pricing Notice, all payments for Equipment are due and payable net thirty (30) days following invoice. Payment terms will be mutually agreed in the Purchase Order and may be milestone based such that payments match cost outflow timing and conditions similar to 20%, 30%, 40%, 10% for Order, Delivery, Project Substantial Completion, Project Final Completion. Unless otherwise provided in a Purchase Order, all payments for Services are due and payable net thirty (30) days following invoice based on progress of the Services being performed. Payment(s) shall be by electronic banking method identified on the Purchase Order.  Buyer will not make payments to Supplier in cash or bearer instruments, nor to an account other than that specified in the Purchase Order.  Buyer will make no unlawful payments, nor make payments through any trust, intermediate entity or other party.  Buyer will not make payment(s) to an individual, employee, or other designee of Supplier.

<div align="center">16</div>

4.6. <u>Disputed Payments</u>. If a dispute arises regarding the payments to be made hereunder, Buyer or Supplier, as applicable, shall pay all undisputed amounts, and the Parties shall attempt in good faith to resolve the dispute as promptly as practicable.

4.7. <u>Late Payments</u>. Any amount owed by a Party hereunder beyond the date that such amount first becomes due and payable under this Agreement shall accrue interest from the date that it first became due and payable until the date that it is paid at the lesser of (a) LIBOR plus four percent (4%) per annum or (b) the maximum rate permitted by Applicable Law.

4.8. <u>Taxes; Export and Import Duties</u>. Notwithstanding anything herein to the contrary, (i) Supplier shall collect and withhold any and all sales taxes arising in connection with or relating to the supply, sale or Delivery of the Equipment and imposed by any Governmental Authority having jurisdiction over Supplier at the Delivery Point and (ii) Buyer shall be responsible for any and all other Taxes arising in connection with or relating to the supply, sale or Delivery of the Equipment, any and all export duties from the jurisdiction or jurisdictions in which the Equipment is manufactured or from which the Equipment may be shipped and any and all import duties, in each case, arising in connection with or relating to the supply, sale or Delivery of the Equipment. Buyer shall also be responsible for and pay all Taxes in relation to the operation of its business, including in connection with the use of the Equipment. Buyer and Seller shall cooperate to obtain exemption from, or to minimize, any Taxes.

**5.** **<u>DELIVERY</u>.**

5.1. <u>Delivery Terms; Inspection</u>. Unless otherwise provided in a Pricing Notice, delivery of Equipment comprised of Batteries shall be made FCA (Incoterms 2010) at facility of the supplier thereof and delivery of all other Equipment shall be FCA (Incoterms 2010) Supplier location. Prior to Delivery a representative of Supplier and a representative of Buyer may inspect the Equipment for damage and record such damage, if any.

5.2. <u>Guaranteed Delivery Date</u>. Supplier shall use commercially reasonable efforts to Deliver Equipment to the applicable Delivery Point by the applicable guaranteed Delivery date therefore, if any, as set forth in the applicable Purchase Order, subject to extension as provided under this Agreement (as may be extended hereunder, the "**Guaranteed Delivery Date**"). Any other dates in a Purchase Order for performance by Supplier of any work and any other obligations of Supplier pursuant to such Purchase Order are estimated, and not guaranteed, dates. The failure of Supplier to timely achieve such other Supplier milestones or obligations by the applicable dates set forth in the Purchase Order shall not be a breach under this Agreement. Neither the Purchase Order nor any milestone date contained therein, including the Guaranteed Delivery Date for the Equipment, may be changed unless the same has been modified by a duly executed Change Order. If an unexcused delay originates with Supplier or its Representatives, Supplier shall be solely responsible for expedited delivery and other charges to meet Delivery dates.

<div align="center">17</div>

5.3.    Delay Liquidated Damages. Except as may be otherwise agreed in a Purchase Order, if Delivery of the Equipment has not occurred by the Guaranteed Delivery Date for reasons that are not excused hereunder, and Buyer can prove that as a direct result thereof it must pay delay liquidated damages to its Customer, Supplier shall reimburse Buyer for such delay liquidated damages (such reimbursement not to exceed an amount equal to 0.5% of the price set forth in the Purchase Order allocable to the delayed Equipment for every completed week of delay) for each completed week after the Guaranteed Delivery Date that Buyer pays such liquidated damages to its Customer as a result of Supplier's delay, provided, however, that the amount of delay liquidated damages payable by Supplier shall be reduced by any amounts received by Buyer under any delay in startup insurance policies providing coverage for any such losses or damages. Payment of the delay liquidated damages shall be the sole and exclusive remedy of Buyer for delay and under no circumstances shall the total aggregate liability of Supplier exceed five percent (5%) of the price set forth in the applicable Purchase Order.

5.4.    Buyer Caused Delay. If Buyer fails to perform any obligations under a Purchase Order or otherwise causes a delay in the performance by Supplier of its obligations under a Purchase Order, and such failure or delay results in an increase in Supplier's costs and/or impacts Supplier's ability to meet any Supplier milestone in accordance with the schedule contemplated by the applicable Purchase Order, Supplier shall be entitled to a Change Order increasing the price payable under the applicable Purchase Order and extending the date for completion of any Supplier milestones commensurate with such delay and added cost, including overtime charges for labor and equipment.

**6.    TITLE, RISK OF LOSS AND CARE, CUSTODY AND CONTROL.**

6.1.    Transfer of Title and Risk of Loss. Title, care, custody, control and risk of loss of any portion of the Equipment shall pass to Buyer upon Delivery of the Equipment to the Delivery Point. Notwithstanding the foregoing, in no event will title to the Licensed Technology or any other Intellectual Property used in the Equipment or otherwise provided to Buyer, including any Software, transfer to Buyer.

6.2.    Warranty of Title. Supplier warrants to Buyer that, when title to the Equipment or any portion thereof is transferred to Buyer in accordance herewith, Buyer shall have good title to the Equipment or such portion thereof free and clear of all Liens, other than any such Liens which may arise in connection with Buyer's failure to make payments as they become due under this Agreement. In the event of any nonconformity with the foregoing, Supplier, at its own expense, upon written notice of such failure, shall indemnify Buyer from the consequences of such nonconformity and defend the title to such Equipment, and Supplier shall either promptly replace such Equipment or any affected portion thereof or remedy the title defect.

**7.    INSPECTION AND QUALITY CONTROL.**

7.1.    Inspection Rights. Supplier shall permit Buyer, its Representatives and/or customer(s), at Buyer's expense, to inspect Equipment/Services during manufacture at Supplier's facilities or during performance and shall use commercially reasonable efforts to facilitate similar inspections at the manufacturing facilities of third party suppliers. Buyer shall provide Supplier with written notice of its intent to make any such inspection not less than ten (10) Business Days prior to the proposed inspection date. Buyer's inspections/tests will not unduly interfere with Supplier's business or the business of its third party suppliers.

18

7.2.    Quality Control. Supplier shall maintain quality control with respect to the Equipment and Services as mutually agreed upon by the Parties and provide Buyer with quality assurance documentation, manuals or certifications.

**8.    WARRANTIES.**

8.1.    Equipment Warranty. Supplier warrants to Buyer that (i) the Equipment as Delivered shall be new at the time of Delivery and shall have been manufactured using new components and (ii) during the Equipment Warranty Period the Equipment shall be free of any Defects (the "**Equipment Warranty**"). As used herein, the "**Equipment Warranty Period**" means the period of time commencing on the earlier to occur of (i) the date that the Equipment is placed into service as evidenced by the operation thereof for commercial purposes and (ii) the day that is sixty (60) days after the date of Delivery of the Equipment and continuing to and ending on the first (1st) anniversary of such date. Notwithstanding the foregoing, (i) the Parties may agree in any particular Purchase Order to address defect warranties with respect to Batteries separately and (ii) any performance guarantees with respect to Batteries shall be solely as set forth in the applicable Purchase Order.

8.2.    Services Warranty. Supplier warrants to Buyer that any Services shall at the time of performance thereof and during the Services Warranty Period be (i) performed in a good and workmanlike manner and free of any fault, defect or deficiency that would preclude or impair the ability of such Services to fulfill the purposes set forth in the applicable Purchase Order therefor in all material respects, (ii) consistent with a level of care, skill and judgment which conforms with Prudent Industry Practices, and (iii) in compliance with the requirements of this Agreement and the applicable Purchase Order (the "**Services Warranty**"). As used herein, the "**Services Warranty Period**" means the period of time commencing on the date of performance of the applicable Service and continuing to and ending on the first (1st) anniversary of such date.

8.3.    Notification Requirements. Buyer shall promptly (but in any event within ten (10) Business Days after obtaining notice or knowledge thereof) notify Supplier of any failure of the Equipment to satisfy the Equipment Warranty or any failure of the Services to satisfy the Services Warranty, in each case by delivering written notice to Supplier of a warranty claim. The written notice of warranty claim shall, to the extent reasonably practicable, identify the applicable failure and the circumstances or conditions observed by Buyer that indicates the presence of such failure.

8.4.    Corrective Action. If, at any time prior to the expiration of the Equipment Warranty Period, either Party discovers any Defect, Supplier agrees that it shall Deliver a replacement for the applicable Defective part, without cost or expense to Buyer. When a Defective part has been Delivered to Buyer, such replaced part shall be covered by the Equipment Warranty until the later of (a) twelve (12) months from the time such replacement part was Delivered to Buyer, and (b) the end of the Equipment Warranty Period. All replacement parts shall be of good and workmanlike quality and shall be new or newly refurbished. If, at any time prior to the expiration of the Services Warranty Period, either Party discovers any failure of the Services to satisfy the Services Warranty, Supplier agrees that it shall, in its sole discretion, either correctly re-perform or otherwise correct the defective Services, without cost or expense to Buyer. When a defective Service has been remedied, such remedied Service shall be covered by the Services Warranty until the later of (a) twelve (12) months from the time such remedy was completed, and (b) the end of the Services Warranty Period.

8.5.    Warranty Exclusions. The Equipment Warranty and the Services Warranty shall not apply if (a) the applicable Defect or failure is attributable to Buyer's failure to operate, repair or maintain the Equipment in material compliance with the procedures set forth in any Supplier Documents furnished to Buyer, which procedures are identified therein as necessary to maintain the effectiveness of the warranties or (b) the applicable Defect or failure is attributable to Buyer's or Buyer's contractor's misuse or abuse of the Equipment (c) if the Equipment has been used in a manner contrary to Supplier's instructions set forth in the Supplier Documents that are identified therein as necessary to maintain the effectiveness of the warranties; (d) the applicable Defect or failure is attributable to any materials or equipment provided by Buyer; or (e) if the Equipment has failed as a result of ordinary wear and tear.

8.6.    NO IMPLIED WARRANTIES. THE WARRANTIES OF SUPPLIER SET FORTH IN THIS AGREEMENT ARE SUPPLIER'S SOLE AND EXCLUSIVE WARRANTIES AND ARE MADE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE. THE REMEDIES SET FORTH HEREIN WITH RESPECT TO SUCH WARRANTIES ARE BUYER'S SOLE AND EXCLUSIVE REMEDIES, AND SUPPLIER'S SOLE AND EXCLUSIVE LIABILITY, FOR ANY BREACH OF SUCH WARRANTIES. OTHER THAN THE WARRANTIES OF SUPPLIER SET FORTH IN THIS AGREEMENT, SUPPLIER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL OTHER EXPRESS WARRANTIES AND ALL OTHER WARRANTIES, CONDITIONS, DUTIES AND OBLIGATIONS, STATUTORY OR OTHERWISE, IMPLIED IN LAW, INCLUDING THOSE OF PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, CUSTOM, USAGE, OR OTHERWISE. THERE ARE NO OTHER WARRANTIES, CONDITIONS, AGREEMENTS, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, OR UNDERSTANDINGS, WHETHER OR NOT IN A CONTEMPORANEOUSLY EXECUTED OR DATED AGREEMENT OR SPECIFICATION, THAT EXTEND BEYOND THOSE SET FORTH HEREIN AND NO OTHER WARRANTIES, CONDITIONS, AGREEMENTS, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, WHICH MIGHT HAVE BEEN GIVEN BY AN EMPLOYEE, AGENT OR REPRESENTATIVE OF SUPPLIER OR ITS AFFILIATES ARE AUTHORIZED BY SUPPLIER.

8.7.    Reserved Rights. Without limiting Supplier's obligations hereunder to remedy Defects, Supplier reserves the right (i) to make changes and improvements in its equipment and products without incurring any obligation to make such changes and improvements to any Equipment previously sold under a Purchase Order pursuant to this Agreement; and (ii) to change the terms of the warranty it provides to other Persons in the future without incurring any right or obligation to make the revised terms applicable to any Equipment previously sold under a Purchase Order pursuant to this Agreement. The provisions of this Section 8.7 shall survive the termination or expiration of this Agreement.

8.8.    Access to Buyer Data. Real time access on a 24/7 basis to all Buyer Data shall be determined on a case by case basis and set forth in the applicable Purchase Order.

**9.**    **BUYER FURNISHED PROPERTY.**

The term "**Buyer Furnished Property**" shall mean all tools, patterns, equipment, materials or other property which is either supplied by, or purchased by or on behalf of, Buyer or its Representatives to Supplier to perform the Services or furnish the Equipment. Title to Buyer Furnished Property shall remain with Buyer and risk of loss shall be with the Party who has possession. For Buyer Furnished Property in Supplier's possession, custody or control, Supplier shall insure against loss and damage in an amount equal to full replacement cost. Buyer Furnished Property shall carry no guarantee or warranty, express or implied. Supplier shall not use Buyer Furnished Property on any work other than the Equipment/Services. Supplier shall clearly mark Buyer Furnished Property to show Buyer's ownership and prevent a lien, encumbrance or challenge to Buyer's title thereto. Supplier shall, at its own expense, maintain and repair Buyer Furnished Property returning it to Buyer in the condition in which received, reasonable wear and tear excepted. Upon expiration or termination of the Purchase Order, Supplier shall dispose of Buyer Furnished Property as Buyer directs in writing. Buyer reserves the right to abandon Buyer Furnished Property at no additional cost to Buyer. The applicable Purchase Order pursuant to which Buyer Furnished Property was furnished to Seller shall remain in effect so long as Supplier possesses Buyer Furnished Property.

**10.**    **PACKAGING.**

Except where the Purchase Order includes alternative requirements, Supplier shall be responsible for packaging Equipment, and the clear and conspicuous marking of Equipment and packaging, in accordance with Applicable Law, industry standards and in a manner sufficient to permit efficient handling, to provide adequate protection and comply with requirements of carrier and Applicable Law. Packing slips identifying the Purchase Order number, and part number must accompany each shipment. The exterior of each shipping container or package will be clearly marked with Buyer's Purchase Order number and country of origin, which shall also be marked on Equipment, in a clear, conspicuous and permanent manner. Supplier shall provide all necessary shipping documents, including, but not limited to, customs invoices and packing lists in accordance with Buyer's requirements and Applicable Law. Damages and costs incurred by Buyer, its Representative or customer resulting from Supplier or its Representative's failure to comply with this Article 10 shall be paid by Supplier. If Supplier imports wood packaging materials, in accordance with 7 CFR 319.40, Supplier warrants that such wood packaging material is treated and marked under an official program developed and overseen by the National Plant Protection Organization in the country of export.

**11.**    **FORCE MAJEURE.**

11.1.    Effect of Force Majeure. A Party shall not be considered to be in breach or default of this Agreement or any Purchase Order hereunder if and to the extent that its failure or delay in performance or its efforts to cure are prevented by Force Majeure.

11.2.    Procedures. If either Party, as a result of the occurrence of a Force Majeure, is rendered wholly or partially unable to perform its obligations under this Agreement or any Purchase Order, such Party shall comply with the following:

(a)    the affected Party shall promptly notify the other Party hereto in writing, and in any event within five (5) Business Days after the affected Party becomes aware of the occurrence of such Force Majeure event, describing in such notice the particulars of the occurrence;

21

(b)    the affected Party shall give the other Party written notice estimating the event's expected duration and probable impact on the performance of such Party's obligations under this Agreement, and such affected Party shall continue to furnish timely regular reports with respect thereto during the continuation of the event;

(c)    the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the event;

(d)    no liability of either Party which arose before the occurrence of the event causing the suspension of performance shall be excused as a result of the occurrence;

(e)    the affected Party shall exercise all reasonable efforts to mitigate or limit damages to the other Party, promptly taking appropriate and sufficient corrective action, including the expenditure of all reasonable sums of money;

(f)    the affected Party shall use all reasonable efforts to continue to perform its obligations under this Agreement and to correct or cure the event excusing performance; and

(g)    when the affected Party is able to resume performance of the affected obligations under this Agreement, the affected Party shall promptly resume performance and give the other Party written notice to that effect.

11.3.    <u>Termination for Extended Force Majeure</u>. If Supplier experiences a Force Majeure Event completely preventing Supplier's performance for more than forty-five (45) consecutive days, Buyer shall have the right to terminate the applicable Purchase Order and shall be entitled to a refund of all monies advanced to Supplier.

## 12.    **CHANGE ORDERS**.

12.1.    <u>Change Order</u>. A "**Change Order**" is a written instrument signed by the Parties and stating their mutual agreement upon a change in the obligations of the Parties under this Agreement or any Purchase Order, including if applicable the amount of the adjustment in the purchase price and the extent of any adjustment to the Delivery schedule, including the Guaranteed Delivery Date.

12.2.    <u>Change Order Process</u>. In addition to circumstances set forth herein where the Parties are entitled to a Change Order, either Party may request changes in the obligations of the Parties under this Agreement within the scope of this Agreement consisting of additions, deletions, or other revisions to such obligations. If either Buyer or Supplier wishes to change such obligations, it shall submit a change request to the other Party in writing. If the requested change relates to a change to the Equipment supply obligations or results from a condition in which Supplier is entitled to a Change Order under this Agreement, then, within fifteen (15) Business Days following receipt or delivery, as applicable, of the requested change, Supplier shall submit a proposal to Buyer stating (i) the increase or decrease, if any, in the purchase price and changes to the Delivery schedule and/or the Guaranteed Delivery Date, if any, that would result from such change (collectively, the "**Change Order Information**"). If the proposed change relates to any other matter, the requesting Party, at the time the request for the change is made, shall provide the proposed Change Order Information. Within five (5) Business Days following receipt of the Change Order Information, the Parties shall meet and, acting reasonably, negotiate in good faith a mutually acceptable Change Order in accordance with the principles set forth herein. Following agreement on the terms and conditions of the Change Order, the Parties shall execute the same. If the Parties do not agree upon the terms and conditions of the Change Order, and the proposed change relates to circumstances in which a Party is entitled to a Change Order under this Agreement, then either Party may submit the matter to dispute resolution pursuant to Article 24.

22

12.3. <u>Change Order Restrictions</u>. Notwithstanding anything herein to the contrary, Buyer shall not be entitled reduce the scope of the Equipment supply obligations under any Purchase Order.

12.4. <u>No Change</u>. Supplier shall not be obligated to proceed with any change in the Equipment supply obligations requested by Buyer unless and until a Change Order is executed by the Parties in relation to such change. Further, Supplier shall not be required to implement a requested change in the Equipment supply obligations by Buyer if Supplier reasonably believes the implementation of such change would impair Supplier's ability to comply with any of the warranties or the covenants set forth in this Agreement or the applicable Purchase Order.

**13.    INTELLECTUAL PROPERTY.**

13.1. <u>Grant of License</u>. Upon transfer of title with respect to any Equipment purchased hereunder and upon providing parts under the Equipment Warranty hereunder, Supplier hereby grants to Buyer a non-exclusive, transferable, fully paid-up with no further royalty obligation, worldwide, license in and to, all Intellectual Property owned or licensed by Supplier which are necessary for the use and enjoyment by Buyer of Equipment hereunder (the "**License**") to import into the Territory and use the Licensed Technology (including any Intellectual Property in the Licensed Technology) within the Territory, and solely in accordance with the terms of this Agreement. Such license includes a perpetual license to use software provided for the operation of the Equipment, including but not limited to all modifications or additions to software upon payment of commercially reasonable service charges to be negotiated, as well as all related documentation and technical information. With respect to any Confidential Information contained within the Licensed Technology, Buyer may disclose such Confidential Information to third party contractors who have a need to know such parts of the Licensed Technology solely for Buyer's use and operation of the Equipment and in accordance with the terms of this Agreement; <u>provided</u> that such third parties shall first execute a confidentiality agreement consistent with this Agreement containing restrictions on disclosure and use at least as restrictive as those in Article 17 (and such third party contractors shall not be permitted to disclose the Licensed Technology to any other third party). The Licensed Technology is Confidential Information of Supplier as defined in Section 17.1 even if not marked as "confidential," "proprietary" or with other such similar language, except where an exception in Section 17.3 applies.

13.2. <u>No Copies</u>. Except as otherwise permitted by this Agreement, Buyer shall not make any copies of the Licensed Technology without first obtaining express written permission from Supplier. Notwithstanding the foregoing, Buyer may make such number of copies of (i) the documentation and manuals for the Equipment or other Intellectual Property licensed hereunder that is not embedded in the Equipment as are required for Buyer's normal use and operation hereunder (including such copies as may be included in or attached to electronic mail messages by Buyer for delivery to Persons who are otherwise permitted recipients of Supplier's Confidential Information hereunder) and (ii) the Licensed Technology as are reasonably required for back-up, disaster recovery and archival purposes.

23

13.3.  Proprietary Notices. Buyer shall not remove or alter, or permit to be removed or altered, any proprietary notices that appear on or with the Licensed Technology. Buyer shall include on and with the Licensed Technology a written notice stating: "Confidential and Proprietary Information of Supplier. Access and Use Restricted by License." or such other or additional notice as Supplier reasonably may prescribe.

13.4.  Security. Buyer shall take all reasonable steps to ensure that no unauthorized persons have access to the Licensed Technology, and to ensure that no persons authorized to have such access shall take any action which would be in violation of this Agreement. Such steps shall include, but shall not be limited to, imposing password restrictions on use of the Licensed Technology securing Buyer's network on which such Licensed Technology resides from outside intrusion, preventing the making of unauthorized copies of the Licensed Technology and administering and monitoring use of the Licensed Technology.

13.5.  No Reverse Engineering. The Licensed Technology includes trade secrets of Supplier or its Affiliates. In order to protect the Licensed Technology, Buyer shall not modify, translate, decompile, reverse engineer, decrypt, extract or disassemble the Licensed Technology or otherwise reduce or attempt to reduce any Software in the Licensed Technology to source code form. Buyer shall ensure, both during and (if Buyer still has possession of the Licensed Technology) after the performance of this Agreement, that (a) Persons who are not bound by a confidentiality agreement consistent with this Agreement shall not have access to the Licensed Technology and (b) Persons who are so bound are put on written notice that the Licensed Technology contains trade secrets, owned by and proprietary to Supplier or its Affiliates.

13.6.  Open Source Software. Buyer shall not sell, sublicense, or otherwise make available the Licensed Technology or any part thereof as Open Source Software, nor combine the Licensed Technology with any Open Source Software in a manner that could require the release, disclosure or distribution of the Licensed Technology, or otherwise infect the Licensed Technology so as to impose any obligation on Supplier or diminish any rights Supplier may have therein.

13.7.  Reporting. Buyer shall promptly report to Supplier any actual or suspected violation of this Article 13, and shall take such further steps as may reasonably be requested by Supplier to prevent or remedy any such violation.

13.8.  Relief. Because unauthorized use or transfer of the Licensed Technology is likely to diminish substantially the value of such Licensed Technology and irreparably harm Supplier and will not be susceptible of cure by the payment of monetary damages, if Buyer breaches the provisions of this Article 13, Supplier shall be entitled to injunctive and/or other equitable relief, in addition to other remedies afforded by law, to prevent or restrain such breach.

13.9.  Improvements.

   (a)  By Supplier. Any improvement hereafter made by or for Supplier or any of its Affiliates in the Licensed Technology that is approved and adopted by Supplier for use by Buyer under this Agreement shall be included in the Licensed Technology for purposes of the License. The Parties agree that Supplier may decide in its sole discretion which improvements it shall approve and adopt for purposes of Buyer's use under the License; provided, however, that if Supplier makes improvements available to buyers similarly situated to Buyer in terms of project scope and fees paid, Supplier also shall make such improvements available to Buyer on terms at least as favorable to Buyer as the terms generally provided to such similarly situated buyers.

24

(b) <u>By Buyer</u>. Buyer may not modify the Licensed Technology except as expressly permitted in this Section 13.9(b). Buyer may suggest modifications in the Licensed Technology to Supplier. Any modification in the Licensed Technology suggested by Buyer must first be approved by Supplier in its sole discretion in writing before it is used by Buyer hereunder. If Buyer develops any material modification or improvement in the Licensed Technology (whether permitted or not), it shall promptly disclose it to Supplier in writing. If and only if, and to the extent, Applicable Law mandates that Buyer own any modifications to or improvements in the Licensed Technology, in whole or in part, and notwithstanding the terms of this Agreement, Buyer hereby grants to Supplier and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free license to make, have made, import, offer for sale, sell, copy, make derivative works, use and sublicense others to use these modifications or improvements.

13.10. <u>Ownership</u>.

(a) <u>Supplier</u>. As between the Parties, Supplier or its Affiliates shall own the Licensed Technology, including any modifications, discoveries, derivative works and improvements derived from or based on it, whether developed by Supplier, by Buyer, or by the Parties jointly, all Intellectual Property therein and any Intellectual Property developed during, or arising out of, the performance of Supplier's obligations under this Agreement, to the extent permitted by Applicable Law. Buyer acquires only certain rights to use the Licensed Technology under the License, strictly in compliance with the terms of this Agreement, and does not acquire any ownership rights or title to it.

