UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| In re FLUENCE ENERGY, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 1:25-cv-00444-PTG-IDD <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | ) ) ) ) ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
<u>TO DISMISS THE CONSOLIDATED COMPLAINT</u>**

4930-0227-0039.v1

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

ARGUMENT..........................................................................................................................5

I.      The Complaint Is Not Impermissible Puzzle Pleading ...............................................5

II.     Plaintiff Alleges Defendants' False and Misleading Statements and Omissions ................6

        A.      Defendants Misrepresented the Nature and Success of Fluence's Gen 6
                Products While Concealing Systemic Issues Caused by Its Early Release ............6

        B.      Defendants Misled Investors About Fluence's Customer Relationships.................8

        C.      Defendants' "Testing Omissions" Arguments Fail....................................................9

                1.      The Gen 6 Systems Were Not Fully Designed Upon Release.....................9

                2.      The Gen 6 Systems Were Not Fully Tested.............................................10

        B.      Defendants' Remaining "Omissions" Arguments Fail ..........................................13

        C.      Defendants Were Not "Puffing" ...............................................................................15

        D.      The Safe Harbor Does Not Protect Any of the Alleged Misstatements ...............17

        E.      Defendants Were Not Offering Opinions ................................................................18

III.    Plaintiff Alleges Defendants' Scienter......................................................................19

        A.      Defendants Knew or Recklessly Disregarded the Alleged Issues with the
                Gen 6 Products.........................................................................................................20

        B.      CW-2's Account Further Demonstrates Defendants' Scienter..............................23

        C.      Defendants' Repeated Pronouncements and the Patent Inconsistencies
                with Known Facts Add to the Strong Inference of Scienter ..................................24

        D.      The Opposing Inference Suggested by Defendants Is Weak.................................25

IV.     Plaintiff Alleges Loss Causation...............................................................................26

        A.      Defendants' Disclosures of Gen 6 Product Issues and Resulting Financial
                Impacts on the Company .........................................................................................27

        B.      The Disclosure of the Diablo Litigation and the Siemens Litigation ...................28

- i -

**Page**

V.    DEFENDANTS' CHALLENGE TO THE SECTION 20(a) CLAIM FAILS...................30

CONCLUSION....................................................................................................................30

4930-0227-0039.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Ash v. PowerSecure Int'l, Inc.*,
2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)..............................................................12, 18, 24

*Bond v. Clover Health Invs. Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022)..................................................................................22

*Boykin v. K12 Inc.*,
54 F.4th 175 (4th Cir. 2022) ...................................................................................................19

*Brubaker v. City of Richmond*,
943 F.2d 1363 (4th Cir. 1991) .................................................................................................22

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) ........................................................................6, 8, 14, 16

*Carlucci v. Han*,
907 F. Supp. 2d 709 (E.D. Va. 2012) ........................................................................................1

*Defeo v. IonQ, Inc.*,
134 F.4th 153 (4th Cir. 2025) .....................................................................................27, 29, 30

*Dunn v. Borta*,
369 F.3d 421 (4th Cir. 2004) ...................................................................................................16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................................26

*Emps.' Ret. Sys. of the City of Baton Rouge & Parish of E.
Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) .......................................................................................14, 18, 19

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...................................................................................................26

*Greebel v. FTP Software, Inc.*,
194 F.3d 185 (1st Cir. 1999).....................................................................................................20

*Hunter v. Earthgrains Co. Bakery*,
281 F.3d 144 (4th Cir. 2002) ...................................................................................................22

*In re 2U, Inc. Sec. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) .........................................................................15, 16

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)..........................................................................21

4930-0227-0039.v1

**Page**

*In re Cable & Wireless, PLC,*
321 F. Supp. 2d 749 (E.D. Va. 2004) ...................................................................16

*In re Connetics Corp. Sec. Litig.,*
542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................22

*In re Dexcom Inc. Class Action Sec. Litig.,*
2025 WL 1399196 (S.D. Cal. May 14, 2025)..........................................................5

*In re DXC Tech. Co. Sec.,*
2025 WL 950398 (E.D. Va. Mar. 27, 2025) ..........................................................16

*In re Emergent BioSolutions Inc. Sec. Litig.,*
2023 WL 5671608 (D. Md. Sept. 1, 2023) .........................................................5, 24

*In re Genworth Fin. Inc. Sec. Litig.,*
103 F. Supp. 3d 759 (E.D. Va. 2015) ..........................................................6, 13, 19

*In re James River Grp. Holdings, Ltd. Sec. Litig.,*
2023 WL 5538218 (E.D. Va. Aug. 28, 2023)........................................20, 21, 23, 29

*In re Massey Energy Co. Sec. Litig.,*
883 F. Supp. 2d 597 (S.D.W. Va. 2012).........................................................24, 29

*In re Mylan N.V. Sec. Litig.,*
379 F. Supp. 3d 198 (S.D.N.Y. 2019)...................................................................22

*In re Res. Am. Sec. Litig.,*
2000 WL 1053861 (E.D. Pa. July 26, 2000)..........................................................26

*In re SCANA Corp. Sec. Litig.,*
2019 WL 1427443 (D.S.C. Mar. 29, 2019) ...............................................15, 17, 18

*In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.,*
604 F. Supp. 2d 1188 (N.D. Ill. 2009) ..................................................................22

*In re Under Armour Sec. Litig.,*
540 F. Supp. 3d 513 (D. Md. 2021).......................................................................13

*In re Van der Moolen Holding N.V. Sec. Litig.,*
405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................................23

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.,*
432 F. Supp. 2d 571 (E.D. Va. 2006) ..............................................................22, 23

*Janus Cap. Grp., Inc. v. First Derivative Traders,*
564 U.S. 135 (2018)...............................................................................................6

- iv -

**Page**

*Katyle v. Penn Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ....................................................................................28

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
2016 WL 3981236 (D.S.C. July 25, 2016) .................................................................21

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) .....................................................................................23

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) .................................................................19, 26

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021) ................................................................ *passim*

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) ....................................................................................16

*Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)
*aff'd*, F. App'x 62 (2d Cir. 2015)...............................................................................19

*In re Marriott, Int'l, Inc.*,
31 F.4th 898 (4th Cir. 2022) .....................................................................................10

*Ollila v. Babcock & Wilson Enters., Inc.*,
2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .........................................................17, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
*Indus. Pension Fund*,
575 U.S. 175 (2015)...................................................................................................18

*Philips v. Triad Guar. Inc.*,
2015 WL 1457980 (M.D.N.C. Mar. 30, 2015) ........................................................15

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) ..........................................................................13, 14, 15

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680 (E.D. Va. Mar. 24, 2021)............................................................17

*S.A. Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023) ...................................................................................9, 13

*Sciolino v. City of Newport News, Va.*,
480 F.3d 642 (4th Cir. 2007) ....................................................................................30

- v -

**Page**

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ....................................................................6, 26, 27, 28

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) ...............................................................................7

*Taylor v. First Union Corp. of S.C.*,
    857 F.2d 240 (4th Cir. 1988) ......................................................................................11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................19, 26

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .............................................................20

*Touchstone Strategic Tr. v. Gen. Elec. Co.*,
    2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022)
    *aff'd*, 2023 WL 6053007 (2d Cir. 2023) .....................................................................22

*U.S. S.E.C. v. Pirate Inv. LLC*,
    580 F.3d 233 (4th Cir. 2009) ......................................................................................24

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ..........................................................................7

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) .........................................................................................9

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ......................................................................................23

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ......................................................................................19

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
    §78j(b) ....................................................................................................................29, 30
    §78u-4(b)(1) ...................................................................................................................6

Federal Rules of Civil Procedure
    Rule 9(b) ..................................................................................................................1, 22
    Rule 10b-5 ......................................................................................................................6
    Rule 11(b)(3) ................................................................................................................22
    Rule 15(a) .....................................................................................................................30
    Rule 15(a)(2) ................................................................................................................30

4930-0227-0039.v1

**INTRODUCTION**

In response to the Complaint's well-pled allegations, Defendants' Motion to Dismiss and Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF 68, 69) ("MTD") resorts to disputing Plaintiff's factual allegations, inventing counter-facts, and improperly rewriting Plaintiff's alleged misleading statements.[1] Defendants' arguments do not support dismissal.