(b) <u>Buyer</u>. As between the Parties, Buyer or its Affiliates shall own (1) any Intellectual Property developed or acquired by Buyer prior to or independently of this Agreement, (2) all data generated or collected by the Equipment or Buyer or its customer during the commercial use of the Equipment (the "**Buyer Data**"), and (3) all Intellectual Property therein, excluding in each case any of the Licensed Technology incorporated therein or any Intellectual Property in any combination of the Licensed Technology and Buyer Data.

(c) <u>Cooperation</u>. Buyer shall reasonably cooperate with Supplier to assist in perfecting Supplier's ownership in any Intellectual Property in modifications, discoveries, derivative works and improvements to Licensed Technology developed by Supplier or by the Parties jointly, including by executing declarations, oaths, assignments or other formalities documents as needed.

25

13.11.   <u>Enforcement</u>. Each Party shall notify the other promptly in writing of any suspected infringement by a third party of the Licensed Technology or any of the Intellectual Property therein. Supplier shall have the exclusive right to enforce and defend the rights appurtenant to the Licensed Technology or the Intellectual Property therein in Supplier's sole discretion and shall have the sole right of control of any such enforcement action or proceeding it elects to initiate (an "**Enforcement Action**"), at Supplier's sole cost and expense. Supplier shall keep Buyer timely and reasonably informed as to significant events during the course of all such Enforcement Actions as would reasonably be expected to affect Buyer's use of the Licensed Technology whether conducted for Supplier's or Buyer's account. Buyer shall provide on Supplier's written request reasonable assistance in preparing and advancing Supplier's case, in consideration of which Supplier shall reimburse Buyer's reasonable out-of-pocket costs incurred in doing so (including reasonable attorneys' fees). Supplier may retain any monetary damages or other compensation or recovery awarded to it in any Enforcement Action under this Section 13.11. Notwithstanding the foregoing, Buyer may participate and be represented in any Enforcement Action by its own counsel at its own expense, to the extent such participation and representation does not materially interfere with Supplier's right to control such Enforcement Action. Supplier shall not settle any such Enforcement Action in a manner materially and adversely affecting Buyer's rights in this Agreement, or in a manner including an admission of wrongdoing by Buyer, without obtaining the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed. Buyer has no right to enforce Supplier's Intellectual Property in the Licensed Technology against any third parties.

13.12.   <u>Duration and Transfers</u>. Subject to termination in accordance with this Agreement, the License (i) shall continue for so long as Buyer or any successor retains ownership of the Equipment and continues operating the same (ii) shall terminate automatically if and when the Equipment is permanently removed from service (subject to earlier termination in accordance herewith) and (iii) shall transfer as part of an assignment that is permitted under Section 25.5. If Buyer sells or transfers the Equipment, or any portion thereof, apart from an Assignment of this Agreement, the License will terminate as to Buyer with respect to the Equipment, or any portion thereof sold or transferred and Buyer must, as a condition thereof, notify Supplier in writing and assign to the transferee thereof the License with respect to the Equipment, or any portion thereof sold or transferred, and procure from the transferee an assumption of such License, on substantially the same terms as set forth in this Article 13 and in form subject to Supplier's prior reasonable approval, to the extent the License is applicable to the assets being sold or transferred. The License may not be assigned, transferred or sublicensed except as expressly permitted in this Section 13.12. Buyer shall be responsible for, and indemnify, defend and hold harmless Supplier, Supplier's Parent, Supplier's Affiliates, and their respective officers, directors, members, agents and employees from and against any damage, injury or loss resulting from the failure of Buyer to comply with the terms of this Article 13. Supplier may terminate the License, except with respect to any Licensed Technology that is integrated in any Equipment as to which title has transferred to Buyer hereunder, on written notice to Buyer if Buyer (a) fails to cure any material breach of an obligation in this Article 13 which is capable of being cured within thirty (30) days after Supplier's written notice specifying the breach, or (b) on more than two (2) occasions in any five (5) year period, Buyer is found, through resolution of a Dispute, whether by settlement or otherwise, to have materially breached the terms and conditions of this Article 13 in substantially the same manner.

26

13.13.    Government End Users. The Software portion of the Licensed Technology is a "commercial item" as that term is defined at 48 CFR 2.101, and includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 CFR 12.212 and in the event the Licensed Technology is provided to the US Government, such Licensed Technology shall be provided to the US Government only as a commercial end item. Consistent with 48 CFR 12.212, civilian US Government end users acquire the Software and documentation with only those license rights set forth herein as restricted by 48 CFR 12.212(a)(1) and (a)(2); Department of Defense end users acquire the Software and documentation with only those license rights set forth herein as restricted by 48 CFR 227.7202-1 through 227.7202-4.

13.14.    Reservation of Rights. Supplier reserves all rights in the Licensed Technology not expressly granted to Buyer in this Agreement. No right or license is granted (expressly or by implication or estoppel) by Supplier to Buyer or its Affiliates under any tangible, Intellectual Property, or other proprietary right.

**14.    DEFAULTS AND REMEDIES.**

14.1.    Supplier Defaults. The occurrence of any one or more of the following events shall constitute an event of default by Supplier hereunder (a "**Supplier Event of Default**"):

(a)    Supplier fails to pay to Buyer any payment required under this Agreement (which is not subject to a good faith dispute) when due, and such failure continues for ten (10) Business Days after receipt of written notice of such failure;

(b)    Supplier voluntarily commences bankruptcy, insolvency, reorganization, stay, moratorium or similar debtor-relief proceedings, or shall have become insolvent or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors;

(c)    Insolvency, receivership, reorganization, bankruptcy, or similar proceedings shall have been commenced against Supplier and such proceedings remain undismissed or unstayed for a period of ninety (90) days;

(d)    Supplier fails to deliver Equipment by the date upon which Supplier exhausts its liability for liquidated damages for delayed deliveries under Section 5.3; or

(e)    Except as otherwise expressly provided for in this Section 14.1, Supplier is in material breach of its obligations under this Agreement and such material breach continues uncured for sixty (60) days after receipt of written notice from Buyer.

14.2.    Buyer Defaults. The occurrence of any one or more of the following events shall constitute an event of default by Buyer hereunder (a "**Buyer Event of Default**"):

(a)    Buyer fails to pay to Supplier any payment required under this Agreement (which is not subject to a good faith dispute) when due, and such failure continues for ten (10) Business Days after receipt of written notice of such failure;

(b)    Buyer voluntarily commences bankruptcy, insolvency, reorganization, stay, moratorium or similar debtor-relief proceedings, or shall have become insolvent or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors;

27

(c)    Insolvency, receivership, reorganization, bankruptcy, or a similar proceeding shall have been commenced against Buyer and such proceeding remains undismissed or unstayed for a period of ninety (90) days;

(d)    Any Assignment by Buyer not in conformity with Section 25.5; or

(e)    Except as otherwise expressly provided for in this Section 14.2, Buyer is in material breach of its obligations under this Agreement and such material breach continues uncured for sixty (60) days after receipt of written notice from Supplier.

14.3.    <u>Remedies</u>. Upon the occurrence of a Supplier Event of Default, Buyer may, by written notice to Supplier, terminate the outstanding Purchase Order(s) under which the Supplier Event of Default has arisen and/or shall be entitled to such rights and remedies as may be available at law or in equity. Upon the occurrence of a Buyer Event of Default, Supplier may, by written notice to Buyer, terminate the outstanding Purchase Order(s) under which the Buyer Event of Default has arisen and/or shall be entitled to such rights and remedies as may be available at law or in equity. Any rights and remedies available under Applicable Law upon termination of this Agreement pursuant to this Section 14.3 shall be limited in all respects by the limitations of liability set forth in Article 16. For sake of clarity, in the event that there are more than one Buyer under this Agreement, (i) a Buyer Event of Default by one such Buyer shall not constitute a Buyer Event of Default by any other Buyer and any remedies available to Supplier shall be exercisable only as against the defaulting Buyer and as regards the non-defaulting Buyer(s) this Agreement and any related Purchase Orders shall continue in full force and effect, and (ii) a Supplier Event of Default with respect to any particular Purchase Order shall only count as a Supplier Event of Default for the applicable Purchase Order and as regards any other Purchase Orders and any other Buyer(s), this Agreement and any related Purchase Orders shall continue in full force and effect.

## 15.    **INDEMNIFICATION.**

15.1.    <u>General</u>. Each Party (the "**Indemnifying Party**") shall indemnify, defend and hold harmless the other Party, its Affiliates, and their Representatives and assigns (the "**Indemnified Party**") from and against all claims, suits, causes of action, losses, liabilities, liens, damages, assessments, costs, expenses, demands, complaints or actions including but not limited to reasonable attorneys' fees and court costs (collectively, "**Claims**") of third parties concerning: (i) death, personal injury, or property damage of third parties, (ii) nonpayment of wages, benefits, fees, amounts owed, and/or any taxes (including penalties and interest) associated therewith arising from the Indemnifying Party's Representatives, suppliers, contractors, and/or materialmen which may include liens or encumbrances on the Equipment/Services or the premises on which located and (iii) violations by the Indemnifying Party or any Person for whom the Indemnifying Party is responsible of Applicable Law; in each case to the extent arising or resulting from the Indemnifying Party's or its Representative's negligence, willful misconduct, or breach of this Agreement. For sake of clarity, if both Parties are negligent or otherwise at fault or strictly liable without fault, then the obligations of indemnification under this Section 15.1 shall continue, but the Indemnifying Party shall indemnify the Indemnified Party only for the percentage of responsibility for the damage or injuries attributable to the Indemnifying Party.

15.2.    <u>Infringement Indemnification by Supplier</u>.

(a)    <u>Indemnity</u>. If an action is brought or threatened against Buyer claiming that Buyer's use, as permitted herein, of the Licensed Technology within the Territory infringes any Intellectual Property arising or existing under Applicable Law, Supplier shall defend, indemnify and hold harmless Buyer, its Affiliates, and their Representatives and assigns at Supplier's expense from and against any and all Infringement Claim Costs of Buyer to the extent arising from such action or claim.

(b)    <u>Corrective Actions</u>. If Buyer's permitted use of the Licensed Technology within the Territory is materially impaired or if Supplier's performance of the Equipment supply obligations under this Agreement or any other obligation is materially impaired by reason of such third party claim, Supplier shall use commercially reasonable efforts, at its expense, to continue its performance of the Equipment supply obligations under this Agreement or the other affected obligations, including at its own election and expense (i) to substitute an equivalent non-infringing item or process for the allegedly infringing item or process, (ii) to modify the allegedly infringing item or process so that it no longer infringes but remains functionally equivalent or better or (iii) to obtain for Buyer the right to continue using such item or process. Supplier shall, prior to proceeding with any of the foregoing actions, consult with Buyer as to the proposed action and consider in good faith any reasonable request of Buyer in respect thereof. Nothing herein constitutes a guarantee by Supplier that such efforts will succeed in avoiding the infringement claim or that Supplier will be able to replace the infringing item or process with an item or process of comparable functionality or effectiveness. If Supplier reasonably believes that an injunction against use of the Licensed Technology in the Territory may be granted against Buyer, either imminently or with the passage of time, Supplier may at its expense, and upon reasonable prior written notice to Buyer, take any of the foregoing actions in order to minimize its liability.

(c)    <u>Exclusions</u>. This Section 15.2 does not apply to, and Supplier assumes no liability with respect to, claims for patent infringement or copyright infringement or improper use of other proprietary rights (including any license or Intellectual Property, whether by way of copyright or otherwise) to the extent that such claims relate, in whole or in part, to (i) Buyer's modification or alteration of the Licensed Technology (except to the extent permitted by this Agreement) or the Equipment, in either case made without Supplier's written consent or contrary to Supplier's instructions, (ii) the combination of the Licensed Technology with other Software, products, materials, equipment, parts or apparatus and not approved in writing by Supplier or (iii) a failure to promptly install an update required by Supplier.

(d)    <u>Entire Liability</u>. THE FOREGOING PROVISIONS OF THIS SECTION 15.2 STATE THE ENTIRE LIABILITY AND OBLIGATION OF SUPPLIER AND ITS AFFILIATES AND THE EXCLUSIVE REMEDY OF BUYER, WITH RESPECT TO ANY ACTUAL OR ALLEGED INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS OR OTHER INTELLECTUAL PROPERTY BY THE EQUIPMENT OR THE LICENSED TECHNOLOGY OR ANY PART THEREOF, EXCEPT TO THE EXTENT THAT SUCH LIABILITY CANNOT BE EXCLUDED IN ACCORDANCE WITH MANDATORY LEGAL REQUIREMENTS.

(e)    <u>Notifications</u>. Buyer shall promptly notify Supplier in writing following receipt of written notice of any claims alleging infringement of patents or other proprietary rights (including Intellectual Property) in connection with Buyer's permitted use of the Licensed Technology or Supplier's performance of the Equipment supply obligations under this Agreement or Equipment Warranty obligations, and shall provide Supplier with all information in its possession relevant to such claim. In turn, Supplier shall notify Buyer as soon as practical in writing of any claims which Supplier may receive alleging infringement of patents or other proprietary rights which may affect Supplier's performance of the Equipment supply obligations under this Agreement or Equipment Warranty obligations under this Agreement or Buyer's right to own, operate and maintain the Equipment.

15.3.    <u>Infringement Indemnification by Buyer</u>.

(a)    <u>Indemnity</u>. If an action is brought or threatened against Supplier claiming that any condition or event described in Section 15.2(c) results in an infringement upon any Intellectual Property within the Territory arising or existing under Applicable Law, Buyer shall defend, indemnify and hold harmless the Supplier Indemnified Parties at Buyer's expense from and against any and all Infringement Claim Costs of Supplier to the extent arising from such action or claim.

(b)    <u>Corrective Actions</u>. If performance of Supplier's obligations hereunder is enjoined by reason of a claim subject to Section 15.3(a), Buyer shall use commercially reasonable efforts, at its option and expense, at its own election (i) to substitute an equivalent non-infringing item or process for the allegedly infringing item or process, (ii) to modify the allegedly infringing item or process so that it no longer infringes but remains functionally equivalent, or (iii) to obtain for Supplier the right to continue using such item or process. Nothing herein constitutes a guarantee by Buyer that such efforts will succeed in avoiding the infringement claim or that Buyer will be able to replace the infringing item or process with an item or process of comparable functionality or effectiveness.

(c)    <u>Exclusions</u>. This Section 15.3 does not apply to, and Buyer assumes no liability with respect to, claims for patent infringement or copyright infringement or improper use of other proprietary rights (including any license or Intellectual Property, whether by way of copyright or otherwise), to the extent that such claims relate, in whole or in part, to (i) a modification to the Licensed Technology or the Equipment requested by Buyer but executed by Supplier or with Supplier's supervision and control or (ii) the combination of the Licensed Technology with other products, materials, equipment, parts or apparatus approved in writing by Supplier.

15.4.    <u>Indemnification Procedures</u>.

(a)    If an Indemnified Party receives written notice of a Claim, the Indemnified Party shall give prompt written notice to the Indemnifying Party, including a reasonably detailed description of the facts and circumstances relating to such Claim, a complete copy of all notices, pleadings and other papers related thereto, and a description in reasonable detail of the basis for the potential claim for indemnification with respect thereto. The Indemnified Party's delay or deficiency in notifying Supplier shall not relieve Supplier of liability or obligation except to the extent (and only to the extent) such delay materially impacts the defense of the Claim.

<div align="center">30</div>

(b)     The Indemnifying Party shall be entitled to assume the defense and to represent the interests of the Indemnified Party, which shall include the right to select and direct legal counsel and other consultants (all of whom shall be reasonably acceptable to the Indemnified Party), appear in proceedings on behalf of the Indemnified Party and to propose, accept or reject offers of settlement, subject to Section 15.4(c) below, all at its sole cost. Nothing herein shall prevent an Indemnified Party from retaining its own legal counsel and other consultants or participating in its own defense at its own cost and expense. Notwithstanding the foregoing, if (i) the claim is primarily for non-monetary damages against the Indemnified Party, or primarily for an injunction or other equitable relief that, if granted, would reasonably be expected to be material to the Indemnified Party, (ii) there is a material actual or potential conflict of interest that makes representation of the Indemnifying Party and the Indemnified Party by the same counsel or the counsel selected by the Indemnifying Party inappropriate, or (iii) the claim is a criminal proceeding, then in each case the Indemnified Party may, upon notice to the Indemnifying Party, assume the exclusive right to defend (and in the case of clause (iii) above, compromise and settle), such claim and the reasonable fees and expenses of the Indemnified Party's separate counsel shall be borne by the Indemnifying Party; however the settlement of any claim pursuant to clauses (i) and (ii) above shall be governed by Section 15.4(c) below. Notwithstanding anything to the contrary herein, for sake of clarity, the Parties agree that the foregoing provisions shall not be construed so as to permit the Indemnified Party to control or assume the defense of any action, lawsuit, proceeding, investigation, demand or other claim brought against the Indemnifying Party concurrently with or in a joint proceeding in respect of any claim that is the subject of an indemnification claim hereunder by the Indemnified Party.

(c)     Notwithstanding anything to the contrary herein, the Indemnifying Party shall not compromise or settle, or admit any liability with respect to any third party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), unless the relief consists solely of (i) money damages (all of which the Indemnifying Party shall pay), and (ii) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all liability with respect thereto. If the Indemnified Party assumes the defense of or represents their own interests, no settlement shall be made without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

15.5.    <u>Limited Waiver of Certain Immunities</u>. Each of the Parties hereby specifically and expressly agrees that with respect to any and all claims against an Indemnified Party by any representative of an Indemnifying Party, any indemnification available hereunder shall not be limited by reason of any immunity to which such Indemnifying Party may be entitled under any workers compensation and/or industrial insurance acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for the Indemnifying Party to such representative with respect to any such claim. For the sake of clarity, the Indemnifying Party's waiver of immunity by the provisions of this section extends only to indemnification claims against the Indemnifying Party by or on behalf of the Indemnified Party under or pursuant to this Agreement, and does not apply to any claims made by the Indemnifying Party's representatives directly against the Indemnifying Party.

31

15.6.    Survival. The indemnities set forth in this Article 15 shall survive the termination or expiration of this Agreement.

**16.    LIMITATIONS OF LIABILITY.**

16.1.    WAIVER OF CERTAIN DAMAGES. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT OR ANY PURCHASE ORDER EXECUTED HEREUNDER TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE, WHETHER BASED IN CONTRACT, GUARANTY, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, STRICT LIABILITY, INDEMNITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, FOR: LOSS OF USE, REVENUE, SAVINGS, PROFIT, INTEREST, GOODWILL OR OPPORTUNITY, COSTS OF CAPITAL, COSTS OF REPLACEMENT OR SUBSTITUTE USE OR PERFORMANCE, LOSS OF INFORMATION AND DATA, LOSS OF POWER, VOLTAGE IRREGULARITIES OR FREQUENCY FLUCTUATION, CLAIMS ARISING FROM BUYER'S THIRD PARTY CONTRACTS, OR FOR ANY TYPE OF INDIRECT, SPECIAL, PUNITIVE, EXEMPLARY, COLLATERAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR ANY OTHER LOSS OR COST OF A SIMILAR TYPE.

16.2.    MAXIMUM LIABILITY. SUPPLIER'S MAXIMUM LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE PURCHASE PRICE SET FORTH IN THE APPLICABLE PURCHASE ORDER PURSUANT TO WHICH THE APPLICABLE CLAIM AROSE.

16.3.    EFFECTIVENESS. THE PARTIES AGREE THAT THE EXCLUSIONS AND LIMITATIONS IN THIS ARTICLE 16 WILL PREVAIL OVER ANY CONFLICTING TERMS AND CONDITIONS IN THIS AGREEMENT OR ANY PURCHASE ORDER EXECUTED HEREUNDER AND MUST BE GIVEN FULL FORCE AND EFFECT, WHETHER OR NOT ANY OR ALL SUCH REMEDIES ARE DETERMINED TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE. THESE LIMITATIONS OF LIABILITY ARE EFFECTIVE EVEN IF SUPPLIER HAS BEEN ADVISED BY BUYER OF THE POSSIBILITY OF SUCH DAMAGES. THE WAIVERS AND DISCLAIMERS OF LIABILITY, RELEASES FROM LIABILITY AND LIMITATIONS ON LIABILITY EXPRESSED IN THIS ARTICLE 16 EXTEND TO THE PARTIES' RESPECTIVE AFFILIATES, PARTNERS, PRINCIPALS, MEMBERS SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, SUPPLIERS, AGENTS, AND SUCCESSORS AND ASSIGNS.

16.4.    Commencement of Claims. Except with respect to claims arising under Article 13, Article 15 or Article 17, any legal action of either Party arising under this Agreement or any Purchase Order issued hereunder must be commenced within two (2) years after the Delivery of the applicable Equipment or performance of the applicable Service. To the maximum extent permitted by Applicable Law, each Party hereby waives any right to commence any claim or action after such two (2) year period.

**17.    CONFIDENTIALITY.**

17.1.    Confidential Information. Each Party shall, and shall cause its respective Affiliates and Representatives to, keep confidential any information which it may have or acquire before or after the date of this Agreement, concerning the other Party and its assets, business, operations, affairs, financial condition or such information, "**Confidential Information**").

32

17.2. <u>Non-Disclosure</u>. Neither Party shall use any Confidential Information in any manner detrimental to the other Party nor shall any of them disclose, publish or make accessible, directly or indirectly, any Confidential Information to any person. In addition, the Parties shall exercise all reasonable efforts to prevent any other person from gaining access to such Confidential Information and take such protective measures as may be or become reasonably necessary to preserve the confidentiality of such Confidential Information.

17.3. <u>Exceptions</u>. Notwithstanding Section 17.1 and Section 17.2, either Party may disclose Confidential Information:

(a)     to any Representative of such Party, provided that such Representative has a need to know and has been informed of the confidential nature of the information pursuant to Section 17.4;

(b)     to the extent required by (i) any Applicable Law of any Governmental Authority (including any rule or regulation of the Securities and Exchange Commission), (ii) any stock exchange rule or regulation or (iii) any binding judgment, order or requirement of any court or other Governmental Authority of competent jurisdiction; provided, that the Party required to disclose Confidential Information, as the case may be, has delivered written notice to and consulted, to the extent practicable, with the other Party prior to disclosure of such Confidential Information; and

(c)     to the extent such Confidential Information becomes available within the public domain (otherwise than as a result of a breach of this Article 17).

17.4. <u>Representatives Bound</u>. Each Party shall inform any representative to whom it provides Confidential Information that such information is confidential and shall instruct them (a) to keep such Confidential Information confidential and (b) not to disclose it to any third party (other than those persons to whom such Confidential Information has already been disclosed in accordance with the terms of this Agreement). The disclosing Party shall be responsible for any breach of this Article 17 by the person to whom the Confidential Information is disclosed.

17.5. <u>Survival</u>. Notwithstanding anything herein to the contrary, the provisions of this Article 17 shall survive the termination of this Agreement for a period of three (3) years and, with respect to each Party, shall survive for a period of three (3) years following the date on which such Party is no longer a Party.

**18.     REPRESENTATIONS AND WARRANTIES.**

18.1. <u>Representations of the Parties</u>. As of the Effective Date (or, with respect to each Further Siemens Contracting Party that becomes a Buyer hereunder, as of the time of execution of a joinder hereto), and as of the entry into of each Purchase Order hereunder, each Party represents to the other Party as follows:

(a)     <u>Due Formation</u>. Such Party (i) is a duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) has the requisite power and authority to own its properties and carry on its business as now being conducted and currently proposed to be conducted and to execute, deliver and perform its obligations under this Agreement, and (iii) is qualified to do business in every jurisdiction in which failure so to qualify could be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(b)    <u>Authorization; Enforceability</u>. Such Party has taken all action necessary to authorize it to execute, deliver and perform its obligations under this Agreement. This Agreement constitutes a legal, valid and binding obligation of such Party enforceable in accordance with its terms, subject to bankruptcy, reorganization, moratorium or other similar laws affecting the enforcement of the rights of creditors generally and subject to general principles of equity.

(c)    <u>No Conflict</u>. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any Applicable Law, (ii) result in any breach of such Party's constituent documents or (iii) conflict with, violate or result in a breach of or constitute a default under any agreement or instrument to which such Party or any of its properties or assets is bound or result in the imposition or creation of any lien or security interest in or with respect to any of such Party's property or assets, other than in each case any such violations, conflicts, breaches or impositions which could not be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(d)    <u>No Authorization</u>. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any third party (other than those which have been obtained) is required for the due execution, delivery and performance by such Party of this Agreement, other than any such authorizations, approvals or actions the failure of which to obtain could not reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

(e)    <u>Litigation</u>. Such Party is not a party to any legal, administrative, arbitration or other proceeding, and, to such Party's knowledge, no such proceeding is threatened, before any Governmental Authority that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of this Agreement, the subject matter hereof, or that which could be reasonably be expected to have a material adverse effect on such Party's ability to perform its obligations hereunder.