While the Court must consider the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), it "must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff." *Carlucci v. Han*, 907 F. Supp. 2d 709, 720-21 (E.D. Va. 2012). Doing that here should result in the Court denying Defendants' motion. For instance, Defendants essentially concede the premature release and pervasive issues with the Company's Gen 6 products and the resulting litigation with Fluence's largest clients, but baselessly assert that Fluence's "risk disclosures" somehow shield almost every misstatement alleged in the Complaint. They do not. Fluence said nothing about the premature release of its Gen 6 products or the consequences to Fluence of doing so. Their failure to do so rendered each of their statements false and misleading.

Defendants baselessly assert that the Complaint also fails to adequately allege scienter. But Defendants' fraud centered on Fluence's lifeblood – its Gen 6 products. The notion that Fluence's top executives were unaware of catastrophic issues with the Company's largest clients and affecting hundreds of millions of dollars in revenue is not credible. Viewed collectively (as they must be), Plaintiff's allegations support a strong inference of scienter for each of the Defendants.

---

[1] Unless otherwise noted, citations are omitted, emphasis is added, capitalized terms not otherwise defined have the same meaning as set forth in Plaintiff's Consolidated Complaint for Violations of the Federal Securities Laws (ECF 58) (the "Complaint"), and all "¶__" or "¶¶__" citations herein refer to the Complaint.

- 1 -

Finally, Defendants' claim that the Complaint fails to plead loss causation is belied by the fact that each of the alleged corrective disclosures relate directly to Defendants' fraud and each caused significant declines in Fluence's stock price.  Nothing more is required.

Defendants' motion should be denied in its entirety.

### STATEMENT OF FACTS

In January 2018, AES and Siemens Industry launched Fluence as a joint venture to sell battery energy storage solutions ("BESS") for the installation, commissioning, operation, and maintenance of BESS products.  ¶33.  Since the Company's inception, both AES and Siemens Industry have provided Fluence with significant financial and operational assistance, while exerting control and influence over Fluence's board and management.  ¶¶32, 37, 203.

On October 19, 2021, AES and Siemens Industry took Fluence public via an IPO, raising $868 million.  ¶¶5, 33, 73.  To sell the Company to investors, Defendants emphasized Fluence's supposedly revolutionary Gen 6 products, its ability to execute "scalable," "configurable," and "cost-effective" solutions that could be "configured for specific use cases," all with "rapid on-site installation and commissioning."  ¶¶2-3, 74-76.  Fluence also highlighted its relationship with Siemens Industry, pointing to the revenue it was generating from that relationship.  ¶77.

Fluence continued with these, and similar, representations throughout the Class Period, representing the "scalable," "configurable," and "cost-effective" nature of its solutions and its ability to execute on its largest infrastructure projects.  Fluence highlighted its progress on what it termed "mega-site" installations, telling investors that "[w]e have successfully installed 10 Gen 6 systems since the beginning of this year," which "include[d] several mega site installations such as Diablo and High Desert."  ¶85.  Defendants mentioned "some cost overruns" on "a few specific projects," but assured investors that they "ha[d] acted swiftly to implement corrective actions."  ¶¶81, 87.  Defendants further assured investors that they were "not really seeing a signal from our

- 2 -

customers that they're not wanting to sign service agreements" (¶88) and stated that, in fact, customers selected Fluence because they were "sure that [the products] were going to be delivered, that they're going to perform as we tell them that they're going to perform, . . . and that will have them running for them when they need it." ¶104; *see also* ¶¶74, 89, 99-100, 107.

In reality, Defendants concealed that they had rushed the release of Fluence's Gen 6 products to market, before they were tested on a system-wide level, because Fluence had signed contracts with customers to deliver systems by certain dates and the contractual penalties for missing those deadlines outweighed the need to fully test the Gen 6 products. ¶¶42-43. As a result, the Gen 6 systems suffered from chronic defects and failures, causing Fluence to fail to fulfill its contractual obligations to customers and escalating its costs. *See, e.g.*, ¶¶40, 46, 48, 58. The most critical of these contracts was with Diablo Energy, and it represented nearly $240 million – *approximately 75% of the Company's U.S. revenues for its 2020 fiscal year*. ¶49. Fluence was contractually required to complete the Diablo Project in June and July 2021. ¶50. But due to issues with Gen 6, the project was not completed until April 29, 2022, nearly ten months behind schedule. ¶¶49-50. And worse, when Fluence turned it over to Diablo, the system immediately experienced a series of failures, including dozens of control system and inverter failures in the subsequent months. ¶¶51-55.

The Individual Defendants knew that the Diablo Project was severely delayed and plagued by issues. Diablo brought the system failure issues to Fluence's attention in July, August, September, and November of 2022, as dozens of warranty claims accumulated and remained outstanding. ¶¶51, 52, 56. Yet, Defendants said nothing to investors. On October 6, 2023, Fluence sued Diablo for breach of contract. ¶¶56, 113. Diablo filed a cross-complaint on November 13, 2023, bringing its own breach of contract claims and seeking $229.1 million in damages – *the entire value of the project*. *Id.*

- 3 -

4930-0227-0039.v1

Fluence also concealed a dispute with another major customer – Siemens Energy, Inc. ("SEI"), *an affiliate of Fluence's corporate parent, Siemens Industry*. ¶60.  Like Diablo, Fluence was at odds with SEI over its installation *before the IPO*.  Fluence abandoned the design included in its accepted proposal and opted to use a Gen 6 product that did not meet SEI's specifications. ¶¶61-64.  The result forced SEI to incur over $5 million in costs trying to make Fluence's system work.  ¶¶65-67.  SEI notified Fluence on September 17, 2021 – *one month before the IPO* – that Fluence was responsible for these costs.  ¶67.  Again, Defendants said nothing to investors.

Defendants also failed to mention that similar issues to Diablo and SEI plagued Fluence's "High Desert" "mega site" installation in San Bernardino County, California.  ¶¶40, 58.  Once commissioned in December 2021, the High Desert Project was at 82% availability rather than the contractually specified 97%.  *Id.*  Fluence was unable to get the system to 97% despite working on it for almost a year.  *Id.*

On December 8, 2023, while concealing the Siemens Litigation, Fluence again tapped the markets, conducting a registered secondary public offering ("SPO") that enabled the Company's largest shareholders, including defendant AES and Siemens Industry, to collectively sell 18 million shares of Fluence stock at approximately $22 per share for proceeds of nearly $400 million.  ¶¶5, 115.  Just weeks earlier, Fluence reported its results for the fourth quarter and fiscal year 2023 where it proudly proclaimed to have "achiev[ed] profitability for the first time" and to have "exceeded our regional [sic] annual revenue guidance by more than $600 million."  ¶¶109-110. While Defendants attributed these results to Fluence's ability to "execut[e]" on projects, "to navigate challenges," and to "deliver solutions to our customers," they again, mentioned nothing to investors about the premature release of Gen 6 or the issues that it had caused with important customers.

- 4 -

4930-0227-0039.v1

The truth of Defendants' fraud was revealed through a series of disclosures, in which the Company admitted to the market the issues with Fluence's Gen 6 products, the fact that Fluence was engaged in litigation with its customers, and the devastating resulting financial impact on the Company. ¶¶169-189. These disclosures caused Fluence's stock price to collapse from a Class Period high of over $35 per share to $6.18 per share, *a loss of more than 83%*. ¶136. On the last day of the Class Period, Defendants finally disclosed that Fluence had to reduce its revenue projections by $600 million because of what financial analysts called "execution missteps" – causing the Company's stock to fall more than 52%. ¶¶188-189.

## ARGUMENT

### I.    The Complaint Is Not Impermissible Puzzle Pleading

Defendants' claim that the Complaint is a "puzzle" is wrong. MTD at 9-10. It groups Defendants' misstatements by date and explains why those statements were false and/or misleading. *See* ¶¶73-136. The Complaint also adds emphasis to identify which statements in a longer quote Plaintiff alleges are false. *Compare, e.g.*, ¶74, *with* ¶88. Much longer and less clear complaints have been upheld. *See In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *12 (D. Md. Sept. 1, 2023) (rejecting "'puzzle pleading'" for "225-page" complaint with 100 paragraphs of false statements before a falsity explanation because this "approach [was] sufficient, even if imperfect.").[2]

Defendants also complain that the Complaint does not emphasize every alleged misstatement. MTD at 9-10. But they cite no authority requiring as much. *Id*. In fact, they ignore

---

[2]    Defendants' reliance on *In re Dexcom Inc. Class Action Sec. Litig.*, 2025 WL 1399196, at *3-*6 (S.D. Cal. May 14, 2025) is misplaced. MTD at 10. The complaint in *Dexcom*, unlike here, added confusion by highlighting portions of statements unrelated to plaintiffs' theory of liability. *Dexcom*, 2025 WL 1399196, at *3-*6. And, contrary to Defendants' suggestion (MTD at 9-10), a statement may be actionable if it is either false, misleading, or both. Plaintiff may proceed under either or both theories.