18.2.    <u>Additional Representations of Supplier</u>. In addition to representations and warranties set forth elsewhere in this Agreement, Supplier hereby represents and warrants as of the Effective Date and as of the entry into of each Purchase Order hereunder as follows:

(a)    None of Supplier, its Affiliates or Representatives is the target of or designated under any sanctions program that is established by statute or regulation of the United States, by Executive Order of the President of the United States, or by designations of any department or agency of the United States government including but not limited to those designations reflected in the "list of Specially Designated Nationals and Blocked Persons" of the Office of Foreign Asset Control, U.S. Department of the Treasury;

(b)    Supplier's Representatives are legally authorized to work in the United States and Supplier shall complete as required by Applicable Law the Department of Labor's Form I-9 and to retain it for the statutorily designated period and, if requested by Buyer, Supplier shall provide copies of such Forms I-9 to Buyer unless such disclosure shall be prohibited by Applicable Law;

34

(c)      For Services provided at Buyer's, it's customer or third party's premises, Supplier has examined the worksite in order to acquaint itself with the local conditions, including applicable regulations codes, permits, licenses, registrations, environmental standards, and notification requirements concerning site safety and/or security;

Supplier has not and will not, absent prior written approval from Buyer, take any actions that: (i) create, or purport to create, any obligation on behalf of Buyer, or (ii) grant, or purport to grant, any rights or immunities to any third party under Buyer's intellectual property or proprietary rights; and

(d)      The bank account named by Supplier to Buyer for all payments to be effected in connection with any Purchase Order hereunder is held in Supplier's name and solely for its account.

## 19.      **ENVIRONMENT, HEALTH AND SAFETY.**

19.1.    <u>Compliance and Related Matters</u>.

(a)      Each of the Parties shall, in addition to other obligations set forth in this Agreement, during the course of performance of their respective obligations under this Agreement or any Purchase Order issued hereunder:

(i)       comply with Applicable Laws concerning health, the environment, safety, or pertaining to or regulating pollutants, contaminants, or hazardous, toxic or radioactive substances, materials or wastes, including without limitation the handling, transportation and disposal thereof, or governing or regulating the health and safety of personnel, including but not limited to the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act, and the Toxic Substance Control Act ("**TSCA**"), as amended (collectively referred to as "**EHS Laws**") (pollutants, contaminants, or hazardous, toxic or radioactive substances, materials or wastes as defined under EHS Laws shall be referred to collectively as "**Hazardous Materials**");

(ii)      take reasonable and prudent measures, as appropriate, consistent with applicable industry standards, to mitigate hazards to the environment and to the health and safety of persons;

(iii)     select and use only equipment, including but not limited to personal protection equipment, that comports with EHS Laws, implement programs to train its Representatives in the use of such equipment in a safe and lawful manner, and maintain such equipment in good working order at all times; and

(iv)     promptly notify the other Party of any incident involving death, injury or damage to any person or property in connection with any Equipment or Purchase Order.

35

(b)     Supplier shall, in addition to other obligations set forth in this Agreement, during the course of performance of its obligations under this Agreement or any Purchase Order issued hereunder:

    (i)     ensure that Equipment/Services comply with EHS Laws;

    (ii)     ensure the Equipment, and any and all parts, components, or material thereof, as Delivered by Supplier, bear all markings, labels, warnings, notices or other information required under applicable EHS Laws at the time of such Delivery; and

    (iii)     comply with any applicable substance declarations and other requirements set forth in Exhibit C.

19.2.     <u>On-Site Environmental and Safety Responsibility</u>. Where the Purchase Order includes the presence of Supplier or its Representatives on the premises of Buyer, Buyer's customer, or any other location other than the premises of Supplier ("**Work Site**"), Supplier shall: (1) be responsible for the safety, health, medical surveillance, industrial hygiene, training and all other matters required under EHS Laws relating to safety and health of its Representatives at the Work Site, (2) appoint a competent person as its representative for environmental, health and safety who shall take part in safety discussions with Buyer, its Representatives, customer, or the owner of the Work Site, (3)  be responsible for the handling, use, transportation and disposal of any and all substances regulated under the EHS Laws which Supplier or its Representatives bring onto the Work Site or generate in the performance of Supplier's work pursuant to the applicable Purchase Order, including but not limited to excess, waste or residue, containers or any of such substances not consumed, and for any spills, releases or discharges of such substances to the extent attributable to acts or omissions of Supplier or its Representatives, strictly in accordance with EHS Laws, and (4) ensure Supplier's Representatives participate in any site-specific safety training and comply with all rules and requirements of Buyer, its customer, or such other owner of the Work Site, in each case, of which Buyer provides Supplier advance written notice.

19.3.     <u>Health and Safety Plan</u>. Prior to commencing any Services at a Work Site, Supplier shall, in accordance with EHS Laws provide and comply with a site specific health and safety plan, Work Site requirements, and shall make the same available to Buyer or its Representatives at Buyer's request. If Supplier fails to comply with this Article 19, Buyer may, at its sole option and without limiting its other rights, order Supplier or its Representatives to cease Services until Supplier complies at Supplier's sole cost and expense. If Supplier is unable or refuses to take corrective action hereunder Buyer may contract with a third party or otherwise continue such Services at the Work Site and charge Supplier any excess cost reasonably incurred by Buyer. Buyer shall have the right, at its sole discretion, to remove Supplier or its Representatives from a Work Site for violation of this Article 19.

<div align="center">36</div>

20.    **OPEN SOURCE SOFTWARE.**

Supplier shall inform Buyer no later than ten (10) Business Days following receipt of any written request from Buyer in connection with a Purchase Order, whether the Equipment/Services contemplated thereby include "Open Source Software." As used herein "**Open Source Software**" means any Software that is licensed royalty-free (i.e., fees for exercising the licensed rights are prohibited, whereas fees for reimbursement of costs incurred by licensor can be permitted) under any license terms or other contract terms ("**Open License Terms**") which require, as a condition of use, modification and/or distribution of such Software and/or any other Software incorporated into, derived from or distributed with such software ("**Derivative Software**"), either of the following: (i) that the source code of such Software and/or any Derivative Software be made available to third parties; or (ii) that permission for creating derivative works of such software and/or any Derivative Software be granted to third parties. If Open Source Software is included, Supplier shall deliver to Buyer, not later than the date of order confirmation, (A) a schedule of all Open Source Software files known to be used, indicating the relevant license(s) to the extent known by Supplier; and (B) a written notice that Supplier is not aware of any violation of such license(s) due to such Use of Open Source Software.

21.    **EXPORT CONTROL AND FOREIGN TRADE REGULATIONS.**

21.1.    Acknowledgement and Compliance. The Parties acknowledge that all Equipment to be delivered and Services to be provided according to this Agreement are subject to export control and sanctions laws and regulations, including, without limitation, the U.S. Export Administration Regulations ("**EAR**") (15 C.F.R. §§ 730-774), the U.S. Foreign Trade Regulations (15 C.F.R. Part 30), and the regulations, rules, and executive orders administered by OFAC (collectively, the "**Export Controls and Sanctions Laws**"). Each Party agrees to comply with all Export Controls and Sanctions Laws applicable to any such Equipment/Services and shall not take any action that will cause the other Party to violate or be subject to penalty under the Export Controls and Sanctions Laws.

21.2.    Export Licenses. Supplier shall obtain all necessary export licenses, unless Buyer or any party other than Supplier is required to apply for the export licenses pursuant to the applicable Export Controls and Sanctions Laws. To the extent Supplier is requested to deliver Equipment/Services regulated under the Arms Export Control Act or the Atomic Energy Act, Supplier shall advise Buyer in advance of order or contract acceptance.

21.3.    Provision of Trade Data. At the request of Buyer, Supplier shall provide Buyer for Equipment and Services delivered the following trade data as applicable: (i) "Export Control Classification Number" according to the EAR's Commerce Control List (ECCN) or the Munitions List Category Designation according to the US International Traffic in Arms Regulations, and all other export control list numbers; (ii) the statistical commodity code according to the current commodity classification for foreign trade statistics and the HS (Harmonized System) coding; (iii) the country of origin (non-preferential origin); and (iv) Supplier's declaration for preferential origin (in case of European suppliers) or preferential certificates, Supplier's declaration for preferential origin (in case of European suppliers) or preferential certificates (in case of non-European suppliers) such as NAFTA certificates of origin.

21.4.    Changes. In the event Supplier has knowledge of any alterations to origin and/or characteristics of the Equipment/Services, it shall notify the Buyer not later than ten (10) Business Days after discovery thereof.

37

21.5.    <u>Additional Buyer's Obligations</u>. Buyer agrees that it will not, in violation of applicable Export Controls and Sanctions Laws:

(a)    directly or indirectly, export, reexport, or transfer Equipment or Services to, or transship Equipment or Services through, a Sanctioned Country;

(b)    directly or indirectly, release, sell, provide, export, reexport, transfer, divert, loan, lease, consign, allow access to, or otherwise dispose of Equipment or Services to a Prohibited Person; or

(c)    use Equipment or Services to produce products that will be shipped, sold, or supplied, directly or indirectly, to a Sanctioned Country or a Prohibited Person.

21.6.    <u>Certain Relief</u>. No Party shall be obligated to fulfill this Agreement if such fulfillment is prevented by any impediments arising out of national or international foreign trade or customs requirements or any embargoes or other sanctions.

## 22.    **BUYER CODE OF CONDUCT.**

Supplier shall comply with the principles and requirements of the "Code of Conduct for Siemens Suppliers and Third Party Intermediaries" attached hereto as Exhibit D (hereinafter the "**Code of Conduct**"). If and as requested by Buyer, Supplier shall, not more than once a year (at its option), provide to Buyer either (A) a written self-assessment in substantially the form provided by Buyer or (B) a written report reasonably acceptable to Buyer describing the actions taken or to be taken by Supplier to assure compliance with the Code of Conduct. In addition to any other rights and remedies Buyer may have, in the event of Supplier's material or repeated failure to comply with the Code of Conduct, after providing Supplier reasonable notice and a reasonable opportunity to remedy, Buyer may terminate any outstanding Purchase Orders under this Agreement without any liability whatsoever. Material failures include, but are not limited to, incidents of child labor, corruption and bribery. The notice and remedy provisions herein shall not apply to material failures set forth in the preceding sentence.

## 23.    **COMPLIANCE WITH LAWS AND PERMITS.**

The Parties and their Representatives shall comply with all Applicable Laws in the course of the performance of their respective obligations under this Agreement and any Purchase Orders issued hereunder. In addition, Supplier and Buyer shall each obtain all required licenses, permits, authorizations, registrations or approvals required with respect to the performance of their respective obligations under this Agreement and any Purchase Orders issued hereunder.

## 24.    **DISPUTE RESOLUTION.**

24.1.    <u>Referral to Senior Management</u>. Except as otherwise provided by this Agreement, any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof (which breach or alleged breach by a Party remains uncured within ten (10) Business Days after receipt of written notice thereof from another Party) or the validity or termination hereof or the relationship created between the Parties by and/or through this Agreement (a "**Dispute**") shall first be settled as far as possible by good faith negotiations between the parties to the Dispute, in the form of meetings between senior- management level representatives of such Parties, upon the written request by any such Party to the other parties to the Dispute, which writing shall set forth in reasonable detail the nature and extent of the Dispute.

38

24.2.  <u>Referral to Arbitration</u>. If the parties to the Dispute are unable for any reason to resolve a Dispute within thirty (30) days after receipt by any Party of written notice of a Dispute, then any Party may submit the Dispute to arbitration to be finally and exclusively resolved under the Arbitration Rules of the American Arbitration Association ("**AAA**") then in effect, except as modified herein, with respect to Equipment and Services to be provided to a Customer with the United States (as applicable, the "**Rules**"). There shall be three (3) arbitrators. If there are two (2) parties to the Dispute, each of the parties to the Dispute shall nominate one (1) arbitrator in accordance with the Rules. If there are more than two (2) parties to the Dispute, the arbitrators shall be nominated in accordance with the Rules; provided, however, that any Party and its Affiliates shall be entitled to nominate only one (1) such arbitrator. The arbitrators so nominated, once confirmed by the AAA, shall nominate an additional arbitrator to serve as chairman, such nomination to be made within fifteen (15) days of the confirmation by the AAA of the second arbitrator. If the initial arbitrators shall fail to nominate an additional arbitrator within such fifteen (15) day period, such additional arbitrator shall be appointed by the AAA. The arbitrators shall be required to submit a written statement of their findings and conclusions. Except as otherwise agreed by the parties to such Dispute, exclusive venue of arbitration with AAA will be Wilmington, Delaware, and the language of the arbitration shall be English. Each of the Parties will submit to the non-exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware for preliminary relief in aid of arbitration and for the enforcement of any arbitral award from AAA. By agreeing to arbitration, the Parties do not intend to deprive any national court of its jurisdiction to issue any pre-arbitral injunction, pre-arbitral attachment or other order in aid of arbitration proceedings.

24.3.  <u>Neutral Arbitrators</u>. None of the Parties or the arbitrators shall select any arbitrator for the arbitral tribunal who has any interest in the Dispute or who has, or within the immediately preceding five (5) years has had, any economic or other relationship with any party to the Dispute.

24.4.  <u>Procedures and Costs</u>. The arbitrators shall not have the right to award consequential, incidental, indirect, special, treble, multiple or punitive damages. The arbitral tribunal shall not be empowered to decide any dispute ex aequo et bono or amiable compositeur, and the arbitral tribunal shall decide the Dispute under the substantive laws of the State of Delaware, without regard to applicable choice of law provisions thereof. The arbitration award shall be decided by majority opinion and issued in writing in the English language and shall state the reasons upon which it is based. It may be made public only with the consent of each participating Party or as may be required by law or regulatory authority or as necessary for enforcement of such award. The arbitrators shall allocate the fees and costs of the arbitration. The losing Party(ies) shall pay the prevailing Party(ies)' attorney's fees and costs and the costs associated with the arbitration, including the expert fees and costs and the arbitrators' fees and costs borne by the prevailing Party(ies), all as determined by the arbitrators. Each Party shall bear its own fees and costs until the arbitrators determine which, if any, Party is the prevailing Party(ies) and the amount that is due to such prevailing Party(ies).

24.5.  <u>Award</u>. The award rendered by the arbitrators shall be final and binding on the participating Parties and shall be the sole and exclusive remedy between and among the participating Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal. The award shall be issued no later than one hundred twenty (120) days from the signing or ratification of the Terms of Reference (as defined in the Rules) or as soon thereafter as practicable. The award shall be paid within thirty (30) days after the date it is issued and shall be paid in U.S. Dollars in immediately available funds, free and clear of any Liens, Taxes or other deductions. A judgment confirming or enforcing such award may be rendered by any court of competent jurisdiction.

<div align="center">39</div>

24.6.  Confidentiality. The arbitration shall be confidential. No Party may disclose the fact of the arbitration, any award relating thereto or any settlement relating to any Dispute without the prior consent of the other Party(ies); provided, that such matters may be disclosed without the prior consent of the other Party(ies) to lenders, auditors, tax or other Governmental Authority or as may be required by law or regulatory authorities or as necessary to enforce any award.

24.7.  Continued Performance; Provisional Remedies. Notwithstanding the existence of any Dispute, the Parties shall continue to perform their respective obligations under this Agreement unless the Parties otherwise mutually agree in writing. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent the Parties from seeking temporary injunctive relief at any time as may be available under Law or in equity to preserve its rights pending the outcome of any arbitration. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies or order the Parties to request that a court modify or vacate any temporary or preliminary relief issued by a court, and to award damages for the failure of any Party to respect the arbitral tribunal's orders to that effect. The Parties agree that any issue regarding the arbitrability of any claims or disputes arising under, relating to or in connection with this Agreement is an issue solely for the arbitrators, not a court, to decide.

24.8.  Waiver of Jury Trial. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY OR OTHERWISE ON ANY CLAIM, CAUSE OF ACTION, SUIT OR PROCEEDING PERMITTED UNDER THIS ARTICLE 24. THE PROVISIONS OF THIS AGREEMENT RELATING TO WAIVER OF TRIAL BY JURY SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.

**25.  MISCELLANEOUS.**

25.1.  Governing Law. This Agreement shall be controlled by and construed in accordance with the substantive laws of the State of Delaware without regard to conflict of laws principles. The United Nations Convention on Contracts for the International Sale of Equipment of April 11, 1980 shall be excluded.

25.2.  Records. Supplier and its Representatives shall maintain accurate and complete records of all contracts, papers, correspondence, copybooks, applications, accounts, invoices, and/or other information reasonably relating to this Agreement and any Purchase Orders issued hereunder (collectively, "**Records**") in accordance with recognized commercial accounting practices, and shall retain such Records for a period of seven (7) years unless a longer period is required under Applicable Law.

25.3.  Intentionally Omitted.

25.4.  Insurance. Supplier and its Representatives shall comply with the Insurance requirements set forth in Exhibit E attached hereto.

25.5.    Assignment; Successors. Neither Party may assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any purported assignment which fails to comply with the requirements of this Section 25.5 shall be null and void. Notwithstanding the foregoing: (i) either Party may, without the prior written consent of the other Party, assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, to an Affiliate, which will accept such assignment and assume all obligations related to this Agreement and any applicable Purchase Orders (including by executing a joinder to this Agreement in the form of Exhibit B hereto); provided that, notwithstanding any such assignment, the assigning Party shall not be relieved of any of its obligations hereunder by reason of such assignment and shall remain liable hereunder to the same degree that the assigning Party would be responsible had there been no assignment.

25.6.    Subcontracting. Supplier shall be solely responsible for the proper selection, supervision, acts and omissions of its subcontractors.

25.7.    Other Terms and Amendments. The terms and conditions contained in any sales order, acknowledgment, invoice, website, letter, writing, software or file (such as "clickwrap", "shrinkwrap", or website terms of use), or other document or medium shall not be applicable or amend this Agreement or any Purchase Order issued hereunder nor bind the Parties hereto or their Affiliates or Representatives. This Agreement and any Purchase Order issued hereunder may only be amended by a written instrument signed by authorized Representatives of the Parties.

25.8.    Government Contracts. When the Equipment/Services are to be used in the performance of a contract or subcontract with a Governmental Authority, applicable government contract requirements attached to this Agreement shall apply and are incorporated herein by reference.

25.9.    Relationship of the Parties. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, employee-employer relationship, trust or other association of any kind between the Parties and each Party shall be individually responsible only for its obligations as set forth in this Agreement. Any Services provided by Supplier, its Affiliates and Representatives pursuant to this Agreement are provided as independent contractors of Buyer and not in the capacity of an employee or agent of Buyer.

25.10.    Publicity. No Party hereto shall refer to or use, or permit any persons to refer to or use, any other Party's name, trademarks, service marks or logos in any advertising, promotional materials, press releases or other publicity without obtaining the prior written consent of the applicable Party.

25.11.    Non-Exclusive Remedies and Non-Waivers. No delay or omission by the Parties in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy nor shall it be construed as a bar to or waiver of any such right or remedy on any future occasion. Any waiver authorized on one occasion must be made in writing and is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion. The rights and remedies of the Parties herein shall not be exclusive and are in addition to any other rights and remedies provided by Applicable Law or in equity.

41

25.12.  <u>Severability</u>. Any provision of this Agreement or any Purchase Order issued hereunder that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof (provided the substance of the agreement between the Parties is not thereby materially altered), and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Laws, the Parties hereto hereby waive any provision of Applicable Law which renders any provision hereof prohibited or unenforceable in any respect.

25.13.  <u>Survival</u>. The Title and Risk of Loss, Warranties, Intellectual Property, Defaults and Remedies, Indemnification, Limitations of Liability, Confidentiality, Export Control and Foreign Trade Regulations, Dispute Resolution and Miscellaneous sections of this Agreement, and any provision that contemplates performance or observance subsequent to termination or expiration shall survive termination or expiration of this Agreement.

25.14.  <u>Affirmative Action</u>. Supplier shall, to the extent applicable, comply with Buyer's requirements as promulgated by the U.S. Department of Labor, Office of Federal Contract Compliance Programs set forth in Exhibit F.

25.15.  <u>Complete Agreement and Counterparts</u>. This Agreement, together with all Purchase Orders issued hereunder, shall constitute the entire agreement between Buyer and Supplier and shall supersede all previous communications, representations, agreements or understandings, whether oral or written, with respect to the subject matter hereof. The headings used in this Agreement are for reference and shall not limit or affect the meaning or interpretation of any of the terms hereof. Upon the effectiveness of this Agreement, the Prior Agreement shall be deemed amended and restated and superseded and replaced in its entirety by this Agreement, and shall be of no further force or effect.

25.16.  <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

25.17.  <u>No Pre-Printed Terms</u>. Pre-printed terms or conditions in any invoice, quotation, shipping notice or order acknowledgement issued by Buyer or Supplier shall be of no force or effect, except to the extent included in a Pricing Notice. The terms and conditions applicable to each Purchase Order issued by Buyer shall be those set forth herein and in such Purchase Order and the applicable Pricing Notice therefor.

25.18.  <u>Priority</u>. In the event of inconsistency between or among the provisions of this Agreement, a Purchase Order and the applicable Pricing Notice therefor, the following order of precedence, from highest to lowest, shall govern:

(a)  mutually agreed Change Orders;

(b)  Purchase Order;

(c)  this Agreement.

25.19. <u>Notices</u>.

(a)    All notices and other communications which either Party is required or may desire to serve upon the other shall be addressed to the Party to be served as follows, unless a different address is designated in writing by the Party to be served:

To Buyer:

        Siemens Industry, Inc.
        4800 North Point Parkway
        Alpharetta, GA 30005
        Attn: Craig Langley, Associate General Counsel
        Email: langley.craig@siemens.com

To Supplier:

        Fluence Energy, LLC
        4601 N. Fairfax Drive, Suite 600
        Arlington, VA 22203
        Attn: Marek Wolek, SVP – Strategy & Partnerships
        Email: marek.wolek@fluenceenergy.com

With a copy to:

        Fluence Energy, LLC
        4601 N. Fairfax Drive, Suite 600
        Arlington, VA 22203
        Attn: Frank Fuselier, General Counsel
        Email: frank.fuselier@fluenceenergy.com

(b)    All notices, requests, consents and other communications under this Agreement must be in writing and shall be deemed to have been duly given and effective (i) immediately (or, if not delivered or sent on a Business Day, the next Business Day) if delivered or sent and received by electronic mail, (ii) on the date of delivery if by hand delivery (or, if not delivered on a Business Day, the next Business Day) or (iii) on the first Business Day following the date of dispatch (or, if not sent on a Business Day, the next Business Day after the date of dispatch) if by a nationally recognized overnight delivery service (all fees prepaid). In the case of notice via email, each Party shall provide confirmation of receipt or non-receipt upon the request of the transmitting Party.

(c)    All notices, requests, consents and other communications under this Agreement shall include reference to the applicable Purchase Order number, if any.

25.20.    <u>Joint Effort</u>. Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other. Any rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, or any amendments or Exhibits hereto.

25.21.    <u>Language of the Agreement, Correspondence, Documentation</u>. The language of this Agreement shall be English. Unless to the extent agreed otherwise, correspondence, technical and commercial documents as well as any other information exchanged between the Consortium Members relating to this Agreement shall be in English.

[SIGNATURE PAGE FOLLOWS]

44

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first below above.

**Siemens Industry, Inc.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**Fluence Energy, LLC**

By: _____
Name:
Title:

By: _____
Name:
Title:

[Signature Page to Amended and Restated Storage Core Frame Purchase Agreement]

**Schedule 1.1(a)**

The information contained in columns C and D is provided for informational purposes only. For purposes of this Agreement, the definition of "**Applications**" shall include Column E.

| A | B | C | D | E |
|---|---|---|---|---|
| No | Application | Typical Customer | Typical system Size in MW | Definition |
| 1 | Flexible capacity | Power Plant | 50 to 100 MW | Flexible capacity is the use of energy storage as a substitute for peak generating capacity or to meet flexible dispatch ability needs in order to secure grid stability. Such fast acting power sources are an integral part of the grid to provide the required flexible capacity. The control system is designed such to monitor the grid condition, recognize the need and acts immediately until the grid returns to stable condition, or to be dispatched by the grid operator. The system is connected to Grids with a Voltage level > 1kV. The control system makes sure the storage is at the needed stage of charge (subject to setting) |
| 2 | Conventional hybrid | Power Plant | up to 10MW | Conventional hybrid is the use of energy storage in conjunction with a conventional generation resource to react on e.g. peak demands. The system is connected to Grids with a Voltage level > 1kV. The storage is monitoring and acting based on its own control system |
| 3 | Frequency Control | TSO / DSO & PP / Investor | up to 50MW and greater single system size | Frequency regulation is the use of energy storage to regulate electric system frequency as a primary, secondary, or contingency reserve resource. Energy Storage system is installed usually before the meter and secures the power grid frequency within the frequency band defined by the regulator. Spinning reserve is a subset of frequency control to deliver the mandatory reserve power out of a storage unit instead of a Power Plant. The system is connected to Grids with a Voltage level > 1kV. |
| 4 | Renewable hybrid | TSO / DSO & PP / Investor | up to 5MW | Renewable hybrid is the use of energy storage in conjunction with a renewable generation resource; (e.g. wind and solar) to control (integral control system) the ramp-up and ramp-down of the power generation or to make the power injection into the power grid stable in relation to the forecast considering parameter such as weather forecast. The system is connected to Grids with a Voltage level > 1kV. |
| 5 | T&D investment/ replacement deferment | TSO / DSO | up to 10MW | Transmission and distribution investment, replacement and deferral is the use of energy storage to replace or defer investment in new conventional electric transmission or distribution infrastructure assets. The system is connected to Grids with a Voltage level > 1kV. The storage is monitoring and acting based on its TSO / DSO up to 10MW own control system |
| 6 | T&D capacity release | TSO / DSO | up to 10MW | Transmission and distribution capacity release is the use of energy storage to improve the utilization of existing conventional electric transmission or distribution infrastructure assets. The system is connected to Grids with a Voltage level > 1kV. The own Storage control system is monitoring the grid conditions and takes corrective action if needed |

| A | B | C | D | E |
|---|---|---|---|---|
| No | Application | Typical Customer | Typical system Size in MW | Definition |
| 7 | Microgrid and Islands* | On shore Microgrid owners and utilities on geographical islands | 1-3MW | Energy Storage systems combined with a Microgrid controller providing the micro or island grid master role resulting in a maximized usage of renewable power generation vs. conventional power generation on a geographical or grid island while keeping system voltage and frequency stable monitored and controlled by the storage control systems. Improving the efficiency of conventional diesel generation where applicable. The system is connected to Grids with a Voltage level > 1kV. |
| 8 | Power Quality (MS UPS)* | Industry / Transportation | 1-25MW | Energy Storage system placed behind the meter typically in an industrial environment injecting power in case of grid failure and or voltage dip. The ability to disconnect ultrafast (<10ms) from the grid to avoid the storage feeding a grid failure. In addition the system can bridge 15 to 30 minutes power interruption, possibly combined with a diesel power generation. The system operates on Voltage level > 1kV. The storage control system is monitoring and acting driven by its on control system. |
| 9 | Consumer peak shaving (demand charge mgmt.) | Industry / Transportation | 1-25MW | Consumer peak shaving, the use of energy storage to reduce an electric consumer's bill, optimize an electric consumer's consumption, or to provide other reliability services to the electric consume r. This energy Storage system is placed behind the meter. The system operates on Voltage level > 1kV. The 1 – 25 MW storage control system is monitoring and acting automatically following the given settings. |
| 10 | Black start | Gas Turbine power Plants and wind power generation | 1-25MW | Black start, the use of energy storage to support generation start-up during recovery from a partial or total shutdown of an electric system as an emergency Gas turbine start up solution. The Energy Storage system providing power according a defined process until ignition of a gas turbine. The system operates on Voltage level > 1kV. The initiation of the Black Start is usually manually, the control system makes sure the black star process as such is following a defined procedure. |

* Included in the definition of "**Application**" solely for purposes of Section 4.3.