- 5 -

that the Complaint identifies specific portions of quotes or summarizes the statements to make it clear to the reader which statements are being discussed. *See* ¶¶78, 80, 84, 86, 91, 93, 98, 101, 105, 108, 111, 114, 127. This approach resolves Defendants' complaint about their misstatements when reporting Fluence's 3Q23 results. MTD at 10. The specific statements alleged to be false are quoted in the identified paragraphs. *See* ¶¶106-108. Nothing more is required.[3]

## II.    Plaintiff Alleges Defendants' False and Misleading Statements and Omissions

The PSLRA requires plaintiffs to "'specify each statement alleged to have been misleading'" and "'the reason or reasons why the statement is misleading.'" *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018) (quoting 15 U.S.C. §78u-4(b)(1)). Although "section 10(b) and SEC Rule 10b-5 'do not create an affirmative duty to disclose any and all material information,'" disclosure "is required when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 432 n.5. "'[I]t is not necessary for Plaintiff to prove absolute, incontrovertible falsity at the motion to dismiss stage.'" *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015). "[O]nce a party speaks on a topic, they have an obligation to tell the whole truth." *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020).

### A.    Defendants Misrepresented the Nature and Success of Fluence's Gen 6 Products While Concealing Systemic Issues Caused by Its Early Release[4]

While Defendants' motion focuses on their alleged omissions, they also made numerous statements about the adaptable nature of Fluence's Gen 6 products and the success of their

---

[3]    Defendants' description of the Complaint as an "utterly indecipherable morass of obfuscation" (MTD at 10), is belied by the fact that Defendants seemed to have no problems constructing an appendix summarizing the alleged misstatements. *See id*. at 10 n.2; ECF 69-1.

[4]    Citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2018), Defendants suggest that the Complaint does not "identify[] who made or had authority over" the alleged misstatements. MTD at 21. But the Complaint clearly sets out which defendant made

- 6 -

installations.   Their claims that Fluence's products were "scalable" (¶¶74-75, 79), "highly configurable" (¶74), "cost-effective" (¶75), performing as advertised (¶¶81-83, 85, 88, 94-96, 100), and that Fluence enjoyed "strong project execution" (¶¶97, 99, 100) with "rapid on-site installation and commissioning" (¶76), resulting in "successful[]" "mega site installations such as Diablo and High Desert" (¶85), were simply untrue (¶¶92, 94).  When Defendants made these and similar statements (¶¶97, 102-103, 109), they omitted that Fluence had released its Gen 6 systems before being fully tested and that doing so had caused a litany of issues at major installation sites.  The Diablo Project – Fluence's largest – was not "rapid[ly] . . . install[ed]" or "scalable."  Fluence delivered a project that did not work ten months late.  ¶¶48-55.  And neither the High Desert Project nor the Siemens Energy Project were "configurable" or "cost-effective."  ¶78.  High Desert was 15% below the contractually required 97% availability.  ¶40.  And SEI spent $5.5 million trying to make Fluence's BESS work for its project.  ¶67.  By "giving a positive impression of the company's prospects" while "fail[ing] to disclose related adverse information," Defendants misled investors.  *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 518 (D. Md. 2022).[5]

Defendants' statements on February 10, 2022, that Fluence had "***identified the issues and we've implemented the fixes***" for "***temporary***" "***cost overruns***" on "***a few specific projects***" that "***we have addressed***" (¶¶81-83, 87) were particularly misleading.   When they made these

---

each statement.  ¶¶79, 81-83, 85, 87-90, 94-97, 99-100, 102-104, 106-107, 109-110, 112-113, 117, 125-126, and 128-129.

[5]     Defendants argue that the alleged "omitted 'facts' have no connection to, and are often temporally divorced from, the challenged statements."  MTD at 22-23.  Not true.  Defendants themselves connected the performance of Fluence's Gen 6 products with the success of Gen 6 installations.  ¶85.  Defendants' authority thus is inapt.  *See, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019) (statements regarding "internal controls over financial reporting . . . ha[d] no connection to the consumer-facing business practices").  Defendants' claim that the Complaint alleges that their misstatements "wrongfully omitted three amorphous things" (MTD at 21-22), likewise ignores that the Complaint provides specific, contemporaneous facts rendering each statement false or misleading.  *See, e.g.*, ¶¶78(a)(i), 78(c)(i), 80(a)(i)-(ii), 84(a) (i)-(v).

4930-0227-0039.v1

statements, Defendants omitted these performance issues and that they were caused by the Gen 6 premature release.  They also omitted that those same performance issues were the reason for Fluence opening the Pennsylvania testing facility that Defendants discussed on August 16, 2022. ¶¶90, 91(d).  Worse still, the performance issues certainly had not been already "addressed."  The failures and defects at the Diablo Project still existed as late as February 2024.  ¶52.  And with High Desert, Fluence's performance remained below the required availability as late as late 2022, nearly a full year post-commissioning.  ¶¶40, 58.  By giving investors a positive impression while omitting the adverse information, Defendants again misled investors.  *See Cambridge*, 496 F. Supp. 3d at 962 (failing to disclose Jeld-Wen's anticompetitive behavior "made its prior statements about its pricing strategy 'utterly misleading'").

**B.      Defendants Misled Investors About Fluence's Customer Relationships**

Defendants' statements about the purported strength of Fluence's customer relationships were also untrue.  When Defendants told investors that "we are not really seeing a signal from our customers that they're not wanting to sign service agreements" (¶88), that Fluence had "[s]trong [c]ustomer [r]elationships" (¶99), and that "those customers that we selected . . . want to keep working with us . . . [and] developing their portfolios with us" (¶89), Fluence was contemporaneously embroiled in disputes with major customers.  SEI had already sent a letter to Fluence demanding the Company remedy its noncompliance with SEI's contracted specifications. ¶67.  And High Desert did not perform as required, resulting in a year of costly remediation (¶¶40, 58), while Diablo was suffering from chronic system and inverter failures (¶¶51-54).  These concealed customer disputes resulted in both the Diablo Litigation and Siemens Litigation, and cost Fluence business.  ¶¶41, 56, 131-136, 184-189.  Defendants again misled investors by giving positive information while concealing the negative.  *See Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 659 (E.D. Va. 2021).

### C.  Defendants' "Testing Omissions" Arguments Fail

#### 1.  The Gen 6 Systems Were Not Fully Designed Upon Release

Defendants argue that the Complaint's allegations that the Gen 6 systems were not "fully designed" before being released are not well-pled.  MTD at 22.  But there is no dispute that the Gen 6 systems – as designed – were not capable of fulfilling contractual specifications.  SEI's allegations demonstrate that Fluence's chosen BESS could not fulfill SEI's specifications, and that Fluence's system did not work.  ¶¶60-70.  The same was true with High Desert (¶¶40, 58) and Diablo (¶¶51-54).

While Defendants contend that they were not "obligat[ed] to disclose minutia about projects or Gen 6's development" (MTD at 22), a premature release of a major product riddled with defects hardly qualifies as "minutia."  And Defendants' focus on the "type of testing" required is misplaced.  *Id.* at 23.  The early release caused serious issues at major installations.  Once Defendants spoke about the Gen 6 rollout, and specifically the Diablo and High Desert mega-site installations, they had a duty to provide the full truth.  *Klein*, 525 F. Supp. 3d at 659.[6]

While Defendants argue that they "disclosed that production and installation has and can entail project modifications" (MTD at 22), they overlook that the early release, as designed, caused serious failures at major installations.  ¶¶38-72.  Defendants assured investors that the Gen 6 systems required minor tweaks, not year-long remedial efforts due to the early release.  ¶¶40, 58.[7]

---

[6]    Defendants' authority shows what was missing from their disclosures – a representation that the Gen 6 products were "'not there yet.'"  *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (representing that the company was "'continuing [its] work to increase the stability, performance, and flexibility of [the program] . . . but we're not there yet.'").

[7]    Defendant's cited case law is of no consequence to the analysis.  MTD at 22.  The purported disclosures here did not provide "'specific warnings'" akin to those at issue in *S.A. Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 245-46 (4th Cir. 2023) (projections not misleading because defendants "**specifically warned** that the assumptions underlying their projections were uncertain and potentially flawed").