**Exhibit A**

**Form of Purchase Order**

The following sets forth the minimum terms and conditions to be included on a Purchase Order under this Agreement, which terms and conditions may be modified or supplemented by the mutual agreement of the Parties:

Equipment:

1. Type of Equipment

2. Quantity of Equipment

3. Unit Price of Equipment

4. Total Price of Equipment on this Purchase Order

5. Manufacturing Location

6. Incoterms and Delivery Location

7. Guaranteed Delivery Date

8. Insurance

9. Equipment Warranty Period

10. IP/Software Terms

11. Supplier Documents

12. Technical Specifications

13. Special Packaging Requirements

Services:

1. Type of Services

2. Amount of Services

3. Price of Services

4. Total Price of Services on this Purchase Order

5. Performance Location

6. Performance Date(s)

7. Insurance

8. Services Warranty Period

9. IP/Software Terms

10. Supplier Documents

11. Specifications

Other Terms:

1. Electronic Banking Method for Payments

2. Buyer Furnished Property

**EXHIBIT B**

**Joinder Agreement Template**

**This Joinder Agreement (the "Joinder Agreement") to the Amended and Restated
Storage Core Frame Purchase Agreement, dated [●], 2021 between SIEMENS
INDUSTRY, INC. and FLUENCE ENERGY, LLC is made and entered into**

**by and between**

**___**

**with its registered seat in [Place], [Country]**

**- hereinafter referred to as "Supplier" -**

**and**

**Siemens (Local Company) ___,
with its registered seat in [Place], [Country]**

**- hereinafter referred to as "Buyer" -**

**- Supplier and Buyer are hereinafter individually
referred to as a "Party" and collectively as the "Parties" -**

WHEREAS, Supplier and **SIEMENS INDUSTRY, INC.** ("Siemens") entered on January 1, 2018 into the Amended and Restated Storage Core Frame Purchase Agreement (the "Agreement") which is attached hereto as <u>Annex 1</u>;

**WHEREAS,** Buyer is an Affiliate of Siemens and wishes to become a party to the Agreement and to adopt the terms and conditions thereof, and consequently Supplier and Buyer wish to enter into this Joinder Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and premises contained herein, the Parties agree as follows:

**ADOPTION OF THE AGREEMENT**

a)  Buyer hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, Buyer shall be deemed a party to the Agreement for all purposes of the Agreement, and shall have all of the obligations of a "Buyer" under the Agreement, as though an original party to the Agreement. Buyer hereby ratifies, as of the date hereof, and agrees to be bound by, and subject to, all of the covenants, terms, provisions and conditions applicable to "Buyer" contained in the Agreement. The terms and conditions as set out in the Agreement are incorporated herein by reference and are made applicable between the Parties.

b)  Without limiting the generality of the foregoing, Buyer hereby represents and warrants that each of the representations and warranties of "Buyer" contained in the Agreement is true and correct as of the date of the execution and delivery of this Joinder Agreement.

c)  This Joinder Agreement shall be controlled by and construed in accordance with the substantive laws of the State of Delaware without regard to conflict of laws principles.

d)  This Joinder Agreement contains the entire agreement between the Parties and supersedes any and all prior negotiations, correspondence, understandings between the Parties concerning the subject matter hereof. It may not be changed orally, but only by an agreement in writing signed by both Parties hereto.

e)  This Joinder Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Joinder Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

**SPECIFIC STIPULATIONS UNDER THIS JOINDER AGREEMENT**

[**ONLY** country specific deviations from the Agreement are to be stipulated here.]

a)   [Delivery and Payment terms]

b)   [Term and Termination]

c)   [Country specific regulations (jurisdiction, governing law, tax etc.)]

d)   ...

---

**SPECIFIC STIPULATIONS UNDER THIS JOINDER AGREEMENT**

[**ONLY** country specific deviations from the Agreement are to be stipulated here.]

a)   [Delivery and Payment terms]

b)   [Term and Termination]

c)   [Country specific regulations (jurisdiction, governing law, tax etc.)]

**ORDER OF PRECEDENCE BETWEEN THE AGREEMENT AND THE ADOPTION AGREEMENT**

In the event of any conflict or inconsistency between the terms of this Joinder Agreement and the Agreement, the Joinder Agreement shall prevail over the Agreement.

| **Supplier** | **Buyer** | |
| Place, Date: | Place, Date: | |
| | | |
| Name: | Name: | Name: |
| (Print) | (Print) | (Print) |
| Title: | Title: | Title: |

**Annex 1**: Amended and Restated Storage Core Frame Purchase Agreement

**Exhibit C**

**Substance Declaration**

If Supplier furnishes Equipment that are subject to restrictions, rules or regulations for Hazardous Materials or other substances comprising, part of or contained in such Equipment, including but not limited to statutes, rules, regulations, codes, rules, standards and requirements of (1) EHS Laws, (2) governing, controlling or regulating Hazardous Materials, including but not limited to the Restriction on the Use of Certain Hazardous Substances in Electrical and Electronic Equipment (hereinafter "RoHS"), Directives 2002/96/EC and 2012/19/EU as well as their respective incorporation into EU member states' legislation including any amendments thereto (hereinafter "WEEE"), (3) the Regulation EC 1907/2006 of the European Parliament and of the Council concerning the Registration, Evaluation, Authorization and Restriction of Chemicals including any amendment thereto (hereinafter "REACH"), (4) EC Directive 2006/66/EC on Batteries and Accumulators and Waste Batteries and Accumulators and/or (5) TSCA, without limiting Supplier's obligations under this Purchase Order, Supplier shall comply with the requirements of this "Substance Declaration".

Supplier shall submit to Buyer with each Equipment, the chemical substances contained therein or in the Service deliverable, and/or Material Safety Data Sheets, Safety Data Sheets or other such documentation as required by Applicable Laws (including without limitation the OSHA Hazardous Communication Standard 29 CFR 1910.1200 et seq.). If Supplier furnishes Equipment that are subject to substance restrictions, rules or regulations including but not limited to those identified in this Exhibit, Supplier shall declare such substances on the Buyer's web database BOMcheck (www.BOMcheck.net) or, only if and approved in writing in advance by Buyer, in another reasonable format provided to Buyer no later than first delivery date of the Equipment, and Supplier shall prior to Supplier 's first delivery of Equipment complete and comply with the Declarable Substances-Form (hereinafter "Substance Declaration") in the Buyer supplier portal "SCM STAR" or in hard copy forwarded to Buyer. In addition, for Equipment that are subject to substance restrictions, rules or regulations Supplier shall provide ordering entity with a safety data sheet required in Article 31of the Regulation EC 1907/2006 (REACH) and Supplier shall keep this Substance Declaration up to date.

Should a delivery hereunder contain "dangerous goods" as so classified pursuant to Applicable Laws, Supplier shall notify Buyer in writing in sufficient detail to identify the Equipment, the hazards, and the laws, rules or regulations applicable thereto no later than three (3) business days after receipt of the Purchase Order.

**Exhibit D**

**Code of Conduct for Siemens Suppliers and Third Party Intermediaries**

Siemens Group Code of Conduct
for Suppliers and Third Party Intermediaries

**This Code of Conduct defines the basic requirements placed on the suppliers and third party intermediaries of the Siemens Group concerning their responsibilities towards their stakeholders and the environment. The supplier and/or third party intermediary declares herewith to:**

<u>**Legal Compliance**</u>

- · Comply with the laws and regulations of the applicable legal systems.

<u>**Human Rights and Labor Practices**</u>

To ensure respect of all internationally proclaimed human rights by avoiding causation of and complicity in any human rights violations, heightened attention shall be paid to ensuring respect of human rights of specifically vulnerable rights holders or groups of rights holders such as women, children or migrant workers, or of (indigenous) communities.

Ø Prohibition of Forced Labor
- · Neither use nor contribute to slavery, servitude, forced or compulsory labor and human trafficking.

Ø Prohibition of Child Labor
- · Employ no workers under the age of 15 or, in those countries subject to the developing country exception of the ILO Convention 138, employ no workers under the age of 14.
- · Employ no workers under the age of 18 for hazardous work according to ILO Convention 182.

Ø Non-Discrimination and Respect for Employees
- · Promote equal opportunities and treatment of employees, irrespective of skin color, race, nationality, ethnicity, political affiliation, social background, disabilities, gender, sexual identity and orientation, marital status, religious conviction, or age.
- · Refuse to tolerate any unacceptable treatment of individuals such as mental cruelty, sexual harassment or discrimination including gestures, language and physical contact, that is sexual, coercive, threatening, abusive or exploitative.

Ø Working Hours, Wages & Benefits for Employees
- · Recognize the legal rights of workers to form or join existing trade unions and to engage in collective bargaining; neither disadvantage nor prefer members of employee organizations or trade unions.
- · Adhere to all applicable working-hours regulations globally.
- · Pay fair wages for labor and adhere to all applicable wage and compensation laws globally.
- · In the event of cross-border personnel deployment adhere to all applicable legal requirements, especially with regard to minimum wages.

Ø Health & Safety of Employees
- · Act in accordance with the applicable statutory and international standards regarding occupational health and safety and provide safe working conditions.
- · Provide training to ensure employees are educated in health & safety issues.
- · Establish a reasonable occupational health & safety management system[1].

Ø Grievance Mechanism
- · Provide access to a protected mechanism for their employees to report possible violations of the principles of this Code of Conduct.

Code of Conduct Version 4.0, October 2019

**SIEMENS**

## Environmental Protection

- Act in accordance with the applicable statutory and international standards regarding the environment. Minimize environmental pollution and make continuous improvements in environmental protection.
- Establish a reasonable environmental management system[1].

## Fair Operating Practices

Ø   Anti-Corruption and Bribery
- Tolerate no form of and do not engage directly or indirectly in any form of corruption or bribery and do not grant, offer or promise anything of value to a government official or to a counterparty in the private sector to influence official action or obtain an improper advantage. This includes to renounce from giving or accepting improper facilitation payments.

Ø   Fair Competition, Anti-Trust Laws and Intellectual Property Rights
- Act in accordance with national and international competition laws and do not participate in price fixing, market or customer allocation, market sharing or bid rigging with competitors.
- Respect the intellectual property rights of others.

Ø   Conflicts of Interest
- Avoid and/or disclose internally and to Siemens all conflicts of interest that may influence business relationships, and to avoid already the appearance thereof.

Ø   Anti-Money Laundering, Terrorism Financing
- Not directly or indirectly facilitate money laundering or terrorism financing.

Ø   Data Privacy
- Process personal data confidentially and responsibly, respect everyone's privacy and ensure that personal data is effectively protected and used only for legitimate purposes.

Ø   Export Control and Customs
- Comply with the applicable export control and customs regulations.

## Responsible Minerals Sourcing

- Take reasonable efforts to avoid in its products the use of raw materials which originate from Conflict-Affected and High-Risk Areas and contribute to human rights abuses, corruption, the financing of armed groups or similar negative effects.

## Supply Chain

- Use reasonable efforts to make its suppliers comply with the principles of this Code of Conduct.
- Comply with the principles of non-discrimination with regard to supplier selection and treatment.

[1] www.siemens.com/code-of-conduct/managementsystems

Code of Conduct Version 4.0, October 2019

**Exhibit E**

**Insurance**

(A) Supplier shall, at its sole expense, maintain the types of insurance coverage(s) listed below. The coverage limits for each type of insurance listed below shall be the greater of: (i) the coverage limits listed below; or (ii) if the Purchase Order requires Supplier to maintain higher limits, then the coverage limits specified in the Purchase Order. Evidence of insurance required by this Purchase Order is to be furnished before any Goods/Services is commenced. Supplier and its Representatives shall maintain such insurance in full force and effect during the term of this Purchase Order, and, in addition, for as long as Supplier is under any warranty obligations arising out of this Purchase Order. All insurers on required insurance coverage(s) shall have an A.M. Best Rating of A- /VIII or better. Customer and its subsidiaries, Affiliates, and its or their Representatives, and/or any other party designated on the Purchase Order as applicable shall be named as an additional insured, with respect to the Commercial General Liability and Automobile Liability policies/coverage(s). All insurance certificates shall be in a form satisfactory to Customer. Supplier shall deliver the certificates of insurance, naming Customer and, if applicable, Customer's customer/end user, as the Certificate Holder. All of Supplier's policies of insurance, except for Workers' Compensation and Employers Liability, shall be primary insurance and noncontributing with any other insurance maintained by Customer, Customer's customer/end user and/or other parties. All of Supplier's policies of insurance, except for Worker's Compensation and Employer's Liability, shall contain a cross-liability or severability of interest clause. The limits of insurance set forth below may be satisfied by any combination of excess and primary insurance coverage. Supplier shall require all its insurers to waive all rights of subrogation against Customer, Customer's customer/end user, and their respective subsidiaries, Affiliates, and Representatives, and any other party designated as an additional insured.

(B) Supplier shall maintain the following insurance coverage(s):

(i) **Worker's Compensation Insurance** in accordance with the statutory requirements of the location in which the Purchase Order is performed. If there is an exposure to injury to Supplier's employee under the U.S. Longshoremen's and Harbor Worker's Compensation Act, the Jones Act or under laws, regulations or statutes applicable to maritime employees, coverage required by law shall be provided for same.

(ii) **Employer's Liability Insurance** with the following limits of liability:

• $1,000,000 for each occurrence;
• $1,000,000 Disease Policy
• $1,000,000 Each Employee.

(iii) **Commercial General Liability Insurance**, in occurrence coverage form, with minimum limits of $5,000,000 per occurrence, including the following coverages:

- Products and Completed Operations
- Contractual Liability insuring the indemnity obligations assumed by Supplier under this Purchase Order
- Premises/Operations
- Underground, Undermining, Explosion and Collapse (XCU) Hazard,
- Broad Form Property Damage (including Completed Operations)

(iv) **Automobile Liability Insurance**, including coverage for owned, hired, and non-owned automobiles and trucks used by or on behalf of the Supplier providing insurance for bodily injury, liability and property damage liability with minimum limits for each type of coverage of $5,000,000 per occurrence.

(C) The following coverages are specifically required if a Purchase Order involves: (i) [intentionally omitted]; (ii) watercraft owned, operated or chartered by Supplier or its Representatives, liability arising out of such watercraft shall be insured by the General Liability or by Protection and Indemnity Insurance with a CSL of no less than $1,000,000 per each occurrence; (iii) the hauling and/or rigging of property in excess of $100,000, Supplier shall carry "All Risk" Transit Insurance, or "All Risk" Motor Truck Cargo Insurance (Such insurance shall provide a limit of not less than the replacement cost of the highest value single lift or highest value being moved, whichever is greater, and insuring the interest of Supplier, Customer and Customer's customer/end user, as their respective interests may appear); (iv) aircraft (fixed wing or helicopter) owned, operated or chartered by Supplier or its Representatives, liability arising out of such aircraft shall be insured for not less than $1,000,000 CSL each occurrence; (v) access, storage, transmission or processing of Customer's, its customer's /end user's, its or their Representatives' confidential information, a Cyber Liability Errors and Omissions Policy shall be procured by Supplier providing coverage, for acts, errors, omissions, and negligence of employees and contractors giving rise to potential liability, financial and other losses relating to data security and privacy, including cost of defense and settlement, in an amount of at least $2,000,000 each claim and in the aggregate; (vi) engineering, design and/or development services, Supplier shall procure Professional Liability and Errors and Omissions Liability Insurance providing coverage for acts, errors, omissions arising out of insured's negligence in an amount not less than $5,000,000 (USD) per claim and in the aggregate; (vii) [intentionally omitted]; (viii) Supplier, its Affiliates and/or its and their respective Representative being granted access to Customer or Customer's Affiliate's facilities, premises and/or systems, Supplier shall procure Employee Dishonesty and Computer Fraud Insurance covering losses arising out of or in connection with any fraudulent or dishonest acts committed by its personnel, acting alone or with others, in an amount not less than $1,000,000 (USD) per occurrence. Furthermore, on a case by case basis, where a Purchase Order specifies that environmental liability insurance is required for that specific project, then Supplier shall obtain Environmental Impairment Liability Insurance for such project with limits of $5,000,000 per occurrence and in the aggregate.

(D) The procurement, maintenance or acceptance of insurance coverage by Customer, if any, shall not: (i) relieve Supplier of liability for loss or damage in excess of the policy coverage limits specified herein; or (ii) limit or release Supplier of its obligations or liabilities under the Purchase Order.

(E) No delay or failure in declaring any default or in enforcing any of the requirements of this Exhibit E, and no course of dealing between Customer and Supplier shall constitute a waiver of any of the requirements of this Exhibit E.

**Exhibit F**

**Affirmative Action**

As a federal contractor/subcontractor, Siemens is required to comply with certain federal regulations, including the regulations promulgated by the U.S. Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP"). As a federal contractor, Siemens is also required to ensure compliance of the OFCCP by its subcontractors, vendors and suppliers covered under the OFCCP (each, a "Covered Party"). Supplier is hereby notified of Siemens' policy related to affirmative action and our mutual OFCCP obligations to the extent Supplier, its subcontractors, vendors or suppliers is a Covered Party.

Siemens is an equal opportunity/affirmative action employer and does not discriminate on the basis of race, color, creed, religion, national origin, ancestry, sex, age, physical or mental disability, marital status, pregnancy, genetic information, sexual orientation, gender identity, protected veteran or military status, or any other consideration not related to the person's ability to do the job or otherwise made unlawful by federal, state or local law in the following employment practices, including among others: recruiting, hiring, placement, transfer, promotion, demotion, selection for training, layoff, termination, shift assignment, determination of service, rates of pay, benefit plans, and all forms of compensation and other personnel actions.

As a federal contractor/subcontractor, Siemens' Covered Parties (including Supplier and its Covered Parties, if applicable) also have an obligation to comply with equal opportunity and affirmative action principles. Therefore, Siemens' Covered Parties (including Supplier and its Covered Parties, if applicable) will take appropriate action in support of these principles. Through our mutual effort and cooperation, we will continue to provide a working environment that appreciates and encourages diversity, promotes equal employment opportunity and is free from any type of discrimination.

Supplier and its Covered Parties, if applicable, shall abide by the requirements of the "Equal Opportunity Clause" in Section 202 of Executive Order 11246. See 41 CFR 60-1.4(a).

The following shall also apply if the Supplier is a Covered Party:

**For contracts of $100,000 or more, Supplier shall comply with the following: This Supplier, contractor and subcontractor shall abide by the requirements of 41 CFR 60-300.5(a). This regulation prohibits discrimination against qualified protected veterans, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified protected veterans.**

**For contracts of $10,000 or more, Supplier shall comply with the following: This Supplier, contractor and subcontractor shall abide by the requirements of 41 CFR 60-741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability, and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.**

**Exhibit G**

**Key Agreements**

1.  Third Amended and Restated Limited Liability Company Agreement of Fluence Energy, LLC, dated as of [      ].

2.  Amended and Restated Credit Support and Reimbursement Agreement dated as of June 9, 2021, among The AES Corporation, Siemens Industry, Inc. and Fluence Energy, LLC.

3.  Amended and Restated Siemens License Agreement, dated as of June 9, 2021, between Fluence Energy, LLC and Siemens Aktiengesellschaft.

4.  Amended and Restated Siemens License Agreement, dated as of June 9, 2021, between Fluence Energy, LLC and Siemens Industry, Inc.

5.  Siemens Master Sales Cooperation Agreement, dated as of [ ], by and between Fluence Energy, LLC and Siemens Industry, Inc.

6.  Services Agreement, dated as of January 1, 2018, between Siemens Aktiengesellschaft, Fluence Energy, LLC and such other companies as set forth therein.

7.  Amended and Restated Company Name Affix and Trademark License Agreement, dated [ ], between Siemens Aktiengesellschaft and Fluence Energy, LLC.

8.  Amended and Restated Equipment Services and Purchase Agreement, dated [ ], between Siemens Industry, Inc. and Fluence Energy, LLC.

**Attachment A**

**DESCRIPTION OF SUPPLIER'S BATTERY STORAGE EQUIPMENT AND SERVICES**

Exhibit 10.24

**SECOND AMENDMENT TO COMPANY NAME AFFIX AND TRADEMARK LICENSE AGREEMENT**

This SECOND AMENDMENT TO COMPANY NAME AFFIX AND TRADEMARK LICENSE AGREEMENT (this "**Second Amendment**"), is dated as of [●], 2021, by and between The AES Corporation, a corporation incorporated and validly existing under the laws of the State of Delaware ("**AES**") and Fluence Energy, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware ("**Licensee**"). AES and the Licensee may herein collectively be referred to as the "**Parties**"

WHEREAS, AES and Licensee are parties to that certain Company Name Affix and Trademark License Agreement, dated on or about July 9, 2017, which was amended by that certain Amendment to Company Name Affix and Trademark License Agreement, dated on or about June 9th, 2021 (collectively, the "**Trademark License Agreement**");

WHEREAS, certain other parties are entering into a series of transactions in connection with the formation of Fluence Energy, Inc., a Delaware corporation ("**Issuer**") to serve as the vehicle through which the public will own indirect interests in Licensee through an initial public offering (the "**IPO**");

WHEREAS, in connection with the IPO, the Parties desire to further amend the Trademark License Agreement as set forth in this Second Amendment, with such Second Amendment to take effect as of the Effective Date (as defined in Section 3 hereof), without any further action necessary on the part of the Parties; and

WHEREAS, this Second Amendment is duly made by the Parties pursuant to Section 17.2 of the Trademark License Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the covenants and agreements set forth in this Second Amendment, and subject to the terms and conditions set forth in this Second Amendment, the Parties agree as follows:

1.        **Capitalized Terms**. Capitalized terms used and not otherwise defined in this Second Amendment shall have the respective meanings ascribed to them in the Trademark License Agreement.

2.        **Amendments**. The Parties agree to amend the Trademark License Agreement as follows:

(a)        Definitions. Article 1 of the Trademark Agreement is hereby amended to add the following definitions:

"**AES Grid Stability**" shall mean AES Grid Stability, LLC, a Delaware limited liability company.

"**Affiliate**" shall mean, at any time, and with respect to any Person or group of Persons, a Person that at such time directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person or group of Persons. No Person shall be considered an Affiliate of another Person or under the Control of such other Person so long as (i) it is owned less than 50% by such other Person, (ii) such other Person has no capacity to elect or appoint the majority of the board of directors or similar governing body of the subject Person, (iii) such other Person does not consolidate the subject Person in its financial reporting and (iv) there is no other management or services agreement pursuant to which such other Person exerts control over the subject Person. With respect to Siemens, none of Gamesa Corporación Technológica S.A., Siemens Healthineers AG nor any of their respective Subsidiaries shall be considered an Affiliate of Siemens.

"**Control**" shall mean, with respect to the relationship between two or more Persons, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise. The terms "Controlled" or "under common Control with" have correlative meanings

"**Person**" shall mean any natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company or any other entity (whether or not having separate legal personality), and shall include any successor (by merger or otherwise) of such entity

"**Shares**" shall mean (i) the Class A Common Stock of the Issuer, calculated on a fully diluted basis and assuming that all options, warrants and any other rights to purchase shares of Class A Common Stock of the Issuer have been exercised in full, including, for sake of clarity, the Underlying Class A Shares plus (ii) any other equity securities now or hereafter issued by the Issuer, together with any options thereon and any other shares of stock or other equity securities issued or issuable with respect thereto (whether by way of a stock dividend, stock split or in exchange for or in replacement or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization); provided, however, that in no event shall the Shares include the Class B Common Stock of the Issuer.

"**SII**" shall mean Siemens Industry, Inc., a Delaware corporation.

"**Third Party**" shall mean any Person other than SII and its Affiliates or AES Grid Stability and its Affiliates.