- 9 -

### 2.    The Gen 6 Systems Were Not Fully Tested

Defendants argue that the Complaint does not adequately allege "that the Gen 6 system was not 'tested'" before its release.  MTD at 22.  Not true.  It cites CW accounts and Defendants' own statements showing that the systems were not fully tested.  ¶¶39-40, 43, 45, 90, 92.  Indeed, Defendants tacitly admit that Gen 6 was not fully tested as an entire system before it was released, asserting that "system *components* were tested."  MTD at 23.  That is not the same thing, as demonstrated by Fluence's failure to meet contract specifications.  As CW-2 explained, "Fluence's customers who received the initial Gen 6 systems received systems that had never been fully tested for customer use."  ¶¶43, 45.  According to CW-1, when the Diablo Project and the High Desert Project were commissioned, they were not ready to meet the customers' specifications.  ¶¶39-40. Defendants' assertion that the Complaint does not allege that testing "would have obviated any alleged issue with a specific project" overlooks these allegations.  MTD at 23.

Defendants further assert that the Complaint takes Boll's statements about the Pennsylvania testing lab "out of context."  *Id.*  But they do not say how.  And they do not address the Complaint's allegation that, according to CW-2, Boll wanted this test lab because of the early Gen 6 release.  ¶45.  CW-2's explanation distinguishes this case from the "'mischaracterizations and exaggeration'" that Defendants rely on from *In re Marriott Int'l, Inc.*, 31 F.4th 898, 904 (4th Cir. 2022).  MTD at 23.  The omission of these facts made Defendants' statements materially false and misleading.

Defendants also argue that allegations about "delays [and] warranty claims" "lack the requisite particularity," complaining about the allegation that "the issues that culminated in the Diablo Litigation had been present since early 2022."  MTD at 23.  But they overlook that those issues are addressed in detail throughout the Complaint.  ¶¶39, 48-56, 86(a)(ii).

- 10 -

Defendants also argue that these "derivative" allegations "have nothing to do with the challenged affirmative statements" and do not contradict them.  MTD at 23.  Not so.  For example, allegations that the Diablo Project was installed almost a year behind schedule (¶86(a)(ii)) contradict Pérez's statement that Fluence was "fully caught up on our Gen 6 installation schedule," citing "successful[] install[ations]" including Diablo (¶85), and Nebreda's statements about "improved execution" (¶110).  Since these facts contradict Defendants' representations, *Marriott*, again, does not support Defendants.  31 F.4th at 902 (failing to disclose vulnerable IT system did not contradict statement that company data is critical).

Defendants claim that the IPO Registration Statement did not "assert that the Diablo Project was proceeding as scheduled" (MTD at 24), but they simultaneously ignore that those statements also included assurances of "rapid on-site installation and commissioning," which was simply untrue.  And their other statements (¶¶74-77) painted a picture of a stackable system ready to meet customers' needs, which was also untrue (¶78).  Vague references to "cost overruns and delays," which Defendants cite (MTD at 24), did not disclose the truth to investors.[8]

Defendants also assert that "[m]any allegations . . . suffer from timing problems," stating that "the Complaint does not specifically allege that any control system 'failures'" occurred before" Pérez's May 12, 2022 statement.  MTD at 24.  Not true.  The Complaint alleges that when Diablo assumed control of the project on April 29, 2022, it "immediately began experiencing a series of failures" and that "Diablo began notifying Fluence of the control system defects in July

---

[8]     Defendants' reliance on *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244 (4th Cir. 1988) is misplaced.  MTD at 24.  There, "nondisclosure of . . . merger discussions" was not actionable because there was no contradiction – "defendants had [not] previously denied the possibility of a merger." *Taylor*, 857 F.2d at 244.  This case does not involve a similar lack of contradiction.

- 11 -

4930-0227-0039.v1

2022." ¶52. Defendants' claim that "Diablo did not inform 'Fluence' about issues regarding the control system until August 2022" is not true. MTD at 24 n.7.

Defendants further claim that there are "no well-pled allegations that the 'issues' at Diablo . . . were related to installation." MTD at 24. But installation issues were not the only material issues. Pérez misled investors by using Diablo as an example of a successful installation for a "mega site" while omitting the other issues that immediately arose at Diablo, especially because Defendants had specifically linked "installation and commissioning." ¶76. Similarly, Nebreda misled investors by identifying Fluence as "a leader among the mega project side" without revealing Fluence's past and ongoing struggles with mega-sites like Diablo and High Desert. ¶¶94, 98(a). Regardless, Defendants do not contest that Plaintiff alleges that the control system failures and other issues at Diablo (¶¶52-53) had occurred by Pérez's August 16, 2022 statement addressing "project cost overruns," which he minimized as being on "a few specific projects" (¶87). By concealing that, the Diablo Project and High Desert Project had, by that time, been suffering from severe, chronic defects and failures for months, which issues had been raised with Fluence, Defendants misled investors. ¶91(a)(i)-(v).

Defendants also argue that the Complaint "guess[es]" that Diablo and High Desert were described in Pérez's August 16, 2022 statement. MTD at 24-25. But even if Pérez was referring to other projects experiencing "cost overruns," it was misleading for him to have spoken about those projects while omitting the contemporaneous issues at Diablo and High Desert. *See Klein*, 525 F. Supp. 3d at 659. Simply put, Defendants' statements about "cost overruns" did not disclose the relevant truth. MTD at 24-25.[9]

---

[9]    Defendants' reliance on *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *8 (E.D.N.C. Sept. 15, 2015) to argue that Defendants disclosed the issues that "contributed to the negative financial results" fails. MTD at 25. PowerSecure "disclosed the negative effect of operational

- 12 -

B.     **Defendants' Remaining "Omissions" Arguments Fail**

***Risk Omission***: Defendants argue that the Complaint's allegations that the Gen 6 premature release "created a material undisclosed risk" cannot support its claims.  MTD at 25.  Not so.  While Defendants claim that "demand for Gen 6 products grew steadily throughout the Class Period, as did Fluence's customer base," *id.*, that is a "factual dispute" that cannot be resolved at this stage.  *See Genworth*, 103 F. Supp. 3d at 776.  Defendants are also seeking to improperly introduce exhibits into the record for the truth of the statements contained therein.  MTD at 25 (citing *id*. at 8).  Nevertheless, Defendants are wrong that the undisclosed risk is speculation.  *See Klein*, 525 F. Supp. 3d at 661 (falsity adequately alleged where Defendants "chose not to inform investors about []risks" that "marketing scheme . . . posed to JUUL and Altria").  The Complaint alleges that customer National Grid decided not to proceed with the Copperhead Project with Fluence because of issues caused by the premature release.  ¶¶41, 48-56, 60-72.  And while Defendants point to their risk disclosures, they do not address any disclosure that was sufficient on this topic.[10]

***Dispute Omission***: Defendants argue that "the Complaint alleges no particularized fact concerning any dispute with SEI, or the existence of the dispute itself, that contradicts a Challenged Statement."  MTD at 25-26.  But the existence of the lawsuit – which Fluence first filed – is evidence of a dispute.  And contrary to Defendants' contention (MTD at 25-26), Plaintiff can rely

---

inefficiencies" and "predicted 'some continued inefficiencies.'"  Here, Defendants represented that the cost overruns were temporary, occurred at only a few sites, and had been addressed.

[10]     Defendants' reliance on *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613, 617 (4th Cir. 1999) to argue that Plaintiff is speculating about undisclosed risk is misplaced.  MTD at 25.  That case did not involve speculation.  The language that Defendants cite addressed allegations that the court characterized as "mischaracterizations and exaggeration."  *Phillips*, 190 F.3d at 617.  The allegations here do not do the same.  And Defendants' reliance on *S.A. Fire*, 75 F.4th at 246 is, once again, misplaced.  In addition to the reasons stated in n.7, the growth projections in that case were not "too optimistic because" defendants "specifically warned that this optimism was based on 'pipeline discussions' with customers rather than finalized deals."  *Id.*  This case does not involve any projections.