"**Underlying Class A Shares**" shall mean all shares of Class A Common Stock of the Issuer issuable upon redemption of Common Units of the Licensee, assuming all such Common Units are redeemed for Class A Common Stock of the Issuer on a one for one basis

"**Voting Power**" shall mean the total voting power of all Shares entitled to vote generally in the election of directors (for clarity, on a basis that assumes that all Common Units of Licensee have been redeemed for shares of Class A Common Stock of the Issuer on a one for one basis and that there are no shares of Class B Common Stock of the Issuer outstanding).

(b)        Termination. Section 12.2 of the Trademark License Agreement is hereby amended and restated in its entirety as follows:

"12.2 During the period commencing on the Effective Date and ending on January 1, 2024 (the "**Lock-up Period**"), Siemens may terminate this Agreement only in the event of one of the following (each, a "**Termination Event**"), in each case with immediate effect by giving written notice thereof to Licensee: (i) for cause as set forth in 12.3 below, (ii) if at any time, the then outstanding Voting Power represented by the Shares held collectively by SII and its Affiliates is ten (10) percentage points or more than the then outstanding Voting Power represented by the Shares held collectively by AES Grid Stability and its Affiliates at such time (measured by the total Voting Power of all outstanding shares), (iii) if at any time, SII and AES Grid Stability, together with their respectively Affiliates, collectively no longer hold Shares representing more than fifty percent (50%) of the then outstanding Voting Power, (iv) if at any time, any Third Party together with its Affiliates, collectively holds Shares representing a higher percentage of the then outstanding Voting Power as compared to the then outstanding Voting Power represented by the Shares held by either (A) SII and its Affiliates, or (B) AES Grid Stability and its Affiliates, at such time. After the conclusion of the Lock-up Period, provided this Agreement is not earlier terminated pursuant to a Termination Event, Siemens is entitled to terminate the rights and licenses granted under this Agreement upon 90 day written notice to Licensee without having to present to Licensee the reasons for such termination."

3.        **Effectiveness of this Second Amendment**. Each of the Parties, by its signature below, does hereby give its written consent to the amendment of the Trademark License Agreement in accordance with this Second Amendment. This Second Amendment will become effective as of the day on which the Class A Common Stock of the Issuer is issued to the underwriters in the Issuer's IPO (the "**Effective Date**"); provided, that if the Effective Date does not occur on or prior to December 31, 2021, this Second Amendment shall be deemed terminated as of such date and of no force or effect without further notice or action by the Parties, and the Trademark License Agreement shall remain in full force and effect without any amendment thereto.

4.        **No Other Amendments**. Except as expressly modified by this Second Amendment, the Trademark License Agreement (as heretofore modified) shall remain unmodified and in full force and effect.

<div align="center">3</div>

5.        **Counterparts**. This Second Amendment may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one (1) and the same Second Amendment. A signed copy of this Second Amendment delivered by facsimile or email will be deemed to have the same legal effect as delivery of an original signed copy of such Second Amendment.

6.        **Execution and Delivery**. A .pdf, or other reproduction of this Second Amendment may be executed by one or more parties hereto and delivered by such Party by email or any similar electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any Party hereto, all parties hereto agree to execute and deliver an original of this Second Amendment as well as any .pdf or other reproduction hereof.

7.        **Governing Law**. This Second Amendment is exclusively governed by, and shall be exclusively construed in accordance with the laws of the United States and the laws of the State of Delaware, without regard to any conflict of law rules that require the application of the laws of any other jurisdiction.

[Signature page follows]

4

**IN WITNESS WHEREOF**, the Parties have executed this Second Amendment as of the day and year first above written.

**The AES Corporation**

By: _____

Name: [Chris Shelton]

Title:   [Vice President and Chief Product Officer]

By: _____

Name:

Title:

**Fluence Energy, LLC**

By: _____

Name:

Title:

Signature Page – Second Amendment to Trademark License Agreement

**Exhibit 10.25**

**SECOND AMENDMENT TO COMPANY NAME AFFIX AND TRADEMARK LICENSE AGREEMENT**

This SECOND AMENDMENT TO COMPANY NAME AFFIX AND TRADEMARK LICENSE AGREEMENT (this "**Second Amendment**"), is dated as of [●], 2021, by and between Siemens Aktiengesellschaft, with registered seats in Berlin and Munich, Federal Republic of Germany ("**Siemens**") and Fluence Energy, LLC, a limited liability company duly organized and validly existing under the laws of the State of Delaware ("**Licensee**"). Siemens and the Licensee may herein collectively be referred to as the "**Parties**"

WHEREAS, Siemens and Licensee are parties to that certain Company Name Affix and Trademark License Agreement, dated on or about July 9, 2017, which was amended by that certain Amendment to Company Name Affix and Trademark License Agreement, dated on or about June 9th, 2021 (collectively, the "**Trademark License Agreement**");

WHEREAS, Siemens Industry, Inc., a Delaware corporation and affiliate of Siemens ("**SII**"), Licensee, and certain other parties are entering into a series of transaction in connection with the formation of Fluence Energy, Inc., a Delaware corporation ("**Issuer**") to serve as the vehicle through which the public will own indirect interests in Licensee through an initial public offering (the "**IPO**");

WHEREAS, in connection with the IPO, the Parties desire to further amend the Trademark License Agreement as set forth in this Second Amendment, with such Second Amendment to take effect as of the Effective Date (as defined in Section 3 hereof), without any further action necessary on the part of the Parties; and

WHEREAS, this Second Amendment is duly made by the Parties pursuant to Section 17.2 of the Trademark License Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the covenants and agreements set forth in this Second Amendment, and subject to the terms and conditions set forth in this Second Amendment, the Parties agree as follows:

1.        **Capitalized Terms**. Capitalized terms used and not otherwise defined in this Second Amendment shall have the respective meanings ascribed to them in the Trademark License Agreement.

2.        **Amendments**. The Parties agree to amend the Trademark License Agreement as follows:

(a)        Definitions. Article 1 of the Trademark Agreement is hereby amended to add the following definitions:

"**AES**" shall mean AES Grid Stability, LLC, a Delaware limited liability company.

"**Affiliate**" shall mean, at any time, and with respect to any Person or group of Persons, a Person that at such time directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person or group of Persons. No Person shall be considered an Affiliate of another Person or under the Control of such other Person so long as (i) it is owned less than 50% by such other Person, (ii) such other Person has no capacity to elect or appoint the majority of the board of directors or similar governing body of the subject Person, (iii) such other Person does not consolidate the subject Person in its financial reporting and (iv) there is no other management or services agreement pursuant to which such other Person exerts control over the subject Person. With respect to Siemens, none of Gamesa Corporación Technológica S.A., Siemens Healthineers AG nor any of their respective Subsidiaries shall be considered an Affiliate of Siemens.

"**Control**" shall mean, with respect to the relationship between two or more Persons, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise. The terms "Controlled" or "under common Control with" have correlative meanings

"**Person**" shall mean any natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company or any other entity (whether or not having separate legal personality), and shall include any successor (by merger or otherwise) of such entity

"**Shares**" shall mean (i) the Class A Common Stock of the Issuer, calculated on a fully diluted basis and assuming that all options, warrants and any other rights to purchase shares of Class A Common Stock of the Issuer have been exercised in full, including, for sake of clarity, the Underlying Class A Shares plus (ii) any other equity securities now or hereafter issued by the Issuer, together with any options thereon and any other shares of stock or other equity securities issued or issuable with respect thereto (whether by way of a stock dividend, stock split or in exchange for or in replacement or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization); provided, however, that in no event shall the Shares include the Class B Common Stock of the Issuer.

"**Third Party**" shall mean any Person other than SII and its Affiliates or AES and its Affiliates.

"**Underlying Class A Shares**" shall mean all shares of Class A Common Stock of the Issuer issuable upon redemption of Common Units of the Licensee, assuming all such Common Units are redeemed for Class A Common Stock of the Issuer on a one for one basis

<div align="center">2</div>

"**Voting Power**" shall mean the total voting power of all Shares entitled to vote generally in the election of directors (for clarity, on a basis that assumes that all Common Units of Licensee have been redeemed for shares of Class A Common Stock of the Issuer on a one for one basis and that there are no shares of Class B Common Stock of the Issuer outstanding).

(b)    <u>Termination</u>. Section 12.2 of the Trademark License Agreement is hereby amended and restated in its entirety as follows:

"12.2    During the period commencing on the Effective Date and ending on January 1, 2024 (the "**Lock-up Period**"), Siemens may terminate this Agreement only in the event of one of the following (each, a "**Termination Event**"), in each case with immediate effect by giving written notice thereof to Licensee: (i) for cause as set forth in 12.3 below, (ii) if at any time, the then outstanding Voting Power represented by the Shares held collectively by AES and its Affiliates is ten (10) percentage points or more than the then outstanding Voting Power represented by the Shares held collectively by SII and its Affiliates at such time (for example, AES holding Voting Power equal to 30% (or more than 30%) and Siemens holding Voting Power equal to 20%), (iii) if at any time, SII and AES, together with their respectively Affiliates, collectively no longer hold Shares representing more than fifty percent (50%) of the then outstanding Voting Power, (iv) if at any time, any Third Party together with its Affiliates, collectively holds Shares representing a higher percentage of the then outstanding Voting Power as compared to the then outstanding Voting Power represented by the Shares held by either (A) SII and its Affiliates, or (B) AES and its Affiliates, at such time. After the conclusion of the Lock-up Period, provided this Agreement is not earlier terminated pursuant to a Termination Event, Siemens is entitled to terminate the rights and licenses granted under this Agreement upon 90 day written notice to Licensee without having to present to Licensee the reasons for such termination."

3.    **Effectiveness of this Second Amendment**. Each of the Parties, by its signature below, does hereby give its written consent to the amendment of the Trademark License Agreement in accordance with this Second Amendment. This Second Amendment will become effective as of the day on which the Class A Common Stock of the Issuer is issued to the underwriters in the Issuer's IPO (the "**Effective Date**"); provided, that if the Effective Date does not occur on or prior to December 31, 2021, this Second Amendment shall be deemed terminated as of such date and of no force or effect without further notice or action by the Parties, and the Trademark License Agreement shall remain in full force and effect without any amendment thereto.

4.    **No Other Amendments**. Except as expressly modified by this Second Amendment, the Trademark License Agreement (as heretofore modified) shall remain unmodified and in full force and effect.

<div align="center">3</div>

5.        **Counterparts**. This Second Amendment may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one (1) and the same Second Amendment. A signed copy of this Second Amendment delivered by facsimile or email will be deemed to have the same legal effect as delivery of an original signed copy of such Second Amendment.

6.        **Execution and Delivery**. A .pdf, or other reproduction of this Second Amendment may be executed by one or more parties hereto and delivered by such Party by email or any similar electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any Party hereto, all parties hereto agree to execute and deliver an original of this Second Amendment as well as any .pdf or other reproduction hereof.

7.        **Governing Law**. This Second Amendment is exclusively governed by, and shall be exclusively construed in accordance with, the substantive laws of Germany with the exclusion of the Vienna Convention on the International Sale of Goods and without regard to any conflict of law rules that require the application of the laws of any other jurisdiction. This includes, without limitation, the legal concepts and terms contained in this Second Amendment, the English translation of which may not be identical with the original German terms in their respective legal understanding. Any possible current of future obligations between Parties which fall under the EC Regulations No. 864/2007 on the Law Applicable to Non-Contractual Obligation ("**Rome II**") are governed by German Law, the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law rules that require the application of the laws of any other jurisdiction being excluded.

[Signature page follows]

4

**IN WITNESS WHEREOF**, the Parties have executed this Second Amendment as of the day and year first above written.

**Siemens Aktiengesellschaft**

By: _____
Name:
Title:

By: _____
Name:
Title:

**Fluence Energy, LLC**

By: _____
Name:
Title:

Signature Page – Second Amendment to Trademark License Agreement

**Master Sales Cooperation Agreement (2021)**

between

**Siemens Industry, Inc. – Smart Infrastructure**

with its principal place of business at 100 Technology Drive, Alpharetta GA 30005

- hereinafter referred to as "Siemens" -

and

**Fluence Energy, LLC**

with its principal place of business at 4300 Wilson Blvd., #1100, Arlington VA 22203

- hereinafter referred to as "Fluence" -

- Siemens and Fluence hereinafter referred to individually
as "Party" or collectively as "Parties"

**Article 1 - Purpose**

1.1    Fluence is a company providing battery energy storage solutions ("BESS") and related services for the installation, commissioning, operation and maintenance of BESS products in an industrial environment.

1.2    Siemens is a company providing products, services and solutions to the buildings and energy markets and also intending to provide its customer base with BESS as part of larger solutions.

1.3    Siemens, as a major shareholder of Fluence, has an interest that Fluence further succeeds in addressing its markets.

1.4    The Parties previously entered into a January 1, 2018 Master Sales Cooperation Agreement ("Initial MSCA") for the intent of cooperating to ensure meeting customer demands, timely delivery of high-quality BESS and related service and effective order planning and processing. In order to accelerate the adoption of energy storage in the market and to leverage Siemens' extensive sales reach, Fluence is using Siemens sales organizations and customer relationships in some countries to bring Fluence's BESS to Siemens customers as well as working together to assist Siemens in offering BESS as part of a larger solution. Fluence benefits from the extensive global sales reach of Siemens and its established customer relationships.

1.5    The Parties agree that the Initial MSCA is terminated effective as of the date of the signing of this Master Sales Cooperation Agreement ("MSCA 2021") and that this MSCA 2021 replaces the Initial MSCA in its entirety.

1.6    Each Party shall endeavor to provide the other Party with information reasonably required for the purpose of the MSCA 2021.

**Article 2 - Scope**

2.1    The Parties intend to cooperate and to deliver value to each of the Parties' customers ("Cooperation"). It is the objective of the Parties to benefit from this Cooperation by expanding their individual capabilities, making use of their combined capabilities, and achieving synergies where possible.

> (1) The Parties intend to continue and further grow their mutual supplier relationship in accordance with the Storage Core Frame Purchase Agreement and the Equipment and Services Purchase Agreement (both dated January 1, 2018), as the same may be amended from time to time.

> (2) Siemens intends to support Fluence in a potential usage of the Siemens sales organization worldwide. The specific support any Siemens affiliate can provide, and related terms of support (including potential commission), will be defined by a country specific agreement and/or project related agreements. Those agreements are expected to include arrangements covering among others: Dedicated Siemens resources, services (e.g. grid studies) and equipment deliveries, Siemens commission rates and expectations for Fluence.

2.2    Special Cooperation sales models between the Parties (e.g. consortium approach) shall be defined on a project specific basis.

2.3    The decision to pursue any specific project or transactions under any of the agreements shall be made independently and at the sole discretion of the Parties.

2.4    Any Cooperation activities are non-exclusive and are always subject to all applicable antitrust laws. The Parties will continuously review with their antitrust experts whether the intended sharing of project leads is admissible under the applicable antitrust laws before discussing any opportunities with each other.

**Article 3 - Legally binding provisions**

3.1    The Parties shall not be legally committed to provide any Cooperation activities as described in Article 2 above. The Parties will in their sole discretion decide whether to provide the Cooperation activities and in their sole discretion decide upon the length of time that it will offer the Cooperation activities. Neither Party will be liable for deciding not to provide Cooperation activities nor for deciding to cease providing Cooperation activities.

3.2    Each Party shall bear its own internal and external costs related to drafting and execution of this MSCA 2021.

3.3    Neither Party shall have grounds for any claim under any theory of law (including, without limitation, claims for damages and cost reimbursement) against the other Party as it relates to this MSCA 2021.

3.4    Each Party shall treat the negotiations and the contents of this MSCA 2021 as confidential unless the other Party gives its prior written consent to the disclosure of such information to a third-party. This confidentiality obligation shall not apply to information which is generally known, which can be shown to have been independently developed by the recipient, or which has been acquired from a third party without nondisclosure obligation to the disclosing Party. This obligation shall likewise not apply to the extent a Party is required by statutory regulations, governmental orders, legal process or stock exchange requirements to reveal this MSCA 2021 or any of the information such Party has obtained. This obligation shall survive the term of this MSCA 2021 for a period of three (3) years.

3.5    The substantive law governing this MSCA 2021 shall be that of the State of Delaware.

3.6    Modifications to this MSCA 2021 shall only be valid if made in writing. The requirement of the written form can itself only be waived in writing.

3.7    This MSCA 2021 shall become effective upon signature by all Parties and will continue in effect until December 31, 2022 ("Initial Term"). The MSCA 2021 shall automatically extend by consecutive one (1) year terms ("Renewal Term") unless terminated by a Party upon three (3) months prior written notice to the other Party with effect from the end of the Initial Term or the respective Renewal Term. Clauses 1.5, 3.1, 3.2, 3.3, 3.4 and 3.5 shall survive termination.

**Siemens Industry, Inc. –**
**Smart Infrastructure**

By: _____

Name: _____

Title: _____

Date: _____


By: _____

Name: _____

Title: _____

Date: _____

**Fluence Energy, LLC**

By: _____

Name: _____

Title: _____

Date: _____


By: _____

Name: _____

Title: _____

Date: _____

**Amended and Restated Cooperation Agreement**

between

Fluence Energy, LLC

and

The AES Corporation

Dated as of [____], 2021

Case 1:25-cv-00444-PTG-IDD    Document 69-4    Filed 07/11/25    Page 977 of 1007 Exhibit 10.27
PageID# 1956

THIS **AMENDED AND RESTATED COOPERATION AGREEMENT** (this "**Agreement**") is made and entered into on [_____], 2021 (the "**Effective Date**"), between **The AES Corporation**, whose principal place of business is at 4300 Wilson Boulevard, Arlington, VA 22203 hereinafter referred to as "**AES**" and **Fluence Energy, LLC**, whose principal place of business is 4601 N. Fairfax Drive, Suite 600, Arlington, VA 22203 hereinafter referred to as "**Fluence**". Each of AES and Fluence are referred to herein as a "**Party**" and collectively are referred to herein as the "**Parties**."

WHEREAS, AES is a company headquartered in Arlington, Virginia with electrical transmission, distribution and power generation subsidiaries located globally, supplying power services to utilities, power systems, and end customers;

WHEREAS, Fluence is a company headquartered in Arlington, Virginia with a battery storage system business, and seeks to sell Battery Energy Storage Systems and Solutions to owners of power projects and assets;

WHEREAS, Fluence and AES are parties to that certain Cooperation Agreement, dated as of January 1, 2018, by and between Fluence and AES (the "**Prior Agreement**"); and

WHEREAS, AES Grid Stability LLC ("**AES LLC**"), a Delaware limited liability company and wholly-owned subsidiary of AES, owns a 43.18% membership interest in Fluence as of the Effective Date, but prior to the initial public offering described in the recitals below;

WHEREAS, AES LLC is party to the Second Amended and Restated Limited Liability Company Agreement of Fluence, dated as of June 9, 2021(the "**Second A&R LLC Agreement**");

WHEREAS, Fluence, AES LLC and certain other parties are entering into a series of transactions in connection with the formation of Fluence Energy, Inc., a Delaware corporation ("**Issuer**") to serve as the vehicle through which the public will own indirect interests in Fluence through an initial public offering;

WHEREAS, in connection with the initial public offering, the Second A&R LLC Agreement is being amended and restated in its entirety by the Third Amended and Restated Limited Liability Company Agreement, dated on or about the date hereof (the "**Third A&R LLC Agreement**"), to, among other things, reflect Issuer's ownership of Fluence and the restructuring of Fluence and its Affiliates; and

NOW, THEREFORE, the Parties agree that the Prior Agreement is hereby amended and restated in its entirety by this Agreement, and further agree as follows:

**Article 1.**       **Definitions**

    1.1       Definitions. The terms used in this Agreement, with their initial letters capitalized, shall, unless the context thereof otherwise requires, have the meanings specified in this Section 1.1.

    "**AAA**" shall have the meaning assigned to such term in Section 13.2.

    "**AES**" has the meaning set forth in the Preamble hereto.

    "**AES Entity**" shall mean either AES or an Affiliate of AES, as the case may be.

1

"**AES LLC**" has the meaning set forth in the Recitals hereto.

"**AES Representative**" shall have the meaning assigned to such term in Section 6.1.

"**AES Strategic Business Unit**" shall mean one of the primary regional business groupings managed by a SBU President in AES.

"**Affiliate**" means, at any time, and with respect to any Person or group of Persons, a Person that at such time directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person or group of Persons..

"**Agreement**" has the meaning set forth in the Preamble hereto.

"**Application**" has the meaning set forth in the LLC Agreement.

"**Battery Energy Storage Systems and Solutions**" means any battery based energy storage system and related services offered for sale from time to time by Fluence, including such as may be purchased pursuant to the Storage Core Frame Purchase Agreement.

"**Branding Agreement**" means that certain Branding Agreement entered into as of the Effective Date between AES and Fluence.

"**Claim**" shall have the meaning assigned to such term in Section 9.1.

"**Compliance Breach**" shall have the meaning assigned to such term in Section 8.2.

"**Confidential Information**" shall have the meaning assigned to such term in Section 12.1.

"**Control**" means, with respect to the relationship between two or more Persons, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise. The terms "Controlled" or "under common Control with" have correlative meanings.

"**Customer**" is the end-use customer for any Battery Energy Storage Solutions proposed as part of a project owned by AES Entity.

"**Dispute**" shall have the meaning assigned to such term in Section 13.1.

"**Effective Date**" has the meaning set forth in the Preamble hereto.

"**Fluence**" has the meaning set forth in the Preamble hereto.

"**Fluence Entity**" shall mean either Fluence or an Affiliate of Fluence, as the case may be.

"**Fluence Representative**" shall have the meaning assigned to such term in Section 6.1.

"**Government Official**" shall mean any officer or employee or family member of an officer or employee of a government, department (whether executive, legislative, judicial or administrative), agency or instrumentality of such government, or any person acting in an official capacity for or on behalf of such government or any candidate for public office or representative of a political party.

2

"**Governmental Authority**" means a federal, state, local or foreign governmental authority (including any regulatory authority); a state, province, commonwealth, territory or district thereof; a county; a city, town, township, or other municipality; a district, ward or other subdivision of any of the foregoing; any executive, legislative or other governing body of any of the foregoing; any agency, authority, board, department, system, service, office, commission, committee, council or other administrative body of any of the foregoing; any court or other judicial body; and any officer, official or other representative of any of the foregoing.

"**Indemnified Party**" shall have the meaning assigned to such term in Section 9.1.

"**Indemnifying Party**" shall have the meaning assigned to such term in Section 9.1.

"**Initial Term**" shall have the meaning assigned to such term in Section 10.1.

"**Integrated Solution**" has the meaning set forth in the LLC Agreement.

"**Issuer**" has the meaning set forth in the Recitals hereto.

"**LLC Agreement**" means the Second A&R LLC Agreement prior to the effectiveness of the Third A&R LLC Agreement, and thereafter means the Third A&R LLC Agreement.

"**Parties**" has the meaning set forth in the Preamble hereto.

"**Party**" has the meaning set forth in the Preamble hereto.

"**Person**" means any natural person, corporation, partnership, joint venture, trust, estate, unincorporated association, limited liability company or any other entity (whether or not having separate legal personality), and shall include any successor (by merger or otherwise) of such entity.

"**Prohibited Payment**" means any offer, gift, payment, promise to pay, or authorization of the payment of any money or anything of value, directly or indirectly, to a Government Official for the purpose of either (i) influencing any act or decision of the Government Official in his or her official capacity, (ii) inducing the Government Official to do or omit to do any act in violation of his or her lawful duty, (iii) securing any improper advantage or (iv) inducing the Government Official to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist in obtaining or retaining business or in directing business to any party.

"**Prohibited Transaction**" means any of the following: (i) receiving, transferring, transporting, retaining, using, structuring, diverting or hiding the proceeds of any criminal activity whatsoever, including drug trafficking, fraud or bribery of a Government Official; (ii) engaging or becoming involved in, financing, or supporting financially or otherwise, sponsoring, facilitating, or giving aid to any terrorist person, activity or organization; or (iii) participating in any transaction or otherwise conducting business with any Person that appears on any list issued by a United States or European Union Governmental Authority, the World Bank or the United Nations with respect to money laundering, terrorism financing, drug trafficking or economic or arms embargoes.

3

"**Representatives**" means, with respect to any person, such person's shareholders, officers, directors, employees, accountants, consultants, legal counsel, financial advisors and other representatives and agents.

"**Rules**" shall have the meaning assigned to such term in Section 13.2.

"**Second A&R LLC Agreement**" has the meaning set forth in the Recitals hereto.

"**SLA**" shall have the meaning assigned to such term in Section 5.2.

"**Storage Core Frame Purchase Agreement**" means that certain Amended and Restated Storage Core Frame Purchase Agreement entered into as of the Effective Date between AES LLC and Fluence pursuant to which AES Entities may from time to time purchase Battery Energy Storage Solutions from Fluence.

"**Third A&R LLC Agreement**" has the meaning set forth in the Recitals hereto.