- 13 -

on allegations in other pleadings to corroborate its allegations. *See In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 521 (D. Md. 2021) (allegations from an "SEC Order lend[ed] support to the allegations of the [p]laintiffs"). Concealing the Siemens Litigation contradicted Defendants' statements that the Gen 6 systems could be "configured for specific use cases," rendered misleading Defendants' statements highlighting Fluence's related-party transactions with Siemens Industry (¶77), and prevented investors from recognizing that the Diablo Litigation was not an isolated dispute (¶¶114(d), 118(a)(ii), 119). *See Cambridge*, 496 F. Supp. 3d at 963 ("disclosing a lawsuit's existence and allegations while also vigorously denying their validity does not satisfy a company's duty to make full, honest disclosures").[11] Defendants' assertion that the specifics of Fluence's dispute with SEI "do not come close" to alleging falsity (MTD at 26) is wrong. In fact, SEI's allegations contradict Defendants' claims that the Gen 6 system was "scalable," "configurable," ready for "rapid . . . installation and commissioning," and that they could meet customers' specific needs. ¶¶74-76, 79, 94, 96.[12]

Defendants' description of the Siemens Energy Project as a "customized design for the specific system" related to a "specific power station," MTD at 26, does not insulate their representation that Gen 6 could be "configured for specific use cases." ¶74. The Siemens Energy Project revealed that statement to be false. And Fluence's willingness to sue an affiliate of its

---

[11]    Defendants' further reliance on *Marriott* is, again, misplaced. MTD at 25. There, the court held that the "'basic problem'" with the complaint on this point is that "'the facts it alleges do not contradict [Marriott's] public disclosures.'" *Marriott*, 31 F.4th at 902. That "basic problem" is absent here. Defendants also cite *Emps.' Ret. Sys. of the City of Baton Rouge & Parish of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023), but offer no explanation as to how the safe harbor discussion therein supports their argument. MTD at 25.

[12]    *Phillips* does not help Defendants. There, the defendants' statement that the company was "not for sale" was not contradicted by allegations that they began merger negotiations – which did not necessarily include being purchased – shortly after that statement. *Phillips*, 190 F.3d at 613. Here, Fluence's inability to configure a BESS to suit SEI's needs directly contradicts their Class Period statements, as discussed *infra* at 7-8.

- 14 -

4930-0227-0039.v1

corporate parent (with the affiliate filing a counterclaim) belies Defendants' statements that the dispute was immaterial.  ¶¶128-129.  Investors' reaction when the suit was revealed confirms as much.  *See* §IV.

Defendants argue that the Complaint's allegations about "potential 'reputational harm, including through the loss of business'" are "speculation."  MTD at 26.  They are not.  Analysts specifically stated that the revelation of the Diablo Litigation raised "reputational risks for [Fluence]" and explained that they saw "greater risk of future reputational damage or demand hit from ramping lawsuits."  ¶¶177, 182.  *Phillips*, 190 F.3d at 615, on which Defendants rely, did not involve similar statements by analysts.  MTD at 26.[13]

***Item 303 Omission***: Defendants allege that Plaintiff's Item 303 allegations fail because the Complaint does "not allege that purported Item 303 omissions rendered affirmative statements misleading."  MTD at 26.  Not true.  The Complaint states, specifically, that "the information omitted from Fluence's MD&A was necessary for an understanding of Fluence's results of operations and its statements about the nature, installation, and costs of its Gen 6 systems."  *See* ¶¶140-145 (citing paragraphs containing alleged misstatements).  For the reasons discussed above, Defendants' disclosures (MTD at 26-27), were insufficient.  *See infra* at 9, 13, 14.[14]

### C.    Defendants Were Not "Puffing"

"[M]isstatements [that] express[] certainty rather than an uncertain view of a fact . . . cannot be described as . . . puffery."  *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019).  If a statement can be proven true or false, it is not puffery.  *See In re 2U, Inc. Sec.*

---

[13]    Fluence did not "disclose[] that exact risk."  MTD at 26.  Fluence was engaged in a dispute with SEI before the Class Period.  Fluence never revealed the dispute.  ¶¶70, 120.

[14]    Defendants rely on *Philips v. Triad Guar. Inc.*, 2015 WL 1457980, at *11 (M.D.N.C. Mar. 30, 2015) to argue that "'Plaintiff has not alleged that the material facts'" in their SOX certifications "'were false.'"  MTD at 21 n.6.  Not true.  The Complaint identifies each SEC filing containing the misstatements and explains why they were false.  ¶¶79, 117.

4930-0227-0039.v1

*Class Action*, 2021 WL 3418841 (D. Md. Aug. 5, 2021).  To qualify as true puffery, a statement must be "'so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *Id.* at *11 (quoting *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766–67 (E.D. Va. 2004)). And "[a]lthough 'opinion or puffery will often not be actionable,'" they are actionable "'in particular contexts when . . . both factual and material.'" *Cambridge*, 496 F. Supp. 3d at 964 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).

Defendants characterize nearly everything they told investors as puffery.  MTD at 27-28. It was not.  Defendants spoke to critical aspects of Fluence's business, including descriptions of their products as "highly configurable," "scalable," "optimized," and "cost-effective" that reflected "design improvements."  ¶¶74-76, 79, 94, 112.  These were not vague statements of optimism.  In the context of Fluence's business, these statements conveyed that the Company's products were ready for the market and for the largest mega-site installations.  *Id.*[15]  In fact, Defendants used these descriptions to distinguish Fluence from its competitors, and to explain why customers were selecting Fluence, conveying the most important information that investors could receive about an investment in the Company.  *See, e.g.*, ¶¶74, 94.

Defendants' statements can also be proven true or false.  The Complaint is replete with allegations demonstrating that Fluence released its Gen 6 products before they were fully tested and, as a result, faced a litany of execution issues at numerous sites, including at its most important mega project Diablo.  *See, e.g.*, ¶¶38-70.  The early release, and its consequences, rendered Defendants' statements about the nature of its products and its installations, including claims about

---

[15]    These descriptive statements stand in contrast to the vague descriptions about a "'transformational journey'" and "operating model improvements" found to be puffery in *In re DXC Tech. Co. Sec.*, 2025 WL 950398, at *11 (E.D. Va. Mar. 27, 2025).  MTD at 27-28.

- 16 -

project execution, false and misleading.  *See 2U, Inc.*, 2021 WL 3418841, at *11 (citing *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) (finding that misrepresentations were not puffery where they were "not simply sales pitches but rather can be proven true or false")).  This is especially true for Defendants' claim to have "successfully installed" ten Gen 6 systems (¶85) while omitting that the largest customer, Diablo, was delivered a system nearly a year behind schedule that did not work, and that other installations faced similar issues (¶¶97, 99, 102-103, 106, 109, 117); *see also infra* at 7-8.[16]

### D.      The Safe Harbor Does Not Protect Any of the Alleged Misstatements

The PSLRA's safe harbor "'does not protect representations of current or historical fact.'"  *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4-*5 (W.D.N.C. Feb 8, 2018).  Here, Defendants focus on isolated terms within a few excerpted statements to claim safe harbor protection.  MTD at 28.  But in each instance, Defendants' description of Fluence's current business condition is what was false and misleading about each statement.  *See* ¶81 ("Fluence had quickly 'implement[ed] corrective actions' to address 'cost overruns' related to the rollout of its 'first Generation 6 product installations and commissioning'"); ¶82 (Pérez "represented that the 'corrective actions' Fluence had implemented to address product installation issues had '[r]ectified issues with customers'"); *see also* ¶¶83, 90, 92, 113, 117.  The safe harbor does not apply to these statements.  *SCANA*, 2019 WL 1427443, at *7.  To the extent that any statement contains a forward-looking term, the safe harbor does not protect the present aspect. *See Ollila*, 2018 WL

---

[16]      Defendants suggest that the term "successful[]" made in the context of a product launch is a mere subjective opinion.  MTD at 28 (relying on *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *26 (E.D. Va. Mar. 24, 2021)).  But here, Pérez was asserting a fact, not offering an opinion.  He used the term "successful" to support his representation that Fluence had completed the installation at ten different sites.  ¶85 ("[W]e are now fully caught up on our Gen 6 installation schedule.").