1.2    Interpretation.

1.2.1    When a reference is made in this Agreement to an Article, Section clause, Exhibit or Schedule, such reference shall be to an Article, Section or clause of, Exhibit or Schedule to, this Agreement unless otherwise indicated, and the words "Agreement," "hereby," "herein," "hereof," "hereunder" and words of similar import refer to this Agreement as a whole (including any Exhibits) and not merely to the specific section, paragraph or clause in which such word appears. The table of contents and the Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and do not in any way affect the meaning or interpretation of this Agreement. The phrases "the date of this Agreement," "the date hereof" and terms of similar import, shall be deemed to refer to the Effective Date. References to any statute are to that statute, as amended from time to time, and to the rules and regulations promulgated thereunder. Unless otherwise expressly provided herein, references to any agreement or document shall be a reference to such agreement or document as amended, modified or supplemented and in effect from time to time and shall include reference to all exhibits, schedules and other documents or agreements attached thereto or incorporated therein, including waivers or consents. Unless otherwise expressly provided herein, references to any Person include the successors and permitted assigns of that Person. Whenever the content of this Agreement permits, the masculine gender shall include the feminine and neuter genders, and a reference to singular or plural shall be interchangeable with the other. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. As used in this Agreement: (i) the term "including" and words of similar import mean "including, without limitation" unless otherwise specified, (ii) "$" and "dollars" refer to the currency of the United States of America, and (iii) "any" shall mean "one or more". Unless the defined term "Business Days" is used, references to "days" in this Agreement refer to calendar days.

1.2.2    The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

1.2.3    No summary of this Agreement prepared by or on behalf of any Party shall affect the meaning or interpretation of this Agreement.

**Article 2.    Scope**

2.1    Scope. The Parties shall use commercially reasonable efforts to maximize opportunities to use Battery Energy Storage Solutions on a global basis across the AES fleet. AES shall cause the AES Entities to apply this Agreement on a global basis, with the same understanding as to applicable laws concerning transfer pricing.

2.2    AES Entities. In the case of non-controlled AES Entities, AES agrees to promote and educate those entities about the benefits of energy storage and Fluence. AES agrees to use commercially reasonable efforts to enable interactions between Fluence and non-controlled entities for the purpose of exploring energy storage project investments, enabling the participation of Fluence in any energy storage procurements, and creating a preferred vendor role for Fluence where permitted and applicable.

2.3    Key Interfaces. During the term of this Agreement, each Party shall provide the other Party with contact persons to serve as liaisons for effective cooperation and communication between AES and Fluence regarding the implementation of the terms of this Agreement. These contact persons shall schedule regular meetings. These contact persons include, but are not limited to, the following:

2.3.1    Management: The Fluence Representative and the AES Representative will be the respective interfaces at the management level for this Agreement. The Fluence Representative will manage the business plan and competitiveness of the Battery Energy Storage Solutions, and the AES Representative will manage interaction across AES Strategic Business Units with respect to energy storage project development. The Fluence Representative and the AES Representative shall both manage his or her respective teams independently and will be his or her respective Party's representative with respect to escalated matters to be resolved, including but not limited to target sharing, availability of agreed technical sales support, capacity planning, and project delivery matters which cannot be resolved by Fluence sales people and the AES Strategic Business Units or individual AES project leads.

4

**Article 3.        Offer Management Process – Supporting BD at AES**

3.1        BD Process. It is recognized that AES projects will move through several life cycle stages from original conception to investment implementation. Fluence will provide support to AES as a preferred vendor of Battery Energy Storage Solutions throughout this process. AES will manage its project development process at its own discretion and will make information, pricing, support, or other needs known to Fluence for use in AES internal investment reviews, external bid processes, or other activities aimed at expanding the market for energy storage. AES will have the sole discretion to pursue project development investments. AES and Fluence agree that each will bear their own cost of these activities.

3.2        Bid Support. From time to time, AES may participate in bid or RFP processes to win contracted projects from Customers. Fluence will support AES as a key vendor in these processes with information, diagrams, processes, and personal representation as suitable and agreed upon request. AES will have the sole discretion to bid or not bid in any process. AES and Fluence agree that each will bear their own cost of these activities.

3.3        Advanced Projects. As AES projects advance in maturity, AES will have the sole discretion for whether to continue to fund and develop its own projects for investment. Fluence will support this effort in a manner consistent with a key project vendor. Any financial support, credit support, warranty support, or other commitment by Fluence will be subject to a specific Purchase Order under the Storage Core Purchase Agreement.

**Article 4.        Marketing Cooperation and Related Matters**

4.1        Business Planning. As needed, but at least on an annual basis, the Parties shall jointly review the Fluence business plan and the AES outlook for project investments that could include energy storage, including discussion of any new technical requirements or needs from Fluence to assist AES in realizing project opportunities.

4.2        Joint Marketing. Joint marketing activities and trade events, including, but not limited to, marketing and trade fairs within a broader AES context, shall be agreed and planned in the business planning discussed in Section 4.1 between AES and Fluence. The Parties will mutually discuss in good faith proposals for joint marketing and fair participations. For agreed joint marketing or trade fair events in which AES enables Fluence to participate, Fluence will be responsible to pay any added fees or costs for materials related to its participation. AES shall be permitted to utilize images, product names, and materials from Fluence at events and in promotional efforts related to the sale of Battery Energy Storage Solutions, subject to compliance by AES with Fluence's usage and brand guidelines and the Branding Agreement.

**Article 5.        AES Business Development**

5.1        Staffing. The staffing and hiring of personnel of AES and AES Entities shall be under the sole discretion of the AES Entity. Fluence shall have no right under this Agreement to make any decisions with respect to AES Business Development.

5.2        Funding. Funding of AES Business Development shall be the exclusive responsibility of the AES Entity's own budget at its own expense and as needed to achieve project development objectives. In a rare case and for a limited purpose, Fluence may conclude a separate service level agreement ("**SLA**") with the AES Entity to provide a fixed payment for a certain period of time to fund additional storage development resources. Any such SLA shall be negotiated in good faith between the parties and shall include development personnel as mutually agreed upon by the AES Entity and Fluence as well as customary reporting/feedback on performance.

5.3        Compensation. No AES Entity shall be entitled to any compensation payment from Fluence or any Fluence Entity in connection with any sales of Battery Energy Storage Solutions facilitated pursuant to this Agreement, except and then only to the extent that a specific SLA for sales resources as contemplated by Section 5.2 above applies.

5.4        Training. The Parties shall work together to develop a training program to facilitate the development of projects that utilize Battery Energy Storage Solutions by the AES Strategic Business Units. AES will name specific management and business development personnel to participate. The travel costs and expenses of the participants shall be borne by AES, and the costs and expenses for trainer and training facilities shall be borne by Fluence. Fluence shall provide initial training to the nominated personnel at regional training sessions within 180 days of the Effective Date. The Parties agree that such training program will continue on an ongoing basis throughout the Term and that they will work together in good faith to ensure that the AES business development team is properly trained at all times.

**Article 6.        Contact Persons**

6.1        Nomination. The Parties shall nominate permanent contact persons on both sides to act as liaison for communications between the AES Entity and Fluence (the "**AES Representative**" and the "**Fluence Representative**" respectively). These contact persons shall schedule regular meetings in order to exchange relevant information regarding (i) current project development activities, (ii) trade fairs, (iii) roadmaps for budgeting tools, and (iv) marketing activities.

6.2        Initial Contact Persons. The nominated contact person from AES (subject to replacement by AES on prior written notice to Fluence) is:

> The AES Corporation
> 4300 Wilson Boulevard
> Suite 1100
> Arlington, VA 22203
> Attention: [_____]
> Email: [_____]

The nominated contact person from Fluence (subject to replacement by Fluence on prior written notice to AES) is:

> Fluence Energy, LLC
> 4601 N. Fairfax Drive
> Suite 600
> Arlington, Virginia 22203 USA
> Attention: President, Americas
> Email: john.zahurancik@fluenceenergy.com

**Article 7.        No Restrictions**

7.1        No Fluence Restrictions. AES acknowledges and agrees that notwithstanding anything to the contrary in this Agreement or the LLC Agreement, AES does not have any exclusive rights to market and sell the Battery Energy Storage Systems and Solutions, and that the relationship contemplated by this Agreement shall not restrict Fluence in any way from utilizing the services of other Persons for the marketing and sale of Battery Energy Storage Solutions or from itself marketing and selling such Battery Energy Storage Solutions directly.

**Article 8.        Compliance**

8.1        Compliance Representations and Obligations.

8.1.1        Both Parties shall ensure that they and their respective Affiliates and Representatives comply fully with all applicable anti-bribery, anti-corruption, anti-terrorism, economic sanctions and anti-money laundering Applicable Laws and regulations, including, without limitation, international anti-corruption conventions such as the United Nations Convention Against Bribery, and the United States Foreign Corrupt Practices Act, and in each case, any applicable implementing legislation, with respect to their respective obligations under this Agreement.

8.1.2        Both Parties represent and warrant that neither they nor any of their respective Affiliates or Representatives, have, either directly or indirectly, made a Prohibited Payment or engaged in a Prohibited Transaction with respect to their respective obligations under this Agreement.

8.1.3        Both Parties shall ensure that neither they nor any of their respective Affiliates or Representatives, will, either directly or indirectly, make, promise or authorize the making of a Prohibited Payment or engage in a Prohibited Transaction with respect to their respective obligations under this Agreement.

8.1.4        Both Parties agree to notify the other Party immediately upon gaining knowledge that a Prohibited Transaction or Prohibited Payment related to the obligations set forth in this Agreement and/or the sales and marketing efforts with respect to the Battery Energy Storage Solutions may have occurred and to cooperate in good faith with each other to determine whether a Prohibited Transaction or Prohibited Payment has occurred.

8.1.5    Both Parties agree that, if the other Party has any reasonable grounds to believe that a Prohibited Transaction has taken place or a Prohibited Payment has been made, it shall cooperate in good faith with the other Party in determining whether such a violation occurred by taking necessary measures, which could include engaging an independent third party to investigate the matter and to provide a written report of its findings to the Parties.

8.1.6    Both Parties acknowledge receipt of a copy of the other Party's Code of Conduct and understands the standards to which the other Party expects all its contractors to comply with when performing services for or on behalf of the other Party.

8.1.7    In order to mitigate potential exposure to risk, the Parties shall perform due diligence on any subcontractors, consultants or agents prior to their engagement pursuant to the standards set forth in the other Party's compliance program. The Parties shall execute a written agreement with each subcontractor, consultant, agent or representative which shall include the provisions at least as restrictive as those contained in this Article 8.

8.1.8    For the purpose of detecting potential violations of Applicable Law, the Parties shall perform periodic internal or independent audits of its financial books, accounts and records.

8.1.9    The Parties agree to provide an effective education and training program about the requirements and prohibitions of applicable anti-corruption laws for its subcontractors, consultants, agents and representatives who perform services under this Agreement.

8.2    Compliance Breaches. The Parties agree that a material breach of one or more of the covenants or representations ("**Compliance Breach**") in this Article 8 shall be sufficient cause for the other Party to terminate this Agreement, , in each case in whole or in part, and to declare all or any of them null and void, in which case the breaching Party agrees that it shall forfeit any claim to any additional payments due to it under any of such terminated agreements, other than payments for services previously rendered under such terminated agreements, in addition to being liable for any damages or remedies available to the other Party under Applicable Law. the breaching Party shall indemnify and hold harmless the other Party from any claims, costs, liabilities, obligations, and damages the other Party incurs (including, without limitation, for the fees of any legal counsel Company may retain or engage) as a result of such Compliance Breach.

8.3    Survival. All the provisions in this Article 8 are material and shall survive the termination of the Agreement between AES and Fluence.

**Article 9.    Indemnification**

9.1    General. Each Party (the "**Indemnifying Party**") shall indemnify, defend and hold harmless the other Party, its Affiliates, and their Representatives and assigns (the "**Indemnified Party**") from and against all claims, suits, causes of action, losses, liabilities, liens, damages, assessments, costs, expenses, demands, complaints or actions including but not limited to reasonable attorneys' fees and court costs (collectively, "**Claims**") of third parties concerning: (i) death, personal injury, or property damage of third parties, (ii) nonpayment of wages, benefits, fees, amounts owed, and/or any taxes (including penalties and interest) associated therewith arising from the Indemnifying Party's Representatives, suppliers, contractors, and/or materialmen and (iii) violations by the Indemnifying Party or any Person for whom the Indemnifying Party is responsible of Applicable Law; in each case to the extent arising or resulting from the Indemnifying Party's or its Representative's negligence, willful misconduct, or breach of this Agreement. For sake of clarity, if both Parties are negligent or otherwise at fault or strictly liable without fault, then the obligations of indemnification under this Section 9.1 shall continue, but the Indemnifying Party shall indemnify the Indemnified Party only for the percentage of responsibility for the damage or injuries attributable to the Indemnifying Party.

9.2    Indemnification Procedures.

9.2.1    If an Indemnified Party receives written notice of a Claim, the Indemnified Party shall give prompt written notice to the Indemnifying Party, including a reasonably detailed description of the facts and circumstances relating to such Claim, a complete copy of all notices, pleadings and other papers related thereto, and a description in reasonable detail of the basis for the potential claim for indemnification with respect thereto. The Indemnified Party's delay or deficiency in notifying the Indemnifying Party shall not relieve the Indemnifying Party of liability or obligation except to the extent (and only to the extent) such delay materially impacts the defense of the Claim.

9.2.2    The Indemnifying Party shall be entitled to assume the defense and to represent the interests of the Indemnified Party, which shall include the right to select and direct legal counsel and other consultants (all of whom shall be reasonably acceptable to the Indemnified Party), appear in proceedings on behalf of the Indemnified Party and to propose, accept or reject offers of settlement, subject to Section 9.2.3 below, all at its sole cost. Nothing herein shall prevent an Indemnified Party from retaining its own legal counsel and other consultants or participating in its own defense at its own cost and expense. Notwithstanding the foregoing, if (i) the claim is primarily for non-monetary damages against the Indemnified Party, or primarily for an injunction or other equitable relief that, if granted, would reasonably be expected to be material to the Indemnified Party, (ii) there is a material actual or potential conflict of interest that makes representation of the Indemnifying Party and the Indemnified Party by the same counsel or the counsel selected by the Indemnifying Party inappropriate, or (iii) the claim is a criminal proceeding, then in each case the Indemnified Party may, upon notice to the Indemnifying Party, assume the exclusive right to defend (and in the case of clause (iii) above, compromise and settle), such claim and the reasonable fees and expenses of the Indemnified Party's separate counsel shall be borne by the Indemnifying Party; however the settlement of any claim pursuant to clauses (i) and (ii) above shall be governed by Section 9.2.3 below. Notwithstanding anything to the contrary herein, for sake of clarity, the Parties agree that the foregoing provisions shall not be construed so as to permit the Indemnified Party to control or assume the defense of any action, lawsuit, proceeding, investigation, demand or other claim brought against the Indemnifying Party concurrently with or in a joint proceeding in respect of any claim that is the subject of an indemnification claim hereunder by the Indemnified Party.

9.2.3    Notwithstanding anything to the contrary herein, the Indemnifying Party shall not compromise or settle, or admit any liability with respect to any third party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), unless the relief consists solely of (i) money damages (all of which the Indemnifying Party shall pay), and (ii) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all liability with respect thereto. If the Indemnified Party assume the defense of or represents their own interests, no settlement shall be made without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

9.3    Limited Waiver of Certain Immunities. Each of the Parties hereby specifically and expressly agrees that with respect to any and all claims against an Indemnified Party by any representative of an Indemnifying Party, any indemnification available hereunder shall not be limited by reason of any immunity to which such Indemnifying Party may be entitled under any workers compensation and/or industrial insurance acts, disability benefit acts, or other employee benefits acts and any limitation on the amount or type of damages, compensation, or benefits payable by or for the Indemnifying Party to such representative with respect to any such claim. For the sake of clarity, the Indemnifying Party's waiver of immunity by the provisions of this section extends only to indemnification claims against the Indemnifying Party by or on behalf of the Indemnified Party under or pursuant to this agreement, and does not apply to any claims made by the Indemnifying Party's representatives directly against the Indemnifying Party.

9.4    Survival. The indemnities set forth in this Article 9 shall survive the termination or expiration of this Agreement.

**Article 10.    Term and Termination**

10.1    Term. The term of this Agreement shall commence as of the Effective Date and shall continue until the fourth (4th) anniversary thereof (the "**Initial Term**") and thereafter shall be automatically extended in successive one (1) year increments (the Initial Term together with any such extensions, the "**Term**").

10.2    Early Termination. Either Party may terminate this Agreement effective upon the expiration of the Initial Term or the expiration of any extension thereof upon not less than six (6) months prior written notice of termination furnished to the other Party. No termination of this Agreement pursuant to this Section 10.2 shall affect any Purchase Orders executed between the Parties prior to the date of termination or any Consortium Agreement then in effect.

10.3    Transition. If this Agreement is terminated pursuant to this Section 10.2, the Parties shall cooperate to manage any projects or opportunities in progress so as to ensure minimal disruption to the end customer, subject to compliance with Applicable Law (including antitrust requirements). Each Party shall submit a list of opportunities in progress for which the Parties agree to continue working together and where existing sales arrangements will be honored through completion.

10.4    Termination for Cause and other Remedies. A Party may terminate this Agreement for cause and/or pursue such other rights and remedies as may be available to it at law or in equity, upon thirty (30) days prior written notice in the event the other Party hereto materially breaches this Agreement and fails to cure the breach within thirty (30) days after receipt of written demand therefor.

8

**Article 11.**        **Limitations of Liability**

11.1        <u>WAIVER OF CERTAIN DAMAGES</u>. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY SHALL BE LIABLE, WHETHER BASED IN CONTRACT, GUARANTY, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY, STRICT LIABILITY, INDEMNITY OR ANY OTHER LEGAL OR EQUITABLE THEORY, FOR: LOSS OF USE, REVENUE, SAVINGS, PROFIT, INTEREST, GOODWILL OR OPPORTUNITY, COSTS OF CAPITAL, COSTS OF REPLACEMENT OR SUBSTITUTE USE OR PERFORMANCE, LOSS OF INFORMATION AND DATA, LOSS OF POWER, VOLTAGE IRREGULARITIES OR FREQUENCY FLUCTUATION, CLAIMS ARISING FROM THE OTHER PARTY'S THIRD PARTY CONTRACTS, OR FOR ANY TYPE OF INDIRECT, SPECIAL, LIQUIDATED, PUNITIVE, EXEMPLARY, COLLATERAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR FOR ANY OTHER LOSS OR COST OF A SIMILAR TYPE.

11.2        <u>EFFECTIVENESS</u>. THE PARTIES AGREE THAT THE EXCLUSIONS AND LIMITATIONS IN THIS <u>ARTICLE 12</u> WILL PREVAIL OVER ANY CONFLICTING TERMS AND CONDITIONS IN THIS AGREEMENT AND MUST BE GIVEN FULL FORCE AND EFFECT, WHETHER OR NOT ANY OR ALL SUCH REMEDIES ARE DETERMINED TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE. THESE LIMITATIONS OF LIABILITY ARE EFFECTIVE EVEN IF A PARTY HAS BEEN ADVISED BY THE OTHER PARTY OF THE POSSIBILITY OF SUCH DAMAGES. THE WAIVERS AND DISCLAIMERS OF LIABILITY, RELEASES FROM LIABILITY AND LIMITATIONS ON LIABILITY EXPRESSED IN THIS <u>ARTICLE 12</u> EXTEND TO THE PARTIES' RESPECTIVE AFFILIATES, PARTNERS, PRINCIPALS, MEMBERS SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, SUPPLIERS, AGENTS, AND SUCCESSORS AND ASSIGNS.

11.3        <u>Commencement of Claims</u>. Except with respect to claims arising under <u>Article 10</u> or <u>Article 13</u>, any legal action of either Party arising under this Agreement must be commenced within two (2) years after the earlier to occur of (i) such Party having obtained knowledge of such claim or (ii) the expiration or termination of this Agreement. To the maximum extent permitted by Applicable Law, each Party hereby waives any right to commence any claim or action after such two (2) year period.

**Article 12.**        **Confidentiality**

12.1        <u>Confidential Information</u>. Each Party shall, and shall cause its respective Affiliates and Representatives to, keep confidential any information which it may have or acquire before or after the date of this Agreement, concerning the other Party and its assets, business, operations, affairs, financial condition or such information, "**Confidential Information**").

12.2        <u>Non-Disclosure</u>. Neither Party shall use any Confidential Information in any manner detrimental to the other Party nor shall any of them disclose, publish or make accessible, directly or indirectly, any Confidential Information to any person. In addition, the Parties shall exercise all reasonable efforts to prevent any other person from gaining access to such Confidential Information and take such protective measures as may be or become reasonably necessary to preserve the confidentiality of such Confidential Information.

---

12.3    Exceptions. Notwithstanding Section 12.1 and Section 12.2, either Party may disclose Confidential Information:

12.3.1  to any Representative of such Party, provided that such Representative has a need to know and has been informed of the confidential nature of the information pursuant to Section 12.4;

12.3.2  to the extent required by (i) any applicable law of any Governmental Authority (including any rule or regulation of the Securities and Exchange Commission), (ii) any stock exchange rule or regulation or (iii) any binding judgment, order or requirement of any court or other Governmental Authority of competent jurisdiction; provided, that the Party required to disclose Confidential Information, as the case may be, has delivered written notice to and consulted, to the extent practicable, with the other Party prior to disclosure of such Confidential Information; and

12.3.3  to the extent such Confidential Information becomes available within the public domain (otherwise than as a result of a breach of this Article 12).

12.4    Representatives Bound. Each Party shall inform any representative to whom it provides Confidential Information that such information is confidential and shall instruct them (a) to keep such Confidential Information confidential and (b) not to disclose it to any third party (other than those persons to whom such Confidential Information has already been disclosed in accordance with the terms of this Agreement). The disclosing Party shall be responsible for any breach of this Article 12 by the person to whom the Confidential Information is disclosed.

12.5    Survival. Notwithstanding anything herein to the contrary, the provisions of this Article 12 shall survive the termination of this Agreement for a period of three (3) years.

**Article 13.    Dispute Resolution and Choice of Law**

13.1    Referral to Senior Management. Except as otherwise provided by this Agreement, any dispute, controversy or claim arising out of or in connection with, or relating to, this Agreement or any breach or alleged breach hereof (which breach or alleged breach by a Party remains uncured within ten (10) Business Days after receipt of written notice thereof from another Party) or the validity or termination hereof or the relationship created between the Parties by and/or through this Agreement (a "**Dispute**") shall first be settled as far as possible by good faith negotiations between the parties to the Dispute, in the form of meetings between senior-management level representatives of such Parties, upon the written request by any such Party to the other parties to the Dispute, which writing shall set forth in reasonable detail the nature and extent of the Dispute. For this purpose a senior-management level representative of AES shall be named and the senior-management level representative of Fluence shall be its Chief Executive Officer.

13.2    Referral to Arbitration. If the parties to the Dispute are unable for any reason to resolve a Dispute within thirty (30) days after receipt by any Party of written notice of a Dispute, then any Party may submit the Dispute to arbitration to be finally and exclusively resolved under the Commercial Arbitration Rules of the American Arbitration Association ("**AAA**") then in effect (the "**Rules**"), except as modified herein. There shall be three (3) arbitrators. If there are two (2) parties to the Dispute, each of the parties to the Dispute shall nominate one (1) independent arbitrator in accordance with the Rules. If there are more than two (2) parties to the Dispute, the independent arbitrators shall be nominated in accordance with the Rules; provided, however, that any Party and its Affiliates shall be entitled to nominate only one (1) such independent arbitrator. The arbitrators so nominated, once confirmed by the AAA, shall nominate an additional arbitrator to serve as chairman, such nomination to be made within fifteen (15) days of the confirmation by the AAA of the second arbitrator. If the initial arbitrators shall fail to nominate an additional arbitrator within such fifteen (15) day period, such additional arbitrator shall be appointed by the AAA. The arbitrators shall be required to submit a written statement of their findings and conclusions. Except as otherwise agreed by the parties to such Dispute, exclusive venue of arbitration shall be New York, New York, and the language of the arbitration shall be English and each of the Parties hereby submits to the non-exclusive jurisdiction of the state and federal courts located in New York, New York for preliminary relief in aid of arbitration and for the enforcement of any arbitral award. By agreeing to arbitration, the Parties do not intend to deprive any national court of its jurisdiction to issue any pre-arbitral injunction, pre-arbitral attachment or other order in aid of arbitration proceedings.

13.3    Neutral Arbitrators. None of the Parties or the arbitrators shall select any arbitrator for the arbitral tribunal who has any interest in the Dispute or who has, or within the immediately preceding five (5) years has had, any economic or other relationship with any party to the Dispute.

13.4    Procedures and Costs. The arbitrators shall not have the right to award consequential, incidental, indirect, special, treble, multiple or punitive damages. The arbitral tribunal shall not be empowered to decide any dispute ex aequo et bono or amiable compositeur, and the arbitral tribunal shall decide the Dispute under the substantive laws of the State of Delaware pursuant to the Rules of AAA, without regard to applicable choice of law provisions thereof. The arbitration award shall be decided by majority opinion and issued in writing in the English language and shall state the reasons upon which it is based. It may be made public only with the consent of each participating Party or as may be required by law or regulatory authority or as necessary for enforcement of such award. The arbitrators shall allocate the fees and costs of the arbitration. The losing Party(ies) shall pay the prevailing Party(ies)' attorney's fees and costs and the costs associated with the arbitration, including the expert fees and costs and the arbitrators' fees and costs borne by the prevailing Party(ies), all as determined by the arbitrators. Each Party shall bear its own fees and costs until the arbitrators determine which, if any, Party is the prevailing Party(ies) and the amount that is due to such prevailing Party(ies).

13.5    Award. The award rendered by the arbitrators shall be final and binding on the participating Parties and shall be the sole and exclusive remedy between and among the participating Parties regarding any claims, counterclaims, issues or accounting presented to the arbitral tribunal. The award shall be issued no later than one hundred twenty (120) days from the last hearing held by the arbitrators or as soon thereafter as practicable. The award shall be paid within thirty (30) days after the date it is issued and shall be paid in U.S. Dollars in immediately available funds, free and clear of any Liens, Taxes or other deductions. A judgment confirming or enforcing such award may be rendered by any court of competent jurisdiction.