- 17 -

792069, at *5 ("If a statement is a mix of both forward-looking and present or past facts, it is taken out of the safe harbor with respect to the parts of the statement that are not forward-looking.").[17]

### E.       Defendants Were Not Offering Opinions

Defendants contend that a handful of statements are "non-actionable opinions." MTD at 29-30. They are mistaken. The Supreme Court addressed the difference between statements of fact and opinion in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). It explained that "[a] fact is 'a thing done or existing' or '[a]n actual happening'" whereas "[a]n opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'" *Id.* at 183. To "transform[]" a statement of fact into opinion, a speaker typically uses terms like "'I believe'" or "'I think.'" *Id.* A statement of opinion is actionable if "the speaker did not in fact hold the stated belief, ***or the supporting facts supplied by the speaker were untrue***." *SCANA*, 2019 WL 1427443, at *9. "Opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.*

Here, Defendants' purported opinions were not couched in terms of "I believe" or "I think" or otherwise hedged with uncertainty. Defendants expressed certainty about facts, including customer demand (¶¶88, 89), the Company's ability to deliver on complex projects (¶96), Fluence's product performance (¶¶104, 107), Fluence's performance on the Diablo Project (¶117),

---

[17]       Defendants' safe harbor argument also fails because they have not explained how the laundry list of "risk disclosures" they cite "put investors 'sufficiently on notice of the danger of the investment [in Fluence] to make an intelligent decision about it.'" MTD at 29. Defendants' case law confirms that cautionary language cannot be meaningful if defendants do not explain its importance. *See MacroGenics*, 61 F.4th at 390 (discussing specific risk warnings); *PowerSecure*, 2015 WL 5444741, at *8 ("cautionary language . . . warned investors of the very risk that was later realized"). And since Defendants knew that their statements were false and misleading when made (*see* §III.), the safe harbor provides no protection. *See Ollila*, 2018 WL 792069, at *5 ("cautionary language is meaningless if it warns only of risks which have already materialized, or if defendants knew their statements were false or misleading when made").

- 18 -

the importance of the Siemens Litigation (¶¶125-126), and the merit of the Blue Orca Report (¶¶128-129).  These statements were assertions of fact.  *See Genworth*, 103 F. Supp. 3d at 778-79 (representations "not necessarily statements of opinion" where they "do not contain the words 'believe' or 'think,' but instead suggest a greater sense of certainty").[18]

## III.   Plaintiff Alleges Defendants' Scienter

To plead scienter, "a plaintiff must show that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).  "Allegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss."  *Id.*  "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007).  The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.  A complaint stands when the inference is "cogent and at least as compelling as any opposing inference one could draw."  *Id.*[19]

---

[18]   Defendants' authority is in accord.  MTD at 29-30.  In *Boykin v. K12 Inc.*, 54 F.4th 175, 183-84 (4th Cir. 2022) the court explained that opinions "may often be recognized by their wording," noting that "[t]he prefatory 'I believe' or 'I think,' . . . conveys that a speaker is sharing a personal belief, not warranting facts" and that "[t]he 'reasonable investor is expected to understand' such a statement 'in its full context.'"  *Id.*  ("By including the language of 'we believe,' the statement reflected not an incontestable fact but an individual perspective" and "was couched as opinion, not as fact.").  And in *Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 578 (S.D.N.Y. 2014) *aff'd* F. App'x 62 (2d Cir. 2015) the court held that the statement "'*[w]e believe* that our brand *is recognized* as premium in our offerings'" was "undeniably a reference to a belief as to what third parties think about the company and its products, not an assertion or guarantee by the company as to a fact."  *Id.*  Defendants' reliance on *MacroGenics* is misplaced.  MTD at 29-30.  There, the court held that "'[i]nterpretations of clinical trial data are considered opinions'" and found that plaintiffs had failed to allege that defendants did not believe their general positivity where plaintiffs simply "interpreted the data in the graph differently."  *MacroGenics*, 61 F.4th at 387-88.

[19]   Each of the Individual Defendants' scienter is imputed to Fluence.  *See Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 608 (E.D. Va. 2015).

- 19 -

### A.    Defendants Knew or Recklessly Disregarded the Alleged Issues with the Gen 6 Products

This is not a case in which the alleged fraud concerned a low-level division, an overseas entity, or a small slice of a large conglomerate's revenue.  The fraud centered on the core of Fluence's business: the sale and installation of Gen 6 products.  Fluence stated throughout the Class Period that its "revenue is primarily derived from sales of our energy storage products and solutions" and the Company's "revenue growth is directly tied to the continued adoption of energy storage [solutions] by our customers."  ¶148.  The Company's revenue also depended upon a few large customers: in FY21 Fluence's five largest customers represented a startling 76% of its revenues.  This concentration barely changed throughout the Class Period, and the Diablo Project alone stood to earn Fluence $238 million, equivalent to *75%* of the Company's 2020 U.S. revenues. ¶149.[20]  "Where a certain product is 'so critical' to a company's success, a complaint can establish that the product constitutes a 'core operation,' elevating the plausibility that senior officers 'were aware of the facts underlying the allegedly false statements and material omissions.'" *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *21 (E.D. Va. Aug. 28, 2023) (considering "'core operations' allegations as part of its 'holistic analysis of scienter'").  This is particularly true when, as here, the corporation is relatively small.  *Compare* ¶19 ("When the Class Period started . . . , the Company had approximately 450 employees."), *with Todd v. STAAR*

---

[20]    Defendants suggest Diablo cannot be considered relatively significant by comparing its value to Fluence's 2020 revenue, because Diablo's "problems" began in 2022.  MTD at 15.  But, the problems with the Diablo Project started in 2021 when Fluence was months behind completion deadlines (¶51) and continued after Fluence turned the project over to Diablo ten months late in 2022 (¶¶48-55).  At any rate, a project worth almost a quarter of a billion dollars to Fluence is plainly important whether it would be the rough equivalent of 42% of Fluence's overall revenue in FY20, 35% (FY21), 20% (FY22), or 11% (FY23), especially when Fluence posted eight and nine figure net losses each of those years.  *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 n.18 (1st Cir. 1999) ("problems with a transaction with a major impact on revenue[]" more likely support strong scienter inference).

*Surgical Co.*, 2016 WL 6699284, at \*13 (C.D. Cal. Apr. 12, 2016) ("relatively small company with only 335 employees" supported inference of defendant's actual knowledge of fraud).

Pérez's attention to these customers demonstrates their importance. During Fluence's December 9, 2021 and February 10, 2022 earnings calls, an Evercore analyst referenced Pérez "going to see customers" and stated, "every time we speak, you're on an airplane or heading to an airplane or going somewhere to see a customer." ¶157; *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) ("it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market, especially in light of McCoy's multiple trips to check on operations in Brazil during the Class Period"). And Pérez made challenged statements *after* the discussion of his frequent customer and site visits. *See* ¶85 (May 12, 2022: "*[W]e are now fully caught up on our Gen 6 installation schedule*. We have *successfully installed* 10 Gen 6 systems since the beginning of this year . . . includ[ing] several *mega site installations such as Diablo and High Desert . . . .*"); *see also* ¶¶81, 87, 89.

Fluence executives signaled that they knew about the problems by repeatedly mentioning "issues" they claimed to have fixed. For example, in February 2022, Pérez claimed Fluence had "implement[ed] corrective actions" and "[r]ectified issues with customers." ¶82. Boll echoed, "[W]e've identified the issues [that led to cost overruns] and we've implemented the fixes." ¶83. In December 2022, Sial said "that issues confronted are well understood and now largely behind us." ¶95. "In combination with their positions," such "revelations of personal and intimate involvement with many of the allegedly misrepresented issues allows the Court to reasonably infer each Individual Defendants' knowledge regarding the true state of affairs." *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at \*9 (D.S.C. July 25, 2016); *see also James River*, 2023 WL

- 21 -

5538218, at *19 ("[e]xecutives' 'personal involvement' in the review of a relevant business unit can support an inference of scienter").

The Company's inability to meet its contractual specifications, resulting in lawsuits with its biggest customers – one an affiliate of Fluence's corporate parent – are squarely the business of top executives, even more so when the customer base is "small" and contracts constitute huge percentages of the Company's revenue.[21]  The pervasiveness of the Gen 6 problems makes it "highly implausible for [Fluence] executives to have remained in the dark about so widespread an issue." *Bond v. Clover Health Invs. Corp.*, 587 F. Supp. 3d 641, 677 (M.D. Tenn. 2022); *see also In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (finding unpersuasive inference that defendants "were essentially clueless as to the major problems existing within the company").[22]

---

[21]   Defendants contend the allegations in the Diablo and SEI suits cannot be considered.  MTD at 15-16.  But courts have held "the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because 'neither Circuit precedent nor logic supports . . . an absolute rule' against doing so." *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) (compiling decisions).  At any rate, even decisions that suggest allegations from other litigation should not be considered speak of "'uncorroborated allegations.'"  MTD at 15 (quoting *Touchstone Strategic Tr. v. Gen. Elec. Co.*, 2022 WL 4536800, at *2 (S.D.N.Y. Sept. 28, 2022) *aff'd*, 2023 WL 6053007 (2d Cir. 2023) (unpublished)); *see also id.* (citing and quoting other language in *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) ("plaintiffs cite no authority that stands for the proposition that an attorney may rely *entirely* on another complaint as the *sole* basis for his or her allegations")).  Two customers separately leveling similar complaints about Fluence's Gen 6 products during the same timeframe; two former Fluence employees independently verifying significant problems with the Gen 6 rollout (and one specifically confirming Diablo's account that their system did not work correctly); and Defendants' statements vaguely confirming "issues" (which they purportedly had fixed) belie that the allegations in this case are uncorroborated.  And the corroboration being offered here readily satisfies Rule 11(b)(3), which requires that an "allegation merely must be supported by *some* evidence," *Brubaker v. City of Richmond*, 943 F.2d 1363, 1377 (4th Cir. 1991), which need not be admissible, *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153 (4th Cir. 2002), and is offended only when there is "***no*** factual basis for [an] allegation." *Brubaker*, 943 F.2d at 1377.