13.6    Confidentiality. The arbitration shall be confidential. No Party may disclose the fact of the arbitration, any award relating thereto or any settlement relating to any Dispute without the prior consent of the other Party(ies); provided, that such matters may be disclosed without the prior consent of the other Party(ies) to lenders, auditors, tax or other Governmental Authority or as may be required by law or regulatory authorities or as necessary to enforce any award.

13.7    Continued Performance; Provisional Remedies. Notwithstanding the existence of any Dispute, the Parties shall continue to perform their respective obligations under this Agreement unless the Parties otherwise mutually agree in writing. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent the Parties from seeking temporary injunctive relief at any time as may be available under Law or in equity to preserve its rights pending the outcome of any arbitration. Without prejudice to such provisional remedies as may be available under the jurisdiction of a national court, the arbitral tribunal shall have full authority to grant provisional remedies or order the Parties to request that a court modify or vacate any temporary or preliminary relief issued by a court, and to award damages for the failure of any Party to respect the arbitral tribunal's orders to that effect. The Parties agree that any issue regarding the arbitrability of any claims or disputes arising under, relating to or in connection with this Agreement is an issue solely for the arbitrators, not a court, to decide.

13.8    Waiver of Jury Trial. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY OR OTHERWISE ON ANY CLAIM, CAUSE OF ACTION, SUIT OR PROCEEDING PERMITTED UNDER THIS ARTICLE 13. THE PROVISIONS OF THIS AGREEMENT RELATING TO WAIVER OF TRIAL BY JURY SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT IT IS RELYING ON THE WAIVER CONTAINED HEREIN AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATES IN THIS SECTION 13.8.

**Article 14.        Miscellaneous**

14.1    Governing Law. This Agreement (including any Dispute) shall be deemed made and prepared and shall be governed, construed and interpreted in accordance with the internal laws of the State of Delaware, without regard to principles of conflict of laws thereof which may require the application of the law of another jurisdiction.

14.2    Assignment; Successors. Neither Party may assign all or any part of this Agreement, or any rights or obligations hereunder, without the prior written consent of the other Party, which consent shall not be unreasonably withheld. Any purported assignment which fails to comply with the requirements of this Section 14.2 shall be null and void. Notwithstanding the foregoing: (i) either Party may, without the prior written consent of the other Party, assign all or any part of this Agreement or any Purchase Order issued hereunder, or any rights or obligations hereunder or thereunder, to an Affiliate, which will accept such assignment and assume all obligations related to this Agreement; provided that, notwithstanding any such assignment, the assigning Party shall not be relieved of any of its obligations hereunder by reason of such assignment and shall remain liable hereunder to the same degree that the assigning Party would be responsible had there been no assignment. It shall be reasonable for a Party to withhold consent to a proposed assignment where the proposed assignee is identified on Exhibit D to the LLC Agreement.

14.3    Compliance with Applicable Law. The Parties agree to comply with all applicable laws and regulations. The Parties' obligations to fulfill this Agreement are subject to the condition that the fulfillment is not prohibited by any national and/or international foreign trade and customs regulations or any embargos or other applicable sanctions.

14.4    Amendments. Any modification or amendment to this Agreement must be made in writing and signed by authorized representatives of the Parties to be effective.

14.5    Relationship of the Parties. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, employee-employer relationship, trust or other association of any kind between the Parties and each Party shall be individually responsible only for its obligations as set forth in this Agreement. In each case where a AES Entity referred to in this Agreement is an Affiliate of AES, such reference shall be deemed to mean that AES shall cause such AES Affiliate to comply with the applicable obligation, and in each case where a Fluence Entity referred to in this Agreement is an Affiliate of Fluence, such reference shall be deemed to mean that Fluence shall cause such Fluence Affiliate to comply with the applicable obligation.

14.6    <u>Publicity</u>. No Party hereto shall refer to or use, or permit any persons to refer to or use, any other Party's name, trademarks, service marks or logos in any advertising, promotional materials, press releases or other publicity without obtaining the prior written consent of the applicable Party, except when, and to the extent that, such communication is required by applicable laws, regulations or stock exchange rules.

14.7    <u>Non-Exclusive Remedies and Non-Waivers</u>. No delay or omission by the Parties in exercising any right or remedy provided for herein shall constitute a waiver of such right or remedy nor shall it be construed as a bar to or waiver of any such right or remedy on any future occasion. Any waiver authorized on one occasion must be made in writing and is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion. The rights and remedies of the Parties herein shall not be exclusive and are in addition to any other rights and remedies provided by Applicable Law or in equity.

14.8    <u>Severability</u>. Any provision of this Agreement issued hereunder that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof (provided the substance of the agreement between the Parties is not thereby materially altered), and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Laws, the Parties hereto hereby waive any provision of Applicable Law which renders any provision hereof prohibited or unenforceable in any respect.

14.9    <u>Survival</u>. The Indemnification, Limitations of Liability, Confidentiality, Dispute Resolution and Miscellaneous sections of this Agreement, and any provision that contemplates performance or observance subsequent to termination or expiration shall survive termination or expiration of this Agreement.

14.10    <u>Complete Agreement and Counterparts</u>. This Agreement shall constitute the entire agreement between the Parties and shall supersede all previous communications, representations, agreements or understandings, whether oral or written, with respect to the subject matter hereof. The headings used in this Agreement are for reference and shall not limit or affect the meaning or interpretation of any of the terms hereof.

14.11    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which when so executed and delivered shall constitute a duplicate original and all counterparts together shall constitute one and the same instrument. Transmission of the executed signature page of a counterpart of this Agreement by electronic mail shall be effective as delivery of an executed counterpart of this Agreement.

14.12    <u>Notices</u>.

14.12.1    All notices and other communications which either Party is required or may desire to serve upon the other shall be addressed to the Party to be served as follows, unless a different address is designated in writing by the Party to be served:

To AES:

The AES Corporation
4300 Wilson Boulevard
Suite 1100
Arlington, VA 22203
Attention: [_____]
Email: [_____]

13

With a copy to:

        AES Grid Stability, LLC
        4300 Wilson Boulevard
        Suite 1100
        Arlington, VA 22203
        Attention: [_____]
        Email: [_____]

To Fluence:

        To the contact person designated pursuant to Article 6 above

With a copy to:

        Fluence Energy, LLC
        Attn: General Counsel
        Email: frank.fuselier@fluenceenergy.com

14.12.2      All notices, requests, consents and other communications under this Agreement must be in writing and shall be deemed to have been duly given and effective (i) immediately (or, if not delivered or sent on a Business Day, the next Business Day) if delivered or sent and received by electronic mail , (ii) on the date of delivery if by hand delivery (or, if not delivered on a Business Day, the next Business Day) or (iii) on the first Business Day following the date of dispatch (or, if not sent on a Business Day, the next Business Day after the date of dispatch) if by a nationally recognized overnight delivery service (all fees prepaid). In the case of notice via email, each Party shall upon request of the other Party expressly acknowledge or deny receipt of such notice.

14.13    Joint Effort. Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other. Any rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement, or any amendments or Exhibits hereto.

14.14    Language of the Agreement, Correspondence, Documentation. The language of this Agreement shall be English. Unless to the extent agreed otherwise, correspondence, technical and commercial documents as well as any other information exchanged between the Consortium Members relating to this Agreement shall be in English.

[Signature page follows]

14

IN WITNESS WHEREOF, Fluence and AES have caused their duly appointed representatives to execute this Agreement.

**The AES Corporation**

By: _____
Name:   [_____]
Title:    [_____]

**Fluence Energy, LLC**

By: _____
Name:   [_____]
Title:    [_____]

[Signature Page to AES Cooperation Agreement]

## GLOBAL PAYING SERVICES AGREEMENT



Dated as of ____July 22_____ 2021, between Fluence Energy, LLC, a Delaware limited liability corporation ("<u>Buyer Parent</u>") and Citibank, N.A., a U.S. national banking association ("<u>Citibank</u>").

### BACKGROUND

A.   From time to time Buyer (as defined in Article I) enters into commercial trade transactions with various suppliers (each, a "<u>Supplier</u>") for the purchase of goods and/or services, resulting in Payment Obligations (as defined in Article I) owed by Buyer to the respective Suppliers.

B.   To facilitate the processing of Payment Obligations, Buyer and Suppliers intend to utilize one or more computerized settlement systems, including related services, Equipment and Software (each as defined in Article I and, as updated from time to time, collectively, the "<u>System</u>") provided by Citi (as defined in Article I). Citi is prepared to provide Buyer with a license to the System, subject to the terms and conditions set forth in this Agreement and in any applicable Joinder Agreement (as defined in Article I).

C.   Buyer wishes to engage Citi to act as Buyer's paying agent with respect to the transactions it wishes to settle using the System. Citi is willing to act as Buyer's paying agent, on the terms and conditions set forth herein and in any applicable Joinder Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, conditions, representations and warranties contained herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Buyer and Citi agree as follows:

### ARTICLE I:   DEFINITIONS

In this Agreement:

"<u>Adverse Transfer Notice</u>" means any notice that (i) any Payment Obligation or any portion thereof has been sold, transferred or pledged as security for the obligations of a Supplier, or (ii) a Bankruptcy Event has occurred with respect to a Supplier.

"<u>Affiliate</u>" means any domestic or foreign partnership, joint venture, corporation, limited liability company, bank or other form of enterprise in which Buyer Parent or Citi Parent, as applicable, possesses (directly or indirectly) an ownership interest of 80 percent or greater.

"<u>Agreement</u>" means this Global Paying Services Agreement, as such may be amended, restated, supplemented or otherwise modified from time to time (including via Joinder Agreement) in accordance with its terms.

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations from time to time, as amended, concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and all other applicable anti-bribery and corruption laws.

"<u>Anti-Money Laundering Laws</u>" means all applicable money laundering statutes, financial recordkeeping and reporting requirements of the jurisdictions where Buyer or its parents or subsidiaries conduct business, the rules and regulations thereunder

and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental or regulatory agency.

"<u>Approved Buyer Affiliate</u>" means any Affiliate of Buyer Parent that is reasonably acceptable to Citi for settling transactions utilizing the System.

"<u>Authorized Users</u>" means employees, agents or contractors of Buyer whom it has designated as being authorized to access the System on its behalf and who have been provided Logins to access the System by Citi.

"<u>Bankruptcy Event</u>" means, as to any Supplier, any of the following: (a) any case or proceeding with respect to such Supplier under applicable law (whether under Title 11 Bankruptcy of the United States Code or any other national, federal or state bankruptcy, insolvency, reorganization or other law affecting creditors' rights generally) or any other or similar proceedings seeking any stay, reorganization, arrangement, composition or readjustment of the obligations and indebtedness of such Supplier; (b) any proceeding seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to such Supplier or any material portion of its assets; (c) any proceedings for liquidation, dissolution or other winding up of the business of such Supplier; (d) any assignment for the benefit of creditors or any marshaling of assets of such Supplier; or (e) any analogous procedure or step taken in any jurisdiction.

"<u>Business Day</u>" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in the jurisdiction where the applicable Citi entity is located and the principal financial center of each relevant currency.

"<u>Buyer</u>" means, individually or collectively (as the context requires), Buyer Parent and each of its Approved Buyer Affiliates a signatory to this Agreement or any Joinder Agreement.

"<u>Buyer Contracting Party</u>" means any Approved Buyer Affiliate that is a party to this Agreement or any Joinder Agreement.

"<u>Change of Control</u>" with respect to Buyer Parent or any other Buyer, means any of the following: (i) the sale, lease or transfer of all or substantially all of the assets of Buyer Parent or any other Buyer; (ii) the liquidation or dissolution of (or the adoption of a plan of liquidation by) Buyer Parent or any other Buyer; (iii) the acquisition by any Person or group (as such term is defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of more than 50% of the voting stock of Buyer Parent or any other Buyer by way of merger or consolidation or otherwise, (iv) the adoption by the equity holders of Buyer Parent or any other Buyer of a plan or proposal for the merger, transfer of substantially all assets, consolidation, liquidation or dissolution Buyer Parent or any other Buyer, or the effectuation of such plan or proposal, (v) the execution by Buyer Parent or any other Buyer of any binding agreement to effectuate any of the foregoing actions, or (vi) if at any time the guarantees signed by Siemens Corporation and AES Corporation in favor of Citibank shall for any reason cease to be

1

NY Law GPSA (Version 7.0)

valid and binding or cover less than one hundred percent (100%) of the Payment Obligations under this Agreement or any Joinder Agreement.

"Citi" means individually or collectively (as the context requires), Citibank and any Affiliate of Citibank a signatory to this Agreement or any Joinder Agreement.

"Citi Contracting Party" means any Citi entity that is a party to this Agreement or any Joinder Agreement.

"Citi Parent" means Citigroup, Inc., a Delaware corporation.

"Contracting Party" means any Buyer Contracting Party or any Citi Contracting Party, as applicable;

"Contracting Parties" means any or all Buyer Contracting Parties and any or all Citi Contracting Parties, as the context requires.

"Disbursement Account" has the meaning set forth in Section 5.1.

"Equipment" means all equipment provided by or on behalf of Citi to Buyer for the purpose of accessing or using the System, including all authentication products.

"Fees" has the meaning set forth in Section 4.1.

"Intellectual Property Rights" means all rights in inventions, patents, copyrights, design rights, database rights, trademarks and trade names, service marks, trade secrets, know-how and other intellectual property rights (whether registered or unregistered) and all applications and rights to apply for any of them anywhere in the world that apply to the Licensed Resources.

"Joinder Agreement" means any agreement pursuant to which the applicable Contracting Parties assume obligations and obtain rights under this Agreement, as such obligations and rights may be modified or supplemented by the terms of such Joinder Agreement in accordance with Article VI hereof.

"License" has the meaning set forth in Section 2.1.

"Licensed Resources" means, collectively, the Logins, the System and the Policies and Procedures.

"Logins" means usernames and passwords for Authorized Users to access the System."

"Losses" has the meaning set forth in Section 2.7(f).

"Message" has the meaning set forth in Section 2.4.

"Party" or "Parties" means each or both of Buyer and Citi, as the context requires.

"Payment Due Date" means, with respect to a Payment Obligation, the Business Day on which such Payment Obligation is due and payable as set forth in the applicable Payment Instruction for payment of such Payment Obligation, or if such date is not a Business Day the first Business Day following that date; provided in no event shall the Payment Due Date be earlier than the date 2 Business Days after the Payment Instruction Date.

"Payment Instruction" means the instruction issued by Buyer to Citi through the System directing payment of the specified Payment Obligation to a specified Supplier on the Payment Due Date.

"Payment Instruction Date" means the date a Payment Instruction is submitted to Citi, as recorded by the System.

"Payment Obligation" means a specified amount to be paid by Buyer to a specified Supplier (or its assignee pursuant to Section 5.4) on a Payment Due Date to settle one or more commercial trade transactions between Buyer and such Supplier for the purchase of goods and/or services.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, a government or any political subdivision or agency thereof, or any other entity.

"Policies and Procedures" means all tangible printed information (including any in electronic form) provided from time to time by Citi to Buyer in connection with the use of the System.

"Sanctions" means economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by any Sanctions Authority.

"Sanctions Authority" means the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, Her Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

"Sanctioned Jurisdiction" means, at any time, a country or territory that is, or whose government is, the subject of Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions related list maintained by any Sanctions Authority, (b) any Person located, organized, or resident in a Sanctioned Jurisdiction, or (c) any other subject of Sanctions, including, without limitation, any Person controlled or 50 percent or more owned in the aggregate, directly or indirectly, by, or acting for or on behalf of, or at the direction of, any such Person or Persons described in the foregoing clauses (a) or (b).

"Services" means the paying agency services and related functions provided by Citi pursuant to this Agreement, any Joinder Agreement or other agreement or document related thereto.

"Software" means all software, programming or object code provided by or on behalf of Citi to Buyer for utilizing a computer or like device to use the System.

## ARTICLE II:  THE SYSTEM; REPRESENTATIONS, WARRANTIES AND COVENANTS

**2.1    License Grant.**  (a)    Subject to the terms and conditions set forth herein, Citi hereby grants Buyer a limited, personal, non-exclusive, non-transferable license and right, without the right to further sublicense, during the term of this Agreement, to access and use the Licensed Resources, solely for the purposes contemplated by this Agreement (the "License"). Except as expressly set forth in this Agreement, Buyer shall have no other right (including any ownership right or intellectual property right), title or interest to or in the Licensed Resources or any portion thereof.

(b)    Buyer acknowledges that all right, title and interest in and to the System, including without limitation, all Intellectual Property Rights, are vested, and shall remain vested, in Citi and/or its licensors. Notwithstanding anything to the contrary contained herein

2

NY Law GPSA (Version 7.0)

and except as otherwise may be expressly agreed in writing, all right, title and interest in and to revisions, upgrades, updates, derivative works and other improvements to the System shall vest solely in Citi and its licensors. Except for the grant herein by Citi to Buyer of the License, nothing in this Agreement shall act to operate as an assignment or other transfer of any of such rights to Buyer.

**2.2   Usage.**    (a)    Buyer shall access and use, and shall ensure that its Authorized Users access and use, the System only in accordance with this Agreement and the Policies and Procedures. Buyer shall remain informed and notify its Authorized Users as to any updates to the Policies and Procedures that may be implemented from time to time. Approval and acceptance of an update to the Policies and Procedures shall be deemed to be given if Buyer continues to utilize the System subsequent to the publication of any such update.

(b)    Buyer shall promptly use any successors, updates, new releases or replacements of any portion of the Equipment or Software provided to it from time to time by Citi for use in accessing the System, and cease to use the previous version or release of such portion.

(c)    Buyer shall have the right under the License to use the content of the System website on a computer screen, to print reasonable extracts from the website, and to save reasonable copies to Buyer's hard drive, in each case solely for the purposes contemplated by this Agreement. All other copying, distribution or commercial use of any of the content of the website is strictly forbidden. Except for the limited right granted by this Section 2.2(c), no other right or license is granted in respect of the content of the website.

(d)    Buyer shall have no right to, and shall not, without the written consent of Citi, alter or modify the whole or any part of the Licensed Resources.

(e) Buyer shall ensure that only its Authorized Users access the System and shall procure that its Authorized Users maintain the secrecy of their Logins and do not disclose their Logins to any other person.

(f) Buyer shall immediately notify Citi in writing if it becomes aware of any unauthorized use, loss or theft of its Authorized Users' Logins or if Buyer becomes aware or suspects that any of them have become known by an unauthorized person. Upon such notification Citi may (at its absolute discretion) revoke, suspend or disable such Logins and/or issue new Logins to Buyer.

(g)    Buyer shall not, and shall ensure that none of its representatives, access or attempt to gain access to any part of the System that is not permitted under its Logins.

**2.3   Security.**    Buyer shall safeguard and keep confidential, and put into effect and maintain commercially reasonable security measures to safeguard and keep confidential, the Licensed Resources. In furtherance of the foregoing, Buyer agrees that:

(i) it will not knowingly interfere with, defeat, circumvent or tamper with any Message or other information or instruction that is, by the terms of this Agreement or the Policies and Procedures, to be transmitted through the System, or with the restrictions on use of functionality or access to information on any portion of the System, or attempt to do so;

(ii) it will not knowingly introduce into any portion of the System any virus or other data or code that harms, or may adversely affect, the operation of the System, and will put into effect and maintain commercially reasonable measures to prevent any such introduction; and

(iii) it will ensure that all Messages being communicated by Buyer through the System are sent in accordance with this Agreement and the Policies and Procedures.

**2.4   Messages.** Buyer shall use the System to send all messages under this Agreement (including, without limitation, Payment Instructions and any updates to Buyer's list of personnel authorized to use the System on Buyer's behalf) (each, a "Message"). Any Message sent or purported to be sent by Buyer via the System is valid and binding on Buyer, and Citi is entitled to rely thereon, irrespective of any error or fraud contained therein or the identity of the individual who sent the Message, except to the extent that such error or fraud or use of the System by an unauthorized third party is a result of the failure by Citi to use commercially reasonable security measures to prevent unauthorized access to the System. Buyer agrees that the act of sending a Message electronically in accordance with this Agreement is as legally binding as if Buyer had manually executed and delivered that Message in written form, and that Buyer will not contest the validity, legally binding nature or enforceability of that Message on the basis that the act of sending the Message electronically is invalid or not binding on Buyer.

**2.5   System Availability**.    Buyer acknowledges and agrees that: (i) Citi does not represent or warrant that the System will be error-free; (ii) there will be downtime from time to time when the System cannot be accessed; and (iii) Buyer is responsible for providing and maintaining, and  Citi has no liability or responsibility in respect of, equipment not supplied by or on behalf of Citi, or utility services that Buyer utilizes as a result of its participation in the System and maintaining a link to the System.

**2.6   Confidentiality**. (a)    Each Party agrees to maintain the confidentiality of any Confidential Information (as defined below) of the other Party to which it has access under the System or otherwise under this Agreement.  "Confidential Information" shall mean information of a Party that the other Party knows or reasonably should know to be confidential to such first Party.

(b)    Notwithstanding the foregoing:

(i)    "Confidential Information" does not include information that: (1) was in the public domain before disclosure or becomes part of the public domain after disclosure through no wrongful act of the receiving party; (2) was already known to the receiving party, as evidenced by written or electronic documentation in its files; (3) has been lawfully received from a third party without restrictions; or (4) was independently developed by employees or agents of the receiving party who did not have access to the Confidential Information;

(ii)    either Party may transfer and disclose Confidential Information obtained from the other Party to any authority of competent jurisdiction if disclosure is required pursuant to a court order or instruction of any regulatory or supervisory authority having jurisdiction over it, provided that the disclosing Party shall have given the other Party prompt notice thereof (unless it has a legal obligation to the contrary) so that the other Party may seek a

NY Law GPSA (Version 7.0)

protective order or other appropriate remedy to prevent disclosure; and

(iii) Citi may transfer and disclose Confidential Information obtained from Buyer:

(1) to its subsidiaries and affiliates,

(2) to its professional advisers, auditors and other service providers (such as rating agencies and third-party trustees), as well as to any regulatory, supervisory, judicial or other governmental authority,

(3) to any Person to (or through) whom Citi sells, assigns or transfers (or may potentially assign or transfer) all or any of its rights and obligations under this Agreement or with respect to any Payment Obligations owed by Buyer to a Supplier (or a counterparty in (x) a securitization or similar transaction in relation to which any Payment Obligations or this Agreement forms a part of the asset pool or collateral pool, (y) a sub-participation in relation to any such Payment Obligations or this Agreement, or (z) any other transaction (including credit derivative transactions) under which payments are to be made by reference to any such Payment Obligations or this Agreement), and

(4) to any Person with whom Citi is merging or consolidating or is proposing to merge or consolidate.

**2.7 Representations, Warranties and Covenants of Buyer.** Buyer hereby represents, warrants and covenants to and with Citi as follows:

(a) Buyer's use of the System is solely to settle genuine and lawful commercial trade transactions, arising in the ordinary course of business, for the purchase of goods and/or services by Buyer from Suppliers. Each Payment Instruction constitutes Buyer's irrevocable acceptance of and agreement to pay, without set-off or counter claim, the applicable Supplier's claim for payment of the amount specified in such Payment Instruction on the applicable Payment Due Date for the goods and/or services related thereto. Buyer shall not use the System for investment or arbitrage functions or purposes, or for any money laundering purpose, or in contravention of any law or regulation, and Messages issued at Buyer's request shall not be, and are not intended to be, used in furtherance of any of the foregoing.

(b) Buyer has independently verified the validity of the entity and account information and any changes to such information stored on the System with respect to each Supplier to whom Citi is instructed to make payment as Buyer's agent. Buyer acknowledges that Citi has no obligation to inspect or view the content of Messages conveyed through the System, and that Citi has no liability in the event that Buyer is in breach of this Article.

(c) Buyer shall comply with all relevant laws and regulations applicable to this Agreement and transactions conducted using the System including, without limitation, all relevant Sanctions, export control laws, and U.S. tax information reporting requirements, if any. In addition, Buyer agrees that this Agreement does not relieve Buyer of any obligation to information-report under Section 6041 or 6041A of the Internal Revenue Code (the "Code") with respect to payments made to Suppliers through the System or to perform backup withholding under Code section 3406 when required. Any and all payments made hereunder shall be made free and clear of and without deduction for any and all present and future taxes (including value-added taxes, stamp taxes and withholding taxes), levies, imposts, deductions charges or withholdings, and all liabilities with

respect thereto (collectively, "Taxes"). If requested by Citi, Buyer shall furnish to Citi at its address hereunder, the original or a certified copy of a receipt evidencing payment of Taxes.

(d) Information provided by Buyer to Citi from time to time in connection with this Agreement is and shall be true and accurate in all material respects, and Citi is hereby authorized from time to time to verify such information, either pursuant to Section 5.5(b) or otherwise as Citi reasonably determines. Buyer Parent has provided to its independent auditor this Agreement, the form of Supplier Agreement to be entered into by Citi and certain of Buyer's suppliers and any other information or documents relevant to the Services to be provided by Citi, including any relevant marketing material presented by Citi to Buyer.