[22]   Defendants argue "'[a]llegations that a defendant must have known that a statement was false and misleading because of his or her position in the company are precisely the types of inferences which courts . . . have determined to be inadequate to withstand Rule 9(b) scrutiny.'"  MTD at 12 (quoting *Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp.

- 22 -

## B.      CW-2's Account Further Demonstrates Defendants' Scienter

CW-2 also confirms that the Individual Defendants knew about the issues with the Gen 6 systems.  A complaint may rely on confidential sources when it "list[s] the dates of the confidential witness' employment with [the company], the various positions that they held, the duties that they fulfilled, where they worked, with whom they conversed and to whom they reported." *Klein*, 525 F. Supp. 3d at 667; *see also James River*, 2023 WL 5538218, at *25 (same).  Here, CW-2 worked in the product organization at Fluence between 2020 and 2022, where he was personally involved in product discussions and business reviews with executive management, directed cost reduction initiatives, and delivered to customers their desired specifications for each product.  ¶42.  CW-2 confirmed that Fluence chose to deliver the first Gen 6 products without full testing to avoid contractual penalties for missed deadlines.  ¶43.  CW-2 also spoke directly to Boll and the CFOs – Fehr and Sial were the CFOs during CW-2's employment – among others, about the issues with Fluence's Gen 6 products.  ¶42.  CW-2 also reported that by sometime within 2022, after the initial rollout of Gen 6, VP (later COO) Kepshire drafted and sent a memorandum to the executive management team (which CW-2 received) describing issues with the rollout of the Gen 6 systems. ¶44; *see In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 407 (S.D.N.Y. 2005) (fact that "reports were available to" the management committee "support[s] a reasonable inference that [defendants] either were aware of or had access to [them] and the information contained therein").

---

2d 571, 592 (E.D. Va. 2006)).  But *Iron Workers* held that "holding an executive position *alone* does not" establish scienter.  432 F. Supp. 2d at 592.  Indeed, position is unavoidably "relevant to the . . . holistic analysis of scienter." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014).  Defendants likewise argue that "'bare allegations that [Defendants] have knowledge of key facts . . . because such knowledge relates to the business's core operations are not enough, standing alone, to'" plead scienter.  MTD at 14-15 (quoting *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021)).  The limitation is in the phrase: "standing alone."  Scienter in this case rests on numerous facts combined, not any one fact or category of fact by itself.

Defendants' arguments that the Complaint "contains insufficient allegations as to CW-2's identity, job title, or detailed duties" (MTD at 12) are not well taken.  The Complaint describes – for both CW-1 and CW-2 – "the dates of [their] employment with" Fluence, "the various positions that they held, the duties that they fulfilled, where they worked, with whom they conversed and to whom they reported." *Klein*, 525 F. Supp. 3d at 667; ¶¶38-45.  Nothing more is required. *See also Emergent BioSolutions*, 2023 WL 5671608, at *12 ("CW allegations may be reinforced by other allegations that bolster their reliability.").[23]

### C.    Defendants' Repeated Pronouncements and the Patent Inconsistencies with Known Facts Add to the Strong Inference of Scienter

"'One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.'" *U.S. S.E.C. v. Pirate Inv. LLC*, 580 F.3d 233, 243 (4th Cir. 2009); *see also In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 620-21 (S.D.W. Va. 2012) ("frequent statements" by defendants on the subject bolster scienter).

Despite the ongoing problems with Gen 6 installations throughout the Class Period, Defendants repeatedly assured investors that the installations were successful, unspecified issues were fixed, and customers were happy.  For example, in February 2022, Pérez said they had "[r]ectified issues with customers." ¶82.  At the time, Fluence still had not finished the first phase of its nearly quarter of a billion-dollar project for Diablo and already missed its completion deadline by six months. ¶84(a)(iii).  In May 2022, in the middle of the unsuccessful year-long effort to make High Desert perform as the customer ordered, Pérez said: "We have successfully

---

[23]    Other than arguing that "CW-1 [did not have] any contact with an Individual Defendant," MTD at 13, Defendants do not contend that allegations attributed to CW-1 are inadequate. Defendants' reliance on *PowerSecure*, 2015 WL 5444741, at *13, to argue that CW-1's allegations do not go to actual knowledge (MTD at 13) fails because CW-1's allegations also go to core operations, and scienter can be pled through severe recklessness.

installed 10 Gen 6 systems," including "mega site installations such as Diablo and High Desert." ¶85. In August 2022, Fehr said they were "not really seeing a signal from our customers that they're not wanting to sign service agreements" and Pérez claimed Fluence's customers were "very loyal" and "want to keep working with us." ¶¶88-89.

The Complaint is replete with additional examples demonstrating Defendants' knowledge that the opposite was true. When they made these statements, Fluence was nine months into its unsuccessful remedial efforts at High Desert; SEI had already demanded that Fluence pay the $5.5 million for unplanned costs and subsequently complained about additional problems discovered in May 2022; the month prior, Diablo had complained to Fluence about repeated control system failures (81 from May 15 to August 22, 2022, six days after Fehr and Pérez made these statements) and Azure Sky was encountering the same issues as High Desert and Diablo that led that customer to cancel other Gen 6 plans. ¶¶41, 91; *see also* ¶99 (February 9, 2023, earnings call in which Nebreda touted Fluence's "Strong Customer Relationships"); ¶109 (November 28, 2023, press release ten days before SPO in which AES would sell $156 million in Fluence stock (¶163) and amidst continuing disputes with SEI and Diablo and after failure to fix High Desert, Nebreda claims "[o]ur strong execution . . . demonstrates our ability to navigate challenges [and] deliver solutions to our customers"); ¶128 (August 8, 2024, conference call in which Pasha said Diablo allegations were "without merit").

### D.    The Opposing Inference Suggested by Defendants Is Weak

Defendants argue that a stronger inference is that they "(transparently disclosed) operational challenges" and did not intend to mislead anyone. MTD at 17. Putting aside the fact that scienter may be shown through deliberate recklessness, proclaiming, for example, that the Gen 6 products were ready for "rapid on-site installation and commissioning" while vaguely alluding to "delays we are experiencing" but omitting the eye-catching details – Fluence did not meet any

4930-0227-0039.v1

deadlines for a $238 million contract and still had not finished phase one when it was supposed to be finished with the project months ago – is opaque, not transparent.

Defendants try to bolster their inference by arguing that the Complaint does not "identify any Defendant's motive to defraud."  MTD at 16.  But motive is not required for scienter.  *See Tellabs*, 551 U.S. at 325.  And in this case, there was a strong motive.  Defendants pursued the IPO and SPO to raise $1.2 billion in capital and wanted the public to perceive Fluence as a well-functioning company, all of which benefitted Defendants.  Inferring that Defendants thought full disclosures would undercut those efforts is no reach.  Even if that common incentive does not plead scienter by itself, it "at least paint[s] a rational and plausible picture of why the executives would have gone along with the alleged fraud," *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001), and supports scienter when coupled with Plaintiff's other averments, *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *6 (E.D. Pa. July 26, 2000) ("desire to raise capital by means of a secondary public offering" supports scienter inference).