(e) Buyer shall defend, indemnify and hold harmless Citi and its affiliates, employees, directors, officers and agents acting within the scope of their authority (each an "indemnified party"), from and against any and all claims, liabilities, losses, Taxes, damages, costs and expenses, including reasonable attorneys' fees and disbursements, other dispute resolution expenses (including reasonable fees and expenses in preparation for a defense of any investigation, litigation or proceeding) and costs of collection (collectively, "Losses"), including, without limitation, Losses (i) relating to the enforcement of this indemnity or (ii) arising out of or in any way relating to (1) Citi's reliance on any Message sent by Buyer using the System (including any Message which Citi believes in good faith was sent by Buyer irrespective of any error, fraud or the identity of the individual who sent it), (2) any breach of Buyer's representations, covenants or obligations under this Agreement, or (3) any suit, demand, claim or other dispute with respect to a transaction by Buyer using the System, except to the extent that such Losses are caused by the gross negligence or willful misconduct of such indemnified party.

(f) Buyer does not conduct any business, activities or transactions of, with or involving (including any purchase or sale of goods or services originating in, from or to) an individual, entity, vessel, country or territory that is the subject of Sanctions. Neither Buyer, any subsidiary of Buyer, or any party who owns them, nor to the best of its knowledge, any of their directors, officers, employees, agents, affiliates or representatives, (i) is a Sanctioned Person, or (ii) is located, organized or resident in a country or territory that is a Sanctioned Jurisdiction. Buyer will not instruct Citi to make a payment to any Person that is the subject of Sanctions or located, organized or resident in a country or territory that is a Sanctioned Jurisdiction. None of the execution, delivery or performance of this Agreement, nor any activities, transactions or services contemplated by this Agreement, would result in a violation by Citi or its affiliates of Sanctions or export controls.

(g) Each of Buyer and its subsidiaries (i) are conducting and will continue to conduct its business in compliance with Anti-Money Laundering Laws and Anti-Corruption Laws and (ii) have implemented, maintain, and will continue to maintain in effect policies and procedures to ensure compliance by Buyer and its subsidiaries and their respective directors, officers, employees, and agents, with Anti-Money Laundering Laws and Anti-Corruption Laws. No action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving Buyer or any of its subsidiaries with respect to Anti-Money Laundering Laws or Anti-Corruption Laws is pending or, to the knowledge of Buyer, threatened.

4

NY Law GPSA (Version 7.0)

(h) Buyer shall provide written notice to Citi at least 30 days prior to making any change to its name or organizational structure.

**2.8    Mutual Representations, Warranties and Covenants of the Parties.** (a) Each Buyer and Citi represents, warrants, and covenants as follows: (i) it is validly existing and in good standing and has the power to enter into and perform, and has all necessary authorizations for the entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement; (ii) this Agreement constitutes its legal, valid and binding obligation, enforceable in accordance with its terms; and (iii) its execution, delivery and performance of this Agreement does not contravene any contract binding on or affecting it or any of its properties, does not violate any applicable law or regulation, and does not require any notice, filing or other action to or by any governmental authority.

(b)    Except as expressly provided in this Agreement or the Policies and Procedures, no representation, warranty, term or condition, express or implied, statutory or otherwise, is given or assumed by Citi in respect of (i) the Licensed Resources, (ii) Buyer's underlying commercial transactions, or (iii) the goods or services to which such underlying transactions relate (regardless of any assistance that Citi may, in its sole discretion, provide to Buyer.)    All such representations, warranties, terms and conditions are excluded, except to the extent that this exclusion is prohibited by law. Without limiting the foregoing, Buyer understands that Citi is not giving any representation or warranty as to condition, performance, fitness for purpose, suitability, merchantability, quality or otherwise, except as expressly provided herein or in the Policies and Procedures.

## ARTICLE III:  PAYING AGENT

**3.1    Appointment of Agent.** Buyer hereby appoints Citi as Buyer's paying agent with respect to transactions executed through the System, and Citi hereby accepts such appointment, in each case in accordance with, and subject to, the terms and conditions set forth in this Agreement. In performing its obligations hereunder, Citi may consult as to any legal matters with lawyers selected with due care by it, and Citi shall be protected from and shall incur no liability for any action taken or not taken with respect to such matters in good faith and in accordance with the opinion of such lawyers.

## ARTICLE IV:  FEES AND CHARGES

**4.1 Fees and Charges.** Buyer shall pay Citi such fees, commissions and other amounts with respect to the Services of Citi hereunder, as set forth in Exhibit A attached hereto and made a part hereof (collectively, "Fees").

## ARTICLE V:  DISBURSEMENT ACCOUNTS AND PAYMENT PROCESS

**5.1    Disbursement Account.**    Each Buyer shall maintain a designated account with Citi for purposes of this Agreement (each a "Disbursement Account"). Each Buyer authorizes Citi to debit from any Disbursement Account all amounts corresponding to Payment Instructions or otherwise payable hereunder as such amounts become due and payable. Under no circumstances shall Citi be liable for interest on monies deposited in the Disbursement Account at any time pursuant to any provision of this Agreement or otherwise, nor shall Citi be required to invest such monies. Monies held by or deposited with Citi hereunder need not be segregated from other funds except to the extent required by law, and Citi need not

collateralize or provide any security interest for any funds received by it pursuant to this Agreement.

**5.2    Payment Instructions.**  Buyer from time to time will submit Payment Instructions through the System. Each Payment Instruction will specify the Supplier to receive payment, the amount of the relevant Payment Obligation and the Payment Due Date. If the Payment Instruction is accepted by the System, Citi shall notify, by means of the System, the Supplier identified in the Payment Instruction of the terms and provisions of such Payment Instruction. If the Payment Instruction is not accepted by the System, Citi shall promptly notify Buyer to that effect and the Payment Instruction will be deemed cancelled by Buyer. Buyer's submission of a Payment Instruction (unless not accepted by the System) shall constitute (i) a representation and warranty by Buyer that the payment amount, denomination and currency uploaded to the System is true and accurate representation of the Payment Obligation in all respects, (ii) an undertaking and acknowledgement by each Buyer and Buyer Parent to Citi and each Supplier of its independent, irrevocable, unconditional and primary obligation to fund (or to cause a Buyer subsidiary to fund) the Disbursement Account with cleared funds in the amount of the Payment Obligation (without setoff, deduction or any other reduction of any kind or nature) on or prior to 12:00 noon (New York City time) on the relevant Payment Due Date,  (iii) an irrevocable and unconditional request by Buyer to Citi to make payment of the Payment Obligation on the Payment Due Date and as otherwise specified in such Payment Instruction, and (iv) an agreement that as between Buyer and Citi, the amount specified in such Payment Instruction shall be conclusive. Without limiting the foregoing, Citi shall not be obligated to accept any Payment Instruction with respect to a Payment Obligation that would be constrained pursuant to any law, rule or regulation applicable thereto.

**5.3    Payment Due Date.**    (a)    On the relevant Payment Due Date, Buyer shall deposit or cause to be deposited in the Disbursement Account sufficient funds to enable Citi to pay the amounts specified in the relevant Payment Instructions and such other amounts, including Fees, payable under this Agreement.

(b)    Provided that sufficient funds are available in the Disbursement Account, Citi shall make payment of the Payment Obligation to the Supplier or its assignee on the Payment Due Date, in accordance with the terms of the relevant Payment Instruction, by automated clearing house network or wire transfer of immediately available funds to a bank account maintained by such Supplier (or such assignee, if applicable), as specified in the Payment Instruction or otherwise through the System. Buyer's obligation to pay the Payment Obligations pursuant to the Payment Instructions shall not be satisfied by any tender or recovery pursuant to any judgment which is expressed in or converted into any currency other than as specified in the relevant Payment Instruction, except to the extent that such tender or recovery results in the actual receipt by Citi of the full equivalent amount of the Payment Obligation.

(c)    Citi has no obligation to make payment of the Payment Obligation specified in any Payment Instruction prior to receipt by Citi in the Disbursement Account of a corresponding and final payment in cleared funds of the relevant amount. If Citi makes such payment before such receipt and Buyer fails to fund the Disbursement Account on the Payment Due Date as required hereunder, Citi may either (i) reverse all or part of the payment and make an appropriate entry to the Disbursement Account, or (ii) deem

5

the funding by such payment by Citi as an overdraft under Buyer's overdraft line of credit with Citi and require repayment of an amount corresponding to such Payment Obligation under such overdraft line of credit pursuant to its terms. Citi is not required to draw under the overdraft line of credit or otherwise make any payment of a Payment Obligation from the Disbursement Account which might result in or increase a debit balance. If the total amount of payments of Payment Obligations from the Disbursement Account at any time would otherwise result in a debit balance or exceed the immediately available funds on deposit in the Disbursement Account, Citi may decide which Payment Obligations it will make (in whole or in part and in the order it selects).

**5.4    Supplier Designee.** Buyer consents and agrees that (a) any Supplier may assign to Citi (or another financial institution) any or all of its right to receive payment of Payment Obligations in connection with any Payment Instruction issued hereunder pursuant to a purchase or transfer agreement between a Supplier and Citi (or another financial institution) (each a "Purchase Agreement") and (b) such Purchase Agreement may be governed by the laws of New York, the laws of England or another governing law as determined between Citi and the Supplier. Buyer agrees that notice of any such assignment or designation pursuant to a Purchase Agreement or otherwise received (i) as a Message through the System or (ii) by any other written or electronic means, shall be effective notice of such assignment or designation and that any such notice may be in English. Buyer agrees that it will provide an acknowledgment of any such notice of assignment if requested by Citi or if such acknowledgement is required in order to perfect such assignment under the laws of the jurisdiction where the relevant Supplier is organized or located. Following any notice of assignment to Citi as assignee, Buyer shall treat any notice from Citi relating to the transferred Payment Obligation as being delivered by the relevant Supplier. If Citi has purchased any Payment Obligations under a Purchase Agreement, Buyer hereby authorizes Citi to make payment of such transferred Payment Obligations to Citi for its own account. Buyer further acknowledges and recognizes each assignment of Payment Obligations under a Purchase Agreement as a valid and effective transfer, notwithstanding any invalidity of, or any defect or lack of perfection or priority in, such assignment under the relevant Purchase Agreement. In the event that any agreement between Supplier and Buyer contains any provision restricting the sale, assignment or transfer of Payment Obligations by such Supplier to Citi or any other transferee (or by Citi or any transferee to any subsequent transferee), Buyer hereby releases Supplier, Citi or such transferee from such restriction.

**5.5    Information, Data and Access.** (a)  Buyer shall maintain sufficient records of all transactions concluded by it utilizing the System and otherwise with respect to its obligations and activities under or in connection with this Agreement, including information with respect to any underlying commercial trade transaction (or associated disputes) to which it is a party, and with respect to compliance of such transactions with applicable laws and regulations. Buyer shall retain each record required to be maintained under this Section 5.5 during the term of this Agreement and, if applicable, for such longer period as may be required by law or regulation.

(b)  Buyer shall allow representatives of Citi, at reasonable times upon reasonable notice, to examine and take copies of any of Buyer's records relating to this Agreement which are reasonably required in order to comply with an order, instruction or request from any governmental, administrative, judicial or emergency body or any other authority of competent jurisdiction, or to ensure compliance with the terms of this Agreement. Any such documents shall be returned to Buyer once such access is no longer required.

**5.6    Other Covenants and Agreements.**    (a)    Buyer agrees that Buyer's obligations under this Agreement and any Payment Instructions shall not be affected by the invalidity, unenforceability, existence, performance or non-performance of the underlying commercial trade transaction or any related contract or undertaking, nor shall those obligations be subject to claims or defenses of any Buyer (including Buyer Parent) in relation to the same, including, without limitation, set-off, breach of contract, suretyship defenses or breach of statutory obligation.

(b)    Buyer's issuance of a Payment Instruction, and its funding of the Disbursement Account with an amount sufficient to pay all or part of such Payment Instruction on the Payment Due Date therefor, shall each be deemed to constitute Buyer's confirmation that its representations and warranties set forth in Article II remain true and correct as of the date of such Payment Instruction and as of such Payment Due Date, and that Buyer is not in breach of any of its covenants or other obligations under this Agreement. No additional documentation or further action by either Buyer or Citi shall be necessary in order to evidence Buyer's reiteration of such representations and warranties as true and correct as of such dates, and of its compliance with the terms of this Agreement as of such dates.

(c)  If Buyer receives any Adverse Transfer Notice (other than any notice of the assignment of a Payment Obligation by a Supplier to Citi) or otherwise reasonably believes the Supplier intends to assign, transfer or encumber any Payment Obligation (or has already done so), Buyer shall promptly (and in any event within one Business Day of knowledge thereof) notify Citi and cease submitting any Payment Instructions relating to Payment Obligations attributable to the applicable Supplier.  Buyer agrees not to assist Supplier in assigning, transferring or otherwise creating any encumbrance or security interest in and over any of the Supplier's right, title and interest in and over any payment in respect of any Payment Instruction.

(d)  Upon the occurrence of a Change of Control, Buyer shall immediately cease submitting any Payment Instructions hereunder and promptly (and in any event within three Business Day)  notify Citi of such Change of Control.

(e)  Buyer hereby grants to Citi a non-exclusive, non-sublicensable, revocable, royalty free license to use Buyer's trademarks, tradenames and service marks in marketing material and to promote and administer the program.

### ARTICLE VI:    GLOBAL MASTER AGREEMENT; JOINDER AGREEMENTS

**6.1    Global Master Agreement.** This Agreement is the Global Paying Services Agreement which sets forth (i) the rights and obligations of Buyer and Citi and (ii) the terms and conditions applicable to the System and the Services provided by Citi, on a global basis; as each may be amended, supplemented or otherwise modified pursuant to a Joinder Agreement as agreed between the Contracting Parties thereto.

6

**6.2 Joinder Agreements.** Buyer Parent and any Approved Buyer Affiliate may utilize the Services as "Buyer", provided such entity is a signatory to this Agreement or a Joinder Agreement. Each Joinder Agreement may modify and/or supplement the terms and conditions of this Agreement in order to comply with applicable laws, regulations and product structure requirements of the Citi Contracting Party delivering the Services in a particular country or region. If the Contracting Parties wish to modify or supplement any terms or conditions of this Agreement, the applicable Joinder Agreement must explicitly identify the term or condition to be modified or supplemented, and how it is to be modified or supplemented. If requested by a Contracting Party, Citibank and Buyer Parent shall also execute the applicable Joinder Agreement acknowledging their rights and obligations with respect thereto; provided, however, the absence of such acknowledgement shall not affect the rights and obligations of Citibank and Buyer Parent under this Agreement or any Joinder Agreement.

**6.3 Conflicts.** This Agreement shall control in the event of any conflict with any Joinder Agreement, except as explicitly set forth as an exception in the applicable Joinder Agreement.

**6.4 Additional Agreements.** The Parties acknowledge and agree that in certain countries and/or regions it may be necessary for the applicable Contracting Parties and Buyer Parent to enter into agreements, documents or instruments in addition to or in lieu of a Joinder Agreement in order to accommodate the local laws, regulations or product structure requirements of the Citi Contracting Party delivering the Services in such country or region.

## ARTICLE VII: MISCELLANEOUS

**7.1 Waivers; Severability.** No delay or failure of any Party hereto in exercising any right, privilege or option under this Agreement shall operate as a waiver of such or of any other right, privilege, or option. If any provision of this Agreement is or becomes illegal or invalid under any applicable law, the validity of the remaining provisions shall not be affected thereby.

**7.2 Limitation on Liability.** (a) Citi shall not be liable for any Losses arising out of or relating to any of its actions or omissions to act hereunder, except to the extent that any such Losses are caused by Citi's gross negligence or willful misconduct.

(b) Except for liabilities to third parties relating to defense and indemnification obligations hereunder, neither Party shall be liable to the other Party or responsible for any loss of business or profits, revenue or goodwill, or any indirect or consequential, special, exemplary or punitive losses or damages, whether arising from negligence, breach of contract or otherwise, even if informed of the possibility of those losses or damages.

(c) Neither Party shall be deemed to be in default of any of the obligations required to be performed by it under this Agreement to the extent that performance thereof is delayed, hindered or becomes impossible because of any act of God or public enemy, hostilities, war (declared or undeclared), sanctions, terrorist activities, act of sabotage, earthquake, flood, hurricane, storm, explosion, fire, labor disturbance, strike, riot, epidemic, act of government or its agencies or officers, power interruption or transmission failure, or any cause of a similar nature beyond the control of such Party (a "Force Majeure Event").

**7.3 No Implied Duties.** Citi shall be obliged to perform such duties and only such duties as are specifically set forth herein, and no implied duties or responsibilities shall be read or implied into this Agreement against Citi. Notwithstanding any other provision elsewhere contained in this Agreement, Citi is acting solely as agent of Buyer. Citi shall have no duties or obligations hereunder to any Person other than Buyer and, without limiting the foregoing, does not assume any obligation or relationship of agency or trust hereunder for, or with, any Suppliers, or any other Persons.

**7.4 Assignment.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto and the Suppliers; provided, however, that Buyer may not assign any of its rights or obligations hereunder or under any Payment Instruction without Citi's prior written consent, given in its sole discretion. Citi shall have the right without the consent of or notice to Buyer to sell, transfer, assign, or grant participations in all or any part of, or any interest in, Citi's obligations, rights and benefits hereunder.

**7.5 Termination.** Either Party hereto may terminate this Agreement at any time and with immediate effect upon 60 days' prior written notice to the other Party. Either Party also may terminate this Agreement with immediate effect if the other Party is in breach of, or fails to perform, any of its material obligations hereunder. In addition, Citi may, at its option, terminate this Agreement with immediate effect upon 3 Business Days' prior written notice in the event there are insufficient funds available in the Disbursement Account to pay all amounts in respect of Payment Instructions when due, provided that such failure by Buyer to fully fund the Disbursement Account is not the result of a Force Majeure Event. Upon notice of termination of this Agreement, Citi will no longer accept Payment Instructions from Buyer; provided, however, that to the extent there are sufficient funds available in the Disbursement Account, Citi shall continue to pay Payment Instructions that were received and accepted by Citi prior to such notice of termination, and Buyer shall be responsible for funding the Disbursement Account with respect thereto.

**7.6 Survival.** If this Agreement is terminated in accordance with Section 7.5, then this Agreement shall become null and void and of no further force and effect, except that all confidentiality, security, indemnity, payment and reimbursement obligations and all limitation of liability provisions contained in this Agreement shall survive and remain in full force and effect notwithstanding such termination and the payment of all amounts owing hereunder.

**7.7 Governing Law; Jurisdiction.** (a) This Agreement and any action arising out of or in connection with this Agreement (whether in tort, contract, equity or otherwise) is governed by and shall be construed and interpreted in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof. The Parties agree that any New York State court or Federal court sitting in New York County or an appellate court having appellate jurisdiction over such courts has non-exclusive jurisdiction to settle any disputes in connection with this Agreement, and each Party submits to the jurisdiction of those courts. Each Party waives any right to immunity from jurisdiction to which it may be entitled (including, to the extent applicable, immunity from pre-judgment attachment and post-judgment attachment and execution.)

NY Law GPSA (Version 7.0)

(b) If Buyer is an entity organized outside the United States, Buyer agrees that any service of process or other notice of legal process may be served upon it by mail or hand delivery if sent to

[NOTE: CITI REQUIRES THIS PROVISION TO BE COMPLETED AT CLOSING]

[OPTION 1] its U.S. Buyer:

Fluence Energy, LLC
4601 N. Fairfax Drive, Suite 600
Arlington, VA 22203
USA

which each Buyer confirms it has designed as its authorized agent for service of process with respect to the courts located in the State of New York.

Buyer agrees that nothing in this Agreement shall affect Citi's right to serve process in any other manner permitted by law. Buyer agrees that final judgment against it in any action or proceeding shall be enforceable in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which shall be conclusive evidence of the judgment.

**7.8    WAIVER OF JURY TRIAL.** THE PARTIES WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THIS AGREEMENT.

**7.9    Notices.** Except as otherwise expressly contemplated herein, all notices pursuant to this Agreement shall be in writing, duly signed by the Party giving such notice, and shall be delivered, faxed or mailed by registered or certified mail, as follows:

| If given to Buyer: | If given to Citi: |
|---|---|
| **Fluence Energy, LLC** | Citibank, N.A. |
| 4601 N. Fairfax Drive, Suite 600 | 388 Greenwich Street |
| Arlington, VA 22203 | New York, New York 10013 |
| E-mail: | Telephone: 212-816-9144 |
| frank.fuselier@fluenceenergy.com | Fax: _____ |
| Attention: General Counsel | Attention: Anubhav Shrivastava |

Buyer Parent hereby accepts each notice hereunder on behalf of, and undertakes to deliver each notice hereunder to, each Buyer. Each Buyer hereby acknowledges and agrees that a single notice to Buyer Parent shall constitute notice to each Buyer with respect to (i) any notice given pursuant to this Agreement, and (ii) any notice of assignment of a Payment Obligation.

**7.10    Officer's Certificate/Resolutions.** On or before the date of this Agreement, Buyer shall have provided Citi with (i) evidence that the execution and delivery of this Agreement and related documents and the performance by each Buyer of its obligations under this Agreement and related documents have been duly authorized and (ii) an Officer's Certificate certifying the incumbency and authorization of the officers of each Buyer executing such documents, in each case in form and substance reasonably satisfactory to Citi.

**7.11    Entire Agreement; Amendments; Multiple Buyers.** This Agreement and all Joinder Agreements embody the entire agreement between Buyer and Citi relating to the subject matter and supersedes all prior agreements relating to the subject matter. This Agreement and any Joinder Agreement shall not be construed to confer any right, benefit, remedy or claim upon any Person other than Buyer, Citi and the Suppliers (as express third party beneficiaries) and their successors and permitted assigns. All amendments and waivers to this Agreement must be in writing and signed by or on behalf of Buyer Parent and Citibank and shall be binding on all Contracting Parties. If (i) this Agreement is signed by two or more entities as "Buyer" and/ or (ii) any Approved Buyer Affiliate executes a Joinder Agreement (and, therefore, becomes a "Buyer" under this Agreement), all such entities shall be jointly and severally liable for all obligations of Buyer hereunder (including all obligations of any Buyer for which a Change of Control has occurred), and notices sent by Citi in accordance with Section 7.9 to, and notices from or the consent of, any such entity shall be sufficient to bind all such entities.

**7.12    Counterparts.** This Agreement may be executed in any number of counterparts, which taken together shall constitute a single copy of this Agreement. Any signature delivered by facsimile or by email in "pdf" format shall be deemed an original signature hereto.

8

NY Law GPSA (Version 7.0)

IN WITNESS WHEREOF, each of the Parties hereto has executed this Agreement as of the date and year first above written.

**FLUENCE ENERGY, LLC,** as Buyer and as Buyer Parent

By: *Manuel Perez Dubuc*

Name: Manuel Perez Dubuc
Title: CEO

By:

Name: Dennis Fehr
Title: CFO

**CITIBANK, N.A.**

By:

Name:    Anubhav Shrivastava
Title:    Vice President

Jul 26, 2021

NY Law GPSA (Version 7.0)

EXHIBIT A
TO GLOBAL PAYING SERVICES AGREEMENT

Fees payable by Buyer to Citi pursuant to the Global Paying Services Agreement shall be as follows:

1.   [waived].

This Exhibit constitutes the complete agreement of Citi and Buyer with respect to the subject matter set forth herein except as may be modified or supplemented in any Joinder Agreement. Notwithstanding anything in the Agreement to the contrary, the fees set forth in this Exhibit are subject to change, at Citi's discretion, with 30 days notification.

Exhibit 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated June 24, 2021, with respect to the consolidated financial statements of Fluence Energy, LLC included in the Registration Statement (Form S-1) and related Prospectus of Fluence Energy, Inc. dated October 18, 2021.

/s/ Ernst & Young LLP

Tysons, Virginia
October 18, 2021

**Consent to be Named as a Director Nominee**

      In connection with the filing by Fluence Energy, Inc. of the Registration Statement on Form S-1 (the "Registration Statement"), and in all subsequent amendments and post-effective amendments or supplements thereto, with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of Fluence Energy, Inc. in the Registration Statement and any and all amendments and supplements thereto. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Date: October 14, 2021

/s/ Cynthia Arnold
Name: Cynthia Arnold

**Consent to be Named as a Director Nominee**

In connection with the filing by Fluence Energy, Inc. of the Registration Statement on Form S-1 (the "Registration Statement"), and in all subsequent amendments and post-effective amendments or supplements thereto, with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of Fluence Energy, Inc. in the Registration Statement and any and all amendments and supplements thereto. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Date: October 14, 2021

/s/ Herman Bulls

Name: Herman Bulls

**Exhibit 99.3**

**Consent to be Named as a Director Nominee**

In connection with the filing by Fluence Energy, Inc. of the Registration Statement on Form S-1 (the "Registration Statement"), and in all subsequent amendments and post-effective amendments or supplements thereto, with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of Fluence Energy, Inc. in the Registration Statement and any and all amendments and supplements thereto. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Date: October 14, 2021                                   /s/ Harald von Heynitz
                                                          Name: Harald von Heynitz

Exhibit 99.4

**Consent to be Named as a Director Nominee**

In connection with the filing by Fluence Energy, Inc. of the Registration Statement on Form S-1 (the "Registration Statement"), and in all subsequent amendments and post-effective amendments or supplements thereto, with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), I hereby consent, pursuant to Rule 438 of the Securities Act, to being named as a nominee to the board of directors of Fluence Energy, Inc. in the Registration Statement and any and all amendments and supplements thereto. I also consent to the filing of this consent as an exhibit to such Registration Statement and any amendments thereto.

Date: October 14, 2021               /s/ Elizabeth Fessenden
                                     _____
                                     Name: Elizabeth Fessenden