## IV.	Plaintiff Alleges Loss Causation

Loss causation only requires a plaintiff to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also Kiken*, 155 F. Supp. 3d at 609 ("[w]ith respect to loss causation, '[s]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds").  To plead loss causation, a plaintiff must allege: "(1) the exposure of the defendant's misrepresentation or omission, *i.e.*, the revelation of new facts suggesting the defendant perpetrated a fraud on the market, and (2) that such exposure resulted in the decline of the defendant's share price." *Singer*, 883 F.3d at 445 (cleaned up).  The Fourth Circuit has held there are:

> [T]hree ways of showing such exposure. . . .  The first is through a "corrective disclosure theory," in which "the defendant company itself made a disclosure that 'publicly revealed for the first time' that the company perpetrated a fraud on the market by way of a material misrepresentation or omission." . . .  The second way is through a "materialization of a concealed risk theory," which allows for the possibility that a miscreant company's fraud is exposed by a third party. . . .  The third is through an "amalgam" of the first two, allowing for the reality that the truth of a company's fraud can leak out slowly from a variety of different sources.

*Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025).  Where the truth is revealed through a series of partial disclosures, plaintiffs "'need not precisely identify the misrepresentation or omission' about which [they] complain[], but 'must reveal to the market in some sense the fraudulent nature of' such misrepresentation or omission." *Singer*, 883 F.3d at 446.

Here, Defendants' fraud was revealed through five partial disclosures, each of which resulted in a significant decline in the Company's stock price.  ¶¶169-189.  Each of these events "expos[ed]" Defendants' prior misrepresentations or omissions regarding the execution-related issues caused by the early release of Fluence's Gen 6 systems and "resulted in the decline of" Fluence's share price.  *Singer*, 883 F.3d at 445.

### A.    Defendants' Disclosures of Gen 6 Product Issues and Resulting Financial Impacts on the Company

During the Class Period, the Company made three disclosures of new, material information that revealed the truth regarding the problems with Fluence's Gen 6 products and the resulting financial impacts on the Company.  ***First***, on February 9, 2022, Fluence announced disappointing results for its first fiscal quarter 2022, which Pérez attributed to "cost overruns in the rollout of our first Generation 6 product installations and commissioning."  ¶¶172-175.  Analysts were surprised by this news, and attributed the Company's poor results to Gen 6 "cost overruns and delays."  *Id.* These disclosures caused a single day 19.97% drop in Fluence's stock price.  ¶173.

***Second***, on November 25, 2024, Fluence announced the Company's results for its fourth fiscal quarter and full year 2024, during which Pasha revealed that Fluence's fiscal 2025 revenue

- 27 -

would be heavily "back-end loaded," with the Company recognizing approximately 80% of all revenues during the second half of fiscal 2025. ¶¶184-186. Analysts were surprised and confused by this, stating that the revenue guidance "leaves more questions than answers" and that the second half weighting "provides trepidation." ¶185. Fluence's stock fell by 22%. ¶186.

*Third*, on February 10, 2025, Fluence announced that it was reducing its fiscal 2025 revenue guidance by approximately $600 million, supposedly due to project issues in Australia. ¶¶187-188. This news shocked the market, especially coming only a few months after the Company had just said 80% of its revenue would come in the second half of the year. Analysts at Bank of America attributed this to "***execution missteps***" and stated that "***we believe there are likely incremental project pushes that were not addressed on the call***." ¶189. On this news, the Company's stock fell ***more than 52%***. *Id.*

Defendants ignore these allegations, and argue that the disclosures were merely generic earnings misses. MTD at 20. They were not. Each was specific to the fraud and revealed the partial truth regarding the issues caused by Fluence's early release of its Gen 6 products and the resulting financial implications. *See Singer*, 883 F.3d at 447 ("Such an allegation is wholly adequate to demonstrate that the exposure of the Company's fraud was at least 'one substantial cause of the investment's decline in value.'").[24]

### B.      The Disclosure of the Diablo Litigation and the Siemens Litigation

On December 20, 2023, *Energy Storage News* published a news article revealing that the owner of the Diablo Project had filed a cross-complaint against Fluence seeking $230 million and

---

[24]      The single case Defendants cite in support, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011), is inapposite. There, the Fourth Circuit reasoned that press releases stating that "three state regulatory boards or commissions" had failed to act on the relevant leveraged buyout agreement "following a four month extension of the LBO's closing deadline," did "nothing to discount the possibility that state regulators would approve the LBO before the extended closing deadline or that the LBO would ultimately be consummated." *Id.* at 473-74. The Complaint's alleged corrective disclosures do not suffer from this flaw.

4930-0227-0039.v1

alleging Fluence's work on the Diablo Project suffered from a "litany of 'defects, deficiencies, and failures.'" ¶176. On this news, Fluence stock fell more than 15%. ¶177.

Defendants contend that because the existence of litigation over the Diablo Project had been previously disclosed, the information in the *Energy Storage News* article and cross-complaint could not have caused Fluence's stock price decline. MTD at 19-20. Not so. Analysts attributed the stock decline to the information in the article. Roth published a report stating, "shares closed down 15% as it appears [the counter claim] ***was not widely understood***" and that "FLNC's complaint against Diablo Energy Storage LLC and the subsequent cross-complaint introduces financial and reputational risks for FLNC" and that "the Energy Storage News article ***focused attention on the issue***." ¶177; *see James River*, 2023 WL 5538218, at *26 ("Though Defendants contest the degree to which this press release presented new facts to the market, the Court refrains from making factual determinations with respect to loss causation at the motion to dismiss stage.").[25]

On February 22, 2024, Blue Orca Capital published a research report revealing that SEI had filed a counterclaim in the Siemens Litigation accusing the Company of fraud, misrepresentations, and a "laundry list" of engineering and design failures and that Fluence had unilaterally altered the design of its original proposal, which resulted in significant operational failures. ¶180. On the news of this litigation, Fluence stock fell 13%. ¶182.

Defendants' only response is to claim *IonQ* prohibits any information in a short seller report from being used to plead loss causation. *See* MTD at 18-19. They are wrong. *IonQ* emphasized that in appropriate circumstances, short seller reports may be used to plead loss causation. *See IonQ*, 134 F.4th at 163 ("That doesn't mean that a short-seller's report can never

---

[25] A "truth-on-the-market" defense is "'intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint . . . .'" *Massey Energy*, 883 F. Supp. 2d at 616.

support the loss causation element."). Rather, in *IonQ*, the Fourth Circuit took issue with a particular short seller report because it "relie[d] on anonymous sources for its nonpublic information and *disclaim[ed] its accuracy*." *Id.* Here, the Blue Orca Report contained objectively independent and verifiable information that Fluence had not previously disclosed the existence of the Siemens Litigation *with* references to those undisclosed legal documents. ¶181. Blue Orca had to send someone in person to the state court in Arlington County, confirming that those legal documents were not readily available. *Id.* As Guggenheim reported:

> [h]aving carefully read the [Blue Orca] report *as well as the related legal documents*, we believe that . . . there is one element of the report that did merit further investigation in our view, specifically the assertion that FLNC has been engaged in litigation with Siemens Energy (SMNEY, $14.84, NC) regarding an energy storage project. *We note that the litigation was not disclosed in any of FLNC's public filings, which also merited attention in our view*.

¶182. Blue Orca introduced credible, new information, related to the fraud that caused a negative stock price reaction. This is adequate to allege loss causation.

## V.    DEFENDANTS' CHALLENGE TO THE SECTION 20(a) CLAIM FAILS

Since Plaintiff has adequately pled a primary §10(b) violation, Defendants' motion to dismiss Plaintiff's §20(a) claim must be denied. MTD at 30.

### CONCLUSION

For all the foregoing reasons, Defendants' motion should be denied in its entirety. If the Court is inclined to grant any part of Defendants' motion, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 651, (4th Cir. 2007) ("Rule 15(a) instructs that leave to amend 'shall be freely given when justice so

DATED: July 25, 2025                            Respectfully submitted,

                                                  */s/ Craig C. Reilly*

- 30 -

CRAIG C. REILLY
VSB #20942
THE OFFICE OF CRAIG C. REILLY, ESQ.
209 Madison Street, Suite 501
Alexandria, VA  22314
Telephone:  703/549-5354
703/549-5355 (fax)
craig.reilly@ccreillylaw.com

Liaison Counsel

DOUGLAS R. BRITTON
LUCAS F. OLTS
JOSEPH J. TULL
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
lolts@rgrdlaw.com
jtull@rgrdlaw.com

GREGG S. LEVIN
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
MOTLEY RICE LLC
CAMERAN M. GILLIAM
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com
cgilliam@motleyrice.com

Lead Counsel for Lead Plaintiff

- 31 -

4930-0227-0039.v1